AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Lisa Palmer, Special Agent with Internal Revenue Service-Criminal Investigation (IRS-CI), Denver Field Office, being duly sworn, deposes and states under penalty of perjury that the following is true to the best of my information, knowledge and belief:

1. I am a Special Agent with the Department of Treasury, Internal Revenue Service-Criminal Investigation (IRS-CI) since 2017 with primary investigative responsibilities involving criminal matters such as tax evasion and money laundering. I have participated in several fraud investigations including investigations involving bank fraud, healthcare fraud, and money laundering. Prior to my employment with the IRS, I spent approximately two years with Charles Schwab first as an IT Audit Senior Specialist and then as an IT Audit Manager. Prior to working for Charles Schwab I worked for three years with Ernst and Young in the IT Risk Assurance practice. I have a Master of Accounting degree from the University of New Mexico.

2. This affidavit is being submitted in support of a criminal complaint charging the following defendant with the following offense:

> a. Michael Aaron Tew with a violation of Title 18, United States Code Section 1956(h) [Conspiracy to Commit Money Laundering].

3. Due to the limited purpose of this affidavit, I have not included each and every fact known concerning this investigation, although to the best of my information, knowledge, and belief, I have not omitted any material fact that undermines the statements and conclusions herein. I have set forth only the facts I believe are necessary to establish probable cause to show that TEW committed the offense described herein.

## Summary of the Investigation

4. The Federal Bureau of Investigation (FBI) and Internal Revenue Service – Criminal

1

Investigation (IRS-CI) and other law enforcement agencies have been investigating Tew and others for fraud and money laundering activities, to include money laundering through the use of various forms of cryptocurrency. Based on my training and experience, cryptocurrency such as Bitcoin are often used to launder proceeds of specified unlawful activities like fraud.

5. The investigation has revealed that TEW has conspired with others known and unknown to knowingly engage or attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 that is derived from specified unlawful activity, specifically wire fraud, and to knowingly conduct or attempt to conduct a financial transaction designed to conceal or disguise the nature, location, source, ownership or control of proceeds of the wire fraud.

## Background and Probable Cause

6. During some portion of time between 2015 and September 2018, MICHAEL AARON TEW (TEW) served as a contracted chief financial officer (CFO) for a Florida company named National Air Cargo (NAC). He was a contractor for NAC rather than an employee. Between at least 2015 and present, he has resided in Colorado with his wife Kimberly Tew (nee Ventanen) (K. TEW). During the time TEW served as the contracted CFO for NAC, TEW was not paid directly by NAC for his services. Rather, he billed NAC and was paid by NAC through a single-member LLC, of which he was the only member. The name of that entity was Sand Hill LLC ("Sand Hill") and it was established by TEW in or around July 2012.

7. In or around September 15, 2018, NAC fired TEW for, *inter alia*, unauthorized use of a corporate credit card. The unauthorized use began in or around June 2018.

8. Between no later than August 2018 and present, TEW conspired with others known and unknown to engage or attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 that derived from a scheme to defraud NAC via wire and to

2

knowingly conduct or attempt to conduct a financial transaction designed conceal or disguise the nature, location, source, ownership or control of proceeds of the wire fraud.

9. After Tew's termination and beginning in or around December 2018 through July 2020, three companies named Global Fuel Logistics (GFL), Aero Maintenance Resources (AMR), and Political Media (PM) tendered invoices to and received payments from NAC in the amount of more than $4 million in the aggregate. Invoices from these companies referenced purported services such as "[b]usiness [c]onsulting," "fuel modification inspection & research," and "[m]aintenance." The payments to these three entities were executed through wires or Automated Clearinghouse (ACH) transactions. Many of the wires and ACH payments from NAC, located at a minimum in Florida and New York, were made into accounts owned and controlled by TEW and, sometimes also by his wife K. TEW, who both reside in Colorado. Some of the accounts were business accounts belonging to Global Fuel Logistics or GFL, but other accounts were personal accounts belonging to TEW or his wife. The wires and ACH transactions involve interstate commerce between NAC and TEW and K. TEW.

10. The invoices from GFL, AMR and PM were fraudulent because they were for goods and services NAC never received. TEW submitted or caused to be submitted these fraudulent invoices. Moreover, according to NAC, GFL, AMR and PM were not properly approved vendors for NAC. On July 1, 2020, NAC's co-owner Christopher Alf advised that he was unaware of the fact of payments being directed to accounts either directly owned by TEW and K. TEW, or indirectly controlled by them. That same day, Alf also stated that he was unaware at the time the payments were being made about the total amount of payments to these entities. The first payment to one of these three entities was made in or around December 2018 and the most recent payment was made by NAC on or around June 30, 2020. These are the payments to GFL, AMR, and PM known at

this time. There are additional fraudulent payments to other entities for the benefit of TEW and/or his wife beyond the three entities identified above as well as additional payments to the three entities listed.

11. On July 1, 2020, the co-owner of NAC, Christopher Alf, and the Director of Accounting, Abby Schwartz, also both advised that TEW's contractor agreement was terminated by NAC in or around September 2018 after Schwartz, with the input and assistance of others, determined that charges made by TEW on a corporate American Express card were fraudulent. The charges reflected the unauthorized purchase of gift cards by TEW and K. TEW, and served no legitimate business purpose for NAC. Alf and Schwartz further advised that, since TEW's September 15, 2018 termination, NAC has had no further legitimate business dealings or contracts with TEW or K. TEW.

12. I interviewed Jonathan Yiolous, NAC's now former Director of Finance and Controller, on July 7 and 8, 2020. Based on the investigation to date, this fraud began while TEW was still employed at NAC. In approximately summer 2018, TEW requested that then-Director of Finance for NAC, Yioulos, pay an invoice for a company named 5530 Jessamine Development LLC ("Jessamine"). Mr. Yioulos processed that payment, later learning from TEW that the payment was fraudulent as Jessamine had not provided services to NAC, or at least not in the amount claimed.

13. According to Mr. Yioulos, TEW, and at times his wife as well, used the fact that he had previously paid a fraudulent invoice to Jessamine as leverage for him to continue to process fraudulent invoices, even after TEW's employment at NAC was terminated. Mr. Yioulos stated that TEW and his wife threatened to alert NAC about Mr. Yioulos's prior payment of fraudulent invoices and that such disclosure could threaten Mr. Yioulos's continued employment. At one point in time, K. TEW contacted Mr. Yioulos's now ex-wife electronically which Mr. Yioulos

4

understood as a threat so that he would continue to pay the fraudulent invoices. Mr. Yioulos also stated that while he exchanged various cryptocurrency with TEW and/or K. TEW at various points during this scheme, he only retained a few Bitcoin for his own personal benefit. Similarly, Mr. Yioulos stated that TEW and/or his wife K. TEW offered him season tickets to the Buffalo Bills for his assistance with the execution of this fraud, but he declined as he already had season tickets.

14. It was part of the conspiracy that different maneuvers would be undertaken to evade detection of the payment of the fraudulent invoices by NAC. TEW took steps or caused steps to be taken to make it difficult to ascertain that payments being tendered to GFL, AMR, and/or PM were going to him, either directly or indirectly for his benefit. For TEW's benefit, Mr. Yioulos also took multiple steps in the processing and approval of the payments to evade detection by anyone at NAC.

15. Yioulos and TEW, who was sometimes accompanied by his wife, communicated about the fraud by phone call and text message. Mr. Yioulos stated that TEW used the phone numbers 917-685-1312 and 917-669-7473 interchangeably to communicate with him from at least June 2018 to present. According to Mr. Yioulos, TEW discussed with him how to execute the fraud, to include the amount reflected on the invoices and the timing of subsequent payments. Mr. Yioulos stated that early to mid-2019, he communicated to TEW that one of the company's names in which fraudulent invoices were tendered, "Political Media," may arouse detection at NAC because the name of that company did not clearly align with the work of NAC, which, *inter alia*, provides freight forwarding solutions through charter and airlift operations, often to the United States Department of Defense. Subsequent to that conversation, TEW began submitting fraudulent invoices in the names of GFL (Global Fuel Logistics) and AMR (Aero Maintenance Resources).

16. At some point after 2016, Mr. Yioulos assumed the role of Controller but maintained his

5

responsibilities as the Director of Finance. He was TEW's point of contact at NAC between late 2018 and present. He was terminated by NAC on July 7, 2020.

17. Based on our investigation to date, it was part of the conspiracy that TEW and his wife K. TEW maintained a complex and ever-revolving network of bank accounts into which the NAC funds were deposited. These proceeds were largely deposited into accounts that TEW jointly controlled or otherwise had access to. Once the NAC funds were deposited, in order to launder those proceeds from the wire fraud, the NAC funds, in large part or in their entirety, were either quickly withdrawn in cash or otherwise wired or transferred to other accounts and often, ultimately, into various cryptocurrency exchanges. These amounts were often in excess of $10,000, and on occasion approached amounts like $100,000. TEW transferred the victim proceeds or caused those proceeds to be transferred or withdrawn. Many of the cash amounts withdrawn, often with multiple cash withdrawals a day by TEW and separately by K. TEW, were then deposited into Bitcoin ATMs like those operated by Digital Vending Solutions d/b/a XBTeller. Often in an attempt to evade detection, TEW made or caused to be made multiple withdrawals and deposits into Bitcoin ATMs in one day in lower dollar amounts.

18. An August/September 2019 transaction provides an example of how this conspiracy operated. On August 29, 2019, the email account accounting@globalfuel.co sent an email containing three invoices to Jonathan Yioulos's email address at National Air Cargo, jyioulos@nationalaircargo.com. One of these three invoices, Invoice 1023, was also dated August 29, 2019, and demanded $90,000.00 for the purported service of "Trailing Edge Flap Maintenance Review." The invoice stated that a 50% deposit was due immediately. Mr. Yioulos advised that payment for this invoice was split into two $45,000 payments. Based on his relationship with TEW, Mr. Yioulos, as he had done before, caused two ACH transfers to tender those two

6

payments. One ACH transfer for $45,000 was conducted on or around August 26, 2019, and the other transfer for $45,000 was conducted on or around September 3, 2019. Mr. Yioulos advised that it was not unusual to submit payment on an invoice even before the invoice was received as was the case with the first ACH transfer here on August 26, 2019. TEW communicated to Mr. Yioulos what routing and account numbers to direct those ACH transfers to. Based on that instruction, on September 3, 2019, Mr. Yioulos submitted or caused to be submitted an ACH payment of $45,000 from a Signature Bank account ending in 5545, a NAC account, via routing number ABA 256074974. Mr. Yioulos directed those $45,000 of proceeds as part of the wire fraud to a Navy Federal Credit Union (NFCU) account ending in 5336, and Mr. Yioulos provided the name Global Fuel Logistics as the recipient or destination for this ACH transfer. TEW was the sole owner of the NFCU account ending in 5336.

19. The next day, on September 4, 2019, TEW transferred or caused to be transferred $45,000 from the NFCU checking account ending in 5336. Prior to the transfer of $45,000 initiated by Mr. Yioulos on September 3, 2019, the balance in the NFCU account ending in 5336 was no more than approximately $1236.42. The balance immediately after the transfer of $45,000 out of the NFCU account ending in 5336 was no more than approximately $1236.42. The $45,000 that was transferred out of the NFCU account ending in 5336 was routed to a different account at NFCU with number 7085338486, a joint checking account held by TEW and his wife K. TEW. Over the next two days, the funds were then split into various pieces with some being routed for example to Google Payments, others being routed to the Wynn Hotel, and withdrawal of $19,000 in cash over two separate transactions, $10,000 and $9,000, respectively.

20. Mr. Yioulos was working and operating out of NAC's New York location, NAC was itself located in Florida and New York, while TEW and K. TEW were accessing their bank accounts in

7

Colorado. These wire and ACH transfers, and the instructions to effectuate the transfers, involved interstate commerce.

21. I know through training and experience that persons who seek to "clean" proceeds of illegal activity use digital currency, such as Bitcoin, to complete the transactions. The digital currency gives the vendor and customer a perceived sense of anonymity. However, before customers can use the proceeds, to, for example, make a purchase on an online marketplace, they must first convert their fiat currency, such as the American dollar, into a digital or cryptocurrency accepted on the online marketplace.

22. Based on my training and experience investigating crimes involving cryptocurrency and money laundering, an exchange of Bitcoin for fiat currency, in either direction, constitutes a financial transaction involving the movement of funds by wire or other means or otherwise affects interstate commerce because a fiat currency for Bitcoin exchange, in either direction, involves one or more monetary instruments.

23. I, Lisa Palmer, being duly sworn according to law, depose and say the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information, and belief.

        _s/ Lisa Palmer_____
        Lisa Palmer, IRS-CI Special Agent

Sworn before me by reliable electronic means this 8th day of July, 2020.

_____
The Honorable Kristen L. Mix
United States Magistrate Judge
District of Colorado

**Affidavit reviewed and submitted by Assistant United States Attorney Hetal J. Doshi.**