**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 20-cr-0305-DDD

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

**1. MICHAEL AARON TEW**,

**2. KIMBERLEY ANN TEW**.

    Defendants.

---

**REPLY IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE (Doc. 200)**

Defendants, Michael Aaron Tew ("Mr. Tew") and Kimberley Ann Tew ("Ms. Tew") (collectively Mr. and Ms. Tew), by their counsel of record, Peter R. Bornstein, submits the following reply in support of their *Motion to Suppress Evidence* (the "Motion to Suppress")(Doc. 200) and to the *Government's Response to Defendants' Motion to Suppress Evidence* (the "Response") (Doc. 204):

### I. IMPACT OF *CARPENTER*

The Government downplays the Supreme Court's holding in *Carpenter v. United States*, 585 U.S. ___, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018), arguing that the decision is narrow and that it does not disturb the Third-Party Doctrine articulated in *United States v. Miller*, 425 U.S. 435 (1976) and *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979).[1] Nevertheless, the *Carpenter* majority rejected application of the Third-Party

---

[1] The Supreme Court in *Miller* held there was no Fourth Amendment search when the government subpoenaed defendant's bank records, including deposit slips, transaction statements, and check copies. 425 U.S. at 437-38. In *Smith*, the Court held a pen register installed by the phone company at the government's behest to obtain a paper record of the telephone numbers that Smith dialed from his landline phone was not a Fourth Amendment search. 442 U.S. at 743-44.

Doctrine of *Miller* and *Smith* to cell site location information ("CSLI") on the basis of the unique and "revealing nature of CSLI." 138 S. Ct. at 2210). Yet the Government here, as in *Carpenter*, seeks to "mechanically apply the third-party doctrine," *see id.*, which the Court in *Carpenter* effectively reigned in.

*Carpenter* stressed that "*Smith* and *Miller,* however, did not rely solely on the act of sharing," but also "considered 'the nature of the particular documents sought' and limitations on any 'legitimate expectation of privacy' concerning their contents." *Id.* (quoting Miller, 425 U.S., at 442). Applying the test articulated in *Katz v. United States*, 389 U.S. 347 (1967)[2], Chief Justice Roberts in *Carpenter* wrote that there is a Fourth Amendment search when a government official intrudes into a "private sphere" in which "an individual 'seeks to preserve something as private,' and his expectation of privacy is one that society is prepared to recognize as reasonable." *Carpenter*, 138 S. Ct. at 2213 (alteration and internal quotation marks omitted in original) (quoting *Smith*, 442 U.S. 740).

> Commentators have noted that the Court in *Carpente*r
>
> included in its multifactor analysis several familiar factors that courts had used to decide Fourth Amendment requirements applicable to such surveillance techniques as bugging, wiretaps, video surveillance, and email acquisitions. In those cases, courts inquired whether the technique was (1) hidden, (2) continuous, (3) indiscriminate, and (4) intrusive. Although the Court did not list these four factors explicitly, they were clearly central to its holding, together with the expense and effort required to compile the data.

Susan Freiwald & Stephen Wm. Smith, *The Carpenter Chronicle: A Near-Perfect Surveillance*, 132 Harv. L. Rev. 205, 219 (2018) (footnotes omitted).

While the Government rests on the *Carpenter* majority's averment that its holding is limited, the Court in that case "proceeded to list a number of matters left for another day--real-time CSLI, cell tower dumps, conventional surveillance techniques such as

---

[2] *Katz* held that the Fourth Amendment requires a search warrant for the government to install a wiretap on a public pay phone. 389 U.S. 357-59.

security cameras, business records incidentally revealing location information (for example, credit card transactions), and other collection techniques involving foreign affairs or national security." Freiwald & Smith, 132 Harv. L. Rev. at 227 (footnotes omitted) (citing *Carpenter*, 138 S. Ct. at 2220).

The Response cites pre-*Katz* cases[3], thereby avoiding discussion of the Supreme Court's struggle to apply anachronistic concepts and statutes in an age of exponentially evolving technology. This struggle includes: *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 760 (2012) (assuming that a person has a reasonable expectation of privacy in his or her text messages); *United States v. Jones*, 565 U.S. 400, 403 (2012) (installation and use of a GPS tracking device constitutes a Fourth Amendment search based even though the vehicle's movements were in public view); *Riley v. California*, 573 U.S. 373, 403 (2014) (holding that, absent exigent circumstances, a search warrant is required for law enforcement to search a cell phone).

The Response defends the § 2703(d) Orders on the basis that they do not require production of the contents of communications. But this is a distinction without a difference; indeed, both *Carpenter* and *Riley* only involved the seizure of tracking data rather than communications. Moreover, the § 2703(d) Orders here go well beyond the seizure of a list of numbers of calls made or received on a land line, utilizing pen and trap and trace devices. The expansive nature of the information sought by the Orders in this case, as stated in the "Attachment A"s, invades multiple areas in which computer and cell phone users have – or should have – a reasonable expectation of privacy. The "Attachments A"s required the providers to obtain and provide the Government:

> A.  The following information about the customers or subscribers of the Account:
> 1.  Names (including subscriber names, user names, and screen names);
> 2.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

---

[3] *See* response at 5-6 (citing *Oklahoma Press Pub'g Co. v. Walling*, 327 U.S. 186, 208 (1946) and *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)).

      3. Local and long distance telephone connection records;
      4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Proto co 1 ("IP") addresses) associated with those sessions;
      5. Length of service (including start date) and types of service utilized;
      6. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI))   [sic];
      7. Other subscriber numbers or identities (including temporarily assigned network addresses and registration Internet Protocol ("IP") addresses (including carrier grade natting addresses or  ports)); and
      8. Means and source of payment for such service (including any credit card or bank account number) and billing records.
   B. All records and other information (not including the contents of communications) relating to the Account, including:
      1. Records of user activity for each connection made to or from the Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;
      2. Information about each communication sent or received by the Account, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers);
      3. Information about all accounts or other identifiers that are linked to the Account including, without limitation, links by cookies, creation IP address, recovery email, telephone number, or other identifiers ("Linked Account"), including subscriber information (Part II.A of  this Attachment) for each Linked Account; and
      4. All listing of all services being used by the Account.
      5. Information about all devices connected to the Account.

The foregoing list includes personal information such as account subscriber names; devise identification numbers, types and dates internet and other services were utilized; financial information including source of payment for all services, including credit card and bank account information; records of communications sent and received; IP addresses and websites accesses. Just as the petitioner in *Carpenter* had a legitimate expectation of privacy in his location data, Michael Tew and Kimberly Tew had a

reasonable expectation of privacy in the information seized warrantlessly pursuant to the § 2703(d) Orders.

## II.     IMPACT OF *WARSHAK*

The government devotes two paragraphs to the argument that Defendants here misconstrue *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010). Response at 6-7. The Government purports to distinguish *Warshak* on the basis that *Warshak* involved the seizure of emails, whereas the § 2703(d) Orders here authorized seizure of transactional data short of the actual contents of emails.  In *Warshak*, the court analogized the § 2703(d) seizure of emails to the seizure of unopened mail considered in *United States v. Jacobsen*, 466 U.S. 109 (1984). *Warshak*, 631 F.3d at 285. Analogously, information about an email sent or received, even without the seizure of its contents, is the functional equivalent of an unopened letter.  Moreover, as noted above, the Orders here required and resulted in seizure of much more than simply a list of emails sent and received.

## III.    SUPPRESSION AS A REMEDY FOR UNCONSTITUTIONAL SECTION 2703(d) ORDERS

The Government's reasoning at page 8 of the Response is circular. The Government says that: "the non-content metadata disclosed as a result of the orders is not protected by the Fourth Amendment, there is no constitutional violation, and there is thus no basis for suppressing that evidence or for suppressing its derivative use in the later warrants." *Id*. This analysis sidesteps the issue: assuming, as is asserted in the *Motion to Suppress*, that the consequence of *Carpenter* is that the 2703(d) Orders were unconstitutional because they enable the Government to warrantlessly obtain materials in which the Tews had a legitimate expectation of privacy. In such case, there of course would be a "constitutional violation" and suppression is the appropriate remedy.

The Government seeks to limit its exposure by asserting under the SCA remedies and sanctions set forth in § 2706 are the "only judicial remedies and sanctions for ***nonconstitutional*** violations of this chapter."  To reach this assertion it cites 18 U.S.C.

§§ 2707 and 2808 for that proposition. Response at 8 (quoting 18 U.S.C. § 2808) (emphasis supplied). This misses the mark because Defendants' argument is that the information seized by the § 2703(d) Orders, even if authorized by the SCA, violated the Fourth Amendment under the reasoning of *Carpenter*. The suggestion that there could be a non-constitutional violation of the Fourth Amendment is an oxymoron. The Supreme Court long ago recognized that suppression is the remedy for Fourth Amendment violations. *See Herring v. United States*, 555 U.S. 135, 139–40, (2009) (explaining history of exclusionary rule). However, it is axiomatic that "even if it intends to do so, Congress cannot legislate away protections provided by the Constitution." *Silver v. Garcia*, 760 F.2d 33, 38 (1st Cir. 1985) (citing L. Tribe, American Constitutional Law 403 n. 18 (1978)). *See also Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 229 (D.D.C. 2018); ("Congress cannot legislate away the due process requirements of the Constitution."); *Willingway Hosp., Inc. v. Blue Cross & Blue Shield of Ohio*, 870 F. Supp. 1102, 1106 (S.D. Ga. 1994) ("Congress cannot legislate away a defendant's due process rights."). Suppression is therefore the remedy for constitutional violation of the Fourth Amendment.

## IV. ISSUE OF STANDING

The Response, at 10, cites cases for the proposition that Defendants have the burden of establishing standing, and that it must be established by sworn testimony in the form of an affidavit. Since neither Michael nor Kimberly Tew submitted an affidavit with the Motion to Suppress, the Government argues, they lack standing to challenge the execution of search warrants for the four pertinent email accounts.[4]

The Government overlooks that there are affidavits here that establish standing. That is, the affidavits sworn by government agents here in support of the search warrants

---

[4] The four pertinent email accounts are: i.e., "chrisrncn@gmail.com," "political.media.wdc@gmail.com," "meyersconsultinggroupinc@gmail.com," and "kley@me.com."

established standing. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 14 (2010) (2705 (concluding plaintiffs had established standing based on facts presented by the government); *United States v. Bogle*, No. 3:19-CR-137(1), 2021 WL 1720893, at *2 (S.D. Ohio Apr. 30, 2021) (noting that the warrant affidavit stated that defendant's primary residence is located at the premises to be searched).

The Government argues that a party challenging a search "must submit sworn evidence, in the form of an ***affidavit or testimony***, that they each have privacy interests in the accounts.: *Response*, at 10 (emphasis added) (citing *United States v. Almaleh*, 2022 WL 602069, at *13 (S.D.N.Y. Feb. 28, 2022)). In addition to relying on the actual search warrant affidavits to establish standing, Defendants hereby request a hearing and are willing to testify, subject to the protections of *Simmons v. United States*, 390 U.S. 377 (1968), consistent with the offers of proof stated below.

    **A.**     **Email account kley@me.com.**

        1. Government Search Warrant's Establishment of Standing.

The Government claims in paragraphs 26, 27, 28, 29 and 34 of the affidavit in support of the search warrant establish that Kimberley Tew is the owner of the email address. That email address is linked to the Apple phone and the Apple Cloud. (The Affidavit is attached to the Motion to Suppress as Exhibit D).

        2. Further Offer of Proof.

If she testified Kimberley Tew would state that the email was her account, but that the iCloud account was merged with Michael Tew's iCloud account around July 11, 2020 so that both of their personal information is obtained from the same Apple account. Michael Tew would also testify that his Apple iCloud information now appears in Kimberley Tew's account and vice versa.

    **B.**     **Email account chrismcn@gmail.com.**

        1. Government Search Warrant's Establishment of Standing.

The Government claims in paragraphs 17, 19, 21, and 22 of the affidavit in support of the search warrant that that account's recovery phone number list to Michael Tew and the IP address is located in Colorado not in Texas where the real Christian Rincon lives and works. That account was used by Michael Tew to communicate about fraudulent conduct with co-conspirator Jonathan Yioulos. The Government claims that the email address was really Michael Tews' and not an email account belonging to Christian Rincon or his company 5530 Jessamine Development, LLC. (The Affidavit is attached to the Motion to Suppress as Exhibit H).

        2.    Further Offer of Proof.

If she testified Kimberley Tew would say she created the email account and she used it.

        **C.**    **Email account meyersconsultinggroupinc@gmail.com.**

        1. Government Search Warrant's Establishment of Standing.

The Government claims in paragraphs 17, 23, 24, and 25 of the affidavit in support of the search warrant that Mr. Myers has a company that is an LLC and not an Inc. and that he never sent any invoices to NAC using an email account. The government lists emails using the email account back and forth between Ms. Tew and Mr. Tew. That account was used by Kimberley Tew to send fraudulent invoices to Mr. Yioulos for payment. The Government claims that the email address was really Kimberley Tews' and not an email account belonging to Michael Meyers or his company Meyers Consulting Group LLC. (The Affidavit is attached to the Motion to Suppress as Exhibit I).

        2. Further Offer of Proof.

If she testified Kimberley Tew would say she created the email account and she used it.

        **D.**    **Email account political.media.wdc@gmail.com.**

        1. Government Search Warrant's Establishment of Standing.

The Government claims in paragraphs 17, 21, 22, and 25 of the affidavit in support of the search warrant that that account's recovery email address and the phone number list to Michael Tew. That account was used by Michael Tew to communicate about fraudulent conduct with co-conspirator Jonathan Yioulos. The Government claims that the email address was really Michael Tews' and not an email account belonging to Larry Ward or his company Political Media, Inc. (The Affidavit is attached to the Motion to Suppress as Exhibit K).

    2. Further Offer of Proof.

If he testified Michael Tew would say he created the email account and he used it.

**V.    PROBABLE CAUSE FOR ISSUANCE OF SEARCH WARRANTS**

The Government quotes *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994) for the general rule that "if the search or seizure was pursuant to a warrant, the defendant has the burden of proof." Response at 13. Of course, the flip side of that rule, also recognized in *Carhee* is that, when a seizure is warrantless, the defendant "bears the burden of proving whether and when the Fourth Amendment was implicated, after which "[t]he government then bears the burden of proving that its warrantless actions were justified." *Carhee*, 27 F.3d at 1496. As discussed above and in the Motion to Suppress, Defendants' position is that the warrantless seizure of information utilizing § 2703(d) Orders is unconstitutional in light of *Carpenter*. If this is so, the Fourth Amendment has been implicated and the government bears the burden of proving that the warrantless searches were justified by an exception to the warrant requirement. The Government does not attempt to make such proof Instead, it stands upon its argument that the § 2703(d) orders here were legal and outside the purview of the Fourth Amendment.

The prosecution does not deny that information it obtained from the § 2703(d) Orders were incorporated into the later-issued search warrants. Indeed, each of the four warrants was preceded by a § 2703(d) Order, with the respective "Attachment As" incorporated in each Order. Indeed, it concedes as much by stating: "The government

9

used 2703(d) orders — essentially, judicially-pre-approved subpoenas — to obtain *noncontent* information. It then used the information it lawfully obtained from those court orders, to obtain search warrants." Response at 2 (emphasis in original).

It is well established that courts should exclude all "evidence deemed to be fruit of the poisonous tree." *United States v. Olivares-Rangel*, 458 F.3d 1104, 1108-09 (10th Cir. 2006) (citing *Wong Sun v. United States,* 371 U.S. 471, 485, (1963)). The Government here makes no argument that the information seized by execution of search warrants, following warrantless seizure of information by illegal § 2703(d) Orders, was discovered by "means *sufficiently distinguishable* to be purged of the primary taint." *United States v. Shrum*, 908 F.3d 1219, 1228 (10th Cir. 2018) (emphasis in original) (quoting *Wong Sun* 371 U.S. at 488.

Not only did the Search warrants violate the Fourth Amendment because each incorporated poisonous fruit from execution of the § 2703(d) Orders, is insufficient because they rely almost exclusively on conclusions stated by the affiant in the respective affidavits rather than on sourced facts. That is, the affidavits make broad summary conclusions about what the agents' investigation has discovered, without providing any underlying facts to enable a magistrate to determine the factual underpinnings of the conclusions. The government quibbles with whether such conclusions constitute "facts;" s*ee* Response at 13-14. However, the quintessential definition of a "bare bones affidavit" is one containing conclusory statements without supporting facts. *See United States v. Washington*, 380 F.3d 236, 241 n. 4 (6th Cir. 2004) ("A 'bare bones' affidavit 'states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.'") (quoting *United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir.1998)); *United States v. Johnson*, 4 Fed. Appx. 169, 172 (4th Cir. 2001) (a "'bare bones' affidavit is one which recites conclusions of others"); *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996) ("An affidavit that states suspicions, beliefs, or conclusions, without providing some underlying factual

circumstances regarding veracity, reliability, and basis of knowledge, is a 'bare bones' affidavit."); *United States v. Chapa-Ibarra*, 49 F.3d 727 (5th Cir. 1995) ("[b]are bones affidavits contain only conclusory statements without supporting facts and circumstances that would allow a magistrate independently to determine probable cause") (citing United *States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir.1992)).

## VI.   ISSUE OF LACK OF PARTICULARITY AND RIPENESS

The Motion to Suppress argued that the Government exceeded its authority in executing the warrants to search the four above-referenced email accounts because it seized materials that were beyond the scope of each respective warrant, including privileged communications. Furthermore, the Motion to Suppress argues that the Government improperly delegated authority to execute and review the contents of email accounts to the respective email providers. *See* Motion to Suppress at 19, and 25, 27, and 29.

The Government counters that it merely followed the "two-step process" outlined in Fed. R. Crim. P. 41 by first seizing the entire contents of the accounts, which authorizes the seizure of electronically stored information, subject to "a later review of the media or information consistent with the warrant." Response at 16 -17 (quoting Rule 41(e)(2)(B)).

The Government claims Rule 41 and Section 2703 authorize the Government to seize the entire contents of an email account and then search through the seized documents later. Response at 18-19 (citing *United States v. Deppish*, 994 F. Supp. 2d 1211 (D. Kan. 2014)). *Deppish*, in turn, cited *United States v. Brooks*, 427 F.3d 1246 (10th Cir. 2005). *Deppish*, 994 F. Supp. 2d 1220.  *Brooks* involved a warrant to search the defendant's computers for evidence of child pornography. The search warrant in *Brooks* authorized officers to search two computers and discs "'for evidence of child pornography,' including 'photographs, pictures, computer generated pictures or images, depicting partially nude or nude images of prepubescent males and or females engaged in sex acts," . . . as well as "correspondence, including printed or handwritten letters,

electronic text files, emails and instant messages[.]" *Id.* at 1252 (alteration in original). Rejecting the defendant's argument that the search warrant was overbroad, the court reasoned that:

> While the warrant does not explicitly instruct officers to look solely for those text files containing child pornography, in context—and certainly in the view of the officers conducting the search—the restrictions placed upon searches for image files also apply to the other types of files. In other words, although the language of the warrant may, on first glance, authorize a broad, unchanneled search through Brooks's document files, as a whole, its language more naturally instructs officers to search those files only for evidence *related to child pornography*. In this light, the warrant should be—and was—read by officers to implicitly place the same restriction (i.e., to locate child pornography) on the scope of the entire search.

*Id.* at 1252 (italics in original).

The Search warrants here are not similarly circumscribed. The "Attachment B" in each warrant authorized seizure of a universe of materials greatly exceeding government's investigation of fraud and money laundering. *See, e.g.,* Motion to Suppress at 18-19 (describing breadth of Attachment B in Apple [kley@me.com email account](kley@me.com email account). Equally noteworthy is that, in *Brooks*, as the above-quoted passages make clear the search warrant instructed law enforcement officers what to search for.

Here, on the other hand, each of the four search warrants instructs the email provider, not law enforcement, to determine what evidence is to be seized. For example, the Apple kley@me.com email Search Warrant, at Attachment B (attached to Motion to Suppress as Exhibit D), states that: "Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A: . . ." The same is true with the Attachment Bs associated with the other search warrants here. *See* Exhibits F, H, and K attached to Motion to Suppress. Fed. R. Crim. P. 41(f) states that an **officer** executes the warrant, an officer must be present to prepare and verify an inventory, and the officer must promptly return it to the designated magistrate judge. The rule defines federal law enforcement officer in sub-part (a)(2). There is no provision that allows the magistrate to allow private parties like Apple or Google to execute a search warrant and perform the

acts required of a law enforcement officer. The magistrate violated the Rule in this case and thereby allowed a violation of Constitutional rights.

The Government also argues that it has implemented a filter team to minimize disclosure of privileged information. Response at 19, 27. Given the breadth of the privileged communications seized and produced in discovery, as demonstrated by examples filed with the Motion to Suppress (Exhibits T through BB), the filter team failed. The Government then inexplicably blames Defendants' prior counsel for not cooperating with the filter team. Response at 22-23. That is not the obligation of defense counsel.

The concept of a government-run filter team is inherently suspect. *See United States v. Under Seal (In re Search Warrant Issued June 13, 2019),* 942 F.3d 159, 176 (4th Cir. 2019) (holding that a magistrate judge was wrong to authorize the prosecution's filter team protocol on grounds that determination of a dispute about the attorney-client privilege or work-product doctrine is a judicial function, not an executive function). On this issue, Defendants incorporate their *Motion for Sanctions for Violating Communication Privileges* (Doc. 214).

It is difficult to understand how the issues raised in the Motion to Suppress cannot be ripe. *See* Response at 23 (stating that "the defendants' motion is not ripe: there are currently very few items to suppress because the government hasn't even been able to conduct its search"). Although it is true that several attorneys have represented Michael Tew and Kimberly Tew during various states of this case, the evidence was seized over 20 months ago and it can't stay in limbo indefinitely.

## VII.   ISSUE OF THE GOOD FAITH EXCEPTION

The Response claims that this seizure should be spared from the exclusionary rule by the rule's good faith exception. Response at 28-29. The Government argues that application of the exclusionary rule here would not serve the purpose of deterrence. However, as a court stated in another context, "[t]he Government's requests raise Fourth Amendment warning flags, which threaten heavy weather if either were to be allowed."

*In re Application of the United States of America*, 441 F. Supp. 2d 816, 836-37 (S.D. Tex. 2006).

It is well established that is the government's burden to demonstrate the objective reasonableness of the officers' good faith reliance on a warrant. *United States v. Burgess*, 576 F.3d 1078, 1096 (10th Cir. 2009) (citing *United States v. Corral–Corral,* 899 F.2d 927, 932 (10th Cir. 1990). *See also United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992); *United States v. Michaelian*, 803 F.2d 1042, 1048 (9th Cir.1986).

There are several circumstances which make the *Leon* good faith exceptions inapplicable, including a warrant supported by a bare bones affidavit, i.e. a warrant that "is so facially deficient that the executing officer could not reasonably believe it was valid." *United States v. Irving,* 347 F. Supp. 3d 615, 625 (D. Kan. 2018) (quoting *United States v. Danhauer*, 229 F.3d 1002, 1007 (10th Cir. 2000) (citation omitted)). An affidavit is "bare bones" if it is so deficient in demonstrating probable cause that it renders an officer's belief in the existence of probable cause completely unreasonable. *United States v. Cisneros*, 112 F.3d 1272, 1278 (5th Cir. 1997); *see also United States v. Washington*, 380 F.3d 236, 241 n.4 (6th Cir. 2004) (describing a bare bones affidavit as "an affidavit that merely "states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge") (quoting *United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998)). Stated otherwise, "'[b]are bones' affidavits contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992).

The affidavits here suffer from the same deficiencies as those in *Irving*. In that case, one of the warrants listed seven categories of items to be seized from the defendant's Facebook account, including:

> (1) all contact and personal identifying information, including name, user identification number, birth date, gender, contact email addresses, Facebook passwords, Facebook security questions and answers, physical address, telephone numbers, screen names, and other personal identifiers;

> (2) all activity logs and all other documents showing the user's posts; (3) all photoprints, including all photos uploaded by the user or photos tagging the user; (4) all Neoprints, including profile contact information, status updates, photographs, wall postings, friend lists, groups and networks, rejected friend requests, comments; (5) all other records of communications and messages made or received by the user including all private messages, chat history, video calling history, and pending friend requests; (6) all IP logs; and (7) all past and present lists of friends created by the account.

*Irving*, 347 F. Supp. 3d at 623-24. The court in *Irving* cited *United States v. Blake*, 868 F.3d 960 (11th Cir. 2017), which found the government's Facebook search to be overbroad because it "required disclosure to the government of virtually every kind of data that could be found in a social media account," and noted that "the Eleventh Circuit stated that it would have undermined any claim that the Facebook warrants were the internet-era version of a 'general warrant.'" *Irving*, 347 F. Supp. 3d at 624. *Irving* held that the warrant was overbroad:

> This warrant, however, allowed the officer to search virtually every aspect of Defendant's Facebook account. It required disclosure of all data and information that was contained in his account. It included all contact and personal identifying information, all private messages and chat histories, all video history, all activity logs, all IP logs, all friend requests, all rejected friend requests, all photoprints, all Neoprints, and all past and present lists of friends. In addition, there was no specified time frame so the warrant covered the entire timeframe that Defendant operated and had the Facebook account. In sum, the warrant encompassed everything in Defendant's Facebook account and there were no set limits.

*Id*.

The court in *Irving* also held that the good faith exception did not apply: "There does not appear to be an objective reason that the officer should have believed that this general rummaging would be permitted. 'A reasonably well-trained officer should know that a warrant must provide guidelines for determining what evidence may be seized.'" *Id*. at 625 (quoting *United States v. Leary*, 846 F.2d 592, 609 (10th Cir. 1988)).

## VIII. CONCLUSION

For the foregoing reasons, Defendants Michael Aaron Tew and Kimberley Ann Tew respectfully request that this Court issue an order or orders suppressing all evidence

obtained from the execution of the above-described Orders and Search Warrants, including the fruits thereof.

Respectfully submitted this 22nd day of June, 2022,

/s/ Peter R. Bornstein
Peter R. Bornstein
The Law Offices of Peter R. Bornstein
Greenwood Village, CO 80111
(720) 354-4440 phone
(720) 287-5674 fax
pbornstein@prblegal.com
*Attorney for* Defendants Michael Aaron Tew *and Kimberley Ann Tew*

### STATEMENT CONCERNING SPEEDY TRIAL

Pursuant to Judge Domenico's Practice Standard III(C), Defendants Michael A. Tew and Kimberley Ann Tew state that this motion will have no effect on the speedy trial clock unless the Court orders a hearing on the matter to take place after the already-existing ends-of-justice continuance expires.

### CERTIFICATE OF COMPLIANCE

I hereby certify that undersigned counsel had complied with the type-volume limitation authorized by the Court's *Order granting Motion for Leave to file a Reply* (Doc. 223).

/s/ Peter R. Bornstein
Peter R. Bornstein

### CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2022, I electronically filed the foregoing *Reply in Support of Motion to Suppress Evidence* with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel of record.

*Jeannette Wolf*
Jeannette Wolf