```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF COLORADO

 3
     Criminal Action No. 20-cr-00305-DDD
 4

 5    UNITED STATES OF AMERICA,

 6           Plaintiff,

 7           vs.

 8    KIMBERLY ANN TEW and MICHAEL AARON TEW,

 9           Defendants.

10   ------------------------------------------------------------

11                      REPORTER'S TRANSCRIPT
                           MOTION HEARING
12
     ------------------------------------------------------------
13
             Proceedings before the HONORABLE DANIEL D. DOMENICO,
14   Judge, United States District Court for the District of
     Colorado, commencing at 9:37 a.m. on the 12th day of
15   October, 2022, in Courtroom A1002, Alfred A. Arraj United
     States Courthouse, Denver, Colorado.
16
                            APPEARANCES
17
     For the Plaintiff:
18   BRYAN D. FIELDS and ALBERT C. BUCHMAN, Assistant U.S.
     Attorneys, UNITED STATES ATTORNEY'S OFFICE, 1801 California
19   Street, Suite 1600, Denver, CO 80202

20   For the Defendants:
     PETER BORNSTEIN, Attorney at Law, THE LAW OFFICES OF
21   PETER R. BORNSTEIN, 6060 Greenwood Plaza Blvd., Suite 500,
     Greenwood Village, CO 80111
22

23


24      JULIE H. THOMAS, RMR, CRR, 901 19th Street, Room A256,
          Denver, CO 80294, (303)296-3056  (CA CSR No. 9162)
25

             Proceedings reported by mechanical stenography;
                 transcription produced via computer.
```

20-cr-00305-DDD                    Motion Hearing                    10/12/2022    2

1                                    I N D E X

2
     GOVERNMENT'S WITNESSES                                              PAGE
3
     ANTHONY ROMERO
4        Direct - Mr. Fields                                              54
         Cross - Mr. Bornstein                                           75
5        Redirect - Mr. Fields                                          100
     SARAH ANDERSON
6        Direct - Mr. Fields                                            108
         Cross - Mr. Bornstein                                          119
7    LISA PALMER
         Direct - Mr. Fields                                            144
8        Voir Dire - Mr. Bornstein                                      150
         Direct (Resumed) - Mr. Fields                                  154
9        Cross - Mr. Bornstein                                          162
         Redirect - Mr. Fields                                          172
10

11                    GOVERNMENT'S
                      EXHIBITS                        RECEIVED
12
                        6                              154
13
                        6:2-3                           59
14
                        7                              155
15
                        8                              158
16
                        8:34-35                         64
17

18
                      DEFENDANTS'
19                    EXHIBITS                        RECEIVED

20                      A                               85

21                      B                               87

22

23

24

25

     Julie H. Thomas, RMR, CRR                              (303)335-2111

| MOTIONS | PAGE |
|---|---|
| Defendant Kimberly Ann Tew'S Motion for Severance [218] | |
|    Mr. Bornstein | 6 |
|    Mr. Fields | 8 |
|    Mr. Bornstein | 11 |
|    Mr. Fields | 15 |
|    Mr. Bornstein | 17 |
|    Mr. Fields | 18 |
|    Mr. Bornstein | 19 |
|    Taken Under Advisement | 20 |
| | |
| Defendants' Motion for Franks Hearing [215] | |
|    Mr. Bornstein | 21 |
|    Mr. Fields | 25 |
|    Mr. Bornstein | 41 |
|    Ruling of the Court | 51 |
| | |
| Defendants' Motion to Suppress Evidence From Search of 3222 East First Avenue, Apartment 224 [221] | |
|    Mr. Fields | 175 |
|    Mr. Bornstein | 178 |
|    Taken Under Advisement | 193 |
| | |
| Defendants' Motion to Suppress the Use of Statements [216] | |
|    Mr. Fields | 183 |
|    Mr. Bornstein | 187 |
|    Taken Under Advisement | 193 |
| | |
| Defendants' Motion to Suppress [200] | |
|    Mr. Bornstein | 193 |
|    Mr. Fields | 200 |
|    Mr. Bornstein | 210 |
|    Mr. Fields | 213 |
|    Taken Under Advisement | 215 |
| | |
| Defendants' Motion for Sanctions for Violating Communication Privileges [214] | |
|    Mr. Bornstein | 215 |
|    Mr. Fields | 221 |
|    Mr. Bornstein | 229 |
| | |
| Defendants' Motions for James Hearing [219] [220] | |
|    Mr. Fields | 228 |
|    Mr. Bornstein | 230 |
|    Taken Under Advisement | 233 |

1           (Proceedings commenced 9:37 a.m.,

2       October 12, 2022.)

3           THE COURT:  Good morning.  Please take your seats.

4           This is a motions hearing in Case No. 20-cr-305,

5   United States versus Michael Aaron Tew and Kimberley Ann Tew.

6   We have a number of motions.

7           Before we begin, I just want to let everyone know

8   that last night I started feeling a little unwell, got a bit

9   of a slight fever and some aches, so I took some medicine,

10  took a COVID test last night and another one this morning,

11  negative.  Just thought I would let everybody know.  I'm

12  feeling better today.  The fever is gone.  If anybody wants to

13  wear a mask, you're certainly welcome to, but I just thought I

14  would let everyone know about that little scare I had last

15  night, but I think I can make it through today, if anybody has

16  a problem with that.

17          Why don't I, with that, ask everyone to -- counsel to

18  enter their appearances and introduce the folks that they have

19  brought with them today.  For the Government?

20          MR. FIELDS:  Good morning, Your Honor.  Bryan Fields

21  for the United States, and I'm joined at counsel table by

22  Al Buchman.  In the audience are Special Agent Lisa Palmer

23  with the IRS, Special Agent Sarah Anderson with the FBI, and

24  Special Agent Anthony Romero with the IRS.

25          THE COURT:  All right.  Thank you all for being here.

1          For the defense?

2          MR. BORNSTEIN:  Good morning, Your Honor.  Peter

3   Bornstein appearing on behalf of the defendants.  With me at

4   counsel table is Kimberley Tew and Michael Tew.

5          I would also, just as the Court mentioned its health

6   issue, they have a sick child, and their sick child is also

7   their child who has got special needs.  There's a nurse

8   watching them, but they wanted me to alert the Court that if

9   they got an emergency phone call, that the Court would know

10  that from the beginning.

11         THE COURT:  Okay.  I appreciate that.  And I think --

12  I mean, I really kind of want to get through all this, so

13  obviously I totally understand.  If someone needs to leave,

14  they can waive their appearance here, and we can just proceed,

15  but I certainly understand that.  And thank you, and welcome.

16         So Miss Dodds, I think, sent out an e-mail kind of

17  letting you know the structure of how I wanted to proceed

18  today.  Part of the reason I wanted to start with the

19  severance motion, frankly, was I just want -- there are a

20  couple things about that motion that made me want to make

21  sure, Mr. Bornstein, that there's not a conflict with your

22  joint representation.  And we had this hearing -- we had a

23  hearing.  I know that you weren't -- that wasn't with you, but

24  the Tews had to make sure they understood the risks of joint

25  representation, but the severance motion makes a couple of

```
 1    points that concern me a little bit about making sure there's

 2    not a conflict in your representation of both defendants.  And

 3    so I just thought I would let you address that, make sure you

 4    have thought through whether severance is in both defendants'

 5    interest.  I know it was filed only on behalf of Miss Tew.  Is

 6    there any reason I should be concerned about whether severing

 7    the case would potentially be in one of your client's

 8    interests but not the other?

 9           MR. BORNSTEIN:  Should I come to the podium?

10           THE COURT:  Either way is fine, but for this part it

11    might be easier if you just stay where you are.

12           MR. BORNSTEIN:  My analysis of the severance issue is

13    that if the Court were to grant a severance, that that would

14    not prejudice Miss Tew.  In fact, it would avoid prejudice to

15    Miss Tew.  And I don't see how that would prejudice Mr. Tew

16    other than it would raise some evidentiary issues in which

17    some evidence, as I mentioned, about potential statements that

18    the Government might use that implicate each other, but that

19    would have to be worked through somehow by the Court in terms

20    of what would be admissible and what would not be admissible.

21    But in terms of my professional role in representing both of

22    them, I don't see the severance issue as raising that badly.

23           THE COURT:  Okay.  I mean, I just -- I think there's

24    a line in there about needing to cross-examine Mr. Tew.

25    Cross-examining your own client is obviously problematic
```

1  potentially, but that may have been just kind of a

2  misstatement about the way the process would work.  I just

3  want to make sure you've kind of fully thought through what

4  that would look like.

5          And I guess my other question was would it -- part of

6  the motion is based on this idea that the jury would have

7  difficulty separating the two of them out given their

8  relationship.  Does having one lawyer representing them both,

9  doesn't that potentially exacerbate that risk?

10          MR. BORNSTEIN:  Your Honor, yes, it does, and that's

11  why I have to -- I have professionally advised both clients,

12  independently of each other, of the risks that are involved in

13  having joint representation, told them that there are risks,

14  suggested to them that two lawyers are better than one and

15  that that would be preferable for them to have two lawyers

16  rather than one.  However, their decision is to go with one

17  lawyer.  Maybe some of that is financial, maybe some of that

18  is related to some other issues between them, but I think I've

19  advised them that it's a problem and that I would prefer to

20  have another lawyer, but that's their decision.

21          THE COURT:  All right.  Thank you, Mr. Bornstein.

22          Mr. Fields, Mr. Buchman, does the Government want to

23  weigh in on this at all?

24          MR. FIELDS:  Yes, Your Honor.  May I -- is speaking

25  from here okay?

1            THE COURT:  Yes.

2            MR. FIELDS:  So, Your Honor, we would reiterate all

3    the arguments we made about joint representation.  It's

4    extremely problematic in this case.  And if Mr. Bornstein, as

5    he just commented, thinks that two lawyers would be

6    appropriate, one could be appointed by the Court.  So

7    financial, sort of, means should not play into that analysis.

8            In terms of the severance motion, the Government

9    believes that a joint trial is good for reasons of judicial

10   economy, but if there was a severance, a trial against

11   Kimberley Tew by herself would actually be much easier.  She

12   would be much more prejudiced by a separate trial, and the

13   reason for that is that Michael Tew proffered.  In his

14   proffer, he provided extensive text messages detailing the

15   conspiracy.  Those text messages might not be admissible in a

16   joint trial.  They would almost certainly be admissible

17   against Miss Tew in a separate trial.  So at that point, if

18   you have a separate trial, Miss Tew is going to be confronted

19   with text messages by her husband outlining her involvement in

20   the scheme as a coconspirator as well as his own involvement

21   and the involvement of Jonathan Yioulos.  So a severance in

22   that case actually does prejudice Miss Tew, and I was actually

23   surprised to actually see a severance motion in this case for

24   exactly that reason.

25           You also have the problem of if the Court is inclined

1  to grant any of these motions to suppress, some of the --

2  Fourth Amendment rights are personal rights.  So the fact

3  that, let's say, Miss Tew is using one of the e-mail accounts;

4  Michael Tew is using one of the others.  You suppress one of

5  those accounts.  If you suppress Michael Tew's account because

6  he has a right to privacy in it and he's using it, that

7  evidence could still be used against Kimberley Tew at a

8  separate trial.

9         Severance here presents all sorts of problems, and I

10  think that actually this motion has just highlighted a lot of

11  the issues the Government has previously presented.  So we

12  would again reiterate that a trial here or going forward in

13  this case both clients should have independent representation

14  that guarantees a fair trial and that also prevents a 2255 or

15  appellate issues down the road.  And so I don't see any good

16  reason here to allow joint representation, especially when the

17  Court could appoint independent counsel.

18         THE COURT:  Well, so I appreciate that, Mr. Fields,

19  and we went through this once before.  I understand all the

20  arguments.  I get it.  On the other hand -- and I should

21  reiterate that if it's truly a financial issue, Mr. Fields is

22  right, depending -- obviously there are kind of limits and

23  requirements for getting appointed counsel, but if it's truly

24  a financial issue, there may be ways to solve that.  I don't

25  think that should drive the decision.

1        I do think they have -- there are potential other

2   benefits to -- as I mentioned when we first went through this,

3   there are potential benefits to being able to have joint

4   representation and act jointly.  It is risky in a number of

5   ways, as Mr. Fields pointed out.  I, like everyone, urge the

6   Tews to really think through whether this is the best way to

7   handle this case for both of them and for each of them, but at

8   this point, given Mr. Bornstein's having thought it through,

9   having discussed it with them, their having decided again to

10  continue running those risks, I'm not going to require that

11  they have separate counsel at this time, but I do urge

12  Mr. Bornstein to keep an eye on whether it goes beyond just

13  thinking it would be preferable to have joint -- separate

14  counsel to being truly necessary, because it could certainly

15  tip over into that.

16       All right.  So thank you for addressing that, both of

17  you.

18       Then we might as well -- Mr. Fields got a little bit

19  into the merits of the severance motion.  I'll just say both

20  of these first -- both *Franks* and the severance issue I want

21  to give you a chance to make your case.  I'm pretty skeptical

22  on both of them, Mr. Bornstein, that you have met the burden

23  or that you can meet the burden that you have to justify

24  either of those things, but I did want to give you a chance to

25  make the argument this morning.  So why don't you go ahead and

1    explain to me why you think -- and I've read all the briefs.

2    I've read some of the cases.  Explain to me why you think

3    severance is appropriate in this case, and then we can go from

4    there.  So Mr. Bornstein.

5         MR. BORNSTEIN:  Your Honor, let me first address the

6    *Bruton* issue with respect to the severance.  At the time that

7    I wrote the motion and I wrote in that motion, as far as

8    *Bruton* was concerned, that there was statements made by

9    Michael Tew that would implicate and incriminate his wife,

10   Kimberley Tew, and I was not particularly specific about those

11   statements, and the Government called me on that and said in

12   their response that I wasn't specific.

13        So since that time I have tried to -- there was a

14   particular set of telephone calls that were made on July 7th

15   of 2020.  On July 7th of 2020, the FBI and the IRS had

16   contacted Mr. Jonathan Yioulos in Buffalo, New York.  They had

17   indicated they were going to arrest him, that he was going to

18   be charged in a case here in Denver, and he decided to

19   cooperate.  And in terms of his cooperation that day on

20   July 7th, the Government agents arranged for a pretext call in

21   which Mr. Yioulos would, with the Government listening in,

22   make a pretext call to Michael Tew and try to get him to make

23   incriminating statements on the telephone that the Government

24   could use against him at the trial.

25        At the time we had one hour and 13 minutes worth of

1    audiotapes of these conversations -- well, maybe not that long

2    with that one, but we had audiotapes, and the Government had

3    not provided me with a transcript of those audios.  So we

4    had -- we used a program, software program that's not very

5    good, to produce some transcripts that I could then use to

6    bolster my argument that there is a *Bruton* problem in the

7    case.

8              I now have these bad transcripts, but they are able

9    for me then to point out to the Court that in several specific

10   parts of the case -- parts of the conversation, Mr. Yioulos

11   would ask Mr. Tew something about his wife and thereby elicit

12   from him that -- and his incriminating statements,

13   incriminating statements about his wife, and he would -- from

14   what I've read in these transcripts, at least four or five

15   times he moves the conversation -- I don't know if the agents

16   were, you know, behind there saying what to do, but -- we

17   don't know that yet, but anyway I can tell from the

18   transcripts that he would move the conversation and say, Well,

19   didn't Mrs. Tew do X, Y, and Z, and didn't she participate

20   this way, and didn't she participate that way?

21             THE COURT:  But isn't the Government's point that

22   they will redact any statements like that and they won't get

23   to use those in a joint trial, and potentially if it's

24   separate then they would be used against her in a separate

25   trial?

```
 1              MR. BORNSTEIN:  Well, I would like to hear from the
 2     Government on how they are going to do that with these since
 3     they're audio, since they're audio statements and not written
 4     statements or otherwise written by Mr. Yioulos and adopted by
 5     him as a statement.  They're mixed in.  I foresee that there's
 6     a big problem.  I don't know how the Government can do that.
 7     I don't know how -- yes, that's what the law says you can do
 8     to avoid the Bruton problem, but I think, as a practical
 9     matter, I think the Government has a big problem here.
10              THE COURT:  Fair enough.  I'll be curious about
11     exactly how they plan, and what they plan to redact is a good
12     question, and I will expect them to address that.
13              MR. BORNSTEIN:  And then the second part that I
14     raised in my motion, other than the Bruton issue, is what
15     either is called the spillover issue.  And, again, this all --
16     there's a lot of spillover in this case involving Mr. Yioulos
17     talking about the two of them acting together or not acting
18     together.  At one point he says, I don't want to talk to you
19     anymore, and says, I don't want to have any more conversations
20     with Mrs. Tew, and yet again sometime later the Government
21     claims that there was a conversation, at least by text, that
22     we say is not hers.  It's not her text message.  It's Michael
23     Tew's text message.  And so we have a lot of spillover.
24              And then, finally, my third part of my argument
25     relates to the issue of whether -- when there's a trial
```

20-cr-00305-DDD                Motion Hearing              10/12/2022   14

 1   involving a husband and wife and the allegations are that

 2   they're in it together -- I mean, that's the allegations in

 3   the case; it's a conspiracy that, you know, they're obviously

 4   involved together, according to the Government's theory --

 5   will the jury be able to give her a separate, independent

 6   evaluation of the evidence and not taint her with the evidence

 7   against her husband.

 8           Those are the three parts of my argument.  The

 9   Court's read it, and that's how I present the severance issue.

10           THE COURT:  All right.

11           MR. BORNSTEIN:  I have one more thing.

12           THE COURT:  Go ahead.  Go ahead.

13           MR. BORNSTEIN:  One more thing.  The other reason I

14   file severance motions in cases such as this is just in case

15   something happens in the middle of trial.  And so if I've

16   alerted the Court to the fact that there could be a big

17   problem, that evidence could come in that would taint one or

18   the other, that something might be that the jury would have

19   big trouble following an instruction, I've preserved that

20   issue.

21           THE COURT:  Okay.  Thank you.

22           Mr. Fields, go ahead and respond however you want,

23   especially with how you plan to do redactions, how we can

24   maybe -- how much of that can be dealt with before trial so we

25   don't run into this issue that he just raised.

1           MR. FIELDS:  Absolutely, Your Honor.  So first with

2    that July 7th telephone call, that July 7th telephone call

3    wouldn't be covered by *Bruton* anyways.  That July 7th

4    telephone call would involve coconspirator statements which

5    are classically non-Brutoned.  There's no confrontation clause

6    issue related to those because they're nontestimonial.  That's

7    black-letter law.  It's United States versus Clark, 717 F.3d

8    790.  It's a Tenth Circuit case from 2013.  So nothing in that

9    pretextual call would need to be redacted.

10          THE COURT:  So those would come in, either way,

11   unredacted in a joint trial, a separate trial.  That's your --

12   okay.

13          MR. FIELDS:  Correct, Your Honor.  The redactions

14   would come into play -- and this is actually maybe the more

15   difficult issue -- if Mr. Bornstein decides to violate the

16   proffer agreements and present a defense, which would be

17   inconsistent from what the Tews told us in their proffers.

18          So let's talk about the proffers for a second.  Both

19   of these defendants have proffered with the Government.  That

20   means they've come in, they've talked about their role in the

21   scheme in some detail.  Both have admitted that they're

22   guilty.  If during the trial they present a defense that's

23   inconsistent with those proffer statements, then those

24   proffers can potentially come in.  Those would be testimonial,

25   and those would be potential *Bruton* statements.

1    Those are audiorecorded.  I think that those

2    redactions can be done if the defense does intend to breach

3    the proffer agreements.  One of those proffer meetings with

4    Michael Tew, the first one, was sort of cabined in a way so

5    that he was not talking about Kimberley Tew.  So that one is

6    very easy to redact, because he's mostly talking about his own

7    complicity in the scheme, and we would just play the tape.

8    Kimberley Tew's proffer, her proffer and Michael

9    Tew's second proffer are not so cabined, but even in those

10   cases it would be pretty easy to do the redactions if

11   redactions were even necessary.  So there are times where in,

12   for instance, Kimberley Tew's proffer where she just says, I'm

13   guilty, and then talks about why she alone is guilty.  So you

14   don't have to redact anything there.  She's not implicating a

15   coconspirator.

16   The reason that that might become problematic is

17   depending on, sort of, how the case goes.  If Mr. Bornstein

18   does breach the proffers in the middle of the trial, that

19   could create a severance issue in the middle of trial, and

20   also we again end up with this issue involving their joint

21   representation.  So I think it is important for Mr. Bornstein

22   to, sort of, make a representation that he does not intend to

23   breach the proffer agreements.

24   THE COURT:  What do you mean -- what is your take on

25   what would breach the proffer, in your view?  When you say

1   that, you mean presenting some sort of evidence, rather than

2   just requiring you to prove your -- I'm curious what your

3   position on -- what would -- what could they do besides just

4   say there's insufficient evidence and not present a defense

5   that, in your view, would not breach the proffers?

6           MR. FIELDS:  Our position is that they are limited to

7   presenting a defense that basically says the Government's

8   evidence is insufficient, so a complete reasonable doubt

9   defense.  If they try to present evidence, testimony, argument

10  that they did not participate in this scheme, then the proffer

11  agreement is breached, and those proffer statements can come

12  in.

13          We can redact them at that point to avoid any *Bruton*

14  issues if the Court wants to hold a joint trial.  If the Court

15  is inclined to grant the severance, then both of those proffer

16  agreements can come in.

17          THE COURT:  Okay.  Thank you, Mr. Fields.

18          MR. BORNSTEIN:  Your Honor, may I address one thing

19  that Mr. Fields raised that I disagree with?

20          THE COURT:  Yes, please.

21          MR. BORNSTEIN:  He began -- Mr. Fields began his

22  argument by saying that the July 7th telephone conference is a

23  statement by coconspirators.  However, my understanding of the

24  law is that once Mr. Yioulos had given it up and was working

25  with the Government, he was no longer a conspirator, and that

1    telephone call was not made in furtherance of the conspiracy.

2    And so under 801(d)(2)(3) [sic] it has to be done both by a

3    conspirator and made in furtherance of the conspiracy, and if

4    that telephone call was made in furtherance of helping the FBI

5    or the IRS, it doesn't count.

6         THE COURT:  So his statements you might be right

7    about, but aren't we talking about Mr. Tew's statements?  And

8    he was still, at least thought he was, trying to further the

9    conspiracy.

10        MR. BORNSTEIN:  I think it's the conversation,

11   whether that conversation was made in furtherance of the

12   conspiracy, not whether one person was -- erroneously thought

13   that he was still involved in it and was wrong.

14        THE COURT:  Okay.  Thank you, Mr. Bornstein.

15        Mr. Fields -- and Mr. Bornstein, I'll give you a

16   chance to answer this too -- this issue about the proffers

17   seems to me to be potentially -- not necessarily -- I mean, I

18   guess it plays into, obviously, into the severance question,

19   but it, sort of, seems to me that it might behoove all of us

20   to try to kind of fight that out before we have a jury sitting

21   around and a trial going on.  Do you see any way we could

22   handle that before a trial, like figuring out exactly what

23   they can and can't do, or do we just have to, sort of, see how

24   the trial goes?

25        MR. FIELDS:  Your Honor, I have a proposal.  I think

 1   there are -- do you want me to take --

 2            THE COURT:  Either.  It doesn't matter to me.

 3            MR. FIELDS:  So I think there are two options.  The

 4   first option would be for Mr. Bornstein to represent here

 5   today that he has no intention of breaching the proffer

 6   agreements.  If that's the case, then we, sort of, know

 7   exactly what trial is going to be like.  It's going to be a

 8   reasonable doubt defense.  He will cross-examine, he will

 9   impeach, he will do what he needs to do, but that's the trial.

10            On the other hand, if he thinks there are

11   circumstances where he would need to breach the proffer

12   agreements, at that point we would handle it through a motion

13   in limine, which I can file relatively quickly, and we can set

14   a, sort of, pretrial hearing on the motion in limine, which

15   usually wouldn't be granted because motions in limine, but

16   that's a pure issue of law, and I think it's one that could be

17   teed up easily before the trial.

18            THE COURT:  Okay.  I guess -- well, why don't I ask

19   Mr. Bornstein.

20            Mr. Bornstein, is your view of the proffer agreements

21   consistent with Mr. Fields' view that you're, sort of, limited

22   to a reasonable doubt defense and -- unless you want to

23   potentially allow those proffers in, or do you disagree with

24   his take on that?

25            MR. BORNSTEIN:  I disagree with his take.  I think

```
 1   it -- let me try it this way.  It is possible for my clients

 2   to take the stand and testify consistent with the proffer but

 3   add facts or discuss facts that were not either dealt with in

 4   the proffer or were misunderstood in the proffer.  It's

 5   walking a fine line.  I don't know if I would do it or not.

 6   That's a tactical decision.  I haven't made that tactical

 7   decision.  I probably wouldn't make that tactical decision

 8   until the middle of trial.  But I have thought through that

 9   fact that that is a line that could be walked.

10           THE COURT:  But in that case you would -- they would

11   take the stand, but the proffers would also come in.  Is that

12   right?

13           MR. BORNSTEIN:  No.  As I understand the terms of the

14   proffer, they have to deny something that they told the

15   Government in the proffer, and then the proffers come in.

16           THE COURT:  Okay.  All right.  Well, I guess we'll

17   see if we can work that out beforehand, but I guess you're

18   probably right, Mr. Bornstein, it may just -- we may just have

19   to see how it goes.  All right.  Thank you.

20           So I should say on most of these things I'm probably

21   going to issue a written order as quickly as I can.  I'm not

22   inclined right now to sever.  I'll go back and look through a

23   little bit and issue a written order.  I do want to make sure

24   we kind of clarify how redaction would work.  So I'll probably

25   issue a written order.
```

1           If there's nothing else on that, I would like to turn

2    to the *Franks* issue.  And, to be clear, what I want to do

3    right now is figure out if a *Franks* hearing is necessary.  My

4    inclination, as I said before, is that it's not.  It's a high

5    burden, as the Government has pointed out.  I did sense -- in

6    the reply there were affidavits attached.  I wanted to give

7    Mr. Bornstein an opportunity to explain his view of why those

8    meet the very high burden under *Franks* for a hearing.

9           So, Mr. Bornstein, why don't you go ahead and make

10   your argument on that, on why we should have a hearing.

11          MR. BORNSTEIN:  As the Court pointed out, in my

12   motion for the *Franks* hearing I indicated in the motion that

13   it's related to the search warrants, the multiple search

14   warrants that were issued in the case, some four or five of

15   them, each of which had an affidavit attached to it by one of

16   the -- IRS agent or the FBI agent.  And we have found in those

17   affidavits many omissions and misstatements of fact.  And the

18   Government filed their response, and they essentially said,

19   Well, we don't think that you have the right to a *Franks*

20   hearing just because you've set forth in detail in paragraph 4

21   A through Q or O what it is that you thought was misstatements

22   of fact or things that were left out, for example, the fact

23   that Mr. Yioulos had engaged in embezzlement of funds from

24   National Air Cargo before any transactions that involved

25   Mr. Tew, and that that was a serious fact, for example, that

1   the magistrate should have known about Mr. Yioulos and what he

2   was saying and why the agents were using his statements to

3   attempt to obtain a search warrant from the magistrates.

4          The Government said that the case law required some

5   sort of an offer of proof.  Or some cases talked about

6   affidavits; some cases talked about testimony.  I'm prepared

7   to put my clients on the stand to deal with each one of the

8   issues A through O under the doctrine of the *Simmons* case,

9   which says that if you are testifying in order to preserve a

10  constitutional issue, you don't waive your Fifth Amendment

11  rights and that can't be used against you.

12         So I didn't know that I needed to put my clients on,

13  so I got affidavits, and I had them each sign a declaration

14  with those materials in it.  I don't know how to meet this

15  burden without doing that.  That seems to me, reading the case

16  law, that if I provide declarations, set forth specifics about

17  what it is that we are saying are omissions or misstatements,

18  that that should be sufficient to get a *Franks* hearing.  If

19  the case law says that I have a higher burden than that, I

20  don't know how to meet it other than to put my clients on the

21  stand, as I'm willing to do, as I say, this morning.

22         THE COURT:  Well, I agree with you; I don't think

23  it's necessary to put them on the stand.  I think the

24  affidavits probably were necessary.  But my reading of the

25  case law and my understanding of the *Franks* doctrine is it's

1    not enough to just say here are some things in the search

2    warrant applications that weren't true.  You have to show that

3    they were knowingly and recklessly untrue and that, even if I

4    believe everything in the affidavits, that taking those out

5    would mean there was no probable cause.  And I'm not sure you

6    have met either of those burdens of showing knowing or

7    reckless disregard for the truth or that even accepting all of

8    these declarations that that defeats probable cause.

9           MR. BORNSTEIN:  The only way I can answer the Court's

10   question about that is I can present the omissions and the

11   misstatements from the perspective of what the defense knows.

12   I cannot call the agent and ask them, Why did you say this,

13   you know, What belief did you have in saying this?  That's

14   beyond my ability either to call the agents and ask them for

15   information to support my motion, or at this hearing I don't

16   know if I could call them to establish that.

17          So the issue is, okay, there's a burden, there's a

18   bar, and it's a fairly high bar, and I have to meet that

19   fairly high bar, but I don't know how I can meet this first

20   part you mentioned without the agents testifying themselves.

21          THE COURT:  Well, it's always -- I mean, you're

22   right, it's a very difficult burden for the defense to meet.

23   I mean, that's just the law.  And the problem is, though, that

24   we often, in the law -- the prosecution in many cases has to

25   show that actions -- the defendants' actions were taken

1    knowingly.  They can't force the defendants to testify.  So we

2    have to use, sort of, our view of all the evidence, and does

3    that add up to a suggestion that these misstatements, these

4    false facts, were a knowing and reckless -- or reckless effort

5    to mislead the magistrate judge or -- so I think that's your

6    burden.

7         And then, secondarily, you still have to show that

8    there wasn't probable cause without these things, and I'm just

9    not sure that, even accepting everything that's said in the

10   affidavits, even accepting your clients' statements as true,

11   that defeats probable cause.  And that is more of a, kind of,

12   straight legal question.

13        MR. BORNSTEIN:  Now, that straight legal question, as

14   I understand it, Your Honor, would involve perhaps taking the

15   affidavit, striking those parts of the affidavit that relate

16   to the matters that are either misstatements or omissions, and

17   then doing an analysis to determine if the balance is

18   sufficient or not.

19        THE COURT:  I think that's right.

20        MR. BORNSTEIN:  All I -- at this stage of the

21   proceeding, my analysis of the affidavit is that it's no

22   longer necessarily one that a magistrate ought to consider

23   anymore.  The Government has not done that exercise either.  I

24   guess neither of us have actually taken the exercise, excised

25   everything that relates to the matters A through O of

1    paragraph 4 of the motion, and see what's left.

2          THE COURT:  All right.  Thank you.  Why don't I give

3    Mr. Fields a chance to respond.

4          MR. FIELDS:  Thank you, Your Honor.  So first I want

5    to dispel the notion that *Franks* is impossible to meet.  The

6    usual *Franks* scenario is you are dealing with, let's say, a

7    drug case, and you have a confidential informant or a witness

8    who tells the agent something or at least the agents recount

9    it in the affidavit.  Usually in the *Franks* context what will

10   happen is defense counsel or a private investigator for

11   defense counsel interview that witness, and the witness will

12   say, I didn't tell the cops that; that was completely false.

13   That's where you end up with a *Franks* hearing, because then

14   you have got a witness who is going to say the agents lied in

15   their affidavit.

16         The reason it's so difficult to meet the burden here

17   is that this is not that case.  It did not involve

18   confidential informants.  It is an incredibly

19   document-intensive fraud case where every aspect of the fraud,

20   from the invoices to the bank records, is laid out in paper

21   and described in the affidavits.  That makes a *Franks*

22   challenge in this particular context really difficult to meet.

23         THE COURT:  Let me ask you, really quickly, why is it

24   at least not sort of like your hypothetical?  We have sworn

25   statements that the defendants, at least for a number of these

1   things, would have personal knowledge about whether the

2   statement in the warrant affidavit is true, that say that's

3   not true.  So why is that not, at least in some ways, similar

4   to your hypothetical?

5           MR. FIELDS:  So in this particular case -- it's a

6   demonstrative exhibit we haven't gone through yet, but if you

7   look through the exhibit book here, Government Exhibit 43 lays

8   out each of the false allegations and then, sort of, where in

9   the search warrant it was.

10          What we have here is a situation where these

11  defendants have submitted post hoc affidavits, right, but they

12  don't describe what the agents knew at the time.  And there's

13  no allegation that at the time the agents knew all of these

14  things.  That's what's required for *Franks*.  And, as Your

15  Honor pointed out, you know, the Government is required to do

16  this all the time when we accuse someone of a crime, what was

17  your mens rea, what did you intend.  In this case defense

18  counsel has access to all the discovery, sort of, when -- you

19  know, a chronicle of the investigation, and has made no effort

20  to try to actually use all of that to craft this narrative

21  that the agents had certain evidence at the time and

22  recklessly omitted it or that they had evidence at the time

23  and just lied about it.  That's what's required in *Franks*.  So

24  they don't meet the intent prong.

25          The materiality prong here is also really

 1   significant, Your Honor.  So, first of all, Mr. Bornstein says

 2   neither party has really done that analysis.  It's not the

 3   Government's analysis to do here, Your Honor.  He's the one

 4   who is saying that this affidavit is so deficient that, you

 5   know, there are these lies, and they are material, therefore,

 6   a magistrate judge was hoodwinked.  Usually in a *Franks*

 7   motion, every one I've handled in every District Court that I

 8   have ever been in across the United States, what you will get

 9   is defense counsel will submit an affidavit, and they will

10   actually black out the portions that they think are false,

11   right, so you can actually see it.  Then there will be a

12   detailed analysis in the motion of how -- if you look at, sort

13   of, all those black boxes in the warrant, Your Honor, all

14   those, sort of, gaps, that's now their missing PC.

15          That wasn't done here, and there's good reason for

16   that.  Most of these are relatively, like, nitpicky things.

17   So if you look at Government's Exhibit 43, one of the

18   allegations they are saying is false is that National Air

19   Cargo was a Florida corporation.

20          THE COURT:  Does Mr. Bornstein have a copy of your

21   exhibits?

22          MR. FIELDS:  He does.

23          THE COURT:  Okay.  Thank you.  Go ahead.

24          MR. FIELDS:  I am prepared to go through each of

25   them, sort of, piece by piece to talk about how they are

```
 1   immaterial, but I don't think we need to do that now.  I will

 2   just use an example.

 3        So this Florida corporation.  Right?  First of all,

 4   the affidavit never says "Florida corporation."  So what they

 5   are saying is false isn't actually in there.  What it says is

 6   "a Florida company."  National Air Cargo was headquartered in

 7   Florida, had operations in Florida.  Its executives were in

 8   Florida.  And even if it wasn't a Florida corporation or a

 9   Florida company, it's hard to see how that would materially

10   affect whether or not there's probable cause to believe that

11   this company, outside the state of Colorado, was being fleeced

12   out of millions of dollars through all these fake invoices.

13        Similarly, you get some quibbling over did they have

14   multiple joint accounts or just one account.  If you look at

15   the affidavits in their totality, they are describing Michael

16   Tew and Kimberley Tew each had lots of different bank

17   accounts, and they were all using those bank accounts to, sort

18   of, funnel the money that they were taking from National Air

19   Cargo.  Whether one was joint or multiple were joint does not

20   make a material difference as to whether or not there's

21   probable cause.  Remember, that's a fair probability.  Reading

22   the warrant in a holistic, nonhypertechnical way, could a

23   magistrate judge have decided there's probable cause?  Yes.

24        I mean, for each of these warrants, each of the, sort

25   of, e-mail accounts, basically the structure of it is:  Here
```

1   is the scheme as laid out by a coconspirator and also as

2   corroborated by all these bank records.  National Air Cargo,

3   they, as a corporation, retain their e-mails.  You look

4   through those e-mails, and you see an e-mail coming in from

5   Meyers Consulting Group, Inc., with an invoice.  So they have

6   already got that e-mail.  They know that e-mail account was

7   used to submit the false invoices.  We have a fair probability

8   to believe that that account was used to commit a crime.

9   That's all you need to issue a warrant here.

10          And all of these allegations they are making, even if

11   they were false, would be relatively immaterial to that

12   entire, sort of, calculation.

13          But going back to it, none of them are recklessly

14   false.  And there's no evidence here that these agents, who

15   lay all this out thoroughly, lied or were intentionally trying

16   to, sort of, hoodwink a magistrate judge to get a warrant they

17   otherwise didn't think they were entitled to.

18          THE COURT:  So let me just, sort of, ask you to

19   expand on -- I mean, how do we -- I think you're right, a lot

20   of these are nitpicky, and sort of individually none of them

21   would undermine probable cause, in my view.  I think I agree

22   with you that overall they don't undermine probable cause

23   probably, but can't we, sort of -- if there's a long list of

24   things that were wrong, isn't that generally how we do go

25   about proving -- well, if over and over again statements are

1    wrong, they tend generally to be statements that are more

2    incriminating than -- if the mistakes all go in one direction,

3    I guess, does that suggest -- isn't that how, at least

4    mentally, we would go about deciding if something was done

5    knowingly or recklessly?

6          MR. FIELDS:   I think that could be one piece of it,

7    Your Honor.  You're right, if there's, sort of, a litany of

8    mistakes, that might be a piece of evidence showing that there

9    was something intentional here, but it would only be one

10   piece, and I'm not sure that that by itself would be enough to

11   warrant a *Franks* hearing.  Mere negligence isn't enough.  We

12   are talking about intentional, like, these agents got together

13   and decided that, like, we need to lie to get a search

14   warrant.  That is what *Franks* is all about.  Or a reckless

15   disregard for the truth:  We don't actually care whether they

16   committed a crime.  We are just throwing all this stuff in the

17   affidavit and hoping we get a search warrant so we can gather

18   the evidence.

19         That is not what happened here, and none of these

20   supposed false statements would even go to meet that

21   threshold.

22         And here I'll point out if we do the exercise, if we

23   go through Government's Exhibit 43, a lot of what they are

24   alleging as false, those statements aren't actually in the

25   warrant.  So the Florida corporation, that's one example.

1    Another particular example is this --

2             THE COURT:  Why don't we just go ahead and do it.

3    Let's look at Exhibit 43.

4             COURTROOM DEPUTY:  Your Honor, this is up on the

5    screen too.

6             THE COURT:  All right.  Thank you.

7             MR. BORNSTEIN:  It's on the screen, though.  Yes.

8             MR. FIELDS:  So we'll go through Government's

9    Exhibit 43, and then we'll focus -- some of these only apply

10   to some warrants; some apply to others.  So let's actually

11   look at the ones that are in each of the affidavits.  Right?

12            So statement 4(b) here is that *Jonathan Yioulos*

13   *engaged in embezzlement of funds from National Air Cargo*

14   *before engaging in transactions with Mr. or Ms. Tew.*  That is

15   true, Your Honor.  The agents didn't know that at the time --

16            DEFENDANT K. TEW:  Yes, they did.

17            MR. FIELDS:  -- and there's no allegation that they

18   did.

19            THE COURT:  Miss Tew, you are going to have to remain

20   silent, please.

21            Go ahead, Mr. Fields.

22            MR. FIELDS:  And they have presented no evidence that

23   that was true.

24            Even if it was true, the affidavit lays out the fact

25   that Mr. Yioulos was defrauding National Air Cargo.  That's

 1    laid out in multiple paragraphs.  He's described as a

 2    coconspirator.  So the magistrate judge is already, sort of,

 3    on notice that this person who is making these statements is a

 4    fraudster.  So there's no intent to sort of deceive or mislead

 5    there.

 6              *Jonathan Yioulos was threatened with a loss of*

 7    *employment if he refused to pay fraudulent invoices.*  That

 8    statement in its precise form -- in that precise form is not

 9    in the affidavit.  If you go to paragraph 23 of Government's

10    Exhibit 1, which is the kley@me, what you get here is that

11    *Mr. Yioulos stated that M. Tew and K. Tew threatened to alert*

12    *NAC about Mr. Yioulos's prior payment of fraudulent invoices*

13    *and that such disclosure could threaten Mr. Yioulos's*

14    *continued employment.*

15              So you get sort of a paraphrase of that here.  They

16    are alleging that that's false.  Even if that threat wasn't in

17    there or there was some, like, issue involving Mr. Yioulos,

18    it's hard to see how that fundamentally affects probable

19    cause.  Remember, like, that doesn't actually say that there's

20    no scheme going -- you take that out, it doesn't actually,

21    sort of, reflect on whether or not a scheme was actually

22    happening and whether or not kley@me.com was used to

23    perpetrate this scheme.  So even if you take that out, it's

24    still immaterial.

25              4(d), that *Michael Tew made the suggestion to use*

1     *phony invoices -- phony companies for invoices to NAC when it*

2     *was Jonathan Yioulos who determined the mechanics.* So a

3     dispute among the conspirators about who came up with the

4     mechanisms to defraud National Air Cargo, again, doesn't

5     fundamentally affect whether or not the scheme was actually

6     taking place. Instead, what you have got is a lot of finger

7     pointing over this coconspirator was the one who did it, no,

8     it was this one, or maybe actually just a confused

9     recollection over who initially came up with the idea. Again,

10    immaterial to whether there was actually a fraud scheme and

11    whether or not kley@me.com was used to perpetrate it.

12           4(e). *Kimberley Tew said she wanted to take*

13    *responsibility for the NAC fraud at the meeting held July 28,*

14    *2020, at Yeti.* So in Government's Exhibit 1 that's paragraph

15    65. So, first of all, the statement that they are saying is

16    false, again, isn't in there. So the meeting at Yeti was

17    actually on July 29th, not July 28th. And what's actually

18    stated in the affidavit is not, sort of, the verbatim

19    allegation there but instead kind of in the middle of this

20    paragraph -- this is on Government's Exhibit 1, and it's Bates

21    labeled at the bottom SW 80. So the actual statement in the

22    affidavit is: *K. Tew also made statements indicating that the*

23    *intent of her action was to take responsibility for the*

24    *fraudulent payments originating at NAC in order to allow*

25    *M. Tew to remain out of custody in order for him to parent*

1    *their children.*  The exact statement that they are saying is

2    false isn't in the affidavit.  What you have here is a classic

3    agent paraphrase of a meeting at Yeti on July 29th, 2020.

4    Even if you took that out that M. Tew indicated she wanted to

5    take responsibility, okay, that actually shows that she's

6    involved with the scheme, but there's other evidence,

7    including the rest of the warrant describing the fact that

8    she's getting a lot of the money into her accounts, describing

9    her involvement in the scheme.  So, again, even if you strike

10   that, we are still left with a situation where there's plenty

11   of probable cause in the warrant.

12          I would add, and actually I will do this at each

13   point, if you eliminated each of these statements that I have

14   been talking about, you would still have probable cause

15   because you'd still have all of the evidence that National Air

16   Cargo was not paying millions of dollars to the Tews for

17   services that weren't being rendered and that they were

18   getting the money.  Right?  That's fundamentally the fraud

19   here.  And those bank accounts, a lot of them had kley@me.com

20   as a contact address, showing that it's involved in the

21   scheme.  That's all you need is a fair probability that a

22   crime occurred and a fair probability that the evidence would

23   be there.

24          And so if we -- the next one is that *Kimberley Tew*

25   *communicated with Jonathan Yioulos about paying fraudulent*

1   *invoices when it was actually he who insisted on only talking*

2   *to Michael Tew.*  So that's not in the affidavit, so that's an

3   alleged omission.  If that was added to the affidavit, it

4   actually would have made the affidavit stronger.  It would

5   have shown that Kimberley Tew was communicating about paying

6   fraudulent invoices.  So that is a particular one where if you

7   added it to the affidavit, it would just make probable cause

8   stronger.  So that's certainly not a basis for granting a

9   *Franks* hearing.

10        If we go to the next page, 4(g), you have:  *Jonathan*

11  *Yioulos received small amounts of Bitcoin for his part of the*

12  *fraud.*  That is in the affidavit.  The Tews in their affidavit

13  sort of assert that they know he was getting more about that.

14  When the agents proffered the Tews, they didn't say anything

15  about that.  The evidence available at the time to the agents

16  showed that he would get some Bitcoin from the Tews, and

17  that's described in the affidavit, but he would often

18  immediately give it back, usually because Kimberley Tew would

19  say, I need it back, because she had a gambling debt or

20  something else that she needed the money for.

21        So this is also a statement where even if it turns

22  out that Jonathan Yioulos was getting more money as part of

23  the scheme, again, it doesn't fundamentally affect the

24  probable cause to believe that there was a scheme.  Also

25  doesn't fundamentally affect the probable cause to believe

1   that kley@me.com was used to further the scheme.  So, again,

2   immaterial.  All that would do is sort of assign relative

3   culpability among the coconspirators, again, not really

4   affecting probable cause.

5         4(h), that *Kimberley Tew had accounts and was on*

6   *forms* -- I think that should be "forums" -- *on the Dark Net.*

7   That's not in the affidavit.  Also hard to see how whether or

8   not she is or is not on the Dark Net really affects probable

9   cause.

10        4(i), so *Kimberley Tew shared bank accounts (plural)*

11  *with Michael Tew.*  This is in paragraph 40 of Government's

12  Exhibit 1.  And it's only in this one.  And so it's -- down at

13  the bottom it's SW 74.  And it's in this, sort of,

14  parenthetical just before the agent lists all of the various

15  accounts.  It says, *Some of the accounts listed are jointly*

16  *held with M. Tew.*  The idea, I guess, being since that -- only

17  one of these accounts is actually joint.  It's the one ending

18  8486.  The other ones are actually held by Kimberley Tew.  So

19  the idea, I guess, is that this statement is false because

20  it's "accounts (plural)" when only one is actually a joint

21  account.

22        Again, hard to see how that's material especially

23  since at other points in the affidavit it's clearly described

24  that both were using these accounts.  So, for instance, if you

25  go to SW 70, paragraph 16 of Government's Exhibit 1, the agent

1   makes it very clear that this is a scheme where ACH payments

2   from National Air Cargo were made into accounts owned and

3   controlled by M. Tew and sometimes also by his wife, K. Tew.

4   And then it talks about some of the accounts were personal

5   accounts belonging to one or the other.  Hard to see how one,

6   sort of, arguable misstatement about whether or not they had

7   more than one joint account really affects probable cause

8   under these circumstances.  And, again, add up each of these,

9   and we're still not even close to, sort of, piercing the

10  fundamentals here, which is was there a scheme, were they

11  involved, and is evidence at kley@me.

12          4(j).  *Michael Tew's bank deposits came from the*

13  *National Air Cargo fraud.*  That statement is not in any of the

14  affidavits, so I guess that would be an alleged omission.  If

15  the agents had added that, it would have increased probable

16  cause, not decreased it.  But fundamentally here the agents

17  were never alleging that every deposit into their bank

18  accounts was from the fraud.  Most were, because we are

19  talking about $5 million, which is a lot of money, but not all

20  of them.  He had -- he was doing, sort of, other -- this was a

21  side hustle.  He did have a real job, and the agents have

22  never argued otherwise, and nothing in the affidavit says

23  otherwise.

24          4(k) is sort of similar to 4(c).  It's that thing

25  about the threats, so I have already addressed that.

1          4(l).  *Kimberley Tew accessed fraudulent payments*

2   *from NAC in a variety of bank accounts.*  That exact statement

3   is not in any of the warrants, but sort of being charitable, I

4   have pointed out where you might actually, if you, sort of,

5   read it generally, find sort of a paraphrase of that

6   sentiment.

7          So, again, Government's Exhibit 1, this is the

8   closest one to it:  *He advised that both he and K. Tew*

9   *accessed the fraudulent proceeds from National Air Cargo in a*

10  *variety of bank accounts.*  So they are arguing that that's

11  false.  If you go through, you can see how the agents in the

12  next -- in the next one, next part of Government's Exhibit 1,

13  paragraphs 42 through 56, actually describe in some detail

14  exactly the, sort of, flow of money.  The bank records

15  themselves sort of bear that out.  And even if, again, you

16  strike that -- let's assume that it's false for purposes of

17  this affidavit -- does it affect materiality?  And the answer

18  to that is no, because you still get specific instances where

19  bank accounts associated with the kley@me.com address are used

20  to access funds derived from National Air Cargo which were not

21  authorized to be paid by National Air Cargo.  So still scheme,

22  participants, fair probability that there's evidence here.

23         The next page.  The next page, page 3.  Just if you

24  scroll down.  I can actually pull it up on the document camera

25  if it's easier.

1          So the next one is 4(m).  This is the Florida

2     corporation.  I have already addressed that one.

3          Then 4(n) and 4(o).  4(n) is:  *Invoices submitted to*

4     *National Air Cargo were from unapproved vendors.*  And 4(o) is:

5     *The payments via ACH were not approved.*

6          So, first of all, neither of these statements in

7     those exact terms are in the affidavit.  What the affidavit

8     does describe, instead, is the process by which Jonathan

9     Yioulos would pay the sham companies set up by the Tews.  So

10    it does talk about how those companies were not approved to be

11    paid by National Air Cargo.

12         Or *Payments via ACH were not approved.*  That

13    statement -- what they are getting at here is Jonathan

14    Yioulos, a coconspirator, would approve the payments, but

15    that's different than National Air Cargo saying that they are

16    approved.  So that's sort of a weird quibbling about the

17    evidence, but doesn't -- if you read these paragraphs in their

18    entirety -- so in Government's Exhibit 1 it's paragraphs 15,

19    16, and 17 -- these are paragraphs sort of summarizing what

20    the Tews told the agents in their proffers, so that they have

21    already admitted to be true, what Jonathan Yioulos said, and

22    also what happened on that pretextual call.

23         So the way the scheme worked is that an insider,

24    Jonathan Yioulos, would approve payments to these sham

25    companies.  Now, National Air Cargo did not have good internal

1  controls.  The coconspirators were basically exploiting all

2  those internal controls.  So I think what they are getting at

3  here is that National Air Cargo didn't really have a system

4  for approving vendors.  And National Air Cargo when it comes

5  to, sort of, ACH payments was sort of loose about them.  But

6  this is not a false statement.  And even if it was, even if we

7  are talking about, sort of, internal controls by National Air

8  Cargo, again, that doesn't fundamentally affect the probable

9  cause here, which is:  Was National Air Cargo being fleeced by

10 these coconspirators?  Yes.  Millions of dollars were leaving

11 National Air Cargo for services that were never rendered, and

12 it ended up in the Tews' bank accounts, and those bank

13 accounts were associated with kley@me.com.

14        Or, in other instances, now if we look at the other

15 warrants, Michael Mora, the Political Media, or the Chris

16 Rincon account, those were e-mail accounts set up to further

17 the scheme.  So those accounts send false invoices to give the

18 scheme the appearance of legitimacy.  And that's all laid out

19 in the affidavits.

20        All of this is to say, Your Honor, that, again, even

21 if you assumed that the agents were just lying because they

22 were trying to get a warrant they otherwise weren't entitled

23 to, none of these would be material.  And the Tews here are

24 not really quibbling with a vast majority of the affidavit

25 which lays out in detailed terms how this fraud took place.

1   So for a *Franks* hearing you need both of those prongs, and the

2   Government's contention is that they haven't met either of

3   those.

4           THE COURT:  All right.  Thank you, Mr. Fields.

5           Mr. Bornstein, why don't I give you a chance to

6   respond.

7           MR. BORNSTEIN:  Thank you.

8           Let me begin by saying that, as the affidavit spells

9   out, and we don't argue, that Mr. Tew worked for National Air

10  Cargo for many years.  He was essentially their controller or

11  their financial officer, even though -- for many of those

12  years.  So the matters that are being stated here for a large

13  part are based on his knowledge, which is why he submitted the

14  affidavit about what occurred.  And the actual issue about

15  whose bank accounts were involved in terms of Miss Tew, she

16  would know that information because that's within her purview,

17  within her knowledge.

18          But let me deal with this, because "materiality" is a

19  word that is amorphous.  I mean, what's material to one person

20  may not be material to another.  But my position is that there

21  are so many of these things that build on top of each other

22  and are repeated in warrant after warrant, affidavit after

23  affidavit.  As the Government says, for example, in number

24  4(c) this appears in paragraph 14 of three separate

25  affidavits, paragraph 23 of a fourth affidavit, and paragraph

1    35 of a fifth affidavit, that Jonathan Yioulos was threatened

2    with the loss of employment.  Now, the point of that that I

3    make -- the point of that being pointed out as a

4    misstatement -- and, again, I want -- it doesn't have to be

5    intentional; it doesn't have to be lying; it can be reckless

6    disregard for the truth -- is that the Government found out or

7    should have found out and apparently did find out eventually

8    that Jonathan Yioulos was not telling them the truth.  He was

9    embellishing statements that he made to them at the beginning

10   of the case.  And he told them that the reason he was involved

11   in this was that he was being threatened -- that's the word,

12   "threatened" -- that he would be turned in to NAC and would

13   lose his employment.

14          THE COURT:  Right, but they didn't know that at the

15   time of these affidavits, right, the agents, when they wrote

16   these warrant applications?

17          MR. BORNSTEIN:  Well, maybe not at the first one, but

18   by the time they -- by the time they got to the ones that were

19   in September -- not the ones in July -- the ones that were in

20   September and the one that was in December, they should have

21   known that by that time, because eventually -- we know that

22   eventually it shows up in their statements, um, the, uh, the

23   statement to the Court in advance of plea for Mr. Yioulos,

24   that he was not threatened.  He was a willing participant in

25   this fraud of NAC.

1          Excuse me for a minute, Your Honor.

2          THE COURT:  Mm-hmm.

3      (The defendants and counsel confer.)

4          MR. BORNSTEIN:  So that Mr. Yioulos tried to tell the

5   agents at the beginning in July of 2020 that, Oh, I did this

6   because whatever I did I was being threatened by Mr. Tew or

7   Mrs. Tew, and that's the reason I was involved, and that they

8   would get me fired unless I kept going on this.  Well, that

9   turns out to not be true.  He was -- number one, had devised

10  this ability to steal from NAC all by himself way before these

11  events started.  And, number two, if you listen, and we have

12  listened, to the telephone conversations which the Government

13  had, for example, like the telephone conversation that

14  occurred on July 7th, the pretext call, there's nothing in

15  that pretext call that would suggest to an agent that

16  Mr. Yioulos was acting because he was threatened with his loss

17  of employment.  That's number 4(b) and 4(k).

18          4(a), let's go to 4(a).  4(a) appears in -- they have

19  put down here GX 5.  I'm not sure, reading their exhibit,

20  which search warrant GX 5 is offhand, but whatever it is it's

21  probably one of the later ones.  I could go look it up, if it

22  makes a difference.

23          THE COURT:  I don't think it does.  My guess is it's

24  the -- what is the date on this one -- July 31st, 2021, search

25  warrant.

1          MR. BORNSTEIN:  Is that a 2021, which is --

2          THE COURT:  Or, I'm sorry, 2020.

3          MR. BORNSTEIN:  Okay.  The issue in this is that

4    Mr. Yioulos was trying to tell the agents, erroneously, that

5    as far as July 1st of 2020 he was still getting text messages

6    from Kimberley Tew to participate in this.  It turns out that

7    that text message was not from her.  It wasn't from her

8    account, and it wasn't from her phone number.  And that was

9    something that the agents could easily have determined that

10   Mr. Yioulos misled the agents.

11         So part of the issue is Mr. Yioulos is misleading the

12   agents about some facts.  They, in turn, give it to the

13   magistrate and mislead the magistrate as to some of the facts

14   necessary to establish probable cause.

15         4(d).  *Michael Tew made the suggestion to use the*

16   *phony companies.*  It turns out that we know that Mr. Yioulos

17   used phony companies to embezzle money for himself before

18   2018, before the alleged fraud started.  So that he was the

19   one who had determined, as a CPA, which he is, and the

20   Government knew that, and the Government knew that he was in

21   charge of paying the invoices and that he was the financial

22   officer at that time of the company and had taken Mr. Tew's

23   place as the financial officer of that company, that he had

24   used phony invoice matters.  We have an e-mail from the agents

25   in which they are asking NAC, Please look up these different

1    invoices that predate the fraud, and they come from

2    Mr. Yioulos.  So the agents at some point knew that there was

3    phony invoices that predated Mr. Yioulos's explaining to

4    Mr. Tew, according to the Government, how to do this fraud

5    with the phony invoices for phony companies.  The magistrate

6    should have known that.  That might have made a difference.

7    Maybe any one of these wouldn't make a difference, but when

8    you add them all up and accumulate them, that's where we say

9    they do make a difference.

10              4(e).  At the time of this meeting at Yeti, which is

11   a store, I guess, in Cherry Creek, Miss Tew shows up at the

12   meeting, and she makes the statement, which is misinterpreted

13   by the agents.  The statement they interpret says that she

14   wanted to take responsibility for the NAC fraud.  Well, at

15   that point in time she did not even know what the agents were

16   investigating.  She couldn't take responsibility for the NAC

17   fraud because she didn't know that that's what the agents were

18   talking about.  In fact, she thought that the agents were

19   talking about an issue with American Express cards, that had

20   nothing to do with this particular part of the NAC fraud, or

21   the agents were talking about a meeting that she had had with

22   government agents previously, the prior January, with regard

23   to her transactions in Bitcoin, which relates to another

24   matter which is the Government knew, should have known,

25   because the agents had interviewed her in January of '20, well

```
 1   before these matters came to arrest, that she had been

 2   interviewed about what her knowledge was with dealing with

 3   various individuals on the Bitcoin cryptocurrency market and

 4   that she had been recruited to potentially be an informant for

 5   the government on Bitcoin transactions for people that they

 6   were investigating.  The Government should have known that

 7   because there is a e-mail from the agent who had interviewed

 8   her, and the e-mail back to the agent, saying, Leave this

 9   alone; we're investigating her now for something new.  And the

10   agent sends a e-mail that says, Good, we're going to cease all

11   operations and contact with Miss Tew, and we're going to not

12   use her as a possible informant or government cooperator.

13            Which then goes back to another one of these issues,

14   number 4(l) -- h, i, j, k, l -- 4(l).  Kimberley Tew accessed

15   fraudulent payments from NAC in a variety of bank accounts.

16   What the agents never said was that she had been involved and

17   had this Bitcoin business in which she made a substantial

18   amount of money that went into these bank accounts from a

19   legitimate Bitcoin business that she had and that she was

20   working on over the course of many years that provided money

21   that went into bank accounts and that was in addition to any

22   employment that Michael Tew had that also had money going into

23   these bank accounts.  The affidavit would lead the magistrate

24   to believe that these bank accounts were filled with fraud

25   money, that's all that was in there was fraud money, and,
```

1   therefore, anything that came out of these bank accounts was

2   fraud money.  And that's how they misled the magistrate,

3   because that was not a true fact or a true set of

4   circumstances.

5          Number 4(f), the Government calls that an omission,

6   that *Kimberley Tew communicated with Jonathan Yioulos about*

7   *paying fraudulent invoices. . .*  They got this -- they made

8   a -- they didn't understand this.  What we meant in 4(f) was

9   that the agents said that Yioulos and Kimberley Tew

10  communicated about paying fraudulent invoices.  What the fact

11  is is that at a very early point in time Mr. Yioulos cut

12  Miss Tew off from any contact by phone and insisted that the

13  only person he would talk to was Michael Tew.  And so for

14  significant periods of time there is no communication with

15  Jonathan Yioulos except there was some -- some communication

16  in 2018.  In 2018 they cut her off -- or he cut her off, and

17  so that statement is a misunderstanding and, therefore, a

18  misrepresentation of the relationship between Yioulos and

19  Kimberley Tew.

20         Again, materiality is if you take all of these and

21  you present them to the magistrate, does the magistrate start

22  to say:  I'm not sure I should issue this search warrant.

23  These matters are material to me.  They do change the

24  calculus, and, therefore, I'm not going to issue a search

25  warrant if you tell me these matters.

Julie H. Thomas, RMR, CRR                          (303)335-2111

1         That's speculation.  I understand that's speculation.

2    I can't speak for what's in the magistrate's mind or what the

3    magistrate would or would not have done, but we're left after

4    the fact to go over these matters, and then Your Honor makes

5    the determination of materiality one way or the other.

6         For example, the Government makes it sound like all

7    of Mr. Tew's bank deposits came from fraud.  That's 4(j).

8    That's not a true fact.  As even the Government admits now, he

9    had income, separate income.  Miss Tew had separate income.

10   So to tell the magistrate, well, all this money, bank

11   deposits, came from the fraud is misleading.

12        *Kimberley Tew shared bank accounts with Michael Tew.*

13   This is an attempt by the affidavit writer to say that they

14   are working hand in glove, they're working absolutely together

15   on this fraud, therefore, issue the warrant for her Apple

16   account because they shared these bank accounts, and any money

17   that came to Michael Tew was shared with Kimberley Tew.  Well,

18   the fact is that the primary accounts that were done during

19   2018 and up to some date in 2019 were a bunch of variety of

20   banks.

21        The true fact is that Mr. Tew was working for a

22   company that was in the cannabis industry.  And whenever a

23   bank found out that he was getting money that was related to a

24   company called Cannasys, in the banking industry, as we know,

25   banks got scared and stopped those accounts, so he had to find

1    another account.  Eventually, as the Government says, they had

2    an account at Navy Federal Credit Union.  In that one the only

3    account that they shared was one, one checking account, not a

4    multiple set of accounts.  So the magistrate may have thought,

5    well, these people are working together with all these

6    accounts when that's not true.

7              Where else am I here?  With regards to *Payments via*

8    *ACH were not approved,* the point about that is, Your Honor,

9    that under the NAC bookkeeping system, if they paid by check,

10   they had to have two signatures.  So Mr. Yioulos would not pay

11   by check.  Mr. Yioulos was allowed, under the system, if he

12   paid with an ACH payment, that he could do it solo, by

13   himself.  And that was how he did that.  He was the financial

14   officer of the company.  If he sent an ACH payment, literally

15   that was an approved payment from the company even if it

16   turned out to be to a vendor that didn't exist.

17             Which is then 4(n), that *Invoices submitted to NAC*

18   *were from unapproved vendors.*  There was no way in -- there

19   was no system in National Air Cargo for this vendor is

20   approved, this vendor isn't approved.  And that should have

21   been learned early on because in July, around July 4th or 5th

22   of 2020, the agents went to Buffalo, New York.  There they met

23   with the accountant for the company named Abby Schwartz, they

24   met with the president of the company, and they had an

25   opportunity to learn the bookkeeping system and how the

1   bookkeeping system worked.

2           So basically I think I've gone through all of them,

3   but putting them all together you see exactly where they --

4   where we are now.

5           I'm looking at a search warrant affidavit.  I'm not

6   sure which one it is in the list, but at paragraph 35, and it

7   says, *According to Mr. Yioulos, M. Tew, and at times K. Tew as*

8   *well, continued to ask and demand that he process fraudulent*

9   *invoices even after M. Tew's employment at NAC was terminated.*

10  *Mr. Yioulos described that between June of 2018 and early July*

11  *of 2020 K. Tew contacted him via phone and/or text messages on*

12  *multiple occasions.*

13          Well, back in July 7th when Mr. Yioulos was

14  interviewed, they got his phone.  They asked for his phone; he

15  gave up his phone.  They looked in his phone, and they well

16  could have seen and should have seen that between June 2018

17  and early July '20 Kimberley Tew did not contact him via phone

18  or text messages on multiple occasions.

19          They then say, *Mr. Yioulos described telling Michael*

20  *Tew that he had attempted to block Kimberley Tew on his phone*

21  *but that she still was able to get through by using other*

22  *phone numbers.*  That's not a true statement either.

23          Paragraph 36 of this particular affidavit says,

24  *Mr. Yioulos also stated that while he exchanged various*

25  *cryptocurrencies with M. Tew and/or K. Tew at various points*

1    *during the scheme, he only retained a few Bitcoin for his own*

2    *personal benefit.*  We've gone back and looked, and the

3    agents -- from the agents obtaining his bank records, that he

4    had hundreds of thousands of dollars worth of Bitcoin, not,

5    quote, retained a few for his own personal benefit.

6          All I can say is, you know, the Court will make its

7    own determination.  That's why we submitted this motion.

8    That's why we believe that there is substantial evidence that

9    shows that there were misstatements.  My understanding of the

10   law is that if we meet the hurdle, then we get a hearing.  At

11   that hearing I could call the agents.  At that hearing I could

12   call them as adverse witnesses, and I could go through these

13   with them and demonstrate why they should have known that this

14   was false at an earlier stage and why they put it into their

15   warrant -- or affidavit for the warrant anyway.

16         So just to go back, we're asking for a hearing, and

17   that's what the issue is for the Court.  Do we get a hearing?

18   If we have that hearing, I intend to subpoena the agents and

19   fill in the other material with respect to why it was

20   reckless.  It doesn't have to be intentional.  It can be a

21   reckless matter.  But that's what I would do if the Court

22   granted me a hearing.  Thank you.

23         THE COURT:  Thank you, Mr. Bornstein.

24         So I have reviewed the briefs.  I appreciate

25   everyone's arguments.  I appreciate going through the

1    affidavits.  I don't believe that a hearing is appropriate in

2    this case.  As everyone recognizes, it's a very high bar to

3    even get the hearing.  I understand that the defendants have

4    put forward a number of statements that are false.  As the

5    Government pointed out, though, a number of those are only

6    false in a very technical way that don't really affect the

7    statements as they are included in the affidavits.

8            In addition, a lot of the statements are things that

9    apparently Mr. Yioulos, according to the defendants, lied to

10   the investigators.  And the investigators, I suppose, could

11   have done more to follow that up, as Mr. Bornstein points out,

12   but that is not enough to meet this fairly high standard.  As

13   the *Colkley* case points out, requiring that sort of thing

14   before a search warrant is obtained would sort of put us in an

15   endless loop.  And so the fact that Mr. Yioulos may have been

16   misleading investigators at times I don't think suggests that

17   there was knowing, intentional, or reckless disregard for the

18   truth with most of these statements.  I do think there are a

19   few things in there that seem to have been mistakes or

20   overstatements.  Most of them are quite technical.  Even if I

21   removed all of the statements that the defense pointed to,

22   though, these are lengthy, detailed -- lengthy, detailed

23   affidavits, and to me they don't undermine the probable cause.

24   The discussion of threats or that sort of thing, these are

25   not -- these were not extortion or anything.  The search

1    warrants weren't based on threats.  They were based on

2    potential fraud investigation.  And so, in my view, there

3    remains probable cause, so under, sort of, both prongs of this

4    test I don't think a *Franks* hearing is necessary.

5           So, with that, I think we need to take a bit of a

6    break at this time.  Why don't we try to come back at 11:20 to

7    at least get started on -- and I would like to at least get

8    started on the motions to suppress.  I know I suggested an

9    order.  My usual practice with a motion to suppress, since the

10   burden is, sort of, on the Government, is to let the

11   Government go first, and then let you cross-examine any

12   witnesses, and we'll have a bit of an argument on each one.

13   So that will be my plan.

14          Mr. Fields, I guess my intention was to start with

15   200, but we can start with another one if you prefer.  But for

16   now why don't we take a break until, say, 11:20.

17      (Proceedings recessed 11:04 a.m. to 11:22 a.m.)

18          THE COURT:  All right.  Let's take our seats.

19          As I indicated, I think we should turn now to the

20   motions to suppress.  I've read the motions and the briefing

21   on them, so you don't need to reiterate the arguments, but,

22   Mr. Fields, which do you think we should start with?

23          MR. FIELDS:  Your Honor, my proposal is that we start

24   with the motion to suppress the statements and then the

25   photographs of the apartment, and we start by, sort of, laying

1    down that testimony, and then we can have argument on all the

2    motions.  ECF 200 I think is mostly legal because it's about

3    the reach of *Carpenter*, so we don't need to, sort of, start

4    with that.

5            THE COURT:  All right.  That works for me.  Why don't

6    you go ahead, then, with your evidence.

7            MR. FIELDS:  Thank you, Your Honor.  The United

8    States called Anthony Romero.

9            COURTROOM DEPUTY:  Please raise your right hand.

10       (The witness was sworn.)

11           COURTROOM DEPUTY:  Please be seated.

12           Please state your name, and spell your first and last

13   names for the record.

14           THE WITNESS:  My name is Anthony Romero.

15   A-n-t-h-o-n-y, R-o-m-e-r-o.

16     **ANTHONY ROMERO, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

17   BY MR. FIELDS:

18   Q.  It's still the morning, so good morning.

19   A.  Good morning.

20   Q.  Mr. Romero, or Special Agent Romero, where do you work?

21   A.  I work at the Denver Field Office for the Internal Revenue

22   Service.

23   Q.  Do you work in a particular part of the Internal Revenue

24   Service?

25   A.  Criminal investigation.

1  Q.  What is your title?

2  A.  Special agent.

3  Q.  What are your current responsibilities?

4  A.  I work on an organized crime strike force with the FBI.

5  Q.  Did you have those same responsibilities back in 2020?

6  A.  I did not.

7  Q.  What did you do then?

8  A.  I worked criminal tax cases and money laundering cases.

9  Q.  Have you received training in interviewing witnesses?

10  A.  I have.

11  Q.  What kind of training?

12  A.  The training was at FLETC, Federal Law Enforcement

13  Training Center.  And basically it just dealt with how to talk

14  to people, how to ask questions, and how to hopefully get

15  answers that are truthful.

16  Q.  Do you get training on when to issue what's called a

17  Miranda warning?

18  A.  I am, yes.  I do.

19  Q.  Describe that to us.

20  A.  Typically when someone is being detained, you want to read

21  them the Miranda warning once somebody is being arrested.

22  Q.  In your mind, what does it mean for somebody to be

23  detained?

24  A.  When they are no longer free to move about.  When their

25  freedom has been curtailed, I guess you could say.

1   Q.   During your years in the IRS, approximately how many

2   interviews would you say you have done?

3   A.   Hundreds.

4   Q.   Sometimes when you are doing those interviews, are there

5   safety concerns?

6   A.   There are, absolutely.

7   Q.   How do those come up?

8   A.   When you don't know the situation.  When tensions are

9   high.  When somebody becomes erratic, so to say.  Typically if

10  you are unfamiliar with the surroundings, say a closed door or

11  something like that, that could be agent safety, agent safety

12  issue.

13  Q.   When you have those safety concerns, what do you do to

14  address them while you are conducting an interview?

15  A.   Typically what I try to do is I try to keep the situation

16  calm, and the individual in question I try to keep them with

17  me at all times.

18  Q.   When you say "keep them with you," do you detain them?

19  A.   Oh, no.  I don't have the right to detain them, no.

20  Q.   So how do you keep them with you?

21  A.   I ask them.

22  Q.   Are you familiar with an investigation of Michael Aaron

23  Tew and Kimberley Tew?

24  A.   I am, yes.

25  Q.   How did you become familiar with it?

1    A.  I became familiar with it on July 8, 2020.  I was asked to

2    respond to an address in Cherry Creek, Denver.  At that point

3    I knew nothing about the case, but I did know that there was

4    concern at the time that Mr. and Mrs. Tew were going to flee

5    the country.

6    Q.  Who asked you to do that?

7    A.  Special Agent Lisa Palmer and Supervisor Special Agent

8    Emil Stark.

9    Q.  Lisa Palmer, what was her role in the investigation?

10   A.  She is one of the two case agents.

11   Q.  What is a case agent?

12   A.  Case agent is typically somebody who is in charge of the

13   case.  They delegate things to be done.  They write up

14   affidavits and such.  They are the main person on a case.

15   Q.  So when you were asked to go to this address, were you

16   asked to do anything in particular?

17   A.  Basically, I was asked to go and surveil.  They wanted to

18   know if they were there.  So my objective was to find if they

19   were there, and, if so, I was to basically maintain

20   surveillance on the location.

21   Q.  When you say "maintain surveillance," what does it mean to

22   conduct surveillance in a situation like this?

23   A.  Watch the comings and goings of who is coming into the

24   building, who is leaving the building, specifically if the

25   Tews were coming or going.

1    Q.   What was the identified address for Michael Tew?

2    A.   It was 3222 East First Avenue, Denver, Colorado.

3    Q.   All right.

4         MR. FIELDS:   And if we could, let's see if we can

5    pull up Government's Exhibit 6, page 2.   That's not in

6    evidence.

7    A.   I'm sorry.   What was that again?

8    BY MR. FIELDS:

9    Q.   Government's Exhibit 6, page 2.

10   A.   Okay.   I have that.

11   Q.   Let's see.

12        MR. FIELDS:   Just two digits, 06, and then page 2.

13        May I have just a moment, Your Honor, to do some

14   troubleshooting?

15   BY MR. FIELDS:

16   Q.   Do you recognize this photograph?

17   A.   I do.

18   Q.   What is it?

19   A.   That is the apartment complex where the Tews were living

20   at the time.

21   Q.   Now, if we go to page 2 or, sorry, page 3, just down one,

22   what is that?

23   A.   That's going to be entrance, I believe, to the lobby of

24   the apartment complex they lived in, the Steele Creek

25   Apartments.

```
 1              MR. FIELDS:  Your Honor, at this time I'd move for

 2   the admission of Government's Exhibit 6, pages 2 and 3.

 3              THE COURT:  Any objection, Mr. Bornstein?

 4              MR. BORNSTEIN:  No objection for this hearing.

 5              THE COURT:  All right.  It's admitted.

 6         (Government's Exhibit 6:2-3 admitted.)

 7   BY MR. FIELDS:

 8   Q.  Is there a lobby area to the building, or was there at the

 9   time?

10   A.  There was.

11   Q.  Where were the residences located?

12   A.  The residence was located on the second -- I believe there

13   are seven or eight floors in that building -- second of the

14   seven or eight floors.

15   Q.  Approximately what time did you arrive at the apartment

16   building?

17   A.  1 o'clock.

18   Q.  Who was with you?

19   A.  I was with four other agents:  Agents Stark, Tweet,

20   Garrett, and -- it's difficult to spell --

21   M-o-d-o-l-t-s-t-o-v [sic].

22   Q.  Is that Molotsov?

23   A.  I believe so, yes.

24   Q.  How were you all dressed?

25   A.  Casually.  I believe I had a long shirt on.  Everyone else
```

1    had a long shirt on.

2    Q.   Were you armed?

3    A.   We were.

4    Q.   Where were your firearms?

5    A.   Concealed underneath our shirts.

6    Q.   Why were they concealed?

7    A.   By IRS it's policy not to show your weapons when you are

8    working, period.

9    Q.   What did each of you do when you arrived at the apartment

10   building?

11   A.   It was our objective to determine whether the Tews were

12   there, so we looked at the garage first, and we did locate

13   their vehicle.

14   Q.   Then what did you do?

15   A.   At that point we positioned two agents in the lobby by the

16   elevator, and myself and two additional agents went up to the

17   second floor, and we positioned ourself by unit 224, which was

18   their residence.

19   Q.   What did you do after you positioned yourself?

20   A.   Really nothing.  We just waited.  We had determined, to

21   the best of our knowledge, that they were there, so our

22   objective was not to make contact.  It was, rather, to follow

23   them if they went somewhere and, again, to observe comings and

24   goings.

25   Q.   What happened at approximately 2:50 p.m.?

```
 1    A.   A gentleman walked out, who I believed to be Michael Tew,

 2    of unit 224.

 3    Q.   As you sit in the courtroom today, do you see that same

 4    gentleman?

 5    A.   I do.

 6    Q.   Where is he seated?

 7    A.   He's seated at the defense table there to my left.

 8    Q.   Did you approach that person?

 9    A.   I did.

10    Q.   Describe this first interaction for us.

11    A.   I identified myself as a special agent with the IRS-CI.  I

12    asked him if he was Michael Tew.  He said he was.  I said that

13    there was an FBI agent, Sarah Anderson, that was on her way at

14    the time to talk with him.  And I asked him if there was

15    someplace we could talk privately, we could meet privately.

16    Q.   What did he say in response to that?

17    A.   He was agreeable to that.  He said, yes, there was.  He

18    had to inform his wife of what was going on.  And he

19    recommended that we meet in the common area behind his

20    apartment.

21    Q.   Where is that common area?

22    A.   It's on the second floor.  It's visible from First Avenue.

23    It's a common area that's open-air.  It's directly behind the

24    Tews' apartment, and basically they can enter the common area

25    from the back of their apartment.
```

```
 1    Q.  So after this first encounter in the hallway, where did
 2    Mr. Tew go?
 3    A.  He went back into his residence.
 4    Q.  Where did you go?
 5    A.  I went, per his direction, around the hall to the common
 6    area.  There was an exit on the east side of the hallway.
 7    Q.  Why did you let him go back in his residence?
 8    A.  I had no reason to believe that there was a concern at
 9    that time, that there was danger at that time.  We had just
10    contacted him.  He was being very -- he was being very
11    cooperative.  So I let him go back into his apartment.  Plus
12    we didn't have any authority to detain him at that time.
13    Q.  So did you go out to that common area?
14    A.  I did.
15    Q.  What happened when you got to that common area?
16    A.  We were joined shortly by Mr. Tew and -- Mr. and Mrs. Tew.
17    Q.  Can you describe for us this common area?  What does it
18    look like?
19    A.  What I would say is I believe there was three residences
20    that back up to it.  It's an open-air common area.  There's a
21    fire pit there, and there are chairs and sofas surrounding the
22    fire pit.
23              MR. FIELDS:  Let's look at Government's Exhibit 8, if
24    we can go to page 34.  So if you type in 08-034.
25    BY MR. FIELDS:
```

1    Q.  Do you recognize this photograph?

2    A.  I do.

3    Q.  Or I'll give you a second.  Do you need it on the monitor,

4    or you can pull it up?

5    A.  I can see it on the monitor, yes.

6    Q.  Okay.  Do you see a door right there?

7    A.  Yes, I do.

8    Q.  Where does that door go?

9    A.  That's an exit.  I believe it goes back into the hall area

10   that's on the west side of the structure.

11   Q.  If we go to the next page, what do you see here?

12   A.  What I can see is the common area -- well, I guess the

13   back patio for the Tews.  And you can see the fire pit also

14   with the sofas I have mentioned previously and the chairs

15   mentioned previously.  That's the common area I was referring

16   to.

17   Q.  Can you -- on your screen there if you just sort of use

18   your finger, you can circle the fire pit area.  Can you circle

19   that for us?

20   A.  Sure.  It's right there.

21            MR. FIELDS:  At this time I'd move for the admission

22   of Government's Exhibit 8, page 34 and 35.

23            MR. BORNSTEIN:  I'm sorry.  Exhibit what?

24            MR. FIELDS:  It's 8.

25            THE COURT:  Just those two pages; is that right?

1          MR. FIELDS:  Just those two pages for now, Your

2    Honor.

3          MR. BORNSTEIN:  Which two pages, please?

4          MR. FIELDS:  34 and 35.

5          THE COURT:  Any objection?

6          MR. BORNSTEIN:  No objection.

7          THE COURT:  All right.  I'll admit those.

8       (Government's Exhibit 8:34-35 admitted.)

9    BY MR. FIELDS:

10   Q.  So we will stay here on page 35.  Can you describe for us

11   where you were and where the Tews were during your encounter?

12   A.  Yes.  From what I recall, the Tews were sitting on the

13   sofa that's not facing us.  It's facing towards the open area.

14   I have circled that.

15          I was seated right here in this chair marked by an X.

16          There was an agent on the far sofa also marked by an

17   X.

18          And then there was also a chair to the right where

19   the third agent was.

20   Q.  And you have mentioned the Tews' residence.  In this

21   photograph where is the Tews' residence?

22   A.  If you look to the right, there's a door opening right

23   there.  That goes into the residence right there.

24   Q.  And this patio area where we see two chairs, is that their

25   patio area?

1    A.   It is.

2    Q.   And so this common area, do you also see a door right

3    there?

4    A.   I do.

5    Q.   And then doors right there?

6    A.   Yes.

7    Q.   Does one of those doors lead into the common hallway?

8    A.   It does, yes.

9    Q.   These doors, were any of them locked?

10   A.   Not to my knowledge.

11   Q.   And during your encounter with the Tews, were they able to

12   get up and move around?

13   A.   They were.

14   Q.   Did they?

15   A.   They did, yes.

16   Q.   Where did they move around to?

17   A.   They moved around in the patio area.  They moved around

18   where you can see the sofa, the fire pit.  Their children were

19   also there as well.

20   Q.   Now, when you were asked to go out to this apartment

21   building, were you asked to look for both Mr. Tew and

22   Mrs. Tew?

23   A.   It was Mr. Tew.

24   Q.   So when he showed up here with Mrs. Tew, was that a

25   surprise to you?

1   A.  Uh, I didn't know that she was home at the time.  I didn't

2   know she was home until he had told me.  I guess it was a

3   surprise, yes.

4   Q.  So if you were there for just Mr. Tew, why did you allow

5   Miss Tew to join this conversation?

6   A.  Because I wasn't there necessarily to interview them, to

7   have them answer questions.  I was basically there to -- to

8   observe until Special Agent Anderson arrived.

9   Q.  So at this point when you had made an encounter with

10  Mr. Tew and he was there and Special Agent Anderson hadn't

11  arrived yet, what was your plan?

12  A.  My plan was just to engage him in small talk, just

13  conversation.  Again, I knew nothing about the case.  I just

14  wanted to make them at ease, and so we just talked about

15  pretty much whatever they wanted to talk about.  Just

16  background questions, you know.  I believe I asked them about

17  their kids or something like that.

18  Q.  Did you have a plan if they had declined to speak with

19  you?

20  A.  Well, if they had declined to speak with me, there was

21  nothing I could have done.  They weren't being detained, so

22  they were free not to engage with me.

23  Q.  What would you have done at that point?

24  A.  Nothing.

25  Q.  How would you describe the demeanor of the Tews when they

```
 1    first came out?

 2    A.   They were very calm.  Mr. Tew was very calm.  I would say

 3    Mrs. Tew was maybe, uh, concerned, and that went up and down

 4    as we -- as we spoke.

 5    Q.   Now, you said at some point the Tews got up and they were

 6    able to move around?

 7    A.   Yes.

 8    Q.   At one point in time did Mr. Tew get up to walk back

 9    inside his apartment?

10    A.   He did.

11    Q.   What did you do at that point?

12    A.   I asked if he could please stay in the area where I could

13    see him.

14    Q.   Why did you ask him that?

15    A.   It goes back to the agent safety.  I believe during that

16    point in the conversation tensions were high.  I believe

17    Mrs. Tew was acting erratic at that time.  And I was

18    concerned, based on what I was seeing, that not only was there

19    a danger to myself and my fellow agents but also to Mr. Tew

20    and the children.  So I didn't know what was inside the house,

21    and that's why I asked him to stay visible to me.

22    Q.   What did he do?

23    A.   He complied.

24    Q.   After that, what happened?

25    A.   The tensions I would say subsided.  I only talked to them
```

```
1    about 20 minutes before Special Agent Anderson arrived.
2    Q.   During this 20 minutes, did they ever decline to answer
3    any of your questions?
4    A.   They declined to answer the questions, but they did have
5    questions of their own.
6    Q.   And what happened when they declined to answer questions?
7    A.   I didn't -- I didn't press the issue.
8    Q.   Why not?
9    A.   Because, again, I had no set interview questions for them.
10   I knew nothing about the case, and the issues that I was
11   attempting to speak with them about was simply background
12   information, how long they had lived in Colorado, information
13   about their kids, things like that.
14   Q.   I think you said you were there for about 20 minutes
15   before Special Agent Anderson arrived.
16   A.   Correct.
17   Q.   Approximately what time do you think she arrived?
18   A.   Approximately 3:12 p.m.
19   Q.   You say approximate and 3:12.  That's pretty specific.
20   Why are you so specific on the time?
21   A.   It's in the memorandum.
22   Q.   Did you review that memorandum --
23   A.   I did.
24   Q.   -- before your testimony?
25            How was Special Agent Anderson dressed?
```

1    A.  Very casually.  I would say she's dressed like she is

2    today.  Business coat, business slacks.

3    Q.  Was she armed?

4    A.  I couldn't tell you, but I'd assume she was, yes.

5    Q.  How would you describe her demeanor?

6    A.  Very calm, very professional, very relaxed.

7    Q.  What did she do when she arrived?

8    A.  She basically -- she identified herself.  She said she was

9    there to ask questions of them related to employment with NAC.

10   Specifically, there were questions concerning, I believe, gift

11   card transactions and also credit card transactions.

12   Q.  How did Kimberley respond when Special Agent Anderson

13   started asking questions?

14   A.  She was erratic.  She really didn't want to answer

15   questions at that time.

16   Q.  Did Special Agent Anderson ask to record the conversation?

17   A.  She did.

18   Q.  What happened when she made that request?

19   A.  Mrs. Tew said she did not want the conversation to be

20   recorded.

21   Q.  How did Special Agent Anderson respond when Kimberley said

22   she didn't want it recorded?

23   A.  That was well within Mrs. Tew's rights.  There wasn't any

24   kind of confrontation.  She was fine with that.

25   Q.  At some point during this conversation after Special Agent

1   Anderson arrived, did Kimberley Tew accuse the IRS agents of

2   having done something?

3   A.  Yes.

4   Q.  What was the accusation?

5   A.  She accused me of grabbing her husband Michael when I

6   first encountered him in the hallway outside of his apartment.

7   Q.  Did you grab him?

8   A.  I did not.

9   Q.  What happened after she made the accusation?

10  A.  I turned to Mike, and I asked him if that was true, if I

11  did grab him.  And he said, no, it wasn't true.

12  Q.  Did you ever put your hands on him?

13  A.  I didn't, no.

14  Q.  Did you ever, sort of, get up into his personal space or

15  something like that?

16  A.  No.

17  Q.  So at that point who took the lead in asking questions?

18  A.  Special Agent Anderson did.

19  Q.  And how did the Tews respond to Special Agent Anderson's

20  questions?

21  A.  I do know that they answered some of the questions Special

22  Agent Anderson was asking.  They also volunteered information.

23  They were making a mention of, I believe, an individual back

24  in New York was the cause of them moving out to Colorado.  I

25  believe Mrs. Tew said that they had been set up, something

1    like that.

2    Q.   At some point did Kimberley ask Michael not to provide any

3    more information?

4    A.   Yes.

5    Q.   And what happened at that point?

6    A.   At that point Special Agent Anderson served the Tews with

7    a grand jury subpoena.

8    Q.   Did Special Agent Anderson ask if they wanted to meet at

9    another time?

10   A.   Yes.

11   Q.   So what happened when she made that request?

12   A.   They did want to meet at another time.  I think there was

13   issues with the children and some kind of appointment, but

14   they did agree to meet a few days later.

15   Q.   How did they set up that meeting?

16   A.   The meeting was set up initially as Special Agent Anderson

17   asked for a phone number, but Mrs. Tew declined to provide

18   that.  She didn't want to.  So they agreed upon Mrs. Tew

19   providing an e-mail address.

20   Q.   Did Mrs. Tew say that she would send an e-mail to Special

21   Agent Anderson?

22   A.   Yes.

23   Q.   Did she send an e-mail?

24   A.   As far as I know, she did, yes.

25   Q.   Did you note the time of that in your report?

Julie H. Thomas, RMR, CRR                              (303)335-2111

```
 1   A.  I believe the time was 3:42.

 2   Q.  So between the time Special Agent Anderson got there and

 3   the time this e-mail was sent, approximately how much time had

 4   elapsed?

 5   A.  Approximately half an hour.

 6   Q.  And what did Kimberley do after saying she sent the

 7   e-mail?

 8   A.  She went back into the apartment with the kids.

 9   Q.  Anyone stop her?

10   A.  No.

11   Q.  You have mentioned these children.

12   A.  Yes.

13   Q.  Where were they during this interview?

14   A.  I believe they were in the common area -- or not the

15   common area, the patio for the Tews at the time.  I believe

16   Mrs. Tew had closed the gate so she could observe them, but

17   they were kind of in a confined area.

18   Q.  When Kimberley went back into the apartment, did anyone

19   stop her?

20   A.  No.

21   Q.  Why not?

22   A.  It wasn't within our right to stop her.

23   Q.  So at that point was Michael Tew by himself?

24   A.  He was.

25   Q.  What did he do?
```

1   A.  He made some small talk.  He asked if there was a problem.

2   He, I believe, also asked if I could be present at the next

3   interview when that did occur, but --

4   Q.  Did he explain why he wanted you present at the next

5   interview?

6   A.  He didn't, but I think it was because there was a good

7   rapport between him and I.  He felt comfortable with me.

8   Q.  So at some point did Michael go back inside the apartment?

9   A.  He did.

10  Q.  What happened at that point?

11  A.  At that point there was a brief period of time where the

12  back door was open.  We could observe them.  We were still in

13  the area.  After a couple minutes, though, they closed the

14  door to their apartment and closed the blinds as well.

15  Q.  Anyone stop him from going inside the apartment?

16  A.  No.

17  Q.  Why not?

18  A.  It wasn't within our right.

19  Q.  And after they closed the door and closed the blinds, what

20  happened at that point?

21  A.  After that happened, it was approximately -- I believe it

22  was approximately 3:49, and we were still awaiting further

23  notice, I believe, Special Agent Anderson was, so we remained

24  in the area, in that common area.

25  Q.  Did Special Agent Anderson come back and give you

1   instructions?

2   A.  She did.  She said that a warrant had been issued for

3   Michael's arrest.  That was at approximately 4:11 p.m.

4   Q.  So how long were you waiting outside without the Tews

5   present?

6   A.  Approximately 20 minutes.

7   Q.  After that 20 minutes, what did you do?

8   A.  Once the warrant for his arrest came about, contacted

9   them.  I knocked on the back door, myself and the other

10  agents.  Michael answered the door.  He came to the back.  I

11  asked him to come outside.  I told him he was under arrest,

12  had him turn around.  I cuffed him.  I searched him quickly,

13  and then I read him his rights, to which he -- I asked him did

14  he understand them, and he said, yes, he did.

15  Q.  Is that the first time you had read him his rights?

16  A.  It is, yes.

17  Q.  Why did you only read him his rights at that point?

18  A.  Because he wasn't detained before that.

19  Q.  Even before you had read him his rights, did he decline to

20  answer some of your questions?

21  A.  He did.

22          MR. FIELDS:  Your Honor, may I have just a moment?

23          THE COURT:  Yes.

24  BY MR. FIELDS:

25  Q.  Just one final question, Mr. Romero.  During the course

 1   of -- you know, you were there talking to the Tews for a

 2   little bit.  Special Agent Anderson arrived.  And then they

 3   went back.  How would you describe the sort of tone and tenor

 4   of the conversation throughout the encounter?

 5   A.  You know, I'd say with Mr. Tew it was very calm and

 6   collected.  There was good rapport, and there was calm

 7   conversation.  I would say there were times, though, when

 8   during this interaction Mrs. Tew became very erratic, and

 9   that's when tensions seemed to rise.

10   Q.  When you say "erratic," what do you mean by that?

11   A.  Just making loud statements, again, about accusing someone

12   in New York about setting them up.  Again, the accusation to

13   me as far as touching her husband, laying hands on her

14   husband.  And it seemed to go up and down emotionally like

15   that.

16           MR. FIELDS:  Your Honor, no further questions at this

17   time.

18           THE COURT:  Thank you, Mr. Fields.

19           Mr. Bornstein, cross-examination?

20                       **CROSS-EXAMINATION**

21   BY MR. BORNSTEIN:

22   Q.  Mr. Romero, hi.

23   A.  Hello, sir.

24   Q.  I'm Peter Bornstein.  I represent Mr. and Mrs. Tew.

25   A.  Nice to meet you.

1    Q.   We've never met before?

2    A.   I don't believe so, no.

3    Q.   Okay.  So, as I understand it, on July 8th of 2020 Emil

4    Stark was your supervisor?

5    A.   That's correct, yes.  No, he wasn't my supervisor.  He was

6    a supervisor in the office.

7    Q.   Okay.  He wasn't your supervisor, but he was a supervisor?

8    A.   Correct.  Correct.

9    Q.   Because this report that I believe you looked at is

10   written by him.

11   A.   It is.

12   Q.   And Lisa Palmer is a lawyer with the IRS?

13   A.   No.

14   Q.   She's a special agent?

15   A.   Correct.

16   Q.   And you work with her?

17   A.   I do.

18   Q.   Which one of them contacted you about going to the

19   apartment?

20   A.   I believe it was Supervisor Special Agent Stark.

21   Q.   Stark, okay.

22   A.   Yes.

23   Q.   And they said that they had information that the Tews were

24   going to flee; right?

25   A.   Correct.

1   Q.  Flee what?

2   A.  Flee the country.

3   Q.  Why?

4   A.  I have no idea.

5   Q.  Well, as an agent, you said, Well, they're going to flee.

6   What did they do?  Right?  You asked Stark, What did they do?

7   Why would they flee?

8   A.  No.

9   Q.  Mr. Romero, are you saying that you received a request

10  that some people might be fleeing the country, and that the

11  IRS wanted to stop them from fleeing, and they wanted four

12  agents with guns to go to the apartment?  Right?

13  A.  I was asked to respond to that address, yes.

14  Q.  No, you were asked -- four agents were asked to go.  Did

15  you go in four cars?

16  A.  I believe so, yes.

17  Q.  And who was in charge?

18  A.  Supervisor Special Agent Stark.

19  Q.  Okay.  And you positioned yourself in the garage, in the

20  lobby, and on the second floor; right?

21  A.  No.

22  Q.  I thought you said two agents went to the garage to

23  determine if the car was there.

24  A.  We positioned ourselves in the lobby of the first floor by

25  the elevator, and the rest were in the hallway on the second

1    level.  There was no agents in the garage.

2    Q.  You didn't determine if the car was there?

3    A.  When we got there, we did, yes, but there was no one

4    positioned there.

5    Q.  I'm sorry?

6    A.  I said initially when we first went there we went to the

7    garage to determine the cars were there.

8    Q.  Yes.

9    A.  Then after that point there were no agents in the garage.

10   Q.  Okay.  How did you know what cars to look for?

11   A.  We were instructed by the case agent what cars to look

12   for.

13   Q.  Uh-huh.  And you were given pictures of Mr. Tew?

14   A.  I was given a description of Mr. Tew.

15   Q.  By who?

16   A.  I believe it was Supervisor Special Agent Stark.

17   Q.  All right.  And do you know, was it a mugshot?

18   A.  I don't believe it was a mugshot.  No, I don't believe so.

19   Q.  Was it a photograph?

20   A.  I believe it was a DMV photograph.

21   Q.  So apparently Agent Stark had a DMV photograph to show

22   you.  Right?

23   A.  I believe he did, yes.

24   Q.  And he showed all the agents in case any of the agents

25   would see Mr. Tew?

1   A.  I don't know what he did with the other agents.

2   Q.  So if Mr. Tew was going to flee the country, you were

3   going to let him flee the country?

4   A.  Well, at that point, again, it was within his rights to go

5   wherever he wanted to go.  My objective at that time was to,

6   A, determine if he was there and to, B, follow him if he went

7   anywhere.

8   Q.  Is that really correct, Agent Romero, that you would have

9   let him flee the country?

10  A.  Would I have let him flee the country?

11  Q.  Would you let him flee Denver?

12  A.  Well, what I would have done is I would have followed him.

13  Q.  You would have followed him to the airport?

14  A.  Wherever, wherever he went.

15  Q.  Would you have gotten on the airplane with him?

16  A.  I can't answer that.  I don't know.

17  Q.  And your other agents, they were also instructed to say

18  that he should not be allowed to flee the country; right?

19  A.  No.  That was never -- that was never said.

20  Q.  Didn't you have knowledge that there was, quote, PC,

21  standing for probable cause, to stop him from fleeing?

22  A.  No.

23          DEFENDANT K. TEW:  Hmm.

24  BY MR. BORNSTEIN:

25  Q.  While you were going to the apartment, what were you told

1    Agent Anderson was doing?

2    A.  I was told she was on her way.

3    Q.  Now, the report says that Anderson explained Title 18

4    United States Code 1001.  Do you know what that is?

5    A.  False statements given to federal officers.

6    Q.  All right.  Let's -- let me ask you this.  This was

7    July 8th; right?

8    A.  Yes, sir.

9    Q.  Two days earlier, on July 6th, did you send a e-mail to

10   Daniel at Bustabit with a copy to Lisa Palmer?

11   A.  I don't recall that.

12         DEFENDANT K. TEW:  Hmm.

13         MR. BORNSTEIN:  What exhibit is that?

14         MR. FIELDS:  I haven't marked it.

15         DEFENDANT K. TEW:  It was submitted in discovery.

16         MR. BORNSTEIN:  Oh.

17   BY MR. BORNSTEIN:

18   Q.  You don't remember sending an e-mail?

19   A.  I don't, no.

20         DEFENDANT K. TEW:  Hmm.

21   BY MR. BORNSTEIN:

22   Q.  Do you remember saying -- who is Daniel@bustabit?

23   A.  I have no idea.

24   Q.  Do you remember saying, Please find the attached letter of

25   request and two attachments for Bustabit account holder

1    information?

2    A.  I don't recall that, sir.

3              MR. BORNSTEIN:  Can I have this marked and your staff

4    give it to the witness?

5              THE COURT:  Yes.  You can give it to Mr. Keech,

6    please.

7              COURTROOM DEPUTY:  What do you want it marked as?

8              MR. BORNSTEIN:  Defense Exhibit 10 --

9              COURTROOM DEPUTY:  A?

10             MR. BORNSTEIN:  I think the Judge wants only numbers.

11             THE COURT:  For this we can do it however.  A is

12   fine.  I'm not sure which number we would be on.

13             COURTROOM DEPUTY:  Do you want to use the Elmo so

14   everyone can see it or --

15             MR. BORNSTEIN:  Uh, yes.  Yes, let me do that so

16   that -- I don't have a lot of copies.

17             Can the witness see it without anybody else seeing

18   it?

19             COURTROOM DEPUTY:  No, it's all or --

20             MR. BORNSTEIN:  All or nothing?

21             THE COURT:  That's all right.  I'm not a jury.  I can

22   clear my mind of it if I decide not to admit it.  Go ahead.

23   BY MR. BORNSTEIN:

24   Q.  Can you see what's now been marked as Exhibit A?

25   A.  Yes, I can.

1   Q.  And do you see that the date is July 6th of 2020?

2   A.  I do.

3   Q.  And do you see that it's an e-mail from you?

4   A.  Yes, I do.

5   Q.  Do you remember it now?

6   A.  I do not.

7         DEFENDANT K. TEW:  Hmm.

8   A.  I mean, obviously that's my e-mail address.  I'm not

9   disputing that I sent that, but I have no idea what this

10  pertains to.

11  BY MR. BORNSTEIN:

12  Q.  And Lisa Palmer gets a carbon copy or a copy of it?

13  A.  Yes.

14  Q.  In fact, isn't it a fact that this involved Kimberley Tew?

15  Right?

16  A.  Again, I do not recall this.

17  Q.  Well, do you know who Bustabit is?

18  A.  I do not, no.  I deal in many, many hundreds of e-mails,

19  and I deal with many, many cyber-related activities.  This is

20  just one of many hundreds.  I have no idea.

21  Q.  Do you know why this is in the discovery provided to the

22  defense by the Government?

23  A.  I do not.

24  Q.  Did you provide this to the Government?

25  A.  No.  Did I provide this to the Government?

1    Q.  Yes.

2    A.  Well, it's part of a record as a federal employee.

3    Q.  Did you provide this to the United States Attorney

4    handling this case?

5    A.  No, I did not.

6    Q.  Are you aware that in July of 2020 that the IRS had made

7    contact with Kimberley Tew?

8    A.  Am I aware now that that happened?

9    Q.  Well, are you aware now?

10   A.  I am aware now, yes.

11   Q.  Were you aware then?

12   A.  No.

13   Q.  What are you aware now?

14   A.  I'm aware now of everything that, you know, that I'm

15   learning as part of this process, but, again, I wasn't the

16   case agent for this case.

17   Q.  Well, were you the case agent for Operation Honest

18   Cocaine?

19   A.  I was one of the agents involved in that case, yes.

20   Q.  And are you aware that the agents in Honest Cocaine had

21   interviewed Kimberley Tew in January of 2020?

22   A.  I do know that agents from the Phoenix field office

23   interviewed her.

24   Q.  What were their names?

25   A.  I don't recall I think one was Special Agent Fleischman,

1    possibly.

2    Q.   But you were part of Honest Cocaine?

3    A.   Uh, we -- at the time I was assigned to an HSI task force.

4    Honest Cocaine was one of many hundreds of leads that we had.

5    Q.   What kind of a task force?

6    A.   It was an HSI Dark Net task force.

7    Q.   I'm sorry.  Maybe the court reporter got that, but I can't

8    understand.

9    A.   Homeland Security Investigations Dark Net task force.

10   Q.   Okay.

11   A.   Yeah.

12   Q.   And what is a Dark Net task force?

13   A.   You know, I could talk about it all day, but what I will

14   say is it was a task force that was designed to go after Dark

15   Net market vendors and marketplaces selling illegal drugs.

16   Q.   And was Daniel@bustabit somebody who was on the Dark Net?

17   A.   I don't recall.

18   Q.   Based on being part of this, do you know what Bustabit is?

19   A.   I don't recall.

20   Q.   Do you know that it's an online gambling site?

21   A.   You know what, now that you mention it, yes, it may be

22   something like that, but I don't recall specifically what this

23   was.

24   Q.   And online gambling sites is something that Homeland

25   Security was interested in back in 2020?

1    A.  I can't speak to that.  I don't know.

2    Q.  Well, okay, what was Honest Cocaine then?

3    A.  Honest Cocaine was a cocaine vendor.  He sold cocaine on

4    the Dark Net.

5    Q.  So Honest Cocaine is a person, not a code name for an

6    investigation.

7    A.  Honest Cocaine is a person.  It's a moniker.

8    Q.  Oh, a monitor?

9    A.  Yes, a moniker.

10   Q.  A moniker?

11   A.  It's like a slang.  It's, uh, a nickname.

12          MR. BORNSTEIN:  Offer the exhibit, Your Honor,

13   Exhibit A.

14          THE COURT:  Mr. Fields, any objection?

15          MR. FIELDS:  No objection, Your Honor.

16          THE COURT:  All right.  I'll admit it.  Go ahead.

17      (Defendant's Exhibit A admitted.)

18   BY MR. BORNSTEIN:

19   Q.  All right.  So there was no statement to the officers or

20   the agents that there was information sufficient to get a PC

21   arrest, in other words, a warrantless arrest of Mr. Tew;

22   right?

23   A.  I didn't know the specifics of why we were there that day.

24   I simply responded to conduct surveillance.

25          MR. BORNSTEIN:  Can I have another exhibit marked,

1    Your Honor?

2              THE COURT:  Yes.

3              MR. BORNSTEIN:  Can I put it on the Elmo?

4              THE COURT:  Sure, yeah.

5              MR. BORNSTEIN:  Or do you want Mr. Keech to do that?

6              THE COURT:  No, if you can do it, go ahead.

7    BY MR. BORNSTEIN:

8    Q.  Can you see Exhibit B, Mr. Romero?

9    A.  I can't see the exhibit tag, sir, but I can see the arrest

10   report in front of me.

11   Q.  Okay.  You see -- let me see if I can --

12   A.  Yes, I see it now.

13   Q.  Do you see that Exhibit B is dated July 9th of 2020?

14   A.  I do.

15   Q.  And do you see that Emil Stark signed it?

16   A.  I do.

17   Q.  And do you see -- is this a form that the IRS uses?

18   A.  Can you pull it down a little bit?

19   Q.  This way?

20   A.  The other way.

21   Q.  Form 1327-A?

22   A.  Yes.

23   Q.  This way?

24   A.  That's good, yes.

25   Q.  That's an IRS form?

1    A.  Yes.

2    Q.  You use that for arrests.

3    A.  Yes.

4    Q.  All right.  Do you see that Mr. Stark, who wrote the same

5    report that you used to refresh your memory, wrote this

6    report?  Right?

7    A.  It's a form, yes.

8    Q.  And it says on July 8th, 2020 --

9              MR. BORNSTEIN:  Well, let me offer the exhibit,

10   Exhibit B, please, before I read it.

11             THE COURT:  Any objection, Mr. Fields?

12             MR. FIELDS:  Yes, Your Honor.  This is another

13   agent's report.  I'm not sure it's particularly relevant here,

14   so I would object on those grounds.

15             THE COURT:  I will admit it, and you can -- we can

16   discuss its relevance.  Go ahead.

17      (Defendant's Exhibit B admitted.)

18   BY MR. BORNSTEIN:

19   Q.  Do you see on box section 17 it says that the special

20   agent who was the arresting officer is yourself?

21   A.  Yes, I do.

22   Q.  Do you see that the box 15 says that the arrest is on

23   July 8th of 2020?

24   A.  Yes, I see that.

25   Q.  All right.  So this is the Internal Revenue Service form

1   for your arrest of Mr. Tew; right?

2   A.  Yes.

3   Q.  It wasn't Agent Anderson's arrest or Agent Palmer's

4   arrest?

5   A.  It was my arrest, yes.

6   Q.  It was your arrest?

7   A.  Yes.

8   Q.  Why were you the arresting person if it was Agent Anderson

9   who was coming to speak to Mr. Tew?

10  A.  I was the person delegated to make the arrest.

11  Q.  By who?

12  A.  By Special Agent Anderson, Special Agent Palmer, Special

13  Agent Stark.

14  Q.  All three of them?

15  A.  From what I recall, yes.

16  Q.  It says in box 23 that the special agent filing the

17  affidavit is Agent Palmer; right?

18  A.  That is correct.

19  Q.  Do you know why she is filing the affidavit rather than

20  Agent Stark or yourself?

21  A.  Again, she was the case agent.  I can't speak to more than

22  that.

23  Q.  It says, *July 8th of 2020, AUSA Doshi informed FBI special*

24  *agent to conduct a PC arrest of Michael Tew at his residence.*

25          What's a PC arrest?

1   A.   Probable cause.

2   Q.   So that's a nonwarrant arrest?

3   A.   Yes --

4   Q.   Warrantless arrest?

5   A.   There was sufficient evidence to make an arrest.

6   Q.   Is that a warrantless arrest when you say "PC arrest"?

7   A.   I believe, yes.

8   Q.   Because otherwise, if it wasn't a warrantless arrest, you

9   would have said conduct an arrest pursuant to a warrant issued

10  by a magistrate; right?

11  A.   Correct.

12  Q.   He was placed in custody, and then you said, *Later the*

13  *same day IRS-CI special agent swore out a criminal complaint*

14  *of Tew for Title 18 United States Code 1956(h).*

15        That's money laundering; right?

16  A.   Yes.

17  Q.   *A memo of activity and a memo of interview were completed*

18  *and are referenced to this report.*  Is that right?

19  A.   Yes.

20  Q.   You wrote a memo of interview, didn't you?

21  A.   I don't recall.

22  Q.   So when Exhibit B says that you wrote a memo of interview,

23  what does that mean?

24  A.   Well, I think what you are -- I think what you are

25  referring to is the memo that Special Agent Stark wrote that I

1    witnessed.

2    Q.  On July 8th there was an arrest warrant issued, wasn't

3    there?

4    A.  Yes.

5    Q.  And who sought the arrest warrant that day?

6    A.  I believe it was AUSA Hetal Doshi and FBI Special Agent

7    Sarah Anderson.

8    Q.  So while the IRS was keeping an eye on Mr. Tew at the

9    apartment, the AUSA and a FBI special agent were seeking an

10   arrest warrant; right?

11   A.  I can't speak to what they were doing at that time.  I can

12   only speak to what I was doing.

13   Q.  Well, you knew -- you were told that while you were doing

14   what you were doing the FBI Agent Anderson, working with an

15   AUSA, was seeking an arrest warrant for Michael Tew, weren't

16   you?

17   A.  Well, I know that, again, there was concern with him

18   fleeing the country.  I know that I was tasked to keep an eye

19   on him, if you would.  I believe that there was conversation

20   between the FBI special agent and the AUSA as to what to do

21   were that to occur, but I was not privy to those

22   conversations.

23   Q.  Well, was Emil Stark privy to those conversations?

24   A.  Again, I don't know.  I'm not Emil Stark.

25   Q.  Well, you talked to him.  Fellow agents speak to each

 1   other, don't they?

 2   A.   Well, in that instance on that day, sir, we were focused

 3   on the task at hand, which is making sure that we knew where

 4   Mr. Tew was -- Mr. and Mrs. Tew were.

 5   Q.   And making sure he wouldn't flee the country; right?

 6   A.   Well, again, I didn't have the authority to prevent him

 7   from going anywhere.

 8   Q.   You said there's -- you had warrantless arrest authority

 9   for a PC arrest; right?

10   A.   That was after the fact, sir.  I'm talking about when I

11   dealt with Mr. Tew prior to the arrest.

12   Q.   Okay.  When you did arrest him, you were told that

13   Anderson and -- AUSA Doshi and Agent Anderson had obtained an

14   arrest warrant; right?

15   A.   I was told an arrest warrant had been obtained.

16   Q.   Who told you?

17   A.   I believe it was Supervisor Special Agent Stark.

18   Q.   You guys are in constant communication during this, aren't

19   you?

20   A.   Say that again?

21   Q.   You agents are in constant communication with each other

22   during this, aren't they?

23   A.   I don't know, sir.  Again, I can only speak to what I was

24   doing.

25   Q.   You weren't in contact using communication devices?

1   A.  Myself?  No.

2   Q.  Agent Stark?

3   A.  I can't speak to what he was doing at the time.

4   Q.  Who was with you on the second floor?

5   A.  Agent Stark, Agent Garrett, Agent Anderson.

6   Q.  They had communication devices, cell phones, didn't they?

7   A.  I was watching a door.  I wasn't watching them.

8   Q.  So you were the one who said that Agent Anderson was on

9   her way and that she would like to speak to Michael Tew; is

10  that right?

11  A.  Yes, sir.

12  Q.  And then you said, Is there a place we could speak

13  privately; right?

14  A.  Yes.

15  Q.  All right.  Now, actually you arrived not at 1 o'clock,

16  but about 11:55; right?

17  A.  I believe that's when Special Agent Stark arrived.

18  Q.  Okay.  How about if that was when Special Agent Stark was

19  asked to --

20  A.  Actually, you know what, correct, you're right, he was

21  asked to, and he arrived about 1 o'clock, I believe.  All of

22  us arrived at the same time.

23  Q.  So then you took Michael Tew to this back area of the

24  apartment; right?

25  A.  No.  I actually met him there.

1  Q.  I thought you met him in the hallway coming out of the

2  front door.

3  A.  Both.  I met him in the hallway coming out the front door.

4  Then he went back inside his apartment to tell his wife what

5  was going on, and we went and met in the back.

6  Q.  It says here that you asked if there was a place to speak

7  privately.

8  A.  Yes.

9  Q.  Why did you want to speak privately to Michael Tew?

10  A.  Well, I wanted a place where we could meet privately.

11  And, again, it was for her -- it was for his -- I didn't want

12  him to be embarrassed.  It was for his, I guess, privacy, if

13  you would.

14  Q.  What would embarrass him?

15  A.  Four individuals meeting with somebody, you know,

16  overhearing something like that.

17  Q.  Four individuals who were getting ready to arrest him;

18  right?

19  A.  At that point I had no knowledge of that, sir.

20  Q.  Well, you knew that FBI Agent Anderson was coming to speak

21  to him; right?

22  A.  Yes, I did.

23  Q.  And you knew that FBI Agent Anderson, working with an

24  Assistant United States Attorney, was also seeking an arrest

25  warrant too?

Julie H. Thomas, RMR, CRR                              (303)335-2111

1    A.   I had no knowledge of that.

2    Q.   How did you know Anderson was coming?

3    A.   I was told by Special Agent Stark.

4    Q.   Now, let's talk about this common area a minute.

5    A.   Okay.

6            MR. BORNSTEIN:   Could we have the photograph back up,

7    please.   It's Exhibit --

8            MR. FIELDS:   8.

9            MR. BORNSTEIN:   -- 8, and pages 3 and 4, I believe.

10           MR. FIELDS:   34 and 35.

11           MR. BORNSTEIN:   34 and 35.

12   BY MR. BORNSTEIN:

13   Q.   Okay.   Let's start with this page.

14   A.   Okay.

15   Q.   So you see the page that's displayed?

16   A.   Yes, I do.

17   Q.   Do you see the children's toys?

18   A.   I do.

19   Q.   All right.   So, now, that's the door on the left into the

20   house; right?

21   A.   Yes.

22   Q.   And on the right there's a door for this patio area?

23   A.   It's a gate, yes, sir.

24   Q.   Where were the children?

25   A.   From what I recall, I believe the children were in this

1    area right here, the patio area.

2    Q.  And you talked to them, didn't you?

3    A.  I don't recall.

4    Q.  You made nice to the children?

5    A.  You know what, I like kids.  Maybe I did.  Possibly.

6    Q.  Okay.  You made nice to the children.  Did you tell one of

7    the girls -- they're two young girls; right?

8    A.  I believe so, yes.

9    Q.  All right.  And did you tell one of the girls that you

10   were not there to arrest their daddy?

11   A.  I don't recall that.

12   Q.  Don't recall that.

13   A.  No.

14   Q.  All right.  So then there's this door up here.  What's

15   that door to?

16   A.  That's the exit right there, or one of the two exits.

17   Q.  Exit to what?

18   A.  Back to the hall area.

19   Q.  All right.  And that door was closed when you were in the

20   hall area; right?

21   A.  I don't recall that.  I never went out that door or

22   exited -- I never used that door right there.

23   Q.  Okay.  Then how did you get to this patio?

24   A.  There's a door behind this photo.  So we are looking west

25   right now.  The other door is on the east side of that common

Julie H. Thomas, RMR, CRR                          (303)335-2111

1    area.  That's the door that we used to get into the -- into

2    the common area.

3    Q.  Okay.  The patio; right?

4    A.  Patio, common area, yes.

5    Q.  Well, it wasn't common to the whole building, was it?

6    A.  I believe anybody that is a resident of that building was

7    able to use that common area.

8    Q.  What makes you think that?  What makes you think it wasn't

9    only for the people on that floor?

10   A.  I don't know.

11   Q.  You don't know that; right?

12   A.  I know it was a common area that was available to at

13   least, you know, people -- a certain amount of people that

14   rented apartments there.

15   Q.  And the door to the hallway is locked, isn't it?

16   A.  I believe it was locked.

17   Q.  And you were in the hallway.  There was a locked door to

18   get to this common patio area.  Who unlocked the door for you?

19   A.  I believe it was Mr. or Mrs. Tew.

20   Q.  So in terms of a locked door, that would indicate that it

21   was not available to anybody in the building; right?

22   A.  I don't know.

23          MR. BORNSTEIN:  Could we have the other photo,

24   please.

25   BY MR. BORNSTEIN:

1    Q.  Okay.  So this is looking the other direction; correct?

2    A.  Yes, that's looking towards the east.

3    Q.  And so is this the door you went out of?

4    A.  I believe it is, yes.

5    Q.  And what is this?

6    A.  I believe that's another unit.

7    Q.  Ah.  How many units per floor?

8    A.  No idea.

9    Q.  Well, you were out in the hallway.  You could count.

10   A.  My job wasn't to count the units on the floor.  It was to

11   keep an eye on one specific unit.

12   Q.  All right.  While you were out there, you talked to

13   Michael Tew about his employment at National Air Cargo; right?

14   A.  I believe -- I don't recall the specifics of what I spoke

15   to him about before Special Agent Anderson got there, but I do

16   know that once she got there, NAC was brought up.

17   Q.  And you were privy to that conversation.

18   A.  Yes.

19   Q.  And once she got there, NAC was brought up.  So it was

20   brought up that he had worked for National Air Cargo; right?

21   A.  I believe so, yes.

22   Q.  And that he was no longer working for National Air Cargo;

23   right?

24   A.  Yes.

25   Q.  And she asked questions about what he had done with

 1   National Air Cargo; right?

 2   A.   I don't recall if she had asked what he had done with

 3   National Air Cargo.  I just know that National Air Cargo was

 4   brought up.

 5   Q.   Well, she explained 18 United States Code 1001 to him, so

 6   that it was an explanation that says please don't lie to an

 7   FBI agent; right?

 8   A.   Again, she explained that code, but I wouldn't say that

 9   she used that -- that wording right there.

10   Q.   No, but she said 1001 would get you in a lot of trouble;

11   right?

12   A.   Never said that.

13   Q.   She said it's a felony, isn't it?

14   A.   Never said that.

15   Q.   What did she say?

16   A.   Again, I believe she explained the nuances of 1001.  I

17   don't believe she used that language right there.

18   Q.   She essentially said don't lie to an FBI agent, didn't

19   she?

20   A.   She explained 1001.

21   Q.   Isn't that don't lie to an FBI agent?  Isn't that -- isn't

22   that what that's all about?

23   A.   She explained 1001.

24   Q.   All right.

25            MR. BORNSTEIN:  Excuse me, Your Honor.

1   BY MR. BORNSTEIN:

2   Q.  Well, Mr. Romero, then what triggered the fact that you

3   asked Michael Tew to come outside and be arrested?

4   A.  I was informed that a warrant for his arrest had been

5   issued.

6   Q.  All right.  And you knocked on the door.

7   A.  I did.

8   Q.  And he opened the door?

9   A.  He did.

10  Q.  And you placed him under arrest.

11  A.  I did.

12  Q.  And he was barefoot?

13  A.  I don't recall.

14  Q.  You don't recall the fact that he needed to have his shoes

15  put on?

16  A.  Yes, he did have to have his shoes put on, yes.

17  Q.  Do you recall his wife putting his shoes on because he

18  couldn't do it with the handcuffs?

19  A.  I believe that happened.

20  Q.  And you believe that while his wife was putting on the

21  shoes and he was handcuffed, one of his daughters was crying

22  and screaming, Don't take my daddy, Don't take my daddy.  Do

23  you remember that?

24  A.  No.

25  Q.  Do you remember the daughter saying, You promised that you

 1   would not arrest my daddy?

 2   A.  I do not recall that.

 3              MR. BORNSTEIN:  No further questions.

 4              THE COURT:  All right.  Thank you, Mr. Bornstein.

 5              MR. BORNSTEIN:  Where should I put Exhibit A and B,

 6   Your Honor?

 7              THE COURT:  You can give them to Mr. Keech for now.

 8              MR. BORNSTEIN:  Here's A.  What did I do with B?

 9              THE COURT:  It might still be on the overhead.

10              COURTROOM DEPUTY:  It's over here.

11              THE COURT:  Mr. Fields, any redirect?

12              MR. FIELDS:  Very briefly, Your Honor.

13              THE COURT:  All right.  Go ahead.

14                      **REDIRECT EXAMINATION**

15   BY MR. FIELDS:

16   Q.  Special Agent Romero, do agents work in teams?

17   A.  They do.

18   Q.  Are there, sort of, separate IRS teams?

19   A.  Yes.

20   Q.  Sometimes will one team ask another team to perform tasks?

21   A.  Yes.

22   Q.  Why?

23   A.  Depending on the volume of the workload, aspects of the

24   case, it's simpler for someone to -- one team to perform

25   surveillance while the other team is working on another aspect

1    of the case.

2    Q.  So you weren't the case agent on this case, were you?

3    A.  No, I was not, no.

4    Q.  Have you been the case agent on other cases?

5    A.  I have.

6    Q.  When you have been the case agent on other cases, have you

7    asked other agents to help you?

8    A.  Yes, I have delegated the responsibility to other agents.

9    Q.  When you have asked other agents to help you, what do you

10   tell them?

11   A.  Just the basics.  I don't give them a full background on

12   the case.  I just tell them what they need to know to be

13   successful with that specific task.

14   Q.  Do you remember being shown that e-mail to someone on

15   Bustabit?

16   A.  I do.

17   Q.  Are agents sometimes asked to serve process?

18   A.  They are.

19   Q.  What does that mean?

20   A.  That means basically they are asked to serve subpoenas or

21   summonses to third-party companies for information.

22   Q.  So, as the case agent, sometimes on your own cases have

23   you asked other agents to serve process?

24   A.  Yes.

25   Q.  When you do that, what do you tell them?

1    A.  Please serve this for me --

2    Q.  Do you --

3    A.  -- the attachment.  Thank you very much.

4    Q.  Do you tell them anything else?

5    A.  No.

6    Q.  Why not?

7    A.  Because they don't need to know.

8    Q.  Have you asked other agents to do surveillance for you?

9    A.  I have.

10   Q.  When you ask them to do surveillance for you, what do you

11   tell them?

12   A.  Basically the specifics of the surveillance, maybe a

13   description of the individuals involved, the cars in question,

14   possibly small background on the case, but not the details.

15   Q.  So in this particular case when you were asked to do

16   surveillance, did you ask any questions about the case?

17   A.  No.

18   Q.  Why not?

19   A.  Because I didn't need to know the case, the specifics, to

20   be successful at the job I was asked to do.

21   Q.  Now, you were asked a lot of questions about a PC arrest,

22   et cetera.  Was this all a ruse to arrest Michael Tew?

23   A.  No, it was not.

24   Q.  Why did you go to the apartment that day?

25   A.  To perform surveillance.  To identify whether Mr. Tew was

1   there.   And if he were to leave the apartment, to follow him.

2   Q.   Who were the case agents on the case?

3   A.   Special Agent Sarah Anderson and Special Agent Lisa

4   Palmer.

5   Q.   So we talked a little bit about a PC arrest.   What does it

6   mean to make a PC arrest?

7   A.   Have probable cause to basically initiate an arrest

8   without a warrant being available.

9   Q.   Does that mean that an agent would have to have sufficient

10   information based on their, sort of, personal knowledge of a

11   case to decide to make an arrest?

12   A.   Yes.

13   Q.   Did you have sufficient, sort of, information about the

14   case to arrest Michael Tew?

15   A.   No.

16   Q.   Who would have?

17   A.   Special Agent Palmer.   Special Agent Anderson.

18   Q.   And what would they have done, based on your experience as

19   an IRS agent, before making any determination like that?

20   A.   They would have consulted with the U.S. Attorney's Office.

21   Q.   You have been an IRS agent for how long?

22   A.   25 years.

23   Q.   In your experience, will agents sometimes try to interview

24   a subject before making an arrest?

25   A.   Yes.

1    Q.   Why?

2    A.   Typically more information would be available at that

3    point before someone would be arrested.  People would be more

4    inclined to speak at that point.

5    Q.   And sometimes do you want to get your subject's side of

6    the story before you make an arrest?

7    A.   Yes.

8    Q.   Why?

9    A.   It's important to the case.  You have to know all aspects

10   of the case.

11   Q.   Is it typical when that happens, when you interview a

12   subject before making an arrest or before making any

13   decisions, are they detained?

14   A.   No.

15   Q.   Why not?

16   A.   Because there is no PC developed at that point.  If there

17   was, they would be arrested.  And there is no warrant that has

18   been issued.

19   Q.   All right.  Let's just talk about this timeline again so

20   it's clear.

21        When you first got there, what did you do?

22   A.   1 o'clock we determined that the Tews' vehicle was in the

23   garage.

24   Q.   What did you do after that?

25   A.   We then put two agents in the lobby guarding the -- not

1    guarding, but basically watching the elevator.  Then myself

2    and two other agents were on the second floor where unit 224

3    was located, and we just basically kept eyes on the unit.

4    Q.   Did Michael Tew eventually come out?

5    A.   He did.

6    Q.   Okay.  Then, after that, was that the discussion out on

7    the common area?

8    A.   You mean as far as what we talked about?

9    Q.   Yeah.

10   A.   From what I recall, we didn't talk about anything

11   specific.  I think, uh, talked about his children.  Uh, his

12   wife was volunteering information as far as she asked if I

13   knew about cryptocurrency, and she made some other statements.

14   But as far as specifics of the case, nothing was asked at that

15   point.

16   Q.   Then Special Agent Anderson arrived?

17   A.   Yes.

18   Q.   Who took the lead at that point?

19   A.   Special Agent Anderson did.

20   Q.   Did that portion of the interview conclude?

21   A.   My portion of the interview?

22   Q.   Yeah.

23   A.   Yes, it did.

24   Q.   Then the portion with Special Agent Anderson, did it

25   eventually conclude?

1    A.   It did, yes.

2    Q.   What happened at the conclusion of that portion?

3    A.   She served a subpoena to Mr. Tew for Sand Hill LLC.

4    Q.   Did he go back in his residence?

5    A.   She did first.  She went, I believe it was 3:42, and he

6    went in about 7 minutes later.

7    Q.   Then after all of that had taken place, when was the

8    decision made to make an arrest?

9    A.   4:11.

10   Q.   Who made that decision?

11   A.   The decision was made by the case agent upon consultation

12   with the U.S. Attorney's Office, the AUSA.

13          MR. FIELDS:  Your Honor, may I have just a moment?

14          THE COURT:  Sure.

15   BY MR. FIELDS:

16   Q.   One final subject matter.  You were shown all those

17   reports.

18   A.   Yes.

19   Q.   Do you remember seeing that?

20   A.   I do.

21   Q.   Do you remember seeing the report from Emil Stark about an

22   arrest?

23   A.   I do.

24   Q.   Based on your experience as an IRS agent, would that have

25   been written before the arrest or after?

Julie H. Thomas, RMR, CRR                        (303)335-2111

1    A.   After.

2    Q.   Why?

3    A.   Because you can't necessarily state all the facts as they

4    are occurring.  You have to wait until time has passed.

5    Typically we have a certain set time, but I think this was

6    written within a day or so.  But you have to gather all the

7    facts before you can memorialize it in your reports.

8              MR. FIELDS:  No further questions, Your Honor.

9              THE COURT:  All right.  Thank you, Mr. Fields.

10             Agent Romero, you may step down.  Thank you.

11             THE WITNESS:  Thank you.

12             THE COURT:  All right.  It's 12:30.  Why don't we

13   take a one-hour lunch break and return at 1:30 to continue.

14   Thank you.

15        (Proceedings recessed 12:30 p.m. to 1:34 p.m.)

16             THE COURT:  Please take your seats.

17             Welcome back.  Mr. Fields, I understand you have more

18   witnesses.

19             MR. FIELDS:  Yes, Your Honor.  Two more witnesses.

20             THE COURT:  All right.  Go ahead.

21             MR. FIELDS:  The United States calls Sarah Anderson

22   to the stand.

23        (The witness was sworn.)

24             COURTROOM DEPUTY:  Please be seated.

25             Please state your full name, and spell your first and

1    last names for the record.

2              THE WITNESS:  Sarah Anderson.  S-a-r-a-h,

3    A-n-d-e-r-s-o-n.

4              MR. FIELDS:  May I begin, Your Honor?

5              THE COURT:  Yes, go ahead.

6         **SARAH ANDERSON, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

7    BY MR. FIELDS:

8    Q.  Where do you work?

9    A.  I work at the FBI Denver division.

10   Q.  What is your title?

11   A.  Special agent.

12   Q.  Were you a special agent in 2020?

13   A.  Yes.

14   Q.  Where were you assigned?

15   A.  I was assigned to a white collar financial crimes squad.

16   Q.  How long have you been a special agent?

17   A.  Since 2008.

18   Q.  Have you had training in interviewing witnesses?

19   A.  Yes.

20   Q.  Describe that training for us.

21   A.  I had new agent training at Quantico, Virginia, and then

22   I've had just on-the-job training in interviewing.

23   Q.  As part of that training, are you given instructions on

24   when to issue something called a Miranda warning?

25   A.  Yes.

```
1    Q.  Generally speaking, when would an agent give such a

2    warning?

3    A.  When an individual is in custody and you are attempting to

4    interview them.

5    Q.  What does that mean?

6    A.  So when you have detained an individual, when they are no

7    longer voluntarily with you.

8    Q.  During your years in the FBI, approximately how many

9    interviews would you say you have done?

10   A.  Hundreds.

11   Q.  Are you familiar with an investigation of Michael Aaron

12   Tew and Kimberley Tew?

13   A.  Yes.

14   Q.  How are you familiar with it?

15   A.  I'm the assigned case agent from the FBI for that case.

16   Q.  Were you working on the case with any other agencies?

17   A.  I was working with a co-case agent from IRS criminal

18   investigation.

19   Q.  Who is she?

20   A.  Special Agent Lisa Palmer.

21   Q.  On July 8th, 2020, did you receive information indicating

22   that Michael Tew might be trying to flee?

23   A.  Yes.

24   Q.  Describe how that happened.

25   A.  I was aware of a text communication that indicated he was
```

1   concerned Jonathan Yioulos was working with law enforcement, I

2   think the FBI in particular, and was indicating he might need

3   to get away, get out of the country.

4   Q.   Where were you when you got this information that Michael

5   Tew might be trying to flee?

6   A.   Um, I can't recall specifically, but earlier that day I

7   was in court on another proceeding.

8   Q.   After you found out about the possibility that he might

9   flee, what were you asked to do?

10  A.   To go over to attempt to interview Michael Tew.  And I

11  also had a subpoena that had been prepared, to serve him with

12  a subpoena.

13  Q.   Were you able to make it to Mr. Tew's residence right

14  away?

15  A.   Not immediately.  So initially the court proceeding, I

16  thought, was anticipated to be done before lunch.  It ran

17  long, so we came back in.  And that was after I was notified

18  it would be good if I could go conduct an interview.  So after

19  that was finished for the afternoon session, I went back to my

20  office in order to get the subpoena.  I didn't have it with me

21  at the time, and I wanted to print it and take it.

22  Q.   Were you able to make it to the Tew residence that

23  afternoon?

24  A.   Yes.

25  Q.   Around what time?

1    A.  Late afternoon.

2    Q.  Where was the residence?

3    A.  It was on East First Avenue in the Cherry Creek area.

4    Q.  What did you do when you arrived?

5    A.  When I arrived, I notified the IRS agents who were already

6    located at the residence that I was -- I had just gotten

7    there.  I think they were awaiting my arrival.  I met with one

8    agent, and then I -- I walked with him up to the residence,

9    where the residence area was.

10   Q.  Describe the residence area for us.

11   A.  So I was taken outside into, like, a courtyard area, what

12   I'd describe as a courtyard area.  It was a common area that

13   various apartments seemed to back up to.  And as I went out

14   there, Mr. and Mrs. Tew were in a -- sort of a cordoned off

15   area on their property.  It wasn't like a deck, but it was

16   like a patio for their property.

17   Q.  Let me pull up Government's Exhibit 8, page 35.  It's

18   already in evidence.

19          MR. FIELDS:  So just type in 08-035.

20   BY MR. FIELDS:

21   Q.  Do you recognize this photograph?

22   A.  Yes.

23   Q.  What do you see there?

24   A.  Um, so you see the area I described as the patio area for

25   the Tews' residence, and then beyond that there's like a

1   retaining wall and then more of an open courtyard area with a

2   fire pit and some seating around it.

3   Q.  So when you got to this area, could you point out for

4   us -- you can actually draw on the monitor -- where did you

5   see the Tews?

6   A.  Behind the patio wall here.

7   Q.  Where were the agents?

8   A.  Spread around the courtyard area beyond that patio wall.

9   Q.  How were you dressed?

10  A.  I was dressed like much like I am today.

11  Q.  Business casual?

12  A.  Um, I was in a suit, I believe.  I had just come from

13  court.

14  Q.  Suit, with a jacket?

15  A.  Yes, with a jacket.

16  Q.  Were you armed?

17  A.  Yes.

18  Q.  Where was your firearm?

19  A.  It was on my -- it was on my waist.

20  Q.  In a holster?

21  A.  Yes.

22  Q.  Was it visible?

23  A.  Not evidently visible.  I can't say it was never visible,

24  depending on clothing movement, but it was concealed under a

25  jacket.

1   Q.  All right.  So when you got into this common area, what

2   did you do?

3   A.  So I spoke with Mr. and Mrs. Tew and told Mr. Tew I'd like

4   to ask him some questions regarding his previous employment at

5   National Air Cargo.

6   Q.  How did he respond?

7   A.  He indicated that he'd be willing to answer some

8   questions.

9   Q.  Did you ask him some questions?

10  A.  I did.

11  Q.  And so what happened as you proceeded to ask him

12  questions?

13  A.  So we proceeded over towards the fire pit area and then

14  sat around on the sofa at the fire pit area.  Just Mr. Tew

15  came over to that location and was seated.  I began to ask him

16  questions about National Air Cargo and his employment there.

17  Q.  Did he answer your questions?

18  A.  Yes.

19  Q.  At some point during this initial part of the encounter

20  did you ask to record the interview?

21  A.  Yes.

22  Q.  What happened when you asked?

23  A.  So Mrs. Tew, she was not seated with us at the courtyard

24  area.  She was at the retaining wall area of the patio, but

25  she could hear what was going upon and sort of participating

1    in an offset area.  But she yelled over not to record, that

2    they did not want to allow the interview to be recorded.

3    Q.  How did you respond to that request?

4    A.  I didn't engage the recorder.  I didn't turn it on.

5    Q.  So during the course of your interview, were there any

6    times where Mr. Tew declined to answer questions?

7    A.  Yes.

8    Q.  Describe that for us.

9    A.  So there were pauses in the interview where he would say,

10   um, you know, I don't want to answer the question, or rather

11   than answering the question ask a question of us, sort of, um,

12   what we were doing, what this was all about.  And at times

13   during the interview Mrs. Tew would interject and sometimes

14   volunteer information that I wasn't soliciting, that wasn't in

15   response to the question I was asking.

16   Q.  At some point during the interview did you give him

17   something called a 1001 warning?

18   A.  Yes.

19   Q.  What is that?

20   A.  So during the interview it became apparent -- it became

21   apparent to me in at least one occurrence that I was receiving

22   an answer that wasn't being forthright.  So after that

23   occurred, I just told him that it's a federal offense to lie

24   to a federal officer.

25   Q.  How did he respond to that?

1   A.   Just acknowledged.

2   Q.   Did he stop the interview?

3   A.   Um, no.  And at the time I provided that, the interview

4   was effectually over already.

5   Q.   At some point during the interview did Kimberley give

6   instructions to Michael?

7   A.   Yes.  She -- she told him that he shouldn't answer any

8   further questions and should revisit the interview at a later

9   time.

10  Q.   After she gave that instruction, what did you do?

11  A.   I said:  I'd be happy to do that.  I just want to set up a

12  date and time that we could do it.

13  Q.   What happened when you tried to set up a date and time?

14  A.   So initially I just asked for a phone number so that I

15  could recontact them to -- to set up the appointment, but I

16  wasn't provided a telephone number.  So I asked for another

17  form of communication, like an e-mail, that I could

18  communicate with them.

19  Q.   Were you given an e-mail?

20  A.   Yes.

21  Q.   Now, during this interview, was -- do you see this door

22  here on the right-hand side of this photograph, Government's

23  Exhibit 35?

24  A.   Yes.

25  Q.   Where does that lead to?

1    A.   That goes into the Tews' residence.

2    Q.   Was it open during the entire interview?

3    A.   To the best of my recollection, it was open, and I -- it

4    was open, but concealed because I think there were window

5    coverings kind of hanging down.  So it was -- the residence

6    itself seemed obscure.

7    Q.   Were there children present during the interview?

8    A.   Yes.

9    Q.   Where were they?

10   A.   They were in different locations.  They were in and out of

11   the unit from time to time.  I can't recall if they were

12   frequently on the other side of the retaining wall, like the

13   patio wall, but I know they were -- the majority of the time

14   they spent on that patio area.

15   Q.   Did the Tews themselves move around during the interview?

16   A.   Yes.

17   Q.   Describe that for us.

18   A.   Well, Mr. Tew, at one point during the interview when he

19   agreed to answer questions he sat along the fire pit area.

20   Then subsequent to a few questions being asked, he got up and

21   returned to the area behind the retaining wall.

22   Q.   All right.  Could you describe to us how the interview

23   came to an end?

24   A.   It ended, um, after I made the attempt to get the e-mail

25   address and obtain that, and then at the conclusion of the

1    interview I provided a subpoena for records to Mr. Tew related

2    to his entity Sand Hill.

3    Q.  What happened at that point?

4    A.  I just told him I have a subpoena for records I'd like to

5    give to him he took from me.  Typically when I give someone a

6    subpoena, I just show them that the contact information for

7    the U.S. Attorney's Office and the AUSA handling the matter is

8    on the front and explain that there's a second page to the

9    subpoena about how to comply with it and where to send the

10   records to so there's no questions.

11   Q.  How would you describe the tone of the interview?

12   A.  Um, I would say that it was not a very fruitful interview

13   in that many of the questions I asked were just not answered.

14   I didn't think that they were going to be forthright.  I think

15   they were more just trying to figure out what I was there for

16   specifically.

17   Q.  Were any voices raised?

18   A.  Um, Mr. Tew was pretty quiet.  Kimberley Tew sometimes,

19   um, became a little more irritable during the course of the

20   interview.

21   Q.  At the end of the interview where did Michael Tew go?

22   A.  Um, I -- I believe when I left the interview area he was

23   in the courtyard, like his patio area.  And I departed the

24   area prior to him actually going back inside his residence.

25   Q.  What did you do when you left the interview?

1    A.   I had a phone call coming in, and so I took a phone call,

2    but I went back inside the corridor of the apartment complex

3    itself.

4    Q.   Who was the phone call with?

5    A.   It was with AUSA Hetal Doshi.

6    Q.   Was a decision made as a result of that phone call?

7    A.   Yes.   I spoke with AUSA Doshi and just told her what had

8    happened during the course of the interview, and then she gave

9    me a green light, if you will, to go ahead and execute a

10   probable cause arrest on Mr. Tew.

11   Q.   What is a probable cause arrest?

12   A.   It's an arrest based on knowledge of the case without

13   having a warrant issued, a physical warrant.

14   Q.   Did you have probable cause to make an arrest before you

15   went to the apartment that day?

16   A.   I believed I did.

17   Q.   But had you decided to make an arrest before you went to

18   the apartment that day?

19   A.   No.

20   Q.   Why not?

21   A.   Um, one basic reason was I had never made a probable cause

22   arrest prior to this incident, so it was unusual for me to do

23   so in any of my cases.   And at the time I really just wanted

24   to solicit information to see if he would cooperate in our

25   investigation and also just to see what kind of answers or

1    confessions I might be able to get from him.

2    Q.  So when you got back into that courtyard, where was

3    Michael Tew?

4    A.  He was inside the residence.

5    Q.  Describe how he was arrested.

6    A.  So we remade contact with him.  And I actually can't

7    recall if we called him out, if there was still an open

8    doorway, or if we called him out and said, Mr. Tew, we need

9    you to step outside, or we knocked and then told him he needed

10   to step outside.  But he stepped outside into that courtyard

11   area, and then we informed him he was under arrest, and then

12   he was handcuffed.

13            MR. FIELDS:  Your Honor, may I have a moment?

14            THE COURT:  Sure.

15            MR. FIELDS:  Your Honor, I have no further questions.

16            THE COURT:  All right.  Thank you, Mr. Fields.

17            Mr. Bornstein, cross-examination?

18            MR. BORNSTEIN:  Thank you.

19                         **CROSS-EXAMINATION**

20   BY MR. BORNSTEIN:

21   Q.  Good afternoon, Agent Anderson.

22   A.  Good afternoon.

23   Q.  I'm Peter Bornstein.  I represent Michael and Kimberley

24   Tew.  We have not met before; right?

25   A.  No.

1    Q.   Okay.  Let me walk a little backwards here.  We're talking

2    about July 8th, 2020.  When was a complaint filed in the

3    court?

4    A.   On July 8, 2020.

5    Q.   And that complaint was filed by AUSA Doshi?

6    A.   Yes.

7    Q.   Was that complaint -- was there an affidavit attached to

8    that complaint?

9    A.   Yes.

10   Q.   And were you the author of that affidavit?

11   A.   No.

12   Q.   Who was the author of that affidavit?

13   A.   My co-case special agent, Lisa Palmer.

14   Q.   Okay.  When was the affidavit prepared?

15   A.   I can't say specifically, but I believe it was prepared

16   when the decision was made to arrest Michael Tew.

17   Q.   So do you think it was prepared late in the afternoon?

18   A.   I do.

19   Q.   And you had a -- but you had a subpoena that was signed

20   that was issued for Sand Hill.

21   A.   Yes.  I actually had two subpoenas, one for Sand Hill and

22   one for a different entity, that were both prepared in advance

23   of a potential interview with Mr. Tew.  I only served one

24   subpoena.

25   Q.   Not the other one?

1    A.   I served the other one to the registered agent, which was

2    a company located in the Denver Tech Center, later on.

3    Q.   Okay.  So was this subpoena signed by an AUSA, or was it

4    an administrative subpoena issued by the IRS?

5    A.   It wasn't an administrative subpoena.

6    Q.   It was or not?

7    A.   It was not.

8    Q.   So it was one that was signed by an AUSA?

9    A.   Yes.

10   Q.   And had you met with -- was that AUSA Doshi?

11   A.   Yes.

12   Q.   Okay.  Had you met with her to physically obtain the

13   subpoena?

14   A.   I had not.

15   Q.   Had Agent Palmer met with her to physically obtain the

16   subpoena?

17   A.   I can't say for certain, but I don't think so, because I

18   believe she was still in Buffalo, New York, around the time

19   that the subpoena was being prepared.

20   Q.   Okay.  So the subpoena -- this wasn't a subpoena that you

21   were faxed or e-mailed.

22   A.   I received it via e-mail after it was, I guess, um, after

23   it was prepared.

24   Q.   All right.  All right.  So do you know about -- were you

25   in verbal contact or e-mail contact with the AUSA Doshi that

1    day?

2    A.  I was in telephonic contact.

3    Q.  All right.  So she was the one who called you and said,

4    Arrest him?

5    A.  No, she didn't call me to say, Arrest me [sic].  She

6    called to ask how the contact with him went, how the interview

7    went.

8    Q.  Right.

9    A.  Yes.

10   Q.  And you said, Not well, and then she said, Arrest him?

11   A.  I told them his responses to some of the questions I

12   received, and I told them my opinion that he wasn't being

13   forthright with some of his responses.  And then she told me,

14   based upon the scheme that we had uncovered previously, that

15   it would be advisable to arrest him under probable cause.

16   Q.  All right.  Now, I was under the impression, having just

17   talked with Agent Romero -- and you were listening to that

18   colloquy; right?

19   A.  Yes.

20   Q.  He seemed to indicate that he was arrested pursuant to a

21   warrant that afternoon.

22   A.  Yes.

23   Q.  Is he wrong?

24   A.  I think he was mistaken, yes.

25   Q.  Now, usually there's a warrant that goes along with a

1    complaint filed in this court for a arrest pursuant to -- or a

2    case that's beginning by a complaint before a grand jury.  Do

3    you -- do you know if there was a warrant issued out of this

4    court?

5    A.  I'm a little confused on what you are asking, but I know

6    there was a warrant issued.  It was -- a complaint was filed

7    later that evening, and I did receive a copy of the warrant

8    that evening, but he was already booked into the downtown

9    detention center.

10   Q.  So you are aware that, in terms of procedure, if the

11   AUSA -- if the U.S. Attorney's Office is proceeding with a

12   complaint, as opposed to an indictment, they always get a

13   warrant to go along with it.

14   A.  Yes.

15   Q.  Okay.  But you think that the warrant in this case was

16   issued after he was arrested.

17   A.  Yes.

18          MR. BORNSTEIN:  Your Honor, is the warrant in the

19   case file?

20          THE COURT:  Yeah.

21          MR. BORNSTEIN:  And with a timestamp on it?

22          THE COURT:  Well, let me look.

23          DEFENDANT K. TEW:  I have the return of the warrant.

24   They tried to get it signed.

25          THE COURT:  I don't see any time information on the

1    docket, no.

2         MR. BORNSTEIN:  So the file just indicates the

3    warrant itself?

4         THE COURT:  Right.

5         MR. BORNSTEIN:  Okay.

6         THE COURT:  And the day, but not the time.

7         COURTROOM DEPUTY:  Your Honor, was that a warrant in

8    this case or the underlying MJ case?

9         THE COURT:  Oh, the arrest warrant, which I think is

10   document 2 on the docket.  I think that's what we're talking

11   about.  Right?  The arrest warrant for Mr. Tew --

12        MR. BORNSTEIN:  That's what I --

13        THE COURT:  -- on July 8th?  That's what we're

14   talking about?

15        MR. BORNSTEIN:  That's what we're talking about.

16        THE COURT:  That's what I have.  I don't see a time.

17        MR. BORNSTEIN:  Okay.  Thank you for looking.

18        THE COURT:  Sure.  Go ahead.

19   BY MR. BORNSTEIN:

20   Q.  All right.  So now let me go back -- I started at the end.

21   Let me go back a bit.

22        That morning you believe that your co-agent Lisa

23   Palmer was in Buffalo, New York?

24   A.  Yes.

25   Q.  And you understood that she was interviewing Jonathan

1   Yioulos.

2   A.  Or was in Buffalo because in the preceding days she had

3   interviewed him.  I don't have a recollection if she met with

4   him on the 8th or not.  I know she had traveled out there to

5   conduct an interview.

6   Q.  All right.  I mean, I know we have an audio of an

7   interview on the 7th.  I just was interested if there was also

8   a follow-up meeting on the 8th.

9   A.  Yes, I don't recall if there was or not.

10  Q.  But, anyway, she was the source of the information that

11  the Tews were going to flee.

12  A.  Yes.  She had received, I believe, a text message

13  forwarded on to her from Mr. Yioulos.  So she was the, I

14  guess, the go-between.  I think the source was Mr. Yioulos.

15  Q.  Okay.  So Yioulos had a text message.  He showed it to

16  Agent Palmer.  Agent Palmer relayed to you the contents.

17  A.  Yes.

18  Q.  And the contents of that text message was both Mr. and

19  Mrs. Tew were going to flee the country.

20  A.  Without looking at it again, I couldn't say if it was

21  inclusive, or if it was one of them, or if you could determine

22  if it was indicating both or one would want to flee.  I'd have

23  to look at it again, but it was indicating that he wanted to

24  flee the country or was -- I think, it was best for him to do

25  so.

1    Q.  Did it indicate what they were going to do with their

2    children?

3    A.  No.

4    Q.  You knew they had children.

5    A.  Yes.

6    Q.  And you took that seriously.

7    A.  The text message?

8    Q.  Yes.

9    A.  Yes.

10   Q.  And that would be normal FBI procedure to say if you have

11   word that a suspect under investigation was going to flee the

12   country, to stop them -- to stop them from doing so; correct?

13   A.  It's a concern.  I wouldn't necessarily say it falls under

14   any specific procedure.

15   Q.  In your experience, there have been many instances where

16   individuals under investigation get stopped at one or another

17   airport about to board a plane and taken off the plane and

18   said, You're not leaving, and put under arrest; right?

19   A.  I don't have a lot of personal experience with it, with

20   those -- that type of cases where individuals are attempting

21   to flee.  I don't think it's outside the realm of reason, but

22   I don't have a lot of experience with it.

23   Q.  All right.  At least you have read reports or even media

24   reports about the FBI stopping people at the airport or even

25   taking them off of a plane before it leaves; correct?

1   A.  Um, yes.

2   Q.  In your mind, you were not going to let the Tews, one or

3   both, leave this country; right?

4   A.  Well, I was concerned that they were attempting to flee.

5   It wasn't a steadfast, um, hard line that they wouldn't flee.

6   I didn't have any preconceived notions about what they were

7   going to do.

8   Q.  Let me ask you.  This came from Jonathan Yioulos.  At that

9   point in time did you believe Mr. Yioulos?

10   A.  Yes, I had no reason to doubt the -- the text that he had

11   received.

12   Q.  And you don't remember the contents of that text.

13   A.  I remember the generalization of it, but I don't unless I

14   saw it specifically again to refresh my memory.

15   Q.  In any event, you were sufficiently concerned that you

16   contacted not FBI agents but you contacted IRS agents to

17   assist; is that right?

18   A.  No, I didn't make any contact with the IRS agents.

19   Q.  That came from Buffalo.

20   A.  I think it came just from the IRS office itself.

21   Q.  Was there a specific request from Agent Palmer sitting in

22   Buffalo saying do something, take some action?

23   A.  I don't know specifically who gave the overall order to

24   contact him immediately.

25   Q.  All right.  But you knew about that order.

1   A.   Yes.

2   Q.   How did you find out?

3   A.   When I was in court earlier that day, I think we had a

4   lunch recess, so I went out and checked my phone in my car and

5   saw voicemails or -- I'm not sure if it was a voicemail, but

6   it might have had a voicemail to return a call.  So I called

7   Hetal Doshi, or perhaps I took a call while I was out on the

8   recess.  I can't specifically remember, but I spoke with her,

9   and she asked me if I could go over to the Tews' residence

10  because there was IRS agents gonna stand by to try to

11  interview him and get a subpoena served.  I just informed her

12  that I couldn't immediately do that, I had an obligation I had

13  to continue with.  And then when that was over, then I

14  proceeded over there.

15  Q.   So I'm -- listening to your testimony, I'm beginning to

16  get an idea that AUSA Doshi was in the middle of all of this.

17  A.   Yes.

18  Q.   So that she would be the one who would receive information

19  from Agent Palmer.  She would relay information to you.  You

20  would relay information back to her.  And she was kind of the

21  captain of the ship.

22  A.   In part.  She was engaged.

23  Q.   Okay.

24       Okay.  So she told you that at least four, maybe

25  five, IRS agents had been dispatched to the apartment on

1    Second [sic] Avenue.

2    A.   I don't remember her specifying a number, but she did

3    indicate IRS agents had gone to his residence and that they

4    were expecting me to arrive to conduct an interview.

5    Q.   And AUSA Doshi knew this, but you don't know how she knew

6    this.

7    A.   Not specifically, no.

8    Q.   All right.  But she did tell you IRS agents were over at

9    the -- coming over to the apartment.

10   A.   Yes.

11   Q.   And did she tell you that one of their operational

12   instructions was, Don't let Mr. Tew leave?

13   A.   No.

14   Q.   What did you know about the instructions to the IRS

15   agents?

16   A.   The instructions that I knew was they were standing by

17   because it was thought prudent to try to conduct an interview

18   of Mr. Tew.  But because the co-case agent was not in the area

19   at the time, none of the IRS agents who were asked to go to

20   assist with interviews would have had any knowledge of the

21   case, so they were standing by for my arrival, because I would

22   have had the case -- historic case knowledge.

23   Q.   When you arrived, you found at least two agents in the

24   first floor by the elevator where anybody would leave?

25   A.   I can't remember how many.  It was a little bit of a

1    whirlwind when I first arrived, but I did arrive.  I met one

2    agent from the IRS in the parking lot, and he then walked me

3    up.  And I can't remember even walking through the lobby at

4    that time.  There was also some, like, interior stairwells.

5    So I don't know if we went up through the elevator in the

6    lobby or if we just went in one of the stairwells and walked

7    up to the second floor --

8    Q.  This --

9    A.  -- that they had already had access to.

10   Q.  This parking lot was attached to the building.  It was for

11   tenants.

12   A.  It was adjacent to the building.  It was a surface lot.

13   Q.  Okay.  Was it open or closed?

14   A.  It was open.  There is a closed lot under the building I

15   think you might need a pass code or keycard to get into, but I

16   just parked in a lot behind the building that I considered to

17   be probably overflow or maybe for the residences there.

18   Q.  All right.  And an agent met you there in the parking lot.

19   A.  Yes.

20   Q.  And he directed you up to the second floor, whether it was

21   by elevator or stairs.

22   A.  Yes.

23   Q.  So when you got up to the second floor, was the

24   apartment [sic] to 222 open or closed?  Or 224.

25   A.  I think it was -- it's Apartment 224, but I don't -- I

1   didn't go to the front of the apartment unit, the one that

2   would be -- the entrance that would let out into the common

3   interior hallway.  I was escorted by the IRS agent to the

4   courtyard area.

5   Q.  Okay.  And was that door locked at that time, or was that

6   door left open?

7   A.  I don't recall.  We -- the two of us, without anyone

8   opening it for us, were able to make entry into the courtyard.

9   So I don't know if it was propped open or if he had a card.  I

10  don't remember.  We just went into the courtyard area.

11  Q.  When you went into the courtyard area, you found the rest

12  of the IRS agents already there.

13  A.  Yes.

14  Q.  And I believe, from Agent Romero, that would be Agent

15  Stark, Agent Romero, and one other agent.

16  A.  Um --

17  Q.  I'm trying to remember the name he gave us --

18  A.  Yes, um --

19  Q.  -- but I don't remember it.

20  A.  Agent Molotov or --

21  Q.  Okay.  So those three were already there in the rear of

22  the apartment area that is either a patio or a common area or

23  whatever name we are going to give it.

24  A.  Yes.

25  Q.  Were those agents around the fire pit?

1   A.   Um, no, I wouldn't say they were around the fire pit.

2   They were throughout that courtyard area.  I think one might

3   have been leaning against a wall.  They weren't seated, um,

4   but they were just in that general area.

5   Q.   Okay.  Was there an agent watch -- making surveillance in

6   the hallway leading to the main door to the apartment?

7   A.   Yeah, I don't think I was aware of it at the time, but I

8   later learned there were additional IRS agents located in the

9   vicinity of the apartment.

10  Q.   Okay.  They were located and positioned in a way that if

11  Mr. Tew had tried to bolt out of the front door of the

12  apartment, he would be stopped by an agent.

13  A.   I don't know what their intentions were.  I wasn't even

14  sure -- I didn't know they were there until after we executed

15  an arrest.

16  Q.   Well, I'm sure you'd noticed these males standing around

17  who looked like agents.  I mean, you knew they were there.

18  A.   The three that were on the courtyard, but the way we made

19  entry to the courtyard from the parking lot, there were two

20  other IRS agents there, but I didn't know they were there

21  until after --

22  Q.   Okay.

23  A.   -- we made contact with Mr. Tew.

24  Q.   But now you know that there was one waiting in the hallway

25  so that if Mr. Tew were to try to bolt and leave via the main

1    door, he could be stopped.

2    A.   I'm not sure what -- what they were standing out there for

3    or where they were located during that period of time.

4    Q.   All right.  Well, then let me ask you this.  You certainly

5    were not surprised, when you walked into the outdoors, to see

6    three agents out there with -- waiting for you.

7    A.   Initially I was a little surprised.  I just thought I'd --

8    when I went up, I initially thought I'd have a moment before

9    making contact with Mr. Tew myself initially to kind of get a

10   little handoff or this is what's going on.  I didn't realize

11   they were already in contact with Mr. and Mrs. Tew when I went

12   out there initially.  In fact, I probably would have liked to

13   have gotten the recorder on and done an intro into the

14   recorder, and then I was caught cold out in the courtyard and

15   began to engage with Mr. and Mrs. Tew.

16   Q.   And at that point you said he was sitting on a couch.  She

17   was behind the wall.

18   A.   No, he wasn't sitting on the couch.  I think he came over

19   to the couch when he agreed to answer some questions, and then

20   we thought let's sit down, and it turned into a conversation.

21   I can't remember exactly where he was.  He might have been in

22   the courtyard.  He might have been on the patio initially.

23   Q.   All right.  So I'm looking at the report that Agents Stark

24   and Romero prepared, and they say that *At approximately*

25   *3:12 p.m. FBI Special Agent Sarah Anderson arrived.*  Is that

1   accurate?

2   A.   That sounds about accurate.

3   Q.   Okay.  And it said the first -- *She confirmed with Michael*

4   *and Kimberley that there were no weapons in the residence.*

5   A.   Yes.

6   Q.   Okay.  Now, that's standard procedure, is it not, to

7   determine that your safety is secured because there's no

8   weapons in the residence?

9   A.   Typically.  I like to feel a little safe, and because of

10  the location where we were and not being able to see into the

11  residence, I just wanted to kind of make sure that our safety

12  wasn't, um, at risk.

13  Q.   All right.  Now, would you agree with me that when one of

14  the first things out of the mouth of an FBI agent -- I mean,

15  I'm sure you identified yourself.  Maybe you showed your

16  badge, or I don't know if you did or not, but as soon as you

17  identify yourself, I'm Sarah Anderson, I'm with the FBI, are

18  there any weapons around, that that would alert the suspect

19  that something is afoot; right?

20  A.   It might.

21  Q.   Okay.  All right.  And then you told Mr. Tew that you were

22  there because of his previous employment with National Air

23  Cargo and some credit card and gift card activities.  Is that

24  accurate?

25  A.   That is accurate.

1  Q.  All right.  And Mrs. Tew responded that they didn't want

2  to answer any questions about, what, credit card and gift

3  cards?  Is that what she said?

4         It says here that she -- *She responded they didn't*

5  *want to answer any questions and then stated multiple times*

6  *they had filed IC3 reports two years ago on Craig LN* -- last

7  name unknown.

8  A.  Yes.

9  Q.  And at that point in time you knew who Craig last name

10 unknown was, Craig Fiken; right?

11 A.  I did know who she was referring to, yes.

12 Q.  And an IC3 report is an FBI internet report of what?

13 A.  It's -- we call it IC3.gov report, but it's a report that

14 someone submits when they want to file a complaint on an

15 internet-based crime.  It goes to a portal so they can be

16 sorted and allocated properly.

17 Q.  But it's an FBI portal?

18 A.  Yes.

19 Q.  Okay.  And then one of the Tews explained that the IC3 is

20 for internet crimes.  And you already knew that, but they were

21 telling you that?

22 A.  Yes.  I didn't actually ask about that, but they

23 volunteered that they had submitted those reports.

24 Q.  And then you said, I want to record this conversation, and

25 Mrs. Tew said, We don't consent.

1    A.   Correct.

2    Q.   And you honored that.

3    A.   Yes.

4    Q.   But you also know that once you take out your recording

5    and say, I want to record the statement, that alerts the

6    suspect that the FBI is serious about this.

7    A.   I can't say what they thought when I asked to record it,

8    but they declined.

9    Q.   Then, according to this, Mrs. Tew said -- asked why were

10   the agents there and why had they come.  Is that right?

11   A.   Yes.

12   Q.   And then at that point she wondered why somebody had

13   grabbed Michael, and they went through this issue about

14   whether Michael was grabbed or not grabbed.

15   A.   I don't recall a lot of that conversation.  I know it's in

16   the report, but I don't -- I didn't have a context for it when

17   I showed up as to what was being talked about, so I really

18   didn't, um -- that didn't register with me at the time.

19   Q.   Did you ever get a report from Mr. -- Agent Romero about

20   what he had learned prior to your arrival?

21   A.   No.

22   Q.   Did you ever ask him, What did you ask and what did you

23   learn prior to my arrival?

24   A.   No.

25   Q.   All right.  But at the time of your arrival and your

1    questions, you were still not going to Mirandize Mr. Tew.

2    A.   No.

3    Q.   But then you did ask him that you wanted to ask him about

4    his previous employment at National Air Cargo.

5    A.   Yes.

6    Q.   And then he told you facts.  Like, he said, I was referred

7    for employment by an older gentleman that worked for National

8    Air Cargo by a contract through his company Sand Hill.  And

9    those were facts that you learned.

10   A.   Yes.

11   Q.   And then you learned that Chris Alf is the owner of NAC,

12   but you already knew that?

13   A.   Yes.

14   Q.   Okay.  And then Mrs. Tew jumped in and said that Chris

15   owns NAC, but his spouse Lori Alf fired Michael.  Is that

16   accurate?

17   A.   Yes.

18   Q.   And then you learned that before Michael was fired,

19   somebody was in communication with Chris Alf, and then

20   communication just stopped.  And then you talked about Michael

21   getting a letter from NAC that he was no longer employed.  He

22   wasn't told why.

23           Those are all accurate parts of your conversation

24   with him; right?

25   A.   Yes.

1    Q.  Okay.  And you were told this all went back to 2018, which

2    would be about -- almost two years before.

3    A.  Yes.

4    Q.  And Mr. Tew went on.  He told you that he was close to

5    Mr. Chris Alf and that he wished he was still working for NAC.

6            Did he say that?

7    A.  I don't recall it at this point, but I have reviewed the

8    MOI and read it in there.  But I don't remember him

9    specifically saying that he wished he still worked at NAC.

10   Q.  Who was taking notes?  You weren't?

11   A.  I wasn't.  There was an IRS agent taking notes.  I think

12   the individual who prepared the MOI.

13   Q.  Was that Mr. Stark?

14   A.  I believe so.

15   Q.  I mean, this is pretty detailed.  That's why I -- somebody

16   must have been taking notes.

17   A.  Sure.

18   Q.  But you could see an agent taking notes.

19   A.  Yes.

20   Q.  Mr. Tew also told you that he had helped Chris Alf from

21   going bankrupt.  And that's factual; right?

22   A.  Yes.

23   Q.  And she -- Mrs. Tew said that her last contact with Lori

24   was in November of 2018, and that Michael worked for Lori, and

25   that Lori had fired Richie Schaeffer because Michael -- before

1    Michael.   That's accurate?

2    A.   Yes.   At the time I didn't know who Richard Schaeffer was.

3    So some of the information I had no frame of reference for,

4    but it was volunteered.

5    Q.   Okay.   Oh, so you -- some of this was new.   Some of it was

6    old.

7    A.   Correct.

8    Q.   All right.   Michael referred to himself as a fixer during

9    his employment with NAC, and he also told you he had an M.B.A.

10   Was that new or old?

11   A.   I was aware he had an M.B.A.

12   Q.   But not that he was a fixer?

13   A.   I mean, I had never thought of his employment there in

14   that term on my own before, but --

15   Q.   You thought he was like a financial officer.

16   A.   Of some sort, and he was involved -- I did know he was

17   involved in helping sort through the bankruptcy proceedings

18   for National Air Cargo.

19   Q.   So you knew all that before you interviewed him?

20   A.   Yes.

21   Q.   Okay.   You asked Michael if he still talked to anyone at

22   National, and that time neither one answered.

23   A.   Correct.

24   Q.   Did that send little alarm bells in your head?

25   A.   A little bit, yes.

```
 1   Q.  Because you really wanted to know if they were talking to
 2   Yioulos; right?
 3   A.  I expected if they were going to be answering truthfully,
 4   they would indicate they had made contact with him.  That was
 5   my -- what I anticipated.
 6   Q.  And then Michael -- you pressed.  You pressed on that a
 7   little bit, and Michael said that Jacob last name unknown was
 8   telling him what was going on at NAC.
 9   A.  Yes.
10   Q.  Do you know who this Jacob is now?
11   A.  No, I do not.
12   Q.  So you learned all of -- as far as this report is
13   concerned, those are all things that you learned from
14   interviewing him.
15   A.  Yes.
16   Q.  Would you consider that to be incriminating evidence in
17   terms of your preparing a case?
18   A.  I think the -- the thing that I thought was most
19   incriminating was just the, um, the failure to acknowledge he
20   had been in recent contact with some employees at National Air
21   Cargo.
22   Q.  Were you -- so when you -- let's go through this a minute.
23            When you got the phone call or the message from AUSA
24   Doshi to make the arrest, describe what happened.
25   A.  So I received a phone call, and so I took -- took my phone
```

1    and went inside where I could speak with her more privately.

2    And I think I gave her a synopsis of what had occurred, that I

3    had been able to serve the subpoena, attempted interview

4    questions, they wanted to potentially meet at another time to

5    answer questions further, and just gave her an overview of

6    what the interaction had been.

7    Q.   All right.  And then she said, Arrest him.

8    A.   She said we could proceed with a, um -- we could -- I

9    think there was enough probable cause with the text message

10   and the information we had gleaned from the investigation thus

11   far to proceed with the probable cause arrest.

12   Q.   You communicated that to Romero?

13   A.   I did.

14   Q.   Because he was the actual arresting officer?

15   A.   Yes.  And I don't know if I communicated to Romero

16   initially or Agent Stark with the IRS.  I can't specifically

17   say.  I would have known I would have communicated to them we

18   had been given the go-ahead to make a probable cause arrest of

19   Mr. Tew or to -- and I can't say I told them it was a probable

20   cause, but to go ahead and arrest Mr. Tew.

21   Q.   Did you watch?

22   A.   Yes, I was present for the arrest.  I just didn't handcuff

23   him.

24   Q.   Did he come out with his bare feet and had to get arrested

25   in -- barefooted?

1    A.  I don't know if he had socks on or barefoot.  I do know we

2    later got him shoes, so I don't think he had footwear on at

3    the time.

4    Q.  And his wife helped him put the shoes on?

5    A.  Yes.  Not on the courtyard, but after he was in cuffs, we

6    proceeded to an interior hallway area just so it wasn't so out

7    in the open, and then at that point we tried to prepare him

8    for the, like, transport, so . . .

9    Q.  When did you Mirandize him?

10   A.  He was Mirandized when he was still in the courtyard as

11   soon as he was informed he was under arrest.

12   Q.  Was that done in writing or just orally?

13   A.  Orally.

14   Q.  You didn't ask him to sign a Miranda form?

15   A.  No.

16   Q.  And do you remember one or more of the children crying?

17   A.  No, I don't recall the children crying.

18   Q.  You don't remember one of the children saying, You

19   promised not to arrest my daddy?

20   A.  No.

21   Q.  Where were the children when you watched the arrest?

22   A.  When Michael was actually in custody, to the best of my

23   recollection the children were inside the residence.  I can't

24   say they didn't appear or they didn't -- they weren't at the

25   window and couldn't see into the courtyard, but I don't

```
 1  remember them in the courtyard at that time.  I do -- I do

 2  know one of the reasons we moved him into the interior hallway

 3  of the apartment complex was because I think Mrs. Tew had

 4  expressed concern that she didn't want her children to see him

 5  arrested or handcuffed, so we walked back into the interior

 6  where --

 7  Q.  And so --

 8  A.  -- it would be less visible.

 9  Q.  She brought out shoes for him?

10  A.  Yes.

11  Q.  And those were put on while he was in the hallway?

12  A.  Correct.

13  Q.  What were the other agents doing while Mr. -- Agent Romero

14  and you were effectuating an arrest?

15  A.  They were -- they were colocated with us.  They were

16  assisting and preparing him to transport.

17          MR. BORNSTEIN:  No further questions.  Thank you.

18          THE COURT:  Thank you, Mr. Bornstein.

19          Redirect?

20          MR. FIELDS:  No, Your Honor.

21          THE COURT:  All right.  Thank you.

22          You may step down, Agent Anderson.

23          You can call your next witness, Mr. Fields.

24          MR. FIELDS:  Thank you, Your Honor.  The United

25  States calls Lisa Palmer.
```

 1           COURTROOM DEPUTY:  Please raise your right hand.
 2      (The witness was sworn.)
 3           COURTROOM DEPUTY:  Please be seated.
 4           Please state your name, and spell your first and last
 5  names for the record.
 6           THE WITNESS:  My name is Lisa Palmer.  L-i-s-a,
 7  P-a-l-m-e-r.
 8           MR. FIELDS:  May I --
 9           THE COURT:  Go ahead.
10      **LISA PALMER, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**
11  BY MR. FIELDS:
12  Q.  Miss Palmer, where do you work?
13  A.  I work for the IRS in the criminal investigation division.
14  Q.  What's your title?
15  A.  Special agent.
16  Q.  What are your current responsibilities?
17  A.  The primary responsibility is to investigate allegations
18  of basically tax fraud, money laundering, and other related
19  financial crimes.
20  Q.  Did you have those same responsibilities back in 2020?
21  A.  I did.
22  Q.  How long have you been an IRS agent?
23  A.  I started with the agency in 2017, and I graduated the
24  academy in 2018.
25  Q.  Did you get training on executing search warrants?

1   A.   I did.

2   Q.   Describe that training for us.

3   A.   We received a mix of training.  Some was, I will say,

4   theoretical, so like the legal framework that underlines an

5   agent and an agency's ability to execute a search warrant, and

6   some of it was practical.  So we would have mock search

7   warrants with role players who were on site to act as either

8   attorneys or subjects or observers, and we would then -- once

9   we had executed these, you know, mock search warrants, we

10  received feedback on what we did well, what we did poorly.

11          And then there's also practical on-the-job training

12  when you get out of the academy where you start going on

13  warrants, and it's a constant process of continual feedback

14  and what can we do better, that sort of stuff.

15  Q.   There's standard procedures you follow when you are

16  executing a search warrant?

17  A.   There are.

18  Q.   What are they?

19  A.   So the first thing we do when we make entry is we knock

20  and announce:  Police with a warrant.  Open the door.

21          The building is then made clear, meaning that the

22  agents who have made entry are looking for threats and for

23  people.  Once entry has been made and the site has been

24  secured, the entire warrant location will be photographed.

25  Then once the photographs have been made, the search will be

1    executed.  Evidence is then photographed in place and then

2    also separately to give an idea of scale and details.  Once

3    the warrant is complete and there's no further places to be

4    searched, the residence or the premises will be photographed

5    again to document the state it was left in.  And the site has

6    to be secured.  And definition of "secure" can vary depending

7    on the particulars of the site, but generally it means that

8    the building cannot be reentered if it is private.

9    Q.  So it sounds like there are three sets of photographs.

10   A.  Correct.

11   Q.  That's a lot of photographs.  Why do you take so many

12   photographs?

13   A.  Two reasons.  One is to protect the government, and the

14   other is to protect the subjects of the investigation.  In the

15   case of protecting the government, it's to show, hey, here is

16   what was at the site when it was searched and what we found.

17   And to protect the subjects, basically to show this is what

18   happened while we were there, this is what it was like before,

19   what it was after.  It makes it very difficult for agents to

20   behave improperly.

21   Q.  Do those photographs also sometimes have independent

22   evidentiary value?

23   A.  They do.

24   Q.  How so?

25   A.  For example, today in identifying the apartment building.

1    Sometimes we might have -- there might be something where it

2    is not on a list of items to be seized, but it is still of

3    interest.  Maybe we didn't know something was there

4    beforehand.  We will take a photograph of it to save for

5    later, potentially for another warrant.

6    Q.  Let's talk about the search warrant in this case.  Did you

7    prepare a warrant for -- or was a warrant prepared to search

8    3222 First Avenue, Apartment 204 [sic]?

9    A.  It was.

10   Q.  What was the objective of that warrant?

11   A.  The objective was to obtain Kimberley Tew's cell phone as

12   well as two money bags.

13   Q.  When you say "money bag," what do you mean by that?

14   A.  In surveillance footage we saw that there was, like, a

15   cloth zippered pouch that had the name of a bank on it.  We

16   discovered through the proffer with Mr. Tew that those money

17   bags were given to him by the bank when he would go and

18   withdraw cash from the bank.  He would then take the cash and

19   go to various locations, including Bitcoin ATMs, and deposit

20   the proceeds.

21   Q.  Approximately when was the search warrant executed?

22   A.  I believe it was executed the afternoon of July 31st,

23   2020.

24   Q.  Were you part of the execution team?

25   A.  I was part of the search warrant team, yes.

1    Q.  How many agents were on the search?

2    A.  I believe there were approximately ten personnel.  Not all

3    of them were agents, though.  I think seven or eight of them

4    were agents.

5    Q.  Why did you need seven or eight agents?

6    A.  Standard procedure.  Um, when we execute a search warrant,

7    we bring a fairly large team with us.  We never know exactly

8    what we are going to encounter, so we want to make sure that

9    we have enough personnel to kind of overcome the unknowns.

10   And then also, from a safety perspective, we find that things

11   tend to be de-escalated and calmer when there are a lot of

12   agents around instead of just one or two.

13   Q.  So when the search warrant was executed, did you make

14   initial entry?

15   A.  I did not.

16   Q.  What did you do?

17   A.  I waited in the hallway for the entry team to complete

18   their sweep and securing the residence.

19   Q.  What happened after the sweep?

20   A.  We began documenting the scene, in this case, the photos.

21   And then I entered the residence, and I believe it was Special

22   Agent Anderson and myself made contact with Mr. Tew.

23   Q.  What did you tell him?

24   A.  That we were executing a search of the residence, and we

25   told him we were looking for Mrs. Tew's phone and the two

1    money bags.

2    Q.  What did he say about the phone?

3    A.  He said that Kimberley Tew was no longer at the residence,

4    she had her phone with her, and the phone wasn't there.

5    Q.  What did he say about the money bags?

6    A.  He showed us where to find the money bags.

7    Q.  Were photographs taken during the search?

8    A.  They were.

9    Q.  Did you review those photographs before your testimony

10   today?

11   A.  I did.

12         MR. FIELDS:  Let's look at Government's Exhibit 6.

13   BY MR. FIELDS:

14   Q.  Are these the photographs taken before the search?

15   A.  This particular photo is just -- it's done at kind of the

16   start of every search showing the location that's being

17   searched, who is the photographer, that sort of stuff, so yes.

18   Q.  Yeah.  So if we go through each of these, is this the

19   tranche of photographs sort of documenting the beginning of

20   the search?

21   A.  Yes.

22         MR. FIELDS:  Your Honor, at this time I'd move for

23   the admission of Government's Exhibit 6.

24         THE COURT:  Any objection, Mr. Bornstein?

25         MR. BORNSTEIN:  Can I voir dire a little bit, because

1    this exhibit seems to have 30 pages.

2            THE COURT:  Sure, briefly.

3                    **VOIR DIRE EXAMINATION**

4    MR. BORNSTEIN:

5    Q.  Ms. Palmer -- Agent Palmer, does this exhibit have 30

6    pages?

7    A.  I would have to double-check if -- I'm not sure without

8    scrolling through the pages myself at this moment.

9    Q.  Did you review it before the hearing today?

10   A.  I did.

11   Q.  Do you remember approximately how many pages there were?

12   A.  I believe it would be approximately 30 pages, yes.

13   Q.  And what do those pages show?  I mean, Mr. Fields just

14   showed us a couple of the first ones.

15   A.  They show photographs that were taken during the search.

16   Q.  All right.  So, um, you don't have the ability to maneuver

17   that.

18           MR. BORNSTEIN:  Would you do 21?

19           MR. FIELDS:  Do you want page 21?

20           MR. BORNSTEIN:  Page 21.

21           THE COURT:  You do have a paper copy of it, too, I

22   think --

23           THE WITNESS:  Oh, thank you.

24           THE COURT:  -- if that's easier.

25           THE WITNESS:  I'm so sorry.

1              THE COURT:  That's okay.

2              MR. BORNSTEIN:  Ah.  Okay.  Thank you, Your Honor.

3    That makes things a lot easier.

4    BY MR. BORNSTEIN:

5    Q.  All right.  Page 21 shows a children's room?

6    A.  Correct.

7    Q.  It shows little children's toys?

8    A.  Correct.

9    Q.  It looks like a children's bed, two beds.

10   A.  Correct.

11   Q.  What's the evidentiary value for that photograph?

12   A.  We --

13             MR. FIELDS:  Your Honor, I object.  This is more of a

14   cross-examination and not the voir dire.

15             MR. BORNSTEIN:  Okay.  I'll -- let me just identify.

16   I won't go into it.  I'll --

17             THE COURT:  All right.

18             MR. BORNSTEIN:  I'll leave that alone.

19             THE COURT:  Thank you.

20   BY MR. BORNSTEIN:

21   Q.  Look at page 23.  Is that a children's room with two beds?

22   A.  It appears to be.

23   Q.  Page 24 looks like a children's closet.

24   A.  Correct.

25   Q.  Same with 25?

20-cr-00305-DDD                Palmer - Voir Dire              10/12/2022    152

1    A.   Agreed.

2    Q.   27, looks like a photograph of at least one child, maybe

3    two.

4    A.   Correct.

5    Q.   28.  What's shown in 28?

6    A.   28 appears to be the same room and the same individuals as

7    the previous photo.

8    Q.   Is that an adult or a child?

9    A.   It looks like there are two adults and one child -- or,

10   sorry, two children and one adult.

11   Q.   What's picture 30?

12   A.   Is 30 the closet with the white hangers?

13   Q.   Yes.

14   A.   It appears to be a closet with white hangers.

15   Q.   Go back, if you would, please, to picture 13.  What's 13?

16   A.   Is 13 what is showing right now?

17   Q.   Yes.

18   A.   That appears to be the main room and a little bit of the

19   kitchen area of the Tews' residence.

20   Q.   What's 12?  I'm going backwards.

21   A.   12 appears to be a utility closet.

22   Q.   11?

23   A.   That appears to be another photograph of the utility

24   closet.

25   Q.   To, what, a washing machine and a dryer?

Julie H. Thomas, RMR, CRR                          (303)335-2111

1    A.  It appears that way.

2    Q.  Picture 7, what's in 7?

3    A.  That appears to be -- it's a room with a lot of bookcases

4    and a desk.

5    Q.  Where was that in the apartment?

6    A.  I believe that was just off of the kitchen, but I would

7    have to check a floor plan to be sure.

8    Q.  All right.  What's in picture 17?

9         MR. FIELDS:  Your Honor, I object.  This is going

10   beyond voir dire.  The pictures are what they purport to be.

11        THE COURT:  I'll go ahead, but --

12        MR. BORNSTEIN:  I believe a record should be made of

13   what this exhibit really is.  That's why I'm trying to -- I

14   want this in the record.  That's why I'm making it.

15        THE COURT:  Okay.  I mean, this is a suppression

16   hearing.  You don't have a jury.  You're just trying to get

17   stuff in front of me so I can decide --

18        MR. BORNSTEIN:  Correct.

19        THE COURT:  -- what's what.  But you can go ahead for

20   a little bit.

21        MR. BORNSTEIN:  And for purposes of my

22   cross-examination, I just wanted to get subject matter

23   established in the record.

24   BY MR. BORNSTEIN:

25   Q.  The last question.  What's 17?

1    A.   17 appears to be a bathroom.

2              MR. BORNSTEIN:   Thank you.   No further voir dire.

3              No objection.

4              THE COURT:   Okay.   So that's admitted.

5         (Government's Exhibit 6 admitted.)

6              THE COURT:   Go ahead, Mr. Fields.

7                   **DIRECT EXAMINATION (Resumed)**

8    BY MR. FIELDS:

9    Q.   You mentioned three tranches of photographs earlier.   We

10   were just looking at the photographs taken before the search.

11   Let's look at Government's Exhibit 7.

12             MR. FIELDS:   And if we go to page 35.

13             MR. BORNSTEIN:   What page?

14             MR. FIELDS:   35.

15   BY MR. FIELDS:

16   Q.   Is this the tranche of photographs taken after the search?

17   A.   I believe so, yes.

18             MR. FIELDS:   Your Honor, at this time I'd move for

19   the admission of Government's Exhibit 7.

20             MR. BORNSTEIN:   Is that a one-page exhibit?

21             MR. FIELDS:   No.   It's approximately 30 pages.

22             MR. BORNSTEIN:   Excuse me.   Let me look at this, Your

23   Honor, if I might.

24             THE COURT:   Okay.

25             MR. BORNSTEIN:   My problem is I think I'm looking at

1   Exhibit 7, and something else is on the screen.

2          MR. FIELDS:  This is page 35 of Government's

3   Exhibit 7.

4          MR. BORNSTEIN:  Oh, I'm sorry.  Okay.

5          No objection.

6          THE COURT:  All right.  It's admitted.

7      (Government's Exhibit 7 admitted.)

8          THE COURT:  When you said "before and after the

9   search," could you just get the witness to clarify what you

10  mean by "before and after the search" in these two different

11  exhibits?

12         MR. FIELDS:  Yeah, sure.  Let's talk about that

13  again.  First of all, let's take that down.

14  BY MR. FIELDS:

15  Q.  So you described for us earlier in your testimony the

16  procedure that's used when you're executing warrants.

17  A.  Mm-hmm.

18  Q.  Describe for us the three parts of a warrant where

19  photographs are taken.

20  A.  So the first part is after the residence or the premises

21  has been secured.  A photographer will go and they will take

22  photographs of the entire location to be searched, including

23  interior and exterior photos, to document the state of the

24  premises when we entered.

25  Q.  What's the second time they take photographs?

1    A.   The second time that they take photographs is whenever

2    evidence is found.   So say an agent is searching the bedroom,

3    and they find a cell phone or a pile of drugs.   They'll call

4    the photographer over and have them photograph the evidence,

5    first, in place where it was found and then, secondly, kind of

6    in detail.   So if it's a cell phone, they will flip it over so

7    you can see, you know, the serial number on the back,

8    something like that, or hold a ruler up to it so they can

9    actually see the size and have some context for what the photo

10   is of.

11   Q.   So Government's Exhibit 6 was before the search.

12   Government's Exhibit 7 was after the search.   Now let's look

13   at Government's Exhibit 8.

14           MR. FIELDS:   And if we could, please, go to page 20.

15   BY MR. FIELDS:

16   Q.   Now, in this photograph do you see a little yellow

17   placard?

18   A.   I do.

19   Q.   What does that yellow placard indicate?

20   A.   That yellow placard indicates that evidence was found at

21   that location.

22   Q.   So is this tranche of photographs that's Government's

23   Exhibit 8, are these the photographs that were taken during

24   the search?

25   A.   Yes.

1   Q.   So this would be that third tranche of photographs?

2   A.   Yes.  I think you said the third tranche was after, so --

3   Q.   So, yeah, before, during, after.

4   A.   Correct.  This would be the photos taken during the

5   search.

6          MR. FIELDS:  Your Honor, at this time I'd move for

7   the admission of Government's Exhibit 8.

8          THE COURT:  Mr. Bornstein?

9          MR. BORNSTEIN:  Your Honor, I'm going to object to 8,

10  because it's represented that this is what was found in the

11  search that has evidence or documents, what they seized that

12  was pursuant to the court warrant, and I don't believe that

13  that's what these photographs are.

14         THE COURT:  Why don't you go ahead and respond,

15  Mr. Fields.

16         MR. FIELDS:  Your Honor, the agent just testified

17  that that little placard there, which shows a 1, is where they

18  found evidence pursuant to the search.

19         THE COURT:  Okay.

20         MR. BORNSTEIN:  Yes, but this is 40 pages of

21  photographs, and only one page is what they found in the

22  search.

23         THE COURT:  All right.  So I guess is that right,

24  Mr. Fields?  Does just this one photograph have the placard?

25  Is that right?

1              MR. FIELDS:  That is right, Your Honor.  For purposes

2     of this motion to suppress, as I understand their motion, they

3     are saying there were an excessive amount of photographs.  I

4     think getting all of these photographs into the record

5     establishes exactly how many photographs were taken.  And the

6     agent has just described, sort of, how and why they were

7     taken.  So I think they are relevant for that purpose.

8              THE COURT:  So I will overrule the objection and

9     admit number 8 with that kind of understanding of what these

10    show, which is obviously different than what might happen in a

11    trial.

12         (Government's Exhibit 8 admitted.)

13    BY MR. FIELDS:

14    Q.  All right.  So when agents take these photos three times,

15    before, during, after, are they photographing the same areas

16    of a place?

17    A.  Yes.

18    Q.  Do they photograph the entire place?

19    A.  Yes.

20    Q.  Why?

21    A.  We will photograph the entire area that we are allowed to

22    search regardless of whether or not we find evidence there, at

23    least for the first tranche and the last tranche of photos.

24    And, again, it's to document the scene as we found it and as

25    we left it.

1   Q.   Are agents sometimes accused of damaging property?

2   A.   They are.

3   Q.   So how do photographs help -- why are they relevant to

4   accusations like that?

5   A.   So if agents do damage property, it should show up in

6   those photos, whether it be even that first tranche if damage

7   was made during entry or in that last tranche if damage was

8   made during the search.  It documents the scene as it was at

9   the time the photos were taken.

10  Q.   All right.  So here we are in Government's Exhibit 8, page

11  20, and we talked about this yellow placard.  Now could we go

12  to Government's Exhibit 8, the next page, page 21?  Is this a

13  close-up view?

14  A.   Yes, that's a close-up view.

15  Q.   And now page 22.  Now are we even closer?

16  A.   Yes.

17  Q.   What did the agents find?

18  A.   We found one of the two money pouches we were searching

19  for.

20  Q.   Now page 23.  Is this one of those money pouches?

21  A.   Yes.

22  Q.   Now let's go to Government's Exhibit 7.  These are the

23  photographs taken after the search.  Page 30.  Do you

24  recognize this space?

25  A.   Yes, I do.

20-cr-00305-DDD                    Palmer - Direct               10/12/2022   160

1    Q.  What is this space?

2    A.  That space is the primary bedroom of the apartment that we

3    searched that day.

4    Q.  Do you recognize the closet?

5    A.  I do.

6    Q.  Was anything found inside that closet?

7    A.  I believe one of the money pouches was found in that

8    closet.

9    Q.  So if we go to Government's Exhibit 8 and page 24.

10            MR. FIELDS:  08-024.

11   BY MR. FIELDS:

12   Q.  Do you see another yellow placard?

13   A.  I do.

14   Q.  Now the next page, page 25.

15            MR. BORNSTEIN:  What page are we looking at for

16   another placard?

17            MR. FIELDS:  24.  So let's go back up to page 24.

18            MR. BORNSTEIN:  Oh, okay.  I'm sorry.  Thank you.

19   BY MR. FIELDS:

20   Q.  Just so we have it in the record, do you want to circle

21   where you see the placard?

22   A.  It's a little off, but in the white box.

23   Q.  Now if we go to the next page, page 25.  Is that a

24   close-up view?

25   A.  It is.

1    Q.  Page 26, is that an even closer view?

2    A.  It is.

3    Q.  Now if we go to page 27, does that show the bag that was

4    found?

5    A.  It does.

6           MR. FIELDS:  Okay.  We can take those down.

7    BY MR. FIELDS:

8    Q.  How long did it take to execute the search warrants?

9    A.  I believe it took approximately two hours.

10   Q.  Now, if Mr. Tew pointed out the location of the bags and

11   said that the phone wasn't in the apartment, why did it take

12   two hours?

13   A.  We still are obligated to perform a complete and thorough

14   search until we find everything we are looking for.  And

15   people lie to federal agents during investigations.

16   Q.  Yeah.  So if Mr. Tew told you that the phone wasn't there,

17   why didn't you take his word for it?

18   A.  Again, people lie, so we had the right per the warrant to

19   be at the premises to execute the search, so we completed the

20   search until we were confident the phone was not on the

21   premises.

22   Q.  Did you find the phone?

23   A.  We did not find the phone.

24   Q.  What was ultimately seized pursuant to the warrant?

25   A.  The two money pouches.

1            MR. FIELDS:  May I have a moment, Your Honor?

2            THE COURT:  Sure.

3            MR. FIELDS:  No further questions, Your Honor.

4            THE COURT:  All right.  Thank you.

5            Cross-examination?

6                          **CROSS-EXAMINATION**

7    BY MR. BORNSTEIN:

8    Q.  Miss Palmer, you said you graduated from the academy in

9    2018?

10   A.  That is correct.

11   Q.  What month?

12   A.  I believe it was February 2018.

13   Q.  So in July of 2020 you had been a special agent for a year

14   and a half?

15   A.  Uh, I think it's two and a half, two years and change, at

16   that point.

17   Q.  Two years.  And during those two years, how many warrants

18   did you obtain, personally sign off on?

19   A.  I believe at that point none.

20   Q.  And how many warrants did you participate with a team in

21   executing a warrant up to that point?

22   A.  My best guess is 15 to 20, but I'm not actually sure.

23   Q.  All right.

24           MR. BORNSTEIN:  So if we could call up Exhibit 8 with

25   the number 2 on it, please.

1            MR. FIELDS:  You want page 2?

2            MR. BORNSTEIN:  The page with the number 2, uh,

3    placard that shows something found.  That's one.  Okay.  So if

4    you could go back a photo, please.

5            MR. FIELDS:  So placard 2 is here.

6            MR. BORNSTEIN:  Okay.

7    BY MR. BORNSTEIN:

8    Q.  So placard 2 is -- that shows -- what kind of money bag is

9    that?

10   A.  It's a cloth pouch with a zipper.

11   Q.  Okay.

12           MR. BORNSTEIN:  Could we do the next photo, please?

13   BY MR. BORNSTEIN:

14   Q.  And how big is that bag?

15   A.  Um, I would have to look at the measurements, but maybe

16   like 4 or 5 inches by 9 inches approximately.

17   Q.  All right.  And what bank is it from?

18   A.  Guaranty Bank and Trust Company.

19           MR. BORNSTEIN:  Could we see the next photograph, I

20   believe?

21   BY MR. BORNSTEIN:

22   Q.  And does that show the ruler?

23   A.  Yes, it does.

24           MR. BORNSTEIN:  And then the next photograph?

25   BY MR. BORNSTEIN:

Julie H. Thomas, RMR, CRR                        (303)335-2111

1    Q.  Where did all those little thumb drives show up?

2    A.  I believe they were inside the bag.

3    Q.  So did that indicate to you that that bag had never been

4    used for money?

5    A.  No, it did not.

6    Q.  It was used to store thumb drives?

7    A.  No, it did not.

8    Q.  Why not?

9    A.  Because you don't get a bag like that without it being

10   provided by the bank.

11   Q.  That's true.  It's got a bank name on it, but in this case

12   it was not being used for money, was it?

13   A.  At this point in time, no, it was not being used for

14   money.

15   Q.  How did you know at that point in time that it had ever

16   been used for money?

17   A.  Guaranty Bank and Trust Company was one of the banks where

18   Mr. Tew had accounts that received proceeds from the alleged

19   NAC fraud.  That included cash withdrawals.

20   Q.  All right.  So you, "you" meaning the IRS, conducted

21   surveillance of Mr. Tew at banks; right?

22   A.  No, we did not.

23   Q.  You didn't conduct surveillance or get surveillance

24   footage at the Navy Federal Credit Union?

25   A.  We did get surveillance footage from Navy Federal Credit

1   Union.

2   Q.  Did you ever get surveillance footage from Guaranty Bank?

3   A.  No, I did not.

4   Q.  Do you have a date when he ever went to Guaranty Bank to

5   withdraw any money?

6   A.  I believe that there are bank statements that show that

7   cash withdrawals were made in person, but I would want to

8   check my notes before I answered that definitively.

9   Q.  You have here in this photograph proof that this bag was

10  used to store thumb drives; right?

11  A.  Correct.

12  Q.  How -- for how long had that bag been used to store thumb

13  drives?

14  A.  I do not know.

15  Q.  Okay.  Now, explain to me, please, how seizing that bag

16  was given to you -- I mean, how seizing that bag fits into the

17  warrant you obtained.

18  A.  The warrant included a list of items to be seized, and it

19  included two cloth bags.  During Mr. Tew's proffer, he had

20  detailed that he had used bags to transport cash withdrawals.

21  Q.  Let me go back to the question.  The question was:  What

22  makes you think that the warrant allowed you to seize a bag

23  that has thumb drives in it?

24  A.  Because the name of the bank on the bag is one of the

25  banks where Mr. Tew received proceeds from the National Air

1   Cargo fraud, and then Mr. Tew told us that he used bags such

2   as this to transport currency that he withdrew from those

3   accounts.

4   Q.   What year?

5   A.   I believe Mr. Tew had the Guaranty Bank and Trust account

6   in 2018, but I would have to double-check my records.

7   Q.   So he had a bank account in 2018, and you are doing a

8   search in 2020, and you find a Guaranty Bank [sic] with a lot

9   of thumb drives in it, and you think that your warrant gave

10  you permission to take that bag?

11  A.   Yes.

12  Q.   All right.  Did you ask -- did you write the warrant?  Did

13  you write the affidavit?

14  A.   I helped in preparing it.

15  Q.   And who else helped?

16  A.   AUSA Doshi and Special Agent Anderson and, I believe,

17  other members of the prosecution team.

18  Q.   Okay.  Who else on the prosecution -- you had a lawyer

19  from the Attorney General's -- I mean, the, uh -- from the

20  prosecution.  You had a special agent from the FBI.  Yourself.

21  Who else?

22  A.   There was a forensic accountant by the name of Matt Morgan

23  who helped with our review of financial documents.

24  Q.   What did Matt Morgan's review have to do with a bank bag?

25  A.   We were reviewing bank documents, and Mr. Morgan helped

1    with the review of bank documents.

2    Q.   Okay.

3    A.   It relates to the affidavit as a whole.

4    Q.   So you were looking for a Wells Fargo Bank bag too; right?

5    A.   Correct.

6    Q.   When did Mr. Tew have any account at Wells Fargo?

7    A.   I do not remember the dates that he had the account, but I

8    do know that between 2018 and 2020 he did receive multiple

9    deposits from National Air Cargo as part of the fraud.

10   Q.   That's not my question.  My question is:  You asked the

11   magistrate judge for permission to seize a Wells Fargo bag.

12   What made you think a Wells Fargo bag was evidence of a crime?

13   A.   Because Mr. Tew had received deposits from the National

14   Air Cargo as part of the fraud to his accounts at Wells Fargo,

15   and he --

16   Q.   Okay.  Link that to Wells Fargo.  When did he have a Wells

17   Fargo account?

18   A.   I do not remember the exact dates of the statements, but I

19   know during the fraud between 2018 and 2020 Mr. Tew received

20   deposits into a Wells Fargo account from National Air Cargo as

21   part of the fraud.

22   Q.   He only had a Wells Fargo account for about three months;

23   isn't that true?

24   A.   I don't remember the duration.  I could check the bank

25   statements and let you know.

1   Q.  When you asked the magistrate judge for permission to

2   seize a Wells Fargo bag, what made you think that that bag was

3   linked to any fraud with National Air Cargo?

4   A.  We reviewed the Wells Fargo Bank statements for the

5   accounts that Mr. Tew was the signatory on, and he made large

6   cash withdrawals at Wells Fargo immediately after receiving

7   the NAC proceeds from the fraud.

8   Q.  How many times?

9   A.  I don't remember off the top of my head.

10  Q.  More than five?

11  A.  I don't remember.

12  Q.  Six times?

13  A.  I don't remember.

14  Q.  Large cash.  How much?

15  A.  I would have to check my notes, but several thousand

16  dollars at least.

17  Q.  How is several thousand dollars supposed to fit into a

18  bank bag that size?

19  A.  Depends on the denomination.  If you use bills such as

20  hundred bills, a thousand dollars is only ten bills.

21  Q.  Did you have evidence of hundred-dollar bills?

22  A.  No.

23  Q.  What evidence did you have that that bank bag was actually

24  linked to this crime?

25  A.  Mr. Tew told us that he used bank bags in his proffer, and

```
1    then we had security footage from the -- a couple of -- from

2    two different Bitcoin kiosks.  One in particular included a

3    video where he was taking money out of the bag and putting it

4    into the Bitcoin kiosk.

5    Q.  What bank bag was used?

6    A.  I don't recall off the top of my head.

7    Q.  Was it Wells Fargo?

8    A.  I don't recall.

9    Q.  So I'm going to go back.  You asked a judge to give you

10   permission to seize a Wells Fargo bag by name; right?  It's in

11   the warrant; right?

12   A.  I would double-check, but yes.

13   Q.  You said to the judge, I want to seize a Wells Fargo bag.

14          Were you taught at the academy that you have to link

15   what you want to seize to the crime?

16   A.  Yes.

17   Q.  So I'm asking you:  How did you link a Wells Fargo bag in

18   2020 to accounts that were used years before?

19   A.  Again, Mr. Tew or accounts controlled by Mr. Tew received

20   deposits from National Air Cargo as part of the fraud.  That

21   was at Wells Fargo.

22   Q.  When?

23   A.  I don't recall without looking at bank statements, but it

24   was between 2018 and 2020.

25   Q.  Closer to '18, or closer to '20?
```

 1   A.  I do not recall the exact dates.

 2   Q.  '19?

 3   A.  I do not recall the exact dates.

 4   Q.  For how many months did he have that account opened at

 5   Wells Fargo?

 6   A.  I do not recall without checking the bank statements.

 7   Q.  All right.  One other question.  Did you ask the

 8   magistrate judge for permission to take hundreds -- 120

 9   photographs?

10   A.  We did not explicitly ask permission to take photographs.

11   Q.  Why not?

12   A.  Because it is standard operating procedure for all

13   agencies to take photographs related to a search warrant.

14   Q.  Well, do you know what the Fourth Amendment to the

15   Constitution of the United States says about what you can

16   seize?

17   A.  It says that we can seize whatever the Court allows us to

18   so long as we have probable cause.

19   Q.  And you did not ask the Court for permission to seize a

20   hundred-some photographs, did you?

21   A.  We did not seize photographs.  We took photographs, and we

22   did not ask the Court for permission to take photographs.

23   Q.  You seized images of the apartment.  Correct?

24          MR. FIELDS:  Your Honor, this is skating into legal

25   territory over what constitutes a seizure.  I'm not sure the

1   agent is competent to answer those legal questions.

2              MR. BORNSTEIN:  Well, I'm just trying to --

3              THE COURT:  That they took all those pictures I don't

4   think is really contested, so go on.

5              MR. BORNSTEIN:  All right.

6   BY MR. BORNSTEIN:

7   Q.  So is it your testimony that because -- you work for the

8   United States Treasury department; right?

9   A.  At the IRS, yes.

10  Q.  Is it your testimony that the United States Treasury

11  department has a procedure that says you don't have to ask

12  permission from a magistrate judge to seize images in an

13  apartment building?

14  A.  It is our policy.  It is what we are taught.  I do not

15  point to the policy number for that, but we are taught to

16  document a scene when we arrive.  We are taught to take photos

17  before, during, and after.

18  Q.  Were you taught whether that policy meets the requirements

19  of the Fourth Amendment to the United States Constitution?

20  A.  It is my understanding that that particular policy is

21  constitutional, but I am not a lawyer.

22             MR. BORNSTEIN:  No further questions.

23             THE COURT:  Okay.  Thank you.

24             Any redirect?

25             MR. FIELDS:  Very briefly, Your Honor.

Julie H. Thomas, RMR, CRR                          (303)335-2111

1          THE COURT:  Okay.

2                       **REDIRECT EXAMINATION**

3    BY MR. FIELDS:

4    Q.  Special Agent Palmer, do you recall being asked about the

5    evidence linking those particular bank bags to the crime?

6    A.  Yes, I do.

7    Q.  Did you actually put that -- was that put into the

8    warrant?

9    A.  It was.

10   Q.  Were you shown the warrant during your cross-examination?

11   A.  I didn't check it, no.

12   Q.  Let's look at Government's Exhibit 5, if we could, and

13   then let's go to --

14          MR. BORNSTEIN:  Can I get that out, please?

15          Thank you.

16   BY MR. FIELDS:

17   Q.  Let's go to page 15.

18   A.  Is it page 15 of the exhibit or page --

19   Q.  Page 15 of the exhibit.  It's stamped at the bottom SW 45.

20   A.  Thank you.

21   Q.  If you could please read to yourself paragraphs 40 and 41.

22          Have you read them?

23   A.  Yes.

24   Q.  Do those photographs describe in sum and substance and in

25   pertinent part why two bank bags were relevant to your

1    investigation?

2    A.  Yes, it does.

3    Q.  Who told you about these bank bags?

4    A.  Mr. Tew told us about the bank bags, and then the

5    surveillance footage was also a source of information.

6    Q.  And what two bank bags were you told about?

7    A.  The Guaranty Bank and Trust bag and the Wells Fargo bag.

8    Q.  What two bank bags were seized during the warrant?

9    A.  The Guaranty Bank and Trust bag and the Wells Fargo bag.

10   Q.  And do you remember being asked whether or not the warrant

11   authorized your ability to seize those particular bank bags?

12   A.  Yes, I do.

13   Q.  So if we could look at Government's Exhibit 5 again, and

14   let's go to page 4.  Is this attachment B to the warrant?

15   A.  It is.

16   Q.  Is this the attachment that tells you what you are allowed

17   to seize when you execute a warrant?

18   A.  Yes, it does.

19   Q.  What does part A there tell you you are allowed to seize?

20   A.  Two cloth, or similar material, bags approximately the

21   size of 8.5 by 11 inches piece of paper, with one bag bearing

22   the insignia, label, or logo of Wells Fargo and the other

23   bearing an insignia, label, or logo of another bank.

24   Q.  Now, when you seized these bank bags pursuant to the

25   search warrant, you also took those photographs as well;

1    right?

2    A.  Correct.

3    Q.  Do those photographs help show where the bank bags came

4    from?

5    A.  Yes.

6    Q.  Why is that important?

7    A.  It's to show kind of the context for where they were

8    found, and also to show kind of their scale and if they were

9    in use in another form or how they existed at the time they

10   were found.

11   Q.  When you are trying to show the relevance of these bags,

12   do you have to show who may have owned or used them?

13   A.  Not at the time of the photos.

14   Q.  But can those photos help -- do they provide evidence of

15   who might have used those bags?

16   A.  Yes, they do.

17   Q.  How so?

18   A.  It can be where it was found.  So say it was found in the

19   subject's bedroom.  That would be evidence or support that the

20   subject was using them, whereas if they were found, say, in

21   someone else's room, that would be support for the fact that

22   maybe they weren't the subject's.

23            MR. FIELDS:  No further questions, Your Honor.

24            THE COURT:  All right.  Thank you, Mr. Fields.

25            Agent Palmer, you may step down.

1           THE WITNESS:  Thank you so much.

2           THE COURT:  Mr. Fields, am I right that that is the

3    extent of your evidence?

4           MR. FIELDS:  It is, Your Honor.

5           THE COURT:  All right.  Why don't we take a 10-minute

6    recess and come back and discuss this and then move on to

7    discussing the remaining items.  So we'll take a 10-minute

8    recess.

9       (Proceedings recessed 3:07 p.m. to 3:21 p.m.)

10          THE COURT:  Please take your seats.

11          Okay.  So we've completed the evidentiary portion of

12   the hearing.  I think now we can talk about a little bit of a

13   discussion about the -- a little bit of argument as to the

14   suppression issues.

15          Why don't we begin with the Government.  Explain why

16   you believe you've met the burdens for these motions.

17          MR. FIELDS:  Your Honor, I'm going to start

18   backwards.  I'm going to start with the motion to suppress the

19   evidence at the apartment building.

20          THE COURT:  Okay.

21          MR. FIELDS:  First, I just want to note for the

22   record that I think, given that each of these searches was

23   conducted pursuant to a warrant under *Carhee*, it's actually

24   the defense that bears the burden of showing a motion -- that

25   everything should be suppressed.  That being said, the motion

1   should be denied for several reasons.

2          So the motion to suppress -- this is the motion to

3   suppress the search at 3222.  That's ECF number 221 is the

4   defense motion.  So two arguments raised by the defense there.

5   One is there was no link between the bank bags and the crime.

6   There was.  And if you look at Government's Exhibit 5 on page

7   15 and 16, paragraphs 40 and 41, you will see how the agents

8   sort of lay it out.

9          Why did they think the bank bags were used in the

10  scheme?  Well, because Michael Tew told them that he used bank

11  bags to collect money from the scheme.  And even if he hadn't

12  told them that, they saw ATM surveillance footage of him with

13  the bags collecting proceeds of the fraud.  So that's the

14  link.

15         The photographs.  So there are a lot of photographs

16  here, Your Honor.  The Government is not going to use all of

17  these photographs at trial.  Most of that I think can be

18  addressed through a motion in limine, but here we are at a

19  motion to suppress.  He's asking for blanket suppression of

20  all of them.  Blanket suppression should not be the remedy

21  here.  It should be, sort of, photograph by photograph.

22         Even before we get to that, though, we need to see

23  was there actually a seizure, and there was not.  So a

24  seizure, the definition is a -- something that interferes with

25  the possessory interests of the user.  So if there's no

1    seizure, there's no Fourth Amendment violation.

2            So the, sort of, keynote case here is *Maryland versus*

3    *Macon*, 472 U.S. 463, but you can also look at *Arizona versus*

4    *Hicks*.  So *Arizona versus Hicks* is that kind of famous case

5    that's taught in law school still where agents are there, they

6    find some stereo equipment, they look underneath, and they see

7    a serial number.  The lifting of the stereo equipment, Justice

8    Scalia says, Well, that's a search, but actually just

9    recording the serial number, not a seizure.  And the reason

10   for that, as he explains on page 324 of that opinion, is that

11   you are not interfering with anyone's possessory interest of

12   those particular speakers.

13           The same is true here, Your Honor.  Taking all of

14   these photographs does not interfere with anyone's possessory

15   interest in anything in the apartment building, and so there

16   was no seizure.  And without a seizure, no Fourth Amendment

17   violation.  That's what the courts conclude in *Bills versus*

18   *Asteline* and *United States versus Harb* cited in the

19   Government's brief.

20           Even if you were to conclude that it was a seizure,

21   here the question would be:  Okay.  Well, is it in violation

22   of the Fourth Amendment?  And no.  It would be under plain

23   view.  The agents certainly had authority to be inside of the

24   apartment.  They could describe to a jury everything that they

25   saw in, sort of, minute detail.  Oftentimes -- you know, we

1    are not dealing with that here, because in this era federal

2    agents didn't wear bodycams, but if they were, they'd have a

3    bodycam, so you're recording everything, just like their eyes,

4    and all of that would be plain view.  They have authority to

5    be there.  So no Fourth Amendment violation there.

6            And even then, Your Honor, if you are inclined to

7    say, okay, maybe it wasn't plain view, or maybe it was a

8    seizure, the agents -- the warrant authorized them to collect

9    evidence or information related to these crimes.  Attribution

10   evidence showing that these particular bank bags actually

11   belonged to Michael Tew is relevant and is evidence of the

12   crime.  And the fact that these bank bags were located within

13   the apartment owned by Kimberley Tew and Michael Tew and used

14   solely by them as their family residence surely is evidence

15   attributing those bank bags to them and then those bank bags

16   used in the crime.

17           Does Your Honor want to sort of go -- do you want me

18   to argue about all the motions now?

19           THE COURT:  No.  Why don't you let Mr. Bornstein

20   respond on that one, and then we can move on.

21           MR. BORNSTEIN:  Your Honor, in the old tradition of

22   the search and seizure law, we were involved with things like

23   possession and trespass, but -- and since that time search and

24   seizure law has moved from the physical trespass of property

25   and physical possession of property into expectations of

1   privacy, and we are now talking about -- and this gets into a

2   little bit about motion 200 -- that once you start talking

3   about expectations of privacy, you start talking about do you

4   have an expectation of privacy of your apartment where you

5   live, your residence, which the Fourth Amendment has always

6   been -- had a special favor for residences.  And to walk into

7   somebody's apartment and then say we can -- as the evidence

8   is, Michael Tew gives them these two bank bags, says, My wife

9   isn't here, which is very easy to determine.  He calls his

10  wife during the course of this search and says that they're

11  here.  They could call and make a phone call and say that her

12  phone is not there, because she answers the phone, and

13  determine it's time to leave.  They should have finished their

14  search and left instead of doing what they did, which was to

15  stay there for two and a half hours photographing every room,

16  including the kids' house -- kids' rooms.  That's point one.

17          Point two is in their own exhibits 27 and 23 --

18  photographs 27 and 23 as part of Exhibit, I believe, 8, shows

19  that the bank bags that they seized were not 8 and a half by

20  11.  The warrant says that these bank bags are to be 8 and a

21  half by 11, the size of a -- of a, you know, regular paper, 8

22  and a half by 11 sheet of paper.  These bags were 4 by 9,

23  approximately half the size that they had told the magistrate

24  judge that they were looking for.

25          Third, the plain view doctrine was established to say

1    that if you see something illegal, contraband, in plain view,

2    you didn't have to shut your eyes to it.  It's not a plain

3    view doctrine that says that you can, you know, look for

4    things all over the apartment once you have finished your

5    search or should have finished your search just to see if,

6    quote, maybe I can find something.  That's --

7              THE COURT:  So let me ask you --

8              MR. BORNSTEIN:  Yeah.

9              THE COURT:  -- a quick question, because I do think

10   probably your best argument on this one is that they should

11   have stopped their search, not that photographs are seizures

12   or anything like that, but they found all the evidence they

13   were going to find early on --

14             MR. BORNSTEIN:  Right.

15             THE COURT:  -- but continued on.  But is that

16   actually true?  I mean, I suppose they could have taken his

17   word for it or done something else, but they were

18   authorized -- I mean, let me take a step back.  Yes, you

19   certainly have an expectation of privacy in your apartment,

20   but a warrant was issued to search it.  Your expectation of

21   privacy once a warrant has been issued to search your

22   apartment is certainly decreased, if not completely gone.

23             But you're right that -- I think you're right that

24   once the agents have found all the evidence they are

25   authorized to seize, they have to end their search, but what

```
 1   is -- how do I know that that -- when and how that happened?

 2   When do you think they should have stopped?

 3            MR. BORNSTEIN:  All right.  I think that they should

 4   have stopped when Michael Tew called on his phone and talked

 5   to his wife.

 6            THE COURT:  Because they should have known that that

 7   was the phone, that they weren't going to find the phone at

 8   that point?

 9            MR. BORNSTEIN:  Yes.  Or they could have, you

10   know -- they knew because it's -- when they got the warrant,

11   it says the phone number.  The warrant has a phone number in

12   it.  And so they know that -- they have phones.  If they

13   didn't believe him that he was calling that phone number, they

14   could pick up their phone, call that phone number, and say,

15   Mrs. Tew, and all she has to do is say yes, and that's the end

16   of it.

17            THE COURT:  Okay.

18            MR. BORNSTEIN:  That's if they don't believe him.

19            THE COURT:  Right.  And I don't think they are

20   obligated to believe him.  I mean, I guess they could, but --

21            What do you think of Mr. Fields' point that even if

22   some of this should be suppressed or shouldn't be used, that

23   your motion just asks for a blanket suppression of everything

24   from the apartment and that that's not appropriate even if

25   they took too many photographs and spent too long there?
```

1        MR. BORNSTEIN:  I guess if you ask for the sun, the

2    moon, and the stars, and the Court says, I'm going to give you

3    the sun, but you aren't going to get the moon and the stars,

4    that that's part of life in arguing motions in front of a

5    court in a criminal case.  So I think if the Court cuts

6    back -- issues a ruling in which the Court cuts back on what

7    is excessive in terms of the execution of the warrant, then

8    that's the Court's prerogative.  And the Court certainly has

9    the discretion and the ability to do that, and I don't think

10   any appellate court would fault the Court for doing that.

11       THE COURT:  Okay.  You can go ahead, if you have a

12   couple of other --

13       MR. BORNSTEIN:  No, I think those were the things

14   that I wanted to deal with from Mr. Fields' argument.  Those

15   were the plain view doctrine, the possession versus privacy,

16   the size of the bags, the fact that the execution went too

17   long, and the idea that somehow taking all those photographs

18   is not a seizure.  But, you know, if the Court -- I kind of --

19   I appreciate the Court's comments that -- the fact that they

20   exceeded what's reasonable.  I mean, reasonable has always

21   been the touchstone of Fourth Amendment, what was reasonable

22   in terms of when you stop the search.  The search was not

23   reasonable.

24       THE COURT:  Okay.  Thank you.

25       Mr. Fields, do you want to have a little bit of

1    rebuttal?

2              MR. FIELDS:  No, Your Honor.

3              THE COURT:  All right.  Thank you.  Why don't we then

4    move on to the next motion.

5              MR. FIELDS:  So, Your Honor, again sort of working

6    backwards through the testimony, the next one I'd like to

7    address is the motion to suppress the statement, so this is

8    defense motion 216.

9              THE COURT:  Go ahead.

10             MR. FIELDS:  There we heard testimony from Special

11   Agent Anderson and Special Agent Romero.  I don't want to

12   repeat too much of what's in the brief, so what I will do now

13   is I will just put it in the context of the testimony we

14   heard.

15             So the question here is whether or not these

16   statements were custodial.  The definition is, of course,

17   could a reasonable person would [sic] have felt he or she was

18   not at liberty to terminate the interrogation and leave.  And

19   the courts have elucidated a five factor test:  location of

20   the interview, the duration, statements made during the

21   interview indicating whether or not someone had a belief that

22   they could leave, whether physical restraints were used, and

23   whether or not the interviewee is released at the end.  All of

24   those factors weigh in favor of a finding here that this was

25   not custodial.

1          First of all, the location.  There is no doubt that

2     this took place at the Tews' residence, so this was not a

3     police-dominated environment.  This is their personal

4     residence where they are going to feel most comfortable.  They

5     have got their children there.  They are free to move around.

6     They can go into this common space.

7          This factor is not, sort of, determinative, but I

8     would say that the courts do give it more weight than others.

9     That's the *Richie* case, cited in our brief, which says the

10    courts are much less likely to find something was custodial

11    when it takes place at home as opposed to, you know, a police

12    station or a cruiser or something like that.

13         The duration of the interview.  The actual sort of

14    meat of the interview was about 30 minutes, so we are not

15    talking about, sort of, a, you know, five-hour long

16    interrogation here where someone's will was overborne.  We are

17    talking about a short encounter, which again I think weighs in

18    the favor of the finding that it's not custodial.  30 minutes

19    just sitting and chatting is not, sort of, a huge limitation

20    on someone's freedom of action.

21         Statements made during the interview.  In this

22    particular case, the Tews declined to answer a lot of

23    questions.  They weren't really being responsive.  At one

24    point Kimberley Tew actually told Michael Tew to stop, and he

25    did.  At one point in time the agents asked to record the

1    interview, and that invitation is declined.  All of that does

2    not -- all of that indicates a situation where the Tews here

3    are well aware that they have freedom, that they can make

4    decisions, and they are not in custody.

5              THE COURT:  Let me just interrupt you a little bit,

6    because I guess in my mind I have a little trouble keeping

7    distinct the idea of being in custody and voluntarily making

8    statements, which are related, obviously, and both can cause

9    problems, but are not necessarily the same thing.  So I think

10   you could be in custody and still refuse to answer questions.

11   I mean, these are pretty sophisticated people, probably

12   understand they have a right not to answer questions.  So the

13   fact that they at times at least said, We don't want to answer

14   questions, might play into whether other statements were

15   voluntary, but I'm not sure it plays into whether -- or how it

16   plays into the custody question.  Does that make sense?

17             MR. FIELDS:  It does, Your Honor.  And actually the

18   courts -- oftentimes the, sort of, Miranda motion is paired

19   with a voluntariness motion.  As I understand the defense's

20   motion, it's just about Miranda.  So when you look at Miranda,

21   I think what the courts have often done is that analysis gets

22   compressed into, sort of, one, sort of, step, you know, the

23   voluntariness and the statements.  I think the way to read

24   that case law is to say that, sort of, you're right that

25   someone can be in custody and their statement can still be

1   voluntary.  In terms of were they in custody in the first

2   place -- and maybe actually courts have, sort of, created

3   this, like, ouroboros loop, but I think it's a fair reading of

4   the case law to say that the courts look to see did these

5   individuals, sort of, make statements indicating their

6   voluntariness, which would indicate that they are not in

7   custody.  Right?  They still have freedom of action.  They

8   still have freedom of movement.  The court's looking at

9   custody as sort of a real limitation on someone's freedom and

10  as someone's will sort of being -- not overborne in sort of

11  a -- you can be in custody and still make statements, but

12  still there's a dividing line somewhere along there.

13          I'm not sure how to parse that out here, and I don't

14  think we have to.  I think it's, sort of, one factor among

15  many, and it's one that weighs in favor of a finding here that

16  it's not custodial even if it's not determinative.

17          THE COURT:  Okay.

18          MR. FIELDS:  And then release at the end.  Now, the

19  release at the end here was only about 20 minutes, but courts

20  have said that's enough.  He was free to go.  He went back

21  into his apartment.  The agents had to go get him.  That is

22  also unrebutted.

23          THE COURT:  I think you would agree if he had hopped

24  in a cab, he might not have been free to -- they might have

25  stopped him then.  Don't you think there's -- they were

1    prepared, if they had to, to arrest him if he started to

2    leave, not just to go back in the apartment, but to actually

3    go somewhere else where they weren't?

4            MR. FIELDS:  I think they were making those

5    preparations, Your Honor, which is what the testimony says.

6    Right?  So you have this place where the -- the agents are

7    there.  They are conducting surveillance.  They are not sure

8    they are going to make an arrest yet.  They want to talk to

9    him.  Eventually they do make that decision, and it happens

10   pretty quickly, but it is made after the interview.  Right?

11   And so, you know, could he have left?  What would have

12   happened?  All of that is speculative.  And, also, the courts

13   are very clear on this, the subjective intent of the agents

14   does not matter.

15           So looking at all of this objective -- all of these

16   objective factors, the Government would urge the Court to deny

17   the motion because this was not custodial.

18           THE COURT:  All right.  Thank you, Mr. Fields.

19           Mr. Bornstein.

20           MR. BORNSTEIN:  In my view, what the Court started to

21   ask about is the key question in the case or key fact in the

22   case in this motion.  A commonsense, ordinary, regular human

23   beings, not lawyers in court, we're told that the agents went

24   there to make sure that he was not going to flee, would say

25   that if he tried to leave, they would have stopped him.  And

1  the idea that they wouldn't have stopped him or they would

2  have followed him to the airport and watched him get on a

3  plane and head to wherever it would be, South America, is just

4  not believable.  They would not have done that.

5          THE COURT:  So I agree with you about that, and I

6  think Mr. Fields agrees, largely, but I think Mr. Fields'

7  point is that's not the question because that's not what

8  happened.  What happened was they showed up, they asked him

9  some questions, then they let him go back in his apartment,

10  and then they decided to arrest him.

11          And in some senses, you know, I think a normal

12  citizen, FBI agents -- a bunch of FBI agents show up, no

13  matter what, you are going to feel some sense that your

14  freedom to move is restricted in some sense.  I think we all

15  understand that just being confronted by a bunch of law

16  enforcement officers in almost any circumstances is, in that

17  sense, a normal person wouldn't typically just think, well,

18  nothing will happen if I just start to run, for example.

19          On the other hand, the law is also pretty clear that

20  despite maybe that instinct that we all would have, that

21  that's not enough to say you are in custody.  There has to be

22  some actual reasonable either expression or the circumstances

23  have to show that you are not allowed to leave.

24          And here what are those factors, I mean, that he

25  actually would have known about?  Now, there was, as you

1   pointed out, a lot going on behind the scenes.  They may have

2   been preparing to arrest him, but why would someone in his

3   circumstances feel that he was in custody in a way that

4   someone -- anyone else in similar circumstances wouldn't?  I

5   guess my point is:  Doesn't your argument prove a little bit

6   too much that basically any kind of interrogation or

7   questioning by law enforcement officers is going to be

8   involuntary if I agree with your argument here or going to

9   mean you are in custody?

10           MR. BORNSTEIN:  No, Your Honor, because this goes

11  back to Mr. Fields' argument about subjective versus

12  objective.  So that if the -- if we put a defendant on the

13  stand and say, How did you feel about these officers, and he

14  says, Oh, my God, there were four officers, I knew they were

15  armed, I knew that if I did anything they'd, you know, shoot

16  me or stop me or do something to me, that would be subjective,

17  and he would say, Absolutely, subjectively I thought I was in

18  custody.  And the law has said we're not interested in that.

19  You know, you can get on the witness stand and say you

20  subjectively thought that you were not free to leave, and we

21  are not going -- the law is not going to give that a lot of --

22  give -- is not going to make that the touchstone, not going to

23  make that the test.

24           So that's why I go back to the actual test is

25  objectively he couldn't leave.  He could stay in that

1    apartment until they arrested him, but eventually they were

2    going to go into that apartment and arrest him.  The AUSA is

3    obtaining a complaint and a warrant to arrest him.  These

4    agents are aware of that from the AUSA being in contact with

5    them.  So I'm going to go with Mr. Fields' subjective versus

6    objective line of cases.

7             THE COURT:  All right.  I get what you are saying,

8    and I think you are saying that objectively we know all these

9    things, but I think the test is maybe some kind of a weird --

10   well, it's not that weird.  It's -- we do it pretty

11   frequently, I think, in the law, which is -- it's an objective

12   test, but it's from the perspective of a reasonable person in

13   the defendant's -- in the person challenging -- the person

14   making the statements, it's from a reasonable person test in

15   those circumstances.  And he didn't know about what the AUSA

16   was doing behind the scenes.  So that I don't think is

17   relevant to the question of what a reasonable person in his

18   circumstances would have thought about whether he was free to

19   go.  Because the reason custody is important is because we, I

20   guess, sort of as Mr. -- we want to make sure that people when

21   they are -- as Miranda says, we want to make sure people when

22   they are in custody know that they are free not to answer

23   questions.  If you can just walk away or think you can just

24   walk away, then we are not as concerned if you voluntarily --

25   if you go ahead and answer questions.

1          MR. BORNSTEIN:  Well, let me give you a hypothetical
2     then.  Let me give you a hypothetical.
3          THE COURT:  I thought I'm the one who's supposed to
4     give hypotheticals.  This is why I got out of practicing law.
5     But go ahead.
6          MR. BORNSTEIN:  Suppose a very savvy police officer,
7     detective, FBI agent, whatever it is, approaches the subject
8     and says to that subject:  I promise you, I will not arrest
9     you.  I just want to have a couple of words with you.  You
10    know, maybe after you talk to me I'll understand that you are
11    not part of this criminal activity, and I absolutely promise
12    you I'm not going to arrest you.  And he's lying.  I mean, his
13    subjective intent was he was going to arrest him when this was
14    over.  And the subject says, Oh, I believe you.  Oh, you know,
15    you're a law enforcement officer wearing a badge and a gun,
16    and if you tell me I'm -- you know, you're not going to arrest
17    me, I believe you.  Does that mean that they are not in
18    custody?
19         THE COURT:  Yeah, it's a good question.  Isn't the
20    answer no, they are not in custody?  I think the answer is no
21    in that circumstance, isn't it?  Because a reasonable person
22    would say, if they didn't want to answer the questions, would
23    either say, I'm not going to answer it, or just say, Leave me
24    alone, I don't want to talk to you.
25         MR. BORNSTEIN:  But the reason that we ask for

1    Miranda is to advise the subject that what you say might be

2    used against you, and before you talk to me you need to know

3    that what you say might be used against you.  And if you need

4    to consult with a lawyer before making that decision, you have

5    a right to do so.

6           And if you are not told that -- I mean, Miranda is

7    more than just a talisman.  I mean, it actually is supposed to

8    be -- whether, you know -- how it actually works on the field

9    is sometimes a little hard to fathom, but it's supposed to be

10   a talisman that does advise you that, you know, you have some

11   rights.

12          THE COURT:  I agree.  So what do you think are the

13   factors that would tell a reasonable person in Mr. Tew's

14   circumstances that he was in custody at the time he made these

15   statements, not afterwards, but at the time he answered the

16   questions that he answered?

17          MR. BORNSTEIN:  I think the number of agents there is

18   certainly -- and the fact that the agents have positioned

19   themselves so that they are in all different locations in that

20   area.  He goes out in the hallway.  He sees at least two of

21   them in the hallway.  He might not know there's one or two

22   waiting at the bottom of the lobby, but he knows that -- he

23   goes out in the hallway, and here's these people who were out

24   there.  They identify themselves as agents.  More show up, and

25   eventually they tell him that an FBI agent is on her way to

1    question you.  Those are all the factors that I would stress.

2            THE COURT:  Okay.  Thank you.

3            Mr. Fields, any rebuttal?

4            MR. FIELDS:  No, Your Honor, but thank you.

5            THE COURT:  All right.  Thank you.

6            All right.  So I'm going to take these motions under

7    advisement and issue a written order on all the suppression.

8            So why don't we move on, then, to the e-mail, the

9    electronic information motion, which is 200, I think.  I think

10    probably, Mr. Bornstein, I should let you go first and last on

11    this one, since it's not really an evidentiary question, and

12    just highlight for me kind of your legal arguments, and then

13    I'll let Mr. Fields go, and let you have the last word too, if

14    you want to, on this motion.

15            MR. BORNSTEIN:  Thank you.

16            The issue that this motion raises for the Court is

17    twofold.  The first fold is was the use of the Stored

18    Communications Act to obtain ESP, electronically stored data,

19    to obtain ESP records, was that constitutional.  The courts --

20    we argue that it's not constitutional and that the search

21    warrants were invalid.  And we stressed the issue of *Carpenter*

22    *versus the United States*, but I also want to go back a few

23    years to *Riley versus California*.  And in *Riley California* the

24    Court issued the cell phone determination and determined that

25    what was in your cell phones in terms of data was what you --

1    you were carrying around, you know, your life in your cell

2    phone, and that if the police or the FBI, or whatever the law

3    enforcement agency, wanted the contents of your cell phone,

4    they had to get an order.  And in this case when you have

5    Google and Apple, you're talking about not only your cell

6    phone, but your entire cell phone plus your computers, no

7    matter how many computers you have or what other cell phones

8    you have.  And in this case we also have factual information

9    that Mr. Tew's Apple data became merged in Miss Tew's Apple

10   data, and things that were not separate but between the two of

11   them, we're not quite sure how that happened, but at some

12   point those datas were mixed.  So now what you have is not

13   just in terms of *Riley versus California,* not just your cell

14   phone, but your cell phone plus your computer and plus any

15   other computers or cell phones that are linked.  And Google

16   and Apple ask you -- literally ask you, Please, you know, link

17   all of your -- all of your material together.

18          So once you look at *Riley* and *Carpenter* together, we

19   have, in my view, the law catching up or trying to catch up

20   with technology.

21          THE COURT:  Well, let me -- so let me ask you to,

22   sort of, stop right there, because I think I agree with you,

23   the law has probably not entirely caught up with technology,

24   but to go back to *Carpenter*, I mean, the Government is right,

25   the Supreme Court went out of its way to try to limit the

1    holding in *Carpenter*, and you, I think, are -- you know,

2    you're not wrong to suggest that maybe all of these things you

3    just said are true about what is on people's phones and their

4    e-mail and their -- all these accounts being linked up

5    together.  You are not wrong about how modern technology, sort

6    of, puts everything out there.  But I think my view of the law

7    is you've got to convince a higher court than me to deal with

8    that.  The Supreme Court basically said in *Carpenter*, Hey,

9    we're talking a step to modernize some of this Fourth

10   Amendment law when it comes to modern technology, but we're

11   not undoing our precedents as to anything else.  And I'm just

12   down here at the bottom of the ladder, and I'm stuck with

13   that.  Right?  I'm not the one who gets to say, Hey, yeah, now

14   is the time to, sort of, expand *Carpenter* into a new area.

15   Right?

16             MR. BORNSTEIN:  I understand what the Court is

17   saying, obviously.  I mean, I have anticipated that thought

18   and that argument, and I went back, and I read in *Carpenter*

19   what the court said about *Miller* and *Smith*, because *Miller* and

20   *Smith* are the third-party doctrine cases, and that was what

21   was preserved specifically in *Carpenter* was to preserve the

22   *Miller* and *Smith* records for business records exceptions.  I

23   cited to the Court a magistrate judge out of Kansas.  Waxby is

24   the name of the magistrate judge.  And although obviously

25   that's not precedent for this Court, it is a 20-some-odd page

1    opinion that's very well reasoned.  It's a 2016 opinion that's

2    very well reasoned in terms of why *Miller* and *Smith* can stand

3    there, because *Miller* was based on the business records of a

4    bank, and the relationship between the customer and the bank

5    records is limited by the business records exception and by

6    the fact that the customer does direct business with the bank.

7           We do not do direct business with Google.  We do not

8    do direct business with Apple.  If we do a search looking for

9    doctors or -- well, let's say we are looking for abortion

10   clinics, and we are doing that search.  We don't ask Google or

11   Apple to save that information for us like we ask them to save

12   our bank records.  They do it whether we want them to do it or

13   not.  We can't even stop them from doing it.  So there's a

14   difference -- a distinction with a real difference between the

15   bank records in *Miller* and the way that these records are kept

16   by Google, Amazon, Microsoft, et cetera, et cetera.

17          THE COURT:  Okay.

18          MR. BORNSTEIN:  So I agree, the court did want to

19   preserve *Miller* and *Smith*.  If I remember, *Smith* was the

20   traditional trap and trace device which we've -- law

21   enforcement has used for 25, 30 years.  The trap and trace

22   device is a way in which the telephone company would record

23   that the suspect's telephone called these 25 numbers on this

24   day.  It wouldn't tell you who owned those 25 numbers, what

25   those 25 numbers -- whether, you know -- content of the

1    conversation.  I think it did record how many minutes the

2    conversation lasted, but law enforcement would have to find

3    another way to find out who is on that other end of those

4    telephones.  They did.  They often knew that, you know, one

5    drug dealer was calling another drug dealer, and they knew

6    both telephone numbers, and so they could figure out that

7    there was conversations going on between the two.

8            But *Smith* is also different because your relationship

9    to your telephone company is, again, a direct relationship

10   where you make your calls, they bill you.  Often if you ask

11   them, Can I see who I called, can you give me a printout of

12   what my calls were, for example, a business wants to see that,

13   and it's a direct one-to-one relationship, different again

14   from the fact that Google doesn't ask you, you know, what they

15   are going to save.

16           THE COURT:  I get it.  I guess -- and, I mean,

17   believe me, I'm not -- the way that our information is used by

18   Google and other companies, I'm not here to defend that, but

19   isn't the fact that they -- when you use Google or these

20   e-mail -- these free e-mail providers, aren't you -- I mean,

21   it's worse in some ways.  Right?  At least with your bank it's

22   just the two of you having this relationship.  They are not

23   sharing your bank account information with whoever comes along

24   and asks to buy all of it.  Right?  And that's what these

25   internet companies do.  They share it -- it's not just third

1  party.  There's millions of people who have access to all this

2  information.

3          MR. BORNSTEIN:  And they make money doing it.

4          THE COURT:  Exactly.  That's their product.

5          MR. BORNSTEIN:  They make money telling you, you

6  know, how to make searches so that they are tailored directly

7  to the kinds of --

8          THE COURT:  Right.

9          MR. BORNSTEIN:  -- businesses that you historically

10  went to.

11          THE COURT:  Right.  So, but that suggests that you

12  are sharing this information with everybody who wants it.

13          MR. BORNSTEIN:  All I can say to the Court is that

14  the court in *Warshak* was willing to go out on a limb a little

15  bit with its ruling, that in *Carpenter* both the majority and

16  the dissent cited to *Warshak*.  Neither one criticized it as

17  being an example of going too far.  You know, yes, maybe I am

18  asking this Court to go out on a limb a little bit, but, you

19  know, in the interest of -- in the interest of the

20  Constitution, I guess I am, I'm asking this Court to go out on

21  a limb.

22          THE COURT:  All right.  Fair enough.  I appreciate --

23  I appreciate that.

24          Let me then just ask you to address the standing

25  argument, which is sort of tied to the idea that these are

1   kind of, very broad motions that you haven't necessarily tied

2   to every particular account.  You know, each -- you can only

3   assert your own privacy interests in a Fourth Amendment

4   context, not others'.  Mr. Tew can't protect Mrs. Tew's

5   privacy interests, vice versa, let alone anyone else.  And I'm

6   not totally sure I know whose these accounts all are.

7          MR. BORNSTEIN:  Maybe I should call Mr. Tew to the

8   witness stand and put him on about these accounts.

9          THE COURT:  If you want to, I suppose you could do

10  that.  I'm willing to, sort of, take your word for it, though,

11  if you want to just tell me --

12         MR. BORNSTEIN:  I mean, I can tell you -- I think in

13  my reply -- let me look and see if it's in my reply.

14         THE COURT:  I mean, you do list each one, but isn't

15  it -- isn't it that if Miss Tew had an account, it would only

16  be suppressed as to her?  I mean, do you disagree with that

17  sort of proposition?

18         MR. BORNSTEIN:  No, I do not.  I agree with that

19  proposition.  I agree that if the account -- what I do want to

20  make sure the record is clear.  Even though these accounts had

21  Political Media, Rincon, Meyer Consulting, those individuals

22  were not responsible for those e-mail addresses.  Those e-mail

23  addresses were created by one or more of my clients.  So they

24  were not belonging to Mike Meyers.  They were not belonging to

25  Christian Rincon.  They were not belonging to third parties.

1   They belonged to either Mr. or Mrs. Tew, probably Mr. Tew.   I

2   can put him on, we can make a factual record, but I do agree,

3   yes, if that e-mail account is one created by Mr. Tew,

4   Mrs. Tew does not have a privacy interest in it.

5          THE COURT:  Okay.  Before we have him come up, unless

6   there's something else you want to say right now, why don't I

7   let Mr. Fields respond.  And then if we need to, we can -- I

8   will certainly let you come back up, and if we need to, we can

9   take some evidence.  I don't think it's probably necessary.

10          MR. BORNSTEIN:  I just want to say if standing is an

11   issue, then I can clear that standing issue up with that one

12   or -- of my clients has standing to make that issue, to make

13   that argument.

14          THE COURT:  Okay.  All right.  That's good enough for

15   me for now on that.  Thank you.

16          Mr. Fields.

17          MR. FIELDS:  Thank you, Your Honor.  So, as I

18   understand the defendant's motion, we are not talking -- I

19   mean, a warrant was used here.  Right?  So the question is:

20   Does -- do 2703(d) orders, which ask for noncontent, sort of,

21   routing metadata, do those run afoul of the Fourth Amendment?

22   In this particular case, I would say it's not a matter of

23   extending *Carpenter*.  It would actually be running up directly

24   against Tenth Circuit precedent.  *United States versus*

25   *Perrine*, which is cited in the Government's brief,

1    specifically held there's no reasonable expectation of privacy

2    in any of that information.  So for the Court to conclude that

3    the 2703(d) orders here violated the Fourth Amendment, it

4    would actually have to somehow distinguish *Perrine*, and I

5    don't think the defendant has offered any valid way to do

6    that.

7           Let's say maybe, actually, there's the suggestion

8    that *Carpenter*, sort of, sub silentio overturned Tenth Circuit

9    decisions like *Perrine*.  That's where you I think you get into

10   Justice Roberts' very, very explicit, sort of, language that

11   he is not overturning the third-party doctrine in multiple

12   different contexts.  And for good reason, Your Honor.  I mean,

13   if you look at the solicitor general's brief in that case, it

14   was really concerned with the idea that if the court ruled a

15   certain way, use of subpoenas generally might come into

16   question.  Right?  And the use of subpoenas goes back all the

17   way to the common law, to the writs of King Henry VIII.

18   There's precedent going back hundreds of years.  That's why we

19   cite cases like *Morton Salts*, *Oklahoma Press*.  Subpoenas can

20   be used to gather information from third parties without

21   running afoul of the Fourth Amendment.  You give your

22   accountant all of your tax records, and the government

23   subpoenas your accountant, not a violation of the Fourth

24   Amendment.

25          Now, when you start dealing with technology, maybe

1    eventually you get to a point where there's, sort of, issues

2    with, you know, sort of, a mosaic of surveillance over

3    someone.  That's what I think *Carpenter* was getting at was

4    sort of drawing that line right there, but there's been -- I

5    think drawing that line here is very difficult, and there's

6    not a good reason to extend *Carpenter*.  For one, we are not

7    dealing with location information, sort of, 24/7 surveillance.

8    That's not the information we are talking about here.  We are

9    talking about basically the information that's on the envelope

10   of an electronic communication.  The Supreme Court has ruled

11   for hundreds of years, going back all the way back to *Ex parte*

12   *Jackson* in the 1900s, that sort of the information on an

13   envelope when it goes to the postal service, it's in plain

14   view, and there's no Fourth Amendment violation to read the

15   envelope or to use it.

16          THE COURT:  Doesn't the motion make a decent argument

17   that this goes a little bit beyond that, sort of, very basic

18   information that would be on an envelope?  I mean, it's a

19   little bit -- it doesn't include the contents of the e-mails,

20   but doesn't it go a little bit beyond just maybe what an

21   envelope would?

22          MR. FIELDS:  I think so, Your Honor, and there I

23   think we run up against -- in order for the Court to rule in

24   the defendants' favor, you'd almost have to kind of overrule

25   *Katz* a little bit.  You'd have to get into a reasonable

1    expectation of privacy test.  And as has already been

2    discussed, a lot of these companies are very up front about

3    the fact that the bargain here is you get to use Google for

4    free, you get Gmail, you get the suite of documents, and it's

5    great for you, the consumer, who gets all this free stuff, but

6    in return we are going to pillage your data, and we are going

7    to use it, and we are going to sell it to third parties.  And

8    they are very up front about that.

9          So you don't have a reasonable expectation of privacy

10   when you use Google accounts.  If you wanted to use something

11   else, there are all sorts of other, sort of, market actors

12   that will actually protect your privacy.  You can use

13   ProtonMail.  You can use Signal.  You can use all sorts of

14   other things if that's really important to you.  That wasn't

15   this case.

16         So I think in order to extend *Carpenter,* you have got

17   multiple problems.  It's overruling *Perrine.*  It's then

18   getting into, sort of, is *Katz*' reasonable expectation of

19   privacy test privacy-protective enough in this world?  And

20   that is definitely something that could percolate up, but the

21   law on that is very clear.  In order for the Fourth Amendment

22   to apply, it's a reasonable expectation of privacy that

23   society is willing to protect, and it's both subjective and

24   objective.

25         So I think for all of those reasons extending

1    *Carpenter* here does not make a lot of sense.

2          And then I just want to address this, sort of, direct

3    business test potentially that we could use.  I think with a

4    bank oftentimes there will be a personal relationship when you

5    are doing direct business.  It's not really the case with a

6    lot of phone companies.  Right?  Or the idea that the phone

7    company is different because you can call them, and they're

8    keeping track of your number so you have it for a bill, that's

9    exactly what Google does.  You have got all of your e-mails

10   that you could ever use to a personal particular person sorted

11   for you.  So let's say you wanted to talk to your accountant

12   about preparing your taxes.  Here's all the e-mails I sent,

13   you know, to that accountant or to someone else.  That is the

14   service they provide, and you are doing direct business with

15   Google, again, recognizing the bargain that's been struck when

16   you signed their terms of service and got that, the mail.  So

17   I'm not sure that a, sort of, direct business test really gets

18   us any further.

19         The other thing I'll note is just the courts that

20   have addressed whether or not *Carpenter* should be extended

21   here, all the Circuit Courts to address it have declined to do

22   so.  So *Soybel*, cited in the Government's brief at 13 F.4th

23   584, that's particularly talking about, sort of, ISPs and

24   whether or not they should be discovered under the *Carpenter*

25   ambit, but the cases cited in there from various other

1    circuits have come to the same conclusion:  *Carpenter* does not

2    extend to 2703 information.  So if the Court is inclined to

3    look towards persuasive authority, I think those are the cases

4    it should look at.

5          The District of Kansas cases that the defendant is

6    citing -- I think they are on page 9 of his brief -- those are

7    cases, sort of, describing *Warshak* and, sort of, the fallout

8    from *Warshak*.  And the question there was:  Can you use 2703

9    to get content?  And there's this whole content/noncontent

10   distinction.  We are not there here because the Government got

11   a warrant.  It did exactly what the *Warshak* court said the

12   Government should do.

13         So for all --

14         THE COURT:  Let me ask you a quick question about

15   that.  Wouldn't, though, all of the discussion we just had

16   about how Google and these e-mail companies share your

17   information and they sweep through all your stuff, don't they

18   do the same thing with the content of your -- I mean, they may

19   not share it directly in the same way, but, I mean, they seem

20   to know what's in your e-mails.  They get the content.  So

21   wouldn't our -- if we are going to say the third-party

22   doctrine applies -- I mean, this is not that case because you

23   are not asking -- you didn't do that here, but wouldn't truly

24   applying the third-party doctrine in the way we are talking

25   about, sort of, mechanically saying, Well, did you share this

1    with someone else who shares it with a third party, wouldn't

2    that apply to the content too?

3              MR. FIELDS:  Yes.

4              THE COURT:  Okay.

5              MR. FIELDS:  And so I think actually what the court

6    ended up there doing is -- you know, the reasonable

7    expectation of privacy test, *Katz*, really does depend on

8    higher courts saying this is a privacy interest that society

9    is prepared to accept.  So they did that in *Carpenter*.  They

10   did that in *Warshak*.  They have not done that with all this,

11   sort of, routing digiting ISP information we are talking about

12   here.

13             Also I just wanted to note for the record that even

14   if the Court was inclined to conclude that the use of 2703(d)

15   orders here runs afoul of the Fourth Amendment, then you get

16   this analysis where, okay, all of that stuff should be severed

17   from the warrants.  And so then you look at the warrants and

18   you say, Is there still probable cause?  And there is, Your

19   Honor.  If you look at the warrants, what you will see is it

20   describes the fraud, and then National Air Cargo, the victim

21   here, had e-mails in its servers from these e-mail accounts,

22   the ones that were the subject of the warrants, with sham

23   invoices.  So that gives you probable cause to believe that

24   those e-mail addresses, the ones that submitted the sham

25   invoices, may have evidence of a crime.  So I still think you

1    have PC even if the Court were inclined to extend *Carpenter*

2    and to do sort of a *Kastigar*-type analysis.  You could sever

3    out all of that stuff and still conclude that these warrants

4    shouldn't be suppressed.

5            And even then, Your Honor, if the Court were inclined

6    to rule that the use of this information violated the Fourth

7    Amendment, if the Court were inclined to then strike all those

8    portions from the warrants and conclude that they weren't

9    valid, then you get to good faith, and then you get to the

10   fact that here the agents are relying on *Perrine* and other,

11   sort of, well-established Tenth Circuit cases saying that

12   you -- this is how you do investigations.  You start from

13   small to big.  Right?  So we don't have probable cause yet.

14   We have reasonable and articulable suspicion, so we use a 2703

15   order, and you sort of go up the ladder in terms of invading

16   people's privacy.  They followed that law, and they did what

17   the courts and everyone have asked them to do.

18            THE COURT:  Let me ask you about that.  I meant to,

19   kind of, do a little research on that, but I didn't, so maybe

20   you have.

21            How does that work when -- my understanding of the

22   good faith is when, say, a warrant includes information that's

23   wrong and you go to the wrong place, but if -- if the mistake

24   is a legal one, that this was actually not legally authorized,

25   does good faith really apply in that circumstance?  Because it

1    seemed odd to me.  How would you ever -- no one would ever win

2    one of these cases.  Right?

3           MR. FIELDS:  That's right, Your Honor, and actually

4    they don't win that initial case.  Instead, basically a

5    precedent is created where future defendants might win.

6           So *Warshak* is actually a great example.  *Warshak*,

7    there they declared 2703(b) unconstitutional to the effect

8    that it allowed the Government to obtain the content of e-mail

9    without a warrant.  But the Sixth Circuit said, Actually, our

10   precedent at the time allowed the Government to do just that,

11   so we are not going to suppress, but now we have told you, and

12   everyone is on notice that you need to get a warrant from now

13   on.  So defendant lost in that particular case, but future

14   defendants got the, sort of, fruit of that.

15          THE COURT:  Well, that's sort of a heads I win, tails

16   you lose situation, right, for the Government?  And why would

17   anyone bother to take these cases to the Supreme Court if they

18   would lose either way?

19          MR. FIELDS:  Because sometimes you get strategic

20   litigants who are concerned about, sort of, shaping the law

21   for future defendants.  But in particular cases, Your Honor,

22   the reason for this, as stated in, sort of, *Herring* and *Leon*,

23   is that suppression is a really radical remedy.  What we are

24   talking about here is distorting the truth process and

25   preventing a jury -- like, the fact is maybe actually, because

1   we haven't actually looked through these warrants because of

2   the sanctions motion that we will talk about, but if there are

3   text messages in there in which the Tews are talking back and

4   forth about, sort of, fleecing a company out of $5 million and

5   those just exist, going into court with all of that, like,

6   factual information removed from a jury is a distortion, which

7   is not what the courts are all about.  So the Supreme Court

8   has said you should only do that if it's going to deter

9   misconduct.  There's no misconduct here, Your Honor.  The

10  agents did exactly what everyone wants agents to do, which is

11  get a warrant.  They didn't, sort of, you know, go out on a

12  limb.  They didn't try to do anything.  What they did is they

13  consulted an AUSA who said, This is the state of the law at

14  the time.  AUSA reviews the warrant.  It gets submitted to a

15  magistrate judge.  And the magistrate judge, also taking into

16  account legal training and, sort of, you know, knowledge of

17  precedent, issues the warrant.  So good faith should still

18  apply under all these circumstances.

19          There are also some arguments that haven't been

20  addressed orally, Your Honor, about, sort of, the two-step

21  process and, sort of, gathering all that stuff.  I'm happy to

22  address them, but they weren't addressed initially, and I

23  think our brief recognizes or addresses all of them.

24          THE COURT:  I agree.  Thank you.

25          Mr. Bornstein, rebuttal?

1            MR. BORNSTEIN:  Your Honor, I want to address the

2    two-step process --

3            THE COURT:  Okay.

4            MR. BORNSTEIN:  -- if I might.

5            THE COURT:  Go ahead.

6            MR. BORNSTEIN:  Because in this case the two-step

7    process has failed, completely failed.  The Government asked

8    Apple and Google and AT&T to execute the warrant and give them

9    all of the information in this e-mail accounts between certain

10   dates.  They didn't pay attention to what the warrant said.

11   They gave dates -- they gave information that went back way

12   beyond and way greater than what the warrant issued and even

13   what the U.S. Attorney said this is what we want.  And so

14   Apple and Google -- first of all, I have some problems

15   saying -- the Fourth Amendment talks about law enforcement

16   watching these warrants, and it says, for example, that the

17   law enforcement agent is to file a return with the court.  I

18   have not found any returns from Apple or Google.  There was a

19   return filed for AT&T.  It turned out to have -- AT&T sent the

20   U.S. Attorney the wrong person's -- somebody else's

21   information, and the U.S. Attorney had to go back to AT&T and

22   say, No, no, you sent me the wrong information, do it again.

23   But I don't think there's -- the returns on Rule 41 are

24   supposed to be done by the law enforcement.  We don't have

25   returns yet.  The Government has admitted that now, two

1  years -- it was 20 months when I wrote the brief, so it's

2  obviously more than 20 months now, and they don't know what's

3  in these e-mails.  They haven't read these text messages,

4  these e-mails, or these other matters to ensure that the

5  two-step process -- that what they got was, in fact, what the

6  magistrate authorized them to take.

7           And we've found that they have in their computers a

8  huge trough of information that they are not entitled to have.

9  And so the two-step process just has not -- I mean, it made

10 sense.  You used to take -- I mean, we had cases.  The FBI

11 would seize a computer.  They would take a image of that

12 computer, of how it existed on that date.  They'd give the

13 computer back -- except that it had child porn or something,

14 then they wouldn't give it back -- but they -- if it didn't

15 have child porn, if it had something else, they would give it

16 back.  They had the image.  They'd send it to the forensic

17 laboratory and process it and determine what was in there.

18 But in this case the facts of this case are they haven't done

19 that yet.  They have not sifted through hundreds of thousands

20 of text messages and e-mails to determine what's not

21 authorized by the warrant, and to me that is such a problem.

22 And that's, again, technology exceeding the law and, in fact,

23 in this case exceeding the ability of the U.S. Attorney to

24 process what they got.

25           THE COURT:  Okay, and I think I understand.  I may

1   give Mr. Fields, since I didn't have him speak on this, a

2   chance to respond to that.  But, I mean, isn't that partly my

3   fault, partly you suggesting they shouldn't be going through

4   those?  I mean, isn't that because they're concerned about

5   potential privileges in there?

6        MR. BORNSTEIN:  As to privileges, yes, but not as to

7   nonprivileged information.  And their privilege was originally

8   limited to only the attorney-client privilege, and we said

9   that there's husband-wife spousal material, there's medical

10  material, there's accountant material.  Those privileges,

11  that's one box.  The other box is irrelevance, thousands and

12  thousands of irrelevant texts and e-mails that have never been

13  culled out.

14        Okay.  That's -- I'll --

15        THE COURT:  Go ahead.

16        MR. BORNSTEIN:  *Perrine,* United States versus

17  *Perrine*, it predates both *Riley* and *Carpenter*, and it

18  represents the fact that the courts had not at that time in

19  *Perrine* caught up with cloud computing at all.  *Perrine* is

20  just a case that the law has, by *Riley* and *Carpenter*, have

21  gone beyond it.  And, as I say, I think *Riley* is as important

22  as *Carpenter* in terms of where we are.

23        And then, finally, I wanted to say the affidavit and

24  application in this case were reviewed by a lawyer, a member

25  of the U.S. Attorney's Office, and so the agent -- most of the

1    time on our *Leon* good faith we sort of say, Well, here's this

2    police officer, not a trained lawyer, doesn't know the law,

3    hasn't been there, acts in good faith, accepts what the

4    magistrate judge says because the magistrate judge is a lawyer

5    and knows the law, and so we can't punish the police officer

6    for violating the Constitution.  In this case, we have the

7    entire United States Attorney's Office involved in the

8    decision as to what's in these warrants.

9           And the key about the 2703(d) is that what's

10   important to the case is what made it into the warrants,

11   because it's the warrants that have the content, and it's the

12   content that's going to be the evidence at a trial.  So how

13   did the Government get all this content evidence?  They got it

14   from a warrant, and that warrant was based on all of these

15   270 (d)'s [sic] requests, in part.  In part.  I need to say

16   that.

17          THE COURT:  I appreciate that.

18          If Mr. Fields wants to respond on the two-step, go

19   ahead, since he brought it up.

20          MR. FIELDS:  Thank you, Your Honor.

21          So with regards to the two-step process, this isn't a

22   technological problem at all.  In fact, agents had started to

23   execute the warrants.  They had started to actually -- so

24   they'd get the entire account, step one.  Then they have to go

25   through it, apply Attachment B and actually see the relevant

1    communications.  When they started to do that, they realized

2    that despite the fact they had already tried to filter out

3    communications taking place before the arrest, so before known

4    lawyers were involved, it looked like there still might be

5    lawyers.  So out of an abundance of caution, they stopped.  At

6    that time the Tews were not represented, so a decision was

7    made, Let's wait until they've got a lawyer.  Then that

8    lawyer, who would be in the best position to protect their

9    privilege, we can engage with the lawyer and, sort of, figure

10   out a filter process.

11        The Tews' lawyer, Mr. Ekeland, asserted a blanket

12   privilege and said, Do not look at anything regarding these.

13   Right?  The Government counsel tried to work through with

14   Mr. Ekeland how that was going to happen.  I was actually

15   scheduled to meet with him in Brooklyn in December, was

16   getting on a train to go out there, and I get a call that he's

17   withdrawing from the case.  So we never had an opportunity to

18   do that.

19        And, actually, the reason the Government hasn't done

20   this is not because we are not, sort of -- I think we have a

21   right to go through it, and we can, but when you get motions

22   for sanctions talking about Government attorneys, sort of,

23   rifling through privileges, that makes even, sort of, you

24   know, the most stiff-spined AUSA a little bit nervous.  And so

25   we haven't done that.  We have been waiting for this motion to

1   get resolved and to potentially engage Mr. Bornstein in our

2   filter process.  Mr. Bornstein's position, as I understand it,

3   is the same as Mr. Ekeland's:  That our entire filter process

4   is problematic.  We shouldn't be using filters at all.  No one

5   from the Government should be looking to see what's relevant

6   at all yet.  Instead, there needs to be maybe a special master

7   or something else.

8           We disagree with that, but that's why the warrants

9   haven't been executed yet.  So it's not a technological

10  problem.  It's actually, sort of, a legal one, and it's the

11  Government being, sort of, mindful and prudent and thoughtful

12  about how to go about doing this.

13          THE COURT:  Okay.  Thank you.  Well, why don't we go

14  ahead and talk about the sanctions motion, then.  I should

15  probably let Mr. Bornstein go first on that.

16          Why don't you go ahead and address the sanctions

17  motion, and specifically address, kind of, the -- you can talk

18  about whatever you think you need to highlight, but about

19  this, sort of, last point about what exactly -- I mean, I know

20  you asked for dismissal as a sanction, but is there not

21  something else?  Why -- is there any other possible sanction?

22  Is there any other possible way to resolve any of this?  Why

23  do you think that's appropriate?

24          MR. BORNSTEIN:  By the time I got into this case,

25  this issue had already been raised by prior counsel and

1    decisions had been made.  And, as I understood the decision --

2    and I received a memo that was authored by Mr. Fields.  I

3    believe it's dated March of 2022.  And that memo indicated or

4    said what the Government's position was and that they had

5    assigned a filter team, taint team, and that the taint team

6    was dealing with the attorney-client privilege because prior

7    counsel, Mr. Ekeland, had raised the attorney-client privilege

8    and had raised a Fourth Circuit Court of Appeals case

9    concerning, concerning that case, the one I cite on paragraph

10   7 of my motion.

11           When I got the case, I felt that it was too late to

12   deal with these issues that way anymore, that they had already

13   had this information.  They did not set up this filter team.

14   I mean, they were talking about searches that occurred in

15   2020, July, September, December of 2020.  I get a memo that's

16   written in 2022, and my determination was, okay, it's too late

17   for this.

18           And, beside that, the team has not been asked to look

19   at spousal privilege material, has not been asked to look at

20   medical privilege material, has not been asked to look at

21   accountant privilege material.  And there's a lot of spousal

22   material.  Perhaps some of that spousal material may be, you

23   know, admissible in evidence because of coconspirator law.

24   Perhaps it might be admissible because of crime-fraud

25   exception or something, but it had not been culled out.  So I

1    needed to figure out what I was going to do.

2            I think that what could be done as terms of a lesser

3    sanction is to not let the Government use the Apple computer

4    material.  That's the biggest tranche of e-mails and text

5    messages which we demonstrated go back to 2013 when the

6    warrant said that it only wanted two years worth of documents,

7    and Google paid no attention to being told that they only

8    wanted two years worth of documents.  They did not filter out

9    by time or date.  They just dumped their entire file on the

10   U.S. Attorney.  And so I think that could be a lesser way to

11   deal with it is to simply say they can't use the Apple

12   computer material.  They can use the other material as long as

13   it doesn't have privileged documents in it.

14            I don't know how else to deal with it.  I mean, if

15   the Court fashions some way to deal with this problem that's

16   intermediate or less onerous, I guess I just -- I just don't

17   know how to do it, but if the Court has a way of doing it,

18   obviously the Court has the discretion to fashion any remedy

19   that the Court feels is appropriate.

20            THE COURT:  Let me ask you to at least address the

21   argument that these other privileges you are asserting beyond

22   attorney-client privilege are not appropriate, that some of

23   them may apply to the evidence the Government could introduce

24   at trial, but they don't apply necessarily to this sort of

25   information -- the investigatory process.  Can you address

1    that?

2              MR. BORNSTEIN:  I'm not sure I understand the Court's

3    question yet.

4              THE COURT:  Well, the Government -- a big part of the

5    problem you are asserting is that the Government maybe has

6    never planned, doesn't plan to, and has never filtered out

7    anything but attorney-client --

8              MR. BORNSTEIN:  Right.

9              THE COURT:  -- privileged material.  What is your

10   argument as to why they have to?  I mean, the Government I

11   think says some of that may not be ultimately admissible, but

12   that doesn't mean that it has to be filtered out of their

13   investigatory process.

14             MR. BORNSTEIN:  Okay.  If the purpose of the

15   privileges are to take -- as I say, there's a difference

16   between testimonial privileges and communication privileges.

17   And the purpose of the privileges -- and we are talking about

18   the communication privileges, not the testimonial ones, right

19   now.  And the communication privileges essentially say, for

20   example, if I'm called into the grand jury and I'm asked by

21   the grand jury, What did your wife tell you about

22   such-and-such, I can tell the grand jury, That's private, and

23   I don't need to tell you that.  And if they then take me to

24   court and seek a court order ordering me to violate a private

25   communication between husband and wife, my hope is that the

1   court would say, No, you can't, we are not going to hold you

2   in contempt for not answering that question in front of the

3   grand jury.

4          So I would say that that's material that the husband

5   and wife or the doctor and patient can say:  It's off limits.

6   You're not supposed to know that I have cancer.  You're not

7   supposed to know that I have some other life threatening

8   disease.  You're not supposed to know what we talked about

9   unless you can establish a crime-fraud exception or some kind

10  of exception to that.

11         And that would be a two-step process also because

12  then you would go to the Court seeking a contempt citation and

13  say, We have a right to know this information because the

14  privilege has been broken.  But I believe that that's the way

15  the privileges are supposed to be protected.

16         THE COURT:  All right.  Then let me ask how you

17  think -- I know you said you think it's too late.  Just humor

18  me with how you think the process should have worked or, if it

19  weren't too late, how you think it should work.  You recognize

20  there's some exceptions.  Some of these statements maybe could

21  come in some other way.  Whose burden is it at which stage to

22  establish that, which ones come in and which ones don't?  How

23  would we figure that out?

24         MR. BORNSTEIN:  I think that when you have conducted

25  a search and in that conducting of a search the Government has

1    material that is, let's say, potentially privileged, including

2    spousal privilege, that they should set that aside, not use it

3    to obtain other warrants or other material or use it in their

4    investigation.  Set it aside, and go to a court.  If there's

5    been an indictment, then we have a court to deal with.  If

6    there hasn't been an indictment, we have all these cases that

7    are now propping up with regard to these privileges that are

8    being handled by the court that issued the search warrant, and

9    say, Judge, we have a problem with this material.  And then if

10    the Government wants it, they need to argue why it's -- why

11    they should be able to look at it and use it.  And if they

12    fail to do that, which they can do at a reasonably early stage

13    in the search process, not two years later, I think that would

14    work.

15         THE COURT:  Okay.  Do you think a filter team would

16    ever suffice?

17         MR. BORNSTEIN:  It's up in the air.  I mean, we

18    have -- we all know about the Eleventh Circuit Court of

19    Appeals and what they are going to say about a special master

20    as opposed to a filter team.  I think that's an area of the

21    law that's in flux.

22         THE COURT:  Okay.  Fair enough.

23         MR. BORNSTEIN:  I mean, I prefer -- I think I would

24    prefer a special master for reasons that they are independent

25    of the prosecution team, and that protects that -- it's a

```
1    level of protection.  I could understand if some Court of
2    Appeals says these taint teams are good enough, but I
3    personally would like to see more use of special masters if
4    this comes up.
5           THE COURT:  Okay.
6           MR. BORNSTEIN:  And this never used to come up.  It's
7    coming up again because they're getting these warrants for
8    massive amounts of data in the cloud, and it's the cloud.
9    It's not your -- your computer at your desk that they can take
10   an image of.  It's the damn stuff is all up there in the
11   cloud.
12          THE COURT:  I get it.  Thank you.
13          Okay.  I'll give Mr. Fields a chance to respond.
14          MR. FIELDS:  Just a couple of things, Your Honor.
15          First, it hasn't been two years.  Different defense
16   counsel have taken different approaches to this.  Initial
17   defense counsel for the Tews did not require filtering for
18   spousal privilege, did not assert any of these other
19   privileges and, in fact, really tried to cooperate with the
20   Government on a way to best protect attorney-client privilege,
21   which is sui generis and I'm going to set aside because it's
22   just analytically difficult.
23          Really what happened is -- so all this prior counsel
24   were sort of allowing it.  The Tews had proffered, it looked
25   like they were going to cooperate, and then they fire their
```

1    attorneys, and there's a period of a couple of months before

2    the indictment where they have no attorneys.  I've already

3    said in those circumstances, Your Honor, what happened is when

4    we started to execute the warrants, there was attorney-client,

5    and we decided it would make sense:  indictment, work with

6    defense counsel.  That's when you get defense counsel --

7    basically over the span of a year it's been defense counsel

8    who has said:  Don't look at anything.  If you look at any of

9    this stuff, we are going to move for sanctions.  It's

10   completely inappropriate.  We don't like your filter process.

11   Just don't do it.

12          We were trying to work through that, Your Honor, and

13   again that's when Mr. Ekeland, sort of, withdrew.  Then we had

14   another couple-of-month period where there was no

15   representation, and Mr. Bornstein.  Mr. Bornstein, as I

16   understand it, continues to object to the entire idea of a

17   filter process.  And even here when you asked him point blank,

18   he didn't have sort of a good answer as to what should happen

19   here.

20          Suppressing all of this stuff because the Government

21   acted prudently and tried to engage defense counsel to best

22   protect attorney-client privilege is not an appropriate remedy

23   and would run counter to, again, all of the -- you know, *Leon*

24   and *Herring* aren't directly on point, but if the idea of

25   suppression is sort of to deter misconduct, this would do the

1   opposite of that, Your Honor.  It would sort of reward

2   defendants', sort of, just delay and, sort of, dilatory

3   tactics and punish AUSAs who are trying to act in good faith

4   to resolve difficult privilege issues.

5          So that's why these warrants have not yet been

6   executed because we have been waiting on all of that.

7          Now let's look at spousal privilege and everything

8   else.  First, I want to draw the Court's attention to *United*

9   *States versus Wilson*.  It's F05 [sic] F.Supp. 3d 3.  It's out

10  of the District of Massachusetts.  It's one of these Varsity

11  Blues cases.  So those have been somewhat high-profile cases

12  involving often husband and wives who are offering bribes to

13  get their children into various elite schools.  The question

14  came up should -- the government has all these e-mails.  Do

15  they need to filter for spousal privilege?  Squarely keyed up,

16  and the court there said, No, absolutely not.  And the reason

17  for that is all of these privileges are creatures of Federal

18  Rule of Evidence 501.  They are not constitutionally based,

19  Your Honor.  This is federal common law.  And when you are

20  dealing with, sort of, *Wong Sun* and fruit of the poisonous

21  tree and, sort of, other issues related to suppression, those

22  remedies are associated with constitutional violations.

23  That's why cases cited in the Government's brief like

24  *Squillacote* or *Squillacote* -- I'm never going to be able to

25  pronounce that -- of the Fourth Circuit make it very clear

1    that because these are evidentiary privileges, sort of,

2    suppressing everything isn't appropriate.  The Government can

3    still look at them.  They can use them potentially for

4    derivative evidence.  They can look to see if there's an

5    exception to the privilege.  And really all this will come

6    into play during motions in limine or at the trial itself

7    when, let's say, the Government sort of offers a

8    communication, defense objects and says, Actually, that's

9    protected by Federal Rule of Evidence 501.  Then you get a

10    ruling.

11           THE COURT:  Let me ask you to respond to

12    Mr. Bornstein's hypothetical, I guess, about someone being

13    asked to testify against their spouse in front of a grand

14    jury.  How do you think that would play out?

15           MR. FIELDS:  I think that hypothetical is -- there

16    are cases on this, actually.  So because the spousal privilege

17    is two privileges -- right?  It's the testimonial privilege,

18    and it's also the communications privilege.  So if they are

19    actually married, completely inappropriate.  You could not use

20    a grand jury subpoena to compel someone to testify because of

21    the testimonial privilege.  Let's say they are divorced, and

22    actually one of the spouses does not want to talk in the grand

23    jury.  It's -- I think, as a matter of substantive law, they

24    could actually compel that testimony, and the grand jury would

25    be entitled to use it to gather other evidence, because the

1    grand jury is an investigative body.  And so you are not

2    dealing -- the Rules of Evidence don't apply.  You don't have

3    to deal with Rule 501.  So they could do that.  Would an AUSA

4    do that?  I don't know, and the reason is because there's a

5    lot of churn in that case law over whether or not that's

6    appropriate to do.

7            THE COURT:  So then what's the different -- why is

8    that different from you guys looking through spouse's e-mails

9    to each other?

10           MR. FIELDS:  Here we have a -- well, so here what you

11   have is warrants laying out a conspiracy between a husband and

12   wife.  So a magistrate judge looked at all of that, concluded

13   that a warrant should issue for accounts for the husband and

14   wife, sort of, detailing the conspiracy, and then allowing and

15   specifically, sort of, ex ante, like before the Government

16   even gets started, allowing the Government to search through

17   that for evidence of a crime because there's probable cause.

18   So there there's been, sort of, judicial buy-in and, sort of,

19   judicial sanction before they do it.

20           That being said, Your Honor, I will say actually if

21   you were to, sort of, press me, could the AUSA compel

22   testimony from [sic] a grand jury from an ex-spouse about

23   communications, the answer to that is yes.  And the grand jury

24   could use that evidence that they have gathered to gather

25   other evidence that might result in an indictment.  I think

1   there would be issues with using the actual communications in

2   the grand jury to get an indictment, but you could use it to

3   gather derivative evidence, if that makes sense.  So a spouse

4   says -- ex-spouse says, Yeah, I talked to my husband about a

5   bank robbery, and he buried the bag of money in the backyard.

6   The grand jury could then direct the evidence -- the agents to

7   go get that bag of money in the yard and use that bag of

8   money -- maybe it's got the fingerprints on it -- without

9   using the actual communications, if that makes sense.  That

10  would be the prudent way to do it there.

11          And that's essentially what we are trying to do here,

12  Your Honor, is sort through the evidence and figure out what

13  could actually be used in a court of law consistent with Rule

14  501.

15          THE COURT:  Let me just make sure I understand where

16  we actually are on this.  There was a time where the

17  Government was reviewing some of this.  They began this

18  process, right, when there was prior counsel, and then

19  stopped?  So some number of -- presumably some number of

20  communications -- let's say you perfectly filtered out all the

21  attorney-client privileged communications, but some number of

22  these others were not filtered out.  Right?

23          MR. FIELDS:  Correct.

24          THE COURT:  Okay.  And it got to you guys, the

25  prosecution team.

1          MR. FIELDS:  Correct, Your Honor.  And I will say,

2    very candidly, spousal communications in particular, right,

3    because this is a conspiracy committed by husband and wife?

4          THE COURT:  Sure.

5          MR. FIELDS:  So the exact timeline here is a lot of

6    these warrants come down.  We execute them in December.  We

7    start getting them in January.  The indictment is in February.

8    Agents started searching very specifically for communications

9    between coconspirators.  Right?  And some of those were used

10   to secure the indictment.  After defense counsel comes on

11   board and says, Do not look through any of those, we are going

12   to move for sanctions, it's completely inappropriate, we stop

13   out of an abundance of caution.  Right?  And then there's a

14   period where there's some negotiations, and the Government

15   says, Look, we are negotiating here.  We are going to set up

16   this filter process and ask the agent to go back and actually

17   start looking at it again.  And that's when the agent finds

18   something that might actually be related to an attorney, and

19   full stop, and nothing has been looked at since that time.

20          Again, the reason for that is because -- and this is

21   my specific ask of the Court -- we would like an order from

22   the Court specifically denying this motion for sanctions and

23   allowing the Government's filter process to continue.  At that

24   point the Government can expeditiously execute the warrants,

25   look at Attachment B, which is the evidence we are actually

1    able to seize, and that's when we can start preparing a *James*

2    log, which -- now I'm getting a little bit ahead, but I think

3    the Government's ask with respect to a *James* hearing is we are

4    not opposed to one, but we need time to execute the search

5    warrants, which have been sort of delayed I think in good

6    faith as we tried to work through this with defense counsel,

7    but now it's teed up for the Court.  Once we get that ruling,

8    we'd like a period of approximately eight weeks to sort

9    through that, prepare the *James* log, and have the hearing.

10            THE COURT:  That was obviously the --

11            MR. FIELDS:  Yeah.

12            THE COURT:  -- I think the last thing on the agenda

13   today.  We might as well just talk about it briefly, because I

14   know I have to do some kind of order.  Do you think eight

15   weeks -- is that a real estimate?  Do you think you can do it

16   quicker than that?  Obviously we are -- the trial date in this

17   case is going to be very difficult to stick, if it's possible

18   at all.  So I'm just trying to figure out what we're looking

19   at.  Do you really think it will be eight weeks to do the

20   *James* log?

21            MR. FIELDS:  I think actually eight weeks is really

22   aggressive on our part in terms of, like, time frame, because

23   we are talking about searching through all that and then

24   preparing the log.  If -- we want this to happen

25   expeditiously.  If the Court orders it to happen in eight

1    weeks, we will do it, but ideally we would actually like

2    closer to maybe 12 weeks, which I know is sort of pushing

3    things, but I think consistent with the Speedy Trial Act the

4    Court could set the hearing on that motion sometime in

5    January, which would toll the statute of limitations while

6    that -- or not -- speedy trial while that hearing is pending,

7    and there's 30 days after that to resolve the hearing, so that

8    would put trial sometime in February or March.  I think that

9    would be appropriate.  I think it's doable.

10         I also think it's quite possible that as we start

11   executing the warrants and the evidentiary picture starts to

12   harden even more, defense counsel might need a little bit more

13   time to prepare for trial, so we might get another ends of

14   justice motion, which I think would be sort of warranted on

15   the facts here.

16         THE COURT:  Okay.  Thank you.

17         Why don't I let Mr. Bornstein respond on all of that.

18         MR. BORNSTEIN:  Number one, Mr. Fields said something

19   interesting that I wanted to emphasize in the record, which is

20   that attorney -- not attorney -- husband-wife communications

21   were used in the grand jury to obtain the indictment in this

22   case.  And that's partially why I can say it's too late to put

23   the genie back in the bottle, because it's already been used

24   to obtain an indictment.  I'm not sure where they, you

25   know -- I have a grand jury transcript, and there was

1   testimony about the -- that Mr. and Mrs. Tew said this to each

2   other.

3          Second -- your court reporter is --

4          COURT REPORTER:  Just shaking my hands out --

5          MR. BORNSTEIN:  -- showing some --

6          COURT REPORTER:  -- while you pause.  Go ahead.

7          MR. BORNSTEIN:  -- showing some signs of wear and

8   tear here, Your Honor.

9          THE COURT:  I know, and we should all finish up as

10  quickly as we can, but go ahead.  I want you to say your

11  piece.

12         MR. BORNSTEIN:  I've just -- I've never had a case

13  like this.  I've never been -- I've never been two months from

14  trial in a case that's two years old and had the Government

15  say a large tranche -- a large piece of the evidence we are

16  going to use at trial we haven't even seen yet, and after we

17  see it, then we'll determine what we want to use, and then

18  we'll file a *James* log, and then you can object that it's

19  either not part of the conspiracy, you know, the whole *James*

20  thing, you know, it either wasn't in further of the conspiracy

21  or at the time it wasn't -- this person wasn't in the

22  conspiracy or it's not conspiratorial.  I have never had this

23  happen to me.

24         THE COURT:  Well, you probably have more experience

25  than me.  I haven't either, but I think that the -- a large

 1   part of that is because the Government was going down a more

 2   routine path, and then counsel changed, strategy changed, the

 3   approach to privilege and the filter team changed, lots of

 4   things changed, and so they, sort of, stopped in the middle,

 5   and now here we are.  I need to resolve these issues before

 6   they can go on, because obviously part of your position is

 7   they shouldn't be looking at any of that.  So if they had gone

 8   through it -- if they had just bowled through and reviewed all

 9   of it, your sanctions motion would be even more outraged than

10   it already is.  Right?  So, I mean, I think there's a reason

11   we are in this unusual position, and until I resolve some of

12   these legal issues, we are sort of stuck with that.  Right?

13            MR. BORNSTEIN:  And I am the one who raised the

14   spousal privilege.

15            THE COURT:  Right.

16            MR. BORNSTEIN:  Prior counsel only was dealing with

17   attorney-client.  I am the one who said, Whoa, you know,

18   there's a whole other set of privileges that are here,

19   especially husband-wife.

20            THE COURT:  Okay.  Yeah, exactly, and so they sort of

21   stopped -- it strikes me as, in good faith, they stopped in

22   the middle to make sure they weren't going even further down a

23   path, your position is, was incorrect.

24            So I agree with you, it's unusual.  It's very

25   strange.  I can't see any way that the trial date sticks given

1   everything that's going on, but I do need to resolve all these

2   motions so, to be fair to everybody in the case, we can know

3   the ground rules and proceed.  So I'm going to rule on them

4   all as quickly as I can.  But did you have anything else you

5   wanted to respond to?

6          MR. BORNSTEIN:  Let me look at my notes here.

7          Oh, yes.  Yes.  With respect to the *James* proffer and

8   the *James* hearing, there are hearsay statements that the

9   Government has from Michael Mora, Christian Rincon, Michael

10  Meyers, and Larry Ward which, if they are coconspirators,

11  which they might be, I am not sure if the Government says so,

12  they could have done *James* proffers for all of those people in

13  the interim time.  There are hearsay statements from Jonathan

14  Yioulos.  They know that Jonathan Yioulos and Michael Tew

15  communicated about financial matters related to NAC that were

16  not part of any fraudulent scheme.  And so separating those

17  out in terms of whether they are going to try to use any of

18  those or whether those were made by a conspirator during the

19  course of the conspiracy and in furtherance of the conspiracy,

20  so they could have done some *James* work while waiting for

21  this, and they didn't.

22         There's hearsay statements from Michael Tew's cell

23  phone which they obtained -- he gave it up early in the case,

24  and they made a -- copies, took screenshots from his cell

25  phone with communications between him and his wife.  That

1   could have been subject to a *James*.  Those are all other *James*

2   things that are beyond just the material in the iCloud.

3          THE COURT:  Okay.  So that's probably a good reason I

4   can sort of hold them to the fire on a somewhat shorter

5   timeline for the *James* briefing, but I do think we are going

6   to need a *James* hearing in this case once they -- and I do

7   want to give them time to review it.  So I will probably --

8   eight weeks or so is probably fair.  But anything else?

9          MR. BORNSTEIN:  No.  Thank you.

10          THE COURT:  All right.  Thank you, Mr. Bornstein.

11          All right.  I already earlier denied the motion for a

12   *Franks* hearing.  Everything else I am taking under advisement

13   for now.  We will get out written orders to try to be as clear

14   as possible about my rulings on all those.  I will try to do

15   it as soon as I can and then after that either have a status

16   conference or ask for status report about the timing as we go

17   from there, but I do want to move this along as quickly as we

18   can.  I appreciate everybody's patience.

19          If there's nothing else -- well, why don't I ask.

20          Is there anything else for the Government,

21   Mr. Fields?

22          MR. FIELDS:  No, Your Honor.  Thank you very much.

23          THE COURT:  Anything else, Mr. Bornstein?

24          MR. BORNSTEIN:  I have nothing for today.

25          THE COURT:  All right.  Thank you all for your time

1    and attention.  The Court will be in recess.

2         (Proceedings concluded 4:59 p.m.,

3         October 12, 2022.)

4
                         REPORTER'S CERTIFICATE
5
              I, JULIE H. THOMAS, Official Court Reporter for the
6    United States District Court for the District of Colorado, a
     Registered Merit Reporter and Certified Realtime Reporter, do
7    hereby certify that I reported by machine shorthand the
     proceedings contained herein at the time and place
8    aforementioned and that the foregoing pages constitute a full,
     true and correct transcript.
9         Dated this 27th day of December, 2022.

10

11            _____/s/ Julie H. Thomas_____
                    Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25