IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00305-DDD

UNITED STATES OF AMERICA,

     Plaintiff,

v.

   1. **MICHAEL AARON TEW, and**
   2. **KIMBERLEY ANN TEW,** a/k/a Kimberley Vertanen,

     Defendants.

---

### GOVERNMENT'S MEMORANDUM IN SUPPORT OF *JAMES* LOG

---

"Do you really understand tho? That's a lot of money out of NAC. Like that's straight jail time. And I mean that. I wake up at night constantly worried." Ex 1 # 97. Not worried enough to stop. Almost every day for nearly two years, Jonathan Yioulos, Michael Tew and Kimberley Tew had the chance to heed this warning. Instead, almost every day for nearly two years they woke up and made a conscious decision to commit fraud, stopping only when the IRS and the FBI finally showed up to confront them. This memorandum (1) describes the contours of their conspiracy to systematically loot a business out of over $5,000,000; (2) details a separate conspiracy between the Tews to quickly use their ill-gotten gains to speculate in cryptocurrency, gamble in Las Vegas, and otherwise quickly disburse funds into each other's pockets; and (3) chronicles some of the statements each made to further their criminal designs, as set forth in the concurrently filed *James*

1

log attached here as Exhibit 1.

## I.    Purpose and Scope of Proffer

A James hearing is a Tenth Circuit-specific reference to the procedure contemplated in Federal Rule of Evidence 104(c) focused on whether statements can be admitted under Federal Rule of Evidence 801(d)(2)(E). The latter rule says that statements are not hearsay when they are offered against a party if the statement was made by the party's coconspirator in furtherance of a conspiracy. To determine whether it is more likely than not that the prerequisites of admission under this rule are satisfied—whether a conspiracy existed, whether the declarant and the party were conspirators, and whether the statement furthered the conspiracy—the Court can consider any information without regard to the rules of evidence, including the statements themselves. Fed. R. Evid. 104(a); *United States v. Bourjaily*, 483 U.S. 171, 181 (1987); *United States v. Stein*, 985 F.3d 1254, 1269 (10th Cir. 2021).

Of course, items of evidence may be admissible under more than one theory. The defendants are accused of fraud. They made false statements to further their joint criminal agreement and those statements are independently admissible because they are false and not offered for the "truth of the matter asserted." Fed. R. Evid. 801(c)(2); *United States v. Lewis*, 594 F.3d 1270, 1284 (10th Cir. 2010). *See, e.g.,* Ex. 1 # 1, 3, 11, 41, 86, 241. Likewise, conspirators often give instructions to one another. *See, e.g.,* Ex. 1 # 117, 147, 333. Those statements further the conspiracy under Rule 801(d)(2)(E), but they also do not make truth claims and are independently non-hearsay. *United States v. Rutland*, 705 F.3d 1238,1252–53 (10th

Cir. 2013). Sometimes, the Tews would communicate about their joint efforts to disburse the proceeds of their fraud by simply sending one another photographs of deposit slips or QR codes to consummate cryptocurrency transactions. *See, e.g.,* Ex. 1 # 351. Those photographs are not "statements" and thus not covered by the hearsay rule at all and are also admissible simply to link the defendants to the conspiracy. *Cf. United States v. Chavez*, 229 F.3d 946, 953-54 (10th Cir. 2000) (noting that paper scraps with telephone numbers and vague phrase was not hearsay). Finally, the Tews often discussed their scheme with one another or with co-conspirator Jonathan Yioulos. In those situations, each defendants' respective statement is admissible against that defendant under Rule 801(d)(2)(A) and the other defendant's responses and acknowledgements are admissible for the non-hearsay purpose of showing the effect on the listener. *See, e.g.,* Ex. 1 # 317. *United States v. Cesareo-Ayala*, 576 F.3d 1120, 1129-1130 (10th Cir. 2009).

## II. Michael and Kimberley Tew agreed to use interstate wires in execution of a scheme to take millions from National Air Cargo between July 2018 and July 2020.

The Indictment is incorporated here by reference. It identifies and describes the victim corporation (Indictment ¶2), the conspirators (Indictment ¶¶1, 8, 10) and describes their background relationships (Indictment ¶¶ 3-7). It also describes how the scheme operated (Indictment ¶ 11) and then details the means and methods by which it was carried out (Indictment ¶¶ 12 - -25), including the use of sham companies identified as HS CPAs, MCG, 5530JD, PM, GFL, and AMR. It also describes the use of the corporate entity Sand Hill to receive proceeds of the scheme (Indictment ¶¶ 4, 16). Summaries of the payments made to each of these entities,

compiled by collecting and analyzing the false invoices and corresponding bank records is attached as Exhibits 1002 and 1003. Where applicable, the *James* log identifies how a statement relates to one of the paragraphs of the Indictment.

## III.   Michael and Kimberley Tew also agreed with one another to engage in large financial transactions with their ill-gotten loot

Overlapping with the conspiracy to commit fraud was a separate conspiracy between Michael and Kimberley to engage in large financial transactions between and among themselves and with others in order to quickly convert the proceeds of their fraud to their personal use. (Indictment ¶ 32). The Indictment describes the means and methods used by the Tews to accomplish the conspiracy's purpose of spending the proceeds of their fraud. The Tews used multiple bank transfers to move funds around (Indictment ¶ 33.a), made cash withdrawals at bank counters and ATMs (Indictment ¶ 33.b), withdrew money using wires (Indictment ¶ 33.c), transported cash to bitcoin ATMs to convert it into cryptocurrency (Indictment ¶33.c and 33.d), transferred money using bitcoin "wallets" (Indictment ¶¶ 33.c) used fraud proceeds to buy an Audi (Indictment ¶ 33.f), and used proceeds to gamble at a casino in Las Vegas (Indictment ¶ 34). Where applicable, the *James* log identifies how a statement relates to one of the paragraphs of the Indictment.

## IV.   Evidence Supporting the Conspiracies

### A.   Michael Tew, Kimberley Tew and Jonathan Yioulos were caught red-handed by the IRS and the FBI while executing the scheme

By July 2020 the FBI and the IRS had gathered substantial evidence of the Tews' fraud scheme. They approached Jonathan Yioulos and he agreed to cooperate.

He is expected to provide testimony at trial describing all of the means and methods identified in the Indictment to further the fraud scheme and to authenticate his communications with the Tews in the *James* log. He will also authenticate two lengthy consensually recorded conversations with Michael Tew, who was using the x1312 number. *See, e.g.,* Ex 1 # 374, 375. At the time those conversations occurred, Yioulos was no longer a conspirator. But Michael and Kimberley had each recently asked Yioulos to send them more money. Ex. 1 # 371, 372. And NAC had independently begun looking at transactions in a way that raised concerns among the conspirators. Ex. 1 # 368. Michael's conversations with Yioulos — his efforts to describe, justify, and explain the scheme — were all part of an effort to assuage Yioulos's concerns and keep him involved in the conspiracy. They were thus in furtherance of it and each should be admitted for the reasons designated in the James Log.

### B.    Bank records, by themselves, evince the conspiracy

Exhibit 1001 is a list of the accounts controlled by Michael or Kimberley that received proceeds of the Scheme. Exhibits 1004 – 1007 are composite summary charts connected to the specific counts of the Indictment.

The account statements by themselves, show that the payments from NAC were not related to any of the described services but were instead quickly transferred between and among accounts controlled by the Tews, wired to others, withdrawn as cash, or used for personal extravagances. The records also independently corroborate and authenticate the messages in the *James* log by contemporaneously documenting the bank transactions discussed by the Tews. For

example, after telling Michael "we need to get an ACH today . . . offer J [Yioulos] 3 BTC [bitcoin]. I have to go to Vegas," Ex. 1, # 185, Yioulos used the automated clearinghouse (ACH) to send $28,000 in scheme proceeds into the Tews' joint NFCU bank account under the false pretense it was for a "consultation: Engine Search and MRO Resource." Kimberley Tew then went to the bank and withdrew $15,000. [NAC_00000560]. Bank cameras captured Kimberley smiling on the way out the door with her bag of loot:



[NAVY_00001779].

Another representative example features Michael. After talking to Kimberley about the status of an expected scheme payment of $33,000 from Yiolous on February 12, 2020, Michael transferred the money from an NFCU account on which he was the sole signatory to the Tews' joint NFCU account. He then withdrew $10,000. Ex. 1, # 324;  [NAVY_00000970-971]. Bank cameras show him in the lobby

of the bank that day, happily taking custody of the cribbed cash:



[NAVY_00001767].

      **C.**      **Business records and witness testimony establish the Tews' use of telephone numbers and email addresses associated with the scheme**

*Telephone number 917-685-1312* Records from AT&T show that this number was used by Michael Tew. [ORD_000019224]. Michael also represented to NAC that this was his number while he worked there as a contract employee. Ex. 1 # 1. And Michael provided this number to several banks as his means of contact. [NAVY_00001964].

*Telephone number 917-669-7473.* Records from AT&T show that this number was used by Michael Tew. [ORD_000019224-25]. He also provided this number as a means of contact for some of his bank accounts. [WFB_00000537.]

*Telephone number 917-446-2046.* Records from AT&T show that this number

was used by Kimberley Tew. ORD_000019224. Kimberley also represented to NAC that this was her number while she worked there as a contract employee. [*See, e.g.,* NAC_00000731]. And Kimberley provided this number to several banks, businesses and cryptocurrency exchanges as her means of contact.[NAVY_00001960]. She also relayed information about paying for this telephone number to Michael as part of her efforts to spur him to ask Yioulos for more money. Ex 1. # 184.

*Google Voice number 469-319-0152*. Records from Google identify the user of this Google voice number as Kimberley Tew. [ORD_00015068]. The number was used to contact Yioulos about getting more money from NAC and referred to "Michael" in the third person, indicating that he was not the sender and that it was, instead, Kimberley. Finally, Kimberley had previously talked to Michael about using Google Voice, including to contact Yioulos in particular. Ex. 1 # 160, 338. Even if there remains some doubt as to whether this was Michael or Kimberley, it is not one that precludes admission under the coconspirator exception to the hearsay rule. Communications from this account in furtherance of the conspiracy can be attributed to both Michael and Kimberley through the underlying principles of agency even if the actual declarant remains unknown: it is enough for the court to conclude that it was made by someone — anyone — in furtherance of the conspiracy's objectives. *United States v. Martinez*, 430 F.3d 317, 326 (6th Cir. 2005); *United States v. Ayala*, 601 F.3d 256, 268 (4th Cir. 2010) (noting that it isn't even required that statements be attributed to an identified person so long as there is enough evidence to show that a declarant is a conspirator).

*Email address kley@me.com.* Kimberley also represented to NAC that this was her email while she worked there as a contract employee. [*See, e.g.,* NAC_00000731; NAC_E_00058418; 60469]. Kimberley provided this number to several banks as her means of contact. [*See, e.g.,* NAVY_00001960]. She also communicated with Michael in furtherance of the conspiracy, identifying this as her email address. Ex. 1 # 160, 184, 270.

*Email address Mtew@sandhillrp.com.* Records from GoDaddy show that Michael paid for and maintained the domain name sandhillrp.com, [ORD_00019823], and he also used the email address mtew@sandhillrp.com [ORD_00019224; ORD_00019225]. He also used it in his correspondence with NAC.

*Email address accounting@globalfuel.co.* Michael created and controlled Global Fuel Logistics after Yioulos told him that he needed to create a separate company if they were going to continue their fraud without being detected. Ex. 1 # 195 (explaining preference not to use Sand Hill and instead advising that "you should set up a legit Corp for the fuel consulting"). He paid for and maintained the domain name globalfuel.co and used the email address "accounting@globalfuel.co." [ORD_00019821].

*Email address associated with MCG.* There is a preponderance of evidence — it is more likely than not — that the Google email address used to send false invoices to Jonathan Yioulos at NAC, which contains MCG's name, was used by Kimberley Tew. Among other things, that account also contained orders for luxury women's clothing and accessories to Kimberley Tew's address (albeit under the

fictional name "Amy Tew"). [SW_FIL_00003054, 6094, 6901, 8364, 9825]. The close
coordination between the use of this email and communications between the Tews
and Yioulos make this likelier still. For example, in March 2020 Michael and
Kimberley had a discussion about how Yioulos was not responding to Michael. Ex. 1
# 338. This was followed up by a message from the MCG email address to Yioulos
with the accusatory statement "I heard you are not available," Ex. 1 # 339, and
Kimberley later suggesting to Michael that they could induce Yioulos to respond by
stoking fear about another MCG email, Ex. 1 # 341. As with the Google Voice
communication above, communications from this account in furtherance of the
conspiracy can be attributed to both Michael and Kimberley through the underlying
principles of agency even if the actual declarant remains unknown. *Martinez*, 430
F.3d at 326; *Ayala*, 601 F.3d at 268.

*Email address associated with PM.* It is more likely than not that Michael
Tew used this account. Google records show that Michael Tew's x7473 telephone
number and sandhillrp email address were used as the "account recovery" contacts.
[ORD_00017716]. Michael told Yioulos that invoices would come via QuickBooks
and the two the logistics of paying PM in close coordination with Michael's requests
for payments through the PM email. Ex. 1 #87 (discussing how invoices would be
sent via QuickBooks and coordinating receipt and payment). Regardless, like the
MCG email address, it is enough for the court to conclude that it was used in
furtherance of the scheme even if there is doubt about precise attribution.

*Email address associated with 5580JD.* Google records show that this

account, too, used one of Michael Tew's telephone numbers — the x1312 number — as one of the means to recover the account. [ORD_00015084]. And just as with the MCG and PM email addresses, the close coordination between its use and the communications by and between the Tews and Yioulos, also make it more likely than not that it was used in furtherance of the conspiracy.

> ### D. Text messages preserved in Kimberley Tew's iCloud account chronicle the conspiracy on an almost day-to-day basis

Kimberley Tew used an Apple iCloud account associated with her email address, kley@me.com, to store text messages between her and Michael and between Michael and Yioulos. As the Court is aware from the hearing regarding the defendants' motion to suppress, ECF No. 262, the Government executed a search warrant on that account and has recovered many of those messages. The messages were provided by Apple in a zip file that contained, among other things, Excel files with the messages and those messages were, in turn, screened through a filter to protect any applicable attorney-client privilege held by the defendants. The Government has used Cellebrite software to render that data in a more visually appealing way or, where the software was unable to sort relevant tables, has located them in the original Excel file. These messages are themselves evidence of the conspiracy. *Bourjaily*, 483 U.S. at 180. *See, e.g.,* Ex. 1 # 14, 40, 46, 59, 68, 73, 93, 117, 81, 147, 175, 220, 256, 257, 258, 317, 329, 341. Further authentication and attribution of a message to one defendant or another can be accomplished by looking at all of the circumstantial evidence, including the messages' context, contemporaneous bank records showing transaction being made in one or the other

of the Tews' accounts, witness testimony, and other information set forth in this proffer or in the messages themselves. *Martinez*, 430 F.3d at 326; *Ayala*, 601 F.3d at 268.

### E. Witness testimony

NAC's owners, as well as other employees, will testify that Michael Tew was fired in September 2018 and that neither he nor Kimberley provided services to NAC after that time. They will also testify that payments made to HS CPAs, MCG, 5530 JD, PM, GFL, and AMR were not authorized and that NAC did not receive any goods or services. H.S. and M.M., the purported principals of HS CPAs and MCG are expected to testify that they did not perform services for NAC.

### F. Telephone Records

Telephone toll records confirm and corroborate the extensive communications between and among the Tews and Yioulos.

## V. The Statements in the Government's *James* log were made by the Tews in furtherance of the charged conspiracies

The evidence proffered above shows that Michael and Kimberley (1) agreed to execute a fraud scheme and agreed to engage in financial transactions involving the proceeds of that scheme (i.e., there were conspiracies), (2) Michael and Kimberley were conspirators, and (3) the statements in the attached *James* log furthered the conspiracy. *Stein*, 985 F.3d at 1269.

**A.    There were agreements between the Tews to defraud NAC and then to engage in financial transactions with the proceeds**

A criminal conspiracy occurs when there is: (1) an agreement between two or more people to break the law; (2) knowledge by those people of the essential objectives of the conspiracy; (3) knowing and voluntary participation in the conspiracy; and (4) interdependence among the conspirators. *United States v. Cornelius*, 696 F.3d 1307, 1317 (10th Cir. 2012). The Government can show an agreement to do something illegal by pointing to the co-conspirators' statements, as well as all of the other evidence described above and below. *Id.*

Evidence of the agreement must be "substantial," but that just means it must be "more than a scintilla," or "evidence that a reasonable mind would accept as adequate to support a conclusion." *United States v. Bucaro*, 801 F.2d 1230, 1232 (10th Cir. 1986). Substantial evidence can be direct or circumstantial and just because the evidence can be susceptible to two inconsistent conclusions does not make it unreasonable to accept one conclusion over another. *United States v. Peterson*, 611 F.2d 1313, 1330 n.1 (10th Cir. 1979); *Bucaro*, 801 F.2d at 1232.

An agreement to commit a crime doesn't need to be formal or explicit, *United States v. Dumas*, 688 F.2d 84, 86 (10th Cir. 1982); it can be based on tacit and mutual understanding. *Rutland*, 705 F.3d at 1250. For this reason, circumstantial evidence can be and often is the only proof of a conspiracy and a conspirator's participation in it. *See, e.g.*, *United States v. Isaac-Sigala*, 448 F.3d 1206, 1210-1211 (10th Cir. 2006). Indeed, to establish the connection of the declarant and the defendant to the conspiracy, a court may make the circumstantial inference that a

defendant is a knowing participant in a conspiracy when he acts in furtherance of the conspiracy's objective. *See United States v. Tranakos*, 911 F.2d 1422, 1430 (10th Cir. 1990)

### B. Statements Were Made During the Course of and in Furtherance of the Conspiracy

In determining the third factor—that the statement was made during the course of and in furtherance of the conspiracy—several rules apply. First, the focus is on whether the declarant's intent in making the statement was to advance the conspiracy, not whether the statement actually advanced the conspiracy. *United States v. Perez*, 989 F.2d 1574, 1578 (10th Cir. 1993). To determine this, the Court must examine the nature of the statement and its context. *Id.* at 1579. Second, there is no requirement that the statement be made by one conspirator to another. *United States v. Williamson*, 53 F.3d 1500, 1519 (10th Cir. 1995); *United States v. LeRoy*, 944 F.2d 787, 789 (10th Cir. 1991). Third, a statement may be admissible, even if subject to alternative interpretation, if a reasonable interpretation of the statement is consistent with an intent to promote the conspiracy. *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989); *see also United States v. Patterson*, 713 F.3d 1237, 1245 (10th Cir. 2013) (interpretation that coded calls were in furtherance of conspiracy was not clearly erroneous).

Examples of statements made in furtherance of a conspiracy include but are not limited to those in the list below, which correspond to the letters designated as "Basis for Admission" in the attached *James* log.

  a. Statements that in any way promote the objective(s) of a conspiracy.

*Rutland*, 705 F.3d at 1252; including statements that indicate payments or demands for payment to accomplish activities of the conspiracy, *United States v. Townley*, 472 F.3d 1267, 1274 (10th Cir. 2007) (citation omitted).

b.  Statements that reveal the existence of a conspiracy. *United States v. Garcia*, 994 F.2d 1499, 1505 (10th Cir. 1993).

c.  Statements that are intended to recruit potential coconspirators or otherwise to induce others to assist in carrying out the objectives of the conspiracy. Perez, 989 F.2d at 1578; *United States v. Alcorta*, 853 F.3d 1123, 1137 (10th Cir. 2017).

d.  Statements that identify a conspirator or the role of a conspirator. *Rutland*, 705 F.3d at 1252; *Townley*, 472 F.3d at 1273.

e.  Statements that explain important events in the conspiracy. *Rutland*, 705 F.3d at 1252; *Townley*, 472 F.3d at 1273.

f.  Statements of future intent that set transaction integral to the conspiracy in motion and maintain the flow of information among the co-conspirators. *United States v. Morgan*, 748 F.3d 1024, 1037 n.16 (10th Cir. 2014) (citation omitted).

g.  Statements that are designed to advise co-conspirators of the progress of the conspiracy and keep them abreast of activities associated with the conspiracy. *Alcorta*, 853 F.3d at 1137; *Townley*, 472 F.3d at 1273; *Perez*, 989 F.2d at 1578.

h.  Statements which are intended to assure the listener of a conspirator's ability to consummate a particular transaction. *United States v. Echeverry*, 759 F.2d 1451, 1457 (9th Cir. 1985).

i.  Statements that are designed to gain the trust of other conspirators or potential conspirators, to reassure trustworthiness, or to allay suspicions or fears. *Rutland*, 705 F.3d at 1252.

j.  Statements which are intended to control damage to the conspiracy that are made during the course of the conspiracy. *Alcorta*, 853 F.3d at 1136 (affirming admission of coconspirator statement about erasing data on phones prior to arrest and advice to defendant to get rid of his phone).

k.  Statements that prompt the listener to respond in a way that

15

facilitates carrying out the activities of the conspiracy. *United States v. Rahme*, 813 F.2d 31, 35 (2d Cir. 1987); *see also Alcorta*, 853 F.3d at 1136 ("Vega coached Adrienne to avoid ruse drug checkpoints…. Those instructions were indisputably in furtherance of drug deliveries.").

l.  Statements that conceal the objective of the conspiracy. *Rutland*, 705 F.3d at 1252-53; *Alcorta*, 853 F.3d at 1139.

m.  Statements to co-conspirators or potential co-conspirators indicating potential investigation, apprehension, or punishment. *Alcorta*, 853 F.3d at 1139; *United States v. Williamson*, 53 F.3d 1500, 1520 (10th Cir. 1995); *United States v. Triplett*, 922 F.2d 1174, 1181 (5th Cir. 1991).

n.  Statements between conspirators regarding the distribution of the proceeds. *United States v. Morgan*, 748 F.3d 1024, 1036-37 (10th Cir. 2014);*United States v. Ammar*, 714 F.2d 238, 253 (3d Cir. 1983) ("The distribution of the proceeds of a conspiracy is one of its central objectives, and statements which are directed to that purpose must be considered to be in furtherance of the conspiracy.").

## C. Statements in furtherance of a conspiracy are, by definition, not privileged

"[C]onversations between husband and wife about crimes in which they conspire or participate or, after the fact, participate in, are not privileged marital communications for the purpose of protection as confidential marital communications. *United States v. Neal*, 743 F.2d 1441, 1447 (10th Cir. 1984); *see also United States v. Marashi*,  913 F.2d 724, 730 (9th Cir. 1990) (citing cases from First, Second, Third, Fourth, Fifth, Sixth, Seventh, and Tenth Circuits supporting

principle that marital communications privilege does not apply when both spouses are joint participants in a crime).

COLE FINEGAN
United States Attorney

By:   */s/ Bryan Fields*
Bryan Fields
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bryan.Fields3@usdoj.gov
Attorney for the Government

**Certification of Type-Volume Limitation**

I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1).

*/s/ Bryan Fields*
Bryan Fields

**Statement of Speedy Trial Impact**

Pursuant to Judge Domenico's Practice Standard III(C), the government notes that this motion will not affect the speedy trial clock in this case because any resolution of it will be within the already-granted ends-of-justice continuances granted on March 17, 2023 ECF Nos. 317 and 318.

*/s/ Bryan Fields*
Bryan Fields

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of December, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to counsel of record in this case.

<u>s/ *Bryan Fields*</u>
Bryan Fields
Assistant U.S. Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
Bryan.Fields3@usdoj.gov