IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00305-DDD

UNITED STATES OF AMERICA,

     Plaintiff,

v.

    1.  MICHAEL AARON TEW and
    2.  **KIMBERLEY ANN TEW**,
       a/ka Kimberley Vertanen,

    Defendants.

---

## STATEMENT REGARDING SENTENCING OF KIMBERLEY TEW

---

Jonathan Yioulos told Kimberley that what they were doing was "1000% fraud." ECF No. 341-1 (Log Entry #37[1]). Her own husband and co-conspirator encouraged her to make realistic deals, pay off her debts, and move on. *Id.* (Log Entry # 129). But Kimberley didn't care and she didn't want to move on. She knew what she was doing and she wanted it all. She wanted to gamble with other people's money, speculate in cryptocurrency risk-free, and enjoy luxury living without a life of labor. Her only complaint was that the people around her weren't stealing enough fast enough frequently enough. Day after day for nearly two years, she cajoled,

---

[1] The text exchange corresponding to this entry, marked as Government Exhibit 637, was admitted at trial after the Court clarified that messages from Yioulos were in furtherance and unprotected by a privilege.

1

comminated, and corrupted everyone around her in the selfish pursuit of more and more money. Without her, it is highly likely that this crime would not have occurred. She was the animating force behind a $5,053,878.50 fraud conspiracy that destroyed lives and cut at the fraying bonds of trust that our society relies upon for its continued commercial prosperity. Kimberley Tew is the most culpable of the conspirators and deserves the highest sentence.

The government recommends that the Court impose a top-of-the-Guidelines sentence of 151 months' imprisonment, the maximum three-year term of supervised release, and a fine of $250,000 (the "Recommended Sentence").

## I.   MICHAEL AND KIMBERLEY TEW COMMITTED WIRE FRAUD AND THEN USED THE BANKING SYSTEM TO HANDLE ITS PROCEEDS, ALL WHILE REFUSING TO PAY TAXES[2]

Evidence at trial showed that Michael Tew, Kimberley Tew, and Jonathan Yioulos engaged in a complex scheme to defraud a Florida-based company, N.A.C., Inc. ("the Victim Company") of more than $5 million through the submission of

---

[2] This statement of facts is repeated without change in the sentencing statements for both Michael and Kimberley Tew. The court has already found by a preponderance of the evidence that many of the statements in the government's *James* proffer, ECF No. 341-1, were in furtherance of the charged conspiracy. ECF No. 361. That is sufficient for the Court to rely on those statements for purposes of making findings relevant to sentencing. Because the *James* log is easily searchable and accessible on the docket and because only some of those statements were admitted at trial even though those and others are relevant for sentencing, the government cites here to the *James* log when describing defendant statements and incorporates both the *James* Proffer, ECF No. 341, and the statements found to be in furtherance in the log, ECF No. 341-1, by reference. Other citations are to admitted government exhibits.

fraudulent invoices billing the Victim Company for services never rendered. Their conspiracy began in August 2018 and ended only after the intervention of federal law enforcement in July 2020. [Testimony of Jonathan Yioulos; GX 1002,1003, and 1008]

Michael Tew and Kimberley Tew — sometimes borrowing the identities of their friends, their associates, and those friends' and associates' companies — submitted these invoices on behalf of what appeared to be six different entities. They calculatingly adjusted the amounts demanded by each invoice based on the Victim Company's resources at any given moment. [Testimony of Jonathan Yioulos]. As the Victim Company paid these invoices, Michael and Kimberley Tew engaged in multiple financial transactions through multiple financial institutions in amounts greater than $10,000 from money they knew to be the proceeds of wire fraud. [GX 1009 − 1023].[3]

Michael Tew was convicted by a jury of failing to file taxes. But both he and Kimberley Tew had previously filed tax returns and each was therefore aware of their obligation to file tax returns. Neither did so between 2018 and 2019. [GX 110-112] Instead, each took affirmative steps to evade or defeat assessment and payment of their taxes.

---

[3] These exhibits were not admitted at trial, but were shown to the jury as summaries. They reference the underlying exhibits that *were* admitted at trial and are the handiest reference.

### A.      The Individuals and Entities Involved

#### 1.      *Michael Aaron Tew*

Michael Tew is a resident of the State of Colorado. He has a master's degree in business administration from New York University and has held roles in finance, to include serving as Chief Financial Officer (CFO) for private companies, including the Victim Company. As part of this scheme, he submitted fraudulent invoices from Colorado to the Victim Company, communicated and coordinated with his coconspirators Kimberley Tew and Jonathan Yioulos in and from Colorado, and engaged in financial transactions largely in Colorado with the proceeds of the fraud. [Testimony of C.A., Testimony of B.P., A.S., Jonathan Yioulos, Lisa Palmer and Roman Hernandez, GX 535, 571-576, 974, 975]

He also recruited others into the scheme, both witting and unwitting. He recruited Jonathan Yioulos to knowingly agree to be part of the fraud. But he also used his friend, L.W., to help him. [Testimony of Jonathan Yioulos; GX 975]. Michael Tew used interstate wires to submit these fraudulent invoices by electronic mail to the Victim Company, and he engaged in financial transactions that were executed through the use of interstate wires. [Testimony of M.O.]. The defendant personally benefitted from the scheme to defraud, setting up multiple bank accounts at several different institutions to take custody of scheme proceeds and sometimes using third parties to receive fraud money in their bank accounts. [GX 312, 363, 975, 1001]. At all times during the conspiracy, he was married and remains married to coconspirator

Kimberley Tew.

He did not pay taxes on either his legitimate or illegitimate income. [Testimony of Roman Hernandez, GX 101 – 112]

### 2. *Jonathan Yioulos*

Jonathan Yioulos is a resident of the State of New York and was, at some prior to 2018, the Director of Finance for the Victim Company. Sometime between 2018 and July 2020, Yioulos became the Victim Company's controller while continuing to perform his responsibilities as Director of Finance. Michael and Kimberley Tew recruited Yioulos to be a part of their fraud scheme by leveraging Michael Tew's friendship and by promising to pay him bitcoin.

Once Yioulos had agreed to start giving the Tews money based on fraudulent invoices, they kept him involved in the conspiracy through a combination of emotionally manipulative techniques, best summarized in one of Michael Tew's texts to Kimberley: "I'm trying being nice I'm trying being mean I'm trying to threaten I'm trying to help him I'm trying to play ball I'm trying every method and he is not responding." ECF No. 341-1 (Log Entry #341); *see also id.* (Log Entry 347 ("I have to threaten hi" [sic]). As shown at trial, Michael and Kimberley Tew maintained Yioulos's involvement in a two-year criminal enterprise by making appeals to friendship — offering Yioulos bitcoin, ECF No. 341-1 (all entries in furtherance referencing Indictment ¶ 25); other things of value like football tickets, *Id.* (Log Entry # 317); and payments for his student loans and mortgage, *Id.* (Entries # 130 & 131).

When that wouldn't work, they preyed on his fears and anxieties — threatening to take action that would cause Yioulos to lose his accounting license, *Id.* (Log Entry # 59); to adversely affect Yioulos's marriage and then divorce proceedings, *Id.* (Log Entry # 265); and to trick Yioulos into believing that, if stopped sending money, others would call the Victim Company and have Yioulos fired. *Id.* (Log Entry# 650). [Testimony of Jonathan Yioulos; Testimony of Lisa Palmer].

Yioulos benefited financially from the conspiracy, but only on the terms and conditions dictated by Michael and Kimberley Tew, and at a much lower level. The Tews ultimately got over $5 million, whereas Yioulos got around $100,000. The Victim Company fired Yioulos on July 7, 2020, after his involvement in the conspiracy was uncovered by a combination of another employee and law enforcement. [Testimony of Jonathan Yioulos; Testimony of A.S., Testimony of C.A.; Testimony of Sarah Anderson; Testimony of Lisa Palmer].

### 3. *Kimberley Tew*

Kimberley Tew is a resident of Colorado who conspired with Michael Tew and Jonathan Yioulos to execute this scheme to defraud her husband's former employer. Kimberley Tew pushed the fraud forward by directing Michael Tew to ask Jonathan Yioulos for payments. She used those funds to stake her gambling wagers, to subsidize a separate cryptocurrency investment scam that she ran in parallel with the charged fraud, and to support her opulent lifestyle. [Testimony of Jonathan Yioulos; GX 974 and 975].

She represented to others that she graduated from Fordham University in New York and that she had previously held jobs at Google. [Testimony of C.A.; Testimony of M.M.]. She used tactics similar to Michael Tew's to keep Yioulos involved. "Play into greed," she once encouraged Michael. ECF No. 341-1 (Log Entry # 130). On another occasion she suggested that Yiolous was a "kid" who could be manipulated with "something small" and then worked with Michael to offer Yioulos concert tickets or sports tickets. *Id.* (Log Entry # 317). Lurking behind it all was her ruthless willingness to exploit others' fears and weaknesses. *Id.* (Entries #59, 117, 118, 265, 317). Kimberley Tew also tried to recruit others to participate in the fraud, including H.S. and M.M.. [Testimony of H.S.; Testimony of M.M.]

### 4.   *The Victim Company*

The Victim Company was headquartered in Florida with an office in Buffalo, New York. The Victim Company operated in the United States and around the world. Its subsidiaries included N.A.C. Group, Inc., d/b/a N.A., which operates as an airline, and provides freight forwarding solutions. N.A.C. Holdings, Inc. ("NAC Holdings") was one of several affiliates of the Victim Company. C.A., the owner of the Victim Company, testified at trial to the immense hardships imposed by the fraud, which created cash shortages that strained the company's reputation with vendors and caused enormous stress on its staff. At times, there were concerns the company wouldn't even be able to make payroll. [Testimony of C.A.; Testimony of Jonathan Yioulos]. These hardships were corroborated in contemporaneous statements among

the conspirators. ECF No. 341-1 (Entries # 84, 85, 156, 186-188, 194, 196). C.A. also testified that he placed a tremendous amount of professional and personal trust in Michael Tew before the Tews betrayed him and the company and Michael Tew was fired in September 2018.

### 5. Sand Hill, LLC ("Sand Hill")

In February 2012, Michael Tew incorporated Sand Hill in New York. Sand Hill was a single-member LLC with Michael Tew as its only member. In or around November 2018, Michael Tew registered Sand Hill as a foreign limited liability company in Colorado. He then opened accounts for Sand Hill at local bank branches in Colorado to further dissipate the fraud proceeds across several different financial institutions and accounts. During the course of this fraud, in an effort to defeat detection, Michael Tew and Jonathan Yioulos agreed to abbreviate Sand Hill, Inc.as "SHI LLC" on records used by NAC's accounting team in order to create the false impression of another entity. [Testimony of Jonathan Yioulos; Testimony of B.P., Testimony of R.T.]; ECF No. 341-1 (Log Entries # 54, 55, 61, 199, 207, 208, 217).

### 6. Sham Vendors associated with the Tews' friends and partners: HS CPA, MCG, Inc., 5530 JD and PM

HS CPA; MCG, Inc.; 5530 JD, and PM were all entities affiliated or purportedly affiliated with former friends or associates of Michael and Kimberley Tew. Michael Tew had the connection with PM. Kimberley Tew had connections with H.S., M.M. and C.R., who were the supposed principals of HS CPA; MCG, Inc.; and 5530JD. Michael and Kimberley Tew submitted or caused to be submitted fraudulent invoices

to the Victim Company for each of these four entities. [Testimony of H.S.; Testimony of M.M., Testimony of Jonathan Yioulos, Testimony of Lisa Palmer; GX 601, 603, 607, 611, 629, 638, 642, 647, 649, 674, 680, 683, 684, 688, 692 700, 703, 706, 711, 716, 719, 723, 727, 732, 737, 742, 748, 764, 801, 974, GX 975, 1002, 1003, 1004-1007, 1008[4]].

Kimberley Tew created a fake email account in the name of MCG, Inc., only slightly modifying the name of that company so that it would appear to be from M.M.. [Testimony of Lisa Palmer, GX 524, 980-984]. Michael Tew created fake email accounts for C.R. and P.M. [Testimony of Lisa Palmer, GX 520, 521, 975]. These invoices were paid by the Victim Company. [Testimony of A.S., Testimony of Jonathan Yioulos, Testimony of Matt Morgan, GX 1002, 1003, 1004, 1005].

### 7.   *Global Fuel Logistics, Inc. (GFL)*

On or around July 9, 2019, Michael Tew created and registered GFL in Wyoming. [GX 546]. A couple of days later, on or about July 11, 2019, the defendant registered GFL in Colorado as a foreign corporation and, shortly thereafter, opened additional bank accounts for GFL at local bank branches in Colorado. [Testimony of Matt Morgan; Testimony of Lisa Palmer; Testimony of R.T.; GX 526, 975, 1001]. Michael Tew created GFL to diversify the names of the entities submitting fraudulent invoices to the Victim Company and to align the name of the shell company more closely with the business of the Victim Company. These efforts assisted in evading

---

[4] Government Exhibits 1004-1007 were shown to the jury but not admitted. They reference the underlying exhibits and remain handy references for purposes of identifying bank transactions.

the Victim Company's detection. [Testimony of Jonathan Yioulos, Testimony of A.S.]. The Victim Company paid invoices based on the fraudulent pretense that GFL was one of its vendors. [Testimony of Jonathan Yioulos, Testimony of A.S., Testimony of Matt Morgan, GX 539, 841, 844, 845, 875, 887, 903, 912, 928, 933, 935, 950, 952, 953, 954, 955, 959, 969, 1002, 1003, 1006].

Michael Tew intentionally did not list the Colorado address he shared with Kimberley Tew on the registration materials with the States of Colorado and Wyoming. Instead, he chose to list an address in Michigan associated with Kimberley Tew's parents as the principal office address and mailing address. [Testimony of R.T.]; ECF NO. 341-1 (Log Entry # 208). He did so to put multiple layers between himself and GFL, which had no legitimate business operations and whose sole function was to serve as a shell company nominee listed on invoices to the Victim Company. GFL was never registered in Michigan. [GX 974, GX 975].

### 8.   *Aero Maintenance Resources (AMR)*

Michael Tew never registered AMR as a separate entity in any state. To serve the defendant's and the coconspirators' goal of evading detection by diversifying the names of the entities on the fraudulent invoices, the defendant, with the knowledge and coordination of Kimberley Tew and Jonathan Yioulos, submitted invoices on behalf of AMR. [Testimony of Jonathan Yioulos]. AMR was described on the fraudulent invoices as a "division" of GFL. [Testimony of Jonathan Yioulos].

**B.    The Relationships between the Tews and the Victim Company**

Between sometime in 2015 and September 2018, the defendant served as the contracted CFO for the Victim Company. As a contractor, he was paid approximately $10,000 per month to, in later months, up to $25,000 per month pursuant to his contracts with the Victim Company. [GX 535, 550, 571-576]. The Victim Company paid for the defendant's contracted CFO services through his single-member LLC, Sand Hill. Kimberley Tew also provided limited contract services to the Victim Company related to the creation of a virtual web application. [Testimony of C.A., Testimony of Jonathan Yioulos, GX 986].

In June 2018, Michael Tew began to use an American Express corporate card issued to him for work-related expenses to instead purchase gift cards at Target, King Soopers, Walgreens, and other retailers. He did this at the request and encouragement of Kimberley Tew, who needed the gift cards to pay off a debt. When American Express and the Victim Company separately asked Michael Tew questions about these expenses, the defendant lied to both entities. Michael Tew, in coordination with Kimberley Tew, had purchased those gift cards because they could be easily, and largely anonymously, sold for cryptocurrency such as bitcoin. The defendant needed these funds because of family debts, some of which were the result of Kimberley's gambling and crypto-speculation. [Testimony of C.A., Testimony of Jonathan Yioulos, Testimony of A.S., GX 335, 338, 339, 347 – 353, 532, 538]

In or around September 15, 2018, the Victim Company terminated Michael

Tew's contract for this unauthorized use of the corporate credit card and because another individual to whom Kimberley owed a debt had called employees and owners of the Victim Company to threaten and extort them. [Testimony of C.A., Testimony of Jonathan Yioulos, Testimony of A.S., GX 536]; ECF No. 341-1 (Log Entries # 33, 36, 37, 50, 59, 85, 93, 108, 156). After September 15, 2018, the Victim Company did not know it had engaged in any further business dealings with Michael or Kimberley Tew. The Victim Company learned of the scheme to defraud in or around July 2020, after it was contacted by the IRS and the FBI. [Testimony of C.A.; Testimony of Sarah Anderson; Testimony of Lisa Palmer].

### C. The Tews inflicted millions of dollars of loss on the Victim Company during a two year crime-spree

#### 1. *The Tews used adaptive invoicing techniques to make their scheme more effective over time*

In or around August 2018, Michael Tew, at the encouragement and direction of Kimberley Tew, began submitting fraudulent invoices to the Victim Company, which the Victim Company paid. Initially, the dollar amounts for the invoices were relatively small, but over time, the amounts demanded by each fraudulent invoice grew substantially. Between August 2018 and July 2020, as a result of this conspiracy to commit wire fraud, the Victim Company paid $5,053,878.50 either directly to the defendant and Kimberley Tew or to third parties recruited by Michael and Kimberley Tew. [GX 1002, 1003]

The fraud was perpetrated to pay outstanding and ongoing debts incurred by

Kimberley Tew's gambling, to cover the redemptions of "investors" who were victims of a separate cryptocurrency scheme, and to finance a lavish lifestyle that included a luxury apartment in Cherry Creek, designer clothes, expensive food, and Las Vegas junkets.

Initially, the invoices were submitted by or on behalf of entities not previously used as vendors by the Victim Company and who performed functions unrelated to the conspiracy. Over time, the invoices were submitted by shell company nominees that existed as vehicles to continue the fraud, to evade detection, and to conceal the source and destination of income. When the amount paid to one sham vendor became large enough to make its notice a higher audit risk, Michael and Kimberley would pivot to a different vendor, spreading their fraud across multiple different entities so that no single vendor would stand out. [Testimony of Jonathan Yioulos, GX 974, 975, 1002, 1003].

The fraudulent invoices were all approved by Yioulos, and the payments were largely made via automated clearinghouse (ACH) transactions, although some payments were tendered by wire transfer. The ACH transactions were executed through interstate wires from the Victim Company's account at Signature Bank in New York to bank accounts in Colorado and elsewhere. [Testimony of M.O.; Testimony of Jonathan Yioulos; GX 9-40, 355-262, 365-367, 369-377, 379-380, 383-384, 386-392, 428-468, 492; GX 1001 - 1007].

Kimberley Tew directed Michael Tew to obtain money from the Victim

Company. Michael Tew, in turn, would advise Jonathan Yioulos to continue authorizing invoices, or risk the Tews and their associates going to the Victim Company's management, something which would result in the termination of Yioulos's employment. Yioulos, who initially had a friendly relationship with Michael Tew, agreed and continued to knowingly process fraudulent invoices submitted by or for the benefit of the defendant and Kimberley Tew during the course of the conspiracy. In exchange, the Tews also offered Yioulos a few bitcoin as compensation, which Kimberley would supposedly invest on Yioulos's behalf. Under this arrangement, the bitcoin was transmitted by Michael or Kimberley to Yioulos, then requested back, and then re-transmitted multiple times. Ultimately, Jonathan Yioulos received a relatively small portion of the fraud proceeds: approximately $100,000 worth of bitcoin, which he then converted into fiat currency. [Testimony of Jonathan Yioulos; GX 527]; ECF No. 341-1 (all log entries found to be in furtherance in which Kimberley requests money from Jon, all entries found to be in furtherance referencing Indictment paragraph 25, all log entries describing texts between Michael Tew and Jonathan Yioulos).

At first, both Michael and Kimberley Tew contacted Yioulos to request or demand money from the Victim Company. Later, Yioulos cut off contact with Kimberley Tew because of her caustic tone and mercenary tactics. *See, e.g.,* ECF No., 241-1 (Log Entries # 115, 118); *see also Id.* (Log Entry # 197 (encouraging Michael Tew to threaten Jonathan so that Kimberley can get money to pay redemptions of her

"investors"). From that time forward, Kimberley would tell Michael when she needed money, direct him to ask Yioulos, and Michael would execute her instructions. [GX 974, 975].

To accommodate these demands for payment, Yioulos often advised Michael Tew about the financial status of the Victim Company and/or its affiliates so that payments of the fraudulent invoices did not result in the Victim Company and/or its affiliates overdrawing their bank accounts. Michael would then pass along this information to Kimberley. *See, e.g.,* ECF No. 341-1 (Log Entry # 156, 187, 194, 317) Yioulos often made payments in installments or "progress payments." That is, Yioulos authorized and approved multiple ACH transfers or wire transfers where each transfer was for an amount less than the total amount of an invoice to try to pay the defendants with whatever money was available to the Victim Company or its affiliates at that time. [Testimony of Jonathan Yioulos]; *See, e.g.,* ECF No. 341-1 (Log Entry # 348).

Michael and Kimberley Tew accepted partial payments based on what the Victim Company or its affiliates could afford at any given time during the conspiracy. Many times partial payments were made by the Victim Company and its affiliates prior to the receipt of an invoice to satisfy Michael Tew and/or Kimberley Tew's immediate demands for money. During the conspiracy, if Yioulos deferred or delayed payment of the fraudulent invoices based on the financial status of the Victim Company or its affiliates, Michael and Kimberley Tew pressured or threatened

Yioulos to induce him to pay the invoices. [Testimony of Jonathan Yioulos]; ECF No. 341-1 (Log Entry #341); *see also id.* (Log Entry 347 ("I have to threaten hi" [sic]).

Over time, the conspirators used more sophisticated means to conceal the fraud. For example, at the beginning of the scheme to defraud, the fraudulent invoices contained generic descriptions of services like consulting services or "service fee[s]" but over time, those descriptions grew more specific with later fraudulent invoices bearing descriptions like "Trailing Edge Flap"; "Replacement of Moisture Barrier over Kevlar (Labor Hours)"; and "A-330-200 (N819CA) Crew / Operations / Staff Training[.]" [GX 845, 875, 969]

Michael Tew, in coordination and consultation with Kimberley Tew and Yioulos, also took steps to ensure that the face of each invoice would not arouse suspicion at the Victim Company. Indicia of legitimacy on the fraudulent invoices included the following:

- Unique, non-consecutive invoice numbers, which implied that invoices were being directed to other companies beyond the Victim Company or its affiliates;

- Naming an entity that was purportedly providing services, entities whose registration with various Secretaries of State could be confirmed, a description of services and, sometimes, a project name, as well as a due date;

- Identifying a sum certain, sometimes round numbers and other times specific numbers, that were associated with the purported provision of certain numbers of hours of service or work and which were sometimes reduced by "adjustments";

- Identifying real bank account information for the entities, even if the

16

entity was not in fact associated with that bank account; and

- Identifying a purported specific person, for example, "Jessica Thompson," as a contact person in the "Accounting Department" for questions about the invoices. "Jessica Thompson" did not in fact exist.

[Testimony of Jonathan Yioulos, GX 539,601, 603, 607, 611, 629, 638, 642, 647, 649, 674, 680, 683, 684, 688, 692 700, 703, 706, 711, 716, 719, 723, 727, 732, 737, 742, 748, 764, 801, 841, 844, 845, 875, 887, 903, 912, 928, 933, 935, 950, 952, 953, 954, 955, 959, 969, 975].

### 2. *The Tews' used a shell company as another artifice to deceive the Victim Company while insulating themselves from detection*

Michael Tew took additional steps to evade detection by also creating and using newly-formed shell entities to submit these fraudulent invoices. These new entities, GFL and AMR, appeared to at least superficially engage in work that related to the Victim Company's industry, but in fact had no other operations beyond being used to perpetrate this fraud. The defendant not only intentionally registered them in a manner that would make it difficult to connect the entities to him Kimberley Tew, he requested Employer Identification Numbers, [GX 545], created official-sounding new email addresses, [GX 512], and otherwise attended to the business of perpetrating this fraud, [GX 974, 975]. [Testimony of Jonathan Yioulos].

### 3. The Tews recruited third parties to assist in their criminal endeavor and then, when those parties balked at such brazen fraud, stole their identities to insulate themselves from detection

As set forth above, the fact that using the same vendor over and over again would draw attention imposed an inherent constraint on the Tews' ability to perpetrate the fraud. Furthermore, Michael and Kimberley Tew were aware that another risk of their criminal endeavor was that others might see their association with a vendor. For the first few months of their scheme, the Tews tried to push the risk of exposure away from themselves and towards third parties they felt they could manipulate.

### a. Kimberley Tew's Exploitation of H.S.'s addiction

In August 2018 — just after Kimberley Tew had been caught using Michael Tew's corporate credit card to purchase gift cards — Kimberley pitched H.S. on an opportunity make money with bitcoin. H.S. initially agreed to invest with Kimberley's bitcoin opportunity. But when Kimberley asked H.S. to open a bank account to receive a large sum of money, H.S. turned Kimberley down. This didn't stop Michael or Kimberley from using H.S. to help advance their fraud: they simply adopted H.S.'s name for use on some of their fake invoices, falsely stating that H.S. was a CPA contracted by Michael Tew in his capacity as the Victim Company's CFO. H.S. has never been a CPA, and she was entirely unaware of the scheme to defraud or the use of her name in that endeavor. Kimberley Tew knew that H.S. had addiction problems and a troubled background that would make her a convenient scapegoat. She also

relied on her friendship with H.S., believing that H.S. would be less likely to divulge information to the authorities. Michael Tew explained this thinking in one of the calls with Yioulos that was recorded by law enforcement. [Testimony of H.S.].

      **b.**    **Kimberley Tew's exploitation of M.M.'s financial desperation**

Kimberley Tew was a cryptocurrency hobbyist who used the peer-to-peer exchange platform Paxful. There, she met M.M. while using the false name "Matthew Vertanen." M.M. had established his own company, MCG, LLC, to engage in peer-to-peer cryptocurrency exchange brokering. Over a course of time Kimberley convinced M.M. that she was his friend. Eventually, she played up her experience at Google and told M.M. that she had a trading algorithm she could use to generate fantastic 100% returns on the market for bitcoin. She offered M.M. the opportunity to invest, noting that she did this for others too. Kimberley Tew's description of her luxury tastes — Jimmy Choo shoes and elaborate trips to the Wynn in Las Vegas — lent further credibility to her appearance of success. M.M. agreed and, at least at first, enjoyed spectacular returns that basically doubled his investments. Michael Tew helped Kimberley Tew with this separate "investment" business, once meeting with M.M. in person in Ft. Collins to withdraw money that the Tews promised to convert into bitcoin. He invested more and more with Kimberley until, eventually, he had invested almost everything he had. [Testimony of M.M.]; *see also* ECF No. 341-1 (Log Entries # 162, 205) (discussing debt owed to M.M.).

M.M. was not a wealthy investor. He was a high school graduate and former

construction worker without a large financial safety net. Over time, Kimberley's apparent success evaporated. She was late in returning money to M.M. Or she would return his bitcoin when asked, but then immediately ask for that bitcoin's return on the pretense that, without it, her algorithm would collapse and everyone would be worse off. When Kimberley Tew's returns to Michael decreased, or she delayed in returning his bitcoin, M.M. became desperate and angry. *See, e.g.,* ECF NO. 341-1 (Log Entries # 204 and 205)

In the fall of 2018 Kimberley Tew took advantage of M.M.'s desperation by offering him another opportunity to make money. She asked M.M. to open bank accounts to receive money from the Victim Company. In return, he could keep 10% of the transaction. M.M. agreed. Michael and Kimberley then instructed Yioulos to send NAC's money to M.M.'s accounts. M.M. would then convert that money into bitcoin, which he would transfer to Kimberley. On a few occasions, when M.M. was slow to get the money to Kimberley, Kimberley would respond with threats. Kimberley once called M.M.'s wife and accused M.M. of stealing. She also told M.M. that she would turn M.M. into authorities. [Testimony of M.M., GX 1004].

### c.   *Michael Tew's exploitation of his friendship with L.W.*

By the end of 2018, Michael and Kimberley needed to use another vendor to hide their scheme. Michael Tew turned to his friend, L.W., who was the proprietor of a business called P.M. Michael Tew prevailed on his friend to receive payments from the Victim Company and then kick those payments back to Michael Tew. L.W. did

this on two occasions. After that, Michael Tew cut out L.W. as a middleman, appropriated the P.M. name, and directed Yioulos to send the money directly into a joint bank account controlled by both Michael and Kimberley Tew or into his own accounts. [Testimony of Jonathan Yioulos, Testimony of Matthew Morgan, GX 312, 363, 975, 1002, 1003, 1005]; ECF No. 341-1 (Log Entries # 174 and 175 (discussing payments to "actual" PM).

### 4. The Tews' use of dummy email accounts and their staggered deceptions of the Victim Company and Jonathan Yioulos

Michael and Kimberley Tew further staggered their layers of deception by using dummy e-mail addresses to make it appear that the invoices were coming from others. Kimberley Tew created an email account using the name "MCG, Inc." — a disguised variant of M.M.'s company — and then used that email account to submit false invoices to the Victim Company. [Testimony of Lisa Palmer; GX 524, 980-984]

Michael Tew similarly created email addresses using others' names or companies. The first he created used the name of C.R., who was another cryptocurrency enthusiast befriended by Kimberley Tew. Another used P.M.'s name. After he had set up GFL he took additional steps to bolster the pretense that it was a real company by paying for a dedicated domain name — globalfuel.co — and an associated email address, accounting@globalfuel.co. [Testimony of Lisa Palmer, GX 512, 520, 521, 975].

Yioulos was a willing but often reluctant coconspirator. To encourage his

participation, the Tews represented to him that they were being extorted or blackmailed and that only more money would save them. They also represented that M.M. and C.R. — the purported extortionists — were the ones sending emails to Yioulos. [Testimony of Jonathan Yioulos]; *see e.g.,* ECF No. 341-1 (Log Entries # 37, 115). These statements were false. Michael and Kimberley Tew were using the same tools they used to deceive the Victim Company to deceive Yioulos. The Tews did not really believe that M.M. was going to resort to violence against them. Michael told Kimberley that M.M. was just "empty threats. ECF No. 341-1 (Log Entry #205). And C.R.'s "extortion" amounted to telling Michael and Kimberley that he would report their theft of his money to the police. *Id.* By convincing Yioulos that they were receiving emails from others of unpredictable disposition, Michael and Kimberley Tew could manipulate Yioulos's fear. To encourage him to send them NAC's money they would send emails from the MCG, Inc. and CR email accounts suggesting that failing to do so would cause M.M. or C.R. to report Yioulos. *See, e.g.,* ECF No. 341-1 (Log Entries # 58, 67, 75, 339).

### 5. *The Tews developed expertise in banking practices to avoid detection and ensure access to their ill-gotten gains*

The banking side of the fraud was also intricate. Michael Tew and Kimberley Tew maintained multiple bank accounts at multiple financial institutions; some they held in their individual names, and others were joint accounts. [GX 1001]. Through these multiple bank accounts, they each made multiple transfers of funds that originated from the fraud against the Victim Company or its affiliates. On many

occasions, those transfers led to several cash withdrawals in a single day from accounts controlled by Michael Tew or Kimberley Tew or both Michael and Kimberley Tew. After withdrawing cash from the proceeds of the fraud, Michael Tew and Kimberley often deposited the aggregated amount of cash from that day or over a few days into cryptocurrency ATMs, where they were able to deposit United States dollars in exchange for bitcoin, either held in their own wallets or sent to third parties, many of whom were owed money. All told, the Tews deposited approximately $2,429,181 into just one company's cryptocurrency ATMs during the conspiracy. This likely substantially undercounts the total converted into cryptocurrency because other companies also provide bitcoin ATM services and messages describe routine bitcoin atm transactions. *See, e.g.,* ECF No. 341-1 (Log Entry # 176, 179, 189, 192, 193, 348, 351, 356).

During the early part of the conspiracy, when a bank that held accounts receiving payments from the Victim Company closed some or all of the defendant and/or Kimberley Tew's accounts, the defendant and Kimberley Tew then created multiple accounts at another credit union, of which Kimberley Tew was a member. [GX 975]. Michael Tew asked bank managers at that location detailed questions about their policies and what they might flag as suspicious transactions. [Testimony of B.P.].

### D.   Summary of the Entities Used to Submit Fraudulent Invoices and the Dramatic Increase of Invoiced and Paid Amounts

The chart pictured below, admitted at trial as Government Exhibit 1002,

summarizes the fraudulent invoices by the entity; the number of fraudulent invoices submitted by or on behalf of that entity; the total dollar amount paid by the Victim Company to the entity for Michael Tew and Kimberley Tew's benefit or directly to bank accounts controlled or operated by the defendant and Kimberley Tew; and the increase over time in the amounts that the Tews personally benefitted from this fraud.

| Company | 2018 | | 2019 | | | | 2020 | | | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Qtr3 | Qtr4 | Qtr1 | Qtr2 | Qtr3 | Qtr4 | Qtr1 | Qtr2 | Qtr3 | |
| H... Service CPA | $ 50,000.00 3 Payments | | | | | | | | | $ 50,000.00 |
| 5530 J... De... | $ 75,000.00 5 Payments | $ 30,000.00 1 Payment | | | | | | | | $ 105,000.00 |
| M... Co... G... | | $110,125.00 5 Payments | | | | | | | | $ 110,125.00 |
| Po... M... | | $ 21,250.00 1 Payment | $267,962.50 11 Payments | $551,665.00 22 Payments | $ 59,675.00 4 Payments | | | | | $ 900,552.50 |
| Global Fuel Logistics | | | | | $446,000.00 14 Payments | | | $ 847,338.00 12 Payments | $95,000.00 1 Payment | $ 1,388,338.00 |
| Aero Maintenance Resources | | | | | $329,200.00 8 Payments | $810,500.00 22 Payments | $682,055.00 22 Payments | $ 648,108.00 10 Payments | | $ 2,469,863.00 |
| Grand Total | $125,000.00 | $161,375.00 | $267,962.50 | $551,665.00 | $834,875.00 | $810,500.00 | $682,055.00 | $1,495,446.00 | $95,000.00 | $ 5,023,878.50 |

### E.   Michael Tew responded to the possibility of being caught by seeking additional fraud payments so that he could flee

In the days and weeks leading up to Michael Tew's eventual arrest, Michael and Kimberley Tew were both in touch with Yioulos. In early July 2020, Yioulos had told the defendant that the FBI was asking questions, a fact that Yioulos had become aware of as the Victim Company began looking at its books to understand the fraudulent payments. Both Michael Tew and Kimberley Tew were concerned about an FBI and/or IRS investigation. On July 8, 2020, Michael Tew again asked Yioulos

24

for additional funds in the form of bitcoin; this time, the money was to be used to facilitate his, Kimberley Tew, and their minor children's flight from the country. [Testimony of Jonathan Yioulos]; ECF NO. 341-1 (Log Entry # 376).

### F.   Prohibited Financial Transactions

Between August 2018 and July 2020, Michael Tew and Kimberley Tew organized and coordinated numerous prohibited financial transactions in amounts greater than $10,000 that each knew was sourced from the proceeds of unlawfully obtained activity, namely conspiracy to commit wire fraud and wire fraud. Each of these transactions was described at trial using summary exhibits GX 1000 – 1023 that reference the underlying bank records.

### G.   Kimberley Tew's efforts to obstruct the investigation and prosecution

Kimberley Tew acted to obstruct the investigation into the charged fraud and money laundering conspiracy by tampering with witnesses and by destroying evidence.

Kimberley's Tew's first act of obstruction was her most successful: she convinced Michael Tew not to cooperate against her. Michael Tew was arrested on July 8, 2020. He immediately agreed to cooperate, but negotiated a major concession. His first proffer contained a provision that prevented the government from using his information to prosecute Kimberley. Michael Tew later decided to waive that concession, agreed to cooperate against Kimberley, and he agreed to provide information against her at a subsequent proffer session. He also agreed to allow the

government to image his phone. IRS-CI and FBI agents surreptitiously arranged a meeting with him (outside of Kimberley Tew's knowledge) at a Yeti store in Cherry Creek to perform the cell phone extraction on July 29, 2020. Sometime that day, however, Kimberley Tew figured out that the meeting was happening. While the imaging was underway, Kimberley Tew showed up and immediately began haranguing Michael Tew, his attorneys, the prosecutors, and the agents. Using their children as a cudgel — claiming that Michael Tew didn't care about them — and generally doing everything she could to disrupt the meeting, including claiming to fire Michael Tew's attorney without his consent, she eventually coaxed her husband into leaving. [GX 551].[5] Michael eventually stopped cooperating.

At the July 29 Yeti meeting, which was audio recorded, Kimberley Tew admitted to her second act of obstruction. Acknowledging that the agents were there to gather evidence from Michael Tew's phones, she tried to convince the assembled gathering that it was a futile exercise: "I already wiped most of it anyway," she said. [GX 584]. Sure enough, when agents later tried to obtain messages that were stored in Kimberley's iCloud account, they found that her tampering had resulted in a situation where half of conversations — the half involving Kimberley Tew — were

---

[5] GX 551 is the audio recording of the entire meeting. It was marked, but not admitted at trial. Statements made by Michael Tew on the recording are protected by the proffer agreement and should not be referenced as part of his sentencing. But Kimberley Tew was not a party to that agreement, her statements were made of her own volition, and the Court can and should review and consider the entire recording as evidence of her obstruction.

missing. *See, e.g.,* ECF No. 341-1 (Log Entries # 19, 28, 35, 37, 46, 51, 85, 108, 115, and 118).

Finally, as the Speedy Trial Act ticked its way towards indictment, Kimberley Tew took action to tamper with H.S. She tried to play on H.S.'s sympathy by sending her a slideshow with pictures of their friendship. In late 2020 or early 2021 she tried the other tack: she threatened to reveal extremely embarrassing and intimate private information about H.S. unless H.S. remained silent. [Testimony of H.S.]. The Grand Jury's indictment came in February 2021.

## H. Michael and Kimberley Tew's parallel cryptocurrency investment fraud scheme

As described above, Kimberley Tew offered M.M. an "investment opportunity" involving cryptocurrency. She offered Jonathan Yioulos much the same. But it was just another scam. Kimberley was taking bitcoin from others under the pretense that she had a proprietary algorithm that could double their money. But she lost it. Michael Tew explained all of this to Yioulos:

> MT 1312:   she has other investors, legitimate wealthy guys that are buying BTC through her right now. Its weird to explain but they are too old to use the exchanges.

> MT1312:    Totally separate from any of this. NY people. Not my people, I don't know any of them. Its her own thing.

> MT1312:    She can get it.

ECF No. 341-1 (Log Entry # 175). Later on, Michael Tew told Yioulos a variation of the story that Kimberley Tew had told M.M.: sometimes she couldn't pay people back

because her "script" had gone amok. "She came to me and said shit I have jons BTC I'm sending ypbuimband [sic] then said shit I just lost momentum in my script," Michael Tew told Yioulos. ECF No. 341-1 (Log Entry # 257). Michael Tew elaborated the next day: "KT was running her script, was waiting for $15K from my airline / chairman of frontier project, he literally never sent it I've been slaving away for him and it fucked everything up." *Id.* (Log Entry # 257)

Kimberley Tew, aided and abetted by Michael Tew, was essentially committing one fraud to subsidize another, like a particularly grotesque Ponzi scheme. *Id.* (Log Entry # 129) (noting plan for Kimberley to use "the last two wires" to build a "portfolio").

On August 5, 2019, Michael Tew begged Yioulos for money from the Victim Company, explaining that without it "we're going to bounce a check to investors. A check to investors." *Id.* (Log Entry #220). In correspondence between Michael Tew and Kimberley Tew, Kimberley would complain that having to pay back her investors meant not having any money to gamble. *Id.* (Log Entry # 283) ("With the negative accounts and bills we have to pay plus the car and AN that's over 60K. It really leaves nothing for Vegas."). On other occasions, Kimberley would pressure Michael to ask Yioulos for money so that she could use the Victim Company's money to recoup investor losses, instead of paying them out herself. *Id.* (Entres # 173, 178, 185, 187, 192, 197 222, 261, 274, 286, 347, 367) (discussing need for money from Jon to pay out several others).

28

*James* log entry number 185 is particularly illuminating. Kimberley had lost so much money gambling in Las Vegas that she couldn't pay an investor who was "all over" her to see his account. Desperate, she told Michael to offer Yioulos three bitcoin to send them money. Then she and Michael proceeded to make up false excuses as to why they couldn't pay the investor, with Michael pointedly noting that they "need a new story." Just a few days later, Kimberley told Michael that she had gotten a loan from one investor that she could use to pay another (a classic manifestation of a Ponzi scheme), while they waited for money from Yioulos so that Kimberley would not "blow up." *Id.* (Log Entry # 187). When "everyone is cashing" out their investment with Kimberley, she asked Michael to ask Yioulos to bail her out. *Id.* (Log Entry # 197). And then she and Michael discussed how to alter the date and amount of withdrawals from cryptocurrency investors so they could show them false and fraudulent statements. *Id.* On another occasion, Kimberley warned Michael that an investor "could cash a check" and that she needed to make sure Yioulos sent them money to cover it. *Id.* (Log Entry # 274.); *see also Id.* (Log Entry # 261) (featuring Kimberley asking Michael to "talk to Jon" because "I have people asking for money today").

In September 2023, a Denver District Court concluded by a preponderance of the evidence that Kimberley Tew committed civil theft when she took cryptocurrency from an investor and refused to give it back. ECF No. 450-1 at 15. The court's description of the undisputed facts tells a story similar to the one detailed by M.M. and Yioulos. Kimberley Tew learned that an acquaintance, D.B., had an interest in

cryptocurrency, told D.B. she could make enormous returns trading cryptocurrency, and offered to take bitcoin and invest it on D.B.'s behalf. She also represented that she was doing the same for others. D.B. gave Kimberley thousands of dollars. When he asked for it back, he got the same types of excuses Kimberley had given M.M. Kimberley eventually refused to give the money back. *Id.* at 2-10.

I.     **Evidence related to Michael and Kimberley Tew's income while retaining counsel through the Criminal Justice Act program**

On December 13, 2022 Michael Tew and Kimberley Tew filed affidavits with the Court so that it could make the statutorily required finding that they were "financially unable to obtain counsel." 18 U.S.C. § 3006A(b). However, bank records show that, between January 2022 and December 2022, Michael Tew received $678,595.22 in deposits into a single bank account. This is just over nine times the median United States income of $74,580. https://www.census.gov/library/publications/2023/demo/p60-279.html.

Between January 2022 and January 2024, Michael Tew's single account received enough money to make him a bona fide millionaire: $1,212,181.27.

| Month and Year | Deposits |
|---|---|
| 01/22 | $50,875.79 |
| 02/22 | $124,989.95 |
| 03/22 | $55,521.54 |
| 04/22 | $57,233.14 |
| 05/22 | $71,069.11 |
| 06/22 | $62,932.81 |
| 07/22 | $53,482.97 |
| 08/22 | $51,086.67 |
| 09/22 | $59,056.31 |

| | |
|---|---|
| 10/22 | $27,523.52 |
| 11/22 | $25,332.10 |
| 12/22 | $39,491.31 |
| 01/23 | $36,856.25 |
| 02/23 | $46,199.01 |
| 03/23 | $41,929.82 |
| 04/23 | $22,987.04 |
| 05/23 | $33,174.51 |
| 06/23 | $35,474.86 |
| 07/23 | $36,500.05 |
| 08/23 | $30,875.68 |
| 09/23 | $43,116.57 |
| 10/23 | Not available |
| 11/23 | $51,069.33 |
| 12/23 | $63,477.26 |
| 01/24 | $91,925.67 |
| TOTAL | $1,212,181.27 |

The records show a similarly byzantine financial history to that presented at trial, including substantial transfers to cryptocurrency exchanges; Kimberley Tew; and app-based peer-to-peer payment platforms. And this is only one account. Other evidence obtained by the government shows that the Tews had financial accounts at other banks and brokerages. Moreover, during the pendency of the case, Michael and Kimberley Tew lived in a luxury apartment complex in downtown Denver for $8,649.69 a month.

The government has asked the Court to release the affidavit so that it can evaluate whether the Tews were truthful in their statements to the Court. It does not have the affidavit and so cannot say whether the Tews committed perjury or defrauded the Criminal Justice Act program. But the Probation Office can access the affidavit and determine whether they did and, if so, how that should impact their

sentence, including whether to impose a fine as part of that sentence.

### J.   Evading Payment of Taxes

Despite having taxable income from their contracts with the Victim Company and later from the fraud described herein, neither Michael nor Kimberley Tew filed income tax returns for tax years 2016 through 2022. They had previously filed tax returns, and were therefore aware of their responsibility to do so. Michael and Kimberley Tew, while living and working in Colorado, devised the complex fraud as an income generation scheme, and then took a variety of actions to conceal that income. These actions included causing the Victim Company to issue payments to pre-existing companies like MCG, 5530 JD and PM but to route those payments into accounts that the defendant and his coconspirators knew were controlled by the Michael and Kimberley Tew. Later, Michael Tew used shell entities like GFL and AMR as nominees, again to put distance between the defendant and the income that was being generated to GFL and AMR. These were, among others, affirmative acts taken by Michael and Kimberley Tew to evade or attempt to evade the payment their taxes. Michael and Kimberley Tew engaged in these actions willfully: they knew that they had income, that they were required to file tax returns and pay tax on that income, and that they specifically intended not to pay those taxes. *See, e.g.,* ECF NO. 341-1 (Log Entry # 129, 139, 242) (musing about how they are going to get money to pay their taxes).

A very conservative estimate of the taxes due and owing is $1,307,743.60

calculated by adding together the fraud proceeds in the relevant years plus either compensation reflected in IRS records and then applying the 20% tax rate set forth at U.S.S.G.§2T1.1(c)(2)(A):

| Tax Year | | Amount | Applicable Tax Rate | Tax Loss |
|---|---|---|---|---|
| 2016 Income | Gross | $185,000.00 | 20% | $37,000.00 |
| 2017 Income | Gross | $312,500.00 | 20% | $62,500.00 |
| 2018 Income | Gross | $702,215.00 | 20% | $140,443.00 |
| 2019 Income | Gross | $2,465,002.00 | 20% | $493,000.40 |
| 2020 Income | Gross | $2,471,001.00 | 20% | $494,200.20 |
| 2021 Income | Gross | $403,000.00 | 20% | $80,600.00 |
| | | | | **$1,307,743.60** |

## II.   ALL OF THE FACTORS THAT THE COURT MUST CONSIDER WEIGH IN FAVOR OF THE RECOMMENDED SENTENCE

In fashioning a sentence, the Court must address each of the factors set forth at 18 U.S.C. § 3553(a), including (1) the applicable United States Sentencing Guidelines (the "Guidelines"), (2) the nature, circumstances, and seriousness of the offense, (3) the history and characteristics of the defendant, and (4) the need to promote respect for the law, afford adequate deterrence, and protect the public from further crimes. Each fully supports the Recommended Sentence.

**A. The Guidelines recommend a substantial prison sentence that should not deviate from others that would be imposed on similarly situated defendants being sentenced in other district courts around the country (18 U.S.C. §§ 3553(a)(4) and (a)(6))**

The government submits that Kimberley Tew's Offense Level is 32, based on reference to the relevant Guidelines:

| Enhancement | Guideline Provision | Offense Level |
|---|---|---|
| Total Fraud Offense level | | 27 |
| *Base Offense level* | *2B1.1(a)(1)* | *7* |
| *Loss > $3.5 million* | *2B1.1(b)(1)(J)* | *+18* |
| *Sophisticated Means* | *2B1.1(b)(1)* | *+2* |
| **Additional Enhancements** | | |
| § 1957 laundering | 2S1.1(b)(a) | +1 |
| Leader/Organizer[6] | 3B1.1(c) | +2 |
| Obstruction | 3C1.1 | +2 |
| **Total Offense Level** | **32** | |
| **Recommended Range** | **121-151     months** | |

**1. *There is no doubt about the base offense level, the intended loss, or the applicability of the enhancement for violating 18 U.S.C. § 1957***

Evidence presented at trial showed beyond a reasonable doubt that the defendant committed wire fraud (which has a base offense of 7), "spending" money laundering in violation of 18 U.S.C. § 1957 (a one-level enhancement) and that the

---

[6] Despite her lack of criminal history, Kimberley Tew does not qualify for the zero-point offender reduction under new guideline §4C1.1 because she was a leader and organizer of the scheme. U.S.S.G. § 4C1.1 *See United States v. Mahee*, 2023 WL 8452433, *3-4 (N.D. Ga. Dec. 6, 2023) ("No defendant who receives an Aggravating Role Adjustment under § 3B1.1 of the Guidelines can ever be eligible for the Zero-Point Offender Adjustment under § 4C1.1(a)."); *see also United States v. Gordon*, 2023 WL 8601494, at *3 (D. Maine, Dec. 12, 2023).

defendant intended to inflict the losses charged in the indictment: $5,053,878.50,

(an 18-level enhancement). The court should also have no trouble concluding that it

is more likely than not that the other sentencing enhancements apply here.

U.S.S.G. § 6A1.3, comment; *United States v. Watts,* 519 U.S. 148, 156 (1997)

(acknowledging that preponderance of the evidence standard is appropriate for

findings of fact related to sentencing).

> ### 2. Kimberley Tew's sophisticated knowledge of digital platforms and familiarity with the Victim Corporation led her to use sophisticated means to siphon over $5 million from a large corporation through frequent but relatively small individual transactions to maintain the scheme for two years

The Tews submitted false invoices in return for money. But the surface-level

simplicity of this type of fraud belies the "especially intricate offense conduct

pertaining to the execution or concealment of" of their fraud offense. U.S.S.G. §

2B1.1 cmt. app. n. 9(B). Kimberley Tew directly carried out the scheme using

several of the means and methods the Sentencing Commission and courts around

the country have identified as hallmarks of sophistication:

- <u>Use of others' identities</u>. Kimberley adopted the identity of M.M. and MCG to create the appearance that multiple fake vendors were submitting invoices, all as part of a clever effort to spread out the payments on the victim company's internal balance sheets so that she and Michael Tew could avoid detection and keep the scheme going. *Cf. United States v. Sethi*, 702 F.3d 1076, 1079 (8th Cir. 2013) (noting sophisticated involved in using names an identifies of others to conceal workers' compensation insurance scheme). She was the primary source of contact with H.S., too, whose identity was used to help further the scheme in August 2018. That was just after Kimberley's first, clumsy, effort to obtain money from the Victim Corporation using

Michael Tew's corporate credit card.

- <u>Creation of shell companies</u>. Kimberley Tew caused Michael Tew to use and create a shell company, Global Fuel Logistics, that would perpetrate the scheme. For example, in August 2019 Michael asked Yioulos about how Yioulos was accounting for things in the Victim Company's books. "*We're* just trying to understanding the banking issues," Michael told him — conveying that Kimberley, too, was sensitive to the fact that in order to maintain the scheme they needed to have legitimate-seeming corporations with their own banking issues. Other evidence ties her to GFL. It was registered using her parents' address to make sure that mail would go to someone the Tews' trusted and controlled. And numerous communications reference her coordination with Michael to get money from the Victim Company through the GFL artifice. ECF No. 341-1 (Log Entries # 253, 292, 293, 295, 299, 302, 304, 313, 314, 318, 332, 360, 361, 362). There is no doubt that she directly used and encouraged the artifice of a shell company to help make the scheme a success. U.S.S.G. § 2B1.1 cmt. app. n. 9(B) ("Conduct such as hiding assets or transactions, or both, through the use of fictitious entities . . . also ordinarily indicates sophisticated means."); *See, e.g., United States v. Robertson*, 493 F.3d 1322, 1332 (11th Cir. 2007) (finding no error where district applied enhancement against defendant who used fictitious entities and then switched them out at intervals to circumvent victim controls and avoid detection). Kimberley also encouraged Michael's use of Sand Hill to help conceal the transmission of scheme proceeds. *See, e.g.,* ECF NO. 341-1 (Log Entry # 85)

- <u>Use of multiple bank accounts and structured transactions.</u> Kimberley Tew used multiple bank accounts and then employed a dizzyingly complicated series of transfers, wires, deposits, and withdrawals to evade her banks' anti-money laundering protocols and quickly distance herself from the fraud proceeds. ECF No. 341-1 (Log Entry # 194). As set forth above, she encouraged Michael Tew to create sham bank accounts in the name of GFL to add a layer of fraud and deception to his enterprise. Although Sand Hill was not completely fraudulent, Michael took specific steps to register that entity as a foreign corporation in Colorado so that he could then open bank accounts specifically for the use of obtaining fraud proceeds. Kimberley Tew then relied upon Michael's efforts as a way to collect scheme proceeds while insulating herself from liability. ECF No. 341-1 (Log Entries # 139, 184, 193, 292, 295, 299, 302, 313, 314, 318); *United States v. Mirando*, 768 F. App'x 596, 598 (9th Cir. 2019) (affirming as reasonable exercise of discretion District Court's finding that use of fake entity and associated bank account

36

was sophisticated); *United States v. Erwin*, 426 F. App'x 425, 436-37 (6th Cir. 2011) (affirming District Court's reasoning that using knowledge of bank system to structure transactions to conceal scheme was among sophisticated means used to perpetrate fraud).

- Creation of Fake invoices. Kimberley Tew used her savvy at creating marketing presentations to create the sham invoices for MCG, Inc. that she then sent to Yioulos using the dummy MCG, Inc. account. She also routinely discussed the use of false invoices with Michael Tew. *See, e.g., United States v. Tanke*, 743 F.3d 1296, 1307 (9th Cir. 2014) (concluding that creation of fake invoices supported sophisticated means enhancement). Kimberley Tew directly discussed the need to create the false invoices and pushed Michael Tew to make them. *See, e.g.,* ECF No. 341-1 (Log Entries # 173) ("He [Jon] needs to pay that invoice himself again today."); *Id.* (Log Entries # 28, 46, 140, 173, 332).

- Creation of fake email accounts. Kimberley Tew created the MCG, Inc. fake email account to further disguise her involvement in the submission of false invoices. This aspect of the scheme layered one deception on top of another in a way that shrewdly leveraged her deceptions for maximum effect. Michael Tew and Kimberley Tew was already deceiving the victim company by using false invoices. But they were also deceiving co-conspirator Jonathan Yioulos, telling him that the invoices were being submitted by third-parties who were extorting and blackmailing the Tews. That wasn't true. It was part of an effort to disingenuously appeal to Yioulos's desire for friendship. In reality, the emails were sent by either Michael or Kimberley Tew. ECF No. 341-1 (Log Entries # 339 -341); *cf. United States v. Milligan*, 77 F. 4th 1008, 1013 (D.C. Cir. 2023) (affirming finding of sophisticated means where defendant created fake email accounts to impersonate others).

- Recruitment of others. Kimberley Tew recruited others to help her perpetrate the scheme so that she could diffuse responsibility. She was directly responsible for trying to bring H.S. into the scheme and she successfully persuaded M.M. to let her use his bank account to receive fraudulent money, which was then forwarded Kimberley Tew in transactions designed to conceal their role. *Cf. United States v. Snow*, 663 F.3d 1156, 1164 (10th Cir. 2011) (affirming sophisticated means finding in scheme that involved defendant asking others to help in scheme).

- Cryptocurrency. Kimberley used her advanced knowledge of cryptocurrency to help herself and Michael Tew hide scheme proceeds, quickly spend them,

and to reward co-conspirators like Yioulos. ECF No. 341-1 (Log Entries # 139, 171, 185, 197, 201, 283, 286, 291, 304, 308, 345). M.M. testified at trial that Kimberley used cryptocurrency platforms to eventually the money fraud money that was deposited into M.M.'s account by the Victim Company as part of the scheme. And it was Kimberley's perceived prowess at crypto investing that helped induce Yioulos's participation. *See, e.g., Id.* (Log Entry # 256).

Even if any single transaction might be viewed as unsophisticated, the relentless, intricate, and coordinated nature of the overall conduct is more than sufficient to make the scheme — which evaded detection by the victim company's accounting staff for two years through dozens of transactions that sometimes required multiple false invoices, the use of six different fake vendors, and dozens of bank accounts — an especially complex one. *United States v. Weiss*, 630 F.3d 1263, 1279 (10th Cir. 2010) (explaining that "Guidelines do not require every step of the defendant's scheme to be particularly sophisticated" and quoting opinions in other districts for principle that scheme as a whole can be sophisticated where it involves repetitive and coordinated conduct that links several steps to exploit vulnerabilities and avoid detection); *Cf. United States v. Hogeland*, No. 10-cr-0061, 2012 WL 4868904, at *6 (D. Minn. Oct. 15, 2012) (finding sophisticated means in remarkably similar wire fraud scheme perpetrated that victimized logistics company through submission of fraudulent invoices from multiple fake vendors), *affirmed on other grounds United States v. Bennett*, 765 F.3d 887, 899 (8th Cir. 2024); *United States v. Horob*, 735 F.3d 866, 872 (9th Cir. 2013) (affirming finding of sophisticated means where defendant "manipulated several people to lie for him, used several different

bank accounts (including accounts of other people) to move funds around, and fabricated numerous documents. Moreover, the complicated and fabricated paper trail made discovery of his fraud difficult").

### 3.    *Kimberley Tew led Michael Tew's efforts, organized them, and encouraged them, all while seeking other opportunities to expand the scheme by using others*

Leadership can be manifold: criminal conspiracies are often compartmentalized, with each conspirator exercising entrepreneurial verve within a delimited area of responsibility. The court and can and should apply the enhancement to both Michael and Kimberley Tew because each organized and led different aspects of the fraud. U.S.S.G. § 3B1.1 cmt. app. note 4 ("There can, of course, be more than one person who qualifies as a leader or organizers or a criminal association or conspiracy); *United States v. Valdez-Arieta*, 127 F.3d 1267, 1271 (10th Cir. 1997) (noting this feature of guidelines and going on to conclude that someone can be subject to this enhancement even if he or she has no underlings: it's enough to have an organizing role and there can be many organizers).

- Recruiting of Accomplices. Kimberley Tew started the scheme, encouraged it, maintained it, demanded that Michael Tew be a part of it, and recruited M.M. to help with it. She was directly responsible for turning Michael to crime to maintain her lifestyle and subsidize her gambling. *See, e.g.,* ECF No. 341-1 (Log Entries # 301, 304, 332). She used the same tactics that Michael used against Yioulos. She threatened Michael with jail. "I'm going to jail if I don't get you money. That's what you said," Michael told Kimberley in April 2019. ECF No. 341-1 (Log Entry # 162). She manipulated his desire for family and ridiculed him as a provider: "why don't you ever think about your

family?" she pointedly accused him in June 2019 as part of an effort to prod him to ask Yioulos for money. *Id.* (Log Entry #192); *see also Id.* (Log Entry # 370) (suggesting that Michael Tew didn't want to be in the family because of his reluctance to involve his friend in a criminal conspiracy). At other times, stressed over her inability to pay her debts, she overrode Michael's stirring conscience. Michael reminded Kimberley they had promised to give Yioulos his expected bitcoin and that Yioulos had already sent them money. But Kimberley wanted more, ridiculing Michael for "freaking" and coldly ignoring Michael's questioning about "why do we purposely fuck hom [sic] over?" *Id.* (Log Entry # 249); *see also Id.* (Log Entry # 364) (encouraging Michael to encourage Yioulos to commit fraud despite Yioulos's desire to stop). She also pondered the possibility that Michael Tew might try to help his friend by engaging in self-sabotage and took active steps to warn Michael against it. *Id.* (Log Entry #177). All of this is consistent with leadership. *Cf. United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (finding enhancement could apply where defendant controlled another criminal participant). In addition to her own husband, Kimberley Tew was also directly responsible for recruiting M.M. to open a bank account into which she and Michael Tew could deposit fraudulent proceeds. *United States v. Yarnell*, 129 F.3d 1127, 1139 (10th Cir. 1997) (concluding that defendant was leader or organizer of scheme). She also tried, unsuccessfully, to recruit H.S.

- <u>Obtaining unwitting services of third parties</u>. Kimberley Tew encouraged, supervised, and organized the participation of her own mother, who agreed to let the Tews use her bank accounts and cryptocurrency trading accounts. Kimberley Tew used her own mother to further the fraud by using those accounts to obtain and dissipate fraud proceeds, thereby furthering her own fraud while circumventing anti-money laundering controls put in place by the banks to stop exactly that. *See, e.g.,* ECF No. 341-1 (Log Entries #159, 160, 162, 166, 168, 171, 176, 177, 194, 197, 205, 262, 264) *Cf. United States v. Byrd*, 690 F. App'x 892, 894 (6th Cir. 2017).

- <u>Nature of Participation</u>. Kimberley Tew was the driving force behind the fraud. She was the one who initiated it, using Michael Tew's corporate card to pay off her debts and then, when that was shut down, encouraging Michael to commit the invoicing fraud to keep paying those debts, to subsidize her gambling, and to finance their lifestyle. *See, e.g.,* Id. (Log Entry # 178) (criticizing Michael Tew for not making enough money and directing Michael to tell Yioulos "to just pay the invoice again himself."). The evidence shows that she was the one who decided when Michael would ask for money, directing him to make the requests to Yioulos. *See, e.g.,* ECF No. 341-1 (Log

Entries # 139, 178, 185, 192, 197, 249, 260, 274, 276, 279, 283, 288, 291, 304, 308, 330, 334, 348, 364, 368). And she kept track of how much Yioulos had sent to them. *See, e.g., Id.* 1 (Log Entry # 311). It is difficult to find examples of fraudulent payments made entirely on Michael Tew's initiative: it appears, instead, that Michael — and thus Yioulos — acted only when Kimberley expressed a need for money. *Cf. United States v. Atkins*, 881 F.3d 621, 628 (8th Cir. 2018) (concluding that there was no error in applying enhancement to defendant who planned timing and frequency of fictitious transactions as well as amount of fraudulent proceeds in each payment); *United States v. Byrd*, 690 F. App'x 892, 895 (6th Cir. 2017) (affirming District Court's application of enhancement to defendant whose accomplice testified that he took instructions from defendant and took no action without approval).

- <u>Planning and Organizing of Offense</u>. Kimberley Tew, in conjunction with Michael Tew planned and organized the use of the various different vendors to maintain the scheme over the course of two years. She helped plan and organize the use of sham vendors HS CPA, MCG, Inc. and 5530 JD using the names of her friends and crypto-trading associations. She organized much of the complex banking that helped them evade detection, giving Michael Tew detailed directions on how to money their money between and among fiat and cryptocurrency accounts belonging to her, her family, and her associates. *See, e.g.,* ECF No. 341-1 (Log Entries # 153, 167, 168, 171, 173, 177, 178, 182, 185, 189, 197, 202, 255, 261, 264, 276, 281, 282, 291, 302, 311, 332, 334, 343, 348, 356, 363, 366). And she designed their plan for what they would do if they ever got caught: turn in one of them so that other could escape. *See id.* (Log Entry # 338). She also helped plot the scenarios that would frighten Yioulos the most, helping to stimulate his consistent involvement. *See, e.g., id.* (Log Entry #129, 341). And she advised Michael not to send sham agreements in addition to the sham invoices. *Id.* (Log Entry # 59).

- <u>Claimed Right to Proceeds</u>. Michael Tew and Kimberley Tew controlled and laid claim to the vast majority of the millions taken as a result of the scheme. *Cf. United States v. Brown*, 293 F. App'x 826, 830 (2d Cir. 2008) (concluding that District Court was reasonable in applying leadership enhancement where defendant paid coconspirators only a small fraction of amount he kept for himself); *United States v. Tookes*, 456 F. App'x 159, 163 (3d Cir. 2012) (finding no error in application of enhancement where defendant recruited co-conspirators, directed their actions, and maintained sole control of assets and proceeds of fraud). Although she tried to claim at trial that Michael controlled the bank accounts that received the proceeds, any suggestion that she did not control where the proceeds went is belied by the copious text messages in

41

which she give Michael detailed demands on where the money should go. *See, e.g.,* ECF No. 341-1 (Log Entries # 153, 167, 168, 171, 173, 177, 178, 182, 185, 189, 197, 202, 255, 261, 264, 276, 281, 282, 291, 302, 311, 332, 334, 343, 348, 356, 363, 366).

But for Kimberley Tew's relentless requests for money, her constant cajoling of others to carry out the scheme, and her ability to recruit others to participate, this scheme would not have been successful for two years. The court should recognize the criminogenic nature of Kimberley Tew's conduct and apply the enhancement.

### 4. *Kimberley Tew repeatedly attempted to obstruct justice in order to avoid accountability*

Kimberley Tew did exactly what the Guidelines describe as the kind of thing that should result in an enhancement for obstruction: "threatening, intimidating, or otherwise unlawfully influencing a co-defendant [or] witness . . . directly or indirectly, or attempting to do so" and "destroying . . . evidence that is material to an official investigation or judicial proceeding . . . or attempting to do so." U.S.S.G. § 3C1.1 cmt. app. n. 4(A) & 4(D).

Kimberley's audio-recorded efforts to convince Michael Tew not to cooperate against her constitutes obstruction under the Guidelines. The fact that it involved two members of the same family is legally irrelevant. *United States v. Hesser*, 800 F.3d 1310 (11th Cir. 2015) explains why. In that case, the Eleventh Circuit affirmed an obstruction enhancement for a husband who asked his wife to "go over" her testimony and, when she refused, told her "if you don't want to help, I'll know whose

head to lop off." *Id.* at 1331. The defendant later told his children that their mother was betraying them by working for the government. *Id.* The defendant argued that the comments were part of a domestic spat. The district court disagreed and the Eleventh Circuit affirmed. *Id.* Kimberley's self-interested use of their children to cajole Michael into leaving a meeting with federal agents is different only in its particulars, not in its intent or consequences. *Hesser* is not an outlier. Courts have had no trouble concluding that spouses can obstruct justice by making efforts to stymie cooperation. *See also United States v. Pofahl*, 990 F.2d 1456, 1481 (5th Cir. 1993) (describing defendant's effort to obstruct justice by writing husband letter imploring him to stop providing information to authorities); *cf. United States v. Bingham*, 81 F.3d 617, 632 (6th Cir. 1996) (concluding that letters by defendant to co-defendant girlfriend were obstructive effort to influence decision whether to plead guilty).

An effort to obstruct does not have to be successful to evince contempt for the law and the need for additional punishment. An attempt is sufficient. Even if the Court is unpersuaded that Kimberley Tew stopped her husband from cooperating, Kimberley Tew's unsuccessful efforts to persuade H.S. not to speak to law enforcement independently justifies application of the obstruction enhancement. *United States v. Pinkney*, 552 F. App'x 512, 515 (6th Cir. 2014)

Kimberley's deletion of text messages also independently justifies the sentencing enhancement.

> **5.     The range of 121-151 months recommended by the guidelines provides a rough approximation of the kind of sentence that is sufficient but not greater than necessary to accomplish the goals of criminal justice**

The defendant has no known criminal history. At Offense Level 32, the Sentencing Guidelines recommend a sentence between 121 and 151 months' imprisonment. U.S.S.G.§ 1B1.1(a)(7); U.S.S.G. ch. 5 pt.A. This range is, by itself, one of the factors the Court should consider before imposing a sentence. 18 U.S.C. § 3553(a)(4).

The Guideline range is not mandatory, but it should be a persuasive background consideration for organizing and thinking about sentencing in this case. As the Supreme Court has advised, the sentencing range provides a useful framework for evaluating all of the various sentencing factors in one conclusive gestalt because it provides a "rough approximation" of sentences that will achieve all of § 3553(a)'s objectives. *Rita v. United States*, 551 U.S. 338, 350 (2007); *United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006). For this reason, sentences within the Guideline range are presumed to be reasonable on appeal. *Kristl*, 437 F.3d at 1054. Furthermore, a sentence within the range satisfies not just one factor but two: sentencing within the range is the best way to avoid an unwarranted sentencing disparity as required by 18 U.S.C. § 3553(a)(6). *Id.* (describing how Guidelines remain essential tool for creating a fair and uniform sentencing regime across the country). The Recommended Sentence is thus supported by two of the statutory sentencing factors.

But set the Guidelines aside for a moment. As set forth in more detail below the conclusion that the Guidelines independently urge in this case — a sentence between 121-151 months — is not an abstract or academic one. The particular facts of this case viewed through the prism of § 3553(a) fully support the Recommended Sentence of 151 months.

**B.    The brazen and callous nature of a serious crime that imposed substantial financial and emotional harm under privileged circumstances fully support the Recommended Sentence (18 U.S.C. § 3553(a)(1) and (a)2(A))**

Kimberley Tew was the animating force behind a two year crime spree that consumed everyone around her. The crime was born of greed. "I really really really don't want to stress you out, but we are going to need more money," she told Michael in October 2019. ECF No. 341-1 (Log Entry # 283). Quite simply, she never had enough money for the lifestyle she wanted, the crypto-business accolades to which she thought she was entitled, or the gambling wagers she wanted to make. "It's just not enough. With the negative accounts and bills we have to pay plus the car and AN [one of the investors to whom she owed money] that's over 60K. It really leaves nothing for Vegas," she complained. *Id.* To get money, she turned to crime, bringing her husband around with her. "I need you to work on Jon for sending today," she told him. *Id.* She repeated this request over and over and over again. *See, e.g.,* ECF No. 341-1 (Log Entries # 139, 178, 185, 192, 197, 249, 260, 274, 276, 279, 283, 288, 291, 304, 308, 330, 334, 348, 364, 368). She did this despite being warned that what she was doing was 1000% fraud. *Id.* (Log Entry # 37). When she

didn't get her way, she ruthlessly threatened to destroy the lives around her. *Id.* (Log Entries # 59, 265, 317). She did this even to the people, like Michael Tew, she purported to love. *Id.* (Log Entry # 162). For two years, deceit became a central focus of her life.

As with Michael Tew, nothing about Kimberley Tew's decision to commit her crimes — and to bring others into it —arose out of some kind of moral, ethical, or professional dilemma. She wanted money so she took it. Without scruples. She took it from the Victim Company. She took it from investors. She took it from people she considered friends. She took it and then she gambled it away, always feeling entitled to more. *See, e.g. Id.* (Log Entry #342) (reporting to Michael that they did not have enough for rent and needed money from Yioulos to pay it). Nothing about the circumstances of her crime helps to contextualize, explain, or minimize it. Throughout this period the defendant lived in upper -class comfort, using income from the fraud to pay for a luxury apartment, fine dining, vacations, and cutting-edge couture. This was a crime of choice chosen deliberately and without regard for consequences.

Federal wire fraud and money laundering crimes that inherently spill across state lines to infect interstate are already among the most serious of non-violent crimes a person can commit. But Kimberley Tew's crime stands out. This was not a "one off" or an anomaly. It was a deliberate pattern of criminal behavior carried out over a long period of time. This makes it more serious than most theft crimes. The

loss amount of more than $5,000,000 also makes it more serious. In 2022 the median loss amount for federal fraud offenders was $160,737 and only 17.5% involved losses of more than $1.5 million. The defendant's crime is likely among the most serious that will be evaluated by all federal courts this year. *Quick Facts*, Fiscal Year 2022, *available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY22.pdf* (accessed on March 7, 2024) ("Quick Facts"). Everything else about the crime — its complicated nature and broad scope, its corruption of the banking system, its contempt for the criminal justice process, its criminogenic tendency to ensnare others in criminal behavior, and its blithe disregard for consequences — makes it worse.

The nature of the crime is serious and nothing about its circumstances makes it sympathetic or deserving of leniency. This factor weighs heavily in favor of the Recommended Sentence.

### C. Nothing about the defendant's history warrants less punishment and everything about the characteristics she demonstrated while committing the crime support the Recommended Sentence (18 U.S.C. § 3553(a)(1)

Kimberley Tew's pursuit of money came at everyone else's expense. She was a college-educated and tech-savvy entrepreneur who could have made an extremely comfortable living by working hard. She didn't do that. Instead, she myopically pursued her own selfish desires through crime. For example, she once gambled so much in Vegas that she and her family risked being stranded without the money to

buy tickets home and then had to beg Michael for another execution of their fraud. ECF No. 341-1 (Log Entries # 297 and 301). There is nothing about the defendant's background that mitigates, explains or contextualizes her criminal behavior. "Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999).

To commit, continue, and conceal her crime for two years Kimberley Tew had to exhibit characteristics that were particularly cruel and callous. She convinced Michael to treat Yioulos with derision and contempt. ECF No. 341-1 (Log Entry # 242, 317). When Michael Tew wouldn't commit fraud for her, she threatened to make him responsible for all of her schemes including her cryptocurrency fraud. *Id.* (Log Entry # 177 ) (featuring Kimberley threatening to tell "everyone you are holding the crypto," and telling Michael he was "useless"). She did this even after Michael strongly suggested they needed to stop committing fraud, telling her that they needed to make realistic deals to get out of debit and "move on." *Id.* (Log Entry # 129). She, just like Michael, layered one lie on top of another: she lied to Yioulos about being threatened by others and she lied to Yioulos about invoices being submitted to Yioulos by M.M. and C.R. *Id.* (Log Entry #37, 115). The Court will have to evaluate whether she even lied in the middle of her prosecution by asking for counsel, intended for the indigent and those in true need, while pocketing tens of

48

thousands of dollars.

The Recommended Sentence, which is at the very top of the advisory guideline range, takes into account the lack of any mitigating factors here. The defendant has no criminal history, but the guidelines already take that into account. Quick Facts (noting that 70.6% of offenders sentenced using § 2B1.1 of the Guidelines were in Criminal History Category I); *Cf. United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) (noting, in context of disfavored Guideline departure at U.S.S.G. § 5H1.11, that it expects district courts to view good character references with skepticism in sentencing executives who commit white-collar offenses); *Stefonek*, 179 F.3d at 1038 (emphasizing that district judges should not impose 'middle class' sentencing discount and then explaining, by reference to U.S.S.G. 5H1.10, that "[b]usiness criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity.")

Kimberley Tew's criminal appetite appears to be driven by an untreated gambling addiction, but she had numerous opportunities, loving support, and adequate resources to attend treatment. She made a deliberate choice not to do so, consciously embracing and selecting the thrill of the tables over the costs it imposed on others. *See, e.g.,* ECF No. 341-1 (Log Entry # 301) (refusing to come up from gaming floor and, instead, asking Michael for another execution of the fraud scheme so that Kimberley would be "more comfortable"). Her threats were non-violent, but

they were malicious: she cynically tried to use the government and — ultimately — judicial consequences as a bludgeon to keep her drafted minions in line.

Kimberley Tew's cynical views of the criminal justice system manifested themselves in other ways. Evidence shows she believed that she had the power to get immunity for herself or for others so that they could escape from consequences. *Id.* (Log Entry # 338).

Kimberley Tew committed the crime knowing that getting caught would mean she faced the very realistic possibility of being incarcerated during the childhoods of her two daughters. This consequence — unimaginable to many — did nothing to deter her lies or encourage her to make different choices. Rather, she weaponized the plight of her children to stop her husband from trying to make things right.

The Recommended Sentence reflects that fact that the Guidelines were created, in part, to help address the concern that white-collar offenders received special treatment and "frequently do not receive sentences that reflect the seriousness of their offenses." S. Rep. No. 98-225 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3260. A sentence outside the Guidelines range would create disparities with other types of offenders that would simply reinforce this perception of special treatment and thus undermine deterrence and respect for the law. *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or

social status."); *United States v. D'Amico*, 496 F.3d 95, 107 (1st Cir. 2007) (explaining that lower sentences for white collar criminals contradicts purpose of Guidelines), reversed on other grounds, *D'Amico v. United States*, 522 U.S. 1173 (2008).

The Recommended Sentence takes into account the personal characteristics that combined to turn Kimberley Tew into the leader of a multi-year multi-million dollar conspiracy.

**D. The Recommended Sentence would deter Kimberley Tew from committing other crimes while deterring other would-be fraudsters from tearing at the bonds of trust that are vital to our general prosperity**

The nature and circumstances of the crime, combined with the characteristics the defendant exhibited to carry it out, make a strong a strong case for concluding that she *is* the Holmesian bad actor personified: the kind of person who "cares nothing for an ethical rule which is believed and practiced by his neighbors" but who "is likely to care a good deal to avoid being made to pay money, and will want to keep out of jail if he can." Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L. Rev. 458, 459 (1897). That is, she is precisely the kind of person who can be deterred only if she can accurately predict that courts will impose a lengthy prison sentence for her conduct.

Specific deterrence supports the Recommend Sentence. Everything known about the crime, its circumstances, and the defendant's characteristics suggest that Kimberley Tew is exactly what she has never denied: a gambler seeking the thrill

that comes from beating the odds (or the boost from imagining you are so smart the normal odds don't even apply to you) — the kind of person who rationalizes the odds, balances the probability and size of the reward against the risks of failure, and then makes her wager. The sentence in this case should convince her that the house always wins.

The sentence in this case should also do what appeals to her conscience by friends and the specter of being unavailable for her children could not: alter the defendant's decision calculus so that the consequences, discounted by the likelihood of getting caught, outweigh the perceived benefits. *See* Richard A. Posner, Economic Analysis of the Law 256 (9th ed. 2014) (Attachment 1).

Research indicates that the Recommended Sentence is likely to have that effect. United States Sentencing Commission, *Length of Incarceration and Recidivism* at 4 (April 2020), available at https://www.ussc.gov/sites/default/ files/pdf/research-and-publications/research-publications/2020/20200429 _Recidivism-SentLength.pdf (last accessed March 13, 2024) (finding significant deterrent effect to sentences of more than 60 months); S*ee Loughran et al., Can Rational Choice Theory Be Considered a General Theory of Crime? Evidence from Individual-Level Panel Data,* 54 Criminology 86, 107 (2016) (finding that criminals "act in accordance with anticipated rewards and costs of offending") (Attachment 2).

Anything less than the Recommended Sentence would also undermine general deterrence. "Defendants in white collar crimes often calculate the financial

gain and risk of loss, and white collar crime can therefore be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (citing cases and Congressional findings supporting the deterrent effect of prison on white collar crime).

Kimberley Tew calculated here that stealing over $5 million was "worth it," once she discounted the likelihood she'd be caught and the high probability that she could hold on to large sums of that money by offshoring it on cryptocurrency platforms. Anyone else who thinks that they can take millions and then obtain immunity or otherwise hack the justice system to get away with it —other would-be criminal millionaires weighing the possibly enormous gains of fraud against the likely consequences, discounted by the likelihood of detection — should be able to look at the sentence in this case and rationally conclude that the crime is not worth it (taking into account the remarkably resilient ability of individuals to believe that they are above average and that they can avoid the pitfalls that led *others* to be caught).

The Court should also consider the possibility that the defendant is simply not deterrable. In this case, the defendant kept committing fraud (1) in the shadow of constant paranoia regarding whether Yioulos was a "rat" who would turn her in, (2) after she found out that the FBI had contacted the Victim Company, and (3) in background circumstances of substantial financial security that would leave almost

anybody content. Then, *after* being indicted and *despite* being aware that she faced years in prison, the defendant's internal decision calculus somehow computed that the gains of applying for CJA counsel through the same judge who would eventually sentence her outweighed the potential consequences. If the defendant cannot be deterred from committing fraud in a situation almost custom-built to do exactly that — supervision by federal pretrial services while confronting the extremely high likelihood of a conviction and the resulting serious sentence — it is difficult to imagine what could deter her from lying for personal benefit.

If the defendant cannot be deterred, only the Recommended Sentence will be sufficient, but not greater than necessary, to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)C). This is all the more true when the defendant at issue has extensive experience and knowledge regarding most effective means and methods for committing financial crime. She knows how to create and use a shell corporation, how to manipulate bank procedures to avoid anti-money laundering protocols, how to use and maintain digital aliases, the most effective ways to recruit and retain accomplices, how to create other fake documents, how to use offshore cryptocurrency platforms to hold on to any ill-gotten gains, and how to use all of these means to defraud others. The only way to ensure she is not tempted to use this knowledge to immediately enrich herself — or take stake another wager as part of another criminal venture — is a lengthy sentence of imprisonment.

**E.    Only the Recommended Sentence would impose just punishment and instill respect for the law from a defendant who has treated it with contempt**

Imposing the Recommended Sentence would mean that the defendant receives one year of prison for approximately every $404,310 she stole. Even spread across a sentence longer than Michael Tew's, that's still one year of prison for taking more than most people in the United States will earn in over five years while following the law. And that simple calculus does not include qualitative aspects of the crime, like her callous manipulation of others. Approximately twelve-and-a-half years, given all of the circumstances, is just punishment that "reflects the gravity of the offense" and "takes into account the cost of the defendant's criminal conduct and the cost society must undertake to punish that offense." *Simon v. United States*, 361 F. Supp. 2d 35, 44 (E.D.N.Y. 2005) (interpreting this § 3553(a) factor with support from legislative history and circuit precedent).

The Recommended Sentence would also promote the respect for the law that Kimberley Tew held in contempt throughout the conspiracy and during the pendency of his criminal prosecution.

## III.   CONCLUSION

"I don't care if we all go down," Kimberley once told Michael in a moment of candor. ECF No. 341-1 (Log Entry # 317). And she didn't: all of the evidence shows that Kimberley lied for years with no remorse. If she had regrets, it was that the people around her failed to give ger more money. *Id.* (Log Entries # 129, 192, 267,

283, 340, 341, 367). In just two years she managed to ruin several lives and squander a stolen fortune. Then she applied the same tactics she had used to perpetrate the fraud to target the justice system itself, targeting its witnesses, mechanisms and objectives. She lived a life that was 1000% fraud. She deserves a sentence that is at least 100% of what our judicial system, through the Sentencing Commission, demands of everyone else in a similar circumstance. For all of the reasons set forth above, the Recommended Sentence is sufficient, but not greater than necessary, to achieve all the goals of criminal justice set forth at 18 U.S.C. § 3553(a).

Respectfully submitted,

COLE FINEGAN
United States Attorney

By:    */s/ Bryan Fields*
Bryan Fields
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bryan.Fields3@usdoj.gov
Attorney for the Government

By:    */s/ Sarah H. Weiss*
Sarah H. Weiss
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Sarah.Weiss@usdoj.gov
Attorney for the Government

**Certification of Type-Volume Limitation**

Judge Domenico's Practice Standard III(A)(1) does not impose a type-volume limitation on sentencing statements.

*/s Bryan Fields*
Bryan David Fields

**Statement of Speedy Trial Impact**

56

Pursuant to Judge Domenico's Practice Standard III(C), the government notes that this motion will not affect the speedy trial clock in this case because trial has already occurred within the Speedy Trial Act deadline.

## CERTIFICATE OF SERVICE

I certify that on this 14th day of March, 2024 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case

s/ *Bryan David Fields*
BRYAN DAVID FIELDS
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
Bryan.Fields3@usdoj.gov