IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-305-DDD

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

1. MICHAEL TEW,
2. KIMBERLEY TEW,


     Defendants.
_____

**REPORTER'S TRANSCRIPT**
JURY TRIAL, DAY 2
_____

          Proceedings before the HONORABLE DANIEL D. DOMENICO,

Judge, United States District Court for the District of

Colorado, occurring at 9 a.m., on the 6th day of February,

2024, in Courtroom A1002, United States Courthouse, Denver,

Colorado.

**APPEARANCES**

          Bryan Fields and Sarah Weiss, Assistant U.S.

Attorneys, 1225 17th Street, Suite 700, Denver, Colorado,

80202, appearing for the Government.

          Jason Dale Schall, Bowlin & Schall Law LLC, 7350 East

Progress Place, Suite 100, Greenwood Village, CO 80111 and

Kristen M. Frost, Ridley McGreevy & Winocur PC, 303 16th

Street, Suite 200, Denver, CO 80202, appearing for the

Defendant, Michael Tew.

1     David Scott Kaplan and Jamie Hughes Hubbard, Stimson

2 LaBranche Hubbard, LLC, 1652 North Downing Street, Denver, CO

3 80218, appearing for Defendant, Kimberley Tew.

4

5     TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
          901 19th Street, Denver, Colorado 80294

6        Proceedings Reported by Mechanical Stenography
            Transcription Produced via Computer

7

8                  **P R O C E E D I N G S**

9     (In open court at 9:01 a.m.)

10         *THE COURT:*  Good morning.  Please take your seats.

11 I -- my understanding, counsel, we're still waiting on -- maybe

12 waiting on one juror or two, but I have just a couple of things

13 I wanted to bring up, that one of them, I guess, my --

14 hopefully will smooth things out a little bit this morning.

15         So, as to, you know, we're talking about these

16 documents from Apple™, and what part or how much of them could

17 be considered admitted.  To me, Mr. Fields, I think all I need,

18 given our previous rulings on certifications and declarations

19 or whatever we want to call them is, sort of, in addition to

20 what you were doing yesterday with Mr. Yioulos, to get him to

21 explain the kind of contents of his conversations.  To get

22 these documents, themselves, admitted, if you just point me to

23 where, in the record, we have the certification or declaration.

24 So, I think, my understanding is like these two are referenced

25 in **Document 378-1**, which are Apple™ certifications, and they

1    then, sort of -- that cross-references exhibits that are marked

2    there as 1115 and 1140. If you just point me to that, sort of,

3    thing, and say, these are in there, pursuant to my previous

4    ruling on authentication, I think the documents, themselves, as

5    I have said, are admissible given that, and then if you do the

6    work you were doing with the witness, to authenticate the

7    contents of the messages, I think the whole thing will come in.

8    Does that make sense?

9         MR. FIELDS: Yes. Thank you, Your Honor. For the

10   record, I can also move those declarations into evidence. I

11   usually wouldn't do that, but I'm happy to do that, just to

12   make a very clear record.

13        THE COURT: I don't know that you need to move those

14   into evidence, but I just want you to point me to them, at the

15   very least, and tell me where they are, so that I can confirm

16   that they are the sort of thing that's covered. Ms. Hubbard?

17        MS. HUBBARD: Sorry, Your Honor. Mr. Kaplan and I

18   were talking about this at length last night. I think there's

19   still a missing link in the authentication chain, even with

20   that. So, the way I understand that this works is the data,

21   itself, that was returned by Apple™, pursuant to a search

22   warrant, is what's covered by the business records

23   certification, that data then gets processed by someone through

24   software such as Cellebrite, and produced -- and turned into a

25   report.

1          THE COURT:  Hm-hm.

2          MS. HUBBARD:  The exhibit that the witness is seeing

3    is the report from someone taking the data that is a business

4    record and interpreting it into a report.

5          THE COURT:  Hm-hm.

6          MS. HUBBARD:  I will also tell the Court that that

7    report then has been modified by the government, because those

8    highlighting, green and white, is not a Cellebrite function.

9    That is something that has been overlaid by the government.

10   So, we have, at least, two parts, steps in the chain, that we

11   do not have appropriate evidence of, I think, at this point, to

12   admit those documents?

13         THE COURT:  Okay.  I will let the government respond.

14   I mean, I think as a factual interpretation of the process, I

15   think that's accurate, right, Mr. Fields?

16         MR. FIELDS:  Your Honor, these particular messages

17   actually weren't processed by Cellebrite.  These were in

18   comma-separated value files that were in the Apple™ production.

19   So comma-separated value files, as a lot of people probably

20   know, can be easily rendered in Excel.  So that's all that

21   happened here.  Those messages are original Excel spreadsheets

22   produced directly by Apple™.  We're going to have other

23   witnesses who are going to talk, exactly, about this, but they

24   are covered by that declaration.  So I think, pursuant to the

25   Court's rulings, those declarations should be sufficient.  In

1    addition, all of the other content there is not hearsay.  It's

2    machine-generated non-statements that would come into evidence

3    anyways.  It's the content, the actual, sort of, message body

4    and message date that was the subject of so much foundation

5    testimony yesterday, that's really what the government wants to

6    admit, and, sort of, assert truth values for, and that

7    foundation, we believe, has been laid.

8         THE COURT:  Well, I agree with that, and I just --

9    what you were asking for was admission of the documents,

10    themselves, which are more than that, and I think the

11    highlighting, at least, right, is something done after it's

12    received from Apple™.  So, not really covered by the

13    certifications.  So, do you -- does that cause a problem?  Can

14    I just admit it?  How do we deal with the fact that they have

15    been manipulated, at least to some extent, as far as

16    certification covers?

17         MR. FIELDS:  I'm sorry, Your Honor.  Mr. Yioulos did

18    testify yesterday that that color -- he reviewed them, right,

19    and he is the one who said the color is Michael Tew, the white

20    is me.  So there's already statements in the record showing

21    that these been modified in that regard for the convenience of

22    the jury.

23         THE COURT:  Okay.  Okay.  Well, I think, given that, I

24    think that -- I think they are admissible as business records.

25    They have been certified.  I think, to the extent they have

1  been manipulated or highlighted, I guess is the better

2  description, I think that that's something that, certainly, is

3  something that can be brought up, but I don't think that makes

4  them inadmissible. So, I think if we -- if you just point me,

5  because I haven't necessarily matched every exhibit, but when

6  you get ready to use one of these, point me to where you have

7  given me, at least, the certification or declaration. That,

8  plus what you were doing with Mr. Yioulos, with others about

9  the content, is sufficient to admit them.

10      So, I understand there will be, sort of, ongoing

11  objection to that, but that will be how I would like to

12  proceed, without having to come up for every document.

13          MR. FIELDS: Your Honor, may I --

14          THE COURT: Hm-hm.

15          MR. FIELDS: -- address one other thing? So, I do

16  anticipate, later on in the testimony today, we are going to

17  get into some of the texts that were rendered by Cellebrite, so

18  those are the, what I will call, the one-sided messages. I

19  expect similar testimony from Mr. Yioulos, that he reviewed

20  those messages. He sort of independently confirmed that they

21  are messages with Kimberley Tew. He knows that from his

22  personal memory, and from context, but those -- you know that

23  extra step, them actually being rendered by Cellebrite, that is

24  an issue. We're going to have a witness later on, who did the,

25  sort of, Cellebrite processing, who can talk about that. But

1    the government's position would be that -- basically, the same

2    as it was last time, right?  The fact that they were rendered

3    in Cellebrite, doesn't actually change the authentication

4    argument, which is what -- the one I understand them to be

5    making.  So that's not a 1(b)(1), a witness with personal

6    knowledge who can testify, and so, I would say that it's

7    legally irrelevant that they were rendered by Cellebrite.  To

8    the extent that the defense wants to, sort of, make arguments

9    about Cellebrite not being reliable or something like that,

10   that goes to weight not admissibility, as the cases always say.

11   It's no different than, sort of, a tampering argument someone

12   would make about a physical item, right?  The argument being,

13   *It's actually not in the same condition as it was when you had*

14   *it, Mr. Witness?  It's actually been changed.*  They can make

15   that argument, and ultimately it's for the jury to decide, but

16   that should not actually prohibit its consideration by the

17   jury, in advance.

18        *THE COURT:*  So, he has personal knowledge of what he

19   texted about, right?  But -- so, he can certainly testify about

20   that.  But I think I understood the argument, yesterday, to be

21   these -- he doesn't have personal knowledge of this document,

22   that you are asking to be admitted, so why is that okay?

23        *MR. FIELDS:*  He doesn't have personal knowledge of the

24   document, but he has personal knowledge of the content, and

25   that's enough.  So I would sort of analogize it to, let's say

 1    two defendants are, sort of, passing notes around or something

 2    like that, someone who has personal knowledge of the, sort of,

 3    contents of that, say the scraps were found later on, could

 4    say, *Yes, those are the messages*, right?  Or let's say they

 5    were rendered in a different format.  Someone else found these

 6    scraps of paper, wrote them down, scraps of paper are

 7    immediately lost, that witness could say, *The original scraps*

 8    *were lost, but this is the content.  I remember it.  And I am*

 9    *telling you, ladies and gentlemen, under oath, that that,*

10    *authentically, is the message*.  And so this comes up -- may I

11    grab my notebook real quick?

12            *THE COURT:*  Yeah.

13            *MR. FIELDS:*  Couple of cases on this.  The Tenth

14    Circuit has actually addressed this exact issue.  So, *United*

15    *States vs. Arnold*, it's 696, it's in the federal appendix, it's

16    not binding, but it's 903, 907, Tenth Circuit, 2017.  So, what

17    that says is again, sort of, the black-letter law, around Rule

18    901, is that a party offering a piece of evidence can establish

19    that it is what the witness claims it is, simply by the

20    testimony of a witness with knowledge, that that is the case.

21            So, in *Arnold*, what happened is the victim in a child

22    pornography case testified that he cut and pastes text messages

23    into a separate file.  The original texts were lost.  They

24    weren't there.  They were deleted.  But at trial, this victim

25    testified, *Yep, they were cut and pasted into separate*

1    *document, and, ladies and gentlemen, I'm telling you that these*

2    *are the actual text exchange that I had with the defendant*

3    *involving this child porn case.*  What the Tenth Circuit said

4    there, is when evidence is unique, readily identifiable, the

5    foundation need only consist of testimony that the evidence is

6    what its proponent claims.  So, that's what we expect here, is

7    that Yioulos is going to say, *These are my text messages.  They*

8    *are what everyone is claiming them to be*.  The fact that they

9    were rendered using Cellebrite, you know, something else,

10   doesn't actually change that analysis.  Again, it goes to, sort

11   of, the tampering-type thing I was talking about.

12        THE COURT:  So, instead of getting them from

13   Cellebrite, you had sat down with him, or someone had sat down

14   with him, and said, *What do you remember your text*

15   *conversations to have been?*  And then he wrote it down, and

16   then you typed it up in a nice, fancy PowerPoint-looking thing,

17   would that be treated the same as this?

18        MR. FIELDS:  I think --

19        THE COURT:  And what -- what would be actual -- what

20   would we be admitting?  You know, what is this document that's

21   been created in that way?

22        MR. FIELDS:  What would have been created were the

23   statements of co-conspirators.  So, you know, coming back to

24   this particular case, these are one-sided messages, they are

25   only Jonathan Yioulos' messages, but the Court has already

105

1    concluded they were in furtherance of the conspiracy.  The

2    substantive evidence there are like these actual statements

3    come in under 801(d)(2)(e) and, sort of, any other evidentiary

4    issues, really do go to authenticity, which is 901(b) really

5    relatively low threshold.  This is ultimately a jury question.

6    So from the government's perspective, the question for

7    Your Honor is is there, you know, sufficient evidence for any

8    rational jury to conclude that these are, in fact, what the

9    messages are, and that's what the cases actually talk about.

10         So that's *United States vs. Siddiqui*, 11th Circuit,

11   235, F.3d, 1318.

12         So, it's, again, a really relatively low threshold.

13   This is certainly something that they can and should argue,

14   Your Honor, but, ultimately, it's a jury question.  The jury is

15   going to have to decide, do they believe Jonathan Yioulos?

16   That these are, in fact, his messages.  They have not been

17   tampered with.  And if the jury comes to that conclusion, then

18   they can credit them.  If they don't, then they won't.

19         *THE COURT:*  All right.  I will let the defense

20   respond, briefly.

21         *MS. HUBBARD:*  Your Honor, I think your comments show a

22   good understanding of the issue.  I would note that this is a

23   distinct -- I have not read *Arnold*, but just based on the

24   government's description, my understanding is that in that case

25   the victim was testifying that he had copied and pasted the

1   messages into a separate document, and so the victim then has

2   personal knowledge of that document that's being offered into

3   evidence.  I think that's a very different situation than we

4   have here.  I don't believe -- I'm certainly not taking the

5   position that Jonathan Yioulos can't testify to what he

6   remembers of these conversations and his memory of messages

7   that he sent.  He testified yesterday he has, basically, a

8   photographic memory of those messages, so he should be able to

9   recall them perfectly fine without admitting the document

10  itself.

11          The document is -- particularly when we get to the

12  bubble messages, there is a ton of data in there.  There are a

13  lot of issues where -- and this is what will come in, I think,

14  through the Cellebrite person, later, where Cellebrite or

15  Apple™ or whoever is storing messages between Jon Yioulos and

16  Michael Tew, in the same chain as messages between, what

17  appears to be, Jonathan Yioulos and Kimberley Tew, sometimes

18  back to, back to, back, to back.

19          So, this document is not something that's like a

20  recreation of what existed at the time.  And again, Mr. Yioulos

21  can testify, I think that's appropriate, if there's a scrap of

22  paper, that people are passing back and forth, and the scrap of

23  paper goes missing, then you have testimony about what people

24  remember was on the scrap of paper.

25          THE COURT:  Yeah.  So, I'm going to treat the

 1    Cellebrite stuff like I was treating the things yesterday,

 2    essentially, until we've got enough from the Cellebrite person

 3    to admit the document, itself.  You can, basically, use it as a

 4    demonstrative.  So that's how I'm going to treat those.  These

 5    other ones, as long as you point me to where we've got the

 6    authentication, I understand that's not fully satisfactory to

 7    the defense, so I understand there's, sort of, an ongoing

 8    objection to that, but that's how I will treat those.

 9            MS. HUBBARD:  Your Honor, could you, just for the

10    record, have a standing objection to both of the Court's

11    rulings this morning?

12            THE COURT:  Yes, yes, of course.

13            MS. FROST:  On behalf of Mr. Tew, we would join in

14    that objection, adopt Ms. Hubbard's arguments and ask for the

15    same continuing objection.  And just for the record I have not

16    read *Arnold* either, myself, but I think the Court raised an

17    important distinction with what's at issue, in Exhibit 605 --

18    pardon me -- 605, that has all of the extra data on it, because

19    it has been manipulated, to use that word, by someone other

20    than the person texting; 605 is completely different than if

21    the government would have created exhibits with just a copy of

22    the text, whether it's a photograph of the text, or, you know,

23    using the text language on its own with nothing else in the

24    document.  So we would just maintain our objection.

25            THE COURT:  Understood, and I will certainly treat

1    that as a standing objection, as well.  Mr. Fields, anything

2    else?

3            MR. FIELDS:  Your Honor, I want to make sure that I --

4    may I go to the podium?

5            THE COURT:  Yes.

6            MR. FIELDS:  Your Honor, with regard to Michael Tew's

7    objection, particularly, the United States would just note that

8    Michael Tew provided all of his text messages, images of his

9    phone as part of those proffers.  So, an objection by him, to

10   authenticity, we think does run afoul of the proffer agreement.

11   He has already admitted that the content of those phones was

12   there.  He, you know, allowed the government to, sort of, admit

13   them.  He has no basis to challenge -- no good-faith basis to

14   challenge the authenticity of the content.

15           THE COURT:  I don't think I agree with that.  I will

16   have to go back and look at the language, but I think it

17   referenced introducing evidence, making arguments, but not

18   objections.  So, I'm not inclined to agree with that, but you

19   are, basically, getting what you want, anyway.

20           MR. FIELDS:  Exactly, Your Honor.  Thank you.

21           THE COURT:  All right.  The only other thing I wanted

22   to mention just briefly is to give you a little bit of heads

23   up, after Mr. Jacobsmeyer and I did a little bit of reading on

24   the severance question, you certainly can still file things

25   tomorrow, as I originally ordered, but, you know, I'm fairly

1   skeptical, at this point, particularly, given the timing, but

2   even on the merits.  There's a case that I think is pretty

3   difficult for a proponent of severance, at this point, that I

4   would like to be addressed.  It's *United States vs. Jones*, 530,

5   F.3d, 1292.  It's pretty on point, and suggests there's a

6   really difficult barrier for defendants.  So, I just want to,

7   at least, if you are going -- if you are going to continue to

8   press that point, to address that case.

9           That's all I had for this morning.  Is there anything

10  else the parties need to bring up?

11          *MR. FIELDS:*  Nothing from the government, Your Honor.

12  Thank you.

13          *MR. SCHALL:*  Not for Mr. Tew.

14          *MR. KAPLAN:*  No, Your Honor.

15          *THE COURT:*  All right.  Thank you, all.  Do you think

16  all of our jurors are here?

17          *THE COURTROOM DEPUTY:*  I'm guessing yes.  We were

18  short one.

19          *THE COURT:*  Well, if we're ready to go, why don't you

20  go ahead.  If they're ready, I will just stay.

21          *MR. FIELDS:*  Your Honor, should we have Mr. Yioulos

22  take the stand now?

23          *THE COURT:*  You might as well.

24          *THE COURTROOM DEPUTY:*  All rise.

25      (Jury in at 9:22 a.m.)

JONATHAN YIOULOS – Direct

1      *THE COURT:*  All right.  Let's all take our seats.

2   Welcome back, ladies and gentlemen.  Thank you all, again, for

3   being here today.  I should have given you a warning about

4   trying to get into downtown Denver at 9 o'clock.  It's

5   sometimes a challenge.  So, I appreciate everybody being here.

6          We're going to pick up where we left off.  Mr. Yioulos

7   is on the stand, he remains under oath, and so the government

8   can continue.

9      *MR. FIELDS:*  Thank you Your Honor.

10                      **DIRECT EXAMINATION**

11  *BY MR. FIELDS:*

12  *Q*   Good morning, Mr. Yioulos.

13  *A*   Good morning.

14  *Q*   Do you remember yesterday we were talking about Bitcoin™ a

15  little bit?

16  *A*   I do.

17  *Q*   Did you give Kimberley Tew a Bitcoin™?

18  *A*   A portion of a Bitcoin™.  Yes.

19  *Q*   Why did you do that?

20  *A*   Because Michael Tew had asked me to send a Bitcoin™.

21  *Q*   After you gave Kimberley Tew a Bitcoin™, would she ask for

22  it back?

23  *A*   Yes.

24  *Q*   Did she ask for it directly or was it through Michael?

25  *A*   Both.

JONATHAN YIOULOS - Direct

1    *Q*   All right.  Let's -- this has not yet been admitted into

2    evidence.  Let's look at Government's Exhibit 857.  What is

3    this?

4    *A*   Text message conversation between myself and Michael Tew,

5    on Tuesday, September 17th, 2019.

6    *Q*   Is this one of the text messages that you reviewed before

7    your testimony?

8    *A*   Yes.

9    *Q*   And to verify that it was actually one of your text

10   messages, did you follow the same process we described during

11   your testimony yesterday?

12   *A*   Yes, I did.

13          *MR. FIELDS:*  Your Honor, pursuant to the Declaration,

14   That's Government's Exhibit 1115, and the testimony that's

15   already been laid in the record, the government would move into

16   evidence Government's Exhibit 857.

17          *THE COURT:*  All right.  Understanding where we stand

18   with these sorts of documents, that will be admitted.

19          *MR. FIELDS:*  Your Honor, the government would do the

20   same thing, now, Government's Exhibit 605 and 863, move those

21   entire documents into evidence, because it's the same

22   Declaration.

23          *THE COURT:*  Those were the ones we dealt with

24   yesterday?  Yes.  Those are admitted with the same

25   understanding.

JONATHAN YIOULOS - Direct

1           MR. FIELDS:  All right.  If we could, let's zoom in up

2    there on the message time and message body so you can see

3    these.

4    Q    All right.  When were these sent?

5    A    Tuesday, September 17th, 2019.

6    Q    All right.  If you could, please read these for us?

7    A    Okay.  Michael said me, *How are you doing?  Can you talk at*

8    *2, 2:30*?  I said, *Sure*.  He said, *.05 sent to you.  Check your*

9    *address*.  And he sent the alphanumeric code for my wallet.  I

10   said, *Got it*.  He said, *Told you.  It's going to be okay*.  I

11   said, *Ha-ha, I know, I'm just stressed cause of the situation*

12   *here.  If we had more cash, this wouldn't even be a worry*.

13   Q    *Zero point five sent to you*; 0.5 what?

14   A    Bitcoin™.

15   Q    Keep going, please.

16   A    He said, *Send what you can.  Don't get into any trouble --*

17   *maybe we wait until next week for the larger chunk.  Kimberley*

18   *says she is running a script.  Says she can turn that .5 to 75*

19   *if you want.  She can make money with it right now.  The day is*

20   *going well.  Up to you.  That's how she came up with the .5.*

21   *Some days are really good.*

22   Q    All right.  *Send what you can.  Don't get into any trouble.*

23   What was your understanding of what he wanted you to send?

24   A    ACH money from National Air Cargo.

25   Q    *Kimberley says She is running a script*.  What does script

JONATHAN YIOULOS – Direct

1    mean?

2    *A*    Michael would say that Kimberley would run algorithms,

3    different things, electronically, that could predict the trends

4    in the prices of cryptocurrency.  So if one could predict these

5    trends, they could make money pretty quickly.

6    *Q*    Let's keep going.

7    *A*    Then he sent an alphanumeric code, which would be the

8    Bitcoin™ wallet, he would want me to send it back to.  He said,

9    *Send back here if you want, she will turn to .75*.  I said, *How*

10   *quickly*?  He said, *How fast do you want it, she asks*.  I said,

11   *I think I will just hold for now, I think I'm getting served*

12   *with papers today, and I want to make sure that I have had*

13   *least her portion*.  He said, *You'll have it*.  I said, *Send me*

14   *bank info, trying for 30*.

15   *Q*    Trying for 30 what?

16   *A*    Thirty thousand.

17   *Q*    What were you going to do with that 30,000?

18   *A*    Send it to Michael.

19   *Q*    And whose money was that 30,000?

20   *A*    National's.

21   *Q*    We can take that down.  Remind us how much Bitcoin™ did you

22   get for being part of the conspiracy?

23   *A*    At the end of it all?  Anywhere between probably six and

24   nine Bitcoin™.

25   *Q*    How much cash, US dollar, do you think that was?

JONATHAN YIOULOS – Direct

1    A    Anywhere between 60 and a hundred-thousand dollars.

2    Q    Did Michael or Kimberley ever offer you anything else of

3    value?

4    A    Yes.

5    Q    What?

6    A    They offered Buffalo Bills season tickets.

7              MR. KAPLAN:  I'm going to object to the dual question.

8              MR. FIELDS:  I can rephrase.

9              THE COURT:  I will sustain it.  Can you just rephrase

10   that?

11             MR. FIELDS:  Yeah.

12   Q    Did Michael Tew ever offer you anything of value?

13   A    Yes.

14   Q    Did Kimberley Tew ever offer you anything of value?

15   A    Yes.

16   Q    Let's first talk about Michael Tew.  What did he offer you

17   of value?

18   A    For Buffalo Bills, season tickets, also to pay off my

19   student loans.

20   Q    What about Kimberley Tew, what did she offer you?

21   A    Bitcoin™, and to also pay off my student loans.

22   Q    What's your favorite football team?

23   A    Buffalo Bills.

24   Q    Where did you go to college?

25   A    Canisius College, in Buffalo.

JONATHAN YIOULOS – Direct

1    Q    Did you have student loans?

2    A    I did.

3    Q    How much student loan debt do you think you ever had?

4    A    At the most I had about 60,000, at that time, probably

5    closer to 30.

6    Q    All right.  Let's look at Government's Exhibit 731, which

7    is not yet in evidence.  What is this?

8    A    This is a text message conversation between myself and

9    Michael Tew, on Monday, March 18th, 2019.

10           MR. FIELDS:  Your Honor, the government would move

11   into evidence Government's Exhibit 731?

12           THE COURT:  Is this covered by the same --

13           MR. FIELDS:  Same Declaration.

14           THE COURT:  Yes.  It's admitted.

15   Q    Would you please read that for us?

16   A    Yeah, no problem.  He said, *Call you in five.  One sec, I'm

17   so sorry.  How much is owed on your student loans right now?

18   Hundred percent of it, and mortgage*?  I said, *Just call me*.  He

19   said, *See email*.  I said, *Got it.  Out*.

20   Q    You can take that down.  Did Michael Tew ever help you out

21   with your student loans or your mortgage?

22   A    No.

23   Q    What about Kimberley Tew?

24   A    No.

25   Q    All right.  Let's go back to Government's Exhibit 857,

JONATHAN YIOULOS – Direct

1    which we looked at a little bit earlier.  It's already in

2    evidence.  Do you remember a reference to serving papers in

3    that exhibit?

4    A    Yes.

5    Q    Did you go through a divorce during this period of time?

6    A    I did.

7    Q    Before the divorce, did Michael use your relationship with

8    your wife, to get you to do anything related to the conspiracy?

9         MR. SCHALL:  Objection, Your Honor.  Speculating on

10   what Michael was intending to do.

11        THE COURT:  Yeah.  That's a bit of a leading question.

12   If you would rephrase, please.  Sustained.

13   Q    Sure.  Did you have any discussions with Michael Tew about

14   your relationship with your wife at the time?

15   A    Yes, I did.

16   Q    What about with Kimberley Tew?

17   A    Um, no.

18   Q    Describe your conversations with Michael regarding your

19   relationship with your wife, at the time?

20   A    I was getting a divorce, and Bitcoin™ would have had –– the

21   amount of Bitcoin™ I loaned to Michael, was a purchase that I

22   made, with my wife, at the time, that we were married.

23   Obviously, going through a divorce, you are going to share

24   finances, both sides want to look at who has got what assets,

25   and my wife, at the time, knew that I had or that we had

1    cryptocurrency together.  This cryptocurrency was no longer in

2    my possession, as I had sent it to Michael and Kimberley, and

3    so it was more in reference to that saying, *Hey, I need this*

4    *Bitcoin™ back*, *or at least what I loaned you back, so that I*

5    *can, you know, put it in my files and in my finances for my*

6    *divorce*.

7    Q   Let's look at Government's Exhibit 707, which is not yet in

8    evidence.  What is this?

9    A   This was is another text message conversation between

10   myself and Michael Tew, Thursday, January 17th, 2019.

11        MR. FIELDS:  Your Honor, pursuant to that same

12   Declaration, Government's Exhibit 1115, government would move

13   this exhibit into evidence.

14        THE COURT:  Okay.  It's admitted.  Go ahead.

15   BY MR. FIELDS:

16   Q   All right.  Can you please read this one for us.

17   A   He said, *Call when can.  Just tried you.  Let me know when*

18   *you have a few minutes.  Talked to Amex*.  I said, *Okay.  Call*

19   *soon*.  He said, *We're all going to blow up.  I can't pay that*

20   *bill.  I won't have a choice it's 45K*.  I said, *I just sent you*

21   *40K.  Plus you have another 30K in crypto, that's 70K that you*

22   *got in fucking two weeks.  You said it's to pay the Amex.*

23   *That's a ton of money, and you act like you are starving.  I*

24   *don't even make 70K cash in a year after taxes are taken out*

25   *and you have gotten that in two weeks*.

JONATHAN YIOULOS - Direct

1    *Q*    Keep going.

2    *A*    *And you said it's to the pay the Amex*.  He said, *that's a*

3    *ton of money* -- or I said that, I'm sorry.  *That's a ton of*

4    *money.  And you act like you are starving*.  Sorry.  Already

5    read that.  He said, *I had a shit ton of bills*.  I said, *Okay*?

6    *And I can't physically send you anymore*.  He said, *What's the*

7    *process for ACH at HSBC*.  I said, *Whatever.  Keep the 30K.*

8    *Blow it up then, fuck it.  You guys have given me nothing, and*

9    *I am the one taking all of the risk*.

10   *Q*    Keep going.

11   *A*    I said, *I sent over 200K to Meyers and Jess and over 70K to*

12   *Political Media, and now you are asking for more*?  I said, *This*

13   *is a sick joke*.  He said, *Look, I don't want any money.  Is*

14   *there a way that you can pay the Amex off directly?  It's a*

15   *question.  My credit had been ruined*.  I say, *How can I pay the*

16   *Amex?  Makes no sense*.

17   *Q*    Next page.

18   *A*    He said, *Why did you tell Kimberley you were talking to the*

19   *FBI today, for us*?  *I asked you if anything was going on and*

20   *you said nothing*.  He said, *Please respond or she is going to*

21   *start emailing you.  It's important for all of us.  Now she*

22   *thinks I'm working with you, against her, my own wife.  What*

23   *happened today?  I asked you twice, and you said nothing.*  I

24   said, *I'm eating dinner.  I will call at 9:30*.

25            He said, *She's sending an email and copying Lori and*

119
JONATHAN YIOULOS - Direct

1   *Chris right now.  That's what happens when you say that shit.*

2   I said, *I'm calling you at 9:30, and I will explain*.  He said,

3   *No, she's sending an email right now.  What the fuck were you*

4   *dealing with today*?  I said, *I will call you.*

5           *Fuck*, he said, *my daughters are screaming.  They think*

6   *I'm going to jail*.  I said, *Jesus calm down*.  He said, *She's*

7   *sending an email to Stephanie at stephbuffalo.com, I'm not*

8   *'ducking' around*.  I said, *Jesus Christ wait fucking ten*

9   *minutes*.  He said, *Okay*.

10  Q   All right.  Let's start here at the bottom.  She is sending

11  an email to Stephanie@*stephbuffalo.com*.  Who is the *she* Michael

12  is referring to?

13  A   Kimberley Tew.

14  Q   *Stephanie@stephbuffalo.com*, what is that?

15  A   Stephanie was my ex-wife.  I think he meant to say

16  *staffbuffalo.com*, that's the company that she worked for, at

17  the time.

18  Q   Was that concerning to you?

19  A   Yes.

20  Q   Why?

21  A   Because I didn't tell Stephanie about any of the

22  conspiracy.  I didn't tell her anything about any misdealings

23  at National, and I didn't tell her that I had sent Michael and

24  Kimberley the Bitcoin™.  So, I didn't want her to find out.

25  Q   Now, let's scroll back up.  All right.  So, do you see, *She*

JONATHAN YIOULOS - Direct

1   *is sending an email and copying Lori and Chris right now.*

2   Again, who is the *she* there?

3   A   Kimberley.

4   Q   And Lori and Chris, you told us yesterday, but remind us,

5   who were they.

6   A   They were the owner and his wife at National Air Cargo.

7   Q   Was that concerning to you?

8   A   Absolutely.

9   Q   Why?

10  A   Because, one, I would lose my job, mostly instantly, and

11  probably end up in the same place I am right now.

12  Q   All right.  And you know, at the top there, *Why did you*

13  *tell Kimberley you were talking to the FBI today*?  Did you tell

14  Kimberley you were talking to the FBI?

15  A   Yes.

16  Q   Why did you tell her that?

17  A   Because I -- I can't -- I don't remember if I had talked

18  to -- actually talked to the FBI.  I don't believe I did, but,

19  it was more or less to try to get them off my back, and asking

20  me to stop sending them money.

21  Q   Had you actually gone to the FBI?

22  A   No.

23  Q   All right.  Now, let's look at Government's Exhibit 865,

24  which is not yet in evidence.  What is this?

25  A   This is a text message conversation between myself and

JONATHAN YIOULOS - Direct

1    Michael Tew on Friday September 27th, 2019.

2              *MR. FIELDS:*  Your Honor, pursuant to that same

3    Government's Exhibit 1115, the government would move this into

4    evidence.

5              *THE COURT:*  For the same reason it's admitted.

6    *Q*   And ... same thing, let's read this part and then we will

7    stop.

8    *A*   Okay.  Michael said, *That was my daughter on the car with*

9    *me 'job.'  Jon.*  I said, *I didn't know.  Sorry.*  He said, *Fuck*

10   *you.  This is Kimberley.  I'm calling the fucking husband.  You*

11   *asshole, fuck you for talking to my husband like this.  What*, I

12   said.  She said, *You asshole*.

13   *Q*   I think early in your testimony, you testified that the

14   messages in green were from Michael?

15   *A*   Yes.

16   *Q*   Did Kimberley ever text you using Michael's phones?

17   *A*   Yes.

18   *Q*   When would that happen?

19   *A*   When I would not send money or she would get frustrated

20   with the way I was talking to Michael.

21   *Q*   When Kimberley was using Michael's phone, how could you

22   tell it was Kimberley and not Michael?

23   *A*   One, she would say it was Kimberley; or two, I could tell

24   from the tone and references to Michael.

25   *Q*   Let's keep going.

JONATHAN YIOULOS – Direct

1    *A    We are all in this together.  Don't you ever talk to*

2    *Michael like that again*.  I said, *LOL I have sent you guys over*

3    *1.3 million, I think I'm entitled to get frustrated once in*

4    *awhile*.  *Phone, 716-858-7618.  You have sent once in a while.*

5    *He is like your personal punching bag.*

6    *Q*    Let's stop there.  That telephone number, did you recognize

7    that telephone number at the time?

8    *A*    When I first saw it, I did not recognize it, so I had to

9    Google what telephone number it was.

10   *Q*    What did you find when you Googled it?

11   *A*    It was Erie County Sheriff's Office.

12   *Q*    Erie County, where is that?

13   *A*    That's Buffalo, New York, located with Erie County.

14   *Q*    Once you had Googled that, found out she texted the number

15   to the Erie County Sheriff's Office, how did that make you

16   feel?

17   *A*    Not great.

18   *Q*    Why?

19   *A*    Um, well, so the -- as you know, I was -- at this time I

20   had filed for divorce, and I had started seeing a new woman,

21   and one of -- and her -- one of her daughter's fathers worked

22   for the Erie County Sheriff's Office, so I was, you know, a

23   little concerned that she might actually contact the sheriff's

24   office, ask to speak with him, specifically, and, you know,

25   being the sheriff's office, in general, conspiracy like this,

1    sending out over $1.3 million, I was a bit concerned that it

2    would get reported to the authorities, and he would find out,

3    as well.

4    Q    Let's keep going.

5    A    I said, *Okay*.  She said, *How do you think it feels to be in*

6    *our shoes and have no control.  I'm sick of this shit.  I'm*

7    *sick of trying to cope.  That BTC is just sitting in your*

8    *wallet.  I don't care if we all go down, I can't live like*

9    *this*.

10   Q    Next page.

11   A    *My daughter, you asshole, pretending that you want to be*

12   *our friend and come visit I knew it, Michael refused to ask you*

13   *FYI, and I took out a two BTC loan.  It was his 40th birthday*

14   *yesterday.  Did you know that?  And he refused to ask you*.  And

15   I said, *Are you done*?  She said, *I want to die.  Don't you get*

16   *it*.  I said, *Just tell me where you want the shit sent*.  She

17   said, *Every day I wake up afraid.  No.  I want to know this can*

18   *end*.  I said, *Well, I have been assured it is.  You guys lie*.

19   She said, *You think we skim?*  I said, *That's all you do*.  She

20   said, *We don't*.  I said, *That's all you do is lie about shot,*

21   *shit*.  She said, *Michael used a fucking coupon for his B-day*

22   *dinner*, *which was with just one of our daughters.  Don't you*

23   *get it, my husband actually thinks of you as a friend and*

24   *trusts you more than me, and you treat him like shit.  I lie*?

25   *Really?  Then what the fuck am I lying about?  Wrong answer*.  I

JONATHAN YIOULOS – Direct

1    said, *Are you done*? *How is this progressive*. *I offered to*

2    *send it back*. She said, *I am angry at the way you treat*

3    *Michael*. *He gets really upset*. I said, *He is an adult Jesus*

4    *stop texting me*. She said, *Fuck you, you know what*? I said

5    *huh*? She said, *Fuck you*.

6    Q    There was a reference earlier to wallet, and then it's just

7    sitting there, and now you say *offer to send it back*. What

8    were you talking? About what was the *it*.

9    A    The Bitcoin™ that Kimberley had sent to me.

10   Q    Let's keep going.

11   A    I said, *Okay cool*. She said, *You don't know anything*. *He*

12   *doesn't even have his family*. *No one called to wish him a*

13   *happy birthday*. *You're his friend*. *If that's all you have to*

14   *say is stop texting you, and he is an adult, you know nothing*

15   *about anything, and you definitely do not care about him or us*.

16   *I'm the piece of shit*. *Not him*. *Do not, don't ever forget*

17   *that he doesn't deserve this*. *Fucking apologize, you asshole*.

18   *I know you don't give a shit because you're fucking someone*

19   *else and destroying another family but Michael has kids and you*

20   *were so out of line*.

21   Q    Next page.

22   A    *Seriously, you're not going to respond and apologize*? *I*

23   *swear to God you will regret it*. *Fuck you call and apologize*

24   *to him*. *I really will track down that husband*. I said, *OMG*

25   *relax I'm on a call and driving*. Then she sent the

JONATHAN YIOULOS - Direct

1   alphanumeric code for her wallet, her Bitcoin™ wallet, and I

2   said, *It's sent*.

3   Q   Did you consider Michael Tew to be a friend?

4   A   At one point, yes.

5   Q   Now, at the time you were working for National -- we can

6   take that down.  Thank you.  Were you a certified public

7   accountant?

8   A   Yes.

9   Q   Is that sometimes abbreviated CPA?

10  A   Yes, it is.

11  Q   How do you get a CPA?

12  A   You have to go to school, go to college, at least 150 hours

13  into your degree.  So most people go for a Masters program,

14  then you have to sit for an exam.  There's four parts to it.

15  You have to score above a 75 on each part.

16  Q   Do you have to have a license?

17  A   Yes.

18  Q   How do you get a license?

19  A   You have to pass an exam, and you have to pay for the

20  license.

21  Q   Can you lose that license?

22  A   You can.

23  Q   How?

24  A   If you don't keep up on continuing education; one, or if

25  you do unethical things, you can lose your license, as well.

JONATHAN YIOULOS - Direct

1   Q   Did that ever come up with in a conversation with Michael?

2   A   Yes.

3   Q   Did it ever come up with a conversation with Kimberley?

4   A   Yes.

5   Q   Let's look at Government's Exhibit 659.  What is this?

6   A   This is a text message, conversation between myself and

7   Michael Tew.

8           *MR. FIELDS:*  Your Honor, pursuant to Government's

9   Exhibit 1115, the government would move this into evidence.

10          *THE COURT:*  All right.  It's admitted.

11  BY MR. FIELDS:

12  Q   Read this for us.

13  A   I said, *Answer.  Urgent*.  He said, Kimberley *tried to text*

14  *you last night.  I was traveling but this Christian guy I think*

15  *there is an ethics violation.  He is not a straight-out loser*

16  *like Craig, but we just said no money.  We suggested 1099 a*

17  *LLC, and he wanted like 1K in BTC.  Go pay his accountant,*

18  *which we also said no to him.*  I said, *Ethics violation, what*

19  *the hell?  Just tell him not to worry about and not file it as*

20  *income on his taxes*.  He said, *Isn't NA going to 1099 him*?  I

21  said, *Let's just talk tomorrow.  I'm swamped for the rest of*

22  *the night, brother.  Please answer tomorrow*.  He said, *I hear*

23  *ya.  I'm on this call, BRB, Kimberley can text*.

24  Q   We will talk a little bit more about this letter, but now I

25  want to advance to page two.  All right.  Let's pull up that

JONATHAN YIOULOS - Direct

1    top section.  Read the green box for his us, please.

2    A    Okay.  This is from Michael's phone, it says, *It's K.*

3    *Michael can't send any agreements.  This is a really bad*

4    *situation.  We have not received any of this money and Michael*

5    *doesn't have a job.  You should take this seriously, because*

6    *you could lose your license if he reports you.  We are just out*

7    *of this.  We can't have anything to do with this, especially if*

8    *you think you're untouchable.  You have the capability to buy*

9    *BTC.  I'm in a jam here.  Can you help at all?  400 bucks, it's*

10   *Tew.*

11   Q    So, *It's K.*  Who is K?

12   A    Kimberley.

13   Q    How did you know that?

14   A    Because there was references to Michael in this text;

15   Kimberley starts with a K.

16   Q    Is this a particular conversation that stood out to you?

17   A    Yes.

18   Q    Why?

19   A    Because I was a little confused about them saying they were

20   going to report me for an ethics violation, and I could lose my

21   license, and that I just remember where I was when they asked

22   me to -- when Michael asked me for 400 bucks.

23   Q    Where were you?

24   A    I was at a high school football game.

25   Q    These agreements, *Michael can't send any agreements*, what

JONATHAN YIOULOS – Direct

1    agreements was she referring to?

2          MR. SCHALL:  Objection, Your Honor.  Speculation.

3          THE COURT:  Overruled.

4    A    The agreements were agreements with these fraudulent

5    vendors.  I wanted -- a lot of these fees were for consulting

6    fees, and as a part of that I wanted actual consulting

7    agreements to put in the files, in case there was an audit.  I

8    wanted the invoices to match up with what was said to be in the

9    agreements, so whatever the consulting work was done, I wanted

10   something on file to look more legitimate.

11        Q    (By Mr. Fields) Did Michael ever give you an

12   agreement?

13   A    No.

14        MR. FIELDS:  Go ahead and take that down please.

15        MR. SCHALL:  Your Honor, if I may, was 659 admitted?

16   I missed it.

17        THE COURTROOM DEPUTY:  Yes, Your Honor.

18        THE COURT:  Yes, it was.  Thank you.

19   Q    Now, before you agreed to be part of this fraud, had you

20   agreed to be --

21        MR. SCHALL:  Objection, Your Honor.

22        THE COURT:  Sustained.

23        MR. FIELDS:  Okay.

24        THE COURT:  Just let him describe it.

25   Q    Before you had entered into this agreement with Michael and

JONATHAN YIOULOS - Direct

1  Kimberley, had you agreed to be part of a separate illegal

2  activity?

3  A    Yes.

4  Q    What did you do?

5  A    Myself and another individual, at National, we had made

6  invoices for actual companies, actual vendors at National, and

7  basically put them into the accounting system as real invoices

8  to pay, and paid ourselves, basically, for those invoices.

9  Q    How much did you take as part of this separate crime?

10 A    About $40,000.

11 Q    Over what period of time?

12 A    Um ... I can't remember when it began, but it was

13 throughout the time of the -- this conspiracy, as well.

14 Q    But did Michael or Kimberley have any involvement in this?

15 A    No.

16 Q    This was completely --

17 A    Completely separate.

18 Q    Did you ever stop doing this separate fraud?

19 A    Yes.

20 Q    Why did you stop doing that?

21 A    Because I knew it was unethical.

22 Q    In this separate fraud, how did -- how did it work?  How

23 did you, actually, get paid money?

24 A    Well, this other individual that works at National, we

25 would split whatever funds were sent out, 50/50.  Essentially,

JONATHAN YIOULOS - Direct

1    we would create an invoice that was identical to the  -- an

2    actual invoice that was sent from the vendor, initially.  So,

3    we would create it for say $10,000, and put the other

4    individual's banking information, majority of the time, that

5    ACH would go out, and he would receive the funds the next day,

6    and he would send me a Venmo for half of it.

7    Q    Did you ever tell Michael about this other side scheme you

8    were running?

9    A    No, I did not.

10   Q    Was it fair to say that even before you had started doing

11   what you say you have been doing with Michael and Kimberley,

12   you were experienced at committing fraud against National?

13   A    Yes.

14   Q    So you knew you could do it without getting caught?

15   A    Correct.

16   Q    So, Mr. Yioulos, was it your idea to come up with this

17   agreement you have been talking about with Michael and

18   Kimberley?

19   A    No, it was not.

20   Q    Even though you had already been doing this before?

21   A    Correct.

22   Q    Whose idea was it?

23   A    Michael Tew.

24   Q    How did it come up?

25   A    He said he was in a jam, this one individual was

JONATHAN YIOULOS - Direct

1   threatening to call National Air Cargo, basically saying that

2   he owed them money, even though they were -- this individual

3   had nothing to do with National.  He knew that Michael was

4   employed there as a consultant, and he was going to call, and

5   Michael asked for funds, and he said is there any way that you

6   can help me out and pay this, and I said there's nothing I can

7   send you directly.  Nothing will get approved by Chris.  To

8   send you an advance on your, you know, general rate, as a

9   consultant, nothing like that.  And so, he sent me an invoice

10  that was fraudulent, and said, just pay this, and I would get

11  the funds from this individual, or this will go to pay that

12  individual, directly.

13  Q   So, your testimony under oath, is that even though you were

14  doing this before, it was Michael's idea --

15  A   Correct.

16  Q   -- to do this?

17  A   Correct.

18  Q   So, let's step back for a bit.  You testified earlier that

19  you agreed to cooperate with the government; is that right?

20  A   That is correct.

21  Q   Before you entered into that agreement, did you sit down

22  and meet with prosecutors?

23  A   I did.

24  Q   Is that part of something called a proffer?

25  A   Correct.

JONATHAN YIOULOS - Direct

1  Q    Before you came in for that proffer, did you promise to

2  tell the government the truth?

3  A    Yes, I did.

4  Q    The whole truth?

5  A    Correct.

6  Q    Did you promise to be honest?

7  A    I did.

8  Q    What did you tell the government about this sort of

9  separate fraud scheme, when you first met with them?

10 A    Nothing.

11 Q    Did you hide it from them?

12 A    No.

13 Q    Well, did you tell him about it?

14 A    I did not tell him about it.

15 Q    Why did you not tell them about it?

16 A    Because when I met with the government, initially, the

17 majority of the questions related to this conspiracy and this

18 fraud, and the gravity of the amount of dollars that went out

19 in this conspiracy, which was over $5 million, that other piece

20 didn't click in my head, at that time, and, you know, unless I

21 was asked, specifically, about it, I wasn't thinking about

22 that, at that time.

23        Most of my questions were about the Tews, about this

24 conspiracy with National.  When I was asked about it,

25 eventually, I did -- I was upfront, honest and gave them

JONATHAN YIOULOS - Direct

1    everything they needed to know about those actions.

2    *Q*    Do you think it was particularly honest not to tell them

3    about, sort of, your misdeeds, in that first meeting?

4    *A*    I definitely should have, looking back on it, but I just --

5    it truly did not cross my mind.

6    *Q*    All right.  So, I think you testified earlier that you sent

7    money to National Air Cargo under false pretenses?

8    *A*    Correct.

9    *Q*    What was the false pretense?

10   *A*    For which conspiracy?

11   *Q*    For the -- well, let's talk about the money that you would

12   send to Michael?

13   *A*    Yes.

14   *Q*    Was that sent under a false pretense?

15   *A*    Yes.

16   *Q*    The money you would send to Kimberley, was that under a

17   false pretense?

18   *A*    Yes.

19   *Q*    What was the false pretense?

20   *A*    Um, that these vendors actually performed work at National

21   when, in fact, there was no services, nothing done, relating to

22   the business, at all.

23   *Q*    What were the names of these sham companies used as part of

24   that pretense?

25   *A*    There was Hannah Scaife, CPA, Meyers Consulting, Jessamine

1    Development, there was Global Fuel Logistics, Arrow Maintenance

2    Resource Group, and Political Media.  May have been one more

3    that I'm forgetting, but those are the majority of them.

4    Q    While you remember working at National, who had the

5    authority to decide whether to pay a vendor?

6    A    I did.

7    Q    Anyone else at the company have that authority?

8    A    When Michael was there, he did.

9    Q    Who gave you that authority?

10   A    Chris Alf.

11   Q    When he gave you that authority, did he give the authority

12   to pay invoices like these?

13   A    No.

14   Q    Why not?

15   A    Because they didn't relate to the business, and unless they

16   related -- had a business relation, I wouldn't pay them.  I

17   shouldn't be paying them.

18   Q    When Michael Tew worked at National, did he have the

19   authority to pay invoices?

20   A    He didn't have bank authority.  So, he was not a signer on

21   the bank, but as a -- as the CFO, he could instruct which

22   invoices to pay, and I would pay them.

23   Q    What happened to Michael Tew's employment in 2018?

24   A    It was terminated.

25   Q    How did you find out that he had been terminated?

JONATHAN YIOULOS - Direct

1   A    Through the -- I was actually in the HR office, when he was

2   terminated, on a phone call, with him, and the HR director,

3   Chris, and Lori, were on the phone, as well, and obviously

4   talking to Michael, after the fact, knowing that he was no

5   longer an employee.

6   Q    Approximately when was he fired?

7   A    I believe it was like mid 2018, mid to late 2018.

8   Q    Do you know what happened to cause his termination?

9   A    Yes.

10  Q    How do you know that?

11  A    From the information I obtained from knowing the Alfs

12  personally, but also, Michael.

13          MR. SCHALL:  Objection, Your Honor.  If he is going to

14  testify what the Alfs told him.

15          THE COURT:  Sustained, as to that extent, but you can

16  ask him what he knows.

17      Q    (By Mr. Fields) What did Michael tell you about why

18  he was fired?

19  A    There was an individual by the name of Craig, who claimed

20  that Michael and the Tews -- Michael and Kimberley both owed

21  money to this Craig individual, and Craig was, more or less,

22  threatening the Alfs' kids; sending photos to his daughter --

23          MR. SCHALL:  Objection, Your Honor.  It's unclear who

24  told him this.

25          THE COURT:  No, it's not.  He said this is what -- the

JONATHAN YIOULOS - Direct

1    question was about what Michael told him.  So, overruled.  Go

2    ahead.

3         THE WITNESS:  Yes.  Michael told me that the -- this

4    Craig individual had sent messages to Chris' daughter and son,

5    said that he was going to, essentially, superimpose Chris'

6    daughter's face on, basically, nude images, and post them

7    online if funds weren't send from National.

8         So, obviously, Chris and Lori were upset about this,

9    and it was the main reason for the termination.  There was also

10   a American Express card that had about $40,000 of charges on

11   it, prior to this, while Michael was employed at National.

12   There was no legitimate backing for these charges, no business

13   expenses, and Chris kept Michael on, at this time, even though

14   these charges were on, because he liked working with Michael,

15   but then these charges were never legitimized and so this --

16   these charges that were fraudulent, on his Amex card, coupled

17   with this Craig situation, were the main reason for the

18   termination.

19        Q    (By Mr. Fields) The Amex card in particular, did

20   Michael tell you more about how that was used?

21   A    Yes.

22   Q    What did he tell you?

23   A    Said that Kimberley went into stores in Denver, and bought

24   gift cards, and with these gift cards would upload them and

25   purchase cryptocurrency with these gift cards.  Basically,

JONATHAN YIOULOS - Direct

1   prepaid Visa cards, purchased with Amex.  So, it was a quick

2   way to turn credit into cryptocurrency.

3   Q    After Michael Tew was terminated, were you authorized to

4   pay him money for any additional work?

5   A    No.

6   Q    Was he an authorized vendor?

7   A    No.

8   Q    Did you ask for permission to send National's money to

9   those -- to the sham companies that you described earlier?

10  A    I did not.

11  Q    And Kimberley Tew, had she done work for National before,

12  prior to Michael being fired?

13  A    Yes.

14  Q    The work she did, prior to Michael being terminated, was

15  that legitimate?

16  A    Yes, it was.

17  Q    After Michael was terminated, was she authorized to be paid

18  for any work to be performed by National?

19  A    No.

20  Q    All right.  As the controller and finance manager at

21  National, did you have access to National's bank accounts?

22  A    I did.

23  Q    Were you a signatory on the account?

24  A    I was.

25  Q    What does it mean to be a signatory on a bank account?

JONATHAN YIOULOS - Direct

1  A   I had the authority to send checks, initiate and approve

2  wire transfers, initiate and approve ACH transfers, as well.

3  Q   What bank did National use?

4  A   Signature Bank.

5  Q   Where was that located?

6  A   New York City.

7  Q   Was there ever a time, during your employment at National,

8  where a different bank was considered?

9  A   Yes.

10 Q   Which bank?

11 A   HSBC.

12 Q   Did that transaction ever happen?

13 A   We made a couple transactions through it, but we ended up

14 going back to Signature, fully.  We never made the full

15 transition to HSBC.

16 Q   During the period we have been discussing, 2018 to 2020,

17 which bank did National use?

18 A   Signature Bank.

19 Q   You mentioned something called ACH.  What is that?

20 A   It's a form of electronic funds transfer.

21 Q   Is the same as a wire transfer?

22 A   Not quite.  ACHs are cheaper than wire transfers.  Wire

23 transfers, domestically, would cost around like about ten bucks

24 per transfer.  ACHs were much cheaper.  Wire transfers, as soon

25 as the funds were approved, the funds would arrive to that

139
JONATHAN YIOULOS – Direct

1    other bank account almost instantaneously.  With an ACH, as

2    long as they were sent out before 4 p.m. on that business day,

3    they would be received in the morning, the next business day,

4    once the banks opened again.

5    Q    Did National have some internal controls relating to

6    payments by wire?

7    A    We did.

8    Q    What were the controls?

9    A    Whoever input the wire could not approve the wire.

10   Q    Who had approval authority for a wire?

11   A    Abby Schwartz and Chris Alf.

12   Q    What about you?

13   A    I did, as well, yes.

14   Q    Let's look at Government's Exhibit 433, which is not yet in

15   evidence.  Are you familiar with this type of record?

16   A    I am.

17   Q    What is it?

18   A    This is a bank confirmation from Signature Bank.

19   Q    How were records like these created?

20   A    These records were kept electronically, but you could print

21   to a PDF form.

22   Q    Is the regular practice of National to make records like

23   these?

24   A    Yes.

25   Q    Was it the regular practice of National to keep and

JONATHAN YIOULOS – Direct

1    maintain these records?

2    A    Yes.

3            MR. FIELDS:  Your Honor, at this time I move to admit

4    433.

5            THE COURT:  Any objection to 433?

6            MR. SCHALL:  No objection, Your Honor.

7            MR. KAPLAN:  No objection.

8            THE COURT:  All right.  433 is admitted.

9        Q    (By Mr. Fields) Let's orient ourselves to these types

10   of records.  So, let's look at, first, that section up at the

11   top; debit information.

12   A    Yes.

13   Q    Do you see where it says, entered by?

14   A    Yes.

15   Q    What do you see there?

16   A    My name, Jonathan.

17   Q    Did you enter all of the information that went into this

18   part?

19   A    I did.

20   Q    How would you do that?

21   A    So, on the bank's website, there is a section where you can

22   enter in the routing number and the account number and the

23   account name, and then -- and the amount, and then, as soon as

24   you enter those and confirm with wherever you are getting those

25   details from, the banking details, you just press submit.

JONATHAN YIOULOS - Direct

1    Q   And then do you see where it says, *transmitted by*?

2    A   Yes.

3    Q   What name is this there?

4    A   Abby.

5    Q   Who is Abby?

6    A   Abby Schwartz was the director of accounting at the time at

7    National.

8    Q   If we go to the next part, *recipient information*.   Who

9    would put this information into these documents?

10   A   Myself.  So, this is the routing number and the account

11   number, along with the account name, that I would enter.

12   Q   Keep going down.  Keep going.  All right.  Do you see that

13   bottom window there, where it says, *approval history*

14   *information*?

15   A   Yes.

16   Q   What information is provided there?

17   A   This is the time that the request was actually entered, and

18   the time that the request was actually approved.

19         *MR. FIELDS:*  You can take that down.

20      Q    (By Mr. Fields) ACH payments, did they also require

21   two approvals?

22   A   They do not.

23   Q   Who could approve these ACH payments?

24   A   The same person who entered them.  So would either be

25   myself, Abby or Chris.

JONATHAN YIOULOS - Direct

1    Q    And while you worked at National, did you have access to

2    the system that was used to make ACH payments?

3    A    Yes.

4    Q    Describe to us how that worked?

5    A    Very similar.  Same website, just essentially a different

6    portal, drop-down menu, you could just click ACH payment,

7    instead of wire, but you entered the information the exact

8    same, the routing number, account number, vendor name and memo,

9    if you would like.  Basically saying what invoice it was paying

10   and the amount.

11   Q    Let's look at Exhibit 8, which is not yet in evidence.

12   Have you seen records like these before?

13   A    Yes.

14   Q    Are you familiar with how they were made?

15   A    Yes.

16   Q    How were they made?

17   A    Very similar.  On the bank's website, you could print out

18   payment confirmations just like this.

19   Q    What is this?

20   A    This is an ACH payment confirmation.

21   Q    Was it the regular practice of National to make records

22   like these?

23   A    Yes.

24   Q    Was it the regular practice of National to keep these

25   records in its files?

JONATHAN YIOULOS – Direct

1    *A*    Yes.

2    *Q*    What did you call these types of records?

3    *A*    Confirmations.

4           *MR. FIELDS:*  Your Honor, at this time I move into

5    evidence, Government's Exhibit 8.

6           *THE COURT:*  Any objection?

7           *MR. SCHALL:*  Only so much as, Your Honor, I'm not sure

8    he said he created this or how it was stored in the system.  My

9    understanding, it was a website, and there's a gap there,

10   between how the website became this.

11          *THE COURT:*  I think just ask a bit of clarification,

12   please.

13      *Q*    (By Mr. Fields) I think you testified about printing

14   things out?

15   *A*    Yes.

16   *Q*    Okay.  Describe what you would do when you would enter ACH

17   payments?

18   *A*    So, when I would enter the ACH payment, I enter the routing

19   number, the account number, say which account I would like it

20   paid from.  Also, the name of the account, the amount and

21   submit it and approve it, and to approve it, I had a digital

22   key, which refreshed a number every 60 seconds.  This was,

23   essentially, two-factor verification saying, *Okay, as long as*

24   *you are in possession of this, this number, regenerates every*

25   *60 seconds, or 30 seconds*, and you type in those numbers, press

JONATHAN YIOULOS - Direct

 1  approve and your ACH is out.

 2          This record -- these records were kept on Signature

    Bank website, and I had the ability to print out the PDF

 4  confirmation, such as these.

 5  Q   Looking at this particular record, did you create this?

 6  A   I printed this from the website.  Yes.

 7          MR. FIELDS:  Your Honor, at this time, I move into

 8  evidence, Government's Exhibit 8.

 9          MR. SCHALL:  No objection.

10          THE COURT:  All right.

11          MR. KAPLAN:  No objection.

12          THE COURT:  All right.  It's admitted.

13      Q    (By Mr. Fields) Let's orient ourselves to this type

14  of record.  So, what does it say up at the top?

15  A   From which part.

16  Q   The -- do you see in bold there?

17  A   Yes.  It says, *Completed ACH transaction details, Templet*

18  *Information.*

19  Q   And then all of that information that goes into Templet

20  Information, who put that information in?

21  A   I did.

22  Q   And then, if you go to the next section, Credit Destination

23  Accounts, who would put in that information?

24  A   I would.

25  Q   All right.  So that first column there, ABATRC, what is

JONATHAN YIOULOS – Direct

1    that?

2    A    That's the routing number.

3    Q    And then what's the next account?

4    A    The last four digits of the account number.

5    Q    And then do you see where it says name?

6    A    Yes.

7    Q    Who would put in name?

8    A    I would.

9    Q    How would you know what name to put in there?

10   A    I would typically match it to the vendor that we were

11   paying.

12   Q    And the name that you put in there, did National rely on

13   those types of records for its auditing functions?

14   A    Yes.

15   Q    How so?

16   A    So, for keeping track of payments, where they went out to,

17   people who -- so the accounts payable clerk, the next morning,

18   would typically go into the bank and see which vendors we paid,

19   and update our daily cash sheet.  This, basically, meant a

20   real-time look at how much cash was on hand.  So, she would

21   take a look at what payments went out the night before, and ACH

22   payments, when they went out on the website, they didn't have

23   the vendor name, when you just looked at the, like, account

24   summary for the day.  So, you would see a debit to the account

25   for $15,250, in this case, and if the accounts payable clerk

JONATHAN YIOULOS - Direct

1   wanted more clarity on that, she would have to go into the

2   payment confirmation.  She could pull up the name, and see

3   Political Media and know that was the vendor and that vendor

4   was paid, update the cash sheet, but also the accounting system

5   and say, *Hey, we paid this vendor 15,000.*

6   Q   This particular vendor, Political Media, are you familiar

7   with it?

8   A   Yes, I am.

9   Q   How are you familiar with it?

10  A   This is one of the fraudulent vendors that was paid by

11  National.

12  Q   Do you see the account, to which this is a destination?

13  A   Yes.

14  Q   Those last digits there, '8486, are you familiar with that

15  account?

16  A   I am.

17  Q   How are you familiar with that account?

18  A   This was the account that was on Political Media invoices.

19  Q   Do you know who owned that account?

20  A   Michael Tew.

21  Q   How do you know that?

22  A   Because this was his -- his -- one of his personal bank

23  accounts.

24  Q   All right.  We can take that down.  So, you say you went

25  online to make these payments?

JONATHAN YIOULOS - Direct

1    A    I did.

2    Q    Did National have any business offices in Colorado, during

3    this period of time?

4    A    No.

5    Q    So, if you wanted to send money to someone in Colorado, how

6    would National have to do that?

7    A    They could send a check, that would take awhile.  So, if we

8    wanted to send it that quickly with a payment confirmation, it

9    would be through ACH or wire transfer.

10   Q    Was that all done electronically?

11   A    Yes.

12   Q    All right.  So, there should be -- there's a Redweld® right

13   there.  And if you see, there should be one called Signature

14   Bank?

15            THE COURTROOM DEPUTY:  One or two?

16            MR. FIELDS:  Two.

17            THE COURTROOM DEPUTY:  Both of them?

18        Q    (By Mr. Fields) All right.  So the thicker one.

19   Before your testimony today, did you review those exhibits?

20   A    I did.

21   Q    All right.  So, those are exhibits I'm going to list off

22   some numbers, so I will go slowly, 9 through 40, 355 through

23   362, 365, to 367, 369 to 377, 379 and 380, 383 and 384, 386

24   through 392, 428 through 468, and 492.

25            Are those all ACH payment confirmations for payments

JONATHAN YIOULOS – Direct

1   made to the sham companies that you described earlier in your

2   testimony?

3   A   They are.

4           MR. FIELDS:  Your Honor, at this time I move into

5   evidence all of those exhibits.

6           THE COURT:  So, first of all, did everybody who needs

7   to write all of those numbers down, get them written down?

8   Mr. Keech?

9           MR. SCHALL:  Need to repeat.

10          THE COURT:  Would you go through them one more time?

11          MR. FIELDS:  Nine through 40, 355 through 362, 365 to

12  367, 369 to 377, 379 to 380, 383 and 384, 386 through 392, 428

13  to 468, and 492.

14          THE COURT:  All right.  Thank you.  So, any objection

15  to those?

16          MR. SCHALL:  Your Honor, I don't know if it's

17  appropriate, but I would ask Mr. Yioulos to look at them all,

18  to make sure they are what he reviewed, rather than just open

19  up a folder that was sitting next to him.

20          THE COURT:  Fair enough.  We can have you make sure

21  they are what you previously reviewed.

22      Q   (By Mr. Fields) You can take off the clip.

23  A   Yeah.

24              (Pause in proceedings.)

25  A   Yeah.

JONATHAN YIOULOS - Direct

1    *Q*    Have you reviewed all of those?

2    *A*    I have.

3    *Q*    Are those ACH payment confirmations that you created during

4    your time at National?

5    *A*    They were.

6    *Q*    Were those ACH payments to those sham companies you

7    described earlier?

8    *A*    They were.

9           *MR. FIELDS:*  Your Honor, I would move all of those

10   exhibits into evidence.

11          *THE COURT:*  Any objection now?

12          *MR. SCHALL:*  No objection, Your Honor.

13          *MR. KAPLAN:*  Your Honor, I am relying on the

14   Government's exhibit list that represents what Mr. Fields just

15   represented to the witness, and that all of these are the ones

16   that he authorized and submitted on behalf of the sham

17   corporations; is that the representation?

18          *MR. FIELDS:*  (Nodding head.)

19          *THE COURT:*  I believe that was the question; is that

20   right?  Why don't you just make sure we know exactly what these

21   are, Mr. Fields.  Thank you.

22   *BY MR. FIELDS:*

23   *Q*    So, having looked through all of those, what are -- what is

24   that pile of documents in front of you?

25   *A*    They are all payment confirmations to the sham companies

JONATHAN YIOULOS – Direct

1    that were referenced that I had initiated and also approved.

2        *MR. KAPLAN:*  No objections.

3        *THE COURT:*  All right.  Those are admitted.  Thank

4    you.

5        Q    (By Mr. Fields) Who gave you instructions to make all

6    of those payments?

7    A    Michael and Kimberley Tew.

8    Q    To make those payments --

9        *MR. KAPLAN:*  Your Honor, I'm going to object to the

10   blanket testimony, just moved a bunch of documents in.

11       *THE COURT:*  I will overrule it.  I mean, that's

12   certainly a point that you can bring up, but I think he can

13   testify to that.  Overruled.

14       Q    (By Mr. Fields) To make those payments, did you have

15   to deceive National?

16   A    I did.

17   Q    How did you deceive them?

18   A    By sending these -- essentially, setting up fake vendors,

19   sending these invoices to the accounts payable clerk, who input

20   them, and making the -- actually making the ACH payments out to

21   these vendors for services that were not actually performed.

22   Q    Now, National's bank accounts, during the course of your

23   experience there, did you become personally familiar with

24   National's bank statements from Signature Bank?

25   A    I did.

JONATHAN YIOULOS – Direct

1    *Q*    How did you become familiar with those bank statements?

2    *A*    I reviewed them monthly, and I would go through them.  I

3    would go through the website daily, as well.

4    *Q*    So now, the, sort of, smaller folder in front of you.  Do

5    you see Government's Exhibits 2, 3, 5 and 7?

6    *A*    Yes.

7    *Q*    What are those?

8    *A*    Bank statements, from National Air Cargo from Signature

9    Bank.

10   *Q*    Are they for your time when you were the controller there?

11   *A*    Yes.

12   *Q*    During this period that we have been talking about, between

13   2018 and 2020?

14   *A*    Yes.

15          *MR. FIELDS:*  Your Honor, at this time, I would move

16   into evidence Government's Exhibits 2, 3, 5 and 7.

17          *THE COURT:*  Any objections?

18          *MR. SCHALL:*  No objection.

19          *MR. KAPLAN:*  No objection.

20          *THE COURT:*  All right.  Those are admitted.

21      *Q*    (By Mr. Fields) What is an invoice?

22   *A*    It is, essentially, a request to pay for services or goods

23   from a vendor.

24   *Q*    How were invoices used to further the agreement that you

25   have been talking about?

JONATHAN YIOULOS - Direct

1    A    So, within the scheme to send money out, essentially,

2    invoices were needed to make it look more legitimate.  If I --

3    if I were to send a payment out for $15,000, for example, and

4    there was no related invoice to it, there would be questions to

5    say, *Where did you send this money*?  *Why did you send this*

6    *money*?  So, having an invoice that said there was some service

7    performed, was needed to help make this look more legitimate.

8    Q    Who would provide invoices for these sham companies, to

9    you?

10   A    Michael Tew.

11   Q    Were those invoices real?

12   A    They were real for the fact that we put them into the

13   system, but they were not for real services.

14   Q    How do you know that those services were not actually

15   performed?

16   A    Because they were not an approved vendor by National.

17   Every vendor had to be approved by somebody who was,

18   essentially, an officer of the company, which, at the time, I

19   was or Chris Alf or somebody with high authority at the

20   airline.  These vendors were not.  I knew that these vendors

21   were not real.  I knew that these services were not actually

22   performed.

23   Q    Did you discuss the use of false invoices with Michael Tew?

24   A    Yes.

25   Q    Describe those conversations to us?

JONATHAN YIOULOS - Direct

1    A    There were several times where there would be a request for

2    funds to be sent from Michael Tew.  I would request invoices

3    from those sham companies to be sent, so that I could match up

4    the ACH amounts with the actual invoices themselves.  So, if

5    there was a $15,000 payment, there would be a $15,000 invoice,

6    and then in some cases if there was a -- if there was two

7    payments made or -- yeah.  Say two payments made for 15,000

8    each, I would request an invoice for possibly 30,000 from

9    Michael so those two payments would add up to $30,000.  So,

10   just different ways to make the funds that were sent out, more

11   legitimate.

12   Q    Did you ever text with Michael about these invoices?

13   A    I did.

14   Q    Let's look at Government's Exhibit 832, which is not yet in

15   evidence.  What is this?

16   A    This is a text message conversation between myself and

17   Michael Tew, on Wednesday, August 21st, 2019.

18        MR. FIELDS:  Your Honor, pursuant to that Declaration

19   1115, the government would move this into evidence.

20        THE COURT:  All right.  Considering our previous

21   discussion, it's admitted.

22        Q    (By Mr. Fields) If we could, let's read from the top.

23   A    I said, *This is for Global Fuel Logistics, 256K so far sent*

24   *since July 24th.  This is for Political Media, for payments I*

25   *don't have invoices for.  Starting with the 9200.  Essentially,*

JONATHAN YIOULOS - Direct

1    *even though the number was supposed to be 350K, I have sent*

2    *315K already between the two since July 1. I'm really not mad.*

3    *I'm just letting you know.*

4    He said, *Copy that. Just got back from dropping the*

5    *girls at school. I will get you the invoices. Look, I don't*

6    *have a lot of time, I'm working four jobs, mostly for equity,*

7    *at like a quarter of the National salary, and keeping the*

8    *lights on here. Admittedly, a lot of this is my fault. I have*

9    *undershot the mark a bit, primarily because I just want to keep*

10   *things between us copasetic. I like you and I respect you and*

11   *what you have done for my family. I will never forget. I'm*

12   *angry beyond belief at the Alf family, and all of the other BS,*

13   *but that's separate. I'm desperately trying to get this thing*

14   *done and behind us, and I need you to just hear me out, so we*

15   *can get it done for both of us. Then we can move on to our*

16   *monthly thing until the end of the year, which will also be a*

17   *great help, plus you get your BTC as per our agreement. I*

18   *respect you and we have an agreement.*

19   Q    All right. So this reference to number, in quotations,

20   what was the number?

21   A    This was the dollar amount that was supposed to end this

22   conspiracy. Essentially, it was only supposed to be $350,000,

23   and additional payments there were sent out, to end this

24   conspiracy, and I would not be asked to send anything else.

25   Q    How did -- who came up with that number?

JONATHAN YIOULOS - Direct

1    *A*    The Tews.

2    *Q*    Do you know how they came up with it?

3    *A*    It was a combination of the money that they owed to people

4    and any -- I'm not sure the rest of it.  It was just money they

5    said they owed to people.

6    *Q*    You said, *The Tews*, but I want to be careful here.

7    *A*    Yes.

8    *Q*    Was it Michael Tew?

9    *A*    Yes.  That's who I would have gotten that number from.

10   *Q*    Was it also Kimberley Tew?

11   *A*    She would ask for -- I'm not sure if that number came from

12   Kimberley, directly.

13   *Q*    And then there's this reference here to, you know, *We have*

14   *an agreement*.  What was the agreement?

15   *A*    That I would get my Bitcoin™, that I had originally loaned

16   them, back.

17   *Q*    And there's a reference there to Michael being angry at the

18   Alfs.  Did Michael ever express anger towards the Alfs?

19   *A*    Yes.

20   *Q*    What was he angry about?

21   *A*    Just that he felt like he never got a fair shake at

22   National, as much as the ... I'm not sure, exactly, the

23   dealings with the Amex.  I don't know how the fraud came about.

24   I don't know why the fraud was -- for the Amex was committed,

25   but Chris seemed to want to wipe that clean from Michael's

JONATHAN YIOULOS - Direct

 1   slate, and this other individual, Craig, who was threatening

 2   the Alf family, really was the catalyst to Michael being

 3   terminated, and without that situation, I don't know if Michael

 4   would have been terminated, at that time, and he just felt like

 5   it was a little unfair for him to be terminated.  He felt like

 6   I was working a lot he was working a lot--

 7        MR. SCHALL:  Objection, Your Honor.  He is testifying

 8   to what Mr. Tew felt.  I don't know how he would know that.

 9        THE COURT:  We can understand that, but he can give an

10   answer of his understanding, and you can probe that on Cross.

11   Overruled.

12   A   So, just upset at the Alf family, felt like he worked and

13   got the company to a decent position, was terminated without

14   just cause, in his opinion.

15   Q   Did he ever claim that the Alfs used derogatory language

16   A   Yes.

17   Q   What did he say about that?

18   A   That it was mostly from Kimberley -- not Kimberley.  I'm

19   sorry.  Lori Alf.  And it was her being upset at the situation,

20   of the threats that Craig made to the children and also the

21   credit card fraud.  Basically, Lori did not hold back any

22   language, essentially, said, *Fuck you, Michael, fuck you*

23   *Kimberley*, you --

24        MR. SCHALL:  Objection, hearsay.

25        MR. FIELDS:  He said Michael said these things.

JONATHAN YIOULOS – Direct

1              *THE COURT:*  I don't really think it's being offered

2      for the truth of the matter either.  So, go ahead.  Overruled.

3              *THE WITNESS:*  And I witnessed, firsthand, Lori saying

4      these things to Michael and Kimberley, as well.

5              *MR. SCHALL:*  Your Honor, that sounds like it's being

6      offered for the truth of the matter.

7              *THE COURT:*  No, it doesn't.  Overruled.

8      Q    All right.  Can we keep reading?

9      A    *I need 50K today, for tomorrow, and then 40K early next*

10     *week and we're done.  I know that's more than we agreed, but*

11     *some things out of my personal control happened.  We're only*

12     *like 50K over that, and we're really arguing about here.  I can*

13     *call you, just on a call now, and I can speak after.  Have*

14     *another call at 1 p.m., Eastern.  I know you are under*

15     *tremendous stress.  I know that.  We have to stick together,*

16     *and just move on from this, Jon.  That's me talking sincerely.*

17     *Thank you.  BRB, on a quick call.*  I said, I *can't do 50K*

18     *today.*

19     Q    Keep going.  He said, *Please don't yell.  This is*

20     *man-to-man.  Okay*?  I said, *DFAS money never came.  Copy.*

21     Q    What is DFAS?

22     A    That was the receivables that we had from the Department of

23     Defense, that was just a reference to them.

24     Q    Keep going.

25     A    He said, *Oh fuck.  Can you do anything today*?  I said,

JONATHAN YIOULOS – Direct

1    *Literally, no DFAS.* He said, *I'm jammed up to keep pushing.*

2    *Fuck. I will call you around 2:30. Yes, I can do something.*

3    He said, *Okay. Okay thanks. Thanks Jon, call me 2:30ish.* He

4    said, *I'm getting a lot of shit here, trying to get some*

5    *clarity on my end, as I know you are, as well. I have a call*

6    *2:30 Eastern, actually for about 30 minutes. Should we talk*

7    *before? I can talk at 2 if that works.*

8    Q    Keep going.

9    A    I said, *Sure. FYI, she's chasing the invoices hard for*

10   *Global Fuel. I bought some time here, but she is clearly*

11   *snooping around.* He said, *Call me when can.* I said, *On a*

12   *call.* He said, *Sorry, that was a stupid idea. Yes, talk*

13   *shortly.* I said, *Send me account info. I can probably send*

14   *25K today, but not much more, today. Maybe more tomorrow, but*

15   *this is tough. On a call with Jacob.*

16        He said, *Okay.* I said, *Trying to get rid of him.*

17   *Send me info.* And he sent the account names, *Sand Hill, LLC,*

18   *bank name, Wells Fargo Bank, NA, account number, 7596376934,*

19   *ABA, 102000076.* I said, *Sand Hill, now*, question mark,

20   question mark. *I thought I hit the limit*, question mark.

21   Q    *I bought some time here, but she is clearly snooping*

22   *around.* Who is the she?

23   A    Abby.

24   Q    Snooping around what?

25   A    So, when we would pay invoices, it's a practice of many

JONATHAN YIOULOS - Direct

1   businesses, especially National, to have an invoice to pay

2   against, and when there's payments on books against an account

3   with no invoices, so then when you pull up an aging report,

4   which is a list of all of your vendors, and when they are due,

5   when their invoice cames in, there would be a debit balance on

6   that account, because a payment went out, but there's no

7   invoice against it.  So, those were more or less red flags,

8   when you pull up an account and you say, *Hey, I see all of*

9   *these payments to this vendor, where are the invoices*?

10          So, Abby was doing a lot of the day-to-day accounting

11  with her -- she was the direct supervisor to these accounts

12  payable clerks, and so when she is reviewing her, the vendors

13  and the listings, if there's an account that doesn't have

14  invoices for these payments, she would investigate the

15  specialist to say, *Where are the invoices*?  *Well, I haven't*

16  *gotten them from Jon yet*, so that's where she would be snooping

17  around.

18  Q   Did you work pretty closely with Abby?

19  A   I did.

20  Q   How much would you see her?

21  A   Every day.

22  Q   How would you describe her diligence?

23  A   She was a hard worker.  You know, she was very -- she liked

24  things to tie to the penny.  She was very -- get there early,

25  stay late.  One of the harder workers I knew at National.

160
JONATHAN YIOULOS - Direct

1    Q    To make all of this work, did you have to lie to her?

2    A    I did.

3    Q    What kind of lies did you tell her?

4    A    Um, that the invoices were coming, that they were coming

5    from a legitimate source.  You know, earlier there was an

6    exhibit, I can't remember the number of the exhibit, and it was

7    an actual wire transfer to a fraudulent account.  I had to have

8    her approve that invoice that was fraudulent, even though she

9    had no idea, and I told her it was for a legitimate company,

10   and it wasn't.

11   Q    And do you see Sand Hill there?

12   A    I do.

13   Q    What was Sand Hill?

14   A    Sand Hill was the company that Michael had used when he was

15   a consultant at National.

16   Q    You can take that down.  Did the invoices evolve over time?

17   A    They did.

18   Q    How so?

19   A    They became more detailed.  Originally, they started as

20   very vague invoices, for consulting fees, and then as the

21   scheme grew, the invoices became more detailed, so that if

22   there was an audit, there would be a little bit more beef to

23   them.

24   Q    What do you mean by *more beef*?

25   A    By *more beef*, they just look more legitimate.  Instead of

JONATHAN YIOULOS - Direct

1    saying consulting, they would say what the services were for;

2    subscription fee or a, you know, the number of hours for

3    consulting.  Just something that had a little bit more

4    substance.

5    Q   Now, let's look at Government's Exhibit 642, which is not

6    yet in evidence.  What is this?

7    A   This is a email sent to my National account email, from

8    Chris Rincon.  It's an invoice that said, *Attached is the*

9    *latest consulting invoice.  Please send me the confirmation*

10   *when funds are released.  Thank you*.

11   Q   Did you personally receive this email?

12   A   I did.

13   Q   Was it the regular practice of National Air Cargo to keep

14   emails like this in its records?

15   A   Yes.

16   Q   Did you send and receive emails pursuant to the regularly

17   conducted activities of National Air Cargo?

18   A   I did.

19        *MR. FIELDS:*  Your Honor, pursuant to the certification

20   that's Government's Exhibit 1134, the government would move

21   this exhibit into evidence.

22        *THE COURT:*  All right.

23        *MR. SCHALL:*  Your Honor, I can't tell from my screen

24   if the attachment is included or if it's just the email.

25   Assuming the witness has identified the attachment too, no

JONATHAN YIOULOS - Direct

1    objection.

2            THE COURT:  Okay.  I think that -- I think that it

3    will be admitted.  Thank you.

4            MR. KAPLAN:  Excuse me?

5            THE COURT:  I'm going to admit it, unless you have

6    some objection?

7            MR. KAPLAN:  I have the same objection in terms of

8    what the certification is that's allowing the document to come

9    in, as opposed to the reference on it, which is the invoice.

10   Q   Let's look at page two.  Was page two attached to that

11   email?

12   A   Yes.

13   Q   Was it the regular practice of National Air Cargo to

14   sometimes get invoices by email?

15   A   Yes.

16   Q   What would you do with those invoices when you received

17   them?

18   A   I would forward them to accounts payable.

19   Q   And were emails with these attachments kept in the regular

20   course of National's business?

21   A   They were.

22           MR. FIELDS:  I would move into evidence Government's

23   Exhibit 642.

24           MR. SCHALL:  No objection.

25           MR. KAPLAN:  No objection.

JONATHAN YIOULOS – Direct

1          *THE COURT:*  Okay.  It's admitted.

2     *Q*   Let's look at page one.  All right.  So, do you see that

3     email address up there at the top?

4     *A*   I do.

5     *Q*   What's that email address?

6     *A*   *Jyioulos@nationalaircargo.com.*

7     *Q*   Was that your email at the time?

8     *A*   It was.

9     *Q*   Chris Rincon, we will talk about him more later, but for

10    now, very generally, who he is?

11    *A*   He was one of the individuals involved in the scheme.

12    *Q*   Who is he associated with?

13    *A*   Michael and Kimberley Tew.

14    *Q*   Was he associated with a particular vendor?

15    *A*   Yes, Jessamine Development.

16    *Q*   Does it appear that there's an attachment to this email?

17    *A*   Yes.

18         *MR. FIELDS:*  Now, let's look at page two.  Zoom out a

19    little bit.

20    *Q*   What is this?

21    *A*   This is the attached invoice from Jessamine Development.

22    *Q*   Can you see when it was submitted?

23    *A*   Yes, 9-15-2018.

24    *Q*   Was that kind of early in, sort of, this course of conduct

25    that you have been describing, in the middle or towards the

JONATHAN YIOULOS - Direct

1    end?

2    *A*    This is early on.

3    *Q*    And what's the description there?

4    *A*    Investor due diligence.

5    *Q*    So, in the grand scheme of, sort of, the invoices you have

6    been talking about, is this a simpler invoice or a more complex

7    invoice?

8    *A*    This is definitely a simpler invoice.

9    *Q*    And simple invoices like this simply say *investor due*

10   *diligence*, that cause any concerns?

11   *A*    Yes.

12   *Q*    Why?

13   *A*    Because there was no backing behind what due diligence was

14   done.  Most of the time, with any type of invoice from somebody

15   who is doing due diligence or any type of service, there's

16   typically an addendum to it, which might have the hours that

17   were worked, and a little bit more detail about the services

18   performed.  So, you may receive this as a blanket invoice,

19   typically would be more backing behind it.

20   *Q*    Now, let's look at Government's Exhibit 646, which is not

21   yet in evidence.

22        *THE COURT:*  Mr. Fields, I think -- why don't we take a

23   15-minute recess before you get into another exhibit.  So, we

24   will just recess.

25        Members of the jury, all my previous instructions

JONATHAN YIOULOS – Direct

1    about keeping an open mind, not discussing the case, not doing

2    any research remain in place.  Please, be back in 15 minutes.

3    Thank you.

4          THE COURTROOM DEPUTY:  All rise.

5       (Recess at 10:37 a.m.)

6       (In open court at 10:58 a.m.)

7          THE COURT:  Please take your seats.  Can we go ahead

8    and bring the jury back?

9          THE COURTROOM DEPUTY:  All rise.

10      (Jury in at 10:59 a.m.)

11         THE COURT:  All right.  Let's take our seats.  And,

12   Mr. Fields, when you are ready, you may continue.

13         MR. FIELDS:  Thank you Your Honor.

14   Q   Is there anything about consulting, in particular, that

15   caused concerns?

16   A   Yes.

17   Q   What?

18   A   We didn't have too many consultants at National Air Cargo.

19   Having a large number of consulting fees at the end of year

20   might raise a red flag in an audit.

21   Q   Let's look at Government's Exhibit 732, which is not yet in

22   evidence.  Do you recognize this?

23   A   I do.

24   Q   What is it?

25   A   It's an email with an attached invoice from Political

JONATHAN YIOULOS - Direct

1    Media.

2    Q    Do you, personally, receive this email?

3    A    I did.

4    Q    Again, were emails like this kept in the regular course of

5    National Air Cargo's business?

6    A    Yes.

7    Q    Was it the regular practice of National Air Cargo to

8    receive email like this?

9    A    Yes.

10            MR. FIELDS:  Your Honor, I would move this exhibit

11   into evidence, pursuant, also, to the Declaration, that's

12   Government's Exhibit 1130.

13            THE COURT:  Any objection?

14            MR. SCHALL:  If I could just see the second page,

15   Your Honor.  No objection.

16            MR. FIELDS:  There's another page, as well.

17            MR. SCHALL:  Thank you.  Still no objection.

18            MR. KAPLAN:  Would you go back to the first page?

19            MR. KAPLAN:  No objection.

20            THE COURT:  All right.  It's admitted.

21   Q    So, we will turn to this again later, but for now I want to

22   draw your attention to page three.  What is this?

23   A    This is an invoice to National Air Cargo from Political

24   Media.

25   Q    What would you do with invoices like these, once you had

JONATHAN YIOULOS – Direct

1   received them?

2   A    Forward them to our accounts payable clerk.

3   Q    Now, let's look at Government's Exhibit 733, which is not

4   yet in evidence.  What is this?

5   A    This is an email that I had -- this is the original email

6   that I had received, with me forwarding it to Talika Howard.

7         MR. FIELDS:  Your Honor, I move into evidence,

8   Government's Exhibit 733, pursuant to that same Declaration,

9   1130.

10        THE COURT:  Any objection?

11        MR. SCHALL:  Is that just one page, Mr. Fields?

12        MR. FIELDS:  It's also the other pages of --

13        MR. SCHALL:  No objection, Your Honor.

14        MR. KAPLAN:  No objection.

15        THE COURT:  Okay.  It's admitted.

16  Q    All right.  So, you mentioned Talika Howard.  Who is that?

17  A    She was the account's payable specialist for National

18  Airlines.

19  Q    And looking at the underlying email itself.  First of all,

20  what date was that sent?

21  A    Which one?  The actual email or the forward?

22  Q    Yeah.  So, this one right -- let's take that down.  Pull

23  the exhibit back up.

24        Do you see the email on March 18th, 2019 at 1:27 p.m.?

25  A    I do.

JONATHAN YIOULOS – Direct

1    Q    That email.

2    A    March 18, 2018.

3    Q    Let's zoom out a little bit.  All right.  Do you see the

4    name Christopher Weir?

5    A    I do.

6    Q    Who is that?

7    A    I don't know.  He was referenced in this email as the

8    director of operations, but I was not aware of anybody named

9    Christopher Weir.

10   Q    Did you of meet him?

11   A    No, I did not.

12   Q    These emails from -- well, who are these emails from?

13   A    Michael Tew.

14   Q    Wait a second.  Do you see in the *from* slot there?  Do you

15   see an email address?

16   A    I do.

17   Q    What's that email address?

18   A    *Political.media.wdc.gmail.com.*

19   Q    Doesn't *Michaeltew@gmail.com*, how do you know that's

20   Michael Tew?

21   A    Because of discussions on the phone with Michael, and the

22   fact we would come up with the dollar amounts for the invoices

23   through text message or a phone calls.

24   Q    Now, let's look at Government's Exhibit 741, not yet in

25   evidence.  What is this?

JONATHAN YIOULOS - Direct

1    A    This is a text message conversation between myself and

2    Michael Tew, on Wednesday April 3rd, 2019.

3         MR. FIELDS:  Your Honor, at this time I move into

4    evidence action Government's Exhibit 741, pursuant no

5    Declaration 1115.

6         THE COURT:  All right.  It's admitted.

7    Q    All right.  Read this for us.

8    A    Yes.  He said, *Let me know when free.*  I said, *Can you*

9    *change this invoice at all*?  He said, *Yes.  What do you need*?

10   He said, *Check your email.  Perfect.  Done.  Thank you.*

11   Q    Now let's look at Government's Exhibit 742, which is not

12   yet in evidence.  What is this?

13   A    This is an invoice or an email with an invoice attached

14   from Political Media.

15   Q    How does it compare in date to that text exchanged that we

16   just looked at?

17   A    Can you go back to the text exchange?  I just want --

18   Q    Let's go back to Government's Exhibit 741.

19   A    The dates are both April 3rd, 2019.

20        MR. FIELDS:  At this time, I move into evidence

21   Government's Exhibit 742, pursuant to the Declaration that is

22   1130.

23        MR. SCHALL:  No objection.

24        THE COURT:  All right.  It's admitted.

25        MR. FIELDS:  All right.  So, Government's Exhibit 742,

JONATHAN YIOULOS - Direct

1    if we can, we are going to try something a little more

2    complicated.  Let's pull it up on the right-hand side of the

3    screen, and let's keep 741 on the left-hand side of the screen.

4    Oh, 741.  Sorry.

5    Q    Did you see reference in 741 to, *Check your email*?

6    A    Yes.

7    Q    And what happened around the same time you got that text

8    message?

9    A    I received an email.

10   Q    Now, let's look at Government's Exhibit 732, which is not

11   yet in evidence.

12          *THE COURTROOM DEPUTY:*  Seven-thirty-two --

13          *MR. FIELDS:*  Yep.

14          *THE COURTROOM DEPUTY:*  -- is in evidence.

15          *MR. FIELDS:*  Oh, thank you.

16          *MR. FIELDS:*  All right.  Let's look at 742 and 732,

17   side-by-side.  Let's look at page three of each of those

18   exhibits.

19   Q    Are those both invoices?

20   A    Yes, they are.

21   Q    On which dates?

22   A    Both on March 18th, 2019.

23   Q    You notice anything different about them?

24   A    Yes.

25   Q    What do you notice, that's different?

JONATHAN YIOULOS - Direct

1    *A*    The invoice on the left is for $9,900 more than the invoice

2    on the right.

3    *Q*    Who made those changes?

4    *A*    Michael Tew.

5    *Q*    Why?

6    *A*    To match up with the payments that had been sent out.  So,

7    at the time there was 30,150 sent out, or to be sent out, so to

8    holistically encompass the amount that had been sent out, I

9    wanted an invoice that reflected that total amount.

10   *Q*    Take those down.  And now let's look at an exhibit that's

11   not in evidence, 706.  What is this?

12   *A*    Email with an attached invoice from Political Media.

13   *Q*    Did you receive this while you were in National?

14   *A*    I did.

15        *MR. FIELDS:*  Pursuant to the Declaration that

16   Government's Exhibit 1130, I would move into evidence

17   Government's Exhibit 706.

18        *MR. SCHALL:*  Mr. Fields, can I just see the --

19        *MR. FIELDS:*  If we could scroll down so they can see

20   the pages.

21        *MR. SCHALL:*  No objection, Your Honor.

22        *MR. KAPLAN:*  No objection.

23        *THE COURT:*  It's admitted.

24   *BY MR. FIELDS:*

25   *Q*    Let's go to page three.  What is this?

JONATHAN YIOULOS – Direct

1    A    This is an invoice from Political Media.

2    Q    Was this invoice legitimate or illegitimate?

3    A    Illegitimate.

4    Q    How do you know that?

5    A    Because these consulting hours that were referenced here

6    were never performed for National Air Cargo.

7    Q    And what's the date on this invoice?

8    A    January 11, 2019.

9    Q    Now, let's look at Government's Exhibit 705, which is not

10   yet in evidence.  What is this?

11   A    This is a text message conversation between myself and

12   Michael Tew, that's dated January 10th, 2019.

13   Q    Around the same time as the email we just looked at?

14   A    Yes.

15        MR. FIELDS:  Pursuant to the Declaration, that's

16   Government's Exhibit 1115, the government would move this

17   exhibit into evidence.

18        THE COURT:  It's admitted.

19   Q    Please read this for us.

20   A    He said, *Sending.  On a call*.  I said, *Okay.  Need invoice*

21   *before 4 if money is to be received tomorrow.  If not, funds*

22   *will hit Monday*.  He said, *All set*.  I said, *Jesus, it was*

23   *supposed to be 23,500.  You always increase it.  Shit, I*

24   *flipped it.  That was an accident, I swear*.  He said, *Now what*?

25   I said, *It's whatever.  And no it didn't flip, cause the two*

JONATHAN YIOULOS – Direct

1    *totals add up to over 25K, and also the hours don't match, 30.9*

2    *times 350 is 10,815, not 825.*  He said, *Rounding.*  I said,

3    *Okay.*  He said, *Something must have happened in Excel.*  I said,

4    *Okay.*  I said, *Also when should I expect my BTC?  For real*

5    *though.  I know you have been struggling but you have got to*

6    *understand where I'm coming from.*

7             He said, *If you can do cash tomorrow, if not brb and*

8    *give you for real.*  I said, *What do you mean if I can do cash,*

9    *like bank-to-bank transaction or actual cash?  Ha.  Also, done.*

10   Q    All right.  When you said, *You always increase it*, what is

11   the *it* you were referring to?

12   A    The dollar amount that he would originally request to be

13   sent via ACH, it always ended up being more than was originally

14   requested.  If he asked for 5,000, I would get a request right

15   before I sent it to say, *Do you think you can get out ten or do*

16   *you think you could get out 15*.  This happened more often than

17   not.

18   Q    That make things difficult for you?

19   A    It did.

20   Q    How?

21   A    National Air Cargo was not in the best financial situation.

22   When I say*, not in the best*, they were in a very poor financial

23   situation.  The amount of people that the company owed money

24   to, the amount of vendors the company owed money to was vastly

25   greater than the amount of money that company was actually

JONATHAN YIOULOS – Direct

1    bringing in.  So to keep operations moving, paying off vendors

2    that actually had a legitimate purpose and for legitimate

3    expenses became difficult, when I was sending money out for

4    this conspiracy.

5    Q    As a former financial officer of National Air Cargo, did

6    Michael have a good working understanding of National's

7    internal controls?

8    A    Yes, he did.

9    Q    Did he ever give you advice on how to make sure these

10   invoices would pass scrutiny?

11   A    Yes.

12   Q    What kind of advice would he give?

13   A    Just what type of details should be included.  He would ask

14   what was going on at the company, during that time.

15   Originally, started out as consulting invoices, because during

16   Michael's time at National we did use a lot of -- we did have

17   some consultants for things like a deal we are trying to make

18   with a Chinese conglomerate or any other type of other airline

19   that we might be partnering with, there may be due diligence

20   that needed to be performed.  And then as the scheme continued

21   to grow, he would ask, *What's going on at National?  Where are*

22   *the air crafts?  Is any of them down for maintenance?  Is*

23   *anything going on?  Maybe we can use where the air crafts are*

24   *to, you know, more legitimize the invoices.*

25   Q    Let's look at Government's Exhibit 747, which is not yet in

JONATHAN YIOULOS - Direct

1  evidence.  What is this?

2  A    This is a text message conversation between myself and

3  Michael Tew, on Monday April 8th, 2019.

4       MR. FIELDS:  Pursuant to that Declaration, that's

5  Government's Exhibit 1115, the government would move this in

6  evidence.

7       THE COURT:  All right.  Admitted.

8  Q    If you could read.

9  A    He said, *Can we send to an existing vendor in the system,*

10 *just add a bank account.*  I said, *No, we are using Political*

11 *Media.  I'm not going to bring another vendor into this.*  I

12 said, *Raises too many red flags if it's an existing vendor.*

13 *1099 issues, if they have questions regarding their account and*

14 *there are issues or discrepancies in the accounts matching.  We*

15 *would be screwed.*

16      He said, *I know you are nervous.  I know you can't*

17 *breath.  I'm the same.  I'm totally fucked.  If we could do*

18 *something for tomorrow.  When I say fucked, I mean fucked.  No*

19 *exaggeration.  If we do something for tomorrow, then we take a*

20 *break and make the final invoice plan.  I know you have gotten*

21 *nothing.  I gave you my word, and I will keep it, that's part*

22 *of what we are doing here.*

23      I said, *Yeah.  But when you say something, how much do*

24 *you mean?  $29,975, just keep the invoice simple.  Fuel*

25 *procurement.  As long as it says fuel, it shouldn't matter.*

JONATHAN YIOULOS – Direct

1    *Should keep the questions to a minimum.  The airline sucks fuel*

2    *every week.  Multiple vendors handle it.  I think simple is*

3    *better, in this case.*

4    Q    So, *I gave you my word*, what was Michael Tew's word?

5    A    That he would get me a Bitcoin™ back.

6    Q    Keep going.

7    A    I said, *That's so fucking much.  Fuel gets run through FMS,*

8    *you know this.*

9          He said, *I know, but they still won't ask questions.*

10   *Fuel procurement consulting, even if it says fuel on it.  I'm*

11   *not breathing right now.*

12         I said, *So, you are saying you want 30K now, then you*

13   *want another final invoice for 75K, is that real life*?

14         He said, *I know.  No, this is towards that, or this,*

15   *that.  When you submit it, you say the airline needs a lot of*

16   *help managing its full offsets right now, to actually lower its*

17   *average cost, that's why we are terminating the other guy, he*

18   *wasn't doing anything.*

19         I said, *I have a better plan.*

20   Q    Let's keep going.

21   A    I said, *Fuel modification, inspection and research, 75K,*

22   *related to new aircraft, amount due today, 40 percent due on*

23   *invoice.*

24         He said, *Can you do 50 percent down?  I just realized,*

25   *I have an overdraft.*

JONATHAN YIOULOS – Direct

1          I said, *You're joking.  Whatever.  Sure, 37,500.*

2    *Honestly, this, 100 percent, has to be the last, like no*

3    *bullshit.*

4          He said, *Invoicing for the 75K though and we address*

5    *rest later right?  That was our discussion.  Confirming.*

6    *That's what invoice says.  It's good.*

7          Yes, *Invoice for the 75, 50 percent down.*

8          *All okay*?  He said.  I said, *Yup good to go*.  He said

9    *Thank God, or dot, dot, dot, thank you.  You are a good man.*

10   *Q*    Let's take that down, and let's look at an exhibit that's

11   not yet in evidence.  Government's Exhibit 748.  What is this?

12   *A*    This is an invoice from Political Media received on April

13   8th, 2019.

14   *Q*    Similar to those other emails that you got from Political

15   Media?

16   *A*    Yes.

17          *MR. FIELDS:*  Pursuant to the Declaration, that's

18   Government's Exhibit 1130, the government would move this into

19   evidence.

20          *THE COURT:*  Do you need to scroll through it, briefly?

21          *MR. SCHALL:*  Thank you, Your Honor.

22          *MR. SCHALL:*  No objection.

23          *MR. KAPLAN:*  No objection.

24          *THE COURT:*  It's admitted.

25      Q    (By Mr. Fields) All right.  So now let's go to page

JONATHAN YIOULOS – Direct

1    three.  What do you see as the activity on the invoice?

2    A    Fuel modification, inspection and research related to new

3    aircraft.

4    Q    Had that come up before?

5    A    Yes.

6    Q    How?

7    A    Through the text message conversations I had with

8    Michael Tew.

9    Q    Who made this invoice?

10   A    Michael Tew.

11   Q    Who benefited from it?

12   A    Michael Tew.

13          *MR. FIELDS:*  You can take that down.

14       Q    (By Mr. Fields) Does the concept of *invoice being*

15   *final* mean anything to you?

16   A    Yes.

17   Q    What does that mean?

18   A    It would be the last.

19   Q    Would that have internal accounting significance at

20   National?

21   A    For purposes of like an audit or my records, yes.

22   Q    At any point, between 2018 and 2020, did you try to make

23   this whole thing stop?

24   A    Yes.

25   Q    How so?

JONATHAN YIOULOS – Direct

1   A   I would ask -- I would; one, say I would refuse to pay

2   invoices; I would say I can't do it; two, I would say, can we

3   have a consulting agreement, with a final number in there?  I

4   wanted it to come to some sort of resolution, so that it would

5   stop.  So, it was mostly asking for final invoices and

6   agreements.

7   Q   Let's look at Government's Exhibit 765, which is not yet in

8   evidence.  What is this?

9   A   This is an email that I forwarded to Talika Howard, April

10  29th, 2019, with attached invoices from Political Media.

11          MR. FIELDS:  Let's scroll down through, so everyone

12  one can see it.

13          Your Honor, pursuant to the Declaration that's

14  Government's Exhibit 1130, the government would move this

15  exhibit into evidence.

16          THE COURT:  Any objection?

17          MR. SCHALL:  No objection.

18          MR. KAPLAN:  No objection.

19          THE COURT:  It's admitted.

20      Q   (By Mr. Fields) We are already here on page -- well,

21  let's look at page -- yeah, the last page there.  What does it

22  say on that invoice?

23  A   In the activity section?

24  Q   Yep.

25  A   Fuel modification, inspection and research, final invoice.

JONATHAN YIOULOS - Direct

1    *Q*   Did this effort to have final invoices submitted work to

2    stop this whole thing?

3    *A*   No.

4    *Q*   Why not?

5    *A*   Because it went on to a different vendor, and/or there was

6    another explanation of, *Well, that wasn't the real final*

7    *invoice.  There is a final, final invoice*, so.

8    *Q*   Government's Exhibit 775, which is not yet in evidence.

9    What is this?

10   *A*   This is a text message conversation between myself and

11   Michael Tew, on Wednesday, May 15th, 2019.

12          *MR. FIELDS:*  Your Honor, pursuant to that Declaration

13   1115, the government would move this into evidence.

14          *THE COURT:*  That's admitted.

15   *Q*   Can you read this for us?

16   *A*   He said, *Can you send 19K, the last 19K to close out*

17   *Political Media situation, urgent or I wouldn't ask.  He's*

18   *holding me up and it's not a good person to be on the wrong*

19   *side with.  And I can get you two BTC, ASAP.  I know you don't*

20   *care, but you will, look where it's headed.*

21          I said, *Jesus Christ*.  He said, *Trust me, I know.*

22   *Just try not to think about it.  I'm not.  I'm just trying to*

23   *protect the situation.*

24          I said, *We're almost at $1 million*.  He said, *Let's*

25   *talk about auditors and accounting tonight, after work*.  I

1    said, *This is the eighth payment to PM in the last 30 days.*

2    *Over 200K.  And I still don't have a fucking piece of BTC.  You*

3    *have said this is the last one a million times.  You've given*

4    *me your word a million times.*

5           He said, *I don't have anything either.  I know.  You*

6    *have lied to me a million times.  I have not lied to you.  I*

7    *told you what I promised.  So why would I trust you now?*  He

8    said, *I'm not lying, I'm not.*  I said, *Ha-ha-ha-ha.  Until next*

9    *week, when you ask for more, and the week after that, and the*

10   *week after.  Like, if you have no BTC, how can you get me two*

11   *BTC, ASAP?  Makes zero sense.  Until you say, Oh, can you send*

12   *it back.*

13          He said, *No.  I haven't gotten anything out of this.*

14   *I'm not saying we don't have it, and of course I'm not going to*

15   *ask for it, back.*  I said, *Well, you have every other time.*  I

16   said, *Look, I don't know what you are dealing with, but this is*

17   *fucking bullshit.  You desperately needed 40K Friday, now 19K.*

18   *What's to say you need more*?

19          I said, *Seriously though.*  He said, *I'm not stupid and*

20   *I am not greedy, this is not about any of that.*  And I said,

21   *And if you have 2 BTC to send ASAP, then why do you need 19K*?

22   He said, *Firstly, Larry doesn't use BTC.  He hates it.*

23   *Secondly, I don't have the 2 BTC.  Kimberley is going to get it*

24   *for you.  I wish had 2 BTC.*

25          I said, *How does that even make fucking sense?*  He

JONATHAN YIOULOS - Direct

1    said, *She has other investors, legitimate, wealthy guys that*

2    *are buying BTC through her right now.  It's weird to explain,*

3    *but they are too old to use the exchanges.  Totally separate*

4    *from any of this.  New York people.  Not my people.  I don't*

5    *know any of them.  It's her own thing.  She can get it.  I'm*

6    *keeping her away from all of this.*

7        I sent a bunch of question marks.  He said, *What does*

8    *question mean?  Sorry.  We're both smart people.  In some ways*

9    *you are smarter than I am.  We need to think about this*

10   *analytically and put this behind us.*

11       I said, *Why aren't you answering?  Which account?*

12   *This the fucking last and I mean it, the fucking last time.  I*

13   *can't do this anymore.*

14       I said, *Which PM account the real one or yours?*  He

15   said, *AT & T® is gone from my building.  It's fucked up.  Send*

16   *to mine.  Nothing to him until I have his signature.*  He said,

17   *Only Facetime, audiotapes, audio.  Like overnight.  Zero bars.*

18   *Send like 19,650, and we'll talk tonight to get the invoices*

19   *straight.  We have to have the right PNL allocations.*

20       I said, *I just sent it 19,900.*  He said, *Perfect.*

21   *What time are you free later?*  I said, *Let's talk tomorrow*

22   *morning if you can.  Tonight I'm swamped.*  He said, *Yeah,*

23   *that's no problem.  Got it.*

24   Q    There's a reference in there to someone named Larry.  Who

25   is Larry?

JONATHAN YIOULOS – Direct

1   *A*   Larry is the individual that he said he knew at Political

2   Media, Larry Ward.

3   *Q*   *We have to have the right PNL allocations.*   What is PNL?

4   *A*   Those are the right expense accounts to use, to book the

5   expenses to at National.

6   *Q*   Did you have to book these two specific PNL accounts?

7   *A*   Yes.

8   *Q*   Why?

9   *A*   Each invoice, when it goes into the system, needs to be

10  coded, and when I say coded, it needs to have a certain account

11  that it hits a certain expense account, and if the accounts

12  payable clerk didn't know what it could be, I have to at least

13  give her some guidance on what it should be.

14  *Q*   Let's take that down.   At any point during this whole

15  thing, did you take steps to destroy evidence?

16  *A*   Yes.

17  *Q*   What?

18  *A*   Deleted text messages.

19  *Q*   Did you ever urge anyone else to do that?

20  *A*   Yes.

21  *Q*   Who?

22  *A*   Michael and Kimberley.

23  *Q*   Why?

24  *A*   I just felt like I didn't want records of any of this on

25  text message.   Didn't want them to, you know, have their side

JONATHAN YIOULOS – Direct

1    of the records and me not have it.  I didn't like to keep the

2    messages on my phone, in case my wife went through my phone, or

3    my current significant other, to go through my phone.  I didn't

4    like to keep those messages, so if I didn't have them, I didn't

5    want them to have them either.

6    Q   Let's look at Government's Exhibit 635, which is not yet in

7    evidence.  What is this?

8    A   This is a text message conversation between myself and

9    Kimberley Tew.

10   Q   Did you review it before your testimony?

11   A   I did.

12   Q   Does this one look a little bit different than some of the

13   other text message conversations we have been looking at it?

14   A   It does.

15   Q   How do you know that you sent these to Kimberley?

16   A   Because of the nature of the conversation, references to

17   Michael and references to the scheme.

18   Q   We talked earlier about the process that you used to, sort

19   of, verify those other text messages.  Did you follow that same

20   process, when it came to these types of messages?

21   A   Yes, I did.

22        MR. FIELDS:  Your Honor, at this time, I move to admit

23   Government's Exhibit 635, pursuant to that Declaration that's

24   1115.

25        THE COURT:  So, this is subject to the same

JONATHAN YIOULOS - Direct

1    Declaration; is that right?

2         *MR. FIELDS:*  Yes.

3         *THE COURT:*  All right.

4         *MR. SCHALL:*  Your Honor, this is the issue that we

5    talked about this morning involving the processing of these

6    types of exhibits in a different manner than the other ones.

7         *THE COURT:*  Can I ask you to just approach, briefly,

8    so I know what we're discussing.

9       (At the bench:)

10        *THE COURT:*  Just explain why these are different.  Are

11   these the Cellebrite ones or the Apple™ ones, because -- just

12   explain to me where we are?

13        *MR. FIELDS:*  The Cellebrite ones are different in that

14   they were rendered using Cellebrite.  The question is, why are

15   some rendered using Cellebrite?  Why are some just in that CSV

16   file?  And the answer to that has to do with the filter.  So,

17   initially everything is put through Cellebrite, that's what was

18   used to review, so that's what the agents usually did.  Once we

19   went through the filter process, all of those were, sort of,

20   set aside until they could be filtered.  They were brought back

21   out of the filter.  By that point in time, we also had more

22   information about what was, sort of, in that iCloud account,

23   and so we could just look at those comma separated value files.

24        *MS. HUBBARD:*  I don't think that's right.  My

25   understanding is different.  All of Michael's messages with Jon

JONATHAN YIOULOS - Direct

1    went through the filter too.  So, I don't understand why these

2    would be different than the way that they are formatted --

3    other ones are formatted, so that doesn't make sense to me.

4    What I believe is different about these is that they were

5    supposedly recovered somehow, because they had been deleted.

6    So, there's -- that's why there's only one side of the

7    messages.  I think that's stuff we need testimony about.

8           THE COURT:  Right.  Well, so then, I think we're just

9    kind of where we were this morning.  I will let you use them

10   kind of as a demonstrative for now, and if you want to admit

11   these particular ones, I need that step, at least cleared up

12   with some testimony, which is what I think my order said.

13   Okay.

14          MR. FIELDS:  Would he be allowed to read these

15   messages?

16          THE COURT:  Yeah.  The same thing we were doing

17   yesterday, yeah.

18          MR. SCHALL:  Just the context of the message though,

19   right?

20          THE COURT:  Right.  Not the sort of --

21          MR. SCHALL:  Data.

22          THE COURT:  -- things that he doesn't know about.

23          MS. HUBBARD:  Like I don't think that he has personal

24   knowledge as to -- these all came from Kimberley's iCloud,

25   allegedly; not his devices, not his iCloud.  So, he doesn't

JONATHAN YIOULOS - Direct

1    have personal knowledge.  He might be able to say he deleted

2    them from his own devices, but I don't think he can testify as

3    to where these came from, how they were stored, what he knows

4    about them being deleted or recovered or any of that.

5            I think -- this is why I think what Your Honor was

6    suggesting with refreshing recollection is actually more

7    accurate way to do it.  Does he remember about the messages?

8            THE COURT:  I think you are right about that.  He

9    can't testify about where this document came from.  He can

10   testify he may have deleted it, but he can't testify about what

11   Kimberley did or how this was recovered.  I think that's right.

12   Okay.

13           (In open court.)

14           MR. FIELDS:  All right.  So let's go to the very last

15   page of this exhibit.

16           THE COURTROOM DEPUTY:  Is this exhibit received?

17           THE COURT:  I'm sorry.  You can display this, but it's

18   not admitted, but you can show it to the jury.

19           MR. FIELDS:  If we could zoom in.  Let's start at the

20   bottom.

21   Q    Again, to whom did you send these messages?

22   A    To Kimberley Tew.

23   Q    And again, how do you know that?

24   A    From the context of the situation -- context of the text

25   messages, I reviewed them, there's references to Michael,

JONATHAN YIOULOS – Direct

1   there's references to the scheme, and I have recollection of

2   these conversations.

3   Q   What's the first message you sent?

4   A   I said, *Relax.  Nobody is turning on you.*

5   Q   Let's go up.

6   A   I said, *You're really not.  Just deep breath.  I talked to*

7   *Michael.  We have to delete all text records ... we will figure*

8   *this out.*  I said, *I know.*  I said, *Okay.  I'm deleting*

9   *everything ... we need to.  Worse case scenario, they take our*

10  *phones.  I have to delete these records for now.*  I said, *I*

11  *suggest you do the same.*

12  Q   Now, let's look at Government's Exhibit 636, which is not

13  yet in evidence.  What is this?

14  A   Text message conversation between myself and Michael Tew,

15  on September 13th, 201.

16  Q   Same day as the other message we looked at?

17  A   Yes.

18      MR. FIELDS:  Your Honor, pursuant to that Declaration

19  1115, I would move this into evidence.

20      THE COURT:  This is admitted.  Go ahead.

21  Q   Please read it for us

22  A   I said, *Craig called again.*  He said, *Handling.  Just stay*

23  *focused.*  I said, *He talked to Karen, told her you represented*

24  *yourself as a National Air Cargo employee and he wants his*

25  *money.  He wants $7500.  He threatened to drag National through*

JONATHAN YIOULOS - Direct

1    *the mud.  He was asking for Karen's name and shit.  She came*

2    *into Abby's office nearly in tears and kind of freaked out.  I*

3    *was in Abby's office.  Abby immediately called Chris and left*

4    *him a message telling him she had something urgent to talk*

5    *about.*

6          He said, *Important you and I handle the airline*

7    *payables ASAP.  He's down there today.*  He said, *I will take*

8    *care of it.  He's still sleeping.  He has his money.  I'm going*

9    *to get him his last bit here and making him go away.*

10          I said, *Well, I've heard it's taken care of numerous*

11    *times, I'm sorry if I'm skeptical here and he called again.*

12    *This time he talked to Bob because Karen --* I can't see

13    that ...

14   Q    Scroll down.

15   A    *Craig called again.  This time he talked to Bob because*

16    *Karen was in with myself and Abby.*  He said, *What?*  I said,

17    *Craig called again.  He talked to Bob this time.  Now Abby has*

18    *left a voice mail for Chris and a text.  This guy has been*

19    *calling Chris and Lori too.*

20          He said, *Onto Lori now.*  I said, *Okay.  Don't forget*

21    *to delete texts from both phones.  I'm doing that now.  It*

22    *needs to happen.*  I said, *What's going on*?

23   Q    These references to Craig, how does that relate to the

24   incident you described to us earlier?

25   A    So, Craig was an individual who wanted -- who the Tews were

JONATHAN YIOULOS - Direct

1    dealing with, and who called National and texted Chris and

2    Lori's children, same individual.

3    Q    That's who you talked about earlier?

4    A    Yes.

5    Q    These references to Karen and Bob, who are they?

6    A    Karen was our director of HR at National Air Cargo and Bob

7    was the -- basically our operations director in the Buffalo

8    office.

9         MR. FIELDS:  You can take that down.

10   Q    At any point in time did you ever consider just going to

11   the police or the FBI?

12   A    Yes.

13   Q    Let's look at Government's Exhibit 715.  What is this?

14   A    Text message conversation between myself and Kimberley Tew.

15   Q    How do you know that you sent these to Kimberley?

16   A    Based on the same review I did prior.

17        MR. FIELDS:  Just scroll all the way down to the end.

18   Q    Did you review all of those before your testimony?

19   A    I did.

20   Q    You have a personal memory of actually sending all of

21   these?

22   A    I do.

23        MR. FIELDS:  Your Honor, I would ask permission to

24   publish this exhibit.

25        THE COURT:  So, again, this will be shown for now, but

JONATHAN YIOULOS – Direct

1  not admitted.  Go ahead, Mr. Keech.

2  Q   What did you say there at the bottom?

3  A   I said, *Hey, sorry I had you blocked from that one night*

4  *awhile ago I never undid it.  My fault.*

5  Q   So, blocked.  Did you ever block Kimberley?

6  A   I did.

7  Q   How would you block her?

8  A   Just through my cell phone, I could block her cell phone

9  number.

10 Q   What would happen when you blocked her?

11 A   I will get text messages from other cell phone numbers.

12 Q   Why did you block her?

13 A   Because ... when I would not send money or refused to send

14 money or any sort of disagreement, she would get extremely

15 nasty.

16 Q   What's the next message?

17 A   *I swear to tell you.  I tell you everything I know.  If*

18 *anything went down, I would be getting fucked to.  It*

19 *shouldn't.  I know the FBI thing scares you, but I don't know*

20 *what they could possibly do or even care about once it's paid.*

21 *You really shouldn't be.  No shit.  We've had some intense*

22 *moments for sure.  And I have had more intense freakout*

23 *moments, and for that I'm sorry.  I really don't think that.*

24 *I'm really trying to stay out of it all.  And I figured you*

25 *have, and I appreciate that.  Okay.  Thank you.  I promise you,*

JONATHAN YIOULOS - Direct

1    *he is not.  I'm the one who pushed the button.  There's no way*

2    *for that.  This is all so close to going away.*

3    Q    All right.  So *pushing the button*, what button?

4    A    On the bank's website, to submit and approve the ACHs.

5              *Well, if that's the case, then just give me a warning.*

6    *I really don't blame you.  My God, that would be so stupid of*

7    *me.*

8    Q    Let's stop there.  Do you remember what the *stupid* thing

9    would have been?

10   A    Yes.

11   Q    What was it?

12   A    Ratting them.  When I say *ratting them*, I mean just blaming

13   them for the conspiracy.

14   Q    Kimberley ever express concerns that you might do that?

15   A    Yes.

16   Q    What would she say?

17   A    She would -- one, she would call me a rat, when she thought

18   I might be doing it.  She would say that I was essentially

19   turning on her, that I was going to try to blame it all on

20   Michael.

21   Q    What was your response when she would do things like that?

22   A    I would block her, her phone, and then I would text Michael

23   and tell him that I don't want Kimberley texting me.

24   Q    Let's keep going.

25   A    *Cause there's no chance I don't go down for something.  I*

JONATHAN YIOULOS - Direct

1    *don't know.  I don't know these guys.  I have asked for an*

2    *agreement of some sort and I need it.  We can put anyone's*

3    *fucking name on it.  As long as we have that, we're buttoned up*

4    *on that.  The charges have fallen off the company account, so*

5    *she doesn't care anymore.*

6    Q    Who was the *she* that doesn't care anymore?

7    A    That was in reference Abby Schwartz.  I said, *I'm just*

8    *frustrated with this whole thing.  We have sent them over a*

9    *hundred K each, and I am sure you have sent them the BTC you*

10    *had.*

11    Q    So, this was in approximately February of 2019.  Who was

12    the *them* to whom you had sent 100K?

13    A    This was to Jessamine Development and Michael Meyers.

14    Q    All right.

15    A    I said, *Okay, what do you got?  Wait what?  I'm not*

16    *following.  You really think they would stop?  I don't know.*

17    *Maybe we do go to the authorities then.  That's your call,*

18    *because these guys are clearly harassing you nonstop.*

19    Q    *These guys* and *harassment*.  What was that all about?

20    A    So these were individuals, the guys that I'm referencing

21    here, Michael Meyers, Chris Rincon, these were two individuals

22    who had been sent funds from National, through invoices,

23    fraudulent invoices, and they made a reference to these

24    individuals threatening them and their family if they didn't

25    get more money.

JONATHAN YIOULOS – Direct

1  *Q   When you say* they, *who in particular?*

2  *A   Kimberley and Michael made reference to these individuals.*

3  *Q   Keep going.*

4  *A   I mean they're never going to stop.  I think you have to.*

5  *That seems like the only option.  I know it will fuck all over,*

6  *but you shouldn't live in fear.  Between Chris, Mike, Hannah,*

7  *and Political Media, 406K.*

8        *MR. FIELDS:*  Let's stop there.

9  *Q   Chris, who is that in reference to?*

10  *A   Chris Rincon.*

11  *Q   What company was he associated with?*

12  *A   Jessamine Development.*

13  *Q   Mike, who is that in reference to?*

14  *A   Michael Meyers.*

15  *Q   What company was he associated with?*

16  *A   Meyers Consulting.*

17  *Q   Hannah, who was that?*

18  *A   Hannah Scaife.*

19  *Q   Was that associated with a different company?*

20  *A   Yes.*

21  *Q   Which one.*

22  *A   Hannah Scaife, CPA.*

23  *Q   Were any of those companies legitimate vendors of National*

24  *Air Cargo?*

25  *A   No, they were not.*

JONATHAN YIOULOS – Direct

1  Q   Let's keep going.

2  A   *I don't know what else to do.  I don't know yet.  I mean*

3  *I'm going to have to make up agreements, when we get down that*

4  *road, if the auditors ask.  Then they call.  They got paid.*

5  *Didn't they?  I have their invoices and emails and everything.*

6  *That's what those additional wires were supposed to be for.*

7  *For tax issues.*

8  Q   All right.  So *tax issues*, what were the tax issues?

9  A   So, at the end of every year National Air Cargo would send

10 out 1099 forms to any vendor who was not a corporation, that

11 performed any services, and these forms were required to be

12 filed by the IRS.  These vendors essentially receive these 1099

13 forms every year, with the total amount that they were paid by

14 National for the services they performed, and these were in

15 reference to both Chris Rincon and Michael Meyers, both

16 received 1099s, or at least their companies did, for the

17 services that they had performed at National Air Cargo.

18 Q   Did that create any complications?

19 A   Yes.

20 Q   What?

21 A   So, one, these 1099s were prepared by Abby Schwartz.  So,

22 it just brought a little bit more light on to those vendors.

23 When I say *more light*, just she looked into these vendors a bit

24 more when she is preparing these 1099s.  And also these

25 individuals were not expecting to receive a 1099 from National

JONATHAN YIOULOS – Direct

1    Air Cargo, according to Chris and -- according to Michael and

2    Kimberley.

3        So, when they received the 1099, they raised the issue

4    they would have to pay tax on the funds they received.

5    Q    As a result, what did they want?

6    A    More money.

7    Q    Let's keep going up.

8    A    I said, *Mike essentially got 30K that was supposed to go to*

9    *Chris, and then got 25K as tax money. Chris got an additional*

10   *30K of tax money too. Those were their final invoices. Well*

11   *then we have no choice. We made our beds. Exactly. And I*

12   *have sent out 406K and have received zero benefit. Not saying*

13   *you have, but I'm essentially pressing the button for nothing.*

14   Q    Now *zero benefit*, at that point, had you really received

15   nothing?

16   A    Correct.

17   Q    Let's keep going up.

18   A    *You're right. At this point I just want it to all go away.*

19   *I don't care what it takes. I honestly don't need anything*

20   *anymore. I don't know that. I honestly didn't know how much*

21   *you guys still -- how much you still talked to those guys. Now*

22   *I'm obviously worried. You're right. I don't. I don't know*

23   *their world, and guys in their world don't seem to ever stop.*

24   *So you truly don't think they will stop? If you say no, then*

25   *we have to go to somebody. It does. It really does. I know*

JONATHAN YIOULOS - Direct

1    *what I'm doing here.  You got to believe me.  I can tell you*

2    *this, we can make it work.  We need to have the agreement*

3    *signed by both Chris and Mike.  I have both of their*

4    *signatures.  They both have emailed me saying they would send*

5    *the agreements once they were paid in full if we have the*

6    *agreement with their signatures and show the payments to them*

7    *in full, there's literally not a thing they can say.  They have*

8    *been paid and they said there's an agreement via email we go to*

9    *the authorities if we have to and there's a signed agreement*

10   *with payments in full.  What are they going to do?  Prove they*

11   *didn't do the work?  That's not possible.  And do they really*

12   *want the IRS and others up their ass*?

13   *Q*   When you say*, I know what I'm doing here*, what did you mean

14   by that?

15   *A*   I want agreements to tie back to the invoices, and to have

16   something to say -- to, kind of, fight back against Chris and

17   Mike, for asking for more money, to say, *Hey, you guys said*

18   *this is the final agreement, as per your agreement, this is*

19   *what we have*, and if they were to put pressure on myself or

20   anybody at National, go back and show this agreement, whether

21   it was legitimate or not.  I didn't want -- I didn't think

22   Chris or Mike would want themselves shown as doing fraudulent

23   work either, and being part of this conspiracy.

24        *MR. FIELDS:*  We can take that down.

25   *Q*   Earlier you mentioned the term *rat*.

JONATHAN YIOULOS - Direct

1    A    Yes.

2    Q    What does that mean?

3    A    Um, basically, somebody who is telling on somebody else.

4    You know, implicating them for doing something illegal.

5    Q    What happens to rats?

6    A    Rats tend to -- not great things happen to rats.  Rats can

7    get killed.  Rats can -- just not good things.

8    Q    Were you ever called a rat, at any point, in this period of

9    time?

10   A    Absolutely.

11   Q    Who called you that?

12   A    Kimberley Tew.

13   Q    Did that concern you?

14   A    Yes.

15   Q    Why?

16   A    Because she --

17        *MR. KAPLAN:*  Objection, relevance.

18        *THE COURT:*  Overruled.  Go ahead.

19   A    Because, you know, she made reference to these individuals

20   threatening her and her family, and, you know, calling me a

21   rat, and saying that these individuals were not good people,

22   basically it wasn't comforting for me.

23   Q    Let's look at Government's Exhibit 718, which is not yet in

24   evidence.

25        What is this?

JONATHAN YIOULOS - Direct

1              MR. FIELDS:  We can scroll down.  Keep going.

2    Q    Do you recognize that?

3    A    Yes.

4    Q    What is it?

5    A    A text message conversation between myself and

6    Kimberley Tew.

7    Q    Did you review it before your testimony?

8    A    I did.

9    Q    Again, how do you know that this is a conversation between

10   you and Kimberley Tew?

11   A    The context of the conversation, involving the conspiracy

12   and references made to the conspiracy, and Michael, as well.

13             MR. FIELDS:  Your Honor, same thing, I would ask for

14   permission to publish this?

15             THE COURT:  So, this can be published, but not

16   admitted, at this time.

17   Q    All right.  Let's zoom in and let's read from the bottom,

18   up.

19   A    I said, *If you keep texting me, yes I'm done helping.*

20   *Because you are extremely rude and confrontational and think*

21   *I'm some sort of rat trying to fuck you guys over.  Just let me*

22   *deal with Michael.  Scream at him?  Right.*

23   Q    Let's stop there.  Did you prefer dealing with Michael?

24   A    I did.

25   Q    Why?

JONATHAN YIOULOS – Direct

1   *A*   Just because he was -- much calmer demeanor.

2   *Q*   Did you ever scream at him?

3   *A*   Absolutely.

4   *Q*   Why?

5   *A*   I mean, this whole situation was frustrating for me.  Just

6   continuously sending money out of a company that didn't have

7   any, doing unethical things, wanting it to be over and it never

8   seeming to end.

9   *Q*   Let's keep going up.

10  *A*   *Criminal?  Never said that.  Like what the fuck.  I've done*

11  *nothing but try to help.  You know how much has been sent.  I*

12  *don't need to rehash that.  Okay?  He knew that was coming.*

13  *That's why he got so much fucking money and that last wire.*

14  *Wait, wait, what?  Why are you sending me BTC right now?  And*

15  *the address isn't right.  Alphanumeric code with a Bitcoin™*

16  *wallet.  I'm trying to help.  I really am.  But how much do you*

17  *really think I can send out of this place?  Honestly though.*

18  *This was eight days ago.  Hold on.  How much have you sent*

19  *total?  I'm freaking out.  What happened?  Cause where would*

20  *this crypto be?  I can't fucking log into my Binance right now,*

21  *and haven't been able to for awhile cause I lost my*

22  *authenticator.  Why wouldn't you confirm the address with me.*

23  *Q*   Bianance.  Remind us, what is Bianance?

24  *A*   That was a platform to trade cryptocurrency on.

25  *Q*   Authenticator.  What is an authenticator?

JONATHAN YIOULOS - Direct

1   *A   It's a two-factor authentication.  So, I lost my password*

2   *to log into it, at that time, and so I could not actually get*

3   *into my account, because I couldn't authenticate it, that it*

4   *was actually me.*

5   *Q   Keep going.*

6   *A   I've sent Michael the new address a bunch of times.  And*

7   *these addresses are different.  The 2.5 and the .5.  You are*

8   *joking.  I would have gotten emails that I received money in my*

9   *account.  I have those enabled.  I don't hate you.  I just*

10  *don't believe I received these funds and I can't even check.*

11  *Q   Why didn't you believe her?*

12  *A   Because I believed that this was -- I believe she told me*

13  she sent me the Bitcoin™ to make me feel like I was getting

14  something out of this, and -- but never actually sent it,

15  because, one, she didn't have it, and they were asking for more

16  money.

17  *Q   Keep going.*

18  *A   Why wouldn't you have said something?  Why wouldn't Michael*

19  *have?  Why didn't I get emails?  I'm not saying you are lying,*

20  *but I'm just asking these questions.  Wonderful.  Okay what*

21  *happened?  No never.  I would never give anyone else these*

22  *addresses.  No.  Obviously.  I guess I'm not getting it.*

23  *Sorry.  I'm confused.  Will I ever get it?  Is it just gone*?

24  *Q   And the it there, what's the it you were referring to?*

25  *A   The Bitcoin™.*

JONATHAN YIOULOS - Direct

1   Q   Now let's look at Government's Exhibit 717.  Which is not

2   yet in evidence.  What is this?

3   A   A text message conversation between myself and Michael Tew.

4   Q   This is the same date as the earlier text explaining?

5   A   Yes.

6        MR. FIELDS:  Pursuant to the Declaration 1115, the

7   government moves this into evidence.

8           THE COURT:  Okay.  Seven-seventeen is admitted.

9           THE COURTROOM DEPUTY:  Admitted?

10          THE COURT:  Yes.

11  Q   What did you say?

12  A   I said, *Now Kimberley is texting me.  This is awesome.*

13  *It's like clockwork*.  He said, *I told her not to.  I'm on a*

14  *conference call.  I'll ring you after*.  I said, *Okay.  Done*

15  *helping you.  Your wife is now sending emojis, calling me a*

16  *rat.  Fucking brilliant.  Send a revised one.  Need it to say*

17  *March not February.  Actually, it's fine*. He said*, Okay.  For*

18  *you now it's a mistake.  Okay.  Yes?  It's done*.

19          MR. FIELDS:  You can take that down.

20  Q   All right.  So should be a Redweld® in front of you.  So, I

21  want to look now at --

22          MR. FIELDS:  I have given these exhibits to defense

23  counsel earlier.

24  Q   Government's Exhibits 601, 603, and 607 did you review

25  those before your testimony?

JONATHAN YIOULOS – Direct

1  A   Yes, I did.

2  Q   What are they?

3  A   These are invoices from Hannah Scaife.

4  Q   Are they attached to emails?

5  A   Yes, they are.

6  Q   From whom did you receive those emails?

7  A   Michael Tew.

8        MR. FIELDS:  At this time, I move into evidence,

9  Government's Exhibits 601, and 603 and 607, pursuant to the

10 Declaration that's 1130.

11       THE COURT:  Any objection to those three?

12       MR. SCHALL:  No objection, Your Honor.

13       MR. KAPLAN:  Your Honor, I have an -- I have, sort of,

14 an objection.  I think since there are different packets there,

15 without needing him to go through each individual one, rather

16 than this, do a blanket foundation from some previous view, I

17 would prefer, if the government indicated in each one, some

18 more foundation, as it relates to the categories of invoices

19 that are there.

20       THE COURT:  For each exhibit, you mean?

21       MR. KAPLAN:  Not for each exhibit.  They are grouped.

22       THE COURT:  Right.

23       MR. KAPLAN:  I'm looking for a compromise, so the

24 foundation is not totally outside of the court, without making

25 him go through every one, because who they are from and to are

JONATHAN YIOULOS - Direct

1    grouped by category.

2              THE COURT:  Fair enough.  So, if we could just explain

3    a bit more of how they're -- what is he looking at.

4    Q    Government's Exhibit 601, 603 and 607, what are those?

5    A    They are emails with invoices attached.  In Exhibit 601 it

6    is just an invoice from Hannah Scaife, CPA, with the email

7    attached to it.  And in Exhibit 603, it's another invoice, from

8    Hannah Scaife, email from Michael Tew, and then in Exhibit 607,

9    there's actually two invoices, here one of them is from Michael

10   Tew, himself, and the other is from Hannah Scaife.  Both of

11   these invoices are attached to emails sent by Michael Tew.

12             MR. FIELDS:  I move those exhibits into evidence.

13             MR. KAPLAN:  No objection.

14             THE COURT:  Those are admitted.  Thank you.

15        Q    (By Mr. Fields) You said that each of those had

16   invoices for Hannah Scaife?

17   A    Yes.

18   Q    Did you pay those invoices?

19   A    I did.

20   Q    Through which bank?

21   A    National Air Cargo Holdings, I believe.  I would have to

22   confirm via the bank account information.

23   Q    Well, regardless of which account it was, which bank

24   controlled those accounts?

25   A    National Air Cargo.

JONATHAN YIOULOS – Direct

1   *Q*   Which bank?

2   *A*   Oh, Signature Bank.  I'm sorry.

3   *Q*   Who instructed you to pay those invoices?

4   *A*   Michael Tew.

5   *Q*   Was Michael Tew in New York State when he gave you those

6   instructions?

7   *A*   He was not.

8   *Q*   Those invoices, that you paid, was that based on a false

9   pretense?

10   *A*   Yes, they were.

11   *Q*   What was the false pretense?

12   *A*   That these services were performed, when really they were

13   not.

14   *Q*   Performed by who?

15   *A*   Anybody.  These services never took place and never to the

16   benefit of National Air Cargo.

17   *Q*   So, let's look now at Government's Exhibit 601.  All right,

18   so, who is attached to this email?

19   *A*   Michael Tew.

20   *Q*   All right.  If you look at the date, where was Michael Tew

21   working at the time?

22   *A*   Out of Denver, Colorado, for National Air Cargo.

23   *Q*   Still working at National, at the time?

24   *A*   Yes.

25   *Q*   As the chief financial officer.  And read this for us.

JONATHAN YIOULOS – Direct

1    What does it say?

2    A    It says, JY, expense invoice for the financial consultant

3    attached.  I can send you the agreement with the consultant if

4    need be.  Easier just to the send the money to me and I will

5    pay them.

6         Then there's the wire instructions, ACH $15,000,

7    Michael Tew, Guaranty Bank & Trust Company, routing 102000966,

8    account 4000767867.

9    Q    So, I can send you the agreement with the consultant if

10   need be.  Easier just to send the money to me and I will pay

11   them.  Was it a common practice at National for you to pay

12   Michael Tew and for him to pay a vendor?

13   A    No.

14   Q    And do you see the email address down there at the bottom?

15   A    I do.

16   Q    You recognize it?

17   A    I do.

18   Q    Was that the email that Michael Tew used when he was at

19   National Airlines?

20   A    Yes, it was.

21   Q    If you could, please read it into the record for us.

22   A    Mtew@ctr.nationalairlines.com.

23   Q    So, that email address is a little bit different than

24   yours, at least the domain name at the end there?

25   A    Yes, it was.

207
JONATHAN YIOULOS – Direct

1   Q   Why is it different?

2   A   Because he was a consultant and not an actual employee of

3   the company.

4        MR. FIELDS:  If we could look at the next page.

5   Q   What is that up there?

6   A   That is the invoice from Hannah Scaife, CPA.

7   Q   Down there, the next page, are these followup exchanges

8   between you and Michael?

9   A   Yes, it is.

10       MR. FIELDS:  Take that down.  Let's look at

11  Government's Exhibit 602.  Not in evidence, yet.

12  Q   What is this?

13  A   This is a text message conversation between myself and

14  Michael Tew on Tuesday, August 7th, 2018.

15  Q   Same day as that email that we just looked at?

16  A   Yes, it was.

17       MR. FIELDS:  Pursuant to the Declaration, Government's

18  Exhibit 1115, the government would move this into evidence.

19       THE COURT:  All right, 602 is admitted.

20  Q   If you could please read it for us.

21  A   He said, *Let me know when you have five minutes to speak.*

22  I said, *Now is fine.* He said, *Received?* I said, *Yeah. Call*

23  *me as soon as you can.  Leaving in a minute.*  He said, *Will*

24  *resend ASAP.  Thank you.  Should I email Kim to pull it*?  I

25  said, *Working from my computer now.  Send your invoice, with*

JONATHAN YIOULOS - Direct

1    *just Feign Consulting Invoice attached for fees.  I will be*

2    *working for 1.5 hours.*  He said, *Will do.  You're a good man.*

3    *Not sure why you are doing this for me?  Just need to get out*

4    *of the Sam.*  I said, *All good.  You work your ass off.  Let's*

5    *just keep rolling, guarantee account.  15K ACH today, right?*

6    *ACH is our -- out.*  He said, *Thank you.  Sent you invoice to*

7    *load into the system.*

8    Q    *You are a good man, not sure why you are doing this for me.*

9    What was *this*?

10   A    Sending him the funds.

11   Q    Was he entitled to receive those funds?

12   A    No, he was not.

13   Q    Has Chris Alf or anyone authorized him to receive that

14   money?

15   A    No.

16   Q    Hannah Scaife, did you ever meet Hannah Scaife?

17   A    No.

18   Q    Did Michael ever tell you about her?

19   A    That she was a friend of his and Kimberley's, that they

20   knew, that eventually went crazy.  That's all I know.

21   Q    These invoices for Hannah Scaife, was there a cover story

22   in case anyone asked about them?

23   A    Yes.

24   Q    What was the cover story?

25   A    That they were just for consulting fees.

                        JONATHAN YIOULOS - Direct

1    Q   Was there a particular deal going on around this time?

2    A   Yes.

3    Q   What was the deal?

4    A   Deal with HNA.  HNA was a large conglomerate company, and

5    National was trying to either get part of it bought out by HNA

6    or partner with HNA to do additional work.

7    Q   Where was that company based?

8    A   China.

9    Q   All right.  Now, similarly, we're going to look at a couple

10   of exhibits here, also been reviewed by defense counsel.  I

11   think you mentioned earlier a company called Jessamine

12   Development?

13   A   Yes.

14   Q   If you look in that folder there you will see -- just hold

15   on for one second.  See a folder for Jessamine Development.

16           THE COURTROOM DEPUTY:  JD?

17           MR. FIELDS:  Yep.  If you could, for each of those,

18   just read off the exhibit numbers that are on the bottom there.

19   A   Okay.  Exhibit 611, Exhibit 629, Exhibit 638, Exhibit 642,

20   and Exhibit 674.

21   Q   Did you review those exhibits before your testimony?

22   A   Give me a second to just make sure.  Yes, I did.

23   Q   What are they?

24   A   They are email conversations and invoices from Jessamine

25   Development.

JONATHAN YIOULOS - Direct

1    Q    Who sent them to you?

2    A    Chris Rincon.

3    Q    Did National Air Cargo maintain email records like that, in

4    the regular course of its business?

5    A    Yes, they did.

6    Q    And was National Air Cargo -- was its regular practice to

7    pay and receive invoices like that?

8    A    Yes.

9         MR. FIELDS:  Your Honor, at this time I move into

10   evidence Government's Exhibits 611, 629, 638, 642 and 674.

11        THE COURTROOM DEPUTY:  And, Your Honor, for what its

12   worth, 642 was previously admitted.

13        THE COURT:  Thank you.  Any objection to the others?

14        MR. SCHALL:  Can I have just a moment to look,

15   Your Honor?

16        THE COURT:  Hm-hm.

17        MR. SCHALL:  No objection, Your Honor.

18        MR. KAPLAN:  No objection.

19        THE COURT:  Okay.  Those others will also be admitted.

20   Go ahead.

21        MR. FIELDS:  Your Honor, at this point in time we're

22   going to be discussing, sort of, Jessamine Development.  I

23   don't know when the Court planned on breaking for lunch, but

24   now might be a good time?

25        THE COURT:  If you think it will take more than 10 or

JONATHAN YIOULOS - Direct

1    15 minutes then we can take a break.

2            *MR. FIELDS:*  Probably between 15 and 30.

3            *THE COURT:*  Let's go ahead then, and -- let's -- let's

4    break for lunch until -- if the jury would be back at 1:15, and

5    if counsel would be back at noon, just in case we have -- or at

6    1, I'm sorry, that would be good.  We will recess until then.

7            *THE COURTROOM DEPUTY:*  All rise.

8        (Jury out at 12:06 p.m.)

9        (In open court at 1:05 p.m.)

10           *THE COURT:*  All right.  Please take your seats.  My

11   understanding is, Ms. Hubbard, you may have an issue to

12   discuss?

13           *MS. HUBBARD:*  Feeling like a little bit of a

14   sacrificial lamb for the defense team.  I'm hoping you wouldn't

15   hold it against me.

16           *THE COURT:*  I was wondering why you had that look on

17   your face, but go ahead.

18           *MS. HUBBARD:*  My understanding is this afternoon the

19   government intends to introduce Government's Exhibits 974 and

20   975, which are recordings of monitored phone calls between

21   Jonathan Yioulos and Michael Tew, that were made on the day law

22   enforcement approached Mr. Yioulos.  That's the July 7th and

23   the next day.  These monitored phone calls occurred after

24   agents had approached Mr. Yioulos, confronted him about the

25   scheme that we're here at trial on, after agents had

JONATHAN YIOULOS – Direct

1   Mr. Yioulos sign a consent, allowing them to monitor the calls,

2   and government devices were used to record the call.  The

3   problem with admitting these calls is as it relates to

4   Kimberley Tew.  Under *Bruton*, as the Court knows, use of

5   testimonial statements made by one codefendant against another

6   implicates the confrontation clause; that is, to the extent

7   that Michael Tew's statements on those recordings implicate

8   Kimberley Tew.  We have no ability to confront Michael Tew in

9   this trial, and that's where the confrontation clause kicks in.

10  I'm aware of the *Samia* case from last term that kind of recited

11  *Bruton*, and the progeny from *Bruton* that have narrowed the

12  holding somewhat, but even the *Samia* case says that the

13  government has an obligation to, essentially, sanitize

14  codefendant statements to make sure they are not directly

15  implicating the other codefendant.

16          So, what we have on these recorded calls is multiple

17  references directly to Kimberley.  Multiple discussions of

18  facts that the government has alleged, go directly to the proof

19  in this case, including Mrs. Tew's gambling activity,

20  Mrs. Tew's connections to people like Mike Meyers, who, as the

21  Court, I don't think has heard yet, I anticipate is coming up

22  very quickly, submitted invoices for payment.  We have

23  references to trading in crypto, to gambling, and again

24  Mrs. Tew is charged not only with being part of the scheme, but

25  also laundering, so use of whatever happened with those

JONATHAN YIOULOS - Direct

1    proceeds goes directly to the laundering count.

2          I think the *Bruton*, *Samia* issues means that it would

3    violate Ms. Tew's confrontation clause to simply play those

4    recordings without any redaction, as I believe the government

5    is intending to do.

6          *THE COURT:* Okay.  Why don't I get the government's

7    response.  Thank you.

8          *MR. FIELDS:* Sorry, Your Honor.  This was just brought

9    up.  Obviously, it wasn't briefed at all in the *James* or

10   anything else.  So, again, this argument should be deemed

11   waived.  They had the opportunity to bring this way back during

12   the *James*.  They are waiting until the very last minute to

13   raise all of these arguments in a way that prevents really

14   thoughtful sort of process-driven results.

15          That being said, we don't even get to *Samia* and *Bruton*

16   because it is black letter, Supreme Court law, from *Crawford vs*

17   *Washington*.  Justice Scalia, if you recall, goes through -- he

18   starts discussing all of these old precedences and then very

19   specifically, inexplicitly, in a way designed to assure

20   practitioners about the scope of the rule, makes a bright-line

21   assertion that statements in furtherance of a conspiracy are

22   not testimonial.  That Supreme Court law has been adopted in

23   every Circuit, of course, including the Tenth, although I don't

24   have citations right now, because I was not able to do any

25   research beforehand, but the Court's ruling that the phone

JONATHAN YIOULOS - Direct

1    calls are in furtherance of the conspiracy takes us outside of

2    any confrontation clause problems.  They are non-testimonial,

3    so we don't even need to get to *Bruton* or anything else.

4         THE COURT:  When do you think you will get to these?

5         MR. FIELDS:  This afternoon.

6         THE COURT:  Like right now or --

7         MR. FIELDS:  No, probably --

8         THE COURT:  I guess my question is, can we do a chunk

9    of this, while I look at some of these cases, maybe you look at

10   some of the cases, and I can get a little more comfortable with

11   it before I rule on it.

12        MR. FIELDS:  Yeah.  I don't think we will be able to

13   do any research, Your Honor, you know, being from the

14   government, we don't have fancy hotspots or anything like that.

15   I can try to do some computer research on my phone to pull up

16   Tenth Circuit law -- cases.  *Crawford*, I can pull up that

17   citation, because that's easy enough, it's --

18        THE COURT:  Well, that one I can find myself.  So I

19   don't need that.  Maybe you could send that to -- back to the

20   office.  But, I guess my question is, do you plan to do it in

21   the next hour and a half?

22        MR. FIELDS:  No.

23        THE COURT:  All right.  Well let's -- let's do the

24   next hour and a half, then, and then we will revisit, take a

25   break somewhere in there and revisit it.

JONATHAN YIOULOS - Direct

1          If there's nothing else, let's the jury -- I don't

2    want to bring them back yet.  They still have a few minutes,

3    and I will take -- I will take another few minutes.  So, let's

4    just take a couple-minute break until 1:15 or so.

5          THE COURTROOM DEPUTY:  All rise.  Court is now in

6    recess.

7          (Recess at 1:12 p.m.)

8          (In open court at 1:22 p.m.)

9          THE COURT:  Please take your seats.  Can we go ahead

10   and bring the jury in, please?

11         THE COURTROOM DEPUTY:  All rise.

12         (Jury in at 1:24 p.m.)

13         THE COURT:  All right.  Let's take our seats.  Welcome

14   back, ladies and gentlemen.

15         Mr. Fields, when you are ready, you may go ahead.

16         THE GOVERNMENT:  Thank you, Your Honor.

17   BY MR. FIELDS:

18   Q   Mr. Yioulos, do you still have -- before we left for the

19   break, we were looking at Government's Exhibit 611, 629, 638,

20   642 and 674.  Do you remember that?

21   A   I do.

22   Q   Remind us what are those?

23   A   They were invoices and emails from Chris Rincon, relating

24   to Jessamine Development.

25   Q   Just so we have the full name, in the record.  When you say

JONATHAN YIOULOS - Direct

1    Jessamine Development, what was the full name of that company?

2    A    It was 5530 Jessamine Development, LLC.

3    Q    Those invoices that were attached to those emails, did you

4    pay them?

5    A    I did.

6    Q    Through which bank?

7    A    Signature Bank.

8    Q    Who instructed you to pay those invoices?

9    A    Michael Tew.

10   Q    Was Michael Tew in New York, when he gave you those

11   instructions?

12   A    He was not.

13   Q    Were those payments based on those invoices based on false

14   pretenses?

15   A    They were.

16   Q    What was the false pretense?

17   A    That the invoices were for services that were not actually

18   performed, and especially not performed in National Air Cargo's

19   benefit.

20       MR. FIELDS:  Let's look at one of these.  Let's pull

21   up Government's Exhibit 611.

22   Q    All right.  So, who is this email from?

23   A    Chris Rincon.

24       MR. FIELDS:  And let's go to page two.  Let's go to

25   page two.  Zoom out.

JONATHAN YIOULOS - Direct

1    Q    What is this?

2    A    This is an invoice from Jessamine Development.

3         MR. FIELDS:  And the next page, please.

4    Q    What is this?

5    A    This is an email that I had sent to Chris Rincon, copying

6    Michael Tew, for payment confirmation, that was also attached

7    in this email.

8         MR. FIELDS:  Next page.

9    Q    Is that one of those confirmations?

10   A    Yes, it is.

11   Q    So, let's go back to page three.  What was the email

12   address that was used to send these invoices to you?

13   A    That was sent to me?

14   Q    Yeah.

15   A    Okay.  *Chrisrncn@gmail.com.*

16   Q    Who is cc'd on this email?

17   A    Michael Tew.

18   Q    So, was he still employed at National, at this time?

19   A    Yes, he was.

20   Q    What date are we talking about here?

21   A    August 22, 2018.

22   Q    Pull up Government's Exhibit 613.  It's not yet in

23   evidence.  What is this?

24   A    A text message exchange between myself and Michael Tew.

25        MR. FIELDS:  Your Honor, pursuant to that Declaration,

218
JONATHAN YIOULOS – Direct

1   Government's Exhibit 1115, the government would move this into

2   evidence.

3          THE COURT:  Six-thirteen is admitted.

4   Q   What do you notice about the date?

5   A   Same date as the email.

6   Q   Okay.  Go ahead, read this to us.

7   A   Yes.  Michael said, *Wire st Tus*.  I said, *It's out.  Just

8   sent you the confirm*.  He said.  *Thank you.  Holy duck, this

9   Boeing Plane deal.*  Then he said, *What us your BTC address*?  I

10  sent him my Bitcoin™ wallet address, alphanumeric characters.

11  He sent back the Blockchain, essentially receipt of the

12  transaction.  I said, *Thank you.  Got it.*  He said*, Happy*?

13  Q   Now let's look at another exhibit that's not yet in

14  evidence, Government's Exhibit 614.  What is this?

15  A   Text message exchange between myself and Michael Tew, on

16  Thursday, August 23rd, 2018.

17  Q   Is that the next day?

18  A   Yes.

19         MR. FIELDS:  Your Honor, pursuant to that Declaration,

20  at 1115, the government would move this into evidence.

21         THE COURT:  It's admitted.

22  Q   All right.  Could you read this for us?

23  A   Yes.  It says, *Hell yes.  Thank you and thank Kimberley for

24  me too.*  He said, *That account number for Jessamine Development

25  was wrong.  Guy gave us the wrong account number.  There's only

JONATHAN YIOULOS - Direct

1  *one five in the account number, 775232171.  Yes.  Can you*

2  *resubmit?  Yes.  Not your fault.  Thanks.  Guy gave bad wire*

3  *instructions.  Thanks.  That wire is out.  Funds hit.  Thank*

4  *you.  Finally.  No problem.*

5  Q   Very top message.  Why were you thanking Kimberley?

6  A   Because she was the one who helped coordinate the Bitcoin™

7  getting back to me.

8  Q   Now, let's look Government's Exhibit 615, which I do not

9  believe is in evidence.

10      *THE COURTROOM DEPUTY:*  Correct.

11  Q   What is this?

12  A   Email exchange between myself and Chris Rincon, with

13  Michael Tew, copied on it.

14      *MR. FIELDS:*  Pursuant to the Declaration, Government's

15  Exhibit 1130, the government would move this one into evidence?

16      *THE COURT:*  Any objection?

17      *MR. SCHALL:*  Your Honor, just the witness said it was

18  an email, but he didn't -- I don't know that he authenticated

19  as one he had seen or sent, all of that.

20      *THE COURT:*  A little bit more.

21      Q   (By Mr. Fields) Was this an email that you personally

22  received?

23  A   Well, it's an email that I had received and also sent.

24  Q   Are you familiar with it?

25  A   I am.

JONATHAN YIOULOS – Direct

1    *Q*   Was it the regular practice of National to keep copies of

2    emails like these in its records?

3    *A*   Yes.

4    *Q*   Was it the regular practice to engage in email

5    correspondence about records like these?

6    *A*   Yes.

7         *MR. FIELDS:*  Pursuant to that Declaration, 1130, the

8    government would move this into evidence.

9         *MR. SCHALL:*  No objection.

10        *MR. KAPLAN:*  No objection.

11        *THE COURT:*  It's admitted.

12   *Q*   All right.  If we go to page three of this email.  What is

13   this?

14   *A*   This is the wire confirmation.

15        *MR. FIELDS:*  Now, we've already looked at Government's

16   Exhibit 611, which had one of those payment confirmations.

17   Let's compare them side-by-side, if we can.  So, on the left,

18   let's put Government's Exhibit 615, page three -- well, now on

19   the left, let's put Government's Exhibit 611, page four.  If

20   you look at the recipient account information.  Let's try to

21   blow those up.

22   *Q*   What do you notice?

23   *A*   In the -- Exhibit 611, on the left, there's two fives in

24   the account number, and then in Exhibit 615, on the right,

25   there's only one five in the account number.

JONATHAN YIOULOS - Direct

1    Q    How, if at all, is that consistent with the text exchange?

2    A    Michael had informed me that the account number that was

3    given to him was incorrect, and that I needed to send out a new

4    wire to this new account number with only one five in the

5    account number.

6         MR. FIELDS:  Now, let's look at Government's Exhibit

7    625, which is not yet in evidence.  Put that on the full

8    screen.

9    Q    What is this?

10   A    This is a text message conversation between myself and

11   Michael Tew on Friday, September 7th, 2018.

12        MR. FIELDS:  Pursuant to that Declaration, at 1115,

13   the government would move this into evidence.

14        THE COURT:  It's admitted.

15   Q    What did you say?

16   A    I said, *Hey, I need another Jessamine invoice for the last*

17   *amount you had me pay the other day*.  He said, *Will do*.  I

18   said, *We also have to talk payables and whatnot.  Give me a*

19   *call when you have some time*.

20        He said, *Yes, will do, BRB, been working around the*

21   *clock, Hong Kong and London hours*.

22        I said, *By the way, not to stress you out, but I'm*

23   *going to start getting shit from Abby, since August 2nd, we've*

24   *sent you 77,500.  That's one month.  I know Jessamine was its*

25   *own thing, but that's another 45K, plus we're eating the Amex*

JONATHAN YIOULOS - Direct

1    *costs at 45K.  That's 167K in one month, essentially.  And*

2    *another 30K to Schaife, that's 200K.  Okay.  Getting caught up.*

3    Q    That 200K, by September 7th, 2018, was Michael Tew still

4    working the National, at that point?

5    A    Yes.

6    Q    Look at Government's Exhibit 638, which has already been

7    admitted.  Is this an email from Chris Rincon to you?

8    A    Yes.

9    Q    And now let's go to page two.  Another one of those

10   invoices?

11   A    Correct.

12   Q    Now page three.  All right.  What did you write to Chris

13   Rincon, in response to his email about the attached invoice?

14   A    I said, *Hi, Chris, I wanted to inform you that Michael is*

15   *no longer with National, as you may or may not know.  It's very*

16   *unfortunate, but I will make sure this invoice gets taken care*

17   *of.  Also, do you happen to have a copy of the consulting*

18   *agreement?  It would be helpful to have that on record, as I*

19   *recall Michael did say that you did work through September, so*

20   *this would be the last invoice.  Thank you.*

21   Q    Does that help you, generally, remember when, exactly,

22   Michael Tew was terminated?

23   A    Yes.

24   Q    When, approximately, was Michael Tew terminated?

25   A    September of 2018.

JONATHAN YIOULOS – Direct

1    Q    Now, during the --

2         MR. FIELDS:  Let's look at Government's Exhibit 639.

3    Q    What is this?

4    A    A text message conversation between myself and Michael Tew.

5    Q    Is it on the same date as the email that we just looked at?

6    A    Yes, it is.

7         MR. FIELDS:  Pursuant to that Declaration, at 1115,

8    the government would move this into evidence.

9         THE COURT:  Okay.  Six-thirty-nine is admitted.

10   Q    Read this for us.

11   A    He said, *Any news*?  I said, *I don't know what I can*

12   *possibly do.  It's way too risky, even to Jess*?  *Yes.  I can't*

13   *pay invoices from HK Investing without them coming from either*

14   *you or Chris.  I literally don't know what to do.*

15        He said, *Okay.  So they're watching invoices*?  *I'm*

16   *screwed, bro.  If this is the last one, obv, you think they*

17   *will notice*?  I said, *Hey, Got an email from Chris Rincon, HK*

18   *Consulting, going to email, tell him slash her you're no longer*

19   *employed with National but it looks like we have one more*

20   *invoice to pay, is that fine?  Assuming you have a personal*

21   *relationship, can you get the consulting agreement too, just in*

22   *case I need it?  Really appreciate it.*  Then the same message

23   again, next.

24   Q    Scroll down.

25   A    I said, *Don't forget to get the consulting agreement.*  He

JONATHAN YIOULOS – Direct

1    said, *Won't, working on it, finding it, thank*s.

2    Q    All right.  Do you see where it says *Chris Rincon HK*

3    *Consulting*?  What is that in reference to, HK Consulting about?

4    A    Hong Kong Consulting.

5    Q    Was he really associated with Hong King Consulting?

6    A    No.

7         MR. FIELDS:  You can take that down.

8    Q    During the period of time that you were getting invoices

9    from Scaife and 5550 Jessamine Development, did that period of

10   time overlap a little bit?

11   A    Yes.

12        MR. FIELDS:  Let's look at Government's Exhibit 628,

13   which I do not believe is in evidence.  Now, if we could --

14   let's scroll down so you can look through it.

15   Q    Did you review this message before your testimony?

16   A    I did.

17   Q    What is it?

18   A    A text message conversation between myself and

19   Kimberley Tew.

20   Q    How do you know it was Kimberley Tew?

21   A    Because of the nature of the conversation, references to

22   Michael and the conspiracy.

23        MR. FIELDS:  Your Honor, I would ask for permission to

24   publish?

25        THE COURT:  You can publish, but it's not admitted

JONATHAN YIOULOS - Direct

1   yet.  Go ahead, Mr. Keech.

2   Q    What did you say to Kimberley?

3   A    I said, *Yeah.  I need Michael to send me two invoices for*

4   *Jessamine.  One for last time.  Sure, I just need Michael to*

5   *send me an email asking me to pay?  It will help with Abby*

6   *asking questions.  Yeah, that would be great.  If I have an*

7   *invoice, a W-9, Michael copied on the email.  It would be easy.*

8   Q    What is a W-9?

9   A    It's an important documentation that we receive from

10  vendors, with all of their business information, their tax

11  identification number, their address, their name.  We had a

12  policy at National that we ended up making, eventually, that we

13  needed to have -- every vendor needed to have a W-9 in the

14  system, prior to payment.  That was just to ensure that at the

15  end of the year we were not chasing down W-9s, because Abby

16  would need the W-9 with the employer identification numbers and

17  everything like that, to send out the 1099s.  So, instead of

18  having her have to chase, at the end of the year, we would have

19  it already.

20  Q    So is it a tax form?

21  A    It is a tax form.  Yes.

22  Q    How is it used in the administration of taxes?

23  A    Essentially it's on file, and it has all of their

24  identification numbers.  Each business has their own tax ID

25  number, and if we issued the W-9 and filed it -- or the 1099

JONATHAN YIOULOS – Direct

1    and filed it, that information was part of the IRS, and they

2    would be subject to taxes on those funds that they received

3    during the year.

4    Q   Let's keep going.

5    A   *Just sent Michael an email.  It's super important I get*

6    *those things.  Schaife need a W-9.*

7    Q   Let me stop you there.  Why were you asking Kimberley to

8    give you a W-9 for Schaife?

9    A   Because Michael indicated that she was a colleague of both

10   him and Kimberley.

11   A   *Just give me some sort of info for Schaife.  Need address,*

12   *phone, et cetera.  Ten min.  This literally has to be the last*

13   *one for this consultant, because the other ones were supposed*

14   *to be the last as well.  Can't do anymore for this one.*

15   Q   Why were you saying you couldn't do anymore for this one?

16   A   I'm not sure.

17   Q   Go up.

18   A   *Hey, all set.  It's an ACH, funds hit tomorrow.  It was the*

19   *only thing I could do.  You have to trust me on that.  Too many*

20   *questions other wise.  I'm sorry.  Maybe.  It just draws a lot*

21   *more attention.  Especially because I'll have to recall the ACH*

22   *okay.  I'll try to get it out around 1:30 my time.  Wire is*

23   *ready to go but waiting on Abby approval.  Wire is out.*

24   Q   Would you talk to Kimberley about ACH and wire payments?

25   A   Yes.

JONATHAN YIOULOS - Direct

1   Q   Did she have a preference for one over the other?

2   A   Preferred wire payments.

3   Q   Why?

4   A   Because the funds would arrive instantaneously,

5   essentially, maybe there was a five- ten-minute lag, but they

6   arrived that same business day.

7   Q   Did you have any conversations with Kimberley about, sort

8   of, the speed by which you were able to pay her?

9   A   Yes.

10  Q   What kind of conversations?

11  A   I prefer to send ACH payments, because I could control

12  those myself.  I didn't have to get a secondary approval.  She

13  wanted the payments quicker, so she preferred wires.

14  Q   She explain why she needed the money so quickly?

15  A   Because the -- because there were people who were asking

16  her for the funds, and she needed to get that money to those

17  people quicker.

18          MR. FIELDS:  All right.  We can take that down.

19  Q   Christian Rincon, person associated with 5530 Jessamine

20  Development, did you meet him?

21  A   No.

22  Q   What did you know about him?

23  A   Nothing.

24  Q   Was there another company used after 5530 Jessamine

25  Development?

JONATHAN YIOULOS - Direct

1   A    Yes.

2   Q    Which company was that?

3   A    Meyers Consulting.

4   Q    Now, as part of this, you know, course of conduct between

5   2018 and 2020, did you think you were more or less likely to

6   get caught if you paid the money to multiple companies or just

7   one company?

8   A    I wanted to pay it to multiple companies.

9   Q    Why?

10  A    Spread out the expense.  You know, having a lot of money

11  going to one specific vendor for consulting fees, or any other

12  type of service, may have raised some red flags within anybody

13  checking on the books; such as, auditors or internally with

14  Abby or doing payables or vendors.

15  Q    So, same thing we did, sort of, before in that Redweld®

16  there, you will see one for Meyers Consulting Group.

17          THE COURTROOM DEPUTY:  I'm sorry, for who?

18          MR. FIELDS:  Meyers Consulting Group.

19          THE COURTROOM DEPUTY:  MCG?

20          THE GOVERNMENT:  Yep.

21          THE WITNESS:  Thank you.

22      Q    (By Mr. Fields) If you could read off, slowly, for

23  our court reporter, each of the exhibit numbers in there.

24  A    Yes.  Exhibit 647, 649, 680, 692, and that is it.

25  Q    Did you review those before your testimony?

JONATHAN YIOULOS – Direct

1   A   Just want to make sure they are the same ones.  Yes, I did.

2   Q   What are they?

3   A   They are emails and invoices and other -- W-9s from Meyers

4   Consulting Group.

5         MR. FIELDS:  At this time, pursuant to the

6   Declaration, at Government's Exhibit 1130, the government would

7   move Government's Exhibits 647, 649, 680 and 692, into

8   evidence.

9         THE COURT:  Any objections?

10        MR. SCHALL:  None, Your Honor.

11        MR. KAPLAN:  No, Your Honor.

12        THE COURT:  All right.  Those are admitted.

13  BY MR. FIELDS:

14  Q   Let's look at Government's Exhibit 649.  Is this one of

15  those exhibits that we just looked at?

16  A   Yes.

17  Q   Again, what is it?

18  A   It's an email from Meyers Consulting Group, to myself, with

19  invoice attached.

20  Q   Now, you say an invoice is attached.  How was this invoice

21  attached?

22  A   As a PDF.

23  Q   In some of the prior emails we looked at there was, sort

24  of, an attachment just below the subject line.  This one

25  doesn't have that.  So, why do you say there was an invoice

JONATHAN YIOULOS – Direct

1   attached?

2   A   Because some of these emails, the PDF would actually take

3   you to an online website, so you would be viewing the PDF

4   online instead.  I don't know why it wouldn't be showing up

5   here.

6   Q   What did you do when you went online and saw the invoice?

7   A   Pay it.

8   Q   Did you collect them for National's files?

9   A   Yes.

10  Q   What would you do with those?

11  A   Either forward it to -- I would typically forward it to the

12  accounts payable clerk, but there was a couple that I just put

13  into the system myself.

14  Q   Now, let's look at another Exhibit, not yet in evidence.

15  It's Government's Exhibit 683.  What is this?

16  A   This is an email from myself, to Kim Singer, another

17  employee at National.

18  Q   What's attached to it?

19  A   There's two invoices from Meyers Consulting.

20  Q   And if we scroll down to the next pages.  Are those the

21  attached invoices?

22  A   Yes, they are.

23      MR. FIELDS:  Your Honor, at this time, pursuant to the

24  Declaration that's Government's Exhibit 1130, the government

25  would move this into evidence.

JONATHAN YIOULOS – Direct

1          MR. SCHALL:  No objection.

2          MR. KAPLAN:  No objection.

3          THE COURT:  It's admitted.

4   Q   So let's, first of all, *ksinger@nationalaircargo.com*.  Who

5   is Kim Singer

6   A   She was another accounts payable clerk.

7   Q   And what did you tell her to do?

8   A   To put the invoices into the system and apply a payment

9   that was already on the books to one of the invoices.

10  Q   Let's go to the next page.  These those invoices?

11  A   Yes.

12  Q   So, this first one, the description.  What's the

13  description there?

14  A   Consulting fee.

15  Q   And the next page.  What's that one?

16  A   Also, consulting fee.

17  Q   Now, Government's Exhibit -- let's look at Government's

18  Exhibit 694.  What is this?

19  A   This is an email from myself to Kim Singer, with another

20  invoice attached, from Meyers Consulting.

21          MR. FIELDS:  At this time, pursuant to that

22  Declaration, that's Government's Exhibit 1130, we would move

23  this one into evidence.

24          MR. SCHALL:  No objection.

25          MR. KAPLAN:  No objection.

JONATHAN YIOULOS – Direct

1          *THE COURT:*  It's admitted.

2    *BY MR. FIELDS:*

3    *Q*   If we go to page two.  This just another one of those

4    invoices?

5    *A*   Yes.

6    *Q*   Similarly, just for a consulting fee?

7    *A*   Yes.

8    *Q*   All right.  One more of these.  Let's look at Government's

9    Exhibit 657.  What is this?

10   *A*   This is an email from Kim Singer, to myself, relating to

11   Meyers Consulting Group, LLC as the subject.

12   *Q*   Go down to the next page.  Is that your response to her?

13   *A*   Yes.

14   *Q*   Then the next page.  The next page.  Is that an invoice and

15   a W-9 that you sent to her?

16   *A*   Yes.

17         *MR. FIELDS:*  Your Honor, at this time, pursuant to the

18   Declaration, that's Government's Exhibit 1130, we would move

19   these into evidence.

20         *THE COURT:*  Any objections.

21         *MR. SCHALL:*  No objection.

22         *MR. KAPLAN:*  No objection.

23         *THE COURT:*  They are admitted.

24   *Q*   All right.  So let's go back to page one, so we can see

25   here.  Kim was in accounts payable?

JONATHAN YIOULOS – Direct

1    A    Yes.

2    Q    Would they sometimes ask you about invoices that weren't

3    yet in the system?

4    A    Yes.

5    Q    Why would they do that?  Or how would they know there was

6    no invoice in the system?

7    A    Because I would send out -- occasionally, I would send out

8    payments by request, sometimes for legitimate purposes and

9    other times for fraudulent purposes, with no actual invoice on

10   file, and when there was a credit balance on the account or a

11   payment that was unapplied to an invoice, they wanted an

12   invoice to match that payment up to.

13           MR. FIELDS:  And if we go to on page four.

14   Q    What is this?

15   A    This is a W-9 form.

16   Q    For who?

17   A    Michael Meyers.

18   Q    Who is Michael Meyers?

19   A    He was the consultant at Meyers Consulting Group.

20   Q    Did you ever actually meet him?

21   A    I did not.

22   Q    We will go back to that.  But do you know how you got this

23   W-9?

24   A    Through an email from Michael Meyers.

25           MR. FIELDS:  All right.  You can take that down.

234
JONATHAN YIOULOS - Direct

1  *Q*  So, some of those emails, you were forwarding invoices to

2  accounts payable.  If there are other invoices in National Air

3  Cargo's system, relating to Meyers Consulting Group, how would

4  they have gotten there?

5  *A*  From either Kimberley -- not Kimberley -- Kim Singer

6  inputting them, herself, if there are any others that she did

7  not put in, I would have manually uploaded them into the

8  system, as well.

9  *Q*  Now, let's look at Government's Exhibit 537.  Now, 540,

10  541, 542 and 543.

11       Do you recognize each of those documents?

12  *A*  I do.

13  *Q*  What were they?

14  *A*  Invoices from Meyers Consulting Group.

15       *MR. FIELDS:*  Your Honor, at this time, the government

16  would move into evidence, Government's Exhibits 537, 540, 541,

17  542, and 543, through the Declaration this time at 1134.

18       *THE COURT:*  Any objections?

19       *MR. SCHALL:*  No objection.

20       *MR. KAPLAN:*  No objection.

21       *THE COURT:*  Those are admitted.

22  *Q*  Look at Government's Exhibit 537.  Is there handwriting on

23  there?

24  *A*  Yes.

25  *Q*  Whose handwriting is that?

JONATHAN YIOULOS – Direct

1    *A*    Mine.

2    *Q*    So, I think you can do this on your screen.  Try to circle

3    where you see your handwriting?

4    *A*    (Witness complies)

5    *Q*    Is that a J and a Y?

6    *A*    It is.

7    *Q*    Why did you put JY on this one?

8    *A*    To indicate that I had approved this vendor, and the date

9    that I had received the invoice and approved it.

10   *Q*    So each of these invoices, 537, 540, 541, 542 and 543, did

11   you pay those invoices?

12   *A*    I did.

13   *Q*    Through which bank?

14   *A*    Signature Bank.

15   *Q*    Who instructed you to pay those invoices?

16   *A*    Michael Tew.

17   *Q*    Was Michael Tew in the State of New York when he gave you

18   those instructions?

19   *A*    No, he was not.

20   *Q*    These payments that you made, based on these invoices, were

21   they based on false pretenses?

22   *A*    They were.

23   *Q*    What was the false pretense?

24   *A*    That these invoices were for consulting fees, relating to

25   work that was performed by National Air Cargo, when none of

JONATHAN YIOULOS – Direct

1    these fees were actually uncured by National Air Cargo.

2    Q    Did you text with Kimberley Tew about Michael Meyers?

3    A    Yes.

4    Q    Did you also just talk to her about Michael Meyers?

5    A    I did.

6    Q    What did she say about Michael Meyers?

7    A    That he wasn't a great person, that he was smarter than

8    Chris Rincon, that he wanted his money.

9    Q    Now, I want to show you Government's Exhibit 637.  Not yet

10   in evidence.  And I will slowly scroll through so you can see

11   it.  Did you review this before your testimony?

12   A    I did.

13   Q    What is it?

14   A    It's a text message conversation between myself and

15   Kimberley Tew.

16   Q    Again, how do you know that?

17   A    From the context of the conversation, references made to

18   Michael Tew and references to the conspiracy.

19        MR. FIELDS:  Your Honor, we would ask for this to be

20   published, and I would also just note that this, in particular,

21   is one of the messages that was the subject of our pretrial

22   conference.

23        THE COURT:  Okay.  And we've discussed this.  It will

24   be published at this time.

25   Q    All right.  Can you start reading it for us, please, from

JONATHAN YIOULOS – Direct

1  the bottom up.

2  A   Yes.  I said, *Yeah.  I'm not staying for long.  Without*

3  *Michael, this job is going to be impossible.  I just tried*

4  *calling him ... Yeah, but at what point is salary and the*

5  *bullshit not worth it*?

6  Q   Is this on September 18th, 2018?

7  A   Yes.

8  Q   Same day you were texting with Michael about those emails

9  that we discussed earlier?

10  A   Yes.  *You say exactly why you didn't pay it.  You were*

11  *being blackmailed and why would you pay something when you*

12  *can't afford it?  Well, why would you pay something when being*

13  *blackmailed?  That doesn't make sense.  Just hear me out ... it*

14  *makes no sense to pay money back when being blackmailed.  Can*

15  *we talk tomorrow?  Be easier for me anyway ...  I don't know*

16  *what to do or tell you.  I really don't.  I feel so fucking*

17  *bad.  You guys are getting fucked over by this scumbag Craig.*

18  *You guys were being blackmailed and you would do anything to*

19  *keep yourselves safe, that's all there is to it.  Super fucked.*

20  *Let's talk tomorrow ... it is 1000 percent fraud.  No, no, no,*

21  *no.  You have legitimate proof, this Craig guy blackmailed you*

22  *though.  I'll talk to Michael in AM.*

23  Q   That reference to Michael, was that reference to

24  Michael Meyers or Michael Tew?

25  A   Michael Tew.  *We will.  I promise.  You won't.  Hi.  You're*

JONATHAN YIOULOS – Direct

1    *joking, right?  I can't text.  By who?  I already told Michael*

2    *I'm calling at noon.  I just can't text right now, because I'm*

3    *swamped.*

4    *Q*   Okay.  All right.  And I think you referenced National

5    issuing 1099s at the end of the year?

6    *A*   Yes.

7    *Q*   Were some of those 1099s directed towards Michael Meyers?

8    *A*   Yes.

9    *Q*   As the end of the year approached in 2018, were you worried

10   what would happen as those 1099s were being prepared?

11   *A*   Yes.

12   *Q*   Let's look at Government's Exhibit 697.  What is this?

13   *A*   This is a text message conversation between myself and

14   Michael Tew, on Wednesday, December 19th, 2018.

15        *MR. FIELDS:*  Pursuant to the Declaration, Government's

16   Exhibit 1115, we would move this in evidence.

17        *THE COURT:*  All right, 697 is admitted.

18   *Q*   Can you read this for us, please.

19   *A*   He said, *In the air.  Can you ACH 15K to Meyers*?  I said,

20   *No.  Why do you insist on this?  I don't want to hear that name*

21   *ever again, honestly.  Like, I'm trying to help, I really am,*

22   *but I get physically ill every time I hear that name.  You know*

23   *I can't send out more for consulting.  It's ridiculous.  If I*

24   *send out anymore, I will get caught.  We've sent over 225,000*

25   *to Meyers and Jess.  What else can I really do?  I even sent*

JONATHAN YIOULOS - Direct

1    *out money to Political Media.*

2        He said, *Right*.  And I said, *Do you really understand*

3    *though?  That's a lot of money out of NAC.  Like, that's*

4    *straight jail time, and I mean that.  I wake up at night*

5    *constantly worried.*

6        I said, *Look, I know it's not you, but sometimes I*

7    *don't think you know the gravity of the situation sometimes.*

8    *Cash is super tight here, and I am sending off payments to*

9    *consultants and shit.  Plus I have to tiptoe around this shit*

10    *because Abby does all of the 1099s at the end of the year, and*

11    *I am praying to God she doesn't ask too many questions.*

12        He said, *Q.  Does she do them at the end of this year*

13    *or beginning of next*?  I said, *I still don't have an agreement*

14    *from you regarding Meyers/Jess.  Nothing.  I have asked for*

15    *months and still have nothing.  I'm sorry.  It's just*

16    *frustrating.  I'm trying to help.  I really am, but I have got*

17    *nothing back.*

18        He said, *Just in terms of actually getting them done*

19    *and out*.  He said, *Beginning of next, I'm assuming*.

20    *Q*  You can take that down.  Do you remember describing the

21    circumstances behind Michael Tew's termination?

22    *A*  Yes.

23    *Q*  Were you ever afraid what happened to Michael might happen

24    to you?

25    *A*  Yes.

240
JONATHAN YIOULOS – Direct

1    Q    Why?

2    A    Because I didn't know if one of these individuals, Chris or

3    Michael Meyers, were going to reach out to the company, if they

4    weren't given their funds.  You know, reach out to Chris, Lori,

5    anybody in HR, and then the same type of thing would happen to

6    me.  So I was concerned about that.

7    Q    Did you ever discuss that with Michael?

8    A    Yes.

9    Q    Did you ever discuss that with Kimberley?

10   A    Yes.

11   Q    Let's look at Government's Exhibit 649.  Not yet in

12   evidence -- oh, no, I think this is in evidence.

13          Look at that.  What is this?

14   A    This is an email with an attached invoice from Meyers

15   Consulting Group.

16   Q    That's Michael Meyers?

17   A    Yes.

18   Q    Is this the day before Halloween?

19   A    Yes.

20   Q    Let's look at Government's Exhibit 650, which is not yet in

21   evidence.  What is this?

22   A    Text message conversation between myself and Michael Tew on

23   the same date, Tuesday, October 30th, 2018.

24          MR. FIELDS:  Your Honor, pursuant to that Declaration,

25   Government's Exhibit 1115, we move this into evidence.

JONATHAN YIOULOS - Direct

1          THE COURT:  Six-fifty is admitted.

2    Q    Please read this for us.

3    A    I said, *This is a joke, right*?  He said, *This is not a*

4    *joke.  My life is not a joke, but I have become a joke, and*

5    *things are out of my control, because other people make choices*

6    *that fuck me.*  He said, *Did you block Kimberley*?  I said, *No.*

7    He said, *You don't get it, 10K saves my life right now.  None*

8    *of this should have ever happened.*  I said, *I can't do it.*

9    *Literally you guys just keep asking me for fucking money.  It's*

10   *become absolutely ridiculous.  Like it's just wire after wire*

11   *after wire.  I know you didn't get a severance, and yes it's*

12   *bullshit.  But it becomes too fucking risky for me to do this*

13   *shit.  I literally can't do it.  I have to say no at some*

14   *point.  I'm sorry.*

15          He says, *Saying no is what started this.  You are in*

16   *charge.  Don't put this on us.  I'm not doing this.  I'm not*

17   *lying another minute.  This was never my idea.  I can't look at*

18   *these texts and not think it makes me look guilty as shit.*

19          I said, *Ha-ha okay.  Look, I have never done anything*

20   *but try to help you guys out of a jam.  I've tried to help you*

21   *at every corner, because of that, I'm guilty of this shit too,*

22   *which is fucking ridiculous, because I'm the one taking all of*

23   *the risk, and for what*?

24          He said, *Sorry, I lost you.*  I said, *Don't you ever*

25   *threaten me or my wife again.  Like, it's 10K.  Figure it the*

JONATHAN YIOULOS - Direct

1  *fuck out*.  He said, *Hey I never threatened you or your wife*.

2  *Never*.

3            He said, *We already gave them 10K*.

4  Q   Let's stop for a second there.  *Sorry, I lost you*.  Do you

5  have a distinct memory of this text exchange?

6  A   I do.

7  Q   Was there a call in the middle of it?

8  A   Yes.

9  Q   What happened during that call?

10 A   The connection was lost.

11 Q   What were you discussing on the call?

12 A   The conspiracy, whether or not I could get more money up.

13 Q   Do you recall, was there a threat made during that call?

14 A   Not during that call, no.

15 Q   Okay.  Let's keep going.

16 A   He said, *We already gave them 10K*.  He said*, To make sure*

17 *they don't.  Not joking.  To be clear, I never threatened you.*

18 *I am just communicating*.

19            I said, *This is fucking unreal*.  He said, *When*

20 *Kimberley told me Craig would call Lori, I didn't believe it*

21 *and I felt the same way*.

22 Q   So, Michael Tew says *I never threatened you*.  What was

23 happening -- what happened during that phone call?

24 A   He specifically did not threaten me.  Basically, told me

25 that -- or during that phone call did not threaten me at all.

JONATHAN YIOULOS – Direct

1    He said that these individuals could reach out to myself or my

2    wife, and that these weren't very good individuals to,

3    basically, be enemies with.

4    *Q*    And, you know, there is a reference there to *we already*

5    *gave them 10K*.  Who is the *we* that Michael Tew was referring

6    to?

7    *A*    Him and Kimberley.

8    *Q*    All right.  Let's go to the next page.  Okay.  Keep

9    reading.

10   *A*    He said, *I need to know if you can make that wire happen*

11   *today*.  *If I go back to them about a story about an ACH it*

12   *could just make it worse*.  *If you don't think you can send a*

13   *wire today don't send anything*.  *There's nothing I can do at*

14   *that point*.  *Just send it please, please, please*.  I said, *I*

15   *am*.  *On with the Peter*.  *Wire has been confirmed*.  *Getting*

16   *reference number*.  He said, *Okay, thanks*.  *Sorry, just getting*

17   *done once and for all, going to have -- going to have them pull*

18   *it on the other end*.  I said, *Bottom number*.  He said, *Thank*

19   *you*.  *Call me tonight*.  *Dog walk*.  I said, *Okay*.

20   *Q*    Who is Peter?

21   *A*    Peter Masatti (phonetic).  He was our representative at

22   Signature Bank.

23   *Q*    Were you afraid something would happen if you didn't send

24   this wire?

25   *A*    Yes.

JONATHAN YIOULOS – Direct

1    Q    What did you think would happen?

2    A    Either one of these individuals would reach out to

3    National, Chris, Lori, or possibly my wife, at the time.

4    Q    Did Michael Tew tell you anything about whether or not

5    Michael Meyers and Christain Rincon knew each other?

6    A    He said that they were the same person.

7    Q    What did he tell you about why he was having to send money

8    to this person?

9    A    That, essentially, they were being used, initially, to

10   repay cryptocurrency that they had borrowed, and then it was

11   all about getting the money for taxes, eventually.

12   Q    Now, let's look at Government's Exhibit 674.  What is this?

13   A    It's an email from -- or to Chris Rincon, from myself.

14   Q    Is that actually sort of an email thread?

15   A    Yes.  It's an email thread with a final invoice payment

16   confirmation.

17        MR. FIELDS:  And let's go to the next page.  And the

18   next page.

19   Q    That the whole thread?

20   A    Yes.

21        MR. FIELDS:  Your Honor, pursuant to the Declaration,

22   that's Government's Exhibit 1134, we move this one into

23   evidence.

24        THE COURTROOM DEPUTY:  Your Honor, this exhibit was

25   already received.

JONATHAN YIOULOS – Direct

1        *MR. FIELDS:*  Oh, sorry.  Thank you.

2        *THE COURT:*  Yeah.  Go ahead.

3   Q   All right.  So let's go to page two, at the bottom there.

4   I apologize for that.  Do you see that message on Friday,

5   November 9th, 2018?

6   A   Yes.

7   Q   What does it say?

8   A   It says, *Hi, Jon I was wondering if you could put me in*

9   *touch with your CFO or a legal team as I have some questions*

10  *regarding the tax around the consulting payments received.*

11  *Please direct me accordingly as the issue is quite urgent, CR.*

12  Q   What was your reaction to the idea that Christian Rincon

13  wanted to talk to the CFO or the legal team at National?

14  A   I panicked.

15  Q   Why?

16  A   Because I thought I had the payments under control with

17  this Christain Rincon individual, and him wanting to talk to

18  somebody else at National just brought me back to the time that

19  Craig reached out to individuals at National and I thought he

20  might do the same.

21  Q   All right.  And then what was your response?

22  A   *Hello, please give me a call at the number below and I will*

23  *be able to assist you.*

24  Q   Did you actually have a telephone conversation with

25  Christain Rincon?

JONATHAN YIOULOS – Direct

1    *A    I did not.*

2    *Q    Instead, what was the email response?*

3    *A    He said,* Hi, Jon.  I'm not really interested in speaking

4    with you directly regarding this issue, as it is my

5    understanding that you are the holdup as to why I have not

6    received my final payment.  I will personally forward you a

7    copy of the agreement upon receipt of final payment.  According

8    to my records, there's a 30K remaining balance, including the

9    termination fee.  If you would kindly point me to the right

10   person to whom I should speak with regarding this matter, I

11   believe that would be best.  CR.

12         *MR. FIELDS:*  Let's turn back to Government's Exhibit

13   659, which is already in evidence.  Just orient ourselves, can

14   you go to page two?

15   *Q    Is this the text exchange where,* It's K.  Do you see that?

16   *A    Yes.*

17   *Q    Now, let's go back to the beginning.  Let's read this whole

18   thing.  Now we have a little bit more context.*

19   *A    I said,* Answer, urgent.  He said, Kimberley *tried to text*

20   *you last night.  I was traveling, but this Christian guy thinks*

21   *there was an ethic violation.  He is not a straight-out loser*

22   *like Craig, but we just said no money.  We suggested 1099 a*

23   *LLC, and he wanted like 1K in BTC, go pay his accountant, which*

24   *we also said no to.  Ethics violation?  What the hell.  Just*

25   *tell him not to worry about it and not to file it as income on*

JONATHAN YIOULOS – Direct

1    *his taxes.*  He said, *isn't NA going to 1099 him*?  I said, *let's*

2    *just talk tomorrow.  I'm swamped for the rest of the night,*

3    *brother.  Please answer tomorrow.*  He said, *I hear ya.  I'm on*

4    *this call BRB.  Kimberley can text.  This guy isn't stupid and*

5    *we don't have any BTC tossed him.*

6    Q    Keep going.

7    A    I said, *I don't have any BTC.  I don't.  I told Abby*

8    *consulting payments were done, because she was asking fucking a*

9    *billion questions about Meyers.*

10         He said, *Okay good that's exactly what we said.  I*

11   *said awesome, glad we're both on the same page, brother*.  He

12   said, Kimberley *knows more about this shit and of course she's*

13   *freaking out*. I said, *Okay.  Let's talk when you can*.  He said,

14   *Okay.  Not sure what to say, just exhausted.*

15   Q    So, Kimberley *knows more about this*.  Did Michael tell you

16   a little bit more about why Kimberley knew more?

17   A    It was more about the cryptocurrency piece.  She knew more

18   about the cryptocurrency community, and, you know, how to move

19   cryptocurrency around and how she could pay Meyers.

20        *MR. FIELDS:*  All right.  You can take that down.

21   Q    Did Michael ever tell you to send the money to

22   Michael Meyers, as a payment for Jessamine Development?

23   A    Yes.

24   Q    Let's look at Government's Exhibit 674.  All right.  So, we

25   were at this one a little bit earlier.  Now, if you go to page

248
JONATHAN YIOULOS - Direct

1    two.  What was the date that email was sent about the -- this

2    one right here?

3    A    Monday, November 19th, 2018.

4    Q    Now, let's look at Government's Exhibit 665.  What is this?

5    A    This is the text message conversation between myself and

6    Michael Tew on that same day.

7         MR. FIELDS:  Pursuant to the Declaration, that's

8    Government's Exhibit 1115, we move this into evidence.

9         THE COURT:  It's admitted.

10    Q    Read this for us.

11    A    He said, *When do you have five minutes to speak*?  I said,

12    *I'm working from home, so not really time to actually talk.  Is*

13    *there an issue with the agreement or what's going on*?

14         He said, *Been working on resolving this with finality.*

15    *What's the dif between having an agreement now versus later*

16    *this week?  There's a reason why I'm asking, and better over*

17    *the phone.*  I said, *I need, before I send, that's why.*  He

18    said, *You don't though.  I'm not trying to be a dick.*  I said,

19    *I do though, and I am not trying to be a dick either.  I have*

20    *been asking for this fucking three months.  Like, why can't it*

21    *be sent today or tomorrow?  Seriously, though.*  He said, *It's*

22    *logistics.  It is going to be sent from an airgap computer,*

23    *which is being arranged.  You're going to get what you want/*

24    *need.  Has to be done right.*

25    Q    Keep going.

JONATHAN YIOULOS - Direct

1    A    For everyone.  I said, *It doesn't matter where it's sent*

2    *from as long as it's coming from Jess*.  I said, *Look, to be*

3    *honest I would rather just do this shit tomorrow, when I'm in*

4    *the office anyway.  Then it hits Wednesday which is the day*

5    *before break and nobody is back till Monday anyway.  Just makes*

6    *life easier and gets you another day to get the agreement sent*

7    *from Jess.  Yet still be before the long weekend*.  He said, *No*

8    *go.  He just messaged us that he is pissed*.  I said, *Well, I*

9    *need him to send the agreement then.  That's literally the only*

10   *way.  I'm not doing it any other way.  You can just tell him*

11   *that it's impossible without the agreement.  He doesn't know me*

12   *or anything at all*.  He said*, I have to take the girls to an*

13   *appointment in Boulder.  Do what you want.  I'm not telling you*

14   *what to do.  I don't care.  None of this is for me.  If you can*

15   *step out, walk the dog?  Great.  Call me, I can talk*.

16   A    He said, *I relayed the message*.  I said, *I got another*

17   *email from him saying the fucking final balance is 30K*.  I

18   said, *Dude, I'm tired of this shit.  I really am.  You there?*

19   He said, *I am too.  Whatever you want to do is fine.  I just*

20   *want it -- I just want it go away*.

21           I said, *I need the agreement, and I can send it*

22   *instantly.  I can't do it without.  Our -- it -- you have got*

23   *to understand why*.  He said, *Tell him that I'm driving to*

24   *Boulder*.  I said, *Does he have it*?  He said, *Does it have to*

25   *go to his bank account*?  *Fuck him*.  I said, *I'm confused.  How*

JONATHAN YIOULOS - Direct

1    *do we settle this without it going to his account*?  He said, *If*
2    *you are sending 30 send -- if you are sending 30 send to Mike's*
3    *account and we can take your BTC out.  He doesn't even have*
4    *that Chase account.*

5            I said, *How does this solve our problem with Jess*?  He
6    said, *Chris and Mike are the same.  Just trust me*.  He said *do*
7    *you have the ACH for MM*?  *He is including your BTC in that*
8    *number*.  *I want to make sure you get it*.  I said, *Okay.  Hold*
9    *on, can we talk, quick?  You are driving, right*?  He said, *I*
10   *will hold the phone*.  I said, *Found ACH info, 063104668*.  I
11   said, *How do I know that this guy still isn't going to ask for*
12   *more now that I'm paying Mike?  Like that fucks me if he is*
13   *like, nope, you never sent payment*.  He said, *Meyers said he*
14   *would send you info*.
15   Q    So, this message, he is including your BTC in that number?
16   BTC what is that?
17   A    Bitcoin™.
18   Q    So, *in that number*, what does that mean?
19   A    So, the BTC I had loaned him, he said he would return full
20   BTC back.  He was including that amount in the total number.
21   Q    Would that have come from fraud proceeds?
22   A    Yes.
23   Q    So, were you going to profit from this?
24   A    Yes.
25   Q    Next page.

JONATHAN YIOULOS - Direct

1   A   He said, *I don't know.  I'm with you.  Whatever you want to*

2   *do.  We will get you your BTC.  Told them it's coming tomorrow.*

3   I said, *He sent the wire routing.*  He said, *I don't know, use*

4   *the ACH.*  I said, *I'm sending via ACH, okay.*  Michael said, *He*

5   *said it's in bold.*  I said, *Got it.  Is it cool to send the*

6   *confirmation to Chris afterwards?  Let me know.*  He said, *Do*

7   *whatever you need to do.*  I said, *No, I'm asking, are they*

8   *working together?  Is it the same person?  Sent.*  He said,

9   *Sorry been driving.*

10        Can't read that last part.  *Sorry.  I have been*

11  *driving.  Thank you.  In Boulder and then hour drive back.*

12  *Touch base tonight when back and at computer.*

13  Q   This Chris and Mike are the same.  Did Michael ever explain

14  that to you?

15  A   He said that they were, essentially, the same person.

16  Q   Let's look at Government's Exhibit 674, again.  Talking

17  about sort of November 19th.  Do you see this bottom email,

18  there?

19  A   Yes.

20  Q   All right.  What did you tell Chris Rincon on the 19th?

21  A   I said, *I apologize for the delay.  I can send payment that*

22  *will hit your bank account tomorrow, but can you confirm your*

23  *bank has changed*?

24  Q   Did he email you back?

25  A   He said, *Jon, please delete my prior invoice, as I have*

JONATHAN YIOULOS - Direct

1    *updated my banking instructions for BBVA Compass.  New invoice*

2    *attached here.  I also wanted to let you know that this is*

3    *indeed the final invoice, and I will send the agreement with*

4    *the changes you requested upon receipt.  Thanks.  CR.*

5    Q    What was your response a little bit later?

6    A    *Chris, appreciate the updated invoice.  Please see attached*

7    *for payment confirmation.  Also, as promised, please send the*

8    *agreement.  Thank you.*

9    Q    Government's Exhibit 668.  What is this?

10   A    A text message exchange between myself and Michael Tew, on

11   Tuesday, November 20th, 2018.

12   Q    Was that six days before that email we were just looking

13   at?

14   A    I believe so, yes.

15   Q    Now, if you go ahead and read this for us -- actually,

16   sorry.

17          MR. FIELDS:  Pursuant to the Declaration, that's

18   Government's Exhibit 1115, the government would move this

19   evidence.

20          THE COURT:  Six-sixty eight is admitted.

21   A    He said, *Dude, I got fucked, 101 fever.  Can't hear a*

22   *thing.  Was sluggish this AM, but got really sick.  Must be*

23   *from Boulder yesterday.  Canceled everything.  Can't move.  Let*

24   *me just get better and touch base later.  All okay.  Kimberley*

25   *handling.  I'm a bad sick person.*

1    I said, *Okay.  Please touch base later.  Really need a*

2    *few things*. He said, *Yes.  Sick*. I said, *Sorry to hear you're*

3    *sick.  Look, I know you're not here, but you have got to*

4    *understand we're over a hundred K sent out.  I really need to*

5    *talk to you about the agreement.  I cannot possibly send out*

6    *anymore without raising red flags.  Need to go over logistic*s.

7    Q    What was Kimberley handling?

8    A    The coordination to ensure that Meyers had -- the whole

9    wire between Meyers and Chris Rincon was taken care of.

10   Q    Let's look at Government's Exhibit 673, which is not yet in

11   evidence.  What is this?

12   A    A text message conversation between myself and Michael Tew

13   on Monday, November 26th, 2018.

14   Q    Same day as that email exchange that we looked at a little

15   earlier?

16   A    Yes.

17        *MR. FIELDS:*  Pursuant to the Declaration, that's

18   Government's Exhibit 1115, we would move this into evidence.

19        *THE COURT:*  It's admitted.

20   Q    Read it for us?

21   A    Yes.  I said, *Come on.  It's now Monday, a full week since*

22   *I sent Meyers and still don't have an agreement or a final*

23   *invoice for what I sent last week.  Or my BTC back.*

24        He said, *Just getting going.  Kimberley tells me*

25   *Meyers never paid Jess, so she's been trying to work it out.  I*

JONATHAN YIOULOS - Direct

1    *have a ton of shit to catch up on. I have been so sick. Let's*

2    *talk later, re logistics. It's fine. Just stay calm. Stay*

3    *focused. I'm finally back to normal today. Can't talk now,*

4    *but can talk later on.*

5    I said, *OMG, this is ridiculous, that's why I wanted*

6    *to send to Jess to begin with. When are you guys going to stop*

7    *fucking with me? Seriously. I knew that was a bad idea to*

8    *send to Meyers. You are really screwing me here.*

9    I said, *You keep telling me to stay calm and stay*

10   *focused, yet you're not helping me out at all. You won't*

11   *answer calls, you won't respond, and now are going to get to a*

12   *point where you are going to need another 30K sent. I know it.*

13   *You guys won't fucking stop with me. I'm not sending another*

14   *dime. I need an invoice and an agreement, that's what I need,*

15   *that's the bottom line, that's it. Is it really that*

16   *difficult? You're a consultant. You know how these agreements*

17   *work. Just put it together and end this. Please Michael, stop*

18   *this. Like, we have to move on. I need an agreement so I can*

19   *button this down and get the fuck out of here. I can't stand*

20   *it here anymore, but I need things buttoned up before I*

21   *eventually leave. Please be a man of your word and get this*

22   *done finally. I have been waiting on this for months.*

23   He said, *Calm down. I will call you. Jess has the*

24   *agreement, but not signed. This is not about money.* I said, *I*

25   *know what you need. Calm down. This isn't about money. Look,*

JONATHAN YIOULOS - Direct

1    *I'm sorry, but I hope you can understand why this is*

2    *frustrating for me.*

3    Q   That comment, *This isn't about money*, what did you

4    understand that to mean?

5    A   I didn't -- it was about logistics about the agreement, and

6    who got what, but I wasn't sure, exactly, what he meant by

7    that.

8    Q   And you make this statement, *Before I eventually leave*.  So

9    earlier we were talking ways you could have stopped.

10   A   Yes.

11   Q   Why didn't you just quit your job?

12   A   Because if I quit my job um there were some open ends here,

13   where if, during an audit, one of these invoices got pulled or

14   somebody was looking for a consulting agreement, they could

15   come back and look and say, *Okay, where is this*, and this whole

16   fraud this conspiracy would have been uncovered, essentially,

17   if I didn't have agreements in the system.

18       What I was looking to do was to get all of these

19   numbers tied up.  I wanted to have matching invoices to the

20   matching dollar amounts that were sent out.  Agreements in

21   place for the consulting fees, investor relations, so that I

22   could leave National, eventually, and just be done with the

23   situation.  Not be asked to send another dime out, and

24   hopefully we would all just walk away from this unscathed.

25   Q   Did you ever tell Michael that's what you wanted to happen?

JONATHAN YIOULOS – Direct

1  *A*   Yes.

2  *Q*   Did he ever get you all of those invoices so that you could

3  do that?

4  *A*   He would get me invoices, but never these consulting

5  agreements.  No.

6  *Q*   Next page.

7  *A*   He said, *You are going to get your BTC back.  You think I'm*

8  *some kind of scammer or something.  It makes me uncomfortable.*

9  *I was sick for like four days.  I was at the doctor when we*

10 *texted last.  It was a long holiday weekend.  Kimberley is*

11 *working on.*  I said, *I don't think it's you at all.  I'm just*

12 *frustrated with the process.  I'm sorry you were sick.  It's*

13 *getting closer to year end, and I am sorry, I'm getting*

14 *nervous.  I fucking knew this would happen.  Why would you tell*

15 *me to send to Meyers?  Why?  Pick up the phone.  This is out of*

16 *fucking control.* Question mark. *This is a joke, right*?  *By*

17 *the way, has to be an ACH anyway, because we only have like 15K*

18 *in the account until tomorrow morning.  Anyway with CRAF*

19 *receivables so*?

20 *Q*   What is CRAF receivables?

21 *A*   Receivables from the government, which is what we did with

22 the Department of Defense.

23 *Q*   So, 15K in the accounts, 15,000 seems like a lot of money.

24 Is that a lot of money for National Air Cargo?

25 *A*   No.

JONATHAN YIOULOS - Direct

1    Q    Keep going.

2    A    I said, *Leaving the gym in about two min.  I really need*

3    *the agreement from Jess, commenting on working in conjunction*

4    *with Meyers.  As soon as I have that from Jess, I can send an*

5    *ACH confirmation to him, and we put this to bed.  It should be*

6    *pretty simple.  I don't think it's too much to ask for an*

7    *agreement to be sent over before sending a final payment.*

8         He said, *On a call, copy.  I think the more of an*

9    *issue you make of the agreement the more of an issue it will*

10   *become.  But my understanding is you are going to get it, but*

11   *he needs the ACH confirmation ASAP.  Did he send an invoice*

12   *that said final on it.*

13        I said, *He sent an email that it's the final one.*

14   *Michael, I need the agreement.  Let's be honest, as soon as I*

15   *send this, I will never hear from him again.*  He said*, I think*

16   *if you go into it with a cordial attitude, you will get what*

17   *you want, but if you don't show him the ACH confirmation, this*

18   *agreement thing could become an issue, whereas of now, I don't*

19   *think it is.*

20        I said, *Look you're worried about it all coming back*

21   *to you.  I get it.  But this is the only way.  There's several*

22   *emails from you telling me to pay Jess with invoices, and the*

23   *only way I can justify this and protect us both, in an audit,*

24   *is with an agreement.  Auditors won't ask why.  They will just*

25   *want a copy ... this is the only way I can justify and protect*

JONATHAN YIOULOS - Direct

1    *us both in an audit is with an agreement.  Auditors won't ask*

2    *why.  They will just want a copy.  That's it.  Chris, National*

3    *Chris, will be none the wiser.*

4          He said, *But he will help with audits et cetera*

5    *whatever you need.  Doesn't matter when you get the agreement.*

6    *Stop trying to control the situation.  It's not worth it.*  I

7    said, *Is it actually done, seriously though.*

8    Q   Keep going.

9    A   I said, *I need five minutes.  Please call me.  It's about*

10   *the routing number.*  He said, *What's the issue on a call.  BRB.*

11   I said, *It looks as if routing number may be incorrect, when*

12   *looking at the BBVA account for ACH.  I just want to get it*

13   *right.*

14         He said, *Okay.  Two secs.  Confirming.  Routing number*

15   *TEL, 113010547, account number 6758470987.*  I said, *Okay*

16   *thanks.  We're all set.*  He said, *Copy.  Let's put this to bed,*

17   *finally.  I have to run to an appointment.  Be back shortly.*

18   Q   Let's take that down.  Did you ever get complaints from

19   Meyers about problems with payments?

20   A   Yes.

21   Q   Let's look at Government's Exhibit 692, which has already

22   been admitted.  Is this part of your text exchange with Meyers?

23   A   This is an email exchange.

24   Q   Email exchange.  Sorry.  Thank you.

25   A   Yes.

JONATHAN YIOULOS - Direct

1    Q    So before we forget, do you see that email down there at

2    the bottom, Meyers Consulting Group?

3    A    Yes.

4    Q    What was the email address that was used to send you these

5    invoices?

6    A    *Meyersconsultinggroupinc@gmail.com.*

7    Q    All right.  And what does it say up there at the top?

8    What's this email that you got from Meyers Consulting Group?

9    A    It says, *Jon, as you are aware, I did not receive this ACH.*

10   *I have attached my final invoice with my bank instructions.  I*

11   *would like this -- this to be paid via wire for Tuesday, the*

12   *11th, I sincerely hope there are no further issues and that the*

13   *funds are sent without delay.  If I do not receive payment in*

14   *full I will be contacting someone at your company to discuss.*

15   *I will confirm receipt for this final invoice when the funds*

16   *hit my own account.  Please do not send payment for this*

17   *invoice to any account but the one on the actual invoice.*

18   *Thank you for your understanding, Mike.*

19   Q    So, earlier we talked about Jessamine, wanting to talk to

20   the CFO or the legal team.  Similarly, how did it make you feel

21   that Meyers, potentially, going to contact someone else in the

22   company to discuss?

23   A    Exact same feelings I had with Jessamine, just worried that

24   he would actually do it.

25   Q    Now let's look at Government's Exhibit 693.  Which is not

JONATHAN YIOULOS - Direct

1    yet in evidence.  What is this?

2    A   A text message exchange between myself and Michael Tew, on

3    Tuesday, December 11th, 2018.

4    Q   Same day as that email that we just looked at?

5    A   Yes.

6         MR. FIELDS:  Pursuant to the Declaration, Government's

7    Exhibit 1115, we would move this into evidence.

8         THE COURT:  It's admitted.

9    Q   Read this for us.

10   A   I said, *Just got an email from Meyers saying he didn't*

11   *receive anything.  Fuck this.  Are you fucking kidding me?*

12   *This is a sick joke.  Says he wants 25K by wire, today.  Fix*

13   *this.  What the fuck.  He was supposed to send me an email*

14   *saying he got paid before you guys even sent him anything.  You*

15   *guys are really fucking me.  Hello?*

16        He said, *Just waking up.  WTF is going on with this*

17   *guy.  I'm not doing anything to you.  Call you shortly.*

18        I said, *I know you're not I'm just really upset man.*

19   He said, *Let me look into this, BRB*.  I said, *Please.  Thanks.*

20   Q   Keep going.

21   A   He said, *Larry sent Christian.  All good there.*

22   *Christian's account got flagged at BBVA.  New account,*

23   *apparently, and the fraud department was asking for all kinds*

24   *of invoices.  I helped with all of that yesterday to clear up*

25   *the issues.  That's what I know.  Looking further.*

JONATHAN YIOULOS - Direct

1          I said, *I'm going to the FBI.  Fuck this*.  He said, *I*

2   *can't tell you what to do or what not to do ... I can't be*

3   *personally involved with you in that.  What I can say is I*

4   *personally have filed three separate reports with the FBI about*

5   *Craig, and they have done absolutely nothing, and probably*

6   *never will.  So I'm not sure how all of that works*.

7          He said, *Call you shortly.  I'm on a call, doing my*

8   *best, I honestly am*.  He said, *I was at the library for two*

9   *hours with my kids in sweats yesterday trying to secure a job*

10  *for the new year.  Job market sucks here for guys like me*.

11  Q   Keep going.

12  A   I said, *I know you are.  But Michael, I really need an*

13  *agreement, like badly.  It's getting closer and closer to end*

14  *of year.  If we don't have something, it will end up fucking*

15  *us.  You, me, Mike and Christian, honestly.  But if we have an*

16  *agreement, there's something there that, unless all parties*

17  *want to fuck it up for one another, we have to agree on.  Clear*

18  *this Mike issue up with Kimberley, but please work on getting*

19  *me an agreement.  It's essential.*

20  Q   What was the *Mike issue* that you cleared up with Kimberley?

21  A   The fact that Mike -- that the payment to Mike -- payment

22  from Mike was sent to Christian, and how we resolved that.

23  Q   All right.  If we go -- scroll back up.  There's this

24  reference to *Larry sent Christian*.  Do you see that?  It's in

25  the middle?

JONATHAN YIOULOS – Direct

 1    A    Yes.

 2    Q    Again, who is Larry?

 3    A    Larry was Michael's contact at Political Media.

 4    Q    All right.  So we've got Larry, Christian, Mike.  Is there

 5    a relationship between these three people, as far as you know?

 6    A    Not that I knew.

 7    Q    Take that down.  At some point did you, Michael and

 8    Kimberley stop using Meyers Consulting Group?

 9    A    Yes.

10    Q    Was that relatively early in this course of conduct in sort

11    of middle or towards the end?

12    A    It was early on, I would say.  Early to middle.

13    Q    Even after that, did you get an email from Meyers

14    Consulting Group later on in this course of conduct?

15    A    Yes.

16    Q    Government's Exhibit 939, which is not yet in evidence.

17    What is this?

18    A    This is an email from Meyers Consulting Group, to me.

19    Thursday March 19th, 2020.

20    Q    Is this to your work email?

21    A    Yes.

22    Q    Was it the regular course of practice for National

23    Consulting Group to keep emails like this?

24    A    Yes.

25              MR. FIELDS:  Pursuant to the Declaration, that's

JONATHAN YIOULOS - Direct

1    Government's Exhibit 1134, we would -- or 1130, we would move

2    this into evidence.

3                THE COURT:  Any objection to 939?

4                MR. SCHALL:  No, Your Honor.

5                MR. KAPLAN:  No, Your Honor.

6                THE COURT:  It's admitted.

7    Q    Anything about this email stand out to you?

8    A    It was just -- no invoice attached this time.  There's no

9    request for an invoice.  Just -- no sign of either.

10   Straight -- straight words.  No real substance to it.

11   Q    Were you surprised to get this email in 2020?

12   A    Yes.

13   Q    Why?

14   A    Because we hadn't paid Meyers Consulting Group in quite

15   awhile, or used them as a vendor, so I was a little confused at

16   why I would get an email like this.

17   Q    All right.  Let's take this down.  All right.  And again,

18   in that Redweld® there, in front of you, we are going to move

19   on to a different company.  Should be one marked Political

20   Media.  So, there's quite a few more in there.  Similarly,

21   slowly, for our court reporter, can you read through the

22   exhibit numbers that are there in front of you?

23   A    Exhibit 688, Exhibit 700, Exhibit 703, Exhibit 706, Exhibit

24   711, Exhibit 716, Exhibit 719, Exhibit 723, Exhibit 727,

25   Exhibit 732, Exhibit 737, Exhibit 742, Exhibit 748, Exhibit

1    764, Exhibit Exhibit 801, and that's it.

2    Q    Did you review all of those exhibits before your testimony?

3    A    I did.

4    Q    What are they?

5    A    They are emails between myself and Political Media, with

6    attached invoices and payment confirmations.

7    Q    Did you, personally, receive those while you were at

8    National Air Cargo?

9    A    I did.

10   Q    Is it National Air Cargo's regular practice to archive

11   those emails?

12   A    Yes.

13   Q    Was giving and receiving emails about invoices part of

14   National Air Cargo's regular business?

15   A    Yes.

16        MR. FIELDS:  Your Honor, at this time, I would move

17   into evidence, all of those exhibit numbers which I can read

18   again -- if necessary.

19        THE COURT:  Any objection.

20        MR. SCHALL:  No objection, but I wouldn't mind

21   repeating them just for --

22        THE COURT:  Okay.  Just to make sure we're all on the

23   same page.  If we read them again, are there any objection,

24   Mr. Kaplan?

25        MR. KAPLAN:  No, Your Honor.

JONATHAN YIOULOS – Direct

1          THE COURT:  Go through the list one more time, please.

2          MR. FIELDS:  Government's Exhibit 688, 700, 703, 706,

3   711, 716, 719, 723, 727, 732, 737, 742, 748, 764, and 801, and

4   of those, I believe actually 748 has already been admitted.

5          THE COURTROOM DEPUTY:  So, are 706 and 716,

6   Your Honor.

7          MR. FIELDS:  Thank you.  I would move the others into

8   evidence, at this time.

9          THE COURT:  Those are all admitted.  Yeah.  Thank you.

10  Q   Remind us, what are they?

11  A   They are invoices, emails and payment confirmations between

12  myself and Political Media.

13  Q   Who sent those to you?

14  A   Michael Tew.

15  Q   What is attached to them?

16  A   Invoices.

17  Q   Did you pay those invoices?

18  A   I did.

19  Q   Who instructed you to pay those invoices?

20  A   Michael Tew.

21  Q   Was Michael Tew in the State of New York when he gave you

22  those instructions?

23  A   No, he was not.

24  Q   Were the payments that you made, based on those invoices,

25  based on false pretenses?

JONATHAN YIOULOS - Direct

1    *A*    Yes.

2    *Q*    What were the false pretenses?

3    *A*    That services were performed for National Air Cargo, when,

4    in, fact they were not.

5    *Q*    Let's look at Government's Exhibit 716.  Let's go to page

6    five.  So, up at the top, is this you forwarding an email to *T*

7    *Howard*?

8    *A*    Yes.

9    *Q*    Remind us, who is *T Howard*?

10   *A*    She was the accounts payable clerk for National Air Cargo

11   Group.  So that's National Airlines.

12   *Q*    What did you tell her to do?

13   *A*    Please book as advertising expense for this one.

14   *Q*    Was it a real advertising expense?

15   *A*    No.

16   *Q*    Were you being truthful with Ms. Howard?

17   *A*    No, I was not.

18   *Q*    Why were you not telling her the truth?

19   *A*    Because it was part of this conspiracy.  I wanted to look

20   as legitimate as possible.

21   *Q*    Now, if you see the actual, sort of, email below.  You see

22   that on February 7th, 2019?

23   *A*    I do.

24   *Q*    What does it say the invoice is for?

25   *A*    This invoice is for your advertisement in defense --

JONATHAN YIOULOS – Direct

1   *National Defense Magazine*, and related marketing material and

2   services.

3   Q   Have you ever read *National Defense Magazine*?

4   A   No.

5   Q   Do you know if National Air Cargo ever advertised *National*

6   *Defense Magazine*?

7   A   No.

8   Q   How do you know they did not advertise in *National Defense*

9   *Magazine*?

10   A   I didn't even know if that was a real magazine.

11   Q   All right.  Let's look at Government's Exhibit 725.

12        THE COURTROOM DEPUTY:  Seven-twenty-five?

13        MR. FIELDS:  Yes.

14        Q    (By Mr. Fields) Is this another email being forward

15   to Talika Howard?

16   A   Yes.

17   Q   What did you tell her to record this as?

18   A   Professional fees, consulting.

19   Q   Were there really professional fees for consulting?

20   A   No.

21   Q   Again, were you being honest with Talika Howard?

22   A   No, I was not.

23   Q   Let's look at Government's Exhibit 749?

24        MR. KAPLAN:  I didn't catch that.

25        MR. FIELDS:  Seven-forty-nine.

JONATHAN YIOULOS - Direct

1   Q   Do you see that email on April 8th?

2   A   Yes.

3   Q   Was that --

4   A   This is an email from myself to Talika Howard.

5   Q   And what did you tell her to do there?

6   A   I basically gave her instructions for the invoice.

7   Q   What did you say?

8   A   I said, *I know, I know.  Chris told me to pay today, but*

9   *hopefully, HOPEFULLY this is the last ... full invoice is for*

10  *$75,000.  We just paid $37,500 today.  Going to try to drag the*

11  *final payment out ... We can book this to 50605, out services*

12  *contractors, since it's for inspection, other due diligence for*

13  *the new aircrafts.  Thanks.*

14  Q   Did Chris tell you to pay?

15  A   No, he did not.

16      *MR. FIELDS:*  Your Honor, I was just told that maybe

17  these are on the screen yet?

18      *THE COURT:*  Mr. Keech, is this published?

19      *THE COURTROOM DEPUTY:*  My apologies, Your Honor.

20      *THE COURT:*  Okay.  I think we're okay, now.

21      *THE COURTROOM DEPUTY:*  Actually, 749 --

22      *MR. FIELDS:*  Sorry.  That's why.  I apologize.

23  Q   So, first of all, 725 and 749, are those also emails that

24  you received?

25  A   Yes.

269
JONATHAN YIOULOS - Direct

1          MR. FIELDS:  Pursuant to the Declaration, Government's

2     Exhibit 1130, we would move those into evidence.

3          THE COURT:  That's '25 and '49?

4          MR. FIELDS:  Yes, 725 and 749.

5          THE COURT:  Any objection to those?

6          MR. SCHALL:  None.

7          MR. KAPLAN:  None, Your Honor.

8          THE COURT:  All right.  Those are admitted.  Thank

9     you.

10         MR. FIELDS:  Thank you, Mr. Keech.  I'm sorry about

11    that.

12    Q    So, *I know, I know.  Chris told me to pay today.*  Who is

13    the Chris you are referring to today?

14    A    Chris Alf.

15    Q    Did Chris tell you to pay an invoice for Political Media?

16         MR. SCHALL:  Objection, Your Honor.

17         THE COURT:  Sustained.

18    Q    This statement *Chris told me to pay today*, was that true?

19    A    No.

20    Q    How was it false?

21    A    Chris never instructed me to pay this invoice.

22    Q    Why were you making a false statement to Talika Howard?

23    A    To make it more believable, and seem like it was coming

24    from the -- the chairman of the company.

25         MR. FIELDS:  You can take that down.

JONATHAN YIOULOS - Direct

1    Q    Now, we looked at all of those emails, you sat here in

2    court today, are you positive that every payment that you made

3    to Political Media had a corresponding invoice?

4    A    Yes.

5    Q    You are positive that all of them had invoices?

6    A    I'm 95 percent positive that they all had corresponding

7    invoices.  That was one of the -- the biggest things for our

8    accounting records, to get all of those invoices in.

9    Q    Assuming that 5 percent possibility, if there was a payment

10   but there's no corresponding invoice, what would that mean?

11   A    Um, that there was just a payment made and the invoice

12   wasn't received, and there might be a credit balance on the

13   account.

14           MR. FIELDS:  Let's look at Government's Exhibit 749.

15   Is this already in evidence?

16           THE COURTROOM DEPUTY:  It is.

17           MR. FIELDS:  Thank you.

18   Q    All right.  So, you know, we talked about this a little bit

19   but this Christopher Weir.  Did you ever talk to Michael Tew

20   about Christopher Weir?

21   A    Not about Christopher Weir.  No.

22   Q    Did you ever ask Michael Tew more about Political Media?

23   A    Yes.

24   Q    What did he say about it?

25   A    That there was an individual there by the name of Larry

JONATHAN YIOULOS - Direct

1  Ward, that was one of his friends and colleagues, that he knew

2  Larry very well, that I could send the payment to Larry Ward,

3  and that Larry would facilitate getting the funds over to the

4  Tews.

5  Q   Let's look at Government's Exhibit 688, please.  Is this

6  one of those emails?

7  A   Yes.

8  Q   Okay.  What's the date on it?

9  A   December 7th, 2018.

10 Q   Now, let's look at Government's Exhibit 687, which has not

11 been admitted.  What is this?

12 A   A text message conversation between myself and Michael Tew.

13 Q   On the same date that you got that email?

14 A   Yes.

15        MR. FIELDS:  Your Honor, at this time, pursuant to the

16 Declaration, Government's Exhibit 1115, we would move this into

17 evidence.

18        THE COURT:  Six-eighty-seven is admitted.

19 Q   If you could read it for us.

20 A   I said, *So what's going on?  Haven't heard from you guys at

21 all today*.  He said, *Have a plan, call you shortly*.  I said,

22 *Okay*.  He said, *If invoice comes from QuickBooks®, can you just

23 click the link to pay, or is it all manual*?  *You will have in

24 five minutes.  All set.  Sent?  I don't have anything yet.*  He

25 said, *Two minutes*.  I said, *Okay, no worries.  Sorry.  Got it.*

JONATHAN YIOULOS – Direct

1    *Done.  He said, *Please send the confirmation.  Thank you.*

2    *Thank you.  Thank you.  I can send confirm back to that email?*

3    *Yes.  Okay.  Thanks.  Done.  This has to be it.*

4            He said, *What email did you send to?  Yes, obviously.*

5    *Did you just reply to the invoice?  Got it.  Okay.  Good.  Go*

6    *home have a drink, or seven.*

7    Q    Now let's see pull up Government's Exhibit 688, again.

8    Now, if we go down to the next page, do you see there under

9    the -- this whole box here?

10   A    Yes.

11   Q    First of all, are you familiar with something called

12   QuickBooks®?

13   A    Yes.

14   Q    What is QuickBooks®?

15   A    Accounting software.

16   Q    Can you use it to prepare invoices?

17   A    You can.

18   Q    And you know where it says, you know, looks like there's

19   button here, *review and pay*, was that an Internet link?

20   A    Yes.

21   Q    Where would it take you?

22   A    It would take you to a website where you could facilitate

23   payment electronically that way.

24   Q    And do you see, here, does this list a bank?

25   A    Yes, it does.

JONATHAN YIOULOS - Direct

1    Q    What is the bank?

2    A    Access National bank.

3    Q    If you could, what's the account number?

4    A    It's 2915965.

5    Q    All right.  So, now let's pull up Government's Exhibit 700.

6    Go to page two.  The same bank listed on that invoice?

7    A    Yes.

8    Q    All right.  But now let's look at 703.  Page two.  What do

9    you notice about the bank account here, where it says payment

10   account?

11   A    It's a different bank account.  It's for Navy Federal

12   Credit Union.

13   Q    What's the account number?

14   A    It's 7085338486.

15   Q    You know who used that account ending '8486 at Navy Federal

16   Credit Union?

17   A    Michael Tew.

18   Q    How do you know that?

19   A    Because I paid invoices to his account before.

20   Q    Why did these accounts switch between the one we were

21   looking at earlier and this one?

22   A    Because the funds were no longer going to his contact at

23   Political Media.  Apparently that became a problem, so instead

24   the funds were being sent to him directly.

25   Q    Let's look at Government's Exhibit 774.  What are these?

JONATHAN YIOULOS - Direct

1   A    Text messages between myself and Michael Tew on Friday, May

2   10th, 2019.

3         MR. FIELDS:  Pursuant to the Declaration, that's

4   Government's Exhibit 1115, we would move this exhibit into

5   evidence?

6         THE COURT:  Seven-seventy-four is admitted.

7   Q    Would you read this for us, please.

8   A    Yes.  He said, *I need you to resend the original $39,780*

9   *ASAP for Monday.  This is for the actual Political Media.  I*

10  *know you are going to be pissed and angry, but no fucking*

11  *around.  Too much risk associated with Political Media, and he*

12  *started asking lots of questions, because of that one 20K that*

13  *hit his account directly.  If you can resend that 39K today for*

14  *Monday, we will finalize all of the invoices on Monday, and be*

15  *done with this all.  No loose ends.  Just trust me, not worth*

16  *discussing.*

17       *Okay.  I can't get him on the phone this very second,*

18  *but I know that 40K will do it.  That was what we discussed.*

19  *Here is what we will do, send to the same account.  When he*

20  *knows I have the funds, I will get him to sign the NDA,*

21  *non-disparagement release document, and he will get his money*

22  *on Monday once it hits my account.  It's the safest play.  I*

23  *will talk to him today and resolve this.  You have my word.*

24  *The rest of the other stuff is already done.*

25       *Send 40K to your account?  I promise you I'm not going*

JONATHAN YIOULOS - Direct

1   *to touch it, it's to resolve this matter. I will send it to*

2   *him -- I will send it directly to him, once I have the docs*

3   *signed. He is not a shakedown artist. He just needs one*

4   *quiet. I wouldn't say unless I knew.*

5   Q   So, this -- first, at the top there. So, *This is for*

6   *actual Political Media*, and *he started asking questions*. Who

7   is the *he* that's being referenced there?

8   A   Larry Ward.

9   Q   And why was there too much risk associated with Political

10  Media?

11  A   Because apparently Larry had raised concerns about actually

12  receiving funds, and was not comfortable with it anymore.

13  Q   Let's keep reading.

14  A   *Forty-fucking thousand. Unreal. Everyone gets money*

15  *except us. Time to move on. Ha, and what about the BTC?*

16  *Like, I was supposed to have that too, but I see that's not*

17  *happening either. Whatever.*

18      He said, *Yes. We're sending that, as agreed. All of*

19  *our agreements stand.*

20      I said, *40K is out, 40K even*. He said, *Okay. I'll*

21  *take care of it with him. You have my word. Then we never*

22  *have to deal with it again. Guaranteed.*

23  Q   So, *as agreed* and *all of our agreements stand*. What was

24  the agreement?

25  A   That I would get one BTC back.

JONATHAN YIOULOS – Direct

1   Q   Keep going?

2   A   He said, *Enjoy the weekend and have like 20 beers for me.*

3   I said, *All good.  Have a good weekend.*

4   Q   All right.  Now, let's look at Government's Exhibit 801.

5   And now page three.  Do you see what date was this?

6   A   The date on the invoice was May 13th, 2019.

7   Q   And what's the total amount on this invoice?

8   A   The total amount was $89,750.  The total due was 40,000.

9   Q   Why is it split up into those different amounts like that?

10  A   Because we had already paid 49,750 to Political Media for

11  fraudulent services that did not have an invoice yet, so the

12  additional 40,000 was being sent.  So, instead of sending over

13  two individual invoices, he sent over one invoice for the full

14  amount, and this way the numbers could tie for the two

15  different payments.

16  Q   We can take that down.  Did you ever text with

17  Kimberley Tew about Political Media?

18  A   Yes.

19  Q   Let's look at Government's Exhibit 708, which is not yet in

20  evidence.  And again let's sort of scroll through it.  Did you

21  review this message before your testimony?

22  A   I did.

23  Q   What are these messages?

24  A   Text message conversation between myself and Kimberley Tew.

25  Q   Okay.  How do you know that you sent these to

JONATHAN YIOULOS – Direct

1    Kimberley Tew?

2    A    The nature of the conversation, references to the

3    conspiracy and references to Michael.

4         MR. FIELDS:  All right.  Your Honor, pursuant to the

5    Declarations at 1115, I just ask this be published?

6         THE COURT:  So, it will be published, but not admitted

7    at this time.  Thank you.

8    Q    All right.  What did you tell her?

9    A    I said, *We are.  I just thought it would be easier to go*

10   *through one person.  It's nothing personal.  Seriously.  How*

11   *so?  There's literally no way I can do that.  Jesus.  I'm not*

12   *trying to screw you guys over.  If any of this gets out, we're*

13   *all fucked.  That's why I'm still here, honestly.  I have to*

14   *button this up and stay here until we can get our ducks in a*

15   *row and my wife can find another job in Buffalo, because our*

16   *families are here.  Don't be.  I have this under control.  You*

17   *have to trust me a bit.  I'm pissed.  I have sent over*

18   *$77,037.50 to Political Media, and another 200K-plus to Jess*

19   *and Meyers.  And I tried.  But then Michael got fired because*

20   *of Craig.  The Amex thing would have been handled, but Lori*

21   *went on a rampage.  Don't put this shit on me.  Okay?  Again,*

22   *you're putting this on me, like it's my fault.*

23   Q    You can take that down.  Kimberley blame you for all of

24   this?

25   A    At times she would blame me.  Yes.

JONATHAN YIOULOS – Direct

1   *Q*   How would she say this was your fault?

2   *A*   She assumed that I may have, essentially, been trying to

3   take Michael's job.  I pushed Michael out, so I could advance

4   my career.

5   *Q*   Did you?

6   *A*   No.

7   *Q*   All right.  So let's move on to another company.  Do you

8   remember referencing Sand Hill, earlier, in your testimony?

9   *A*   Yes.

10  *Q*   Remind us, what was Sand Hill?

11  *A*   Sand Hill was the LLC company that Michael used, initially,

12  when he was a contractor at National Air Cargo.

13  *Q*   Was it ever used as part of this fraud scheme?

14  *A*   Yes.

15  *Q*   How so?

16  *A*   The bank account for Sand Hill was used to send money to.

17  *Q*   Let's look at Government's Exhibit 681.  What is this?

18  *A*   A text message exchange between myself and Michael Tew, on

19  Tuesday, December 4th, 2018.

20        *MR. FIELDS:*  And pursuant to the Declaration, that's

21  Government's Exhibit 1115, we would also move to admit this

22  into evidence.

23        *THE COURT:*  Okay.  Six-eighty-one is admitted.

24  *Q*   And what's there at the top.  Just an account number?

25  *A*   It's a routing number, account number and account name.

279
JONATHAN YIOULOS – Direct

1    Q    And could you read that into the record for us?

2    A    Just the account number?

3    Q    Yep.

4    A    It's 139101388385.

5    Q    What's the account name there?

6    A    Sand Hill, LLC.

7    Q    All right.  Please keep reading for us.

8    A    I said, *Got it.  For the record, we've given Jess 105K,*

9    *after this, it's 100K to Mike too, so try to work that into the*

10   *agreement.  Fuck, that's so much money.  Of course.  Copy.*

11   *Okay.  Final decision.  Send to Sand Hill.  We're going to*

12   *handle it.  Do not send to Jess.  BOFA account.*

13        I said, *Are you sure?  Positive.  Yes, one hundred*

14   *percent.  Better for both.  Okay.  How is this going to get*

15   *handled so Mike doesn't ask for more?  Just wondering.  Can't*

16   *blame me for asking that question because we got fucked before.*

17   Kimberley *taking care of it which is why better goes to Sand*

18   *Hill no more people in middle.  No more wasting time.  That's*

19   *fine that she says that, and I trust you guys, but what's from*

20   *stopping him from sending an email tomorrow, saying he never*

21   *got paid?  That's my worry.  I get, she's handling it, but what*

22   *does that mean?  Apologize for all of the questions.  I just*

23   *can't keep doing this shit.*

24        *He can't, because he knows it's coming from us.*

25   *You're out of it.  That's why it works.  Obviously, we are more*

JONATHAN YIOULOS - Direct

1    *reliable.  Question mark.  Getting it out now.  No changing*

2    *minds after this.  Done.*

3    Q    Okay.  So, Kimberley *taking care of it*, and Sand Hill, do

4    you know if Kimberley was a signatory on the Sand Hill

5    accounts?

6    A    I'm not sure.

7    Q    So how -- do you know how she was taking care of it?

8    A    I was assuming that she was facilitating the --

9              MR. KAPLAN:  Objection, Your Honor.

10             THE COURT:  Overruled.  He can state what he

11   understands.

12             THE WITNESS:  I understood that she was going to

13   facilitate the funds from the Sand Hill bank account, getting

14   to Mike Meyers.

15             MR. FIELDS:  We can take that down.

16   Q    So, went through a bunch of different emails there, a bunch

17   of different invoices.  As more money went to Political Media,

18   what happened to your level of concerns?

19   A    My level of concern was raised, as well.

20   Q    Why?

21   A    Because having a lot of money sent to one vendor can raise

22   red flags, audits, if you continue to -- continue to send

23   payments to a vendor that nobody, other than myself, at

24   National had really heard of, when there wasn't much money to

25   be spent, would raise concerns around the office, as well.

JONATHAN YIOULOS - Direct

1        If Abby were to talk to Chris about, you know,

2   payments that needed to get out, vendors who were calling,

3   needed legitimate payments, if she reviewed payments and went

4   out and said we've sent 200,000 to Political Media, Chris might

5   say, *Who the hell is Political Media*?  So, I was concerned that

6   we were sending too much to certain individual vendors.

7   Q   Let's look at Government's Exhibit 795.  What is this?

8   A   Text message conversation between myself and Michael Tew.

9   On Wednesday, June 26th, 2019.

10       *MR. FIELDS:*  Pursuant to the Declaration, 1115, the

11   government would move this into evidence.

12       *THE COURT:*  Seven-ninety-five is admitted.

13   Q   Can you read this for us?

14   A   Yes.  He said, *Bank is calling me to confirm ACH.  Please*

15   *confirm you received this.*  I said *Yes.*  He said, *Did they*

16   *call*?  I said, *No.*  He said, *They are asking about money coming*

17   *in to Political Media.  Call 7473.*  I said, *Just tried twice,*

18   he said, *Sand Hill, LLC account 7596376934, A B A tel,*

19   *102000076, that's ACH ABA.  Not wire for Wells.  All set, 30K I*

20   *couldn't do 45.  I'm sorry.*

21       He said, *Understood.  Talk later.  Running to the*

22   *bank.*  I said, *Call me I have a good explanation.*  He said,

23   *Maybe she's being paranoid because of what happened here but*

24   *still a good question.*

25       I said, *It won't get flagged.  If your bank account*

JONATHAN YIOULOS – Direct

1   *says Sand Hill and I send to Sand Hill, there's no issue at*

2   *all.  Our bank won't flag it.  They have no clue.*

3        He said, *What about on your end?  Okay.  And nobody*

4   *can see in signature.*  I said, *No nobody can see.  It really*

5   *doesn't matter unless Abby got curious.  Never does.*

6        He said, *I guess she was asking.  Jeez, why didn't we*

7   *do that earlier on, but it's sort of water under the bridge*

8   *now.*

9        I said, *Well, because it's safer to use a company name*

10  *in case she does go snooping, and if I need confirmation for*

11  *audits and shit. I would rather not use Sand Hill, but in this*

12  *emergency situation I can.  That's why you should set up a*

13  *legitimate corp for the fuel consultant.  Does that make sense*

14  *to you?  Yes.  Copy.  Thank you.*

15  *Q*   Let's go back up.  All right.  Down a little bit.  So,

16  *safer to use a company name in case she goes snooping.*  Who is

17  the *she* there?

18  *A*   Abby Schwartz.

19  *Q*   And then, Michael's message earlier in green there, *I guess*

20  *she was asking jeez why didn't we do that earlier*?  Who is the

21  *she*, that he is referring to there?

22  *A*   Kimberley Tew.

23  *Q*   So this money to Sand Hill, why hadn't you sent money to

24  Sand Hill earlier?

25  *A*   So, I didn't like using Sand Hill's bank account because it

JONATHAN YIOULOS - Direct

1    was associated with Michael Tew.  He had already been

2    terminated from the company.

3    Q    And then, you know, at the bottom there, *That's why you*

4    *should said up a legitimate corp*.  What did you mean by *legit*

5    *corp*?

6    A    Through conversations with Michael Tew, on the phone and

7    text messages, we had talked about setting up -- if he needed

8    funds still, to set up an actual LLC, in his name, with a

9    legitimate corporation that was set up that could send

10   invoices.

11   Q    Did he eventually take this advice?

12   A    Yes.

13   Q    What company did he set up?

14   A    Global Fuel Logistics, LLC.

15   Q    All right.  So, what's the date here?

16   A    June 26th, 2019.

17   Q    Let's look at Government's Exhibit 801.

18        *MR. FIELDS:*  If we could -- let's go to page 11.

19   Q    Is this an invoice for Political Media?

20   A    Yes, it is.

21   Q    But earlier in that text exchange -- well, first of all,

22   let's go up a little bit.

23        Is the date on this invoice the 27th, is that around

24   the same time as those text messages?

25   A    Yes.

JONATHAN YIOULOS – Direct

1   Q   So, this invoice looks like it's from Political Media, but

2   you sent money to Sand Hill.  Why was that the case?

3   A   That's what Michael had requested me to do.

4   Q   Did that create any sort of accounting issues?

5   A   It could.

6   Q   Okay.  So, you said you didn't like using Sand Hill,

7   because it was associated with Michael Tew, right?

8   A   Yes.

9   Q   Did you do anything to conceal that relationship?

10  A   Yes.

11  Q   What did you do?

12  A   So, the reason I didn't like using Sand Hill, as -- so it

13  wasn't just the account number.  It was also the account name.

14  He had indicated that at a previous date an invoice or a

15  payment that I had sent to Sand Hill was flagged at the bank,

16  because the name that I used on the account was not Sand Hill.

17  I used the business name for Political Media, and sent it to

18  the Sand Hill bank account.  He had told me that ACH -- those

19  funds were frozen.  So I wanted to make sure that the funds

20  would not be frozen.  So I wanted to use an acronym that looked

21  like Sand Hill so that if a bank was reviewing it, they could

22  see, okay, this acronym is very close to Sand Hill.  Those

23  names kind of match, we are going to approve this to go

24  through.  Wouldn't get flagged.

25  Q   What was the acronym?

JONATHAN YIOULOS - Direct

1    A    SHI.

2    Q    Let's look at Government's Exhibit 817, which is not yet in

3    evidence.    What is this?

4    A    A text message conversation between myself and Michael Tew,

5    on Thursday, August 1st, 2019.

6           MR. FIELDS:    Pursuant to the Declaration, that's

7    Government's Exhibit 1115, we would move this into evidence.

8           THE COURT:    All right.    Eight-seventeen is admitted.

9    Q    Could you read this for us.

10   A    *Look, I hear you man.  We tend to get into arguments when*

11   *things don't go as planned.  Things generally don't go as*

12   *planned and that's frustrating.  I'm trying to keep it together*

13   *here and meet my own deadlines, as well.*

14   *      One guy put in for 92K, and he is problematic for the*

15   *other 47K.  I'm trying to stretch everything as much as*

16   *possible.  I truly, truly, truly am.  I know we're at 192, so*

17   *that leaves 150K.*

18          I said, *Well, yeah, it's fucking frustrating.   You*

19   *know how tight things are here.  You know the situation and yet*

20   *it's nonstop, and I truly feel like after we to get 150K it's*

21   *not ending.  I still have no BTC.  This feels like it's never*

22   *going to stop.  The reason why these things happen is because*

23   *of a vol in BTC, which is why everyone wants out anyway, which*

24   *is fine, because this will all be over soon.  In other words,*

25   *if they expect X value, but BTC goes up, as it has in the past*

JONATHAN YIOULOS – Direct

1   *few days, all of a sudden they want more.  So the fight to get*

2   *them less is ongoing, if you see what I'm saying.  They will*

3   *use their leverage to get as much as possible, we use ours to*

4   *get them as little as possible.  I know this is a bit more*

5   *information than you want to know, but I want you to know that*

6   *I'm truly not bullshitting you.  Okay?*

7   Q   So, let's stop there for a second.  That message up at the

8   top, *One guy put in for 92K, it's problematic for the other*

9   *47K.*  Did you understand what Michael was talking about there?

10  A   No.

11  Q   All right.  Then this, *I know we are another 192 so that*

12  *leaves 150K.*  Do you know what he meant there?

13  A   Um, 150,000 more that needed to be sent out.

14  Q   And then, *The reason why these things happen is because of*

15  *vol in BTC.*  What is *vol in BTC*?

16  A   The volatility in Bitcoin™.  Price could go up or down at

17  any given day.  Relatively sharp changes.

18  Q   And, *These things happen.*  Did you know what *things* Michael

19  was talking about?

20  A   Not particularly.  When he would get technical, I kind of

21  just phased out, because I knew, at the end of the day, I would

22  most likely have to send more money, anyway.

23  Q   Why would you have to send more money, because of

24  volatility in Bitcoin™?

25  A   Because of what they were doing with these individuals they

JONATHAN YIOULOS – Direct

1    were trading with, and that's all I knew.

2    *Q*    When you say *they*, again, I want to be in particular.  Who

3    is the *they*?

4    *A*    Yes.  I'm sorry.  Michael Tew and Kimberley Tew.

5    *Q*    How do you know it was Michael Tew that was engaging in

6    this?

7    *A*    Because of discussions through texts and phone calls with

8    Michael.

9    *Q*    What about Kimberley Tew?  How did you know she was

10    involved with this?

11    *A*    Because of discussions with Michael and also with

12    Kimberley.

13    *Q*    Let's keep reading.

14    *A*    Yeah.  Please stay calm.  I honestly do not know the*

15    *current cash position, other than it's stretched.  I need to*

16    *know if you can do anything for tomorrow.  I know you are*

17    *worried about invoices.  We can make that work.  But if we have*

18    *money available, we should use it to make this move faster.*

19    *Hear what I'm saying?  Call me.  Lunch, if you can?  I need*

20    *money for tomorrow or things can get fucked.  I know you are*

21    *pissed.  I know you are angry.  I know you are totally*

22    *frustrated.  I am also.  Can we send to a different vendor?  I*

23    *know you have obligations.  I know you are doing your best.  I*

24    *know these things.*

25             *No.  We can't send to a different vendor.  I'm not*

JONATHAN YIOULOS - Direct

1   *getting this all fucked up again... I understand.  Sorry.  Been*

2   *working on this on top of my other stuff, been falling behind.*

3   *I know you are putting your foot down, and I know you are*

4   *managing risk.  What's the most reasonable amount you may be*

5   *able to sneak out for tomorrow.*

6   Q   Keep going.

7   A   *If you can send 45K you get your one BTC.  If you don't get*

8   *it over the weekend, you don't send another penny.  Assuming we*

9   *honor the deal and you get it, then we pick up where we left*

10  *off with the plan.  Think on it.*

11  Q   *Honor the deal* what was the deal?

12  A   BTC.  I was going to get a full Bitcoin™ back.

13  Q   What would you have to do before you get that Bitcoin™

14  back?

15  A   Send 45,000.

16  Q   Let's keep going?

17  A   *That's so much to send again, fuck.  True, but it's a*

18  *weekend and we will create invoices for fuel.  What if you sent*

19  *15K to Political Media, Sand Hill, and 30K to Global Fuels?*

20  *IDK.  Political Media goes to Shill account and 30K goes to*

21  *fuel.  IDK.  I kind of want to be done with PM.  Okay.  Hang*

22  *on.  It's all fuel, and you owe AG like 4 mil, right?  Can you*

23  *book it to that account in the cash sheets?  Yeah, IDK.  If you*

24  *send to Global Fuel you book -- you book it -- you book it to*

25  *AEG cash nobody knows that's an account of theirs.*

JONATHAN YIOULOS - Direct

1    *Q    What was AEG?*

2    *A    AEG was our largest fuel vendor at National.*

3    *Q    Let's keep going.*

4    *A    You don't understand the process.  Obviously not.  Calling.*

5    *I need bank information before four.  On it.  Account name,*

6    *Sand Hill, LLC, bank name, Wells Fargo Bank, NA, account number*

7    *7596376934, ABA 102000076.  This is for ACH, not wire.  Wells*

8    *has a different wire ABA.  Yup.*

9        *Assuming all is on plan, let me know how much and when*

10   *next week, if it's Monday or Tuesday day, and I won't bother*

11   *you again.  Your 47K out.  OMG, not sure how you did it, but*

12   *thank you.  You'll have your BTC, next week, Monday slash*

13   *Tuesday?  Which one is better?  Probably Tuesday.  Works,*

14   *thanks.  In a board meeting.  What's up?  All good.  Just*

15   *checking you're okay.  Yeah, I'm fine.  Email the W-9 over when*

16   *you can.  Okay.  Just confirming you sent this to Sand Hill but*

17   *booking as Global Fuel.  Why not in the past just send to*

18   *Michael Tew account holder at Navy Federal in the past.  Yes.*

19   *Sent to Sand Hill, but booking as Global Fuel.  We're just*

20   *trying to understand the banking issues, cause I have to put*

21   *the name in the remittance.  If I put your name and someone*

22   *ever pulls the remittance, we're fucked.  I don't hate doing it*

23   *in a pinch, but still.*

24       *Got it.  Doesn't everyone know Sand Hill also?  Yes*

25   *but it goes out as SHI, LLC, nobody knows what the fuck that*

1    *is, and I can be like, Oh, shit, I put the wrong name.  If it*

2    *says Michael Tew, that's too obvious.*

3            *Interesting question could you just use a portion of*

4    *the account number as the name on the account?  That might be a*

5    *good one.  I will talk to you tomorrow.  N P.*

6            MR. FIELDS:  Take that down.  I just have a couple

7    more in this particular section.  I don't know what time the

8    court wants to take the afternoon break.

9            THE COURT:  I think this is actually a -- probably a

10   pretty good time.  Let's take a break until 3:30.

11           THE COURTROOM DEPUTY:  All rise.

12      (Jury out at 3:13 p.m.).

13      (In open court at 3:30 p.m.)

14           THE COURT:  Please take your seats.  Ms. Hubbard, I

15   understand you have something else?

16           MS. HUBBARD:  Feels a little like Groundhog Day.  I

17   have been trying to research to supplement the argument I made

18   earlier.  I believe the government has some case law that they

19   want to put in front of the Court, as well.  But I wanted to

20   raise somewhat of subsidiary issue that I think is related.

21   The argument I made before was confrontation clause related

22   *Bruton* and *Samia*, I think is the name of the other case, and

23   that relates to whether or not the statement is testimonial and

24   other things.

25           Even if the Court were to find that the statement is

JONATHAN YIOULOS - Direct

1    not testimonial, then I think the next issue is whether it is

2    admissible against just Michael Tew as non-hearsay statement,

3    or if it is admissible against both Kimberley Tew and Michael

4    Tew, as a co-conspirator statements, and Your Honor, the Court

5    previously withheld ruling, or reserved ruling, on these

6    recordings in the order on the *James* log, and saved the issues

7    for motions in limine and/or trial objections.  So I don't

8    think there's been a finding here that the entirety of the

9    recordings is admissible as a co-conspirator statement, and I

10   don't believe it is.

11          Specifically, there is Tenth Circuit case law in

12   *United States vs Rutland*, 705 F.3d, 1238, trying to go a little

13   slower for the court reporter, I have a tendency to run through

14   -- yep, 705 F.3d, 1238, and I -- just to be frank, I'm just

15   getting into this aspect of my research, but that statements,

16   narrative statements about past events, are not in furtherance

17   of a conspiracy.  And so, there are portions of these

18   recordings, you can imagine, Mr. Yioulos, knowing that he is

19   acting as an agent for law enforcement and trying to get

20   Mr. Tew to talk about what happened in the past.  He is asking

21   questions designed to get Mr. Tew talking about where the

22   proceeds went?  What's the real story behind why you guys

23   needed this money.  That's where the gambling conversations,

24   the Bitcoin™, some of these relationships, this occurs in

25   summer 2020, and Mr. Yioulos is asking Mr. Tew about Mike

JONATHAN YIOULOS - Direct

1   Meyers and others that really are not involved in this after

2   spring of 2019, so these are very clearly conversations and

3   Mr. Tew is making statements about past events that are not in

4   furtherance of the conspiracy.

5          So, the way that I think, and again I'm trying to

6   caveat this, I'm trying to do the best I can researching it,

7   but I think the way that would play out is Michael Tew's

8   statements.  So they are non-hearsay as to him, but they are

9   not non-hearsay as to Mrs. Tew.  So, I think, at least, that

10  will require some kind of limiting instruction as to those

11  statements.  So, I just -- I knew the Court was kind of looking

12  at this issue, big picture.  I didn't want you to -- I just

13  wanted to put out, all of the issues that I have kind of come

14  across at this point.

15         THE COURT:  Okay.  Thank you, Ms. Hubbard.  Why don't

16  I let the government respond.

17         MR. FIELDS:  Your Honor, first, on the Bruton issue,

18  we were able to look back, over the break, and this Groundhog

19  Day is so apt.  We had, actually, already litigated, briefed,

20  argued this issue at the severance hearing, and the Court's

21  order, actually specifically addressed it.  **ECF Number 260**, and

22  the Court noted there, the black-letter law, I stated earlier,

23  which is that co-conspirator statements are not testimonial.

24         If you needed anymore, sort of, confirmation on that

25  point, Tenth Circuit law confirms that.  So, some of the key

JONATHAN YIOULOS - Direct

1   cases there, *United States vs Small*, 605 F.3d, 765, 779, Tenth

2   Circuit, 2010.  As the government stated in its *James* log it

3   admits that that Yioulos was not part of the conspiracy, but

4   Michael Tew was, and the focus on whether or not something is

5   actually part of the confrontation clause or whether there's

6   testimonial, is the declarant's state of mind, and Michael Tew

7   was not making a statement to a, sort of, interrogation agent.

8   It's not like *Lally's* case or anything like that, which is what

9   takes it very much out of the heartland.  Everything that

10  Justice Scalia was talking about in *Crawford*.

11          The government was able to find one case that is

12  particularly persuasive, *United States vs Dale*, 614 F.3d, 942,

13  the pin site is 955.  This is from the Eighth Circuit in 2010.

14  The facts, at as they relate to this issue, are really close.

15  You are dealing with tape-recorded conversation by one

16  cooperator against another, where, sure enough, the

17  co-conspirator on the call starts implicating other

18  conspirators.  So defense raises this objection at the District

19  Court, and the District Court says, *Yeah, actually I agree with*

20  *that.  You should redact the tape, government.*  So the

21  government redacts the tape.  It goes up on appeal, after he is

22  convicted anyways, and the Eighth Circuit says, *Actually, you*

23  *didn't need to redact that tape at all*.  Nothing that was said

24  on that call is about *Bruton*, and the Eighth Circuit is very

25  explicit about this.  It is clear that the, sort of, declarant

JONATHAN YIOULOS - Direct

1    there, this co-conspirator, it's *Dale* in that case, had no idea

2    that the conspirator was wearing a wire or that the

3    incriminating statements he made would ultimately be used

4    against him at trial.  So, that's the key thing.  So, in making

5    those statements, this co-conspirator would not reasonably

6    expect them to be used prosecutorial -- not reasonably expect

7    them to be used prosecutorially.  So, they make, especially,

8    this *Bruton* finding and conclude that it's not testimonial,

9    *Bruton* is not implicated, and the introduction of all of those

10    out-of-court statements was perfectly fine.

11        Now what I'm getting is, sort of, this separate issue.

12    So, on that, Your Honor, what I would say, it is a continuing

13    source of frustration that arguments that could have been made

14    much earlier are not made, and instead, they try to get bites

15    at the apple over and over and over again.  Any arguments like

16    this are waived.

17        Their motion -- their response, their very short, you

18    know, seven-page response, was explicit about, sort of, their

19    objection was, Yioulos isn't part of the conspiracy, don't

20    admit this.  They are not making the same sort of claims that

21    they're making now about all of this.  But even if the Court

22    were to address that on the merits, government's response would

23    be two fold; first, the entire statements come in against

24    Michael Tew; to the extent that the Court makes any findings

25    that some of these statements were not in furtherance of the

JONATHAN YIOULOS - Direct

1    conspiracy, it can order limiting instructions.

2          Tenth Circuit case law on that is also very explicit.

3    When the Court gives limiting instructions, the law presumes

4    that jurors are going to follow them, because otherwise our

5    judicial system would run amuck, if we assume that jurors don't

6    listen to their instructions.

7          Second, what the government would say is that

8    narratives about past events are not in furtherance.  We would

9    agree with that.  But it's context dependent.  As the

10   government, sort of, noted in its *James* log, and as we expect

11   the testimony today will show what was happening at the time is

12   that the FBI had actually already contacted National Air Cargo.

13   National Air Cargo was already nervous and already tipped off

14   Michael Tew to the fact that there was a lot of snooping going

15   around.  Jonathan Yioulos was really nervous about this.  He

16   was afraid they were going to get caught.  All of these

17   narrative of past events, what Michael Tew was doing, what

18   Kimberley was doing with money, is there going to be more about

19   this, was all designed, very explicitly, to help reassure,

20   Yioulos that Michael Tew had covered his tracks, that this

21   gambling issue stopped and to make sure that Yioulos continued

22   to send the money.  Playing on Yioulos' friendship.

23   Threatening him when that doesn't work.  It's reassuring him,

24   when that doesn't work.  It's all part of the same, sort of,

25   design.  These statements are in furtherance of the conspiracy,

JONATHAN YIOULOS - Direct

1    because they are designed to keep Yioulos in it, so that

2    Michael and Kimberley Tew can continue to profit from it.

3        So, for all of those reasons, which were already

4    raised, the government would say that the entirety of the

5    statements are in furtherance, but again, all of the fallback

6    arguments that I have also just made.

7        THE COURT:  All right.  Thank you.  So I did --

8    Mr. Jacobsmeyer and I did a bit of research ourselves.  I think

9    some similar things, and I agree with the government on this,

10   both the fact that this could have been raised -- in fact, was,

11   in many ways, raised years ago.  Let alone, the details of this

12   I think could have been raised at least a couple of months ago

13   or a month or so ago.  But even on the merits, I do think that

14   the statements made, as we discussed previously, and I don't

15   really think that it was contested by the defendants, that

16   Michael Tew's statements were in furtherance of the conspiracy.

17   He was -- believed himself to be part of the conspiracy, at the

18   time.  He believed Mr. Yioulos was still part of it, and given

19   the context -- the additional context I, sort of, have from

20   today, it seems more clear that Mr. Fields' description of him

21   trying to reassure Mr. Yioulos seems accurate.  To me, at

22   least, accurate enough to admit that under that rule and to

23   consider it a statement in furtherance of the conspiracy.

24   Given that, it's quite clear that *Bruton* doesn't apply.  *Wright*

25   *& Miller* say if the codefendant's statement is not testimonial,

JONATHAN YIOULOS - Direct

1    the confrontation right does not apply, no *Crawford*, no *Bruton*,

2    assuming the statement is admissible under the Rules of

3    Evidence it may be received.  So, to that extent, I think it's

4    not -- there's not a *Bruton* issue, and I also don't think

5    there's an issue as to Mrs. Tew either.  She was, again, the

6    conspiracy, for purposes of Rule 801, is not necessarily the

7    same as saying I think there was proof of the criminal

8    conspiracy that's alleged here, but I have found that there is

9    a conspiracy that included all three of these people, for

10   purposes of Rule 801.  The statements were made -- the

11   statements by Mr. Tew, that we're talking about, were made in

12   furtherance of that conspiracy, for the reasons we just talked

13   about.  There's no *Bruton* issue.  No *Crawford*, as I just said,

14   and no hearsay issue, and so I think they can be admissible as

15   to either defendant, and I guess if the government and I are

16   wrong about that, there's risks to that.  But overruling the

17   objections.  I don't plan to issue a limiting instruction

18   either.  So that's my ruling on that.

19          Can we go ahead and bring the jury back in?

20          *MR. SCHALL:*  Your Honor, before we do, Ms. Frost is

21   momentarily back.  Is it all right if Mr. Poland is excused?

22          *THE COURT:*  Yes.  Thank you for being here.  I hope

23   you enjoyed yourself.  And she can just come in -- I already

24   instructed them about people coming and going, so that's fine.

25   Thank you.

JONATHAN YIOULOS – Direct

1          MR. FIELDS:  Your Honor, we're going to bring in

2     Mr. Yioulos.

3          THE COURT:  That's fine.  I'm actually -- you guys

4     should sit down, because I'm having a tech issue for a moment.

5          THE COURTROOM DEPUTY:  All rise.

6        (Jury in at 3:45 p.m.)

7          THE COURT:  All right.  Let's all take our seats.

8     Welcome back, ladies and gentlemen.  Thank you all for your

9     patience and attention.  I believe the government is continuing

10    with Mr. Yioulos, who is still under oath.

11         MR. FIELDS:  Thank you.  May I begin?

12         THE COURT:  Yes.

13        Q    (By Mr. Fields) Mr. Yioulos, before the break we were

14    talking about this acronym, SHI.  What was that?

15    A   It was an acronym for Sand Hill.

16    Q   Now, let's look at Government's Exhibit 383, which is in

17    evidence, and if we go here to page two.  What do you see there

18    for credit destination accounts?

19    A   Yes.  I see the routing number, the last four of the

20    account number and the name is SHI, LLC.

21    Q   All right.  So, when you put SHI, LLC what did SHI stand

22    for.  Sand Hill, LLC.

23    Q   Okay.  And zooming out a little bit, could you look at the

24    date on this particular ACH?

25    A   Yes.  It was entered and approved, August 1st, 2019.

JONATHAN YIOULOS – Direct

1   Q   Let's go back to Government's Exhibit 817.  We were just

2   looking at --

3           MR. FIELDS:  Scroll down a little bit.

4   Q   All right.  And yeah, you see there, Political Media goes

5   to SHI, LLC account?

6   A   Yes.

7           MR. FIELDS:  Keep scrolling down.  Keep going down.

8   All right.

9   Q   And then you see where you said, *Yes, it goes out as SHI,*

10  *LLC*?

11  A   Yes.

12  Q   Is this the same date as that ACH confirmation we just

13  looked at?

14  A   Yes, it was.

15          MR. FIELDS:  All right.  So, now we're going to try --

16  see how our software holds up here.  I want to display four

17  documents at the same time.  So, in the upper left, let's put

18  Government's Exhibit 13, and upper right, Government's Exhibit

19  15, lower left, Government's Exhibit 17, and then bottom right

20  Government's Exhibit 18.  Those are all way too small to read.

21  Let's see if we can zoom in on *credit destination accounts* for

22  each one.

23  Q   What do they all have in common?

24  A   The same routing number, the same last four of the account

25  number, and the same name.

JONATHAN YIOULOS - Direct

1    *Q*    What is that name?

2    *A*    SHI, LLC.

3    *Q*    Three more.  Let's look at 19, 22, and 23.  Same thing.

4    What do you notice about those?

5    *A*    Same routing number, name, last four of the account numbers

6    and same name.

7    *Q*    What is that name?

8    *A*    SHI, LLC.

9    *Q*    So, all of these payments to SHI, LLC, were any of those

10   for a legitimate purpose?

11   *A*    No.

12   *Q*    Did you ever book anything at National Air Cargo using this

13   acronym SHI for a legit purpose?

14   *A*    No.

15   *Q*    All right.  One last company.  So, should be in that

16   Redweld®, Global Fuel Logistics.  All right.  So, before we get

17   into this.  Global Fuel logistics, was there any other entity

18   associated with it?

19   *A*    Yes.

20   *Q*    What was that?

21   *A*    Aero Maintenance Resources.

22   *Q*    What was the relationship between Arrow Maintenance

23   Resources and Global Fuel Logistics.

24   *A*    Essentially, Aero Maintenance Resources was a partner

25   company, subsidiary, of Global Fuel Logistics.

JONATHAN YIOULOS – Direct

1  Q   So, if you could, same thing we've done earlier.  Look at

2  the folder, review each exhibit, and as you are reviewing them,

3  please read off, slowly, the exhibit numbers.

4  A   Exhibit 841, Exhibit 844, Exhibit 845, Exhibit 875, Exhibit

5  887, Exhibit 903, Exhibit 912, Exhibit 928, Exhibit 933,

6  Exhibit 935, Exhibit 950, Exhibit 952, Exhibit 953, Exhibit

7  954, Exhibit 955, Exhibit 959, and Exhibit 969.

8  Q   Did you review all of those before your testimony?

9  A   I did.

10  Q   What are they?

11  A   They are emails with invoices attached, as well as a W-9,

12  all from Global Fuel Logistics.

13  Q   What about the other Company?  Do any of them relate to the

14  other company you mentioned?

15  A   Yes, Aero Maintenance Resources.

16  Q   Were those emails sent to you while you were at National

17  Air Cargo?

18  A   Yes, they were.

19  Q   Is it the regular practice of National Air Cargo to archive

20  emails like that?

21  A   Yes.

22  Q   Was it part of National Air Cargo's business to get,

23  receive and pay invoices like this?

24  A   Yes, it was.

25          MR. FIELDS:  Pursuant to the Declaration, Government's

JONATHAN YIOULOS – Direct

1    Exhibit 1130, we would move into evidence, all of those

2    exhibits, and I can read them again if that's helpful?

3         THE COURT:  Why don't you read them one more time, so

4    we all have the same list.  Go ahead.

5         MR. FIELDS:  Government's Exhibit 841, 844, 845, 875,

6    887, 903, 912, 928, 933, 935, 950, 952, 953, 954, 955, 959, and

7    969.  Government would move all of those into evidence.

8         THE COURT:  Any objections?

9         MR. SCHALL:  None.

10        MR. KAPLAN:  No, Your Honor.

11        THE COURT:  All right.  Those are all admitted.  Thank

12   you.

13   Q   Who sent these to you?

14   A   Michael Tew.

15   Q   You said there were invoices attached to them?

16   A   Yes.

17   Q   Did you pay those invoices?

18   A   I did.

19   Q   Who instructed you to pay those invoices?

20   A   Michael Tew.

21   Q   Was Michael Tew in the State of New York when he gave you

22   those instructions?

23   A   No he was not.

24   Q   Were those payments that you made based on false pretense?

25   A   Yes, they were.

JONATHAN YIOULOS – Direct

1   Q   What was the false pretense?

2   A   Services were performed by these companies for National

3   Airlines when, in fact, they were not.

4   Q   Let's look at Government's Exhibit 841.  Is this one of

5   those emails?

6   A   Yes.

7   Q   All right.  Do you see who they are from?

8   A   Yes.

9   Q   Who is that?

10  A   It says accounting person.  Jessica Thompson.

11  Q   Did you ever meet Jessica Thompson?

12  A   No.

13  Q   Who is she?

14  A   A made up person.

15  Q   How do you know she was made up?

16  A   Because there was no real Global Fuel Logistics.  I knew

17  Global Fuel Logistics was made up by Michael Tew, and any

18  invoices were sent from him.

19  Q   Let's look at page five.  This one of the invoices?

20  A   Yes.

21  Q   Is there an email address listed there?

22  A   Yes.

23  Q   What's email address?

24  A   *Accounting@globalfuel.co.*

25  Q   How much is this invoice for?

JONATHAN YIOULOS – Direct

1   *A*   It's $152,000.

2   *Q*   Did you ever pay him that much money all at once?

3   *A*   No, I did not.

4   *Q*   Why would you split it up?

5   *A*   To put less invoices in the system, smaller wires --

6   smaller ACH payments would be made, and then we wouldn't have

7   to continue -- he wouldn't have to continue to create invoices

8   just put it all in one.

9   *Q*   And, you know, this $152,000 number, how was that

10  generated?

11  *A*   Depended on how much had gone out in payments.  The

12  majority of the time I would send payments when requested, and

13  invoices would follow.  So, essentially, if I sent out, say,

14  $130,000 of invoices, and he had a request for another 22,000.

15  He would say, *Okay, I'll get over an invoice for 152 to meet*

16  *130,000 you already sent, plus the 22 to get to that 152*

17  *number.*

18  *Q*   Let's look at Government's Exhibit 875.  What is this?

19  *A*   This is an email from Aero Maintenance Resources with

20  invoices attached.

21  *Q*   What does it say undereath Jessica Thompson?

22  *A*   Aero Maintenance Resources, A Unit Of Global Fuel

23  Logistics.

24  *Q*   When you would get invoices for Global Fuel Logistics or

25  Aero Maintenance Resources, how would you book them?

JONATHAN YIOULOS – Direct

1  A    I would forward them to accounts payable.

2  Q    Would they go under Global Fuel or Aero Maintenance

3  Resources?

4  A    It depended on which invoice -- what the invoice said.

5  Q    Was it helpful to have two different companies?

6  A    Yes.

7  Q    How so?

8  A    During audit, oftentimes, the auditors would look at your

9  top customers and your top vendors.  So if you continue to make

10  significant payments to certain vendors, they might make your

11  top-ten vendor list at the end of the year.  So, for, like,

12  they call it a concentration risk.  To lower that concentration

13  risk, divided it into two different companies.

14  Q    We can take that down, please.  Did Michael Tew direct you

15  to send the Global Fuel money to different accounts?

16  A    Yes.

17  Q    Let's look at Government's Exhibit 828.  What is this?

18  A    This is a text message conversation between myself and

19  Michael Tew.

20        *MR. FIELDS:*  Pursuant to the Declaration, that's

21  Government's Exhibit 1115, we would move this into evidence.

22        *THE COURT:*  All right.  Eight-hundred-twenty-eight is

23  admitted.

24  Q    Read this for us.

25  A    *All good for tomorrow?  Literally been slammed.*  I said,

JONATHAN YIOULOS - Direct

1    *Send bank info.*  He said, *Global Fuel Logistics, Inc., Navy*

2    *Federal Credit Union, account number 7088875336.  Routing*

3    *number 256074974.*  I said, *You want it to that one, now*?  I

4    said, *It's out.*  He said, *Thank you.*

5    Q    Okay.  Navy Federal Credit Union, what do you know about

6    Navy Federal Credit Union?

7    A    That account belonged to Michael Tew.

8    Q    Now, would you confirm with Michael, when you were sending

9    him money for these Global Fuel Logistics payments?

10   A    When you say confirm?

11   Q    Would you confirm that you were sending the money?

12   A    Yes.

13   Q    Let's look at Government's Exhibit 830.  What is this?

14   A    This is another text message conversation between myself

15   and Michael Tew, on August 19th, 2019.

16   Q    All right.  And let's --

17          MR. FIELDS:  Well, pursuant to the Declaration, that's

18   Government's Exhibit 1115, I'm going to move this into evidence

19   Your Honor.

20          THE COURT:  It's admitted.

21          MR. FIELDS:  All right.  Let's put it on the left-hand

22   side of the screen and if we could pull up on the right-hand

23   side of the screen Government's Exhibit 14.  Now, let's zoom in

24   on Government's Exhibit 830.  Okay.

25   Q    What does it say

JONATHAN YIOULOS – Direct

1   A    For which side?

2   Q    On the left there.  Sorry.

3   A    It's okay.  *Global Fuel Logistics, Inc., Navy Federal*

4   *Credit Union, account number 7088875336, routing number*

5   *256074974, 9500 out.  Thanks, talk tonight.*

6   Q    What do you see on the right there?

7   A    An ACH confirmation, with the same routing number, same

8   last four of the account number, and the same name and the same

9   amount as in the -- that's in the text message.

10        *MR. FIELDS:*  Let's take those down.  Let's look at

11  Government's Exhibit 833.

12        *MR. KAPLAN:*  Excuse me.  Could you repeat that?

13        *MR. FIELDS:*  Eight-hundred-thirty-three.

14        *MR. KAPLAN:*  Sorry, just...

15        *MR. FIELDS:*  No, it's okay.

16  Q    What is this?

17  A    A text message conversation between myself and Michael Tew.

18        *MR. FIELDS:*  Pursuant to the Declaration, at

19  Government's Exhibit 1115, we would move this into evidence?

20        *THE COURT:*  Exhibit 833 is admitted.

21  Q    And we're going to be doing the same thing.  So, we will

22  put up Government's Exhibit 815 over on the right -- I'm sorry

23  833.  Let's put that on the left.  And Government's Exhibit 15,

24  which is already in evidence, on the right.

25        Now, zoom in on just the message body over there on

JONATHAN YIOULOS - Direct

1   the left, Government's Exhibit 833.  Let's read this.

2   A    I said, *Need account.  Account name, Sand Hill, LLC, bank*

3   *name, Wells Fargo, bank NA account number 7596376934.  ABA TEL,*

4   *102000076.  Can you send 25?  Thank you.  I have already sent*

5   *37,500 this week.  Really can't.  I have pushed everything*

6   *quite a bit.  It's a tight situation.  The most you can send*

7   *the better.  I do understand your situation, as well.  I have*

8   *sent nearly 350K in a month.  Really don't think you get it.*

9   *When things are this tight.  I know you just want your BTC.  I*

10  *know you are traveling tomorrow.  Do you want to talk tonight?*

11  Q    Keep going down.

12  A    *Let's just talk this weekend.  I'm fucking beat and my*

13  *flight leaves at 6 AM.  Honestly, as long as we get everything*

14  *in, invoices, by Monday morning, we'll be good.  Thanks for*

15  *checking, though.  Are you sure?  I'm fine with that if you*

16  *are?  Yeah, it's fine.  I know you are getting the shit beat*

17  *out of you.*

18  Q    Over on the right, on Government's Exhibit 15, what do you

19  see?

20  A    Payment confirmation on -- initiated on August 21, 2019,

21  effective data August 22d.

22  Q    For ACH payments, when you put them in, how long would it

23  take for the money to actually be sent?

24  A    It would take the next business day.  So if they were sent

25  before 4 PM, they would be received the next business day, in

JONATHAN YIOULOS - Direct

1    the morning.

2    Q   You can take that down.  So, Global Fuel Logistics and Aero

3    Maintenance Resources, were they used towards the beginning of

4    the course of conduct, in the middle or towards the end?

5    A   The end.

6    Q   Is Kimberley still involved during that phase of the course

7    of conduct?

8    A   Yes, she was.

9    Q   Let's look at Government's Exhibit 820.  What is this?

10   A   A text message conversation between myself and Michael Tew,

11   on Monday, August 5th, 2019.

12        MR. FIELDS:  Pursuant to the Declaration, Government's

13   Exhibit 1119, the government would move this into evidence.

14        THE COURT:  Exhibit 820 is admitted.

15   Q   If you can read that for us.

16   A   Okay.  *Been a long weekend.  Kimberley sent you .05.*

17   *Things got tight because that move up in BTC.  Are you cool*

18   *with that?  We can send you the rest ASAP.  Literally, took*

19   *every dollar that I had to get that to you.  Q.  Can you send*

20   *anything at all for tomorrow?  I promise you are going to get*

21   *the rest.  Trying to keep this short.  It's been a busy few*

22   *days.  Sorry for the delay.  I mean that.  Really can't send*

23   *anything for tomorrow.  We have no cash right now.  It's*

24   *obviously -- it's even going to be tight tomorrow to send, but*

25   *I will, obviously.  And thank you for sending.  I will let you*

JONATHAN YIOULOS – Direct

1   *know when it arrives.  The goal is to get you 2.5 BTC over*

2   *time, as we close this out.  You are a saint.  I plan to close*

3   *this out too.  Pretty easy one, with regards to invoices.  We*

4   *will get you to that 2.5.  I know you don't have cash or not a*

5   *lot.  Can you squeeze 7K out?  It make as difference.  Is there*

6   *any way you can send 25K today?  We're going to bounce a check*

7   *to investors.  A check to an investor.  There's no way I can do*

8   *that.  I'm sorry.  I really can't.  Account name, Sand Hill,*

9   *LLC, bank name, Wells Fargo, bank NA, account number*

10  *7596376934, ABA, 102000076.  15K our, out.  Amazing.  Talk*

11  *after work.  Thank you.*

12  Q   So, a *check to an investor*, do you know what investors

13  Michael Tew was talking about?

14  A   Not specifically, no.

15  Q   Even at this stage, were you still hoping that you would

16  get your Bitcoin™ back?

17  A   Yes.

18  Q   Look at Government's Exhibit 837.  What is this?

19  A   Text message conversation between myself and Michael Tew.

20      *MR. FIELDS:*  Pursuant to the Declaration, at 1115,

21  government would move this in evidence?

22      *THE COURT:*  Okay.  It's admitted.

23  Q   Could you read this for us.

24  A   He says, *When are you free?  Account name, Sand Hill, LLC,*

25  *bank name, Wells Fargo, bank NA, account number 759637634, ABA*

1    *TEL, 10200076.  Can you send 40?  Done.  Yes.  If I send 45, do*

2    *you think I can get at least one BTC soon?  Either way I sent*

3    *45K.  It's done.  Out.  Thank God.  Yes.  Pulling in now.  Was*

4    *on with Marcum, believe it or not.  Ha-ha.  Bizarre.  So funny.*

5    Q   This money that was going out in the name of Global Fuel,

6    Aero Maintenance Resources, who received that money?

7    A   Michael Tew.

8    Q   And earlier we discussed, sort of, 1099s, some of the tax

9    issues.  Do you remember that?

10   A   Yes.

11   Q   The subject of taxes ever come up with Michael Tew?

12   A   Yes.

13   Q   What did he say about that?

14   A   With regard to these, I was concerned that it's a

15   corporation, that Global Fuel Logistics was set up as.  A

16   corporation that continues to collect money for services or

17   receive funds for revenue would be subject to corporate tax.

18   So I was concerned that at the end of this all, there would be

19   a large tax liability to pay, as well, and I wanted to ensure

20   that he was paying the taxes on that.

21   Q   Why did you want to make sure Michael Tew was paying his

22   taxes?  Why did you care?

23   A   Because, if the IRS was looking into Global Fuel Logistics,

24   Aero Maintenance Resources, I wanted to make sure that there

25   was the -- the taxes were paid on those, so it wouldn't come

JONATHAN YIOULOS – Direct

1    back to me or National.

2    Q    What did he tell you about whether or not he was paying his

3    taxes?

4    A    That he had not paid the taxes, yet.

5    Q    And before I move away from this.  So, there's that

6    reference down there to *Marcom*.  What is *Marcom*?

7    A    Marcom was our audit firm.

8         *MR. FIELDS:*  Go ahead and take that down.

9    Q    As the director of finance and the controller, during this

10   period, did you have information to how National was doing

11   financially?

12   A    I did.

13   Q    I think earlier you described National as struggling?

14   A    Yes.

15   Q    Did it struggle throughout this entire period or just

16   during certain periods?

17   A    Pretty much this entire period, started to rebound a bit

18   during COVID, actually.

19   Q    Did that affect your ability to help Michael and Kimberley?

20   A    Yes.

21   Q    How so?

22   A    When the company was struggling, it became difficult to

23   meet our actual real obligations for the company.  Things that

24   would continue operations.  So, paying fraudulent invoices,

25   when you had limited funds, was very difficult.

1    Q    How did you overcome that difficulty?

2    A    I made it work the best I could.  I would send the money

3    when they asked, and was on the phone, often, with our vendors,

4    trying to negotiate terms and negotiate payment plans and do

5    different things of that nature.

6    Q    Did you tell Michael and Kimberley about these problems at

7    National?

8    A    Yes, I did.

9    Q    First of all, with regard to Michael, what was his response

10   to these concerns?

11   A    He was sympathetic.  He had been there with me, when he was

12   employed at National.  He understood the cash crunch that we

13   were in.  He, you know, just said, *Hey, do what you can, but*

14   *also we need money*.

15   Q    With respect to Kimberley, what was her response?

16   A    Wasn't as sympathetic.  Didn't really grasp the fact that I

17   couldn't send money when I said I couldn't.  Just wanted the

18   funds to be sent by any means necessary, and thought I was

19   lying about the cash situation.

20        *MR. FIELDS:*  Okay.  Government's Exhibit 685.  Which

21   is already in evidence.  Again let's scroll through this,

22   slowly, so you can see it again.

23   Q    Do you recognize this document?

24   A    I do.

25   Q    What is it?

JONATHAN YIOULOS – Direct

1    A    It's a text message conversation between myself and

2    Kimberley Tew.

3    Q    Did you review it before your testimony?

4    A    I did.

5    Q    I've asked you this with each of these, but I will ask you

6    again, how do you know this is a message that you sent to

7    Kimberley Tew?

8    A    The context, the talk about the conspiracy, references to

9    Michael.

10         MR. FIELDS:  Your Honor, I would ask for permission to

11   publish this, pursuant to the Declaration of 1115 and the

12   Court's prior rulings?

13         THE COURT:  We will publish it, but it's not admitted,

14   yet.

15   Q    All right.  Let's start reading, again, from the bottom

16   here on page 22.

17         MR. FIELDS:  Let's see if we can zoom in, because that

18   will help.

19   A    *She gets alerts every time it's used.  What are you talking*

20   *about?  Peter called me about canceling Meyers.  Yours went*

21   *through*.

22   Q    Again, remind us, you mentioned this name earlier, Peter's.

23   Who is Peter?

24   A    Peter Grassotti.  He was our representative at Signature

25   Bank.

JONATHAN YIOULOS - Direct

A    I'm not fucking around or messing with anyone.  Because now

the money is gone, it never bounced back, sending out more will

raise suspicions on the cash sheet.  It's like why are we

sending 100K to consultants in the last month but can't buy

fuel?  That's my point, the fact that the money never bounced

back is an issue.  It's not that easy.  We had to send back

payments for PNC and another loan that auto drew.  That's 280K

total that we had to pay.  No.  We don't have the funds for.

Q    You were talking about we don't have the funds for.  Who

were you references there?

A    National.  That's how bad things are.  What do you mean the

money showed up?  Do what?  Have Michael call me from his

phone.  Okay.  Not until Monday.  That's what I have been

saying.  I don't think you realize how that works.  It's not

that simple.  And without funds backing it, it would never

work.  I have no reason to lie to you or to Michael.  Look, I'm

doing the best I can right now.  We have a plane getting out of

the maintenance Saturday.  We are getting more funds from Dubai

as well.  Abby is also out of the office on Monday, too.  I

blocked off 30K to Sand Hill because I thought it was -- this

was over, but now that money never came back.  No that's my

point.  If it did, there wouldn't be a problem, because I could

easily just send it back out.  Look, I'm freaking out.  I can't

think.  I can't do anything.  I would love to send 5 K to stop

this headache but we don't have it, we just don't.  Thank God.

JONATHAN YIOULOS – Direct

1    *What do you mean?  I'm really not trying to fuck this up.  For*

2    *real though.  I'm trying my best on my -- I'm trying my best on*

3    *my side and I hope you know that.  Can you talk to me, please?*

4    *What's going on?  I need to know how fucked we are right now.*

5    *I'm sorry, I'm just freaking out.  They received Monday.*

6    Q    Now, this screen shot here, what is this?

7    A    This is a payment confirmation, a snippet of a payment

8    confirmation to Sand Hill, LLC, with the submit date and the

9    approval date.

10   Q    Let's go up.

11   A    *I don't know what you're saying.  I'm sorry.  I'm not*

12   *understanding.*

13   Q    Is that the image that you sent to her?

14   A    Yes.

15   Q    What did you say there?

16   A    *I don't know.  I'm sorry.  I really am ... what's going on*

17   *with Mike though.  That's my question.  You said you could get*

18   *money what's going on with that?  That's what I'm asking you.*

19   *I'm so confused right now.  10K can hit Monday.  We don't have*

20   *money, and I only have a seven minute for the window.  I might*

21   *be able to make 15K work to hit Monday.  I only have five*

22   *minutes.  I don't know what you want from me.  You know that*

23   *doesn't work.  How?  That's what the additional wires were for.*

24   *We're fucked.  I can't get anything out today.  That means*

25   *we're fucked.  I'm out of time.  It's 4 PM.  It's not possible.*

JONATHAN YIOULOS – Direct

1   *Abby has to approve.  It will never work.*

2   Q    What is the significance of the *4 PM* and *Abby's approval*?

3   A    So, Abby's approval was required for wire transfers, and

4   ACH, if they were sent out the next business day, they would

5   have to be sent out before 4 PM.

6        *I'm just telling you the situation.  What do you mean*

7   *a loan?  Look, can I talk to one of you, so I understand this*

8   *is a bit more ... where are you taking the loan from?  And if*

9   *you are taking out a loan, then why do you need money from me*

10  *still?  Especially if you are getting the funds I sent*

11  *yesterday, in a month.  I need to actually talk to one of you.*

12  *It's so much easier than texting.  If I could have -- if I*

13  *could have I would have sent an ACH.  It's life or death, but*

14  *you or Michael can't take five minutes to actually talk to me.*

15  *Talk to me please.*

16  Q    Let's look at Government's Exhibit 689.  What is this?

17  A    A text message conversation between myself and Michael Tew.

18  December 6th, 2018.

19       *MR. FIELDS:*  Your Honor, pursuant to the declaration,

20  Government's Exhibit 1115, government would move this one in

21  evidence.

22       *THE COURT:*  This is admitted.

23  Q    Would you read these for us?

24  A    I'm trying.  *No only is work the absolute worst right now,*

25  *but we have no money to pay vendors at all.  Like, everything*

JONATHAN YIOULOS - Direct

1    *is getting threatened to get cut off.  OMG.  Oh, because the*

2    *plane was in check so long?  So just no cash flow?  Michael,*

3    *it's not getting out until Saturday, and I sent out 90K*

4    *payments to consultants in the past two weeks.  OMG.  That's*

5    *why this is getting so stressful.  It starts to look obvious.*

6    *Think about it.  We sent 30K to Meyers instead of Jess.  Jess*

7    *said they never got it.  So we sent 30K to Meyers too.  Then we*

8    *just sent another 30K yesterday.  This is why I'm freaking out.*

9    *This is why I need an agreement.  I'm sorry, I hope you*

10   *understand.  We'll just do something small Friday for Monday,*

11   *just to buy time and that's it.  Okay.  Literally -- okay.*

12   *That's, literally, the best I can do.  I'm really sorry.  I*

13   *wish I could do more.  But for real, I need an agreement ASAP.*

14   *With limited funds, if there's a question about why we sent*

15   *money somewhere, I need that handy.  I can talk my way out of*

16   *it, if I have the agreement.  I know you're swamped with trying*

17   *to get new work, but please.*

18   Q   Now let's look at Government's Exhibit 786 what is this?

19   A   Text message conversation between myself and Michael Tew.

20   Wednesday June 12, 2019.

21        *MR. FIELDS:*  Pursuant to the Declaration, Government's

22   Exhibit 1115, government would move this into evidence.

23        *THE COURT:*  It's admitted.

24   Q   Will you read it for us.

25   A   He said, *What are the chances you can send something small*

JONATHAN YIOULOS - Direct

1    *for tomorrow?  9900.  Need it for something important.  I know*

2    *it's deadline and I can't talk.  I'm with the kids in a class.*

3    *Trust me I know.  Just need to know yea or nay.  Thank you.*

4    *Can't do it.  I have no money.  We might not make payroll.*

5    *Would if I could.  Literally OMG, fuck.  Okay.  Payroll is*

6    *Friday?  Some draws tomorrow, some Friday.  Dude, I just sent*

7    *28K.  Fuck.  I know, I know.  I have an emergency.  I can't*

8    *explain.  Well, I can't send it.  I'm sorry, literally nothing*

9    *I can do.  You know I would if I could.*

10   *Q*   Were you telling him the truth about that, not being able

11   to make payroll?

12   *A*   Yes.

13   *Q*   Did National Air Cargo ever miss payroll during this time

14   period?

15   *A*   No.

16   *Q*   Let's take that down.  Let's look at Government's Exhibit

17   788.  What is this?

18   *A*   A text message conversation between myself and Michael Tew,

19   on Thursday, June 13th, 2019.

20       *MR. FIELDS:*  Pursuant to the Declaration, Government's

21   Exhibit 1115, the government would move this into evidence.

22       *THE COURT:*  Exhibit 788 is admitted.

23   *A*   He said, *Got a late start.  Need you to pull off a miracle*

24   *for me today.  Need to know if anything has changed or improved*

25   *overnight.  Just taking the kids to school now.*

JONATHAN YIOULOS – Direct

1          *I really don't think I can.  As of now, we don't have*

2    *enough for payroll and are hoping more cash comes in from Dubai*

3    *soon.  FYI, I got payroll covered.  Not much left, still sent*

4    *9500.  Please don't ask me ever again.  This is the last one,*

5    *man.*

6    *Q*   What is Dubai?

7    *A*   National Air Cargo had an office in Dubai.  We would

8    occasionally exchange funds between the two offices.

9    *Q*   All right.  Two more of these.  Let's look at Government's

10   Exhibit 858.  What is this?

11   *A*   A text message conversation between myself and Michael Tew.

12          *MR. FIELDS:*  Pursuant to the Declaration, at

13   Government's Exhibit 1115, we would move this into evidence.

14          *THE COURT:*  Exhibit 858 admitted.

15   *Q*   Can you read this for us?

16   *A*   *Did you get AEG to put up anything -- to put anything up to*

17   *cover payroll?  Do you think your GF will start digging through*

18   *your phone?  No never.  It's not that serious.  Do you have any*

19   *money at all?  Asking straight up.  What?  NA.  What are you*

20   *saying?  KT was running her script, was waiting for 15K from my*

21   *airline chairman of Frontier project.  He literally never sent*

22   *it, and I have been slaving away for him, and it fucked*

23   *everything up.*

24          *Stop doing stupid shit.  I'm tired of this.*

25   *Q*   What is NA?

JONATHAN YIOULOS - Direct                                      321

1   *A*   National Airlines.

2   *Q*   And KT, what is that?

3   *A*   Reference to Kimberley Tew.

4   *Q*   She was running her script.  What's that a reference to?

5   *A*   Her script for cryptocurrency, checking the volatility of

6   Bitcoin™.

7   *Q*   What did you understand is their need for money, at this

8   time?

9   *A*   It was personal.

10  *Q*   For what?  What were they using it for?

11  *A*   At the time, Michael was -- a lot of the work he was doing

12  was for equity, or so he claimed, and they needed money for

13  themselves, to cover their own expenses, and also to just pay

14  off any debts they had.

15  *Q*   Let's keep going.

16  *A*   *Fuck you.  IMG -- OMG, I don't want excuses.  I want this*

17  *fine -- done.  Fucking script.  Fuck off.  I'm going to bed.*

18  *How much money do you think I can send out?  Holy fuck.  Look*

19  *this is going to be done.  We are on the same team.  We are.  I*

20  *need to know if there's anything small to eke out, that's all*

21  *I'm asking.*

22  *My ass is on the line really more than anyones.  Are*

23  *you there?  You say we're in this together, too.*

24  *Q*   There's a reference to this *team*.  What was the *team*?

25  *A*   Myself, Michael and Kimberley.

JONATHAN YIOULOS – Direct

1    Q    What were you all doing together, as a team?

2    A    We were part of a conspiracy to take funds from National

3    Air Cargo.

4    Q    Let's keep going.  Is that it?  Okay.  All right.  Last

5    one, let's look at Government's Exhibit 796.  What is this?

6    A    A conversation between myself and Michael Tew, on Friday

7    June 28th, 2019.

8         MR. FIELDS:  Pursuant to the Declaration, Government's

9    Exhibit 1115, the government would move this was in evidence?

10         THE COURT:  All right, 796, is admitted.

11    Q    Can you read that for us.

12    A    Yes.  He said, *Hi.  I'm sorry I wasn't in touch.  I was in*

13    *SF for meetings and didn't walk in the door until 1 a.m., in*

14    *bed at 3 a.m. I will get right to the point.  I'm sure things*

15    *are not good there.  I'm hoping you were able to get through*

16    *payroll.  I'm sure it's been a tough couple days.  My money is*

17    *all locked up in the bank for ten days, including all of my own*

18    *money, consulting, prepayments, et cetera, that I was*

19    *contributing.  I can't even pay rent on Monday.  If there's*

20    *anything you can contribute today to Monday, even 10K, it goes*

21    *a long way.  I'm working on buying time with the guy.  Sorry to*

22    *long text.  Not sure what's going on there.  And again, I'm*

23    *sorry.  Bank is sitting at negative 672K.  Holy fuck.  Yup.*

24    *Chris put in?  Nope.  Oh, fuck.  He is just saying figure it*

25    *out.*

JONATHAN YIOULOS - Direct

1  *Q   Bank is sitting at negative 672K.*  Whose bank?

2  *A*   Signature Bank, for National.

3  *Q   Chris put in*, who is Chris?

4  *A*   Chris Alf.

5  *Q*   Who is he?

6  *A*   He was the chairman/owner of National Air Cargo.

7  *Q*   But he sometimes put in his own money in the National Air

8  Cargo?

9  *A*   He would.

10  *Q*   When would that happen?

11  *A*   When we were short on payroll, he would contribute more

12  funds.

13       *MR. FIELDS:*  All right.  Let's take that down.  Let's

14  go to July, 2020.  Let's look at Government's Exhibit 969.

15  *Q*   What is this?

16  *A*   This is an email with invoices attached from Global Fuel

17  Logistics, with invoices from Aero Maintenance Resources and

18  Global Fuel Logistics.

19  *Q*   What's the date.

20  *A*   June 30th, 2020.

21  *Q*   Let's look at Government's Exhibit 390.  What is this?

22  *A*   This is a payment confirmation, ACH payment confirm to

23  Global Fuel logistics, with the transaction date of 6-22-2020,

24  effective date of 6-23-2020.

25  *Q*   Was Michael Tew still asking you to send money from

JONATHAN YIOULOS - Direct

1   National Airlines around this time period?

2   A   Yes.

3   Q   Was Kimberley Tew still asking you to send money from

4   National Airlines around this time period?

5   A   Yes.

6   Q   You can take that down.  Were there times where you are

7   just trying to ignore them?

8   A   Yes.

9   Q   That happen around this time?

10  A   Yes.

11  Q   Do you recall getting a text message on July 1st, 2020?

12  A   I do.

13  Q   Let's look at Government's Exhibit 972.  You recognize

14  this?

15  A   Yes, I do.

16  Q   What is it?

17  A   It's a text message from Kimberley Tew.

18  Q   Now, this one looks a little bit different.  What's

19  different about it?

20  A   The phone number, there's no contact at the top.  Also,

21  just a picture of my phone, at that time.

22      MR. FIELDS:  Your Honor, the government would move

23  into evidence Government's Exhibit 972?

24      THE COURT:  Any objections?

25      MR. SCHALL:  Your Honor, if he could just tell us how

JONATHAN YIOULOS – Direct

1   he knows it's his phone.

2   Q   How do you know it's your phone?

3   A   I can tell, especially from the case.  That is a case that

4   I had, and I recall this picture being taken.

5   Q   Who took this picture?

6   A   The government.

7   Q   Government who?

8   A   It was either one of the two agents who I met with when I

9   was -- on July 7th, 2020, they took this picture.

10          MR. FIELDS:  Your Honor the government would move into

11   evidence Government's Exhibit 972?

12          MR. SCHALL:  No objection.

13          MR. KAPLAN:  No objection.

14          THE COURT:  It's admitted.

15   Q   All right.  So that number up at the top --

16          MR. FIELDS:  Let's blow that up a little bit.  We can

17   actually see it all.

18   Q   What is that telephone number?  Can you read that for us

19   A   Yes, it is 469-319-0152.

20   Q   Now, did your phone recognize that number?

21   A   No, it did not.

22   Q   Did you recognize that number?

23   A   No, I did not.

24   Q   The content here, who was that from?

25   A   Kimberley Tew.

JONATHAN YIOULOS - Direct

1    Q    How do you know it was from Kimberley Tew, if that number

2    is one you have never seen before and your phone didn't

3    recognize?

4    A    Because the conversation that I had had with Michael

5    leading up to getting this text message.  I had sent out a

6    significant ACH prior to this, and there's references in here

7    to Michael, and I -- and there was a request to send more

8    funds, as well.  So, the only person who would be referencing

9    Michael and sending more funds would be Kimberley Tew.

10   Q    Could you read this for us?

11   A    Yes.  *OMG, thank you.  OMG, you have saved me and my*

12   *family.  I mean that.  Don't send anything until the fall.  I*

13   *will figure out how to break news to Michael.  He is going to*

14   *be livid, also, but thank you so much, Jon.  I just don't know*

15   *what to say.*

16         *No chance at sending anything today and tomorrow?*

17   *Like splitting it?  Or best, just once?  I don't know how it*

18   *all works, that's Michael's area.*

19         *I can't, unfortunately.  I'm not in the office right*

20   *now.*

21         *Totally get it, Jon.  OMG thank you.  Thank you.*

22   Q    And you described having a conversation with Michael before

23   this.  What was that conversation about?

24   A    To get one -- another large wire or ACH payment out.  The

25   last -- was going to be the last one for awhile.

JONATHAN YIOULOS – Direct

1    Q    We can take that down.  When did you stop working at

2    National Air Cargo?

3    A    July 7th, 2020.

4    Q    Before that, did you get a feeling that something strange

5    was happening?

6    A    Yes.

7    Q    What was going on?

8    A    There was some discussions, internally, at National, that

9    the -- between myself, Chris, Lori, Abby, that the FBI was

10   looking into the Tews again.

11   Q    Did you tell Michael about that?

12   A    I did.

13   Q    What was his response?

14   A    Concerned and confused.

15   Q    Did he say anything about Kimberley?

16   A    Yes.

17   Q    What did he say?

18   A    That she was concerned, as well.

19   Q    July 7th, 2020, was that a big day in your life?

20   A    Yes, it was.

21   Q    What was the first big thing to happen to you that day?

22   A    So, as soon as I walked into my office and sat down, the

23   director of security, one of his colleagues, and the director

24   of operations of the office, all walked into my office, shut

25   the door, told me to pack up everything, my personal

JONATHAN YIOULOS - Direct

1    belongings.  I was terminated from National.  That's all they

2    were going to tell me, at that time, and that National did

3    not -- National had the right to pursue any legal action after

4    the fact.

5  Q    Did they describe what, sort of, legal action they might

6    take?

7  A    No, they did not.

8  Q    Who was the head of security?

9  A    Brian.

10  Q    What was his last name?

11  A    I can't recall off the top of my head right now.

12  Q    After you were fired, what happened after that?

13  A    I have remembered the name now.

14  Q    What is the name?

15  A    Brian Boyd.

16  Q    So, after you were fired, what happened?

17  A    I was walked out, with my personal belongings, walked out

18    of the doors of National, and as soon as I walked out, at the

19    end of the walk path, about probably from myself to the doors

20    over there, there were two agents standing there, Agent Palmer,

21    and I can't remember the other agent from the FBI.  I can't

22    remember his name.  But they were both standing there, waiting

23    for me.

24  Q    Did you know they were agents?

25  A    I could tell, yes.  Just by the suits, laniards.  They just

JONATHAN YIOULOS - Direct

1    looked like agents.

2    Q   What did they say to you?

3          MR. SCHALL:  Objection, Your Honor.

4          THE COURT:  Sustained.

5      Q    (By Mr. Fields) What happened -- what happened after

6    that?

7    A   As I walked towards the parking lot, the agents approached

8    me, and they said --

9          MR. SCHALL:  Objection, Your Honor.

10         MR. FIELDS:  Your Honor, it goes to, sort of, affect

11   on the listener.  Helps explain the course of events.  It's not

12   for the truth of the matter asserted.

13         THE COURT:  Yeah.  I doubt this is for the truth of

14   what they said, so go ahead.

15         THE WITNESS:  I walked up to the agents, and they

16   identified themselves.  Agent Palmer identified herself, with

17   the IRS, the other agent with the FBI.  Said they had some

18   questions for me.  If I would be willing to answer them about

19   National Air Cargo, and their dealings with Michael and

20   Kimberley Tew.

21   Q   Did you agree to talk to them?

22   A   I did.

23   Q   Did they ask you to do something for them?

24   A   Yes.

25   Q   What did they ask you to do?

1   *A*   To tell them about what was going on, and then eventually

2   to have conversations with the Tews or with Michael.

3   *Q*   Did you agree to do that?

4   *A*   I did.

5   *Q*   Why did you agree to betray Michael like that?

6   *A*   I was ... I was at a point where I just needed to come

7   clean about everything.  You know, dealing with not only the

8   stresses of the office and being short on funds every day, but

9   also trying to deal with this conspiracy, something that's

10  extremely unethical.  It was like -- as much as it was

11  concerning to see the agents, it was almost like a weight off

12  my shoulders.  Like, this is over, and I wanted to make it

13  right as quickly as possible, in any way that I could, knowing

14  that I couldn't return the funds, but that I could just get the

15  whole truth out there.

16  *Q*   Did you agree to make a call to Michael?

17  *A*   I did.

18  *Q*   The agents give you instructions on what to do during that

19  call?

20  *A*   They did.

21  *Q*   What instructions did they give you?

22  *A*   Nothing specifically.  With regard to things to say, it was

23  more or less -- it was not to let them know that I was -- not

24  to let Michael know that I was in custody -- or not in custody,

25  because they never formally arrested me at that time, but that

JONATHAN YIOULOS – Direct

1    I was with the agents, not to tell Michael that I was no longer

2    employed at National, and then there was other instructions of

3    just topic points that they wanted me to bring up during that

4    conversation.

5    Q    Did you record your call with Michael Tew?

6    A    The call was recorded, yes.

7    Q    Who recorded it?

8    A    The agents.

9    Q    Did you agree to let them do that?

10   A    I did.

11   Q    Did you listen to that telephone call before testifying

12   today?

13   A    I did.

14   Q    Has that call been marked as Government's Exhibit 974?

15   A    Yes.

16   Q    And after listening to that recording, is it a fair and

17   accurate recording of your call with Michael Tew, on July 7th,

18   2020?

19   A    Yes, it was.

20        MR. FIELDS:  Your Honor, at this time the government

21   would move to admit Government's Exhibit 974.

22        THE COURT:  Any objections, other than what we've

23   already discussed?

24        MR. SCHALL:  As discussed previously, Your Honor,

25   reurging those objections.

1        MR. KAPLAN:  Likewise, we renew the objections that

2   have been put on the record.

3        THE COURT:  Okay.  Overruled, as discussed previously.

4   Mr. Fields how long do you expect this play?

5        MR. FIELDS:  The call is about 30 minutes, Your Honor.

6        THE COURT:  Yeah.  If you want to play some of it, you

7   can.  If you would rather do something else and play it in the

8   morning we could do that.  I don't want to make the jury stay

9   too much longer.

10       MR. FIELDS:  I wouldn't make the jury stay longer,

11  Your Honor.  I think we can play the first 15 minutes without

12  it being too disorienting tomorrow.

13       THE COURT:  Let's do that.  While you do, just -- I'm

14  having a repeat of my tech issue, but I think Mr. Keech can

15  help me while it's playing, if that's all right.  So, go ahead.

16  Q   Which number did you call to get in touch with him?

17  A   I don't remember.

18  Q   Let's -- let's play this recording up to 15 seconds in.

19       (Whereupon the recording was played for the members of

20  the jury.

21  Q   All right.  *Hey, dude, what's going on and what's the*

22  *story.*  Whose voice is that?

23  A   Michael Tew's.

24  Q   How do you know that's his voice?

25  A   I could tell his voice from prior conversations.

JONATHAN YIOULOS – Direct

1    Q    Did you hear another voice in that call?

2    A    No -- or my own voice, yes.

3    Q    That was yours?

4    A    Yes.

5    Q    Now, let's play -- well, first of all, did Michael ask you

6    about, sort of, those strange happenings at NAC, the FBI call?

7    A    Yes.

8    Q    Let's play from one minute and eight seconds and going to

9    play to six minutes and 33 seconds.

10            (Whereupon it was played for the members of the jury.)

11   Q    Let's stop right there.  So, *Chris*.  Who is the *Chris* you

12   are referring to?

13   A    Chris Alf.

14   Q    And*, Should have had you in on the conversation*.  What

15   conversation?

16   A    He said he had a conversation with the FBI and with Abby

17   regarding any happenings with the Tew.

18   Q    Is that what you previously disclosed to Michael Tew,

19   earlier?

20   A    Yes.

21            *MR. FIELDS:*  Let's keep going.

22            (Played for the members of the jury.)

23       Q    (By Mr. Fields) *Lori*.  Who was *Lori*?

24   A    Lori Alf.

25   Q    All right.  *And Lori is a lunatic if there was anything it*

JONATHAN YIOULOS – Direct

1    *would be out in the open*.  What did you understand that to be?

2    A   Lori didn't like to hide her emotions.  If there was any

3    problem with anything at National or anybody that she had

4    issues with, or any situation she was uncomfortable with, she

5    made it known.  She was just that type of personality.

6            *MR. FIELDS:*  Let's keep going.

7            (Played for the members of the jury.)

8    Q   Stop there.  Why was it bad for everyone when you got

9    nervous?

10   A   Just because if I was nervous about the situation, he

11   didn't want me to stop sending funds or, you know, go to Chris

12   and Lori or the authorities.

13   Q   There's this reference, earlier, to *panic attacks*.  Do you

14   remember hearing that?

15   A   Yeah.

16   Q   And you said, you know, *Michael would calm you down*?

17   A   Yeah.

18   Q   How would Michael calm you down?

19   A   I mean, he didn't truly calm me down.  I think that was

20   more of a way for me to tell him that I like enjoyed talking to

21   him, at times.  You know, he would say, *It's all right.  Like,*

22   *we're going to get through this.  It's almost over.  We're*

23   *almost through.  We're almost to the finish line.  Keep your*

24   *head up buddy*.  Those types of things.  None of them had any

25   substance to them, but by me telling him that, he would help to

335
JONATHAN YIOULOS - Direct

1    calm me down.  I felt like that was a better way to, you know,

2    at least let him know that, you know, I considered him kind of

3    a colleague, and you know, more or less, gain his trust over

4    the phone.

5    Q    And this reference to you *helping them out in the fall*, had

6    that subject been discussed?

7    A    Yes.

8    Q    How did they expect you to help them out in the fall?

9    A    More ACHs.

10   Q    Now, let's play from six minutes and 33 seconds to 8:41.

11        *MR. SCHALL:*  Your Honor, if I may?  I don't know that

12   the government intends to keep doing this, but we would object,

13   under Rule 106, and ask that the entire recording be played

14   instead of this piecemeal approach.

15        *THE COURT:*  For now, I will allow it.  So, go ahead

16   for now, and I will consider whether we need to play the whole

17   thing.  Go ahead.

18        (Played for the members of the jury.)

19   Q    You heard a reference there to a C Corp?

20   A    Yes.

21   Q    What's a C Corp?

22   A    It's a type of business entity.

23   Q    And does setting this up as a C Corp, did that have tax

24   implications?

25   A    Yes.

JONATHAN YIOULOS - Direct

1    Q    What were they?

2    A    C Corps do not receive 1099s.  They file their own taxes.

      They are not reliant on receiving 1099s from any customer.

4    Q    So, how can, if at all, setting up as C Corp, help this

5    course of conduct you have been describing?

6    A    It would, as we had prior issues, with Meyers and Jessamine

7    Development, as they were not C Corps, Abby, who was in charge

8    of issuing the 1099s, she would not have to prepare 1099s for

9    Global Fuel, as they were a C Corp.

10   Q    We have time for one more portion.  We are at 8:41.  Let's

11   continue playing here until 11:45.

12            (Continued playing for the members of the jury.)

13   Q    All right.  So references to these other people that

14   Kimberley was involved with.  Who were those people?

15   A    The only ones that I knew, for sure, were Chris Rincon,

16   Michael Meyers, that's about it.

17   Q    Did you ever talk to Michael Meyers or Chris Rincon in

18   person?

19   A    No.

20   Q    So, any information that you had about them interacting

21   with the Tews, who did you get that information from?

22   A    The Tews.

23   Q    Do you, as you sit here today, have any independent

24   confirmation as to whether or not there were actually

25   threatening or blackmailing the Tews?

JONATHAN YIOULOS - Direct

1    *A*    No.

2    *Q*    And you said the *accountant in you*, sort of run these

3    numbers beforehand, it's a lot of money.  How much was a lot of

4    money, at this point in time?

5    *A*    In excess of $5 million.

6            *MR. FIELDS:*  Your Honor, we can keep playing another

7    portion but now --

8            *THE COURT:*  I think now is a good time for all of us

9    to break for the day.

10           Members of the jury, I'm going to -- we're going to

11   recess again for the evening, until 9 a.m. tomorrow.  All my

12   previous instructions that I gave you last night, and a number

13   of times about keeping an open mind until you have heard all of

14   the evidence, not discussing the case with anyone, including

15   one another, and not researching or doing any other looking

16   into the case on your own.  All of those still stand.  With

17   that, I will allow you to go until 9 o'clock tomorrow.

18           *THE COURTROOM DEPUTY:*  All rise.

19       (Jury out at 4:57 p.m.)

20           *THE COURT:*  All right.  Let's take our seats, quickly.

21   You can step down, Mr. Yioulos.  So, I know we have the 106

22   issue.  Do you want to discuss that a little bit more now or in

23   the morning?  Is there a reason not to play the whole thing or

24   what's -- what is your response to that, Mr. Fields?

25           *MR. FIELDS:*  Your Honor, there are references to the

 1    Tew's children.  I have been trying to keep them out of this.

 2    So gaps in the recording, it's the children in the background.

 3    There's references to the children.  I don't think that's

 4    particularly relevant.  It's not in furtherance of the

 5    conspiracy.  Doesn't, you know -- it's not why we're here.

 6        THE COURT:  That seems reasonable to me.  Maybe what I

 7    would like is for you, tonight, before we start in the morning,

 8    to confer about which fall into that category.  If there's

 9    other things you think are being left out that are relevant or

10    necessary we can discuss that, Mr. Schall.

11        MR. SCHALL:  Your Honor, my first response is that

12    Federal Rule of Evidence 106 says if a party introduces all or

13    part of a statement, an adverse party may require the

14    introduction, at that time, of any other part or any other

15    statement that, in fairness, ought to be considered at the same

16    time.  And, the kids, they have introduced text after text,

17    with Mr. Tew talking about his kids in the background,

18    sweatpants at the library, all of these things, and it can't

19    sanitize this just by skipping over parts here and there.

20    Frankly, Your Honor, they are already sanitizing the first four

21    hours of the recording, which was Jonathan Yioulos' interview

22    with the IRS, which was also recorded, that's not being

23    offered, and we're not talking about that, yet, but I mean to

24    ask that 30 seconds here, 30 seconds there be included, I don't

25    think is unreasonable.

JONATHAN YIOULOS - Direct

1          THE COURT:  Okay.  If you think, in fairness, it

2     should be included, I mean, I guess I don't have a strong

3     feeling.  If the Tews want the jury to hear about their family,

4     I don't think it's the government's position to say they

5     shouldn't.  Is that the -- Mrs. Tew positions too -- as well, I

6     guess I should say.

7          MS. HUBBARD:  We don't take a position on the rule of

8     completeness.  I would like to address a prior issue before we

9     break for the day.

10          THE COURT:  So, you don't have a position one way or

11     the other.  I will go back to what I said a minute ago then.  I

12     want you to confer about what's being left out, what's not.  If

13     Mr. Tew's position is it's unfair to leave out references or

14     the children in the background, and they are willing to have

15     that played for the jury, I think -- I will allow it, and I

16     guess that means play the rest of the provision.  We will have

17     to figure out the logistics of doing that.  Is there anything

18     else that's being left out of the -- the tape, Mr. Fields?

19          MR. FIELDS:  Your Honor, I think there's a joke about,

20     you know, Yioulos' goldfish being named Larry, same as to

21     Political Media.  Some of the things like that.  Portions that

22     I plan to excise were pretty small.  And honestly, if the Tews

23     want to have the jury listen to their kids, sort of bring in

24     the background of the call, we can play the whole thing.

25          I do think that there are some, you know, 403 issues

JONATHAN YIOULOS - Direct

1    involved with that.  It's one thing for it to be a text

2    message.  It's another thing, you know, for, sort of, the

3    children in the background, to the extent that's, sort of, a

4    plea for sympathy, that does not have a place in the courtroom,

5    and the jurors verdict shouldn't be based on it.

6        THE COURT:  Yeah.  I mean, I don't really see too much

7    risk of that, and to the extent where there's a rule of

8    completeness, you're playing part of a recording, I don't think

9    that danger that the jury will base its verdict on hearing

10   these handful of seconds here and there is too much of a risk.

11   So, if the Tews are okay with it, maybe the easiest way to do

12   it, just have you start from the beginning tomorrow, right at

13   the start, and just go all the way through, without skipping

14   anything.

15       MR. FIELDS:  Your Honor, it did take some breaks.  We

16   played the majority of the recording this morning.  I would

17   stop, but then we would start from there.  So, I think the only

18   portion that would be, sort of, omitted was from 15 seconds in

19   to a minute and 33 seconds in.  So, we can certainly play that

20   portion of the recording for the jury.  It's a lot of just,

21   sort of, throat clearing, sort of, talking about the beginning

22   of the day, but we can play it.

23       THE COURT:  All right.  Well, I will ask you to confer

24   about the best way to do that and see if you can come up with a

25   plan.  Mr. Schall?

JONATHAN YIOULOS – Direct

1          MR. SCHALL:  Just is to add, I anticipate there will

2    be a second call, as well, that's longer, the next day, July

3    8th, 2020, and -- Mr. Tew's position will be the same, should

4    play the entire call.

5          THE COURT:  Okay.  Well, you can discuss the

6    implications of that.  I don't know enough about what would or

7    wouldn't be left out to be able to rule on it now, but kind of

8    got an idea of what I generally think.  Ms. Hubbard?

9          MS. HUBBARD:  Your Honor, when we were addressing the

10   issue of whether these are co-conspirator statements, before,

11   at the last break, I believe the Court had not yet heard the

12   recording at the *James* hearing.  My understanding is there was

13   an audio, that it couldn't be introduced.  I was taking notes,

14   as the recording was being played, and I would renew our

15   objection to the entirety of these recordings being found to be

16   co-conspirator statements.

17          Jonathan Yioulos' portion of these conversations

18   clearly cannot be as a matter of law, co-conspirator

19   statements.  He, as the government has admitted, was no longer

20   a co-conspirator.  So, at least 50 percent of what we've heard

21   so far is Jonathan Yioulos.  As to what Michael Tew was saying,

22   the bulk of those statements were about far, far past events.

23   Jon asked, *Be honest, how did we get here, what happened, be*

24   *honest, did she really gamble or were there actual people*?

25   This is all talking about things that happened in the past.

                                                                        342
                        JONATHAN YIOULOS – Direct

1    It's not --

2              THE COURT:  There's no rule that says it's not

3    furtherance of it just because you are talking about something

4    that happened in the past, is there?  I mean, it's certainly

5    something to take into consideration, but this is not a call

6    where Mr. Tew is just, sort of, rehashing, telling old story.

7    This is a call where Mr. Yioulos is saying, I'm freaking out.

8    What are we going to do?  How are we going to deal with this?

9    Help me figure out what's going on.  You know, asking about

10   taxes.  Like, this is, clearly, from Mr. Tew's perspective, it

11   seems to me, clearly him responding, trying to say, reassure

12   Mr. Yioulos so he doesn't flip to the government, so he doesn't

13   back out, so he kind of calms down, I guess, and that furthers

14   the conspiracy from Mr. Tew's perspective, which is the

15   question as to his statements.

16             MS. HUBBARD:  And, Your Honor, I'm happy to provide

17   additional research, if I can find something overnight.  I do

18   believe the Court has an obligation to consider this on a

19   statement-by-statement basis.  Typically, in *James* we're

20   talking about text messages or emails where they can be excised

21   if a portion is not in furtherance.  Here, the government is

22   asking the Court to find that two different --

23             THE COURT:  How long have you had this tape?

24             MS. HUBBARD:  I'm not sure, Your Honor.  I can't say.

25             THE COURT:  Okay.  Go head on.

JONATHAN YIOULOS - Direct

 1          MS. HUBBARD:  And, Your Honor, I believe a related

 2    issue is that if this is not a co-conspirator statement, then

 3    it wouldn't be admissible against Ms. Tew at a separate trial.

 4    So, I would renew our request for that, a limiting instruction,

 5    and I do believe that this gives us grounds to move for a

 6    severance, which we did not do yesterday, based on opening

 7    statements, but which we would do now, given that the evidence

 8    would not be admissible against Mrs. Tew, if she was in a

 9    separate trial.

10          THE COURT:  All right.  Thank you.  I will let the

11    government respond briefly, if they would like.

12          MR. FIELDS:  Your Honor, I'm getting the impression

13    that defense counsel didn't actually read the prior record

14    before they assumed this case.  This was argued in the motion

15    for severance, and it's part of the Court's Order **ECF 260**.

16          Mr. Bornstein raised this exact issue regarding the

17    recording, because he knew about it, knew that it was likely to

18    come in, and made a motion for a severance.  So, the Court has

19    already ruled, and the government would again raise the same

20    arguments it raised then, and ask the Court to reach the same

21    ruling it reached then, now.

22          THE COURT:  Yeah.  I'm inclined to agree with that.  I

23    will look at it again overnight.  I think that that is

24    consistent.  I know this came up in the severance context, and

25    as I said nothing I have heard so far convinces me that Mr. Tew

JONATHAN YIOULOS - Direct

1    was not trying to reassure a member of the conspiracy, what he

2    believed to be a member of the conspiracy, during this

3    conversation, and I don't -- and as I already expressed my

4    thoughts about how that applies to Mrs. Tew, but I will look it

5    over again tonight.

6             Is there anything else before we break for the night?

7             MS. FROST:  Just really quickly, Your Honor.  I know

8    it's been a long day.

9             THE COURT:  Go ahead.

10            MS. FROST:  When I got back, some of the text messages

11   the government was using was Exhibit 685, I think 788.  What I

12   will call the bubble text, which I think are from the

13   Cellebrite report, and I understand the Court made a ruling

14   this morning that they were not getting admitted, but that the

15   government, you know, could display them as demonstrative and

16   further tie them up, potentially, later, based how the

17   Cellebrite issue plays.

18            So, I guess my concern -- perhaps my confusion, based

19   on your order this morning, Your Honor, was that they are

20   demonstratives that are being shown to the jury right now,

21   under 611(a), with Mr. Yioulos, but Mr. Yioulos is reading from

22   them, as demonstratives.  That, to me, I didn't contemplate

23   your order to include allowing the witness to read off a

24   document that actually hasn't been admitted into evidence, and

25   indeed if those -- if those bubble texts, I will call them, the

JONATHAN YIOULOS - Direct

1    Cellbrite texts, don't later get admitted, because of the

2    Cellbrite issue, I'm concerned about that.  So, I guess, for

3    the record, I would object to the fact that he read off them,

4    because he is reading it into evidence, and to the extent it's

5    going to happen again, I would lodge an objection.

6         THE COURT:  Okay.  We kind have gone over this, I

7    think.  My basic position, as we discussed a bit yesterday, and

8    a little bit more detail today, is that the bubble-text

9    portions of these, which is what was read from, Mr. Yioulos

10   testified those accurately reflect what he said.  They, in this

11   case, were recreated through a, sort of, highly technical

12   process that hasn't been fully established yet, which is why

13   those are not admitted, but his testimony was this is what we

14   said.  They could have been recreated just from him writing

15   them down and then the government making a demonstrative that

16   showed what he told them or what he believed them to have said,

17   and so I don't think that's reason not to allow him to do that,

18   but I will -- as with the other ones, I understand the

19   objection, and we will treat it as, sort of, an ongoing

20   objection, as we've kind of -- I know Mrs. Tew had the same

21   basic objection that we have -- I understand that to be ongoing

22   to both defendants.

23        MS. FROST:  I was just distinguishing between

24   publishing the demonstrative under 611(a), where the jury is

25   reading the text, versus him reading, himself, but thank you,

JONATHAN YIOULOS – Direct

1    Your Honor, I understand.

2            *THE COURT:* Understood. Thank you, anything else.

3            *MR. FIELDS:* Not from the government, Your Honor.

4            *MR. SCHALL:* What time do you want us here in the

5    morning?

6            *THE COURT:* Well, do you think I need you here at 8:30

7    or are we going to have a half-hour worth of things to discuss?

8            *MR. FIELDS:* I hope not.

9            *MR. SCHALL:* Can we say 8:45.

10           *MS. HUBBARD:* Can we do 8:45. I have to drive car

11   pool.

12           *THE COURT:* Yes. That's, I mean, that's fine, 8:45 is

13   fine. I don't like to keep the jury waiting, if we ask them to

14   be here at 9, but 8:45 is fine with me. Counsel, please be

15   back at 8:45. Thank you.

16           *THE COURTROOM DEPUTY:* All rise. Court is it in

17   recess.

18       (Recess at 5:12 p.m.)

19                          **INDEX**

20   **Item**                                            **Page**

21   ITEM                                                 PAGE

22           WITNESSES

23      JONATHAN YIOULOS

24           Direct Examination By Mr. Fields                110

25

JONATHAN YIOULOS – Direct

| # | Exhibits | Received |
|---|---|---|
| 1 | Exhibits | Received |
| 2 | 857 | 111 |
| 3 | 605 & 863 | 112 |
| 4 | 731 | 115 |
| 5 | 707 | 117 |
| 6 | 865 | 121 |
| 7 | 659 | 126 |
| 8 | 433 | 140 |
| 9 | 8 | 144 |
| 10 | 9-40, 355-362, 369-377 | 150 |
| 11 | 379, 380, 384, 386 | 150 |
| 12 | 392-428, 468 and 492 | 150 |
| 13 | 2, 3, 5 & 7 | 151 |
| 14 | 832 | 153 |
| 15 | 642 | 163 |
| 16 | 732 | 166 |
| 17 | 733 | 167 |
| 18 | 741 | 169 |
| 19 | 742 | 169 |
| 20 | 706 | 171 |
| 21 | 705 | 172 |
| 22 | 747 | 175 |
| 23 | 748 | 177 |
| 24 | 765 | 179 |
| 25 | 775 | 180 |

JONATHAN YIOULOS - Direct

| 1  | 636                      | 188 |
| 2  | 717                      | 202 |
| 3  | 601, 603 & 607           | 204 |
| 4  | 602                      | 207 |
| 5  | 611, 629, 638 & 674      | 210 |
| 6  | 613                      | 218 |
| 7  | 614                      | 218 |
| 8  | 615                      | 220 |
| 9  | 625                      | 221 |
| 10 | 639                      | 223 |
| 11 | 647, 649, 680 & 692      | 229 |
| 12 | 683                      | 231 |
| 13 | 694                      | 232 |
| 14 | 657                      | 232 |
| 15 | 537, 540-543             | 234 |
| 16 | 697                      | 238 |
| 17 | 650                      | 241 |
| 18 | 665                      | 248 |
| 19 | 668                      | 252 |
| 20 | 673                      | 253 |
| 21 | 693                      | 260 |
| 22 | 939                      | 263 |
| 23 | 688, 700, 703            | 265 |
| 24 | 711, 719, 723            | 265 |
| 25 | 727, 732, 737            |     |

JONATHAN YIOULOS - Direct

| | | |
|---|---|---|
| 1 | 725 & 749 | 269 |
| 2 | 687 | 271 |
| 3 | 774 | 274 |
| 4 | 681 | 278 |
| 5 | 817 | 285 |
| 6 | 841, 844, 845 | 302 |
| 7 | 875, 887, 903 | 302 |
| 8 | 912, 928, 933 | 302 |
| 9 | 935, 950, 952 | 302 |
| 10 | 953, 954, 955 | 302 |
| 11 | 959 & 969 | 302 |
| 12 | 828 | 305 |
| 13 | 830 | 306 |
| 14 | 833 | 307 |
| 15 | 820 | 309 |
| 16 | 837 | 310 |
| 17 | 689 | 317 |
| 18 | 786 | 318 |
| 19 | 788 | 319 |
| 20 | 858 | 320 |
| 21 | 796 | 322 |
| 22 | 972 | 325 |
| 23 | 974 | 332 |
| 24 | | |
| 25 | | |

JONATHAN YIOULOS – Direct

1                    **REPORTER'S CERTIFICATE**

2         I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.  Dated

4    at Denver, Colorado, this 20th day of October, 2024.

5

6                                        *S/Tamara Hoffschildt*
                                         Tamara Hoffschildt
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25