IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-305-DDD

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

1. MICHAEL TEW,
2. KIMBERLEY TEW,

    Defendants.

_____

**REPORTER'S TRANSCRIPT**
JURY TRIAL, DAY 4
_____

    Proceedings before the HONORABLE DANIEL D. DOMENICO, Judge, United States District Court for the District of Colorado, occurring at 9 a.m., on the 8th day of February, 2024, in Courtroom A1002, United States Courthouse, Denver, Colorado.

**APPEARANCES**

    Bryan Fields and Sarah Weiss, Assistant U.S. Attorneys, 1225 17th Street, Suite 700, Denver, Colorado, 80202, appearing for the Government.

    Jason Dale Schall, Bowlin & Schall Law LLC, 7350 East Progress Place, Suite 100, Greenwood Village, CO 80111 and Kristen M. Frost, Ridley McGreevy & Winocur PC, 303 16th Street, Suite 200, Denver, CO 80202, appearing for the Defendant, Michael Tew.

1            David Scott Kaplan and Jamie Hughes Hubbard, Stimson

2    LaBranche Hubbard, LLC, 1652 North Downing Street, Denver, CO

3    80218, appearing for Defendant, Kimberley Tew.

4

5            TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
                  901 19th Street, Denver, Colorado 80294
6            Proceedings Reported by Mechanical Stenography
                  Transcription Produced via Computer
7

8                        **P R O C E E D I N G S**

9       (In open court at 9:00 a.m.)

10          *THE COURT:*  Let's take our seats.  Good morning.

11   Counsel, I understand there's something we may need to discuss;

12   is that right?

13          *MS. HUBBARD:*  Your Honor, I just need to supplement

14   the record.  As being a former appellate lawyer, I'm sure you

15   are aware that sitting over here we're constantly worried about

16   waiving an issue.  So, with respect to our Motion To Sever, if

17   the Court recalls, the original Motion To Sever had to do with

18   whether or not evidence would be admissible against Ms. Tew if

19   she was in a separate trial, that was, kind of, one of the

20   primary bases for our motion to sever.

21          I want to supplement that, because, I believe, the

22   Cross-examination, yesterday, done by Mr. Schall, put our

23   defense of Ms. Tew directly at issue with the defense that they

24   are running for Mr. Tew; specifically, as you heard, during

25   opening statement, our defense of Ms. Tew relates to her

1    knowledge and direct participation in the charged scheme, both

2    as to wire fraud and as to money laundering.  For purposes of

3    money laundering one of the elements is that she has to know

4    the funds that she is alleged to have moved between bank

5    accounts or spent in different ways were proceeds of illegal

6    activity.  And Ms. Tew's knowledge, really goes to the core of

7    our defense, and the -- if the Court recalls yesterday,

8    Mr. Schall emphasized, with Mr. Yioulos, Mr. Yioulos'

9    perspective that Kimberley Tew *had them both by the balls*.

10   They were kind of helpless.  Essentially, that Kimberley Tew is

11   the mastermind behind all of this.  She is the motivating

12   factor.  She is the person driving the train.  However you want

13   to put it.  She is the mover and shaker behind the whole

14   scheme, which is in direct conflict with our theory of the

15   case.

16         So, I wanted to just make that record, which

17   apologies, Your Honor, I will probably continue to do

18   throughout trial, because I think that's what the case law

19   requires.  So, I just wanted to make that record on severance.

20         Another place I would like to just supplement the

21   record, which relates to our Motion To Continue, that we filed,

22   prior to trial, given the Motion To Continue was denied, we

23   have continued to try to work to understand some of this data

24   processing that has been -- has occurred by different

25   specialists inside the federal government, and I have been

1    consulting with someone to try to help me understand all of

2    this.

3            Last night I reached out, because I realized that,

4    essentially, a lot of these reports that are being -- portions

5    of which are being offered by the government as exhibits at

6    trial, the ones that you have not admitted yet, but that have

7    been displayed, were created using a custom ... program/script,

8    that was created by someone inside of the federal government.

9    I asked Mr. Fields, and the government, for a copy of that last

10   night, so that the person I'm working with could try to

11   duplicate, because we have not yet been able to duplicate any

12   of these reports that are being offered as exhibits.

13           I asked for a copy of the script.  It had, apparently,

14   been provided to us in December of 2023.  So, I wanted to

15   supplement our record on the Motion To Continue, where --

16   because the government made multiple representations that we've

17   had everything that we could possibly need to defend this case

18   for years, and that's not true.

19           We have had, perhaps, the data, that was then the

20   government put this special script -- or the data went into the

21   special script, to produce these reports.  We've had the data

22   perhaps longer, but we have not had this custom proprietary

23   special script that was created just for this analysis.  We've

24   only had that since December.

25           So, I wanted to make the record on that point, and

1   then just as a preview for this morning, I expect the first

2   witness is going to be Ms. Scaife, who is a former friend of

3   the Tews, particularly Kimberley Tew.  Ms. Scaife has a number

4   of quite sensitive issues that I believe are likely to come up

5   in her examination.  I think the government has asked me to,

6   kind of, give you a preview that we may need to approach a

7   couple times during her testimony, given the nature of some of

8   the information.  So, I just wanted to give you a heads up on

9   that.

10       THE COURT:  Okay.  Thank you for supplementing the

11   record and giving me that heads up.  I thought the plan was to

12   file something on the severance thing by this morning.  Was

13   that -- I don't know that anyone has done that.  Has anyone

14   done anything?

15       MS. FROST:  Your Honor, that was the one sentence I

16   was going to address, fairly quickly.

17       THE COURT:  All right.  Go ahead.

18       MS. FROST:  I was overly ambitious about being able to

19   file by 9.  So, I was going to ask if we could file by some

20   point today?

21       THE COURT:  I think this is adding to, sort of, the

22   government's point, that a lot of these issues we have known,

23   at least in general terms, about for years, but I will read it,

24   whenever you file it.

25       So, I guess I will give the government a chance, if

1    they feel the need to respond to any of this right now?

2        MS. FROST:  Really quick we -- just we got the

3    transcripts last night from the openings, so that's part of the

4    delay, because you want to be able to address those facts

5    specifically.  So, thank you.

6        THE COURT:  Okay.  Go ahead.  Mr. Fields.

7        MR. FIELDS:  Your Honor, very briefly, on the

8    severance, I'm disappointed that defense counsel still hasn't

9    engaged with the case that the Court specifically gave us,

10   *United States vs Jones*, 530 F.3d, 1292.  So, when it comes to

11   waiver, to the extent that they want us to lay down a record, I

12   think laying down a record that doesn't actually engage with

13   the arguments that have already been presented, numerous times,

14   is problematic, and so I would just say that.

15        Also, to the extent they want to supplement the

16   record, that's what the written filing is for, which the

17   government expects and will respond to.

18        As for the continuance, this idea that they've only --

19   you know, that the government used a custom script is just

20   categorically untrue.  What happened here is we have the

21   Cellebrites.  They have had those same Cellebrite, the combined

22   report, since the discovery of discovery.  These counsel have

23   had it since January of 2023.  The Tews counsel, sort of, ad

24   infinitum going back have had it since 2021.

25        You can use that Cellebrite reader to sort all of the

1  numbers you want, and that is all that was done for the

2  Cellebrites here.  No custom script.  What they're talking

3  about with the custom script, to the extent that they want to

4  challenge whether or not the Cellebrite was accurately

5  rendering the underlying data, an FBI data analyst did that for

6  them.

7          To automate that process, he did create a custom

8  script.  He went through, he used that because it helped make

9  his task a little bit easier, and sure enough, when he did

10  that, he was able to confirm and verify that the data that

11  Apple provided, the underlying data, is indeed accurately

12  rendered by the Cellebrite.  That part is new, but that part

13  isn't going to be admitted as part of this case.  Nothing that

14  the Court has seen, involving those Cellebrites any sort of

15  custom script.  There's no creation of government data, and

16  this idea that the defense only just got it, again, just not

17  true.  They've had the underlying Apple data for a very long

18  period of time.  They've had the Cellebrites.  They have been

19  able to do everything they could possibly want to do regarding

20  this data, for years.

21          To the extent that there was an issue with this custom

22  script, the reports were provided them before the *James*

23  hearing.  The Motion In Limine was a great opportunity for them

24  to respond.  They did not.  They have waived all of these

25  arguments.  And the government, again, objects to, sort of,

1    these very late arguments made after the fact, sort of,

2    tactically right in the middle of trial.  It really defeats the

3    orderly process of litigation, and there's no, sort of,

4    constitutional right to present some, sort of -- you know, to

5    ignore Court deadlines, to not present issues, that's the whole

6    point of a scheduling order, so.

7         THE COURT:  Thank you, Mr. Fields.

8         MS. FROST:  Your Honor, may I, very quickly?

9         THE COURT:  Yes, Ms. Frost.

10         MS. FROST:  First of all, you know, appreciate the

11   Court's understanding about scheduling matters.  I just want to

12   make very clear, we are going to address *Jones*.  Our position,

13   right now, is that *Jones* is factually distinct, than the

14   prejudice, with the mutually exclusive defenses, in this case.

15   Second of all, if you want to apply *Jones* and the three-part

16   test that the Court addresses in that case, this trial

17   satisfies those three prongs, which we will explain in writing,

18   in more depth, and that the prejudice, in this case, starts

19   during opening, and keeps happening as we proceed through the

20   trial, which is why I made the record last night about

21   Mr. Kaplan's Cross-examination and pointing at our client

22   Mr. Tew.

23         The government keeps bringing up waiver.  We have not

24   waived anything.  I have looked at all of the prior pleadings

25   on severance, which specifically addressed *Bruton* and the Sixth

1    Amendment, and the fact that there were more charges against

2    Mr. Tew versus Mrs. Tew.  The concept of antagonistic defenses

3    or mutually exclusive defenses was not raised by Mr. Bornstein,

4    the lawyer that represented both of the defendants in this

5    case, at the time.  Mr. Bornstein only filed a motion on behalf

6    of Mrs. Tew, and when the Court previously addressed this

7    issue, the order relates to what was raised in the pleadings,

8    of course.  *Bruton* and the Sixth Amendment, and the fact that

9    there's more evidence; meaning, the quality -- or quantity of

10   evidence, I should say, against one defendant versus another.

11   That would be addressed in our pleading, as well.

12        We don't have a crystal ball as defense attorneys.  Of

13   course this isn't a civil case, where everything gets litigated

14   upfront, because of a defendant's constitutional rights.  A

15   defendant doesn't have to front any possible defense, and have

16   a crystal ball and anticipate how their codefendant is going to

17   open or try a case.

18        We're not in a joint defense group or -- or a joint

19   defense agreement, with Ms. Tew's counsel.  We had no idea what

20   they were going to open about.  Could we file a motion that's

21   not ripe and anticipate they might say this, that or the?  It

22   didn't make sense.  And when it happens in court, this is what

23   happens in trial, so we have not waived anything, and in terms

24   of scheduling, we're not inadvertently trying to file a

25   pleading.

564

1          You know, just so the Court is aware, you can be

2     irritated with me, if you are irritated, my schedule this week,

3     on a personal level, I have a newborn at home and a sick nanny,

4     so -- not like that matters, but my schedule has been a little

5     jammed, and like I said, I was overly ambitious in trying to

6     get something on file by 9 o'clock this morning, but in looking

7     at the transcripts last night of the opening, I'm picking out

8     what was said, that specifically satisfies the *Jones* test, and

9     the three factors, so that the Court can take a real look at

10    it.

11         *THE COURT:*  Okay.  Thank you.  So, I will just make a

12    couple of quick points, because you will have a chance to

13    address this in writing and have a chance to think it through

14    more thoroughly in response.

15         First, I guess, sort of, going back to my history as

16    an appellate lawyer, one of the -- one of the cases I argued

17    involved the waiver, the concept of waiver, and I guess I will,

18    to that extent, agree with you, that I got a good, long lecture

19    from Justice Ginsburg about the difference between waiver and

20    forfeiture, and I think you are probably right, the waiver is

21    not quite what's at issue here, but forfeiture, might be.  In

22    other words, having an opportunity to raise something, and not

23    doing so, is what I would consider forfeiture, rather than

24    waiver, being, sort of, an affirmative decision or an

25    affirmative foregoing of a right.

565

 1          So, I think the concept we're talking about here is

 2   probably better considered forfeiture, than waiver.  I -- I am

 3   reluctant to rely completely on that, given the stakes, the

 4   constitutional stakes, but I do think there's something to the

 5   government's point that, sure, you don't have a crystal ball,

 6   but you do understand what's going on here.  You know the

 7   underlying facts, and the idea that the defendants might have

 8   positions that would be in conflict is not a surprise.  It was

 9   the underlying -- I mean, that came up the first time I dealt

10   with this case, was the government suggesting that the

11   positions were likely to be in opposition, at least to some

12   extent, and in opposition, and so the government wanted to

13   oppose the defendant's efforts to have a single counsel, and so

14   it's not a surprise that the defendants might have positions

15   that would be contrary to each other.

16          I think -- just on *Jones*, I think the hardest part for

17   you is to overcome the first prong of that test, not

18   necessarily the prejudice prong, but why these are truly

19   antagonistic in the legal sense that the Tenth Circuit uses it

20   in *Jones*, is the hard part for you.

21          So, I don't want to argue about it now.  I will just

22   let you know where I stand, and so when you do file your

23   written responses, you can understand what I think are the most

24   difficult hurdles for you to overcome.

25          So, can we bring the jury in?

HANNAH SCAIFE - Direct

1          MS. FROST:  Sure.  I appreciate the roadmap.

2          THE COURT:  All right.  Thank you.  Thank you.

3          THE COURTROOM DEPUTY:  All rise.

4     (Jury in at 9:17 a.m.)

5          THE COURT:  Good morning, ladies and gentlemen.

6    Welcome back.  Let's take our seats.  While you are getting

7    settled, is the government ready to call their next witness?

8          MS. WEISS:  We are, Your Honor.

9          THE COURT:  All right.  Go ahead, Ms. Weiss.

10         MS. WEISS:  The government calls Hannah Scaife.

11         THE COURT:  Okay.

12         THE COURTROOM DEPUTY:  Please raise your right hand.

13    (**HANNAH SCAIFE** was sworn.)

14         THE WITNESS:  Yes I do.

15         THE COURTROOM DEPUTY:  Please be seated.

16         THE WITNESS:  Thanks.

17         THE COURTROOM DEPUTY:  Please, state your name and

18    spell your first and last names for the record.

19         THE WITNESS:  Yes.  Hi.  My name is Hannah Scaife, and

20    my first name is spelled H A N N A H, last name is S C A I F E.

21                        **DIRECT EXAMINATION**

22    BY MS. WEISS:

23    Q   Is that pronounced Scaife, ma'am?  We have heard it's

24    pronounced different ways?

25    A   It's Scaife, Hannah Scaife.

HANNAH SCAIFE – Direct

1    Q    Got that S K like skate at the beginning?

2    A    Yes, hard syllable.

3    Q    Thank you.  What do you do for a living?

4    A    I'm an architectural representative for a tile company in

5    New York City.  I work with architects and designers to specify

6    tile and stone for large commercial buildings, like apartment

7    towers and hotels.

8    Q    How long have you been doing that?

9    A    I have been in tile for a little over four years, but I

10   have been an architectural rep for various products, primarily

11   one other product category for the last 14 years.

12   Q    Are you a certified public accountant?

13   A    I'm not.

14   Q    What is your educational background?

15   A    I went to college.  I went to Hobart William Smith,

16   graduated in 2002, and I am a little over halfway through my

17   MBA now.

18   Q    When did you start that MBA?

19   A    Fall of 2021.

20   Q    Okay.  Where do you live?

21   A    I live in Brooklyn, New York.

22   Q    Do you know the defendant Kimberley Tew?

23   A    I do.

24   Q    How did you first meet Kimberley Tew?

25   A    Kimberley was in my dorm, I think my freshman year of

HANNAH SCAIFE - Direct

1    college.

2    Q    And how would you describe your relationship with Kimberley

3    during your college years?

4    A    We were acquainted in college.  It was not what I would

5    call a friendship, or certainly not a close friendship.  We

6    were just classmates.

7    Q    Okay.  Did you remain in touch with Kimberley right after

8    graduation?

9    A    No, I didn't.

10   Q    Did you have an occasion to reconnect with Kimberley later

11   on in life?

12   A    I did.

13   Q    And about what year was that?

14   A    It was around June or July of 2012.

15   Q    Okay.  Where were you living at the time?

16   A    Brooklyn, New York.

17   Q    And was Kimberley also living in New York?

18   A    She was living in Manhattan.

19   Q    What were you doing for work, at the time, when you first

20   reconnected with her?

21   A    I was also an architectural rep, but I was working in a

22   different product category.  I was selling guestroom

23   accessories for hotels, exclusively.

24   Q    What about Kimberley, what was she doing?

25   A    Kimberley worked for Tech Oak Energy.  She was doing, I

HANNAH SCAIFE – Direct

1 think, some kind of personal assisting or executive assisting.

2 Q   From your observations, what was the state of her finances,

3 at the time?

4 A   Kimberley seemed affluent.

5 Q   Are there any specific anecdotes that you can recall from

6 that time period that made you think that she was affluent?

7 A   Yes.  I mean, Kimberley always looked great.  She was well

8 put together, always wearing beautiful clothes.  Her hair

9 looked nice.  She took me to a party in the Hamptons.

10 Sometimes we would rent cars.  She always rented the car.  She

11 would rent luxury vehicles, and she frequently rented hotel

12 rooms around New York City.  Always in luxury hotels.

13 Q   Did Kimberley ever say anything to you about how she could

14 afford those types of expenses?

15 A   Yes, she did.

16 Q   And did Kimberley mention any other sources of income to

17 you?

18 A   Yes, she did.

19 Q   Could you tell us what those were?

20 A   Sure.  Kimberley mentioned -- well, let me say, I did ask

21 Kimberley, because the discrepancy in our spending abilities

22 was pronounced, and so I asked, you know, how are you able to

23 afford the lifestyle that you have, and she said she made a

24 hundred thousand dollars a year, and did not contribute to her

25 monthly rent because her boyfriend, at the time, and I assumed

HANNAH SCAIFE - Direct

1   she was on a 1099 and so had more tax writeoffs as a W-2 or W-4

2   employee.

3          So, at the time, Kimberley mentioned some online

4   gambling, that seemed like it was profitable.

5   Q   Okay.  And you briefly mentioned that.  How did that

6   compare with your own financial status, at that point?

7   A   So, at that point in time, in 2012, I was making about

8   $55,000 a year, had a roommate, living in Brooklyn.  I lived in

9   a fourth story walkup.  I did not have discretionary income.

10  Q   Do you mind if I ask you how old you were, at that point in

11  time?

12  A   I was 32.

13  Q   Okay.  So, younger woman making it in the city?

14  A   Yes.  Yeah.  I was starting out.

15  Q   Were you going through any challenges in your personal

16  life, during that period in July of 2012?

17  A   Yes.  Actually, not just during that time period, but

18  really starting.  You know, in 1996, I was taken to my first

19  meeting of Alcoholics Anonymous.  I have struggled with

20  alcoholism and addiction for, really, my entire life, so, at

21  that point in time, in 2012, I was not sober.

22  Q   Okay.  Can you tell us how, specifically, you ended up

23  reconnecting with Kimberley in 2012 -- that summer of 2012; who

24  reached out to whom?

25  A   Sure.  Yeah.  Kimberley and I had exchanged a couple of

HANNAH SCAIFE – Direct

1    Facebook Messenger messages over the last, I don't know -- for

2    a few years prior, and I was, at that specific point in time,

3    in June, of 2012, prescribed an antianxiety medication from my

4    doctor, prescribed Klonopin, going through a rough breakup, and

5    just really lowered my inhibitions to have that benzodiazepine

6    in my system, and so I did respond or -- I guess I reached out

7    to Kimberley on Facebook Messenger.  She invited me to attend a

8    party in the Hamptons for the 4th of July that year.

9    *Q*    And if I could ask you speak up a little bit more into the

10   mic?

11   *A*    Sure.

12   *Q*    Are a little soft spoken.

13   *A*    Yeah.

14   *Q*    What kind of activities would you and Kimberley do

15   together, around that period?

16   *A*    Yeah.  Kimberley and I went out a lot.  I would say we went

17   out to bars, restaurants, hotels.

18   *Q*    Okay.  Going-out friend?

19   *A*    Yes.

20   *Q*    Okay.  So, when I think of girlfriends, I think of respect

21   and admiration and just supporting each other.  Is that the

22   kind of friendship that this was?

23            *MS. HUBBARD:*  Object, Your Honor.

24            *MS. WEISS:*  I can rephrase.

25            *THE COURT:*  That's fine.

HANNAH SCAIFE - Direct

1      Q    (By Ms. Weiss) How would you describe what type of

2   friendship this was?

3         MS. HUBBARD:  I would object.  I believe this is going

4   into character-related evidence.

5         THE COURT:  Overruled.

6         THE WITNESS:  So, I think in 2012, our friendship

7   started out pretty innocently, you know, we did go out

8   together, I remember went to a Knicks game with her, went to

9   the movies, but over time it became an increasingly toxic

10  friendship that was not supportive.

11     Q    (By Ms. Weiss) Okay.  Was Kimberley generous with

12  money with you?

13  A    Absolutely.

14  Q    Okay.  Was her ability or her willingness to spend money on

15  you, part of the appeal to being her friend?

16  A    Yes, it was.

17  Q    So, if Kimberley is bringing money to this friendship, what

18  are you bringing to it?

19  A    I think -- you know, I was 12 years younger, right, I was

20  young, I had maybe a free spirit, I was attractive, I came from

21  a certain background, you know, I think Kimberley and I had fun

22  going out together, and I think I made her look good.

23  Q    Okay.  So, there was a mutually convenience; is that fair

24  to say?

25  A    Yes.

573
HANNAH SCAIFE - Direct

1    *Q*   Ms. Scaife, were you using Kimberley, at that time?

2    *A*   I -- yes, I guess so.  We had some friendship, as well, but

3    I think we were both using each other.

4    *Q*   Would you say that Kimberley had any influence on your

5    decision making during that period?

6    *A*   Yes, she absolutely did.

7    *Q*   In retrospect would you say that that influence was in a

8    net positive in your life?

9        *MS. HUBBARD:*  Objection, Your Honor, this is 2012.

10        *THE COURT:*  Yeah.  I will sustain it.

11       *Q*   (By Ms. Weiss) Did Kimberley ever loan you any money

12   during that period of time?

13   *A*   Yes, she did.

14   *Q*   Can you tell us about that?

15   *A*   Yes.  I --

16       *MS. HUBBARD:*  Objection, this is 2012.

17       *THE COURT:*  Overruled.

18   *A*   I don't remember what year it was.  It might have actually

19   been a little later than 2012, could have been 2013 or 2014.  I

20   remember where we were at the time, on a street corner, near

21   Columbus Circle, where Kimberley lived.  She loaned me a

22   thousand or $1100 to pay my rent.  We were at Bank of America

23   ATM, and I paid her back.

24       *Q*   (By Ms. Weiss) Why would you pay her back?

25   *A*   Because that's the normal thing to do, that's -- whenever I

HANNAH SCAIFE - Direct

1    would borrow money I would pay it back.

2    Q    Would being in debt to Kimberley have any impacts on your

3    friendship?

4    A    Yes.

5    Q    Can you describe that?

6    A    Yes.  Kimberley was very persuasive, and in my opinion.

7    She was emotionally manipulative, and I --

8             MS. HUBBARD:  Objection, Your Honor, relevance.

9             THE COURT:  Overruled.  Go ahead.

10       Q    (By Ms. Weiss) You can continue.  If you want to just

11   start over, that's fine

12   A    Okay.  Yeah.  I was not comfortable owing Kimberley

13   anything, because she was very persuasive and I found her to be

14   emotionally manipulative, and she would put a lot of pressure

15   on me to do things, that I often didn't want to do, but in

16   order to please her, I would do them.

17   Q    Okay.  Did you also meet the other defendant, Michael Tew,

18   around this period, in 2012?

19   A    Yes, I did.

20   Q    Okay.  How much of a relationship, during that time, did

21   you have with Michael Tew, separate and apart from your

22   friendship with Kimberley?

23   A    None.

24   Q    And we're going to talk about the years following in a

25   minute, but would you say you have ever had a relationship with

HANNAH SCAIFE - Direct

1  Michael Tew, separate and apart from Kimberley?

2  A   No, I have not.

3  Q   Have you ever communicated with Michael Tew, directly?

4  A   Not that I remember, no.

5  Q   Okay.  Your communications were always with Kimberley?

6  A   Yes, that's correct.

7  Q   Okay.  Between the years of 2012 and 2018, were there

8  various points in time in which your friendship with Kimberley

9  started and stopped?

10  A   Yes, there were.

11  Q   Okay.  Were those lulls, let's call them, were they

12  initiated by you or by Kimberley Tew?

13  A   By me.

14  Q   Can you tell us what sort of steps you took to distance

15  yourself from Kimberley Tew, at this point?

16          *MS. HUBBARD:*  Objection, Your Honor.

17          *THE COURT:*  Why don't I ask you to approach for a

18  second.

19      (At the bench:)

20          *THE COURT:*  So, I'm going to let -- year-by-year

21  relationship.

22          *MS. WEISS:*  It won't be.

23          *THE COURT:*  I think you basically made the point.  So

24  let's move on to more closely relevant information.

25          *MS. WEISS:*  Sure.

HANNAH SCAIFE - Direct

1          THE COURT:  Anything else?

2          MS. HUBBARD:  Your Honor, since we're here, I might as

well make the record.  One of the things that Ms. Scaife

claims, my client emotionally manipulated her into doing, is

prostituting herself.  So I intend to Cross-exam on that issue.

6          THE COURT:  Why?

7          MS. HUBBARD:  Because she has put on there that my

client is emotionally manipulative --

9          THE COURT:  What does that have to do with anything?

10         MS. HUBBARD:  You let her go into the record.  I was

objecting to keep this out and now I need to put that in

context.

13         THE COURT:  Now -- no, no.  You have made your record.

No.

15         MR. SCHALL:  One last thing.  I don't think defense

ever brought up pretrial -- this is very minor -- but there may

be witnesses where Mrs. Tew's attorney start Cross, first.

18         THE COURT:  I don't care.  That's okay.

19         MR. SCHALL:  Okay.  Thank you.

20         THE COURT:  That's not my thing.

21         (In open court.)

22         THE COURT:  Okay.  Go ahead.

23    Q    (By Ms. Weiss) Just one more question, around this

earlier period -- or the period from 2012 and 2018.  What steps

did you take to distance yourself from Kimberley, during those,

577
HANNAH SCAIFE - Direct

1  sort of, breaks in the friendship?

2  A    Yes.  I verbally communicated to Kimberley that I would

3  like some space, and sometimes, you know, complete distance, no

4  communication, and when that didn't always work, I would block

5  her on social media or text message, email.

6  Q    Okay.  Did you have an occasion to visit Kimberley Tew in

7  person in Colorado in 2016?

8  A    Yes, I did.

9  Q    Okay.  Can you tell the jury about that trip?

10  A    Yes.  I had reconnected with Kimberley in November of 2015,

11  and she invited me to visit her and her family here in Denver.

12  Q    Okay.  And what did you do when you came out to Denver?

13        MS. HUBBARD:  Objection, as to the relevance, as to

14  this 2016 visit.

15        THE COURT:  I will overrule it.  Go ahead.

16  A    So, Kimberley flew me out here for, I think, a weekend,

17  maybe 48 hours or so, and the first night I was here, Kimberley

18  had organized a get together with some of her friends, ordered

19  a lot of wine, which, you know, I drank a lot of Rosé back

20  then, and so there was a lot of Rosé.  There was one other

21  person in attendance that night, and then in the morning we

22  drove to Vail for one night.

23  Q    Could you tell us about that drive?

24  A    The drive was quite tense.

25        MS. HUBBARD:  Objection, Your Honor.

578
HANNAH SCAIFE – Direct

1          *THE COURT:* Overruled.

2     A   So, Michael was driving, and Kimberley was in the passenger

3     seat, I was in the third seat, and there were kids in the

4     middle seat.  What I remember is that Kimberley was verbally

5     abusing Michael and calling him names.  It went on for over 30

6     minutes.  It was extremely uncomfortable.  The mood was tense.

7     Yeah, it was very unpleasant.

8     Q   Okay.  I want to turn your attention now to August of 2018.

9     A   Yes.

10    Q   Did you end up reconnecting with Kimberley around that time

11    period?

12    A   I did.

13    Q   Who reached out to whom in August of 2018?

14    A   I reached out to Kimberley in August of 2018.

15    Q   Ms. Scaife, were you coming out of a rehab program, at that

16    time?

17    A   Yes, I was.

18    Q   Had that caused a financial strain in your, sort of, living

19    expenses?

20    A   Yes, yeah.  As I said, I had been living with alcoholism

21    and addiction for a long time, and I did not manage my finances

22    well.  I also walked out on a well-paying job, a few months

23    prior, because I was simply too drunk to go into work.  So,

24    when I came out of the treatment, I did not have enough money

25    to cover my monthly expenses.

                              HANNAH SCAIFE – Direct

1    *Q*    So, you reached out to Kimberley.  Why did you do that?

2    *A*    To borrow money.

3    *Q*    Specifically for what?

4    *A*    To pay my rent.

5    *Q*    Do you recall about how much money you needed to pay the

6    rent?

7    *A*    I believe it was $3400.

8    *Q*    Did you disclose to Kimberley your circumstances, at that

9    time?  By that, I mean to say, why you needed help with the

10   rent money?

11   *A*    Yes, I did.

12   *Q*    So, she was aware that you had come out of rehab?

13   *A*    Yes.

14   *Q*    Okay.  Was Kimberley supportive of your attempts at

15   recovery?

16   *A*    I don't remember her being interested in how I was doing or

17   what was happening in my life.

18   *Q*    Okay.  Did Kimberley eventually loan you that money,

19   though?

20   *A*    Yes, she did.

21   *Q*    And what method did she use to send you that money?

22   *A*    Zelle or a wire transfer.

23   *Q*    What type of bank account did you have, at that time?

24   *A*    Bank of America, checking account.

25   *Q*    Okay.  Prior to your testimony today, did you review your

HANNAH SCAIFE - Direct

1   banking activity or your statement in August of 2018?

2   A   I did.  Not great.

3   Q   Do you recall anything unusual about the transfers?

4   A   Yes.  So, I didn't remember, without going back and

5   checking, how much I had borrowed from her, but I added up --

6   the money came in chunks.  It did not come all in one transfer.

7   So, to me, that's unusual, and in addition, none of the

8   money -- none of the transfers had Kimberley Tew's name

9   attached to them.  They all had other people's or a business

10  name attached.

11  Q   Okay.  Do you remember any of the names?

12  A   Off the top of my head, I know was Jessamine Development,

13  one was Diana somebody.  There were just names of individuals.

14  Q   Okay.  None of these names were Kimberley Tew, though?

15  A   Correct.

16  Q   How did you know that the money was coming from her?

17  A   Well, I asked her, you know, are these transfers from you,

18  and why do they have strangers' names attached to them?

19  Q   And how did she respond to that question?

20  A   She said they were business associates or investors of

21  herself, at the time.

22  Q   Okay.  So, Kimberley gives you this loan, this generous

23  loan.  Did she ask you to do anything in return, in exchange

24  for the loan?

25  A   Yes, she did.  She asked me to buy and sell Bitcoin at very

HANNAH SCAIFE - Direct

1    specific intervals.

2    Q    And did you agree to do that?

3    A    Yes, I did.

4    Q    Did you have any experience trading cryptocurrency, at that

5    time, in August of 2018?

6    A    No.  I still don't.

7    Q    Did Kimberley help you set up that account to trade

8    cryptocurrency?

9    A    Yes, she did.

10   Q    Did she give you an explanation why she needed you to buy

11   this Bitcoin, rather than just do it herself?

12   A    Yes.  Kimberley said she had been banned from the site or

13   app they were using.

14   Q    And so, you did that, correct, Ms. Scaife?

15   A    Yes, I did.

16   Q    And did you eventually pay Kimberley back for that loan?

17   A    Yeah.  So, I wasn't sure, and I went back into my bank

18   records, and it looks like I did pay her back a thousand

19   dollars, but I sent it to a name that -- it's not familiar to

20   me.  So, I believe it was a repayment to Kimberley.  The other

21   $2400, I'm not sure if it was a gift -- I remember thinking, at

22   the time, that I had more than paid her back, but honestly, it

23   was a very confusing time in my life, just coming out of

24   treatment, after being, you know -- I was so addicted to drugs

25   and alcohol.  I was -- I had an enlarged liver, I had seizures

582
HANNAH SCAIFE - Direct

1    from withdrawal.  I just was not thinking clearly.

2    Q    Okay.  Were you sober during August of 2018, when all of

3    this was happening?

4    A    I was sober from alcohol.  I was not yet sober from drugs.

5    Q    All right.

6    A    Prescription drugs.

7    Q    All right.  Did you end up blocking Kimberley Tew again,

8    around that period?

9    A    Yes, I did.

10   Q    Was there a precipitating event that caused you to block

11   her?

12   A    Yes.  So, we were back in touch in August of 2018, for a

13   period of about two, maximum two-and-a-half weeks, just while I

14   borrowed this money and we exchanged quite a few text messages

15   around that time.  We didn't speak on the phone, but she sent

16   me a text, asking if she could have my social security number,

17   if I would fill out a 1099 form for her, and if she wired me

18   $25,000, if I would withdraw the money in cash and FedEx it to

19   her.

20   Q    Did you do that?

21   A    No.  It was a red flag for me.

22   Q    Okay.

23   A    So, that's when I blocked her.

24   Q    Okay.

25   A    Again, we -- yeah, I hadn't heard from her -- well, I did

HANNAH SCAIFE - Direct

1    hear from her a couple times since then, but I did not -- I did

2    reply to one Instagram message since then.

3    Q    About how long would you say that you were in contact with

4    Kimberley again in 2018?

5    A    Guess two, two-and-a-half weeks.  I don't know exactly,

6    but, yeah, not more than that.

7    Q    Okay.  And the method of communication, was it all text?

8    A    All text.

9    Q    Okay.  Now, you alluded -- has Kimberley attempted to

10   contact you since 2018?

11   A    Yes.  A couple times.

12   Q    Okay.  Can you tell us about those times?  Maybe take them

13   one at a time?

14   A    Sure.  So I -- I don't have a ton of clarity on timeline,

15   because I had -- you know, I wanted Kimberley out of the my

16   life.  I really -- she was not a relevant part of my

17   day-to-day.  So, occasionally she would reach out.  I had no

18   reason to think it was meaningful.  She, at one point, sent me,

19   I think, an iTunes album, maybe some photo montages of our

20   friendship and things we had done together.  She also sent me

21   an Instagram message threatening to disclose some details of my

22   promiscuity, while I was using drugs and alcohol on a public

23   blog that she was hosting.  She threatened to share my personal

24   and private information publicly, without my consent.

25   Q    From your perspective, that Instagram, message was there

HANNAH SCAIFE - Direct

1    any context leading up to that?

2    A   No.

3         *MS. HUBBARD:* I would object on 401, 403 grounds.

4         *THE COURT:* If you could ask a slightly more focused

5    question, maybe that would solve it.

6         *MS. WEISS:* Sure. Sure.

7    Q   (By Ms. Weiss) Do you recall about when you received

8    that Instagram message?

9    A   I believe it was in the end of -- maybe like the final

10   months of 2020, or early 2021.

11   Q   Did Ms. Tew mention, at that time, or as part of that

12   message that she had been recently arrested by law enforcement

13   in relation to this case?

14   A   No, she did not, and I deleted the message, because,

15   obviously, I didn't want to be reminded of this threat. So I

16   don't have a clear timeline, but no, she didn't mention

17   anything about being arrested.

18        *MS. HUBBARD:* Your Honor, may we approach on an issue?

19        *THE COURT:* Yes.

20      (At the bench:)

21        *MS. HUBBARD:* Your Honor, the prosecutor knew the

22   answer to that was going to be no, because there's been

23   extensive prep sessions. She asked the question so the

24   prosecutor could testify to the jury and have the jury put the

25   connection together between the timing of the Indictment and

HANNAH SCAIFE - Direct

1   the Ms. Tew's arrest and the timing of the Instagram message.

2   That is an argument that they can make later, but it is

3   completely improper to do so through questioning of this

4   witness.  They knew that that Instagram message did not

5   reference anything about this case, and they improperly asked

6   that question.  I would ask for it to be stricken.

7        MS. WEISS:  I did try to ask it a different way,

8   first, which was, was there any context around that message or

9   anything precipitating it.  I was asked to make more focused

10   question, so I attempted to do so, if I messed that up, I

11   apologize.

12        THE COURT:  So, I have already instructed them, I

13   think, at least twice, that statements of counsel are not

14   evidence.  I can do it again.  I don't know that an additional

15   instruction striking the question will do anything but draw

16   attention to it, at this point, but I don't disagree with you.

17   So, let's let the witness testify.

18        MS. WEISS:  Sure.

19        (In open court.)

20   Q    (By Ms. Weiss) Ms. Scaife, I want to shift gears and

21   fast forward to October of 2022.

22   A    Okay.

23   Q    Did you receive a visit from federal agents to your home?

24   A    Yes, I did.

25   Q    Did you have any idea they were coming?

HANNAH SCAIFE - Direct

1    A    No, I didn't.

2    Q    Okay.  And did you end up speaking with agents that day?

3    A    I did.

4    Q    Did they show you any documents?

5    A    Yes, they did.

6    Q    I'm going to ask to display what has already been admitted

7    as Government's Exhibit 601?

8         THE COURTROOM DEPUTY:  Six-oh-one.

9         MS. WEISS:  Yes, please.  I believe we just need the

10   second page of that.  The second page, Veronica.  Thank you.

11   Q    Ms. Scaife, does this appear to be one of the documents the

12   agents showed you when they came to your apartment?

13   A    I think so, yes.

14   Q    Okay.  Prior to that day, had you ever seen this document

15   before?

16   A    No, I had not.

17   Q    Okay.  Did you create this document?

18   A    No, I didn't.

19   Q    Did you send this document to anyone?

20   A    No.

21   Q    Is there anything about this document that stands out to

22   you?

23   A    Yes.  I mean, it's got my name on it, although it's

24   misspelled.  So, that was a surprise.

25   Q    Could you tell us what the misspelling is, specifically,

HANNAH SCAIFE - Direct

1    for the record?

2    A    Sure.  My first name has got six letters, it's H A N N A H.

3    Here it's spelled slightly different, with five letters, H A N

4    N A.

5    Q    Ms. Scaife, there's been some mention in your testimony

6    about text messages with Kimberley?

7    A    Yes.

8    Q    Over the course of preparing for this trial, did you learn

9    that the government had possession of your text messages?

10   A    I did.

11   Q    What was your reaction to that?

12   A    Um ... I was shocked.  I have no prior experience with the

13   federal government, and to learn that, you know -- I don't want

14   to say it was an invasion of privacy, but, um, in my normal

15   life, there's no reason that the federal government would look

16   at my text messages.  So, I was pretty shocked.

17   Q    Were you offered the chance to review those messages prior

18   to coming in and testifying today?

19   A    Yes, I was.

20   Q    Did you review all of them?

21   A    No, I did not.

22   Q    Was that your choice?

23   A    It was my choice.  This period of time that we're talking

24   about, when I was friends with Kimberley, was the darkest time

25   of my life, and I do not wish to revisit that.

HANNAH SCAIFE – Direct

1    Q   Okay.  Did you review several of them, at least?

2    A   Yes, I did.

3    Q   Okay.  Was there any patterns in the copies of the messages

4    that you reviewed?

5    A   Well, I think what stood out to me was that I was the only

6    person texting.  There were no messages from Kimberley.

7         MS. HUBBARD:  Objection, Your Honor, to the relevance

8    of this.  It has to do with the data issue that we have been

9    discussing, at length.

10        THE COURT:  Right.  I will overrule it, because we're

11   just getting her impression.  Overruled.  So, go ahead.

12        MS. WEISS:  Okay.

13   A   Yes.  So it wouldn't make sense.  It's not a conversation,

14   but it seems like a conversation, because... but there was only

15   one side of the conversation.

16    Q   (By Ms. Weiss) Okay.  Now I believe I asked this

17   question to you at the beginning, but are you a certified

18   public accountant?

19   A   You did -- I don't know if you asked.  Sorry.  I'm not a

20   CPA.

21   Q   Okay.  What is your experience, if any, with accounting

22   work?

23   A   Yes.  I have taken two accounting courses as part of my

24   MBA.

25   Q   Have you ever held yourself to be a certified public

HANNAH SCAIFE - Cross

1   accountant as a result of those classes?

2   A   No, I have not.

3   Q   Would you ever hold yourself out as a CPA?

4   A   No.

5   Q   Ms. Scaife, can you please just describe to the jury how

6   your life in sobriety is going today?

7   A   Yes, I would love to.  My live in sobriety today is --

8           MS. HUBBARD:  Objection as to relevance.

9           THE COURT:  Overruled.

10          THE WITNESS:  -- incredible.  I'm coming up on five

11  years sober, clean and sober from drugs and alcohol, March 17th

12  of 2024.  And yeah, I have an incredible partner.  I have lots

13  of friends.  I'm in a successful career.  I'm halfway through

14  my MBA.  I have a lot of love and trust in my life, and I am a

15  productive, contributing member of society.  I give back

16  through community service.  I sponsor other women.  I have been

17  able to repair a lot of damage that I caused.

18          MS. FROST:  Your Honor, at this point I'm going to

19  object to narrative.

20          THE COURT:  Overruled.  Go ahead.

21          MS. WEISS:  No further questions from the government,

22  Your Honor.

23          THE COURT:  Thank you, Cross-examination.

24                          **CROSS-EXAMINATION**

25

HANNAH SCAIFE - Cross

1   *BY MS. HUBBARD:*

2   Q   Apologies.  I need to learn to label my folders better.

3   Good morning, Ms. Scaife.  My name is Jamie Hubbard, and I

4   represent Kimberley Tew?

5   A   Nice to meet you.

6   Q   Nice to meet you.  I want to go back to starting in August.

7   You testified that you had just come out of rehab?

8   A   Yes.

9   Q   And that you were hard up for money?

10  A   Correct.

11  Q   Because, as part of your addiction and your drinking and

12  drug use, that had gone on for most of your life, to that date,

13  you quit your good-paying job?

14  A   Yes.

15  Q   You had been away, not able to make money, right?

16  A   Yes.

17  Q   And you needed a way to pay rent?

18  A   Yes.

19  Q   And your July rent check had actually bounced?

20  A   Um ... that sounds correct.  I don't recall.

21  Q   Okay.  And so you were reaching out to people, asking to

22  borrow money from them?

23  A   I reached out to three people.  Yes.

24  Q   So you reached out to your friend Rachel, right?

25  A   Correct.

HANNAH SCAIFE - Cross

1   Q   And she sent you $500?

2   A   Yes.

3   Q   You reached out to your mom?

4   A   Yes.

5   Q   And your mom sent you a hundred dollars?

6   A   I don't remember.

7   Q   Would you like to look at the bank statement, would that

8   help?

9   A   That is -- sure.

10  Q   Okay.

11          MS. WEISS:  Could I have the Bates number?

12          MS. HUBBARD:  It has two, 8327 or 9345.

13          MS. WEISS:  Okay.

14          THE WITNESS:  Thank you.  This is a bank statement

15  that I provided, without being asked for it, just want to say

16  that.

17  Q   That's from the time period we're talking about, right?

18  Late July, early August, 2018?

19  A   I think the time period we're talking about is just --

20  looks like it started August 7, and went through to maybe the

21  20th, or so.  But, oh wow, this -- yeah, this bank statement

22  was over a month.  So that month just started in July.

23  Q   Sure.  So, on July 25th your rent check bounced?

24  A   Um.

25  Q   Return of posted check for 2200?

HANNAH SCAIFE - Cross

1    *A*    Yes, it did.

2    *Q*    Okay.  And you then asked your mom to send you money?

3    *A*    Yes.

4    *Q*    And she gave you a hundred dollars?

5    *A*    Yes.

6    *Q*    In your time of need?

7    *A*    Yes.

8    *Q*    Okay.  Had she paid for you to go to rehab?

9    *A*    No, she had not.

10   *Q*    She had seen you be an addict for 20-plus years?

11   *A*    Yes.

12   *Q*    And so she sent you the hundred dollars, and then I want to

13   talk to you about in your time of need and desperation, how you

14   spent the money that you got from your friends and your mom.

15          The day after you got money from your mom, you spent

16   $800 at Manhattan dermatology.  I'm assuming on Botox?

17          *MS. WEISS:*  We are getting outside of the scope of

18   relevance and argumentative.

19          *THE COURT:*  Overruled.

20   *A*    Yes.  Yeah.  I believe it was on Botox.  I was shocked by

21   that too.

22   *Q*    And you spent $600 at Bumble and Bumble which is a hair

23   place in New York?

24   *A*    I know.  So, when I saw those charges, last week, when I

25   was reviewing this document, I actually reached out to my mom,

HANNAH SCAIFE - Cross

1    just horrified that I had done that.  You know, it's hard to

2    describe what life is like in active addiction, if you have not

3    experienced it yourself, but, you know, I just was not thinking

4    clearly.  I was out of the my mind, and I was not making good

5    decisions.  So, yeah, this is not something I'm proud of,

6    Jamie, but you are correct.

7    Q    And I apologize if I misunderstood.  I thought you had just

8    come out of recovery, at this point?

9    A    You never come out of recovery.

10   Q    Oh, so you had given up your apartment -- or you had given

11   up your job and other things, because of your recovery, then

12   went into treatment, and you came out in this desperate

13   financial situation, but you were still using?

14   A    Yes.

15   Q    Okay.  So, when you told Kimberley Tew you had been sober

16   actually for a couple of months, you lied?

17   A    I don't remember telling her that.

18   Q    Okay.  You don't remember telling Kimberley Tew, August

19   10th, that you had been sober for 72 days, at that point?

20   A    That sounds like something I may have said, um, but at that

21   point I was sober from alcohol, as I said earlier, not from

22   prescription drugs.

23   Q    So, when you told Ms. Tew that you had been sober for 72

24   days, you lied?

25   A    Yes.

HANNAH SCAIFE - Cross

1    *Q*   And when you told your friends that you needed money to pay

2    your rent, you then used it to get Botox?

3    *A*   Yes.

4    *Q*   And when you told your mom you needed money to pay your

5    rent, you used it to get your hair done?

6    *A*   Yes.

7    *Q*   Now, you mentioned that you thought it was ... fishy, that

8    the money that was being transferred to you, was coming from

9    people whose name you didn't know?

10   *A*   Yes.

11   *Q*   And you remember Ms. Tew -- you also testified that Ms. Tew

12   was involved in some different Bitcoin activity around that

13   time?

14   *A*   Yes.

15   *Q*   And Ms. Tew told you that she --

16        *MS. WEISS:*  Objection, Your Honor.  I don't know that

17   counsel can testify to what Ms. Tew told her.

18        *THE COURT:*  Overruled.  I think you can ask your

19   question.

20        *MS. HUBBARD:*  Thank you.

21      *Q*   (By Ms. Hubbard) And Ms. Tew was trying to help you

22   find a way to save your apartment, so you didn't become

23   homeless?

24   *A*   I don't know what Ms. Tew was trying to do.

25   *Q*   Well, that's what you were asking for money for, right?

HANNAH SCAIFE - Cross

1    That's, at least, the representations you were making to

2    Ms. Tew?

3    A    Yes.

4    Q    Was that you needed money, from her, to pay your rent?

5    A    Yes.

6    Q    Okay.  And that's what -- you know, if you tell her that,

7    and you tell her you have been sober for 70-some days?

8    A    Hm-hm.

9    Q    Then it would be reasonable for her to be trying to help

10   you save your apartment?

11   A    I can't speak to what she was trying to do.

12   Q    Okay.  And so she -- she didn't have the money just to send

13   and you knew that.  She has told you she needed to sell some

14   Bitcoin.  She was going to have the people she sold it to, send

15   you the money?

16        MS. WEISS:  Testimony from counsel about things.

17   These are arguments -- that's -- facts not in evidence.

18        MS. HUBBARD:  I'm asking about her recollection of

19   conversations around the time of the money transfers.

20        THE COURT:  Yeah.  Overruled.

21        Q    (By Ms. Hubbard) Ms. Tew told you that she was going

22   to sell some Bitcoin and have the people she was selling to,

23   send you the money via Zelle?

24   A    I have no idea what Kimberley told me.

25   Q    Would you like to see a text message?

HANNAH SCAIFE - Cross

1    *A*    Sure.

2    *Q*    Would that help?

3    *A*    Yep.

       *MS. WEISS:*  Your Honor, we have not received these in

4

5    discovery.  This is the first time I have seen this.

6           *THE COURT:*  Okay.

7           *MS. WEISS:*  Can we have a sidebar on this, please?

8           *MS. HUBBARD:*  I'm just using it to refresh.

9           *THE COURT:*  You can come up.

10       (At the bench:)

11          *THE COURT:*  Go ahead.

12          *MS. WEISS:*  There are discovery obligations that are

13   laid out in discovery conference memorandum order.  These

14   appear to be the other half of the conversations government

15   does not have access to, as you have heard, due to the

16   tampering of the iCloud, so no we have not seen any of these.

17   I do believe that if it's not disclosed properly within the

18   rules of evidence, and the Federal Rules of Criminal Procedure,

19   they should not be allowed to be used.

20          *THE COURT:*  Okay.  I assume they have not been

21   disclosed, that's accurate, right?

22          *MS. HUBBARD:*  Yes.  Your Honor, the only reason we

23   received them -- I'm happy to give them to the prosecution now,

24   I'm only using them to refresh, not using them to impeach

25   anything.

 1          *THE COURT:* For now I will let you use them just for

 2   that, and we can talk about other issues later if we have to.

 3   So go ahead.

 4          (In open court.)

 5      Q   (By Ms. Hubbard) Ms. Scaife, do you see in these text

 6   messages where Ms. Tew tells you she was going to need to sell

 7   some Bitcoin and have the people buying the Bitcoin send you

 8   the money?

 9   A   Yes, I do see that.

10   Q   Okay.  Thank you.  So, I believe you testified that over

11   this couple of weeks that you were back in touch with Ms. Tew,

12   you were sent around $3400 by people?

13   A   That's what I testified, yeah, and that's what I believed

14   to be true, and, I mean, I can only go by the bank records.  I

15   don't remember.  But when I added it up, that is the -- the sum

16   that it came to.

17   Q   And you believe the -- that that money came as a result of

18   your conversations with Kimberley Tew, the $3400?

19   A   Yes.

20   Q   And --

21   A   Yes.  I asked her for a loan, and she gave it to me.

22   Q   And you -- you -- well, let me go back to October 2022,

23   when the federal agents knocked on your door very early in the

24   morning, one morning?

25   A   Yes.

HANNAH SCAIFE - Cross

1    Q    And they interviewed you at your apartment?

2    A    Yes.

3    Q    And they told you it was important that you told them the

4    truth, when you talked to them?

5    A    I'm sure they did, yes.

6    Q    And you understood that if you didn't tell them the truth,

7    you were committing a federal crime?

8    A    I -- I ... I'm sorry.  I don't remember.  I'm sorry.  What

9    is the question?  I'm not clear.

10   Q    Sure.  You got a knock on the door one morning from federal

11   agents?

12   A    Yes.

13   Q    That's something that probably hasn't happened to you many

14   times in your life?

15   A    Zero times.  It hasn't happened to me or anyone else I

16   know.

17   Q    So, you understood that was an important time in your life

18   to take seriously?

19   A    Of course.

20   Q    And they introduced themselves as federal agents?

21   A    Yes, they did.

22   Q    And you knew it was important that you told them the truth?

23   A    Yes.

24   Q    And when you talked to them that morning, you referenced

25   these -- this loan that you had received from Ms. Tew?

599
HANNAH SCAIFE - Cross

1    A    I'm sure I did, yes.

2    Q    You told them it had been paid back in full?

3    A    That was to the best of my memory, at the time, that was,

4    of course, four years after all of this had transpired, and I

5    had not reviewed these records.  Again, it was not top of mind.

6    So, upon review of these records, it appears that I did not pay

7    her back in full.

8    Q    Okay.  So, let's fast forward a little bit, until couple

9    days later you talked on the phone with Agent Palmer, who is

10   sitting over here at the table?

11   A    Yep.

12   Q    And you talked to Mr. Fields, who sitting over here?

13   A    Yes, I did.

14   Q    And you understood, right, that Agent Palmer is, like the

15   guys that knocked on your door, a federal agent?

16   A    Yes.

17   Q    And you understood that Mr. Fields is a federal prosecutor?

18   A    Yes.

19   Q    And you were advised, during that conversation, that it was

20   important that you tell the truth?

21   A    Yes.

22   Q    And during that conversation, enough time had passed that

23   you had time to review your bank records?

24   A    I looked them over.  I did not review them in full until

25   quite recently.  To be honest, this is -- yeah.  Again, not a

600

HANNAH SCAIFE - Cross

1   time in my life that I wish to revisit, and I ... yeah.  I just

2   recently reviewed them in full --

3   Q   Okay.

4   A   -- in detail.

5   Q   So, let me ask my question again.  So, between the time

6   that they initially knocked on your door, and the time you

7   talked to the special agent and the U.S. Attorney on the phone,

8   you had the opportunity to review your bank records?

9   A   I had the opportunity.  Yes.

10  Q   And you told Agent Palmer and Assistant United States

11  Attorney Bryan Fields, that you had repaid Ms. Tew's loan in

12  full?

13  A   I told them that, and I believed it was true, and I was

14  wrong.

15  Q   So, you told them that, when you knew it was important that

16  you be one hundred percent truthful about everything?

17  A   Yes.

18  Q   Okay.  And have they given you notice that you are going to

19  be prosecuted for a federal offense for lying to them?

20  A   I'm sorry?

21  Q   Have they given you notice that you are going to be

22  prosecuted for a federal offense for lying to them?

23  A   No.

24  Q   But that was a lie, right?  Because you hadn't repaid the

25  loan?

HANNAH SCAIFE - Cross

1    *A*    It was an error.  It was not an intentional lie.

2    *Q*    Okay.  I want to talk to you briefly about the trip to

3    Colorado, and your testimony regarding the dynamics of the

4    relationship between the Tews and your observations.  Okay.

5    So -- but before we go there, I want to just recap a couple of

6    things from your testimony about your friendship with Kimberley

7    Tew.

8         So, my understanding is that the time period in which

9    you were close friends was 2012 to 2014ish?

10   *A*    Correct.

11   *Q*    And during that time period, you testified that Kimberley

12   was working, I believe, in the energy sector, with finance

13   people?

14   *A*    That was my understanding, yes.

15   *Q*    And she had a good-paying job?

16   *A*    Yes.

17   *Q*    Then she went to nice lunches and stayed at nice hotels?

18   *A*    Yes.

19   *Q*    And she had access to and worked with some powerful

20   influential people --

21   *A*    Yes.

22   *Q*    -- in the city?  And she introduced you to some of those

23   people?

24   *A*    Yes.

25   *Q*    Including someone named Sandy Goldfarb?

HANNAH SCAIFE - Cross

1    *A*   Yes.

2          MS. WEISS:  Objection, Your Honor.  Can we have a

3    sidebar?

4       (At the bench:)

5          MS. WEISS:  I apologize.  This is the issue that the

6    government raised in its trial brief, related to this

7    witnesses' intimate relationships and previous sexual partners.

8    They have no relevance, whatsoever, in this case, under 401,

9    403, that this is -- absolutely should be excluded.

10         THE COURT:  Okay.  What's the relevance of where this

11   is headed?

12         MS. HUBBARD:  First of all, this isn't coming from my

13   client's knowledge.  She discussed it with the federal agents

14   during multiple interviews.  My source of information --

15         THE COURT:  That doesn't answer my question.

16         MS. HUBBARD:  So it goes to a couple of things.  One,

17   she testified about her promiscuity on Direct.  She also

18   testified on Direct about -- well, she told federal agents that

19   the reason she made some of these life choices, including to

20   engage in an affair with Mr. Goldfarb, was because Kimberley

21   Tew made her do it.

22         THE COURT:  Hm-hm.

23         MS. HUBBARD:  That goes to bias and motive, why is she

24   here testifying?  Because when she revealed the affair to

25   Kimberley, Kimberley shamed her and was mean to her.

HANNAH SCAIFE - Cross

1    Mr. Goldfarb was one of Ms. Tew's bosses.  She had an affair

2    with Ms. Tew's boss, and this woman is upset that Ms. Tew

3    didn't support her, when she revealed the affair.  It goes

4    directly to motive and bias for why she is testifying against

5    my client about a lot of character issues.

6          THE COURT:  Okay.  I think if that's, kind of, what

7    we're getting at, I'm going to let it in.  This is your

8    witness, you did have her testify -- well, not the whole point,

9    but a big part of it was that she was manipulated by Ms. Tew.

10    I think it's relevant that she may still have biases or reasons

11    to be angry at Ms. Tew.  So, perhaps one of those reasons might

12    be this.  I'm not going to let you do this all the way with

13    promiscuity and anything beyond that, but I will let you get

14    about as far as you just got with me.

15          MS. WEISS:  Understood, Your Honor, just for the

16    record, Ms. Scaife did not testify about her promiscuity.  She

17    testified about a threat that was made to her by Kimberley Tew

18    that related to allegations of promiscuity.  So, I do not

19    believe that she put promiscuity at issue; very carefully

20    averted that issue.  I do think there is a way, experienced

21    counsel, to explore issues of bias and motivation, without

22    doing so this is specifically targeted to be harassing and

23    embarrassing to a witness of personal details, that have zero

24    relevance in this case.

25          THE COURT:  I agree.  I agree with you, in general.  I

1   think in this specific case, she brought it up, you thought it

2   was relevant, why her relationship with Ms. Tew, how it fell

3   apart, I think the defense is entitled to dig a little bit into

4   the specifics of that, and so I will let you do that.

5   Obviously, if it becomes harassing or gets -- could pretty

6   quickly flip the 403 balance, but I will let you go about as

7   far as you said.

8          *MS. HUBBARD:*  For the record, I'm not intending to go

9   there right now.  So, this may come up later.  Right now I am

10  just going to ask about being introduced to this gentleman.

11  This is a premature conversation, but I appreciate the

12  opportunity to have it.

13         *MS. WEISS:*  And I will make a record saying 403.

14         *THE COURT:*  Understood.

15         (In open court.)

16         *THE COURT:*  All right.  Ms. Hubbard, why don't you ask

17  your question again.

18     Q    (By Ms. Hubbard) We were talking about what your

19  lifestyle was like back in 2012, 2014 when you were friends

20  with Kimberley Tew, and so she introduced you to some of the

21  people who she worked with in a professional capacity,

22  including a gentleman named Sandy Goldfarb.

23  *A*   Yes, she did.

24  *Q*   And Mr. Goldfarb was some kind of bigwig New York City

25  trader, money guy?

HANNAH SCAIFE - Cross

1    A    Allegedly, yes.

2    Q    Well, you say *allegedly*, but you knew him quite well?

3    A    I did know him quite well.  I mean, I think it depends who

4    you ask, if he was a bigwig, that seems subjective.

5    Q    Right.  Denver standards might be different than New York

6    standards also?

7    A    Yeah.

8    Q    But he was one of those guys who maybe hung out at the Soho

9    House and that kind of place?

10   A    I don't know him to hang out at the Soho House.

11   Q    Some of the fancy lunches that you went on, maybe

12   Mr. Goldfarb was there?

13   A    Definitely.  He was there.

14   Q    And there was -- you and Kimberley would go and do exciting

15   things around the city when you were friends back in 2012 to

16   2014?

17   A    Yes, we did.

18   Q    And so I want to fast forward to 2016, when you had the

19   trip out to colorado.  Between 2014 and 2016, did you your life

20   in New York stay relatively the same?

21   A    It stayed relatively the same.  I became more -- you know,

22   my career progressed.  I started having more and different

23   opportunities, and my life was, I would say, a little calmer

24   and more stable during that time.

25   Q    Okay.  You knew the same was not true for Kimberley Tew?

HANNAH SCAIFE - Cross

1  Between 2014, 2016, she got married to Michael Tew?

2  A    I was aware of that, yes.

3  Q    And they moved out here to Denver?

4  A    Yes.

5  Q    Okay.  And she gave birth to her twins?

6  A    Yes.

7  Q    So, when you came out to visit, in 2016, that was kind of

8  the Kimberley Tew's life that you were walking into?

9  A    Sorry, what?

10  Q    When you came out to visit in 2016, Kimberley was married

11  to Michael?

12  A    Married to Michael with the twins.

13  Q    With the twins, right.  How old were the twins, at that

14  time?

15  A    Two.

16  Q    Twoish, toddler age?

17  A    Yes.

18  Q    Do you have kids?

19  A    Not yet.

20  Q    Okay.  And so you testified on Direct about this -- this

21  trip, that you flew into Denver and then took a trip, went up

22  to Vail?

23  A    Yes.

24  Q    And you previously told federal agents that -- that the

25  dynamics during that trip was kind of scary, weird scary?

HANNAH SCAIFE - Cross

1    *A*    Yes.

2    *Q*    And one of the things that you referenced was that you

3    thought that these kids, who were 2, were like completely

4    absent, I believe was your words?

5    *A*    Yes.

6    *Q*    And that, it was -- you thought it was weird, because,

7    like, you would look at them and smile, and they didn't even

8    know how to smile back?

9    *A*    Yes.

10   *Q*    Okay.  And you thought that was part of this weird dynamic

11   that you testified to on Direct?

12   *A*    I think what I -- what I testified to on Direct was the

13   dynamic between Kimberley and Michael.  I did not testify to

14   anything about the twins.

15   *Q*    Okay.  Well, then let me talk about when you were speaking

16   with federal agents, Agent Palmer and Mr. Fields.  You said

17   that part of your dynamic was the absent nature of the kids,

18   and the fact that they didn't know to smile?

19   *A*    I thought it was unusual.  Yes.

20   *Q*    Okay.  You know one of Ms. Tew's children is on the autism

21   spectrum?

22   *A*    I have heard that, yes.

23   *Q*    You know one of the hallmarks of being on the autism

24   spectrum might be a difficulty interpreting emotions or

25   displaying emotion?

608

HANNAH SCAIFE - Cross

1   *A*   Yes.  But I didn't know that -- I didn't know that her --

2   one of her daughters was on the autism spectrum when I came to

3   visit, and I think only since federal agents came to my door

4   and I discussed this with my friend Rachel.

5   *Q*   You since learned that?

6   *A*   I have since learned that.  Yes.

7   *Q*   So, that could explain some of this like -- the dynamic

8   that you described --

9   *A*   With the kids, yes?

10  *Q*   Now, you testified at length about poor life choices you

11  made?

12  *A*   Yes.  Everyone's favorite topic.

13  *Q*   And when you talked to Special Agent Palmer and AUSA

14  Fields, you told them you felt like this lapse in judgment that

15  you had between 2012 and 2014 was Kimberley's fault, that you

16  blamed Kimberley for that?

17  *A*   Did I say that?

18  *Q*   Would you like to see a transcript?

19  *A*   Sure.

20        *MS. WEISS:*  Can you give me the page?

21        *MS. HUBBARD:*  And I have a copy for the Court too.

22  Thanks, Robb -- Mr. Keech.

23        *THE COURT:*  Thank you.

24        *THE WITNESS:*  What page?

25        Q   (By Ms. Hubbard) Let me find it.  The bottom of page

HANNAH SCAIFE - Cross

1   12, you said, *I felt like it was because of the choices I made*

2   *around her, things she got me into, and the work, she kind of*

3   *sold me false promises, and I blame her.*  Those are your words.

4          MS. WEISS:  Your Honor, this is not the full sentence.

5   Can we please complete the sentence?

6          THE COURT:  Yeah.  Complete the sentence, please.

7      Q    (By Ms. Hubbard) *And I blame her, or I blamed her*

8   *when I wasn't taking responsibility for my own choices.*

9   A   I believe that because of my --

10  Q   Ms. Scaife, the question was, did I read that right, and

11  those were your words that you told the agent and the

12  prosecutor?

13  A   Yes, you did.

14  Q   That you blamed Kimberley Tew for the life choices you made

15  back in 2012 to 2014?

16         MS. WEISS:  Your Honor, mischaracterizing evidence

17  that was just read.

18         THE WITNESS:  Yeah, that's not what I said.

19     Q    (By Ms. Hubbard) I blame her -- or *I blamed her at*

20  *least before I got sober and realized that it's actually my own*

21  *fault; is that what you meant?*

22         MS. WEISS:  Again, Your Honor, I think we should

23  probably stick with the words on the page.

24         THE COURT:  She can respond.  I'm sorry.  Go ahead.

25         THE WITNESS:  Thank you.  To single out that sentence

HANNAH SCAIFE - Cross

 1   is not telling the full story.  I, in my sobriety, where I am

 2   in my life now, I would not be -- I would not be making the

 3   same choice to be engaged in that friendship, and I was

 4   pressured to do things, and I succumbed to that pressure

 5   because I was not in my right mind.  I take responsibility for

 6   using drugs and alcohol.  I do not blame Kimberley for that.

 7   These life choices were mine.  I also wish that I had not been

 8   in a friendship with her.  I do not -- she was not a positive

 9   influence in my life.

10       Q    (By Ms. Hubbard) All right.  So let me say again, so,

11   you blamed Kimberley, at the time that you spoke with federal

12   agents, on October 17th, 2022, for the choices that you had

13   made in your life?

14           *MS. WEISS:*  Same objection.

15           *THE COURT:*  She can answer the question, and if the

16   answer is no, then the answer is no.  So, repeat the question,

17   and I will ask the witness to just answer the question.  Go

18   ahead.

19   *Q*  So, when you talked to federal agents, in October 2022,

20   were you sober?

21   *A*  Yes.

22   *Q*  Okay.  And when you talked to federal agents, in October of

23   2022, and you said, *and I blame her, or I blamed her when I*

24   *wasn't taking responsibility for my own choices*?

25   *A*  That is what I said.

HANNAH SCAIFE - Cross

1   *Q*   So, at least, at some point in your life, you blamed

2   Kimberley Tew for the fact that you were making bad life

3   choices?

4   *A*   Perhaps, for some of the specific choices, not -- I did not

5   blame Kimberley for the fact that I was making bad choices.

6   *Q*   Okay.  Let's talk about some of those choices that you

7   blame Kimberley for.  Let's go back to Mr. Goldfarb.  He,

8   again, was someone who Kimberley Tew worked with in a

9   professional capacity?

10  *A*   You would have to ask her.

11  *Q*   Okay.  She was -- you were introduced to Mr. Goldfarb by

12  Kimberley Tew?

13  *A*   Yes.

14  *Q*   And you understood that she knew him through her, kind of,

15  professional social circle that she was associated with?

16  *A*   Yes.

17  *Q*   And again, she introduced you to Mr. Goldfarb?

18  *A*   Yes.

19  *Q*   And he was married, at the time?

20  *A*   Yes.

21  *Q*   And had kids?

22  *A*   Yes.

23  *Q*   And you started having an affair with him?

24  *A*   Yes.

25  *Q*   And that's one of the things that you blamed Kimberley Tew

HANNAH SCAIFE - Cross

 1    for?

 2    A    Yes.

 3    Q    And you were, I believe you testified, 32 at the time?

 4    A    Yes.

 5    Q    And you had a job?

 6    A    Yes.

 7    Q    And were capable of deciding who you were going to sleep

 8    with, and who you weren't?

 9    A    Yes.

10    Q    You were capable of deciding who you were going to lie to

11    and who you weren't?

12    A    Yes.

13    Q    Right.  You didn't tell Mr. Goldfarb's wife you were

14    sleeping with him?

15    A    No, I did not.  I never met her.

16    Q    And so those were the choices you made back then?

17    A    Yes.  Not good choices.

18    Q    Okay.  So, back in 2012 to 2014, you also testified that

19    you were not making as much money as maybe some of the other

20    people you wanted to be around?

21    A    Correct.

22    Q    And you got yourself in debt?

23    A    Yes, I did.

24    Q    Owed over $10,000 or so in credit card debt?

25    A    Yes.

HANNAH SCAIFE - Cross

1    Q   But you still really wanted to be part of that scene in

2    Manhattan?

3    A   I did.

4    Q   And you were, at the time, drunk and high, pretty much all

5    the time?

6    A   It's true.

7    Q   And it takes money to kind of feed those habits?

8    A   Yes.

9    Q   And it takes money to maintain the lifestyle?

10   A   Yep.

11   Q   And so you chose to start sleeping with people in exchange

12   for sex -- in exchange for money?

13   A   Yes.

14   Q   And you did that?

15           MS. WEISS:  Your Honor, we discussed this.

16           THE COURT:  Sustained.

17   Q   And you are ashamed of the choices that you made back then?

18   A   If I were doing it over I would make different choices.

19   Q   Sure.  And those choices, this lapse in judgment I believe

20   you called it?

21   A   Sure.

22           MS. HUBBARD:  Should we take a break?

23           THE WITNESS:  Nope.

24   Q   If you need a break just let me know.

25           This lapse in judgment, that is part of what you would

HANNAH SCAIFE - Cross

1    blame Kimberley Tew for?

2    A    I mean I -- I take responsibility for all of my choices,

3    and if I were doing it over, I would make different choices.  I

4    would not have slept with people for money.  I would not ...

5         MS. WEISS:  Your Honor, I think maybe let's -- let's

6    take a break or a sidebar, at least to discuss what just

7    happened.

8         MS. HUBBARD:  I'm fine taking a break.

9         THE COURT:  Ms. Scaife is handling herself well.  If

10   she wants a break we will take one.

11   A    I'm fine.  I just want to get this over with.  I would not

12   have been friends with Kimberley.  Do I blame her for making

13   those choices?  I think she was a negative influence on me.  I

14   do not blame her.

15   Q    At some point in 2014, you decided to essentially come

16   clean with Kimberley Tew?

17   A    January of 2014, yes.

18   Q    And you told her that you had been sleeping with

19   Mr. Goldfarb?

20   A    I did not ever sleep with Mr. Goldfarb.

21   Q    I'm sorry.  You told her that I have been having some sort

22   of inappropriate affair with him?

23   A    Yes.  No, she knew that.  She had known that for nine

24   months maybe, six months.  I'm not sure how long it went on.

25   Q    And you told her that you had been being paid to have sex?

HANNAH SCAIFE - Cross

1    *A*    That's how bad I felt about myself, is that, that seemed

2    like the best option.

3           *MS. WEISS:*  Your Honor, I really --

4           *THE COURT:*  Let's approach.

5           *THE COURT:*  No approach, please.

6       (At the bench:)

7           *THE COURT:*  Ms. Hubbard, I told you not to do this.

8           *MS. HUBBARD:*  I'm getting to the bias part right now.

9           *THE COURT:*  No, you keep asking --

10          *MS. HUBBARD:*  That's the last question.

11          *THE COURT:*  But I told you not to do that.  I said no.

12   I said we're not going to get into prostitution.  You asked

13   three questions about being paid to have sex.  Maybe I'm

14   missing some distinction, you are asking about what I said not

15   to ask about.  So, that's enough.

16          *MS. HUBBARD:*  I apologize, Your Honor.  I

17   misunderstood the Court's prior ruling, the second time we were

18   at the bench.  I genuinely did, and I totally apologize for

19   that.  It was not intentional.  I am moving on.

20          *THE COURT:*  Is it clear now?

21          *MS. HUBBARD:*  It is, and again, very much apologize.

22          *THE COURT:*  Okay.  Let's move on.

23          *MS. HUBBARD:*  I want to make sure, I don't want to

24   step on toes.  My intent here is to have this conversation,

25   this goes directly to the bias, that Kimberley did not receive

HANNAH SCAIFE - Cross

1    the information well, and she has bias against her.

2         THE COURT:  Okay.  I will try to be clear.  That's

3    fine.  Inappropriate relationships is fine.  The promiscuity is

4    fine.  The people paying to have sex is not okay?

5         MS. HUBBARD:  Okay.  Apologies.

6         (In open court.)

7    Q    (By Ms. Hubbard) Ms. Scaife, you were vulnerable with

8    Ms. Tew about some of the choices that you had made, and when

9    you came clean with her in January of 2014?

10   A    Yes, I was

11   Q    And she did not respond in a way that you felt was kind?

12   A    No.  She did not.

13   Q    You felt like she blamed you for what you were being

14   vulnerable with her towards?

15   A    Yes.  She seemed angry with me, and I don't know, it was a

16   long time ago, this was ten years ago.

17   Q    And you were supposed to go on a trip together, down to

18   Miami, and then after you had been vulnerable with her, she

19   took that away?

20   A    No, that's not what happens.

21   Q    If you want to look, again at page 12, I believe it's the

22   last line.  For purposes of the record, Ms. Scaife, I'm

23   directing you to a transcript from your interview with Special

24   Agent Palmer and Assistant United States Attorney Bryan Fields.

25   During that interview, you said, *I told her what I had been*

HANNAH SCAIFE - Cross

1    *doing*, I'm going to paraphrase, *and she got mad at me, and she*

2    *also like at that point she had told me she was going to take*

3    *me on a trip to Miami or something, and then, she took that*

4    *away*?

5    A    Yeah.  So, we had been discussing going to Costa Rica or

6    Miami.  At that time, Kimberley was with Michael at Soho House,

7    Miami, I believe -- I don't remember exactly where they were.

8    Somewhere in Miami.  And she called me from the plane on the

9    way back, I remember she said she had been using cocaine with

10   Michael, and that it didn't make sense for us to go away for

11   the weekend together anymore.  I believe it was after that,

12   that I disclosed to her some of these vulnerabilities that we

13   have been discussing.

14   Q    All right.  So, did I read it accurately, from the

15   transcript?

16   A    Yes.  But I did not detail a timeline in the transcripts.

17   Q    Okay.  Okay.  I want to change topics here and talk about

18   some of the promises that you have been made, in order to come

19   here and testify.  So, we talked earlier about the agents who

20   knocked on your door, in October of 2022?

21   A    Right.

22   Q    And they interviewed you and as soon as they left, you

23   emailed the agent about whether you needed a lawyer, and you

24   had some concerns?

25   A    Of course.

HANNAH SCAIFE - Cross

1    Q    And they called you back, and essentially you were wanting

2    immunity from anything that you had done wrong?

3    A    Right.  Because exchanging sex for money is a crime.  I

4    don't know if it's a federal crime, but, you know, also this

5    two-week period in 2018, buying and selling cryptocurrency with

6    Kimberley, and there was this issue where she asked me to FedEx

7    her $25,000 in cash.  At that point in time, it became clear to

8    me that something illegal was happening, and as I said before,

9    I have never been involved in anything to do with federal

10   government, nor has my family or anyone else I know.  I was

11   scared.

12   Q    Sure.  And so, Ms. Scaife, you don't believe that buying

13   and selling Bitcoin is illegal, do you?

14   A    No, it's not.

15   Q    And that's -- I believe what your testimony was, that

16   Kimberley Tew would send you some money, and she would ask you

17   to go buy Bitcoin for her in 2018?

18   A    It was all in an app or online, but yes.

19   Q    Okay.  Thank you.  And when you spoke with Assistant United

20   States Attorney Bryan Fields, you wanted assurances that you

21   wouldn't be prosecuted for anything, right?

22   A    Yes.

23   Q    And since then, you also talked to AUSA Sarah Weiss, over

24   here?

25   A    Yes.

HANNAH SCAIFE - Cross

1    Q    You again asked for assurances that you wouldn't have to --

2    or you wouldn't be prosecuted for anything?

3    A    Right.

4    Q    Right.  And you also wanted assurances that you wouldn't

5    have to talk about some of the things that, unfortunately, you

6    have had to talk about today?

7    A    The questions that you have asked me.  I don't think

8    Sarah Weiss asked me any of those questions, but yeah.  Being

9    Cross-examined does feel like I'm being prosecuted.

10   Q    And so, when you had previously talked with federal

11   prosecutors, you asked for them to guarantee that you wouldn't

12   have to talk about your poor life choices, when you were here

13   to testify?

14   A    That would have been my preference.

15   Q    And you felt like they had assured you that you wouldn't

16   have to do that?

17   A    Um ... listen, there's always the chance.  These -- I

18   regret the past, but I can't shut the door on it, and, you

19   know, Kimberley had threatened to make public some of these

20   details on a blog that she was hosting --

21   Q    Ms. Scaife, do you remember speaking by phone with another

22   federal agent, Anderson?

23   A    Lisa --

24   Q    Sarah?

25   A    Sarah Anderson.

HANNAH SCAIFE - Cross

1          MS. HUBBARD:  Your Honor, I have copies of a

2      transcript.  I have already given them to the prosecution.

3          THE WITNESS:  Thank you.

4      Q    (By Ms. Hubbard) And Sarah Anderson identified

5      herself to you as an agent of the Federal Bureau of

6      Investigation?

7      A    Okay.

8      Q    And so, again, this is somebody that you are speaking with,

9      and you know it's important that you are telling the truth and

10     accurately conveying your understanding of things?

11     A    Okay.  I mean, it's the first time I have seen this

12     transcript.

13     Q    Sure.  I'm not asking you about that right now.  I'm just

14     asking for your recollection of your conversation with

15     Ms. Anderson?

16     A    I spoke with her a few times.

17     Q    Okay.  If you go down to about the middle of the page,

18     there's a longer paragraph, that last paragraph says, *Bryan*.

19     You mean Bryan Fields, the prosecutor in this case?  Is that

20     who you are talking about?

21     A    Yes.

22     Q    And it says here, that *Bryan assured me I wouldn't be*

23     *prosecuted for any of those behaviors*, and that *he, and the IRS*

24     *FBI agent,* I believe you are talking about Agent Palmer?

25     A    Yes.

HANNAH SCAIFE - Cross

1    *Q    They did also assure me that I wouldn't be questioned*

2    *during the Cross-examination about that you know lapse in*

3    *judgment?*

4    *A*    Well ...

5    *Q*    Did I read that right?

6    *A*    Um, yes.

7    *Q*    Okay.  So that's what you told the FBI federal agent, that

8    was your understanding of what you could expect today?

9    *A*    I mean, yes.

10   *Q*    Okay.  Back in January 2014, when Kimberley Tew got angry

11   with you, when you were vulnerable with her, that hurt your

12   feelings?

13   *A*    Hm, it didn't really hurt my feelings.

14   *Q*    Your friendship kind of ended for awhile after that

15   conversation?

16   *A*    It was my choice, yes.

17   *Q*    Yeah.  And you know that now, in this courtroom today,

18   Kimberley Tew is in a vulnerable position?

19   *A*    I don't know that.

20   *Q*    Okay.  And you were brought here by the federal government

21   to testify against her?

22   *A*    Yes.

23   *Q*    And --

24   *A*    Well, I don't know that I'm testifying against her.  I'm

25   just testifying.

HANNAH SCAIFE - Cross

1   Q    The government paid for your plane ticket?

2   A    They did.

3   Q    Okay.  The government was willing to pay for you to have a

4   support person here with you?

5   A    Yes.

6   Q    You have met four, five, six times with the government,

7   before your testimony?

8   A    I didn't -- I don't know.  I'm sorry.  I don't remember.  I

9   didn't count.

10  Q    You have met with the government multiple times before you

11  came to testify today?

12  A    Yes.

13  Q    Okay.  But you didn't understand that you were testifying

14  on behalf of the government?

15  A    I'm testifying on behalf of the government, but it's --

16  yeah.

17  Q    Okay.

18  A    To help -- I guess, I'm testifying for the case, not

19  against any one person.

20  Q    Okay.  And when you came here from New York, you had

21  already spoken by phone or Zoom or something with Ms. Weiss,

22  right?

23  A    Yes.

24  Q    And you, before you got on the plane, went to a shop and

25  got her a gift?

HANNAH SCAIFE - Cross

1    A    I brought donuts for the office.  Yes.

2    Q    Okay.  You brought donuts for the prosecutors, from New

3    York?  You brought donuts from New York?

4    A    For the prosecutors in Denver.  Yes.

5    Q    For the prosecutors?

6    A    Yes, I did.  They didn't eat them or even open them.

7            MS. HUBBARD:  If I could have a moment, Your Honor.

8            THE COURT:  Okay.  Okay.  For Mr. Tew, any

9    Cross-examination?

10            MS. HUBBARD:  If I could have a minute to check with

11    counsel?

12            THE COURT:  Oh, okay, I'm sorry.

13            MS. HUBBARD:  We don't have any further questions,

14    Your Honor.

15            THE COURT:  For Mr. Tew?

16            MS. FROST:  Thank you, Your Honor, just quickly.

17            THE COURT:  Okay.  Thank you, Ms. Frost.

18                              **CROSS-EXAMINATION**

19    BY MS. FROST:

20    Q    Good morning, Ms. Scaife.

21    A    Hi.

22    Q    My name is Kristen Frost and I represent Mr. Tew?

23    A    Hi, Kristen.

24    Q    Were those donuts from the Donut Palace?

25    A    No.  They were from Peter Pan.  I live in a Polish

624
HANNAH SCAIFE - Cross

1   neighborhood, it's just like an old, cash only.  They make the

2   donuts fresh every morning.  It's really good.  Whatever food

3   pantry they brought them to, I'm sure, enjoyed them.

4   Q   Good to know.  I just have a few questions for you.  You

5   brought Mr. Tew up on your Direct Examination?

6   A   No.

7   Q   That's exactly my point.  You don't know Mr. Tew?

8   A   I have met him.

9   Q   Like twice, right?

10  A   I believe it was twice.

11  Q   You never -- when you talked about going out, New York and

12  to the Hamptons, Mr. Tew was never with you when you were

13  socializing with Ms. Tew?

14  A   Once.

15  Q   So, out of all of those years --

16  A   Maybe twice, yeah.

17  Q   Okay.  It's fair to say that you never talked to Mr. Tew on

18  the phone, right?

19  A   I don't remember ever talking to Mr. Tew on the phone.

20  Q   You probably didn't even have his phone number?

21  A   I don't remember ever having his phone number.

22  Q   When you talked about Bitcoin, you were never involved with

23  Bitcoin, with regards to Mr. Tew?

24  A   That's correct.  I was never involved with Mr. Tew,

25  Bitcoin, finances, anything.

HANNAH SCAIFE - Cross

1    Q    Yeah.  And in terms of the gambling that you talked about

2    Mrs. Tew would do.  You never observed Mr. Tew having any kind

3    of gambling problem like that, or anything like that, right?

4    A    I never observed Mrs. Tew having a gambling problem or

5    observed her gambling at all.  This is just what she told me.

6    Q    Okay.  I'm talking about your observations of Mr. Tew?

7    A    No.  I never heard the same about Mr. Tew.

8    Q    Do me a favor, let me finish my question.  We have the

9    court reporter.  We can't talk at the same time?

10    A    Sorry, so sorry.

11    Q    You talked about a trip up to Vail when you came to visit

12    Mrs. Tew in Colorado?

13    A    Yes.

14    Q    And you drove up in the car with Mr. Tew, Mrs. Tew and

15    their twins, right?

16    A    Yes.

17    Q    And you talked about the fact that you overheard Mrs. Tew

18    berating Mr. Tew?

19    A    I did.

20    Q    And I think you heard her call him a monkey?

21    A    Yes.

22    Q    And call him other names?

23    A    I definitely remember monkey.  I think there were other

24    names, but I do remember her calling him a monkey.  Yeah.

25    Q    We can agree, she was just being verbally abusive to him?

HANNAH SCAIFE - Cross

1   A   That was my impression.

2   Q   And with the kids in the car, your memory is that she made

3   some kind of statement that he was a bad father or kind of took

4   a jab at him as a father?

5   A   Yes.

6   Q   And that was with the kids present, of course?

7   A   Yes.

8   Q   And you never really socialized with Mr. and Mrs. Tew

9   together after that Vail trip, right?

10  A   I did.

11  Q   How often?

12  A   Twice.

13  Q   In Colorado or New York?

14  A   Once in New York and once in Orlando.

15  Q   And Mr. Tew was there in Orlando?

16  A   Yes.

17  Q   Okay.  So, it's fair to say that in the last, what, going

18  back to 2012, you have seen Mr. Tew maybe four times?

19  A   I would say a maximum of six.

20  Q   Okay.  So, six times, since 2012?

21  A   Between four and six, yeah.

22  Q   Six times, since 2012, maybe you have seen Mr. Tew?

23  A   Yes.

24  Q   But you are not sure?

25  A   I don't remember exactly.

HANNAH SCAIFE - Redirect

1    Q    Okay.

2            MS. FROST:  Thank you.  I have no further questions.

3            THE COURT:  Thank you, Ms. Frost.  Redirect?

4            MS. WEISS:  Very, very brief Your Honor.

5                    **REDIRECT EXAMINATION**

6    BY MS. WEISS:

7    Q    Hi, Ms. Scaife.

8    A    Hi.

9    Q    Hi.  You were asked some questions about being an addict

10   and being in recovery.  Can you explain the terms active

11   recovery to the jury?

12   A    Sure.  Yeah.  So, I have been in active recovery for about

13   six years.  Some of that, early on, you know, was drinking and

14   going to meetings, drinking after meetings, going to

15   treatments, using prescription drugs, but for the last, almost,

16   five years, I have been going to meetings, AA meetings, almost

17   daily, you know.  I have a sponsor that I meet with on a

18   regular basis.  I ... sorry ... just ... been an emotional

19   morning, um, sponsor other women.  I do service the meetings.

20   Q    It's a process, right, Ms. Scaife?

21   A    It's a process.

22   Q    You have been very committed to that process over the past

23   five years?

24   A    Yep.  Yes, I have, yeah.

25   Q    Is part of that process being honest with yourself and

HANNAH SCAIFE - Redirect

1   others?

2   A   Yeah, yes, that's a big part of the process.

3   Q   And is that what you were attempting to do here, today?

4   A   Yes.

5   Q   Now, you are here under a subpoena?

6   A   I was subpoenaed.

7   Q   So, that means you have to be here?

8   A   Yes.

9   Q   You were asked some extremely personal questions?

10  A   Yes.

11  Q   And you answered them honestly?

12  A   I did.

13  Q   You were under oath?

14  A   I am under oath.

15  Q   And you are also committed to your recovery process?

16  A   It's the most important thing I can do.  Yes.

17       MS. WEISS:  That's all from the government,

18  Your Honor.

19       THE COURT:  All right.  Thank you, Ms. Weiss.  Thank

20  you Ms. Scaife.  You are excused.

21       THE WITNESS:  Okay.  Should I leave those here?

22       THE COURT:  You can leave those there.  Yes.  Thank

23  you.  All right.  Why don't we take a recess until 11 o'clock.

24       Members of the jury, again, all my previous

25  instructions about your conduct and keeping an open mind remain

HANNAH SCAIFE - Redirect

1   in place.  We will be in recess, until 11 o'clock.

2          THE COURTROOM DEPUTY:  All rise.

3      (Jury out at 10:44 a.m.)

4          THE COURTROOM DEPUTY:  Court is now in recess.

5      (Recess at 10:44 a.m.)

6      (In open court at 11:07 a.m.)

7          THE COURT:  Good morning.  Please take your seats.

8   Can we bring the jury in or is there -- Mr. Schall?

9          MR. SCHALL:  Very minor.  Just something we thought

10  about.  The witness that's appearing remotely will be at 1

11  o'clock I believe, and so, wanting to have the jury in their

12  seats at 1 o'clock, we might propose an earlier break to give

13  them their full lunch.

14         THE COURT:  Okay.  I think that's a good idea.  Thank

15  you for bringing it up.  I'm not sure what this next witness'

16  timing looks like, but, like, are you proposing that we just do

17  it now?

18         MR. SCHALL:  I think it will be a brief witness,

19  Your Honor, but I don't know.  Not now.

20         MR. FIELDS:  Your Honor, I think it's possible we can

21  finish this witness before.  It's a witness from the bank,

22  testimony will last 20 to 30 minutes.  I think the Cross was

23  estimated the same.  So I think we can work that in.

24         THE COURT:  All right.  Thank you.  Let's try and work

25  that in.  Mr. Keech.

BRITTANY PERRY - Direct

1            THE COURTROOM DEPUTY:  All rise.

2        (Jury in at 11:10 a.m.)

3            THE COURT:  Let's all take our seats, and the

4    government is calling their next witness.

5            MR. FIELDS:  Thank you, Your Honor.  The United States

6    calls Brittney Perry.

7            THE COURT:  All right.

8            THE COURTROOM DEPUTY:  Please raise your right hand.

9        (**BRITTANY PERRY** was sworn.)

10           THE WITNESS:  I do.

11           THE COURTROOM DEPUTY:  Please be seated.  Please state

12   your name and spell your first and last names for the record.

13           THE WITNESS:  Brittany Perry, B R I T T A N Y,

14   P E R R Y.

15                          **DIRECT EXAMINATION**

16   BY MR. FIELDS:

17   Q   Ms. Perry, I know it's a little awkward.  Could you pull

18   your seat forward, so we can hear you from the mic?  Thank you

19   very much.

20       Ms. Perry, where did you work between 2016 and 2020?

21   A   Navy Federal Credit Union.

22   Q   And which branches?

23   A   Overseas, in Okinawa, Japan, and also here in Centennial,

24   Colorado.

25   Q   Centennial Colorado you said?

631
BRITTANY PERRY - Direct

1   A    Hm-hm.

2   Q    Let's, if we could, let's look at an exhibit that's not in

3   evidence.  Government's Exhibit 414.  You will see it up there

4   on the monitor in front of you.  What is that?

5   A    That is the lobby of the Centennial branch.

6   Q    Do you recognize anyone there?

7   A    I recognize some of the employees and then also Kimberley

8   Tew.

9        MR. FIELDS:  Your Honor, at this time the government

10  would move to admit Government's Exhibit 414.

11       THE COURT:  Any objection?

12       MR. SCHALL:  None.

13       MS. HUBBARD:  None.

14       THE COURT:  It's admitted.

15  Q    Which branch was this photograph taken?

16  A    Centennial.

17  Q    Where is Ms. Tew walking away from?

18  A    To the left, behind her, is the teller, like, teller

19  stations where you would do transactions.  The right side of

20  the branch are member service representative desks, where you

21  do more complex transactions, like account openings.  The

22  middle host stand, is the greeter, where people walk in, and

23  she is headed towards the front entrance/exit.

24  Q    You said over here on the left.  I've just circled it in

25  pink.  Do you see that?

BRITTANY PERRY – Direct

1    A    Yes.

2    Q    What types of transactions take place there?

3    A    Cash transactions, deposits, withdrawals, transfers.

4         MR. FIELDS:  Now, if we could, let's take that down.

5    Let's look at Government's Exhibit 410.

6    Q    What is this?

7    A    This is one of the teller stations.

8    Q    At where?

9    A    At Centennial.

10   Q    Do you recognize anyone in this photographs?

11   A    Yes.  That's some of the employees and Michael Tew.

12        MR. FIELDS:  Your Honor, at this time the government

13   would move to admit Government's Exhibit 410.

14        THE COURT:  Any objections?

15        MR. SCHALL:  None.

16        MS. HUBBARD:  No.

17        THE COURT:  Four-ten is admitted.

18   Q    You said you recognized Michael Tew.  Where is he in this

19   photograph?

20   A    He is the one in front of the employee wearing black and

21   sun glasses, conducting the transaction.

22        MR. FIELDS:  You can take that down.

23   Q    During your time at Navy Federal Credit Union, did you

24   service a lot of customers?

25   A    Yes.

BRITTANY PERRY – Direct

1    Q    Did Michael and Kimberley Tew stand out?

2    A    Yeah.  I saw them more frequently.

3    Q    Any other reasons they stood out?

4    A    The types of transactions that they did were larger

5    transactions that required more attention.

6    Q    Do you see Michael and Kimberley Tew in the courtroom here

7    today?

8    A    I do.

9    Q    Where do you see Michael Tew?

10   A    Michael is at the first table and Kimberley is behind him

11   at the second table.

12   Q    And at that first table there's a couple of people at that

13   table, right?

14   A    Yes.

15   Q    Is Mr. Tew wearing a particular tie?  Can you identify an

16   article of clothing?

17   A    Facing this way, with a silver tie.

18        MR. FIELDS:  Your Honor, I would like the record to

19   reflect the in-court identification of Michael Tew.

20        THE COURT:  It does.

21   Q    And Kimberley Tew, you said she is at the back table?

22   A    Hm-hm.

23   Q    There's a couple of people there, right?

24   A    Yes.

25   Q    So, again, could you, sort of, differentiate her by an

634
BRITTANY PERRY - Direct

1    article clothing?

2    A    Far right, all black, pearls.

3           MR. FIELDS:    The government would like the record to

4    reflect identification of Mrs. Tew.

5           THE COURT:    Yes, it does.

6    Q    What was your position at Navy Federal Credit Union?

7    A    Assistant branch manager.

8    Q    In your role as assistant branch manager, did you become

9    familiar with Navy Federal Credit Union's policies and

10   procedures?

11   A    Yes, I did.

12   Q    Do you also know how to read the bank statements that it

13   generates for customers?

14   A    I do.

15   Q    Was Navy Federal Credit Union insured by The National

16   Credit Union Administration?

17   A    Yes, NCUA.

18   Q    Did Navy Federal Credit Union offer online or mobile

19   banking to its customers?

20   A    They did.

21   Q    How did that work?

22   A    Every member was afforded an online banking account -- well

23   access through online banking, mobile banking.  They can access

24   their accounts at ATMs, as well.

25   Q    Could customers get bank statements by email?

BRITTANY PERRY - Direct

1    A    Yes.  They could sign up for E-delivery.

2    Q    How would they sign up for that?

3    A    They could opt in through their online banking.

4    Q    Would they provide Navy Federal Credit Union with the email

5    address if they wanted their bank statements sent to them?

6    A    Yeah.  They had to agree to electronic -- to receive their

7    statements electronically.

8    Q    If someone at Navy Federal Credit Union wanted, could they

9    have a joint bank account with someone else?

10   A    Yes.

11   Q    What does it mean to have a joint bank account?

12   A    Co-owners, so both people are owners of the account, have

13   access to the account, can conduct transactions on the account.

14   Q    On the other hand when an account is only in one name, what

15   does that mean?

16   A    That's just one sole owner, no one else can access that or

17   should access that account and transact on it.

18   Q    All right.  You said Navy Federal Credit Union was a credit

19   union, right?

20   A    Yes.

21   Q    Did it have a vault at its branches?

22   A    Yes.

23   Q    How much cash did Navy Federal Credit Union, in the branch

24   that you worked at, keep in its vault at any given day?

25   A    It would shift weekly.  Just depended upon cash-flow needs.

BRITTANY PERRY – Direct

 1   We would submit our cash orders on a weekly basis for the

 2   coming week, just based off of reviewing our ATM cash flow,

 3   transactions that happened the prior week, and we would -- like

 4   it could vary.

 5   Q   What was the, sort of, range, generally?

 6   A   There are vault limits.  So it couldn't go over, I think at

 7   the time it was $250,000.  So, we would keep anywhere from 80

 8   to 180 in there, just to stay within our thresholds and not go

 9   over.

10   Q   Would it sometimes be difficult if the customer wanted to

11   make a large cash transaction?

12   A   If it wasn't anticipated.  Yes.

13   Q   Why?

14   A   We have to, obviously, provide cash for all of our clients.

15   So, when we project what might happen for that week or we

16   estimate what our ATM cash flow is going to look like, if

17   there's an outlying transaction that we didn't expect for large

18   dollar amounts, we may not always be able to accommodate that,

19   if we can't maintain a good cash amount till the next shipment

20   day.

21   Q   Were certain transactions at Navy Federal Credit Union

22   considered high risk?

23   A   Yes.

24   Q   What did that mean, in the particular context of your

25   branch?

BRITTANY PERRY - Direct

1    A    Yep.  So, any transactions 5,000 or more required a

2    supervisor override, that could be conducted by a senior member

3    service representative or a manager.  Anything over 5,000 had

4    to have two sets of eyes, account activity had to be reviewed,

5    for source of funds, how long the funds had been in the

6    account, and dual access to the vault had to be done.

7    Q    Did Navy Federal Credit Union ever put holds on bank

8    accounts?

9    A    There could be holds, yes.  If there was -- if the account

10   was negative for awhile or, like, more specific to a

11   transaction, like if they did a large check deposit, there were

12   standard business holds, just different regulations, five to

13   seven business days.

14   Q    Were there ever situations where Navy Federal Credit Union

15   would simply close accounts?

16   A    There are situations.  It would have to be fraudulent

17   activity on the account, but it's just case-by-case basis.

18   Q    So I asked you about cash withdrawals.  What about ATM

19   withdrawals?  Was a limit on those?

20   A    There are limits.  I can't recall specifics.  I know that

21   they have changed over the years.  Like, at one point it was

22   just $500.  During the COVID timeframe that was increased to,

23   obviously, to accommodate clients not being able to come to the

24   branch, upward to $2,000 daily limit.

25   Q    Did Navy Federal Credit Union's ATMs take photographs of

BRITTANY PERRY - Direct

1    the people who are making transactions?

2    A    They all have cameras on them.  Yes.

3    Q    Talked about cash withdrawals, ATM withdrawals, now I want

4    to talk to you about money transfers.  If an NFC customer had

5    multiple accounts, could they transfer money between accounts?

6    A    Yes.

7    Q    How do they do that?

8    A    They could do it through their online or mobile banking or

9    at a teller window.

10    Q    Was there a limit as to how much they could do that?

11    A    Not between their own accounts, no, or member to member.

12    So, I bank at Navy Federal, you bank at Navy Federal, there is

13    no limit from member to member.

14    Q    And these member-to-member or account-to-account

15    transactions, within Navy Federal Credit Union, how would they

16    show up on bank statements?

17    A    It varies.  It could show as transfer to checking, transfer

18    to checking, with that member's name tied to it, or transfer to

19    shares, which means the money was transferred to a savings

20    account.

21    Q    Why did Navy Federal Credit Union call savings accounts

22    shares?

23    A    Because we are non-for-profit.  So every member actually

24    has stock in the company.  So it's their shares.  It's their

25    share savings.  It's just how they titled it.

BRITTANY PERRY - Direct

1   Q   Where was Navy Federal Credit Union headquartered?

2   A   Vienna, Vienna, Virginia.

3   Q   Thank you.  Not Vienna, Austria?

4   A   No.  That threw me off.  That's where headquarters are,

5   Vienna.

6   Q   Did NFCU close its books at a certain time each day?

7   A   Yes.  So, we did what was called midday turnover.  So, 2

8   o'clock, around that timeframe, obviously, based off of foot

9   traffic and if member service representatives had the time to

10  do it at that moment, 2 o'clock is business day turnover.  So,

11  what that means is today is Thursday, the 8th, anything done

12  from the time that you -- we open the branch until 2 PM, is

13  going to show as business day Thursday, February 8th.  Once the

14  system was turned over to the next business day, those

15  transactions would represent the next business day.  So, you go

16  into the branch today at 4 PM, your transaction is going to

17  show as Friday, the 9th.

18  Q   And what about transactions made over a weekend or a

19  holiday?

20  A   Those are going to fall on next business day.  So, a

21  weekend, with no holidays, would show up as Monday.  If Monday

22  was a holiday it would show up as Tuesday.

23  Q   Let's talk about Michael Tew.  Did you personally interact

24  with him during your time at Navy Federal Credit Union?

25  A   Yes.

BRITTANY PERRY - Direct

1   Q    How often would he come to Navy Federal Credit Union?

2   A    Multiple times a month.

3   Q    Were there any transaction patterns associated with his

4   visits?

5   A    Yes.  It was similar transactions every time.

6   Q    What -- describe those patterns to us?

7   A    Large cash withdrawals, wire transfers.

8   Q    What about ATM withdrawals?

9   A    ATM withdrawals, as well.  Those are not necessarily

10  something I'm aware of, because it's happening out at the ATM.

11  Q    Did you ever see --

12  A    Yeah.  I have seen him at the ATM, but as far as what we do

13  in the branch, it would be large cash withdrawals and wires.

14  Q    So, you mentioned, you know, large cash withdrawals, and

15  sometimes they needed to get advance notice.  Would he ever

16  provide advance notice?

17  A    On occasion.  If he came in to do it and we couldn't

18  accommodate at that moment, we would make a game plan of when

19  we would have the funds available for him to come back and get.

20  Q    What was his response like if he arrived and there wasn't

21  enough cash?

22  A    He was okay with it, because we -- I mean, with every

23  member we try to accommodate what they are requesting so, we

24  try to make their experience positive, by doing so we

25  coordinate a time that he could come get it.

BRITTANY PERRY - Direct

1    Q    Approximately when did the Centennial branch of Navy

2    Federal Credit Union open?

3    A    We opened -- I think our official open date was January of

4    2019.  I moved to the area in October of 2018, when we were

5    still building the branch, and it wasn't fully open, I believe,

6    until January.  It was a long three months.

7    Q    Did Michael Tew ever ask you questions about Navy Federal

8    Credit Union's procedures?

9    A    Yes.  He inquired about the types of transactions that he

10   was doing and how those were monitored.

11   Q    Approximately when was that?

12   A    I can't recall an exact time.

13   Q    You described a conversation a little bit, but tell us as

14   much as you remember about this conversation?

15   A    He would inquire about dollar amount thresholds.  What type

16   of reporting we do.  Would give an example of, if I do this

17   transaction, is that reported?  Or if I do it, you know, this

18   day, and then that day is that reported?  Just very inquisitive

19   about the overall process of the reporting.

20   Q    When you say *reporting*, reported to who?

21   A    Um, what -- specifically for those transactions, it would

22   be CTRs, which are currency transaction reports that are

23   regulated by the federal government and IRS.

24   Q    How would you describe his demeanor when he was visiting

25   the bank?

BRITTANY PERRY - Direct

 1    A    Personable, but talk -- overly talkative.  Asked a lot of

 2    questions.  I mean, it wasn't -- it wasn't your usual, like,

 3    client-to-employee banter.  It was more questioning and slight

 4    distraction from the actual transaction that was taking place.

 5    Q    Would he make transactions only in his accounts or also in

 6    other people's accounts?

 7    A    Accounts that he was on, because that's all that's

 8    permitted, so whether it was individual or joint.

 9    Q    Did you ever see him use anyone else's debit card?

10    A    I didn't see it personally.  No.

11    Q    Now let's talk about Kimberley Tew.  Was she also an NFCU

12    customer when you worked there?

13    A    Yes.

14    Q    How often did you see her?

15    A    Not as frequently as Michael.  I did see her on occasion,

16    but not as frequently.

17    Q    What would she do when she came to the credit union?

18    A    Similar transactions as Michael.

19    Q    You say similar, but could you describe them?

20    A    Withdrawals, transfers, wires.

21    Q    Withdrawals of what?

22    A    Large cash amounts.

23    Q    When you say large, how much is large?

24    A    Over 5,000.

25    Q    Did you have any personal conversations with her?

BRITTANY PERRY - Direct

1    *A*    One.

2    *Q*    Do you remember approximately when that was?

3    *A*    It was -- I left the branch in the summer of 2020, and it

4    was in that year.  I can't recall the specific month, but I do

5    know it was closer towards the time that I was no longer with

6    the company.  So, at some point early year 2020.

7    *Q*    Who initiated the conversation?

8    *A*    Kimberley.

9    *Q*    Describe the conversation to us?

10   *A*    She asked to speak to me in my office.  We went in my

11   office.  She was very upset and kind of beside herself, in

12   terms of Michael's handling of their finances, of his

13   attentiveness to the children.  It was -- it was more of she

14   was confiding in me, asking me questions about what she could

15   do to secure her accounts, and just kind of safe keep those.

16   *Q*    Describe handling of the finances.  Did she describe any

17   concerns in particular?

18   *A*    Not specifically.  She was just concerned about, vaguely,

19   what he was doing with their money.

20   *Q*    So, did she appear to be aware of his activity in their

21   accounts?

22   *A*    Um ... aware enough to be concerned for herself.

23   *Q*    During your time at Navy Federal Credit Union, were you

24   ever tasked to review transactions on Michael and Kimberley

25   Tew's bank accounts?

BRITTANY PERRY - Direct

1    A    Yeah.  It's part of supervisory override.  You should

2    review account activity for source of funds, how long the funds

3    have been in the account, before you can just release them to

4    the member.

5    Q    Why would you be called upon to do that?

6    A    If it was a large cash transaction.  So, anything above

7    $5,000, they would need a supervisory override to do that.

8    Q    Let's look at Government's Exhibit 227, which is not yet in

9    evidence.  Do you recognize this?

10   A    Yes.

11   Q    What is it?

12   A    That is the first page of bank statement.

13          MR. FIELDS:  Your Honor, pursuant to the Declaration,

14   at Government's Exhibit 1128, the government would move this

15   into evidence.

16          THE COURT:  Any objection?

17          MR. SCHALL:  None.

18          MS. HUBBARD:  None.

19          THE COURT:  Two twenty-seven is admitted.

20   Q    All right.  So let's orient ourselves a little bit.  Do you

21   see the name of the account holder on this?

22   A    Yes.  It's at the top, above the address, Michael Tew.

23          MR. FIELDS:  And then zoom in a little bit, because

24   it's a little hard to see on this section here.

25   Q    What information is listed there?

BRITTANY PERRY - Direct

1   A   So, that is a list of the accounts that he would be

2   associated with, whether individual or joint.  So, everyday

3   checking is the first category.  All three account numbers

4   listed below that would be checking accounts, and then

5   membership savings, the second category, are any savings

6   accounts that he had.

7           MR. FIELDS:  Let's zoom back out again.

8   Q   Can you tell what period of time this comes from?

9   A   Yeah.  So, top right, December of 2019 through January of

10  2020.

11  Q   There's also something called access number.  What's that?

12  A   That's basically the equivalent of like the members social

13  security number with the government with us.  That's their ID

14  number.  That's their thumb print with Navy Federal.

15          MR. FIELDS:  Let's zoom out again and go back to the

16  account information.

17  Q   So, how many accounts did Michael Tew have, at this point,

18  in -- between December '19 and January 2020?

19  A   There would be four total accounts, three checking, one

20  savings.

21  Q   And previous balance, what information is reflected there?

22  A   That would be the previous balance of probably the end of

23  the statement period.  So December 16, 2019, that range of a

24  statement period.

25  Q   And then deposits, credits.  What information goes there?

BRITTANY PERRY - Direct

1   *A*   So, in the entirety of this statement period, which runs

2   30 -- roughly 30 days, those are any deposits or credits that

3   came into the account, whether it was a cash deposit at the

4   teller window, a transfer from someone else or a wire incoming

5   ACH credits.  So, that's money that came into the account.

6   *Q*   And then the next one, withdrawals or debits, what do you

7   see there?

8   *A*   That's the money that left the account during that

9   statement period.

10  *Q*   So, for this account ending '5336, do you see that one?

11  *A*   I do.

12  *Q*   What was the balance for the month prior?

13  *A*   Negative four dollars.

14  *Q*   How much money was deposited into that account in the 30

15  days between -- approximately 30 days, between December 2019

16  and January 2020?

17  *A*   Um, $247,000.

18  *Q*   Then approximate how much was withdrawn?

19  *A*   Two-hundred and forty-seven thousand dollars.

20  *Q*   All right.  Now let's look at -- well so, were those all

21  personal accounts?

22  *A*   Yes.

23  *Q*   Do you know with whether Michael Tew also had business

24  accounts during this time period?

25  *A*   I don't recall.

647

BRITTANY PERRY - Direct

1    *Q*    Let's look at Government's Exhibit 318.  Not in evidence,

2    yet.  What is this?

3    *A*    This is the first page of another member bank statement.

4    *Q*    For what time period?

5    *A*    Same time period as the one before.  This is one is for

6    Kimberley Tew.

7            *MR. FIELDS:*  Your Honor, pursuant to the Declaration,

8    at Government's Exhibit 1128, the government would move this

9    exhibit into evidence.

10            *THE COURT:*  Any objections?

11            *MS. HUBBARD:*  No objection.

12            *MR. SCHALL:*  No.

13            *THE COURT:*  All right, 318 is admitted.

14            *MR. FIELDS:*  All right.  And if we could, let's zoom

15   in on this, sort of, account -- the summary of the account --

16   summary of deposit accounts.

17   *Q*    Again, what information is here?

18   *A*    So, this lists any checking accounts and savings accounts

19   that Kimberley was tied to, whether individual or joint.  Shows

20   the ending balance for the accounts in the previous statement

21   period, deposits, withdrawals and the ending balance for this

22   statement period.

23   *Q*    How many accounts did Kimberley Tew have at Navy Federal

24   Credit Union, during this period of time?

25   *A*    It appears to be nine; one, two, three, four, five, six,

BRITTANY PERRY - Direct

1    seven, eight, nine.

2    Q   All right.  A little bit of a memory test.  We could look

3    at it before.  Do you remember how many accounts Michael Tew at

4    at this time?

5    A   Three checking and one savings.

6    Q   How many accounts between the two?

7    A   Without having the statements side-by-side to compare the

8    last four of the account numbers, there could be some that are

9    double dipping, if --

10   Q   I see, okay.  No.  I mean, so you said Michael Tew had four

11   accounts?

12   A   Four accounts representing on his statement, and nine are

13   representing on this one.

14   Q   So, that's 13 accounts total, between the two of them?

15   A   That's not what I'm saying.  I'm saying, like, if one of

16   these accounts was also represented on Michael's statement --

17   Q   I got you.  All right.  Well, let's pull them up.

18          MR. FIELDS:  Can we pull up 318 on the left, and 227

19   on the right?  All right.

20   Q   Can you see that?

21   A   Yeah, I can.

22   Q   I don't know if that helped or not?

23   A   Yep, that's good.  There are no overlapping accounts.  So,

24   you are accurate in your statement of I believe you said 13.

25   Q   In your experience, is that more or less than is typical of

BRITTANY PERRY – Direct

1    most customers around this time period?

2    A    I mean, that's more than your average client.

3        MR. FIELDS:  All right.  Now let's look at

4    Government's Exhibit 227.  Again, we can put it up on the full

5    page.  Let's go to page seven.

6    Q    So, do you see here in -- well, first of all, whose

7    statement is this?

8    A    This is Michael Tew's statement.

9    Q    And can you tell that, because it's up there at the top

10   left?

11   A    Yes.

12   Q    All right.  And then, what information is here?

13   A    So, this is showing account activity specific to the

14   account ending in '5336.  It's also showing that there are no

15   joint owners on the account.  So, this is just Michael's

16   account.

17   Q    Okay.  I want to zoom in on a particular transaction, and

18   can you see it right there, on December 17th?

19   A    Yes.

20   Q    What type of transaction is that?

21   A    So, an ACH transaction is automated clearing house, so

22   those can come in in the form of a wire or a transfer, from

23   another financial institution or from National Air, they can

24   process an ACH credit.

25   Q    Then would Navy Federal Credit Union tell you where you

650
BRITTANY PERRY - Direct

1    were receiving that ACH payment from?

2    A    Yeah, they would specify.  That's why you see on there

3    National Air, that's who the funds are coming from.

4    Q    And then -- so, we have been looking at that transaction.

5    Let's zoom out.  And now let's look at, sort of, what happens

6    during the rest of the day, on December 17th.  So, we looked at

7    that deposit.  Based on your understanding of Navy Federal

8    Credit Union accounts, what happened to that that $7,800 after

9    it was deposited?

10   A    Okay.  So, one, two, three, four, line four, the fact that

11   they were charged a wire fee, that shows that the money was

12   wired out, in addition to line five, money was wired out.  So,

13   you see 7800 come in, 4,000 get wired out, and the rest of the

14   money disbursed between the accounts that Michael and Kimberley

15   have with Navy Federal Credit Union.

16   Q    Yeah.  So, if it just says, *transfer to checking*, and then

17   there's a name underneath it, what does that mean?

18   A    It's specifying the member that it was transferred to.

19   Q    These ACH transactions we are looking at, are those more

20   typical for individuals or for businesses?

21   A    You can do both.  So, like if a client at Bank of America

22   transfers a client money, at Navy Federal Credit Union, there's

23   a way that they can do it as ACH.  It will say *ACH deposit*.

24   Q    Now, let's look at the next page, page eight.  What do you

25   see here on December 20th, 2019?

BRITTANY PERRY - Direct

1    A    It's another ACH from National Air.

2    Q    For how much?

3    A    For $14,350.

4    Q    Okay.  What do you see --

5         MR. FIELDS:  Again, zoom out.

6    Q    What do you see on December 24th, 2019?

7    A    Another ACH deposit from National Air, in the amount of

8    $15,200.

9         MR. FIELDS:  And then one more of these.  If we could

10   go to page nine.

11   Q    And if we look at December 27th, 2019, what do you see

12   there?

13   A    An additional deposit from National Air, for 55,500.

14   Q    Now, let's go back to the previous page.  So, we looked at

15   that transaction on the 19th, the one on the 24th, right?  What

16   happened to -- according to the bank statement, what happened

17   after that deposit, that ACH transaction?

18   A    There were a couple standard transactions to PayPal, ATM

19   withdrawals, at Chase, and then similar pattern, disbursing it

20   amongst the additional accounts that Kimberley and Michael

21   owned.

22   Q    The next page.  The same thing, after this deposit on

23   December 27th.  Let's look at the rest of the activity on the

24   27th.  What do you see happening there?

25   A    The exact same thing; two wires, and then transfers to

                          BRITTANY PERRY - Direct

1    additional accounts.

2    Q    Was this kind of activity common on Michael Tew's accounts?

3    A    It was common on Michael's accounts.  Yes.

4    Q    Now, let's look at Government's Exhibit 318.  Again, who --

5    which Navy Federal Credit Union customer is this statement for?

6    A    This is Kimberley Tew.

7    Q    Let's go to page four, please.  Do you see account number

8    up there at the top?

9    A    Yes.

10   Q    Would you read the last four of it, for us, please?

11   A    It's '8486.

12   Q    Now, this time, is there a joint owner listed?

13   A    Yes, it's Michael Tew.

14   Q    I think you said this, but just to be clear, does that mean

15   that both Michael and Kimberley can make transactions in that

16   account?

17   A    They can.

18   Q    Now, if we look on -- we're still here on page four, and if

19   we look on December 20th.

20        MR. FIELDS:  Actually -- yep.  And actually -- go up a

21   little bit.  Back to December 19th.

22   Q    All right.  So, if you see, on December 19th, you see a

23   large cash withdrawal?

24   A    A large cash withdrawal, yes.

25   Q    I said large.  Would you characterize that as large?

653
BRITTANY PERRY - Direct

1  *A*    Um, no.  No.

2  *Q*    Okay.

3  *A*    That's why I paused, because that's not.  Large would be

4  over 5,000 for the dual override.

5  *Q*    Not large from your perspective, then?

6  *A*    Right.

7  *Q*    Okay.  And then, what do you see happening after that, on

8  December 20th?

9  *A*    The standard transfers amongst all of their accounts.

10  *Q*    And we saw, on the other side, some transfers to Kimberley

11  Tew?

12  *A*    Hm-hm.

13  *Q*    On here, do you see transfers from a different account?

14  *A*    Yes.  There's some transfers from Kimberley Tew -- well,

15  one of Kimberley's accounts, to this Kimberley account on

16  12-20, in the amount of 1500, and then you see right below that

17  a transfer from one of Michael's accounts to this joint account

18  in the amount of 3,000.

19  *Q*    Yeah.  So, you know, we were looking, this is an account

20  for Kimberley Tew, right -- at least a joint account.  It says

21  transfer from checking, still has Kimberley Tew.  Does that

22  mean it came from other Kimberley Tew checking accounts, or

23  does it mean something else?

24  *A*    It means it came from other Kimberley accounts.

25  *Q*    So, we were here on page four.  Let's go to page five.  And

BRITTANY PERRY - Direct

 1   let's go down to December 24th.  What do you see there?

 2   A   Additional transfers from one of Kimberley's accounts to

 3   this joint account with her and Michael.

 4   Q   If we go down to the next page, page five.  What do you see

 5   continuing on December 24th?

 6   A   Additional transfers into this account, from accounts owned

 7   by Kimberley or Michael, as well as a wire for $5,000.

 8   Q   And now let's go to page seven.  You see these transactions

 9   on December 27th?  What do you see there?

10   A   It looks like they were reimbursed.  The second and third

11   line.  They were reimbursed for something.  A credit adjustment

12   is typically when a merchant does something wrong, and they

13   credit you, and then several additional transfers into the

14   account, and then transfers out of the account, as well as a

15   cash withdrawal.

16   Q   So, some of these transfers, right, so this one, *transfer

17   to checking*, is there a name underneath it?

18   A   Yes.  So, it's going from this joint account to an account

19   that Kimberley is on.

20   Q   But these up here, I don't see a name underneath it.  What

21   does that mean?

22   A   That could be from like an account that she is not on.

23   These statements vary.  So, sometimes it lists a member name

24   below and sometimes it doesn't.

25   Q   So, it could be from a member or it could be from an

655
BRITTANY PERRY - Direct

1    outside bank?

2    A    Yes.

3              MR. FIELDS:  All right.  We can take that down,

4    please.

5    Q    Did federal agents ask you to pull certain photographs from

6    Navy Federal Credit Union's records?

7    A    Say that one more time.

8    Q    Did federal agents ask you to pull certain photographs from

9    Navy Federal Credit Union's records?

10   A    Yes.

11   Q    Let's look at Government's Exhibit 402, which is not yet in

12   evidence.  What is this?

13   A    So, this is a member service representative desk, that, on

14   the back side of the screen, is the member service

15   representative, and across from him is Michael Tew.

16             MR. FIELDS:  Your Honor, at this time the government

17   would move into evidence, Government's Exhibit 402.

18             THE COURT:  Any objections?

19             MR. SCHALL:  None.

20             THE COURT:  It's admitted.

21   Q    Do you know -- so, orient ourselves.  Who is the person in

22   black?

23   A    The black T-shirt is Michael Tew and the blue T-shirt is an

24   employee.

25   Q    Did you know that employee?

BRITTANY PERRY – Direct

1    *A*    I did.

2    *Q*    What services did that employee perform at Navy Federal

3    Credit Union?

4    *A*    So, at Navy Federal Credit Union, the title *member service*

5    *representative* encompasses all types of transactions.  So, he

6    would conduct things on this side of the branch; such as,

7    account openings, closures, wire transfers, complex research,

8    but on any other given staffing day he might be on the other

9    side, the teller side or on the drive-thru conducting cash

10    transactions.

11    *Q*    Can you tell which side of the bank he is on?

12    *A*    Yeah.  This is the left side, the member service desk side?

13    So, these are going to be transactions that take more time.

14    So, you want to sit a member down, so they are not just

15    standing at the teller window for forever.

16    *Q*    I think you described some of these, which are the ones

17    that take more time?

18    *A*    Account opening, wires, account closures.

19    *Q*    Account opening.  Why would that take a little bit more

20    time?

21    *A*    Because you are opening an account for someone.  So, you

22    have to go through the system and verify their customer

23    identification, key indicators, make sure that's all up to

24    date, open the account, assign a debit card.  If they already

25    have an account, link it on online banking.  Just doing your

BRITTANY PERRY - Direct

1    due diligence, to make sure it's done correctly.

2    Q    Did Navy Federal Credit Union offer accounts for

3    businesses?

4    A    They did.

5    Q    What was the process for opening a business bank account?

6    A    More complex.  We didn't have, necessarily, a business

7    member service representative, so the documents would be taken

8    in and then submitted to our business department, where they

9    would review it and open the account.

10   Q    What kind of documents would you need to open a business

11   account?

12   A    Anywhere from articles of incorporation to your EIN,

13   signers for the account.

14   Q    Can you tell the day that this photograph was taken?

15   A    Yeah.  So that's June 8th of 2020.

16   Q    All right.  Now, let's look at two other exhibits not yet

17   in evidence, Government's Exhibit 419.  There we go, and 420.

18   Do you recognize those photographs?

19   A    Yes.

20   Q    What were those?

21   A    So, those are on the teller side, where Michael is

22   conducting a large cash withdrawal.

23        MR. FIELDS:  At this time, the government would move

24   into evidence Government's Exhibit 419 and 420.

25        THE COURT:  Any objections?

BRITTANY PERRY - Direct

1          MR. SCHALL:  None.

2          THE COURT:  Those are admitted.

3   Q    Now, in -- let's go back to Government's Exhibit 419.   All

4   right.  From this angle, can you see the customer service

5   location that was in the prior photograph we looked at?

6   A    Yes.  It would be -- if you drew a line from the employee's

7   head, straight up the middle of the monitor, it would be that

8   desk.

9   Q    You can actually do that on your screen.  Let's try it.

10  Let's see.  There you go.  So, right there in the middle?

11  A    Yes.

12  Q    In fact, can you see -- it looks like the E.  Is that the E

13  at the end of service?

14  A    It is.

15  Q    All right.  Now, let's look at Government's Exhibit 420.

16  All right.  So, first of all, orienting ourselves, do you see a

17  gentleman in a white T-shirt?

18  A    I do.

19  Q    Who is that?

20  A    That is Michael Tew.

21  Q    Is he wearing a mask?

22  A    Yes.

23  Q    Is that because it was during COVID?

24  A    It is.

25  Q    Even though he is wearing a mask, are you sure you can

659

BRITTANY PERRY - Direct

1   still recognize that person?

2   A    Yes, I can.

3   Q    Do you see a person in orange?

4   A    Yes.

5   Q    Who is that?

6   A    That is the same employee that was previously in blue, at

7   the member service desk, across the lobby, helping Mr. Tew.

8   Q    What's -- did he have supervisor override approval?

9   A    He was a senior member service representative, so -- you

10  get promoted into that.  So, he was one that was able to do

11  overrides for transactions over $5,000.

12  Q    Do you see the thing on the counter there?

13  A    Yeah.  That's -- it's $20,000.

14  Q    Do you know that just by looking at it?

15  A    Yeah.  It's two straps of 10,000 hundreds.

16  Q    Can we zoom in?  Where do you see that?

17  A    It's gold.  Our straps for 10,000 bundles were gold.

18  Q    Okay.  All right.  Now, let's look.  These are not yet in

19  evidence.  Government's Exhibit 411 and then 418, 424 and 470.

20  What were those?

21  A    Those were all images of Michael Tew conducting

22  transactions at the teller window, with different employees.

23         MR. FIELDS:  At this time the government would move

24  those exhibits into evidence.

25         MR. SCHALL:  No objection.

BRITTANY PERRY – Direct

1          *MS. HUBBARD:*  None.

2          *THE COURT:*  All right.  Those are admitted.

3     Q   Let's just look at Government's Exhibit 470 for a second.

4     Now let's go back to 424.  Now 418.  Now 411.

5          All right.  Now, these are not yet in evidence.  Let's

6     look at Government's Exhibits 396, 398, 406, 407, 417, 493.

7     What were those?

8     A   Those are all taken at our walkup ATM that's on the front

9     of the building.

10    Q   Did you see anyone in those photographs?

11    A   Yes.  Every photograph was Michael Tew.

12         *MR. FIELDS:*  Your Honor, at this time, the government

13    would move to admit, I can read these slowly, Government's

14    Exhibits 396, 398, 406, 407, 417, and 493.

15         *MR. SCHALL:*  No objections.

16         *MS. HUBBARD:*  No objection.

17         *THE COURT:*  Those are admitted.

18    Q   All right.  So, first, looking here, we're on Government's

19    Exhibit 493.  Do you see the time that these photographs were

20    taken?

21    A   Yeah.  In the top left-hand of the screen.

22    Q   On the bottom left, I just see letters.  What is CNTFCTT?

23    A   So, that is the identifier, the ATM number.  So, CNT stands

24    for Centennial, that was our branch code and FCTT is that

25    specific ATM.

661

BRITTANY PERRY - Direct

1   Q   Let's go back to 417.  So that's the same ATM there?

2   A   It is the same ATM.  Yes.

3   Q   And 407, same ATM?

4   A   Yes.

5   Q   And 406, same ATM?

6   A   Same ATM.

7   Q   Three-ninety-eight, same ATM?

8   A   Same ATM.

9   Q   Three-ninety-six, same ATM?

10  A   Same.

11  Q   Let's take that down.  Did Navy Federal Credit Union have a

12  branch in Aurora?

13  A   Yes.

14  Q   Where was it?

15  A   Buckley.

16  Q   Buckley Air Force Base?

17  A   It wasn't on the base, it was just nearby, and that was the

18  name they gave it, was the Buckley branch.

19  Q   Have you ever been there?

20  A   Yes.

21  Q   You recognize the inside of it?

22  A   While our branch was being open, in those last three months

23  of 2018, all of our employees interviewed and hired at that

24  place, and we spent some time there training, before we could

25  move into our location.

BRITTANY PERRY - Direct

1    Q    So, now let's look at Government's Exhibits 395, 397, 403,

2    404, 412, 421, 423, 425, 426.  Do you recognize those

3    photographs?

4    A    Yes.

5    Q    Who was in those photographs?

6    A    It was a mixture of Michael and Kimberley Tew at the

7    Buckley branch, but outside.  So whether it be a walkup ATM or

8    walk-thru.

9         MR. FIELDS:  At this time, the government would move

10   those exhibits into evidence.

11        MR. SCHALL:  No objection.

12        THE COURT:  Those are admitted.

13   Q    All right.  Now let's look at Government's Exhibit 408,

14   409, 413, and 422.  What did you see in those photographs?

15   A    Those are images of Michael Tew inside the Buckley branch.

16        MR. FIELDS:  Government would move those exhibits into

17   evidence.

18        MR. SCHALL:  No objection.

19        THE COURT:  Those are admitted.

20   Q    Let's look at Government's Exhibit 409, please.  Do you see

21   Michael Tew in this photograph?

22   A    I do.  He is the person sitting down, reaching into the

23   black bag.

24   Q    Do you ever see Michael Tew use that bag while he was at

25   your branch?

BRITTANY PERRY - Direct

1   A   A couple times, yes.

2   Q   What was that bag used for?

3   A   For when he would do the large withdrawals, to carry the

4   money outside.

5   Q   Now, let's look at Government's Exhibits 399 and 400.  What

6   are those?

7   A   That's Kimberley Tew, at the Centennial branch.

8           MR. FIELDS:  At this time, the government would move

9   those exhibits into evidence.

10          MS. HUBBARD:  No objection.

11          MR. SCHALL:  No objection.

12          THE COURT:  All right.  Those are admitted.

13  Q   So, looking here at Government's Exhibit 400, what is this?

14  A   This is the drive-up ATM.

15  Q   Do you see the date and the time?

16  A   Yes.  It's June 11, 2020.

17  Q   7:53 PM?

18  A   PM.

19  Q   Now, let's look at Government's Exhibit 399.  What is this?

20  A   That's the walk-up ATM, at the -- the front of the branch

21  outside.

22  Q   On the same day?

23  A   If you could -- if you go back to the other slide, I can

24  confirm that.

25  A   Yes, minutes apart.

BRITTANY PERRY - Direct

1   Q   So, those are just different ATMs at the same branch?

2   A   Hm-hm.

3   Q   What are some of the reasons someone would come to the

4   drive-up and to the walk-up ATM?

5   A   It's beyond me.  They do the same things.

6   Q   All right.  Let's look at, finally, at Government's Exhibit

7   405 and then 427.  What did you see there?

8   A   The first one was Kimberley, at the Buckley branch, and the

9   one on the screen now is -- that's too blurry.

10   Q   Too blurry.  So you don't recognize it?

11   A   Yeah.  I don't want to -- it's blurry.

12   Q   Can you, at least, recognize the lobby?

13   A   Yeah, that's Centennial.

14   Q   And do you see the time?

15   A   That's blurry.  I can see June 11th.

16   Q   But not the year?

17   A   Um, 11:03, um, I would guess that's a 9, 2019.

18       MR. FIELDS:  At this time, the government would move

19   into evidence Government's Exhibit 405.

20       THE COURT:  Any objections?

21       MR. SCHALL:  None.

22       MS. HUBBARD:  To clarify, you are not moving in this

23   one?

24       MR. FIELDS:  Right.

25       MS. HUBBARD:  No objection to the prior being

BRITTANY PERRY - Direct

1    admitted.

2         THE COURT:  Okay.  That one is admitted.

3    Q   Let's look at Government's Exhibit 405.  Who do you see

4    there?

5    A   Kimberley Tew, on the right.

6    Q   Can you circle it for us?

7         MR. FIELDS:  Your Honor, may I have a moment, just to

8    consult with my colleague?

9         THE COURT:  Yes.

10        MR. FIELDS:  No further questions.

11        THE COURT:  Okay.  Thank you.  Given the time, I'm --

12   I'm not sure -- should we go ahead with Cross or should we

13   break?  I'm not quite sure what the parties think.

14        MR. FIELDS:  I would defer to defense counsel,

15   Your Honor.

16        MS. HUBBARD:  I believe the lunch recess would be

17   appropriate.

18        MR. SCHALL:  I agree.

19        THE COURT:  Okay.  That's fine with me.  Why don't we

20   recess until 1 o'clock.

21        Ladies and gentlemen, again, all of my previous

22   instructions remain in place.  We will recess until 1 o'clock,

23   thank you.

24        THE COURTROOM DEPUTY:  All rise.

25        (Jury out at 11:59 a.m.)

BRITTANY PERRY - Direct

1      (In open court at 1:02 p.m.)

2          THE COURT:  Good afternoon.  Please take your seats.

3   My understanding is that we're going to go to the video

4   witness, and then back to Cross-examination of the previous

5   witness;, is that right?  Okay.

6          I will just explain that, I guess, briefly, and then I

7   will give this, just, a short instruction, about treating video

8   testimony like any other.

9          All right.  Then let's go ahead and bring the jury in.

10          THE COURTROOM DEPUTY:  All rise.

11      (Jury in at 1:04 p.m.)

12          THE COURT:  All right.  Welcome back.  Let's take our

13   seats.

14          So, ladies and gentlemen, we're going to do -- mix

15   things up a little bit here, so that, as you may recall, we

16   stopped after Direct Examination of the previous witness.  The

17   next witness is appearing by video, and so we're going to go

18   ahead and call that witness next, and then we will go back to

19   Cross-examination -- when both sides are done with this

20   witness, we will go back to the previous witness, and the

21   defendants will have a chance to do their Cross-examination.

22          So, in a moment, the government will call its next

23   witness.  She will be testifying by video.  She will take the

24   same oath as any other witness, and you are to consider her

25   testimony the same as you would any other witnesses.

Meghan Oakes – Direct

1          So, would the government like to go ahead?

2          MR. FIELDS:  Thank you, Your Honor.  The United States

3   calls Meghan Oakes.

4          THE COURTROOM DEPUTY:  Please raise your right hand.

5      (**MEGHAN OAKES** was sworn.)

6          THE WITNESS:  I do.

7          THE COURTROOM DEPUTY:  Please state your name and

8   spell your first and last names for the record.

9          THE WITNESS:  Meghan Oakes.

10     Q    (By Ms. Weiss) Could you spell that for us please,

11  Ms. Oakes

12  A   M E G H A N, O A K E S.

13         MR. FIELDS:  I'm sorry, Your Honor, may I begin?

14         THE COURT:  Yes.  Go ahead.

15                    **DIRECT EXAMINATION**

16  BY MR. FIELDS:

17  Q   Ms. Oakes, where do you work?

18  A   I work for FIS, Fidelity National Information Services.

19  Q   What is Fidelity National Information Services?

20  A   We are a fintech provider.

21  Q   What is fintech?

22  A   Financial technologies utilized by corporates' financial

23  institutions.

24  Q   What do you do at Fidelity National Information Services?

25  A   I'm the vice president and head of product and services for

Meghan Oakes - Direct

1    enterprise payments in the Americas.

2    Q    Have you long have you worked there?

3    A    Going on eight years, this May.

4    Q    And I see you are joining us by video.  Where are you

5    joining us by video from?

6    A    Pittsburgh, Pennsylvania.

7    Q    Where is Fidelity National Information Services

8    headquartered?

9    A    Jacksonville, Florida.

10   Q    Where else does it operate?

11   A    We have locations globally.  Offices in New York,

12   Milwaukee, Little Rock, Phoenix or Chandler Arizona.  A number

13   of locations internationally.  Majority of the satellite

14   offices are just that, satellite offices, and others are data

15   centers.

16   Q    During the eight years you have been at Fidelity National

17   Information Services, have you developed personal knowledge of

18   how it operates its business?

19   A    I have.

20   Q    What types of clients does it have?

21   A    Different types of clients.  In our capital markets

22   business, we have corporate clients, insurance carriers,

23   corporates of all kinds, and then on the banking side of the

24   house, we have predominantly financial institutions.  Inside of

25   our platform segment, we have other fintechs that we partner

Meghan Oakes - Direct

1    with for complete platform processes.

2    Q   Was Signature Bank a client of Fidelity National

3    Information Services, between 2018 and 2020?

4    A   Yes.

5    Q   What services did Fidelity National Information Services

6    perform for Signature Bank, during that period of time?

7    A   Within my business unit, excuse me, we provided ACH

8    processing services to Signature Bank.

9    Q   Are you familiar with the ways in which Fidelity National

10   Information Services helped provide those services to Signature

11   National -- or Signature Bank?

12   A   I am.

13   Q   How are you familiar?

14   A   As head of the business and the PNL owner, I understand

15   where our data centers are operating.  I also understand what

16   services they are contracted for within my business portfolio.

17   In this case, they utilize this specific ACH application that

18   provides access for Signature Bank to initiate ACH

19   transactions.  Those data centers that operate that technology,

20   staff are located in our Milwaukee data centering, as well as

21   our Chandler or Phoenix, Arizona data center.

22   Q   So you mentioned something called an ACH.  What is an ACH?

23   A   An automated clearinghouse transaction.

24   Q   What is that used for?

25   A   Money movement.

Meghan Oakes - Direct

1    Q    Did Signature use Fidelity National Information Services to

2    process its ACH transactions between 2019 and 2020?

3    A    Yes.

4    Q    How were those transactions processed?

5    A    Utilized an application.  They will go into the

6    application, ACH originators, et cetera, to initiate a payment.

7    Those payments then go to the appropriate processing, FIS

8    serves as the mailman for those transactions to flow through

9    the Fed in a NACHA file format.

10          We again, receive that information, send it to the

11    Federal Reserve, in the appropriate capacity.  It then

12    initiates the transaction processing, and if there's returns or

13    exceptions to those payments that are displayed in the

14    application that Signature Bank uses.

15    Q    So, I heard something called NACHA data, is that the word

16    that you used?

17    A    Hm-hm.

18    Q    Could you spell that for us, please?

19    A    NACHA.

20    Q    What exactly is that?

21    A    It's the National Automated Clearing House Association.

22    So, NACHA manages the ACH network in the United States.  It's a

23    standard file messaging format, and not just the governing

24    entity of the ACH network.

25    Q    So, all of this stuff that you have been talking about,

Meghan Oakes - Direct

1    does that take place through electronic communications?

2    A    It does.

3    Q    Were --

4    A    Through secure links.

5    Q    Were all ACH transactions for Signature Bank processed

6    through the servers that you previously described for us?

7    A    For their contract with us, yes, that's correct.

8    Q    And you said it, it was sort of the middle of a longer

9    narration.  Just so it's clear, where, exactly, were those

10   locations?

11   A    We have two data centers, one that's served as the primary

12   and one that is the secondary.  Milwaukee, is our primary data

13   center, and our backup data center is in Chandler, Arizona.

14   Q    At any time --

15   A    It would go to Chandler.

16   Q    Thank you.  At any time between 2018 and 2020, did Fidelity

17   National Information Services process transactions for

18   Signature Bank, from a physical location within the State of

19   Colorado?

20   A    No.

21   Q    So, if there's an ACH transaction between Signature Bank,

22   and a customer of another bank in Colorado, would that

23   electronic transaction have to cross the state line?

24   A    Yes.

25           MR. FIELDS:  Your Honor, at this time I have no

BRITTANY PERRY - Cross

1    further questions.

2            THE COURT:  Okay.  Thank you.  Any Cross-examination?

3            MR. SCHALL:  Not for Mr. Tew, Your Honor.

4            MS. HUBBARD:  None for Mrs. Tew.

5            THE COURT:  Thank you for your testimony.  Your

6    testimony is complete, and we can shut down the VTC, Mr. Keech.

7    Thank you.

8            So, can we bring back Ms. Perry?  All right.  Go

9    ahead.  Thank you.  Yes.  Go ahead and sit down.  And you are

10   still under oath.  We will begin with Cross-examination.

11   Ms. Hubbard.

12                      **CROSS-EXAMINATION**

13   BY MS. HUBBARD:

14   Q   Good afternoon, Ms. Perry.

15   A   Hi.

16   Q   My name is Jamie Hubbard.  I represent Kimberley Tew.  And

17   did you recently get married and changed your name?

18   A   A few years ago, yes.

19   Q   Oh, I didn't realize it was that long?

20   A   Yeah, not recent.

21   Q   In the documentation that I have seen, you are referred to

22   as Ms. McKneel?

23   A   Yes.

24   Q   So apologies in advance if I accidentally use the wrong

25   name.  In my head, you have been Ms. McKneel, as we prepared

BRITTANY PERRY - Cross

1   for trial?

2   A    Sure.

3   Q    I want to go back to -- oop.  Apparently that has to stay

4   there.  I'm going to show you one of the documents you looked

5   at with the government, and that's Exhibit 318, which has been

6   admitted.  This is the bank statement for Kimberley Tew?

7   A    Yes.

8   Q    And you looked at, with the government, this portion here.

9   Those are the accounts that are under her ID number; is that

10  right?

11  A    Yes.  Yes.

12  Q    Okay.  And I believe you testified that this would show

13  either accounts that are just in her name or joint accounts?

14  A    Yes.

15  Q    Okay.  And if we go here, it shows this '8486 account, and

16  that the joint owner on that account is Michael Tew?

17  A    Yes.

18  Q    Okay.  And I believe you said that if it's a joint account,

19  both Kimberley Tew and Michael Tew can do transactions on them?

20  A    Yes, this's correct.

21  Q    Is that true for both in-person and online?

22  A    Yeah.  They would have access to see the accounts that they

23  are tied to, in their online banking, at an ATM, or in a

24  branch.

25  Q    Okay.  So, Michael Tew can go into a branch and withdraw

BRITTANY PERRY - Cross

1   funds from this '8486 account?

2   A    Since he is on that account, yes.

3   Q    Okay.  He could move money to or from the '8486 account?

4   A    Yes.

5   Q    Okay.  And I want to just -- I was a little bit confused by

6   part of your testimony, as it related to Michael Tew's account

7   statement.  So, I want to just take a quick look at that.

8        Just to orient us, this is Exhibit 227, that you

9   looked at with the government, and I believe your testimony was

10  that if he -- if it's a joint account, it should be appear on

11  his statement.

12  A    That's how I would remember it.

13  Q    Okay.  It looks like for whatever reason that's not true,

14  here?

15  A    Yeah.

16  Q    Right?

17  A    Yep.

18  Q    And my understanding is that the reason it appears,

19  perhaps, on Kimberley's statement, is that the account was

20  opened under her --

21  A    She is primary.

22  Q    Okay.  That's dictated by -- there's a number.  What's that

23  number called?

24  A    Well, that's their access number.

25  Q    That's what it was.  I just couldn't think of it?

BRITTANY PERRY - Cross

1    *A*   It would be whoever came into the branch to initiate the

2    account opening.

3    *Q*   When it was first formed?

4    *A*   Yes.

5    *Q*   Okay.  So, Kimberley Tew walked into the account (sic) and

6    originally opened '8486, and then Michael Tew was later added,

7    or if he was added, at the time?

8    *A*   She would always be primary.

9    *Q*   Okay.  And so the '8486 is going to show on all of her

10   statements?

11   *A*   Hm-hm.

12   *Q*   Even though all of the transactions under that account

13   could have been done by Michael Tew?

14   *A*   Other party.

15   *Q*   And with the government, you went through some of the

16   transactions where it would say transfer to, and then sometimes

17   it would have a name and sometimes not?

18   *A*   Hm-hm.

19   *Q*   And if it said *transfer to Kimberley Tew*, that could be

20   that '8486 account?

21   *A*   It could be or it could be any that she's on.

22   *Q*   Yeah.  But because she's, kind of, primary on that '8486

23   account, it shows on her statements, right?

24   *A*   Yeah.  The primary account shows on her statement.

25   *Q*   So, if a transfer is going into or out of the '8486

676

BRITTANY PERRY - Cross

1    account, it's going, at least sometimes, say Kimberley Tew?

2    A    Yes.

3    Q    Even though it's that joint account?

4    A    Yes.

5    Q    Okay.  I want to make sure I was understanding all of that

6    right.  You testified that in your time working at the branch

7    you remembered both of the Tews coming in to do some

8    transactions?

9    A    Yes.

10   Q    And partially because some of the time it was large cash

11   transactions, where they would need two people?

12   A    Yes.

13   Q    And you would have been the second person?

14   A    Could have been.  There were multiple employees that could

15   have done it.

16   Q    Gotcha.  If we're talking about if it's $5,000, 10,000

17   $15,000 cash withdrawal, you might have been involved?

18   A    Yes.

19   Q    I believe you testified that most of the time the person

20   coming in to do those transactions was Michael Tew?

21   A    Those are the ones that I saw more frequently.

22   Q    And you also pulled the pictures that the government went

23   through with you, right?

24   A    Some of them, yes.

25   Q    And most of those pictures are also of Michael Tew doing

BRITTANY PERRY - Cross

1    transactions at the bank?

2    A    Yes.

3         MS. HUBBARD:  Your Honor, if I could have a minute to

4    confer with counsel?

5         THE COURT:  Yeah, that's fine.

6         MS. HUBBARD:  We have no further questions on behalf

7    of Mrs. Tew.

8         THE COURT:  All right.  Thank you.  For Mr. Tew,

9    Mr. Schall?

10                    **CROSS-EXAMINATION**

11   BY MR. SCHALL:

12   Q    Good afternoon.

13   A    Hi.

14   Q    Just a few quick ones.  You saw a bunch of pictures that

15   were introduced as exhibits from ATMs, from branches -- two

16   branches and the drive-thru lane, right?

17   A    Yes.

18   Q    Help me understand where those pictures came from?  What I

19   mean by that is, I'm presupposing the credit union had cameras?

20   A    Yes.

21   Q    Like video cameras, not still frame cameras?

22   A    Correct.

23   Q    And so, those pictures I'm presuming are snapshots of video

24   feed?

25   A    Yes.

BRITTANY PERRY - Cross

1    Q    And I don't know, couple dozen of them, maybe more than

2    that, were introduced; is that right?

3    A    Yes.

4    Q    Did you choose the images to capture from the video to

5    produce the exhibits?

6    A    I don't recall producing all of those exhibits.

7    Q    Did you produce some of them?

8    A    Yes.  But I can't recall which specific ones, because it's

9    been since 2020.  It was a very brief encounter with Agent

10   Palmer.

11   Q    Okay.  It was at Agent Palmer's request that you produced

12   whatever of the exhibits that you did?

13   A    Yes.

14   Q    Of the pictures?

15   A    Yes.

16   Q    Were you provided any direction about the types of pictures

17   that Agent Palmer wanted?

18   A    No.

19   Q    The individuals in them, even?

20   A    Well, it was regarding Michael Tew.

21   Q    And just Michael Tew?

22   A    And Kimberley Tew.

23   Q    Okay.  No other direction from Agent Palmer?

24   A    No.  And I also -- as an employee, we also are required to

25   direct them to like legal, Navy Federal Legal.  So, there was a

BRITTANY PERRY - Cross

 1   limit to what I could provide, other than just my knowledge of

 2   my interactions.

 3   Q   Fair enough.  Last questions, it has to do with your

 4   knowledge of a particular interaction.

 5   A   Okay.

 6   Q   You said on one occasion, prior to you leaving the company

 7   in 2020, you recall Mrs. Tew coming into the branch?

 8   A   Hm-hm.  (Nodding head.)

 9   Q   Was that, for any reason, a memorable event?

10   A   It was not like a specific reason, other than her wanting

11   to talk to me.

12   Q   Okay.  You have been -- I hope this is the correct

13   characterization.  You have been in a service

14   industry/management role at a credit union in other places

15   before?

16   A   Yes.

17   Q   You, I'm gathering, have a lot of experience dealing with

18   the public?

19   A   Yes.

20   Q   All shapes, size, types of people and their issues?

21   A   Hm-hm.  (Nodding head.)

22   Q   Including people with crazy issues, wild stuff?

23   A   Yes.

24   Q   Nothing about this conversation with Mrs. Tew was like

25   that?

BRITTANY PERRY - Cross

1    *A*   It was -- I gathered, from the conversation, that she was

2    of concern, and she was visibly distraught and upset.  I

3    encounter that with all kinds of people, if someone has a

4    failure in their account negative, they are upset about it.

5    But this was more of her talking to me, about a branch officer,

6    about options to safe keep her funds, due to some of her

7    underlying concerns about Michael.

8    *Q*   I'm going to use a big word, feel free to disagree with me

9    if it's not right.  Do you recall Mrs. Tew being paranoid?

10   *A*   Yes.

11   *Q*   Was she upset?

12   *A*   Yes.

13   *Q*   Did you ever get the sense that she was trying to get

14   something out of you?

15   *A*   Just advice on what to do with her accounts.

16   *Q*   Which isn't really your job, right?

17   *A*   It is -- I mean, as an employee at a financial institution,

18   people will ask can -- her questions, more specifically, *Can I*

19   *have my own accounts*.  Those types of questions.  Not financial

20   advice of how to protect her money from him.  But I am

21   considered a subject matter expert at the bank.  So, people

22   have specific account questions, those -- I'm there to answer

23   those.

24   *Q*   Okay.  Nothing else about the -- that conversation that

25   day, in 2020, stands out?

CHRISTOPHER ALF – Direct

1    *A*    No.

2             *MR. SCHALL:*  Nothing further, Your Honor.

3             *THE COURT:*  Thank you, Mr. Schall.  Any Redirect?

4             *MR. FIELDS:*  No, Your Honor.  Thank you.

5             *THE COURT:*  All right.  Thank you, ma'am.  You are

6    excused.

7             *THE WITNESS:*  Thank you.

8             *THE COURT:*  Is the government's next witness ready?

9             *MS. WEISS:*  Yes, Your Honor.  The government would

10   call Christopher Alf.

11            *THE COURTROOM DEPUTY:*  Please raise your right hand.

12        (**CHRISTOPHER ALF** was sworn.)

13            *THE WITNESS:*  Yes I do.

14            *THE COURTROOM DEPUTY:*  Please be seated.  Please state

15   your name and spell your first and last names for the record.

16            *THE WITNESS:*  Christopher Alf, A L F.

17                          **DIRECT EXAMINATION**

18   BY MS. WEISS:

19   *Q*   Do you also go by Chris, sir?

20   *A*   Yes.

21   *Q*   Where do you live?

22   *A*   I live in Boca Raton, Florida.

23   *Q*   Are you married?

24   *A*   Yes, I am.

25   *Q*   To whom?

682

CHRISTOPHER ALF - Direct

1   A   Lori Alf.

2   Q   How long have you and Mrs. Alf been married?

3   A   Almost 30 years.

4   Q   And just -- let's not talk over each other, for the benefit

5   of the court reporter.  Thank you.  Thank you.  What is your

6   educational background?

7   A   I have some college.

8   Q   Did you graduate from college, sir?

9   A   No, I did not.

10  Q   Where do you work?

11  A   I work for National Air Cargo Holdings.

12  Q   What is your title there?

13  A   I'm chairman.

14  Q   Are you also the founder of National Air Cargo?

15  A   Yes, I am.

16  Q   And when was that entity founded?

17  A   Um, 1991 -- 1990/1991.

18  Q   So National has been in business over 30 years?

19  A   That's correct.

20  Q   What did you do before founding National?

21  A   I worked for a small independent airfreight forwarding

22  company.

23  Q   And what did you do there?

24  A   I worked as a straight commission salesperson.

25  Q   Can you tell us how the idea for founding National came

683
CHRISTOPHER ALF – Direct

1    about?

2    A   I worked for another small airfreight for five years, and

3    then left and started National.

4    Q   Now, we've heard, in this trial, National Air Cargo

5    Holdings is an umbrella company; is that correct?

6    A   Correct.

7    Q   So, there are various entities and affiliates underneath

8    that umbrella?

9    A   Yes, that's correct.

10   Q   For purposes of my questioning, I'm just going to refer to

11   National.  Will you please correct me, sir, if there's a

12   specific entity I should be referring to?

13   A   Yes.

14   Q   Does National operate domestically or internationally?

15   A   Both domestic and internationally.

16   Q   Are National and its affiliates publicly traded companies?

17   A   No, they are not.

18   Q   Who owns National?

19   A   I own a hundred percent of National.

20   Q   Approximately, how much is National worth, sir?

21   A   Um, it's hard to say, but somewhere probably close to a

22   billion dollars.

23   Q   Are you proud of that company, sir?

24   A   Absolutely.

25   Q   Did you work hard to build that company?

684

CHRISTOPHER ALF – Direct

1   A    Yes, I did.

2   Q    From the ground up.  And to be clear, sir, you came from

3   not having a college education to now running a billion

4   dollar --

5             MR. SCHALL:  Objection, Your Honor.

6             THE COURT:  Overruled.  Go ahead.

7   A    Um, yes.

8   Q    Can you give the jury an example of some of National's

9   biggest customers?

10  A    Large customer would be the US Department of Defense.  We

11  do work with global E-commerce companies, FedEx, DHL, so forth.

12  Q    In order to give the jury some context into what National

13  does, can you give us an example of what National might do for

14  the Department of Defense, for instance?

15  A    We do multiple things.  We are an airfreight forwarding

16  company, as well as an airline.  For example, on our freight

17  forwarding side of the business, we move small repair parts up

18  to big engines, and parts for submarines and aircraft.  You

19  name it, for it to move supplies, for the US Department of

20  Defense, on a freight-forwarding basis; meaning, that we use

21  all modes of transportation to move the cargo.  So, we will

22  pick up the freight.

23            Give a quick example, we move flight parts out for the

24  Thunder Birds; meaning, that the Thunder Birds are having an

25  airshow someplace, and a plane breaks, they need to get the

CHRISTOPHER ALF – Direct

1    part moved, we will pick it up, organize the pickup in a truck,

2    run it to the airport, get it on a flight, get it delivered and

3    get it to the user, so the show goes on, on time.

4        On the airline side of our business, we are one of the

5    go-to carrier for the Military Silver Reserve Air Fleet.  So

6    that means, in the time of war, our airplanes support the

7    forces globally.  We move both heavy, oversized cargo on 747

8    aircraft, as well as passenger aircraft.

9    Q    National also moves the military service members,

10   themselves?

11   A    Yes, yes.  We move passenger, as well, for the US military,

12   for training, and we were the first carrier, for example --

13   although we moved many troops for training, as well as

14   combat -- from combat.  We also then, as well, for example, we

15   move the civilians that were airlifted out of Afghanistan.  So,

16   the people you saw on T.V., not different people, those people,

17   wound up on our aircraft at LUD in Qatar, and we flew into

18   Washington Dallas Airport, in DC.

19   Q    You also mentioned global E-commerce companies.  What's

20   that?

21   A    It's companies like Amazon, for example, Shein, Temu;

22   essentially, like an Amazon.

23   Q    Okay.  Mr. Alf, I would like to turn your attention to 2014

24   to 2015.  Was National undergoing a period of financial

25   transition during that period?

CHRISTOPHER ALF - Direct

1    A    Yes, it was.

2    Q    Can you explain to the jury, please?

3    A    In 2014, 2015 we had an issue that we lost a case on a

4    contract dispute.

5    Q    And you say you *lost the case*, was this a judgment against

6    the company?

7    A    Yes.  Yes.  Yes.

8    Q    How large was that judgment?

9    A    Eight-million-dollar judgment against the company.  At that

10   time the company was much smaller.

11   Q    Okay.  And what impact did that have on the financial

12   solvency of National and its entities?

13   A    One particular entity it wound out being devastated.  We

14   went into a restructuring.  We went into a Chapter 11

15   restructuring.

16   Q    Okay.  What's the purpose of a Chapter 11 restructuring?

17   A    It's so the business can continue to move forward, and that

18   it's -- it is doesn't go away.  It just gives the company an

19   opportunity to get their affairs in order, and what that means

20   is that we wind up -- make a long story short, we negotiated

21   getting the payments done over a period of time, and all of our

22   vendors, contractors, trucks and so forth that I just talked to

23   you about, and airlines would be paid in full -- close to being

24   paid if full; not quite, but close.

25   Q    Did National or that entity, that component of it, did it

CHRISTOPHER ALF - Direct

1    successfully exit from that Chapter 11?

2    A    Yes, it did.

3    Q    Did you remain CEO throughout that process and after?

4    A    Absolutely.  I was CEO, I remained in control of the

5    company before the Chapter 11, during the the Chapter 11 and

6    after the Chapter 11.  There's no issues, whatsoever.

7    Q    Around that period, were you introduced to an individual

8    named Michael Tew?

9    A    That's correct.

10   Q    How were you introduced to Michael?

11   A    I was introduced through a neighbor of mine, by the name

12   Richie Schaffer.

13   Q    Who is Richie Schaffer, sir?

14   A    Richie Schaffer was the former chairman of the New York

15   Mercantile Exchange, which is a major commodity exchange in New

16   York City -- or the major commodity exchange in New York City I

17   should say.

18   Q    Was it Mr. Schaffer who recommended Mr. Tew to you?

19   A    Yes, he did.

20   Q    How did Mr. Schaffer know Michael Tew?

21   A    He had done work with him before on other projects, as he

22   is now retired, so he was doing consulting, himself, and to

23   raise financing capital for companies.

24   Q    Okay.  And what was Mr. Schaffer's recommendation of

25   Michael Tew's services?

CHRISTOPHER ALF – Direct

1  A    Well, at the time we needed somebody -- he brought Michael

2  on because we needed somebody to help with presentations and

3  building presentations and working with financial modeling and

4  so forth.

5  Q    When you say *presentations*, who were those presentations

6  being delivered to?

7  A    Various investors and Wall Street-type, you know, friends

8  of Richie, as well, that were in Wall Street, to raise capital

9  for the company.

10  Q    So, National was raising capital, at the time; is that

11  fair?

12  A    We were attempting to.

13  Q    So, there was presentations involved with capital raising

14  --

15  A    That's correct.

16  Q    -- efforts?  What was your understanding of Michael Tew's

17  educational background,, when you were introduced to him?

18  A    He was -- I'm sorry.  Repeat the question, again.

19  Q    Absolutely.  What was your understanding of Mr. Tew's

20  educational background, when you were introduced to him?

21  A    That he was highly educated, he had a Masters in Business

22  Administration, from New York University, one of the best

23  business -- if not the best -- definitely one of the best

24  business schools in the whole country.

25  Q    Did you know anything about his prior work experience?

689

CHRISTOPHER ALF - Direct

1    A    Just through Richie Schaffer.

2    Q    Okay.  What was your understanding of that, sir.

3    A    That he -- he did well, through Richie.  Also, by the way,

4    he worked at Barrett Stern, which was one of -- a major firm.

5    Q    Mr. Alf, were you impressed by Michael Tew's credentials

6    A    Yes.

7    Q    All right.  Did you make the decision to hire Michael Tew,

8    after you were introduced?

9    A    Yes.

10   Q    Did you do any independent research into Michael Tew or did

11   you just rely on Richie Schaffer's recommendation?

12   A    I relied on Richie Schaffer's recommendation.

13   Q    Do you recall about when Michael Tew began doing work for

14   National?

15   A    It was -- it was around the whole Chapter 11 bankruptcy

16   stuff.

17   Q    Okay.  So 2015?

18   A    Yes, yes.

19   Q    Okay.  Was Mr. Tew hired on as a payrolled employee or in

20   some other capacity?

21   A    Yeah.  Michael was actually hired on as -- through his

22   company, Sand Hill.  So, we contract with Sand Hill, and Sand

23   Hill -- Michael was an employee of Sand Hill.

24   Q    Was it your understanding that Sand Hill was solely owned

25   by Michael Tew?

CHRISTOPHER ALF - Direct

1   A    That's correct.

2   Q    Were you aware of any other employees of Sand Hill, besides

3   Michael Tew?

4   A    Kimberley was doing work there, as well.

5   Q    Okay.  At some point, did Michael receive a higher job

6   title at National?

7   A    Yes, he did.

8   Q    What was that title, sir?

9   A    Chief financial officer.

10  Q    Can I call that CFO --

11  A    Yes.

12  Q    -- for short?  Thank you.  Was Michael acting CFO for

13  National in the summer and early fall of 2018?

14  A    Yes.

15  Q    Why did you promote him to that title?

16  A    Because we needed somebody with the title, of course, to

17  have credibility when we were out talking with potential

18  investors, and so -- and at the time he was moving along,

19  helping restructure when the -- some financing on some

20  aircraft.  He was doing, overall, pretty good job.

21  Q    Let's talk about that.  You say he was doing a good job.

22  Tell us how he was doing in his work?

23  A    Well, for example, we had to refinance some aircraft, and

24  he worked with somebody else another -- another financial

25  institution to refinance the current financial institution, and

CHRISTOPHER ALF - Direct

1    it worked quite well.

2    Q    Okay.  The bankruptcy that National entity was going

3    through, did that impact how much you needed to rely on Michael

4    Tew's services at that point?

5    A    Yeah, absolutely.  Michael took the lead in helping with

6    the restructuring for the Chapter 11.

7    Q    Mr. Alf, was there anything going on in your personal life

8    that caused you to need to rely on Michael Tew's services more

9    than average?

10   A    Yes.  Yes.

11   Q    Can you tell us what that was?

12   A    My wife had, up until then, an uncurable cancer called

13   multiple myeloma, which is blood cancer.

14   Q    So, is it fair to say, your attention was diverted to that,

15   as well?

16   A    Absolutely.

17   Q    Where did Michael Tew physically work out of?

18   A    He worked out of his home office, in Colorado.

19   Q    Does National have any offices in Colorado?  By that, I

20   mean, you know, running the business out of Colorado?

21   A    No.

22   Q    Had National ever previously hired a CFO to work remotely?

23   A    No, we have not.

24   Q    Why make an exception for Michael Tew?

25   A    Well, it started off with Richie, as just -- I mean want to

CHRISTOPHER ALF - Direct

1   call it, like, odd jobs, with coming in and with helping

2   prepare presentations and so forth.  It evolved and evolved and

3   evolved over time, into more of a critical position with the

4   company, and so that's why I made a decision it was okay to

5   work from his home office in Colorado.

6   Q   How often would you communicate with Michael Tew, in your

7   respective roles as CEO and CFO at National?

8   A   At the beginning, it was not so often, but it eventually

9   became multiple times a day.

10  Q   How would you communicate with him, phone, email, text?

11  A   Yeah, phone.  All of the above, phone, email, texts

12  communications.

13  Q   How often, on average, would you say you saw Michael Tew in

14  person, while he was working for National?

15  A   It depends on what we were working on.  I mean, if we were

16  to travel, I would see him everyday, three days in a row, but

17  there would be other days I might not see him for two, three

18  weeks, or more.

19  Q   Okay.  Did Michael Tew have any signatory authority to any

20  of National's bank accounts?

21  A   No, he did not.

22  Q   Did he have visibilty into, you know, the balances of those

23  bank accounts?

24  A   Yes.

25  Q   Was that an important piece of his role as CFO?

CHRISTOPHER ALF - Direct

1    *A*    Yes.

2    *Q*    You said that you had been happy with the work he was

3    doing, correct?

4    *A*    That's correct.

5    *Q*    All right.  Did you trust him in that role at CFO?

6    *A*    Yes.

7    *Q*    Okay.  And again, this was during the period of the

8    bankruptcy restructuring proceedings?

9    *A*    Yes.

10   *Q*    And your wife's cancer treatments?

11   *A*    Yes.

12   *Q*    Mr. Alf, how would you describe this period of your life?

13   *A*    Chaotic, hectic, all of the emotions, and, you know, this

14   was, as Lori my wife calls it, I have a cancer that I don't get

15   better for.

16           *MR. SCHALL:*  Objection.

17           *THE COURT:*  Go ahead.  Go ahead and answer the

18   question.

19           *MR. SCHALL:*  Can we approach?

20           *THE COURT:*  No -- okay.  Fine.  Come on up.

21       (At the bench:)

22           *THE COURT:*  Go ahead.

23           *MR. SCHALL:*  I mean, I think he is literally about to

24   say what his wife said something for the truth of the matter.

25           *THE COURT:*  Okay.  I mean the question was not about

CHRISTOPHER ALF - Direct

1   what he was -- what she said, right?  If I remember right.  How

2   would you describe this period in your life?  He says my wife

3   calls it -- is there some important reason you have to

4   interrupt him when he is saying his wife calls the cancer

5   something?

6        *MR. SCHALL:*  Yes, we do.  I mean, she is not here.

7   She -- she was on the witness list and she was removed, and you

8   know they have elicited evidence that this was a chaotic time

9   in his life, that there was a lot going on, but that doesn't

10  mean he gets to --

11       *THE COURT:*  Okay.  Fine.  Tell him not -- just

12  instruct him not to say what other people said.  This is a

13  waste of our time.  Go on.

14       (In open court.)

15   Q   (By Ms. Weiss) Mr. Alf, I would just caution you to

16  be careful not to say things that other people have said to

17  you.

18  A   Okay.  I'm sorry.  I apologize to everyone.

19  Q   Testimony is a little different than how we talk outside of

20  work.

21       Was Michael Tew married?

22  A   Yes, he was.

23  Q   And to whom?

24  A   Kimberley Tew.

25  Q   Okay.  Did you ever have occasion to meet Kimberley Tew?

695

CHRISTOPHER ALF – Direct

1    A    Yes.

2    Q    And again, let's try not to talk over each other.  It's for

3    the sake of the court reporter and the jury, please.  Thank

4    you.

5         Okay.  Approximately how many times did you meet

6    Kimberley Tew, in person?

7    A    I can't remember exactly, but I think around three to four

8    times.

9    Q    Okay.  Was there ever a business relationship between

10   National and Kimberley?

11   A    Yes, there was.

12   Q    Can you please describe the nature of the work that she did

13   for National?

14   A    Well, again, it started from the beginning with Richie

15   Schaffer, that he says, *Well, you get a husband and wife team*

16   *with Michael and Kimberley to help with presentations and*

17   *financial modeling, and she is very good at making*

18   *presentations.*

19   Q    And when you say good with making presentations, is there a

20   specific sort of software that you are referring to?

21   A    She would use PowerPoint and those kinds of things.  Yeah.

22   Q    Okay.  Did she also work on an app?

23   A    Yes, she did.  She worked on an app for us, as well.  I

24   believe it was for passengers to check in for flights and so

25   forth.  It was just at the very beginning stages, but that was

696
CHRISTOPHER ALF - Direct

1    a separate side project, other than raising -- the financial

2    raise for the company, that was a side project for, I would

3    call it more day-to-day business that the company was doing

4    versus the investment side of the business, and she had

5    experience from working at Google and doing these types of

6    things.

7    Q    Okay.  So, was there, sort of, a programming component to

8    this app?

9    A    Yes, yes.

10   Q    And was there, sort of, a graphics?

11   A    Exactly, there was graphics, as well.

12   Q    Okay.  And you just mentioned that Kimberely had worked at

13   Google?

14   A    That was my understanding, yes.

15   Q    Okay.  What was your understanding of her education?

16   A    She graduated from Gabelli Business School at Fordham

17   University, New York City; another top business school.

18   Q    How was Kimberley's attention to detail?

19   A    Excellent.

20   Q    Were you also impressed by her background, sir?

21   A    Yes.

22   Q    Over the course of the business relationship with the Tews,

23   did you ever talk to them about personal matters?

24   A    Yes.

25   Q    Were they aware of your family, generally?

CHRISTOPHER ALF - Direct

1    *A*    Yes.

2    *Q*    The structure of it.  Were they aware of your wife's cancer

3    treatments?

4    *A*    Yes, they were.

5    *Q*    Okay.  Now, I believe you mentioned, sir, that when Mr. Tew

6    first began consulting for National, that was more, I think you

7    called it, an odd-job-type-of-relationship; is that correct?

8    *A*    That's correct.

9    *Q*    At some point do you enter into formal consulting

10    agreements with Michael Tew and his company, Sand Hill?

11    *A*    Yes, we did.

12    *Q*    Okay.  Let's take a look at one of those contracts.  The

13    first one is Government's Exhibit 535.  It is in that binder in

14    front of you, and it will be displayed on the screen.

15          *MS. WEISS:*  And if we could please turn to page two, I

16    believe it is.  Sorry, three.

17    *Q*    Okay.  We will just scroll through this, for Mr. Alf's

18    benefit, and once you have had a chance to see all of the

19    pages, whether it be the binder or the screen.

20    *A*    Okay.  Yeah, I see it on the screen.

21    *Q*    Okay.  Do you recognize this document, sir?

22    *A*    Yes, I do.

23    *Q*    Okay.  And is this the type of document that National would

24    retain in its ordinary course of business?

25    *A*    Yes, it is.

CHRISTOPHER ALF – Direct

1    Q    Okay.  And what is a brief description of this document?

2    A    It is an agreement between Sand Hill and National Air Cargo

3    Holdings for consulting services.

4    Q    Okay.

5              MS. WEISS:  I would move to admit and permission to

6    publish this exhibit, Your Honor?

7              THE COURT:  Any objections?

8              MR. SCHALL:  None.

9              THE COURT:  It's admitted then.

10             MR. KAPLAN:  Your Honor, can I see the first page?

11             THE COURT:  I'm sorry.  Yes.

12             MR. KAPLAN:  Before...

13             THE COURT:  Hold on, Mr. Keech.

14             MR. KAPLAN:  Your Honor, I have no objection.  I

15   think -- I don't think the first page ... was identified.

16             THE COURT:  The email string?

17             MR. KAPLAN:  That's correct.

18             MS. WEISS:  Sure.  Yes.

19             THE COURT:  Can you get him --

20        Q    (By Ms. Weiss) Could you also please identify the

21   first page of this document, and identify where in this your

22   name is mentioned?  How you are familiar with this?

23   A    I'm listed, says from Jonathan Yioulos to Karen Eichner and

24   Chris Alf.

25   Q    I apologize.  Are these emails, sir?

CHRISTOPHER ALF – Direct

1   A    Yes, they are.

2   Q    And is the subject matter the agreement we're speaking of?

3   A    Yes.  *MT agreement*, short for Michael Tew.

4         *MS. WEISS:*  Okay.  Move to admit this document, now.

5         *THE COURT:*  Any objection now?

6         *MR. KAPLAN:*  No objection.

7         *THE COURT:*  Okay.  So, 535 is admitted and go ahead

8   and publish it.

9   Q    We're going to turn to page three of this exhibit, sir.

10        *MS. WEISS:*  And if we could just blow up, Ms. Ortiz,

11  just that first paragraph under Consulting Agreement, to begin

12  with.

13  A    Okay.

14  Q    Okay.  Can you summarize for the jury what this is?

15  A    This was is a consulting agreement between Sand Hill,

16  Michael's company, and National Cargo Holding, Inc., our

17  company.  Yes.

18  Q    Did you draft this agreement?

19  A    No, I did not.

20  Q    Did anyone at National draft this agreement, to your

21  knowledge?

22  A    No, we did not.

23  Q    How did you receive this agreement?

24  A    Michael Tew drafted it.  I asked Michael Tew to draft the

25  consulting agreement.

                          700
                    CHRISTOPHER ALF – Direct

1    Q    Okay.  Now we're going to look at the page marked 69612.04.

2    Which is at the end?

3    A    Okay.

4    Q    Whose signature is this, sir?

5    A    That's my signature.

6    Q    And same question, but two pages more, 69612.06?

7    A    That's my signature, as well.

8    Q    And does this page indicate the date that this agreement

9    was entered into?

10   A    Yes, it does.

11   Q    And what date was that, for the record?

12   A    Fifteenth of December, 2016.

13          MS. WEISS:  Okay.  If we can return to the first page

14   of this agreement, please, Ms. Ortiz.  Page three of the

15   PowerPoint -- of the document.

16   Q    Okay.  There's some handwritten marks on this, first page,

17   correct?

18   A    Yes, there is.

19   Q    And is this also you your handwriting?

20   A    I did not hear the question.

21   Q    Sure.  I will get closer to the microphone.  Sorry.  Is --

22   are the handwritten marks on this, is that your handwriting?

23   A    Yes, it is.

24   Q    And how do you know that?

25   A    Because those are my initials.

CHRISTOPHER ALF – Direct

1    Q    And I will just try and do this?

2    A    The squiggly mark.

3    Q    Yeah.  Okay.  All right.  There we go.  All right.  Moving

4    farther down on the same page, could we please blow up and have

5    you read the description of the services that Mr. Tew was

6    contracted to provide to National?

7    A    Okay.  SH, short for Sand Hill, shall, in a consultive

8    capacity, assist the NAC with the following:  And it's the

9    services:  Number one, preparation of financial modeling

10   materials.  Number two, preparation of internally created

11   confidential investment memorandums.  Number three, assistance

12   with financial structuring and advisory.  Number four,

13   assistance with executive search and evaluation.  Number five.

14   Assist third-party licensed agents of NAC with due diligence,

15   materials and communications.  Number six, seeking additional

16   financial resources and/or financing alternatives.  And number

17   seven, other advisory and consultive activities as determined

18   by both NAC, short for National Air Cargo, and SH, short for

19   Sand Hill.

20        MS. WEISS:  Okay.  Can we please blow up and move to

21   the next paragraph.

22   Q    And if you could just summarize what this paragraph

23   describes?

24   A    It's the compensation.  Would you like me to read this as

25   well or?

702

CHRISTOPHER ALF – Direct

1    *Q*    You can summarize it, if that's easier?

2    *A*    Okay.  So, it's as consideration for services to be

render by Sand Hill during the term.  NAC agrees to pay,

National Air Cargo, agrees to pay, and will pay Sand Hill, a

total, and that number got changed, as follows, and there would

be six payments of $25,000 per month.

7    *Q*    And from what period, approximately?

8    *A*    The first was payment on or before November 1st, would get

the first 25,000, and then December 1st, and every first day of

the month up until April 11th, 2017.

11    *Q*    Mr. Alf, is there a discrepancy in this section?

12    *A*    Yeah, there's a discrepancy.

13    *Q*    Could you please describe that, for the record?

14    *A*    The numbers are $25,000, and then it's written out in long

form, if you notice, in that parentheses, it says 15,000 US

dollars, closed parentheses.

17    *Q*    Again, did you draft this document?

18    *A*    No, I did not.

19    *Q*    And did you pay Michael Tew $15,000 a month or $25,000 a

month?

21    *A*    Twenty-five thousand a month.

22    *Q*    Turning to the next page of this exhibit.  Did the

agreement also provide for certain performance-related

incentives?

25    *A*    Yes, it did.

1          *MS. WEISS:*  Okay.  I want to start with the top

2    paragraph, and Ms. Ortiz, if we could just blow up through the

3    word *refinancing* in the third line.  Perfect.

4    Q   Can you describe what is outlined in this paragraph?

5    A   Yes.  In the event -- these are performance thresholds.  If

6    you accomplish these goals he would receive extra commission

7    for accomplishing of said goals.  And it says here that, for

8    the first goal, it says that Michael successfully refinances

9    his secured loans with Black Rock, Sand Hill, Michael's

10   company, shall be entitled to $25,000 US dollars, and we would

11   pay that 15 days after the refinancing happens.

12         *MS. WEISS:*  Okay.  Let's stay on the same page, and

13   move to the next paragraph down, and highlight that one in

14   full.  Thank you, Ms. Ortiz.

15   Q   Can you please describe the incentive payment in this

16   paragraph?

17   A   In the event NAC, or National Air Cargo, successfully

18   closes a capital raise in the form of an equity, or an equity

19   link security, within the term, or within 90 days from the

20   conclusion of that term, the equity rate, Sand Hill, Michael's

21   company, will be entitled to an additional 50,000 US dollars,

22   payable within 15 days of successful closure of that equity

23   raise.

24   Q   So, $150,000 for six months of work?

25   A   Yes.  If made the thresholds, with the extra, yes, that's

CHRISTOPHER ALF - Direct

1    correct.

2    Q    With the extras it's $225,000; is that right, sir?

3    A    Right.  Sorry.  Yes, yes.

4         MS. WEISS:  Yeah.  Okay.  Let's go back to that first

5    paragraph, and now, Ms. Ortiz, let's focus on that last

6    sentence -- or the last couple of sentences that start *a 1099.*

7    Can we please blow those up.

8    Q    And, Mr. Alf, if you could please read this entire portion

9    word-for-word to the jury.

10    A    *A 1099 will be issued with respect to the payments made to*

11    *Sand Hill, SH.  SH is solely responsible for all federal, state*

12    *and local taxes, and SH expressly acknowledges that it is an*

13    *independent contractor.*

14    Q    And, Mr. Alf, this was the payment arrangement that

15    actually happened with Michael Tew's company, correct?

16    A    That's exactly how it transpired.  Yes.

17    Q    Okay.  And so, a 1099 was issued to Michael Tew, for his

18    company, rather -- rather than a payroll?

19    A    That's correct.

20    Q    And again, Mr. Alf, this was language proposed by Michael

21    Tew, right?

22    A    That's correct.

23    Q    One more question, before I move on from this document.

24         MS. WEISS:  Can we go down to the fourth paragraph, on

25    the first one above non-exclusivity, I think, and if we could

705
CHRISTOPHER ALF – Direct

1    blow that one up in full.

2    Q   Could you please summarize what this paragraph is about,

3    for the jury?

4    A   In summarize, it was a cap on expenses for $250, SH agrees

5    not to incur any single item of expense in excess of $250

6    without first obtaining prior approval of NAC.

7    Q   By *expenses*, you mean reasonable business expenses?

8    A   Yeah, absolutely.

9    Q   Okay.  And who would he have sought approval for expenses

10   over $250,000?

11   A   It would be myself, for reasonable business travels,

12   entertainment those kind of things.

13   Q   And, once again, language proposed by Mr. Tew?

14   A   Yes.

15   Q   Did Mr. Tew's pay from National increase over time?

16   A   Yes, it did.

17        *MS. WEISS:*  Okay.  I would like to turn to

18   Government's Exhibit 550, please.  And there are two pages to

19   this.  So if, Ms. Ortiz, you wouldn't mind flipping through

20   both of them, so Mr. Alf can review.

21   A   Is it possible to blow it up just slightly bigger on the

22   screen?  There you go.  That's better.

23   Q   Are you ready, sir?

24   A   Yes, I am.

25   Q   Do you recognize this document?

CHRISTOPHER ALF – Direct

1    A    Yes, I do.

2    Q    And briefly, what is it?

3    A    It's a 1099 which is what we pay for independent

4    contractors.  All companies issue 1099s and this was one that

5    was issued from National --

6    Q    I'm sorry.  Go ahead.

7    A    -- to Sand Hill.

8    Q    And is this the type of record that National would maintain

9    in its ordinary course of business?

10   A    Yes, it does.

11   Q    And are you familiar with this document in your capacity as

12   CEO at National?

13   A    Yes.

14        MS. WEISS:  And I forgot to do this with the last one,

15   Your Honor, I apologize.  Certification 1130, the government

16   moves 550 into evidence?

17        THE COURT:  Any objections?

18        MR. SCHALL:  None.

19        MR. KAPLAN:  No.

20        THE COURT:  All right.  It's admitted.

21        MS. WEISS:  If we could please return to the first

22   page, Ms. Ortiz.  And if we can just blow these up.  You are

23   right, these are difficult to see.  And permission to display?

24        THE COURT:  Yes, that's fine.  Okay.

25   Q    Mr. Alf, does this first piece indicate the compensation

707

CHRISTOPHER ALF – Direct

1  that Sand Hill research partners made from National, in 2015?

2  A   Yes, it does

3  Q   And what is that number?

4  A   It's 57,770.04.

5       MS. WEISS:  And, Ms. Ortiz, I'm going to ask you to

6  blow up the numbers, because they are very hard to read on this

7  document.  Thank you.  That's a little pixilated.  Okay.  Let's

8  move on to 2016.

9  Q   What was the amount of compensation that Sand Hill Research

10 Partners, a/k/a Michael Tew, made in 2016?

11 A   One hundred eighty-five thousand US dollars.

12 Q   Let's move on to 2017.

13 A   Five hundred one thousand eight-hundred and ten, and I

14 think it says 88 cents.

15 Q   And I am not sure --

16 A   Eighty-six cents.

17 Q   I'm not sure if it's better bigger or smaller, so.  Okay.

18 And then on to the next one, for 2018, what was the amount for

19 2018 sir?

20 A   Two hundred fifty-eight thousand, six hundred and forty-one

21 dollars and eighty-nine cents.

22 Q   How did those figures compare to the salaries of other

23 National's other employees, Mr. Alf?

24 A   They are on the high end, if not the highest salaries, for

25 National.

CHRISTOPHER ALF - Direct

1    Q    Okay.  Despite these numbers, were there occasions where

2    National advanced Michael Tew his pay?

3    A    Yes, there was.

4    Q    And can you tell us about that, please?

5    A    There would be sometimes Michael would come and say, *Can*

6    *you advance my pay?  I have some issues going on.  It would*

7    *really help me out if you advance some cash to me.*

8    Q    Did you, personally, authorize those advances?

9    A    Yes, I did.

10   Q    Why would you do that, sir?

11   A    Because Michael, at the time, he asked for it, and he

12   was -- more motivation if I'm helping him, that he will

13   continue to help me and work extra hard.

14   Q    I would like to move on to Government's Exhibit 534.  This

15   is another series that we're going to need to click through

16   multiple pages.  Have you had chance to review, Mr. Alf?

17   A    Yes.

18   Q    Can you please describe what these documents are?

19   A    This would be a wire transfer form.

20   Q    Is there also a communication -- chain of communications

21   related to this wire transfer form?

22   A    Yes.  It would be a chain of command authorizing the said

23   wire transfer.

24   Q    Are you cc'd on at least some of these emails in this

25   chain?

CHRISTOPHER ALF – Direct

1    A   Yes, I am.  I am in the chain.

2    Q   Okay.  Is this the type of document that National would

3    retain in its ordinary business course?

4    A   Yes.

5    Q   And I would ask to move to admit Government's Exhibit 534?

6           THE COURT:  Any objections?

7           MR. SCHALL:  None.

8           MR. KAPLAN:  No, Your Honor.

9           THE COURT:  All right.  It's admitted, and you can

10   publish it.

11          MS. WEISS:  Thank you, Your Honor.

12   Q   Let's go ahead and start.  Actually --

13          MS. WEISS:  And I apologize, Ms. Ortiz, going to have

14   to be nimble.  Can you start on the page ending in 55401?

15   Thank you.  If we could blow up the top, debit information

16   portion.

17   Q   Mr. Alf, can you describe what is summarized here, on this

18   wire form?

19   A   Yes, I can.  It is a domestic wire from the NACH should be

20   the NAC holdings account ending in '5529.  It is -- date of the

21   wire was August 2, 2018, for the amount of $20,000.  It was

22   entered by Jonathan, which would be Jonathan Yioulos, and has a

23   date and time when that was done, and it was transmitted by

24   Abby Schwartz, and the status they confirmed, that means it

25   went through, and there's the reference numbers and so forth.

CHRISTOPHER ALF – Direct

1    Q    Is this the example of a type of wire that would need the

2    two-person authentication?

3    A    This is exactly that type of wire.  Yes.

4    Q    Then let's look at the next portion and just see where this

5    wire went.

6    A    It went to the Guaranty Bank & Trust Company, in Denver,

7    Colorado, and the recipient's name was Michael Tew.  There's an

8    account number for that.

9         MS. WEISS:  Okay.  Can we now turn, Ms. Ortiz, back to

10   the first and second pages of this document, and if it would be

11   possible to -- there's an email that goes from the bottom of

12   page one to the top of page two.  Could we have both of those

13   together so it's a little easier to see?  Perfect.

14   Q    Great.  Okay.  Mr. Alf, can you please summarize that email

15   to us?

16   A    Yes.  This was a request for a $20,000 payment, two

17   payments advance, payment to Michael Tew.  It was an email --

18   back up a little bit.  It was from -- well, let me start at the

19   bottom.

20   Q    Why don't we start from the top with the headings, and then

21   we will get to the content, if you don't mind.

22   A    Okay.  It's an email from Michael Tew, August 2nd, 2018, to

23   Jonathan Yioulos and Chris Alf, me, and the subject wire would

24   be Michael Tew, and it says, *JY, Chris says it's okay to wire*

25   *the funds to my account, advance payment to Michael Tew two*

711

CHRISTOPHER ALF – Direct

1   *payments advanced 20,000.*  JY is, of course, Jonathan Yioulos.

2   Q   Okay.  On the next page, does Mr. Tew provide the wire

3   information that we saw reflected?

4   A   Yes, he does.

5        MS. WEISS:  Okay.  Let's jump back up one email, above

6   this one.  If we could blow that one up.

7   Q   If we could, just start here, Mr. Alf?

8   A   Jonathan Yioulos wrote, *Michael, wiring funds out now, as*

9   *we've restructured this once before, please provide how you*

10  *would like your payments to go out, until you're all caught up.*

11  *Thanks, Jon Yioulos.*

12  Q   Was this the first time you had advanced a payment to

13  Michael Tew?

14  A   I don't recall if this was the first or if there were other

15  payments before that.

16  Q   Do you recall whether it was done more than once?

17  A   It appears that it has been, based on reading this, that

18  we've done this before.

19  Q   Okay.  And how did you respond, sir?

20  A   I'm sorry?

21  Q   How did you respond?

22  A   Oh, how did I respond?  I responded, in the affirmative.

23  *Thanks Jonathan*, exclamation mark.

24  Q   Does that indicate that you approved this advance?

25  A   Yes, I approved it.  And then Michael went on to *say, Jon*

CHRISTOPHER ALF – Direct

 1   *please confirm when can.  Thanks.*

 2   Q   We're going to talk about how the relationship with the

 3   Tews ended, in a little bit, but did you authorize any other

 4   payments to Michael Tew, beyond those reflected in the 1099s,

 5   that we just spoke about?

 6   A   No, I did not.

 7   Q   Did you authorize any other payments to Michael Tew after

 8   he left National?

 9   A   No, I did not.

10   Q   Would you have authorized such payments?

11   A   No, I would not.

12   Q   Did National agree to pay Kimberley Tew any other benefits,

13   beyond those that we've talked about, previously?

14   A   No.

15   Q   Were any payments to Kimberley Tew authorized after Michael

16   Tew left National?

17   A   No.

18   Q   Would you have authorized such payments?

19   A   No.

20   Q   Okay.  Let's talk about how we got there.  Does National

21   use corporate credit cards, Mr. Alf?

22   A   Yes, it does.

23   Q   What is the proper use of those credit cards?

24   A   For corporate expenses; meaning that, for travel,

25   entertainment.  If you are on the road traveling, you have to

CHRISTOPHER ALF - Direct

1    eat, right?  So you can eat lunch, dinner, hotels, car rentals,

2    airfare, if I repeated that a couple times, but yeah, all of

3    those types of things.

4    Q    Business expenses?

5    A    Exactly.

6    Q    Turning your attention to the summer of 2018.  Did you

7    authorize for corporate credit card to be issued to Michael Tew

8    on behalf of of the work he was doing for National?

9    A    Yes, I did.

10   Q    What type of card was that?

11   A    American Express.

12   Q    Why did you approve the issuance of a credit card to

13   Michael Tew?

14   A    Because we were traveling a lot more, and Michael says I

15   don't have the cash to pay out of my pocket for these funds and

16   get reimbursed, so it would be a lot easier if I get a

17   corporate card, so when we travel for business I have a card

18   that I can use.

19   Q    Generally, would it have been National's practice to issue

20   a corporate credit card to someone who is a contractor?

21   A    No, it would not.

22   Q    Why make the exception with Mr. Tew?

23   A    Because we were actively working together, and he was

24   actively working in support of the CFO role for the company.

25   Q    Did you trust that he would use that card appropriately?

CHRISTOPHER ALF – Direct

1    A    Absolutely.  He was the CFO of the company.  Yes.

2    Q    In July of 2018, did someone at National contact you about

3    activity on Mr. Tew's corporate credit card?

4    A    Yes.

5    Q    And who was that?

6    A    Abby Schwartz.

7    Q    In sum and substance, can you describe your understanding

8    of what the activity was on Michael Tew's corporate credit

9    card?

10   A    There were charges at grocery stores, chain stores, there

11   was multiple charges.

12   Q    What was your reaction to hearing that there were multiple

13   retail and grocery store charges on Michael Tew credit card?

14   A    Well, the original thought was the card was stolen.

15   Q    Did you ask Michael Tew about those charges?

16   A    Yes, we did.

17   Q    And what did he tell you?

18   A    Come to find out that he told me that Kimberley used the

19   card.

20   Q    His wife?

21   A    Yes.

22   Q    Did he say what Kimberley used National's corporate credit

23   card for?

24   A    She need -- she needed the money.  She owed money, and she

25   took his card and made charges.

715
CHRISTOPHER ALF – Direct

1  *Q*  And when you say *she owed money*, do you have any other

2  specifics about that?

3  *A*  Only thing they told me, had something to do with Bitcoin,

4  and they owed money for something, and I am not exactly too

5  sure what, but.

6  *Q*  Okay.  What was your response to that explanation?

7  *A*  I mean, like anybody else, it's like, *What*?  *How would*

8  *somebody take your credit card and go to stores and make*

9  *charges?*  It was insanity, and I was just completely shocked

10  and overwhelmed.

11  *Q*  Did Kimberley Tew tell you anything about the charges?  Did

12  you speak to her about it directly?

13  *A*  There was a phone call that I had with Michael, and he put

14  Kimberley on the phone.  *Michael says he will take care of* -- I

15  hate to say it -- *I will take care of my own shit, and I will*

16  *pay you back*.

17  *Q*  And what did Kimberley say?

18  *A*  She said sorry, so on so forth.  She was crying.

19  *Q*  Did you consider taking any personnel action against

20  Michael Tew, at that time?

21  *A*  Yes, I did.

22  *Q*  Did you do so?

23  *A*  Not right at that minute.  No.

24  *Q*  Why not, sir?

25  *A*  Well, because, first of all, it came as a complete shock,

CHRISTOPHER ALF – Direct

1    and Michael said he would pay it back.  We were in the middle

2    of so many different opportunities, and we were in the thick of

3    working together, for -- trying to get fundraising and so

4    forth.

5    Q   Down the line, did Michael Tew take care of his, and I

6    won't repeat the phrase, but did he take care of the charges?

7    A   No, he did not.

8    Q   Did National attempt to challenge the charges with Amex?

9    A   Yes, we did.

10   Q   And what was the outcome of that dispute?

11   A   That they were real charges.

12   Q   By an authorized user?

13   A   Right.

14         MS. WEISS:  Can we now take a look at Government's

15   Exhibit 538.  And I believe this is a two-page document, as

16   well, Ms. Ortiz.  So, if you wouldn't mind scrolling through it

17   for Mr. Alf.  All right.  Let's return to the first page, and

18   start with the bottom email.  Older emails are at the bottom,

19   they work their way up.

20   Q   Can you please just take a look at those and ensure that

21   you were on all of these emails?

22   A   Yes.

23   Q   Okay.  Are these the type of emails that National would

24   retain in the ordinary course of its business?

25   A   Yes, we would.

CHRISTOPHER ALF – Direct

1          *MS. WEISS:*  And subject to the certification,

2     Your Honor, at 1134, I would move to admit Government's Exhibit

3     538 into evidence?

4          *THE COURT:*  Any objections?

5          *MR. SCHALL:*  None.

6          *MR. KAPLAN:*  Your Honor, I would object.  I think this

7     isn't the type of document that can be certified that way,

8     under that rule.

9          *THE COURT:*  Well, I think it can be admitted, based on

10    the authentication and the foundation laid with this witness.

11    So, I will admit it.

12         *MR. KAPLAN:*  Your Honor, it's hearsay -- hearsay

13    objection, also.

14         *THE COURT:*  Right.  But I will admit it.

15    Q    Okay.  So, if we could please display, Exhibit 538 to the

16    jury, and starting with the email at the bottom.  Mr. Alf, we

17    don't need to read this word-for-word, but can you summarize

18    your understanding of what Amex was saying about these charges?

19    A    Repeat the question?  I was reading while you were -- sorry

20    what was --

21    Q    Sure, sure.  Can you summarize your understanding of what

22    Amex was saying about these charges?

23    A    It says -- it says -- it's better just to read it.  *Just*

24    *received a phone call from Amex stating that they spoke to*

25    *Michael Tew regarding his balance.  Per the Amex rep Michael*

CHRISTOPHER ALF - Direct

 1   *advised that they were all corporate charges on a company*

 2   *account and he is not responsible and National had to pay.*

 3   *Michael advised Amex, that due to being that he was let go from*

 4   *the company, we had to pay these charges.  I will reach out*

 5   *again to the Amex rep customer service collections department*

 6   *to make sure they have all of the notes from the original calls*

 7   *on this account.  I just wanted to advise you of today's Amex*

 8   *call.*  That would be me.  *Apparently the balance has started to*

 9   *be moved to his credit, and he is telling them it is not his*

10   *responsibility.*

11        MS. WEISS:  Okay.  Can we please blow up the next

12   email, up, Ms. Ortiz.

13   Q   And, Mr. Alf, if you could please read your response?

14   A   This is an email from myself to Abby Schwartz and Brian

15   Boyd, our director of security.  It says, *Brian, please call me*

16   *as this is complete theft.*

17   Q   Mr. Alf, is that what you consider these charges to be?

18   A   Yes.

19   Q   Theft from the company?

20   A   Yes.

21   Q   Changing topics slightly, Mr. Alf.  Around the same period,

22   at the end of the summer 2018, were you made aware of another

23   issue that was impacting National's business, regarding the

24   Tews?

25   A   That was impacting National business?

CHRISTOPHER ALF - Direct

1   *Q*   Why don't I rephrase it.  Why don't we start with any calls

2   related to the Tews, to your home?

3   *A*   Right.  Sure.  Yeah.  We had -- we had what was extremely

4   strange calls to our home, as well as to -- not my home, but to

5   my -- received texts, one came on my cell phone one came to

6   others, and related phone calls, also to the business, that we

7   owed a guy by the name of Craig, money, and we had to pay.

8   *Q*   What did Craig say he would do if National did not pay?

9   *A*   Well, it wasn't actually just to my wife, it also went to

10   my 20-year-old daughter at university, that we're going -- and

11   I hate to say it, but this is what, the paraphrase, what was

12   said, is that *I'm going to put pictures online, and people will*

13   *see what kind of a slut that you are.*

14   *Q*   So this person threatened to put naked photos?

15   *A*   Right.

16   *Q*   Online?

17   *A*   Right.

18   *Q*   Of your wife?

19   *A*   Right.

20   *Q*   And your?

21   *A*   Daughter.

22   *Q*   Daughter who was in college?

23   *A*   That's correct.  There was text messages to both.

24   *Q*   Did this person specifically name the Tews?

25   *A*   Yes.  He said Michael Tew was -- that -- believe my wife

CHRISTOPHER ALF - Direct

1    was in a scam with Michael Tew and would not pay him.

2    Q    Did you report those calls to the authorities, sir?

3    A    Yes, we did.

4    Q    How did you feel about that?

5    A    Oh my God, it was like the worst thing ever.  I mean, it

6    was -- come to find out later it was a convicted felon that was

7    going -- was making these threats.  This is a real person that

8    you didn't want to take lightly.  This is, like, scary stuff.

9    Q    Was it your understanding that this person also lived in

10   Florida?

11   A    Yes, he did.

12   Q    Around the same period, did you receive information that

13   this same person was also contacting National's offices?

14   A    Yes, he was.

15   Q    Did you confront Michael Tew about these messages from

16   Craig, that were coming to your home and to National's offices?

17   A    Yes, I did.

18   Q    What did he say?

19   A    He says, *It wasn't me.  It was Kimberley, and she was the*

20   *one that hired this guy and she is using him to do computer*

21   *programming, and we owe him money and he did the same thing*

22   *with us, but we do owe him money, and we got to pay him*, and it

23   was for something that had to do with computer software,

24   Michael told me, of Bitcoin that Kimberley hired him to make

25   some type of computer software.

721

CHRISTOPHER ALF – Direct

1   Q   So, computer software related to Bitcoin?

2   A   Right, right.

3   Q   That was all of your understanding?

4   A   That's -- yeah.

5   Q   Did you also speak to Kimberley Tew about these calls?

6   A   Yes, at that time, and ...

7   Q   What did she have to say?

8   A   Michael handed the phone to her.  Of course, she is crying

9   and screaming, saying, *I'm so sorry, I didn't mean this to*

10  *happen.  Didn't want this to happen to Kat.*  My daughter's name

11  is Katrina.  *This is terrible that it's gone this far, and, you*

12  *know, we have to find a way to pay them,* and that was it.  I

13  got to the point I couldn't talk anymore.  I said, *Just put*

14  *Michael back on the phone.*

15  Q   At that point, did you decide to take personnel action

16  against Michael Tew?

17  A   When that phone call got hung up on, that was my last

18  conversation with Michael Tew, and I made a decision to

19  terminate him.

20  Q   Who were the decision makers in that?  Was it just you?

21  A   It was my decision, primarily.

22      MS. WEISS:  Can we please move on to Government's

23  Exhibit 536.  Okay.  If you could please scroll through both

24  pages of this, Ms. Ortiz.  Thank you.

25  Q   And you let me know when you have had a chance to review

CHRISTOPHER ALF - Direct

1    it, sir.

2    A    Yes, I know this document.

3    Q    Okay.  Is this a document that was retained in the ordinary

4    course of National's business?

5    A    Yes.  It was retained in our business.  Yes.

6    Q    All right.  And can you provide a brief explanation of what

7    this document is and its attachment?

8    A    It's a termination of Sand Hill, Michael's company.

9    Q    As well as an email related to that?

10   A    Yes, that's correct.

11          MS. WEISS:  Okay.  The government would move to admit

12   Exhibit 536, pursuant to Certification 1134.

13          THE COURT:  Objections?

14          MR. SCHALL:  None.

15          THE COURT:  All right.  It's admitted.

16          MS. WEISS:  Ms. Ortiz, would you mind, please,

17   displaying page two of this exhibit.

18   Q    Sir, can you please tell the jury, in sum and substance,

19   what this letter communicates to Michael Tew?

20   A    We sent it certified mail, as well as email, for the

21   seriousness, to make sure he got it.  It was a termination of

22   his consulting agreement.  In the agreement we had a 15-day

23   termination clause, and at the request of National Holdings --

24   by the way, it's written by our corporate counsel, Galler Law

25   Group, and it's terminating the consulting agreement between

CHRISTOPHER ALF – Direct

1    Sand Hill effective immediately, and asked -- *Thank you for*

2    *your services, during the term of the agreement.*  And it is

3    also a notation that, *We understand National advanced the sum*

4    *of $35,000 to Sand Hill, against future consulting fees.*

5    *Please repay this amount immediately to National*, and also

6    talks about returning computers and other personal property

7    that belonged to National.

8    Q    I apologize.  My eyes are very, very bad, so I need this.

9    So, the final paragraph, does that indicate that Michael Tew

10   actually owed money to National, at the time of his

11   termination?

12   A    Yes, it does.

13   Q    Did you ever receive that payment back from Michael Tew, to

14   your knowledge?

15   A    No, we did not.

16   Q    Did you speak with Mr. Tew, at all, after this letter was

17   sent?

18   A    No, I did not.

19   Q    Did he attempt to contact you?

20   A    Yes, he did.

21   Q    And did he leave a voice mail or email?  What was it?

22   A    He left a voice mail on my mobile phone.

23   Q    And did you listen to that voice mail, sir?

24   A    Yes, I did.

25   Q    And in sum and substance, what did he say, during that

CHRISTOPHER ALF – Direct

1  voice mail?

2  A  The substance of the call was apologizing for all of the

3  craziness that's happened.  I'm so sorry, but we have got a lot

4  of work to do.  We should keep moving forward.  You know, we

5  got to get these planes refinanced.  Things are going well.  We

6  got to keep working together, and make things, you know, make

7  things happen.

8  Q  Did you return that call, Mr. Alf?

9  A  No, I did not.

10  Q  How about Kimberley Tew?  Did you have any further contact

11  with her, after that letter was sent?

12  A  No, I did not.

13  Q  Did you have any reason to believe, after this letter, that

14  there was any relationship between National and Michael and

15  Kimberley Tew, at all?

16  A  There was no relationship, at all, anymore.

17  Q  I want to fast forward now to late June, 2020, sir.  Were

18  you and your wife contacted by federal law enforcement agents?

19  A  Yes, we were.

20  Q  Do you recall what agency that was?

21  A  The FBI.

22  Q  Do you recall having an idea what you thought they were

23  contacting you about?

24  A  About the whole Craig incident, with the naked pictures and

25  so forth, and that's because we had complained to Denver, of

725

CHRISTOPHER ALF - Direct

1    law enforcement, through Bryan our director of security.

2    Q    Okay.  So you also contacted federal authorities --

3    A    Yes, we did.

4    Q    -- when this came through?  As well as local authorities?

5    A    In the Boca Raton Police department in Florida.  Yes.

6    Q    Did you eventually learn, and we don't need to go into

7    specifics, but did you eventually learn that was not why the

8    FBI was contacting you?

9    A    Yes.

10   Q    Was the FBI interested in certain of National's records?

11   A    Yes.

12   Q    Did you put them in contact with your director of

13   accounting, in Buffalo?

14   A    Yes, we did.

15   Q    And did you instruct that person to assist the agents in

16   their investigation?

17   A    Yes.

18   Q    Over the course of the initial days, did you learn of any

19   other current employees at National that were involved in

20   whatever it was the agents were investigating?

21   A    Yes, we did.

22   Q    And who was that?

23   A    Jonathan Yioulos.

24   Q    And what was Jonathan Yioulos' title at National, again?

25   A    He was corporate controller.

CHRISTOPHER ALF - Direct

1    Q    What was your reaction to learning that National's

2    controller was of interest to law enforcement?

3    A    Again, I was completely shocked.  It was overwhelming, that

4    somebody I trusted that, in the biggest way, and who I liked,

5    was being looked at in this manner.  It was just overwhelming

6    for me.

7    Q    What was your reaction to hearing that National had been

8    sending money out to the Tews?

9    A    At first, you always, like anything else, you can't believe

10   that something like this would possibly happen.  It was just

11   ... you don't even know what to begin.  You just feel so

12   betrayed, that we are struggling with cash, and this money is

13   starting to evaporate.

14   Q    How was National's financial state now?

15   A    Currently?

16   Q    Currently?

17   A    We are very strong, currently.

18   Q    Okay.  During the period of 2018 to 2020, during the events

19   in question, how was National's financial?

20   A    Not strong at all.

21   Q    What do you mean by that?  Can you give me some details?

22   A    We didn't have money to make ends meet.  And if you recall,

23   we had Chapter 11, we were making payments on that, that was

24   over time, to those older vendors, as well as we had the

25   current people that we had to make payments to, and there was

CHRISTOPHER ALF - Direct

1    never enough money to go around, which is very stressful, as

2    you can imagine, because you need these people to do work for

3    you tomorrow, and if you are not going to pay somebody for a

4    pick up of a shipment last week, they are not going to come

5    today, because they are owed that money too.  They did the

6    work.

7    Q    So, National was having trouble paying its vendors during

8    this period?

9    A    Absolutely.

10   Q    Was National also having trouble making its payroll?

11   A    Trouble, yes, but we always found a way to do it.

12   Q    Have you, at various points in time, had to take action at

13   a personal or family level --

14   A    Oh, yeah, absolutely.  We injected millions of dollars into

15   the company just to make payroll, just to make things happen,

16   so we can continue our employees, and also to give extra cash

17   to pay the critical vendors, so the business could keep moving.

18   So, we took cash that was earned years and years ago, and

19   pushed it back into the company again.

20   Q    Mr. Alf, what would you like to tell the jury about how

21   these events have impacted you?

22   A    Oh my God, you can't even -- it's -- you can't imagine

23   being in a position like that.  At that time, that we just

24   talked about, was such a stressful time.  I remember people

25   having discussions, and we would -- in the office, and we would

CHRISTOPHER ALF - Direct

1   be like, *Where did the money go?  We have no idea.  Like, where*

2   *did the cash go?  There has to be more cash here.  Where is it?*

3   *Why can't we pay these vendors?  We know we sold this shipment.*

4   *Our customers pay us.  We have always been a great company.*

5           My dad taught me to pay your vendors fast, and you --

6   they would reward you for that.  Here, we couldn't pay them at

7   all.  We are stretching them out so far.  We couldn't make ends

8   meet.  It was completely devastating.  Highly stressful for the

9   individuals in the corporation, having to take collection

10  calls.  It's not just me.  We have a whole company behind me,

11  of hundreds of people, and you can imagine doing your job, hard

12  at work, and then people literally screaming on the phone, *You*

13  *have to pay me.  Why aren't you paying me?  You owe me money.*

14  *I'm not going to do anymore work for you*.  They have to scurry

15  around to find somebody else to do the work, because we don't

16  have the money to pay them.  The money should be there.  It was

17  taken.  It was horrible.  I can't -- it's -- really no words.

18          *MS. WEISS:*  May I have one moment, Your Honor?

19          *THE COURT:*  Okay.

20          *MS. WEISS:*  No further questions from the government.

21  Thank you, Your Honor.

22          *THE COURT:*  Okay.  Thank you.  I think it makes sense

23  to take a quick break before Cross-examination.  So, why don't

24  we take a break until quarter till.  So, we will be in recess

25  until then.

729
CHRISTOPHER ALF – Direct

1          THE COURTROOM DEPUTY:  All rise.

2      (Jury out at 2:32 p.m.)

3          THE COURTROOM DEPUTY:  Court is now in recess.

4      (Recess at 2:33 p.m.)

5      (In open court at 2:51 p.m.)

6          THE COURT:  Please, take your seats.  Ms. Weiss, I

7  understand you actually still have a couple of questions; is

8  that right?

9          MS. WEISS:  I have a mea culpa in that I have missed

10 one housekeeping item that I'm hoping to just do briefly with

11 Mr. Alf.

12         THE COURT:  Is there any objection to that from the

13 defendants?

14         MR. KAPLAN:  No, Your Honor.

15         MS. FROST:  No, Your Honor.

16         THE COURT:  I do note that we're kind of behind, so I

17 hope there will be some time savings at some point, but,

18 Mr. Keech go, ahead.

19         THE COURTROOM DEPUTY:  All rise.

20     (Jury in at 2:53 p.m.)

21         THE COURT:  Let's all take our seats.  Ms. Weiss had a

22 couple more questions.  You may go ahead.

23         MS. WEISS:  Thank you.  Thank you.

24     Q    (By Ms. Weiss) Mr. Alf, just one more housekeeping

25 item.  You have in front of you a folder that is marked --

CHRISTOPHER ALF – Direct

1    yes -- did you have an opportunity to review the contents of

2    that folder before your testimony today?

3    A    Let me take a look.  Yes, I did.

4    Q    Okay.

5    A    Yes.

6    Q    And the contents of that folder is Government's Exhibit

7    552, 571, 572, 573, 574, 575, and 576.  For the record, sir,

8    what are those documents?

9    A    There's -- documents are just various versions of the

10   consulting agreements.

11   Q    And by consulting agreement, you mean the one between Sand

12   Hill and National?

13   A    Yes.  Yes.  Consulting between Sand Hill and National Air

14   Cargo Holdings, Inc.

15   Q    Okay.  Those are all documents that you are familiar with?

16   A    Yes.

17   Q    And you signed all of those?

18   A    I have to check.  Sorry, everyone.  Yes.  I signed and/or

19   initialed every single document.

20        MS. WEISS:  Okay.  The government would move to admit

21   Exhibits 552, 574, 572, 573, 574, 575, 576.

22        THE COURT:  Any objections as to those?

23        MR. SCHALL:  None.

24        MR. KAPLAN:  No.

25        THE COURT:  All right.  Those are all admitted.

731
CHRISTOPHER ALF - Cross

1          *MS. WEISS:*  Thank you, Your Honor.

2          *THE COURT:*  All right.  Thank you.  All right.

3     Cross-examination, Mr. Schall.

4                   **CROSS-EXAMINATION CONTINUED**

5     *BY MR. SCHALL:*

6     Q    Thank you, Your Honor.  Good afternoon, sir.

7     A    Good afternoon.

8     Q    Is it pronounced Alf or Alf?

9     A    Alf.

10    Q    Alf.  I'm going to try to get that right?

11    A    Don't worry about it, that's okay.

12    Q    People mess up my last name all the time too, I get it.

13    Can you tell us where you grew up?

14    A    I grew up in Upstate New York, near Buffalo.

15    Q    And hate to -- embarrassed, but how old you are?

16    A    Just turned 59.

17    Q    Okay.  A little bit about your educational background.

18    School in Buffalo, high school or?

19    A    Yeah, exactly.  I went to elementary, went to public,

20    elementary, high school, post high school, and did some college

21    at a public college, Buffalo State College.

22    Q    Now, you live in Florida to avoid the winters, I imagine?

23    A    Exactly.

24    Q    Okay.  Enough about your background.  I want to talk a

25    little bit about Mr. Tew?

CHRISTOPHER ALF - Cross

1    *A*    Okay.

2    *Q*    I believe you estimated you first met him in 2014, '15

3    timeframe?

4    *A*    Yeah.  I'm not quite exactly sure of the dates, but I

5    believe sometime around there.

6    *Q*    Okay.  And he was recommended to you by your neighbor?

7    *A*    That's correct.

8    *Q*    Was that a neighbor in New York or neighbor in Florida?

9    *A*    Neighbor in Florida.

10    *Q*    Okay.  Somebody you consider a friend?

11    *A*    Yes.

12    *Q*    So, the recommendation was a strong one, enough to hire

13    Michael?

14    *A*    That's correct.

15    *Q*    And you said he was pedigreed?

16    *A*    Yes.

17    *Q*    And that he was highly recommended?

18    *A*    That's correct.

19    *Q*    In the timeframe 2015, '16, this is the, if I may I call

20    it, the bankruptcy era?

21    *A*    Yeah.  The years kind of merge together, so right, yes,

22    somewhere around that timeframe.  Yes.

23    *Q*    Was there any other bankruptcy proceedings in the -- under

24    the corporate umbrella, in the 30-plus years of National?

25    *A*    No, I don't recall any.

CHRISTOPHER ALF - Cross

1  Q   Okay.  This was --

2  A   Yeah.

3  Q   This was the bankruptcy time?

4  A   Right.

5  Q   And Michael, you, fair to say, worked closely with him on

6  those issues?

7  A   Yes, I did.

8  Q   And those -- is it fair to say, the stakes were fairly high

9  for your company, at that time?

10 A   Somewhat, but I wouldn't say -- kind of like, we know we

11 eventually get through it.  It wasn't going to be the end of

12 the world.  So, when you say fairly high, I would not say that.

13 Q   Put it in your words.  Tell me what?

14 A   Yeah.  It's a time we need to work out some business

15 issues.

16 Q   And that was with the subsidiary or the Air Cargo Holdings

17 umbrella, which?

18 A   One subsidiary of the all of the -- of the National Air

19 Cargo Holdings.  It was National Air Cargo, Inc., the New York

20 corporation.  Just one of many companies.

21 Q   Was that bankruptcy precipitated by the $8 million judgment

22 that you talked about on Direct or unrelated?

23 A   No.  It was directly caused by that.

24 Q   Okay.  So, it was a voluntary bankruptcy?

25 A   That's correct.

734
CHRISTOPHER ALF - Cross

1    Q    Something the company, through its people, you chose to

2    pursue?

3    A    That's correct.

4    Q    As a way -- I'm not a bankruptcy lawyer, but I'm going to

5    try to play one.  As a way to restructure debts of the company?

6    A    That's correct.

7    Q    And you said that, I believe, on Direct, those debts got

8    paid almost in full?

9    A    Almost, not in full, but pretty good, pretty close, yeah.

10   Q    Okay.  And Michael's work, during that time, was valued by

11   National?

12   A    Yes.

13   Q    And he did -- would you say he did a good job?

14   A    Yes.

15   Q    At that time, in a time machine now, 2015, we saw the --

16   the 1099, when Michael was making a substantial salary?

17   A    Okay.

18   Q    Did you feel Michael was worth what he was being paid?

19   A    Yes.

20   Q    And in 2016, same?

21   A    Yes.

22   Q    Up until he was terminated -- well, let me stop there.  At

23   the time of his termination, you knew about the American

24   Express issues?

25   A    Yes.

735
CHRISTOPHER ALF - Cross

1    Q    Up until learning of that, would you say Michael earned his

2    salary?

3    A    Yes.

4    Q    He was a hard worker?

5    A    Yes.

6    Q    I'm going to take it, Mr. Alf, that given your success, you

7    are also a hard worker?

8    A    Yes.

9    Q    Late nights?

10   A    Early mornings, yes.

11   Q    And Michael was responsive in the early mornings and late

12   at night?

13   A    Yes.

14   Q    He was engaged with the work?

15   A    Yes, that's true.

16   Q    Not somebody you had to terminate because he was showing up

17   late?

18   A    No.

19   Q    All right.  Because of the time difference, you were on the

20   East Coast?

21   A    That's correct.

22   Q    Michael was here in Mountain West?

23   A    For the most part.

24   Q    So, when -- it's been awhile, so won't hold you to it, but

25   what's your work day like?  What time do you get up, start

736
CHRISTOPHER ALF – Cross

1    responding to emails, diving into your business?

2    A   Well, it never really ends, so it's 24/7, 365.  So there is

3    always an email to look at.  So, yeah.  So when I get up, back

4    then, you know, kids were in school, thinking you could be up

5    and working, and just like everything else, whatever needs to

6    be done, needed to get done.

7    Q   I understand that.  Michael was responsive through all of

8    that?

9    A   Yes.

10   Q   The -- at some point, I think it was in the 2018 timeframe,

11   on Direct you talked about the advances of his pay occurring.

12   At the time, not now, at the time, what did you -- how did you

13   take that?  What did you think of that?

14   A   It was a request from Michael for some pay advances, and

15   I -- we were working together, and he requested a pay advance

16   and I said, *Okay, I will give you a pay advance.  If you need*

17   *the money I will give you the advance*.

18   Q   Was it a phone conversation?  What do you recall?

19   A   I recall -- yeah.  Definitely would have been a phone

20   conversation at first, and then probably then verify, which it

21   was verified with the emails.

22   Q   Is, if you recall, was this something that he was bashful

23   about or embarrassed about or tucked tail, if you will?

24   A   No, he wasn't embarrassed.  He says, *If you could help me*

25   *out it would be great*.

CHRISTOPHER ALF – Cross

1   Q   Did he provide any color as to why?

2   A   I don't recall for what.

3   Q   Did you inquire?

4   A   He said he needed the cash, that things had been tight or

5   something to that effect, but that's all I can remember.

6   Q   If I may, at that time, as now, you were a man of

7   resources?

8   A   Hm, not at that time, I mean.

9   Q   Well, we can talk about it, but you had assets?

10  A   (Nodding head.) Some.  Yes.

11  Q   And you could advance the payment to Michael without any

12  worries?

13  A   That's correct.  We did, yes.

14  Q   And did, at some point, you become concerned about Michael

15  or, you know, in this day and age, there's all of these things

16  about health of employees, and looking out for each other, that

17  kind of thing, was –– did that ever key in?  Was that an issue

18  for you?

19  A   Yeah.  When he asked for request of advancement that's one

20  reason I gave it.  He said he needed it, and I trusted him, he

21  said he needed it, so okay.

22  Q   But you didn't dig in?

23  A   No.  Not that I remember, no.

24  Q   Okay.  Did Michael talk about his problems or financial

25  constraints or anything like that with you?

CHRISTOPHER ALF - Cross

1   A   Not in any detail, no.

2   Q   Okay.  Did you develop an opinion, at that time, about

3   what, I will call, Michael's financial acumen?

4   A   I don't understand your question.  I have an opinion -- I

5   didn't understand the question.  I'm sorry.  I want to get it

6   right.

7   Q   I appreciate that.  In 2016, 2017?

8   A   Yeah.

9   Q   Everything is going well with Michael's employment?

10  A   Hm-hm.  (Nodding head.)

11  Q   Did you develop an opinion about his savvy with financial

12  matters?

13  A   Yes.

14  Q   And what was that opinion?

15  A   What was what?  I'm sorry.

16  Q   What was your opinion?

17  A   Yeah, he was -- yeah, I liked Michael, personally and

18  professionally, very much so, and I -- he was very well-spoken

19  and very good at presentations and...

20  Q   I appreciate that, but as to his financial stuff, did you

21  develop an opinion about whether he was ... about his financial

22  livelihood?

23  A   I don't know about his personal financial livelihood, if

24  that's what you are asking me.  I have no idea what his

25  personal financial --

CHRISTOPHER ALF - Cross

1   Q   About Michael as a finance guy?

2   A   He is good, that's what I'm saying.  Yeah.

3   Q   Did his -- this is someone you hired to be a finance guy?

4   A   Not at the beginning.  As I stated before, it started off

5   as working through Richie, as a contractor, along with him, to

6   come in and do -- help presentations, so forth, grew into a

7   bigger role, and then it did grow into this hiring as a finance

8   guy, but it didn't start out that way.  It moved along.

9   Q   At some point --

10  A   I agree with you.

11  Q   -- Michael became the chief financial officer of the

12  company?

13  A   That's correct.

14  Q   At that point in time, is when he asked for advances on his

15  pay?

16  A   Yeah.  Somewhere, yes, yes, somewhere in that timeframe.

17  Q   And did that raise red flags with you about any issues

18  Michael might be having?

19  A   No.

20  Q   Now, sitting here today, and reflecting upon those times,

21  you know, putting your ... rewind cap on, should it have raised

22  red flags for you, that your chief financial officer was asking

23  for advances in his pay?  His highly compensated pay?

24  A   He needed -- I -- I was -- didn't, at that time.  He

25  requested some -- a relatively small advance compared to what

CHRISTOPHER ALF - Cross

1   his total outlay that was going to be coming in the coming

2   months, and I didn't see Michael going anywhere.  If he wanted

3   it early, if he needed it, and he said *Chris, I really need it.*

4   *Would you help me out*?  And I did help him.

5   Q   Okay.  Fair enough.  Let's talk about the American Express

6   issue.  Would you agree with me that that was kind of crazy?

7   A   Yes.

8   Q   I believe the word you used was insanity?

9   A   Yes.

10  Q   Why?

11  A   Well, because you give somebody, particularly -- anybody

12  doesn't matter, any worker for the company, that was the

13  agreement that if you put personal charges on a company credit

14  card, that you have to reimburse the company for said personal

15  charges.  But they were all for individual -- in so many

16  transactions, in such a short period of time, cashed one right

17  after the other, in quick form, you know, dot, dot, dot, over a

18  very short period of time was incredibly bizarre.

19  Q   And did you -- I believe you testified on Direct that you

20  had, I believe, a phone conversation with Michael about this?

21  A   Right.

22  Q   And he told you that his wife used the card?

23  A   Yes.

24  Q   And that she needed the money, that she owed money and that

25  she stole his card and used it?

741
CHRISTOPHER ALF - Cross

1  *A*  Didn't use the words stolen, but he said, *She took my card.*

2  *Q*  And were you surprised by this explanation?

3  *A*  Yes, very much so.  We -- I thought highly of Michael and

4  Kimberley, both.  Why would they take the credit card without

5  asking?  You said before, they needed money, and he asked me

6  about that, and I -- if somebody comes to me and says yes, we

7  wanted an advancement, okay, give an advancement, but don't

8  take the card, and everybody, as CFO, is looking at Michael as

9  the top financial person, trying to set the right tone for the

10  company, that the card was used for personal gift cards.

11  *Q*  Do you know if Michael got any of that gift card?

12  *A*  No idea.

13  *Q*  Michael did say to you that he would reimburse the company?

14  *A*  Yes, he did.

15  *Q*  And on the -- on that same call, I believe the phone was

16  handed to Mrs. Tew; is that right?

17  *A*  That's correct.

18  *Q*  And she said she was sorry and was crying?

19  *A*  Yes.

20  *Q*  In this era, 2018ish, did you ever have any conversations

21  with Mrs. Tew, when she was not very emotional?

22  *A*  Yes.

23  *Q*  Tell me what you recall?

24  *A*  Before -- before the credit card stuff, right?  Okay.

25  Yeah.  No, we've had conversations.  Even had dinner together,

CHRISTOPHER ALF - Cross

1   on a couple instances, and met her a few times and that was

2   very cordial.

3   Q   Okay.  After the American Express stuff, did you have any

4   conversations with Mrs. Tew that -- in which she was not a hot

5   mess?

6   A   I don't recall any, no.

7   Q   Okay.  American Express denied the company's request to

8   strike the charges as fraudulent?

9   A   That's correct.

10  Q   And so the company ate how much?  Do you remember?

11  A   I can't remember the exact numbers altogether added up

12  together.  It was like -- I'm sorry, I just can't remember the

13  total.

14  Q   If I were to say ballpark 40 or $50,000?

15  A   Yeah, somewhere in that neighborhood.  Yes.

16  Q   Let's talk about Mrs. Tew.  This whole threat situation

17  that you received and your family received?

18  A   Right.

19  Q   Did Mrs. -- did Michael offer you an explanation of what

20  was going on with that?

21  A   It came from -- yes, that he -- that Mrs. Tew, Kimberley,

22  hired this guy, and it has to do with trading Bitcoin.  I

23  didn't understand exactly what it was.  Somehow trading Bitcoin

24  faster, inventing a better process.  So she hired this

25  developer to do this, and she owed the developer money that

CHRISTOPHER ALF - Cross

1   developed the software.

2   Q   He was this guy who was a prior convicted felon?

3   A   Right, that's correct.

4   Q   And had a screw loose?

5   A   Yeah, definitely.

6   Q   One or more?

7   A   I mean, I would even... that would be a very much

8   understatement of what he was.

9   Q   Tell me, in your words, how nutty this guy was?

10  A   Well, my words are, he -- from what he was convicted of,

11  turning on cameras on girls clothes and watching them change.

12  Q   And?

13  A   That's pretty bad.  That's more than a screw loose.  It's

14  sick.

15  Q   And to your knowledge, aside from his wife's relationship

16  with this Craig individual, Michael, personally, didn't have

17  any relationship with him?

18  A   As far as I know, Michael had no idea who this guy was,

19  until the kind of --

20  Q   Blew up?

21  A   Blew up is a good word.  Yeah, I like that word, blow up.

22  Q   Do you recall Michael even submitting an online report

23  about this individual to the Internet Crime Center, basically?

24  A   I vaguely remember that, yeah, that there was something

25  that he reported, but I didn't know to who.

744

CHRISTOPHER ALF - Cross

1   *Q*   Fair -- is it fair to say, do you know, that Michael was

2   also worried about this guy?

3   *A*   Yes, that's correct.

4   *Q*   When you were talking on the phone with Michael about this

5   Craig guy, he handed the phone to Kimberley, at one point, I

6   believe you testified?

7   *A*   Right.

8   *Q*   And she said to you, *I'm so sorry, I didn't mean for this*

9   *to happen to your daughter*?

10   *A*   That's correct.

11   *Q*   And she -- did you interpret that as her taking the blame

12   for this?

13   *A*   Yeah.  Admitted she did it, yes.

14   *Q*   And you said, I think, you could only take so much of

15   listening to this before you said put Michael on the phone?

16   *A*   Exactly.

17   *Q*   It was -- was this the emotional train wreck, like, you

18   just want to get off the phone?  You couldn't deal with this

19   anymore?

20   *A*   Exactly.

21   *Q*   And I'm going to ask you, did you ever wonder how Michael

22   dealt with this on a daily basis?

23   *A*   Yes.

24   *Q*   What did you think?

25   *A*   I don't know how he could handle it.

CHRISTOPHER ALF - Cross

1    Q    It was crazy?

2    A    Right.

3    Q    So, NAC -- I'm going to refer to your company as NAC; is

4    that okay?  National --

5    A    Companies leading up to National, yes, that's fine.

6    Q    You are, I believe you testified, the one hundred percent

7    owner of the umbrella company?

8    A    That's correct.

9    Q    And so when you were -- these capital raises, whatnot, you

10   were talking about, leverage loans, that kind of stuff, not

11   selling equity in your company?

12   A    We were discussing if we were willing to sell equity in the

13   company.  Yes.

14   Q    But just never --

15   A    Didn't happen.

16   Q    From the -- the day you created the company, to today, as

17   it sits today, you have always been a hundred percent owner?

18   A    Yes, that's correct.

19   Q    Okay.  And so when $50,000, or whatever, is taken from the

20   company, for these gift cards on American Express, after it

21   filters through the corporate process, in many ways, that

22   $50,000 less that is your company's value, that you received?

23   A    That's correct.

24   Q    And if the company does well, Chris Alf does well?

25   A    That's correct.

746

CHRISTOPHER ALF - Cross

 1   Q   And so, when money is taken from the company, do you feel

 2   it's personally taken from you?

 3   A   Yeah.  Indirectly, yes.

 4   Q   So, in this case, not the American Express stuff, the one

 5   we're talking about today, was that money taken directly from

 6   you?

 7   A   Indirectly, yes, it was, at that time.

 8   Q   Did you ever get compensated for that loss?

 9   A   For which -- which loss are you talking about?

10   Q   The -- the allegations in this case, that I'm going to say

11   in the $5 million range?

12   A   Yes.

13   Q   You were compensated?

14   A   Yes.

15   Q   That's through a -- for lack of a better way, an insurance

16   process?

17   A   Yes, that's correct.

18   Q   And the company or the companies maintain insurance for

19   all -- a whole host of things?

20   A   That's correct.  But we are not a hundred percent

21   compensated.  There's money that we still had to pay.

22   Q   The lawyers always get paid, right?

23   A   That's for sure.

24   Q   Something like that?

25   A   Yeah.

CHRISTOPHER ALF - Cross

1    *Q*   How -- you said in the 2018, '19, '20 timeframe, the

2    company was struggling?

3    *A*   Yes.  In the early -- earlier, 2018, 2019, I would say.

4    *Q*   Did the fraud that's alleged in this case, cause the

5    company to become insolvent?

6    *A*   No.

7    *Q*   Did the company have to file a new bankruptcy?

8    *A*   No, it did not.

9    *Q*   Did the company's credit worthiness suffer?

10   *A*   Well, during the timeframe, it did, yes.

11   *Q*   As a result of this fraud?

12   *A*   Yes.

13   *Q*   Can you tell me how?

14   *A*   Because the fact is we didn't have money to pay the bills,

15   because the money was out of -- we didn't have enough cash to

16   go around.  We had discussions, we invoiced people out, we

17   received payments, we don't have money to pay our bills.  Why

18   don't we have money to pay our bills?  This is the time that it

19   was a horrible experience, that people calling for collections

20   to my personnel saying, you know --

21   *Q*   Let me dig into that.  In 2018 to 2020, generally, is what

22   we're talking about, right?

23   *A*   Yeah.  The time -- I'm not sure of the dates.  They kind of

24   run together.  Somewhere whenever these transactions were

25   actually -- were actually done.  So, those are the dates --

748

CHRISTOPHER ALF - Cross

1  Q   Would you agree with me it was a three-year period?

2  A   I don't remember the total dates -- the dates are what the

3  dates are in the documents.

4  Q   Sure.  Would you agree with me, between 2018, July 2018,

5  and July 2020, is a two-year time period?

6  A   Yeah, I would.

7  Q   And the loss, you are familiar with, is estimated to be $5

8  million?

9  A   I think it's a little over that.  Yes.

10  Q   And how much was National missing payroll by?

11  A   We did not miss payroll.

12  Q   The creditors, these concerns that you have narrated about,

13  the numbers, I want to know the numbers.  How much were you

14  off?

15  A   By millions.

16  Q   More than five million?

17  A   No.  Wouldn't be more than 5 million.

18  Q   When you said millions?

19  A   Yes, yes, I don't know --

20  Q   My point is, the company had other issues that were

21  contributing to the lack of funds in the company?

22  A   Yes.

23  Q   And the company has flush times and it has slow times.  It

24  fluctuates, right?

25  A   Yes, that's correct.

CHRISTOPHER ALF - Cross

1   *Q*   And it has since you founded it?

2   *A*   That's correct.

3   *Q*   There have been times when things were hit or miss, when it

4   was tight; is that right?

5   *A*   That's correct.

6   *Q*   And there have been times where, I'm just going to say, you

7   couldn't believe how well the company was doing?

8   *A*   That's correct.

9   *Q*   How is the company doing today?

10  *A*   It's doing quite well.

11  *Q*   What does that mean?

12  *A*   That means we're able to pay our bills and keep moving and

13  making a profit, so.

14  *Q*   What is the -- it's 2024 now.  You might not have gotten

15  2023 numbers yet, but do you know, ballpark, what the gross

16  revenue of National Air Cargo Holdings, Inc. was in 2023?

17  *A*   Trying to remember.  I want to say probably around 6- to

18  $700 million.

19  *Q*   Do you know how many aircraft the company owns?

20  *A*   Currently, we own twelve.

21        *MR. SCHALL:*  Your Honor, if I could ask Mr. Keech to

22  present to the Court and the witness what's marked as

23  Defendant's Exhibit U, as in unicorn.  Copy of which I gave to

24  the government earlier.

25  *Q*   Mr. Alf, you have never seen that before, I imagine.

CHRISTOPHER ALF - Cross

1    A    Um, yeah, I have saw this.

2    Q    Okay.  Well, you saw what's depicted there, right?  But I'm

3    hoping you don't know where it came from.  Let me back up.  I

4    would proffer to you that what's in front of you is a screen

5    shot.  Would you agree?

6    A    That's correct.

7    Q    And is there -- does it -- by looking at it, can you tell a

8    date on that screen shot?

9    A    No.  There's no date on this screen shot.

10   Q    Maybe if you look towards the top?

11   A    Well, there's a date of the the New York Times article, but

12   there's not a date of the photo.

13   Q    Fair enough.

14   A    Sorry.  I thought you meant the photo.

15   Q    By looking at it, can you tell the date of the article?

16   A    Yes.  It's Thursday, February 8, 2024.

17   Q    Would you agree with me that's today's date?

18   A    That's correct.

19   Q    And the image before you appears to be a screen shot from a

20   phone?

21   A    Oh, yeah, because the phone with the little battery on top.

22   Q    It's got the time up there?

23   A    Yeah, yeah.

24   Q    It's got the battery life?

25   A    Right.

CHRISTOPHER ALF - Cross

1   Q   You might wonder why I know this, because I would proffer

2   to you, because it's a screen shot of my phone?

3   A   Okay.

4   Q   From 6:47 or something this morning?

5   A   Okay.

6   Q   Is that the time, at the top?

7   A   Yes, it is.

8   Q   Is it 6:47?

9   A   No 6:45.

10  Q   Okay.  Do you recognize what that is?

11  A   Yes.

12  Q   Is that a headline from the New York Times newspaper?

13  A   Yes.

14  Q   From today?

15  A   Yes.

16  Q   And is that -- is there a picture that goes along with it?

17  A   Yes.

18  Q   And do you recognize that picture?

19  A   Yes.

20  Q   You didn't take that picture?

21  A   No.

22  Q   But you know what's in that picture, generally speaking?

23  A   Generally, yes.

24  Q   In that picture, is there a National plane shown on the

25  headline of the New York Times?

752
CHRISTOPHER ALF - Cross

1    A    Yes.

2          MR. SCHALL:  Your Honor, we would offer Government's

3    Exhibit U, at this time.

4          THE COURT:  Any objection?

5          MS. WEISS:  No, Your Honor.

6          THE COURT:  Okay.  It's admitted.

7    Q    Can you tell, just on your knowledge of aircraft, what kind

8    of a plane that is?

9    A    It's a 747-400 aircraft, cargo aircraft.

10   Q    That's part of the National fleet.

11   A    Yeah, Boeing Converted Freighter.  Yes.

12   Q    And if you look closely inside the hatch that's open, it's

13   hard to see, does it say National, inside that hatch?

14   A    Yes, it does.

15   Q    That's what your planes say, basically, in some of them?

16   A    Yes.

17   Q    Fair to say, you are disappointed with Michael Tew?

18   A    Now, yes, yes.

19   Q    Are you still mad at him?

20   A    More sad, than mad.

21   Q    Tell me how does this make you sad?

22   A    Because I trusted him, and didn't, in my wildest dreams,

23   ever imagine I would be sitting here right now.

24          MR. SCHALL:  Nothing further, Your Honor.

25          THE COURT:  Thank you, Mr. Schall -- I just said thank

CHRISTOPHER ALF - Cross

1   you.

2          *MR. KAPLAN:*  Very briefly.

3          *THE COURT:*  Mr. Kaplan.

4          *MR. KAPLAN:*  Very briefly.

5                          **CROSS-EXAMINATION**

6   BY MR. KAPLAN:

7   Q    Good afternoon

8   A    Good afternoon.

9   Q    Just a few questions.  You had testified that you had had

10  some cordial dinners with Michael Tew and Kimberley Tew during

11  his employment with you?

12  A    That's correct.

13  Q    And at least during his employment, he had always been

14  married to Kimberley Tew, to your knowledge?

15  A    To my knowledge.

16  Q    And when we're talking about the Mr. Faigin catastrophe,

17  you had some information that the Tews had filed their own

18  report trying to investigate the matter?

19  A    Yeah.  Michael mentioned -- and I am not too sure who he

20  filed with or how, but there was some filing about the matter,

21  as well.  He was concerned, as well, for his family.

22  Q    And they were also concerned about their own safety and

23  this crazy guy?

24  A    That's correct.

25  Q    And when you were speaking with Michael Tew and Kimberley

754

CHRISTOPHER ALF – Cross

1   Tew got on the phone, that was the subject of the conversation,

2   the Faigin event?

3   A    Yeah, yeah, in that conversation.

4   Q    Right.  And when Mrs. Tew got on the line, she was pretty

5   frantic about the situation, herself?

6   A    Absolutely.

7   Q    And very apologetic?

8   A    That's correct, very apologetic.

9   Q    And there was no reason for -- well, let me ask you this,

10  you found out about the background of Mr. Faigin as a result of

11  your attempts and requests to have him investigated?

12  A    Yes, that's correct.

13  Q    That's how you got the information that you just testified,

14  in terms of his background?

15  A    Yes.  From the Boca Raton law enforcement.

16  Q    You have no reason to believe that the Tews, Kimberley Tew,

17  knew about his background, when she hired him to help with

18  Bitcoin?

19  A    I have no idea if she had any idea about his prior

20  background or not.  I never asked.

21          MR. KAPLAN:  Thank you.

22          THE COURT:  All right.  Thank you, Mr. Kaplan.  Any

23  Redirect?

24          MS. WEISS:  Nothing from the government.  Thank you.

25          THE COURT:  All right.  Thank you, Mr. Alf.  You are

755
RAESSA TELLY – Direct

1    excused.  Thank you.

2           *THE WITNESS:*  Thank you, sir.

3           *THE COURT:*  Is the government ready with its next

4    witness?

5           *MS. WEISS:*  Yes.  The government would call Raessa

6    Telly.

7           *THE COURTROOM DEPUTY:*  Please raise your right hand.

8    See.

9       (**RAESSA TELLY** was sworn.)

10          *THE WITNESS:*  I do.

11          *THE COURTROOM DEPUTY:*  Please be seated.  Please state

12   your name and spell your first and last names for the record.

13          *THE WITNESS:*  Raeesa Telly, R A E S S A, T E L L Y.

14                       **DIRECT EXAMINATION**

15   *BY MS. WEISS:*

16   *Q*   Have you gone by another name previously?

17   *A*   Yes.  I was previously married.  Last name Ibrahim, I B R A

18   H I M.

19   *Q*   Thank you.  Where do you live?

20   *A*   I live in Lewiston, New York.

21   *Q*   And is that in Upstate New York?

22   *A*   Yes.

23   *Q*   Thank you.  Where do you work?

24   *A*   I work for a company called Wolters Kluwer.

25   *Q*   Does Wolsters Kluwer own another business?

756

RAESSA TELLY - Direct

1    A    Yes.  Vcorp Services, LLC.

2    Q    That's V, like Victor?

3    A    Yes.

4    Q    What type of business is that?

5    A    We basically incorporate companies.  We handle compliance

6    matters for companies, at the Secretary of State level, like

7    filing annual reports, filing amendments with the state, stuff

8    like that.

9    Q    Wonderful.  How long have you worked there?

10   A    Since June -- sorry, July 2015.

11   Q    What is your title now?

12   A    It's customer service team lead.

13   Q    Does Vcorp provide registered agent services?

14   A    We do.

15   Q    Could you provide a friendly explanation of what that is?

16   A    Sure.  So, basically, when a company incorporates in any

17   state, they are typically required to appoint a registered

18   agent, and that is basically a representative within that

19   state, that will accept mail on the company's behalf, and

20   forward it along to the client.

21   Q    Okay.  And what are the pros of using a registered agent?

22   Why do this?

23   A    So, most of the time it's to help with compliance tracking.

24   So, if there are annual reports due, we would send them a

25   reminder, as a registered agent, and a lot of times people

RAESSA TELLY - Direct

1    choose to do that for anonymity purposes.  If they don't want

2    their names on any records.

3    Q    Does it cost money to use a registered agent?

4    A    It does, yes.

5    Q    And in exchange you get, sort of, this administrative sort

6    and anonymity?

7    A    Correct.  And an address we would provide for the state.

8    Q    Wonderful.  So, Vcorp's goals are to make it easy and

9    simple to set up a company?

10   A    Correct.

11   Q    Does Vcorp do anything to confirm, you know, the legitimacy

12   of the companies that it helps?

13   A    We do not really.  We kind of just take it at face value.

14   Whatever information they provide to us.  Whatever the state

15   needs is all that we ask for, typically.

16   Q    More like administrative?

17   A    Correct.

18   Q    Okay.  Can Vcorp registered entities in any state?

19   A    Yes, any state.

20   Q    Are there certain states that are more popular than others?

21   A    Definitely, Delaware is a very popular state, Nevada, is a

22   popular state, and Wyoming as well, and New York, as well.

23   Q    Does Vcorp maintain copies of records related to the

24   entities that it services?  I'm going to call them your

25   clients, but you tell me if that's not the right term?

RAESSA TELLY - Direct

1    *A*    That would be the right term.  Yes.  We do maintain copies

2    of any, like, official paperwork that is forwarded our way as

3    the agent.  We would basically scan those and then forward them

4    over to the client.  So, for those, we would have copies, and

5    anything that we filed for the client, we would keep those

6    copies, as well.

7    *Q*    Okay.  Turning your attention to the time period of

8    approximately 2018 to 2019.  Did you work at Vcorp, at that

9    time?

10   *A*    I did, yes.

11   *Q*    What was your title, at that time?

12   *A*    At that time it was customer service representative.

13   *Q*    Okay.  Can you briefly describe what you were doing in that

14   role?

15   *A*    Yes.  So, at that time, I was basically customer service,

16   just helping clients that call or email, with forming their

17   companies, filing amendments, anything of that nature, with the

18   secretary of states -- respective secretary of state.

19   *Q*    Could you approximate about how many customer service

20   requests you were processing on, let's say, a weekly basis

21   around that period?

22   *A*    I would say at least 80 to a hundred every week.

23   *Q*    Okay.  Fair to say it's not easy to keep independent memory

24   of all of them?

25   *A*    Definitely fair to say.

RAESSA TELLY - Direct

1    Q    Given that, did you do anything to help prepare yourself

2    for your testimony today?

3    A    No.  We just had the mock kind of prep session and that's

4    it.

5    Q    Okay.  Did you review any records as part of that session?

6    A    Just the documents that I had that were part of, basically,

7    the whole case.  I did take a look at them.

8    Q    All right.  Let's turn to today's testimony.  So,

9    Ms. Teller, are you familiar with the name Michael Tew, as a

10    client at Vcorp?

11    A    I am.

12    Q    Did he submit requests to Vcorp on behalf one entity or

13    more than one?

14    A    More than one.

15    Q    Have you ever met Mr. Tew in person, before today?

16    A    I have not.

17    Q    Have you spoken with him over the phone?

18    A    I don't recall, but I do not believe so.

19    Q    Okay.  Have you communicated with him by email?

20    A    Yes.

21    Q    All right.  We are going to now turn to what's been marked

22    as Government's Exhibit 548, I believe that's not in evidence,

23    yet.  So, if we could please display that onto the screen.

24    Ms. Telly, do you recognize this document?

25    A    I do, yes.

RAESSA TELLY - Direct

1   Q   Briefly, what is this document?  You don't have to read the

2   whole thing?

3   A   Okay.  So, this would be, basically, what is considered

4   certificate of good standing, or a certificate of status.  It

5   basically is the secretary of state attesting to the good

6   standing of the company with the state.

7   Q   Is this the type of record that Vcorp would have maintained

8   in its regular course?

9   A   As long as we were requested to obtain it for the client,

10  we would keep it on our records.

11  Q   Are you familiar with it, based on your services, serving

12  Michael Tew's companies?

13  A   Yes.

14          MS. WEISS:  I would move to admit Government's Exhibit

15  548.  Ask for permission to display.

16          THE COURT:  Any objection?

17          MR. SCHALL:  No.

18          THE COURT:  It's admitted.

19  Q   Okay.  I think the jurors can all now see it on their

20  screen, and if we could just maybe just blow up --

21          MS. WEISS:  That's perfect.  Thank you, Ms. Ortiz.

22  Okay.  Can you summarize what we're looking at here?

23  A   Yes.  So, basically, this company, Sand Hill, LLC is a New

24  York LLC.  It's showing it was filed initially on February 8th

25  2012, and it's currently still in existence as of the date of

1    this, and that they had filed a publication, they had filed a

2    change in 2012, and a biannual, which is just like an annual

3    report in 2018.

4         *MS. WEISS:*  Okay.  And then if we could zoom back out

5    again, Ms. Ortiz.

6    Q   And then I see a seal on this document and a signature.

7    Does that indicate that this was, you know, a certified New

8    York document?

9    A   Yes.

10   Q   Thank you.  Okay.

11        *MS. WEISS:*  If we could now turn to what's been marked

12   Government's Exhibit 547, and that is not in evidence yet,

13   either.  And I believe this is multiple pages.  So, if we could

14   just scroll through both pages, Ms. Ortiz.

15   Q   Do you recognize this document?

16   A   I do, yes.

17   Q   And what is this document?

18   A   This is an application for an EIN.  So that would be the

19   tax identification number issued by the IRS to a company.

20   Q   Okay.  And what company is listed here?

21   A   Sand Hill, LLC.

22   Q   And again, is this the type of record that Vcorp would

23   maintain in it's regular course for one of itself clients?

24   A   Yes.  As long as we completed the application for it, we

25   would maintain it for our records.

762
RAESSA TELLY - Direct

1          MS. WEISS:  I would move to admit 547 and ask for

2    permission to publish.

3          THE COURT:  Any objections?

4          MR. SCHALL:  None.

5          THE COURT:  Okay.  It's admitted, then.

6          MS. WEISS:  Okay.  If we could just focus on a couple

7    different portions of this document.  Let's start with the top

8    right corner, please, Ms. Ortiz.

9    Q   What are we seeing here?

10   A   We are seeing an EIN number, so, that's the number that

11   would be assigned for the IRS, which is the tax ID for the

12   company.

13   Q   Tax ID for the company, kind of like a social?

14   A   Correct, yeah.

15         MS. WEISS:  And then can we go to box number one, and

16   we can actually probably pull down through seven and still have

17   enough.

18   Q   Okay.  Can you walk us through what company this pertains

19   to and where it was located?

20   A   Sure.  It's for Sand Hill, LLC.  The address is listed as

21   10 East 29th Street, Apartment 10G, New York, New York, 10016.

22   The county is also New York County, New York, and the

23   applicant -- the IRS always requires an individual to be the

24   applicant.  In this case, it is Michael A. Tew, with his social

25   security number listed 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.

RAESSA TELLY – Direct

1    Q    Okay.  Thank you.

2        MS. WEISS:  If we can now blow up boxes ten and

3    eleven, Ms. Ortiz.

4    Q    Does this document indicate what kind of company Sand Hill,

5    LLC was supposed to be?

6    A    Yes.

7    Q    What --

8    A    Business activity will be consulting.

9    Q    Okay.  And again when was it started or acquired, according

10   to box 11?

11   A    So, that would be the start date of the company, that is

12   February 8th, 2012.

13   Q    Okay.

14       MS. WEISS:  And then if we can go down to the bottom,

15   and the line that says name and title, as well as the text

16   right before it, Ms. Ortiz, please.

17   Q    Okay.  Let's start with the designee first.  What's

18   designee?

19   A    Is says Taylor Lolya.

20   Q    Is that somebody that works for Vcorp?

21   A    She is my colleague.

22   Q    Below that, can you read the text that begins here?

23   A    Sure.  The name and title this is for the applicant Michael

24   A. Tew, member.

25   Q    Okay.  And then the text right above that, please, ma'am?

RAESSA TELLY – Direct

1    *A*    That would be, *Under penalties of perjury, I declare that I*

2    *have examined this application, and to the best of my knowledge*

3    *and belief, it is true, correct and complete.*

4    *Q*    Okay.  And you require the client to sign this box, right?

5    *A*    We do, yes.

6    *Q*    And why is that?

7    *A*    We will not be able to submit the application without a

8    signature.  The IRS would not assign an EIN without it.

9    *Q*    So, it's important to be honest in this form?

10    *A*    Yes.

11    *Q*    All right.

12    *Q*    Can we now please turn to Government's Exhibit 655.  And if

13    we could just page through this entire document.  For the

14    witness.  Thank you.

15    *Q*    Briefly, Ms. Telly, what type of document is this?

16    *A*    This looks like an email thread exchange between myself and

17    Michael Tew.

18    *Q*    Is this the type of document that Vcorp would maintain in

19    its normal business records?

20    *A*    Yes.  We keep all of our email history.

21        *MS. WEISS:*  I would like to move Government's Exhibit

22    655.

23        *THE COURT:*  Any objections?

24        *MR. SCHALL:*  No.

25        *MS. HUBBARD:*  We would object in that an email is not

RAESSA TELLY - Direct

1    an appropriate business record.

2           *THE COURT:*  I think emails can be business records.

3    Overruled.  I will admit it.

4           *MS. WEISS:*  For the record, this is Certification

5    1118.  All of these Vcorp documents will have the same

6    certification.

7           *THE COURT:*  Thank you.

8    Q   Okay.  So, this is one of those email chains, older emails

9    are at the bottom.  So, we're going to go --

10          *MS. WEISS:*  I believe it's the next to last page,

11   Ms. Ortiz, and it's the one ending in '56.  And then if we

12   could start with that box that begins, *Ashley*.  Okay.

13   Q   Ms. Telly, can you just walk us through what's happening in

14   this email?

15   A   Yes.  We received an email.  Ashley is the recipient.

16   However, Ashley is kind of a generic email address that we use,

17   where a bunch of a different clients just get routed to.  So,

18   it's not an actual person.  So, this was an email that we

19   received, saying *Ashley, I think you guys are the managers on*

20   *Sand Hill, LLC.  If so, can you assist in obtaining a cert of*

21   *good standing from New York?  Kindly let me know, Michael Tew.*

22   Q   Can you read off the address?

23   A   Sure.  It's *mtew@sandhillrp.com*, and the phone number is

24   917-685-1312.

25   Q   Okay.  Were you assigned to handle this customer inquiry

RAESSA TELLY – Direct

1   that came in through the general, Ashley?

2   A   Yes, I was.

3   Q   Can we now look at the next email.  I believe sort of goes

4   from the bottom of 55 to the top of 56.  Okay.  And does this

5   indicate your response to that inquiry about getting a

6   certificate of good standing?

7   A   Yes, it does.

8   Q   What did you note might be a hindrance or at least slow

9   that process down?

10  A   So, I took a look at the entity, I noticed that the

11  biennial was past due, which is the annual report that's filed

12  in New York, so I did let him know that was the case.  So, it

13  wasn't in good standing, essentially.

14  Q   If it's not in good standing, would that affect the amount

15  of time that it would take to process, getting it back into

16  good standing?

17  A   Yes.  At that time, it took about one to two weeks to get

18  that back to good standing.

19  Q   If we could just go back -- actually, just look at the date

20  on it, very quickly.  What date did you send that response to

21  Mr. Tew?

22  A   Monday, June 25, 2018.

23  Q   Let's go up to the next email.  Did you send him another

24  email on July 9th, 2018?

25  A   I did.  I sent a followup request, because I did not hear

767

1    back on that initial email.

2    Q    Okay.  And was that email responded to?

3    A    Um ... not that I can recall, but if I ... yes, I do recall

4    he did respond.  I got a response on July 9th, 2018.

5    Q    And what did Mr. Tew say, at that point?

6    A    He said, *Thanks I will want this.  I would like to order*

7    *this later in the week is that possible?  Like Wednesday,*

8    *Thursday?  I would then need proof of the order to show my bank*

9    *who is requiring it.*

10   Q    Okay.  We're not going to go email-by-email through this,

11   but, can you summarize, sort of, what the contents were on the

12   pages at 54 and 53; the next two pages?

13   A    Basically, I was just giving the client a heads up that it

14   will take awhile, so basically if they needed it urgently, to

15   let me know, and then I did provide him with information that

16   we needed in order to get that biennale filed.

17   Q    And then, let's start again at the bottom of page 52.  Were

18   you continuing to try and follow up and complete Mr. Tew's

19   request on July 26th, 2018?

20   A    Yes, that's correct.

21   Q    Let's look up at the next chain.  What is the date of this

22   email?

23   A    This is November 3rd, 2018.

24   Q    So, several months later?

25   A    Correct.

RAESSA TELLY - Direct

1  Q    What is the time of this email?

2  A    2:51 AM.

3  Q    And if you could please read out this email in full?

4  A    Sure. *Raeesa, I do need to get Sand Hill, LLC in good*

5  *standing with New York State asap. Can you assist? I think*

6  *you were saying it's $58 and would take one to two weeks if*

7  *expedited. Please let me know and I can give you CC asap. I*

8  *need to also file a foreign LLC in Colorado. Thanks, Michael*

9  *Tew* and his signature is there too.

10 Q    What is a foreign LLC in a particular state?

11 A    Basically, whenever an entity is incorporated or formed in

12 one state, it can also be qualified in another state, which is

13 a pretty frequent request. It permits that entity to transact

14 in the other state, as well. So, that's what he was referring

15 to, getting the New York State an LLC qualified to do business

16 in Colorado.

17 Q    So, that would take getting New York State up to good

18 standing, and then filing something separate with the State of

19 Colorado to do business in Colorado?

20 A    Correct, yes.

21 Q    Okay. All right. Let's scroll up to 51, and again we're

22 not going to go through this, but can you give a summary of

23 what you were telling him, at that time?

24 A    Yes. So, I had basically provided the quote to get the

25 entity qualified in Colorado and provided the information that

RAESSA TELLY - Direct

1   we would need to get that filed, as well.

2   Q    Okay.  And then let's go to the first page, on page 50,

3   please.  Okay.  And if we can start with the bottom email.

4   Just have you read that out?

5   A    Sure.  So, this is Monday, November 5th, 2018, received

6   email from Michael saying, *Raeesa, thanks.  Yes, I do.  Also*

7   *Vcorp to act as local agent in CO, yes, please.  Also see my*

8   *last email regarding setting up new entity in Wyoming.  Thanks.*

9   Q    So now there's another component to this request?

10  A    Yes.

11  Q    Okay.  And then let's look at the next email up.  Did you

12  try to confirm some information regarding Sand Hill's location,

13  at that time?

14  A    Yes.  I requested, basically, the information that we

15  needed for the registration, because he did not provide the

16  sufficient information.  So, I asked for the principle office

17  address of the entity and the mailing address, if it was

18  different, and then to confirm the information for the New York

19  biennale to file, as well.

20  Q    Okay.  And then, if we could now look at the top email, and

21  what address did he provide, if you could read that in full?

22  A    It was 3222 East 1st Avenue, Denver, Colorado, 80206, and

23  he says, *Can you use that address for all*?

24  Q    Thank you.  If you could now turn to Government's Exhibit

25  654.  Let me know what you have had a chance --

RAESSA TELLY - Direct

 1   *A*   Yes, I reviewed it.

 2   *Q*   Okay.  We are just going to look at the first page of this,

 3   but, for the record, can you please identify what this document

 4   is and any attachments to?

 5   *A*   Sure.  So, basically, this is another email thread between

 6   myself and Michael.  It's regarding qualification of the entity

 7   in Colorado, and then there was an attachment to the email

 8   which is the draft, that I prepared and sent to him for

 9   approval.

10          *MS. WEISS:*  Okay.  Government would seek to admit

11   Exhibit 654?

12          *MR. SCHALL:*  No objections.

13          *MS. HUBBARD:*  Same objection, Your Honor.

14          *THE COURT:*  Overruled.  It's admitted 654.

15   *Q*   Okay.  And then we will just look at the top document.

16   Does this -- the top email.  I apologize.  Does this indicate

17   that you prepared a draft for Mr. Tew's review?

18   *A*   Yes.  I prepared the draft and sent it over to him for

19   review.  We do not typically file anything until we've gotten

20   the client's express permission to do it.

21   *Q*   Okay.  Can we now turn to Government's Exhibit 661.  And do

22   you recognize this document?

23   *A*   I do, yes.

24   *Q*   Okay.  And what is it?

25   *A*   This is another email thread with Michael, as well, and I

RAESSA TELLY - Direct

1  believe this was getting the entity back into good standing in

2  New York, and yes, getting the good standing from New York and

3  explaining the fees for that, and then also he did confirm the

4  draft, and I said, *I will have this filed and we will have*

5  *evidence in about two days.*

6  Q   Okay.  That was all of it, but let's backup for a second,

7  so we can move to admit it.  Is this an email that you are

8  familiar with, that is maintained in Vcorp's normal records?

9  A   Yes, it is.

10      *MS. WEISS:*  Move to admit Government's Exhibit 661.

11      *MR. SCHALL:*  No objection.

12      *MS. HUBBARD:*  Same objection.

13      *THE COURT:*  It's admitted.  Go ahead.

14  Q   If we can start at the last page, Vcorp 48.  Did this

15  indicate that you sent a draft of the documents that Mr. Tew

16  requested?

17  A   This, actually, would indicate that I sent over filed

18  evidence.  So, that particular email format is for when we're

19  sending evidence of a request completed, to the client.

20  Q   Okay.  Great.  Then can we go to Vcorp 47?  Focus on the

21  middle email.  Is this Mr. Tew's response to getting that

22  notification that it had been filed?

23  A   Yes.

24  Q   Could you -- what date was that, for the record?

25  A   This was November 11, 2018.

RAESSA TELLY - Direct

1    *Q*    And -- wonderful.  Can you please just read out -- or

2    summarize, maybe, the top portion, and then after the first

3    *thank you*, read out the rest of the email?

4    *A*    Okay.  So, I believe it was just saying he was apologizing

5    for bothering me.  Just wanted to make sure he was doing it

6    right.  And then he was showing that -- sorry, he said, *It*

7    *shows that you filed a biennial statement, but I don't have a*

8    *copy of the following:  The biennial, the good standing, any*

9    *other updates or documents I need to show proof of good*

10   *standing, or the CO, Colorado registration*.  And then he -- do

11   you want me to continue?

12   *Q*    Yes.  If you could read the rest?

13   *A*    Then he said, *Just need to get a bank account open here.  I*

14   *can pay via CC.  I have $$ coming in by Tuesday/Wednesday?  So*

15   *if you help me organize this, I can pay midweek.  Thank you.*

16   *Q*    Did you eventually end up filing that document with the

17   State of Colorado to register Sand Hill as a foreign LLC?

18   *A*    Yes.

19   *Q*    Let's look at Government's Exhibit 526.

20          MS. WEISS:  And I believe there's multiple pages.  So,

21   if you wouldn't mind scrolling it, Ms. Ortiz.

22   *Q*    Do you recognize this document?

23   *A*    I do, yes.

24   *Q*    And what is it?

25   *A*    This is the confirmation of the entity being qualified to

RAESSA TELLY - Direct

1    do business in Colorado.

2    Q   Okay.

3            MS. WEISS:  I would move to admit Government's Exhibit

4    526.

5            MR. SCHALL:  No objection.

6            MS. HUBBARD:  Objection.

7            THE COURT:  It's admitted.

8            MS. WEISS:  Permission to display?

9            THE COURT:  Sure.

10           MS. WEISS:  And if we could just zoom in on the top

11   portion with the e-filed and the information next to it, first

12   Ms. Ortiz.

13   Q   Does this indicate at what point this document was filed?

14   A   Yes.  It shows the date and timestamp, which is November

15   12th, 2018, at 11:59 a.m.

16   Q   How much did this document cost to file?

17   A   One hundred dollars.

18   Q   Okay.  Moving down.  Let's just do the title, and, sort of,

19   one, two, three.  And what does this document cover?

20   A   So, basically, the first part is showing the company name,

21   which is Sand Hill, LLC, then the state assigned number, and

22   then it's showing the form of entity which is a foreign,

23   limited liability company, and then the jurisdiction, which is

24   the home state of the company, and that shows New York, and

25   then it also shows the principle office address of the company.

RAESSA TELLY - Direct

1    Q    Okay.

2    A    Do you want me to read that?

3    Q    No.  You don't need to read it again, that's fine.  And

4    again, the date on this document was November of 2018, at some

5    point?

6    A    Yes, November 12, 2018.

7    Q    Okay.  I want to fast forward to July of 2019.  Did you

8    have occasion to communicate with Mr. Tew, again, by email,

9    around that time period?

10   A    Yes.

11   Q    All right.  Let's look at what's been marked Government's

12   Exhibit 799.

13          MS. WEISS:  If you could just scroll through it,

14   Ms. Ortiz.  They are all going to be multiple pages, I'm

15   afraid.

16   Q    And what is this document, Ms. Telly?

17   A    This is another email thread between Michael and myself.

18   This was July 1st, 2019.

19          MS. WEISS:  Okay.  If we could please move to admit

20   Government's Exhibit 799?

21          MR. SCHALL:  No objection.

22          MS. HUBBARD:  Same objection.

23          THE COURT:  Okay.  Overruled.  It's admitted.

24   Q    I want to start with the bottom email.  So, it would be

25   Vcorp 14.

                              RAESSA TELLY - Direct

1          Okay.  Since we are in a new time period, can you

2     orient us to the -- who this email is from and the time and

3     date of that email?

4     A   Yes.  So, this was an email from Michael Tew.  This was

5     July 1, 2019.  He requested that I set up a new entity for him,

6     this time in Wyoming, and the company name was to be Global

7     Fuel Logistics, Inc., and he asked for the cost and the

8     information needed.

9     Q   Okay.  And what type of corporation did he want this to be?

10    A   And S Corp.

11    Q   What is an S Corp?

12    A   I'm not too familiar with the guidelines of it, but it's,

13    kind of -- it's like a corporation, but it's taxed kind of like

14    an LLC, that's the only thing I know about it, but.

15    Q   That's fine.  And what about this indication about *shares*?

16    A   He indicated a hundred common only for the stocks

17    authorized.  Each corporation has to issue -- to authorize a

18    number of shares.  So he listed 100.

19    Q   I think you mentioned the state of Wyoming?

20    A   Correct.

21    Q   And then do you respond to that email?

22    A   I did, yes.

23    Q   Okay.  Let's look at Vcorp 13 to the top of 14.  Did you

24    provide the basic information that Mr. Tew would need to

25    provide you in order to set up this company, Global Fuel

RAESSA TELLY - Direct

1    Logistics, in Wyoming?

2    A    Yes, yes, I did.

3    Q    Okay.  Let's go to the next email, which is the bottom of

4    12 to the top of 13.  And if we could please identify the

5    sender, date, and then if you could read this document in full?

6    A    Okay.  So, this is from Michael Tew.  This is Monday, July

7    8th, 2019, 10:05 a.m.  It says, *Raeesa, yes, Vcorp as agent,*

8    *address, 327 Corning Street, Marquette, Michigan, 49855, need*

9    *FEIN, fiscal year end 12-31, par value is 0.01, responsible*

10   *party Michael Tew, 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.  Also will need an out-of-state*

11   *registration for Colorado.  In brackets, doing business in*

12   *Colorado.  What is the S Corp election option?  How long will*

13   *it take to set up and get the FEIN*.

14   Q    Okay.  Let's go through a couple different components here.

15   He is asking for Vcorp to be the agent, again?

16   A    Yes.

17   Q    Does that mean his name wouldn't appear on the documents

18   filed with the Secretary of State, in Wyoming?

19   A    Correct.

20   Q    Okay.  And the address listed is one in Marquette,

21   Michigan?

22   A    Correct.

23   Q    Different from the New York address that we saw before?

24   A    Yes.

25   Q    Different from the Denver, Colorado address that we saw

RAESSA TELLY – Direct

1   before?

2   A   Correct, yes.

3   Q   Okay.  He indicates that he needs an EIN number?

4   A   Correct, yes.

5   Q   Again that's the equivalent of a social security number for

6   a business?

7   A   Correct, yes.

8   Q   He lists here a par value of 0.01.  Do you know what that

9   means?

10  A   Basically, the price of each share.  So, when they go to

11  issue shares, it will be at price of .01.  It's kind of

12  arbitrary.  We don't really understand what it all means, but

13  that's what he assigned as a par value.

14  Q   I hate to put us back in math class.  He asked for a

15  hundred common shares at 0.01.  What does that mean?

16  A   One dollar.

17  Q   Or the shares of the company, I should be more specific?

18  A   Yes.

19  Q   Thank you.  And then, he listed himself as the responsible

20  party?

21  A   He does, yes.

22  Q   And does that mean that's the person similar on that EIN

23  document that we saw for Sand Hill, that would need to be at

24  the bottom?

25  A   Yes, that's exactly what that is.

RAESSA TELLY - Direct

1    Q    Okay.  And he also mentions that this business, Global Fuel

2    Logistics, needs to be registered in Colorado, as well?

3    A    Correct.

4    Q    Does he give you any sense of the urgency of this?

5    A    He just asks how long it will take; that's pretty much it.

6    Q    Okay.  Let's look at your response to this.  It's the

7    middle email on Vcorp.  Did you draft up the documents that

8    were requested?

9    A    I did, yes.

10   Q    Okay.  Let's look at Mr. Tew's response, at the bottom of

11   11 going into 12.  Did he have a correction for you on the

12   draft?

13   A    Yes.

14   Q    And what was that correction?

15   A    He updated the address or requested it to be updated to 327

16   Corning Street, in Marquette, Michigan.

17   Q    And what else did he say?

18   A    He just said, *Otherwise looks great.*

19   Q    And after that?  I know there's a page break.

20   A    He says, *Also remember I need that Colorado document.*

21   Q    Okay.  So, you had a mistake in the original draft?

22   A    Yes.

23   Q    As to the address?

24   A    Yes.

25   Q    And he, specifically, requested that that mistake be

RAESSA TELLY - Direct

1    addressed?

2    A    Correct.

3    Q    Thank you.  And then if we could go up to the email at the

4    top page, 11.  Did you get Mr. Tew's authority to submit these

5    documents?

6    A    I did, on Tuesday, July 9th, 2019, he said, *Perfect.  We*

7    *are okay to go on the new version.  Please submit.*

8    Q    Okay.  And then going back to the previous page, Vcorp 10,

9    and moving farther up this chain.  If you can provide us with

10   the update that you gave him on July 10th, 2019?

11   A    Okay.  So, I, basically, just let the client know that the

12   filing was completed in Wyoming, and I had attached a draft for

13   the Colorado registration now, for him to review.

14   Q    Okay.  And then, if we can look at his response, which,

15   again, for some reason these just keep splitting across the

16   pages, um...

17   A    So, on Wednesday, July 10th, 2019, he said, *Approved the CO*

18   *foreign entity filing.  Thank you*.

19   Q    And just for the record, can you tell me what the font is

20   on that?

21   A    It's all caps.

22   Q    We are now going to look at Government's Exhibit 546.

23   Ms. Telly, can you identify what this document is?

24   A    Yes.  So this is Articles of Incorporation that was filed

25   in Wyoming, and it's for the company Global Fuel Logistics,

RAESSA TELLY – Direct

1   Inc.

2   Q   And again, is this a document that you were familiar with

3   from servicing Mr. Tew's requests?

4   A   Yes.  This was the one that I filed for his corporation.

5   Q   Okay.  Is this one that Vcorp would maintain in its regular

6   course?

7   A   Yes, we would have a copy of this.

8          MS. WEISS:  Government would move to admit 546.

9          THE COURT:  Any objections?

10          MR. SCHALL:  No.

11          MS. HUBBARD:  No.

12          THE COURT:  It's admitted.

13          MS. WEISS:  Permission to display, Your Honor?

14          THE COURT:  Yes.

15   Q   Is this that document that you filed at Mr. Tew's request,

16   with the Secretary of State of Wyoming?

17   A   Yes, it is.

18   Q   And if we can just look at the top.  What date was that

19   filed?

20   A   That was July 9th, 2019.

21   Q   Okay.  And then moving down.

22          MS. WEISS:  Can you please just do the first four

23   sections?  Thank you, Ms. Ortiz.

24   Q   And if you could walk us through that, for the record?

25   A   Sure.  The first article is the name of the corporation,

RAESSA TELLY – Direct

1    which is Global Fuel Logistics, Inc.  The name and address of

2    the registered agent is our company, Vcorp Services, LLC 1908

3    Thomas Avenue, Cheyenne, Wyoming 82001.  Third article is

4    mailing address of the corporation, which is 327 Corning

5    Street, Marquette, Michigan, 49855, and the principle office

6    address of the corporation is the same address, 327 Corning

7    Street Marquette, Michigan 49855.

8    Q    Okay.  And if we could back up and just look at the whole

9    document again.  Where is Michael Tew's name on this document?

10   A    It is not on this document.

11   Q    Why is that?

12   A    We, basically, would sign off as incorporator, just stating

13   that we are the ones who file the entity in the first place.

14   Q    So, when we talk about a registered agent, this is one of

15   the benefits?

16   A    Correct.

17   Q    Your name doesn't appear on it?

18   A    Correct.  When we are requested to file companies, we could

19   sign off as incorporators or organizers, so our name shows up

20   and theirs do not.

21   Q    Let's look next at Exhibit 545.  And do you recognize this

22   document, and it is a couple of pages?

23   A    Yes, I do.

24   Q    What is this document?

25   A    This is the EIN that was assigned by the IRS to the entity

RAESSA TELLY - Direct

1    Global Fuel Logistics, Inc.

2    Q    Okay.  And again, is this something that Vcorp would

3    maintain in it's regular business records?

4    A    Yes.

5         MS. WEISS:  I would move to admit Government's Exhibit

6    545.

7         MR. SCHALL:  No objections.

8         MS. HUBBARD:  No objection.

9         THE COURT:  It's admitted.

10        MS. WEISS:  And if we could just blow up the top third

11   Ms. Ortiz.  Perfect.  All right.

12   Q    If you could please read out the date of this notice?

13   A    It's July 7 -- sorry, July 9, 2019.

14   Q    And the employer identification number?

15   A    It's 84-2339942.

16   Q    And the name of the company and the address listed?

17   A    Global Fuel Logistics, Inc., 327 Corning Street, Marquette,

18   Michigan, 49855.

19   Q    And in order to get this number assigned, Ms. Telly, there

20   has to be an application, right?

21   A    Correct.

22   Q    And we looked at one of those forms below?

23   A    Yes.

24   Q    It has to be signed under penalty of perjury?

25   A    Correct.

RAESSA TELLY - Direct

1    Q    That person that was listed, according to the emails, was

2    Michael A. Tew?

3    A    Correct.

4    Q    Let's turn next to Government's Exhibit 544.  Do you

5    recognize this document, Ms. Telly?

6    A    Yes.  This is another Colorado state registration.

7    Q    Okay.  And what -- is this a registration for what company?

8    A    This is for Global Fuel Logistics, Inc., the Wyoming

9    corporation.

10    Q    And are you familiar with this document?

11    A    Yes.

12    Q    Something that Vcorp would maintain in its regular business

13    records?

14    A    Yes.

15            MS. WEISS:  Can we please move to admit Government's

16    Exhibit 544.

17            THE COURT:  Any objections?

18            MR. SCHALL:  No.

19            MS. HUBBARD:  No.

20            THE COURT:  It's admitted.

21    Q    Okay.  Let's do a similar thing.  Can you tell us when this

22    document was filed?

23    A    Of course.  This was filed July 11, 2019.

24    Q    Okay.  And same hundred-dollar fee for this document?

25    A    That's correct.

RAESSA TELLY – Direct

1    Q    And then, if we could please look up, the top, and just

2    show what this document -- what this document covers.  What

3    entity?

4    A    Okay.  So, this is for Global Fuel Logistics, Inc.  The

5    entity ID number was assigned by Colorado, and it's for a

6    foreign corporation, it's a Wyoming corporation, and then it

7    shows the principle address at 327 Corning Street, Marquette

8    Michigan 49855.

9    Q    Again, this was a document that was required for Global

10   Fuel Logistics to do business in the State of Colorado?

11   A    That's correct.

12   Q    And you prepared this document at the request of Mr. Tew?

13   A    I did, yes.

14   Q    Filed this document at the request of Mr. Tew?

15   A    I did.

16   Q    Only filed it with the approval of Mr. Tew?

17   A    Correct.

18        MS. WEISS:  I would like to return, just briefly, to

19   what we have previously admitted as Government's Exhibit 661.

20   And if we could turn, please, to page 45.  And we're just going

21   to look at the middle email right now.  Blow it up for my

22   benefit, Ms. Ortiz.  Thank you.

23   Q    Okay.  Was there ever an indication that Mr. Tew's wife was

24   interested in setting up an entity through Vcorp?

25   A    Yes.

RAESSA TELLY - Direct

1    *Q*    Could you please read out that portion of this email?

2    *A*    It's, *I think my wife wants to set up her Silver Lane*

3    *Holdings, or whatever, let me confirm with her how she wants to*

4    *do that, thanks.*

5    *Q*    Did you confirm whether or not that entity was ever set up?

6    *A*    It was not set up.

7    *Q*    Ms. Telly, does Vcorp still act as a registered agent for

8    Sand Hill, LLC?

9    *A*    I believe we have resigned as the agent for this entity

10   now.

11   *Q*    Has Vcorp -- is it still registered agent for Global Fuel

12   Logistics?

13   *A*    I believe we have resigned, as of now, as well.

14   *Q*    Okay.  Did that happen very recently?

15   *A*    Very recently.  I believe it was just this past week.

16   *Q*    What was the reason for the resignation?

17   *A*    I believe -- this I'm not hundred percent sure.  I think it

18   was for lack of payment, but I could be mistaken.  I'm not a

19   hundred percent sure.

20        *MS. WEISS:*  Understood thank you.  No further

21   questions at this time.

22        *THE COURT:*  Okay.  Thank you, Ms. Weiss.  I think I

23   need to give Ms. Hoffschildt, her fingers, a break.

24        *MS. WEISS:*  I apologize.  I was trying to fly.

25        *THE COURT:*  That's all right.  Ms. Telly is a quick

RAESSA TELLY - Direct

1    speaker.

2              *MR. SCHALL:*  Your Honor, if I may, just, I know -- I

3    think I know that the witness has a flight.  I have no

4    questions.

5              *THE COURT:*  Okay.

6              *MS. HUBBARD:*  Nor do I.

7              *THE COURT:*  Well, thank you.  I appreciate that.

8    That's the kind of interruption I like, Mr. Schall.  You may

9    go.

10             *THE WITNESS:*  Thank you.

11             *THE COURT:*  Thank you, all.  But let's still take a

12   quick -- if we can be back in 5 or 10 -- let's do 10 minutes.

13   Ten-minute recess.  Thank you.

14             *THE COURTROOM DEPUTY:*  All rise.

15        (In open court at 4:26 p.m.)

16             *THE COURT:*  Please take your seats.  Okay.  I know

17   we're getting close, but it seems like we should at least get

18   started with another witness, unless there's reason not to.

19   Can we do that?  All right.  Let's go ahead and get the jury

20   then.

21             *THE COURTROOM DEPUTY:*  All rise.

22        (Jury in at 4:28 p.m.)

23             *THE COURT:*  All right.  Let's all take our seats.

24   Welcome back.  We are going to get started, at least, with our

25   next witness.  Would the government like to call the next

ABBY SCHWARTZ - Direct

1   witness?

2          MS. WEISS:  Yes, Your Honor.  The government would

3   call Abby Schwartz, please.

4          THE COURT:  All right.  Thank you.

5          THE COURTROOM DEPUTY:  Please raise your right hand.

6      (**ABBY SCHWARTZ** was sworn.)

7          THE WITNESS:  I do.

8          THE CLERK:  Please be seated.  Please state your name

9   and spell your first and last names for the record.

10         THE WITNESS:  My name is Abby Schwartz.  First name is

11  A B B Y, last name is S C H W A R T Z.

12                       **DIRECT EXAMINATION**

13  BY MS. WEISS:

14  Q   Good afternoon, ma'am.

15  A   Good afternoon.

16  Q   I believe you just introduced yourself, but can you state

17  your name again?

18  A   Abby Schwartz.

19  Q   Do you go by Abigail?

20  A   Just Abby.

21  Q   Where do you live?

22  A   Just outside Buffalo, New York.

23  Q   What is your educational background?

24  A   I have a Bachelor Degree in accounting.

25  Q   Turning your attention to the time period of 2018 to 2020,

ABBY SCHWARTZ - Direct

1    where did you work?

2    A    National Air Cargo Holdings.

3    Q    And in 2020, what was your title?

4    A    Director of accounting.

5    Q    When did you start working at National?

6    A    In 2003.

7    Q    Okay.  Were you hired in as director of accounting?

8    A    I was not.  I was hired as staff accountant.

9    Q    Were you promoted up to that role?

10   A    I was.

11   Q    Do you recall around when you were promoted to director of

12   accounting.

13   A    It was a couple years prior to 2018.  I'm not exactly sure

14   of the date.

15   Q    Okay.  And can you please describe your responsibilities as

16   National's director of accounting?

17   A    As director of accounting I managed the accounting

18   department, which handles all of the accounts payable and

19   receivables, mostly the day-to-day activity in and out of the

20   company.

21   Q    Okay.  Do you still work at National?

22   A    I do not.

23   Q    When did you leave?

24   A    I left in October of 2021.

25   Q    What do you do now?

ABBY SCHWARTZ - Direct

1    A    I'm a controller.

2    Q    Did you leave National on good terms?

3    A    I did.

4    Q    Who did you report to when you work at director of

5    accounting?

6    A    I reported to the owner, Christopher Alf.

7    Q    And where was National's accounting department physically

8    located?

9    A    In the Buffalo, Orchard Park office.

10   Q    Did National also have a separate department that handled

11   financial matters?

12   A    We did.  We had a finance and accounting department.  So we

13   had two different departments.  Yes.

14   Q    Can you describe, to the jury, the division of

15   responsibilities between accounting and finance, which I still

16   don't know -- necessarily know the difference about?

17   A    Sure.  In National, the division was the day-to-day

18   accounting.  Your accounts payable and your accounts

19   receivable.  So, all of your invoices that would come in from

20   people that you bought services from, would come into our

21   department and any services that we provided out to anyone, the

22   billing of our customers, was part of my department, and the

23   collection for those invoices that we sent out and the payment

24   of those invoices that we were getting in was kind of our

25   day-to-day activity, and the finance department was more of --

ABBY SCHWARTZ - Direct

1    they looked at a reporting.  So they were more monthly.  So,

2    they were more monthly.  So, they looked at the profit-and-loss

3    statements, and your reports that were kind of due on a monthly

4    basis.  So, we were more hands on, during the day, and then

5    they did most of the reporting for us.

6    Q   Okay.  And the irony of me saying this right now is not

7    lost on me.  Could you slow down, just a little bit, for the

8    sake of our court reporter?

9    A   I will.  Sorry.

10   Q   In your capacity working for National, did you become

11   familiar with Jonathan Yioulos?

12   A   I did.

13   Q   And who was he?

14   A   He started in the finance department, and then became a

15   director of finance and the controller.

16   Q   What were Mr. Yioulos' roles and responsibilities as

17   director of finance and controller.

18   A   He was in charge of -- he had a small staff, and they were

19   in charge of the monthly -- like I said, the monthly

20   activities.  They did any kind of services that we had with the

21   annual audit.  We would have an audit firm come in.  So, he

22   would do audit with them, but mostly reporting and those kind

23   of monthly, a bank rec., kind of just to make sure those kind

24   of things were done on a monthly basis.

25   Q   Okay.  If I oversimplify this, you let me know.  So, is the

ABBY SCHWARTZ – Direct

1  controller position sort of like internal auditing and then

2  external auditors are hired from outside of the company?

3  A    Correct, correct.

4  Q    Mr. Yioulos was the controller?

5  A    Yes.

6  Q    And then also the point of contact for the outside

7  auditors?

8  A    Yes, yes.

9  Q    Can you describe the date-to-day interaction between your

10  role as director of accounting, Mr. Yioulos' role as director

11  of finance?

12  A    Sure.  We -- our offices backed right up to each other.

13  So, we were right next to each other.  But we talked to each

14  other quite frequently, throughout every single day.  We

15  interacted.  We had to discuss, kind of, how much money was in

16  the bank, how much money he determined, you know, we could

17  spend, if we got payments that needed to come in or something

18  that happened, he was the one who we would talk constantly,

19  kind of, about those things.

20  Q    Okay.  So, like how much money is coming in and how much

21  money can we send out --

22  A    Yeah.

23  Q    -- and cover our bills with?

24  A    Yes.

25  Q    Okay.  Was your relationship with Mr. Yioulos a good

ABBY SCHWARTZ - Direct

1    working one?

2    A    It was.

3    Q    Did you talk about your lives outside of work?

4    A    We did.

5    Q    Did you consider him a friend, as well as a colleague?

6    A    I did.

7    Q    Did you also become familiar with Mr. Michael Tew --

8    A    I did.

9    Q    -- while working at National?  Who was he?

10   A    He was an outside consultant that the owner,

11   Christopher Alf had hired.  At the time, I think he was acting

12   controller, acting CFO.  I'm not sure of his exact title, but

13   he worked with Chris a lot on deals that were, kind of, outside

14   of the normal scope of what we did on a daily basis.

15   Q    Okay.  As the director of accounting for National, did you

16   have insight into how Mr. Tew was paid for his consulting

17   services?

18   A    I did.

19   Q    Was Mr. Tew ever on National's payroll?

20   A    He was not.

21   Q    Can you explain how he is paid then?

22   A    Sure.

23   Q    Non-accounting-person-friendly terms?

24   A    Sorry.  Yes.  He would submit invoices to us, just like

25   anyone else would submit an invoice to us for payment.

ABBY SCHWARTZ - Direct

1  Q   Okay.  And do you recall, approximately, how much Mr. Tew

2  was paid for his work?

3  A   To my recollection, I believe it was 20' to 25,000 a month,

4  and sometimes it was -- I believe it was one monthly invoice,

5  but then sometimes it would be broken out into biweekly, if I

6  recall correctly.

7  Q   Okay.  Do you recall if Mr. Tew was paid to himself in his

8  own personal name or was he paid in the name of an entity?

9  A   No.  I believe it was the name of an entity.

10 Q   Okay.  All right.  Ms. Schwartz, how long have you been

11 working at National, again, back in that timeframe?

12 A   I had started at National -- I was going to say 2023 -- in

13 2003, so awhile.

14 Q   Fifteen years, right?  And how much were you making.  As

15 your salary?

16 A   When I left in 2021?

17 Q   Sure.

18 A   I was making -- I believe my salary was 130,000 a year.

19      MS. WEISS:  I would ask now permission to publish

20 Government's Exhibit 607.  We will just look at the second page

21 of this exhibit

22      THE COURTROOM DEPUTY:  You said 607, correct?

23      MS. WEISS:  Yes.  Thank you.

24 Q   Is this an example of one of the Sand Hill, Michael Tew

25 invoices that you referenced?

ABBY SCHWARTZ - Direct

1    A    It is.

2    Q    Okay.  And so this would be what would come into the

3    accounting group?

4    A    It is.

5    Q    Be paid like any other vendor of National's?

6    A    Correct.

7    Q    Okay.  Thank you, very much.  What's the date on this

8    particular invoice?

9    A    August 14th, 2018.

10   Q    And for the record, what was the invoice here for?

11   A    The invoice was for services ... actually, it's a little

12   bit small.  It's for the August 15th invoice.  Just says for

13   services.

14   Q    Okay.  And in an amount of what?

15   A    In the amount was $10,000.

16   Q    Okay.  Then, does it have a payment plan listed on the

17   bottom?

18   A    It does have a payment plan listed on the bottom, by wire

19   ACH.

20   Q    And does this indicate that those payments were reallocated

21   at some point in time?

22   A    Yes, it does.

23   Q    Who did Mr. Tew report to?

24   A    He reported directly to Christopher Alf, the owner.

25   Q    And Mr. Tew didn't work in the Buffalo office with you, did

ABBY SCHWARTZ - Direct

 1  he?

 2  A    No.

 3  Q    Do you know where he was working?

 4  A    I believe he was working out of his home in Denver.  We

 5  didn't have an office for him in the Buffalo headquarters or at

 6  our airline in Orlando.  He didn't have an office.

 7  Q    Did you have an occasion to meet Mr. Tew, in person?

 8  A    I did.

 9  Q    Approximately, how many times?

10  A    Two or three, maybe.  It was not very many.  He wasn't in

11  the office very often.

12  Q    Did you form a personal opinion of Mr. Tew, through those

13  couple of interactions?

14  A    No.  They were very -- I really didn't get much of a

15  chance.  I mean, kind of, a quick conversation, but never, you

16  know, anything personal.  No.

17  Q    Okay.  Did you observe any relationship between Michael Tew

18  and Jonathan Yioulos working together at National?

19  A    No, nothing that stands out.

20  Q    Okay.  During your period at National, did you also become

21  aware of an individual named Kimberley Tew?

22  A    I did.

23  Q    And who, to your understanding, was she?

24  A    It was my understanding she was Michael's wife.

25  Q    Are you aware if Kimberley Tew performed any work on

796

ABBY SCHWARTZ - Direct

1    National's behalf?

2    A    She did.  I remember invoices for consulting services or

3    something that she had done for National Airlines.  I don't

4    remember the scope of it, but I know she was doing something

5    for our airline.

6    Q    Okay.  Can we please turn to Government's Exhibit 978,

7    which I believe is not in evidence.  Let me know when you have

8    had a chance to look at the pages?

9    A    Yes.

10   Q    Okay.  Do you recognize these documents?

11   A    I do.

12   Q    And what are they?

13   A    One is an email to myself from Jonathan Yioulos.  The other

14   one was an invoice.

15   Q    Okay.  Is the invoice attached to that email to you from

16   Jonathan Yioulos?

17   A    It is.

18   Q    Okay.  And is this type documentation that National would

19   retain in its accounting records?

20   A    Yes, it is.

21          MS. WEISS:  The government would move to admit Exhibit

22   978.

23          THE COURT:  Any objections?

24          MS. FROST:  No objection, Your Honor.

25          MR. KAPLAN:  No, Your Honor.

ABBY SCHWARTZ - Direct

1          THE COURT:  Okay.  It's admitted.  Thank you.

2    Q    If we could please start with the bottom email, and I am

3    just going to ask you to note who this email is from and to and

4    what date?

5    A    Sure.  The email is from Michael Tew, and it is sent to

6    Jonathan Yioulos and Christopher Alf.  The date is February

7    8th, 2018.

8    Q    Okay.  And if you could please read the first three lines

9    of that email?

10   A    Sure.  It says, *Chris, Jon, kindly find attached*

11   *Kimberley's invoice.  If you can send tomorrow as a wire that*

12   *would be greatly appreciated.*

13   Q    Okay.  And this is signed by who?

14   A    Michael Tew.

15   Q    And was this email forwarded to you by someone?

16   A    Not to my -- here, yes, it was sent to me from Jon.

17   Q    So, that was forwarded to you, at some point?

18   A    Yes.

19   Q    Okay.  Let's look at the invoice attached.  Could you

20   please walk the jury through this document?

21   A    Sure.  It is an invoice, from Kimberley Tew, dated February

22   8th, 2018, attention to Jon.  Project description says

23   consulting.  It's invoice number one.  It says due upon receipt

24   for consulting services of $10,000.

25   Q    Okay.  And is there wire instructions at the bottom?

ABBY SCHWARTZ - Direct

1    A    There are.

2    Q    And what bank is that?

3    A    It is Chase Bank.

4    Q    And is there a routing and account number?

5    A    There is a routing and account number, correct.

6    Q    Is this an address listed?

7    A    There is.

8    Q    And a phone number?

9    A    Yes.

10   Q    Could you please read the address and phone number out?

11   A    I can.  The address is 3222 E. 1st Street Avenue, Denver,

12   Colorado, 80206.

13   Q    Okay.  And the phone number?

14   A    And the phone number is 917-446-2046.

15   Q    And, Ms. Schwartz, can I direct your attention to the upper

16   left-hand corner, and ask you to also read out the email

17   address?

18   A    Thank you.  It is K, L, as in Larry, E, as in Edward, Y, at

19   M, as in Mary, E, as in Edward, dot com.

20   Q    And who does this invoice indicate that email address

21   *kley@me.com*, and the phone number ending in '2046 belong to?

22   A    Kimberley Tew.

23   Q    Did you ever meet Ms. Tew in person?

24   A    I did not.

25   Q    Did you ever communicate with Ms. Tew?

ABBY SCHWARTZ - Direct

1    *A*    I did.

2    *Q*    How so?

3    *A*    Over the telephone.

4    *Q*    Okay.  Can you please describe those calls with Kimberley

5    Tew?

6    *A*    Um, yes.  She would call regarding payment of Michael's

7    invoices.  When they were going to be paid.  If they were

8    already paid.

9    *Q*    Were those -- what was the tenor of those calls?

10    *A*    There was one, specifically, that was very uncomfortable.

11    She was not very nice.  She was screaming at me regarding a

12    payment that was supposed to be made, but I did not have

13    authorization to make at the time, so I told her I couldn't

14    make it, and she was very unhappy about it and very unpleasant

15    on the telephone because I was saying no.

16    *Q*    You didn't have the authority to say yes?

17    *A*    I did not have the authority to say yes.  It was

18    prepayment, so I could not say yes without Chris'

19    authorization.

20    *Q*    So you told her no?

21    *A*    Hm-hm.

22    *Q*    And you could not have said yes?

23    *A*    No.

24    *Q*    And her reaction was to scream at you?

25    *A*    She was screaming at me.  That I had to pay this invoice.

ABBY SCHWARTZ - Direct

1  Q   Did you ever have any similar experiences where Kimberley

2  was calling on behalf -- checking up on the status of Michael's

3  invoices?

4  A   Hm-hm.  (Nodding head.)

5  Q   Do you recall any of those?

6  A   Yeah.  She would call regarding payment of his invoices.

7  Q   And was she polite in those requests?

8  A   She wasn't screaming at me at those requests.  She was very

9  you know, *Where is my payment?  When will we have it*, kind of a

10  conversation.

11  Q   I apologize that the math is beyond me at 4:30 in the

12  afternoon, but how long have you been in this business?

13  A   I have been in this business since I graduated from

14  college.  So, many years.

15  Q   We will leave it at decades?

16  A   Decades.

17  Q   Have you ever had a spouse call and scream at you on behalf

18  of their spouse's invoices?

19  A   No.  I have had some pretty uncomfortable conversations

20  with an accounting department, but no one had ever screamed at

21  me regarding payment.

22  Q   Did you address that call with anyone at National?

23  A   I did.  I spoke to Christopher Alf and to Michael Tew and

24  requested that she no longer call, regarding payments.  It was

25  very uncomfortable.

ABBY SCHWARTZ – Direct

1    *Q*    So, you basically said, *Do not call here again*?

2    *A*    Do not call.

3    *Q*    Because you did not want to be spoken to that way?

4    *A*    No.  Yeah.  It was, like I said, it was very uncomfortable

5    and uncalled for, and I just didn't want it to happen again.

6    *Q*    Okay.  Could you approximate about how many invoices

7    National was processing per week, during that time period of

8    2018 to 2020?  Approximation.

9    *A*    Wow, it was a long time ago.  It's a lot of invoices.  I

10   mean, we're not talking ten or twenty.  It was many, many

11   invoices on a weekly basis.  It would be hard for me to tell,

12   because I'm not sure of the scope of business we were doing at

13   the time, but it could have been hundreds of invoices.

14   *Q*    Okay.

15   *A*    Between the two companies for sure.

16   *Q*    Okay.  Did National have a system for managing that volume

17   of invoices?

18   *A*    We did.  We used a system that was developed by Microsoft

19   called Microsoft AX.

20   *Q*    At a high level, can you explain to the jury what that

21   software does?

22   *A*    Sure.  This software enabled us to post all of our invoices

23   in the system, so that we could keep track of them, housed all

24   of our vendors, all of their information, what their email

25   addresses, their contact information, their bank information.

ABBY SCHWARTZ – Direct

1    It housed all of our customers' information.  The people that

2    we would bill.  The same kind of things.  All of the documents

3    that we needed for them, and any information that pertained to

4    us doing business with them.  It was a nice system, and it

5    allowed us a lot of nice things.

6    Q   Okay.  Did that very nice system also have the ability to

7    run reports for you?

8    A   It did.

9    Q   Okay.  Who had access at National to that Microsoft Dynamic

10   System?

11   A   Anyone in the accounting or finance departments had access

12   to the system.  Christopher Alf had access to the system.

13   Q   Did he log onto it?

14   A   I don't think so.

15   Q   So you had access to the system?

16   A   Hm-hm.

17   Q   Your team had access to the system?

18   A   Yeah.

19   Q   What about Jonathan Yioulos and the finance team?

20   A   They would have used it on a daily basis and monthly basis

21   to run all of their reports.

22   Q   Okay.  Did a vendor need to be inputted into that system

23   before an invoice could be paid?

24   A   Yes.  Through the system you had to update all of their

25   information.  We needed to know how to pay them.  So, that was

ABBY SCHWARTZ – Direct

1    all housed in there.  So, yes, a vendor would be created.  We

2    called it an account.  All of their invoices would be on their

3    account if you ever pulled them up, everything would be there

4    for you to see.

5    Q    What's the bare minimum information that they would need to

6    process an invoice?

7    A    To initially set up a vendor you need a W-9, which is a

8    legal document, to show they are a company and to advise us how

9    their taxes needed to be done at the end of the year.  So we

10   would need that.  You need their contact information.  So,

11   their address, and sometimes their address wasn't where they

12   wanted payments sent, so you need where they wanted their

13   payment sent and how they wanted their payments done and all of

14   their bank information we would need to be able to send those

15   payments.

16   Q    Okay.  Who had the ability to add a new vendor to the

17   system?

18   A    The accounting department, my accounts payable department,

19   who handled those invoices, Jonathan, myself and Chris Alf.

20   Q    Did vendors need to have agreements or contracts in place

21   in order for National to process an invoice?

22   A    Not a contract or an agreement.  If we had, you know, a

23   customer we just started with, you know, to do business with,

24   it wasn't necessarily a full contract.

25   Q    But if there was a contract, would that have been

ABBY SCHWARTZ – Direct

1    maintained in that system, as well?

2    A    Yes.  Any pertinent information was in there for us to keep

3    our records.

4    Q    And you just said *any pertinent information*.  Would that

5    also include emails that people had back and forth discussing

6    certain invoices?

7    A    Yes.  Yes.  If it pertained to an invoice, or sometimes

8    vendors change an address or change a bank that they are using

9    or change their name.  A lot of times, if they have a different

10   contact person, all of that information would be stored in the

11   system, so whoever opened it would have access to it.

12   Q    Got it.  Did National's emails system and this AX system,

13   did they speak to each other automatically?

14   A    No.  Anything that was going to be uploaded into the system

15   would have had to have been scanned or emailed, like, in a PDF

16   form and manually uploaded by somebody on the team.

17   Q    That sound tedious?

18   A    It is.  But it was nice when you needed it.

19   Q    Yes.  Nice to have those communications, the record, the

20   history of the relationship, the status of an invoice and all

21   of that?

22   A    Very much so.

23   Q    But clunky?

24   A    A little bit.

25   Q    Ms. Schwartz, was it your role in the accounting department

ABBY SCHWARTZ - Direct

1    to investigate or audit the legitimacy of invoices that

2    National received?

3    A   We would reach out to the person who requested the services

4    or who was in the department that pertained to those services.

5    So, if it was something directly that Chris Alf worked on, he

6    would have been the person that approved it.  If it was us

7    buying fuel for one of our airplanes in Asia, it would have

8    been someone at the airline, who worked on the operations team

9    to, kind of, say -- or if it was outside audit, Jon would

10    review those invoices, because he was the one working with

11    those people.  So we would always reach out to whoever it was.

12    If it was a utility bill, no, we just paid those.

13    Q   Did Jonathan Yioulos have a similar responsibility, he

14    being the person to contact and ensure the legitimacy of the

15    invoice?

16    A   Yes, yes.

17    Q   All right.  Let me see how much further I can get in ten

18    minutes.  Let's say a vendor has been added to AX, and they

19    submitted an invoice for service, what payment methods did

20    National have available to use to pay an outgoing invoice?

21    A   Believe it or not, people still like a paper check, but

22    most of our vendors were paid via ACH or a wire transfer.

23    Q   Okay.  And what's an ACH payment?  We've heard that term a

24    lot?

25    A   I don't know what ACH stands for, unfortunately, but it's a

ABBY SCHWARTZ - Direct

1    form of electronic payment, similar to a wire.  A wire is kind

2    of an immediate.  If you asked me to wire you funds, you would

3    have them today.  An ACH, and I am not sure of the legitimacy

4    or how the background works, but it would take three to five

5    business days to perform an ACH, and the reason most of the

6    people asked for ACHs, was those were free transfer from the

7    bank.  If you do a wire, you have to pay for every wire you do.

8    Q    Got it.  Understood.  Who had the authority to issue a

9    payment on an invoice at National's accounting group?

10   A    That would have been Jonathan, myself or Chris Alf.

11   Q    Okay.  Was approval authority different for ACH versus wire

12   payments?

13   A    It was.

14   Q    And how was it different?

15   A    Wire transfers because they are considered -- the way the

16   system was set up, we couldn't tell the system to send the

17   information to the bank.  So one of us would have to input the

18   information, manually, into the bank system, then someone else

19   would have to come in after you, review that payment and

20   approve it.  In ACH, we could do what we call batches, for lack

21   of a better term, where we would create a file flew, the

22   accounting system of -- it could be ten, it could be fifteen or

23   twenty vendors, that all needed to be paid that day, in ACH we

24   would create this batch file, that electronically once that

25   file was approved, NAX would electronically send a file with

807

ABBY SCHWARTZ - Direct

 1    all of those payments and vendors and bank information to the

 2    bank, and the bank would then, kind of, develop this batch on

 3    their end, and then you could -- then only one person had to go

 4    in and review it at the bank, because it was reviewed in the

 5    accounting software first.

 6    Q    Understood.  Could an individual step outside of that batch

 7    process and process an ACH payment directly with the bank?

 8    A    You could.

 9    Q    Okay.  And you had the authority to do that?

10    A    Hm-hm.

11    Q    Mr. Yioulos had the authority to do that?

12    A    Hm-hm (Nodding head.)

13    Q    Okay.  Did Mr. Tew have any authority to log into

14    National's system?

15    A    Not that I'm aware.

16    Q    Did he have the authority to approve a payment on an

17    invoice all on his own?

18    A    Not that I'm aware of.

19    Q    Okay.  So, if he had an invoice for services that maybe he

20    had engaged, like any other National employee, he would need to

21    get you or Jon involved?

22    A    Correct.

23    Q    And that was, basically, the same system for all of

24    National's employees and managers?

25    A    Yes.

ABBY SCHWARTZ - Direct

 1         *MS. WEISS:*  Your Honor, it's 4:53.  I think this is a

 2    natural breaking point.  I know it's seven minutes that we're

 3    losing, but I think it might be worth it.

 4         *THE COURT:*  If it's a decent breaking point, and it's

 5    not going to throw us off in the long run too much, and we will

 6    keep ourselves on track, I'm fine with breaking now.  So, thank

 7    you, Ms. Weiss.

 8         *MS. WEISS:*  Thank you.

 9         *THE COURT:*  So, ladies and gentlemen, we will let you

10    go for tonight.  Please be back and ready to go again tomorrow

11    at 9.  Thank you, again.  My instructions still stand about

12    keeping an open mind until you have heard all of the evidence

13    and my instructions, not speaking to anyone else about this

14    case or doing any outside research, and making sure you decide

15    this case based only on what you hear in this courtroom.  So,

16    with that, I will take a recess until 9 o'clock tomorrow.

17         *THE COURTROOM DEPUTY:*  All rise.

18      (Recess at 4:54 p.m.)

19         *THE COURT:*  You may step down.  Thank you.  Counsel,

20    unless there's something you need to talk about now, can we

21    just plan to meet, be ready a little bit before 9 tomorrow.

22    Okay?  Great.  We will do that.  Thank you.

23         *THE COURTROOM DEPUTY:*  All rise.  Court is now in

24    recess.

25      (Recess at 4:55 p.m.)

1                                    **INDEX**

2      **Item**                                                      **Page**

3      ITEM                                                           PAGE

4              WITNESSES

5        HANNAH SCAIFE

6            Direct Examination By Ms. Weiss              566

7            Cross-examination By Ms. Hubbard             589

8            Cross-examination By Ms. Frost               623

9            Redirect Examination By Ms. Weiss            627

10       BRITTANY PERRY

11           Direct Examination By Mr. Fields             630

12       MEGHAN OAKES

13           Direct Examination By Mr. Fields             667

14           Cross-examination By Ms. Hubbard             672

15           Cross-examination By Mr. Schall              677

16       CHRISTOPHER ALF

17           Direct Examination By Ms. Weiss              681

18           Cross-Examination Continued By Mr. Schall    731

19           Cross-examination By Mr. Kaplan              753

20       RAESSA TELLY

21           Direct Examination By Ms. Weiss              755

22       ABBY SCHWARTZ

23           Direct Examination By Ms. Weiss              787

24

25     Exhibit                 Received

ABBY SCHWARTZ - Direct

| | | |
|---|---|---|
| 1 | U | 752 |
| 2 | 414 | 631 |
| 3 | 410 | 632 |
| 4 | 227 | 644 |
| 5 | 318 | 647 |
| 6 | 402 | 655 |
| 7 | 419 & 420 | 658 |
| 8 | 411, 418, 424, 470 | 660 |
| 9 | 396, 398, 406 | 643 |
| 10 | 407, 417, 493 | 643 |
| 11 | 395, 397, 403 | 662 |
| 12 | 404, 412, 421 | 662 |
| 13 | 423, 425 & 426 | 662 |
| 14 | 408, 409, 413 & 422 | 662 |
| 15 | 399 & 400 | 663 |
| 16 | 405 | 665 |
| 17 | 535 | 699 |
| 18 | 550 | 706 |
| 19 | 534 | 709 |
| 20 | 538 | 717 |
| 21 | 536 | 722 |
| 22 | 552, 571, 572 | 731 |
| 23 | 573, 574, 575 & 576 | 731 |
| 24 | 548 | 760 |
| 25 | 547 | 762 |

ABBY SCHWARTZ – Direct

1    655                    765

2    654                    770

3    661                    771

4    526                    773

5    799                    774

6    546                    780

7    545                    782

8    544                    783

9    978                    797

10                **REPORTER'S CERTIFICATE**

11        I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above-entitled matter.  Dated

13   at Denver, Colorado, this 20th day of October, 2024.

14

15                                    *S/Tamara Hoffschildt*
                                     Tamara Hoffschildt
16

17

18

19

20

21

22

23

24

25