1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 20-cr-305-DDD
3
   UNITED STATES OF AMERICA,
4
        Plaintiff,
5
   vs.
6
   1. MICHAEL TEW,
7  2. KIMBERLEY TEW,
8
        Defendants.
9  _____

10                    **REPORTER'S TRANSCRIPT**
                    JURY TRIAL, DAY 5
11 _____

12          Proceedings before the HONORABLE DANIEL D. DOMENICO,

13 Judge, United States District Court for the District of

14 Colorado, occurring at 9 a.m., on the 9th day of February,

15 2024, in Courtroom A1002, United States Courthouse, Denver,

16 Colorado.

17                       **APPEARANCES**

18          Bryan Fields and Sarah Weiss, Assistant U.S.

19 Attorneys, 1225 17th Street, Suite 700, Denver, Colorado,

20 80202, appearing for the Government.

21          Jason Dale Schall, Bowlin & Schall Law LLC, 7350 East

22 Progress Place, Suite 100, Greenwood Village, CO 80111 and

23 Kristen M. Frost, Ridley McGreevy & Winocur PC, 303 16th

24 Street, Suite 200, Denver, CO 80202, appearing for the

25 Defendant, Michael Tew.

1    David Scott Kaplan and Jamie Hughes Hubbard, Stimson

2    LaBranche Hubbard, LLC, 1652 North Downing Street, Denver, CO

3    80218, appearing for Defendant, Kimberley Tew.

4

5    TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
         901 19th Street, Denver, Colorado 80294
6       Proceedings Reported by Mechanical Stenography
          Transcription Produced via Computer

7

8                    **P R O C E E D I N G S**

9    (In open court at 9:02 a.m.)

10    *THE COURT:*  Good morning.  Let's take our seats.  I

11    have just a few little -- I guess maybe not so little, but a

12    few things that I just want to address this morning, before we

13    get started.

14    First, I think Mr. Keech may have mentioned, given the

15    weather, given that we have, at least, one juror who is coming

16    from Kremmling, I think, so, not a pleasant drive in the snow,

17    and given that my understanding is that the government may not

18    call a number of the witnesses that are on their list, and so

19    it wouldn't push us back too far, what I think I would like to

20    try to do, if we can make it work, would be to just stop today

21    at the lunch break, maybe go a little bit later than noon or

22    so, if we need to, but stop around then, and recess until

23    Monday.  If we can do that, without it pushing us extra days

24    into next week.  Do you think we can do that?

25    *MR. FIELDS:*  I don't think it will push us extra days

1    into next week.  There are two government witnesses, the first,

2    Ms. Schwartz, she is flying back to New York, hopefully, today.

3    We were hoping to get on Michael Meyers, who flew in from

4    Tennessee.  If we could finish those witnesses before the end

5    of the day, the government would appreciate it, so we can get

6    those witnesses home.  I think we could probably finish those

7    witnesses before 2, definitely, depending on sort of how the

8    Cross-examinations go, if not earlier.  I mean, I'm

9    overestimating a little bit.

10            THE COURT:  Yeah.  I mean, that makes sense to try to

11   get both of those in, and we could -- I don't want to try to

12   make everyone stay until 2 without having lunch, but we could

13   take -- try to take a really short lunch break or something, a

14   half-hour.

15            So, does the defense have any thoughts on any of that?

16            MR. SCHALL:  I think it's a great idea.

17            THE COURT:  Okay.  Good.  Mr. Kaplan?

18            MR. KAPLAN:  That's fine.

19            THE COURT:  All right.  Well, let's try to do that.

20   You know one thing, if there are objections, sort of, the type

21   yesterday, about, like, you want to object as to emails as

22   business records, if we can just make those, sort of, a blanket

23   objection, that will save us a couple minutes here and there.

24   To the extent that we can all work towards that, that would be

25   great.

1              The second thing, I got the Motion For Severance.  I

2    have looked at it.  I will give -- can the government, maybe --

3    especially, if we take a break early today, get me a response,

4    say, noon on Sunday, and I will make a decision Monday?

5              *MR. FIELDS:*  Yes, Your Honor.

6              *THE COURT:*  Okay.  Let's do that.  And then,

7    Mr. Jacobsmeyer sent you a draft of the final instructions

8    prior to trial.  He is going to make a few tweaks this morning,

9    based on what's happened so far.  Obviously, we can't make

10   final decisions about everything yet, but he will send you a

11   new version in Word.

12             If you would communicate -- first, confer with each

13   other over the weekend about anything that you can resolve or

14   agree on, and then submit, as track changes, in the Word

15   document, by Monday morning, by the time we start Monday

16   morning.  I understand those are not final, final objections,

17   but just to help us, sort of, smooth things out, if you could

18   work on conferring over the weekend on the instructions, get

19   back to him your proposals as track changes, that will, I

20   think, help us move smoothly next week.

21             Is there anything else, before we bring the jury in?

22             *MR. KAPLAN:*  Very briefly.

23             *THE COURT:*  Okay.

24             *MR. KAPLAN:*  Your Honor, would like to just make a

25   record that based on prior rulings, and we've had many

1    discussions about it, having to do with what would open the

2    door for the proffers to come in.  There has been testimony, I

3    know, Chris Alf, and just because we had the break, I can

4    include Ms. Schwartz, having to do with the American Express

5    charges that the Court has heard testimony of, and I don't know

6    if I will do this in the future, perhaps if need be, I can do

7    it in writing also, but I would like to put on the record, in

8    my evaluation of the status of the rulings, at this point, I'm

9    choosing to not Cross-examine having anything to do with the

10   American Express charges, for fear of crossing the line of what

11   the Court has indicated may open the door to the government

12   using some of those proffers.  So, I understand, and I don't

13   mean to belabor the point, but I just want to make that record.

14         THE COURT:  Okay.  All right.  Thank you.  Anything

15   else before we bring the jury back?

16         MR. FIELDS:  Not from the government, Your Honor.

17         THE COURT:  All right.  Mr. Keech, would you bring the

18   jury in, please.

19         THE COURTROOM DEPUTY:  All rise.

20      (Jury in at 9:08 a.m.)

21         THE COURT:  Welcome back, ladies and gentlemen.  Thank

22   you, again, for being here.  Please take your seats.  Before we

23   get started, I just want to, kind of, let you know, obviously,

24   it's already started to snow.  There's forecast for potentially

25   some significant snow.  We have a few jurors coming from far

ABBY SCHWARTZ – Direct

1    away, including one on the other side of the Continental

2    Divide, and so -- I'm going to try -- we're going to try and

3    get out of here a little early today, maybe as early as early

4    to midafternoon, but that means we may be, sort of, not

5    following our -- may be taking shorter breaks, a really short

6    break, if we take one, so just be prepared for that.

7         At some point, I will take a break and go play

8    weatherman and school superintendent about when we're going to

9    shutdown, but just be prepared for a slightly different

10    schedule today.

11         All right.  With that, the government can pick up

12    where they left off.  Ms. Schwartz is back and still under

13    oath.  Thank you.

14                    **DIRECT EXAMINATION**

15    BY MR. FIELDS:

16    Q    Good morning, again, Ms. Schwartz.

17    A    Good morning.

18    Q    In Buffalo this is just a scattering, right?

19    A    Pretty much.

20    Q    Okay.  I want to jump right back into where we left off.

21    Let's start with, during that period of 2018 to 2020, where

22    were National's bank accounts?  Where was National Banking?

23    A    We used a bank called Signature Bank.  They were out of New

24    York City.

25    Q    Okay.  And were National's operating expenses paid out of

ABBY SCHWARTZ - Direct

1   any particular bank accounts with Signature?

2   A    We did have specific accounts -- excuse me -- for our

3   specific business units.  Yes.

4        MR. FIELDS:  Okay.  If you could just maybe pull up or

5   just a little bit closer to it, that would be super helpful.

6   Thank you.

7   Q    All right.  I'm going to ask you to now turn to

8   Government's Exhibit 308.

9        MS. WEISS:  And, Ms. Ortiz, if you wouldn't mind

10  scrolling through the entire document for witness' benefit.

11  Okay.

12  Q    Are you familiar with this document, ma'am?

13  A    I am.

14  Q    How are you familiar with it

15  A    This -- these are the forms that we would use for the bank

16  to add a signature, give a signature, giving authorization for

17  specific people to use the bank accounts.

18  Q    Is this the type of document that would be maintained in

19  the regular course of National's business?

20  A    Yes.

21       MS. WEISS:  I would move to admit Government's Exhibit

22  308.

23       THE COURT:  Any objections?

24       MS. FROST:  No objection, Your Honor.

25       MR. KAPLAN:  No objection.

ABBY SCHWARTZ - Direct

1        *THE COURT:*  Three-oh-eight is admitted.

2        *MS. WEISS:*  And may I please publish?

3        *THE COURT:*  Yes.

4    *Q*   Let's start on the first page.  And if we could just blow

5    up the top, like third there, before section one.  Perfect.

6    Okay.  Which -- first of all, what kind of a document is this?

7    Is this a signature --

8    *A*   It is.  It's for the addition or removal of a signature,

9    giving authorization on the account or it taking away.

10   *Q*   What is the account title for this particular account?

11   *A*   Particular account is National Air Cargo Group, Inc.

12   *Q*   And what part of the business is National Air Cargo, Inc?

13   *A*   That is our airline.

14   *Q*   And then, if we could please turn to page three of the same

15   document.  And do you see a few names listed on this page under

16   section three?

17   *A*   I do.

18   *Q*   Okay.  What is section three for?

19   *A*   It's for signing authority.

20   *Q*   Okay.  Is your name on this list?

21   *A*   It is.

22   *Q*   Okay.  And does that mean that you had some of the

23   signature authority to authorize payments?

24   *A*   It does.

25   *Q*   Okay.  And then, if we could please go to the bottom of

ABBY SCHWARTZ - Direct

1    this page, section four, and highlight those accounts.

2           And, Ms. Schwartz, if you could please just read out

3    the full account number on the left?

4    A    It is 1502745545.

5    Q    Okay.  Let's turn to the next page, please.  And what part

6    of the form is this?  What's the title of this?

7    A    Additions or Removal of Signatory.

8    Q    Does this indicate that someone was removed as having

9    signing approval for this particular bank account?

10   A    It does.

11   Q    And who was that individual?

12   A    Jonathan Yioulos.

13   Q    What is your understanding when that happened?

14   A    When his employment was terminated with National Air Cargo.

15   Q    If we could now turn to Government's Exhibit 309.  Okay.

16   If we could scroll through this one.  Same questions for you

17   here, ma'am.  Do you recognize this document?

18   A    I do.

19   Q    And what is it?

20   A    It is the same documents for a different bank account.

21   Q    Okay.  And is this something that National retained in its

22   ordinary course of business?

23   A    It is.

24   Q    Okay.

25           MS. WEISS:  The government would move to admit Exhibit

ABBY SCHWARTZ - Direct

1    309.

2          *THE COURT:*  All right.  Hearing no objection, it will

3    be admitted.  Go ahead.

4          *MS. WEISS:*  Permission to publish.  Thank you.

5          *THE COURT:*  Yes.

6    *Q*   And again, if we could just look at the top third.  And,

7    what does this document pertain to?  Which bank account?

8    *A*   It is for National Air Cargo Holdings, Inc.

9    *Q*   Okay.  And what component of the business is that, exactly?

10   *A*   The best way, I guess, I can describe Holdings, is if you

11   look at a pyramid or an umbrella, Holdings was our

12   overall-encompassing business, and then the airline and the

13   cargo, two separate businesses fell underneath that umbrella,

14   or the second pyramid underneath that one.  So, Holdings is

15   what encompassed things that happened for all of the business,

16   instead of specific to one.

17   *Q*   Okay.  If you would please turn to page three of this

18   document, to 2890.  And I'm going to ask, ma'am, if you could

19   just read off the account number at the bottom, ending in

20   '5529?

21   *A*   Yes.  It is 1502745529.

22   *Q*   Okay.  And then, finally, if we could turn to the fifth

23   page, 2892.  Do we see the name removal signature authority for

24   the same individual?

25   *A*   Yes.

ABBY SCHWARTZ - Direct

1    Q    And again, who was that individual?

2    A    Jonathan Yioulos.

3    Q    And again, was that signature authority removed when

4    Mr. Yioulos was terminated?

5    A    It was.

6         MS. WEISS:  Okay.  All right.  And we can take this

7    down.  Thank you, Ms. Ortiz.

8         All right.  We talked a little bit yesterday about the

9    Microsoft AX system.  Do you remember that?

10   A    I do.

11   Q    And if I recall correctly, you said that emails related to

12   invoices could be uploaded onto that system?

13   A    Correct.

14   Q    In a manual fashion?

15   A    Yes.

16   Q    Okay.  And so, if they were uploaded there, you would have

17   had access to them?

18   A    Yes.

19   Q    Even if you were not on that email?

20   A    Correct.

21   Q    Okay.  Is it also true that you could have contacted IT and

22   retrieved emails from other people's accounts, if you needed to

23   do so, for your job, to, sort of, piece things together?

24   A    Yes.  Yes.

25   Q    All right.  I want to turn to Government's Exhibit 653,

ABBY SCHWARTZ - Direct

1    next.  All right.  Could you please identify what this document

2    is and its attachments?

3    A    Yes.  It is an email from Kim Singer to Jonathan Yioulos

4    and myself, and there is -- appears to be an invoice and a W-9

5    that is attached.

6    Q    Okay.  And again, are these all records that you -- were

7    retained by National, in the ordinary course of business?

8    A    Yes.

9    Q    And are you familiar with these documents?

10   A    Yes.

11            MS. WEISS:  The government would move to admit 653.

12            THE COURT:  Any objections?

13            MS. FROST:  No objection, Your Honor.

14            THE COURT:  All right.  It's admitted.

15   Q    If we could please start on the first page and just blow up

16   that --

17            MS. WEISS:  Thank you, Veronica -- thank you,

18   Ms. Ortiz.

19   Q    Okay.  If you could please walk us through this email.

20   A    Yes.  It is an email from Kim Singer, she worked for me as

21   AP specialist, and she was sending an email to Jonathan Yioulos

22   and myself asking, *Is there an invoice for this payment out of*

23   *Holdings*.

24   Q    Is there information in the body of that email, as well?

25   A    Stating that, *There is a wire payment to Meyers Group on*

ABBY SCHWARTZ - Direct

1    *10-30-2018.*

2    *Q*    Is Kim Carloni-Singer one of the employees that you

3    managed?

4    *A*    Yes.

5    *Q*    Was it her role to help, sort of, put all the information

6    together on an invoice like this?

7    *A*    Yes.  She was the AP specialist, so she would have had to

8    post the payment and the invoice.

9    *Q*    Okay.  Is this -- in your experience, is this a fairly

10   typical kind of email that you would experience on a day-to-day

11   basis?

12   *A*    Yeah.  Yeah.

13   *Q*    Okay.  Why would an invoice be needed in relation to a

14   payment that had already been made?

15   *A*    It was her job, every day -- we had a list of all of the

16   transactions that had occurred in every bank account, in the AP

17   team and the AR team, who have to remove pieces and post them,

18   and if she had seen a payment that was made that she did not

19   have any backup for, any invoice for, or knowledge of, she

20   would have asked Jon and myself, you know, if we had that.  If

21   we forgot to send it or if we thought she was copied and

22   wasn't.  She needed to post that, so she had to ask us for what

23   she needed to finish her job.

24   *Q*    Can we now turn to the next page.  All right.  Can you walk

25   us through this email?

ABBY SCHWARTZ - Direct

1   A   Yes.  It's an email from Jonathan Yioulos to Kim Singer

2   with the attached invoice, and W-9 for Meyers Group, the

3   payment that she was asking about.

4   Q   Okay.  And just flipping to -- and we will just briefly

5   review the invoice and the W-9, quickly.  Are these the

6   attachments to that email?  First, the invoice at 54600 and the

7   W-9 at 54601?

8   A   They are.

9   Q   Okay.  Let's go back to that email.  Ms. Schwartz, are you

10  cc'd on this response?

11  A   I'm not.

12  Q   Is it curious to you that you were removed from the chain?

13  A   Yes and no.  I mean, I should have been copied on it.  She

14  addressed both of us.  Jon and I were really good about letting

15  the other one know, so we didn't waste time, both of us looking

16  for something, if the other one had the answer right away, but

17  he could have hit reply instead of reply all.

18  Q   Okay.  Do you think it was reply or reply all; the subject

19  line is different?

20  A   Oh, I didn't notice that.  So, no.

21  Q   Okay.  I want to look at one more example, before we move

22  on.  Can we please turn to Government's Exhibit 630.  And if we

23  could just scroll through this exhibit in its entirety.  Do you

24  recognize these documents?

25  A   I do.

826

ABBY SCHWARTZ - Direct

1   Q   Okay.  And can you briefly describe what they are, for the

2   record?

3   A   Sure.  It's a series of invoices -- series of emails with a

4   few invoices attached.

5   Q   Are these the kind of records that National retained in its

6   ordinary course of business?

7   A   It is.

8          MS. WEISS:  I would move to admit Government's Exhibit

9   630.

10          THE COURT:  Mr. Kaplan?

11          MR. KAPLAN:  Your Honor, being conscious of the

12   Court's ruling, just going to take the opportunity for this one

13   time.  There are emails attached with content to them.  Covered

14   this, you know, before.  I understand the Court's ruling.  We

15   would object to this as an example of that, and then just have

16   it as a continuing objection.

17          THE COURT:  Thank you.  I understand your position on

18   the emails, and I find that there's been sufficient foundation

19   laid for them to be considered business records.  So, it will

20   be a continuing objection.  It's overruled.  Go ahead, it's

21   admitted.

22          MS. WEISS:  Wonderful.  Can we please display

23   Government's Exhibit 630?

24   Q   And this is one of the examples where the older ones are at

25   the bottom.  We will work our way up.  Can we start with the

ABBY SCHWARTZ - Direct

1    second page?  Okay.  Can you please describe who this email is

2    to and from, and the subject line and attachments?

3    A    Sure.  It is another email from Kim Singer to Jonathan

4    Yioulos and myself.  The subject is Scaife, I think is how you

5    say that, invoices, and there are two ACH invoices attached.

6    She is asking if they were paid -- they were addressing that

7    they were paid out of the Holdings bank account, but the

8    invoices appear to be addressed to National Airlines.

9    Q    What's the next line?

10   A    Should the vendor file be set up in Holdings or Airlines?

11   Q    We just looked at two signature cards for those two

12   accounts.  I believe you explained the difference between those

13   two accounts?

14   A    Yes.

15   Q    Was Holdings, and for lack of a better way to put this,

16   more of a grab-bag place to issue payments out of?

17   A    Yes, it was broad scope.

18   Q    Broad scope.  So, things under Airlines would be very,

19   obviously, airlines related --

20   A    Yes.

21   Q    -- kind of --

22   A    Yes.

23   Q    -- I don't know, costs to the business?

24   A    Correct, correct.

25   Q    All right.  And let's move up to the first page.  And I

ABBY SCHWARTZ – Direct

1    believe that's the same email, that just sort of appears twice

2    for some reason.  Okay.  And did you respond to that email?

3    A    I did.

4    Q    Okay.  And what did you say?

5    A    I said, *Please post under Holdings and thank you for*

6    *checking*.

7    Q    Okay.  Then moving up to the next email.

8    A    It's an email from Kim Singer to myself and Jon, and it --

9    she is stating, *There is no contact information on the*

10    *invoice* -- excuse me -- *address or telephone number.  Is this a*

11    *US vendor and is a W-9 needed*?

12    Q    Is this the kind of information that Kim Carloni-Singer

13    would be tasked with tracking down, if it wasn't on there?

14    A    Absolutely.

15    Q    Does this seem like a red flag to have an invoice with no

16    contact information, no address, no telephone number?

17    A    It's very strange.

18    Q    No W-9?

19    A    Yeah.  No way to pay them, we had no contact information or

20    anything.  Yes.

21    Q    Who responded to Kim Carloni-Singer's inquiries?

22    A    Jonathan Yioulos replied to an email to Kim and myself

23    saying, *Getting this information from Michael today; will have*

24    *by the end of the day.  Thank you*.

25    Q    Who is the *Michael* that is being referred to in that email?

829
ABBY SCHWARTZ - Direct

1    *A*   Michael Tew.

2    *Q*   Okay.  And if we could just briefly display 148119.  Is

3    this one of the invoices that was being talked about in that

4    chain?

5    *A*   It is.

6    *Q*   Okay.  And there's no -- as Kim Carloni-Singer noted, there

7    is no contact information on this?

8    *A*   There's no contact information on this.  No.

9    *Q*   Okay.  And apparently no W-9, at that time?

10   *A*   No W-9, at that time.  No.

11   *Q*   Okay.  Excuse me.  All right.  Mrs. Schwartz, we are going

12   to delve into your involvement in this investigation a little

13   later on, but I want to take a slight housekeeping detour, if

14   you don't mind.

15          At some point were you asked by law enforcement to

16   pull certain records from National's AX system and its email

17   system?

18   *A*   I was.

19   *Q*   Did you work with IT to help retain the emails that you

20   would have not been a participant to?

21   *A*   I did.

22   *Q*   Okay.  You have a Redweld® folder over there.  The thicker

23   one.  If you could just take a moment and pull that up there

24   with you.  Did you have an opportunity to review the records in

25   that folder prior to your testimony today?

830
ABBY SCHWARTZ – Direct

1    *A*    I did.

2    *Q*    Did you confirm that all of those records were those that

3    were either housed in National's AX system or its email system?

4    *A*    I did.

5    *Q*    And were those documents all retained in the regular course

6    of National's accounting functions?

7    *A*    They were, yes.

8    *Q*    And should -- for the folder in front of you, did you

9    confirm that the records are true and accurate copies of those

10   that were provided to law enforcement by National?

11   *A*    Yes, they are.

12   *Q*    Okay.

13           *MS. WEISS:*  The government would move to admit the

14   documents in that folder, all at once.  I have provided these

15   to defense counsel beforehand so ...

16           *THE COURT:*  Are there any objections?

17           *MS. WEISS:*  I will read them into the record.

18           *MS. FROST:*  Can you identify the bulk exhibit number?

19           *MS. WEISS:*  Yes.  It is Government's Exhibit 539, 616,

20   618, 624, 626, 627, 631, 632, 643, 653, 657, 658, 666, 675,

21   691, 699, 709, 713, 714, 720, 728, 743, 843, and last but not

22   least, 979.

23           *THE COURTROOM DEPUTY:*  I'm sorry, nine ...

24           *MS. WEISS:*  Nine seven nine.

25           *THE COURT:*  Any objections?

ABBY SCHWARTZ – Direct

1           *MS. FROST:*  Just the continuing objection, Your Honor.

2           *THE COURT:*  Okay.

3           *MR. KAPLAN:*  That's correct, Your Honor.

4           *THE COURT:*  Okay.  All right.  Those will be admitted,

5    with that understanding.

6    Q   Okay.  Thank you, Ms. Schwartz.  Let's shift topics.  In

7    your capacity as director of accounting, did you know whether

8    National issued corporate credit cards to its employees?

9    A   Yes, we did.

10   Q   And what credit card company were those issued through?

11   A   American Express.

12   Q   Was the intended purpose for employees that had one of

13   those corporate credit cards?

14   A   The majority of the people who had the cards were pilots or

15   salespeople, who traveled all the time, or mechanics that

16   traveled with the airplane that had to incur constant travel

17   charges, whether it was a change of flight or hotel or cars,

18   and then the owner of the company, Chris Alf, had a card, his

19   administrative assistant had a card, and Michael Tew was issued

20   a card.

21   Q   Okay.  Who administered the Amex program?

22   A   I did.

23   Q   Did National use any separate software systems to manage

24   its corporate credit card expenses?

25   A   We used a system called Concur, that everyone had to submit

ABBY SCHWARTZ - Direct

1    all of their expenses through and copies of their invoices

2    through, and once they did that, then their credit card payment

3    would be made to Amex directly from Concur, once we reviewed

4    and approved all of that, with the exception of three cards.

5    Q    What were those three exceptions?

6    A    Christopher Alf, his admin assistant and Michael Tew did

7    not go through the Concur system.

8    Q    So, they operated outside of it?

9    A    Hm-hm.

10    Q    Is that a reflection of the position in the company?

11    A    Absolutely.

12    Q    The level of trust in those individuals?

13    A    Yes, yes.

14    Q    How did those cards get paid, if they were not -- they were

15    not paid through the Concur system?

16    A    We paid those payments directly to Amex.  We will issue a

17    payment directly to the Amex website for those.

18    Q    That would have been you?

19    A    Yes.

20        MS. FROST:  I object, to a lot of leading questions.

21        THE COURT:  Sustained.

22    Q    All right.  Let's take a look at what's been marked as

23    Government's Exhibit 335.

24        MS. WEISS:  Yeah.  Thank you, Ms. Ortiz.

25    Q    Do you recognize this document, ma'am?

ABBY SCHWARTZ - Direct

 1    A    I do.

 2    Q    And what is this document?

 3    A    It is a screen shot from American Express website,

 4    issuing -- all the information that we need to issue a credit

 5    card.

 6    Q    Okay.  Whose credit card was at issue in this screen shot?

 7    A    Michael Tew's.

 8    Q    And do you see your name on this document, as well?

 9    A    Yes, I do.

10    Q    Okay.  Is this your authorization --

11    A    Yes.

12    Q    -- to issue that credit card?

13    A    Yes.

14         MS. WEISS:  Government would move to admit exhibit

15    335.

16         MR. KAPLAN:  No objection, Your Honor.

17         THE COURT:  It's admitted.

18         MS. WEISS:  Permission to publish?

19         THE COURT:  Go ahead.

20    Q    Okay.  Turning your attention to the right-hand column

21    here.  Do you see information to when this request for the

22    credit card was submitted under status description?

23    A    Yes.  It was submitted on 6-12-2018.

24    Q    Okay.  And who made that request?

25    A    That would have been myself.

ABBY SCHWARTZ - Direct

1   Q   Okay.  And who was the request for?

2   A   Michael Tew.

3   Q   And then if we can go down to the bottom part, in the blue?

4   A   Hm-hm.

5   Q   Does this list a billing address and home address?

6   A   It does.

7   Q   And are they the same address?

8   A   They are.

9   Q   Could you please read that address into the record?

10  A   Yes.  It is 3222 E 1st Avenue Number 224, Denver, Colorado,

11  80206.

12  Q   Okay.  And, Ms. Schwartz, was it National's common practice

13  to send the Amex credit card bills to the user's home?

14  A   It was.  It was the way we had our account set up with

15  American Express.  Yes.

16  Q   Why do that?

17  A   The American Express system, when we had them set up, it

18  was a corporate card, but each individual was responsible.  It

19  was called individual bill, individual pay or individual bill,

20  corporate pay, but you were still the person who received all

21  of the communications from American Express, directly, to

22  whatever emails you set up or your home address.  So, each

23  individual would have that contact with American Express.

24  Q   If an individual has a contact with American Express, they

25  have the ability to see what's on the credit card statements?

ABBY SCHWARTZ - Direct

1   A   Oh, 100 percent, yes.

2   Q   Did you have the ability to see what was on the credit

3   card?

4   A   Yes.

5   Q   Okay.  What was your understanding of why Mr. Tew received

6   a corporate Amex card in June of 2018?

7   A   I was given the assumption he was traveling a lot more, and

8   was doing a lot more things with the owner, Mr. Alf, so he

9   required a credit card for those charges.

10  Q   Okay.  And does this document indicate whether or not

11  this --

12       MS. WEISS:  And I apologize, Ms. Ortiz.  Can you blow

13  up where you were before?

14  Q   Does this part of the document indicate whether or not this

15  was ordered on a normal course or on a different course?

16  A   It does.  It was a rush delivery request.

17  Q   Okay.  Ms. Schwartz, we're going to do something similar, a

18  little bit of housekeeping here.  Can you take the other

19  slimmer Redweld® folder, and have a look at those documents.

20  Did you have an opportunity to review them, before today?

21  A   I did.

22  Q   And do you recognize what they are?

23  A   I do.

24  Q   What are they?

25  A   They are American Express statements regarding Michael

ABBY SCHWARTZ – Direct

1    Tew's account.

2    *Q*   Is that information that would have been retained in the

3    ordinary course of National's business?

4    *A*   It is.  We would have used this as the invoice for his

5    account.  Correct.

6          *MS. WEISS:*  The government would move to admit all of

7    these records in together.  I will read out the list, first.

8          *THE COURT:*  Okay.  Go ahead.

9          *MS. WEISS:*  Government's Exhibit 338, 339, 347, 348,

10   349, 350, 351, 352, 353.

11         *THE COURT:*  Any objection to admitting those?

12         *MS. FROST:*  Just the same standing objection.

13         *THE COURT:*  Okay.  They are admitted.

14   *Q*   Okay.  Turning your -- and I apologize.  Turning your

15   attention back to July of 2018.  Were you contacted regarding

16   activity on Mr. Tew's corporate Amex card?

17   *A*   I was.

18   *Q*   And again, when was that card issued?

19   *A*   In June 12th of 2018.

20   *Q*   Okay.  You started receiving contacts a month after that

21   card had been issued?

22   *A*   Correct.

23   *Q*   Okay.  Please tell us about that first call?

24   *A*   The first call regarding his -- his account, specifically,

25   was from the fraud department of Amex, concerned about charges

ABBY SCHWARTZ – Direct

1   that were on the account.

2   Q   Did they describe those charges to you, at that time?

3   A   I don't recall if they --

4           MS. FROST:  Objection, to lack of foundation, as to

5   they.

6           THE COURT:  Overruled.  Go ahead.

7           THE WITNESS:  Whether the American Express advocate

8   had given me the specifics or if I -- he had requested that I

9   review them online, but, yes, we discussed the transactions.

10  Q   Okay.

11          MS. FROST:  And I am going to object to hearsay and

12  lack of foundation, at this point, Your Honor.

13          THE COURT:  Sustained as to hearsay.

14          MS. WEISS:  Your Honor, its affect on the listener and

15  not for the truth of the matter asserted.

16          THE COURT:  No, I don't think so.  Sustained.

17          MS. WEISS:  Okay.

18  Q   Let's take a look at that first credit card bill.

19  Government's Exhibit 339.

20          MS. WEISS:  All right.  If we could blow up just that

21  top third again, Ms. Ortiz.

22  Q   Do you recognize this document, ma'am?

23  A   I do.

24          MS. WEISS:  Okay.  And if I could have permission to

25  publish?  It's up, but I'm not sure.

ABBY SCHWARTZ – Direct

1           THE COURT:  Mr. Keech, we can publish that.

2           THE COURTROOM DEPUTY:  It's up.

3           MS. WEISS:  Thank you.  I can't quite see from my

4    angle.

5    Q   Can you tell us what the closing date is on this particular

6    statement?

7    A   Yes.  The closing date is July 16th, 2018.

8    Q   Okay.  And who is this card for?

9    A   It is for Michael Tew.

10   Q   And what is the line underneath Michael Tew's name?

11   A   National Air Cargo.

12   Q   This is the corporate credit card?

13   A   It is.

14   Q   What was the beginning balance on this card?

15   A   The beginning balance was $15, that was the rush fee.

16   Q   Okay.  And then new charges in that month?

17   A   It's 11,501.96.

18   Q   Okay.  For a total balance due?

19   A   Total balance due is $11,516.96.

20          MS. WEISS:  Okay.  Further down the page, Ms. Ortiz,

21   can you blow up the activity on the first page of this exhibit.

22   Q   Can you describe what the initial activity was on this card

23   from June 20th to the 25th?

24   A   There's a charge from the Sheraton®, in Orlando, a few Uber

25   charges, the Orlando Airport it looks like, is a charge, and

ABBY SCHWARTZ - Direct

1    two Amazon charges.

2    Q    Okay.  In your experience as director of accounting and

3    managing the corporate Amex program, are these fairly typical

4    types of business expenses?

5    A    Yes.

6    Q    Anything that stands out to you here?

7    A    No.

8    Q    Okay.

9         MS. WEISS:  Let's turn to the third page of this

10   exhibit.  And just to make it easier to see, Ms. Ortiz, why

11   don't we just focus on the bottom third.

12        All right.  And just for the record, we're seeing

13   about, I guess, activity from July 7th, 2018, through July

14   16th, 2018, at this time.

15   Q    Can you please describe the charges, in general, that we're

16   seeing here?

17   A    Yes.  They are numerous charges to Target, ranging from

18   $200 even, to, it appears to be, 600.  There are two smaller

19   charges, Prime Fresh Charge and a Bed Bath & Beyond®.

20   Q    Okay.  And if you wouldn't mind just counting up the amount

21   of charges that we can see just on this screen, this part of

22   the exhibit?

23   A    Sixteen.

24   Q    Okay.  So, between the dates of July 7th, through July

25   16th, 16 charges of hundreds of dollars at a time?

ABBY SCHWARTZ – Direct

1    *A*    Correct.

2    *Q*    At what location?

3    *A*    The Target location.

4    *Q*    And you wouldn't know this, not being from the area, can

5    you read right after Target?

6    *A*    Oh, Target, Glendale.

7    *Q*    And if you flip to the last page of this exhibit.  Is there

8    one additional charge to the same Target, Glendale there?

9    *A*    Yes, there is.

10   *Q*    Okay.  When you got that initial call, did you review this

11   credit card statement in detail?

12   *A*    The initial call, no.  The very first call we received was

13   just that we were reaching close to our limit on the Amex

14   account.  So, they usually just ask us to make a payment, and

15   it's easier to pay off with the three accounts that we can pay

16   directly.  Otherwise, we would have to sort through all of the

17   stuff in Concur, which can take a day or two to process.  So,

18   if we were coming close to our limit, we would initiate payment

19   on the three cards that were easy to just get the payment

20   recorded that day.

21   *Q*    Okay.  Did you then pay that credit card bill?

22   *A*    I did.

23   *Q*    Okay.  Oh gracious, sorry.  If we could now turn to

24   Government's Exhibit 347.

25           *MS. WEISS:*  And if I could have permission to display

ABBY SCHWARTZ - Direct

1   that one?

2           THE COURT:  Go ahead.

3           MS. WEISS:  Okay.  If we could just do the top third,

4   again, Ms. Ortiz.

5   Q   Can you please tell us what this document is?

6   A   Yes.  It is the corporate statement for Michael Tew, from

7   National Air Cargo's account, dated 8-16-18.

8   Q   So the next months?

9   A   Yes.

10  Q   Can you please read off the previous balance?

11  A   The previous balance was $11,516.96.

12  Q   And the new charges, in the month of July to August --

13  mid-July to mid-August?

14  A   The new charges on the statement were $44,624 even.

15  Q   And was there a payment reflected?

16  A   There was a payment reflected on 7-18.

17  Q   And what was the amount of that payment?

18  A   It's 14,922... and I believe that says 96 cents.

19  Q   Okay.  The balance due at the closing date of August 16th,

20  2018?

21  A   It's $41,218.

22  Q   Okay.  Ms. Schwartz, can you please look at the activity on

23  the first page of this statement --

24          MS. WEISS:  And thank you, Ms. Ortiz.

25  Q   Can you describe, in a general basis, what kind of charges

ABBY SCHWARTZ - Direct

1    we are seeing between the dates of 7-17-2018 and 7-18-2018?

2    A    Yes.  There are numerous charges, again, at the Target, in

3    Glendale, one for $500, the rest for $600, and one charge for

4    $500 at a Walgreens™ in Glendale.

5         MS. WEISS:  Can we go to page three of this document,

6    and why don't we take the first half of it, first.  And for the

7    record, we're showing the activity between the dates of July

8    18th, 2018, through July 20th, 2018, on the screen.

9    Q    Could you please describe what charges we're seeing between

10   those dates?

11   A    Yes.  There are several charges, again, to the Target in

12   Glendale, for that 5- and $600 each.  I think there's four of

13   those.  One, again, at a Walgreens™, just says Denver, for $500

14   and then there are four to a King Soopers, I think is how you

15   say that, for $500, and then the last one is $700.

16   Q    Do you have a King Soopers in Buffalo?

17   A    We don't.  I don't know what that is.

18   Q    Does it indicate below what type of store?

19   A    It does.  It says it's a grocery store.

20   Q    Okay.  We will trust that.

21        MS. WEISS:  All right.  Let's do the next half, from

22   the 21st on to the bottom, please.

23   Q    All right.  Ms. Schwartz, if you can please describe what

24   we're seeing between the dates of July 21st through the 23rd

25   2018, two days of activity?

ABBY SCHWARTZ - Direct

1    *A*    Yes.  There were eight charges, again at the grocery store,

2    King Soopers, ranging from $1,500 to 3,000.  There is a charge

3    at the Target, Glendale, and an Amazon.com for a thousand

4    dollars.

5         *MS. WEISS:*  Can we now turn to the final page of this

6    exhibit?  And for the record, we're seeing the activity between

7    the two dates of July 24th, 2018 through July 26th, 2018.

8    *Q*    Ms. Schwartz, could you please describe, for the record,

9    what is on the activity between those two dates?

10   *A*    Appears to be eight charges at King Sooper, ranging from

11   $4500, couple 3,000, some for 1500, a thousand and a $2,000.

12   *Q*    Okay.  What's the highest charge on here?

13   *A*    It's 4,500.

14   *Q*    All in one?

15   *A*    All in one charge.

16   *Q*    That's at King Soopers?

17   *A*    It is.

18        *MS. WEISS:*  Let's return to the first page of this

19   document, and if we could blow up the band at the top.

20   *Q*    And again, just for the record, what was the amount of new

21   charges that we just looked at between the dates of July 18th,

22   and July 26th, 2018?

23   *A*    It's $44,624.

24   *Q*    How long had Mr. Tew had this corporate credit card?

25   *A*    Two months.

ABBY SCHWARTZ - Direct

1   Q   June 2018 to?

2   A   August.

3   Q   Yeah.  The closing date was August, but --

4   A   Yes.

5   Q   Okay.  Did you receive another call from Amex regarding

6   these charges?

7   A   I did.

8   Q   Did you review the statement, at that time?

9   A   At that time, yes, I did.

10  Q   Did it catch your attention?

11  A   Absolutely.

12  Q   Why?

13  A   Well, none of those charges looked like travel charges, and

14  the number of charges, and even dollar amounts, was very

15  concerning.

16  Q   What did you think happened to Mr. Tew's credit card?

17  A   We assumed that someone had gotten ahold of his credit

18  card, that it was fraud, that someone had either gotten it

19  electronically or had the physical card.

20  Q   Okay.  Did you ask Amex to take action, at that point?

21  A   We asked them to put the card on hold, so we could review

22  it.  Yes.

23  Q   Okay.  After you put that card on hold, did the Amex rep

24  call you again?

25  A   He did call me again.

ABBY SCHWARTZ - Direct

1   Q   And what did he communicate to you?

2            MS. FROST:  Objection, hearsay.

3            THE COURT:  Overruled.

4            THE WITNESS:  That he had spoken to Mr. Tew, regarding

5   the charges to see if they were fraud or if they were

6   legitimate charges.

7   Q   Okay.  And what did Mr. Tew report?

8   A   At that time Mr. Tew reported that he did --

9            MS. FROST:  Object --

10           THE COURT:  That's sustained.

11           MS. WEISS:  Okay.  Your Honor, I don't believe it's

12  for truth of the matter asserted.  I'm happy to discuss at

13  sidebar.

14           THE COURT:  If you want to come up here, you can.

15       (At the bench:)

16           MS. WEISS:  So, Your Honor, there are two layers of

17  hearsay here.  First, Mr. Tew's statements, which aren't

18  hearsay, because he was a party opponent, and then the second

19  layer of hearsay, which is the Amex representative's

20  communication of what Mr. Tew told them to Ms. Schwartz.  Now

21  that one is for effect on the listener, because it impacts how

22  National handled the events, what they understood about

23  Mr. Tew's charges for Amex, and misrepresentations that he made

24  to them.  First, is the misrepresentations that were made to

25  the credit card company.  He told different stories to

ABBY SCHWARTZ - Direct

1    different people.

2         THE COURT:  Right.  But what -- what affect on her are

3    we talking about?

4         MS. WEISS:  That is why she called Chris Alf, is what

5    she will be testifying to, is that it was the second call, and

6    the explanation that was relayed to her, that was given to

7    Amex, by Mr. Tew, that did not make sense to her, and that is

8    why she called Mr. Alf.

9         THE COURT:  Okay.  I will let you ask that.  I have a

10   broader question.  We spent the whole morning on these Amex

11   charges, which, as I understand it, are not part of this --

12   charges, in this case.  What are you doing?

13        MS. WEISS:  I will move it along, Your Honor.

14   Promise.

15        MR. KAPLAN:  I know that this is an area that has some

16   discretion in it, but many of these documents, once they are

17   introduced, speak for themselves, and, you know, I am hesitant

18   to jump up because I think there's some discretion to the

19   government explaining their case, but once it's introduced,

20   they can argue it, instead of reading off all of these

21   documents.

22        THE COURT:  I agree.  We don't need to review -- have

23   her tell us every dollar amount.  So, I will ask you to move it

24   along.

25        MS. WEISS:  I apologize, Your Honor.

847

ABBY SCHWARTZ - Direct

1        THE COURT:  It's okay.

2        MS. FROST:  Just on this hearsay issue.  This isn't

3   your typical party admission.  I mean the Amex person would

4   have to be on the stand to say, *I talked to Mr. Tew, and this

5   is what he told me*, and that's how it comes in.

6        THE COURT:  And that's why we have to use the second

7   exception, right?  To why that Amex person -- it's okay to

8   bring the Amex person's statement in?

9        MS. FROST:  No, I understand.  I'm objecting to the

10  second exception.

11       THE COURT:  I understand.  I think the key is -- the

12  point is what she did in response, and so I will allow it in.

13       MS. FROST:  And we do agree with the questionable

14  relevance of the Amex testimony.

15       (In open court.)

16  Q   Ms. Schwartz, what did the Amex representative tell you at

17  that second call?

18  A   That he had spoken to Michael Tew, and Michael Tew had

19  confirmed that he would look into what was happening with his

20  card.

21  Q   Okay.  And did he provide any specific explanation for what

22  those charges were?

23  A   He did.  He told the Amex representative that he --

24       MS. FROST:  Objection.

25       THE COURT:  Overruled.

ABBY SCHWARTZ – Direct

1       *THE WITNESS:* -- was using the card to purchase gift

2   cards for his employees.

3   Q   Okay.  What was your reaction to that that explanation?

4   A   It was very strange.  He didn't -- didn't have employees

5   under National Air Cargo.  Wasn't sure why anyone would need

6   that number of gift cards for your employees, to buy office

7   supplies and things.

8   Q   Okay.  What did you do, at that point?

9   A   I reached out to Christopher Alf, to notify him what was

10  happening with the card.

11  Q   Okay.  Did you speak with Mr. Tew, directly, about these

12  charges?

13  A   I believe I did, yes.

14  Q   And do you recall what he told you?

15  A   I believe he advised me that he would reach out to Amex and

16  handle this.

17  Q   Okay.  Were you asked to begin an internal investigation

18  into these charges?

19  A   I was.

20  Q   Did anyone at National help you with that investigation?

21  A   Yes.  Jonathan Yioulos helped me investigate the charges.

22  Q   Okay.  Can you describe, broadly, what you did?

23  A   Yes.  We tried to reach out to the specific stores.  It was

24  much harder with Target, because there's a national brand, but

25  reaching out to the stores to see if there was anyway that they

ABBY SCHWARTZ - Direct

1    could provide us with whether it was the actual card being used

2    or whether these were electronic charges, so that we could

3    determine, kind of, the nature of how these charges were

4    happening.

5    Q    Okay.  And what sort of evidence were you able to review?

6    A    We -- King Soopers sent Jonathan a video of the card at a

7    checkout, being used by two individuals.

8    Q    Who were those two individuals?

9    A    It was Michael and Kimberley Tew.

10   Q    Can we please turn to Government's Exhibit 533; and that's

11   five, three, three.  Do you recognize this document and it's

12   attachment?

13   A    I do.  It is an email from myself to Michael Tew, with

14   Jonathan Yioulos in copy, regarding his Amex, and a scanned

15   copy of his statement.

16        MS. WEISS:  Okay.  The government would move to admit

17   533?

18        THE COURT:  Understanding the objection we've

19   discussed, it will be admitted.

20        MS. WEISS:  Okay.  And if I could have permission to

21   display?

22        THE COURT:  Yes.

23        MS. WEISS:  And if we could just see the top half, a

24   little bit bigger for my benefit.  Thank you.

25   Q    Ms. Schwartz, did you advise Michael Tew about the status

ABBY SCHWARTZ - Direct

1    of the -- of the card?

2    A    I did.

3    Q    Okay.  And was he advised that he was responsible for that

4    balance?

5    A    Yes.

6    Q    To your knowledge, did Michael Tew ever pay National back

7    for those credit cards?

8    A    He did not.

9    Q    Who did pay that off?

10   A    We had to pay it.  It was $40,000 that was holding up that

11   much money that we were able to spend on our balance.

12        MS. WEISS:  I would like to turn next to Government's

13   Exhibit 532.  And I believe this has a couple different pages,

14   so if we could scroll through those, as well.

15   Q    Do you recognize this document and its attachments, ma'am?

16   A    I do.

17   Q    What are they?

18   A    The first one is an email from myself to Michael and Jon,

19   with a screen shot of the American Express website, showing,

20   kind of, what our current spend is and what our balance is, and

21   then a series of emails and a screen shot from our bank,

22   showing payment from our Concur application for the other Amex

23   cards.

24        MS. WEISS:  Okay.  The government would move to admit

25   Exhibit 532.

ABBY SCHWARTZ – Direct

1          *THE COURT:* Any objections other than we've already

2     discussed?

3          *MS. FROST:* No, Your Honor.

4          *THE COURT:* It's admitted.

5          *MS. WEISS:* Permission to display 532?

6          *THE COURT:* Okay.

7     Q   All right. Ms. Schwartz, we can talk about this at a high

8     level. Can you please describe, to the jury, what this image

9     is or this graphic that we're seeing in this email?

10    A   Sure. It's kind of just a broad view of the spend and

11    available funds left for all of our employees to use. It was

12    one bucket of dollars that all of our employee cards went

13    against. So, I was showing them, kind of, what we were

14    spending and what we had available, to make sure that we made a

15    payment, so that our employees who were traveling all over the

16    globe, could still use their credit cards

17    Q   Okay. And so was National subject to a credit card limit

18    like, you know, individuals are subject to credit card limits?

19    A   Yes.

20    Q   Okay. And it was important to stay under that limit?

21    A   Yes.

22         *MS. FROST:* Objection, leading again, Your Honor.

23         *THE COURT:* I will overrule this sort of

24    preliminary-type matter, but go ahead.

25         *MS. WEISS:* Okay.

852
ABBY SCHWARTZ – Direct

1   Q   All right.  And who is this email at the top, one from and

2   to?

3   A   Oops.  It's from myself to Michael and Jon.

4   Q   So, were both of those individuals aware of this corporate

5   credit card limit?

6   A   Oh, yes.

7          MS. WEISS:  Can we turn to the last page of this

8   exhibit?

9   Q   Is this that invoice that you were referring to?

10  A   This is the confirmation from Signature Bank that a payment

11  was made from Concur, our credit card company, to American

12  Express.

13  Q   Okay.  And what was the amount of that payment?

14  A   It was $50,048.53.

15  Q   And was that all the credit cards -- all of the other

16  credit cards that were in the Concur system that month?

17  A   It was probably all of them that we could review and

18  confirm at that time.  I'm not sure that was all of them that

19  were in there, but that's what we would have reviewed and

20  confirmed that the payment was okay.

21  Q   Ms. Schwartz, we're going to switch gears now to a somewhat

22  related topic.  In September 2018, was there anything else

23  notable going on at National's Buffalo offices?

24  A   Yes.

25  Q   And can you tell us, at a high level, what that was?

ABBY SCHWARTZ – Direct

1  A    Yes.   There were a few phone calls that were made into the

2  office, that were concerning.

3  Q    Okay.  Did you receive or speak to this caller, at all?

4  A    I did not.

5  Q    Were you charged with speaking to the employees who did

6  receive those calls?

7  A    I was.

8  Q    And did you take down the substance of those calls?

9  A    I did.

10 Q    And did you report those calls to Christopher Alf?

11 A    We did.

12 Q    We are not going to talk about what, exactly, was said in

13 those calls, but can you tell me your employees' reactions when

14 you had those, sort of, sitdowns to record what they were

15 telling them?

16 A    Yes.   It was very unnerving, what was being said on the

17 phone, also was upsetting to our employees.  I had one employee

18 who had been talked to not very nicely.  So, she was very

19 upset, she was in my office not understanding the nature of why

20 this person would call and say what he did.

21 Q    Was there any physical manifestation of how upset that

22 employee was.

23 A    She was crying.

24 Q    Was Mr. Tew terminated shortly thereafter?

25 A    He was.

ABBY SCHWARTZ – Direct

1    *Q*   To your knowledge, were any payments to Michael Tew

2    authorized after that point, from National?

3    *A*   To my knowledge, the only payment that would have been

4    made, would have been his last consulting invoice, that would

5    have paid out.

6    *Q*   Okay.  To your knowledge, were there any payments to Sand

7    Hill, LLC, his company, after that point?

8    *A*   No.

9    *Q*   Were there any payments authorized to Kimberley Tew after

10   that?

11   *A*   Not to my knowledge.

12   *Q*   Ms. Schwartz, we're going to shift gears again.  Fast

13   forward to July of 2020.  Were you still working for National

14   at that time?

15   *A*   I was.

16   *Q*   Still in the same role as director of accounting?

17   *A*   I was.

18   *Q*   Still working with Jonathan Yioulos?

19   *A*   Yes.

20   *Q*   Still sharing a wall?

21   *A*   Yes.

22          *MS. FROST:*  I'm going to object to the leading

23   questions, again.

24          *THE COURT:*  Overruled.  Go ahead.

25          *MS. WEISS:*  Okay.

855

ABBY SCHWARTZ – Direct

1    Q   Perhaps an obvious question, but what was going on in the

2    world in July 2020?

3    A   Wow.  The pandemic was pretty much in full swing.  At

4    National it didn't mean the same thing that it did to the rest

5    of the world.  I know many people were home and working from

6    home and kind of wondering what was going to happen.  At

7    National we were so, so busy.  I want to say it had to have

8    been one of the most busiest times for us.  We were moving PPE,

9    back from China, on all of our planes, because, as we all know,

10   most planes weren't going anywhere.  So, we were moving all of

11   that stuff, and all of that cargo to come back here.  Trying to

12   deal with all of your employees, who didn't know how to handle

13   the pandemic.  We were -- because we were a government

14   contractor, allowed to have all of our employees in the office,

15   and working, you know, with all of our guidelines, and for me

16   it was a little crazy, because our HR director had left us the

17   week the pandemic started.  So, I was doing those roles, as

18   well.

19   Q   Okay.  That's a lot.

20   A   That's a lot.

21   Q   Okay.  Why don't we talk about one specific day, which is

22   July 1st.  Were you contacted by Christopher Alf?

23   A   I was.

24   Q   And were you instructed to go into the office and meet

25   agents with the Federal Bureau of Investigation and Internal

ABBY SCHWARTZ - Direct

1    Revenue Service?

2    A    I was.

3    Q    Were you instructed by Christopher Alf to help the agents

4    however they needed?

5    A    Yes.

6    Q    Was that something that you did?

7    A    Yes.

8    Q    Was this something that anybody else in the office knew was

9    happening?

10   A    No, we met after hours.  It was the 4th of July weekend,

11   that Sunday, right after the 4th of July, I think it was

12   actually July 5th, that we were in the office.  There was only

13   one other person who would have worked in the office on that

14   day, but Christopher Alf wanted us to do it after hours.

15   Q    What was your understanding of why that was?

16   A    To keep what was happening secret, so that no one knew.

17   Q    Okay.  Over the course of the day, did agents ask you to

18   pull information and documents from National's system?

19   A    They did.

20   Q    And we've seen some of those documents?

21   A    Yes, yes.

22   Q    Okay.  Were the agents asking about specific vendors or

23   invoices?

24   A    They were.

25   Q    Okay.  And did you know what connection there could be

ABBY SCHWARTZ - Direct

1  between those vendors and invoices, at first?

2  A   No, I didn't.

3  Q   Were you curious?

4  A   Very.

5  Q   Did you use that AX system to also run some accounting

6  reports for the agents?

7  A   I did.

8         MS. WEISS:  Okay.  If we could turn to Government's

9  Exhibit 841, which has already been admitted, and just go to

10  the last page.

11  Q   And just briefly, Ms. Schwartz, what are we seeing here?

12  A   We are seeing an invoice from Global Fuel Logistics, out of

13  Troy, Michigan, billing National Airlines for fuel, consulting,

14  six months, for the total of $152,000.

15  Q   Okay.  What was the date on this invoice?

16  A   July 1st, 2019.

17  Q   Michael Tew still working at National, at this time?

18  A   No.

19  Q   Does his name appear anywhere on this invoice?

20  A   No.

21  Q   Any obvious connection to Michael Tew on this invoice?

22  A   No.

23  Q   Anything in retrospect that stands out to you about the

24  qualities of this invoice compared the others, that you were

25  seeing, hundreds of, every week at National?

                                                                        858
                          ABBY SCHWARTZ – Direct

1           *MS. FROST:*  I would object to the witness'

2    retrospective, perspective on the invoice.  Relevance.

3           *THE COURT:*  Overruled.  Go ahead.

4           *THE WITNESS:*  The invoice, in particular, does not

5    have anyway to pay them.

6    *Q*   Okay.  And is it fairly generic?

7    *A*   It is.  It doesn't list much detail.

8           *MS. WEISS:*  Can we next look at Government's Exhibit

9    12, which was previously admitted.  And if we could blow up

10   this, just so I can see it a little bit better?  Thank you.

11   *Q*   All right.  Jury has seen a lot of these.  Is this an ACH

12   payment?

13   *A*   It is.

14   *Q*   Okay.  And does it indicate when this payment was made?

15   *A*   It does, July 24th, 2019.

16   *Q*   Okay.  And again, was Michael Tew working at National, at

17   that time?

18   *A*   He was not.

19   *Q*   Okay.  And what was the amount paid on this particular

20   invoice?

21   *A*   It's $45,000.

22   *Q*   And who approved this invoice?

23   *A*   Jonathan.

24   *Q*   So, as you are pulling these documents for the agents,

25   vendor by vendor, invoice by invoice, are you starting to draw

ABBY SCHWARTZ - Direct

1    some connections?

2    A    I was.

3    Q    And what was standing out to you as consistent among all of

4    the documents they were asking?

5    A    That they were entered into our system mostly by Jonathan,

6    and that payments were issued and approved mostly by Jonathan.

7    Q    So, you give the agents the documents?

8    A    I did.

9    Q    You leave the office, hopefully, eventually?

10   A    I did get to go home, eventually.

11   Q    Where did you go?

12   A    Where --

13   Q    Where did you go?

14   A    I went home.

15   Q    Okay.  Did you set this aside, kick back, watch T.V. that

16   night?

17   A    I did not.

18   Q    What did you do?

19   A    I actually worked in home, quite a bit.  It was kind of

20   natural, but I really wanted to look into things that just

21   didn't feel right.  Didn't seem right.  So I began looking

22   deeper into what they were questioning, just for my own sake.

23   Q    Okay.  Did you have an ah-hah moment?

24   A    I did.

25   Q    Can you describe that ah-hah moment for the jury?

ABBY SCHWARTZ - Direct

1   *A*   Sure.  It was -- I don't even remember, it was very late at

2   night or early in the morning that I was going through

3   invoices, and all of the backup document we had from the bank

4   for these vendors that they had picked, and I found a payment

5   that was made on a vendor invoice but the bank account was to

6   Michael Tew's bank.

7   *Q*   So, the name on the invoice did not match the name on the

8   bank?

9   *A*   No.

10        *MS. WEISS:*  Can we please now look at Government's

11  Exhibit 384, which is already admitted.  Three, eight, four.

12  And I am so sorry, Veronica.  Can you just help me out by

13  eliminating the white space?  Thank you.

14  *Q*   All right.  Now I can read it.  Ms. Schwartz, what are we

15  seeing on this document?

16  *A*   This is an ACH document, from July 1st, 2019, payment was

17  made to Sand Hill, LLC, in the amount of $9,200, and it was

18  entered and approved by Jonathan.

19  *Q*   Did Michael Tew still work at National?

20  *A*   He did not.

21  *Q*   Did you recognize the name Sand Hill?

22  *A*   I did.

23  *Q*   Ms. Schwartz, during this period, how would you describe

24  National's cash liquidity to make its outgoing payments to

25  vendor?

ABBY SCHWARTZ - Direct

1    A    We were very tight.  It was during the pandemic, we were

2    flying.  Our airplanes were in constant motion.  At one point

3    we even requested special permission to take the seats out of

4    the our passenger planes, to make them cargo planes, just so we

5    could keep flying.  So, we were moving all of these planes back

6    and forth from China back to the United States, and the United

7    States Government, you have to process after a delivery, you

8    process the invoice after your freight has been delivered into

9    a system, and then they can take up to 30 days to pay you.  So

10   we were flying constantly, but we were out that timeframe,

11   before we would get paid from the government.  So it was --

12   cash was a little bit tight during that period of time for

13   sure.

14   Q    So, National is incurring costs, fuel, pilots, maintenance,

15   all of the things?

16   A    Yes.

17   Q    But the payment associated with that work is not going to

18   come in right away?

19   A    No.  No.  It's 30 to 45 days, on average.

20   Q    Okay.

21   A    Could have been a little slower, due to the pandemic.  I

22   know everyone wasn't in the office, so things were not moving

23   smoothly.

24   Q    That's what was going on when this was discovered?

25   A    Absolutely.

ABBY SCHWARTZ - Direct

1    Q    Have you spoken to Michael Tew since?

2    A    No.

3    Q    Kimberley Tew?

4    A    No.

5    Q    Jonathan Yioulos?

6    A    No.

7    Q    Ms. Schwartz, a couple of the payments at issue here were

8    made by wires?

9    A    Hm-hm.

10   Q    We talked about the process for that?

11   A    Yes.

12   Q    That required two people?

13   A    It did.

14   Q    You were one of those people; is that right?

15   A    I was.

16   Q    Do you recall whether Jonathan Yioulos made any

17   representations to you about the validity of those wires, when

18   he asked for your secondary approval?

19   A    I don't recall, specifically.  Someone would have approved

20   the invoice for it to have been entered, on my team.  It was a

21   fuel invoice, so they would have looked pretty normal to me

22   during the that time.

23   Q    Would you have approved them if you had known they were

24   bogus?

25   A    No.

ABBY SCHWARTZ - Cross

1  Q    How do you feel knowing that you were duped in that way?

2           MS. FROST:  Objection, relevance, 403.

3           THE COURT:  Sustained.

4           MS. WEISS:  Okay.  No further questions, Your Honor.

5           THE COURT:  All right.  Thank you.  I would like to go

6  ahead with Cross-exam -- at least some of the

7  Cross-examination, if the defendants are ready.

8           MS. FROST:  Thank you Your Honor.

9                        **CROSS-EXAMINATION**

10  BY MS. FROST:

11  Q    Good morning, Ms. Schwartz.

12  A    Good morning.

13  Q    My name is Kristen Frost, and I represent Michael Tew?

14  A    Nice to meet you.

15  Q    Nice to meet you too.  Remind me, again, how long you

16  worked for NAC?

17  A    Eighteen years, in total.

18  Q    And were you in the accounting department for that entire

19  18 years?

20  A    I was.

21  Q    And remind me, where you are working now?

22  A    I work for a company just outside of Buffalo, as their

23  controller.

24  Q    So, same type of similar job responsibilities?

25  A    Yes.

ABBY SCHWARTZ - Cross

1    Q    And why did you leave NAC?

2    A    I was just -- I was tired, was very exhausted after

3    everything had happened, and it just felt like a good time, and

4    Christopher Alf had decided it was a good time himself.

5    Q    Do you still have a relationship with Mr. Alf?

6    A    No.  I don't see him on a regular basis or anything.  No.

7    Q    Have you talked to him since the trial started, in this

8    case?

9    A    I saw him in the hallway when he was leaving yesterday.

10   Q    Okay.  I want to go back in time a little bit, and kind of

11   talk about Mr. Yioulos and Mr. Tew, what they did at NAC?

12   A    Okay.

13   Q    Now, Mr. Yioulos, he was kind of a high-level bookkeeper,

14   if you will, right?

15   A    He was the director of finance.

16   Q    And as the director of finance, he did things like entering

17   financial statements into what was AX, is the name of your

18   software?

19   A    The software would have produced the reports for him.

20   Q    And he was in control and responsible for those reports

21   that were produced by AX?

22   A    Yes.  The financial reports, correct.

23   Q    And he dealt with invoices, and inputting that type of data

24   into AX, as well, right?

25   A    That was not his normal duties, that was the accounts

865

ABBY SCHWARTZ - Cross

1    payable job, but he did enter a few of them.  Yes.

2  Q   And he was involved in that process to some degree, right?

3  A   Um, to some degree.  Approving the invoices, but, no, he

4    was not really involved with entering them.  For the most part,

5    no.

6  Q   Okay.  And you -- you, in your department, were responsible

7    for accounts payable?

8  A   Yes.

9  Q   And kind of budgeting, as well?

10  A   We -- no.  We didn't really have budgeting under my scope.

11  Q   Okay.  Was Mr. Yioulos involved with any kind of budgeting

12   issues?

13  A   He would monitor the cash flow for us, and how much we

14   could spend out in a day or a week, depending on when the

15   payments needed to be made, he would monitor that, correct.

16  Q   I guess that's kind of what I meant by high-level

17   bookkeeper, if you will.  He is responsible and in control of

18   monitoring cash coming in, cash going out, right?

19  A   Hm-hm.  (Nodding head.)

20  Q   And he was -- he was a peer of yours?

21  A   Yes.

22  Q   And he was also responsible for preparing quarterly

23   financial statements, right?

24  A   Correct.

25  Q   And monthly financial statements?

866
ABBY SCHWARTZ - Cross

1    *A*    Correct.

2    *Q*    And you didn't do any, kind of, weekly accounting,

3    financial statements, it was just quarterly and monthly?

4    *A*    Not that I know of, no.

5    *Q*    And that's, Mr. Yioulos, his general job description we

6    will say?

7    *A*    Yeah.

8    *Q*    You are his peer, over here, right?

9    *A*    (Nodding head.)

10    *Q*    And you have people underneath you, in your department?

11    *A*    Correct.

12    *Q*    And now, on the other hand, we've got Mr. Tew?

13    *A*    Hm-hm.

14    *Q*    Right.  And Mr. Tew had no access to the AX software?

15    *A*    No, not that I'm aware of.

16    *Q*    And Mr. Tew wasn't in charge of accounts payable, for sure,

17    right?

18    *A*    No.

19    *Q*    Mr. Tew wasn't responsible for the financial statements,

20    the monthlies or quarterlies, right?

21    *A*    No.

22    *Q*    He had nothing to do with those?

23    *A*    No.

24    *Q*    Mr. Tew -- well, he was initially hired as an independent

25    contractor, right?

ABBY SCHWARTZ - Cross

1   *A*   He was.

2   *Q*   Kind of in mid, maybe, 2017, he steps into a new role,

    which is kind of a de facto CFO, if you will?

4   *A*   I'm not sure of the timeframe of that, but he did change

5   his duties a little bit, at some point.

6   *Q*   Because -- and fair enough that this was years ago?

7   *A*   This was years ago.

8   *Q*   Before he switches job responsibilities, there were kind of

9   a lot of people coming in and out of that CFO role, if you

10  will, right?

11  *A*   I don't remember a lot coming in and out of the role.

12  *Q*   Okay.  And you don't remember if there was, like, an issue

13  with prior CFOs?

14  *A*   There were only two really that were there, when I was

15  there.  I don't recall any issues.

16  *Q*   Okay.  But we can agree, at some point, that Mr. Tew kind

17  of steps into that role?

18  *A*   Yes.

19  *Q*   And in that role, you know, he is doing things like

20  investor reporting, right?

21  *A*   I didn't have a whole lot to do with what Mr. Tew was doing

22  on a daily basis, but he was working with Chris Alf a lot, so I

23  would assume those were the types of things.  Yeah.

24  *Q*   Okay.  So, fair enough.  Like, when Mr. Tew is there, you

25  are busy off doing your own work?  You don't really know what

ABBY SCHWARTZ - Cross

1    his specific job responsibilities were?

2    A    Yeah.  He wasn't in the Buffalo office with me, so he

3    didn't work there, so I wasn't sure, again, on a regular basis

4    what he would be working on for Chris.

5    Q    And he reported to Mr. Alf?

6    A    He did.  He did.

7    Q    And, of course, he is in Denver, you are in Buffalo, right?

8    A    Yes.

9    Q    So, you don't really actually see Mr. Tew, a lot, in

10   person?

11   A    No.  If a handful, that would be a lot, in total.  I don't

12   think it was that many.

13   Q    It's a long flight from Denver to Buffalo?

14   A    It is.

15   Q    And so, Mr. Tew is reporting to Mr. Alf, based in Denver,

16   and just doing his thing, if you will?

17   A    Yeah.

18   Q    And his thing really has nothing to do with controlling the

19   finances of NAC?

20   A    Not the day-to-day, for me, no.

21   Q    I want to talk to you -- well, Mr. Yioulos, you talked

22   about -- you talked about him yesterday?

23   A    Hm-hm.

24   Q    You -- he was based in Buffalo, right?

25   A    He was.

ABBY SCHWARTZ - Cross

1    Q    And you would see him all the time?

2    A    Every day.

3    Q    Okay.  And you kind had a friendship with him, right?

4    A    Yeah.

5    Q    And I think you said that every once in awhile you might go

6    to a happy hour or go out after work?

7    A    I didn't say that, but we did.  Yes.

8    Q    Okay.  Pardon me.  I thought you said that.  Is it true

9    that you would go out for happy hours with Mr. Yioulos?

10   A    Yes.

11   Q    And you had this kind of camaraderie for -- how many years

12   did you work with him?

13   A    Oh, wow, I would have to ... I don't know when he started.

14   Five years, if I had to guess.

15   Q    Best estimate?

16   A    Best estimate.

17   Q    And so, during those five years, you worked pretty closely

18   with him, right?

19   A    Yeah.

20   Q    And he ends up getting fired at the end of the day?

21   A    He did.

22   Q    And were you present when he got fired?

23   A    I was in the building.  I was not present when it happened,

24   but I was in the building.

25   Q    Who fired him?

ABBY SCHWARTZ - Cross

1   A   I'm not sure who made the phone call, but we had our

2   security agent from our Airlines come up to be in the building

3   to talk to him.  I'm not sure if HR was in his office.  I was

4   in my office, so I don't know who was in his office, at the

5   time.

6   Q   And there was -- you talked about doing, you know, kind of

7   looking into the invoices, after the IRS showed up at your

8   office, in 2020?

9   A   Hm-hm.

10  Q   You also ended up, kind of, looking into the situation with

11  Mr. Yioulos, where he was committing another fraud?

12  A   Hm-hm.  (Nodding head.)

13  Q   And can you say yes or no?

14  A   Sorry.  Yes.

15  Q   That's okay.  And what you found out is that Mr. Yioulos

16  was -- committed, not just one fraud, but two frauds?

17  A   I'm sorry.  I don't know what you mean by two?

18  Q   Well, let me just go back to number one.  You found out

19  that Mr. Yioulos was submitting false invoices and taking money

20  from NAC for himself, right?

21  A   None of the accounts were to himself, but they were not

22  legitimate accounts.

23  Q   Right.  And he was working with another former employee,

24  Tom Seifert.

25  A   I didn't see Tom on any of the documents that I had

ABBY SCHWARTZ – Cross

1    provided, but Tom was a member of his team.

2    Q   And did you learn that Tom and Mr. Yioulos were working

3    together?

4           MS. WEISS:  Your Honor, objection.  I believe the

5    witness has said she doesn't have any foundation or knowledge

6    of this.

7           THE COURT:  Overruled.  Go ahead.

8           THE WITNESS:  I have no knowledge of Tom working with

9    Jon on any of those things.

10   Q   So, you didn't learn any of that, as part of Mr. Yioulos

11   getting fired?

12   A   No.

13   Q   But we can agree that Mr. Yioulos got fired for taking

14   money from NAC?

15   A   He did.

16   Q   And he was taking money from NAC underneath your nose, for

17   a pretty long time, right?

18   A   (Nodding head.) Yes.  Sorry.

19   Q   For years?

20   A   Yes.

21   Q   And that was pretty shocking for you to learn?

22   A   Absolutely.

23   Q   Because he was a trusted employee, right?

24   A   Hundred percent, yes.

25   Q   You trusted him, I should say?

ABBY SCHWARTZ - Cross

1    A    Yes.  Yes.

2    Q    And you are a trusted employee, right?

3    A    I would hope so.

4    Q    Fifteen years?

5    A    Yeah.

6    Q    And there you are, working side-by-side, going to happy

7    hours with Mr. Yioulos, and he is stealing underneath your

8    nose?

9    A    Hm-hm.

10   Q    Yes?

11   A    Yes.

12   Q    Not to your knowledge, right?

13   A    No.  Not to my knowledge.

14   Q    And the government just asked you about some invoices.  For

15   instance, the one with Hannah Scaife's name on it?

16   A    Correct.

17   Q    You never looked at that invoice, at the time?

18   A    I pulled all of the invoices for them when they requested

19   them.

20   Q    Oh, no, no, no.  Pardon me.  Bad question on my part.  When

21   that invoice was submitted?

22   A    Oh.

23   Q    That invoice was never run past you?

24   A    I don't believe so.  I don't recall it ever being submitted

25   through me.

ABBY SCHWARTZ - Cross

1   Q   The first time you see that invoice is when you pulled them

2   for the IRS?

3   A   I believe so.

4   Q   And the same with the Global Fuel Logistics?

5   A   Yes.

6   Q   You didn't look at the invoice, back when it was submitted?

7   A   No.  My team reviewed the invoices before they were

8   entered.

9   Q   And so, why would you -- you didn't have to review what

10  Mr. Yioulos was doing?

11  A   No.  I was not his boss.

12  Q   Who, on your team, would have looked at, for instance, the

13  Hannah Scaife email -- pardon me -- invoice, or the Global Fuel

14  Logistics invoice?

15  A   My accounts payable team would have looked at that.

16  Q   Obviously, it must have passed muster?  Like, no one looked

17  at it very carefully back in the day?

18  A   They could have.  They could have asked Jon if he knew

19  about it.  If I wasn't available, Jon had the authority to

20  authorize an invoice, just like I did.

21  Q   But there was no, kind of, specific strict scrutiny as to

22  daily invoices, what they should look like, and the data that

23  should be on them, so there were no red flags?

24  A   There was a procedure.  I mean -- there wasn't any invoice

25  information that described how to pay a vendor, which was one

874
ABBY SCHWARTZ – Cross

1    of the examples my team would have to find that or we would

2    have no idea what to do with that invoice.  For larger

3    invoices, we would get approval from someone that was their

4    instructions.  Obviously, not for like utility bills or

5    something like that, but anything that seemed out of the

6    ordinary, if it was a regular vendor that we paid all of the

7    time, they would not, unless something came through that looked

8    odd.  So, if they had an approval on a couple, no, this is a

9    vendor we are going to use regularly to buy our fuel, they

10   would have processed those.

11   Q    Sure.  So let's break that down for a second.

12   A    Sure.

13   Q    You have regular vendors, such as, the vendor that pays for

14   your fuel?

15   A    Correct.  Many.

16   Q    And those are companies that you deal with all the time,

17   right?

18   A    Correct.

19   Q    You and your team would be familiar with the name of the

20   company?

21   A    Hm-hm.  (Nodding head.)

22   Q    The typical, maybe, charges that you are receiving?

23   A    Yes.

24   Q    Yes.  What the invoice looks like, right?

25   A    Yes.

ABBY SCHWARTZ - Cross

1    *Q*   And then there's instances where maybe it's a more

2    unfamiliar vendor, right?

3    *A*   Correct.

4    *Q*   And you, necessarily, wouldn't have that historical

5    knowledge about how they submit their invoices?

6    *A*   Correct.

7    *Q*   Or what their typical cost is, right?

8    *A*   Correct.

9    *Q*   Or what the invoice looks like?

10   *A*   Correct.

11   *Q*   And we can agree that the Hannah Scaife invoice, for

12   instance, that the government just displayed, that wouldn't

13   have been -- now, in retrospect that looks like an atypical

14   invoice?

15   *A*   Correct.

16   *Q*   And I think you, just a few minutes ago, said, in

17   retrospect, maybe Global Fuel Logistics looked like it had a

18   red flag, because it was kind of general, right?

19   *A*   It it was general.  There was no payment information

20   actually on the invoice, telling us who to pay or how to pay

21   them, which is odd.

22   *Q*   Right.  And you're saying that, now, as you sit here today,

23   because, obviously, we're in a federal courtroom?

24   *A*   Hm-hm.  Correct.

25   *Q*   We're in a criminal trial?

ABBY SCHWARTZ - Cross

1    A    Yes.

2    Q    And you understand what's going on here?

3    A    I do.

4    Q    And you talked to the IRS a lot over the years, right?

5    A    I have.

6    Q    And you're aware of, kind of, the nature of the

7    investigation, in this case?

8    A    I am.

9    Q    So, now, in retrospect, of course, it makes sense to sit

10   here and say, *When I look back at these documents they look odd*

11   *to me*, right?

12   A    Yes.

13   Q    But at the time, obviously, they didn't look odd to anyone

14   in your department, because they were approved and paid?

15   A    They were approved, but there were emails from Jonathan

16   Yioulos that he provided to my team that they were okay.

17   Q    And they were approved and paid?

18   A    Correct.

19   Q    And as you sit here, you can't -- you have no personal

20   knowledge -- you can't tell us, kind of, how they were approved

21   and paid, but for some emails that you have looked at, right?

22   A    Correct.

23   Q    So, how many times do you think you have spoken with --

24   well, you have spoken with Agent Palmer, who is here at the

25   table, sitting at the prosecution's table, right?

ABBY SCHWARTZ - Cross

1    A    I have.

2    Q    How many times do you think you have spoken with her?

3    A    Since the beginning?

4    Q    Yeah.

5    A    Um ... probably three or four times in the beginning, and

6    then, recently, right before I came here, a few times.

7    Q    So, July 1st of 2020, was, I believe, the date that you

8    talked about being at your office?

9    A    Hm-hm.

10   Q    And that's when Mr. Alf asked you to come after hours?

11   A    The -- that was when he called to tell me that we were

12   pulling invoices for them.

13   Q    And that's when you started pulling invoices?

14   A    It is.

15   Q    And then you -- did you have a phone call with Agent Palmer

16   on July 4th of 2020?

17   A    She came to Buffalo.  I believe it was July 5th.

18   Q    Okay.  Did you talk with her or were you interviewed by

19   her, before she came to Buffalo?

20   A    I was.

21   Q    And so, that interview would have happened on the

22   telephone, around July 4th or 5th of 2020?

23   A    The phone call was around the 1st.

24   Q    And you also were interviewed again in January of 2021?

25   A    I don't recall.

878
ABBY SCHWARTZ - Cross

1    *Q*    Okay.  That's okay.  What about December of 2023?

2    *A*    Yes.

3    *Q*    And, obviously, then, you met with the agent and the

4    prosecutors before you testified today?

5    *A*    I did.

6    *Q*    And they prepared you to testify?

7    *A*    They did.

8    *Q*    And you're, obviously, here on their subpoena?

9    *A*    I am.

10   *Q*    Once you started speaking with Agent Palmer, you then

11   talked about how you, kind of, did an internal investigation at

12   NAC?

13   *A*    Correct.

14   *Q*    And you started pulling invoices?

15   *A*    Yes.

16   *Q*    And you started to kind of think, *Uh-ho, something bad has*

17   *happened*, right?

18   *A*    Yeah.  Something did not look right, for sure.

19   *Q*    But you were not quite sure what didn't look right?

20   *A*    No, not at that time.  I was not sure.

21   *Q*    And so, for the next what several weeks or months, are you

22   doing this internal investigation?

23   *A*    It only lasted a few days.

24   *Q*    Oh, okay.  And as part of that internal investigation, you

25   pulled American Express statements?

ABBY SCHWARTZ - Cross

1   A    The American Express statements were prior.  They were from

2   2018.  I'm assuming you are talking about July 2020.  The 2018,

3   the Michael Tew statements, would have been pulled prior to

4   that, I did not pull them again in July of 2020.

5   Q    Okay.  So, you did not review any American Express

6   statements, as part of your internal investigation?

7   A    I'm not a hundred percent sure, but, no, I don't believe

8   that was part of my separate investigation.  No.

9   Q    And speaking of American Express statements, the

10  government, obviously, just displayed several of them that you

11  have talked about?

12  A    Correct.

13  Q    I'm not going to pull them back up.  The first -- but I may

14  ask you just a few quick questions about them.

15  A    Sure.

16  Q    One of the statements is Exhibit 339, which had the expense

17  information from June of 2018, related to a trip to Orlando?

18  A    Okay.

19  Q    Do you recall that?

20  A    I do.

21  Q    And we can agree, you were not in Orlando?

22  A    No.

23  Q    You have no idea who was in Orlando?

24  A    No.

25  Q    And those expenses were only for $312, presently?

ABBY SCHWARTZ – Cross

1    A    I believe so.

2    Q    Will you trust me?

3    A    I do.

4    Q    The following July of 2018 credit card statements, you

5    testified about, for instance, Exhibit 339, involved Target,

6    Best Buy and charges of about $500 here and there, right?

7    A    I believe it was 5- and $600 in the original.

8    Q    And again, you are, obviously, not at Target in Glendale,

9    because you live in Buffalo?

10    A    Correct.

11    Q    You probably just learned where Glendale is?

12    A    I still don't know.

13    Q    That's okay.  You talked about the King Sooper charges for

14    $1500, right?

15    A    Yeah.  I believe they were like 1500 to $4500, correct.

16    Q    You are, obviously, just looking at a credit card

17    statement, right?

18    A    Yes.

19    Q    You have no idea who is actually using that credit card at

20    the King Soopers to make that purchase?

21    A    No.

22    Q    And same with you know Target, Walgreens™?

23    A    Correct.

24    Q    And, obviously, you have spoken with Kimberley Tew,

25    Michael's wife?

ABBY SCHWARTZ - Cross

1    *A*    Once or twice.

2    *Q*    And they were unpleasant conversations?

3    *A*    They were.

4    *Q*    She yelled at you?

5    *A*    She -- yes, she did.

6    *Q*    She yelled at you to pay Mr. Tew?

7    *A*    Yes.

8    *Q*    She thought -- well, let me rephrase my question.  During

9    these unpleasant conversations, you were being told to pay

10   Mr. Tew immediately?

11   *A*    I was.

12   *Q*    You were being told that you -- I should say NAC -- owed

13   him more money?

14   *A*    Correct.

15   *Q*    And that involved screaming?

16   *A*    It did.  It was regarding -- if I remember correctly, it

17   was regarding a prepayment that she had said was agreed to be

18   paid, but I didn't have any knowledge of that, so I couldn't

19   pay it without first talking to Christopher Alf, the owner.

20   *Q*    Because there was a process?

21   *A*    I had no invoice, there was no agreement, I had no

22   authorization to make any additional payments.

23   *Q*    So, you were just, kind of, in a tough spot with Kimberley

24   Tew screaming at you, but you had to go get authorization to --

25   *A*    Yes.

882

ABBY SCHWARTZ - Cross

1   Q   -- approve a payment?

2   A   Yes.

3   Q   And did you go to Mr. Alf to get authorization for that

4   payment?

5   A   I believe so.  I don't remember what he said.

6   Q   Not a problem.  You have a second call with Mrs. Tew?

7   A   Equally.

8   Q   That's equally unpleasant?

9   A   She wants payment.

10  Q   Would you consider it threatening?

11  A   I don't remember the exact thing.  I just remember her

12  screaming at me and it being extremely unpleasant.  I don't

13  remember if it was threatening, to be honest with you, what

14  words were used, but it was extremely unpleasant, correct.

15  Q   And after that second call, what happens is you decide,

16  like, *I never want to talk to her again*?

17  A   Yes.

18  Q   And you never did talk to her again?

19  A   No.

20  Q   And you had gone to Mr. Yioulos or Mr. Alf to say, I'm not

21  talking to Kimberley Tew again?

22  A   Yes.

23  Q   And they were not surprised?

24  A   I don't recall.  I mean, I, honestly, don't recall, but we

25  did talk to Michael Tew to ask that she never call me again.

883
ABBY SCHWARTZ - Cross

1    Q    And that was a little crazy?

2    A    It was a little out of the ordinary, yes.

3    Q    And I think you talked about that on Direct Examination.

4    In all of your years, working at NAC, that was odd, for you?

5    A    Yes.  We have had many people call in, obviously, for

6    payments, and you know, talking to you, and some people are

7    upset that you can't pay them on time or, you know, if we are

8    late making a payment, it doesn't make people happy, but I had

9    never had the nature and tone on that call, previously.  No.

10   Q    And you have never met --

11        MS. FROST:  Sorry, Your Honor.  May I --

12        THE COURT:  Why don't you just -- okay.

13        MS. FROST:  Going to get in trouble.

14   Q    You had never met Mrs. Tew in person?

15   A    No.

16   Q    You, obviously, have never been to their house in Denver?

17   A    No.

18   Q    You have no insight into their relationship?

19   A    No.

20   Q    You have no idea how their household finances are run?

21   A    No.

22   Q    You mentioned something about Bitcoin on Direct

23   Examination?

24   A    No.  Bitcoin?

25   Q    Pardon me.  My bad.  I thought you did mention Bitcoin, but

ABBY SCHWARTZ - Cross

1    you wouldn't because it's over your head, right?

2    A    I didn't.

3    Q    You mentioned a situation where a third party had called

4    NAC and upset one of your employees?

5    A    He had spoken to several employees, over the course of a

6    couple days.  Yes.  He... not been very nice and upset one of

7    the employees, correct.

8    Q    And that was another, we will call it, odd situation for

9    you?

10   A    Extremely, yes.

11   Q    And his name was Craig Faigin?

12   A    I believe so.

13   Q    And you had a crying employee in your office?

14   A    She was very upset, yes.

15   Q    Who was that?

16   A    I believe it was Cari, and I don't remember her last name.

17   I'm sorry.

18   Q    That's okay.

19   A    From the operations floor, is who took the call.

20   Q    And someone else from HR took that call, right?

21   A    Yes.  Our HR manager, at the time, took a call, I believe

22   one or two, from him possibly.

23   Q    And this September of 2018?

24   A    Yes.

25   Q    And this is not a former disgruntled employee, it's a

ABBY SCHWARTZ - Cross

1    totally random man named Craig Faigin?

2    A    Correct.  We have -- no one in our office had ever heard of

3    him.

4    Q    Or claiming to be Craig Faigin?

5    A    Or claiming, yes.  That's who he said he was.  I don't

6    know.

7    Q    And so he calls HR, whoever, claiming that Mr. Tew owes him

8    $7500?

9    A    I don't remember the dollar amount.  Yes, he called our

10   operations department saying that he owed the money.  He was

11   looking for Michael.  When the calls kind of got more

12   aggressive, they were passed to our HR department.

13   Q    They get more aggressive at some point, because he is

14   threatening, right?

15   A    Yes.  He was ... from my understanding, he was not

16   pleasant.  I did not talk to the man.

17   Q    Right.  You were just, kind of, the -- part of the internal

18   investigation, if you will, that also starts --

19   A    Yes.

20   Q    -- because he is blowing up your phone?

21   A    Yes.  He was calling --

22   Q    Meaning NAC?

23   A    Several times, yes.

24   Q    And so HR deals with the situation, right?

25   A    To my knowledge, yes.

ABBY SCHWARTZ - Cross

1    Q    And Mr.-- Chris was updated?

2    A    Absolutely, yes.

3    Q    You are kind of part of the situation --

4    A    Yes.

5    Q    -- at this point?

6    A    Yes.

7    Q    Like, you have knowledge as to the fact that this

8    Craig Faigin --

9    A    Yes.

10   Q    -- is threatening employees at NAC, because he is claiming

11   that Mr. Tew owes him money?

12   Q    Correct.

13   Q    And are you aware of whether Bitcoin was involved in that

14   fact pattern?

15   A    No, I was not.

16   Q    Okay.  Someone talked to Mr. Tew about it, as well, right?

17   A    I believe our HR person may have reached out to him

18   directly.  I'm not sure who made the initial contact with him.

19   Q    And Mr. Tew actually filed police reports about this?

20   A    I'm not sure.

21   Q    Okay.  That was a little crazy too?  We can agree that you

22   were pretty disappointed when you found out what Mr. Yioulos

23   had done?

24   A    Disappointed is a great word.  Yes.

25   Q    You felt betrayed?

ABBY SCHWARTZ - Cross

1    A    Absolutely.

2    Q    And when you first spoke with Agent Palmer, on July 4th of

3    2020, Agent Palmer asked you a bunch of questions, right?

4    A    When I spoke to her on the phone, yes, around the 1st.

5    Q    Yes.  And you know, you were providing all of the

6    information you had about the invoices and what looked odd to

7    you, right?

8    A    Um, the first phone call, they were more vague questions

9    regarding the invoices.

10   Q    They were asking you about Mr. Yioulos, during that

11   conversation?

12   A    The initial conversation, it was just regarding invoices

13   and payments that had happened out of National.

14   Q    Fair enough.  Shortly thereafter, you had more extensive

15   conversation with Special Agent Anderson and Agent Palmer,

16   right?

17   A    After I had found out the payments that looked fraudulent.

18   Yes.

19   Q    And they started to ask you questions about Mr. Yioulos and

20   his role at the company, right?

21   A    Correct.

22   Q    And they asked you if there was any way that you thought

23   that Yioulos was not aware or not responsible for the

24   fraudulent payments to GFL, AMR and PM?

25   A    I don't remember the exact conversation, but, yes, they

ABBY SCHWARTZ - Cross

1   were asking about the payments being to those vendors.

2          THE COURT:  Hold on a second.  Yes, ma'am.

3          THE JUROR:  Can we take a break, please?

4          THE COURT:  Yes.  I think we should probably take a

5   break.  So, let's do a ten-minute recess.  Thank you.

6          THE COURTROOM DEPUTY:  All rise.

7      (Jury out at 10:39 a.m.)

8          THE COURTROOM DEPUTY:  Court is now in recess.

9      (Recess at 10:39 a.m.)

10     (In open court at 10:51 a.m.)

11         THE COURT:  Please take your seats.  We can bring the

12  jury back in.

13         MS. FROST:  Your Honor, should I go to the podium?

14         THE COURT:  Sure.  Bring the witness in too.

15         MS. FROST:  For the record, I didn't break the

16  microphone.

17         THE COURT:  The cover just comes off.

18         MS. FROST:  It just popped off.

19         THE COURT:  You are not the first one.

20         THE COURTROOM DEPUTY:  All rise.

21     (Jury in at 10:52 a.m.)

22         THE COURT:  Let's take our seats, and we will allow

23  Ms. Frost to pick up with her Cross-examination.

24         MS. FROST:  Thank you, Your Honor.

25  Q   Ms. Schwartz, before the break we were talking about a

ABBY SCHWARTZ - Cross

1    conversation you had with Agent Palmer on July 4th of 2020.

2    A    Hm-hm (Nodding head.) Yes

3    Q    And during that conversation, the fact that you were asked

4    about Mr. Yioulos and his possible involvement with fraudulent

5    invoices?

6    A    She did not mention Jonathan Yioulos that was -- I

7    discovered that when I was looking into the items that she had

8    asked about.

9    Q    Yeah, no, and so let me rephrase my question.  I'm asking

10   about what the agent was talking to you about, during this

11   conversation, not about what -- not about your work with the

12   invoices.  Does that make sense?

13   A    Kind of.

14   Q    Okay.  Let me rephrase my question.  Isn't it true that on

15   July 4th of 2020, you had a phone interview with Agent Palmer?

16   A    No.  Actually, I talked to her on the phone prior to the

17   4th of July.  It was the 5th of July that I met her in person.

18   Q    Okay.  And so, during the phone conversation -- would you

19   be surprised if I have a report that says it was July 4th?

20   A    Oh, maybe my dates are wrong.

21   Q    Notwithstanding, during that phone conversation, you're

22   being interviewed, and a topic that comes up is Mr. Yioulos and

23   his possible involvement in the fraudulent invoices, correct?

24   A    If that was after my findings, correct.

25   Q    And you were asked whether there was any way you thought

ABBY SCHWARTZ - Cross

1    that Mr. Yioulos could be aware or responsible for fraudulent

2    payments to various companies, right?

3    A    After my discovery?

4    Q    I'm talking about what you were asked during this?

5    A    Initially, no.

6    Q    Okay.  So, you're denying that the agent asked you that

7    question?

8    A    I don't believe Jonathan's name came up, specifically, in

9    my call with her.

10   Q    Okay.  Would -- do you recall telling the agents, quote,

11   *Off the top of my head, no one but Yioulos could have set this*

12   *fraud up*, unquote?

13   A    I don't recall, and that would have been after I found

14   discovery.

15   Q    Would looking at a copy of the report that documents that

16   conversation help refresh your recollection?

17   A    It might.

18   Q    Okay.

19            *MS. FROST:*  Your Honor, may I --

20            *THE COURT:*  Mr. Keech.

21            *MS. FROST:*  It's Bates 5067.  I have shown it to the

22   government.

23            *THE COURT:*  Okay.  Thank you.

24            *THE WITNESS:*  Thank you.

25   Q    And, Ms. Schwartz, if you could flip to paragraph 19, where

ABBY SCHWARTZ – Cross

1  the little green tab is?

2  A    Thank you.

3  Q    Don't read it out loud, but read it to yourself?

4  A    Nineteen, you said?

5  Q    Yes, please.

6  A    Yes.

7  Q    Is your recollection refreshed?

8  A    Yes.

9  Q    Thank you.

10  A    The chain of events is fresher.  Thank you.

11  Q    Years ago, and 2020 was a crazy year.  So, during that

12  conversation, the agents asked you about Mr. Yioulos'

13  involvement with fraudulent invoices, connected to those

14  companies, right?

15  A    Correct.

16  Q    And then your response was, *Off the top of my head, no one*

17  *but Yioulos could have set this fraud up*, right?

18  A    Correct.

19  Q    And at that point, your head and your heart were at odds?

20  A    Absolutely.

21  Q    Because it was Mr. Yioulos who had the access to the

22  accounting software, right?

23  A    Yes.

24  Q    It was Mr. Yioulos who was involved with invoice

25  processing, correct?

ABBY SCHWARTZ - Cross

1   *A*   Yes.

2   *Q*   And it was Mr. Yioulos, at that point, who was the only

3   person that could have been responsible for this fraud?

4   *A*   Yes.

5        *MS. FROST:*   I have no further questions of

6   Ms. Schwartz.   Thank you.

7        *THE COURT:*   All right.   Thank you, Ms. Frost.

8        *MR. KAPLAN:*   Briefly, Your Honor.

9        *THE COURT:*   All right.

10                    **CROSS-EXAMINATION**

11  *BY MR. KAPLAN:*

12  *Q*   Good morning, Ms. Schwartz.

13  *A*   Good morning.

14  *Q*   Just a few questions.

15  *A*   Sure.

16  *Q*   You talked about having conversations with Ms. Tew that you

17  found unpleasant?

18  *A*   Yes.

19  *Q*   Now, that was during the time where Michael Tew was still

20  working at NAC?

21  *A*   Yes.   He was still a consultant for us.   Yes.

22  *Q*   What she was asking about, in an unpleasant manner, was

23  paying him kind of a prepayment out of the normal course of how

24  he got his consulting fees?

25  *A*   Correct.

ABBY SCHWARTZ - Cross

1   *Q*   And she was saying to you that he was entitled to do it,

2   and again, in an unpleasant way, asking you to get those

3   payments out?

4   *A*   Yes.

5   *Q*   And you were explaining to her that you would need

6   authorization.  If that was true, and he was entitled to it,

7   fine, but I need to find somebody, other than on my authority,

8   to pay?

9   *A*   Correct.

10  *Q*   And that would have been, for instance, Chris Alf, could

11  have certainly authorized that?

12  *A*   Absolutely, yes.

13  *Q*   And did you come to learn that Chris Alf actually had

14  authorized prepayments?

15  *A*   Yes.

16  *Q*   All right.  So, the dispute, again, how unpleasant it was,

17  was not that she was asking about something that was incorrect,

18  because it had been authorized.  The -- the dispute, what was

19  unfortunate for you, is your responsibility was to find that

20  out, before you just said, *Fine, I will write the check*?

21  *A*   Yes.  I did not know they were authorized.

22  *Q*   Okay.  Now, did you end up finding that it was authorized

23  and then?

24  *A*   I don't recall.

25  *Q*   Okay.  But at any rate, you found out that they were?

                        ABBY SCHWARTZ - Cross

1    A   I believe so.  I don't recall, specifically, if that one

2    was ended up being paid.

3    Q   Right.  Your recollection was one -- perhaps two

4    conversations about this same question, about getting money?

5    A   Yes.

6    Q   That was the full subject of these conversations.  That was

7    the dispute, that's what you were being asked to do?

8    A   Correct.

9    Q   You let it be known that you didn't want to be talked to

10   that way, and you didn't want to speak with Ms. Tew again, and

11   you let that be known, I know, to Michael Tew and Mr. Yioulos?

12   A   And Mr. Alf.

13   Q   And Mr. Alf, yes.  And Ms. Tew never contacted you again,

14   after that?

15   A   I don't recall speaking to her after that.

16   Q   So, not only did she not speak to you after that, about

17   this, she never called you again, about anything?

18   A   I don't believe so.

19   Q   And your best recollection is that you hadn't spoken to her

20   again?

21   A   No.

22   Q   When you were doing your investigation, you ended up

23   pulling invoices of many of these companies that ended up being

24   suspicious?

25   A   Correct.

ABBY SCHWARTZ - Cross

1    Q    Your investigation had you review many of those invoices?

2    A    Correct.

3    Q    Some of which were shown to you?

4    A    Correct.

5    Q    And the, *ah-hah moment*, that you had, was that one of them

6    had actually been a payment to Sand Hill?

7    A    Correct.

8    Q    And that ah-hah moment was, *Wait a minute, this really does*

9    *have some connection to NAC*?

10   A    Yes.

11   Q    And that Mr. Tew, who had, by the time, obviously, you had

12   been investigating, had been fired?

13   A    Yes.

14   Q    And having been fired, there would be no reason -- in your

15   mind, there would be no reason to pay Sand Hill?

16   A    Correct.

17   Q    And Sand Hill was actually Mr. Tew's company, and the

18   company that received the payments, his contracting payments?

19   A    Correct.

20   Q    And you thought something is fishy?

21   A    Yes.

22   Q    And you thought something is fishy, really, between Michael

23   Tew and Mr. Yioulos?

24   A    Correct.

25   Q    And then it unraveled from there, and you have come to

ABBY SCHWARTZ - Redirect

1    learn that many of the invoices that were provided, were

2    provided by Mr. Yioulos, after conversations and discussions

3    with Mr. Tew?

4    A    I'm not sure exactly how he maintained them, but yes,

5    regarding the payments that were made.

6    Q    When you were going through those invoices and seeing what

7    the jury has seen plenty of now, which is requests and

8    approvals for these invoices, it always had -- always -- if not

9    the vast majority of time, Mr. Yioulos was the one who was

10   making the requests and doing the approvals?

11   A    Correct.

12   Q    And in terms of the invoices that you looked at, and the

13   requests and the payment, Ms. Tew's name didn't appear on any

14   of those?

15   A    No.

16        MR. KAPLAN:  Nothing further.

17        THE COURT:  Thank you.  Redirect.

18        MS. WEISS:  Very briefly Your Honor.

19                    **REDIRECT EXAMINATION**

20   BY MS. WEISS:

21   Q    Ms. Schwartz, you were asked about a lot of the order of

22   events over that 4th of July weekend?

23   A    Yes.

24   Q    One of the questions was whether or not you were asked to

25   provide to the agents the Amex statements of Michael Tew's

ABBY SCHWARTZ - Redirect

1   credit card?

2   A   Yes.

3   Q   Would it refresh your recollection to review a document

4   from around that time period?

5   A   Absolutely.

6   Q   And don't read that out loud, ma'am.  Just read it to

7   yourself, and let me know when you are ready.

8   A   Yes.

9   Q   Okay.  Were you asked by the agents, from the FBI and IRS,

10  to locate and provide to them those Amex statements that we

11  talked about earlier?

12  A   In fact I was, yes.

13  Q   Okay.  Ms. Schwartz, you were also asked some questions

14  about those calls from Craig Feigin, to National's offices?

15  A   Correct.

16  Q   Right.  And -- okay.  I want to be clear, because -- at

17  least it was confusing to me.  There was a more formal internal

18  investigation into the Amex charges?

19  A   Correct.

20  Q   There was formal documentation of the Craig Feigin calls?

21  A   Yes.

22  Q   When I say internal investigation, I mean something more

23  formal, right?

24  A   Yes.

25  Q   Was there a formal internal investigation conducted by you,

1    into these invoices that we have been talking about, with

2    Michael Tew and Jonathan Yioulos, or was that just you on your

3    laptop at home?

4    A    That was me on my laptop, at home, after the initial

5    request and conversation that I had.

6    Q    Okay.  I just want to be clear.

7    A    It was me, at home.

8    Q    I'm going to call that *your* investigation?

9    A    It was my investigation, yes.

10   Q    Versus an internal investigation?

11   A    Yes, yes.

12   Q    As far as the Craig Feigin calls, I believe you said you

13   documented your conversations with the employees that received

14   those calls?

15   A    I believe so.

16   Q    Okay.  And then, would it refresh your recollection to look

17   at your notes from that, to answer some questions I have about

18   those --

19   A    Absolutely.

20        MR. KAPLAN:  I object to refreshing without a question

21   needing refreshing.

22        MS. FROST:  Object.

23        THE COURT:  I will sustain it.  Let's just see if she

24   can remember.  Go ahead.

25   Q    Sure.  Do you recall what Michael Tew said, that day, when

1    he was contacted by you and Chris Alf regarding the

2    Craig Feigin calls?

3    A    On the original conversation, specifically, I don't

4    remember.  I'm sorry.

5         *MS. WEISS:*  That's okay.  May she refresh?

6         *THE COURT:*  I think we can go ahead, then.  Thank you.

7    Q    And once again, Ms. Schwartz, you read to yourself, and you

8    let me know when you are done.

9    A    Thank you.  Yes.  Thank you.

10   Q    Yes.  And you can just put it back in that folder, so you

11   don't see it while your ... okay.

12        Has that refreshed your recollection about what

13   Michael Tew told you and Chris Alf that day about the

14   Craig Feigin calls?

15   A    It does.

16   Q    And what did he say?

17   A    His initial response to us was that he did not know who

18   this gentleman was.  Further, in the conversation, he did

19   acknowledge that he knew the name, and that the gentleman had

20   business dealings with Kimberley Tew, and that Michael would

21   handle with our attorney, Hantman.

22   Q    Thank you.  Ms. Schwartz, you were asked some questions

23   about the responsibilities of Jonathan Yioulos?

24   A    Correct.

25   Q    You were very familiar with what his job responsibilities

ABBY SCHWARTZ - Redirect

1   were?

2   A    Correct.

3   Q    You were also familiar with the responsibility -- or you

4   were asked some questions about the responsibilities of

5   Michael Tew?

6   A    Correct.

7   Q    You were less familiar with those?

8   A    Yes.  Yes.  I didn't have much work relationship with him.

9   He worked directly with Chris.

10  Q    Sure.  Did you have enough knowledge to know whether or not

11  part of Michael Tew's job was not to steal from National?

12  A    Yes.

13  Q    Same question as to Jonathan Yioulos?

14  A    Yes.

15  Q    Same question as to Kimberley Tew?

16  A    Yes.

17  Q    Finally, I want to give you an opportunity -- you were

18  asked some questions about how you felt about --

19  A    Yeah.

20  Q    -- Jonathan Yioulos and the situation --

21  A    Yeah.

22  Q    -- on Cross-examination, using defense counsel's words.

23  So, I want to give you an opportunity, now, to say how you feel

24  about this situation.  You were --

25          MS. FROST:  Objection.

ABBY SCHWARTZ - Redirect

1              MR. KAPLAN:  Objection.

2              THE COURT:  Overruled.  Go ahead and answer.

3              MS. FROST:  Objection, and outside of the scope,

4    Your Honor.

5              THE COURT:  Overruled.

6    Q    It's okay.  Go ahead.

7    A    I was like -- sorry.  It was very discouraging.  You're

8    friends with someone -- I'm sorry.  You are friends with

9    someone, and this is kind of what they do.  It was

10   heartbreaking, to be honest.

11             MS. WEISS:  There are tissues right there, for you,

12   ma'am.  Okay.  That was my last question.  Thank you very much.

13             THE COURT:  All right.  Thank you.  Ms. Schwartz, you

14   are excused.  Thank you for your time.

15             THE WITNESS:  Thank you, Your Honor.

16             THE COURT:  Government have another witness ready?

17   All right.

18             MS. WEISS:  We do, Your Honor.

19             THE COURT:  Go ahead.

20             MS. WEISS:  The government calls Michael Meyers.

21             THE COURTROOM DEPUTY:  Please raise your right hand.

22        (**MICHAEL MEYERS** was sworn.)

23             THE WITNESS:  Yes, sir I do.

24             THE COURTROOM DEPUTY:  Please be seated.  Please state

25   your name and spell your first and last names for the record.

MICHAEL MEYERS - Direct

1      THE WITNESS: Michael Meyers, M I C H A E L,

2   M E Y E R S.

3                    **DIRECT EXAMINATION**

4   BY MS. WEISS:

5   Q   Good morning -- good afternoon -- good morning.  Where do

6   you live, sir?

7   A   Middle Tennessee.

8   Q   You take your time, okay?  Michael Meyers, what do you do

9   for a living?

10  A   I am BIM Specialist, BIM, building information modeling.

11  It's just a fancy way of saying I'm a construction worker that

12  digitally creates a job site in an environment before the

13  installation takes place on the ground.

14  Q   Okay.  What industry were you in before becoming a BIM

15  Specialist?

16  A   Initially started out as an electrician, and then after

17  that, went into Bitcoin peer-to-peer sales.

18  Q   Okay.  What's the highest level of education you have

19  received?

20  A   G.E.D.

21  Q   What is your telephone number, sir?

22  A   It's 615-810-4719.

23  Q   Was that your telephone number during the period of October

24  2018 through December 2018?

25  A   Yes, it was.

MICHAEL MEYERS - Direct

1    Q    Did you have any previous telephone numbers?

2    A    Yes.

3    Q    Can you please read that off, as well?

4    A    It was 615-241-2142.

5    Q    Have you ever had your own business?

6    A    Yes.

7    Q    And what was the name of that business?

8    A    Meyers Consulting Group, LLC.

9    Q    Where was that group, Meyers Consulting Group, LLC,

10   incorporated?

11   A    In Laramie, Wyoming.

12   Q    Okay.  Was it ever incorporated anywhere else, later on?

13   A    Yes.  It was later brought to Tennessee.

14   Q    And when did you incorporate Meyers Consulting Group, LLC?

15   A    Around March or April of 2018.

16   Q    What type of business was Meyers Consulting Group, LLC in?

17   A    Consulting, so peer-to-peer sales was the initial intent.

18   Q    And peer-to-peer sales of what, sir?

19   A    Bitcoin or cryptocurrencies.

20   Q    Okay.  Was Meyers Consulting Group, LLC, your full-time job

21   in the -- and I am just going to say October 2018 to December

22   2018, as the relevant time period here?

23   A    Yes, it was.

24   Q    Okay.  Do you have any employees?

25   A    No.

MICHAEL MEYERS - Direct

1    Q    Just you?

2    A    Yes.

3    Q    Okay.  And again, that was your full-time job?

4    A    Yes.

5    Q    Okay.  Is that entity still active?

6    A    It was dormant for three to four years, but it has been --

7    recently been brought back to activity.

8    Q    What was the reason to bring it back to activity?

9    A    Um ... looking for side work, in essence.  So, I -- in the

10   industry I'm in right now, and the ... I apologize.

11   Q    It's okay.

12   A    It's a little bit much for me.  So, in my industry, I have

13   gone from being a fieldworker to an office worker, working 40

14   hours a week versus being used to 70 hours a week, so having

15   some additional income was becoming of prevalence, and there's

16   a lot of demand for what I do, outside of work hours.  So, I

17   found that was better than the alternative of sitting around

18   watching T.V.

19   Q    So, you are going to use Meyers Consulting Group, LLC for

20   BIM Specialist work?

21   A    Correct.

22   Q    Are you intending on using it for any of the peer-to-peer

23   crypto trading that you were using it before?

24   A    No.  Not unless I would like to get a divorce.

25   Q    Do any cryptocurrency trading, nowadays, Mr. Meyers?

MICHAEL MEYERS - Direct

1    A    No, no.  My wife has a very strict policy on that one.

2    It's that or me, you know.

3    Q    Understood.  And I am going to just grab my water real

4    quick.

5              All right.  Turning to 2018, did you communicate with

6    an individual going by the name Kimberley Tew, at that time?

7    A    Yes, I did.

8    Q    Have you ever seen her in person, prior to today?

9    A    No, I have not.

10   Q    Okay.  How did you meet Kimberley?

11   A    Our initial meeting took place on a website called

12   *Paxful.com*.

13   Q    Can you spell that for the benefit of our reporter?

14   A    It's P A X F U L, dot com.

15   Q    What is *Paxful.com*?

16   A    It's a peer-to-peer sales arbitrager, mediator.

17   Q    Of what, sir?

18   A    The ability to sell Bitcoin to other individuals for US

19   dollar or vice versa.

20   Q    And is that, as compared to an exchange?

21   A    Yes.

22   Q    Could you explain to the jury, and frankly to me, the

23   difference between an exchange and peer-to-peer?

24   A    So, an exchange is typically where a trader, of any sort,

25   will go, and they will register under their identity, and then

MICHAEL MEYERS – Direct

1    are able to buy Bitcoin at market rates.  It's just like the

2    stock market.  It has daily fluctuations of buy-and-sell

3    moments, and so you can buy it at that spot, right, at the

4    time, on an exchange, and based upon verification levels,

5    determines how much you can purchase in a 24 hour or

6    month-to-month or month time.

7            Peer-to-peer sales is a little bit different, where

8    you're paying somebody else, who has purchased it through one

9    of those other means, a surcharge, in essence, to be able to

10   purchase it from them directly, less verification.  It's a

11   little bit easier to get through, and you have communication

12   with an individual versus a website, specifically.

13   Q   Is it more risky to trade peer-to-peer than through and

14   exchange?

15   A   It is.

16   Q   And I probably should have asked this question before, can

17   you define what cryptocurrency is to us in a nutshell?

18   A   Okay.  I will try my best to *slaughter* it.  It's basically

19   the whole idea of cryptocurrency is the ability to eliminate

20   the middleman of a banking institution, and have an ownership

21   of a currency that you're able to send person-to-person without

22   that middle mediator, and the only cost to send those

23   transactions, is then given to the people who are doing a thing

24   called mining.  And mining is a consumption of power and

25   processing to be able to transmit these little packets of data

MICHAEL MEYERS – Direct

1    along to the next wallet.

2            So, you have buyer A and buyer B, you are able to

3    transmit from your wallet to their wallet, without having to

4    have all of the jump-throughs, the time delays, the typical

5    issues that you see in currency.  ACH used to take up to seven

6    days to get to your account.  Kind of due to this technology,

7    that's been expedited, because they see the need for more

8    instantaneous transactions, and that's where this comes into

9    play.

10   Q   Okay.  I sort of understand.

11   A   Me too.

12   Q   Great.  Same page.  Can you provide the jury with an

13   analogy of what your role was on Paxful?  What you were doing

14   on Paxful?

15   A   I was -- I was on there and acting as a storefront, in

16   essence.  Storefront that has an ability to put advertisements

17   out there at a set rate, above or below market value, to try to

18   entice other people to come in and purchase my Bitcoins, or to

19   sell me Bitcoins at a market value.  And so, my intent, or my

20   job, on there was speculating market value, in essence, and at

21   the right moment put a sale out there and try to make a

22   percentage on top of what market value was.  Um, and that's ...

23   kind of perfect-world idea of what it should have been.

24   Q   Okay.  You were doing that full-time?

25   A   Yes.

MICHAEL MEYERS – Direct

1    *Q*    Okay.  How do you access Paxful?  Is it a website an app,

2    what is it?

3    *A*    A website

4    *Q*    When you are on that website, how do you communicate

5    with -- you described yourself as a storefront.  How do you

6    communicate with potential buyers?

7    *A*    So, there's a list of -- when you are going on there to

8    purchase, there's list of transactions available, and you can

9    filter down by type of deposit you want to make or the method

10   that you want to pay for the Bitcoin or vice versa Bitcoin to

11   fiat, and so a user could go and choose, Well, I want to do a

12   bank transfer through ACH or wire transfer or a cash deposit at

13   a bank account or Zelle or Cash App or Google pay, and so once

14   they find your advertisement, and the rate looks within what

15   they're willing to trade for it, they then can open a trade for

16   a portion of the money that you have in there or the entire

17   amount, depends on their need, and then it takes that funds and

18   it puts it into an escrow, and so you can no longer sell what

19   has been partitioned off to that individual, and then you have

20   trade terms that it will open up a chat dialogue, and allow you

21   to discuss, you can put a welcome message that says, *Here's the*

22   *typical things I need you to do, please submit your ID*, *submit*

23   *X and Y*, and then they start those processes and then you

24   initiate conversation.

25   *Q*    Okay.  And so, can you only communicate on Paxful on

MICHAEL MEYERS - Direct

1    someone that you are in one of these open transactions with?

2    A    Yes, though after it's been opened, that communication

3    dialogue is still available.  You can still come back to that

4    chat later, and still say something to them.

5    Q    Is that for like repeat customers?

6    A    Yeah.

7    Q    Understood.  Okay.  Now, you said that during these

8    conversations with a potential buyer or seller, often you would

9    ask for -- or people ask for forms of verification.  So, can

10   you explain why that's done?

11   A    The idea of it is two fold, one is, personal protection.

12   The other idea of it is government mandates for KYC, which is

13   Know Your Customer, and the AML Laws, Anti-Money Laundering

14   protection on your end, you want to make sure you are doing due

15   diligence and getting that person's information, and if you are

16   receiving funds from them, that that ID and name match the name

17   of the account that sent it to you, that, in hopes, elevates

18   some of the risk of false identification or stolen accounts or

19   getting it from a nefarious account.

20   Q    Once again, I'm going to say, understood.  I sort of

21   understand.

22        Okay.  So, how did you meet Kimberley Tew on Paxful?

23   A    Was one of the traders who opened up transactions multiple

24   times on Paxful with me.

25   Q    Was she on the buyer's side or seller's side?

MICHAEL MEYERS - Direct

1  *A*   A little bit of both.  Majority of the time we interacted

2  initially was on the buyer side.

3  *Q*   Okay.  Was Kimberley Tew using that name when you first met

4  her?

5  *A*   No.

6  *Q*   What name was she using?

7  *A*   Matthew Vertanen.

8  *Q*   Did she eventually tell you that -- what that name was?

9  *A*   Yes.

10 *Q*   And who did she say the name, Matthew Vertanen, was?

11 *A*   Her brother.

12 *Q*   Okay.  Did she tell you why she was going by her brother's

13 name on Paxful, not her own?

14 *A*   Something along the lines of...  It's been a long time, so

15 I don't recall exactly, but it was, her account either had been

16 limited or stolen or she couldn't use it anymore, due to

17 someone flagging it, type thing.

18 *Q*   Okay.  How long had you been communicating with Kimberley

19 on Paxful before she revealed that she was not the person she

20 initially presented herself to be?

21 *A*   A few months.

22 *Q*   You continue to do business with her anyway?

23 *A*   Yes.

24 *Q*   Did your communications with Kimberley eventually move off

25 of Paxful to other platforms?

MICHAEL MEYERS – Direct

1    A    Yes, it did.

2    Q    And what type of platforms were you using to communicate

3    with Kimberley?

4    A    Text message, WhatsApp, VOIP, voice over internet protocol

5    lines or Telegram, possibly.

6    Q    Okay.  Can you just briefly describe, you know, what

7    WhatsApp is?

8    A    Basic idea is end-to-end encrypted messages.  The intent of

9    it is for privacy.

10   Q    Okay.  What about VOIP?

11   A    Kind of the same concept, but it gives you the ability to

12   have a phone number without having a phone number.  You don't

13   have to have a SIM card for it.  You can sign up on for it on

14   multiple apps or websites and even Google Voice is a VOIP.  So,

15   it's that concept.

16   Q    Okay.  How about Telegram?

17   A    Same as WhatsApp, it's encrypted end-to-end messaging.

18   Q    Why use encrypted messaging to communicate with Kimberley

19   Tew?

20   A    The whole idea of it is privacy.  Most people who are

21   involved in cryptocurrency, of any sort, are concerned about

22   privacy, for a couple of different reasons, one is, if somebody

23   knows your wallet and your phone number, there's many different

24   scams that can take place, and if somebody gets into your

25   wallet, they have ownership.

MICHAEL MEYERS - Direct

1    *Q*    Okay.

2    *A*    The other side of it is so people can't access the

3    messaging between each other.

4    *Q*    Understood.  Understood.  So, in your experience, was it

5    common to use those types of encrypted messaging platforms with

6    the people you were trading with on Paxful?

7    *A*    It became common, yes.

8    *Q*    Nothing about that struck you as potentially, you know,

9    trying to hide criminal behavior?

10   *A*    Not initially, no.

11   *Q*    Okay.  Did you also communicate with Kimberley Tew by

12   telephone, by her actual telephone?

13   *A*    Yes.

14   *Q*    Okay.  And do you recall what number she was using?

15   *A*    Um, 917-446-2046.

16   *Q*    You knew that off the cuff?  I barely know my own number

17   off the cuff?

18   *A*    Too much time in a hotel.

19   *Q*    Say that again, I'm sorry.  I interrupted you.  You have

20   been in a hotel?

21   *A*    Yeah.

22   *Q*    You looked it up, before coming here today?

23   *A*    It was in documentation from our previous messages.  Yeah.

24   *Q*    Got it.  Did you also email with Kimberley Tew?

25   *A*    I did.

MICHAEL MEYERS - Direct

1   Q    And do you recall the emails that you used?

2   A    Yeah, *kley@imail.com* and *kley@me.com*.

3   Q    Once again, you know those pretty specifically?  Did you

4   just look them up?

5   A    They were ones that I used quite often.  The *iMail* on there

6   I remembered specifically.  The *Me* one, I did not.  Again, in

7   documentation in emails and stuff it is available.

8   Q    Okay.  And, Mr. Meyers, I'm going to ask you to speak up

9   just a smidge.  You are pretty soft-spoken, and I just want to

10  make sure that the court reporter doesn't have trouble.

11  Q    How would you describe this relationship with Kimberley?  I

12  don't want to put words in your mouth, so you tell me what it

13  was?

14  A    It was a business relationship, initially.

15  Q    Okay.  You said *initially*, did it change?

16  A    Yeah.  Became a little bit of a friendship, a little bit of

17  a business, right.  It was intertwined in that way.

18  Q    Okay.  What was the -- the friendship based on?

19  A    Commonality of technology, just kind of nerds-of-a-feather

20  concept.  We were both interested in the technology, and coming

21  from the construction side, that's not what I'm used to.  So

22  it's -- it was an interesting commonality to have.

23  Q    Okay.  Over the course of becoming friends with Kimberley,

24  did she mention anything else that she liked to do outside of

25  trade cryptocurrency?

MICHAEL MEYERS - Direct

1   *A*   Um, the only thing that really came up, besides shopping

2   was gambling-type stuff, or Las Vegas.  Said they spent quite a

3   bit of time down there.

4   *Q*   Okay.  Did her description of shopping and Vegas and

5   gambling, did that contribute, at all, to, you know, your

6   impressions of Kimberley Tew's credibility?

7   *A*   To a point, yeah.

8   *Q*   Can you explain why?

9         *MR. KAPLAN:*  Your Honor, I object to this, in terms of

10  testimony.  That's not allowed by the rules to attack

11  credibility.

12        *THE COURT:*  Yeah.

13        *MS. WEISS:*  I can rephrase.

14        *THE COURT:*  Sustained.  Yeah.  Ask a different

15  question, please.

16        *MS. WEISS:*  Sure.  Sure.

17  *Q*   When it came to being willing to trade with Kimberley on

18  Paxful and, you know, sort of, the verification pieces that we

19  spoke about, did getting to know Kimberley off of Paxful, and

20  hearing about some of her hobbies, contribute to your

21  willingness to trade with her on Paxful?

22  *A*   Yes, it did.

23  *Q*   Can you explain how.

24        *MR. KAPLAN:*  Objection, Your Honor.

25        *THE COURT:*  Overruled.  Go ahead.

MICHAEL MEYERS – Direct

1          THE WITNESS:  There was credence behind it.  I come

2     from construction, again, so you are are not used to people

3     with money.  It's people who get enough money to be able to

4     drink on the weekends type stuff or pay your bills.  So, when

5     there was a name behind it, that I was given, being able to do

6     some due diligence and digging her up by her name, and seeing

7     that they are well educated, their family is well educated, the

8     individuals involved are, and having that type of money, yeah,

9     that's what I was striving for in my life.  I didn't want to be

10    a paycheck-to-paycheck type individual, and so that's what I

11    was trying to find a way to emulate, in essence.

12    Q    So, you looked her up on the Internet?

13    A    Yes.

14    Q    Did you use, sort of, the information she was sharing about

15    her life, to confirm, sort of, her identity, this Internet

16    friend you were making?

17          MR. KAPLAN:  Objection leading.

18          THE COURT:  Overruled.  Go ahead.

19          THE WITNESS:  Yes.  I did that very typically with it,

20    because, as you are speaking with these individuals, as you are

21    making these transactions, there are repeat customers, and one

22    of the biggest concerns that you always have is getting

23    scammed.  You will get someone who says they are this, and send

24    you money from that account, and then it gets returned on you,

25    PayPal.  They do charge backs on it, right.  So, trying to

MICHAEL MEYERS - Direct

1   validate information given is part of the process.

2   Q   Okay.  Did you look up Michael Tew on the Internet?

3   A   Yes.

4   Q   And what did you find there?

5   A   That he was previously the CFO of National Air Cargo, and

6   at one point he was some sort of an officer of a company called

7   Cannisis.

8   Q   Okay.  Did Kimberley tell you what her work experience was?

9   What she did for a living?

10  A   She did.  My memory is a little bit fuzzy on it, but I seem

11  to recall that it had something to do with her working as some

12  sort of coder at Google.

13  Q   In the relevant time period, in 2018, did you communicate

14  with Michael Tew, as well?

15  A   I did.

16  Q   How were you introduced Michael?

17  A   Through -- through messaging, one way or another, and then

18  actually heard his voice through voice mail.

19  Q   Okay.  Was that connection made through Kimberley?

20  A   Yes.

21  Q   Okay.  And so what methods, again, did you use to

22  communicate with Michael Tew?

23  A   Majority of the time was text messages or phone calls.

24  Q   And was that using some of the more encrypted services that

25  we've talked about or just actual telephone numbers?

MICHAEL MEYERS - Direct

1   *A*   There might have been in WhatsApp, but that would have been

2   the only other one.

3   *Q*   Otherwise, normal telephone number?

4   *A*   Correct.

5   *Q*   And then you mentioned voice, did you speak with him on the

6   phone, as well?

7   *A*   I don't recall if I actually spoke to him on the phone.  I

8   know that -- voice mails.

9   *Q*   Okay.  Have you ever seen Michael Tew in person, prior to

10  today?

11  *A*   Yes, I have.

12  *Q*   We're going to put a pin in that and return to it.  Okay.

13          Do you know what number you communicated with Michael

14  Tew on?

15  *A*   It was also a 917, but that's all I recall.

16  *Q*   Okay.  How did you know that Michael Tew was the caller

17  associated with that number?

18  *A*   Personal identification in the voice mail or in the text

19  message saying, *Hey, this is Mike, Michael Tew* or something

20  similar.

21  *Q*   So, he would identify himself in the text messages?

22  *A*   Yes.

23  *Q*   And in the voice mail, that was a male voice --

24  *A*   Yes.

25  *Q*   -- am I understanding you correctly?  Okay.  Did you ever

MICHAEL MEYERS - Direct

1    question whether you were speaking to Kimberley versus Michael

2    Tew, when you were talking to one or the other of them?

3    A    On multiple occasions, yes.

4    Q    Can you explain that?

5    A    Reading the text messages, I had been interacting with

6    Kimberley for a few months, at the time, and there's a

7    similarity in the way things were written versus the way a male

8    would write.  My uneducated opinion of it was that it looked

9    like her writing in some of it.  There's hyphenations, where

10   his did not have, or periods and punctuations, where typically

11   an emotional male writes quickly.  Doesn't spellcheck --

12        MR. KAPLAN:  Your Honor, I object to this, without

13   further foundation as to his ability to do this.

14        THE COURT:  You can probe that.  We're just getting

15   his impression.  So, overruled.

16   Q    You can continue.

17   A    Just, there was, again, just me looking at it, I questioned

18   it quite awhile, if that was really a different person or if it

19   was a VOIP that was being utilized or a second-phone-type

20   thing.

21   Q    Under -- well, I think I understand.  Let me make sure that

22   I understand.

23        So, you believed, at some point in time that number --

24        MR. KAPLAN:  Your Honor, I'm going to object to

25   leading or recap by counsel.

MICHAEL MEYERS – Direct

1          *THE COURT:*  Yes, sustained.

2          *MS. WEISS:*  Okay.

3     *Q*   All right.  Any specific examples of the subject matter

4     that you would discuss in your communications with Michael Tew?

5     *A*   In the evidence that I was shown, some of those text

6     messages, yes.  There was multiple examples in there, where it

7     looked like her writing versus his writing.

8     *Q*   Okay.  And what was the thing that clarified to you that

9     this number wasn't a voice-over IP, it was actually Michael

10    Tew?

11    *A*   A voice mail specifically saying it was him.

12    *Q*   In a male voice?

13    *A*   Yeah.

14    *Q*   Can you describe the tenor of the phone conversations that

15    you had with Kimberley Tew?

16    *A*   Majority of the time they were relatively easy going,

17    conversations were cordial, were decent, talking about

18    opportunities and things that were going on.  Later it moved to

19    a different format completely.

20    *Q*   Okay.  How would you describe the general tenor of that

21    later format?

22    *A*   A lot less patience, a lot more agitation, a lot more

23    hurried responses about stuff.

24    *Q*   Okay.  How about the tenor of your conversations with

25    Michael Tew?

MICHAEL MEYERS – Direct

1   A    By the time that he got involved, they were typically

2   pretty aggressive or very angsty.

3   Q    Okay.  I'm going to move to Government's Exhibit 752.  Sir,

4   did you have an opportunity --

5          MS. WEISS:  And we should just scroll the pages, so

6   Mr. Meyers has an opportunity to see the whole thing.

7   Q    Did you review these messages prior to your testimony

8   today?

9   A    I did.

10  Q    Had you seen them in this format before?

11  A    No, I had not.

12  Q    Did you, nevertheless, recognize their content?

13  A    Yes.

14  Q    How did you recognize their content?

15  A    Because it was text messages that had come to my phone,

16  that had been involved in.

17  Q    And who were those text messages from?

18  A    They came from Michael Tew's telephone number.

19  Q    Okay.

20         MS. WEISS:  Your Honor, I would ask, at this time, for

21  permission to display these messages.  These are from, as we

22  were talking about with Mr. Yioulos, we will have later

23  testimony to further admit them.

24         THE COURT:  Okay.  So, understanding the defense

25  objection we've discussed, can we display them, understanding

MICHAEL MEYERS – Direct

1    you object?

2            *MR. KAPLAN:*  Yes, Your Honor, but we would also add

3    that the others was a foundation of being a co-conspirator.  I

4    think this is a further level of problems with this.

5            *THE COURT:*  Okay.  Well, overruled, as we've discussed

6    on both bases, but go ahead.

7            *MS. WEISS:*  Okay.  So, permission to display 752.

8            *THE COURT:*  Right.

9    *Q*   Okay.  Let's take this message-by-message, Mr. Meyers.  If

10   you could please read the body of the first message and the

11   date it was received?

12   *A*   All right.  On 4-12 of 2019, *You need to calm down and stop*

13   *threatening to cut off communication.  She is not stringing you*

14   *along.  We need to work together.  This will all be resolved*

15   *soon*.

16   *Q*   Okay.  Sticking with this message for a moment, was this a

17   message that you received from the phone number that had been

18   represented to you as Michael Tew?

19   *A*   That is correct.

20   *Q*   Okay.  I want to be very careful and very specific here.

21   Is this the type of message that you believed was coming

22   actually from Michael Tew or did you believe this was a

23   Kimberley Tew message?

24   *A*   I believe this one was a Kimberley Tew.

25   *Q*   And can you explain why?

MICHAEL MEYERS - Direct

1    *A*    Capitalization and punctuation.

2    *Q*    There's a reference to *she* in it.  Who would the *she* be in

3    there.

4    *A*    Kimberley Tew.

5    *Q*    Okay.  So, despite the fact there's a third person

6    referenced to who you believe is Kimberley Tew, you thought

7    that this message was written by Kimberley Tew?

8    *A*    Yes.  Just again, my uneducated, gut feeling of that.

9              MS. WEISS:  If we could move on to the next page --

10   I'm sorry.  Different message.  Let's make sure that we keep on

11   the -- thank you, Ms. Ortiz.

12   *Q*    All right.  Can you read off the date and time of this one

13   as well?

14   *A*    It's 4-12 of 2019 at 11:20 and 28 seconds.

15   *Q*    Could you please read the message, in full?

16   *A*    *Mike, a substantial amount that was supposed to be here*

17   *Tuesday and then gain* -- I'm assuming *again -- today is*

18   *arriving next week.  I am going to do everything I can to make*

19   *sure it is sent Monday.*

20   *Q*    Okay.  Same questions, this was a message received from the

21   number associated with Michael Tew?

22   *A*    Yes.

23   *Q*    And who do you believe wrote this message or who do you

24   believe wrote this message, at the time?

25   *A*    Kimberley.

MICHAEL MEYERS - Direct

1   *Q*   And again, why do you believe that?

2          *MR. KAPLAN:*  Again, I'm going to object to this kind

3   of conclusion based on ...

4          *THE COURT:*  You can -- you can ask about that on

5   Cross-examination, but overruled.

6   *Q*   You can answer the question, sir.

7   *A*   Again, just the way the spelling was.  Typically, in her

8   messages, if my name was in there, there's a hyphen after it

9   and then punctuation after that, it's more structured.

10  *Q*   Okay.  So, in your messages that you were having with

11  Kimberley Tew on WhatsApp and Telegram and those, she would say

12  Mike, hyphen?

13  *A*   Yeah.  If my name was used in it.

14  *Q*   Understood.  And then let's go to the next message down,

15  and if you could do the same thing?

16  *A*   Okay.  This is 4-12-2019, 11:23 and 11 second, *If you don't*

17  *respond I assume you are going hostile.  We want to help you*

18  *with your tax situation.  If I don't hear from you, I assume*

19  *we're not working together.*

20  *Q*   Okay.  Same questions about this one.  Message you received

21  from Michael Tew's number?

22  *A*   Correct.

23  *Q*   And does this one read to you, to you, as a Michael Tew

24  message or Kimberley Tew?

25  *A*   Kimberley, as well.

MICHAEL MEYERS – Direct

1  Q   And then, finally, let's go to the last message on this

2  one.  Okay?

3  A   It's 4-12-2019, at 11:24:20, *She made promises to you*

4  *because she was also promised things.  She was not stringing*

5  *you along.  This is the way things go sometimes.  Sometimes*

6  *it's awesome and sometimes it's bad.  But it's never as bad as*

7  *you think*.

8  Q   Same questions, this was a message received to you from

9  Michael Tew's number?

10 A   Yes.

11 Q   And do you believe this message was written by Kimberley

12 Tew or Michael Tew?

13 A   From Kimberley, as well.

14 Q   Okay.  Once again, I'm seeing the word *she* here.  Who is

15 that *she* in your mind?

16 A   It's Kimberley Tew, as well, in reference to.

17 Q   So, even though there's reference to *she*, you believed this

18 was a message written by Kimberley Tew?

19 A   Yes, gut feeling.

20 Q   And what is that based on?

21 A   Again, that formatting of it, and just word choices and

22 stuff like that.  It structures differently than –– based upon

23 how I write is really where I'm going.  Seeing how a man writes

24 versus a woman, it's night and day.

25 Q   There's a lot going on in those messages, and we are going

MICHAEL MEYERS – Direct

1    to return to some of the topics, so I may bring that one back?

2        *MS. WEISS:*  If we can take it down for the time being

3    though, thank you.

4    *Q*   I believe you testified your initial trades with Kimberley

5    on Paxful, sometimes buyer, sometimes seller.  Okay.  Did there

6    come a time when Kimberley Tew offered you an investment

7    opportunity?

8    *A*   Yes.

9    *Q*   And can you describe, first, when that happened in this,

10   sort of, this online relationship?

11   *A*   To the best of my recollection it would have been

12   three/four months in, August, October, around August of

13   2018ish.

14   *Q*   Okay.  What was the investment opportunity that she offered

15   to you?

16   *A*   If I invested Bitcoin with her, that she would be able to

17   return, within 24 hours, 50 percent to a hundred percent profit

18   off that money given.

19   *Q*   Did she say how she could do that?

20   *A*   Mentioned that she created a trading algorithm that watched

21   the market, and put in micro transactions and buys and sells.

22   *Q*   Okay.  I believe -- is that arbitrage?

23   *A*   Yeah.

24   *Q*   At that point, had Kimberley shared with you that she used

25   to program for Google?

926
MICHAEL MEYERS - Direct

1    A    Yes.

2    Q    So, she offers you this investment.  Did you take her up on

3    it?

4    A    I did.

5    Q    Did you she you whether you were one of her first

6    investors?

7    A    Amongst the first, yes.

8    Q    Okay.  Did she make any representations to you about how

9    the other investors investments were performing?

10   A    Said everything was going really well in it.

11   Q    Okay.  So, did you end up investing?

12   A    I did.

13   Q    Do you recall what you sent her, as the initial buy-in?

14   A    Approximately, US dollar value of 5,000.

15   Q    Did you send that to her in US dollars via currency --

16   A    In Bitcoin.

17   Q    In Bitcoin, okay.

18   A    Yes.

19   Q    Okay.  So, she told you it would have a nice return.

20   Twenty-four hours later, how did it go?

21   A    I had received my investment back and the proceeds from it.

22   Q    And how -- how much were the proceeds?

23   A    An additional 5,000.  Might have been just barely over

24   that, because market value changes.

25   Q    So, you made $5,000 in a day?

MICHAEL MEYERS - Direct

1   A   Yeah.

2   Q   And your understanding of how that was able to be done, was

3   what?

4   A   A really good trading algorithm.

5   Q   How did you feel about that?

6   A   Ecstatic.

7   Q   Was $5,000 a lot of money to you?

8   A   Yes.

9   Q   Did you do it again?

10  A   I did.

11  Q   More than once?

12  A   Yes.

13  Q   How did the return on those investments go, Mr. Meyers?

14  A   Initially, continued on that same path, and then slowly,

15  slowly progressively got worse.  Timetables weren't hit, payout

16  amounts weren't hit, pay outs, once I would receive them, would

17  be requested back within a couple of minutes to couple hours

18  later.

19  Q   Explain to me that part.  So, you would receive a payout,

20  and then what would happen?

21          MR. KAPLAN:  Your Honor, I'm going to object to this

22  continued line of questioning, as relevant to --

23          THE COURT:  Overruled.  He can figure out what's going

24  on.  Go ahead.

25          THE WITNESS:  Can you restate?  Sorry.

MICHAEL MEYERS - Direct

1    Q    Sure.  Of course.  Can you explain to me what you mean by

2    you get a payout, and she would ask for it back?

3    A    Okay.  So, as the trading continued, as time moved on, and

4    I put more in the timetable between her ask of my reinvestment

5    changed, and it started speeding up.  Initially I was hesitant

6    about putting money into it, but once I was more comfortable, I

7    would get a rushed message or something, say, along the lines

8    of, *I need that money back the algorithm is starting to tank*

9    *and if I don't prop it up, we're all going to lose everything*,

10   type thing.

11   Q    Would you send it back?

12   A    Yes.

13   Q    Why would you do that, sir?

14   A    I didn't want to lose all my money.

15   Q    Were you aware of whether Kimberley had any other

16   investors, at the time?

17   A    There were -- yes.  Yes.

18   Q    And did you know anything about whether they were also

19   doing the same thing?

20   A    It was implied.

21   Q    Okay.  Over the course of this business relationship turned

22   *nerd friendship*, did Kimberley Tew ever share anything to you

23   about her husband being fired?

24   A    Yes.

25   Q    And what did she tell you?

MICHAEL MEYERS - Direct

1    *A*   Just that trading wasn't going as well, returns weren't

2    going as well, because they had increased expenses with him

3    being out of work, and not having the typical amount of money

4    to be available for hedging up the algorithm, when it would go

5    south.

6    *Q*   Did Kimberley tell you whether or not Michael got a

7    severance when he was fired?

8    *A*   She told me that he did not receive it.

9    *Q*   He did not receive it?

10   *A*   Yes.

11   *Q*   Did she tell you whether there was a plan to get a

12   severance?

13          *MR. SCHALL:*  Objection, Your Honor leading.

14          *THE COURT:*  Overruled.  Go ahead.

15   *Q*   I will repeat the question.  Did Kimberley Tew tell you

16   whether there was a plan to get Michael a severance?

17   *A*   Yes.

18   *Q*   And what did she say?

19   *A*   Initially, there was a comment about it, was bought up

20   about insurance money being pulled out, or 401K money being

21   pulled out, and then it moved on to, they knew someone, that

22   they could help them get this severance out of the company.

23   Knew somebody at the company they could utilize.

24   *Q*   Did Kimberley Tew ask you for your help getting the

25   severance out of Michael Tew's former employer?

MICHAEL MEYERS – Direct

1    A    Yes, she did.

2    Q    What did she ask you to do, specifically?

3    A    Have a bank account available and ready to receive a wire

4    transfer or ACH deposit, as well as set up a company, have a

5    company account set up for that.

6    Q    Did you already have the company account from Meyers

7    Consulting Group, LLC, at that time?

8    A    Yeah.

9    Q    Did she know that you had that company?

10    A    Yes.

11    Q    What were you supposed get in return for allowing wires to

12    go into your bank account?

13    A    A percentage of proceeds of money coming in.

14    Q    What percentage was that, sir?

15    A    Ten percent.

16    Q    What percentage were you receiving, as their commission on

17    Paxful, at this time?

18    A    Anywhere between that and 3 percent, depended upon trade

19    terms.

20    Q    Okay.  So, your commission for accepting these wires was

21    similar to your commission that you were making at Paxful?

22    A    Correct.

23    Q    Again, you didn't have any other jobs, at the time?

24    A    No.

25    Q    Did you understand that you would be receiving wires from

MICHAEL MEYERS - Direct

1    National Air Cargo?

2    A    Yes.

3    Q    Did you understand that you were receiving wires from

4    National Air Cargo on behalf of Michael and Kimberley Tew?

5    A    Yes.

6    Q    Did you give Kimberley Tew bank routing information?

7    A    I did.

8    Q    And was that for the purpose of accepting money from

9    National Air Cargo, into your bank account, sir?

10   A    It was.

11   Q    Did Kimberley ask you for any other identifying

12   documentation, at that point?

13   A    My driver's license?

14   Q    Did she tell you why she wanted your driver's license?

15   A    Protection.

16   Q    Protection from what?

17   A    In case I tried to run with the money.

18   Q    Did Kimberley Tew have access, signatory access, to any of

19   the bank accounts that we are talking about?

20   A    No, she did not.

21   Q    Did Michael Tew have signatory authority?

22   A    No, he did not, either.

23   Q    So, is there, sort of, an amount of trust that needs to be

24   involved here?

25   A    Yes.

MICHAEL MEYERS - Direct

1    Q    Because you could have run with the money, right?

2    A    Yep.

3    Q    Was it your understanding, Mr. Meyers, that this was a

4    totally legitimate process?

5    A    No.  I tried to tell myself it was.

6    Q    Did you deliberately avoid asking questions?

7    A    I did.

8    Q    Why would you do this, Mr. Meyers?  Can you explain that to

9    the jury, please?

10   A    Pure desperation.  By this point in our trading

11   relationship or professional relationship, I had sent every bit

12   of money that I would make, besides what it would take me to

13   afford that day, and would send it off to her, and at that

14   point the money was coming back slower and slower, and it

15   always had some excuse behind it, that had me desperate.  I

16   didn't know what else to do.  I needed money to be able to turn

17   my life back around and get back to the real world.

18   Q    You spoke of your wife earlier in this?

19   A    Yes.

20   Q    Was this situation affecting your marriage?

21   A    Horribly.

22        MR. KAPLAN:  Objection, relevance.

23        THE COURT:  Sustained.

24   Q    Okay.  Did you ever -- did you ultimately end up receiving

25   wires from National Air Cargo, into one or more of your bank

MICHAEL MEYERS – Direct

1    accounts?

2    A    Yes.

3    Q    Let's talk about the first account.  I'm going to show you

4    what's marked Government's Exhibit 305?

5    A    Okay.

6    Q    Do you recognize this document, sir?

7    A    I do.

8    Q    What is this document?

9    A    It is the Regions bank account signature card.

10   Q    For who?

11   A    Myself.

12   Q    Okay.

13            MS. WEISS:  Government would move to admit Exhibit

14   305.

15            THE COURT:  Any objections?

16            MR. SCHALL:  No.

17            MR. KAPLAN:  No, Your Honor.

18            THE COURT:  It's admitted.

19            MS. WEISS:  Permission to display.

20            THE COURT:  Go ahead.

21            MS. WEISS:  Ms. Ortiz, can we just highlight the top

22   portion of this document with the identifying information

23   first?

24   Q    Okay.  Whose bank account are we discussing here, sir?

25   A    This is mine.

MICHAEL MEYERS - Direct

 1    Q    At Regions?

 2    A    Yes.

 3    Q    Does it indicate if anyone else is the owner of this bank

 4    account?

 5    A    No.  Just me.

 6    Q    For the record, does the document indicate --

 7    A    Sorry.  No, the document only indicates me.

 8    Q    Poor question on my part.  I apologize.

 9    A    I'm terrified, too, so ...

10    Q    Does it list your correct birthdate?

11    A    It does.

12    Q    Your social security number?

13    A    Correct.

14    Q    And the date this account was opened?

15    A    Yes, 3-22 of 2018.

16    Q    Let's move down.  Does this document also indicate your

17    contact address?

18    A    Yes.

19    Q    Email address?

20    A    Yes.

21    Q    Phone number?

22    A    Yes.

23    Q    Is all of that information accurate?

24    A    Yes.

25    Q    Provided by you?

MICHAEL MEYERS - Direct

1   A   (Nodding head.)

2   Q   Okay.  And is there an account number listed, sir?

3   A   Yes, it is.

4   Q   Can you please read that account number into the record?

5   A   It's 0258904514.

6       MS. WEISS:  If we could turn to the second page.

7   Q   Is there an e-signature here, sir?

8   A   Yes, there is.

9   Q   Is that your e-signature?

10  A   Yes, it is.

11  Q   Is this Regions Bank, account ending in '0514, one of the

12  ones that you received wires from National Air Cargo?

13  A   Yes, it is.

14  Q   Did you have an opportunity to review your bank records

15  from Regions Bank, around this time period, prior to coming in

16  to testify, today?

17  A   Yes, I did.

18  Q   Approximately when -- what time period were you receiving

19  wires from National Air Cargo, into your Regions bank account?

20  A   The end of October to the end of November of 2018.

21  Q   Do you recall approximately how much you received into this

22  account?

23  A   It was $70,000.

24  Q   And who did you receive that money into your account for?

25  A   Kimberley and Michael Tew.

MICHAEL MEYERS – Direct

1          *THE COURT:*  Yes, ma'am?

2          *THE JUROR:*  Could the witness sit a little closer to

3     the microphone?

4          *THE COURT:*  Yeah.  You can move the microphone closer

5     to you.  Either way.  Thank you.

6          *THE JUROR:*  Thank you.

7     *Q*    Were you communicating with Michael and Kimberley Tew

8     around the time that those wires were coming in?

9     *A*    Yes.

10    *Q*    Late October November, 2018?

11    *A*    Yes, I was.

12    *Q*    Okay.  I would like to turn to Government's Exhibit 656.

13    Do you recognize this document?

14    *A*    I do.

15    *Q*    Have you seen -- well, what is in this document, first of

16    all?

17    *A*    Text messages between myself and Michael Tew's phone

18    number.

19    *Q*    Okay.  Have you seen it -- these messages, in this format,

20    prior to preparing for your testimony?

21    *A*    Yes.

22    *Q*    Where did you see them?

23    *A*    Through a Webex call.

24    *Q*    Oh, okay.  I apologize.

25    *A*    Beyond that, it was just on my cell phone.

MICHAEL MEYERS – Direct

1    Q    Was it a Webex call with the government?

2    A    Yes.

3    Q    With the U.S. Attorney's Office?  Okay.  Did you,

4    nevertheless, recognize the content of these messages?

5    A    I did.

6    Q    How did you recognize them?

7    A    They came to my phone, and I was sending the responses.

8    Q    Okay.

9         MS. WEISS:  The government would ask for permission to

10    display 656, in the similar manner that we've handled other

11    exhibits out of this particular custodial source.

12        THE COURT:  Understanding the ongoing objections to

13    this, is there anything else?

14        MR. SCHALL:  No, Your Honor.

15        MR. KAPLAN:  I would add foundation objection to it.

16        THE COURT:  That is overruled.  I think there's

17    sufficient foundation.  So, go ahead and show it.

18    Q    And, Mr. Meyers, I'm going to ask you to do just what you

19    did before.  Go through these messages, one by one, reading out

20    the date and time, the message content, and if you would not

21    mind adding on whether or not you believed to be a Michael Tew

22    or Kimberley Tew message.

23    A    First one is 11-6 of 2018, at 4:55, *Mike, I have 30K coming

24    in this week.  Are you going to help my wife out or not*?  This

25    I believe to be Kimberley Tew coming from Michael's phone.

MICHAEL MEYERS - Direct

1    Q    And why is that, sir?

2    A    Punctuations.

3    Q    Even though there is mention of *wife*?

4    A    Yes.

5    Q    Next message?

6    A    Is 11-6-2018, at 4:54, *Stop delegating to your wife, she*

7    *doesn't know what she is talking about.  You need to take your*

8    *wife out of this, because she is screwing everything up.  This*

9    *is my money, nobody else's money, I work my fucking ass off and*

10   *I am not obligated to give you anything or lend anything to*

11   *anyone, period*.

12   Q    Mr. Meyers, does this seem like a Michael Tew message or a

13   Kimberley Tew message to you?

14   A    This one seemed more like Kimberley Tew, as well.

15   Q    And why is that?

16   A    Again, the punctuation style.

17   Q    Okay.  Next message down?

18   A    It's 11-6-2018, at 5:09, 25 seconds, *Are you sending money*

19   *to my wife or not if not, we're not going to send anything this*

20   *week.  Need you to deliver, so we can get to next steps*.

21   Q    Does this appear to be a Michael Tew or Kimberley Tew

22   message to you?

23   A    Kimberley, as well.

24   Q    Why is that?

25   A    Same punctuation style.

MICHAEL MEYERS - Direct

1   Q   Okay.  Following message.

2   A   11-6 of 2018, at 5:10 and 38 seconds, *Every time you send*

3   *her money, she sends to you, back more.*

4   Q   Michael Tew or Kimberley Tew?

5   A   Kimberley Tew.  11-6-2018, 5:13 and 34 seconds, *If you*

6   *aren't even going to dialogue with her and help and simply*

7   *reply, because your wife won't let you, then it's over.*  And

8   then I cannot read that last word.  But again, I felt like this

9   was Kimberley.

10  Q   What makes, you think that, sir?

11  A   Punctuation style, again.

12  Q   Are there multiple dashes in this?

13          MR. KAPLAN:  Objection, Your Honor, recapping and

14  leading.

15          THE COURT:  Overruled.  I think I will allow that one.

16  Go ahead.

17  Q   Final message on this page?

18  A   It's 11-6-2018 at 6:23 and 43 seconds, *I told Kimberley we*

19  *would have send you 75 this week, nice business decision, not*

20  *helping her out, not sending anything, so not a great business*

21  *decision, it turns out*.  And again, I felt like this was

22  Kimberley.

23  Q   Mr. Meyers, I want to scroll back up to the second message.

24  Is there a reference to your wife?

25  A   Yes, there is.

MICHAEL MEYERS – Direct

1   Q   Were there discussions about how this investment was

2   impacting your marriage with Michael and Kimberley Tew?

3           MR. KAPLAN:   Objection.

4           THE COURT:   Overruled.

5           THE WITNESS:   Yes.

6   Q   And I am going to repeat it, because I think I got

7   interrupted.

8           Were there discussions with Michael Tew and Kimberley

9   Tew about how these investments were impacting your marriage,

10  sir?

11  A   Yes.  As well as voice mails and calls that went to her

12  phone, when I wouldn't respond.

13  Q   Do you have a child?

14          MR. KAPLAN:   Objection, relevance.

15          THE COURT:   I will allow it.

16  Q   Mr. Meyers do you have a child?

17  A   Yes.

18  Q   Was this impacting your family?

19  A   Yes.

20  Q   Was that contributing to your decision making?

21  A   Yes.

22  Q   I would like to turn, next, to Government's Exhibit 669.

23  If you could just take a moment to review those?

24  A   (Nodding head.)

25  Q   Do you recognize the content of what is reflected in this

MICHAEL MEYERS - Direct

1    document?

2    A    Yes.

3    Q    And what -- how do you recognize that?

4    A    They were text messages that came into my cell phone.

5    Q    Had you seen this content in this format prior to preparing

6    for testimony?

7    A    In this format, no.  Just the text messages received and

8    then after, in prep.

9    Q    Do you have a specific personal memory of the content of

10   these messages, though?

11   A    I do.

12   Q    And who are these messages from?  Or what number?

13   A    From Michael Tew's telephone number.

14        MS. WEISS:  Your Honor, I would ask to display

15   Government's Exhibit 669, pursuant to the approach we have been

16   following throughout trial.

17        THE COURT:  Understanding the previous objections, if

18   there's nothing else, I will allow it to be shown at this time.

19        Q    (By Ms. Weiss) Okay.  If we could do the same thing

20   that we have been doing with the prior messages, Mr. Meyers.

21   Thank you very much for your patience on this.  Go ahead.

22   A    Says, *Mike, hi, could you please be in touch with Kimberley*

23   *tonight soon.  With all of the drama with Sam, I don't want to*

24   *take any chances, and I don't want to get you wrapped up in a*

25   *mess*.  And to me, that was a text message that looked like it

MICHAEL MEYERS - Direct

1  came from Michael.

2  Q   What about this makes you think this is a Michael Tew

3  versus a Kimberley Tew?

4  A   No punctuations, more grammatical errors.

5  Q   And who is Sam?

6  A   Sam Phillips was a well known peer-to-peer trader on

7  Paxful.com, as well.

8  Q   Do you know if Sam was investing with Kimberley's

9  algorithm?

10  A   I don't know that, specifically.  I know that they did

11  similar sales.

12  Q   Okay.  Next message down, sir.

13  A   My message.  So, at 11-20-2018, at 8:49 I wrote, *Okay I*

14  *will*.

15  Q   And next message down.

16  A   It's 11-20-2018, 8:50, 27 seconds, *Thanks man*.

17  Q   Michael Tew or Kimberley Tew?

18  A   Michael.

19  Q   What makes you say that?

20  A   A man.  It's pretty typical in guys.

21  Q   Next message down.  Please identify that message and read

22  it.

23  A   It's 11-20-2018, 9 clock, *haven't been able -- haven't been*

24  *able yet on Zelle, and it will be two banks for that amount, so*

25  *I am sure 10 to 15 is ideal.*

MICHAEL MEYERS - Direct

1    Q    Were you discussing what to do with the wire transfers

2    here?

3    A    Yes.

4    Q    Next response.

5    A    It's 11-20-2018, *I will do from laptop on the Zelle and set*

6    *up a buy for morning.*

7    Q    Same question, sir.

8    A    This one was my message, and very, very poorly written.

9    Q    Is this an example of what you mean by how males text?

10   A    Yes.

11   Q    Do you know if you received a wire from National on this

12   day, November 20th, 2018?

13   A    I did.

14   Q    Did you have --

15          *MS. WEISS:*   We can take this down.   Thank you

16   Ms. Ortiz.

17   Q    Did you have multiple bank accounts around this period?

18   A    Yes.

19   Q    All different types of institutions?

20   A    Yes.

21   Q    Why so many?

22   A    Peer-to-peer or Bitcoin, itself, is highly frowned on

23   within banking institutions.   It's a high-risk field for them,

24   so upon seeing the amount of in-and-out transaction, a lot of

25   time banks will just close down an account if they learn that

MICHAEL MEYERS - Direct

1    you are on a -- and purchasing Bitcoin, a lot of times there's

2    a clause within their terms a service that says they can close

3    the account.  So, it was kind of a ticking time bomb to use

4    with any bank during this time.

5    Q    So, you had a lot of banking accounts closed, as well?

6    A    Yes.

7    Q    At some point was that Regions bank account, that we looked

8    at before, closed?

9    A    Yes.

10   Q    Did you do that or the bank?

11   A    The bank did that.

12   Q    Okay.  Did Kimberley Tew ask you to open up a new bank

13   account for the purpose of receiving wires from National Air

14   Cargo?

15   A    Yes.

16   Q    Did you do that?

17   A    I did.

18   Q    Did she instruct you which bank to open that account with?

19   A    Yes.

20   Q    And what bank was that?

21   A    ANB Bank.

22   Q    That's A, like apple, N like National, B like bank?

23   A    Yes.

24   Q    Did Kimberley Tew tell you ANB Bank in particular?

25   A    That Michael Tew had an account there, and they had been a

MICHAEL MEYERS – Direct

1    good bank to work with, so far, with those kinds of

2    transactions?  They hadn't had issues.  So, that was kind of a

3    typical thing in that sector.  You would communicate with other

4    traders, see what they were utilizing, without having their

5    accounts closed.  So, I just thought it was along those lines.

6    Q    Okay.  She told you her husband had an account there?

7    A    Yes.

8    Q    Okay.

9         THE COURT:  Ms. Wiess, before you go on, would

10   counsel, just briefly, approach, please.

11      (At the bench:)

12        THE COURT:  So it's about 12:15.  I don't know where

13   we are, exactly, but I'm having some tech issues.  Just makes

14   sense to take lunch now, 45 minutes, still.  Let me -- let

15   people out of here at a decent hour, do you think?

16        MS. WEISS:  I would say I think I have 30 to 40 more

17   minutes on this witness, and then I don't know if Cross will be

18   like so.

19        MS. FROST:  No objection.

20        THE COURT:  I mean, how long do you think?  I'm just

21   trying...

22        MR. KAPLAN:  I'm not going to be that long, so 15 to

23   20 minutes, I think.  I can speed it up.

24        THE COURT:  Okay.  So less than an hour.  Okay.  So

25   let's break until 1, and then hopefully be done by 2.  Okay.

MICHAEL MEYERS - Direct

1          *MS. WEISS:*  Thank you, Your Honor.

2          (In open court).

3          *THE COURT:*  Ladies and gentlemen, we are going to take

4     a lunch break, slightly shorter than we have, as I discussed so

5     we can release you early today.  So we will break until 1

6     o'clock.  So, please, be back and ready to go at 1 o'clock.

7     Again, all my previous instructions are still in place.  So we

8     will be in recess until then.

9          *THE COURTROOM DEPUTY:*  All rise.

10         (Jury out at 12:14 p.m.)

11         *THE COURTROOM DEPUTY:*  Court is now in recess.

12         (Recess at 12:15 p.m.)

13         (In open court at 1:04 p.m.)

14         *THE COURT:*  Please take your seats.  Can we go ahead

15    and get the jury, please.

16         *THE COURTROOM DEPUTY:*  All rise.

17         (Jury in at 1:05 p.m.)

18         *THE COURT:*  All right.  Welcome back.  Please take

19    your seats.  So, ladies and gentlemen, I do expect that we will

20    finish up here pretty early and let you out, even though the

21    weather has, obviously, improved down here, since this morning,

22    it still seems like it could be troublesome later today.  My

23    hope -- at least my expectation -- is this won't stretch us out

24    too long into next week, but I do plan to let us go a little

25    bit early.

MICHAEL MEYERS – Direct

1          But first, we are going to finish with at least this

2   witness.  But go ahead.  Mr. Meyers, you are still under oath.

3   You may begin.

4   Q   Mr. Meyers, when we broke for lunch, we were discussing

5   that ANB Bank account.  Do you remember that?

6   A   Yes, I do.

7   Q   I would like to show the witness Government's Exhibit 301.

8   Do you recognize this document, sir?

9   A   Yes, I do.

10  Q   And what is it?

11  A   Account information sheet for ANB Bank.

12  Q   And is this the account information for your bank account,

13  sir?

14  A   That's correct.

15          MS. WEISS:  The government would move to admit Exhibit

16  301, and ask for permission to publish.

17          THE COURT:  Any objections?

18          MR. SCHALL:  No new ones, Your Honor.

19          MR. KAPLAN:  No objection.

20          THE COURT:  All right.  It's admitted.

21          MS. WEISS:  Ms. Ortiz, would you mind just doing, sort

22  of, the top third?

23  Q   All right.  Mr. Meyers, can you walk the jury through what

24  we're seeing on this document?

25  A   Yeah.  My personal information for when I set up the

MICHAEL MEYERS - Direct

1    account at ANB Bank, my name, social security number and

2    driver's license information.

3    Q    Was all of that information accurate --

4    A    Yes.

5    Q    -- provided by you?

6    A    Yes.

7    Q    And was this set up at an ANB Bank in Laramie?

8    A    Yes, it was.

9    Q    Did you live in Laramie, at the time?

10   A    Yes, I did.

11        MS. WEISS:  And if we can scroll down to the very

12   bottom, Ms. Ortiz.

13   Q    Does this note what account number we're talking about?

14   A    Account ending in '3099.

15   Q    And again, this was the bank account that you opened at

16   Kimberley Tew's request?

17   A    Yes.

18   Q    Did you review your bank records from ANB, during the

19   relevant time period, before coming in to testify?

20   A    Yes, I did.

21   Q    Approximately what time period did you receive wires into

22   that ANB Bank account?

23   A    December of 2018.

24   Q    And do you recall about how much you received in wires?

25   A    It was $40,000.

MICHAEL MEYERS – Direct

1    Q    And were those wires from National Air Cargo?

2    A    Yes, they were.

3    Q    Did you receive the wires from National Air Cargo at

4    Kimberley Tew and Michael Tew's request?

5    A    Yes.

6    Q    Were you communicating with Kimberley Tew during this time

7    period?

8    A    On an off, yes.

9    Q    Were you communicating with Michael Tew during this time

10   period?

11   A    On an off, yes.

12        MS. WEISS:    I would like to move to Government's

13   Exhibit 696, and I believe there's multiple pages.    Thank you.

14   All right.

15   Q    Sir, do you recognize the content?    What's in this

16   document?

17   A    Yes, I do.

18   Q    Have you seen this content in this format, prior to

19   preparing for your testimony

20   A    No.

21   Q    Do you, nevertheless, recognize the content?

22   A    Yes.

23   Q    How do you recognize it?

24   A    Because these were text messages coming to my cell phone,

25   that I was involved in.

MICHAEL MEYERS – Direct

1    Q    I apologize.  I interrupted you.  Repeat yourself?

2    A    Um, I'm very nervous, so I apologize there, as well.  These

3    were messages that were coming into my cell phone, that was

4    involved in the back-and-forth.

5    Q    And these messages were coming from where?

6    A    I believe these were Michael Tew's phone number, as well.

7    Q    Do you have a specific personal recollection of these

8    messages?

9    A    Yes.

10   Q    Okay.

11        MS. WEISS:  Government would ask of for permission to

12   display 696, how we have been handling these messages

13   throughout trial.

14        THE COURT:  All right.  Understanding the ongoing

15   objections, I will allow it to be displayed now.

16   Q    Do you remember the questions I was asking about these text

17   messages before?

18   A    Yes.

19   Q    Can I ask you to do the same thing with each message,

20   starting from the top?

21   A    Okay.  On 12-18-2018, at 3:19:03.  *What's going on?  Are*

22   *you making a deposit*?  And again, just same assumptions

23   previously, I assume this was Kimberley speaking from Michael

24   Tew's phone.

25   Q    And for the record is there a dash in that sentence?

MICHAEL MEYERS - Direct

1    A    Yes.

2    Q    And punctuation?  Apostrophe.  I apologize, I should be

3    more specific.

4    A    Yeah.

5    Q    Next message?

6    A    It 12-18-2018, 3:25:47, *Didn't get back to you the other*

7    *day because I knew she was*.  And this one, to me, looked a

8    little bit more like Michael, but just an assumption.

9    Q    Okay.  All right.  Next message down.

10   A    It's 12-18-2018, 3:25:48, *Sorry about that*.

11   Q    Okay.  Next message.

12   A    It's 12-18, 3:30 and ten seconds, *Can you please let me*

13   *know what is up*?

14   Q    I don't believe you said the prior message.  Who that

15   sounds like?

16   A    These two -- yeah.  Looked to me, like Michael.

17              Then 12-18-2018, 3:46:28 *Calling you to check in*.  And

18   again, seemed like Michael.

19   Q    Okay.

20   A    At 12-18 and 4:17:35, a message from me saying, *You are*

21   *good.  I understand.  I fucked off my wife and I am just about*

22   *to a point where I can apologize now without the BS, so it*

23   *shouldn't be much longer*.

24   Q    Is this a reference to the troubles you were having with

25   your wife over your cryptocurrency training?

MICHAEL MEYERS - Direct

1           *MR. KAPLAN:*  Objection, leading.

2           *THE WITNESS:*  Yes.

3           *THE COURT:*  Overruled.

4    Q    Next message, please.

5    A    It's 12-18 at 4:17:57, *Okay.  Thanks.  Sorry to hear.  We*

6    *all have wives.*

7    Q    Is there a ... something at the end of that?

8    A    A smiley face.

9    Q    And, in your opinion, Michael Tew or Kimberley Tew?

10   A    Kimberley Tew.

11   Q    And what makes you say that, sir?

12   A    Majority of the time guys don't send smiley faces to each

13   other, unless you know them well.

14   Q    Okay.  Next message.

15   A    It's 12-18, 2018, 4:22:37, *Can you get done within 45*

16   *minutes*?

17            That one, I don't know.

18   Q    Okay.  Next message.

19   A    It's 12-18-at 2018 -- 12-18 of 2018, 4:22:46, *Kind of on*

20   *the clock.*

21   Q    Michael Tew or Kimberley Tew or you don't know?

22   A    Ambiguous.

23   Q    Okay.  Last one.

24   A    It's 12-18, 5:34:12.  *It's been all day.  Can you deposit*

25   *$1500?  Yes, no?  We can line up the BOFA deposit.*  That, to

MICHAEL MEYERS – Direct

1  me, was Kimberley.

2  Q    What makes you say that?

3  A    Just the hyphen, and typically the BOA accounts were

4  through one specific trader, and she had that contact.

5  Q    Okay.  BOFA, what is that?

6  A    Bank of America.

7  Q    Did you have a Bank of America, at this time?

8  A    At one point; not at this time, though.

9  Q    Understood.  While you are accepting these wires from

10 National, into your bank accounts, on behalf of Kimberley and

11 Michael Tew, were you also still investing in Kimberley's

12 cryptocurrency algorithm, at that time?

13 A    Yes, I was.

14 Q    And were you up money or down money?

15 A    Down.

16 Q    How much were you down, Mr. Meyers?

17 A    Anything that I made pretty much to that point.  Besides

18 day-to-day funds.

19 Q    Everything?

20 A    Yeah.  Had gone back to work, at that point, in

21 construction.

22 Q    Were you hoping to have that investment pay off?

23 A    Yes, was desperate for it.

24 Q    Is that part of why you accepted these funds?

25        *MR. KAPLAN:*  Objection, leading.

MICHAEL MEYERS – Direct

1          THE COURT:  Overruled.

2          THE WITNESS:  Yes.

3  Q   Did you keep a portion of the funds that were wired to your

4  account from National?

5  A   Hundred dollars here and there; little things, yes.

6  Q   Did you keep enough to cover the losses that you had lost

7  with Kimberley's cryptocurrency algorithm?

8  A   No.

9  Q   Sir, months later did you find out that you might incur a

10 different type of financial liability from this conduct?

11 A   I did.

12 Q   What type of liability was that?

13 A   I received a 1099 form from National Air Cargo, stating

14 that my company had received funds from them, though there was

15 an issue with the name of the company.

16 Q   So, you received a 1099.  What is that, to your

17 understanding?

18 A   What corporations use to be able to pay out to

19 miscellaneous contractors.

20 Q   And is that what income taxes on a company is based off of?

21 A   Yes.

22         MS. WEISS:  If we could please redisplay Government's

23 Exhibit 752, and go to the second page.

24         THE COURTROOM DEPUTY:  Your Honor, is this okay to

25 show to the jury?  This is one of the demonstrative.

MICHAEL MEYERS - Direct

1          THE COURT:  Yes.  We've already discussed this one, I

2    think.

3          MS. WEISS:  Yes.

4          THE COURT:  Yes.

5    Q   And I am specifically referencing the second message, on

6    this -- on this chain.  Can you read that one off, again, just

7    to reorient us?

8    A   If you don't respond I assume you are going hostile.  We

9    wanted to help you with your tax situation.  If I don't hear

10   from you, I assume we are not working together.

11   Q   Is this tax situation the income taxes that you would have

12   owed on the 1099?

13   A   Yes.

14   Q   Did you have money to cover the income taxes related to the

15   funds that were wired to your accounts from National?

16   A   No.

17   Q   Offering to help you with that tax situation?

18   A   It infuriated me.

19   Q   I would like to turn to Government's Exhibit 804.  This is

20   not in evidence as of now.  The only page I am seeking to

21   display, Your Honor, is the third page, ending 374664.

22         THE COURT:  Why don't you try to lay a foundation for

23   it.

24         MS. WEISS:  Okay.

25   Q   It's on up the screen.  My apologies.  Okay.  Mr. Meyers,

MICHAEL MEYERS - Direct

1   do you recognize what you are seeing on the screen right now?

2   A   Yes, I do.

3   Q   And what are you seeing?

4   A   A picture that I sent to, I believe, Kimberley, about this

5   tax form that I received in the mail.

6   Q   Okay.  Had you seen this particular document, prior to your

7   preparing for testimony?

8   A   Yes.

9   Q   Prior --

10  A   I'm sorry.  I received the document.  So, initially, I

11  received it, yes, and then preparation after that.

12  Q   Okay.  But a different format than you had ever seen it

13  before?

14  A   Yes.

15  Q   Do you have a personal recollection of the image that is

16  depicted here?

17  A   Yes, I took that picture.

18  Q   And is there also some words around the picture?

19  A   Yes.

20  Q   Are those your words?

21  A   Yes.

22  Q   Do you recall those words?

23  A   I do.

24       MS. WEISS:  I would ask for permission to display just

25  page 374664 out of Government's Exhibit 804.

MICHAEL MEYERS - Direct

1      *THE COURT:*  Any objection other than what we discussed

2  in the past?

3          *MR. KAPLAN:*  None, other than that, Your Honor.

4          *THE COURT:*  All right.  Then you can display it,

5  Mr. Keech.

6  Q   Mr. Meyers, what are we looking at?

7  A   Text messages from me to Kimberley Tew, when I received

8  this document in the mail, and this was my initial reaction to

9  seeing that document.

10 Q   What did you say?

11 A   Um, basically, the bottom line, is this -- *This is what I'm*

12 *talking about.  This is not mine to deal with.*  Prior to that,

13 was me going off about it.

14 Q   Did you curse?

15 A   Yes.

16 Q   Do you curse a lot, Mr. Meyers?

17 A   Yes, I do.

18 Q   Construction work?

19 A   Yes.

20 Q   And I don't know if you can kind of turn your head, but

21 what's -- what's in box seven of the 1099 form?

22 A   Box seven, the name or the amount?

23 Q   The amount, sir?

24 A   Amount of $125,000.

25 Q   Was it your understanding that you would need to pay income

MICHAEL MEYERS - Direct

1    taxes on $125,000?

2    A    Yeah.

3    Q    Okay.  You mentioned it.  Let's look at the next box over.

4    The name of the company.  What does this document say?

5    A    Meyers Consulting Group, Inc.

6    Q    Is that the name of your company?

7    A    No.

8    Q    What is the name of your company, sir?

9    A    Meyers Consulting Group, LLC.

10   Q    I would like to move to Government's Exhibit 805, and just

11   display the second page, and I apologize, there is a typo.

12   It's page two.  It's, for the record, ending in 396127.

13   Q    Do you recognize this -- what's depicted on just this page?

14   A    Yes.

15   Q    What is it, sir?

16   A    Photo of my pickup's dashboard and text message I wrote.

17   Q    Do you have a specific memory of writing this text message?

18   A    Yes.

19   Q    Taking this picture?

20   A    Yes.

21   Q    Sending it?

22   A    (Nodding head.)

23        MS. WEISS:  Okay.  The government would move to

24   display, just display, at this time, just the second page of

25   805, which is 396127.

MICHAEL MEYERS – Direct

1        MR. SCHALL:  Your Honor, in addition to the prior

2   objections, there's nothing on this that establishes a date or

3   any kind authenticity of when.  I don't think the testimony

4   establishes that, either.

5        THE COURT:  I think you are right about that.  I think

6   we can display it, but it would probably be useful to get that

7   out.

8        MS. WEISS:  Yes, Your Honor.  The other pages of this

9   exhibit do establish that information, but do not fall within

10  Mr. Meyers' knowledge to lay that foundation, so I would seek

11  to, when we do submit this document for admission, through the

12  appropriate witness, we can go over that, specifically.

13       THE COURT:  Okay.  We can display it.

14  Q   Mr. Meyers, can you please describe what we're seeing on

15  the screen?

16  A   Dashboard of my pickup, and in the background is a

17  transmission symbol that had just come on.

18  Q   You drove a pickup, sir?

19  A   Yeah.

20  Q   Did you drive that pickup to your construction job?

21  A   Yes.

22  Q   Reliable car?

23       MR. SCHALL:  Objection, Your Honor.

24       THE COURT:  Overruled.  Go ahead.

25  A   Besides that, yes.

MICHAEL MEYERS – Direct

1   Q   Please read out what you wrote underneath the image of that

2   dashboard.

3   A   *Just lost my transmission in my truck this morning, so,*

4   *great month for you to fuck me over.  Thanks again for keeping*

5   *to your word.  I will be forwarding you my tax bill for Air*

6   *National Carriers shortly, that needs to be covered*

7   *immediately.  Losing my transmission on top of being late on*

8   *rent, means I do not have the means to cover it, nor the*

9   *fucking patience to pussyfoot around any longer.*

10  Q   Are these words a pretty accurate summary of how you felt

11  that morning?

12  A   Yes.

13  Q   How did you feel that morning?

14  A   Absolutely furious, scared, devastated.  I'm the sole

15  moneymaker within my home, and a transmission is not a joke.

16  That's not something small, so ...

17  Q   Who did you send this to, sir?

18  A   Kimberley.

19  Q   Mr. Meyers, the funds that were wired to your account, from

20  National, did Kimberley ask you to do anything else,

21  specifically, with them?

22  A   Pull the cash out, deliver the cash to them.

23  Q   Okay.  Did she ask you to do anything in relation to

24  Bitcoin purchases?

25  A   Yes.  Asked me to make some deposits to Bank of America or

MICHAEL MEYERS – Direct

1    other accounts, that she would set up a transaction for.

2    Q    And what was your understanding of what that money would be

3    used for?

4    A    That it was supposed to be going into the algorithm, to

5    help prop up the money that existed within that system.

6    Q    Did you do that?

7    A    Yes.

8    Q    You mentioned, just now, pulling out some of the funds in

9    cash?

10   A    Yes.

11   Q    Was there a incident where you met Michael Tew in person?

12   A    Yes.

13   Q    And was the purpose of that to exchange cash?

14   A    Yes, it was.

15   Q    Okay.  Tell us about that trip, sir?

16   A    Sometime in December, middle of December, I received some

17   calls and voice mail saying I need to get some money available

18   for them.  I don't remember the exact content of it, but it was

19   *We need cash.  We need cash fast.  Go to the bank and pull out*

20   *some money for us*.  If I recall, like, I tried stopping at the

21   ANB Bank in Laramie to pull some out there.  I do not recall if

22   I actually got any available.  I then traveled to the next

23   nearest location, which was in Ft. Collins, Colorado, which is

24   about a 45-minute drive south from where I was, and there in

25   the parking lot met Michael Tew, before going into the bank to

MICHAEL MEYERS - Direct

1    request funds out.

2    Q    Okay.  So, is that how you recognize Mr. Tew today?

3    A    Yes.

4    Q    You met him in person in Ft. Collins?

5    A    Yes.

6    Q    What -- and you might have mentioned it, what bank?  What

7    financial institution did you go to?

8    A    ANB Bank.

9    Q    Same financial institution that you set up the account at

10   Kimberley Tew's request?

11   A    That's correct.

12   Q    Same one that Kimberley told you Michael had an account at?

13   A    That's correct.

14   Q    Physically, where did you meet Michael?  Outside the

15   building, or inside the building?

16   A    Outside the building, in the parking lot.

17   Q    Did both of you go inside?

18   A    Initially, no.

19   Q    Okay.  Who went in first?

20   A    I did.

21   Q    Okay.  And what did you do when you walked in?

22   A    Waited in line, and then got up to a teller and tried to

23   request getting, I believe, $10,000 in cash out of the account.

24   At that time they notified me that that might be an issue,

25   considering the time of year, and that she needed to get

MICHAEL MEYERS - Direct

1    bank-manager approval before being able to do that.

2    Q    Can I pause you, sir?

3    A    Yeah.

4    Q    What time of year was it?

5    A    Around second or third week of December.  I would say the

6    second.

7    Q    So, around the holidays?

8    A    Yes.

9    Q    Okay.  All right.  While you are waiting for the teller,

10   what happened next?

11   A    At one point they came back to me and notified me that,

12   again, due to the time of year, that they weren't sure if they

13   had the cash funds available to be able to disburse that,

14   because they needed petty cash for other transactions, like

15   people coming in during this time.

16          I was in contact with Michael and Kimberley through

17   text messages and calls, and at some point I notified them that

18   this was ongoing, probably been inside about 15 minutes by that

19   point, and some time around that time, Michael Tew came in.

20   Q    Where did he go in the bank?

21   A    Came up to the teller standing with me.

22   Q    And what happened there?

23   A    He started talking to the teller, on behalf of the money,

24   and started arguing with the teller, telling them that they

25   needed to make those funds available, that it was his money and

MICHAEL MEYERS - Direct

1    they needed to get it to him, as soon as possible, and this was

2    unacceptable-type thing.  Just getting quite agitated with the

3    teller over the situation.

4    Q    And what are you doing while this interaction is happening?

5    A    Awkwardly standing there.  Kind of staring.  Trying to

6    figure out what's going on.

7    Q    How was Mr. Tew's demeanor with the teller?

8    A    Very agitated, very aggressive.

9    Q    Were you able to withdraw the full amount from that ANB

10   bank location?

11   A    I do not believe so, but I also don't fully recall.

12   Q    Did you go to any other ANB Bank locations that day?

13   A    I don't believe I went to another ANB that day.  I went to

14   another bank, though.

15   Q    Oh, okay.  Thank you for correcting me.  Okay.  So, you

16   started at the ANB and you went to, possibly, a different bank?

17   A    Yes.

18   Q    Different financial institution, entirely?

19   A    Yes.

20   Q    Still in the Ft. Collins area?

21   A    Yes.

22   Q    Did Michael Tew go too?

23   A    I don't recall if he was -- he didn't come into the store

24   with me, he was nearby.

25   Q    So, he didn't drive there with you?

965
MICHAEL MEYERS - Direct

1   *A*   No.  Not that I remember.

2   *Q*   Did he follow you in his car?

3   *A*   Yes.

4   *Q*   What kind of a car was he driving?

5   *A*   A black Audi SUV -- not SUV.  Whatever that vehicle is

6   called.

7   *Q*   A luxury --

8   *A*   Just larger than a car.

9   *Q*   Got it.

10  *A*   Sedan.  There we go.  There we go.  I'm just a construction

11  worker.  I don't know these things.

12  *Q*   What did you do with the money that you withdrew that day

13  in Ft. Collins?

14  *A*   Delivered it to them or deposited or purchased Bitcoin

15  with.

16  *Q*   Did you hand some of it to Michael Tew in his own hands?

17  *A*   Yes.

18  *Q*   What was your understanding what would be done with that

19  money, sir?

20  *A*   That it was supposed to be converted to Bitcoin and used to

21  prop up the trading algorithm.

22  *Q*   Prior to that date, had you ever met someone in person to

23  do a peer-to-peer crypto transaction?

24  *A*   I had not.

25  *Q*   Is that something that happens in peer-to-peer

MICHAEL MEYERS - Direct

1    cryptocurrency?

2    A    Yes, it does.

3    Q    What's the purpose of doing that kind of transaction in

4    person?

5    A    One favorable aspect of it is you get cash in hand and

6    don't have the risk of charge backs.

7    Q    While you were doing peer-to-peer crypto trading, did you

8    ever have an experience where you lost money from a charge

9    back?

10   A    Yes, numerous times.

11   Q    Mr. Meyers, you described some urgency at the teller

12   window.  Was this entire situation urgent?

13   A    It felt like it, by all of the messages and things.  The

14   communications were very hurried.  Very, *You have to go do this*

15   *now*.

16   Q    I believe you said that Kimberley did not have the ability

17   to make withdrawals out of those accounts; is that right?

18   A    That's right.

19   Q    So, she could put money in, but not take it out?

20   A    Yes.

21   Q    She expressed some concern to you that you might run with

22   that money?

23   A    That's correct.

24   Q    Would Kimberley Tew inform you that a wire was coming in,

25   beforehand?

967
MICHAEL MEYERS - Direct

1    A    Sometimes.

2    Q    How about Michael Tew?  Would he inform you if a wire was

3    coming in, beforehand?

4    A    Not typically, no.

5    Q    Was there ever an occasion where a wire came into your

6    account that you didn't have advance notice of?

7    A    Yes.

8    Q    Did anything happen as a result of that?

9    A    Yeah.  I was at work, again, returned to construction, at

10   that point, and was working in Cheyenne on a solar project, and

11   sometime during that day a wire transfer had come into my

12   account, and phone calls were made to my phone, that I missed.

13   I did not have service for.  It was a bunch of voice mails and

14   text messages, that came through, at this time, including my

15   wife got called at some point, and voice mails left to her, and

16   I believe -- I don't recall if she responded by text message or

17   answered one of the calls, but she had some communication with

18   Michael, at that time, as well.

19   Q    Nice calls?

20   A    No.

21   Q    What was said on those calls, Mr. Meyers?

22   A    Basically, along the lines, I was a thief and if I ran with

23   the money they were going to make sure and destroy me.

24   Q    Were expletives used?

25   A    Yes.

MICHAEL MEYERS - Direct

1              MR. SCHALL:  Your Honor, if I may.  I don't know it's

2    clear who is using expletives.  Who is talking.  I heard, they.

3              THE COURT:  Well, you will have a chance for

4    Cross-examination, but Ms. Weiss can clear that up too.

5              MS. WEISS:  I'm happy to ask the question.

6    Q    Who was using expletives?

7    A    Initially, it would have come from Michael and Kimberley's

8    side.  After the fact, when I was actually in calls, responded,

9    I very definitely would provide, in kind.

10   Q    Was it coming from Michael Tew's number?

11   A    Both, I do believe, yes.

12   Q    So both Michael Tew's number and also the other forms you

13   were communicating with Kimberley Tew by?

14   A    Yes.

15   Q    WhatsApp, Telegram, those sorts of things?

16   A    Yes.

17   Q    Okay.  You said they threatened to destroy you?

18   A    Yes.

19   Q    Did you consider that be a threat?

20   A    Yeah.

21   Q    Did you have concerns about criminal exposure?

22   A    Hell yes.

23   Q    Did you threaten them back?

24   A    I did.

25   Q    Did you use expletives?

969
MICHAEL MEYERS - Direct

1    A    I did.

2    Q    Did you threaten to hurt them?

3    A    Yeah.

4    Q    Did you send degrading messages to Kimberley Tew?

5    A    Yes.

6    Q    Why did you do that?

7    A    Pure desperation.  Again, I had no money, I was the sole

8    provider for my family, I didn't know where tomorrow was coming

9    from.  I didn't know how I was paying my next bill.  There was

10   a promise of funds, that I thought was there, and was supposed

11   to be owed to me, and it kept getting triggered and held out in

12   front of me like a ... like a carrot-and-a-stick concept, and

13   so I was fed up and I was frustrated.  I was furious.

14   Q    Did you ever make any plans to go hurt them?

15   A    No.  I'm much more of a keyboard-warrior-threaten-type-guy.

16   In reality, I don't have zero desire to drive down there and go

17   to jail for something as dumb as that.

18   Q    Because you had a lot on the line, didn't you?

19   A    Yeah.

20   Q    After that incident, did the relationship with the Tews

21   disintegrate pretty quickly?

22   A    Yes, it did.

23   Q    Did you stop receiving wires into your account?

24   A    Yes.

25   Q    Did you invest with Kimberley still?

MICHAEL MEYERS – Direct

1    A    A few months later, yeah, I did.

2    Q    Sir, did you receive a text from Michael Tew in July of

3    2020?

4    A    I believe so, yeah.

5    Q    Do you recall the content of that text?

6    A    Not directly.

7    Q    Would a document help refresh your recollection?

8    A    Yes.

9    Q    Sir, what I will ask you to do, this is one of those legal

10   formalities, read that to yourself, quietly, just the first

11   page.  When you have read that, if you can close the folder,

12   and let me know when you are ready.

13   A    Okay.

14   Q    Did you receive a text from Michael Tew's phone number in

15   July of 2020?

16   A    Yes.

17   Q    Can you pull the mic a little closer to you, sir?

18   A    Yes.

19   Q    Thank you.  What did that message say?

20   A    Asking me if I reached out to the FBI or if I had done

21   anything with the government.

22   Q    Mr. Meyers, we are going to fast forward to 2022.  At some

23   point that year did you receive a visit?

24   A    Yes, I did.

25   Q    From federal agents?

MICHAEL MEYERS - Direct

1    A    Yes.

2    Q    Any notice they were coming?

3    A    No.  Besides them turning the corner to my home.

4    Q    So, they came to your house, unannounced?

5    A    Yes.

6    Q    Do you remember what agency they were with?

7    A    IRS.

8    Q    Did they ask to interview you?

9    A    Yes.

10   Q    Did you agree to an interview?

11   A    Yes.

12   Q    Without going into substance of what the agents asked you

13   that day, I want to confirm, did you -- were you asked about

14   receiving those wires from National?

15   A    Yes, I did.

16   Q    Did you -- what did you tell the agents, at that time?

17   A    That I did, and that I had the documentation there.

18   Q    What documentation are you referring, sir?

19   A    The 1099 MISC filing, as well as some bank statements.

20   Q    The same one we saw a picture of?

21   A    Yes.

22   Q    Hm.

23              MR. SCHALL:  Your Honor, I'm going to object to the

24   side hms and facial expressions and --

25              THE COURT:  Let's just ask questions, please.

MICHAEL MEYERS - Direct

1          MS. WEISS:  Understood.

2    Q    Okay.  And if we can now turn to Government's Exhibit 525,

3    which I believe is in evidence.  Did the IRS agents show you

4    this document at your home that day?

5    A    Yes, they did.

6    Q    At that time, did you recognize this document?

7    A    No, I did not.

8    Q    Did you complete this document?

9    A    I do not believe so.

10   Q    Are you sure one way or the other?

11   A    Not a hundred percent, no.

12   Q    Is it possible you created this document?

13   A    Yes.

14   Q    Is that your signature, your e-signature?

15   A    It is.

16   Q    Is it also possible that you did not create this document?

17   A    Yes.

18          MR. KAPLAN:  Objection, relevance and speculation.

19          THE COURT:  Overruled.

20   Q    Is it possible that you did not create this document, sir?

21   A    Yes.

22   Q    How could this have been created with your e-signature?

23   A    The length of the -- the communications between us, she --

24   between Kimberely and Michael and myself, they had every piece

25   of identification -- identifiable piece of information about

973
MICHAEL MEYERS - Direct

1  me, at the time.

2  Q   Did that include your e-signature?

3  A   Yes.

4  Q   In what context did you send them your e-signature?

5  A   At one point I sent a lease agreement, about my house, to

6  show what I'm paying and what my debts are and ...

7  Q   Who did you send that to?

8  A   Kimberley.

9  Q   Why did you send her that lease agreement?

10 A   Around the time of me being frustrated about trying to show

11 what my current debts are and how screwed I am on my

12 month-to-month income.

13 Q   Was that similar to the message we saw about your

14 transmission.

15 A   Yes.

16      MR. KAPLAN:  Objection, leading.

17 Q   And I just want to make sure your answer gets on the

18 record.  Was that similar to the message we looked at about

19 your transmission?

20 A   Yes, it was.

21 Q   Did you try to tell the Tews how this was impacting you?

22 A   Yes, I did.

23 Q   Mr. Meyers, prior to that interview, were you familiar with

24 the email address *meyersconsultinggroupinc@gmail.com*?

25 A   No.

MICHAEL MEYERS - Direct

1    Q    Did you create the email

2    *meyersconsultinggroupinc@gmail.com*?

3    A    No.

4    Q    Did you ever use the email *meyersconsultinginc@gmail.com*?

5    A    No.

6    Q    Prior to that interview with the federal agents, at your

7    home, were you even aware that the email

8    *meyersconsultinggroupinc@gmail.com* existed?

9    A    No.

10   Q    Were you shown some invoices during that interview,

11   Mr. Meyers?

12   A    I was.

13        MS. WEISS:  Can we please display Exhibit 537, which

14   is already in evidence.

15   Q    Is this one of the invoices that you were shown by the

16   agents when they came to your home?

17   A    Yes, it is.

18   Q    And what is the name of the company off this invoice, sir?

19   A    The National Cargo Holdings or the Meyers Consulting, Inc.?

20   Q    Um, who signed this invoice or who is it from?

21   A    Meyers Consulting Group, Inc.

22   Q    Once again, is that the name of your company, sir?

23   A    No, it is not.

24   Q    What is the difference?

25   A    LLC versus Inc.

MICHAEL MEYERS – Direct

1    Q    Is that all your Region's bank information though?

2    A    It is.

3    Q    Did you give that information to Michael Tew?

4    A    To Kimberley Tew.

5    Q    Oh, to Kimberley Tew.  I apologize.

6    A    Yes.

7    Q    Did you submit the invoices to National Air Cargo?

8    A    No, I did not.

9    Q    Had you seen this invoice before that day?

10   A    No, I had not.

11   Q    Despite what you knew about these wires coming into your

12   account, did you know how this money was getting out of

13   National?

14   A    No, I did not.

15   Q    Were you aware that they were using the name of your

16   company, or something very similar to it --

17   A    No.

18   Q    -- to get that money out of National?

19   A    I was not.

20   Q    Mr. Meyers, have you ever spoken with Jonathan Yioulos?

21   A    No.

22   Q    Ever communicated with him, at all?

23   A    No.

24   Q    Have you ever spoken to Chris Rincon?

25   A    Yes.

976

MICHAEL MEYERS - Direct

1   Q   Yes.  Is that someone from Paxful?

2   A   Yes.

3   Q   Have you ever spoken to Craig Feigin?

4   A   No.

5   Q   Any idea who that is?

6   A   I do not.

7   Q   Understood.  Did your company ever do any work for

8   National?

9   A   No, it did not.

10  Q   Mr. Meyers, you know anybody named Amy Tew?

11  A   No, I do not.

12  Q   Mr. Meyers, have you ever shopped at Luluemon?

13  A   No, I have not.

14  Q   Mr. Meyers, have you ever shopped at Lilly Pulitzer?

15  A   No.

16  Q   Mr. Meyers, have you ever bought anything from Christian

17  Louboutin?

18  A   No.

19  Q   Mr. Meyers, how do you feel about this period of your life,

20  standing here today, in front of this jury?

21          MR. KAPLAN:  Objection, relevance.

22          THE COURT:  Overruled.  Go ahead.

23          THE WITNESS:  Um ... horrible.  There's not much worse

24  time within my life that I have lived, quite honestly.  For 14

25  years I was an electrical worker, out in the field, and for a

MICHAEL MEYERS - Direct

1   couple of years delved into a completely different realm that I

2   was used to, and during this time I had nothing but problems

3   and nothing but excuses that happened within my life and

4   allowed it to destroy my relationship with my wife and my

5   daughter, and I was drinking heavily and having major issues

6   and it's absolutely terrifying.

7           Being here today, the biggest concern I have is I

8   broke the law, and here I am, in front of a Court, I'm this

9   close to being on the other side of it, and knowing that is

10  terrifying.  Knowing what it did to my wife and my daughter and

11  the years of ... things that it's caused has been horrible.

12          I'm still having to apologize, to this day, to my wife

13  for things that I did to her during those times, because I

14  didn't trust her.  I didn't believe her.  I apologized for her

15  telling me to get the hell away from this.  I made it so far in

16  debt that I was making excuses for this situation and

17  trying ...

18          MR. SCHALL:  Your Honor, has not been a question in

19  awhile.

20          THE COURT:  All right.  Thank you, Mr. Meyers.  I

21  appreciate that.  Is there anything else?

22  Q   How is your life today?  Are you still married?

23  A   I am.  Besides that, doing well.

24  Q   Thank you.

25          MS. WEISS:  Let me just confer, make sure I haven't

MICHAEL MEYERS – Cross

1   missed anything.

2          No further questions from the government, at this

3   time.

4          *THE COURT:*  Thank you.  Mr. Kaplan.

5                    **CROSS-EXAMINATION**

6   *BY MR. KAPLAN:*

7   *Q*   Good afternoon, Mr. Meyers.

8   *A*   Good afternoon, sir.

9   *Q*   You said that you initially were in the construction

10  trades?

11  *A*   Yes, sir.

12  *Q*   And then you gravitated and decided to do Bitcoin business?

13  *A*   Yes, sir.

14  *Q*   In the hope of making more money?

15  *A*   Yeah.

16  *Q*   Imagine you enjoyed some of the computer sense of things?

17  *A*   Yes, sir.

18  *Q*   Talked about being a computer nerd, or something to that

19  effect?

20  *A*   Yeah.

21  *Q*   When you went into the cryptocurrency business, you knew

22  that it was a speculative business?

23  *A*   Yes, sir.

24  *Q*   But you also knew that there was a lot of cryptocurrency

25  kind of talk, and there was trading going on, and it was a

MICHAEL MEYERS – Cross

1    relatively new form of commerce?

2    A    Yes.

3    Q    You didn't go in it thinking that there was anything

4    illegal about it?

5    A    No.

6    Q    You knew that there was a lot of, kind of, unsure ground,

7    but you knew people were doing it and making legitimate money

8    at it?

9    A    Yes, sir.

10   Q    You probably had some sense that it might be a -- kind of a

11   new frontier of how the country does their business?

12   A    Yeah.

13   Q    And the way you talked about it, you said that there was

14   expedited transactions and that was a positive thing?

15   A    Yeah.

16   Q    Allowing for digital transfers, blockchain technology,

17   those kind of things?

18   A    Yeah.

19   Q    And you wanted a position, yourself, in this kind of new

20   business, in the, what I guess you referred to, as

21   peer-to-peer?

22   A    Yes, sir.

23   Q    That's a P2P concept?

24   A    Yes.

25   Q    Know, you spoke a little bit about that, but allowed you to

MICHAEL MEYERS - Cross

1    interject yourself into kind of the -- I would say the middle.

2    I don't know if it's right in the middle, but the middle of a

3    Bitcoin cryptocurrency transaction?

4    A    (Nodding head.)

5    Q    Is that right?

6    A    Yes, sir.

7    Q    Yeah.  As a result of doing that, you would take, for

8    whatever service and value, you would take a percentage, a

9    certain percentage out of the transaction?

10   A    Yes, sir.

11   Q    And that's what ended up getting you on the *Paxful.com*

12   website?

13   A    Yes, sir.

14   Q    And that is what was used by you and many other people to

15   accommodate these kind of transactions?  At least it was one

16   way to do it?

17   A    Yes, sir.

18   Q    And the way that worked is you would purchase the Bitcoin,

19   at some set market rate, and hopefully sell it at markup, and

20   if you were providing a service to the person who you were

21   accommodating those transactions, that's where you would take

22   your little bit of income fee?

23   A    Yes, sir.

24   Q    This was kind -- as a result of that, you are really making

25   money understanding the market, right?

MICHAEL MEYERS - Cross

1   A    Yes, sir.

2   Q    It's, basically, you know, buy-low, sell-high kind of

3   thing?

4   A    Yeah.

5   Q    And it's -- it's actually in a market as we just -- you

6   just mentioned, that was in its infancy?

7   A    Yes, sir.

8   Q    And as a result of that, there wasn't a lot of history to

9   know how best to maximize your profits; is that right?

10  A    Yes, sir.

11  Q    You couldn't go to the brokerage firms that had years and

12  years of tradition, where it was somebody like Schwab or

13  something, advice from Vanguard or things like that, they were

14  not dealing in it?

15  A    Correct.

16  Q    Matter of fact, the banks were either skeptical or thought

17  it as a competitor, so if they saw that was happening, they

18  make kick you out of their accounts?

19  A    That's correct.

20  Q    And a matter of fact, you knew that, within the

21  cryptocurrency world, that had happened?

22  A    Yep.

23  Q    So, having multiple accounts was not unusual for people in

24  the cryptocurrency world?

25  A    Correct.

MICHAEL MEYERS - Cross

1    *Q*    Through this business in Paxful website, you get to meet

2    others of, kind of, a similar temperament?

3    *A*    Yes, sir.

4    *Q*    Similar interests?

5    *A*    Yes.

6    *Q*    You actually could see on Paxful other people that, you

7    know, became somewhat recognizable actually?

8    *A*    Yes.

9    *Q*    Did you sometimes compare information with them, get to

10   know them, if it was only online, as to what was going on?

11   *A*    To a point there was some camaraderie, and then cross

12   transactions between multiple players, so, yeah.

13   *Q*    That's what was creating the market, actually?

14   *A*    Yes.

15   *Q*    So, you were, again, part of this new way of commerce, that

16   you were actually creating with others like-minded in that

17   market?

18   *A*    Yes, sir.

19   *Q*    And that's where you met Kimberley Tew?

20   *A*    That's correct.

21   *Q*    Again, we've talked about a place that legitimate business

22   was transacted?

23   *A*    (Nodding head.) Yes.

24   *Q*    And I think your testimony was that for awhile she had used

25   a name, but somewhere, a couple months in, revealed to you who

983
MICHAEL MEYERS - Cross

1   she was?

2   A    Yes.

3   Q    Saying there had been some problems with other of her

4   accounts, maybe some theft of identity, something like that,

5   that's why she was using somebody else?

6   A    That's correct.

7   Q    And you know when you are talking about that, that was

8   something, I think your testimony was, that people in this

9   market were a little bit concerned about?

10  A    Hm-hm (Nodding head.)

11  Q    Say yes.

12  A    Yes.  Sorry.  Again, I'm new to this.

13  Q    I know how to stay on the good side of the court reporter.

14  And so, the idea was you had to be cautious about that, because

15  there were ways to get ripped off, so to speak?

16  A    Yes, sir.

17  Q    Also, maybe, a function of the new industry with not a lot

18  of regulation and some unknowns to it?

19  A    Yes.

20  Q    But once meeting Kimberley Tew, she did reveal her real

21  name?

22  A    Correct.

23  Q    And she gave you telephone numbers that ended up being

24  legitimate?

25  A    Yes.

MICHAEL MEYERS - Cross

1   *Q*   And an email address that was legitimate?

2   *A*   Yes.

3   *Q*   Matter of fact, you did some due diligence, yourself, to

4   check on this, and then she volunteered it?

5   *A*   Yes, sir.

6   *Q*   And that's because there was a friendship developing, not

7   only a business relationship?

8   *A*   Yes.

9   *Q*   Now, during this initial kind of communication with

10  Kimberley, it was a little bit of the P2P thing you were doing,

11  right?

12  *A*   Yes, sir.

13  *Q*   You were seeing if she wanted to trade, and you could

14  provide the service, and make a little bit of money for

15  yourselves?

16  *A*   Yeah.  She would open a transaction.

17  *Q*   There also became a time where she talked to you about

18  developing an algorithm?

19  *A*   Yeah.

20  *Q*   And that's something that you talked about that really

21  ended up being an issue almost throughout the whole

22  relationship that you testified to?

23  *A*   That's correct.

24  *Q*   And the algorithm that she was talking about was -- not

25  diving too deeply into it.  I don't know that I could ask the

985
MICHAEL MEYERS - Cross

1    right questions, but basically it was an algorithm, where you

2    could evaluate the market, right?

3    A    Yeah.

4    Q    I mean, look at different sales or different locations, set

5    prices, different markets in this cryptocurrency, and have some

6    sense of where you could get a good value, a good deal?

7    A    Yeah.

8    Q    And that was intriguing to you?

9    A    Yes, it was.

10   Q    Because, again, in a new market, things like that would

11   inevitably develop and could give you a little bit of a hedge

12   on other people?

13   A    Yes.

14   Q    Because people wanted to understand, *Hm, what's the best*

15   *way to improve my chances of making money*?

16   A    That's correct.

17   Q    And that's true, very similarly, how the stock market

18   works, in that regard; is that fair to say?

19   A    Yes.

20   Q    And so, your investment in that was an investment that

21   hoped to end up with pretty big returns for you?

22   A    Yes.

23   Q    At first -- and I don't know it's not just the algorithm,

24   but the first investing that you did, returned money?

25   A    Yes, sir.

MICHAEL MEYERS - Cross

1  Q   And you were pretty happy about that?

2  A   (Nodding head.) Yes.

3  Q   And then, as the months came by, the return wasn't as high?

4  A   Yeah.

5  Q   Now, that could be a function of whether the algorithm was

6  working as effectively as one would think, right?

7  A   Correct.

8  Q   It also could be like in any market, the markets fluctuate.

9  They go up, they go down, there's winners and there's losers,

10 right?

11 A   Yes.

12 Q   So, the whole business you are in, is risky business?

13 A   Yes.

14 Q   And I understand that you look back now and are regretful

15 of it, but it also seemed to be an opportunity to make it rich?

16 A   Yeah.

17 Q   The fact that when you invest with somebody, they give you

18 returns, and then the returns aren't as great as you expected,

19 that's not unusual?

20 A   Correct.

21 Q   Really, everybody who does any kind of marketing in the --

22 working the market, I mean, not marketing themselves, are

23 hoping for that, and sometime when you look up, in a risky

24 business especially, you end up saying, *I thought I was going*

25 *to make money but I didn't*?

MICHAEL MEYERS - Cross

1    *A*    Yeah.

2    *Q*    That's what happened to you, right?

3    *A*    In essence, yeah.

4    *Q*    And so the investment -- let me put it this way.  So,

5    people invest in whatever it is, businesses, products, new

6    inventions, and sometimes they make money and then sometimes

7    they lose money?

8    *A*    That's correct.

9    *Q*    You were talking about how it was difficult for you,

10   because of your financial situation?

11   *A*    Correct.

12   *Q*    The more difficult your financial situation, the more

13   conservative -- doesn't it make sense -- the more conservative

14   somebody's investments should be?

15   *A*    Correct.

16   *Q*    Because if you don't have enough to lose, then you

17   shouldn't invest in something that is risky?

18   *A*    Yeah.

19   *Q*    But you didn't do that?

20   *A*    No.

21   *Q*    Because you did see the opportunity to hit it big?

22   *A*    Yes, money symbols.

23   *Q*    Pretty quickly afterwards, you realized it wasn't happening

24   like you thought?

25   *A*    Correct.

MICHAEL MEYERS - Cross

1   Q   And it certainly wasn't happening as quickly as you

2   thought?

3   A   Correct.

4   Q   Which brings me to another few questions.  Sometimes when

5   you have a new product and you're checking it out, you are

6   trying to develop it, it takes time for something to be

7   successful; is that right?

8   A   Yes.

9   Q   Often, as a matter of fact, it takes dumping more money

10  into something, before it gives you the big return?

11  A   Yeah.

12  Q   So, the fact that somebody would have a new idea in a new

13  industry in a new business that needed to raise capital, that's

14  not unusual?

15  A   No.

16  Q   And to have somebody in a new business, that are trying to

17  improve upon it, it would be unreasonable for that business to

18  need the infusion of additional money?

19  A   Correct.

20  Q   And sometimes if you can wait it out and kind of hang with

21  it, it will ultimately succeed?

22  A   Yes.

23  Q   And sometimes, even with the infusion of more money and

24  smart people and a great idea, it fails?

25  A   Correct.

MICHAEL MEYERS – Cross

1   Q   And people who have put their money in, hoping for a big

2   return, end up losing their money, through nobody's fault, just

3   because that thing didn't take off?

4   A   Yes, sir.

5   Q   You talked about losing everything.  That was very much a

6   function of you putting more money than you really had to risk?

7   A   Yeah.

8   Q   Let me move to another topic.  You talk about reviewing

9   those text messages that you said came from Michael Tew's

10  phone, right?

11  A   Yes, sir.

12  Q   And you testified to this jury about your conclusions as to

13  who was giving the messages?

14  A   Right.

15  Q   Let me ask you, right off, there are some of these messages

16  that refer to, you know, Kimberley, in the third person, or

17  something referencing the person talking to you as being

18  Michael, right?

19  A   Yes.

20  Q   And despite that as, in some ways, at least most of us

21  think the best indication of who you are talking to, you're

22  ignoring that?

23  A   Yes.

24  Q   And you are ignoring that because of the problems of, I

25  guess say, authenticating who you are talking to, and who is

MICHAEL MEYERS - Cross

1   giving messages on these kind of forms of communication?

2   A    Yes, sir.

3   Q    So, when it comes to, you know, text, even emails, in the

4   world that we've lived in now, for a little bit longer, there's

5   an increased risk that the person who is talking or -- talking

6   is a bad word.  Communicating on the other end is not who they

7   represent them to be?

8   A    That's correct.

9   Q    So, sometimes when somebody talks about a wife, it's not

10  the wife, right?

11  A    Yes.

12  Q    Sometimes talking about the husband, is not the husband?

13  A    Yes.

14  Q    And you are particularly sensitive to that, because when

15  you are doing financial transactions, that's the whole, what we

16  talked about a moment ago, the confirmation of this --

17  A    Yes.

18  Q    -- is difficult?

19  A    Correct.

20  Q    And some people who wanted to, you know, demonstrate that

21  it is somebody else, might use that third person as the

22  greatest indication, right?

23  A    Yeah.

24  Q    And you ignored the fact that there were some third-party

25  references, like, we're talking about Michael, my wife, those

MICHAEL MEYERS - Cross

1   kind of things, to evaluating it in a difficult way and that

2   is, I think, most of the time that you were talking about it,

3   and correct me if I'm wrong, but most of your explanations had

4   to do with punctuation?

5   A    Yes, sir.

6   Q    That was kind of the key to you?

7   A    Yeah.

8   Q    Okay.  But you don't have -- there's no science to that,

9   right?

10  A    No.

11  Q    You haven't read anything that says, if you really want to

12  validate and authenticate something, let me show you the

13  punctuation that you would look for and things like that?

14  A    No, I have not.

15  Q    That was just something that -- it was kind of an intuition

16  to you?

17  A    Gut feeling, for sure.

18  Q    Matter of fact, there were times that you were not sure who

19  the messages were coming from?

20  A    Correct.

21  Q    So, even in your own mind, when you are looking at it,

22  despite testifying, and I understand that you testified to your

23  beliefs, I'm not questioning that, but even before you were

24  here, looking over and testifying for the government, you were

25  saying, look, there was a time where I thought the messages

MICHAEL MEYERS - Cross

1    were coming from one of them, Kimberley or other times thought

2    coming from Michael, and then you changed your mind about it

3    and you just weren't sure?

4    A    Yeah.

5    Q    At one point, when you thought it was coming from

6    Kimberley, there was another piece of information that you kind

7    of factor in, because then there was an actual call around that

8    same time, I don't know exactly when, and the voice was a male,

9    it was Michael's voice?

10   A    Yes, sir.

11   Q    So, that kind of throws you into another, *Well, here I*

12   *thought, you know that it was Kimberley, but now I hear a male*

13   *voice, so probably -- not probably -- but I could have been*

14   *wrong about what I thought?*

15   A    Agreed.

16   Q    And basically, despite testifying today to, you know, the

17   text messages, that the government asked you about, and you

18   giving, again, your opinion about those things, throughout this

19   period, you actually questioned who you were talking to and

20   wondered who you were talking to?

21   A    Yes.

22   Q    Not sure even to this day, really?

23   A    (Nodding head.) Yeah.

24   Q    The other thing that you mentioned -- let me ask you a few

25   more things, because I, kind of, forgotten them.  The

MICHAEL MEYERS – Cross

1   punctuation piece that you talked about, that's actually one of

2   the things that is discussed when we talk about our digital

3   age, which is what we learned early on, in terms of

4   punctuation, seems to have gone out the window; is that fair to

5   say?

6   *A*   Correct.

7   *Q*   So, when you talk about, well, I thought punctuations were

8   more prevalent with professionals or less prevalent with

9   nonprofessionals, or you look at these texts, you think things

10  capitalized, there's no commas, dashes, those things that, even

11  for people who grew up learning about the punctuation, has kind

12  of very much been thrown out the window, when it comes to this

13  text communicating?

14  *A*   Definitely.

15  *Q*   The other thing that you had mentioned, that a little

16  punctuation was probably the key for you, was also, kind of,

17  the hurried manner, in which you thought some of them...

18  *A*   Difference of how it read, kind of verb usage.

19  *Q*   And if it was hurried and abusive, you thought that was

20  Kimberley?

21  *A*   Depended upon context.

22  *Q*   Okay.  So, these are all of those different things that you

23  are, kind of, wondering about, to come to what you actually

24  thought were guessing at who it was?

25  *A*   Correct.

MICHAEL MEYERS - Cross

1    Q    Because you never met Kimberley Tew?

2    A    No.

3    Q    So, you have never seen her until, I think, you mentioned

4    today?

5    A    Correct.

6    Q    But you had met Michael Tew?

7    A    That's correct.

8    Q    And when it came down to, kind of, the hard, cold cash

9    getting it or meeting up for it or coming from behind the

10   Bitcoin world, which, you said, P2P rarely people meet?

11   A    Correct.

12   Q    So, if you are staying with the Bitcoin currency algorithm

13   world, not having ever met Kimberley was consistent with that

14   world?

15   A    Yes.

16   Q    And then all of a sudden there's a transaction, outside of

17   the Bitcoin cryptocurrency world, and who shows up?  Michael

18   Tew shows up?

19   A    Yes.

20   Q    And when he shows up, you talked about, you know,

21   aggressive and having attitude and being hurried, that is how

22   Michael Tew presented, when you saw him?

23   A    Yes.

24   Q    Because when you saw him, in Ft. Collins, I think you said.

25   First in Wyoming, then you went to Ft. Collins?

MICHAEL MEYERS - Cross

1   A   Yes, sir.

2   Q   When you saw him, your description of him, he was antsy,

3   sweaty, nervous?

4   A   Yes.

5   Q   You went into the bank, and apparently it sounds like when

6   you didn't come out quick enough, with the money, he came in,

7   right?

8   A   Correct.

9   Q   And actually it sounded like he made you uncomfortable,

10   because of how aggressive he was with the teller?

11   A   Yeah.

12   Q   How demanding he was?

13   A   Yes.

14   Q   It was, kind of -- you got to do this -- a little desperate

15   too, it sounded like?

16   A   Yeah.

17   Q   Because he needed the money, he wanted the money, and he

18   was going to get the money?

19   A   Yep.

20   Q   And he ended up getting some that day, right?

21   A   Yes.

22   Q   And so you have had some dealings with Michael, now, in

23   person, and invoice mail, right?

24   A   Correct.

25   Q   And being that you were able to identify him by his voice?

MICHAEL MEYERS - Cross

1   A   Correct.

2   Q   Compared that from when you had an opportunity to actually

3   talk to him?

4   A   Yes, sir.

5   Q   You ... you looked at this invoice, that the government

6   showed you, that had to do with Meyers Consulting Group, Inc.?

7   A   Yes, sir.

8   Q   And you talked about not knowing a bunch of people's names?

9   You didn't know Abby Schwartz was a name; is that right?

10  A   Correct.

11  Q   You didn't know Jonathan Yioulos as a name.

12  A   No.

13  Q   You didn't know the inner workings of National Air Cargo?

14  A   No.

15  Q   Until this was mentioned, you didn't know who National Air

16  Cargo was?

17  A   Correct.

18  Q   You don't know who runs their finances?

19  A   Nope, I do not.

20  Q   You don't know how vendors are accepted into National Air

21  Cargo?

22  A   No, sir.

23  Q   You don't know how an invoice is forwarded through the

24  systems at National Air Cargo?

25  A   No, sir.

MICHAEL MEYERS - Cross

1   Q    And you don't know how something could end up being paid

2   from National Air Cargo?

3   A    That's correct.

4   Q    And you mentioned it says Meyers Consulting Group, Inc.,

5   which is not your business?

6   A    Correct.

7   Q    But you don't know how that ended up on this invoice?

8   A    Yes, sir.

9   Q    You don't?

10  A    I do not.

11  Q    All right.  You don't know who provided that to some system

12  that ended up at National Air Cargo?

13  A    No.

14  Q    You said there was a break in your communication.  The

15  Tews, you didn't know which one, but they stopped having any

16  type of communication with you, for awhile?

17  A    Yes, sir.

18  Q    And then you ended up back in touch, I think it was with

19  Kimberley Tew; is that right?

20  A    Yes.

21  Q    And what you said was that you invested with her again?

22  A    Yes.

23  Q    And that was kind of -- that's what I was saying, that

24  relationship you had with Ms. Kimberley Tew, had to do with

25  this cryptocurrency and the algorithm?

MICHAEL MEYERS - Cross

1    A    Yeah.

2    Q    And after this time had gone on, the investing that you

     were back to doing with Ms. Kimberley Tew, was in the hopes of

     this algorithm making -- still surviving, right?

5    A    Yes.

6    Q    So, in terms of your communication and the relationship

     with Ms. Kimberley Tew, that was an idea that, kind of, just

     still stuck as something that was good?

9    A    I hoped for it, yeah.

10   Q    Yeah.  And when I was talking to you about it earlier,

     which is, sometimes you need to invest some more.  You know,

     got to put a little more skin in the game, in the hope of a big

     payoff?

14   A    Yeah.

15   Q    And because it was a good idea and it was reasonable to

     invest some money, even after all of this was done, you threw

     down, in the hopes that it was going to get you somewhere?

18   A    Again, I was hoping.

19          MR. KAPLAN:  If I may have a moment.  No further

20   questions, Your Honor.

21          THE COURT:  Thank you, Mr. Kaplan.  Mr. Schall.

22                    **CROSS-EXAMINATION**

23   BY MR. SCHALL:

24   Q    Good afternoon.

25   A    Good afternoon to you.

MICHAEL MEYERS - Cross

1   Q   I would submit to you, Mr. Meyers, that the Court, having

2   instructed the jury that we will all go home early after you

3   are done, that I have the hardest job here.  So I will do my

4   best to be brief.  All right?

5   A   Okay.

6   Q   So, you are almost done.  Take a deep breath.  Is it fair

7   to say we have never met?  Please answer out loud.

8   A   Yeah, we've never met.

9   Q   Never even seen each other, as far as we know?

10  A   No, sir.

11  Q   So, we don't really know anything about each other?

12  A   Correct.

13  Q   It is also fair to say that you're nervous?

14  A   As hell.

15  Q   And I believe you said you were terrified?

16  A   Yes.

17  Q   Fair to say you are anxious?

18  A   Yes.

19  Q   Has this, your concern about this testimony, impacted your

20  quality of sleep lately?

21  A   Yes.

22  Q   This is something you are ready to be over with?

23  A   Very much.

24  Q   You said you went -- I can't remember the exact words you

25  used, but you described this phase of your life as being a dark

MICHAEL MEYERS - Cross

1   one?

2   A    Yes.

3   Q    And not something you are proud of?

4   A    Yeah.

5   Q    Well, you have -- you have come through that?

6   A    Yep.

7   Q    And your life is blossoming?

8   A    Yeah.

9   Q    Do you credit your wife with helping you get here?

10  A    Yes.

11  Q    Would you say -- I think I heard you say, but you tell me,

12  would you say she is a strong woman?

13  A    She is.

14  Q    And going back to this phase of your life, the -- what I

15  will call the dark phase, would you say you were in a

16  vulnerable position?

17  A    Yes.

18  Q    What makes you say that?

19  A    Because I had chosen to leave construction and go into a

20  field that I had no experience in, and was hoping to make it

21  big and took a gamble on myself, and the entire time my wife

22  was not behind me.  She hated the idea of it.

23  Q    Fair to say, you took a big risk?

24  A    Yes.

25  Q    And as such, you were -- I'm going to try to use a risk

MICHAEL MEYERS - Cross

1   language.  You were overstretched?

2   A    Yes.

3   Q    You are not from Colorado?

4   A    No.

5   Q    Are you familiar with the expression, *out over your skis*?

6   A    Yes.

7   Q    What does that mean to you?

8   A    That you lean took far forward, put too much into it.

9   Q    At risk of falling?

10  A    Yes.

11  Q    That's what you woke up with, every day of your life,

12  during this time?

13  A    Correct.

14  Q    Were you a father, at that point?

15  A    I was.

16  Q    And you had to provide?

17  A    Yes.

18  Q    Just the one daughter?

19  A    Yes.

20  Q    And I promise, I'm not going to ask much about her.  How

21  old is she now?

22  A    Twenty-four.

23  Q    Okay.  So she is grown?

24  A    Yes.

25  Q    But you still worry about her?

MICHAEL MEYERS - Cross

1   *A*   Very definitely.

2   *Q*   And I'm -- as a father, myself, I'm confident you worry

with the people she associates with?

4   *A*   Yes.

5   *Q*   And you want to protect her, as much as you can?

6   *A*   Correct.

7   *Q*   Looking back on 2018, version of Michael Meyers, and

8   feeling that you were vulnerable, do you now believe that you

9   were taken advantage of?

10  *A*   Yeah.

11  *Q*   Do you feel you were manipulated?

12  *A*   Yes, I do.

13  *Q*   Do you feel that you were led down the prim rose path?

14  *A*   Yeah.

15  *Q*   You aren't a hardened criminal?

16  *A*   No.  I have done things, but.

17  *Q*   More like stupid stuff than --

18  *A*   Drinking and driving, yes.

19  *Q*   -- mistakes?

20  *A*   Yes.

21  *Q*   But they don't define you?

22  *A*   Right.

23  *Q*   But you were specifically at a weak, vulnerable exposed

24  portion of your life?

25  *A*   Yes, sir.

MICHAEL MEYERS - Cross

1   Q   And it's your testimony that that was taken advantage of?

2   A   Yes.

3   Q   And you regret it?

4   A   I do.

5   Q   And you acted out of pure desperation?

6   A   Yes.

7   Q   I believe that's what you said, right?

8   A   Yeah.

9   Q   And so, when you drove to meet, as you testified, Mr. Tew,

10  now, looking back on that, doesn't make a whole lot of sense to

11  you, does it?

12  A   No, sir.

13  Q   It was almost as if you were under somebody's spell?

14  A   Yeah.

15  Q   Under their control?

16  A   Yep.

17  Q   Couldn't break free?

18  A   Yes.

19  Q   To the point of breaking the law?

20  A   Yes.

21  Q   I don't know the answer to this, but I presume you have a

22  cell phone?

23  A   Yes.

24  Q   And I presume you text buddies?

25  A   Yes.

MICHAEL MEYERS - Cross

1    Q    Does your wife ever take your cell phone and send messages

2    as if she was you?

3    A    No.

4    Q    That would be strange?

5    A    Yes.

6    Q    That would be cause for concern?

7    A    It would.

8    Q    Did it -- when -- when these messages were coming in on

9    Michael's phone, that you believed to be from Kimberley, were

10   red flags going off?

11   A    Yes.

12   Q    But you were not at a phase in life to escape?

13   A    Right.

14   Q    You were trapped in a way?

15   A    I was.

16   Q    Did you feel like she had control over you?

17   A    Monetarily, I did, yeah.

18   Q    Meaning, the Bitcoin stuff?

19   A    Yeah.

20   Q    And then, when you were asked, and you discussed with

21   Ms. Tew, how to keep the algorithm going?

22   A    Hm-hm.

23   Q    She told you that she was going to do something illegal to

24   obtain the money?

25   A    Yes.

MICHAEL MEYERS – Cross

1    Q    And your gut told you, this is illegal?

2    A    Yeah.

3    Q    And that you should not ask questions?

4    A    Correct.

5    Q    And that has led you to today?

6    A    Yes.

7    Q    But you are not charged with a crime?

8    A    As of right now, yeah.

9    Q    And you do have a lawyer?

10   A    Yes, sir.

11   Q    And he is here today?

12   A    Yes, sir.

13   Q    He is a good guy, I will just say that.

14   A    Okay.

15   Q    The $5,000 that you initially invested with Ms. Tew's

16   algorithm, that doubled in a day?

17   A    Yes.

18   Q    As a fellow nerd, of sorts, did you, that day, look up what

19   the price of Bitcoin did, to see if it was luck or if there was

20   design behind it?  Did you try to explain or research how your

21   money doubled?

22   A    Initially, no.

23   Q    Did you do that later?

24   A    Yeah.  Started watching the market a little bit more, as I

25   tried to look at other trading bots, to see if I could

MICHAEL MEYERS – Cross

1    replicate on my own, without the stress.

2    Q    By that point, you were happy to have twice your money?

3    A    Yes.

4    Q    Until she asked for it back?

5    A    Correct.

6    Q    You would agree with me that it's -- if somebody calls you

7    up and tells you to meet me -- well, let me back up.  Prior to

8    this meeting in Ft. Collins, you lived in Laramie, Wyoming?

9    A    Correct.

10   Q    Which is about how far of a drive to Ft. Collins?

11   A    Forty-five minutes, I believe.

12   Q    Okay.

13   A    I live in the south, so we go by minutes.  Sorry.

14   Q    Or exits on the highway, right?

15   A    Yes.

16   Q    Looking back, does it strike you as crazy that you would

17   drive down at somebody's direction, to get money to give to

18   them, to further whatever was going on?

19   A    Yes.

20   Q    Is this whole thing crazy?

21   A    Yes.

22         MR. SCHALL:  Can I have just a moment, Your Honor?

23         THE COURT:  Yes.

24         MR. SCHALL:  No further questions, Your Honor.

25         THE COURT:  Thank you, Mr. Schall.  Ms. Weiss, do you

MICHAEL MEYERS - Redirect

1    have some Redirect?

2            *MS. WEISS:*  Very brief, Your Honor.

3                    **REDIRECT EXAMINATION**

4    *BY MS. WEISS:*

5    Q   Mr. Meyers.

6    A   Hello.

7    Q   You were asked some questions, from Mr. Kaplan, about just

8    the speculative nature of cryptocurrency business, right?

9    A   Yes.

10   Q   And he asked you, sometimes you have to keep putting more

11   in, more in; skin in the game, is what he called it, right?

12   A   Yes.

13   Q   Did you put more skin in this game?

14   A   Yes.

15   Q   Over again?

16   A   Yes.

17   Q   Over again?

18   A   Yes.

19   Q   Over again?

20   A   Yes.

21   Q   More than ten times?

22   A   Yes.

23   Q   More an 20 times?

24   A   Yeah.

25   Q   More than 50 times?

MICHAEL MEYERS - Redirect

1   A    About there, maybe more.

2   Q    And then, Mr. Schall asked you, someone had a spell over

3   you, to get you to do that, 50 times over, put more skin in the

4   game, 50 times over, right?

5   A    Yeah.

6   Q    Mr. Schall asked you if you could break free?

7   A    Yes, he did.

8   Q    You did eventually break free, didn't you, Mr. Meyers?

9        MR. KAPLAN:  Leading, Your Honor.

10       THE COURT:  Sustained.

11  Q    Did you actually submit false invoices, sir?

12  A    No, I did not.

13  Q    How much money did you profit from your interactions with

14  Kimberley Tew and Michael Tew?

15  A    I don't believe I did.  If I did, it was minimalistic,

16  like ...

17  Q    Little to no profit?

18  A    Yes.

19  Q    How much less than $5 million dollars was that?

20       MR. SCHALL:  Objection.

21       THE COURT:  Sustained.

22       MS. WEISS:  No further questions.

23       THE COURT:  All right.  Thank you.  Mr. Meyers, you

24  are excused.  Thank you for your time.

25       THE WITNESS:  Thank you.

MICHAEL MEYERS - Redirect

1          THE COURT:  All right.  Ladies and gentlemen, I

2     don't -- I don't want to make you stay any longer than you have

3     to, but I do want to emphasize, before I release you today,

4     given the long break that we're going to have, that all of my

5     previous instructions are still in place.  Please don't do any

6     research, discuss this case with each other, no family members

7     or anyone else.  You're only allowed to decide this case based

8     on what you hear in this courtroom and my instructions that I

9     give you at the close of the case.  Please don't make up your

10    mind about any particular fact or anything else about this

11    case, until you have heard all of the evidence, and so, those

12    are my main instructions for you.  Just put the case, to the

13    extent you can, out of the your mind, over the weekend, and we

14    will -- I will ask you to keep your phones and make sure you

15    are able to hear from or reach out to Mr. Keech.  My

16    understanding we should be okay to start at 9.  So, for now, I

17    will plan to start at 9 o'clock on Monday, but just in case the

18    storm is worse or later than expected, I may start us a little

19    bit late, but plan on 9 o'clock for now, unless you hear

20    otherwise.

21          So, with that, the jury is excused until 9 o'clock on

22    Monday.

23          THE COURTROOM DEPUTY:  All rise.

24      (Jury out at 2:30 p.m.)

25          THE COURT:  Let's briefly take our seats.  So, thank

MICHAEL MEYERS - Redirect

1    you, counsel.  I -- I have one thing I want to bring up before

2    I forget, is at least, I think, three documents, that I've seen

3    so far, including one that was read into the transcript, have

4    Mr. Tew's and I think this witness' social security numbers in

5    them, and I would like counsel to discuss what we should do

6    about that.  I don't want those to be publicized anymore than

7    they already have been.  So, I think we can figure that out

8    pretty easily, but I would like you to come up with a plan for

9    that.

10          Other than that, I think we've discussed everything

11   else that I need to discuss.  Ms. Hubbard?

12          *MS. HUBBARD:*  Yes, Your Honor.  I do have a motion to

13   make.

14          *THE COURT:*  Okay.

15          *MS. HUBBARD:*  Your Honor, at this point, on behalf of

16   Kimberley Tew, we would move for a mistrial.  The government

17   has with, essentially, every fact witness to date elicited what

18   I would call victim impact testimony.  They have asked

19   Abby Schwartz, Mike Meyers, Chris Alf, Jonathan Yioulos,

20   Hannah Scaife about how they have been emotionally impacted,

21   how their life has been affected.  You know, we just heard

22   Mr. Meyers talk about how he was driven to drinking.  It almost

23   ruined his marriage.  It affected his relationship with his

24   child.  Ms. Schwartz talked about the betrayal and the hurt and

25   the pain.  Chris Alf talked about having to deal with this

MICHAEL MEYERS - Redirect

1    while his wife had cancer.  Jonathan Yioulos talked about the

2    impact on him.  Hannah Scaife, of course, the Court recalls,

3    talking about Kimberley Tew ruining her life and causing her to

4    make seriously bad choices.

5           This is irrelevant evidence, and to the extent there

6    is some minimal relevance, to have hardship suffered by some of

7    these witnesses, the degree to which that evidence has been

8    elicited by the government is so far over the top, in this

9    case, from a 403 perspective.

10          I would cite the Court -- I left my laptop.  Give me

11   just a minute and I will grab the cases.  The Tenth Circuit,

12   looking at Rule 403, has held that, quote, *Evidence is unfairly*

13   *prejudicial if it makes a conviction more likely, because it*

14   *provokes an emotional response from the jury, or otherwise*

15   *tends to affect adversely the jury's attitude toward the*

16   *defendant, wholly apart from its judgment as to his guilt or*

17   *innocence of the crime charged.*  And that's *United States vs.*

18   *Leonard,* 439, F.3d, 648, a 2006 Tenth Circuit case.

19          I would also point the Court to a District Court

20   decision out of the District of New Mexico, *United States vs.*

21   *Thompson*, cite for that is 545 F.Supp 3D 1033.  That's a 2021

22   case, Your Honor.  The facts of that are that there was an

23   armed robbery, it was a Hobbs Act case, so there were people

24   testifying in that case who had actually had a gun held to

25   them.  They were threatened by the defendants with a weapon,

MICHAEL MEYERS - Redirect

1    terrified, and the Court held, in that case, under those facts,

2    that testimony about how that experience had terrified them,

3    and given them nightmares and things, was barred under 403.

4         This is not anywhere near that kind of case.  It's a

5    white collar wire fraud case, where there are an overwhelming

6    number of documents that the government can present.  The

7    government has chosen to elicit testimony from each of these

8    fact witnesses that is unfairly prejudicial, particularly to

9    Mrs. Tew.

10        Mrs. Tew has been made out, by the government, and,

11   Your Honor, by Mr. Tew's counsel, to be some sort of mystical

12   woman who has the ability to control what everyone around her

13   does.  She ruined Hannah Scaife's life.  She almost ruined Mike

14   Meyers' marriage.  I mean, she has just been made out to be

15   this devil, when she stands here accused of wire fraud.

16   There's a serious risk that this jury will convict Mrs. Tew,

17   because they don't like her, because they think she is a bad

18   person, and not based on the evidence.  On that grounds,

19   Your Honor, we would ask that the Court declare a mistrial.

20        *THE COURT:*  All right.  I will give the government a

21   chance to respond.

22        *MR. FIELDS:*  Thank you, Your Honor.  First, I would

23   note that at no point during this trial did the words 403 come

24   out of defense counsel's mouth.  We are not talking about --

25        *THE COURT:*  Well, they objected to a lot of these

MICHAEL MEYERS - Redirect

1    questions.

2          *MR. FIELDS:*  They did.  They didn't cite this rule of

3    evidence, which would have been relevant, at the time.

4          *THE COURT:*  I think we knew what they were talking

5    about.

6          *MR. FIELDS:*  Okay.  So, moving on from that,

7    Your Honor, all I would say is that bias is always relevant to

8    the extent that these witnesses feel certain ways towards the

9    Tews, the jury should know that, because it's part of actually

10   how the jury will evaluate their testimony.  Drawing the sting

11   out of that on Direct is a sort of tried and true prosecutorial

12   strategy.  It's certainly something that wasn't unusual, in my

13   experience, as a trial attorney, and certainly part of every

14   trial.

15         It's also no different, I would note, than exactly

16   this sort of bias that Ms. Hubbard was trying to draw out from

17   Hannah Scaife.  This idea that she needed to Cross-examine

18   Ms. Scaife about her sexual prostitution and everything else,

19   because Ms. Scaife would have a bias against Kimberley Tew,

20   that she wanted to address to the jury.

21         Now, in that particular case, the government thought

22   that that went a little bit over the line, that you could, sort

23   of, draw out the bias without getting there, but it's the same

24   thing.  So, I would say, to the extent, even defense counsel

25   sort of implicitly admitted, that it is relevant, and should be

MICHAEL MEYERS - Redirect

1    part of the jury's consideration for each of these witnesses.

2              Finally, I would just note, with regard to this

3    *Thompson* case.  They mentioned it's a Hobbs Act Robbery.  This

4    isn't that type of case.  Well, that's exactly the point.

5    We're not dealing with testimony about, sort of, someone with a

6    gun pointed at them.  So, to extent that there's any, sort of,

7    marginal prejudice, it's certainly not as extreme as in that

8    case, and there's, you know, given the, sort of, everything

9    else that this jury has considered and the overwhelming

10   evidence here, I don't think that there's a risk that the jury

11   is going to make its verdict based on some sort of emotional

12   response.

13             And then finally, to the extent that there is any

14   concern in that regard, the Court can issue a limiting

15   instruction, and I expect that the Court would issue an

16   instruction telling the jury they need to follow the law and

17   the evidence and not any, sort of, emotional reactions.

18             So, we could work with defense counsel, we could,

19   potentially, draw up a jury instruction talking about how you

20   heard testimony about, you know, certain things, that was for

21   purposes of bias, that you could evaluate their credibility,

22   but you should not reach your verdict based on an emotional

23   response.  Any jury instruction here would cure any prejudice,

24   and there is no reason for a mistrial.

25             *THE COURT:*  Thank you, Mr. Fields.  So, for now I'm

MICHAEL MEYERS - Redirect

 1    going to deny it.  I think some of the points are well taken,

 2    in the motion.  I don't think, based on what -- first of all, I

 3    think Ms. Hubbard conflated two different issues.  One is the

 4    emotional response, and that I understand is the focus of this,

 5    and some of the victim impact statements, as Ms. Hubbard

 6    characterized them, the questions about how this made the

 7    witnesses feel.  I don't think that -- my view of it at this

 8    time, is that it doesn't create too much of a risk,

 9    particularly because we will have an instruction, maybe we can

10    make it a little more explicit, about some of that.  We will

11    have a limiting instruction about the jury's -- what the jury's

12    verdict should be based on.  But I don't think the testimony

13    we've heard is -- creates an undue risk of that.  At least my

14    view of it, right now.

15         As Mr. Fields pointed out, I don't think there's

16    anything unfair or improper in the government anticipating that

17    the defense would potentially call into question some of these

18    witnesses' reason to be angry at the defendants, and the fact

19    that it came out on Direct, rather than waiting to see, I don't

20    think makes it improper.

21         So, for now, I will -- I will deny that motion, but

22    without prejudice to potentially raising it again, whenever,

23    but at the end of the case.

24         Is there anything else?

25         *MR. KAPLAN:*  Not by -- on behalf of Ms. Tew.

MICHAEL MEYERS - Redirect

1              *MR. FIELDS:*  Not from the government.

2              *MS. FROST:*  Nothing on behalf of Mr. Tew.

3              *THE COURT:*  The only other thing is I think

4    Mr. Jacobsmeyers, the draft of the final instructions, it turns

5    out most of you are in trial, according to the auto responses

6    that he got, but I think you should have them now, and please,

7    to the extent that you can address this issue, I expect it

8    won't be a unanimous decision on that, but to the extent that

9    you can come up with solutions to any of these things, as well

10   as my issue with the social security numbers, I would

11   appreciate that.  Otherwise, I will -- I don't know that we

12   need to be here too early on Monday, but let's say 8:45 for

13   counsel right now.  With that, we will be in recess.

14             *THE COURTROOM DEPUTY:*  All rise.  Court is now in

15   recess.

16        (Recess at 2:42 p.m.)

17                              **INDEX**

18   **Item**                                              **Page**

19   ITEM                                                  PAGE

20             WITNESSES

21     ABBY SCHWARTZ

22             Direct Examination By Mr. Fields            817

23             Cross-examination By Ms. Frost              863

24             Cross-examination By Mr. Kaplan             892

25             Redirect Examination By Ms. Weiss           896

MICHAEL MEYERS - Redirect

1    MICHAEL MEYERS

2         Direct Examination By Ms. Weiss                        902

3         Cross-examination By Mr. Kaplan                        978

4         Cross-examination By Mr. Schall                       998

5         Redirect Examination By Ms. Weiss                    1007

6    Exhibits                    Received

7    308                          819

8    309                          821

9    653                          823

10   630                          826

11   539, 616, 618               831

12   624, 626, 627               831

13   631, 632, 643               831

14   653, 657, 658               831

15   666, 675, 691               831

16   699, 709, 713               831

17   714, 720, 728               831

18   743, 843, 979               831

19   335                          833

20   338, 339, 347               836

21   348, 349, 350               836

22   351, 352, 353               836

23   533                          849

24   532                          851

25   305                          933

MICHAEL MEYERS - Redirect

1    656                      937

2    301                      947

3                    **REPORTER'S CERTIFICATE**

4        I certify that the foregoing is a correct transcript from

5    the record of proceedings in the above-entitled matter.  Dated

6    at Denver, Colorado, this 20th day of October, 2024.

7

8                                        *S/Tamara Hoffschildt*
                                          Tamara Hoffschildt

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25