1    IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

2

Criminal Action No. 20-cr-305-DDD

3

UNITED STATES OF AMERICA,

4

    Plaintiff,

5

vs.

6

1. MICHAEL TEW,

7    2. KIMBERLEY TEW,

8

    Defendants.

9    _____

10                    **REPORTER'S TRANSCRIPT**
JURY TRIAL, DAY 9

11    _____

12        Proceedings before the HONORABLE DANIEL D. DOMENICO,

13    Judge, United States District Court for the District of

14    Colorado, occurring at 12 p.m., on the 15th day of February,

15    2024, in Courtroom A1002, United States Courthouse, Denver,

16    Colorado.

17                        **APPEARANCES**

18        Bryan Fields and Sarah Weiss, Assistant U.S.

19    Attorneys, 1225 17th Street, Suite 700, Denver, Colorado,

20    80202, appearing for the Government.

21        Jason Dale Schall, Bowlin & Schall Law LLC, 7350 East

22    Progress Place, Suite 100, Greenwood Village, CO 80111 and

23    Kristen M. Frost, Ridley McGreevy & Winocur PC, 303 16th

24    Street, Suite 200, Denver, CO 80202, appearing for the

25    Defendant, Michael Tew.

1    David Scott Kaplan and Jamie Hughes Hubbard, Stimson

2  LaBranche Hubbard, LLC, 1652 North Downing Street, Denver, CO

3  80218, appearing for Defendant, Kimberley Tew.

4

5    TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
      901 19th Street, Denver, Colorado 80294
6      Proceedings Reported by Mechanical Stenography
        Transcription Produced via Computer

7

8                **P R O C E E D I N G S**

9    (In open court at 11:54 a.m.)

10    THE COURT:  Please take your seats.  So, welcome back.

11  As you know, we've now received two notes this morning from the

12  jury, both of them somewhat similar.

13    The first was at 11:15, said, *The jury cannot find*

14  *bank statements for NFCU, account '5336.  Can you please advise*

15  *on exhibit number or binder number*?

16    At 11:47.  The note says, *We are missing the November*

17  *2019 bank statement from Wells Fargo account, ending '6934.*

18  *Was it admitted?  Which exhibit number*?

19    So, my inclination is to essentially tell them that

20  they've received all of the evidence and been instructed and

21  that's all we're going to do.  Especially now that we've gotten

22  two of these.  If we try to start pointing them to things,

23  we're going to just be sitting here going through the whole

24  thing with them, which I'm not, obviously, not going to do, but

25  I will let you state your positions about what we should given

1    this.  Mr. Fields?

2         *MR. FIELDS:*  Your Honor, we agree with that.  We don't

3    think the Court should direct the jury to any particular item

4    of evidence, but the government's proposal would be to give the

5    jury a redacted copy of the exhibit list, and by *redacted*, I

6    mean we would exclude all of the exhibits that were not

7    admitted.  The descriptions on the exhibit list were designed

8    to be non-argumentative and relatively content neutral.

9         I do understand, from Ms. Hubbard, they have objection

10   to some of the descriptions with regard to text messages.  For

11   instance, the defense argued that the text messages that the

12   government says are between Jonathan Yioulos and Kimberley Tew,

13   weren't really with Kimberley Tew, and I think what the

14   government would propose, with that regard, is that we could

15   just say, *Text message on a date*.  These are very quick

16   redactions, the government could make, and I think it's within

17   the Court's discretion to give them the list of admitted

18   exhibits, to help them with their deliberations, and doing so

19   would direct them to a particular item of evidence and wouldn't

20   otherwise be argumentative.

21        *THE COURT:*  Okay.  I will get a response from the

22   defendants.  Mr. Schall.

23        *MR. SCHALL:*  Your Honor, we don't think the exhibit

24   list, in any form, should go back.  They have got their stuff,

25   they have got their job, let them do it.  Sure, it might

1   expedite things, but it's just introducing another element

2   to -- of a situation that's not within our province to do.  So,

3   we would object to sending back any exhibit list.

4          THE COURT:  All right.  For Mrs. Tew.

5          MR. KAPLAN:  Your Honor, we concur with what

6   Mr. Schall said.  I think that document that is created for one

7   purpose is complicating, and what it suggests, if it goes back

8   with exhibits not there or not admitted, my speculation as to

9   that, it just is a component of information providing them that

10  you don't -- we can't even begin to understand what inferences

11  they could make from that.

12         THE COURT:  All right.  Well, I'm not sure I agree

13  it's quite that problematic, but at this point, my inclination,

14  and what I think I'm going to do, Mr. Jacobsmeyer wrote up a

15  proposed response that he can hand out, if he hasn't already.

16  But what I will do, is allow the government to, if they are

17  quick redactions, as you suggested, to have draw one up, that

18  you would propose and share it with counsel and with the Court,

19  electronically, and then I will consider it, if I decide it's

20  appropriate later.  But for now, I -- read that and see what

21  you think of that for now.  It could, I guess, be simplified,

22  if we need to.  Mr. Kaplan.

23         MR. KAPLAN:  Reviewing the response that the Court

24  proposed, we have no objections.

25         THE COURT:  Thank you.

1        MS. FROST:  We have no objection, Your Honor.

2        MS. WEISS:  No objection from the government.

3        THE COURT:  All right.  So, we will do that for now.

4   If the government wants to propose a redacted one, we will

5   consider it, especially if we start to get a sense that they

6   are continuing to be confused, but for now, we will -- I will

7   just give them that written response, not to make them march in

8   and out, if that's all right, and then I will consider anything

9   that the government submits, and I won't just give it to them

10  without having a chance to discuss it again, obviously.

11       MS. FROST:  That's what I was going to ask,

12  Your Honor.  The ability to lodge objections.

13       THE COURT:  Yeah.  I won't do anything without talking

14  to you.

15       MS. WEISS:  I will handle the redactions and circulate

16  it to everyone, including the Court and all parties.

17       MR. SCHALL:  Can I ask a question?  Are we talking

18  redactions like black boxes or new language?

19       MS. WEISS:  I was going to cut out those cells of the

20  table so it's just -- it doesn't even suggest -- which

21  numbers -- there were numbers that were intentionally omitted,

22  and so if we eliminate both those numbers and anything that

23  wasn't admitted, I think it even further, sort of, obscures

24  why, you know, certain numbers are missing --

25       MR. SCHALL:  Your Honor, as someone who has spent

1    hours of my life that I will never get back reading redacted

2    documents to figure out what was said beneath the redactions, I

3    think that's a horrible idea.

4         *THE COURT:*  Yeah.  This is just a list of exhibits.

5         *MR. SCHALL:*  But it says, *Text messages between JY.*

6    It's work product.  It's what it is.  It's not an exhibit.

7    It's not evidence.

8         *THE COURT:*  Right, it's just a list.

9         *MS. WEISS:*  And I am not suggesting black boxes, to be

10   clear.  I will edit the subject lines, as Mr. Fields proposed.

11        *THE COURT:*  Yeah.  Let's see what it looks like, and

12   we can then decide whether you are right.  So, that's what we

13   will do for now.  I will give the jury the proposed -- the

14   proposed response that was handed out, and then the government

15   will circulate their proposed list, and if I'm tempted to do

16   it, I will call you back.  If I'm not, I won't bother you.

17   Okay.  All right.  Thank you.

18        *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

19        (Recess at 12:01 p.m.)

20        (In open court at 5:03 p.m.)

21        *THE COURT:*  Good afternoon.  Please take your seats.

22   Counsel, I have been informed, by a note, from the jury

23   foreperson, stating that they have reached a verdict on all

24   charges.

25        So my plan will be, unless anyone has an objection, my

 1   plan will be to bring the jury back in, I will then review the

 2   verdict form, to ensure that it's properly filled out.  I think

 3   what I may do, given the length of verdict form, if it's, sort

 4   of, all or nothing, I may just say that, rather than going

 5   one-by-one, it's dramatic enough and tense enough as it is, if

 6   it's more complicated than that, I may go one-by-one, then I

 7   will let the parties review the form, if they want, just to

 8   make sure I didn't misread it, and then I will ask Mr. Keech to

 9   poll the jurors.  Does anyone have any objection to that plan?

10        *MR. FIELDS:*  No objection, Your Honor.

11        *MS. FROST:*  No objection, Your Honor, and just so you

12   aware, Mr. Schall couldn't be here.

13        *MR. KAPLAN:*  No objection.

14        *THE COURT:*  All right.  So, Mr. Keech, why don't you

15   bring the jury in, please.

16        *THE COURTROOM DEPUTY:*  All rise.

17     (Jury in at 5:06 p.m.)

18        *THE COURT:*  Welcome back.  Please take your seats.  So

19   I have been informed, by a note from the jury's foreperson,

20   that the jury has reached a verdict.  Would the foreperson

21   please stand and identify yourselves?

22        *THE JUROR:*  Caitlin Dugas.

23        *THE COURT:*  Thank you, ma'am.  Has the jury reached a

24   unanimous verdict concerning all claims and counts in this

25   case?

1          *THE JUROR:*  We have.

2          *THE COURT:*  Have you signed the verdict form?

3          *THE JUROR:*  I have.

4          *THE COURT:*  All right.  Would you please hand it to

5    our court security officer, who will hand it to me.

6          So I will now review the form and make sure that all

7    have been filled in.

8          *THE COURT:*  Madam foreperson, my review of the verdict

9    form is that the jury has found the defendants guilty on each

10   count, except Count 48, as to Kimberley Tew, in which it has

11   marked not guilty.  Is this the jury's verdict?

12         *THE JUROR:*  Correct.

13         *THE COURT:*  All right.  I am now going to -- I will

14   ask Mr. Keech to share the verdict form with the parties, so

15   they may review it, and then Mr. Keech will poll the jury,

16   which means, ask each of you if that is your verdict.

17         Thank you, counsel.  So, as I stated, the verdict

18   form, the jury has found the defendants guilty on each count,

19   except Count 48, as to Kimberley Tew.

20         I will now ask Mr. Keech to poll the jurors.

21         *THE COURTROOM DEPUTY:*  Dennis Higbee, were and are

22   these your verdicts?

23         *THE JUROR:*  Yes.

24         *THE COURTROOM DEPUTY:*  Walter Cox, were and are these

25   your verdicts?

1           THE JUROR:  Yes.

2           THE COURTROOM DEPUTY:  Luann Pulling, were and are

3  these your verdicts?

4           THE JUROR:  Yes.

5           THE COURTROOM DEPUTY:  Rachel Hautzinger, were and are

6  these your verdicts?

7           THE JUROR:  Yes.

8           THE COURTROOM DEPUTY:  Emily Ho, were and are these

9  your verdicts?

10          THE JUROR:  Yes.

11          THE COURTROOM DEPUTY:  David Bacon, were and are these

12  your verdicts?

13          THE JUROR:  Yes.

14          THE COURTROOM DEPUTY:  Emily VanFleet-Sneed, were and

15  are these your verdicts?

16          THE JUROR:  Yes.

17          THE COURTROOM DEPUTY:  Lin Litke, were and are these

18  your verdicts?

19          THE JUROR:  Yes.

20          THE COURTROOM DEPUTY:  Samantha Gambino, were and are

21  these your verdicts?

22          THE JUROR:  Yes.

23          THE COURTROOM DEPUTY:  Deborah Menendez, were and are

24  these your verdicts?

25          THE JUROR:  Yes.

1          *THE COURTROOM DEPUTY:*  Reginald Sanders, were and are

2    these your verdicts?

3          *THE JUROR:*  Yes.

4          *THE COURTROOM DEPUTY:*  Caitlin Dugas, were and are

5    these your verdicts?

6          *THE JUROR:*  Yes.

7          *THE COURTROOM DEPUTY:*  The jury has been polled,

8    Your Honor.

9          *THE COURT:*  Thank you very much.  Ladies and gentlemen

10   of the jury, you have now completed your duties, in this case.

11   In a moment I will discharge you with the thanks of the Court.

12   Given all of my previous discussions about discussing the case

13   or anything like that, you may have questions about whether you

14   may do so, now.  The answer is yes.  You may now discuss this

15   case or your service with anyone, but it's up to you, if you

16   choose to do so.  No one can force you to talk about it, and if

17   you -- if anyone persists in asking you about this case, you

18   should reach out to me or Mr. Keech, if you no longer wish to

19   discuss it with anyone.

20         In addition, our local rules of criminal procedure

21   prohibit parties or their attorneys from contacting jurors,

22   unless they have obtained an order from me, allowing them to do

23   so.

24         I'm going to ask you to briefly wait for me, after

25   you're discharged, so I can talk to you, shortly, about that,

1    and just thank you in person.

2            So you are now discharged from your duties in this

3    case.  I, and the parties, thank you for your service.

4    Mr. Keech -- or actually, if our court security officer will

5    take you back to the deliberation room, you can gather your

6    stuff.  I will come in a few minutes and just thank you, in

7    person, and try to answer any questions you might have, but

8    thank you, again.

9        (Jury out at 5:14 p.m.)

10            *THE COURTROOM DEPUTY:*  All rise.

11        (Jury out at 5:14 p.m.)

12        *THE COURT:*  Okay.  Let's briefly take our seats.  So

13    the probation office is ordered to conduct a presentence

14    investigation and to file a presentence report.

15            We have the motion regarding presentencing release.

16    As I indicated before, I understand the government's position

17    is that that should not be granted.  My view though, is that

18    the defendants have not displayed any reason to think that they

19    are a danger to the community or that they are a flight risk.

20            I understand that the calculus changes a bit, after

21    conviction, but I am inclined to allow them to remain on bond,

22    but to add in the location-monitoring condition; meaning, GPS

23    monitoring.  I think it's standalone monitoring, which will

24    ensure that the probation office is able to keep track of them,

25    and to limit travel outside of Colorado, which I can't remember

1    is -- may already be one of the conditions.

2        So, that's my position on that.  Do the parties wish to

3    address that any further.  Mr. Fields?

4            *MR. FIELDS:*  I do, Your Honor.  I know it's late, but

5    with the Court's indulgence, I would like to make argument?

6            *THE COURT:*  Okay.  Go ahead.

7            *MR. FIELDS:*  Your Honor, so I guess I will just get

8    right to it.  Right now, as the Court knows, under 3143, the

9    law presumes that there will be detention.  It's the

10   defendants' burden, and they have to show it by clear and

11   convincing evidence.

12           In that regard, the Court cannot, as a matter of law,

13   conclude that mere compliance with their conditions up to this

14   point are sufficient to overcome that burden.  That's *United*

15   *States vs Hanhardt*, 173, it's a District Court case, but I

16   think it captures the consensus of the Courts.  That Court

17   right there wrote that, *It is not unusual for persons seeking*

18   *presentence release to point to their compliance with pretrial*

19   *release orders as evidence that they will appear for*

20   *sentencing.  This argument is routinely rejected because prior*

21   *to trial there's the possibility of no imprisonment, which*

22   *evaporates upon a finding of guilt*, and that's also consistent

23   with the Senate Committee Report that actually accompanied the

24   Bail Reform Act of 1984.  There was not to be a presumption in

25   favor of release; in fact, the opposite.

1675

1       The Bail Reform Act was, in many ways, a response to,

2   among other things, Hinkley's attempted assassination of

3   Reagan.  There were real concerns about how the law was being

4   applied at the time, and the Senate responded with this.

5       In addition, the government would note that even if

6   the Court doesn't want to rely on that presumption, there are a

7   host of reasons in favor of detention in this case.

8       First, Kimberley Tew has tried to tamper with

9   witnesses several times during this investigation.  First and,

10  sort of maybe most dramatically, she tampered with her

11  husband's attempt to cooperate.  Her husband was in the process

12  of cooperating with federal officials.  As the Court has heard

13  about the, so called, Yeti incident, Kimberley Tew tracked him

14  down, found him there --

15      *THE COURT:*  Let me interrupt you.  What does that have

16  to do with release?

17      *MR. FIELDS:*  I think it goes to that attempt to tamper

18  with that witness, the attempt to tamper with Hannah Scaife,

19  goes to their efforts to, sort of, undermine the possibility

20  that this day would come and their, sort of, hope that

21  eventually that it would not come, and I think that there is

22  every reason to believe that they thought they were going to be

23  able to manipulate others, and the Court, to escape justice and

24  not end up detained.

25      Moving on from there, Your Honor, I would just note

1   that the underlying conduct that drove this fraud, Kimberley's

2   gambling, all of the, greed continues.  In October of 2023, a

3   Denver District Court imposed a civil fraud judgment against

4   Kimberley Tew related to her Bitcoin investment scam.  The

5   Court heard about this a little bit during the course of the

6   trial, but that continues.  There's good reason to think that

7   it continues.

8        The government has obtained bank records for Michael

9   Tew's accounts, for the past year.  Somehow, I don't know what

10   he put into his CJA affidavit, but he is -- those bank accounts

11   show that he is receiving tens of thousands of dollars every

12   month.  Every month, tens of thousands of dollars disappears

13   from the account into Bitcoin exchanges.

14        The Tews are continuing with that cryptocurrency

15   speculation.  They now have a lot of incentive to flee.  The

16   sentencing guidelines in this case are over ten years.  The

17   evidence at trial showed that they deposited approximately $2.4

18   million from this fraud scheme into cryptocurrency, which is

19   difficult to trace.  The government has done what it can, but a

20   lot of that money could still be out there.  They certainly

21   have the means to flee.

22        In addition to that, you have the bank records that I

23   just proffered to the Court, showing all of that.  If the Tews

24   did lie in their CJA affidavit, I think that goes to, sort of,

25   the disrespect for the law, and the likelihood that they are

1       not going to follow any conditions of release.  They have --

2       Michael Tew has been able to work remotely and continue

3       employment despite the pendency of this case.  There's every

4       reason to think that he could do that.

5               Kimberley Tew is a gambler.  She just made the

6       ultimate gamble with this trial and lost.  She is impulsive,

7       and there's every reason to think they could make the rash

8       decision to try to flee, and if they did that, they would have

9       plenty of resources to sustain themselves wherever they might

10      go.  They have the means, as we've seen, to create false email

11      accounts, use other people's identities, all of the things that

12      they would need to do to successfully do that.

13              So that goes to risk of flight, but as to danger to

14      the community, if they are really continuing with this

15      cryptocurrency scheme, the Courts have said that that is

16      sufficient.

17              So, in that regard, I would point the Court to *United*

18      *States vs Provenzano*, Third Circuit case, 605, F.2d, 85.  What

19      the Court said there, is that, sort of, propensity to commit

20      further crime, including economic crime, is a harm that is

21      cognizable under the Bail Reform Act, and that is sufficient

22      reason to detain someone.

23              Taking all of that aside, Your Honor, if you also look

24      at, sort of, the other factors that the Court has to consider,

25      right; person's character, their mental condition, history of

1     drug use, the Court -- it was a brief mention during the trial

2     court record, but the Court probably heard reference to Michael

3     Tew's use of cocaine.  There's also evidence in the record of

4     Kimberley Tew's use of illicit drugs.  That's among the things

5     that she was -- the friendship with Hannah Scaife involved.

6     All of that adds to the, sort of, increased likelihood that

7     they might flee.  Drugs can make people even more impulsive and

8     these are bound to be very stressful times coming up.

9          So all of those, I think, even if the presumption

10    didn't apply, and it does here, they have the burden of showing

11    by clear and convincing evidence, even if the presumption

12    didn't apply, there would still be plenty of grounds to detain

13    them.

14         Lastly, Your Honor, if Your Honor is inclined to still

15    let them go, the government would ask for much more stringent

16    conditions; home detention with a monitor would be appropriate.

17    Also ask for a condition that Kimberley Tew not gamble, in any

18    form.  She not enter any casinos.  We would ask for a condition

19    that pretrial services approve any financial transaction, other

20    than rent, of more than 1,000 dollars to make sure they are not

21    imposing significant financial harms on others.  And on that,

22    Your Honor, what I would say, you know, that's the government's

23    fallback position, but we still don't think that's going to be

24    enough to really ensure that these defendants are going to show

25    up, and that there's not going to be ongoing financial harm, as

 1   they sort of continue these cryptocurrency schemes, and their

 2   manipulations of others.

 3          So, for all of those reasons, we do not think the

 4   presumption is overcome.  The law requires they be detained.

 5   There's no longer a presumption of liberty.  They are guilty

 6   and they are facing -- even if the Court varied downward,

 7   substantially, like, let's say 50 or 60 percent, they would

 8   still be facing years in prison, and people have fled and done,

 9   sort of, foolish things for less, and I think all of the

10   evidence at trial showed that these are defendants have done

11   foolish and impetuous things in even less stressful

12   circumstances.

13          THE COURT:  Okay.  Thank you, Mr. Fields.  I'm going

14   to go talk to the jury.  I appreciate it.  I'm not changing my

15   mind, right now.  I will consider a motion to modify

16   conditions.  I think the only thing that's changed is the

17   convictions, which is not insignificant.  It's mostly

18   significant to me for the last reason you mentioned, that

19   there's no longer a presumption of liberty that should apply.

20   I don't think it makes it -- in this case, the evidence was

21   fairly strong, from the beginning, and I don't think that the

22   conviction makes it all that much more likely that they are

23   going to flee.  I haven't seen any real evidence, other than

24   that drug use had much to do with any of this or would have

25   anything to do with this.

1    So, in my view, I do feel it's clear and convincing

2    evidence based partly on their conduct in the pretrial release,

3    partly on their showing up for trial, despite the significant

4    costs -- or the significant risk.  I know they have children,

5    and significant ties that make it difficult and unlikely to

6    flee, and I have heard a lot of these arguments repeatedly

7    before, when we were going through similar things, when we were

8    taking off ankle monitors and those sorts of things, and none

9    of those things have come to pass.

10    I am -- I will consider, certainly, some of the

11   additional conditions that the government suggested may make

12   sense.  I certainly understand those.  But for now, I'm going

13   to allow the defendants to remain free on bond.  Although, I

14   understand the government's position.

15    Are this any other matters we need to take up now,

16   that can't be done in writing.  Mr. Kaplan?

17        *MR. KAPLAN:*  I don't believe so, Your Honor.

18        *MS. FROST:*  Nothing on behalf of Mr. Tew, Your Honor.

19        *THE COURT:*  All right.  Well, thank you, all.  I

20   appreciate everyone's hard work in this case, and I will take a

21   recess.  Thank you.

22        *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

23    (Recess at 5:26 p.m.)

24

25

## REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.   Dated at Denver, Colorado, this 20th day of October , 2024.


*S/Tamara Hoffschildt*
Tamara Hoffschildt