APPEAL,TERMED

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CRIMINAL DOCKET FOR CASE #: <u>1:20–cr–00305–DDD</u> All Defendants

Case title: USA v. Tew et al

Magistrate judge case number:  1:20–mj–00088–KLM

Date Filed: 09/29/2020

Date Terminated: 12/06/2024

Assigned to: Judge Daniel D. Domenico

Appeals court case number: 24–1465 USCA–10th Circuit

**<u>Defendant (1)</u>**

| | | |
|---|---|---|
| **Michael Aaron Tew**<br>*TERMINATED: 11/15/2024* | represented by | **Peter R. Bornstein**<br>Peter R. Bornstein, Law Offices of<br>6060 Greenwood Plaza Boulevard<br>Suite 500<br>Greenwood Village, CO 80111<br>720–354–4440<br>Fax: 720–287–5674<br>Email: pbornstein@prblegal.com<br>*TERMINATED: 01/30/2023*<br>*LEAD ATTORNEY*<br>*Designation: CJA Appointment* |

**David C. Boyer , Jr.**
Newland Legal PLLC
PO Box 1413
Midlothian, TX 76065
469–948–1489
Email: david@newlandlegal.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Edward R. Harris**
Federal Public Defender's Office
Districts of Colorado and Wyoming
633 17th Street
Suite 1000
Denver, CO 80202
303–294–7002
Email: co.ecf@fd.org

*TERMINATED: 10/21/2020*
*Designation: Public Defender or Community*
*Defender Appointment*

**Eric M. Creizman**
Armstrong Teasdale LLP
919 Third Avenue
37th Floor
New York, NY 10012
212–209–4400 x4358
Fax: 212–409–8385
Email: ecreizman@atllp.com
*TERMINATED: 08/13/2020*
*Designation: Retained*

**Jason Dale Schall**
Bowlin & Schall Law LLC
7350 East Progress Place
Suite 100
Greenwood Village, CO 80111
720–505–3861
Email: jason@bowsch.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Kristen M. Frost**
Ridley McGreevy & Winocur PC
303 16th Street
Suite 200
Denver, CO 80202
303–629–9700
Fax: 303–629–9702
Email: frost@ridleylaw.com
*ATTORNEY TO BE NOTICED*

**Michael Hassard**
Tor Ekeland Law, PLLC
30 Wall Street
8th Floor
New York, NY 10005
718–737–7264
Email: michael@torekeland.com
*TERMINATED: 03/07/2022*
*Designation: Retained*

**Michael J. Sheehan**
Sheehan Law
8400 East Prentice Avenue
Suite 1040
Greenwood Village, CO 80111
720–381–6146
Email: michael.sheehan.esq@gmail.com

*TERMINATED: 07/29/2020*
*Designation: Retained*

**Thomas Richard Ward**
Stuart & Ward LLP
140 East 19th Avenue
Suite 300
Denver, CO 80203
303–832–8888
Email: tward@stuartwardlaw.com
*TERMINATED: 03/18/2021*
*Designation: CJA Appointment*

**Tor Bernhard Ekeland**
Tor Ekeland Law, PLLC
30 Wall Street
8th Floor
New York, NY 10005
718–737–7264
Email: tor@torekeland.com
*TERMINATED: 03/07/2022*
*Designation: Retained*

**Xuan Zhou**
Lewis Brisbois Bisgaard & Smith LLP
550 West C Street
Suite 1700
San Diego, CA 92101
619–233–1006
Email: xuan.zhou@lewisbrisbois.com
*TERMINATED: 03/07/2022*
*Designation: Retained*

**Zachary Lee Newland**
Newland Legal, PLLC
P.O. Box 3610
Evergreen, CO 80437
303–948–1489
Email: zach@newlandlegal.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Pending Counts**

18 U.S.C. § 1349 (Conspiracy to
Commit Wire Fraud)
(1s)

**Disposition**

Defendant shall be imprisoned for a total term of
forty–two (42) months. This term consists of
forty–two (42) months on each of Counts 1 through
42 and 44 through 56; and twelve (12) months on
each of counts 57 through 60; all counts imposed
concurrently. Three (3) years supervised release on
each count, to run concurrently. , $5,600.00 special
assessment, no fine, and restitution in the total

| | |
|---|---|
| | amount of $6,331,622.10. |
| 18 U.S.C. § 1343 (Wire Fraud)<br>(2s–40s) | Defendant shall be imprisoned for a total term of forty–two (42) months. This term consists of forty–two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently. , $5,600.00 special assessment, no fine, and restitution in the total amount of $$6,331,622.10. |
| 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering)<br>(41s) | Defendant shall be imprisoned for a total term of forty–two (42) months. This term consists of forty–two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently. , $5,600.00 special assessment, no fine, and restitution in the total amount of $$6,331,622.10. |
| 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity)<br>(42s) | Defendant shall be imprisoned for a total term of forty–two (42) months. This term consists of forty–two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently. , $5,600.00 special assessment, no fine, and restitution in the total amount of $$6,331,622.10. |
| 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity)<br>(44s–56s) | Defendant shall be imprisoned for a total term of forty–two (42) months. This term consists of forty–two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently. , $5,600.00 special assessment, no fine, and restitution in the total amount of $6,331,622.10. |
| 26 U.S.C. § 7203 (Willful Failure to File Tax Return)<br>(57s–60s) | Defendant shall be imprisoned for a total term of forty–two (42) months. This term consists of forty–two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently. , $5,600.00 special assessment, no fine, and restitution in the total amount of $6,331,622.10. |

**Highest Offense Level
(Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |

18 U.S.C. § 1349 (Attempt and
Conspiracy)
(1)

18 U.S.C. § 1957 (Engaging in
Monetary Transactions in
Property Derived from Specified
Unlawful Activity)
(2)

26 U.S.C. § 7201 (Attempt to
Evade or Defeat Tax)
(3)

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |

18 U.S.C. § 19569(h) Conspiracy
to Commit Money Laundering

---

Assigned to: Judge Daniel D.
Domenico

Appeals court case number:
24–1333 USCA–10th Circuit

**Defendant (2)**

| **Kimberley Ann Tew** | represented by | **Peter R. Bornstein** |
| --- | --- | --- |
| *TERMINATED: 08/13/2024* | | (See above for address) |
| *also known as* | | *TERMINATED: 12/29/2022* |
| Kimberley Vertanen | | *LEAD ATTORNEY* |
| *TERMINATED: 08/13/2024* | | *Designation: CJA Appointment* |

**David Scott Kaplan**
Stimson LaBranche Hubbard, LLC
1652 North Downing Street
Denver, CO 80203
720–689–8909
Fax: 720–689–8909
Email: kaplan@slhlegal.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Jamie Hughes Hubbard**

Stimson LaBranche Hubbard, LLC
1652 North Downing Street
Denver, CO 80218
720–689–8909
Email: hubbard@slhlegal.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Michael Hassard**
(See above for address)
*TERMINATED: 03/07/2022*
*Designation: Retained*

**Tor Bernhard Ekeland**
(See above for address)
*TERMINATED: 03/07/2022*
*Designation: Retained*

**Xuan Zhou**
(See above for address)
*TERMINATED: 03/07/2022*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud) (1) | Defendant shall be imprisoned for a total term of forty–eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,023,878.50. |
| 18 U.S.C. § 1343 (Wire Fraud) (21–22) | Defendant shall be imprisoned for a total term of forty–eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,023,878.50. |
| 18 U.S.C. § 1343 (Wire Fraud) (25–26) | Defendant shall be imprisoned for a total term of forty–eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,023,878.50. |
| 18 U.S.C. § 1343 (Wire Fraud) (31–32) | Defendant shall be imprisoned for a total term of forty–eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,023,878.50. |

| | |
|---|---|
| 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering) (41) | Defendant shall be imprisoned for a total term of forty−eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,023,878.50. |
| 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity) (43−44) | Defendant shall be imprisoned for a total term of forty−eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,023,878.50. |
| 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity) (47) | Defendant shall be imprisoned for a total term of forty−eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,023,878.50. |
| 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity) (56) | Defendant shall be imprisoned for a total term of forty−eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,023,878.50. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18 U.S.C. § 1343 (Wire Fraud) (16) | Dismissed by Court during jury trial. |
| 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity) (48) | Defendant was found not guilty by jury at trial. |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

Assigned to: Judge Daniel D. Domenico

**Defendant (3)**

| | | |
|---|---|---|
| **Jonathan K. Yioulos**<br>*TERMINATED: 12/06/2024* | represented by | **Michael John Tallon**<br>Michael J. Tallon, Attorney at Law<br>401 Stony Brook Road<br>Rush, NY 14543–9419<br>585–329–8139<br>Email: mtallon@tallonlaw.com<br>*TERMINATED: 07/20/2023*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained* |

**Richard Kent Kornfeld**
Recht & Kornfeld, P.C.
1600 Stout Street
Suite 1400
Denver, CO 80202
303–573–1900
Fax: 303–446–9400
Email: rick@rklawpc.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud) (1) | Defendant shall be imprisoned for a total term of two (2) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $200.00 special assessment, no fine, and restitution in the total amount of $5,023,878.50. |
| 18 U.S.C. § 1343 (Wire Fraud) (39) | Defendant shall be imprisoned for a total term of two (2) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $200.00 special assessment, no fine, and restitution in the total amount of $5,023,878.50. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18 U.S.C. § 1343 (Wire Fraud) (2–38) | Dismissed on United States of Americas Motion to Dismiss Counts. |
| 18 U.S.C. § 1343 (Wire Fraud) (40) | Dismissed on United States of Americas Motion to Dismiss Counts. |

**Highest Offense Level**

**(Terminated)**

Felony

**Complaints**                                             **Disposition**

None

**Movant**

**National Air Cargo Holdings, Inc.**          represented by   **Eric S. Galler**
                                                                Galler Corporate Law Group
                                                                9466 Georgia Avenue
                                                                Suite 130
                                                                Silver Spring, MD 20910
                                                                301–728–3850
                                                                Email: egaller@gcorplaw.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*
                                                                *Designation: Retained*

                                                                **Nancy Lin Cohen**
                                                                Cohen Black Law LLC
                                                                1888 North Sherman Street
                                                                Suite 770
                                                                Denver, CO 80203
                                                                720–699–2323
                                                                Email: nancy@cohenblacklaw.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*
                                                                *Designation: Retained*

**Movant**

**National Air Cargo Group, Inc.**          represented by   **Eric S. Galler**
*doing business as*                                           (See above for address)
National Airlines                                            *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*
                                                              *Designation: Retained*

                                                              **Nancy Lin Cohen**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*
                                                              *Designation: Retained*

**Movant**

**Christopher J. Alf**          represented by   **Eric S. Galler**
                                                 (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Nancy Lin Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

---

**Movant**

| | | |
|---|---|---|
| **Atlantic Union Bank** | represented by | **Lisa Marie Saccomano** |
| | | Kutak Rock LLP |
| | | 2001 16th Street |
| | | Suite 1800 |
| | | Denver, CO 80202 |
| | | 303–297–2400 |
| | | Email: lisa.saccomano@kutakrock.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Retained* |

---

**Plaintiff**

| | | |
|---|---|---|
| **USA** | represented by | **Matthew T. Kirsch** |
| | | U.S. Attorney's Office |
| | | District of Colorado |
| | | 1801 California Street |
| | | Suite 1600 |
| | | Denver, CO 80202 |
| | | 303–454–0100 |
| | | Fax: 303–454–0402 |
| | | Email: matthew.kirsch@usdoj.gov |
| | | *TERMINATED: 11/17/2021* |
| | | *LEAD ATTORNEY* |
| | | *Designation: Federal Agency Attorney* |
| | | |
| | | **Albert C. Buchman** |
| | | U.S. Attorney's Office |
| | | 1801 California Street |
| | | Suite 1600 |
| | | Denver, CO 80202 |
| | | 303–454–0228 |
| | | Email: al.buchman@usdoj.gov |
| | | *TERMINATED: 12/12/2023* |
| | | *Designation: Federal Agency Attorney* |
| | | |
| | | **Andrea Lee Surratt** |
| | | Crowell & Moring LLP |

District of Colorado
1601 Wewatta Street
Suite 815
Denver, CO 80202
303–524–8645
Email: asurratt@crowell.com
*TERMINATED: 06/16/2022*
*Designation: Federal Agency Attorney*

**Bryan David Fields**
U.S. Attorney's Office
District of Colorado
1801 California Street
Suite 1600
Denver, CO 80202
303–454–0100
Fax: 303–454–0402
Email: bryan.fields3@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Hetal Janak Doshi**
U.S. Attorney's Office
District of Colorado
1801 California Street
Suite 1600
Denver, CO 80202
202–808–4241
Email: hetal.doshi@usdoj.gov
*TERMINATED: 02/02/2022*
*Designation: Federal Agency Attorney*

**Laura Beth Hurd**
U.S. Attorney's Office
District of Colorado
1801 California Street
Suite 1600
Denver, CO 80202
303–454–0135
Fax: 303–454–0402
Email: laura.hurd@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Martha Ann Paluch**
U.S. Attorney's Office
District of Colorado
1801 California Street
Suite 1600
Denver, CO 80202
303–454–0100
Fax: 303–454–0402

Email: Martha.paluch@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Sarah Hunter Weiss**
U.S. Attorney's Office
District of Colorado
1801 California Street
Suite 1600
Denver, CO 80202
303–454–0100
Email: sarah.weiss@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/08/2020 | 1 | CRIMINAL COMPLAINT as to Michael Aaron Tew (1). (Attachments: # 1 Affidavit, # 2 Criminal Information Sheet) (cmadr, ) [1:20–mj–00088–KLM] (Entered: 07/09/2020) |
| 07/08/2020 | 2 | Arrest Warrant Issued in case as to Michael Aaron Tew. (cmadr, ) [1:20–mj–00088–KLM] (Entered: 07/09/2020) |
| 07/09/2020 | 3 | Arrest of Michael Aaron Tew. Initial Appearance set for 7/9/2020 02:00 PM in Courtroom A 401 before Magistrate Judge Kristen L. Mix. (Text Only entry)(cmadr, ) [1:20–mj–00088–KLM] (Entered: 07/09/2020) |
| 07/09/2020 | 4 | NOTICE OF ATTORNEY APPEARANCE: Michael James Sheehan appearing for Michael Aaron TewAttorney Michael James Sheehan added to party Michael Aaron Tew(pty:dft) (Sheehan, Michael) [1:20–mj–00088–KLM] (Entered: 07/09/2020) |
| 07/09/2020 | 5 | RESTRICTED DOCUMENT – Level 1: by USA as to Michael Aaron Tew (Doshi, Hetal) [1:20–mj–00088–KLM] (Entered: 07/09/2020) |
| 07/09/2020 | 6 | ORDER ***granting 5 Motion as to Michael Aaron Tew (1), by Magistrate Judge Kristen L. Mix on 7/9/20. (nmarb, ) (nmarb, ). [1:20–mj–00088–KLM] (Entered: 07/09/2020) |
| 07/09/2020 | 7 | MINUTE ENTRY for Initial Appearance as to Michael Aaron Tew held before Magistrate Judge Kristen L. Mix on 7/9/2020. Defendant present in custody via video conference. Defendant advised. Defendant has retained private counsel and is not requesting court appointed counsel. Parties address the Court regarding release conditions. Bond set as to Michael Aaron Tew (1) $20,000 Unsecured with the conditions as set forth in the Order Setting Conditions of Release. Preliminary Examination set for 7/29/2020 2:00 PM in Courtroom A501 before Magistrate Judge Michael E. Hegarty. Defendant advised of conditions of bond and remanded for processing and release. (Total time: 14 minutes, Hearing time: 2:08–2:22)<br><br>**APPEARANCES**: Hetal Doshi on behalf of the Government via video conference, Michael Sheehan on behalf of the defendant, Angela Ledesma on behalf of pretrial via video conference FTR: KLM Courtroom A401. (lgale, ) Text Only Entry [1:20–mj–00088–KLM] (Entered: 07/09/2020) |

| 07/09/2020 | 8 | Unsecured Bond Entered as to Michael Aaron Tew in amount of $20,000 (lgale, ) [1:20−mj−00088−KLM] (Entered: 07/09/2020) |
|---|---|---|
| 07/09/2020 | 9 | ORDER Setting Conditions of Release as to Michael Aaron Tew (1) $20,000 Unsecured by Magistrate Judge Kristen L. Mix on 7/9/20. (lgale, ) [1:20−mj−00088−KLM] (Entered: 07/09/2020) |
| 07/10/2020 | 11 | Passport Receipt as to Michael Aaron Tew.Surrender of passport re Bond Conditions; Passport Number 484644160 issued by USA (jtorr, ) [1:20−mj−00088−KLM] (Entered: 07/10/2020) |
| 07/15/2020 | 12 | Arrest Warrant Returned Executed on 7/8/20 in case as to Michael Aaron Tew. (nmarb, ) [1:20−mj−00088−KLM] (Entered: 07/15/2020) |
| 07/20/2020 | 13 | Unopposed MOTION to Withdraw as Attorney by Michael Sheehan by Michael Aaron Tew. (Sheehan, Michael) [1:20−mj−00088−KLM] (Entered: 07/20/2020) |
| 07/21/2020 | 14 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on 21 July 2020 as to Michael Aaron Tew. The Court is not in possession of a financial affidavit by which to determine whether court appointed counsel is appropriate in this case.Therefore, on or before July 24, 2020, Defendant shall complete and file a financial affidavit by which the Court may determine whether to appoint counsel for Defendant. (cmadr, ) [1:20−mj−00088−KLM] (Entered: 07/21/2020) |
| 07/25/2020 | 15 | SUPPLEMENT to 13 Unopposed MOTION to Withdraw as Attorney by Michael Sheehan by Michael Aaron Tew (Sheehan, Michael) [1:20−mj−00088−KLM] (Entered: 07/25/2020) |
| 07/28/2020 | 16 | Joint MOTION to Exclude *Time Before Indictment* by USA as to Michael Aaron Tew. (Attachments: # 1 Proposed Order (PDF Only))(Doshi, Hetal) [1:20−mj−00088−KLM] (Entered: 07/28/2020) |
| 07/28/2020 | 17 | NOTICE OF ATTORNEY APPEARANCE: Eric M. Creizman appearing for Michael Aaron Tew. Attorney Eric M. Creizman added to party Michael Aaron Tew. (pty:dft) (nmarb, ) [1:20−mj−00088−KLM] (Entered: 07/29/2020) |
| 07/29/2020 | 18 | Minute ORDER by Magistrate Judge Michael E. Hegarty on 29 July 2020. For good cause shown pursuant to D.C. Colo. LAttyR 5(b), the Motion to Withdraw filedby Michael Sheehan 13 is granted. Mr. Sheehan's representation of the Defendant in this case is terminated. Defendant will continue to be represented Eric Creizman. (cmadr, ) [1:20−mj−00088−KLM] (Entered: 07/29/2020) |
| 07/29/2020 | 19 | COURTROOM MINUTES for proceedings held before Magistrate Judge Michael E. Hegarty: Preliminary Hearing as to Michael Aaron Tew held on 7/29/2020. Defendant present on bond. Preliminary hearing waived. Status Conference set for 10/14/2020 at 02:00 PM in Courtroom A 501 before Magistrate Judge Michael E. Hegarty. (Total time: 8 minutes, Hearing time: 2:12 p.m.−2:20 p.m.)<br><br>**APPEARANCES**: Hetal Doshi and Matthew Kirsch on behalf of the Government, Eric Creizman on behalf of the defendant. FTR: A501. (cthom, ) Text Only Entry [1:20−mj−00088−KLM] (Entered: 07/29/2020) |
| 07/29/2020 | 20 | WAIVER of Preliminary Hearing by Michael Aaron Tew (cthom, ) [1:20−mj−00088−KLM] (Entered: 07/29/2020) |
| 07/29/2020 | 21 | |

| | | |
|---|---|---|
| | | ORDER granting <u>16</u> Motion to Exclude as to Michael Aaron Tew (1) by Magistrate Judge Michael E. Hegarty on 7/29/2020. (cthom, ) [1:20−mj−00088−KLM] (Entered: 07/29/2020) |
| 08/04/2020 | <u>22</u> | RESTRICTED DOCUMENT − Level 1: by USA as to Michael Aaron Tew (Doshi, Hetal) [1:20−mj−00088−KLM] (Entered: 08/04/2020) |
| 08/07/2020 | <u>24</u> | NOTICE OF ATTORNEY APPEARANCE Matthew T. Kirsch appearing for USA. Attorney Matthew T. Kirsch added to party USA(pty:pla) (Kirsch, Matthew) [1:20−mj−00088−KLM] (Entered: 08/07/2020) |
| 08/12/2020 | <u>25</u> | MOTION to Withdraw as Attorney by Eric M. Creizman by Michael Aaron Tew. (Creizman, Eric) [1:20−mj−00088−KLM] (Entered: 08/12/2020) |
| 08/12/2020 | <u>26</u> | RESTRICTED DOCUMENT − Level 3: by Michael Aaron Tew. (Creizman, Eric) [1:20−mj−00088−KLM] (Entered: 08/12/2020) |
| 08/12/2020 | <u>27</u> | MOTION for Leave to Restrict by Michael Aaron Tew. (Creizman, Eric) [1:20−mj−00088−KLM] (Entered: 08/12/2020) |
| 08/13/2020 | <u>28</u> | Minute ORDER by Magistrate Judge Kristen L. Mix on 13 August 2020. IT IS HEREBY ORDERED that, on or before August 20, 2020, Defendant shall complete and file a financial affidavit (attached to this Minute Order) by which the Court may determine whether to appoint counsel for Defendant. IT IS FURTHER ORDERED that the Motion to Withdraw # <u>25</u> is GRANTED to the extent that Mr. Creizman is relieved of all further representation of Defendant. (Attachments: # <u>1</u> CJA Attachment) (cmadr, ) [1:20−mj−00088−KLM] (Entered: 08/13/2020) |
| 08/17/2020 | <u>29</u> | RESTRICTED DOCUMENT − Level 3: by Michael Aaron Tew. (Attachments: # <u>1</u> Affidavit CJA 23 Affidavit)(Creizman, Eric) [1:20−mj−00088−KLM] (Entered: 08/17/2020) |
| 08/19/2020 | <u>30</u> | MINUTE ORDER APPOINTING COUNSEL Under CJA, as to Michael Aaron Tew by Magistrate Judge Kristen L. Mix on 8/19/20. IT IS FURTHER ORDERED that if it appears at any time that the Defendant can afford to pay counsel, reimbursement of attorney fees may be required pursuant to 18 U.S.C. §3006A(f). (nmarb, ) [1:20−mj−00088−KLM] (Entered: 08/19/2020) |
| 08/24/2020 | <u>31</u> | NOTICE OF ATTORNEY APPEARANCE: Edward R. Harris appearing for Michael Aaron TewAttorney Edward R. Harris added to party Michael Aaron Tew(pty:dft) (Harris, Edward) [1:20−mj−00088−KLM] (Entered: 08/24/2020) |
| 09/17/2020 | <u>32</u> | MINUTE ORDER by Magistrate Judge Kristen L. Mix on 9/17/20 GRANTING <u>27</u> Motion for Leave to Restrict, as to Michael Aaron Tew (1). Pursuant toD.COLO.LCrR 47.1, the Clerk of the Court is directed to maintain the following document UNDER RESTRICTION at LEVEL 3:1 Declaration of Eric M. Creizman in Support of Motion to Withdraw as Counsel to Michael Tew [#26]. (nmarb, ) [1:20−mj−00088−KLM] (Entered: 09/17/2020) |
| 09/17/2020 | <u>33</u> | RESTRICTED DOCUMENT − Level 1: by USA as to Michael Aaron Tew (Attachments: # <u>1</u> Proposed Order (PDF Only))(Doshi, Hetal) [1:20−mj−00088−KLM] (Entered: 09/17/2020) |
| 09/17/2020 | <u>34</u> | RESTRICTED DOCUMENT − Level 1: by USA as to Michael Aaron Tew (Doshi, Hetal) [1:20−mj−00088−KLM] (Entered: 09/17/2020) |

| | | |
|---|---|---|
| 09/18/2020 | 35 | RESTRICTED DOCUMENT – Level 1: as to Michael Aaron Tew. (nmarb, ) [1:20–mj–00088–KLM] (Entered: 09/18/2020) |
| 09/18/2020 | 36 | RESTRICTED DOCUMENT – Level 1: as to Michael Aaron Tew. (nmarb, ) [1:20–mj–00088–KLM] (Entered: 09/18/2020) |
| 09/22/2020 | 37 | MINUTE ORDER by Magistrate Judge Kristen L. Mix on 9/22/20 as to Michael Aaron Tew re 36 Restricted Document – Level 1. Status Conference set for 11/9/2020 10:00 AM in Courtroom A401 before Magistrate Judge Kristen L. Mix. Text Only Entry (lgale, ) [1:20–mj–00088–KLM] (Entered: 09/22/2020) |
| 09/24/2020 | 38 | Utility Setting Hearings as to Michael Aaron Tew: Text Only Entry Status Conference set for 9/29/2020 01:30 PM in Courtroom A 502 before Magistrate Judge Nina Y. Wang. All parties shall appear by video/telephone conference. (bwilk, ) [1:20–mj–00088–KLM] (Entered: 09/28/2020) |
| 09/29/2020 | 39 | MOTION for Leave to Restrict by Michael Aaron Tew. (Harris, Edward) [1:20–mj–00088–KLM] (Entered: 09/29/2020) |
| 09/29/2020 | 40 | RESTRICTED DOCUMENT – Level 2: as to Michael Aaron Tew. (Harris, Edward) [1:20–mj–00088–KLM] (Entered: 09/29/2020) |
| 09/29/2020 | 41 | RESTRICTED DOCUMENT – Level 2: as to Michael Aaron Tew. (Harris, Edward) [1:20–mj–00088–KLM] (Entered: 09/29/2020) |
| 09/29/2020 | 42 | Unopposed MOTION to Modify 8 Bond, 7 Initial Appearance,,,, Bond Set/Reset,,,, Set Hearings,,,, Text Only Entry – Prompts,,, 9 Order Setting Conditions of Release by Michael Aaron Tew. (Harris, Edward) [1:20–mj–00088–KLM] (Entered: 09/29/2020) |
| 09/29/2020 | 44 | COURTROOM MINUTES for Status Conference, and Arraignment as to Michael Aaron Tew held on 9/29/2020 before Magistrate Judge Nina Y. Wang. Defendant present on bond appearing by videoconference. Defendant advised regarding proceeding by remote means pursuant to CARES Act. Defendant consents. Defendant waives proceeding by indictment. Defendant sworn. Defendant questioned regarding waiver. Waiver tendered to the court. Information and penalty sheet tendered. Criminal Case number issues is 20–cr–00305. Defendant advised regarding the charges, penalties, and fines. Plea of NOT GUILTY entered by defendant. Parties do not believe a discovery conference is necessary in this matter. Defendant intends to file a motion to modify bond which will likely be referred to Judge Mix since she set the original conditions. Parties discuss process for Restricting #39 to Level 1 and the notice period. Defendants bond continues. (Total time: 16 minutes, Hearing time: 1:33–1:49)<br><br>**APPEARANCES**: Hetal Doshi and Matthew Krisch on behalf of the Government, Edward Harris on behalf of the Defendant. FTR: NYW–CRD. (bwilk, ) Text Only Entry [1:20–mj–00088–KLM] (Entered: 09/29/2020) |
| 09/29/2020 | 45 | WAIVER OF INDICTMENT by Michael Aaron Tew by Magistrate Judge Nina Y. Wang on 9/29/2020. (bwilk, ) [1:20–mj–00088–KLM] (Entered: 09/30/2020) |
| 09/29/2020 | 49 | UNRESTRICTED INFORMATION – Level 2 as to Michael Aaron Tew (1) count(s) 1, 2, 3. (Attachments: # 1 Penalty Sheet ) (bwilk, ) Modified on 10/9/2020 to adjust restriction level (athom, ). Modified on 1/20/2021 to unrestrict pursuant to 81 Order (athom, ). (Entered: 10/05/2020) |

| 09/30/2020 | 46 | RESTRICTED DOCUMENT – Level 1: by USA as to Michael Aaron Tew (Doshi, Hetal) [1:20–mj–00088–KLM] (Entered: 09/30/2020) |
|---|---|---|
| 09/30/2020 | 48 | RESTRICTED DOCUMENT – Level 1 as to Michael Aaron Tew. (jgonz, ) (Entered: 10/02/2020) |
| 10/01/2020 | 47 | NOTICE of Disposition by Michael Aaron Tew (Harris, Edward) (Entered: 10/01/2020) |
| 10/06/2020 | 50 | MINUTE ORDER by Magistrate Judge Kristen L. Mix on 10/6/20 as to Michael Aaron Tew re 42 Unopposed MOTION to Modify 8 Bond. Motion Hearing set for 10/8/2020 1:30 PM in Courtroom A 401 before Magistrate Judge Kristen L. Mix. Text Only Entry (lgale, ) (Entered: 10/06/2020) |
| 10/07/2020 | 51 | ORDER Setting Change of Plea hearing and Authorizing VTC or Telephone Conference as to Michael Aaron Tew re 47 Notice of Disposition. Change of Plea Hearing set for 10/22/2020 10:30 AM in Courtroom A 702 before Judge Daniel D. Domenico. The change–of–plea hearing in the above–referenced matter shall be conducted by VTC, or by telephone conference if VTC is not reasonably available. By Judge Daniel D. Domenico on 10/07/2020. (athom, ) (Entered: 10/07/2020) |
| 10/08/2020 | 52 | MINUTE ENTRY for Motion Hearing as to Michael Aaron Tew held before Magistrate Judge Kristen L. Mix on 10/8/2020. Defendant present on bond via video conference. Parties address the Court regarding 42 Motion to Modify as to Michael Aaron Tew (1). For the reasons stated on the record, it is: ORDERED: 42 Motion to Modify as to Michael Aaron Tew (1) is GRANTED. Defendant's bond is modified to remove the condition of home detention. Gps will remain in effect and a 9:00 pm curfew is imposed.Defendant continued on bond. (Total time: 4 minutes, Hearing time: 1:31–1:35)

**APPEARANCES (ALL PARTIES APPEAR BY VIDEO CONFERENCE)**: Hetal Doshi and Matthew Kirsch on behalf of the Government, Edward Harris on behalf of the defendant, Carolos Morales on behalf of probation. FTR: KLM Courtroom A401. (lgale, ) Text Only Entry (Entered: 10/08/2020) |
| 10/21/2020 | 54 | MOTION to Withdraw as Attorney by Edward R. Harris by Michael Aaron Tew. (Harris, Edward) (Entered: 10/21/2020) |
| 10/21/2020 | 55 | ORDER granting 54 Motion to Withdraw as Attorney. Good cause having been shown, attorney Edward R. Harris is relieved of any further representation in this case. The Clerk of Court is instructed to terminate Mr. Harris as counsel of record, and to remove his name from the electronic certificate of mailing. An attorney from the Criminal Justice Act panel shall be appointed to represent Defendant Michael Aaron Tew. Absent extraordinary circumstances, no further motions to withdraw or motions to substitute counsel will be granted. The court reminds Mr. Tew that counsel is under a duty to provide him prudent and considered advice, even if that advice is not what Mr. Tew hopes to hear. SO ORDERED by Judge Daniel D. Domenico on 10/21/2020. Text Only Entry (dddlc2, ) (Entered: 10/21/2020) |
| 10/21/2020 | 56 | ORDER VACATING the change of plea hearing as to Michael Aaron Tew. In the light of this court's order granting Edward Harris' motion to withdraw as counsel for Mr. Tew 55 , the change of plea hearing set for tomorrow, 10/22/2020, is hereby VACATED. SO ORDERED by Judge Daniel D. Domenico on 10/21/2020. Text Only Entry (dddlc2, ) (Entered: 10/21/2020) |

| 10/21/2020 | 57 | Letter by Michael Aaron Tew. (athom, ) (Entered: 10/21/2020) |
|---|---|---|
| 10/22/2020 | 58 | NOTICE OF ATTORNEY APPEARANCE: Thomas Richard Ward appearing for Michael Aaron TewAttorney Thomas Richard Ward added to party Michael Aaron Tew(pty:dft) (Ward, Thomas) (Entered: 10/22/2020) |
| 10/22/2020 | 59 | MINUTE ORDER re: 47 notice of disposition. Defendant shall file a status report regarding the status of his plea and any other issues he wishes to bring to the court's attention no later than 11/12/2020. SO ORDERED by Judge Daniel D. Domenico on 10/22/2020. Text Only Entry (dddlc2, ) (Entered: 10/22/2020) |
| 10/27/2020 | 60 | RESTRICTED DOCUMENT – Level 1: by USA as to Michael Aaron Tew (Attachments: # 1 Proposed Order (PDF Only))(Doshi, Hetal) (Entered: 10/27/2020) |
| 10/27/2020 | 61 | Unopposed MOTION for Leave to Restrict by USA as to Michael Aaron Tew. (Attachments: # 1 Proposed Order (PDF Only))(Doshi, Hetal) (Entered: 10/27/2020) |
| 10/27/2020 | 62 | RESTRICTED DOCUMENT – Level 1: by USA as to Michael Aaron Tew (Doshi, Hetal) (Entered: 10/27/2020) |
| 10/28/2020 | 63 | RESTRICTED DOCUMENT – Level 1: as to Michael Aaron Tew. (athom, ) (Entered: 10/28/2020) |
| 10/28/2020 | 64 | ORDER granting 61 Motion for Leave to Restrict as to Michael Aaron Tew. By Judge Daniel D. Domenico on 10/28/2020. Text Only Entry (athom, ) (Entered: 10/28/2020) |
| 11/12/2020 | 65 | MOTION for Leave to Restrict by Michael Aaron Tew. (Ward, Thomas) (Entered: 11/12/2020) |
| 11/12/2020 | 66 | RESTRICTED DOCUMENT – Level 2: as to Michael Aaron Tew. (Ward, Thomas) (Entered: 11/12/2020) |
| 11/12/2020 | 67 | RESTRICTED DOCUMENT – Level 2: as to Michael Aaron Tew. (Ward, Thomas) (Entered: 11/12/2020) |
| 11/13/2020 | 68 | ORDER granting 65 Motion for Leave to Restrict as to Michael Aaron Tew. For good cause shown, documents 66 and 67 shall remain at a Level 2 Restriction. SO ORDERED by Judge Daniel D. Domenico on 11/13/2020. Text Only Entry (dddlc2, ) (Entered: 11/13/2020) |
| 11/13/2020 | 69 | MINUTE ORDER re Status Report 67 . Defendant shall file a status report regarding the status of his plea and any other issues he wishes to bring to the court's attention no later than 12/10/2020. SO ORDERED by Judge Daniel D. Domenico on 11/13/2020. Text Only Entry (dddlc2, ) (Entered: 11/13/2020) |
| 12/10/2020 | 70 | MOTION for Leave to Restrict by Michael Aaron Tew. (Ward, Thomas) (Entered: 12/10/2020) |
| 12/10/2020 | 71 | RESTRICTED DOCUMENT – Level 2: as to Michael Aaron Tew. (Ward, Thomas) (Entered: 12/10/2020) |
| 12/10/2020 | 72 | RESTRICTED DOCUMENT – Level 2: as to Michael Aaron Tew. (Ward, Thomas) (Entered: 12/10/2020) |
| 12/11/2020 | 73 | ORDER granting 70 Motion for Leave to Restrict as to Michael Aaron Tew (1). For good cause shown, Docs. 71 and 72 shall remain at a Level 2 restriction. Defendant is |

|  |  |  |
|---|---|---|
|  |  | further ORDERED to file a status report in this matter no later than **noon** on 12/23/2020. SO ORDERED by Judge Daniel D. Domenico on 12/11/2020. Text Only Entry (dddlc2, ) (Entered: 12/11/2020) |
| 12/11/2020 | 74 | Utility Setting/Resetting Deadlines/Hearings as to Michael Aaron Tew: Status Report due by 12/23/2020 pursuant to 73 Order. Text Only Entry (athom, ) (Entered: 12/11/2020) |
| 12/23/2020 | 75 | STATUS REPORT by Michael Aaron Tew (Ward, Thomas) (Entered: 12/23/2020) |
| 12/28/2020 | 76 | Order regarding status report 75 filed by Michael Aaron Tew. In light of Mr. Tew's withdrawal of his notice of disposition, unless the parties file a motion to the contrary, the court will remove the restriction on the information on 1/4/21. SO ORDERED by Judge Daniel D. Domenico on 12/28/2020. Text Only Entry (dddlc2, ) (Entered: 12/28/2020) |
| 01/04/2021 | 77 | RESTRICTED DOCUMENT – Level 2: as to Michael Aaron Tew. (Ward, Thomas) (Entered: 01/04/2021) |
| 01/04/2021 | 78 | MOTION for Leave to Restrict by Michael Aaron Tew. (Ward, Thomas) (Entered: 01/04/2021) |
| 01/05/2021 | 79 | MINUTE ORDER as to Defendant Michael Aaron Tew's Motion to Restrict 77 . The government shall file its response in opposition to the motion, if any, no later than 1/12/2021. SO ORDERED by Judge Daniel D. Domenico on 1/5/2021. Text Only Entry (dddlc2, ) (Entered: 01/05/2021) |
| 01/12/2021 | 80 | RESTRICTED DOCUMENT – Level 2: as to Michael Aaron Tew. (Doshi, Hetal) (Entered: 01/12/2021) |
| 01/20/2021 | 81 | Order Denying 78 Motion to Maintain Restriction on Indictment. Mr. Tew has failed to identify a private interest in restriction of the information in this case sufficient to overcome the presumption in favor of public access to court documents. His motion to restrict access is thus DENIED. The clerk is directed to un–restrict the information in this case, Doc. 49. SO ORDERED by Judge Daniel D. Domenico on 1/20/2021. Text Only Entry (dddlc2, ) (Entered: 01/20/2021) |
| 01/20/2021 | 82 | ORDER Setting Trial Date and Related Deadlines as to Michael Aaron Tew. Motions due by 2/17/2021. Responses due by 2/24/2021. Five–day Jury Trial set for 3/15/2021 at 09:00 AM in Courtroom A 702 before Judge Daniel D. Domenico. Trial Preparation Conference set for 3/3/2021 at 01:30 PM in Courtroom A 702 before Judge Daniel D. Domenico. By Judge Daniel D. Domenico on 01/20/2021. (athom, ) (Entered: 01/20/2021) |
| 02/03/2021 | 83 | INDICTMENT as to Michael Aaron Tew (1) count(s) 1s, 2s–40s, 41s, 42s, 44s–56s, 57s–60s, Kimberley Ann Tew (2) count(s) 1, 16, 21–22, 25–26, 31–32, 41, 43–44, 47–48, 56, Jonathan K. Yioulos (3) count(s) 1, 2–40. (Attachments: # 1 Penalty Sheet, # 2 Penalty Sheet, # 3 Penalty Sheet) (athom, ) Modified on 2/9/2021 to correct text (athom, ). (Entered: 02/04/2021) |
| 02/03/2021 | 84 | RESTRICTED DOCUMENT – Level 4 as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. (athom, ) (Entered: 02/04/2021) |
| 02/03/2021 | 85 | Summons Issued as to Michael Aaron Tew. (athom, ) (Entered: 02/04/2021) |
| 02/03/2021 | 86 |  |

| | | |
|---|---|---|
| | | MINUTE ORDER as to Michael Aaron Tew on 02/03/2021. Initial Appearance on Summons set for 2/5/2021 02:00 PM in Courtroom A 401 before Magistrate Judge Kristen L. Mix pursuant to <u>83</u> Indictment. Text Only Entry (athom, ) (Entered: 02/04/2021) |
| 02/03/2021 | 87 | Summons Issued as to Kimberley Ann Tew. Initial Appearance set for 2/10/2021 02:00 PM in Courtroom A 401 before Magistrate Judge Kristen L. Mix. (athom, ) (Entered: 02/04/2021) |
| 02/03/2021 | 88 | Summons Issued as to Jonathan K. Yioulos. Initial Appearance set for 2/9/2021 02:00 PM in Courtroom A 401 before Magistrate Judge Kristen L. Mix. (athom, ) (Entered: 02/04/2021) |
| 02/05/2021 | 89 | MOTION to Modify Conditions of Release by Michael Aaron Tew. (Ward, Thomas) (Entered: 02/05/2021) |
| 02/05/2021 | 90 | MINUTE ENTRY for Initial Appearance, Arraignment and Discovery Hearing as to Michael Aaron Tew held before Magistrate Judge Kristen L. Mix on 2/5/2021. Defendant present on bond and consents to proceeding via video conference. Defendant advised. Counsel has previously been appointed. Plea of NOT GUILTY entered by defendant. Discovery memorandum executed. Argument by counsel for the government and defense counsel as to <u>89</u> Motion to Modify Conditions of Release as to Michael Aaron Tew (1). The Court DENIES <u>89</u> Motion to Modify Conditions of Release as to Michael Aaron Tew (1). Defendant's bond continued, Counsel is directed to chambers. (Total time: 29 minutes, Hearing time: 2:21–2:50)<br><br>**APPEARANCES ALL PARTIES APPEAR BY VIDEO CONFERENCE**: Hetal Doshi and Matthew Kirsch on behalf of the Government, Tom Ward on behalf of the defendant. FTR: KLM Courtroom A401. (lgale, ) Text Only Entry (Entered: 02/05/2021) |
| 02/05/2021 | 91 | Discovery Conference Memorandum and ORDER: Estimated Trial Time – 8 days as to Michael Aaron Tew by Magistrate Judge Kristen L. Mix on 2/5/21. (lgale, ) (Entered: 02/05/2021) |
| 02/09/2021 | 92 | MINUTE ENTRY for Initial Appearance, Arraignment, Discovery and Detention Hearing as to Jonathan K. Yioulos held before Magistrate Judge Kristen L. Mix on 2/9/2021. Defendant present on summons by video conference. Defendant advised. Defendant is not requesting court appointed counsel and is retaining an attorney. Plea of NOT GUILTY entered by defendant. Discovery memorandum executed. Parties address the Court regarding conditions of release. Bond set as to Jonathan K. Yioulos (3) $40,000 Unsecured, with the conditions as set forth in the Order Setting Conditions of Release. Defendant advised of conditions of bond. Counsel is directed to chambers. (Total time: 12 minutes, Hearing time: 2:09–2:21)<br><br>**APPEARANCES ALL PARTIES APPEAR BY VIDEO CONFERENCE**: Hetal Doshi and Matthew Kirsch on behalf of the Government, Michael Tallon on behalf of the defendant, Angela Ledesma on behalf of pretrial. FTR: KLM Courtroom A401. (lgale, ) Text Only Entry (Entered: 02/09/2021) |
| 02/09/2021 | 93 | Unsecured Bond Entered as to Jonathan K. Yioulos in amount of $40,000 (lgale, ) (Entered: 02/09/2021) |
| 02/09/2021 | 94 | ORDER Setting Conditions of Release as to Jonathan K. Yioulos (3) $40,000 Unsecured by Magistrate Judge Kristen L. Mix on 2/9/21. (lgale, ) (Entered: |

| | | 02/09/2021) |
|---|---|---|
| 02/09/2021 | 95 | Discovery Conference Memorandum and ORDER: Estimated Trial Time – 8 days as to Jonathan K. Yioulos by Magistrate Judge Kristen L. Mix on 2/9/21. (lgale, ) (Entered: 02/09/2021) |
| 02/10/2021 | 96 | MINUTE ENTRY for Initial Appearance, Arraignment, Discovery and Detention Hearing as to Kimberley Ann Tew held before Magistrate Judge Kristen L. Mix on 2/10/2021. Defendant present on summons and consents to proceeding by video conference. Defendant advised. Defendant is not requesting court appointed counsel. Plea of NOT GUILTY entered by defendant. Discovery memorandum executed.Parties address the Court regarding conditions of release. Bond set as to Kimberley Ann Tew (2) $10,000 Unsecured with the conditions as set forth in the Order Setting Conditions of Release. Defendant is ordered to report to the probation office on 2–11–21 at 1:00 p.m. Defendant advised of conditions of bond. Counsel is directed to chambers. (Total time: 28 minutes, Hearing time: 2:31–2:59)<br><br>**APPEARANCES ALL PARTIES APPEAR BY VIDEO CONFERENCE**: Hetal Doshi and Matthew Kirsch on behalf of the Government, Jamie Hubbard on behalf of the defendant, Tommie Anderson on behalf of pretrial. FTR: KLM Courtroom A401. (lgale, ) Text Only Entry (Entered: 02/10/2021) |
| 02/10/2021 | 97 | Discovery Conference Memorandum and ORDER: Estimated Trial Time – 8 days as to Kimberley Ann Tew by Magistrate Judge Kristen L. Mix on 2/10/21. (lgale, ) (Entered: 02/10/2021) |
| 02/10/2021 | 98 | Unsecured Bond Entered as to Kimberley Ann Tew in amount of $10,000 (lgale, ) (Entered: 02/10/2021) |
| 02/10/2021 | 99 | ORDER Setting Conditions of Release as to Kimberley Ann Tew (2) $10,000 Unsecured by Magistrate Judge Kristen L. Mix on 2/10/21. (lgale, ) (Entered: 02/10/2021) |
| 02/11/2021 | 100 | Unopposed MOTION to Travel by Jonathan K. Yioulos. (Tallon, Michael) (Entered: 02/11/2021) |
| 02/11/2021 | 101 | ORDER Setting Trial Date and Related Deadlines as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. The court EXCLUDES nineteen days from Mr. Tew's Speedy Trial clock. Motions due by 3/12/2021. Responses due by 3/17/2021. Eight–day Jury Trial set for 4/19/2021 at 09:00 AM in Courtroom A 702 before Judge Daniel D. Domenico. Trial Preparation Conference set for 4/12/2021 at 01:30 PM in Courtroom A 702 before Judge Daniel D. Domenico. By Judge Daniel D. Domenico on 02/11/2021. (athom, ) (Entered: 02/11/2021) |
| 02/11/2021 | 102 | ORDER GRANTING 100 Unopposed Motion to Travel as to Jonathan Yioulos. Mr. Yioulos may travel to Sarasota, Florida, to visit his wife's family from 2/13/21 to 2/18/21. He must (1) provide documentation regarding his travel plans to United States Pretrial and Probation Services in advance of departure, and (2) promptly contact his probation officer upon return from his trip. SO ORDERED by Judge Daniel D. Domenico on 2/11/2021. Text Only Entry (dddlc2, ) (Entered: 02/11/2021) |
| 02/11/2021 | 104 | Passport Receipt as to Kimberley Ann Tew. Surrender of passport re Bond Conditions; Passport Number 522213975 issued by USA. (athom, ) (Entered: 02/12/2021) |

| 02/16/2021 | 105 | Summons Returned Executed on 2/11/2021 as to Kimberley Ann Tew. (angar, ) (Entered: 02/16/2021) |
|---|---|---|
| 02/25/2021 | 106 | NOTICE OF ATTORNEY APPEARANCE: Tor Bernhard Ekeland appearing for Michael Aaron Tew, Kimberley Ann TewAttorney Tor Bernhard Ekeland added to party Michael Aaron Tew(pty:dft), Attorney Tor Bernhard Ekeland added to party Kimberley Ann Tew(pty:dft) (Ekeland, Tor) (Entered: 02/25/2021) |
| 02/28/2021 | 108 | MOTION for Hearing *Regarding Joint Representation Pursuant to Fed. R. Crim. P. 44* by USA as to Michael Aaron Tew, Kimberley Ann Tew. (Doshi, Hetal) (Entered: 02/28/2021) |
| 03/01/2021 | 109 | MINUTE ORDER regarding 108 motion for hearing concerning joint representation of Defendants Michael Aaron Tew and Kimberley Ann Tew. No later than 4:00 PM on 3/4/2021, Mr. Tew, Ms. Tew, and the Government must confer and email the court at domenico_chambers@cod.uscourts.gov with three mutually agreeable dates for a hearing on the Government's motion (Doc. 108) from the following list of dates: 3/9/21, 3/10/21, 3/11/21, 3/17/21, or 3/18/21. Mr. and Ms. Tew must file their responses to the Government's motion, if any, no later than 3/5/2021. SO ORDERED by Judge Daniel D. Domenico on 3/1/2021. Text Only Entry (dddlc2, ) (Entered: 03/01/2021) |
| 03/01/2021 | 110 | NOTICE OF ATTORNEY APPEARANCE Andrea Lee Surratt appearing for USA. Attorney Andrea Lee Surratt added to party USA(pty:pla) (Surratt, Andrea) (Entered: 03/01/2021) |
| 03/02/2021 | 111 | MOTION to Withdraw as Attorney by Thomas R. Ward by Michael Aaron Tew. (Ward, Thomas) (Entered: 03/02/2021) |
| 03/02/2021 | 112 | ORDER setting hearing on 108 motion concerning joint representation and 111 motion to withdraw. A hearing on the Government's motion concerning joint representation (Doc. 108) and Thomas R. Ward's motion to withdraw as counsel (Doc. 111) is hereby set for 3/18/2021 at 10:30 AM before Judge Daniel D. Domenico by video-teleconference. Counsel are directed to contact Courtroom Deputy Patti Glover at patricia_glover@cod.uscourts.gov no later than three business days before the hearing for instructions on how to proceed. SO ODERED by Judge Daniel D. Domenico on 3/2/2021. Text Only Entry (dddlc2, ) (Entered: 03/02/2021) |
| 03/03/2021 | 113 | Unopposed MOTION to Continue *Deadline for Production of Discovery* by USA as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. (Doshi, Hetal) (Entered: 03/03/2021) |
| 03/03/2021 | 114 | ORDER granting 113 Motion to Continue. The Government must produce discovery in this case no later than 14 days after the court rules on the Government's motion concerning joint representation. SO ORDERED by Judge Daniel D. Domenico on 3/3/2021. (dddlc2, ) (Entered: 03/03/2021) |
| 03/11/2021 | 115 | MOTION to Continue *FOR A 180-DAY ENDS OF JUSTICE CONTINUANCE UNDER 18 U. S. C. § 3161(h)(7)* by Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. (Attachments: # 1 Proposed Order (PDF Only))(Ekeland, Tor) (Entered: 03/11/2021) |
| 03/18/2021 | 116 | MINUTE ENTRY for Motion Hearing as to Michael Aaron Tew, Kimberley Ann Tew, held before Judge Daniel D. Domenico on 3/18/2021. granting 108 Motion for Hearing as to Michael Aaron Tew; Kimberley Ann Tew (2); granting 111 Motion to |

| | | Withdraw as Attorney. Thomas Richard Ward withdrawn from case as to Michael Aaron Tew granting 115 Motion to Continue as to all defendants. Pretrial Motions due by 8/30/2021, Responses due by 9/6/2021, Jury Trial (8 days) set for 10/12/2021 – 10/21/2021 09:00 AM; Trial Preparation Conference set for 9/27/2021 at 10:30 AM all in Courtroom A 702 before Judge Daniel D. Domenico Court Reporter: Tracy Weir. (pglov) (Entered: 03/18/2021) |
|---|---|---|
| 03/23/2021 | 117 | NOTICE OF ATTORNEY APPEARANCE: Michael John Tallon appearing for Jonathan K. Yioulos (Tallon, Michael) (Entered: 03/23/2021) |
| 03/29/2021 | 118 | Unopposed MOTION to Travel *Beyond Pre–trial Release Order* by Jonathan K. Yioulos. (Tallon, Michael) (Entered: 03/29/2021) |
| 03/29/2021 | 119 | MOTION for Leave to Restrict by USA as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. (Attachments: # 1 Proposed Order (PDF Only))(Doshi, Hetal) (Entered: 03/29/2021) |
| 03/29/2021 | 120 | RESTRICTED DOCUMENT – Level 1: by USA as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos (Doshi, Hetal) (Entered: 03/29/2021) |
| 03/29/2021 | 121 | RESTRICTED DOCUMENT – Level 1: by USA as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos (Doshi, Hetal) (Entered: 03/29/2021) |
| 03/30/2021 | 122 | ORDER GRANTING 118 Unopposed Motion to Travel as to Jonathan Yioulos. Mr. Yioulos may travel to St. Thomas, American Virgin Islands from 4/5/21 to 4/9/21. He must (1) provide documentation regarding his travel plans to United States Pretrial and Probation Services in advance of departure, and (2) promptly contact his probation officer upon return from his trip. SO ORDERED by Judge Daniel D. Domenico on 3/30/2021. Text Only Entry (dddlc2, ) (Entered: 03/30/2021) |
| 03/30/2021 | 123 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 118 Unopposed MOTION to Travel *Beyond Pre–trial Release Order*, 117 Notice of Attorney Appearance – Defendant filed by attorney Michael John Tallon. The format for the attorneys signature block information is not correct. **DO NOT REFILE THE DOCUMENTS. Action to take –** future documents must be filed pursuant to D.C.COLO.LCr49.1(a) and 4.3(d) of the Electronic Case Filing Procedures (Criminal Cases). Also the documents were scanned and not converted directly to portable document format (PDF). **DO NOT REFILE THE DOCUMENTS. Action to take –** future documents must be filed pursuant to D.C.COLO.LCr49.1(a) and 1.3(f) of the Electronic Case Filing Procedures (Criminal Cases). (Text Only Entry) (athom, ) (Entered: 03/30/2021) |
| 03/30/2021 | 124 | RESTRICTED DOCUMENT – Level 1: as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. (athom, ) (Entered: 03/30/2021) |
| 03/30/2021 | 125 | ORDER granting 119 Motion for Leave to Restrict as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. By Judge Daniel D. Domenico on 03/30/2021. Text Only Entry (athom, ) (Entered: 03/30/2021) |
| 03/31/2021 | 126 | Unopposed MOTION for Protective Order by USA as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. (Attachments: # 1 Proposed Order (PDF Only))(Doshi, Hetal) (Entered: 03/31/2021) |
| 04/01/2021 | 127 | ORDER Granting 126 Unopposed Motion for Protective Order as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. By Judge Daniel D. Domenico on 04/01/2021. (athom, ) (Entered: 04/01/2021) |

| 05/13/2021 | 128 | TRANSCRIPT of TRANSCRIPT OF PROCEEDINGS as to Michael Aaron Tew held on 02/05/2021 before Magistrate Judge Mix. Pages: 1–24. Prepared by: AB Litigation Services.<br><br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 05/13/2021) |
| 05/13/2021 | 129 | TRANSCRIPT of TRANSCRIPT OF PROCEEDINGS as to Jonathan K. Yioulos held on 02/09/2021 before Magistrate Judge Mix. Pages: 1–15. Prepared by: AB Litigation Services.<br><br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 05/13/2021) |
| 05/13/2021 | 130 | TRANSCRIPT of TRANSCRIPT OF PROCEEDINGS as to Kimberley Ann Tew held on 02/10/2021 before Magistrate Judge Mix. Pages: 1–26. Prepared by: AB Litigation Services.<br><br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 05/13/2021) |
| 06/10/2021 | 131 | MOTION for Order , MOTION to Travel by Jonathan K. Yioulos. (Tallon, Michael) (Entered: 06/10/2021) |
| 06/10/2021 | 132 | ORDER GRANTING 131 Unopposed Motion to Travel as to Jonathan Yioulos. Mr. Yioulos may travel to Queens, New York; Erie, Pennsylvania; and Albrightsville, |

| | | |
|---|---|---|
| | | Pennsylvania on June 25 to 27, June 24 to 25, and July 2 to 5, respectively. He must (1) provide documentation regarding his travel plans to United States Pretrial and Probation Services in advance of departure, and (2) promptly contact his probation officer upon return from each trip. SO ORDERED by Judge Daniel D. Domenico on 6/10/2021. Text Only Entry (dddlc2, ) (Entered: 06/10/2021) |
| 06/18/2021 | 133 | NOTICE *OF DEFENDANT KIMBERLEY TEWS MEMORANDUM IN SUPPORT TO MODIFY THE CONDITIONS OF HER RELEASE* by Kimberley Ann Tew (Ekeland, Tor) Modified on 7/2/2021 to correct filer (athom, ). (Entered: 06/18/2021) |
| 06/18/2021 | 134 | MOTION to Modify Conditions of Release by Kimberley Ann Tew. (Attachments: # 1 Affidavit Decl Kimbery Tew ISO Motion to Modify the Conditions)(Ekeland, Tor) Modified on 7/2/2021 to correct filer (athom, ). (Entered: 06/18/2021) |
| 06/21/2021 | 135 | ORDER REFERRING MOTION TO MODIFY CONDITIONS OF PRE–TRIAL RELEASE 134 filed by Kimberly Tew. The Court refers the motion to Magistrate Judge Kristen L. Mix because revocation or modification of a prior release order under § 3142 "is available only when the review of a detention or release order is being conducted by the same judicial officer who entered the order." See United States v. Cisneros, 328 F.3d 610, 614 (10th Cir. 2003); see also United States v. Anaya, 376 F. Supp. 2d 1261, 1262–63 (D.N.M. 2005). SO ORDERED by Judge Daniel D. Domenico on 6/21/2021. Text Only Entry (dddlc2, ) (Entered: 06/21/2021) |
| 06/23/2021 | 136 | NOTICE OF ATTORNEY APPEARANCE: Michael Hassard appearing for Michael Aaron Tew, Kimberley Ann TewAttorney Michael Hassard added to party Michael Aaron Tew(pty:dft), Attorney Michael Hassard added to party Kimberley Ann Tew(pty:dft) (Hassard, Michael) (Entered: 06/23/2021) |
| 07/08/2021 | 137 | MINUTE ORDER by Magistrate Judge Kristen L. Mix on 07/08/2021 as to Kimberley Ann Tew re 134 MOTION to Modify Conditions of Release filed by Kimberley Ann Tew Motion Hearing set for 7/15/2021 11:00 AM in Courtroom A 401 before Magistrate Judge Kristen L. Mix. (alave, ) (Entered: 07/09/2021) |
| 07/15/2021 | 138 | MINUTE ENTRY for Motion Hearing as to Kimberley Ann Tew held before Magistrate Judge Kristen L. Mix on 7/15/2021. Defendant present on bond. Argument by defense counsel and counsel for the government as to 134 Motion to Modify Conditions of Release. Court addresses defense counsel. The Court modifies defendant's bond to remove the condition of home confinement and radio frequency and imposes GPS monitoring and imposes a curfew at 8:00 a.m.–9:00 p.m. Probation is granted discretion to allow exceptions to the curfew when requested by defendant. Defendant acknowledges the new conditions of bond and agrees to abide by them. Defendant's bond continued. (Total time: 22 minutes, Hearing time: 11:08–11:30)<br><br>**APPEARANCES**: Matthew Kirsch, Hetal Doshi and Andrea Surratt on behalf of the Government, Tor Ekeland and Michael Hassard on behalf of the defendant, Carlos Morales on behalf of probation. FTR: KLM Courtroom A401. (lgale, ) Text Only Entry (Entered: 07/15/2021) |
| 07/19/2021 | 139 | NOTICE of Disposition by Jonathan K. Yioulos (Tallon, Michael) (Entered: 07/19/2021) |
| 07/27/2021 | 140 | NOTICE *of Remote Plea Proceeding* by Jonathan K. Yioulos (Tallon, Michael) Modified on 9/9/2021 to correct event (athom, ). (Entered: 07/27/2021) |
| 07/27/2021 | 141 | |

| | | |
|---|---|---|
| | | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 140 Notice, 139 Notice of Disposition filed by attorney Michael John Tallon. The document was scanned and not converted directly to portable document format (PDF). **DO NOT REFILE THE DOCUMENT. Action to take –** future documents must be filed pursuant to D.C.COLO.LCr49.1(a) and 1.3(f) of the Electronic Case Filing Procedures (Criminal Cases). (Text Only Entry) (athom, ) (Entered: 07/27/2021) |
| 07/27/2021 | 142 | ORDER as to Jonathan K. Yioulos. ORDER as to Jonathan K. Yioulos. Pursuant to Notice of Disposition (Doc. 139), a Change of Plea Hearing is SET for 10/7/2021 at 11:30 **AM** in Courtroom A 1002 before Judge Daniel D. Domenico. The trial dates and all other deadlines previously set are VACATED. Counsel for the parties shall email a courtesy copy of the Plea Agreement and the Statement by Defendant in Advance of Plea of Guilty in the form required by Local Crim. R. 11.1(c)–(d) to Domenico_Chambers@cod.uscourts.gov no later than 12:00 p.m. three business days prior to the Change of Plea Hearing. If these documents are not timely submitted, the hearing may be vacated. The original and one copy of these documents shall be delivered to the courtroom deputy at the time of the hearing pursuant to Local Crim. R. 11.1(e). Defense counsel who reviewed and advised Defendant regarding the Plea Agreement must attend the Change of Plea Hearing. SO ORDERED by Judge Daniel D. Domenico on 7/27/2021. Text Only Entry (dddlc2, ) Modified on 7/29/2021 to correct text (athom, ). (Entered: 07/27/2021) |
| 08/10/2021 | 143 | Second MOTION to Continue by Michael Aaron Tew, Kimberley Ann Tew. (Hassard, Michael) Modified on 8/11/2021 to correct applicable parties (athom, ). (Entered: 08/10/2021) |
| 08/20/2021 | 144 | TRANSCRIPT of MOTION HEARING as to Kimberley Ann Tew held on 07/15/2021 before Magistrate Judge Mix. Pages: 1–20. Prepared by: AB Litigation Services.<br><br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 08/20/2021) |
| 09/16/2021 | 145 | MOTION to Modify *date of plea hearing* by Jonathan K. Yioulos. (Tallon, Michael) (Entered: 09/16/2021) |
| 09/17/2021 | 146 | **WITHDRAWN** – Unopposed MOTION to Travel *MOTION UPON ATTORNEY DECLARATION SEEKING ORDER PERMITTING TRAVEL BEYOND PRE–TRIAL RELEASE ORDER AT PARAGRAPH 7(f)* by Michael Aaron Tew, Kimberley Ann Tew. (Attachments: # 1 Proposed Order (PDF Only))(Ekeland, Tor) Modified on 9/20/2021 to correct filers (athom, ). Modified on 2/4/2022 to withdraw pursuant to 173 Order (athom, ). (Entered: 09/17/2021) |
| 09/17/2021 | 147 | |

| | | |
|---|---|---|
| | | MOTION to Withdraw as Attorney by USA as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. (Kirsch, Matthew) (Entered: 09/17/2021) |
| 09/20/2021 | 148 | MOTION to Withdraw Document 146 Unopposed MOTION to Travel *MOTION UPON ATTORNEY DECLARATION SEEKING ORDER PERMITTING TRAVEL BEYOND PRE−TRIAL RELEASE ORDER AT PARAGRAPH 7(f)* by Michael Aaron Tew, Kimberley Ann Tew. (Ekeland, Tor) Modified on 9/22/2021 to correct filers (athom, ). (Entered: 09/20/2021) |
| 09/22/2021 | 149 | ORDER as to Michael Aaron Tew, Kimberley Ann Tew. Defendants' Unopposed Motion for a 12−Month Ends of Justice Continuance (Doc. 143 ) is PARTIALLY GRANTED. One hundred eighty (180) days, from 9/22/2021 to 3/21/2022, will be excluded from the computation of Defendants' Michael Tew and Kimberley Tew's Speedy Trial Act time. Motions due by 1/3/2022. Responses due by 1/10/2022. The eight−day Jury Trial set to begin 10/12/2021 is VACATED and RESET to 4/4/2022 at 09:00 AM in Courtroom A1002 before Judge Daniel D. Domenico. The Trial Preparation Conference set for 09/27/2021 is VACATED and RESET to 3/21/2022 at 01:00 PM in Courtroom A1002 before Judge Daniel D. Domenico. By Judge Daniel D. Domenico on 09/22/2021. (athom, ) (Entered: 09/22/2021) |
| 09/30/2021 | 150 | ORDER as to Jonathan K. Yioulos. Defendant's Motion to Conduct Change of Plea by Video Conference Pursuant to Section 15002(b)(2) of the CARES Act (Doc. 140 ) is GRANTED, and the Motion to reschedule the Change of Plea Hearing (Doc. 145 ) is GRANTED IN PART. The Change of Plea Hearing set for 10/7/2021 at 11:30 a.m. is VACATED AND RESET to 11/18/2021 at 1:30 p.m. in Courtroom A1002 before Judge Daniel D. Domenico and will be conducted by VTC, or by telephone conference if VTC is not reasonably available. Members of the public may attend the Change of Plea Hearing by teleconference at (866) 390−1828, using Access Code 9792296#. All persons participating in court proceedings remotely by VTC or teleconference are prohibited, under penalty of contempt, from recording or broadcasting the proceeding in any manner. By Judge Daniel D. Domenico on 09/30/2021. (athom, ) (Entered: 09/30/2021) |
| 10/12/2021 | 151 | NOTICE OF ATTORNEY APPEARANCE: Tor Bernhard Ekeland *Attorney Xuan Zhou appearing for Michael Aaron Tew and Kimberley Ann Tew* appearing for Michael Aaron Tew, Kimberley Ann Tew (Ekeland, Tor) Modified on 10/13/2021 to correct applicable parties (athom, ). (Main Document 151 replaced on 1/21/2025) (lrobe, ). (Entered: 10/12/2021) |
| 10/13/2021 | 152 | NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 151 Notice of Attorney Appearance – Defendant, filed by attorney Xuan Zhou. The s/signature did not match the filers name on the account for which the login and password are registered. Future documents must be filed pursuant to D.C.COLO.LCivR 49.1(a) and 4.3(c) of the Electronic Case Filing Procedures (Criminal Cases). Attorney Xuan Zhou has failed to comply D.C.COLO.LCr49.1(a) and 4.3(d) of the Electronic Case Filing Procedures (Criminal Cases), which mandate the correct form for an attorneys signature block. This document does not have a s/ signature and must be re−filed. Xuan Zhou must re−file the above referenced document which must contain her s/ signature using her own log in and password. **Counsel is REMINDED that your firm does not represent defendant Yioulos. UNLESS you are filing a joint pleading that pertains to defendant Yioulos, you should ONLY be selecting the Tew defendants as the filers and as the applicable parties. If you are unclear about how documents should be filed and/or which** |

| | | |
|---|---|---|
| | | **parties should be selected when filing your documents, please contact the Clerk's office for assistance or clarification**. (Text Only Entry) (athom, ) (Entered: 10/13/2021) |
| 11/17/2021 | 153 | ORDER GRANTING 147 Motion to Withdraw as Attorney. The Clerk of Court is instructed to terminate attorney Matthew T. Kirsch as counsel of record, and to remove this name from the electronic certificate of mailing. Plaintiff United States of America will continue to be represented by attorneys Hetal Doshi and Andrea Surratt. SO ORDERED by Judge Daniel D. Domenico on 11/17/2021. Text Only Entry (dddlc4) (Entered: 11/17/2021) |
| 11/18/2021 | 154 | MINUTE ENTRY for Change of Plea Hearing by VTC as to Jonathan K. Yioulos held before Judge Daniel D. Domenico on 11/18/2021. Plea of GUILTY entered by defendant Jonathan K. Yioulos to Counts 1,39. Sentencing set for 2/10/2022 01:30 PM in Courtroom A1002 before Judge Daniel D. Domenico. Bond continued.Court Reporter: Julie Thomas. (pglov) (Entered: 11/18/2021) |
| 11/18/2021 | 155 | PLEA AGREEMENT as to Jonathan K. Yioulos (pglov) (Entered: 11/18/2021) |
| 11/18/2021 | 156 | STATEMENT IN ADVANCE OF PLEA OF GUILTY by Defendant Jonathan K. Yioulos (pglov) (Entered: 11/18/2021) |
| 11/19/2021 | 157 | NOTICE OF ATTORNEY APPEARANCE: Xuan Zhou appearing for Michael Aaron Tew, Kimberley Ann TewAttorney Xuan Zhou added to party Michael Aaron Tew(pty:dft), Attorney Xuan Zhou added to party Kimberley Ann Tew(pty:dft) (Zhou, Xuan) (Main Document 157 replaced on 1/21/2025) (lrobe, ). (Entered: 11/19/2021) |
| 11/29/2021 | 158 | NOTICE OF ATTORNEY APPEARANCE Bryan David Fields appearing for USA. Attorney Bryan David Fields added to party USA(pty:pla) (Fields, Bryan) (Entered: 11/29/2021) |
| 11/29/2021 | 159 | MOTION to Withdraw as Attorney by USA as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. (Doshi, Hetal) (Entered: 11/29/2021) |
| 12/09/2021 | 160 | MOTION for Order by Jonathan K. Yioulos. (Tallon, Michael) (Entered: 12/09/2021) |
| 12/15/2021 | 161 | ORDER granting 160 Motion for Order as to Jonathan K. Yioulos (3). The Sentencing Hearing set for 2/10/2022 at 1:30 pm is VACATED and RESET to 7/12/2022 at 10:30 pm before Judge Daniel D. Domenico. SO ORDERED by Judge Daniel D. Domenico on 12/15/2021. Text Only Entry (dddlc2, ) (Entered: 12/15/2021) |
| 12/27/2021 | 162 | MOTION to Withdraw as Attorney by Tor Ekeland by Michael Aaron Tew, Kimberley Ann Tew. (Ekeland, Tor) (Main Document 162 replaced on 1/21/2025) (lrobe, ). (Entered: 12/27/2021) |
| 12/27/2021 | 163 | RESTRICTED DOCUMENT – Level 3: by Michael Aaron Tew, Kimberley Ann Tew. (Ekeland, Tor) (Main Document 163 replaced on 1/21/2025) (lrobe, ). (Entered: 12/27/2021) |
| 12/27/2021 | 164 | MOTION for Leave to Restrict by Michael Aaron Tew, Kimberley Ann Tew. (Attachments: # 1 Proposed Order (PDF Only))(Ekeland, Tor) (Entered: 12/27/2021) |
| 12/27/2021 | 165 | Third MOTION to Continue by Michael Aaron Tew, Kimberley Ann Tew. (Attachments: # 1 Proposed Order (PDF Only))(Ekeland, Tor) (Main Document 165 |

| | | replaced on 1/21/2025) (lrobe, ). (Attachment 1 replaced on 1/21/2025) (lrobe, ). (Entered: 12/27/2021) |
|---|---|---|
| 12/27/2021 | 166 | MOTION to Withdraw as Attorney by Xuan Zhou by Michael Aaron Tew, Kimberley Ann Tew. (Zhou, Xuan) (Main Document 166 replaced on 1/21/2025) (lrobe, ). (Entered: 12/27/2021) |
| 12/27/2021 | 167 | MOTION to Withdraw as Attorney by Michael Hassard by Michael Aaron Tew, Kimberley Ann Tew. (Hassard, Michael) (Main Document 167 replaced on 1/21/2025) (lrobe, ). (Entered: 12/27/2021) |
| 01/19/2022 | 168 | MOTION to Travel by Jonathan K. Yioulos. (Tallon, Michael) (Entered: 01/19/2022) |
| 01/31/2022 | 169 | ORDER REFERRING MOTIONS as to Michael Aaron Tew, Kimberley Ann Tew. 167 MOTION to Withdraw as Attorney by Michael Hassard filed by Michael Aaron Tew, Kimberley Ann Tew, 162 MOTION to Withdraw as Attorney by Tor Ekeland filed by Michael Aaron Tew, Kimberley Ann Tew, 159 MOTION to Withdraw as Attorney filed by USA, 166 MOTION to Withdraw as Attorney by Xuan Zhou filed by Michael Aaron Tew, Kimberley Ann Tew. Motions referred to Magistrate Judge Kristen L. Mix. SO ORDERED by Judge Daniel D. Domenico on 1/31/2022. Text Only Entry (dddlc2, ) (Entered: 01/31/2022) |
| 01/31/2022 | 170 | ORDER granting 168 Motion to Travel as to Jonathan K. Yioulos (3). Mr. Yioulos is permitted to travel as described in the travel plans submitted to the US Attorneys office and the Probation Department. SO ORDERED by Judge Daniel D. Domenico on 1/31/2022. Text Only Entry (dddlc2, ) (Entered: 01/31/2022) |
| 02/02/2022 | 171 | ORDER granting 159 Motion to Withdraw as Attorney. Hetal Janak Doshi withdrawn from case as to Michael Aaron Tew (1), Kimberley Ann Tew (2), Jonathan K. Yioulos (3). Attorney Hetal Doshi is relieved of any further representation of the United States in this case. The Clerk of Court is instructed to terminate Attorney Doshi as counsel of record, and to remove this name from the electronic certificate of mailing. The Government shall continue to be represented by Attorney Bryan Fields. by Magistrate Judge Kristen L. Mix on 2/2/2022. Text Only Entry (klmlc2, ) (Entered: 02/02/2022) |
| 02/02/2022 | 172 | MINUTE ORDER as to Michael Aaron Tew, Kimberley Ann Tew re 167 MOTION to Withdraw as Attorney by Michael Hassard filed by Michael Aaron Tew, Kimberley Ann Tew, 162 MOTION to Withdraw as Attorney by Tor Ekeland filed by Michael Aaron Tew, Kimberley Ann Tew, 166 MOTION to Withdraw as Attorney by Xuan Zhou filed by Michael Aaron Tew, Kimberley Ann Tew. Defendant Michael Tew and Defendant Kimberley Tew shall each file a separate financial affidavit under restriction at Level 3 NO LATER THAN FEBRUARY 14, 2022. by Magistrate Judge Kristen L. Mix on 2/2/2022. Text Only Entry (klmlc2, ) (Entered: 02/02/2022) |
| 02/02/2022 | 173 | ORDER. The Motion to Withdraw Document 148 as to Michael Aaron Tew and Kimberly Ann Tew is GRANTED. Accordingly, the Motion to Travel 146 is DENIED AS MOOT. SO ORDERED by Judge Daniel D. Domenico on 2/2/2022. Text Only Entry (dddlc2, ) (Entered: 02/02/2022) |
| 02/04/2022 | 174 | ORDER as to Michael Aaron Tew, Kimberley Ann Tew. Defendants' counsel Motion for a 3–Month Ends of Justice Continuance (Doc. 165 ) is GRANTED. Ninety (90) days, from 2/4/2022 to 5/5/2022, will be excluded from the computation of Defendants' Michael Tew and Kimberley Tew's Speedy Trial Act time. Motions due |

|  |  | by 5/12/2022. Responses due by 5/19/2022. The eight–day Jury Trial set to begin 4/4/2022 is VACATED and RESET to 6/13/2022 at 09:00 AM in Courtroom A1002 before Judge Daniel D. Domenico. The Trial Preparation Conference set for 3/21/2022 is VACATED and RESET to 6/2/2022 at 03:30 PM in Courtroom A1002 before Judge Daniel D. Domenico. By Judge Daniel D. Domenico on 02/04/2022. (athom, ) (Entered: 02/04/2022) |
|---|---|---|
| 02/10/2022 | 175 | Pro Se Letter by Michael Aaron Tew, Kimberley Ann Tew. (athom, ) (Entered: 02/10/2022) |
| 02/10/2022 | 176 | ORDER REFERRING MOTION as to Michael Aaron Tew, Kimberley Ann Tew 175 MOTION for Extension of Time to File filed by Michael Aaron Tew, Kimberley Ann Tew. SO ORDERED by Judge Daniel D. Domenico on 2/10/2022. Text Only Entry (dddlc2, ) (Entered: 02/10/2022) |
| 02/14/2022 | 177 | MINUTE ORDER by Magistrate Judge Kristen L. Mix on February 14, 2022. This matter is before the Court on Defendants' Motion for Extension of Time 175 (the "Motion"). Defendants ask for a two–week extension to file financial affidavits because they "are currently reviewing an engagement letter with a law firm based in Denver" and, therefore, may not require appointment of counsel through the CJA. IT IS HEREBY ORDERED that the Motion 175 is GRANTED. The deadline for each Defendant to file a separate financial affidavit under restriction at Level 3 is extended to February 28, 2022. (csarr, ) (Entered: 02/14/2022) |
| 02/25/2022 | 178 | NOTICE OF ATTORNEY APPEARANCE: Peter R. Bornstein appearing for Michael Aaron Tew, Kimberley Ann TewAttorney Peter R. Bornstein added to party Michael Aaron Tew(pty:dft), Attorney Peter R. Bornstein added to party Kimberley Ann Tew(pty:dft) (Bornstein, Peter) (Entered: 02/25/2022) |
| 03/04/2022 | 179 | Order. Defense counsel is directed to file a status report on or before 3/10/2022 confirming that he has discussed the potential conflicts of interest that joint representation of criminal codefendants may raise with his clients, and that they each continue to understand these dangers and risks and continue to consent to proceeding with joint counsel in spite of them. SO ORDERED by Judge Daniel D. Domenico on 3/4/2022. Text Only Entry (dddlc2, ) (Entered: 03/04/2022) |
| 03/07/2022 | 180 | ORDER granting 162 Motion to Withdraw as Attorney. Attorney Tor Ekeland is relieved of any further representation of Defendants Michael Tew and Kimberly Tew. The Clerk of Court is instructed to terminate Attorney Ekeland as counsel of record, and to remove this name from the electronic certificate of mailing. Defendants Michael Tew and Kimberly Tew shall continue to be represented by Attorneys Michael Hassard, Peter Bornstein, and Xuan Zhou. by Magistrate Judge Kristen L. Mix on 3/7/2022. Text Only Entry (klmlc2, ) (Entered: 03/07/2022) |
| 03/07/2022 | 181 | ORDER granting 166 Motion to Withdraw as Attorney. Attorney Xuan Zhou is relieved of any further representation of Defendants Michael Tew and Kimberly Tew. The Clerk of Court is instructed to terminate Attorney Zhou as counsel of record, and to remove this name from the electronic certificate of mailing. Defendants Michael Tew and Kimberly Tew shall continue to be represented by Attorneys Michael Hassard and Peter Bornstein. by Magistrate Judge Kristen L. Mix on 3/7/2022. Text Only Entry (klmlc2, ) (Entered: 03/07/2022) |
| 03/07/2022 | 182 | ORDER granting 167 Motion to Withdraw as Attorney. Attorney Michael Hassard is relieved of any further representation of Defendants Michael Tew and Kimberly Tew. The Clerk of Court is instructed to terminate Attorney Hassard as counsel of record, |

| | | and to remove this name from the electronic certificate of mailing. Defendants Michael Tew and Kimberly Tew shall continue to be represented by Attorney Peter Bornstein. by Magistrate Judge Kristen L. Mix on 3/7/2022. Text Only Entry (klmlc2, ) (Entered: 03/07/2022) |
|---|---|---|
| 03/09/2022 | 183 | Unopposed MOTION to Travel by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 03/09/2022) |
| 03/10/2022 | 184 | STATUS REPORT by Michael Aaron Tew, Kimberley Ann Tew (Bornstein, Peter) (Entered: 03/10/2022) |
| 03/14/2022 | 185 | Order granting 183 Motion to travel. Defendants Michael and Kimberly Tew may travel out of state with their children for spring break as requested in their motion. Their pretrial monitoring is modified to stand–alone location monitoring without a curfew. SO ORDERED by Judge Daniel D. Domenico on 3/14/2022. Text Only Entry (dddlc2, ) (Entered: 03/14/2022) |
| 03/21/2022 | 186 | Unopposed MOTION to Travel by Jonathan K. Yioulos. (Tallon, Michael) (Entered: 03/21/2022) |
| 03/22/2022 | 187 | MOTION to Amend/Correct *Conditions of Release* by Kimberley Ann Tew. (Attachments: # 1 Exhibit A)(Bornstein, Peter) (Entered: 03/22/2022) |
| 03/24/2022 | 188 | MINUTE ORDER re. 187 Motion to Amend/Correct Conditions of Supervised Release. The Court reviews the conditions of pretrial release de novo, and having reviewed the transcripts of the two previous hearings as well as the recommendations of the Probation Department, does not find that the Government has shown by a preponderance of evidence that location monitoring is required to reasonably assure the appearance of Kimberley Tew or the safety of another person or the community. The government has until 11:00am on 3/25/2022 to respond. SO ORDERED by Judge Daniel D. Domenico on 3/24/2022. Text Only Entry (dddlc2, ) (Entered: 03/24/2022) |
| 03/25/2022 | 189 | RESPONSE in Opposition by USA as to Kimberley Ann Tew re 187 MOTION to Amend/Correct *Conditions of Release* (Fields, Bryan) (Entered: 03/25/2022) |
| 03/25/2022 | 190 | ORDER GRANTING 187 Motion for Amendment of Conditions of Release as to Kimberley Ann Tew (2). It is ORDERED that Ms. Tew's conditions of release are modified to remove the requirement that she submit to GPS location monitoring. Ms. Tew is directed to contact the Probation Department for instructions on how to comply with her conditions of release going forward. By Judge Daniel D. Domenico on 3/25/2022. (dddlc1, ) (Entered: 03/25/2022) |
| 03/28/2022 | 191 | ORDER granting 186 Motion to Travel as to Jonathan K. Yioulos (3). Mr. Yioulos is permitted to travel as described in the travel plans submitted to the US Attorneys office and the Probation Department. SO ORDERED by Judge Daniel D. Domenico on 3/28/2022. Text Only Entry (dddlc2, ) (Entered: 03/28/2022) |
| 03/31/2022 | 192 | ORDER granting 164 Motion for Leave to Restrict. Doc. 163 is restricted at Level 3. SO ORDERED by Judge Daniel D. Domenico on 3/31/2022. Text Only Entry (dddlc2, ) (Entered: 03/31/2022) |
| 04/26/2022 | 193 | Unopposed MOTION to Continue *Trial and for Ends of Justice Finding Pursuant to 18 U.S.C. § 3161(h)(7)* by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 04/26/2022) |

| 05/10/2022 | 194 | Unopposed MOTION for Leave to File Excess Pages *for Motion to Suppress* by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 05/10/2022) |
|---|---|---|
| 05/12/2022 | 195 | ORDER granting 194 Motion for Leave to File Excess Pages as to Michael Aaron Tew (1), Kimberley Ann Tew (2). The defendants have 6000 words for their motion to suppress and the government has the same number for its response. SO ORDERED by Judge Daniel D. Domenico on 5/12/2022. Text Only Entry (dddlc2, ) (Entered: 05/12/2022) |
| 05/12/2022 | 196 | Unopposed MOTION for Extension of Time to File *Pre−Trial Motions* by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 05/12/2022) |
| 05/12/2022 | 197 | Unopposed MOTION for Reconsideration re 195 Order on Motion for Leave to File Excess Pages, *Motion to Suppress* by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 05/12/2022) |
| 05/12/2022 | 198 | ORDER as to Michael Aaron Tew, Kimberley Ann Tew. Defendants' Motion to Continue Trial and for an Ends of Justice Finding (Doc. 193 ) is GRANTED. One hundred and eighty (180) days, from 5/12/2022 to 11/8/2022, will be excluded from the computation of Defendants' Michael Tew and Kimberley Tew's Speedy Trial Act time. The deadline to file motions to suppress remains 5/12/2022. Other pretrial Motions due by 6/13/2022. Responses due by 6/20/2022. The eight−day Jury Trial set for 06/13/2022 is VACATED and RESET to 12/5/2022 at 09:00 AM in Courtroom A1002 before Judge Daniel D. Domenico. The Trial Preparation Conference set for 6/2/2022 is VACATED and RESET to 11/29/2022 at 03:30 PM in Courtroom A1002 before Judge Daniel D. Domenico. By Judge Daniel D. Domenico on 05/12/2022. (athom, ) (Entered: 05/12/2022) |
| 05/12/2022 | 199 | ORDER granting 197 Motion for Reconsideration re 197 Unopposed MOTION for Reconsideration re 195 Order on Motion for Leave to File Excess Pages, *Motion to Suppress* filed by Michael Aaron Tew, Kimberley Ann Tew as to Michael Aaron Tew (1), Kimberley Ann Tew (2). The defendants have 12,000 words for their motion to suppress, and the government has the same number with which to respond. SO ORDERED by Judge Daniel D. Domenico on 5/12/2022. Text Only Entry (dddlc2, ) (Entered: 05/12/2022) |
| 05/12/2022 | 200 | Motion to Suppress Evidence by Michael Aaron Tew, Kimberley Ann Tew. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB)(Bornstein, Peter) Modified on 8/22/2022 to add document title and un restrict Motion ONLY per 244 Response. (sphil, ). Modified on 10/28/2022 to add text and correct event (athom, ). (Entered: 05/12/2022) |
| 05/12/2022 | 201 | MOTION for Leave to Restrict by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 05/12/2022) |
| 05/18/2022 | 202 | Unopposed MOTION for Extension of Time to File Response/Reply as to 200 Restricted Document − Level 1,, by USA as to Michael Aaron Tew, Kimberley Ann Tew. (Fields, Bryan) (Entered: 05/18/2022) |
| 05/19/2022 | 203 | |

| | | |
|---|---|---|
| | | NOTICE OF ATTORNEY APPEARANCE Albert C. Buchman appearing for USA. Attorney Albert C. Buchman added to party USA(pty:pla) (Buchman, Albert) (Entered: 05/19/2022) |
| 05/19/2022 | 204 | RESPONSE in Opposition by USA as to Michael Aaron Tew, Kimberley Ann Tew re 201 MOTION for Leave to Restrict *(Response to Motion to Suppress, ECF No. 200)* (Attachments: # 1 Government Filter Memo, # 2 Filter Memo – Attachment 1, # 3 Filter Memo – Attachment 2, # 4 Filter Memo – Attachment 3, # 5 Filter Memo – Attachment 4, # 6 Filter Memo – Attachment 5, # 7 Filter Memo – Attachment 6, # 8 Filter Memo – Attachment 7, # 9 Filter Memo – Attachment 8, # 10 Filter Memo – Attachment 9)(Fields, Bryan) (Attachment 6 replaced on 1/21/2025) (lrobe, ). (Entered: 05/19/2022) |
| 05/20/2022 | 205 | MOTION to Withdraw as Attorney by Andrea Surratt by USA as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. (Surratt, Andrea) (Entered: 05/20/2022) |
| 05/20/2022 | 206 | MOTION to Travel by Jonathan K. Yioulos. (Tallon, Michael) (Entered: 05/20/2022) |
| 05/20/2022 | 207 | ORDER granting 206 Motion to Travel as to Jonathan K. Yioulos (3). Mr. Yioulos is permitted to travel as described in the travel plans submitted to the US Attorneys office and the Probation Department. SO ORDERED by Judge Daniel D. Domenico on 5/20/2022. Text Only Entry (dddlc2, ) (Entered: 05/20/2022) |
| 05/20/2022 | 208 | ORDER granting 202 Motion for Extension of Time to File Response/Reply. The government has until and including 6/9/2022 to file a response to the motion to suppress. SO ORDERED by Judge Daniel D. Domenico on 5/20/2022. Text Only Entry (dddlc2, ) (Entered: 05/20/2022) |
| 05/25/2022 | 209 | MOTION to Disclose Grand Jury Material to Defendant by USA as to Michael Aaron Tew, Kimberley Ann Tew. (Attachments: # 1 Proposed Order (PDF Only))(Fields, Bryan) (Entered: 05/25/2022) |
| 05/25/2022 | 210 | Unopposed MOTION for Leave to File *Reply to Government's Response to Defendant's Motion to Suppress Evidence* by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 05/25/2022) |
| 06/07/2022 | 211 | RESTRICTED PRESENTENCE REPORT first disclosure for attorney review as to Jonathan K. Yioulos (Attachments: # 1 Exhibit A)(ntaka) (Entered: 06/07/2022) |
| 06/13/2022 | 212 | Unopposed MOTION for Order *Requiring the Government to Submit Expert Witness Opinions 120 Days Before Trial* by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 06/13/2022) |
| 06/13/2022 | 213 | Unopposed MOTION for Leave to File *Additional Motions* by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 06/13/2022) |
| 06/13/2022 | 214 | MOTION for Sanctions *for Violating Communication Privileges* by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 06/13/2022) |
| 06/13/2022 | 215 | MOTION for Franks Hearing by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 06/13/2022) |
| 06/13/2022 | 216 | MOTION to Suppress *the Use of Statements* by Michael Aaron Tew. (Bornstein, Peter) (Entered: 06/13/2022) |
| 06/13/2022 | 217 | |

| | | |
|---|---|---|
| | | Unopposed MOTION for Extension of Time to File Response/Reply *to Defendant Motions Filed on June 13, 2022* by USA as to Michael Aaron Tew, Kimberley Ann Tew. (Fields, Bryan) (Entered: 06/13/2022) |
| 06/13/2022 | 218 | MOTION to Sever Defendant by Kimberley Ann Tew. (Bornstein, Peter) (Entered: 06/13/2022) |
| 06/13/2022 | 219 | MOTION for James Hearing *and for Government to File a James Proffer* by Michael Aaron Tew. (Bornstein, Peter) (Entered: 06/13/2022) |
| 06/13/2022 | 220 | MOTION for James Hearing *and for Government to File a James Proffer* by Kimberley Ann Tew. (Bornstein, Peter) (Entered: 06/13/2022) |
| 06/13/2022 | 221 | MOTION to Suppress *Evidence from Search of 3222 East First Avenue, Apartment 224* by Michael Aaron Tew, Kimberley Ann Tew. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Bornstein, Peter) (Entered: 06/13/2022) |
| 06/16/2022 | 222 | ORDER GRANTING 205 Motion to Withdraw as Attorney. The Clerk of Court is instructed to terminate attorney Andrea Surratt as counsel of record, and to remove this name from the electronic certificate of mailing. Plaintiff United States will continue to be represented by attorney Bryan Fields and Albert Buchman. SO ORDERED by Judge Daniel D. Domenico on 6/16/2022. Text Only Entry (dddlc2, ) (Entered: 06/16/2022) |
| 06/16/2022 | 223 | ORDER GRANTING 210 Motion for Leave to File a Reply. Defendants have 5000 words for a reply to be filed on or before 6/22/2022. SO ORDERED by Judge Daniel D. Domenico on 6/16/2022. Text Only Entry (dddlc2, ) (Entered: 06/16/2022) |
| 06/16/2022 | 224 | ORDER Granting 209 Motion to Disclose Grand Jury Material as to Michael Aaron Tew, Kimberley Ann Tew. By Judge Daniel D. Domenico on 06/16/2022. (athom, ) (Entered: 06/16/2022) |
| 06/19/2022 | 225 | MOTION to Continue *Sentencing* by Jonathan K. Yioulos. (Tallon, Michael) (Entered: 06/19/2022) |
| 06/22/2022 | 226 | REPLY by Michael Aaron Tew, Kimberley Ann Tew *in Support of Motion to Suppress Evidence [Doc.200–Restricted]* (Bornstein, Peter) (Entered: 06/22/2022) |
| 06/29/2022 | 227 | ORDER granting 225 Motion to Continue as to Jonathan K. Yioulos (3). The sentencing hearing set for 7/12/2022 is VACATED AND RESET to 1/19/2023 at 10:30 AM in Courtroom A1002 before Judge Daniel D. Domenico. SO ORDERED by Judge Daniel D. Domenico on 6/29/2022. Text Only Entry (dddlc2, ) (Entered: 06/29/2022) |
| 07/14/2022 | 228 | ORDER granting 217 Motion for Extension of Time to File Response/Reply. The government has until and including 8/9/2022 to file responses to the motions filed on 6/13/2022. SO ORDERED by Judge Daniel D. Domenico on 8/14/2022. Text Only Entry (dddlc2, ) (Entered: 07/14/2022) |
| 08/09/2022 | 229 | NOTICE *of Conventional Filing Exhibit 1–3* by USA as to Michael Aaron Tew, Kimberley Ann Tew (Buchman, Albert) (Entered: 08/09/2022) |
| 08/09/2022 | 230 | RESPONSE in Opposition by USA as to Michael Aaron Tew, Kimberley Ann Tew re 218 MOTION to Sever Defendant (Buchman, Albert) (Entered: 08/09/2022) |
| 08/09/2022 | 231 | REPLY TO RESPONSE to Motion by USA as to Michael Aaron Tew, Kimberley Ann Tew re 219 MOTION for James Hearing *and for Government to File a James* |

| | | |
|---|---|---|
| | | *Proffer* (Buchman, Albert) (Entered: 08/09/2022) |
| 08/09/2022 | 232 | RESPONSE in Opposition by USA as to Michael Aaron Tew, Kimberley Ann Tew re 220 MOTION for James Hearing *and for Government to File a James Proffer* (Buchman, Albert) (Entered: 08/09/2022) |
| 08/09/2022 | 233 | RESPONSE in Opposition by USA as to Michael Aaron Tew, Kimberley Ann Tew re 215 MOTION for Franks Hearing (Buchman, Albert) (Entered: 08/09/2022) |
| 08/09/2022 | 234 | RESPONSE in Opposition by USA as to Michael Aaron Tew, Kimberley Ann Tew re 214 MOTION for Sanctions *for Violating Communication Privileges* (Buchman, Albert) (Entered: 08/09/2022) |
| 08/09/2022 | 235 | RESPONSE in Opposition by USA as to Michael Aaron Tew, Kimberley Ann Tew re 216 MOTION to Suppress *the Use of Statements* (Attachments: # 1 Conventionally Submitted, # 2 Conventionally Submitted)(Buchman, Albert) (Entered: 08/09/2022) |
| 08/09/2022 | 236 | RESPONSE in Opposition by USA as to Michael Aaron Tew, Kimberley Ann Tew re 221 MOTION to Suppress *Evidence from Search of 3222 East First Avenue, Apartment 224* (Attachments: # 1 Conventionally Submitted)(Buchman, Albert) (Entered: 08/09/2022) |
| 08/09/2022 | 237 | Conventionally Submitted Material : 1 Card USB Flash Drive: Exhibit 1 and Exhibit 2 to Response in Opposition 235 re 229 Notice, by Plaintiff USA. Material placed in the oversized filing area Area D–5–5 of the Clerk's Office. Text Only Entry (athom, ) (submitted additional copy of USB placed in Chambers' mail box) (Entered: 08/11/2022) |
| 08/12/2022 | 238 | ORDER GRANTING IN PART 201 Motion for Leave to File Motion to Suppress Evidence as Restricted Level 1. <br><br>I must narrowly tailor any restrictions on public access, and must consider whether supplying a redacted version of a document in lieu of restricting access to the entire document would adequately protect the interests of the party seeking restriction. *United States v. Walker*, 761 F. App'x 822, 835 (10th Cir. 2019); Local Civ. R. 7.2(c)(4). Defendants Michael and Kimberly Tew have not shown that redacting the identified financial, medical, and other personal information from the motion to suppress is impracticable or would not adequately protect the privacy interests at stake. <br><br>Accordingly, the motion for leave to restrict is GRANTED IN PART with respect to the exhibits to the motion only. The Clerk of Court is directed to maintain Doc. 200 and Docs. 200–1 to 200–28 under Level 1 restriction. Plaintiff must file a public redacted version of the motion to suppress (Doc. 200 ) on or before 8/19/2022. <br><br>SO ORDERED by Judge Daniel D. Domenico on 8/12/2022. Text Only Entry (dddlc1, ) (Entered: 08/12/2022) |
| 08/12/2022 | 239 | ORDER GRANTING IN PART 212 Defendants' Unopposed Motion to Require the Government to Submit Expert Witness Opinions 120 Days Before Trial. <br><br>Expert witness disclosures pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G) and (b)(1)(C) must be made no later than 8/19/2022, and any challenges to such experts must be made no later than 9/9/2022. |

| | | |
|---|---|---|
| | | Rebuttal expert witness disclosures must be made no later than 9/16/2022, and any challenges to such rebuttal experts must be made no later than 10/7/2022.<br><br>SO ORDERED by Judge Daniel D. Domenico on 8/12/2022. Text Only Entry (dddlc1, ) (Entered: 08/12/2022) |
| 08/15/2022 | 240 | Unopposed MOTION for Leave to File *Replies to Government's Responses to Motions* by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 08/15/2022) |
| 08/15/2022 | 241 | ORDER REGARDING PRETRIAL DEADLINES AND PENDING MOTIONS.<br><br>Defendants' Unopposed Motion for Leave to File Additional Motions (Doc. 213 ) is GRANTED. Motions due 9/13/2022. Responses due 9/27/2022. No replies will be permitted without prior leave of the Court.<br><br>Defendants' Unopposed Motion for Leave to File Replies to Government's Responses to Motions (Doc. 240 ) is GRANTED. Replies due 8/23/2022.<br><br>A Motions Hearing is SET for 10/18/2022 at 10:30 AM in Courtroom A1002 before Judge Daniel D. Domenico.<br><br>Due to a conflict on the Court's calendar, the eight–day Jury Trial set for 12/5/2022 is VACATED and RESET to commence on 12/12/2022 at 09:00 AM in Courtroom A1002. Counsel and pro se parties must be present at 08:30 AM on the first day of trial. Due to a conflict on the Court's calendar, the Trial Preparation Conference set for 11/29/2022 is VACATED and RESET to 11/22/2022 at 01:30 PM in Courtroom A1002. See written Order for pretrial deadlines.<br><br>SO ORDERED by Judge Daniel D. Domenico on 8/15/2022. (dddlc1, ) (Entered: 08/15/2022) |
| 08/18/2022 | 242 | Unopposed MOTION for Order *to Reschedule Hearing Date on Motion* by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 08/18/2022) |
| 08/18/2022 | 243 | ORDER GRANTING 242 Unopposed Motion to Reschedule Hearing Date on Motions as to Michael Aaron Tew (1), Kimberley Ann Tew (2). The Motions Hearing set for 10/18/2022 is VACATED and RESET to 10/12/2022 at 09:30 AM in Courtroom A1002 before Judge Daniel D. Domenico. SO ORDERED by Judge Daniel D. Domenico on 8/18/2022. Text Only Entry (dddlc1, ) (Entered: 08/18/2022) |
| 08/19/2022 | 244 | RESPONSE by Michael Aaron Tew, Kimberley Ann Tew re: 238 Order on Motion for Leave to Restrict,,,, (Bornstein, Peter) (Entered: 08/19/2022) |
| 08/23/2022 | 245 | REPLY TO RESPONSE to Motion by Michael Aaron Tew, Kimberley Ann Tew re 214 MOTION for Sanctions *for Violating Communication Privileges* (Bornstein, Peter) (Entered: 08/23/2022) |
| 08/23/2022 | 246 | REPLY TO RESPONSE to Motion by Michael Aaron Tew, Kimberley Ann Tew re 221 MOTION to Suppress *Evidence from Search of 3222 East First Avenue, Apartment 224* (Bornstein, Peter) (Entered: 08/23/2022) |
| 08/23/2022 | 247 | REPLY TO RESPONSE to Motion by Michael Aaron Tew, Kimberley Ann Tew re 219 MOTION for James Hearing *and for Government to File a James Proffer*, 220 MOTION for James Hearing *and for Government to File a James Proffer* (Bornstein, |

| | | Peter) (Entered: 08/23/2022) |
|---|---|---|
| 08/23/2022 | 248 | REPLY TO RESPONSE to Motion by Kimberley Ann Tew re 218 MOTION to Sever Defendant (Bornstein, Peter) (Entered: 08/23/2022) |
| 08/23/2022 | 249 | REPLY TO RESPONSE to Motion by Michael Aaron Tew re 216 MOTION to Suppress *the Use of Statements* (Bornstein, Peter) (Entered: 08/23/2022) |
| 08/23/2022 | 250 | REPLY TO RESPONSE to Motion by Michael Aaron Tew, Kimberley Ann Tew re 215 MOTION for Franks Hearing (Attachments: # 1 Affidavit Declaration of Michael A. Tew, # 2 Affidavit Declaration of Kimberley A. Tew)(Bornstein, Peter) (Entered: 08/23/2022) |
| 09/15/2022 | 251 | Unopposed MOTION to Travel *Out of State* by Kimberley Ann Tew. (Bornstein, Peter) (Entered: 09/15/2022) |
| 09/16/2022 | 252 | ORDER granting 251 Unopposed Motion to Travel as to Kimberley Ann Tew (2). SO ORDERED by Judge Daniel D. Domenico on 09/16/2022. Text Only Entry (dddlc5, ) (Entered: 09/16/2022) |
| 10/07/2022 | 253 | EXHIBIT LIST *for Suppression Hearing of October 12, 2022* by USA as to Michael Aaron Tew, Kimberley Ann Tew (Attachments: # 1 Proposed Exhibit List)(Fields, Bryan) (Entered: 10/07/2022) |
| 10/07/2022 | 254 | WITNESS LIST *for Suppression Hearing of October 12, 2022* by USA as to Michael Aaron Tew, Kimberley Ann Tew (Attachments: # 1 Proposed Witness List)(Fields, Bryan) (Entered: 10/07/2022) |
| 10/12/2022 | 255 | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: Suppression Hearing as to Michael Aaron Tew, Kimberley Ann Tew held on 10/12/2022. Taking under advisement 214 Motion for Sanctions as to Michael Aaron Tew (1), Kimberley Ann Tew (2). Denying 215 Motion for Franks Hearing as to Michael Aaron Tew (1), Kimberley Ann Tew (2). Taking under advisement 216 Motion to Suppress as to Michael Aaron Tew (1). Taking under advisement 200 Defendants Motion. Denying 219 Motion for James Hearing as to Michael Aaron Tew (1). Taking under advisement 221 Motion to Suppress as to Michael Aaron Tew (1), Kimberley Ann Tew (2). Taking under advisement 218 Motion to Sever Defendant as to Kimberley Ann Tew (2). Taking under advisement 220 Motion for James Hearing as to Kimberley Ann Tew (2). Bond continued as to both defendants. Court Reporter: Julie Thomas. (rkeec) (Entered: 10/13/2022) |
| 10/12/2022 | 256 | WITNESS LIST by USA as to Michael Aaron Tew (1), Kimberley Ann Tew (2). With date and time testified. (rkeec) (Entered: 10/13/2022) |
| 10/12/2022 | 257 | EXHIBIT LIST by USA as to Michael Aaron Tew (1), Kimberley Ann Tew (2). (rkeec) (Entered: 10/13/2022) |
| 10/27/2022 | 258 | ORDER Denying 221 Motion to Suppress Evidence from Search of 3222 East First Avenue, Apartment 224 as to Michael Aaron Tew, Kimberley Ann Tew. By Judge Daniel D. Domenico on 10/27/2022. (athom, ) (Entered: 10/28/2022) |
| 10/27/2022 | 259 | ORDER as to Michael Aaron Tew. Mr. Tew's Motion to Suppress the Use of Statements (Doc. 216 ) is DENIED. By Judge Daniel D. Domenico on 10/27/2022. (athom, ) (Entered: 10/28/2022) |
| 10/27/2022 | 260 | |

| | | |
|---|---|---|
| | | ORDER Denying 218 Motion for Severance as to Kimberley Ann Tew. By Judge Daniel D. Domenico on 10/27/2022. (athom, ) (Entered: 10/28/2022) |
| 10/27/2022 | 261 | ORDER Denying 214 Motion for Sanctions as to Michael Aaron Tew, Kimberley Ann Tew. By Judge Daniel D. Domenico on 10/27/2022. (athom, ) (Entered: 10/28/2022) |
| 10/27/2022 | 262 | ORDER Denying 200 Motion to Suppress Evidence as to Michael Aaron Tew, Kimberley Ann Tew. By Judge Daniel D. Domenico on 10/27/2022. (athom, ) (Entered: 10/28/2022) |
| 10/28/2022 | 263 | ORDER GRANTING IN PART 220 Defendant Kimberly Ann Tew's Motion for a *James* Proffer and Hearing. Ms. Tew's request for the Government to file a *James* proffer and for the Court to hold a *James* hearing is granted, though not on the timeline requested. <br><br> The Government must file any statements it will seek to admit at trial under Federal Rule of Evidence 801(d)(2)(E) in the form of a *James* log, along with the referenced exhibits and an accompanying brief, on or before 1/6/2023. The defendants must file their responses to the Government's *James* log and brief on or before 1/20/2023. A *James* Hearing is SET for 1/26/2023 at 09:30 AM in Courtroom A1002 before Judge Daniel D. Domenico. <br><br> In light of the above, the Trial Preparation Conference set for 11/22/2022 is VACATED and RESET for 3/7/2022 at 09:30 AM in Courtroom A1002, and the eight–day Jury Trial set for 12/12/2022 is VACATED and RESET for 3/13/2023 at 09:00 AM in Courtroom A1002. Counsel and pro se parties must be present at 08:30 AM on the first day of trial. Pretrial deadlines remain as stated in the Court's Order Regarding Pretrial Deadlines and Pending Motions (Doc. 241 ). <br><br> SO ORDERED by Judge Daniel D. Domenico on 10/28/2022. Text Only Entry (dddlc1, ) (Entered: 10/28/2022) |
| 11/15/2022 | 264 | MOTION for Leave to Restrict by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 11/15/2022) |
| 11/15/2022 | 265 | RESTRICTED DOCUMENT – Level 3: by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 11/15/2022) |
| 11/15/2022 | 266 | RESTRICTED DOCUMENT – Level 3: by Michael Aaron Tew, Kimberley Ann Tew. (Attachments: # 1 Exhibit A)(Bornstein, Peter) (Entered: 11/15/2022) |
| 11/16/2022 | 267 | Unopposed MOTION to Travel *Out of State* by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 11/16/2022) |
| 11/17/2022 | 268 | ORDER granting 267 Motion to Travel as to Michael Aaron Tew (1), Kimberley Ann Tew (2). Mr. and Mrs. Tew are granted permission to leave the state of Colorado and travel to Marquette, Michigan with their children from 11/18/2022 until 11/27/2022. SO ORDERED by Judge Daniel D. Domenico on 11/17/2022. Text Only Entry (dddlc5, ) (Entered: 11/17/2022) |
| 11/17/2022 | 269 | ORDER granting 264 Motion for Leave to Restrict 265 Restricted Document – Level 3, 266 Restricted Document – Level 3 as to Michael Aaron Tew (1), Kimberley Ann Tew (2). The Clerk of Court is directed to maintain 265 and 266 UNDER RESTRICTION at LEVEL 3. SO ORDERED by Judge Daniel D. Domenico on |

| | | 11/17/2022. Text Only Entry (dddlc5, ) (Entered: 11/17/2022) |
|---|---|---|
| 11/28/2022 | 270 | Unopposed MOTION to Continue *adjourn sentencing* by Jonathan K. Yioulos. (Tallon, Michael) (Entered: 11/28/2022) |
| 11/28/2022 | 271 | ORDER granting 270 Motion to Continue as to Jonathan K. Yioulos (3). Mr. Yioulos's Sentencing set for 1/19/2023 at 10:30 a.m. is VACATED and RESET for 3/29/2023 at 10:30 AM in Courtroom A1002 before Judge Daniel D. Domenico. All related deadlines are continued. SO ORDERED by Judge Daniel D. Domenico on 11/28/2022. Text Only Entry (dddlc5, ) (Entered: 11/28/2022) |
| 11/29/2022 | 272 | Order Regarding Motion for Subpoenas as to Michael Aaron Tew and Kimberley Ann Tew. (angar, ) Modified on 11/29/2022 to correct restriction level and title (angar, ). (Entered: 11/29/2022) |
| 12/01/2022 | 273 | MOTION to Withdraw as Attorney by Peter R. Bornstein by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 12/01/2022) |
| 12/01/2022 | 274 | ORDER REFERRING MOTION as to Michael Aaron Tew, Kimberley Ann Tew 273 MOTION to Withdraw as Attorney by Peter R. Bornstein. Motion referred to Magistrate Judge Kristen L. Mix, by Judge Daniel D. Domenico on 12/01/2022. Text Only Entry (dddlc5, ) Modified on 12/5/2022 to add text (athom, ). (Entered: 12/01/2022) |
| 12/02/2022 | 275 | MINUTE ORDER by Magistrate Judge Kristen L. Mix on 12/02/2022. IT IS HEREBY ORDERED that the Motion 273 is GRANTED as to Michael Aaron Tew (1), Kimberley Ann Tew (2). Mr. Bornstein is permitted to withdraw as counsel for Defendants. IT IS FURTHER ORDERED that on or before December 16, 2022, Defendants shall have replacement counsel enter an appearance or, if they believe they are entitled to appointment of CJA counsel to represent them, shall each file a financial affidavit under restriction at Level 3. (alave, ) (Entered: 12/05/2022) |
| 12/05/2022 | 276 | MOTION for Reconsideration re 275 Order on Motion to Withdraw as Attorney,, *or, in the alternative, motion for expedited appointment and extension of deadlines* by USA as to Michael Aaron Tew, Kimberley Ann Tew. (Fields, Bryan) (Entered: 12/05/2022) |
| 12/05/2022 | 277 | ORDER REFERRING MOTION as to Michael Aaron Tew, Kimberley Ann Tew 276 MOTION for Reconsideration re 275 Order on Motion to Withdraw as Attorney,, *or, in the alternative, motion for expedited appointment and extension of deadlines* filed by USA. Motion referred to Magistrate Judge Kristen L. Mix by Judge Daniel D. Domenico on 12/05/2022. Text Only Entry (dddlc5, ) (Entered: 12/05/2022) |
| 12/06/2022 | 278 | MINUTE ORDER by Magistrate Judge Kristen L. Mix on 12/06/2022. IT IS HEREBY ORDERED that a hearing on the Motion 276 is set for December 9, 2022, at 11:00 a.m. Counsel for the parties, including defense counsel Peter Bornstein who was permitted to withdraw by Minute Order 275 of December 2, 2022, shall be present at the hearing. IT IS FURTHER ORDERED that the Clerk of Court shall email a copy of this Minute Order to Mr. Bornstein. (alave, ) (Entered: 12/06/2022) |
| 12/06/2022 | 279 | Certificate of Service by E–Mail by Clerk of Court re 278 Minute Order to counsel Peter Bornstein at pbornstein@prblegal.com. Text Only Entry. (alave, ) (Entered: 12/06/2022) |
| 12/09/2022 | 280 | MINUTE ENTRY for In Court Hearing as to Michael Aaron Tew, Kimberley Ann Tew held on 12/9/2022 before Magistrate Judge Kristen L. Mix. The court GRANTS |

| | | |
|---|---|---|
| | | 276 Motion for Reconsideration re 273 MOTION to Withdraw as Attorney. 273 MOTION to Withdraw as Attorney is GRANTED in part and DENIED in part to the extent that Mr. Bornstein is permitted to withdraw as private counsel, but otherwise denied. Defendants are ORDERED to submit financial affidavits on or before 5:00 PM Tuesday, December 13, 2022. Should Defendants qualify for court–appointed counsel, Mr. Bornstein will be appointed as CJA counsel. |
| | | The Clerk of Court is ORDERED to allow Mr. Bornstein to file the financial affidavits on the electronic docket on the Defendants' behalf. Should there be any problem with the filing of the financial affidavits, Mr. Bornstein SHALL email them to Mix_Chambers@cod.uscourts.gov.(Total time: 23 minutes, Hearing time: 11:00–11:23) |
| | | **APPEARANCES**: Bryan Fields, Albert Buchman on behalf of the Government, Peter Bornstein on behalf of the defendant. FTR: A–401. (cpomm, ) Text Only Entry (Entered: 12/09/2022) |
| 12/13/2022 | 281 | MOTION for Leave to Restrict by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 12/13/2022) |
| 12/13/2022 | 282 | RESTRICTED DOCUMENT – Level 3: by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 12/13/2022) |
| 12/14/2022 | 283 | ORDER granting 281 Motion for Leave to Restrict 282 Restricted Document as to Michael Aaron Tew (1), Kimberley Ann Tew (2). The Clerk of Court is instructed to maintain 282 at LEVEL THREE RESTRICTION. SO ORDERED by Judge Daniel D. Domenico on 12/14/2022. Text Only Entry (dddlc5, ) (Entered: 12/14/2022) |
| 12/27/2022 | 284 | MOTION to Vacate *Deadlines and for Status Conference* by USA as to Michael Aaron Tew, Kimberley Ann Tew. (Fields, Bryan) (Entered: 12/27/2022) |
| 12/27/2022 | 285 | TRANSCRIPT of MOTIONS HEARING as to Michael Aaron Tew, Kimberley Ann Tew held on 10/12/22 before Judge Domenico. Pages: 1–234. |
| | | **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** |
| | | Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (Thomas, Julie) (Entered: 12/27/2022) |
| 12/27/2022 | 286 | MINUTE ORDER by Magistrate Judge Kristen L. Mix on 12/27/2022. IT IS HEREBY ORDERED that attorney Peter Bornstein is appointed as CJA counsel for Defendants Michael A. Tew and Kimberly A. Tew. (alave, ) (Entered: 12/27/2022) |
| 12/28/2022 | 287 | ORDER DENYING 284 Government's Motion to Vacate Current Deadlines and for Status Conference as to Michael Aaron Tew (1), Kimberley Ann Tew (2). |
| | | Attorney Peter Bornstein represented the defendants as retained counsel for a period |

| | | |
|---|---|---|
| | | of over nine months from February to December 2022 (*see* Docs. 178 , 273 , 275 , 280), and he now continues to represent the defendants as appointed CJA counsel (Doc. 286 ). The Government has repeatedly stated its concern that further delays may prejudice its case and the public (Doc. 284 at 3; Doc. 276 at 2, 3, 5, 8), and has also acknowledged that Mr. Bornstein "is surely in the best position to advance this case without any more delay" (Doc. 276 at 2). Having now been appointed as CJA counsel, Mr. Bornstein has over a week to review the Government's *James* submission prior to its filing on 1/6/2023.<br><br>The Government's request to vacate the deadlines related to its *James* proffer and log is therefore denied.<br><br>SO ORDERED by Judge Daniel D. Domenico on 12/28/2022. Text Only Entry (dddlc1, ) (Entered: 12/28/2022) |
| 12/28/2022 | 288 | MOTION for Order *Appointing Separate Counsel* by Michael Aaron Tew, Kimberley Ann Tew. (Bornstein, Peter) (Entered: 12/28/2022) |
| 12/29/2022 | 289 | ORDER GRANTING 288 Motion for Appointment of Separate Counsel as to Michael Aaron Tew (1), Kimberley Ann Tew (2).<br><br>Attorney Peter R. Bornstein is relieved of any further representation of Defendant Kimberley Ann Tew, and the Clerk of Court is instructed to terminate Mr. Bornstein as counsel of record for Ms. Tew. An attorney from the Criminal Justice Act panel will be appointed to represent Ms. Tew. Defendant Michael Aaron Tew will continue to be represented by Mr. Bornstein as appointed CJA counsel.<br><br>In light of the above, the deadlines for the Goverment's *James* proffer and log and the defendants' response thereto, and the *James* Hearing set for 1/26/2023 are CONTINUED pending further order of the Court.<br><br>Within one week of entry of appearance of new counsel for Ms. Tew, the parties must file a Joint Status Report addressing: (1) the Speedy Trial Act implications of the new representation, if any; (2) mutually agreeable proposed deadlines for further *James* proceedings; and (3) any other issues the parties wish to bring to the Court's attention.<br><br>SO ORDERED by Judge Daniel D. Domenico on 12/29/2022. Text Only Entry (dddlc1, ) (Entered: 12/29/2022) |
| 01/03/2023 | 290 | NOTICE OF ATTORNEY APPEARANCE: David Scott Kaplan appearing for Kimberley Ann TewAttorney David Scott Kaplan added to party Kimberley Ann Tew(pty:dft) (Kaplan, David) (Main Document 290 replaced on 1/21/2025) (lrobe, ). (Entered: 01/03/2023) |
| 01/05/2023 | 291 | MOTION to Unrestrict Document 2 Warrant Issued, 1 Complaint, by USA as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. (Attachments: # 1 Proposed Order (PDF Only))(Fields, Bryan) (Entered: 01/05/2023) |
| 01/06/2023 | 292 | ORDER granting 291 Motion to Unrestrict 291 . The Clerk of Court is directed to unrestrict Documents 1 , 2 , 5 , and 6 as to Michael Aaron Tew (1), Kimberley Ann Tew (2), Jonathan K. Yioulos (3). SO ORDERED by Judge Daniel D. Domenico on 01/06/2023. Text Only Entry (dddlc5, ) (Entered: 01/06/2023) |

| 01/10/2023 | 293 | STATUS REPORT *(Joint Status Report of Parties)* by USA as to Michael Aaron Tew, Kimberley Ann Tew (Fields, Bryan) (Entered: 01/10/2023) |
|---|---|---|
| 01/11/2023 | 294 | MINUTE ORDER as to Michael Aaron Tew, Kimberley Ann Tew re 293 Status Report filed by USA. By 1/17/2023, Mr. Bornstein and Mr. Kaplan must each submit an ex parte filing describing their positions regarding any conflict of interest that might prevent Mr. Bornstein from continuing to represent Mr. Tew and whether a hearing is necessary to evaluate and resolve this issue. SO ORDERED by Judge Daniel D. Domenico on 01/11/2023. Text Only Entry (dddlc5, ) (Entered: 01/11/2023) |
| 01/13/2023 | 295 | NOTICE OF ATTORNEY APPEARANCE: Nancy Lin Cohen appearing for Movants Christopher J. Alf, National Air Cargo Group, Inc., National Air Cargo Holdings, Inc.Attorney Nancy Lin Cohen added to party Christopher J. Alf(pty:mov), Attorney Nancy Lin Cohen added to party National Air Cargo Group, Inc. (pty:mov), Attorney Nancy Lin Cohen added to party National Air Cargo Holdings, Inc.(pty:mov) (athom, ) (Entered: 01/13/2023) |
| 01/13/2023 | 296 | NOTICE OF ATTORNEY APPEARANCE: Eric S. Galler appearing for Movants Christopher J. Alf, National Air Cargo Group, Inc., National Air Cargo Holdings, Inc.Attorney Eric S. Galler added to party Christopher J. Alf(pty:mov), Attorney Eric S. Galler added to party National Air Cargo Group, Inc. (pty:mov), Attorney Eric S. Galler added to party National Air Cargo Holdings, Inc.(pty:mov) (athom, ) (Entered: 01/13/2023) |
| 01/13/2023 | 297 | MOTION to Quash Subpoenas by Christopher J. Alf, National Air Cargo Group, Inc., National Air Cargo Holdings, Inc. as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. (athom, ) (Entered: 01/13/2023) |
| 01/17/2023 | 298 | NOTICE OF ATTORNEY APPEARANCE: Peter R. Bornstein appearing for Michael Aaron Tew (Bornstein, Peter) (Entered: 01/17/2023) |
| 01/17/2023 | 299 | MOTION for Leave to Restrict by Michael Aaron Tew. (Bornstein, Peter) (Entered: 01/17/2023) |
| 01/17/2023 | 300 | RESTRICTED DOCUMENT – Level 3: by Michael Aaron Tew. (Bornstein, Peter) (Entered: 01/17/2023) |
| 01/17/2023 | 301 | RESTRICTED DOCUMENT – Level 3: by Kimberley Ann Tew. (Kaplan, David) (Entered: 01/17/2023) |
| 01/26/2023 | 302 | ORDER granting 299 Motion for Leave to Restrict as to Michael Aaron Tew (1). The Clerk of Court is directed to maintain 300 at a LEVEL THREE RESTRICTION. SO ORDERED by Judge Daniel D. Domenico on 1/26/2023. Text Only Entry (dddlc5, ) (Entered: 01/26/2023) |
| 01/29/2023 | 303 | Unopposed MOTION to Modify Conditions of Release by Jonathan K. Yioulos as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. (Tallon, Michael) (Entered: 01/29/2023) |
| 01/30/2023 | 304 | ORDER GRANTING 303 Unopposed Motion to Modify Conditions of Release as to Jonathan K. Yioulos (3). Mr. Yioulos may travel to Sarasota, Florida, to visit family from 2/16/23 to 2/24/23. He must (1) provide documentation regarding his travel plans to United States Pretrial and Probation Services in advance of departure, (2) contact his probation officer as directed during the time of approved travel, and (3) promptly contact his probation officer upon return from his trip. SO ORDERED by |

| | | |
|---|---|---|
| | | Judge Daniel D. Domenico on 01/30/2023. Text Only Entry (dddlc5, ) (Entered: 01/30/2023) |
| 01/30/2023 | 305 | ORDER WITHDRAWING COUNSEL as to Michael Aaron Tew. Peter R. Bornstein is WITHDRAWN as counsel to Defendant Michael Aaron Tew and relieved of all further representation. The Clerk of Court is instructed to terminate Mr. Bornstein as counsel of record, and to remove his name from the electronic certificate of mailing. An attorney from the Criminal Justice Act panel will be appointed to represent Defendant Michael Tew. Within one week of entry of appearance of new counsel for Mr. Tew, the parties must file a Joint Status Report addressing: (1) the Speedy Trial Act implications of the new representation, if any; and (2) any other issues the parties wish to bring to the Court's attention. On or before 3/13/2023, the parties must file a Joint Status Report with mutually agreeable proposed deadlines for further *James* proceedings. By Judge Daniel D. Domenico on 01/30/2023. (athom, ) (Entered: 01/30/2023) |
| 01/30/2023 | 306 | ORDER as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos.The Motion of Third–Party Victims to Quash Subpoenas (Doc. 297 ) is GRANTED.The defendants' third–party subpoenas dated 12/1/2022 are QUASHED. The defendants may, if they wish, file a renewed motion for leave to serve third–party subpoenas that fully complies with Federal Rule of Criminal Procedure 17. By Judge Daniel D. Domenico on 01/30/2023. (athom, ) (Entered: 01/30/2023) |
| 01/30/2023 | 307 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 303 Unopposed MOTION to Modify Conditions of Release filed by attorney Michael John Tallon. The format for the attorney's signature block information is not correct. **DO NOT REFILE THE DOCUMENT. Action to take –** future documents must be filed pursuant to D.C.COLO.LCr49.1(a) and 4.3(d) of the Electronic Case Filing Procedures (Criminal Cases). The document was scanned and not converted directly to portable document format (PDF). **DO NOT REFILE THE DOCUMENT. Action to take –** future documents must be filed pursuant to D.C.COLO.LCr49.1(a) and 1.3(f) of the Electronic Case Filing Procedures (Criminal Cases). (Text Only Entry) (athom, ) (Entered: 01/30/2023) |
| 01/31/2023 | 308 | NOTICE OF ATTORNEY APPEARANCE: Jason Dale Schall appearing for Michael Aaron TewAttorney Jason Dale Schall added to party Michael Aaron Tew(pty:dft) (Schall, Jason) (Entered: 01/31/2023) |
| 02/03/2023 | 309 | Unopposed MOTION to Continue *Trial* by Michael Aaron Tew. (Schall, Jason) (Entered: 02/03/2023) |
| 02/03/2023 | 310 | ORDER re 309 Motion to Continue as to Michael Aaron Tew. The Court currently does not have enough information to determine whether the ends–of–justice served by the length of delay requested by the Defendant outweighs the best interests of the defendant and public in a speedy trial. In light of the appointment of Mr. Tew's new counsel and the suspension of the present time from the Speedy Trial Act given the James proceeding is not yet under advisement, the eight–day jury trial set for 3/13/23 and Trial Preparation Conference set for 3/7/2023 are VACATED. The Motion to Continue 309 is denied without prejudice. If Defendant wishes to file a renewed Motion to Continue, he should do so concurrent with the status report due 3/13/2023. SO ORDERED by Judge Daniel D. Domenico on 02/03/2023. Text Only Entry (dddlc5, ) (Entered: 02/03/2023) |
| 02/07/2023 | 311 | |

| | | |
|---|---|---|
| | | STATUS REPORT *(Joint Status Report of Parties)* by USA as to Michael Aaron Tew, Kimberley Ann Tew (Fields, Bryan) (Entered: 02/07/2023) |
| 02/17/2023 | 312 | Unopposed MOTION to Modify Conditions of Release by Michael Aaron Tew. (Schall, Jason) (Entered: 02/17/2023) |
| 02/17/2023 | 313 | ORDER granting 312 Motion to Modify Conditions of Release as to Michael Aaron Tew (1). Condition 7(x)(w) is stricken from Defendant's Conditions of Release. Defendant's supervising officer shall notify the Court if any issues arise from the removal of this restriction. SO ORDERED by Judge Daniel D. Domenico on 2/17/2023. Text Only Entry (dddlc5, ) (Entered: 02/17/2023) |
| 03/13/2023 | 314 | STATUS REPORT *re James Hearing (Joint Status Report of all Parties)* by USA as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos (Fields, Bryan) (Entered: 03/13/2023) |
| 03/13/2023 | 315 | Unopposed MOTION for Order *for an Ends of Justice (EOJ) Continuance Pursuant to 18 U.S.C. 3161(h)(7)* by Kimberley Ann Tew. (Kaplan, David) (Entered: 03/13/2023) |
| 03/13/2023 | 316 | Unopposed MOTION to Continue *Trial* by Michael Aaron Tew. (Schall, Jason) (Entered: 03/13/2023) |
| 03/17/2023 | 317 | ORDER as to Kimberley Ann Tew. Defendant's Motion to Continue Trial and for an Ends of Justice Continuance (Doc. 315 ) is GRANTED. Three hundred and twenty−nine (329) days, from 3/17/2023 to 2/9/2024, will be excluded from the computation of Defendant Kimberley Tew's Speedy Trial Act time. Motions due by 9/13/2023. Responses due by 9/20/2023. The eight−day Jury Trial is RESET to 2/5/2024 at 9:00 a.m. in Courtroom A1002 before Judge Daniel D. Domenico. The Trial Preparation Conference RESET to 1/30/2024 at 1:30 p.m. in Courtroom A1002 before Judge Daniel D. Domenico. By Judge Daniel D. Domenico on 03/17/2023. (athom, ) (Entered: 03/17/2023) |
| 03/17/2023 | 318 | ORDER as to Michael Aaron Tew. Defendant's Motion to Continue Trial and for an Ends of Justice Continuance (Doc. 316 ) is GRANTED. Three hundred and twenty−nine (329) days, from 3/17/2023 to 2/9/2024, will be excluded from the computation of Defendant Michael Tew's Speedy Trial Act time. Motions due by 9/13/2023. Responses due by 9/20/2023. The eight−day Jury Trial is RESET to 2/5/2024 at 9:00 a.m. in Courtroom A1002 before Judge Daniel D. Domenico. The Trial Preparation Conference is RESET to 1/30/2024 at 1:30 p.m. in Courtroom A1002 before Judge Daniel D. Domenico. By Judge Daniel D. Domenico on 03/17/2023. (athom, ) (Entered: 03/17/2023) |
| 03/20/2023 | 319 | RESTRICTED PRESENTENCE REPORT as to Jonathan K. Yioulos (Attachments: # 1 Exhibit A)(lgiac) (Entered: 03/20/2023) |
| 03/20/2023 | 320 | RESTRICTED ADDENDUM to Presentence Report 319 as to Jonathan K. Yioulos (lgiac) (Entered: 03/20/2023) |
| 03/22/2023 | 321 | Unopposed MOTION to Continue *adjourn sentencing and apply for,passport* by Jonathan K. Yioulos. (Tallon, Michael) (Entered: 03/22/2023) |
| 03/23/2023 | 322 | ORDER granting 321 Motion to Continue as to Jonathan K. Yioulos (3). The sentencing set for 3/29/2023 is VACATED and RESET for 3/5/2024 10:30 AM in Courtroom A1002 before Judge Daniel D. Domenico. |

| | | |
|---|---|---|
| | | Mr. Yioulos's motion to apply for a passport 321 is GRANTED. If a passport is issued to Mr. Yioulos, his counsel must maintain control of it until specific permission to travel is granted. Mr. Yioulos must separately request permission to travel.<br><br>SO ORDERED by Judge Daniel D. Domenico on 3/23/2023. Text Only Entry (dddlc5, ) (Entered: 03/23/2023) |
| 03/24/2023 | 323 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 321 Unopposed MOTION to Continue *adjourn sentencing and apply for,passport* filed by attorney Michael John Tallon. The format for the attorney's signature block information is not correct. **DO NOT REFILE THE DOCUMENT. Action to take –** future documents must be filed pursuant to D.C.COLO.LCr49.1(a) and 4.3(d) of the Electronic Case Filing Procedures (Criminal Cases). The document was scanned and not converted directly to portable document format (PDF). **DO NOT REFILE THE DOCUMENT. Action to take –** future documents must be filed pursuant to D.C.COLO.LCr49.1(a) and 1.3(f) of the Electronic Case Filing Procedures (Criminal Cases). (Text Only Entry) (athom, ) (Entered: 03/24/2023) |
| 03/27/2023 | 324 | Unopposed MOTION to Modify Conditions of Release *for family travel to Florida on March 30th* by Jonathan K. Yioulos. (Tallon, Michael) (Entered: 03/27/2023) |
| 03/27/2023 | 325 | ORDER granting 324 Motion to Modify Conditions of Release as to Jonathan K. Yioulos (3). Mr. Yioulos may travel to Sarasota, Florida, to visit family from 3/30/23 to 4/6/23. He must (1) provide documentation regarding his travel plans to United States Pretrial and Probation Services in advance of departure, (2) contact his probation officer as directed during the time of approved travel, and (3) promptly contact his probation officer upon return from his trip. SO by Judge Daniel D. Domenico on 3/27/2023. (dddlc5, ) (Entered: 03/27/2023) |
| 03/28/2023 | 326 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES re: 324 Unopposed Motion to Modify Conditions of Release filed by attorney **Michael John Tallon**. The document was scanned and not converted directly to portable document format (PDF). **DO NOT REFILE THE DOCUMENT. Action to take –** future documents must be filed pursuant to D.C.COLO.LCr49.1(a) and 1.3(f) of the Electronic Case Filing Procedures (Criminal Cases). (Text Only Entry) (jtorr, ) (Entered: 03/28/2023) |
| 05/01/2023 | 327 | Unopposed MOTION to Modify Conditions of Release by Michael Aaron Tew. (Schall, Jason) (Entered: 05/01/2023) |
| 05/01/2023 | 328 | ORDER granting 327 Motion to Modify Conditions of Release as to Michael Aaron Tew (1). Condition 7(q) of Mr. Tew's pre–trial release is removed. In lieu of 7(q) Mr. Tew must report to U.S. Pre–trial Services/U.S. Probation by no later than 12:00 p.m. MST every Monday. SO ORDERED by Judge Daniel D. Domenico on 5/1/2023. Text Only Entry (dddlc5, ) (Entered: 05/01/2023) |
| 06/07/2023 | 329 | Unopposed MOTION to Travel by Michael Aaron Tew. (Schall, Jason) (Entered: 06/07/2023) |
| 06/07/2023 | 330 | ORDER granting 329 Motion to Travel as to Michael Aaron Tew (1). Mr. Tew may travel between on or around June 17, 2023 and June 22, 2023 to the States of Wisconsin and Michigan. He must (1) provide documentation regarding his travel plans to United States Pretrial and Probation Services in advance of departure, (2) |

| | | |
|---|---|---|
| | | contact his probation officer as directed during approved travel, and (3) promptly contact his probation officer upon return from travel as directed. SO ORDERED by Judge Daniel D. Domenico on 6/7/2023. Text Only Entry (dddlc5, ) (Entered: 06/07/2023) |
| 06/16/2023 | 331 | Unopposed MOTION to Travel *Out of State* by Kimberley Ann Tew. (Kaplan, David) (Entered: 06/16/2023) |
| 06/16/2023 | 332 | ORDER granting 331 Motion to Travel as to Kimberley Ann Tew (2). Ms. Tew may travel between on or around June 17, 2023 and June 22, 2023 to the States of Wisconsin and Michigan. She must (1) provide documentation regarding her travel plans to United States Pretrial and Probation Services in advance of departure, (2) contact her probation officer as directed during approved travel, and (3) promptly contact his probation officer upon return from travel as directed. SO ORDERED by Judge Daniel D. Domenico on 6/16/2023. Text Only Entry (dddlc5, ) (Entered: 06/16/2023) |
| 07/07/2023 | 333 | NOTICE OF ATTORNEY APPEARANCE: Richard Kent Kornfeld appearing for Jonathan K. YioulosAttorney Richard Kent Kornfeld added to party Jonathan K. Yioulos(pty:dft) (Kornfeld, Richard) (Entered: 07/07/2023) |
| 07/07/2023 | 334 | MOTION to Withdraw as Attorney by Michael J. Tallon by Jonathan K. Yioulos. (Tallon, Michael) (Entered: 07/07/2023) |
| 07/20/2023 | 335 | ORDER granting 334 Motion to Withdraw as Attorney. The Clerk of Court is directed to terminate Attorney Michael John Tallon as counsel of record for Jonathan K. Yioulos (3). Mr. Yioulos will continue to be represented by Richard K. Kornfeld. SO ORDERED by Judge Daniel D. Domenico on 7/20/2023. Text Only Entry (dddlc5, ) (Entered: 07/20/2023) |
| 09/12/2023 | 336 | Unopposed MOTION for Extension of Time to File *Pre−Trial Motions* by Kimberley Ann Tew. (Kaplan, David) (Entered: 09/12/2023) |
| 09/12/2023 | 337 | Unopposed MOTION for Extension of Time to File by Michael Aaron Tew. (Schall, Jason) (Entered: 09/12/2023) |
| 09/13/2023 | 338 | ORDER GRANTING 337 Motion for Extension of Time to File as to Michael Aaron Tew; and<br><br>GRANTING 336 Motion for Extension of Time to File as to Kimberley Ann Tew.<br><br>The motions deadline as to Mr. Tew and Ms. Tew is extended to October 13, 2023. The government must file responses on or before October 20, 2023. SO ORDERED by Judge Daniel D. Domenico on 9/13/2023. Text Only Entry (dddlc3, ) (Entered: 09/13/2023) |
| 10/13/2023 | 339 | STATUS REPORT *(Joint Status Report)* by USA as to Michael Aaron Tew, Kimberley Ann Tew (Fields, Bryan) (Entered: 10/13/2023) |
| 10/26/2023 | 340 | ORDER SETTING *JAMES* HEARING as to Michael Aaron Tew, Kimberley Ann Tew.<br><br>The Government must file any statements it will seek to admit at trial under Federal Rule of Evidence 801(d)(2)(E) in the form of a *James* log, along with an accompanying brief, on or before December 5, 2023. |

| | | |
|---|---|---|
| | | The defendants must file their responses to the Government's *James* log and brief on or before December 12, 2023. A *James* Hearing is SET for December 19, 2023 at 9:30 a.m. in Courtroom A1002 before Judge Daniel D. Domenico. SO ORDERED by Judge Daniel D. Domenico on 10/26/2023. Text Only Entry (dddlc3, ) (Entered: 10/26/2023) |
| 12/05/2023 | 341 | Government's Proffer *(Memorandum in Support of James Log)* re: 340 Order,, by USA as to Michael Aaron Tew, Kimberley Ann Tew (Attachments: # 1 Exhibit 1 – James Log, # 2 Exhibit 1001 – Bank Accounts, # 3 Exhibit 1002 – Scheme Invoice Summary, # 4 Exhibit 1003 – Scheme Deposit Summary, # 5 Exhibit 1004 – HSCPA, MCG & 5530JD Summary, # 6 Exhibit 1005 – PM Summary, # 7 Exhibit 1006 – GFL Summary, # 8 Exhibit 1007 – AMR Summary)(Fields, Bryan) (Entered: 12/05/2023) |
| 12/12/2023 | 342 | MOTION to Withdraw as Attorney by Albert Buchman by USA as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. (Buchman, Albert) (Entered: 12/12/2023) |
| 12/12/2023 | 343 | ORDER GRANTING 342 Motion to Withdraw as Attorney. The Clerk of Court is instructed to terminate attorney Albert Buchman as counsel of record, and to remove this name from the electronic certificate of mailing. The government will continue to be represented by attorney Bryan Fields. SO ORDERED by Judge Daniel D. Domenico on 12/12/2023. Text Only Entry (dddlc3, ) (Entered: 12/12/2023) |
| 12/12/2023 | 344 | MOTION in Limine *Regarding Exhibits Submitted as Part of James Proffer* by USA as to Michael Aaron Tew, Kimberley Ann Tew. (Attachments: # 1 Exhibit List of Authentic Business Records)(Fields, Bryan) (Entered: 12/12/2023) |
| 12/12/2023 | 345 | RESPONSE by Michael Aaron Tew re: 341 Govt's Proffer, filed by USA (Schall, Jason) (Entered: 12/12/2023) |
| 12/12/2023 | 346 | RESPONSE by Kimberley Ann Tew re: 341 Govt's Proffer, filed by USA (Attachments: # 1 Exhibit 1)(Kaplan, David) (Entered: 12/12/2023) |
| 12/13/2023 | 347 | RESTRICTED DOCUMENT – Level 3: by Kimberley Ann Tew. (Kaplan, David) (Entered: 12/13/2023) |
| 12/18/2023 | 348 | MOTION in Limine *regarding post–trial release* by Michael Aaron Tew. (Schall, Jason) (Entered: 12/18/2023) |
| 12/18/2023 | 349 | ORDER as to Kimberley Ann Tew. Jamie Hubbard of Stimson LaBranche Hubbard, LLC is to be appointed as co–counsel for Kimberley Ann Tew's trial pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A et. seq. SO ORDERED by Judge Daniel D. Domenico on 12/18/2023. Text Only Entry (dddlc3, ) (Entered: 12/18/2023) |
| 12/18/2023 | 350 | EXHIBIT LIST *JAMES HEARING* by USA as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos (Fields, Bryan) (Entered: 12/18/2023) |
| 12/18/2023 | 351 | WITNESS LIST *JAMES HEARING* by USA as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos (Fields, Bryan) (Entered: 12/18/2023) |
| 12/19/2023 | 352 | Unopposed MOTION to Travel by Michael Aaron Tew. (Schall, Jason) (Entered: 12/19/2023) |
| 12/19/2023 | 353 | |

| | | |
|---|---|---|
| | | NOTICE OF ATTORNEY APPEARANCE Sarah Hunter Weiss appearing for USA. Attorney Sarah Hunter Weiss added to party USA(pty:pla) (Weiss, Sarah) (Entered: 12/19/2023) |
| 12/19/2023 | 355 | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: James Hearing as to Michael Aaron Tew (1), Kimberley Ann Tew (2) held on 12/19/2023 re 344 MOTION in Limine *Regarding Exhibits Submitted as Part of James Proffer* filed by USA, 348 MOTION in Limine *regarding post–trial release* filed by Michael Aaron Tew. Deferring ruling on 344 Motion in Limine as to Michael Aaron Tew (1), Kimberley Ann Tew (2). Deferring ruling on 348 Motion in Limine as to Michael Aaron Tew (1). James Proffer is TAKEN UNDER ADVISEMENT. Defendants shall file responses to 344 Governments Motion in Limine for Ruling that Certain Exhibits are Authentic and Covered by Business–Records Exception to the Hearsay Rule not later than Friday, December 22, 2023. Bond is CONTINUED as to Defendants Michael Aaron Tew and Kimberley Ann Tew. Court Reporter: Tammy Hoffschildt. (rkeec) (Entered: 12/20/2023) |
| 12/19/2023 | 356 | WITNESS LIST by USA as to Michael Aaron Tew, Kimberley Ann Tew for James Hearing held on 12/19/2023 with Clerk's notations as to date and time testified. (rkeec) (Entered: 12/20/2023) |
| 12/19/2023 | 357 | EXHIBIT LIST by USA as to Michael Aaron Tew, Kimberley Ann Tew for 12/19/2023 James Hearing with Clerk's notations as to exhibits identified by the witness. (rkeec) (Entered: 12/20/2023) |
| 12/20/2023 | 354 | NOTICE OF ATTORNEY APPEARANCE: Jamie Hughes Hubbard appearing for Kimberley Ann TewAttorney Jamie Hughes Hubbard added to party Kimberley Ann Tew(pty:dft) (Hubbard, Jamie) (Entered: 12/20/2023) |
| 12/20/2023 | 358 | ORDER GRANTING 352 Motion to Travel as to Michael Aaron Tew. Michael and Kimberley Tew may travel out of state from on or about December 22 through January 3 as requested so long as Mr. Tew provides completed travel itineraries to the Probation Department once those travel plans are finalized. SO ORDERED by Judge Daniel D. Domenico on 12/20/2023. Text Only Entry (dddlc3, ) (Entered: 12/20/2023) |
| 12/22/2023 | 359 | RESPONSE in Opposition by Michael Aaron Tew re 344 MOTION in Limine *Regarding Exhibits Submitted as Part of James Proffer* (Schall, Jason) (Entered: 12/22/2023) |
| 12/22/2023 | 360 | RESPONSE to Motion by Kimberley Ann Tew re 344 MOTION in Limine *Regarding Exhibits Submitted as Part of James Proffer* (Kaplan, David) (Entered: 12/22/2023) |
| 12/29/2023 | 361 | ORDER REGARDING ADMISSIBILITY OF RULE 801(d)(2)(E) STATEMENTS as to Michael Aaron Tew (1), Kimberley Ann Tew (2). SO ORDERED by Judge Daniel D. Domenico on 12/29/23. (rkeec) (Entered: 12/29/2023) |
| 01/08/2024 | 362 | NOTICE OF ATTORNEY APPEARANCE: Lisa Marie Saccomano appearing for Movant Atlantic Union Bank. (cmadr, ) (Entered: 01/09/2024) |
| 01/09/2024 | 363 | MOTION to Quash *Subpoena* by Atlantic Union Bank as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Saccomano, Lisa) (Entered: 01/09/2024) |
| 01/17/2024 | 364 | |

| | | |
|---|---|---|
| | | RESTRICTED DOCUMENT – Level 3: by Michael Aaron Tew. (Schall, Jason) (Entered: 01/17/2024) |
| 01/18/2024 | 365 | ORDER as to Michael Aaron Tew. An attorney selected from the District's Criminal Justice Act Panel is to be appointed as co−counsel for Michael Aaron Tew's trial pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A et seq. SO ORDERED by Judge Daniel D. Domenico on 1/18/2024. Text Only Entry (dddlc3, ) (Entered: 01/18/2024) |
| 01/18/2024 | 366 | RESPONSE to Motion by USA as to Michael Aaron Tew, Kimberley Ann Tew re 363 MOTION to Quash *Subpoena* (Weiss, Sarah) (Entered: 01/18/2024) |
| 01/19/2024 | 367 | ORDER granting in part and denying in part as outlined in the order 344 Motion in Limine as to Michael Aaron Tew (1), Kimberley Ann Tew (2). Denying as moot 363 Motion to Quash as to Michael Aaron Tew (1), Kimberley Ann Tew (2). SO ORDERED by Judge Daniel D. Domenico on 1/19/2024. (rkeec) (Entered: 01/19/2024) |
| 01/19/2024 | 368 | NOTICE OF ATTORNEY APPEARANCE: Kristen M. Frost appearing for Michael Aaron TewAttorney Kristen M. Frost added to party Michael Aaron Tew(pty:dft) (Frost, Kristen) (Entered: 01/19/2024) |
| 01/22/2024 | 369 | Unopposed MOTION for Order *to Produce Trial Exhibits via Electronic Means* by USA as to Michael Aaron Tew, Kimberley Ann Tew. (Attachments: # 1 Proposed Order (PDF Only))(Fields, Bryan) (Entered: 01/22/2024) |
| 01/23/2024 | 370 | MOTION in Limine *regarding proffer agreements* by Michael Aaron Tew. (Attachments: # 1 Exhibit Defendant's Exhibits A and B)(Schall, Jason) (Entered: 01/23/2024) |
| 01/24/2024 | 371 | CLERK'S NOTE: ORIGINAL GOVERNMENT EXHIBITS for the 355 MINUTE ENTRY for James Hearing as to Michael Aaron Tew, Kimberley Ann Tew were returned to the Government on January 24, 2024. Text only entry. (rkeec) (Entered: 01/24/2024) |
| 01/24/2024 | 372 | ORDER as to Michael Aaron Tew re 370 Motion in limine regarding proffer statements. The government must file a response to Mr. Tew's motion at or before 5:00 pm on Friday, January 26, 2024. SO ORDERED by Judge Daniel D. Domenico on 1/24/2024. Text Only Entry (dddlc3, ) (Entered: 01/24/2024) |
| 01/24/2024 | 373 | MOTION in Limine *re Admissibility of Proffer Statements* by Kimberley Ann Tew. (Attachments: # 1 Exhibit A)(Kaplan, David) (Entered: 01/24/2024) |
| 01/24/2024 | 374 | MOTION to Continue *Trial and Motion for Ends of Justice Continuance of 90 Days* by Kimberley Ann Tew. (Kaplan, David) (Entered: 01/24/2024) |
| 01/24/2024 | 375 | Proposed Verdict Form as to Michael Aaron Tew, Kimberley Ann Tew (Attachments: # 1 Proposed Document Parties' Proposed Verdict Form)(Weiss, Sarah) (Entered: 01/24/2024) |
| 01/24/2024 | 376 | TRIAL BRIEF by Kimberley Ann Tew (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Kaplan, David) (Entered: 01/24/2024) |
| 01/24/2024 | 377 | TRIAL BRIEF by Michael Aaron Tew (Schall, Jason) (Entered: 01/24/2024) |
| 01/24/2024 | 378 | NOTICE *of Certifications of Authentic, Non−Hearsay Business Records* by USA as to Michael Aaron Tew, Kimberley Ann Tew (Attachments: # 1 Exhibit, # 2 |

| | | Exhibit)(Weiss, Sarah) (Entered: 01/24/2024) |
|---|---|---|
| 01/24/2024 | 379 | TRIAL BRIEF by USA as to Michael Aaron Tew, Kimberley Ann Tew (Weiss, Sarah) (Entered: 01/24/2024) |
| 01/25/2024 | 380 | Proposed Jury Instructions *(Joint)* by USA as to Michael Aaron Tew, Kimberley Ann Tew (Weiss, Sarah) (Entered: 01/25/2024) |
| 01/25/2024 | 381 | ORDER re Kimberley Tew's 373 Motion in Limine and 374 Motion to Continue Trial. The government must provide responses to these two motions at or before 11:59 pm on Friday, January 26, 2024. The government's response deadline for Mr. Tew's 370 Motion in Limine is also extended to 11:59 pm on Friday, January 26, 2024. SO ORDERED by Judge Daniel D. Domenico on 1/25/2024. Text Only Entry (dddlc3, ) (Entered: 01/25/2024) |
| 01/25/2024 | 382 | ORDER GRANTING 369 Unopposed Motion to Produce Trial Exhibits Via Electronic Means. The government must provide one original paper set of its proposed exhibits for use at the upcoming trial. The government must provide electronic copies of those exhibits to defense counsel on or before January 26, 2024.<br><br>The government must also provide **three electronic copies (e.g., via three thumb drives)** of its proposed exhibits to the court on or before January 26, 2024. SO ORDERED by Judge Daniel D. Domenico on 1/25/2024. Text Only Entry (dddlc3, ) (Entered: 01/25/2024) |
| 01/25/2024 | 383 | EXHIBIT LIST by USA as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos (Attachments: # 1 Exhibit List)(Fields, Bryan) (Entered: 01/25/2024) |
| 01/25/2024 | 384 | WITNESS LIST by USA as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos (Attachments: # 1 Witness List)(Fields, Bryan) (Entered: 01/25/2024) |
| 01/25/2024 | 385 | NOTICE *regarding proposed witness and exhibit lists* by Michael Aaron Tew (Schall, Jason) (Entered: 01/25/2024) |
| 01/25/2024 | 386 | EXHIBIT LIST *(Amended)* by USA as to Michael Aaron Tew, Kimberley Ann Tew (Attachments: # 1 Amended Exhibit List)(Fields, Bryan) (Entered: 01/25/2024) |
| 01/25/2024 | 387 | EXHIBIT LIST by Kimberley Ann Tew (Attachments: # 1 Proposed Document Proposed Exhibit List)(Hubbard, Jamie) (Entered: 01/25/2024) |
| 01/25/2024 | 388 | WITNESS LIST by Kimberley Ann Tew (Attachments: # 1 Proposed Document Proposed Witness List)(Hubbard, Jamie) (Entered: 01/25/2024) |
| 01/26/2024 | 389 | Proposed Voir Dire by Kimberley Ann Tew (Hubbard, Jamie) (Entered: 01/26/2024) |
| 01/26/2024 | 390 | Proposed Voir Dire by USA as to Michael Aaron Tew, Kimberley Ann Tew (Weiss, Sarah) (Entered: 01/26/2024) |
| 01/26/2024 | 391 | RESPONSE in Opposition by USA as to Kimberley Ann Tew re 374 MOTION to Continue *Trial and Motion for Ends of Justice Continuance of 90 Days* (Fields, Bryan) (Entered: 01/26/2024) |
| 01/26/2024 | 392 | Proposed Voir Dire by Michael Aaron Tew (Schall, Jason) (Entered: 01/26/2024) |
| 01/26/2024 | 393 | RESPONSE in Opposition by USA as to Michael Aaron Tew, Kimberley Ann Tew re 373 MOTION in Limine *re Admissibility of Proffer Statements and 370 Defendant Michael Tew's Motion in Limine* (Weiss, Sarah) (Entered: 01/26/2024) |

| 01/27/2024 | 394 | RESTRICTED DOCUMENT – Level 2: as to Michael Aaron Tew, Kimberley Ann Tew. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Weiss, Sarah) (Entered: 01/27/2024) |
|---|---|---|
| 01/27/2024 | 395 | RESTRICTED DOCUMENT – Level 2: as to Michael Aaron Tew, Kimberley Ann Tew. (Weiss, Sarah) (Entered: 01/27/2024) |
| 01/27/2024 | 396 | MOTION for Leave to Restrict by USA as to Michael Aaron Tew, Kimberley Ann Tew. (Attachments: # 1 Proposed Order (PDF Only))(Weiss, Sarah) (Entered: 01/27/2024) |
| 01/29/2024 | 397 | MOTION for Leave to File *Reply in Support of Motion in Limine* by Kimberley Ann Tew. (Hubbard, Jamie) (Entered: 01/29/2024) |
| 01/29/2024 | 398 | BRIEF in Support by Kimberley Ann Tew to 373 MOTION in Limine *re Admissibility of Proffer Statements (Reply)* (Hubbard, Jamie) (Entered: 01/29/2024) |
| 01/29/2024 | 399 | MOTION to Exclude *Testimony Regarding the Reasons for Michael Tew's Termination from NAC as Proposed in the Government's Trial Brief (ECF 379)* by Kimberley Ann Tew. (Kaplan, David) (Entered: 01/29/2024) |
| 01/29/2024 | 400 | BAIL STATUS REPORT 10 as to Michael Aaron Tew. (lgiac) (Entered: 01/29/2024) |
| 01/29/2024 | 401 | BAIL STATUS REPORT 107 as to Kimberley Ann Tew. (lgiac) (Entered: 01/29/2024) |
| 01/30/2024 | 403 | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: Trial Preparation Conference as to Michael Aaron Tew (1), Kimberley Ann Tew (2) held on 1/30/2024. Taking under advisement 374 Defendant Kimberly Ann Tews Motion to Continue Trial and Motion for Ends of Justice Continuance of 90 Days. Taking under advisement 370 Motion in Limine as to Michael Aaron Tew (1). Taking under advisement 373 Motion in Limine as to Kimberley Ann Tew (2). Taking under advisement 399 Motion to Exclude as to Kimberley Ann Tew (2); re 370 MOTION in Limine *regarding proffer agreements* filed by Michael Aaron Tew, 373 MOTION in Limine *re Admissibility of Proffer Statements* filed by Kimberley Ann Tew, 399 MOTION to Exclude *Testimony Regarding the Reasons for Michael Tew's Termination from NAC as Proposed in the Government's Trial Brief (ECF 379)* filed by Kimberley Ann Tew. Bond is CONTINUED as to Defendants Michael Aaron Tew and Kimberly Ann Tew. Court Reporter: Tammy Hoffschildt. (rkeec) (Entered: 01/31/2024) |
| 01/31/2024 | 402 | ORDER Denying 374 Motion to Continue as to Kimberley Ann Tew (2) by Judge Daniel D. Domenico on 31 January 2024. The trial will proceed on February 5, 2024, as scheduled. (cmadr, ) Modified to correct entry on 1/31/2024 (cmadr, ). (Entered: 01/31/2024) |
| 02/01/2024 | 404 | ORDER REGARDING MOTIONS IN LIMINE AND PRE–TRIAL ISSUES as to Michael Aaron Tew (1) and Kimberley Ann Tew (2) by Judge Daniel D. Domenico on 1 February 2024. Defendants' motions, Docs. 370 and 373 , are GRANTED IN PART and DENIED IN PART as outlined herein. Ms. Tew's motion, Doc. 399 , is therefore DENIED. (cmadr, ) (Entered: 02/01/2024) |
| 02/02/2024 | 405 | Unopposed MOTION for Order *To Obtain Testimony Via Live Contemporaneous Video Conference* by USA as to Michael Aaron Tew, Kimberley Ann Tew. (Fields, Bryan) (Entered: 02/02/2024) |

| 02/02/2024 | 406 | Order GRANTING 405 Unopposed Motion to Obtain Testimony Via Live Contemporaneous Video Conference. The government is cautioned, however, that it bears the risk of any technology malfunctions, whether on the Court's end or the witness's end. SO ORDERED by Judge Daniel D. Domenico on 2/2/2024. Text Only Entry (dddlc3, ) (Entered: 02/02/2024) |
|---|---|---|
| 02/02/2024 | 407 | WITNESS LIST *(Final Witness List)* by USA as to Michael Aaron Tew, Kimberley Ann Tew (Attachments: # 1 Final Witness List)(Fields, Bryan) (Entered: 02/02/2024) |
| 02/02/2024 | 408 | EXHIBIT LIST *Final Exhibit List* by USA as to Michael Aaron Tew, Kimberley Ann Tew (Attachments: # 1 Exhibit)(Weiss, Sarah) (Entered: 02/02/2024) |
| 02/04/2024 | 409 | MOTION for Order *for Finding that Ms. Tew's Waiver of Right to Confront and Cross−Examine Witnesses was Not Knowing or, in the Alternative, Request for Hearing* by Kimberley Ann Tew. (Hubbard, Jamie) (Entered: 02/04/2024) |
| 02/04/2024 | 410 | MOTION for Reconsideration re 404 Order on Motion in Limine,, Order on Motion to Exclude,,, by Michael Aaron Tew. (Schall, Jason) (Entered: 02/04/2024) |
| 02/04/2024 | 411 | NOTICE *of Submission of Alternative Version of Charges for Juror Notebooks* by Kimberley Ann Tew (Attachments: # 1 Attachment)(Hubbard, Jamie) (Entered: 02/04/2024) |
| 02/04/2024 | 412 | RESPONSE in Opposition by USA as to Michael Aaron Tew, Kimberley Ann Tew re 409 MOTION for Order *for Finding that Ms. Tew's Waiver of Right to Confront and Cross−Examine Witnesses was Not Knowing or, in the Alternative, Request for Hearing*, 410 MOTION for Reconsideration re 404 Order on Motion in Limine,, Order on Motion to Exclude,,, (Fields, Bryan) (Entered: 02/04/2024) |
| 02/05/2024 | 413 | EXHIBIT LIST by Kimberley Ann Tew (Hubbard, Jamie) (Entered: 02/05/2024) |
| 02/05/2024 | 414 | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: Jury Trial (Day 1) held on 2/5/2024 as to Michael Aaron Tew (1), Kimberley Ann Tew (2). Denying 410 Motion for Reconsideration re 410 MOTION for Reconsideration re 404 Order on Motion in Limine,, Order on Motion to Exclude,,, filed by Michael Aaron Tew, 409 MOTION for Order *for Finding that Ms. Tew's Waiver of Right to Confront and Cross−Examine Witnesses was Not Knowing or, in the Alternative, Request for Hearing* filed by Kimberley Ann Tew as to Michael Aaron Tew (1). Denying 409 Motion for Order as to Kimberley Ann Tew (2). Bond continued as to both defendants. Court Reporter: Tammy Hoffschildt. (rkeec) (Entered: 02/06/2024) |
| 02/05/2024 | 415 | Jury Strike Sheet – Unredacted – Restricted Doc. – Level 4 (rkeec) (Entered: 02/06/2024) |
| 02/05/2024 | 416 | Jury Strike Sheet with juror names redacted as to Michael Aaron Tew, Kimberley Ann Tew. (rkeec) (Entered: 02/06/2024) |
| 02/05/2024 | 417 | Jury Random List – Unredacted – Restricted Doc. – Level 4 (rkeec) (Entered: 02/06/2024) |
| 02/06/2024 | 418 | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: Jury Trial (Day 2) as to Michael Aaron Tew, Kimberley Ann Tew held on 2/6/2024. Defendant Kimberley Ann Tews oral motion for severance is TAKEN UNDER ADVISEMENT. Bond is continued as to both defendants. Court Reporter: Tammy Hoffschildt. (rkeec) (Entered: 02/07/2024) |

| 02/07/2024 | 419 | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: Jury Trial (Day 3) as to Michael Aaron Tew, Kimberly Ann Tew held on 2/7/2024. Bond is continued as to both defendants. Court Reporter: Tammy Hoffschildt. (rkeec) (Entered: 02/08/2024) |
|---|---|---|
| 02/08/2024 | 420 | Renewed MOTION to Sever Defendant by Michael Aaron Tew. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Frost, Kristen) (Entered: 02/08/2024) |
| 02/08/2024 | 421 | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: Jury Trial (Day 4) as to Michael Aaron Tew, Kimberley Ann Tew held on 2/8/2024. Bond continued as to both defendants. Court Reporter: Tammy Hoffschildt. (rkeec) (Entered: 02/09/2024) |
| 02/09/2024 | 423 | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: Jury Trial (Day 5) as to Michael Aaron Tew, Kimberley Ann Tew held on 2/9/2024. Defendant Kimberley Ann Tews oral motion for mistrial is DENIED. Bond continued as to both defendants. Court Reporter: Tammy Hoffschildt. (rkeec) (Entered: 02/12/2024) |
| 02/11/2024 | 422 | RESPONSE in Opposition by USA as to Michael Aaron Tew re 420 Renewed MOTION to Sever Defendant (Weiss, Sarah) (Entered: 02/11/2024) |
| 02/12/2024 | 424 | ORDER DENYING 420 Michael Tew's Renewed Motion for Severance. By Judge Daniel D. Domenico on 2/12/2024. (dddlc1, ) (Entered: 02/12/2024) |
| 02/12/2024 | 425 | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: Jury Trial (Day 6) as to Michael Aaron Tew, Kimberley Ann Tew held on 2/12/2024. 420 Defendant Michael Tews Renewed Motion for Severance is DENIED. Bond is continued as to both defendants. Court Reporter: Tammy Hoffschildt. (rkeec) (Entered: 02/13/2024) |
| 02/13/2024 | 426 | MINUTE ORDER as to Michael Aaron Tew, Kimberley Ann Tew. The Clerk of Court shall provide lunch to the jury for the duration of their deliberations commencing on Wednesday, February 14, 2024. SO ORDERED by Judge Daniel D. Domenico on 2/13/2024. (rkeec) (Entered: 02/13/2024) |
| 02/13/2024 | 427 | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: Jury Trial (Day 7) as to Michael Aaron Tew, Kimberley Ann Tew held on 2/13/2024. Bond continued as to both defendants. Court Reporter: Tammy Hoffschildt. (rkeec) (Entered: 02/14/2024) |
| 02/14/2024 | 428 | AMENDED MINUTE ORDER as to Michael Aaron Tew, Kimberley Ann Tew. The Clerk of Court shall provide lunch to the jury, including the alternate juror, for the duration of their deliberations commencing on Wednesday, February 14, 2024. SO ORDERED by Judge Daniel D. Domenico on 2/14/2024. (rkeec) (Entered: 02/14/2024) |
| 02/14/2024 | 430 | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: Jury Trial (Day 8) as to Michael Aaron Tew, Kimberley Ann Tew held on 2/14/2024. Defendant Kimberley Ann Tews oral motion for mistrial is DENIED. Defendant Kimberley Ann Tews oral Rule 29 motion is DENIED. Defendant Kimberley Ann Tews oral motion for severance is DENIED. Defendant Michael Aaron Tews oral Rule 29 motion is DENIED. Defendant Michael Aaron Tews oral motion for severance is DENIED. Bond continued as to both defendants. Court Reporter: Tammy Hoffschildt. (rkeec) (Entered: 02/15/2024) |
| 02/14/2024 | 431 | |

| | | Jury Note with juror name – Unredacted – Restricted Doc. – Level 4 (rkeec) (Entered: 02/15/2024) |
|---|---|---|
| 02/14/2024 | 432 | Jury Note with juror name redacted as to Michael Aaron Tew, Kimberley Ann Tew. (rkeec) (Entered: 02/15/2024) |
| 02/14/2024 | 433 | WITNESS LIST by USA as to Michael Aaron Tew, Kimberley Ann Tew with dates and times testified. (rkeec) (Entered: 02/15/2024) |
| 02/14/2024 | 434 | WITNESS LIST by Kimberley Ann Tew as to Michael Aaron Tew, Kimberley Ann Tew. (rkeec) (Entered: 02/15/2024) |
| 02/14/2024 | 435 | EXHIBIT LIST by USA as to Michael Aaron Tew, Kimberley Ann Tew indicating admitted exhibits. (rkeec) (Entered: 02/15/2024) |
| 02/14/2024 | 436 | EXHIBIT LIST by Michael Aaron Tew, Kimberley Ann Tew indicating admitted exhibits. (rkeec) (Entered: 02/15/2024) |
| 02/15/2024 | 429 | ORDER as to Michael Aaron Tew, Kimberley Ann Tew. SO ORDERED by Judge Daniel D. Domenico on 2/15/2024. (rkeec) (Entered: 02/15/2024) |
| 02/15/2024 | 438 | Final Jury Instructions as to Michael Aaron Tew, Kimberley Ann Tew as read into the record on 2/14/2024. (rkeec) (Entered: 02/16/2024) |
| 02/15/2024 | 439 | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: Jury Trial (Day 9) as to Michael Aaron Tew, Kimberley Ann Tew held on 2/15/2024. Jury Verdict as to Michael Aaron Tew (1) Guilty on Count 1,1s,2,2s–40s,3,41s,42s,44s–56s,57s–60s and Kimberley Ann Tew (2) Guilty on Count 1,21–22,25–26,31–32,41,43–44,47,56. Bond is continued as to both defendants. Court Reporter: Tammy Hoffschildt. (rkeec) Modified on 2/16/2024 to correct as to Count 48 (rkeec). (Entered: 02/16/2024) |
| 02/15/2024 | 440 | Jury Note 1 (Question) – Unredacted – Restricted Doc. – Level 4. (rkeec) (Entered: 02/16/2024) |
| 02/15/2024 | 441 | Jury Note 2 (Question) – Unredacted – Restricted Doc. – Level 4. (rkeec) (Entered: 02/16/2024) |
| 02/15/2024 | 442 | Jury Note 3 (Verdict) – Unredacted – Restricted Doc. – Level 4. (rkeec) (Entered: 02/16/2024) |
| 02/15/2024 | 443 | Jury Note 1 (Question) with juror name redacted as to Michael Aaron Tew, Kimberley Ann Tew. (rkeec) (Entered: 02/16/2024) |
| 02/15/2024 | 444 | Jury Note 2 (Question) with juror name redacted as to Michael Aaron Tew, Kimberley Ann Tew. (rkeec) (Entered: 02/16/2024) |
| 02/15/2024 | 445 | Jury Note 3 (Verdict) with juror name redacted as to Michael Aaron Tew, Kimberley Ann Tew. (rkeec) Modified on 2/16/2024 (rkeec, ). (Entered: 02/16/2024) |
| 02/15/2024 | 446 | Court Response to Jury Notes 1 and 2 (Questions) as to Michael Aaron Tew, Kimberley Ann Tew. (rkeec) (Entered: 02/16/2024) |
| 02/15/2024 | 447 | Jury Verdict Un–Redacted – Level 4 – Viewable by Court Only. (rkeec) (Entered: 02/16/2024) |
| 02/15/2024 | 448 | JURY VERDICT with juror name redacted as to Michael Aaron Tew, Kimberley Ann Tew. (rkeec) (Entered: 02/16/2024) |

| 02/15/2024 | 449 | STIPULATION AND ORDER REGARDING CUSTODY OF EXHIBITS AND DEPOSITIONS as to Michael Aaron Tew, Kimberley Ann Tew. SO ORDERED by Judge Daniel D. Domenico on 2/15/2024. (rkeec) (Entered: 02/16/2024) |
|---|---|---|
| 02/16/2024 | 437 | Unopposed MOTION to Continue *Sentencing* by Jonathan K. Yioulos. (Kornfeld, Richard) (Entered: 02/16/2024) |
| 02/21/2024 | 450 | MOTION to Detain *Defendants Michael Tew & Kimberley Tew Pending Sentencing* by USA as to Michael Aaron Tew, Kimberley Ann Tew. (Attachments: # 1 Exhibit)(Weiss, Sarah) (Entered: 02/21/2024) |
| 02/21/2024 | 451 | ORDER as to Michael Aaron Tew, Kimberley Ann Tew re 450 MOTION to Detain *Defendants Michael Tew & Kimberley Tew Pending Sentencing* filed by USA.<br><br>Mr. Tew and Mrs. Tew must each file responses to the government's 450 Motion to Detain on or before **February 27, 2024**. SO ORDERED by Judge Daniel D. Domenico on 2/21/2024. Text Only Entry (dddlc3, ) (Entered: 02/21/2024) |
| 02/21/2024 | 452 | ORDER GRANTING 437 Motion to Continue Sentencing as to Jonathan K. Yioulos. The Sentencing set as to Mr. Yioulos for March 5, 2024 at 10:30 AM is VACATED and RESET for September 17, 2024 at 10:30 AM in Courtroom A1002 before Judge Daniel D. Domenico. SO ORDERED by Judge Daniel D. Domenico on 2/21/2024. Text Only Entry (dddlc3, ) (Entered: 02/21/2024) |
| 02/27/2024 | 453 | RESPONSE in Opposition by Michael Aaron Tew re 450 MOTION to Detain *Defendants Michael Tew & Kimberley Tew Pending Sentencing* (Schall, Jason) (Entered: 02/27/2024) |
| 02/27/2024 | 454 | RESPONSE to Motion by Kimberley Ann Tew re 450 MOTION to Detain *Defendants Michael Tew & Kimberley Tew Pending Sentencing* (Kaplan, David) (Entered: 02/27/2024) |
| 03/12/2024 | 455 | ORDER re 450 Motion to Detain Defendants Michael and Kimberley Tew. The government's motion questions whether Mr. and Mrs. Tew are still eligible for CJA−appointed counsel for this case. There is sufficient evidence to call into question their present eligibility under 18 U.S.C. § 3006A(c).<br><br>The issue of whether Michael Tew and Kimberley Tew remain entitled to ongoing court−appointed counsel under Section 3006A(c) is therefore REFERRED to Magistrate Judge Susan Prose. All other issues raised in the government's motion, including the potential detention of Mr. and Mrs. Tew pending sentencing or the potential un−sealing of any prior CJA affidavits, will be addressed at a detention hearing before this Court as outlined below.<br><br>It is therefore ORDERED that a Hearing on the 450 Government's Motion is SET for April 22, 2024 at 10:30 AM in Courtroom A1002 before Judge Daniel D. Domenico. SO ORDERED by Judge Daniel D. Domenico on 3/12/2024. Text Only Entry (dddlc3, ) (Entered: 03/12/2024) |
| 03/12/2024 | 456 | ORDER as to Michael Aaron Tew. A Sentencing Hearing as to Michael Tew is SET for August 8, 2024 at 10:30 AM in Courtroom A1002 before Judge Daniel D. Domenico. SO ORDERED by Judge Daniel D. Domenico on 3/12/2024. Text Only Entry (dddlc3, ) (Entered: 03/12/2024) |
| 03/12/2024 | 457 | |

| | | |
|---|---|---|
| | | ORDER as to Kimberley Ann Tew. A Sentencing Hearing as to Kimberley Tew is SET for August 8, 2024 at 1:30 PM in Courtroom A1002 before Judge Daniel D. Domenico. SO ORDERED by Judge Daniel D. Domenico on 3/12/2024. Text Only Entry (dddlc3, ) (Entered: 03/12/2024) |
| 03/14/2024 | 458 | SENTENCING STATEMENT by USA as to Michael Aaron Tew (Attachments: # 1 Exhibit, # 2 Exhibit)(Fields, Bryan) (Entered: 03/14/2024) |
| 03/14/2024 | 459 | SENTENCING STATEMENT by USA as to Kimberley Ann Tew (Attachments: # 1 Exhibit, # 2 Exhibit)(Fields, Bryan) (Entered: 03/14/2024) |
| 03/15/2024 | 460 | ORDER SETTING STATUS CONFERENCE as to Michael Aaron Tew, Kimberley Ann Tew by Magistrate Judge Susan Prose on 3/15/2024. A **30–minute in–person** Status Conference is hereby set for 3/18/2024, at 4:00 PM in Courtroom C205 before Magistrate Judge Susan Prose. The parties shall be prepared to discuss Defendant Michael Tew's request for "an *ex parte* hearing... to determine whether Mr. Tew 'is financially able to obtain counsel or to make partial payment for the representation' pursuant to 18 U.S.C. § 3006A(c)." *See* ECF No. 453 at 3. Text Only Entry. (trvo, ) (Entered: 03/15/2024) |
| 03/18/2024 | 461 | MINUTE ORDER as to Michael Aaron Tew, Kimberley Ann Tew by Magistrate Judge Susan Prose on 3/18/2024. At the request of the parties, the Status Conference is RESET for 3/21/2024, at 04:00 PM in Courtroom C205 before Magistrate Judge Susan Prose. Text Only Entry. (trvo, ) (Entered: 03/18/2024) |
| 03/21/2024 | 462 | MINUTE ENTRY for Status Conference as to Michael Aaron Tew and Kimberley Ann Tew held before Magistrate Judge Susan Prose on 3/21/2024. Discussion regarding issue referred to this court (*see* ECF No. 455). An ex parte hearing to determine Michael Tew's entitlement to ongoing court–appointed counsel under 18 U.S.C. § 3006A(c) is SET for March 28, 2024, at 1:30 p.m. in Courtroom C205 before Magistrate Judge Susan Prose. Any documents to be submitted in connection with this hearing shall be sent directly to Chambers, as discussed on the record, on or before 10:00 a.m. March 27, 2024. An ex parte hearing to determine Kimberley Ann Tew's entitlement to ongoing court–appointed counsel under 18 U.S.C. § 3006A(c) is SET for April 15, 2024, at 1:30 p.m. in Courtroom C205 before Magistrate Judge Susan Prose. Any documents to be submitted in connection with this hearing shall be sent directly to Chambers, as discussed on the record, on or before 12:00 p.m. April 10, 2024. Hearing concluded. FTR: C205. (Total time: 1 hour and 8 minutes, Hearing time: 3:57 p.m. – 5:05 p.m.) Text Only Entry.<br><br>**APPEARANCES:** Bryan David Fields and Sarah Hunter Weiss on behalf of the Government, Jason Dale Schall and Kristen M. Frost on behalf of Defendant Michael Aaron Tew and David Scott Kaplan on behalf of Defendant Kimberly Ann Tew. (trvo, ) (Entered: 03/22/2024) |
| 03/21/2024 | 463 | Utility Setting/Resetting Deadlines/Hearings as to Michael Aaron Tew: Ex Parte In Court Hearing set for 3/28/2024, at 01:30 PM in Courtroom C205 before Magistrate Judge Susan Prose. Text Only Entry (trvo, ) (Entered: 03/22/2024) |
| 03/21/2024 | 464 | Utility Setting/Resetting Deadlines/Hearings as to Kimberley Ann Tew: Ex Parte In Court Hearing set for 4/15/2024, at 01:30 PM in Courtroom C205 before Magistrate Judge Susan Prose. Text Only Entry (trvo, ) (Entered: 03/22/2024) |
| 03/27/2024 | 465 | STATEMENT *by Government Regarding Michael Tew's Eligibility for CJA–Funded Counsel Going Forward by* Plaintiff USA (Weiss, Sarah) (Entered: 03/27/2024) |

| 03/27/2024 | 466 | RESTRICTED DOCUMENT LEVEL 3 – Conventionally Submitted Material: 1 Flash Drive re 462 Status Conference, by Plaintiff USA. Location: 1st Floor Area, Box D–5–9. Text Only Entry. (sphil, ) Modified on 4/15/2024 to add restriction (trvo, ). (Entered: 03/27/2024) |
| 03/27/2024 | 467 | RESTRICTED DOCUMENT LEVEL 3 – Conventionally Submitted Material: 1 USB Drive re 462 Status Conference, by Defendant Michael Aaron Tew. Location: 1st Floor Area, Box D–5–9. Text Only Entry. (trvo, ) Modified on 4/15/2024 to add restriction (trvo, ). (Entered: 03/28/2024) |
| 03/28/2024 | 468 | MINUTE ENTRY for Ex Parte Hearing as to Michael Aaron Tew held before Magistrate Judge Susan Prose on 3/28/2024. The Court finds that Defendant Michael Tew remains eligible for court–appointed counsel. A separate public written order will be issued. FTR: C205. (trvo, ) (Entered: 03/29/2024) |
| 04/01/2024 | 469 | ORDER GRANTING 397 Motion for Leave to File Reply as to Kimberley Ann Tew. By Judge Daniel D. Domenico on 4/1/2024. Text Only Entry (dddlc1, ) (Entered: 04/01/2024) |
| 04/01/2024 | 470 | ORDER GRANTING 396 Motion for Leave to Restrict. The Clerk of Court is directed to maintain Docs. 394 and 395 at Level 2 restriction. SO ORDERED by Judge Daniel D. Domenico on 4/1/2024. Text Only Entry (dddlc1, ) (Entered: 04/01/2024) |
| 04/05/2024 | 471 | ORDER REGARDING DEFENDANT MICHAEL TEW'S ELIGIBILITY FOR ONGOING COURT–APPOINTED COUNSEL by Magistrate Judge Susan Prose on 4/5/2024. (trvo, ) (Entered: 04/05/2024) |
| 04/10/2024 | 472 | STATEMENT *by Government Regarding Kimberley Tew's Eligibility for CJA–Funded Counsel Going Forward* by Plaintiff USA (Weiss, Sarah) (Entered: 04/10/2024) |
| 04/15/2024 | 473 | RESTRICTED DOCUMENT LEVEL 3 – Conventionally Submitted Material: 1 USB Drive re 462 Status Conference, by Defendant Kimberley Ann Tew. Location: 1st Floor Area, Box D–5–9. Text Only Entry (trvo, ) Modified on 4/15/2024 to add restriction (trvo, ). (Entered: 04/15/2024) |
| 04/15/2024 | 474 | MINUTE ENTRY for Ex Parte Hearing as to Kimberley Ann Tew held before Magistrate Judge Susan Prose on 4/15/2024. The Court finds that Defendant Kimberley Ann Tew remains eligible for court–appointed counsel. A separate public written order will be issued. FTR: C205. (trvo, ) (Entered: 04/16/2024) |
| 04/16/2024 | 475 | Unopposed MOTION for Order *Requiring the Parties to File Visual Presentations into the Record* by Kimberley Ann Tew. (Hubbard, Jamie) (Entered: 04/16/2024) |
| 04/16/2024 | 476 | ORDER granting 475 Motion for Order Requiring the Parties to File Visual Presentations into the Record. The parties are ordered to file all visual presentations used during opening statements and closing arguments into the record. SO ORDERED by Judge Daniel D. Domenico on 4/16/2024. Text Only Entry (dddlc9, ) (Entered: 04/16/2024) |
| 04/18/2024 | 477 | NOTICE *OF CONVENTIONAL SUBMISSION* re 476 Order on Motion for Order, by USA as to Michael Aaron Tew, Kimberley Ann Tew (Fields, Bryan) (Entered: 04/18/2024) |
| 04/18/2024 | 479 | |

|  |  | Conventionally Submitted Material : USB exhibits to 477 NOTICE OF CONVENTIONAL SUBMISSION re 476 Order on Motion for Order, by Plaintiff USA – Material placed in the oversized area D–5–9 of the Clerk's Office. Text Only Entry (angar, ) (Entered: 04/19/2024) |
|---|---|---|
| 04/19/2024 | 478 | ORDER REGARDING DEFENDANT KIMBERLEY ANN TEW'S ELIGIBILITY FOR ONGOING COURT–APPOINTED COUNSEL by Magistrate Judge Susan Prose on 4/19/2024. (trvo, ) (Entered: 04/19/2024) |
| 04/21/2024 | 480 | MOTION for Leave to Restrict by Kimberley Ann Tew. (Hubbard, Jamie) (Entered: 04/21/2024) |
| 04/21/2024 | 481 | RESTRICTED DOCUMENT – Level 1: by Kimberley Ann Tew. (Hubbard, Jamie) (Entered: 04/21/2024) |
| 04/21/2024 | 482 | RESTRICTED DOCUMENT – Level 1: by Kimberley Ann Tew. (Hubbard, Jamie) (Entered: 04/21/2024) |
| 04/22/2024 | 483 | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: Evidentiary Hearing as to Michael Aaron Tew, Kimberley Ann Tew held on 4/22/2024 re 450 MOTION to Detain *Defendants Michael Tew & Kimberley Tew Pending Sentencing* filed by USA. 450 Motion to Detain as to Michael Aaron Tew (1), Kimberley Ann Tew (2) is DENIED, but the Court will impose additional conditions of bond. Court indicates that a written order shall follow. Bond is continued as to Michael Aaron Tew and Kimberley Ann Tew. Court Reporter: Tammy Hoffschildt. (Attachments: # 1 Government's witness list, # 2 Government's exhibit list) (rkeec) (Entered: 04/22/2024) |
| 04/23/2024 | 484 | NOTICE *of Filing of Visual Presentation* by Kimberley Ann Tew (Attachments: # 1 PowerPoint Closing Statement)(Hubbard, Jamie) (Entered: 04/23/2024) |
| 04/23/2024 | 485 | Unopposed MOTION to Travel *UNOPPOSED MOTION FOR DEFENDANT TO TRAVEL OUT OF THE COUNTRY* by Jonathan K. Yioulos. (Attachments: # 1 Waiver of Extradition)(Kornfeld, Richard) (Entered: 04/23/2024) |
| 04/23/2024 | 486 | NOTICE *Of Clarification Regarding Sentencing Statement* by Michael Aaron Tew (Frost, Kristen) (Entered: 04/23/2024) |
| 04/24/2024 | 487 | ORDER granting 485 Motion to Travel as to Jonathan K. Yioulos. Mr. Yioulos may travel to Montego Bay, Jamaica, from June 26 to July 2, 2024. He must (1) provide documentation regarding his travel plans to United States Pretrial and Probation Services in advance of departure, and (2) promptly contact his probation officer upon return from each trip. SO ORDERED by Judge Daniel D. Domenico on 4/24/2024. Text Only Entry (dddlc9, ) (Entered: 04/24/2024) |
| 04/24/2024 | 488 | NOTICE *Of Filing Of Visual Presentation* by Michael Aaron Tew (Attachments: # 1 Closing Argument PowerPoint)(Frost, Kristen) (Entered: 04/24/2024) |
| 04/25/2024 | 489 | ORDER modifying conditions of release as to Michael Aaron Tew and Kimberley Ann Tew. The following conditions are added to those already in effect: <br><br> 1. Defendants shall disclose a complete list of all bank accounts and peer–to–peer financial services accounts to which they have access no later than April 30, 2024. Defendants shall further provide a statement for each of these accounts to their supervising officer no later than the 5th of each following month, starting on May 5th, 2024. |

|  |  |  |
|---|---|---|
|  |  | 2. Defendants shall refrain from gambling of any kind, purchasing over $50 of gift cards in a given day, and engaging in any cryptocurrency transaction without the prior approval of the supervising officer. |
|  |  | 3.The supervising officer may, in his discretion, share any information provided to him by Defendants pursuant to these conditions with the government. |
|  |  | SO ORDERED by Judge Daniel D. Domenico on 4/25/2024. Text Only Entry (dddlc9, ) (Entered: 04/25/2024) |
| 04/25/2024 | 490 | ORDER denying as moot 348 Motion in Limine in light of 483 and 489 . SO ORDERED by Judge Daniel D. Domenico on 4/25/2024. Text Only Entry (dddlc9, ) (Entered: 04/25/2024) |
| 04/25/2024 | 491 | ORDER granting 480 Motion for Leave to Restrict. The Clerk of Court is directed to maintain Doc. 482 at Level 1 restriction. SO ORDERED by Judge Daniel D. Domenico on 4/25/2024. Text Only Entry (dddlc9, ) (Entered: 04/25/2024) |
| 04/26/2024 | 492 | NOTICE OF ATTORNEY APPEARANCE Martha Ann Paluch appearing for USA. Attorney Martha Ann Paluch added to party USA(pty:pla) (Paluch, Martha) (Entered: 04/26/2024) |
| 04/26/2024 | 493 | RESTRICTED DOCUMENT – Level 3: by USA as to Kimberley Ann Tew (Paluch, Martha) (Entered: 04/26/2024) |
| 04/26/2024 | 494 | RESTRICTED DOCUMENT – Level 1: by USA as to Kimberley Ann Tew (Paluch, Martha) (Entered: 04/26/2024) |
| 04/26/2024 | 495 | MOTION for Leave to Restrict by USA as to Kimberley Ann Tew. (Attachments: # 1 Proposed Order (PDF Only))(Paluch, Martha) (Entered: 04/26/2024) |
| 04/26/2024 | 499 | ORDER Updating Conditions of Release as to Michael Aaron Tew (1) $20,000 Unsecured. SO ORDERED by Judge Daniel D. Domenico on 4/26/2024. (rkeec) (Entered: 05/01/2024) |
| 04/26/2024 | 500 | ORDER Updating Conditions of Release as to Kimberley Ann Tew (2) $10,000 Unsecured. SO ORDERED by Judge Daniel D. Domenico on 4/26/2024. (rkeec) (Entered: 05/01/2024) |
| 04/29/2024 | 496 | Unopposed MOTION to Travel *Out of State* by Jonathan K. Yioulos. (Kornfeld, Richard) (Entered: 04/29/2024) |
| 04/30/2024 | 497 | ORDER granting 496 Motion to Travel as to Jonathan K. Yioulos. Instead of going to Jamaica, Mr. Yioulos may travel to Miami, Florida from June 25 to July 1, 2024. He must (1) provide documentation regarding his travel plans to United States Pretrial and Probation Services in advance of departure, and (2) promptly contact his probation officer upon return from the trip. SO ORDERED by Judge Daniel D. Domenico on 4/30/2024. Text Only Entry (dddlc9, ) (Entered: 04/30/2024) |
| 04/30/2024 | 498 | ORDER granting 495 Motion for Leave to Restrict. The Clerk of Court is directed to maintain Doc. 493 at Level 3 restriction and to maintain Doc. 494 at Level 1 restriction. SO ORDERED by Judge Daniel D. Domenico on 4/30/2024. Text Only Entry (dddlc9, ) (Entered: 04/30/2024) |
| 05/08/2024 | 501 |  |

| | | |
|---|---|---|
| | | ORDER denying 482 RESTRICTED DOCUMENT – Level 1: by Kimberley Ann Tew. Having reviewed the pleadings on this issue and considered the relevant facts, the motion is denied. SO ORDERED by Judge Daniel D. Domenico on 5/8/2024. Text Only Entry (dddlc9, ) (Entered: 05/08/2024) |
| 05/31/2024 | 502 | Unopposed MOTION to Continue *Sentencing and Related Deadlines* by Michael Aaron Tew. (Schall, Jason) (Entered: 05/31/2024) |
| 06/04/2024 | 503 | ORDER granting 502 Motion to Continue as to Michael Aaron Tew. Mr. Tew's sentencing, which was set for 9/12/2024, is vacated and reset for 9/12/2024 at 10:30 AM in Courtroom A1002 before Judge Daniel D. Domenico. SO ORDERED by Judge Daniel D. Domenico on 6/4/2024. Text Only Entry (dddlc9, ) (Entered: 06/04/2024) |
| 07/02/2024 | 504 | RESTRICTED PRESENTENCE REPORT first disclosure for attorney review as to Kimberley Ann Tew (Attachments: # 1 Exhibit A)(aarag, ) (Entered: 07/02/2024) |
| 07/09/2024 | 505 | ORDER RESETTING HEARING as to Jonathan K. Yioulos. Due to a conflict on the Court's calendar, and after consultation with counsel, the Sentencing set for 9/17/2024 is VACATED and RESET for 10/2/2024 at 03:30 PM in Courtroom A1002 before Judge Daniel D. Domenico. SO ORDERED by Judge Daniel D. Domenico on 7/9/2024. Text Only Entry (dddlc1, ) (Entered: 07/09/2024) |
| 07/15/2024 | 506 | Unopposed MOTION for Extension of Time to File *Objections to Presentence Investigation Report* by Kimberley Ann Tew. (Attachments: # 1 Proposed Order (PDF Only) Proposed Order re: Motion for Extension of Time to Submit Objection to Presentence Investigation Report)(Kaplan, David) (Entered: 07/15/2024) |
| 07/17/2024 | 507 | ORDER granting 506 Motion for Extension of Time. Ms. Tew may file objections to the PSIR on or before July 19, 2024. SO ORDERED by Judge Daniel D. Domenico on 7/17/2024. Text Only Entry (dddlc9, ) (Entered: 07/17/2024) |
| 07/19/2024 | 508 | OBJECTION/RESPONSE to Presentence Report by Kimberley Ann Tew (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 3a, # 5 Exhibit Exhibit 4, # 6 Exhibit Exhibit 5, # 7 Exhibit Exhibit 6, # 8 Exhibit Exhibit 6a, # 9 Exhibit Exhibit 7, # 10 Exhibit Exhibit 7a)(Kaplan, David) (Entered: 07/19/2024) |
| 07/19/2024 | 510 | Conventionally Submitted Material : 1 Flash Drive re Objection/Response to Presentence Report, 508 by Defendant Kimberley Ann Tew. Location of Stored Items: Box D–5–5. Text Only Entry (cmadr, ) (Entered: 07/23/2024) |
| 07/22/2024 | 509 | Unopposed MOTION for Leave to Restrict by Kimberley Ann Tew. (Attachments: # 1 Proposed Order (PDF Only) PO re Unopposed Motion to Restrict)(Kaplan, David) (Entered: 07/22/2024) |
| 07/24/2024 | 511 | ORDER granting 509 Motion for Leave to Restrict. The Clerk of Court is directed to maintain Doc. 508 at Level 2 restriction. SO ORDERED by Judge Daniel D. Domenico on 7/24/2024. Text Only Entry (dddlc9, ) (Entered: 07/24/2024) |
| 07/25/2024 | 512 | NOTICE OF ATTORNEY APPEARANCE Laura Beth Hurd appearing for USA. Attorney Laura Beth Hurd added to party USA(pty:pla) (Hurd, Laura) (Entered: 07/25/2024) |
| 07/25/2024 | 513 | MOTION for Forfeiture of Property *for Preliminary Order of Forfeiture* by USA as to Kimberley Ann Tew. (Attachments: # 1 Proposed Order (PDF Only))(Hurd, |

| | | |
|---|---|---|
| | | Laura) (Entered: 07/25/2024) |
| 07/25/2024 | 514 | ORDER re 513 Motion for Preliminary Order of Forfeiture. If Ms. Tew opposes the motion, she is ordered to file a response on or before August 2, 2024. SO ORDERED by Judge Daniel D. Domenico on 7/25/2024. Text Only Entry (dddlc9, ) (Entered: 07/25/2024) |
| 07/25/2024 | 515 | RESTRICTED DOCUMENT – Level 2: as to Kimberley Ann Tew. (Kaplan, David) (Entered: 07/25/2024) |
| 07/26/2024 | 516 | RESTRICTED DOCUMENT – Level 2: as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos. (Attachments: # 1 Conventionally Submitted, # 2 Exhibit, # 3 Exhibit)(Weiss, Sarah) (Entered: 07/26/2024) |
| 07/26/2024 | 519 | Conventionally Submitted Material : One CD re Restricted Document – Level 2 516 by Plaintiff USA. Location of stored items: Sealed Room. Text Only Entry (cmadr, ) (Entered: 07/30/2024) |
| 07/29/2024 | 517 | RESTRICTED PRESENTENCE REPORT as to Kimberley Ann Tew (Attachments: # 1 Exhibit A)(agalv) (Entered: 07/29/2024) |
| 07/29/2024 | 518 | RESTRICTED ADDENDUM to Presentence Report 517 as to Kimberley Ann Tew (agalv) (Entered: 07/29/2024) |
| 08/01/2024 | 520 | RESTRICTED DOCUMENT – Level 2: as to Kimberley Ann Tew. (Weiss, Sarah) (Entered: 08/01/2024) |
| 08/01/2024 | 521 | Unopposed MOTION for Order *To Permit Virtual or Telephonic Attendance for Co−Defendant's Sentencing Hearing* by Michael Aaron Tew. (Frost, Kristen) (Entered: 08/01/2024) |
| 08/02/2024 | 522 | RESPONSE to Motion by Kimberley Ann Tew re 513 MOTION for Forfeiture of Property *for Preliminary Order of Forfeiture* (Kaplan, David) (Entered: 08/02/2024) |
| 08/05/2024 | 523 | ORDER as to Kimberley Ann Tew re 513 Motion for Preliminary Order of Forfeiture. The Court will hold a hearing regarding forfeiture starting at 1:00 PM on August 8, 2024 in Courtroom A1002. Sentencing will follow immediately afterward. SO ORDERED by Judge Daniel D. Domenico on 8/5/2024. Text Only Entry (dddlc9, ) (Entered: 08/05/2024) |
| 08/05/2024 | 524 | ORDER granting 521 Motion for Order as to Michael Aaron Tew to Permit Virtual or Telephonic Attendance for Co−Defendant's Sentencing Hearing. Mr. Tew's counsel is directed to contact the Courtroom Deputy via email (robb_keech@cod.uscourts.gov) no later than 8/6/2024 for instructions on how to proceed by telephone conference. All persons participating in court proceedings remotely by VTC or teleconference are prohibited, under penalty of contempt, from recording or broadcasting the proceeding in any manner. SO ORDERED by Judge Daniel D. Domenico on 8/5/2024. Text Only Entry (dddlc9, ) (Entered: 08/05/2024) |
| 08/06/2024 | 525 | REPLY TO RESPONSE to Motion by USA as to Kimberley Ann Tew re 513 MOTION for Forfeiture of Property *for Preliminary Order of Forfeiture UNITED STATES REPLY TO KIMBERLEY TEWS NOTICE OF OBJECTION TO UNITED STATES MOTION FOR PRELIMINARY ORDER OF FORFEITURE (ECF DOC. 522)* (Hurd, Laura) (Entered: 08/06/2024) |
| 08/08/2024 | 526 | |

| | | |
|---|---|---|
| | | RESTRICTED PRESENTENCE REPORT first disclosure for attorney review as to Michael Aaron Tew (Attachments: # 1 Exhibit A)(ntaka) (Entered: 08/08/2024) |
| 08/08/2024 | 527 | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: Forfeiture Hearing and Sentencing as to Kimberley Ann Tew (2) held on 8/8/2024. Granting 513 Motion for Forfeiture of Property as to Kimberley Ann Tew (2). Granting in part 515 Defendants Motion. Defendant sentenced as reflected on the record. Bond continued. Court Reporter: Tammy Hoffschildt. (rkeec) Modified on 8/8/2024 to include ruling on 515 Defendant's Motion. (rkeec). (Entered: 08/08/2024) |
| 08/13/2024 | 528 | JUDGMENT as to defendant Kimberley Ann Tew (2), Count(s) 1, Defendant shall be imprisoned for a total term of forty−eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,053,878.50.; Count(s) 16, Dismissed by Court during jury trial.; Count(s) 21−22, Defendant shall be imprisoned for a total term of forty−eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,053,878.50.; Count(s) 25−26, Defendant shall be imprisoned for a total term of forty−eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,053,878.50.; Count(s) 31−32, Defendant shall be imprisoned for a total term of forty−eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,053,878.50.; Count(s) 41, Defendant shall be imprisoned for a total term of forty−eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,053,878.50.; Count(s) 43−44, Defendant shall be imprisoned for a total term of forty−eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,053,878.50.; Count(s) 47, Defendant shall be imprisoned for a total term of forty−eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,053,878.50.; Count(s) 48, Defendant was found not guilty by jury at trial.; Count(s) 56, Defendant shall be imprisoned for a total term of forty−eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,053,878.50. Entered by Judge Daniel D. Domenico on 8/13/2024. (rkeec) (Entered: 08/13/2024) |
| 08/13/2024 | 529 | STATEMENT OF REASONS as to Kimberley Ann Tew (2). (rkeec) (Entered: 08/13/2024) |
| 08/14/2024 | 530 | Passport Receipt as to Kimberley Ann Tew (2). Forwarding passport to Dept. of State; Passport Number 522213975 issued by USA. Sent certified mail; receipt number 7019 2920 0001 1984 2431. (rkeec) (Entered: 08/14/2024) |
| 08/15/2024 | 531 | RESTRICTED DOCUMENT – Level 2: as to Michael Aaron Tew. (Schall, Jason) (Entered: 08/15/2024) |
| 08/15/2024 | 532 | |

| | | |
|---|---|---|
| | | RESTRICTED DOCUMENT – Level 2: as to Michael Aaron Tew. (cmadr, ) (Entered: 08/15/2024) |
| 08/19/2024 | 533 | RESTRICTED DOCUMENT – Level 2: as to Michael Aaron Tew. (rkeec) (Entered: 08/19/2024) |
| 08/19/2024 | 534 | Utility Setting/Resetting Deadlines/Hearings as to Michael Aaron Tew: Text Only Entry. Sentencing reset for 11/12/2024, at 01:30 PM, in Courtroom A1002 before Judge Daniel D. Domenico. (rkeec) (Entered: 08/19/2024) |
| 08/20/2024 | 535 | NOTICE OF APPEAL by Kimberley Ann Tew. (Kaplan, David) (Entered: 08/20/2024) |
| 08/21/2024 | 536 | Unopposed MOTION to Continue *Second Unopposed Motion to Continue Sentencing* by Jonathan K. Yioulos. (Kornfeld, Richard) (Entered: 08/21/2024) |
| 08/21/2024 | 537 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 535 Notice of Appeal as to Kimberley Ann Tew to the U.S. Court of Appeals. ( CJA, Fee not paid and 1915 motion not filed,) (Attachments: # 1 Preliminary Record)(cmadr, ) (Entered: 08/21/2024) |
| 08/21/2024 | 538 | USCA Case Number as to Kimberley Ann Tew 24–1333 for 535 Notice of Appeal filed by Kimberley Ann Tew. (cmadr, ) (Entered: 08/21/2024) |
| 08/22/2024 | 539 | ORDER granting 536 Motion to Continue as to Jonathan K. Yioulos. Sentencing set for 10/2/2024 is VACATED and RESET for 11/19/2024 at 10:30 AM in Courtroom A1002 before Judge Daniel D. Domenico. SO ORDERED by Judge Daniel D. Domenico on 8/22/2024. Text Only Entry (dddlc9, ) (Entered: 08/22/2024) |
| 08/26/2024 | 540 | USPS Certified Mail Receipt Return re 530 Passport Receipt by Kimberley Ann Tew (cmadr, ) (Entered: 08/27/2024) |
| 08/28/2024 | 541 | TRANSCRIPT of Sentencing hearing as to Kimberley Ann Tew held on August 8, 2024 before Judge Domenico. Pages: 1–103.<br><br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br>Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, ) (Entered: 08/28/2024) |
| 08/28/2024 | 542 | MOTION for Leave to Restrict by Michael Aaron Tew. (Schall, Jason) (Entered: 08/28/2024) |
| 08/28/2024 | 543 | RESTRICTED DOCUMENT – Level 2: as to Michael Aaron Tew. (Schall, Jason) (Entered: 08/28/2024) |
| 08/28/2024 | 544 | ORDER granting 542 Motion for Leave to Restrict. The Clerk of Court is directed to maintain Docs. 531 , 532 , 533 , and 543 at Level 2 restriction. SO ORDERED by Judge Daniel D. Domenico on 8/28/2024. Text Only Entry (dddlc9, ) (Entered: |

| | | |
|---|---|---|
| | | 08/28/2024) |
| 08/29/2024 | 545 | ORDER to Surrender as to Kimberley Ann Tew; Defendant to surrender to Satellite Prison Camp, FCI Phoenix, on 10/9/2024, at 12:00 PM, and will travel at her own expense. SO ORDERED by Judge Daniel D. Domenico on 8/29/2024. (rkeec) (Entered: 08/30/2024) |
| 09/04/2024 | 547 | TRANSCRIPT ORDER FORM by Kimberley Ann Tew Transcript ordered for proceedings held on 2/5/2024 through 2/15/2024, and 8/8/2024 re 535 Notice of Appeal. (cmadr, ) (Entered: 09/05/2024) |
| 09/05/2024 | 546 | MOTION for Order *Extending the Time for her to Surrender to the Warden at Satellite Prison Camp* by Kimberley Ann Tew. (Attachments: # 1 Proposed Order (PDF Only) Proposed Order re: Motion Requesting an Order Extending the Time for her to Surrender to the Warden at Satellite Prison Camp)(Kaplan, David) (Entered: 09/05/2024) |
| 09/05/2024 | 548 | ORDER of USCA as to Kimberley Ann Tew re 535 Notice of Appeal. (USCA Case No. 24–1333). Upon consideration, the court grants the motion and appoints CJA Panel member Justin A. Lollman to represent appellant Kimberley Ann Tew going forward. See 18 U.S.C. § 3006A. On or before September 16, 2024, Mr. Lollman shall file an entry of appearance in this appeal. The Clerk of the U.S. District Court for the District of Colorado shall wait until at least September 26, 2024 before transmitting the record on appeal to this court. (cmadr, ) (Entered: 09/05/2024) |
| 09/06/2024 | 549 | ORDER denying 546 Motion Requesting Order Extending the Time for her to Surrender to the Warden at Satellite Prison Camp. Mr. and Mrs. Tew have had sufficient time to finalize childcare arrangements. The motion is DENIED. SO ORDERED by Judge Daniel D. Domenico on 9/6/2024. Text Only Entry (dddlc9, ) (Entered: 09/06/2024) |
| 09/16/2024 | 550 | MOTION for Order *for Release Pending Appeal* by Kimberley Ann Tew. (Attachments: # 1 Proposed Order (PDF Only) Proposed Order re: Motion for Release Pending Appeal)(Hubbard, Jamie) (Entered: 09/16/2024) |
| 09/17/2024 | 551 | MINUTE ORDER as to Kimberley Ann Tew re: 550 Motion for Order *for Release Pending Appeal*. The Government must respond by 9/27/2024. SO ORDERED by Judge Daniel D. Domenico on 9/17/2024. Text Only Entry (dddlc1, ) (Entered: 09/17/2024) |
| 09/20/2024 | 552 | RESPONSE in Opposition by USA as to Kimberley Ann Tew re 550 MOTION for Order *for Release Pending Appeal* (Fields, Bryan) (Entered: 09/20/2024) |
| 09/25/2024 | 553 | SUPPLEMENT *Designation of Record* by Kimberley Ann Tew (Attachments: # 1 Exhibit 1 Designation of Record – District Court Docket Sheet)(Lollman, Justin) (Entered: 09/25/2024) |
| 09/25/2024 | 554 | TRANSCRIPT ORDER FORM re 535 Notice of Appeal by Kimberley Ann Tew. (Attachments: # 1 CJA Attachment CJA 24 Form)(Lollman, Justin) (Entered: 09/25/2024) |
| 09/26/2024 | 555 | ORDER Denying 550 MOTION FOR RELEASE PENDING APPEAL as to Kimberley Ann Tew (2) by Judge Daniel D. Domenico on 26 September 2024. (cmadr, ) (Entered: 09/26/2024) |
| 10/08/2024 | 556 | |

| | | REPORTER TRANSCRIPT ORDER FORM as to Plaintiff USA, Movants Atlantic Union Bank, Christopher J. Alf, National Air Cargo Group, Inc., National Air Cargo Holdings, Inc., Defendants Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos, filed by Tamara Hoffschildt. Transcripts ordered 2–5–24 through 2–8–24; 2–9–24 through 2–16–24, JT and 8–8–24 Sentencing (thoff, ) (Entered: 10/08/2024) |
|---|---|---|
| 10/15/2024 | 557 | Unopposed MOTION to Travel by Michael Aaron Tew. (Schall, Jason) (Entered: 10/15/2024) |
| 10/15/2024 | 558 | ORDER granting 557 Motion to Travel as to Michael Aaron Tew. Mr. Tew may travel to Pheonix, Arizona during the following windows: <br><br> 1. October 25 through October 28, 2024; <br> 2. November 1 through November 4, 2024; amd <br> 3. November 8 through November 11, 2024. <br><br> Mr. Tew must (1) provide documentation regarding his travel plans to United States Pretrial and Probation Services as directed in advance of departure, (2) contact his probation officer as directed during approved travel, and (3) promptly contact his probation officer upon return from travel as directed. SO ORDERED by Judge Daniel D. Domenico on 10/15/2024. Text Only Entry (dddlc9, ) (Entered: 10/15/2024) |
| 10/20/2024 | 559 | VOIR DIRE TRANSCRIPT of proceedings held on February 5, 2025 before Judge Domenico. Pages: 1–119. (thoff, ) (Entered: 10/20/2024) |
| 10/20/2024 | 560 | TRANSCRIPT of Jury Trial as to Kimberley Ann Tew held on February 5, 2024 before Judge Domenico. Pages: 1–95. <br><br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** <br><br> Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, ) (Entered: 10/20/2024) |
| 10/20/2024 | 561 | TRANSCRIPT of Jury Trial as to Kimberley Ann Tew held on February 6, 2024 before Judge Domenico. Pages: 96–350. <br><br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** <br><br> Transcript may only be viewed at the court's public terminal or purchased through the |

| | | |
|---|---|---|
| | | Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, ) (Entered: 10/20/2024) |
| 10/20/2024 | 562 | TRANSCRIPT of Jury Trial as to Kimberley Ann Tew held on February 8, 2024 before Judge Domenico. Pages: 351–554.<br><br>NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br><br>Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, ) (Entered: 10/20/2024) |
| 10/20/2024 | 563 | TRANSCRIPT of Jury Trial as to Kimberley Ann Tew held on February 8, 2024 before Judge Domenico. Pages: 555–811.<br><br>NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br><br>Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, ) (Entered: 10/20/2024) |
| 10/20/2024 | 564 | TRANSCRIPT of Jury Trial as to Kimberley Ann Tew held on February 9, 2024 before Judge Domenico. Pages: 812–1018.<br><br>NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br><br>Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, ) (Entered: 10/20/2024) |
| 10/20/2024 | 565 | TRANSCRIPT of Jury Trial as to Kimberley Ann Tew held on February 12, 2024 before Judge Domenico. Pages: 1019–1249.<br><br>NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to |

| | | |
|---|---|---|
| | | **Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br>Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, ) (Entered: 10/20/2024) |
| 10/20/2024 | 566 | TRANSCRIPT of Jury Trial as to Kimberley Ann Tew held on February 13, 2024 before Judge Domenico. Pages: 1250–1509.<br><br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br>Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, ) (Entered: 10/20/2024) |
| 10/20/2024 | 567 | TRANSCRIPT of Jury Trial as to Kimberley Ann Tew held on February 14, 2024 before Judge Domenico. Pages: 1510–1662.<br><br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br>Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, ) (Entered: 10/20/2024) |
| 10/20/2024 | 568 | TRANSCRIPT of Jury Trial, verdict as to Kimberley Ann Tew held on February 15, 2024 before Judge Domenico. Pages: 1663–1681.<br><br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br>Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on |

| | | |
|---|---|---|
| | | PACER. (thoff, ) (Entered: 10/20/2024) |
| 10/20/2024 | 569 | Amended TRANSCRIPT of Jury Trial, Day 3 as to Kimberley Ann Tew held on February 7, 2024 before Judge Domenico. Pages: 351–554. <br><br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** <br><br> Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, incorrect date was entered. ) (Entered: 10/20/2024) |
| 10/20/2024 | 570 | TRANSCRIPT of James hearing as to Kimberley Ann Tew held on December 19, 2023 before Judge Domenico. Pages: 1–140. <br><br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** <br><br> Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, ) (Entered: 10/20/2024) |
| 10/21/2024 | 571 | OBJECTION/RESPONSE to Presentence Report 526 by Michael Aaron Tew (Schall, Jason) (Entered: 10/21/2024) |
| 10/24/2024 | 572 | MOTION for Forfeiture of Property *for Preliminary Order of Forfeiture for a Personal Money Judgment Against Defendant Michael Aaron Tew* by USA as to Michael Aaron Tew. (Attachments: # 1 Proposed Order (PDF Only))(Hurd, Laura) (Entered: 10/24/2024) |
| 10/24/2024 | 573 | OBJECTION/RESPONSE to Presentence Report 571 by USA as to Michael Aaron Tew (Fields, Bryan) (Entered: 10/24/2024) |
| 10/24/2024 | 574 | ORDER as to Michael Aaron Tew re 572 Motion for Preliminary Order of Forfeiture. If Mr. Tew opposes this motion, he is ordered to file a response on or before November 1, 2024. SO ORDERED by Judge Daniel D. Domenico on 10/24/2024. Text Only Entry (dddlc9, ) (Entered: 10/24/2024) |
| 10/29/2024 | 575 | RESTRICTED DOCUMENT – Level 2: as to Michael Aaron Tew. (Attachments: # 1 Exhibit Defendant's Exhibits)(Schall, Jason) (Entered: 10/29/2024) |
| 11/05/2024 | 576 | RESTRICTED PRESENTENCE REPORT as to Michael Aaron Tew (Attachments: # 1 Exhibit A – Revised Recommendation).(agalv) (Entered: 11/05/2024) |
| 11/05/2024 | 577 | |

| | | RESTRICTED ADDENDUM to Presentence Report 576 as to Michael Aaron Tew (Attachments: # 1 Exhibit A – Letters in Support). (agalv) (Entered: 11/05/2024) |
|---|---|---|
| 11/05/2024 | 578 | MOTION for Non–Guideline Sentence by Jonathan K. Yioulos. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Kornfeld, Richard) (Entered: 11/05/2024) |
| 11/05/2024 | 579 | MEMORANDUM in Opposition by USA as to Michael Aaron Tew re 575 Restricted Document – Level 2 *(Response in Opposition to Motion for Variant Sentence)* (Fields, Bryan) (Entered: 11/05/2024) |
| 11/05/2024 | 580 | MOTION For Downward Departure Pursuant to 5K1.1 by USA as to Jonathan K. Yioulos. (Fields, Bryan) (Entered: 11/05/2024) |
| 11/06/2024 | 581 | ORDER RESETTING HEARING as to Jonathan K. Yioulos. Due to a conflict on the Court's calendar, and after consultation with counsel, the Sentencing set for 11/19/2024 is VACATED and RESET for 12/3/2024 at 10:30 AM in Courtroom A1002 before Judge Daniel D. Domenico. SO ORDERED by Judge Daniel D. Domenico on 11/6/2024. Text Only Entry (dddlc1, ) (Entered: 11/06/2024) |
| 11/10/2024 | 582 | ORDER re Sentencing as to Michael Aaron Tew. Live witnesses will not be permitted to testify at Tuesday's sentencing, though the defendant may speak on his own behalf or may submit other support in writing if he wishes. Any victims will also be given an opportunity to speak. SO ORDERED by Judge Daniel D. Domenico on 11/10/2024. Text Only Entry (dddlc9, ) (Entered: 11/10/2024) |
| 11/11/2024 | 583 | PRELIMINARY ORDER OF FORFEITURE FOR A PERSONAL MONEY JUDGMENT as to Michael Aaron Tew (1) by Judge Daniel D. Domenico on 11 November 2024. (cmadr, ) (Entered: 11/12/2024) |
| 11/12/2024 | 584 | MOTION for Victim Rights *(Permission for Telephonic Participation)* by USA as to Michael Aaron Tew. (Fields, Bryan) (Entered: 11/12/2024) |
| 11/12/2024 | 585 | ORDER granting 584 Motion for Victim Rights as to Michael Aaron Tew. While it is unclear whether Fed. R. Crim. P. 32 requires the Court to permit victims not physically present in the courtroom an opportunity to speak at sentencing, the Court will allow any victims in this case an opportunity to speak telephonically at today's sentencing. SO ORDERED by Judge Daniel D. Domenico on 11/12/2024. Text Only Entry (dddlc9, ) (Entered: 11/12/2024) |
| 11/12/2024 | 586 | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: Sentencing held on 11/12/2024 as to defendant Michael Aaron Tew (1). Defendant sentenced as reflected on the record. 575 Defendants Motion is GRANTED IN PART. Bond continued. Court Reporter: Tammy Hoffschildt. (Attachments: # 1 Defendant Exhibit 1, # 2 Defendant Exhibit 2) (rkeec) (Entered: 11/12/2024) |
| 11/14/2024 | 587 | Unopposed MOTION to Travel by Michael Aaron Tew. (Schall, Jason) (Entered: 11/14/2024) |
| 11/15/2024 | 588 | ORDER granting 587 Motion to Travel as to Michael Aaron Tew. Mr. Tew may travel to Pheonix, Arizona to visit his wife at FCI Pheonix between now and his self–report date so long as he provides completed travel itineraries (including both flight and lodging information) to probation at least two weeks prior to travel and receives approval from U.S.P.O. Seth Junker. SO ORDERED by Judge Daniel D. Domenico on 11/15/2024. Text Only Entry (dddlc9, ) (Entered: 11/15/2024) |
| 11/15/2024 | 589 | |

| | | JUDGMENT as to defendant Michael Aaron Tew (1), Count(s) 1s, Defendant shall be imprisoned for a total term of forty–two (42) months. This term consists of forty–two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently., $5,600.00 special assessment, no fine, and restitution in the total amount of $6,361,622.10.; Count(s) 2s–40s, Defendant shall be imprisoned for a total term of forty–two (42) months. This term consists of forty–two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently., $5,600.00 special assessment, no fine, and restitution in the total amount of $6,361,622.10.; Count(s) 41s, Defendant shall be imprisoned for a total term of forty–two (42) months. This term consists of forty–two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently., $5,600.00 special assessment, no fine, and restitution in the total amount of $6,361,622.10.; Count(s) 42s, Defendant shall be imprisoned for a total term of forty–two (42) months. This term consists of forty–two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently., $5,600.00 special assessment, $100,000.00 fine, and restitution in the total amount of $6,361,622.10.; Count(s) 44s–56s, Defendant shall be imprisoned for a total term of forty–two (42) months. This term consists of forty–two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently., $5,600.00 special assessment, $100,000.00 fine, and restitution in the total amount of $6,361,622.10.; Count(s) 57s–60s, Defendant shall be imprisoned for a total term of forty–two (42) months. This term consists of forty–two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently., $5,600.00 special assessment, $100,000.00 fine, and restitution in the total amount of $6,361,622.10. Entered by Judge Daniel D. Domenico on 11/15/2024. (rkeec) Modified on 11/18/2024 to correct fine amount (rkeec). (Entered: 11/15/2024) |
| 11/15/2024 | 590 | STATEMENT OF REASONS as to Michael Aaron Tew (1). (rkeec) (Entered: 11/15/2024) |
| 11/18/2024 | 591 | Passport Receipt as to Michael Aaron Tew (1). Forwarding passport to Dept. of State; Passport Number 484644160 issued by USA. Sent via certified mail receipt number 7019 2970 0001 1984 2455. (rkeec) (Entered: 11/18/2024) |
| 11/21/2024 | 592 | Unopposed MOTION to Travel by Michael Aaron Tew. (Schall, Jason) (Entered: 11/21/2024) |
| 11/22/2024 | 593 | ORDER granting 592 Motion to Travel as to Michael Aaron Tew. Mr. Tew may travel to Marquette, Michigan between January 1, 2025 and his self–report date. He must (1) provide documentation regarding his travel plans to United States Pretrial and Probation Services in advance of departure, and (2) promptly contact his probation officer upon return from the trip. SO ORDERED by Judge Daniel D. Domenico on 11/22/2024. Text Only Entry (dddlc9, ) (Entered: 11/22/2024) |

| 11/22/2024 | 594 | MOTION for Forfeiture of Property *for Preliminary Order of Forfeiture for a Personal Money Judgment Against Defendant Jonathan K. Yioulos* by USA as to Jonathan K. Yioulos. (Attachments: # 1 Proposed Order (PDF Only))(Hurd, Laura) (Entered: 11/22/2024) |
|---|---|---|
| 11/22/2024 | 595 | MOTION to Dismiss Counts *Pursuant to Plea Agreement* by USA as to Jonathan K. Yioulos. (Fields, Bryan) (Entered: 11/22/2024) |
| 11/22/2024 | 596 | MOTION for Decrease for Acceptance of Responsibility by USA as to Jonathan K. Yioulos. (Fields, Bryan) (Entered: 11/22/2024) |
| 11/25/2024 | 597 | NOTICE OF APPEAL as to 589 Judgment,,,,,,,,,, by Michael Aaron Tew. (Schall, Jason) (Entered: 11/25/2024) |
| 11/25/2024 | 598 | PRELIMINARY ORDER OF FORFEITURE FOR A PERSONAL MONEY JUDGMENT as to Jonathan K. Yioulos (3) by Judge Daniel D. Domenico on 25 November 2024. (cmadr, ) (Entered: 11/25/2024) |
| 11/25/2024 | 599 | DESIGNATION OF RECORD ON APPEAL re 597 Notice of Appeal by Michael Aaron Tew. (Attachments: # 1 Exhibit A)(Frost, Kristen) (Entered: 11/25/2024) |
| 11/25/2024 | 600 | MOTION to Proceed in Forma Pauperis by Michael Aaron Tew. (Frost, Kristen) (Entered: 11/25/2024) |
| 11/26/2024 | 601 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 597 Notice of Appeal as to Michael Aaron Tew to the U.S. Court of Appeals. ( CJA, 1915 motion filed,) (Attachments: # 1 Preliminary Record)(cmadr, ) (Entered: 11/26/2024) |
| 11/26/2024 | 602 | RESTRICTED PRESENTENCE REPORT as to Jonathan K. Yioulos (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(mcfont) (Entered: 11/26/2024) |
| 11/26/2024 | 603 | RESTRICTED SECOND ADDENDUM to Presentence Report 602 as to Jonathan K. Yioulos (mcfont) (Entered: 11/26/2024) |
| 11/26/2024 | 604 | USCA Case Number as to Michael Aaron Tew 24–1465 for 597 Notice of Appeal filed by Michael Aaron Tew. (cmadr, ) (Entered: 11/27/2024) |
| 12/02/2024 | 605 | MINUTE ORDER as to Jonathan K. Yioulos re: Sentencing set for 12/3/2024. Members of the public may attend the hearing by teleconference at (571) 353–2301, using guest code 478499919. All persons participating in court proceedings by teleconference are prohibited, under penalty of contempt, from recording or broadcasting the proceeding in any manner. SO ORDERED by Judge Daniel D. Domenico on 12/2/2024. Text Only Entry (dddlc1, ) (Entered: 12/02/2024) |
| 12/03/2024 | 606 | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: Sentencing held on 12/3/2024 as to defendant Jonathan K. Yioulos (3). Granting in part 578 Motion for Non–Guideline Sentence as to Jonathan K. Yioulos (3). Granting 580 Motion for Downward Departure Pursuant to 5K1.1 as to Jonathan K. Yioulos (3). Granting 595 Motion to Dismiss Counts as to Jonathan K. Yioulos (3). Granting 596 Motion for Decrease for Acceptance of Responsibility as to Jonathan K. Yioulos (3). Defendant sentenced as reflected on the record. Bond is continued. Court Reporter: Kevin Carlin. (rkeec) (Entered: 12/03/2024) |
| 12/06/2024 | 607 | JUDGMENT as to defendant Jonathan K. Yioulos (3), Count(s) 1, Defendant shall be imprisoned for a total term of two (2) months on each count to run concurrently, three |

| | | |
|---|---|---|
| | | (3) years supervised release on each count to run concurrently, $200.00 special assessment, no fine, and restitution in the total amount of $5,023,878.50.; Count(s) 2–38, 40, Dismissed on United States of Americas Motion to Dismiss Counts.; Count(s) 39, Defendant shall be imprisoned for a total term of two (2) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $200.00 special assessment, no fine, and restitution in the total amount of $5,023,878.50. Entered by Judge Daniel D. Domenico on 12/6/2024. (rkeec) (Entered: 12/06/2024) |
| 12/06/2024 | 608 | STATEMENT OF REASONS as to Jonathan K. Yioulos (3). (rkeec) (Entered: 12/06/2024) |
| 12/09/2024 | 609 | USPS Certified Mail Receipt Return re 591 Passport Receipt as to Michael Aaron Tew (cmadr, ) (Entered: 12/10/2024) |
| 12/10/2024 | 610 | TRANSCRIPT ORDER FORM re 597 Notice of Appeal by Michael Aaron Tew. (Frost, Kristen) (Entered: 12/10/2024) |
| 12/10/2024 | 611 | TRANSCRIPT ORDER FORM re 597 Notice of Appeal by Michael Aaron Tew. (Frost, Kristen) (Entered: 12/10/2024) |
| 12/10/2024 | 612 | TRANSCRIPT ORDER FORM re 597 Notice of Appeal by Michael Aaron Tew. (Frost, Kristen) (Entered: 12/10/2024) |
| 12/10/2024 | 613 | TRANSCRIPT ORDER FORM re 597 Notice of Appeal by Michael Aaron Tew. (Frost, Kristen) (Entered: 12/10/2024) |
| 12/13/2024 | 614 | ORDER to Surrender as to Michael Aaron Tew (1). Defendant to surrender to FCI Florence, located at 5880 CO–67, Florence, CO 81226 on 2/1/2025, by 2:00 p.m. and will travel at their own expense. SO ORDERED by Judge Daniel D. Domenico on 12/13/2024. (rkeec) (Entered: 12/13/2024) |
| 12/13/2024 | 615 | ORDER of USCA as to Michael Aaron Tew re 597 Notice of Appeal. (USCA Case No. 24–1465). Kari Schmidt is appointed as counsel for Mr. Tew. Within 10 days of the date of this order, Ms. Schmidt shall file an entry of appearance in this appeal. (cmadr, ) (Entered: 12/16/2024) |
| 12/16/2024 | 616 | ORDER as to Michael Aaron Tew (1) by Judge Daniel D. Domenico on 16 December 2024. Accordingly, it is ORDERED that Defendant Michael Aaron Tew's Motion to Proceed In Forma Pauperis, Doc. 600 , is GRANTED. (cmadr, ) (Entered: 12/16/2024) |
| 12/23/2024 | 617 | REPORTER TRANSCRIPT ORDER FORM as to Defendants Michael Aaron Tew, Michael Aaron Tew, filed by Tamara Hoffschildt. Transcripts ordered 01–30–24; 4–22–24; 11–12–24 (thoff, ) (Entered: 12/23/2024) |
| 12/24/2024 | 618 | REPORTER TRANSCRIPT ORDER FORM as to Defendants Michael Aaron Tew filed by Julie Thomas. (nrich) (Entered: 12/24/2024) |
| 12/27/2024 | 619 | REPORTER TRANSCRIPT ORDER FORM filed by Patterson Transcription Company re 597 Notice of Appeal. Transcript due by 1/28/2025. (nrich) (Entered: 12/27/2024) |
| 01/03/2025 | 620 | TRANSCRIPT of Sentencing Hearing as to Jonathan K. Yioulos held on 12/03/2024 before Judge Domenico. Pages: 1–25. |

| | | **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (kcarl, ) (Entered: 01/03/2025) |
|---|---|---|
| 01/07/2025 | 621 | MINUTE ORDER re 589 Judgement as to Michael Aaron Tew. Upon review of the Declaration of Victim Losses and supporting documentation submitted by victim National Air Cargo, and consistent with the judgment imposed in the case of codefendant Jonathan K. Yioulos, the Court finds the restitution owed in relation to victim National Air Cargo is $5,023,878.50. Furthermore, the restitution payees are the insurance companies that reimbursed National Air Cargo, pursuant to 18 U.S.C. § 3664(j). Assistant United States Attorney Bryan David Fields and the defendants attorney, Jason Dale Schall, have advised the Probation Office that they have no objection to the judgment being amended to update the restitution order as detailed above. Therefore, the Court ORDERS the U.S. Probation Office to prepare an Amended Judgment reflecting amendments to the restitution order, as detailed above. SO ORDERED by Judge Daniel D. Domenico on 1/7/2025. Text Only Entry (dddlc9, ) (Entered: 01/07/2025) |
| 01/07/2025 | 622 | MINUTE ORDER re 528 Judgment as to Kimberley Ann Tew. Upon review of the Declaration of Victim Losses and supporting documentation submitted by victim National Air Cargo, and consistent with the judgment imposed in the case of codefendant Jonathan K. Yioulos, the Court finds the restitution owed in relation to victim National Air Cargo is $5,023,878.50. Furthermore, the restitution payees are the insurance companies that reimbursed National Air Cargo, pursuant to 18 U.S.C. § 3664(j). Assistant United States Attorney Bryan David Fields and the defendants attorney, David Scott Kaplan, have advised the Probation Office that they have no objection to the judgment being amended to update the restitution order as detailed above. Additionally, the judgment shall be amended to reflect forfeiture includes a money judgment in the amount of proceeds obtained by the scheme and by the defendants, $5,023,878.50, consistent with the Courts finding during the forfeiture hearing on August 8, 2024. Therefore, the Court ORDERS the U.S. Probation Office to prepare an Amended Judgment reflecting amendments to the restitution and forfeiture orders, as detailed above. SO ORDERED by Judge Daniel D. Domenico on 1/7/2025. Text Only Entry (dddlc9, ) (Entered: 01/07/2025) |
| 01/07/2025 | 623 | ORDER as to Michael Aaron Tew. On 1/7/2025, my chambers received an email from Defendant Michael Tew requesting that I consider an attached motion to extend his self–surrender date. Any documents that require the Court's attention must be filed on the record as motions or other appropriate filings. The parties in this case are ordered not to email my chambers, and any such communications will be ignored in the future. In addition, Mr. Tew is currently represented by counsel, and all motions and papers on his behalf must be filed electronically by his attorney. His attorney may, if Mr. |

| | | Tew wishes, file a motion seeking appropriate relief after conferring with Mr. Tew.<br><br>SO ORDERED by Judge Daniel D. Domenico on 1/7/2025. Text Only Entry (dddlc1, ) (Entered: 01/07/2025) |
|---|---|---|
| 01/08/2025 | 624 | AMENDED JUDGMENT as to Michael Aaron Tew (1), Count(s) 1s, Defendant shall be imprisoned for a total term of forty−two (42) months. This term consists of forty−two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently., $5,600.00 special assessment, no fine, and restitution in the total amount of $6,331,622.10.; Count(s) 2s−40s, Defendant shall be imprisoned for a total term of forty−two (42) months. This term consists of forty−two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently., $5,600.00 special assessment, no fine, and restitution in the total amount of $$6,331,622.10.; Count(s) 41s, Defendant shall be imprisoned for a total term of forty−two (42) months. This term consists of forty−two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently., $5,600.00 special assessment, no fine, and restitution in the total amount of $$6,331,622.10.; Count(s) 42s, Defendant shall be imprisoned for a total term of forty−two (42) months. This term consists of forty−two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently. $5,600.00 special assessment, no fine, and restitution in the total amount of $$6,331,622.10.; Count(s) 44s−56s, Defendant shall be imprisoned for a total term of forty−two (42) months. This term consists of forty−two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently., $5,600.00 special assessment, no fine, and restitution in the total amount of $6,331,622.10.; Count(s) 57s−60s, Defendant shall be imprisoned for a total term of forty−two (42) months. This term consists of forty−two (42) months on each of Counts 1 through 42 and 44 through 56; and twelve (12) months on each of counts 57 through 60; all counts imposed concurrently. Three (3) years supervised release on each count, to run concurrently., $5,600.00 special assessment, no fine, and restitution in the total amount of $6,331,622.10. Entered by Judge Daniel D. Domenico on 1/8/2025. (rkeec) (Entered: 01/08/2025) |
| 01/08/2025 | 625 | AMENDED STATEMENT OF REASONS as to Michael Aaron Tew (1). (rkeec) (Entered: 01/08/2025) |
| 01/08/2025 | 626 | REASON FOR AMENDMENT as to Michael Aaron Tew (1). (rkeec) (Entered: 01/08/2025) |
| 01/08/2025 | 627 | AMENDED JUDGMENT as to Kimberley Ann Tew (2), Count(s) 1, Defendant shall be imprisoned for a total term of forty−eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,023,878.50.; Count(s) 16, Dismissed by Court during jury trial. Count(s) 21−22, Defendant shall be imprisoned for a total term of forty−eight (48) months on |

| | | each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,023,878.50.; Count(s) 25–26, Defendant shall be imprisoned for a total term of forty–eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,023,878.50.; Count(s) 31–32, Defendant shall be imprisoned for a total term of forty–eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,023,878.50.; Count(s) 41, Defendant shall be imprisoned for a total term of forty–eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,023,878.50.; Count(s) 43–44, Defendant shall be imprisoned for a total term of forty–eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,023,878.50.; Count(s) 47, Defendant shall be imprisoned for a total term of forty–eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,023,878.50.; Count(s) 48, Defendant was found not guilty by jury at trial.; Count(s) 56, Defendant shall be imprisoned for a total term of forty–eight (48) months on each count to run concurrently, three (3) years supervised release on each count to run concurrently, $100.00 special assessment ($1,200 total), no fine, and restitution in the total amount of $5,023,878.50. Entered by Judge Daniel D. Domenico on 1/8/2025. (rkeec) (Entered: 01/08/2025) |
| 01/08/2025 | 628 | AMENDED STATEMENT OF REASONS as to Kimberley Ann Tew (2). (rkeec) (Entered: 01/08/2025) |
| 01/08/2025 | 629 | REASON FOR AMENDMENT as to Kimberley Ann Tew (2). (rkeec) (Entered: 01/08/2025) |
| 01/13/2025 | 630 | TRANSCRIPT of Motion Hearing as to Michael Aaron Tew, Kimberley Ann Tew, Jonathan K. Yioulos held on March 18, 2021 before Judge Domenico. Pages: 1–27.  **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**  Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (nrich) (Entered: 01/13/2025) |
| 01/13/2025 | 631 | NOTICE OF ATTORNEY APPEARANCE: Zachary Lee Newland appearing for Michael Aaron TewAttorney Zachary Lee Newland added to party Michael Aaron Tew(pty:dft) (Newland, Zachary) (Entered: 01/13/2025) |
| 01/13/2025 | 632 | NOTICE OF ATTORNEY APPEARANCE: David C. Boyer, Jr appearing for |

| | | Michael Aaron TewAttorney David C. Boyer, Jr added to party Michael Aaron Tew(pty:dft) (Boyer, David) (Entered: 01/13/2025) |
|---|---|---|
| 01/15/2025 | 633 | ORDER to Surrender as to Jonathan K. Yioulos (3). Defendant to surrender to Lewisburg Satellite Camp on January 21, 2025, by 12:00 pm. and will travel at their own expense. SO ORDERED by Judge Daniel D. Domenico on 1/15/2025. (rkeec) (Entered: 01/15/2025) |
| 01/16/2025 | 634 | TRANSCRIPT of Trial Preparation Conference as to Michael Aaron Tew held on January 30, 2024 before Judge Domenico. Pages: 1–100.  **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**  Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, ) (Entered: 01/16/2025) |
| 01/16/2025 | 635 | TRANSCRIPT of Evidentiary hearing as to Michael Aaron Tew held on April 22, 2024 before Judge Domenico. Pages: 1–100.  **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**  Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, ) (Entered: 01/16/2025) |
| 01/16/2025 | 636 | TRANSCRIPT of Sentencing hearing as to Michael Aaron Tew held on November 12, 2024 before Judge Domenico. Pages: 1–31.  **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**  Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, ) (Entered: 01/16/2025) |

| 01/16/2025 | 637 | TRANSCRIPT of Motion to Detain hearing as to Kimberley Ann Tew held on April 22, 2024 before Judge Domenico. Pages: 1–100.<br><br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br>Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, ) (Entered: 01/16/2025) |
| 01/16/2025 | 638 | TRANSCRIPT of Sentencing hearing for the codefendant as to Kimberley Ann Tew held on 1–31 before Judge Domenico. Pages: 1–31.<br><br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br>Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, ) (Entered: 01/16/2025) |
| 01/17/2025 | 639 | RESTRICTED DOCUMENT – Level 2: Defendant's Motion to Extend Self–Surrender Date as to Michael Aaron Tew. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Proposed Order (PDF Only))(Boyer, David) Modified to change event type to a Motion on 1/21/2025 (ggill, ). (Entered: 01/17/2025) |
| 01/17/2025 | 640 | MOTION for Leave to Restrict by Michael Aaron Tew. (Attachments: # 1 Proposed Order (PDF Only))(Boyer, David) (Entered: 01/17/2025) |
| 01/17/2025 | 641 | RESTRICTED DOCUMENT – Level 2: Brief in Support of Motion to Restrict Document No. 639 as to Michael Aaron Tew. (Boyer, David) Modified to update text on 1/21/2025 (ggill, ). (Entered: 01/17/2025) |
| 01/17/2025 | 642 | ORDER granting 640 Motion for Leave to Restrict. The Clerk of Court is directed to maintain Dkt. 639 and 641 at Level 2 restriction. SO ORDERED by Judge Daniel D. Domenico on 1/17/2025. Text Only Entry (dddlc9, ) (Entered: 01/17/2025) |
| 01/17/2025 | 643 | ORDER granting in part Mr. Tew's 639 Motion to Extend Self–Surrender Date. While the Court understands and regrets the extremely difficult situation Mr. Tew's family members are in, that is one of the many unfortunate consequences of Mr. and Mrs. Tew's criminal behavior. Recognizing the complications presented in the motion, Mr. Tew's self–surrender date is extended to March 1, 2025. Otherwise, the motion is denied. SO ORDERED by Judge Daniel D. Domenico on 1/17/2025. Text Only Entry (dddlc9, ) (Entered: 01/17/2025) |

| 01/21/2025 | 644 | NOTICE of Replacement due to Non–Compliant Files re 167 MOTION to Withdraw as Attorney by Michael Hassard, 151 Notice of Attorney Appearance – Defendant, 157 Notice of Attorney Appearance – Defendant, 290 Notice of Attorney Appearance – Defendant, 163 Restricted Document – Level 3, 165 Third MOTION to Continue , [204–6] Attachment to Response in Opposition,, 166 MOTION to Withdraw as Attorney by Xuan Zhou, 162 MOTION to Withdraw as Attorney by Tor Ekeland : The aforelisted documents have been converted to PDF/A standard and replaced on the docket due to a non–compliant PDF file type which prevents creation of a Record on Appeal. (lrobe) (Entered: 01/21/2025) |

1

1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF COLORADO
2

3    UNITED STATES OF AMERICA,    .   Case No. 20-cr-00305-DDD
                                  .
4             Plaintiff,          .
                                  .
5    vs.                          .
                                  .
6    MICHAEL AARON TEW,           .   901 19th Street
     KIMBERLEY ANN TEW, also      .   Denver, CO  80294
7    known as Kimberley           .
     Vertanen, and JONATHAN K.    .
8    YIOULOS,                     .
                                  .
9             Defendants.         .
                                  .   February 10, 2021
10   . . . . . . . . . . . . . .  .   2:31 p.m.

11        TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE
            KRISTEN L. MIX, UNITED STATES MAGISTRATE JUDGE
12

     APPEARANCES:
13

     For the Plaintiff:           United States Attorney
14                                By:  Matthew T. Kirsch*
                                  By:  Hetal J. Doshi*
15                                1801 California Street
                                  Suite 1600
16                                Denver, CO  80202
                                  (303) 454-0100
17
     For the Defendant,           Stimson Stancil LaBranche &
18   Kimberley A. Tew:               Hubbard
                                  By:  Jamie L. Hubbard*
19                                1652 North Downing Street
                                  Denver, CO  80218
20                                (720) 689-8909

21   Also Present:                Kimberley A. Tew
                                  Tommie Anderson
22

     Court Recorder:              Clerk's Office
23                                U.S. District Court
                                  901 19th Street
24                                Denver, CO  80294

25   *All appearances telephonic.

2

1  Appearances continued:

2  Transcription Service:          AB Litigation Services
                                   216 16th Street, Suite 600
3                                  Denver, CO  80202
                                   (303) 296-0017

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

3

1                    (Time noted:  2:31 p.m.)

2            THE COURT:  Case number 20-cr-00305, United States

3    of America versus Kimberley Ann Tew.

4            Let's have counsel enter appearances, please.

5            MR. KIRSCH:  Good afternoon, Your Honor.  Matthew

6    Kirsch and Hetal Doshi appearing for the United States.

7            THE COURT:  Mr. Kirsch, Ms. Doshi, good afternoon.

8            Counsel for the Defendant present?

9            MS. HUBBARD:  Good afternoon, Your Honor.  This is

10   Jamie Hubbard appearing on behalf of Ms. Tew, who appears by

11   video conference from her apartment in Denver.

12           As I indicated to the Court in email earlier

13   today, I'm here entering a special appearance, because I had

14   represented Ms. Tew pre-indictment.  So I wanted to kind of

15   get her started on the right foot, but I do not have a

16   current agreement.

17           THE COURT:  All right.  So to the extent that this

18   is a motion for a special appearance by Ms. Hubbard, it is

19   granted.

20           And we'll proceed.

21           MS. HUBBARD:  Thank you, Your Honor.

22           THE COURT:  Ms. Tew, can you hear me?

23           MS. TEW:  I can, Your Honor.

24           THE COURT:  All right.  Ms. Tew, you're here for

25   an initial appearance, but we're going to take care of a

4

1  number of matters today.

2          The purpose of this initial appearance is for me

3  to inform you of the charges against you and make sure you

4  understand them, and understand what your rights are.

5          You've been accused of 1 count of conspiracy to

6  commit wire fraud, 4 counts of wire fraud, 1 count of

7  conspiracy to commit money laundering, 5 counts of engaging

8  in monetary transactions in property derived from specified

9  unlawful activity.

10         On the conspiracy to commit wire fraud count, the

11  penalty is not more than 20 years imprisonment, not more than

12  a $250,000.00 fine, or two times gain or loss, whichever is

13  greater, or both imprisonment and a fine, not more than three

14  years of supervised release, and a $100.00 special assessment

15  fee.

16         On the wire fraud counts, the penalty for each

17  count is not more than 20 years imprisonment, not more than a

18  $250,000.00 fine, or two times the gain or loss, whichever is

19  greater, or both imprisonment and a fine, not more than three

20  years of supervised release, and a $100.00 special assessment

21  fee.

22         On the conspiracy to commit money laundering

23  count, the penalty is not more than 20 years imprisonment,

24  not more than a $500,000.00 fine, or two times the amount

25  laundered, or both imprisonment and a fine, not more than

5

1    three years of supervised release, and a $100.00 special

2    assessment fee.

3            And on the engaging in monetary transactions in

4    property derived from specified unlawful activity counts, for

5    each count the penalty is not more than 10 years

6    imprisonment, not more than a $250,000.00 fine, or two times

7    the amount laundered, whichever is greater, or both

8    imprisonment and a fine, not more than three years of

9    supervised release, and a $100.00 special assessment fee.

10           Ma'am, do you understand the general nature of the

11   charges against you?

12           MS. TEW:  Yes, Your Honor.

13           THE COURT:  You have the right to remain silent.

14   You do not need to speak to anyone about the circumstances

15   that brought you to Court today.

16           If you do choose to speak to someone other than

17   your attorney about those circumstances, what you say can and

18   probably will be used against you in Court.

19           If you are questioned by the police or law

20   enforcement, you have the right to refuse to answer

21   questions.

22           You also have the right to insist that a lawyer be

23   present with you during questioning.

24           If you choose to remain silent, your silence

25   cannot be used against you in Court.

6

1        Do you understand your right to remain silent?

2        MS. TEW:  Yes, Your Honor.

3        THE COURT:  You also have the right to an

4  attorney.  And if you cannot afford an attorney, I will

5  appoint one for you at no cost to you.

6        Ms. Hubbard has entered a special appearance to

7  represent you today.

8        Are you asking me to appoint free counsel for you

9  today, or not?

10        MS. TEW:  No, I am not, Your Honor.

11        THE COURT:  All right, thank you.  Then I think

12  we're ready to proceed to arraignment and discovery and

13  detention issues.

14        Is the Government ready to proceed, Mr. Kirsch,

15  Ms. Doshi?

16        MR. KIRSCH:  We are ready, Your Honor.

17        THE COURT:  Thank you.  And, Ms. Hubbard, are you

18  ready, as well?

19        MS. HUBBARD:  I am.

20        THE COURT:  All right.  With respect to the

21  arraignment, Ms. Hubbard, how does your client plead?

22        MS. HUBBARD:  She would enter not guilty pleas to

23  all charges.

24        THE COURT:  Thank you.  Does she waive any further

25  formal reading of the charges and advisement of rights?

7

1            MS. HUBBARD:  Yes, Your Honor.

2            THE COURT:  Thank you.  The not guilty pleas are

3   received.

4            Speedy trial dates, counsel:  30 days is March 12,

5   2021; 70 days is April 22, 2021.

6            I do have the discovery conference memorandum and

7   order.  I note that counsel have been through this.  They

8   have signed it and provided disclosure dates, so I'll sign it

9   and make it an order of the Court effective today.

10            With respect to the issue of detention, I've

11   received and reviewed the pre-trial services report, and I

12   take judicial notice of it.

13            Is the Government seeking detention here?

14            MR. KIRSCH:  Your Honor, we are not seeking

15   detention.  However, we are seeking some additional

16   conditions that are not reflected in the proposed bond that

17   we received from the pre-trial services office.

18            THE COURT:  All right, thank you.  I'll hear from

19   you first, then, Mr. Kirsch, with respect to the Government's

20   position on bond.

21            MR. KIRSCH:  Thank you, Your Honor.  I'll just

22   move down the list in terms of the bond paperwork for

23   conditions of release.

24            The first condition that we're seeking, which I

25   suspect is an oversight, is that Ms. Tew surrender her

8

1  passport.  As the pre-trial services report indicates, she

2  does have a valid passport, and we believe that it should be

3  a condition that that be surrendered.

4       The second that we're seeking is under 7(g), as we

5  have with respect to the other Defendants in this case.  We

6  would ask the Court to enter a no-contact order with other

7  witnesses or Defendants in this case.

8       Again, as we did with Mr. Tew, we would except her

9  spouse from that rule, but otherwise we would ask for that

10 provision to be a part of the bond paperwork, as well.

11      With respect to the other issue that we're --

12 well, there are two other issues that we're seeking to

13 change.

14      The first has to do with home detention and/or

15 electronic monitoring or a curfew.

16      The Government's position is that there are

17 additional reasons to think that Ms. Tew poses a potential

18 flight risk in this matter.

19      As the bond report indicates, her only ties to the

20 community come from her husband and two children.  She

21 doesn't have other family here.  She doesn't have employment

22 here.  And she hasn't lived here for a particularly long

23 time.

24      What's more concerning to the Government, however,

25 is the information that's been revealed during the

9

1   investigation of this case, which is that Ms. Tew has both

2   substantial experience with and has engaged over the course

3   of the past few years with a number of transactions on the

4   dark net and transactions involving exchange and arbitrage of

5   Bitcoin and other sorts of crypto-currency.

6          As the Court is aware, those forms of currency are

7   difficult for the Government and the probation officer to

8   monitor and track, and the fluctuation in the value of those

9   can allow her substantial profits to be generated in

10  relatively short periods of time.

11         So we're concerned that Ms. Tew might have a means

12  financially that we simply aren't able to track.

13         And with the return of this indictment and the

14  serious charges that she's no facing, she has an incentive

15  for that flight, as well.

16         So we are asking, in order to address that risk,

17  that the Court either impose a curfew with electronic

18  monitoring, just as has been imposed on her husband, or, in

19  the alternative, that the Court impose a home detention

20  condition.

21         And we think that either of those conditions would

22  reasonably assure her appearance.  But we don't think that we

23  can be sure of that without those conditions.

24         The final set of additions that we would request,

25  again, are the same additional conditions of release that we

 1 tend to request in financial cases, and that we requested

 2 them and the Court imposed with respect to co-Defendant, Mr.

 3 Yioulos.

 4          So in terms of the additional conditions of

 5 release, those would be conditions T through Z, and then also

 6 condition AA, again, on the sort of standard bond paperwork.

 7          I'm happy to answer any questions that the Court

 8 has about any of those now.

 9          THE COURT:  The only question I have is because of

10 my declining hearing.  Did you say conditions T through V

11 like Victory, or T through Z like Zoo?

12          MR. KIRSCH:  I said Z like Zoo, Your Honor, and as

13 well as AA.  Thank you.

14          THE COURT:  All right, thank you.  Ms. Hubbard, do

15 you want to address the Government's position on additional

16 conditions?

17          MS. HUBBARD:  Yes, Your Honor.  I find myself in

18 the rare position of just asking the Court to follow the

19 experts in the case, and impose the conditions of whatever is

20 recommended by the pre-trial office.

21          I'm usually the one fighting their recommended

22 conditions, but here I agree with them.

23          I have been working with Ms. Tew since August of

24 this year.  She has been responsive to me.  She has known

25 she's under investigation.  She has known the potential

1   penalties for the charges.

2           These charges are not a surprise to her, Your

3   Honor.  It's similar to what her husband has been facing, and

4   she has known since her husband's arrest that she was

5   potentially going to be named as a co-conspirator.

6           She hasn't tried to flee.  And, to me, that is the

7   very best evidence that she's not going to try to flee.

8           I also question -- or I take issue with the idea

9   that only having a husband and two children in the Denver

10  area is not enough of a tie to the community.

11          She is a stay-at-home mom to her kids.  They live

12  in Denver.  Their one six year old attends Denver Public

13  Schools.  Your Honor, the other six year old has significant

14  special needs that Mrs. Tew is the caretaker for.

15          She has ties to the community.  Yes, she's not

16  born and raised here, but very few of us who live here are.

17          So I don't think that the fact that she doesn't

18  have extended family here is a strong indicator that she

19  doesn't have ties to the community.

20          She's a mom.  She has little kids.  They are

21  integrated into the community, and she is integrated into the

22  community.

23          I also take issue with the fact that anybody who

24  has access to resources, whether that is yacht currency,

25  which I will tell Your Honor that's a new term for me that

1    I've learned in the case, or Bitcoin or crypto-currency.

2            Just because people have access to money doesn't

3    mean that they are likely to flee.

4            As the Court knows, there are plenty of criminal

5    Defendants in this case who have access to money and are not

6    placed on GPS monitoring or home detention.

7            Again, to me, the best evidence that she is not a

8    flight risk is that we're on now month seven or eight of her

9    knowing that this case was coming down the pipeline, and she

10   has not fled.

11           So I take issue with the fact that just because

12   someone has potential access to money means that they are

13   likely to flee.

14           It's my understanding -- and just, Your Honor, I

15   meant to start with this, and I apologize for not.

16           Mrs. Tew has no objection to surrendering her

17   passport.  She understands that's going to be a condition of

18   pre-trial release.

19           She also has no objection to the no-contact order,

20   with the exception of allowing her to have contact with her

21   husband.

22           So I had talked with those that I told her were

23   going to be conditions, and we have no objection to those.

24           Again, I would just ask the Court to follow the

25   guidance of the pre-trial services office here.  I don't

13

1  believe there are any other conditions that are necessary to

2  ensure that she's going to stay and fight this case.

3          She has been consistent with me that she intends

4  to fight this case, and actually fighting this case is very

5  important.

6          THE COURT:  All right, thank you.  Mr. Kirsch, I

7  have a question for you with respect to home detention.

8          In many previous circumstances where the Court has

9  considered home detention, I've gotten a quizzical look from

10 the United States Probation Office about what's the point of

11 ordering home detention without some enforcement mechanism

12 like GPS monitoring.

13         Am I to understand that the Government in this

14 case is willing to suggest home detention without electronic

15 monitoring?

16         MR. KIRSCH:  Your Honor, my understanding is that

17 home detention would have a monitoring component that is

18 still done through a land line.  It may be that that's a

19 function of it being a while since I've done a case where

20 home detention was really an option.

21         Our preference is to have some sort of electronic

22 monitoring system.  And, frankly, I think GPS monitoring is

23 superior, because it works all the time.

24         So that's the Government's first preference.

25         THE COURT:  All right, thank you.

14

1         MS. HUBBARD:  And, Your Honor, I apologize.  I
2    just forgot this in my notes, as well.
3         But I was instructed to tell the Court that if you
4    are inclined to believe that Ms. Tew's physical presence
5    needs to be monitored in some way, her preference would be
6    for home detention.
7         Ms. Tew, for a number of reasons that aren't worth
8    going into here, rarely leaves her home.  Again, one of the
9    children she has, has significant special needs, and then she
10   has her own reasons.  But leaving home is difficult for her.
11        So it is her express preference for home
12   detention, if the Court believes that condition is necessary.
13   It is still our position that that condition is not necessary
14   to ensure she will show up.
15        THE COURT:  All right, thank you for the
16   clarification.
17        And let me ask the United States Probation Officer
18   who is present to enter his appearance for us, and then I
19   have a question for him.
20        MR. ANDERSON:  Yes, Your Honor.  Officer Anderson
21   from the United States Probation Department.
22        THE COURT:  All right, Officer Anderson, thank
23   you.  Why don't you clear up -- maybe try to clear up my
24   confusion on this point once and for all.
25        I think my confusion derives from the fact that

1  the standard bond additional conditions of release form has

2  separate paragraphs for participating in one of the following

3  location restriction programs, which can include home

4  detention, and submitting to location monitoring, as if those

5  are two separate and distinct conditions that the Court can

6  order.

7          But every time that I've discussed home detention

8  in the past with officers from the United States Probation

9  Office, my understanding is that their preference is that if

10 a person is placed on home detention that there be some

11 enforcement mechanism, like GPS or radio frequency

12 monitoring, to enforce that the home detention condition is

13 being complied with.

14         Is my understanding in that regard correct?  Is

15 that the Probation Office's preference?

16         MR. ANDERSON:  Yes, Your Honor, I believe that is

17 correct.

18         THE COURT:  All right.  And the difference between

19 the GPS monitoring and the radio frequency monitoring, again

20 is what?

21         MR. ANDERSON:  So with the GPS, we always have

22 reportage.  And the radio frequency, we can just pretty much

23 look up and find out where they are.

24         THE COURT:  Okay.

25         MR. ANDERSON:  If that makes sense, Your Honor.

Case No. 1:20-cr-00305-DDD   Document 645-4   filed 05/24/21   USDC Colorado   pg 93 of 460

```
 1              THE COURT:  All right, thank you.
 2              MR. KIRSCH:  Your Honor, I don't know if my
 3    understanding is still correct.
 4              But the understanding that I've always had is that
 5    the radio frequency monitoring allowed the Probation Office
 6    to determine whether or not the Defendant was actually at
 7    home.  It doesn't operate outside of the home.
 8              The GPS monitoring, in contrast, operates 24/7 and
 9    allows the probation officer to determine any location, not
10    just the sort of binary at-home, or not.
11              MR. ANDERSON:  That is correct.
12              THE COURT:  All right, thank you.  So let me ask a
13    practical question, Mr. Anderson.
14              If the Defendant is placed on home detention with
15    radio frequency monitoring, the home detention condition has
16    a lot of exceptions.
17              For example:  Exceptions for attorney visits, and
18    exceptions for religious services, et cetera.
19              So, if by radio frequency monitoring you can only
20    tell whether the Defendant is at home, or not, I assume that
21    if the Defendant plans to leave her home, if placed on home
22    detention, to go to one of the excepted, you know, exceptions
23    -- that's a complicated phrase, permitted, like medical
24    treatment, Court and attorney visits, et cetera.
25              Does she have to receive permission from the
```

1   probation officer to do that in advance?

2           MR. ANDERSON:  Yes, Your Honor.  And then we could

3   put that time in when she's allowed to leave.  So if it's for

4   a hour, we can have a hour time slot where she can leave and

5   come back.

6           THE COURT:  And the radio frequency monitoring

7   would not tell you that she exactly went to whatever

8   appointment you gave her permission to attend, but it would

9   tell you whether she returned to the home in time.  Is that

10  right?

11          MR. ANDERSON:  That's correct, Your Honor.

12          THE COURT:  All right, thank you.

13      (Pause)

14          THE COURT:  All right.  The Court has jurisdiction

15  over the subject matter of the action, and over the parties.

16          Venue is proper in the District of Colorado, and

17  each party has been given a fair opportunity to be heard on

18  the issue of detention.

19          Ms. Tew, there are certain factors under the law

20  that I must examine in determining whether there are

21  conditions of release that will reasonably assure your

22  appearance in Court, as required, and the safety of the

23  community.

24          And those conditions include:

25          The nature and circumstances of the offenses

1  charged, and the weight of the evidence against you.

2         I must also consider your history and

3  characteristics, including your character, your physical and

4  mental condition, your family ties, your employment, your

5  financial resources, your length of residence in the

6  community and community ties, your past conduct, your history

7  related to drug or alcohol abuse, your criminal history, your

8  record concerning appearances at Court proceedings, whether

9  you were on any type of release at the time of commission of

10  the alleged incidents and offense, and the nature and

11  seriousness of the danger to any person or to the community

12  that would be posed by your release.

13         I have carefully reviewed the pre-trial services

14  report, and I take judicial notice of it.

15         I note several things from the pre-trial services

16  report:

17         I note that this 39-year old Defendant became a

18  naturalized citizen in the United States in 1981, and that

19  she is financially reliant on her husband, because she does

20  not work.

21         I note that she does take care of six year old

22  twins full-time, including one who has special needs.

23         I note that the Defendant was diagnosed with

24  depression when she was 12 years old, and she has mostly

25  taken medication for that condition at -- throughout her life

1  since that time.

2          The United States Probation Office has recommended

3  that the Defendant be released on a personal recognizance

4  bond, and that she surrender her passport.  And she, of

5  course, does not object to those conditions.

6          The Government is asserting that due to the nature

7  of the offenses, and due to the Defendant's familiarity, for

8  lack of a better word, and experience with transactions on

9  the dark net, and alternative forms of currency, like Bitcoin

10  and crypto-currency, that that warrants some additional

11  restrictions on the Defendant.

12          I note for the record that these are very serious

13  charges, of course, that the Defendant is facing.

14          I also note that one of the co-Defendants in this

15  case is her husband, and that the conditions of release

16  relating to her husband require her husband to submit to

17  electronic monitoring.

18          I'm very familiar with the file on this matter.

19  It does appear to me that Mr. Tew is the primary Defendant in

20  the case, but that really doesn't matter.  This is a husband

21  and wife team, both of whom are facing extremely serious

22  charges, and who live together, and who will continue to live

23  together and to care for two children.

24          Now, in light of the particular circumstances at

25  issue here, and in light of the Government's allegation of

1    Ms. Tew's substantial experience with transactions conducted

2    on the dark net, that include alternative currency forms, and

3    the Court's understanding and acknowledgment that familiarity

4    with those types of transactions can, in fact, result in an

5    accrual of significant wealth under the radar, so to speak,

6    and outside of the knowledge or ability to obtain knowledge

7    of the Government.

8            The Court will find that there is a combination of

9    conditions that I can impose that will reasonably assure the

10   appearance of this Defendant in Court in the future, and the

11   safety of the community.

12           This will be an unsecured bond in the amount of

13   $10,000.00.

14           The conditions of release will be as follows:

15           The Defendant must submit to supervision and

16   report for supervision to the United States Probation Office.

17           The Defendant must surrender any passport to the

18   Clerk of the Court within two business days, and may not

19   obtain a new passport or other international travel document.

20           Ms. Tew, your travel will be restricted to

21   Colorado, unless you get permission from the Court to go

22   elsewhere.

23           And you must avoid all contact, directly or

24   indirectly, with any person who is or who may be a victim or

25   witness in this investigation or prosecution, except your

1   husband.

2          You may not possess a firearm or destructive

3   device, or another weapon.

4          You may not use alcohol excessively.

5          You may not use or unlawfully possess narcotic

6   drugs or other controlled substances, and that includes

7   marijuana.

8          You must participate in a program of home

9   detention, which means you're restricted to your residence at

10  all times, except for employment, education, religious

11  services, medical, substance abuse, or mental health

12  treatment, attorney visits, Court appearances, Court ordered

13  obligations, or other activities approved in advance by the

14  pre-trial services officer, or the supervising officer.

15         You'll submit to location monitoring by radio

16  frequency, and you must pay all or any part of the costs of

17  that program based on your ability to pay.

18         You must report as soon as possible to the pre-

19  trial services officer.

20         If you have any contact with law enforcement while

21  you are on release, and that includes even a minor traffic

22  stop, you may not act as an informant for any law enforcement

23  agency without permission from the Court.

24         Your employment, if you have any, must be approved

25  in advance by your supervising officer.

 1            You must provide verification of any income or

 2   funds received.

 3            You must provide access to any financial records

 4   requested by the supervising officer.

 5            You may not commingle personal and business funds.

 6            You shall not register any business entities

 7   without prior disclosure to the supervising officer.

 8            You must notify the supervising officer of the

 9   registration of any business entities by your family members.

10            You shall notify third parties of any risks that

11   may be occasioned by your personal history or

12   characteristics, and you must permit the probation officer to

13   make those notifications and to confirm your compliance with

14   the notification requirement.

15            You must not conduct any financial transactions

16   through the financial account of any business entity not

17   previously disclosed to the supervising officer or through

18   any other individual's financial account, and you may not

19   solicit or receive money from third parties without prior

20   approval by the supervising officer.

21            Of course, you must always -- you must also not

22   commit any violation of Federal, State, or local law while on

23   release.

24            You must cooperate in the collection of a DNA

25   sample, if that is authorized by the law.

23

1          You must advise the Court or the Pre-Trial

2     Services Office or the supervising officer, in writing,

3     before you make any change in your residence or your

4     telephone number.

5          And, of course, you must appear in Court as you

6     are directed to appear in the future.

7          Ma'am, do you understand the conditions of your

8     release?

9          MS. TEW:  I'm sorry.  I just wanted to clarify,

10    ma'am.  Bitcoin is not in the dark web.  I am not on the dark

11    web.  I don't necessarily understand that.

12         And I have lived her since 2015.  I moved here on

13    July 6th, Fourth of July weekend, in 2015.

14         I will be there.

15         THE COURT:  I understand.  And what I've taken

16    into account is the Government's suggestion that you have a

17    familiarity with and experience with the dark web.  It

18    doesn't matter so much to me in deciding a condition of bond

19    as to whether that experience is recent, or not.  But I

20    understand what you're saying.

21         MS. TEW:  Thank you.

22         THE COURT:  Do you understand your conditions of

23    release?

24         MS. TEW:  Yes.

25         THE COURT:  All right.  And do you promise to obey

24

 1 | all conditions of release, to appear as directed, and to

 2 | surrender to serve any sentence imposed?

 3 | MS. TEW:  Yes, ma'am.

 4 | THE COURT:  All right.  And are you authorizing me

 5 | to sign this bond paperwork on your behalf, acknowledging

 6 | that you understand these conditions and you promise to obey

 7 | them?

 8 | MS. TEW:  Yes, Your Honor.

 9 | THE COURT:  All right.  I will do that then.

10 | MR. ANDERSON:  Excuse me, Your Honor.  Can we have

11 | the Defendant report to the Probation Office tomorrow at

12 | 10:00 a.m. so we can get her set up?

13 | THE COURT:  Yes.  Ms. Tew, you will have to report

14 | to the Probation Office.  The probation officer is requesting

15 | that you report tomorrow at 10:00 a.m.

16 | That will be for the purpose of setting up your

17 | radio frequency monitoring.

18 | Any problem with that, Ms. Hubbard, that you're

19 | aware of?

20 | MS. HUBBARD:  Your Honor, other than that Ms. Tew

21 | is primarily responsible for supervising kindergarten between

22 | the hours of 9:00 and noon, so I would just ask the pre-trial

23 | officer if they could make it 1:00 or 2:00 o'clock.

24 | But otherwise, I'm confident that she can find a

25 | way to make it work, but it would just be the afternoon

25

1  typically is much easier.

2          THE COURT:  Could we do it, Mr. Anderson, in the

3  afternoon, as opposed to at 10:00 a.m.?

4          MR. ANDERSON:  Yes, Your Honor, 1:00 o'clock would

5  be fine.

6          THE COURT:  All right, thank you.  Then I'll

7  modify my order, Ms. Tew, and ask you to report to the United

8  States Probation Office at 1:00 p.m. tomorrow for purposes of

9  getting set up for the radio frequency monitoring.

10         And I was in the process of signing the bond, and

11  let me return to that.

12      (Pause)

13         MS. HUBBARD:  Your Honor, I'm happy to continue

14  being a conduit until another attorney enters an appearance

15  on behalf of Ms. Tew, if your staff or anybody wants to shoot

16  me any documents that need to get sent to us by email.

17         THE COURT:  All right, that's fine.  You know, I'm

18  going to leave it to the United States Attorney's Office to

19  keep in touch with you, Ms. Hubbard, with respect to what's

20  going on in the case.  I appreciate that.

21      (Pause)

22         THE COURT:  All right.  I have signed the bond

23  paperwork.

24         Ms. Tew has received her instructions for

25  reporting to the United States Probation Office.

26

1          Is there anything further from the Government with

2   respect to Ms. Tew this afternoon, Mr. Kirsch?

3          MR. KIRSCH:  No, thank you, Your Honor.

4          THE COURT:  Thank you.  And anything further from

5   the Defendant, Ms. Hubbard?

6          MS. HUBBARD:  No, thank you.  Thank you for

7   letting me make a special appearance on this case, Your

8   Honor.  I do appreciate that.

9          THE COURT:  You are welcome.  And we will be in

10  recess.  Thank you.

11               (Time noted:  2:59 p.m.)

12                    *  *  *  *  *

13                     CERTIFICATE

14      I, RANDEL RAISON, certify that the foregoing is a

15  correct transcript from the official electronic sound

16  recording of the proceedings in the above-entitled matter, to

17  the best of my ability.

18

19

20  _____        May 13, 2021

21  Randel Raison

22

23

24

25

1

<pre>
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF COLORADO
 2

 3   UNITED STATES OF AMERICA,    .   Case No. 20-cr-00305-DDD-2
                                  .
 4            Plaintiff,          .
                                  .
 5   vs.                          .
                                  .
 6   MICHAEL AARON TEW,           .   901 19th Street
     KIMBERLEY ANN TEW, also      .   Denver, CO  80294
 7   known as Kimberley           .
     Vertanen, and JONATHAN K.    .
 8   YIOULOS,                     .
                                  .
 9            Defendants.         .
                                  .   July 15, 2021
10   . . . . . . . . . . . . . .  .   11:08 a.m.

11        TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE
             KRISTEN L. MIX, UNITED STATES MAGISTRATE JUDGE
12
     APPEARANCES:
13
     For the Plaintiff:           United States Attorney
14                                By:  Matthew T. Kirsch
                                  By:  Hetal J. Doshi
15                                By:  Andrea L. Surratt
                                  1801 California Street
16                                Suite 1600
                                  Denver, CO  80202
17                                (303) 454-0100

18   For the Defendant:           Tor Ekeland Law, PLLC
                                  By:  Tor B. Ekeland
19                                By:  Michael Hassard
                                  30 Wall Steet, 8th Floor
20                                New York, NY  10005
                                  (718) 737-2764
21
     Also Present:                Kimberly A. Tew
22                                Carlos Morales

23   Court Recorder:              Clerk's Office
                                  U.S. District Court
24                                901 19th Street
                                  Denver, CO  80294
25
</pre>

2

```
1   Appearances continued:

2   Transcription Service:         AB Litigation Services
                                   216 16th Street, Suite 600
3                                  Denver, CO  80202
                                   (303) 296-0017
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.
```

3

```
 1              (Time noted:  11:08 a.m.)
 2              THE COURT CLERK:  All rise.  Court is in session.
 3              THE COURT:  Thank you.  Please be seated.
 4              Good morning.  This is case number 20-cr-00305,
 5   United States of America versus Kimberley Ann Tew, et al.
 6              Let's have counsel enter appearances, please,
 7   starting with counsel for the Government.
 8              MR. KIRSCH:  Good afternoon, Your Honor.  Matthew
 9   Kirsch, Hetal Doshi, and Andrea Surratt, here for the
10   Government.
11              THE COURT:  Good morning.
12              MR. EKELAND:  Good morning, Your Honor.  I'm Tor
13   Ekeland appearing for the Defendant.
14              THE COURT:  Good morning.  We're here on the
15   Defendant's motion to modify the terms of her pre-trial
16   release.
17              I have received and reviewed the motion.
18              I'll hear from defense counsel first.  Mr.
19   Ekeland?
20              MR. EKELAND:  May I proceed?
21              THE COURT:  You may.
22              MR. EKELAND:  Thank you, Your Honor.  So I think
23   we've stated clearly, Your Honor, our argument in our motion
24   papers, and we'll stand on those papers.  I'm just asking
25   that we can reply to anything that the Government may raise.
```

4

1          It is my understanding that Mr. Morales, who is

2    the PO for both of the Tews is in Court today, and I think he

3    can inform the Court as to what he thinks are necessary

4    conditions for Mrs. Tew.

5          But basically we're asking for the same conditions

6    of release that co-Defendant, Jonathan Yioulos has, who is

7    facing 25 more felony counts than Ms. Tew.

8          And we would just submit to the Court that there

9    is no evidence in the record, and the Government has the

10   burden here, as the Court knows, by the preponderance of the

11   evidence, to establish that she's a flight risk.  And there

12   is nothing in the record that indicates she's any type of

13   flight risk.

14         Pre-trial's original recommendation was that she

15   be freed on her own recognizance.

16         And I'd note that the Government raised the issue

17   that she had access to Bitcoin cryptocurrency, but financial

18   means by itself is not dispositive of somebody being a flight

19   risk.  You need something more, because Mr. Yioulos has the

20   same resources.

21         And if the seriousness of the charges is

22   determinative of the flight risk here, then Mr. Yioulos

23   should be on home confinement with an ankle bracelet, as

24   well, because his cooperation with the Government is not a

25   factor under the BRA.

5

1          THE COURT:  All right.  Thank you.  Well, let me

2    address one issue relating to the so-called "record" and the

3    repeated statements in the motion and statements by counsel

4    this morning about the lack of any evidence in the record

5    justifying the conditions of release that were previously

6    imposed on the Defendant.

7          I know, Mr. Ekeland, that you probably don't

8    practice in the District of Colorado much, and I don't know

9    how they do things in the Eastern District of New York.

10         But I want to make sure that you understand that

11    the statements that were made by Government counsel at the

12    time of the initial detention hearing are considered evidence

13    in the record.  There is no transcript of that hearing on the

14    Court's electronic docket because a transcript was not

15    ordered by counsel.

16         Nevertheless, those statements and the recording

17    that was made of that proceeding are considered to be part of

18    the record in this case.

19         So to the extent that you're suggesting that there

20    is no record that supports the Court's order with respect to

21    the conditions of release that were placed on your client,

22    that's just incorrect.  There is no transcript of the hearing

23    that was held, but there was, indeed, a record made with

24    respect to the Government's statements.

25         My other concern relates to, of course, the

6

1 Statutory requirement for reopening the proceeding. And, as

2 you know, under 18 U.S.C. section 3142(f)(2), the Court may

3 reopen the detention hearing if:

4          "[I]nformation exists that was not known to the

5 movant at the time of the hearing and that has a material

6 bearing on the issue whether there are conditions of release

7 that will reasonably assure the appearance of the person as

8 required and the safety of any other person and the

9 community."

10          That's the Statutory requirement.

11          Now, I understand that the parties may have

12 reached some agreement with respect to modification of the

13 conditions of this Defendant's release. The Government may

14 not have reached an agreement with the Defendant on that.

15 The Government may have a different proposal from what the

16 Defendant is proposing.

17          But as far as I'm concerned, this is the Statutory

18 threshold that must be met for the hearing to even be

19 reopened. And I haven't heard any suggestion from the

20 Defendant that there is information that exists that was not

21 known to the Defendant at the time of the original detention

22 hearing.

23          But to the extent that such information exists, I

24 think you have the burden of establishing what it is. What

25 is it?

7

1          MR. EKELAND:  Your Honor, we're not arguing new

2    information, but we are arguing that this detention is un-

3    Constitutional and arbitrary under the Bail Reform Act, and

4    that when you compare Ms. Tew's conditions of confinement to

5    Mr. Yioulos, the disparity becomes clear.

6          And, Your Honor, to the extent that there is

7    evidence in a transcript that hasn't been ordered, we will

8    review that.  And I apologize to the Court because it is not

9    our intention to say that the Court has done something wrong.

10          But our main argument as stated in our papers is

11    that the current conditions of release are un-Constitutional

12    under the Fifth Amendment of the United States Constitution,

13    because they appear to have been punitively imposed in order

14    to coerce a plea, and that what we've seen of the evidence,

15    and it's my understanding that the law is the same in the

16    Eastern District as it is in the District of Colorado, seems

17    to indicate that there is not -- the least restrictive means

18    have not been imposed, and there seems to be an arbitrary

19    disparity that we are unaware of a rationale for between Mr.

20    Yioulos' conditions and Ms. Tew's.

21          THE COURT:  All right.  Well, I understand what

22    you're arguing.  I'll hear from the Government with respect

23    to this, as well.

24          Let me just say that, you know, it would not have

25    been difficult for the Defendant and defense counsel to do a

8

1   little homework about this matter and to discover two things:

2           First, that motions to modify conditions of

3   release are assigned to the Magistrate Judge who placed the

4   Defendant on release in the first place.

5           The motion, the written motion in this case, has a

6   tone which appears to me to be under the false impression

7   that the District Judge assigned to the case, Judge Domenico,

8   would be rehearing this motion.

9           If you had done your homework and had understood

10  how things work in the District of Colorado, you would know

11  that this motion would come back to this Magistrate Judge,

12  because I'm the person who put Ms. Tew on the conditions of

13  release in the first place.

14          The other thing which I cannot let go without

15  commenting on are the repeated assertions in the written

16  motion that this Court is racist, in that the Court imposed

17  conditions on this Defendant due to her status as an Asian-

18  American.

19          Again, had you done any research whatsoever into

20  this Judge, I think you would have learned easily, clearly,

21  and definitively, that that is not who I am and that is not

22  who I have ever been.

23          And to the extent that you are suggesting that the

24  Court somehow imposed conditions because of the color of your

25  client's skin, the Court is deeply offended.  And I have to

9

1  make that statement for the record.

2          All right.  I'll hear from the Government counsel,

3  please, Mr. Kirsch.

4          MR. KIRSCH:  Thank you, Your Honor.  First of all,

5  the Government agrees with the Court with respect to the

6  relevant standard here under 3142(f).

7          The Defendant, in order to have a hearing in the

8  first place, the Defendant needs to have alleged not only

9  material that was not available at the time of the original

10 hearing, but that information has to be material.

11          As we read the Defendant's motion as favorably as

12 possible, you could characterize the -- you could

13 characterize the information that she -- that the Defendant

14 temporarily suffered from bruising --

15          THE COURT:  Bruising.

16          MR. KIRSCH:  -- somewhere on her leg, that there

17 is no evidence that's actually connected to the ankle

18 monitor, that is arguably new evidence.  It's the only

19 arguable new evidence, and it is not material to the question

20 before the Court about whether or not what is the combination

21 of conditions that would reasonably satisfy her appearance.

22          To the extent that the Court is entertaining the

23 argument that this constitutes a due process violation,

24 because there is no valid interest in seeking her detention,

25 the Government would refer the Court back to all of the

1   arguments and evidence that the Government presented at the

2   initial detention hearing.

3           The Government believes there is obvious and

4   adequate justification for seeking detention of Ms. Tew.

5           I would also make sure that the Court is aware

6   that there has, in fact, been a transcript prepared of those

7   original proceedings.  It's at docket number 128.  And as far

8   as the Government is aware, it had been prepared at the time

9   Ms. Tew's motion was filed.

10          Finally, I would -- I want to make, on behalf of

11   the United States Attorney's Office, a similar statement to

12   the one that the Court made with respect to the allegation

13   that there is a racial animus that's motivating the

14   Government's position in this case.  That's not true.

15          As the Court is aware, the Government has sought

16   and obtained different conditions of release with respect to

17   each of the Defendants.

18          THE COURT:  From different Judges, right?  I don't

19   think I was the one who put Mr. Yioulos, or whatever the

20   other Defendant's name is, on release.  I believe it was

21   Judge Hegarty, wasn't it?  Maybe not.  I don't remember.  But

22   anyway, go ahead.

23          MR. KIRSCH:  It was -- I believe it was you.

24          THE COURT:  Was it me?  Okay.

25          MR. KIRSCH:  Yes, Your Honor.

1          THE COURT:  Okay.  Fair enough.

2          MR. KIRSCH:  But there are different bond amounts

3    in each cases.  The Government put forth different evidence

4    with respect to Mr. Yioulos and Ms. Tew.

5          And, in particular, two things that bear on the

6    issue of flight risk:

7          One, that Mr. Yioulos had begun cooperating

8    immediately, and had continued to cooperate, and, therefore,

9    had an additional interest to appear.

10          And second, that he doesn't have the substantial

11    experience with cryptocurrency and/or the dark net that --

12          THE COURT:  Or a degree in accounting.

13          MR. KIRSCH:  That's also true.  The last thing

14    that I feel like I have to point out on that point, Your

15    Honor, and, again, the Court probably remembers this already.

16          But at that hearing, there was actually a question

17    about whether or not Ms. Tew should get a curfew and have a

18    GPS monitor, or whether she should be subject to home

19    detention.

20          The Government actually expressed as its first

21    preference that she get GPS monitoring with a curfew.  It's

22    was Ms. Tew's attorney who said her client had asked her to

23    ask for home detention instead.

24          And so the idea that after she requested that,

25    that that could somehow be used as evidence of racial animus,

12

1    is shocking.

2            So the Government's position is there is no

3    evidence to justify the new hearing here in the first place,

4    but to be absolutely fair, the Government's position before

5    was that GPS monitoring with a curfew was fine.  The

6    Government hasn't changed its position about that.

7            And if the Court, despite the lack of proper

8    procedural status to be able to make that modification, if

9    the Court wanted to do that, the Government wouldn't object.

10           THE COURT:  So let's talk about that.  And I will,

11   of course, allow defense counsel to address that, as well.

12           That is my recollection that the Government sought

13   GPS monitoring and curfew at the time of the initial hearing,

14   that defense counsel suggested that Defendant preferred radio

15   frequency monitoring and home confinement.

16           But to the extent that the Government is now

17   saying the Government has no objection to changing the

18   conditions of release to electronic monitoring and a curfew,

19   does the Government have a position with respect to the

20   timing of the curfew?

21           I understand from the pre-trial services report

22   that Ms. Tew does not drive, and, therefore, my thinking is

23   that a curfew, you know, with two small children, of around

24   7:00 p.m. would probably work for the Defendant.

25           What is the Government's position with respect to

13

1   the curfew?

2           MR. KIRSCH:  I didn't discuss this with the

3   probation officer in advance.  I'm sorry.  7:00 p.m. would be

4   completely reasonable to the Government under those

5   circumstances.

6           Our memory is that Mr. Tew's curfew is 9:00 p.m.

7   If the Court were to find that it made sense for them to have

8   the same curfew, the Government wouldn't object to that

9   either.

10           And if Officer Morales has a suggestion for a

11   different time, then we would be likely to defer to that

12   suggestion.

13           THE COURT:  Okay.  And I'll let you talk, Mr.

14   Ekeland.  I promise I will.

15           But Mr. Morales, as I understood it, you don't

16   have a particular preference with respect to a curfew 7:00

17   p.m., 9:00 p.m.?

18           MR. MORALES:  No, Your Honor.

19           THE COURT:  All right.  Thank you.  And I

20   understand also from Mr. Morales that Ms. Tew has done very

21   well on her release to-date.  There is no dispute with

22   respect to that.  There is no allegation of violations of the

23   conditions of her release whatsoever.  I am taking judicial

24   notice of that, as well.

25           All right, Mr. Ekeland, what is your position with

14

1   respect to a potential modification that would include

2   electronic monitoring instead of radio frequency monitoring,

3   and a curfew of 8:00 a.m. to 9:00 p.m.?

4            MR. EKELAND:  Your Honor, we would obviously like

5   no ankle monitoring, as we've argued before, release on

6   personal recognizance.

7            But if there was to be a curfew that ends at 9:00

8   p.m., is acceptable.  And if we could eliminate the home

9   confinement, that's excellent, as well, Your Honor.

10           THE COURT:  All right.  Well, we're in a bit of a

11  procedural quandary here because of the language of the Bail

12  Reform Act.

13           But I am inclined to construe loosely the language

14  requiring information exists that was not known to the movant

15  at the time of the hearing, and to give her the benefit of

16  the doubt with respect to the bruising that was caused by the

17  radio frequency monitor.

18           Arguably, that is information that was not --

19  certainly was not known to the movant at the time of the

20  hearing.

21           And so for that reason, the Court will find that

22  it is appropriate to reopen the hearing to address the issue

23  of the conditions of release.

24           I do take judicial notice of the fact that the

25  Defendant has performed well on the conditions of the release

15

1    to-date.  I also take notice of her affidavit with respect to

2    the bruising from the radio frequency monitoring.

3          I do agree with the Government that given the

4    unique circumstances of this Defendant's background, there is

5    a reason to impose some conditions that will not be overly

6    restrictive, but will guarantee her appearance in Court in

7    the future.

8          I am well aware of the Defendant's

9    responsibilities for her two children, including one of whom

10   is a special needs child.  I am aware of the Defendant's

11   husband's bond conditions at this time.

12         And the Court finds that the bond conditions

13   should be modified, in part, to remove the condition of home

14   confinement, to replace the radio frequency monitoring with

15   electronic monitoring, and to also impose a curfew of 8:00

16   a.m. to 9:00 p.m., so that the Defendant's movements will be

17   monitored between 8:00 a.m. and 9:00 p.m. pursuant to the GPS

18   monitoring, but she won't be dealing with the radio frequency

19   monitoring, which sets off every time she wants to take the

20   kids to the pool, or anything like that.

21         Mr. Morales, is there something you wanted to add?

22         MR. MORALES:  No, Your Honor.  I just wanted it to

23   be clear it's going to be GPS monitoring with a curfew from

24   8:00 to 9:00 p.m.?

25         Could there be some discretion also to allow for

16

1  changes in that?

2          THE COURT:  I was just going to get to that.

3          MR. MORALES:  Okay.

4          THE COURT:  So, you know, we're fortunate that

5  we're dealing with a very experienced United States Probation

6  Officer, who is responsible for Ms. Tew's monitoring while

7  she's on her conditions of release.

8          And in the past, I have modified the authority of

9  the United States Probation Officer to provide essentially

10  exceptions for emergency circumstances, for leisure

11  circumstances, when, in the judgment of the United States

12  Probation Officer, it is appropriate to do that.

13          And I will do that here, as well.  In other words,

14  to the extent that some exception would like to be -- the

15  Defendant would like some exception to her curfew to be made

16  for purposes of leisure activities or anything else, she may

17  ask the United States Probation Officer to authorize that

18  exception, and I'll allow him to do that in his judgment.

19          And there will be no second guessing of that by

20  the Court.  So the United States Probation Officer will have

21  the authority to speak to the Defendant and/or her counsel

22  with respect to modifications of the curfew on an as-needed

23  basis, and to make a decision as to whether it's appropriate

24  based on the circumstances that arise.

25          Does that make sense?

Case No. 2020-000-0505-DDD   Document 644   Filed 01/24/23   Page Color 200   pg

17

```
 1          MR. EKELAND:  Yes, Your Honor.  Thank you.

 2          THE COURT:  All right.  You're welcome.

 3          THE COURT CLERK:  Would Your Honor like to execute

 4   an amended order setting the conditions?

 5          THE COURT:  I think we can cover this, frankly, in

 6   the minutes of today's proceeding.  I want to make sure I

 7   have the Defendant's statement on the record that she

 8   understands the modification of the conditions of her

 9   release.

10          The motion, for the record, is granted in part and

11   denied in part.

12          The Defendant's conditions of release are modified

13   to remove the home confinement condition, to remove the radio

14   frequency monitoring condition, to add a condition for GPS

15   monitoring.  That's going to have to be put in place, of

16   course, by the United States Probation Officer.  To add a

17   curfew of 8:00 a.m. to 9:00 p.m., and to allow the U.S.

18   Probation Officer to have discretion to allow exceptions to

19   the curfew when requested by the Defendant on the judgment of

20   the United States Probation Officer, as appropriate.

21          Do you understand those conditions, or

22   modification of your conditions, Ms. Tew?

23          MS. TEW:  Yes.

24          THE COURT:  All right.  Then the minutes will

25   reflect the modifications, and the minutes will reflect that
```

1  the Defendant understands the modifications of the

2  conditions.

3         And, of course, you also agree to comply with

4  these modified conditions, Ms. Tew.

5         MS. TEW:  I wasn't aware that I would have to be

6  switched to a GPS monitor, which is unfortunately much

7  heavier than the RF monitor, and it also has a separate

8  battery attachment.  And to my knowledge, there's only one

9  unit available.

10        And previously, the first time, and that was on-

11 line, but I believe my former attorney had worked out an

12 agreement where there would be home confinement with a land

13 line, not even an RF ankle monitor, which is how I ended up

14 here.  There was just some confusion there.  But I never once

15 elected for the GPS location just because of the size, and

16 it's just -- it's not a great fit for my current situation

17 with two children.

18        THE COURT:  I mean, I understand that you'd prefer

19 not to have monitoring.  I get that.  You know, I understand

20 that there -- it's difficult, especially in the summertime,

21 to have monitoring because they are visible on a person's

22 leg.

23        For example, going to the pool is a perfect

24 example of a time when a monitor is visible.  And there is a

25 stigma, and it can be an issue of embarrassment and all of

1   that stuff.

2          But the fact of the matter is that based on the

3   record before the Court, the Court is going to impose some

4   kind of monitoring requirement.  The GPS monitoring allows

5   you greater freedom, because you can leave your home.  You'll

6   still be monitored, but never -- and I understand it's

7   heavier and maybe more cumbersome to you, but generally the

8   GPS monitoring is a better situation in terms of your ability

9   to move around and to move around with your children if you

10  wish to do that.

11         So, you know, it's sort of a -- the Court is going

12  to impose it.  And I understand your objection to it.  I

13  understand your concerns about it.

14         What I need to know from you is that you

15  understand that that's going to be imposed, and that you

16  agree that you're going to abide by the conditions that I am

17  imposing.

18         MS. TEW:  Yes, Your Honor.  Thank you for your

19  time.

20         THE COURT:  All right, thank you.  So the minutes

21  will reflect the modification of the conditions, the partial

22  granting of the motion to modify.

23         Is there anything else that we need to address

24  today from the Government's point of view.

25         MR. KIRSCH:  No, thank you, Your Honor.

20

1      THE COURT:  Thank you.  Anything else from the

2  Defendant?

3      MR. EKELAND:  No, Your Honor, thank you.

4      THE COURT:  Thank you.  We're in recess.

5      THE COURT CLERK:  All rise.  Court is in recess.

6          (Time noted:  11:30 a.m.)

7              *  *  *  *  *

8              <u>CERTIFICATE</u>

9      I, RANDEL RAISON, certify that the foregoing is a

10  correct transcript from the official electronic sound

11  recording of the proceedings in the above-entitled matter, to

12  the best of my ability.

13

14

15  _____        August 20, 2021

16  Randel Raison

17

18

19

20

21

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF COLORADO

 3
      Criminal Action No. 20-cr-00305-DDD
 4

 5     UNITED STATES OF AMERICA,

 6             Plaintiff,

 7             vs.

 8     KIMBERLY ANN TEW and MICHAEL AARON TEW,

 9             Defendants.

10    -------------------------------------------------------------

11                        REPORTER'S TRANSCRIPT
                             MOTION HEARING
12    -------------------------------------------------------------

13
              Proceedings before the HONORABLE DANIEL D. DOMENICO,
14    Judge, United States District Court for the District of
      Colorado, commencing at 9:37 a.m. on the 12th day of
15    October, 2022, in Courtroom A1002, Alfred A. Arraj United
      States Courthouse, Denver, Colorado.
16
                              APPEARANCES
17
      For the Plaintiff:
18    BRYAN D. FIELDS and ALBERT C. BUCHMAN, Assistant U.S.
      Attorneys, UNITED STATES ATTORNEY'S OFFICE, 1801 California
19    Street, Suite 1600, Denver, CO 80202

20    For the Defendants:
      PETER BORNSTEIN, Attorney at Law, THE LAW OFFICES OF
21    PETER R. BORNSTEIN, 6060 Greenwood Plaza Blvd., Suite 500,
      Greenwood Village, CO 80111
22

23


24       JULIE H. THOMAS, RMR, CRR, 901 19th Street, Room A256,
           Denver, CO 80294, (303)296-3056  (CA CSR No. 9162)
25

               Proceedings reported by mechanical stenography;
                   transcription produced via computer.
```

1                          I N D E X

2

      GOVERNMENT'S WITNESSES                              PAGE

3
      ANTHONY ROMERO
4        Direct - Mr. Fields                               54
         Cross - Mr. Bornstein                             75
5        Redirect - Mr. Fields                            100
      SARAH ANDERSON
6        Direct - Mr. Fields                              108
         Cross - Mr. Bornstein                            119
7     LISA PALMER
         Direct - Mr. Fields                              144
8        Voir Dire - Mr. Bornstein                        150
         Direct (Resumed) - Mr. Fields                    154
9        Cross - Mr. Bornstein                            162
         Redirect - Mr. Fields                            172
10

11                    GOVERNMENT'S
                      EXHIBITS                    RECEIVED
12
                      6                              154
13
                      6:2-3                           59
14
                      7                              155
15
                      8                              158
16
                      8:34-35                         64
17

18
                      DEFENDANTS'
19                    EXHIBITS                    RECEIVED

20                    A                               85

21                    B                               87

22

23

24

25

      Julie H. Thomas, RMR, CRR                   (303)335-2111

20-cr-00305-DDD                    Motion Hearing                    10/12/2022    3

MOTIONS                                                                    PAGE

Defendant Kimberly Ann Tew'S Motion for Severance
[218]
    Mr. Bornstein                                                           6
    Mr. Fields                                                              8
    Mr. Bornstein                                                          11
    Mr. Fields                                                             15
    Mr. Bornstein                                                          17
    Mr. Fields                                                             18
    Mr. Bornstein                                                          19
    Taken Under Advisement                                                 20

Defendants' Motion for Franks Hearing [215]
    Mr. Bornstein                                                          21
    Mr. Fields                                                             25
    Mr. Bornstein                                                          41
    Ruling of the Court                                                    51

Defendants' Motion to Suppress Evidence From
Search of 3222 East First Avenue, Apartment 224
[221]
    Mr. Fields                                                            175
    Mr. Bornstein                                                         178
    Taken Under Advisement                                                193

Defendants' Motion to Suppress the Use of
Statements [216]
    Mr. Fields                                                            183
    Mr. Bornstein                                                         187
    Taken Under Advisement                                                193

Defendants' Motion to Suppress [200]
    Mr. Bornstein                                                         193
    Mr. Fields                                                            200
    Mr. Bornstein                                                         210
    Mr. Fields                                                            213
    Taken Under Advisement                                                215

Defendants' Motion for Sanctions for Violating
Communication Privileges [214]
    Mr. Bornstein                                                         215
    Mr. Fields                                                            221
    Mr. Bornstein                                                         229

Defendants' Motions for James Hearing [219] [220]
    Mr. Fields                                                            228
    Mr. Bornstein                                                         230
    Taken Under Advisement                                                233

Julie H. Thomas, RMR, CRR                            (303) 335-2111

```
1          (Proceedings commenced 9:37 a.m.,
2       October 12, 2022.)
3             THE COURT:  Good morning.  Please take your seats.
4             This is a motions hearing in Case No. 20-cr-305,
5    United States versus Michael Aaron Tew and Kimberley Ann Tew.
6    We have a number of motions.
7             Before we begin, I just want to let everyone know
8    that last night I started feeling a little unwell, got a bit
9    of a slight fever and some aches, so I took some medicine,
10   took a COVID test last night and another one this morning,
11   negative.  Just thought I would let everybody know.  I'm
12   feeling better today.  The fever is gone.  If anybody wants to
13   wear a mask, you're certainly welcome to, but I just thought I
14   would let everyone know about that little scare I had last
15   night, but I think I can make it through today, if anybody has
16   a problem with that.
17            Why don't I, with that, ask everyone to -- counsel to
18   enter their appearances and introduce the folks that they have
19   brought with them today.  For the Government?
20            MR. FIELDS:  Good morning, Your Honor.  Bryan Fields
21   for the United States, and I'm joined at counsel table by
22   Al Buchman.  In the audience are Special Agent Lisa Palmer
23   with the IRS, Special Agent Sarah Anderson with the FBI, and
24   Special Agent Anthony Romero with the IRS.
25            THE COURT:  All right.  Thank you all for being here.
```

```
 1          For the defense?

 2          MR. BORNSTEIN:  Good morning, Your Honor.  Peter

 3   Bornstein appearing on behalf of the defendants.  With me at

 4   counsel table is Kimberley Tew and Michael Tew.

 5          I would also, just as the Court mentioned its health

 6   issue, they have a sick child, and their sick child is also

 7   their child who has got special needs.  There's a nurse

 8   watching them, but they wanted me to alert the Court that if

 9   they got an emergency phone call, that the Court would know

10   that from the beginning.

11          THE COURT:  Okay.  I appreciate that.  And I think --

12   I mean, I really kind of want to get through all this, so

13   obviously I totally understand.  If someone needs to leave,

14   they can waive their appearance here, and we can just proceed,

15   but I certainly understand that.  And thank you, and welcome.

16          So Miss Dodds, I think, sent out an e-mail kind of

17   letting you know the structure of how I wanted to proceed

18   today.  Part of the reason I wanted to start with the

19   severance motion, frankly, was I just want -- there are a

20   couple things about that motion that made me want to make

21   sure, Mr. Bornstein, that there's not a conflict with your

22   joint representation.  And we had this hearing -- we had a

23   hearing.  I know that you weren't -- that wasn't with you, but

24   the Tews had to make sure they understood the risks of joint

25   representation, but the severance motion makes a couple of
```

Case No. 20-cr-00305-DDD   Document 485   filed 12/27/22   USDC Colorado   pg
129 of 460

1    points that concern me a little bit about making sure there's

2    not a conflict in your representation of both defendants.  And

3    so I just thought I would let you address that, make sure you

4    have thought through whether severance is in both defendants'

5    interest.  I know it was filed only on behalf of Miss Tew.  Is

6    there any reason I should be concerned about whether severing

7    the case would potentially be in one of your client's

8    interests but not the other?

9           MR. BORNSTEIN:  Should I come to the podium?

10          THE COURT:  Either way is fine, but for this part it

11   might be easier if you just stay where you are.

12          MR. BORNSTEIN:  My analysis of the severance issue is

13   that if the Court were to grant a severance, that that would

14   not prejudice Miss Tew.  In fact, it would avoid prejudice to

15   Miss Tew.  And I don't see how that would prejudice Mr. Tew

16   other than it would raise some evidentiary issues in which

17   some evidence, as I mentioned, about potential statements that

18   the Government might use that implicate each other, but that

19   would have to be worked through somehow by the Court in terms

20   of what would be admissible and what would not be admissible.

21   But in terms of my professional role in representing both of

22   them, I don't see the severance issue as raising that badly.

23          THE COURT:  Okay.  I mean, I just -- I think there's

24   a line in there about needing to cross-examine Mr. Tew.

25   Cross-examining your own client is obviously problematic

Case No. 20-cr-00305-DDD  Document 685  Filed 12/27/22  USDC Colorado  pg
130 of 460

1   potentially, but that may have been just kind of a

2   misstatement about the way the process would work.  I just

3   want to make sure you've kind of fully thought through what

4   that would look like.

5          And I guess my other question was would it -- part of

6   the motion is based on this idea that the jury would have

7   difficulty separating the two of them out given their

8   relationship.  Does having one lawyer representing them both,

9   doesn't that potentially exacerbate that risk?

10         MR. BORNSTEIN:  Your Honor, yes, it does, and that's

11  why I have to -- I have professionally advised both clients,

12  independently of each other, of the risks that are involved in

13  having joint representation, told them that there are risks,

14  suggested to them that two lawyers are better than one and

15  that that would be preferable for them to have two lawyers

16  rather than one.  However, their decision is to go with one

17  lawyer.  Maybe some of that is financial, maybe some of that

18  is related to some other issues between them, but I think I've

19  advised them that it's a problem and that I would prefer to

20  have another lawyer, but that's their decision.

21         THE COURT:  All right.  Thank you, Mr. Bornstein.

22         Mr. Fields, Mr. Buchman, does the Government want to

23  weigh in on this at all?

24         MR. FIELDS:  Yes, Your Honor.  May I -- is speaking

25  from here okay?

Case No. 2020-0000505-DDD   Document 64-285   filed 01/24/22   USDC Colorado   pg
131 of 460

```
1              THE COURT:  Yes.

2              MR. FIELDS:  So, Your Honor, we would reiterate all

3    the arguments we made about joint representation.  It's

4    extremely problematic in this case.  And if Mr. Bornstein, as

5    he just commented, thinks that two lawyers would be

6    appropriate, one could be appointed by the Court.  So

7    financial, sort of, means should not play into that analysis.

8              In terms of the severance motion, the Government

9    believes that a joint trial is good for reasons of judicial

10   economy, but if there was a severance, a trial against

11   Kimberley Tew by herself would actually be much easier.  She

12   would be much more prejudiced by a separate trial, and the

13   reason for that is that Michael Tew proffered.  In his

14   proffer, he provided extensive text messages detailing the

15   conspiracy.  Those text messages might not be admissible in a

16   joint trial.  They would almost certainly be admissible

17   against Miss Tew in a separate trial.  So at that point, if

18   you have a separate trial, Miss Tew is going to be confronted

19   with text messages by her husband outlining her involvement in

20   the scheme as a coconspirator as well as his own involvement

21   and the involvement of Jonathan Yioulos.  So a severance in

22   that case actually does prejudice Miss Tew, and I was actually

23   surprised to actually see a severance motion in this case for

24   exactly that reason.

25             You also have the problem of if the Court is inclined
```

Julie H. Thomas, RMR, CRR                              (303)335-2111

Case No. 20-cr-00305-DDD    Document 485    Filed 12/27/22    USDC Colorado    pg
132 of 460

1    to grant any of these motions to suppress, some of the --

2    Fourth Amendment rights are personal rights.  So the fact

3    that, let's say, Miss Tew is using one of the e-mail accounts;

4    Michael Tew is using one of the others.  You suppress one of

5    those accounts.  If you suppress Michael Tew's account because

6    he has a right to privacy in it and he's using it, that

7    evidence could still be used against Kimberley Tew at a

8    separate trial.

9            Severance here presents all sorts of problems, and I

10   think that actually this motion has just highlighted a lot of

11   the issues the Government has previously presented.  So we

12   would again reiterate that a trial here or going forward in

13   this case both clients should have independent representation

14   that guarantees a fair trial and that also prevents a 2255 or

15   appellate issues down the road.  And so I don't see any good

16   reason here to allow joint representation, especially when the

17   Court could appoint independent counsel.

18           THE COURT:  Well, so I appreciate that, Mr. Fields,

19   and we went through this once before.  I understand all the

20   arguments.  I get it.  On the other hand -- and I should

21   reiterate that if it's truly a financial issue, Mr. Fields is

22   right, depending -- obviously there are kind of limits and

23   requirements for getting appointed counsel, but if it's truly

24   a financial issue, there may be ways to solve that.  I don't

25   think that should drive the decision.

Julie H. Thomas, RMR, CRR                              (303)335-2111

1        I do think they have -- there are potential other

2    benefits to -- as I mentioned when we first went through this,

3    there are potential benefits to being able to have joint

4    representation and act jointly.  It is risky in a number of

5    ways, as Mr. Fields pointed out.  I, like everyone, urge the

6    Tews to really think through whether this is the best way to

7    handle this case for both of them and for each of them, but at

8    this point, given Mr. Bornstein's having thought it through,

9    having discussed it with them, their having decided again to

10   continue running those risks, I'm not going to require that

11   they have separate counsel at this time, but I do urge

12   Mr. Bornstein to keep an eye on whether it goes beyond just

13   thinking it would be preferable to have joint -- separate

14   counsel to being truly necessary, because it could certainly

15   tip over into that.

16        All right.  So thank you for addressing that, both of

17   you.

18        Then we might as well -- Mr. Fields got a little bit

19   into the merits of the severance motion.  I'll just say both

20   of these first -- both *Franks* and the severance issue I want

21   to give you a chance to make your case.  I'm pretty skeptical

22   on both of them, Mr. Bornstein, that you have met the burden

23   or that you can meet the burden that you have to justify

24   either of those things, but I did want to give you a chance to

25   make the argument this morning.  So why don't you go ahead and

1    explain to me why you think -- and I've read all the briefs.

2    I've read some of the cases.  Explain to me why you think

3    severance is appropriate in this case, and then we can go from

4    there.  So Mr. Bornstein.

5            MR. BORNSTEIN:  Your Honor, let me first address the

6    *Bruton* issue with respect to the severance.  At the time that

7    I wrote the motion and I wrote in that motion, as far as

8    *Bruton* was concerned, that there was statements made by

9    Michael Tew that would implicate and incriminate his wife,

10   Kimberley Tew, and I was not particularly specific about those

11   statements, and the Government called me on that and said in

12   their response that I wasn't specific.

13           So since that time I have tried to -- there was a

14   particular set of telephone calls that were made on July 7th

15   of 2020.  On July 7th of 2020, the FBI and the IRS had

16   contacted Mr. Jonathan Yioulos in Buffalo, New York.  They had

17   indicated they were going to arrest him, that he was going to

18   be charged in a case here in Denver, and he decided to

19   cooperate.  And in terms of his cooperation that day on

20   July 7th, the Government agents arranged for a pretext call in

21   which Mr. Yioulos would, with the Government listening in,

22   make a pretext call to Michael Tew and try to get him to make

23   incriminating statements on the telephone that the Government

24   could use against him at the trial.

25           At the time we had one hour and 13 minutes worth of

Julie H. Thomas, RMR, CRR                              (303)335-2111

     1   audiotapes of these conversations -- well, maybe not that long

     2   with that one, but we had audiotapes, and the Government had

     3   not provided me with a transcript of those audios.  So we

     4   had -- we used a program, software program that's not very

     5   good, to produce some transcripts that I could then use to

     6   bolster my argument that there is a *Bruton* problem in the

     7   case.

     8           I now have these bad transcripts, but they are able

     9   for me then to point out to the Court that in several specific

    10   parts of the case -- parts of the conversation, Mr. Yioulos

    11   would ask Mr. Tew something about his wife and thereby elicit

    12   from him that -- and his incriminating statements,

    13   incriminating statements about his wife, and he would -- from

    14   what I've read in these transcripts, at least four or five

    15   times he moves the conversation -- I don't know if the agents

    16   were, you know, behind there saying what to do, but -- we

    17   don't know that yet, but anyway I can tell from the

    18   transcripts that he would move the conversation and say, Well,

    19   didn't Mrs. Tew do X, Y, and Z, and didn't she participate

    20   this way, and didn't she participate that way?

    21           THE COURT:  But isn't the Government's point that

    22   they will redact any statements like that and they won't get

    23   to use those in a joint trial, and potentially if it's

    24   separate then they would be used against her in a separate

    25   trial?

1           MR. BORNSTEIN:  Well, I would like to hear from the

2     Government on how they are going to do that with these since

3     they're audio, since they're audio statements and not written

4     statements or otherwise written by Mr. Yioulos and adopted by

5     him as a statement.  They're mixed in.  I foresee that there's

6     a big problem.  I don't know how the Government can do that.

7     I don't know how -- yes, that's what the law says you can do

8     to avoid the *Bruton* problem, but I think, as a practical

9     matter, I think the Government has a big problem here.

10          THE COURT:  Fair enough.  I'll be curious about

11    exactly how they plan, and what they plan to redact is a good

12    question, and I will expect them to address that.

13          MR. BORNSTEIN:  And then the second part that I

14    raised in my motion, other than the *Bruton* issue, is what

15    either is called the spillover issue.  And, again, this all --

16    there's a lot of spillover in this case involving Mr. Yioulos

17    talking about the two of them acting together or not acting

18    together.  At one point he says, I don't want to talk to you

19    anymore, and says, I don't want to have any more conversations

20    with Mrs. Tew, and yet again sometime later the Government

21    claims that there was a conversation, at least by text, that

22    we say is not hers.  It's not her text message.  It's Michael

23    Tew's text message.  And so we have a lot of spillover.

24          And then, finally, my third part of my argument

25    relates to the issue of whether -- when there's a trial

```
 1   involving a husband and wife and the allegations are that

 2   they're in it together -- I mean, that's the allegations in

 3   the case; it's a conspiracy that, you know, they're obviously

 4   involved together, according to the Government's theory --

 5   will the jury be able to give her a separate, independent

 6   evaluation of the evidence and not taint her with the evidence

 7   against her husband.

 8           Those are the three parts of my argument.  The

 9   Court's read it, and that's how I present the severance issue.

10           THE COURT:  All right.

11           MR. BORNSTEIN:  I have one more thing.

12           THE COURT:  Go ahead.  Go ahead.

13           MR. BORNSTEIN:  One more thing.  The other reason I

14   file severance motions in cases such as this is just in case

15   something happens in the middle of trial.  And so if I've

16   alerted the Court to the fact that there could be a big

17   problem, that evidence could come in that would taint one or

18   the other, that something might be that the jury would have

19   big trouble following an instruction, I've preserved that

20   issue.

21           THE COURT:  Okay.  Thank you.

22           Mr. Fields, go ahead and respond however you want,

23   especially with how you plan to do redactions, how we can

24   maybe -- how much of that can be dealt with before trial so we

25   don't run into this issue that he just raised.
```

Julie H. Thomas, RMR, CRR                              (303)335-2111

1        MR. FIELDS:  Absolutely, Your Honor.  So first with

2   that July 7th telephone call, that July 7th telephone call

3   wouldn't be covered by *Bruton* anyways.  That July 7th

4   telephone call would involve coconspirator statements which

5   are classically non-Brutoned.  There's no confrontation clause

6   issue related to those because they're nontestimonial.  That's

7   black-letter law.  It's United States versus Clark, 717 F.3d

8   790.  It's a Tenth Circuit case from 2013.  So nothing in that

9   pretextual call would need to be redacted.

10        THE COURT:  So those would come in, either way,

11   unredacted in a joint trial, a separate trial.  That's your --

12   okay.

13        MR. FIELDS:  Correct, Your Honor.  The redactions

14   would come into play -- and this is actually maybe the more

15   difficult issue -- if Mr. Bornstein decides to violate the

16   proffer agreements and present a defense, which would be

17   inconsistent from what the Tews told us in their proffers.

18        So let's talk about the proffers for a second.  Both

19   of these defendants have proffered with the Government.  That

20   means they've come in, they've talked about their role in the

21   scheme in some detail.  Both have admitted that they're

22   guilty.  If during the trial they present a defense that's

23   inconsistent with those proffer statements, then those

24   proffers can potentially come in.  Those would be testimonial,

25   and those would be potential *Bruton* statements.

Julie H. Thomas, RMR, CRR                              (303)335-2111

 1          Those are audiorecorded.  I think that those

 2   redactions can be done if the defense does intend to breach

 3   the proffer agreements.  One of those proffer meetings with

 4   Michael Tew, the first one, was sort of cabined in a way so

 5   that he was not talking about Kimberley Tew.  So that one is

 6   very easy to redact, because he's mostly talking about his own

 7   complicity in the scheme, and we would just play the tape.

 8          Kimberley Tew's proffer, her proffer and Michael

 9   Tew's second proffer are not so cabined, but even in those

10   cases it would be pretty easy to do the redactions if

11   redactions were even necessary.  So there are times where in,

12   for instance, Kimberley Tew's proffer where she just says, I'm

13   guilty, and then talks about why she alone is guilty.  So you

14   don't have to redact anything there.  She's not implicating a

15   coconspirator.

16          The reason that that might become problematic is

17   depending on, sort of, how the case goes.  If Mr. Bornstein

18   does breach the proffers in the middle of the trial, that

19   could create a severance issue in the middle of trial, and

20   also we again end up with this issue involving their joint

21   representation.  So I think it is important for Mr. Bornstein

22   to, sort of, make a representation that he does not intend to

23   breach the proffer agreements.

24          THE COURT:  What do you mean -- what is your take on

25   what would breach the proffer, in your view?  When you say

Julie H. Thomas, RMR, CRR                              (303) 335-2111

1    that, you mean presenting some sort of evidence, rather than

2    just requiring you to prove your -- I'm curious what your

3    position on -- what would -- what could they do besides just

4    say there's insufficient evidence and not present a defense

5    that, in your view, would not breach the proffers?

6         MR. FIELDS:  Our position is that they are limited to

7    presenting a defense that basically says the Government's

8    evidence is insufficient, so a complete reasonable doubt

9    defense.  If they try to present evidence, testimony, argument

10   that they did not participate in this scheme, then the proffer

11   agreement is breached, and those proffer statements can come

12   in.

13        We can redact them at that point to avoid any *Bruton*

14   issues if the Court wants to hold a joint trial.  If the Court

15   is inclined to grant the severance, then both of those proffer

16   agreements can come in.

17        THE COURT:  Okay.  Thank you, Mr. Fields.

18        MR. BORNSTEIN:  Your Honor, may I address one thing

19   that Mr. Fields raised that I disagree with?

20        THE COURT:  Yes, please.

21        MR. BORNSTEIN:  He began -- Mr. Fields began his

22   argument by saying that the July 7th telephone conference is a

23   statement by coconspirators.  However, my understanding of the

24   law is that once Mr. Yioulos had given it up and was working

25   with the Government, he was no longer a conspirator, and that

Julie H. Thomas, RMR, CRR                                    (303)335-2111

1   telephone call was not made in furtherance of the conspiracy.

2   And so under 801(d)(2)(3) [sic] it has to be done both by a

3   conspirator and made in furtherance of the conspiracy, and if

4   that telephone call was made in furtherance of helping the FBI

5   or the IRS, it doesn't count.

6        THE COURT:  So his statements you might be right

7   about, but aren't we talking about Mr. Tew's statements?  And

8   he was still, at least thought he was, trying to further the

9   conspiracy.

10        MR. BORNSTEIN:  I think it's the conversation,

11   whether that conversation was made in furtherance of the

12   conspiracy, not whether one person was -- erroneously thought

13   that he was still involved in it and was wrong.

14        THE COURT:  Okay.  Thank you, Mr. Bornstein.

15        Mr. Fields -- and Mr. Bornstein, I'll give you a

16   chance to answer this too -- this issue about the proffers

17   seems to me to be potentially -- not necessarily -- I mean, I

18   guess it plays into, obviously, into the severance question,

19   but it, sort of, seems to me that it might behoove all of us

20   to try to kind of fight that out before we have a jury sitting

21   around and a trial going on.  Do you see any way we could

22   handle that before a trial, like figuring out exactly what

23   they can and can't do, or do we just have to, sort of, see how

24   the trial goes?

25        MR. FIELDS:  Your Honor, I have a proposal.  I think

Julie H. Thomas, RMR, CRR                          (303)335-2111

1    there are -- do you want me to take --

2              THE COURT:  Either.  It doesn't matter to me.

3              MR. FIELDS:  So I think there are two options.  The

4    first option would be for Mr. Bornstein to represent here

5    today that he has no intention of breaching the proffer

6    agreements.  If that's the case, then we, sort of, know

7    exactly what trial is going to be like.  It's going to be a

8    reasonable doubt defense.  He will cross-examine, he will

9    impeach, he will do what he needs to do, but that's the trial.

10             On the other hand, if he thinks there are

11   circumstances where he would need to breach the proffer

12   agreements, at that point we would handle it through a motion

13   in limine, which I can file relatively quickly, and we can set

14   a, sort of, pretrial hearing on the motion in limine, which

15   usually wouldn't be granted because motions in limine, but

16   that's a pure issue of law, and I think it's one that could be

17   teed up easily before the trial.

18             THE COURT:  Okay.  I guess -- well, why don't I ask

19   Mr. Bornstein.

20             Mr. Bornstein, is your view of the proffer agreements

21   consistent with Mr. Fields' view that you're, sort of, limited

22   to a reasonable doubt defense and -- unless you want to

23   potentially allow those proffers in, or do you disagree with

24   his take on that?

25             MR. BORNSTEIN:  I disagree with his take.  I think

Julie H. Thomas, RMR, CRR                            (303) 335-2111

```
 1   it -- let me try it this way.  It is possible for my clients
 2   to take the stand and testify consistent with the proffer but
 3   add facts or discuss facts that were not either dealt with in
 4   the proffer or were misunderstood in the proffer.  It's
 5   walking a fine line.  I don't know if I would do it or not.
 6   That's a tactical decision.  I haven't made that tactical
 7   decision.  I probably wouldn't make that tactical decision
 8   until the middle of trial.  But I have thought through that
 9   fact that that is a line that could be walked.
10           THE COURT:  But in that case you would -- they would
11   take the stand, but the proffers would also come in.  Is that
12   right?
13           MR. BORNSTEIN:  No.  As I understand the terms of the
14   proffer, they have to deny something that they told the
15   Government in the proffer, and then the proffers come in.
16           THE COURT:  Okay.  All right.  Well, I guess we'll
17   see if we can work that out beforehand, but I guess you're
18   probably right, Mr. Bornstein, it may just -- we may just have
19   to see how it goes.  All right.  Thank you.
20           So I should say on most of these things I'm probably
21   going to issue a written order as quickly as I can.  I'm not
22   inclined right now to sever.  I'll go back and look through a
23   little bit and issue a written order.  I do want to make sure
24   we kind of clarify how redaction would work.  So I'll probably
25   issue a written order.
```

Julie H. Thomas, RMR, CRR                              (303)335-2111

 1              If there's nothing else on that, I would like to turn

 2    to the *Franks* issue.  And, to be clear, what I want to do

 3    right now is figure out if a *Franks* hearing is necessary.  My

 4    inclination, as I said before, is that it's not.  It's a high

 5    burden, as the Government has pointed out.  I did sense -- in

 6    the reply there were affidavits attached.  I wanted to give

 7    Mr. Bornstein an opportunity to explain his view of why those

 8    meet the very high burden under *Franks* for a hearing.

 9              So, Mr. Bornstein, why don't you go ahead and make

10    your argument on that, on why we should have a hearing.

11              MR. BORNSTEIN:  As the Court pointed out, in my

12    motion for the *Franks* hearing I indicated in the motion that

13    it's related to the search warrants, the multiple search

14    warrants that were issued in the case, some four or five of

15    them, each of which had an affidavit attached to it by one of

16    the -- IRS agent or the FBI agent.  And we have found in those

17    affidavits many omissions and misstatements of fact.  And the

18    Government filed their response, and they essentially said,

19    Well, we don't think that you have the right to a *Franks*

20    hearing just because you've set forth in detail in paragraph 4

21    A through Q or O what it is that you thought was misstatements

22    of fact or things that were left out, for example, the fact

23    that Mr. Yioulos had engaged in embezzlement of funds from

24    National Air Cargo before any transactions that involved

25    Mr. Tew, and that that was a serious fact, for example, that

Julie H. Thomas, RMR, CRR                              (303)335-2111

```
 1   the magistrate should have known about Mr. Yioulos and what he

 2   was saying and why the agents were using his statements to

 3   attempt to obtain a search warrant from the magistrates.

 4          The Government said that the case law required some

 5   sort of an offer of proof.  Or some cases talked about

 6   affidavits; some cases talked about testimony.  I'm prepared

 7   to put my clients on the stand to deal with each one of the

 8   issues A through O under the doctrine of the Simmons case,

 9   which says that if you are testifying in order to preserve a

10   constitutional issue, you don't waive your Fifth Amendment

11   rights and that can't be used against you.

12          So I didn't know that I needed to put my clients on,

13   so I got affidavits, and I had them each sign a declaration

14   with those materials in it.  I don't know how to meet this

15   burden without doing that.  That seems to me, reading the case

16   law, that if I provide declarations, set forth specifics about

17   what it is that we are saying are omissions or misstatements,

18   that that should be sufficient to get a Franks hearing.  If

19   the case law says that I have a higher burden than that, I

20   don't know how to meet it other than to put my clients on the

21   stand, as I'm willing to do, as I say, this morning.

22          THE COURT:  Well, I agree with you; I don't think

23   it's necessary to put them on the stand.  I think the

24   affidavits probably were necessary.  But my reading of the

25   case law and my understanding of the Franks doctrine is it's
```

```
 1    not enough to just say here are some things in the search

 2    warrant applications that weren't true.  You have to show that

 3    they were knowingly and recklessly untrue and that, even if I

 4    believe everything in the affidavits, that taking those out

 5    would mean there was no probable cause.  And I'm not sure you

 6    have met either of those burdens of showing knowing or

 7    reckless disregard for the truth or that even accepting all of

 8    these declarations that that defeats probable cause.

 9            MR. BORNSTEIN:  The only way I can answer the Court's

10    question about that is I can present the omissions and the

11    misstatements from the perspective of what the defense knows.

12    I cannot call the agent and ask them, Why did you say this,

13    you know, What belief did you have in saying this?  That's

14    beyond my ability either to call the agents and ask them for

15    information to support my motion, or at this hearing I don't

16    know if I could call them to establish that.

17            So the issue is, okay, there's a burden, there's a

18    bar, and it's a fairly high bar, and I have to meet that

19    fairly high bar, but I don't know how I can meet this first

20    part you mentioned without the agents testifying themselves.

21            THE COURT:  Well, it's always -- I mean, you're

22    right, it's a very difficult burden for the defense to meet.

23    I mean, that's just the law.  And the problem is, though, that

24    we often, in the law -- the prosecution in many cases has to

25    show that actions -- the defendants' actions were taken
```

Julie H. Thomas, RMR, CRR                                    (303)335-2111

```
 1   knowingly.  They can't force the defendants to testify.  So we

 2   have to use, sort of, our view of all the evidence, and does

 3   that add up to a suggestion that these misstatements, these

 4   false facts, were a knowing and reckless -- or reckless effort

 5   to mislead the magistrate judge or -- so I think that's your

 6   burden.

 7           And then, secondarily, you still have to show that

 8   there wasn't probable cause without these things, and I'm just

 9   not sure that, even accepting everything that's said in the

10   affidavits, even accepting your clients' statements as true,

11   that defeats probable cause.  And that is more of a, kind of,

12   straight legal question.

13           MR. BORNSTEIN:  Now, that straight legal question, as

14   I understand it, Your Honor, would involve perhaps taking the

15   affidavit, striking those parts of the affidavit that relate

16   to the matters that are either misstatements or omissions, and

17   then doing an analysis to determine if the balance is

18   sufficient or not.

19           THE COURT:  I think that's right.

20           MR. BORNSTEIN:  All I -- at this stage of the

21   proceeding, my analysis of the affidavit is that it's no

22   longer necessarily one that a magistrate ought to consider

23   anymore.  The Government has not done that exercise either.  I

24   guess neither of us have actually taken the exercise, excised

25   everything that relates to the matters A through O of
```

```
 1   paragraph 4 of the motion, and see what's left.

 2          THE COURT:  All right.  Thank you.  Why don't I give

 3   Mr. Fields a chance to respond.

 4          MR. FIELDS:  Thank you, Your Honor.  So first I want

 5   to dispel the notion that Franks is impossible to meet.  The

 6   usual Franks scenario is you are dealing with, let's say, a

 7   drug case, and you have a confidential informant or a witness

 8   who tells the agent something or at least the agents recount

 9   it in the affidavit.  Usually in the Franks context what will

10   happen is defense counsel or a private investigator for

11   defense counsel interview that witness, and the witness will

12   say, I didn't tell the cops that; that was completely false.

13   That's where you end up with a Franks hearing, because then

14   you have got a witness who is going to say the agents lied in

15   their affidavit.

16          The reason it's so difficult to meet the burden here

17   is that this is not that case.  It did not involve

18   confidential informants.  It is an incredibly

19   document-intensive fraud case where every aspect of the fraud,

20   from the invoices to the bank records, is laid out in paper

21   and described in the affidavits.  That makes a Franks

22   challenge in this particular context really difficult to meet.

23          THE COURT:  Let me ask you, really quickly, why is it

24   at least not sort of like your hypothetical?  We have sworn

25   statements that the defendants, at least for a number of these
```

Julie H. Thomas, RMR, CRR                                    (303)335-2111

1    things, would have personal knowledge about whether the

2    statement in the warrant affidavit is true, that say that's

3    not true.  So why is that not, at least in some ways, similar

4    to your hypothetical?

5              MR. FIELDS:  So in this particular case -- it's a

6    demonstrative exhibit we haven't gone through yet, but if you

7    look through the exhibit book here, Government Exhibit 43 lays

8    out each of the false allegations and then, sort of, where in

9    the search warrant it was.

10             What we have here is a situation where these

11   defendants have submitted post hoc affidavits, right, but they

12   don't describe what the agents knew at the time.  And there's

13   no allegation that at the time the agents knew all of these

14   things.  That's what's required for *Franks*.  And, as Your

15   Honor pointed out, you know, the Government is required to do

16   this all the time when we accuse someone of a crime, what was

17   your mens rea, what did you intend.  In this case defense

18   counsel has access to all the discovery, sort of, when -- you

19   know, a chronicle of the investigation, and has made no effort

20   to try to actually use all of that to craft this narrative

21   that the agents had certain evidence at the time and

22   recklessly omitted it or that they had evidence at the time

23   and just lied about it.  That's what's required in *Franks*.  So

24   they don't meet the intent prong.

25             The materiality prong here is also really

1   significant, Your Honor.  So, first of all, Mr. Bornstein says

2   neither party has really done that analysis.  It's not the

3   Government's analysis to do here, Your Honor.  He's the one

4   who is saying that this affidavit is so deficient that, you

5   know, there are these lies, and they are material, therefore,

6   a magistrate judge was hoodwinked.  Usually in a *Franks*

7   motion, every one I've handled in every District Court that I

8   have ever been in across the United States, what you will get

9   is defense counsel will submit an affidavit, and they will

10  actually black out the portions that they think are false,

11  right, so you can actually see it.  Then there will be a

12  detailed analysis in the motion of how -- if you look at, sort

13  of, all those black boxes in the warrant, Your Honor, all

14  those, sort of, gaps, that's now their missing PC.

15          That wasn't done here, and there's good reason for

16  that.  Most of these are relatively, like, nitpicky things.

17  So if you look at Government's Exhibit 43, one of the

18  allegations they are saying is false is that National Air

19  Cargo was a Florida corporation.

20          THE COURT:  Does Mr. Bornstein have a copy of your

21  exhibits?

22          MR. FIELDS:  He does.

23          THE COURT:  Okay.  Thank you.  Go ahead.

24          MR. FIELDS:  I am prepared to go through each of

25  them, sort of, piece by piece to talk about how they are

Julie H. Thomas, RMR, CRR                              (303)335-2111

 1   immaterial, but I don't think we need to do that now.  I will

 2   just use an example.

 3        So this Florida corporation.  Right?  First of all,

 4   the affidavit never says "Florida corporation."  So what they

 5   are saying is false isn't actually in there.  What it says is

 6   "a Florida company."  National Air Cargo was headquartered in

 7   Florida, had operations in Florida.  Its executives were in

 8   Florida.  And even if it wasn't a Florida corporation or a

 9   Florida company, it's hard to see how that would materially

10   affect whether or not there's probable cause to believe that

11   this company, outside the state of Colorado, was being fleeced

12   out of millions of dollars through all these fake invoices.

13        Similarly, you get some quibbling over did they have

14   multiple joint accounts or just one account.  If you look at

15   the affidavits in their totality, they are describing Michael

16   Tew and Kimberley Tew each had lots of different bank

17   accounts, and they were all using those bank accounts to, sort

18   of, funnel the money that they were taking from National Air

19   Cargo.  Whether one was joint or multiple were joint does not

20   make a material difference as to whether or not there's

21   probable cause.  Remember, that's a fair probability.  Reading

22   the warrant in a holistic, nonhypertechnical way, could a

23   magistrate judge have decided there's probable cause?  Yes.

24        I mean, for each of these warrants, each of the, sort

25   of, e-mail accounts, basically the structure of it is:  Here

Julie H. Thomas, RMR, CRR                                   (303)335-2111

 1    is the scheme as laid out by a coconspirator and also as

 2    corroborated by all these bank records.  National Air Cargo,

 3    they, as a corporation, retain their e-mails.  You look

 4    through those e-mails, and you see an e-mail coming in from

 5    Meyers Consulting Group, Inc., with an invoice.  So they have

 6    already got that e-mail.  They know that e-mail account was

 7    used to submit the false invoices.  We have a fair probability

 8    to believe that that account was used to commit a crime.

 9    That's all you need to issue a warrant here.

10            And all of these allegations they are making, even if

11    they were false, would be relatively immaterial to that

12    entire, sort of, calculation.

13            But going back to it, none of them are recklessly

14    false.  And there's no evidence here that these agents, who

15    lay all this out thoroughly, lied or were intentionally trying

16    to, sort of, hoodwink a magistrate judge to get a warrant they

17    otherwise didn't think they were entitled to.

18            THE COURT:  So let me just, sort of, ask you to

19    expand on -- I mean, how do we -- I think you're right, a lot

20    of these are nitpicky, and sort of individually none of them

21    would undermine probable cause, in my view.  I think I agree

22    with you that overall they don't undermine probable cause

23    probably, but can't we, sort of -- if there's a long list of

24    things that were wrong, isn't that generally how we do go

25    about proving -- well, if over and over again statements are

1  wrong, they tend generally to be statements that are more

2  incriminating than -- if the mistakes all go in one direction,

3  I guess, does that suggest -- isn't that how, at least

4  mentally, we would go about deciding if something was done

5  knowingly or recklessly?

6          MR. FIELDS:  I think that could be one piece of it,

7  Your Honor.  You're right, if there's, sort of, a litany of

8  mistakes, that might be a piece of evidence showing that there

9  was something intentional here, but it would only be one

10  piece, and I'm not sure that that by itself would be enough to

11  warrant a *Franks* hearing.  Mere negligence isn't enough.  We

12  are talking about intentional, like, these agents got together

13  and decided that, like, we need to lie to get a search

14  warrant.  That is what *Franks* is all about.  Or a reckless

15  disregard for the truth:  We don't actually care whether they

16  committed a crime.  We are just throwing all this stuff in the

17  affidavit and hoping we get a search warrant so we can gather

18  the evidence.

19          That is not what happened here, and none of these

20  supposed false statements would even go to meet that

21  threshold.

22          And here I'll point out if we do the exercise, if we

23  go through Government's Exhibit 43, a lot of what they are

24  alleging as false, those statements aren't actually in the

25  warrant.  So the Florida corporation, that's one example.

Julie H. Thomas, RMR, CRR                                (303)335-2111

20-cr-00305-DDD              Motion Hearing              10/12/2022    31

 1   Another particular example is this --

 2           THE COURT:  Why don't we just go ahead and do it.

 3   Let's look at Exhibit 43.

 4           COURTROOM DEPUTY:  Your Honor, this is up on the

 5   screen too.

 6           THE COURT:  All right.  Thank you.

 7           MR. BORNSTEIN:  It's on the screen, though.  Yes.

 8           MR. FIELDS:  So we'll go through Government's

 9   Exhibit 43, and then we'll focus -- some of these only apply

10   to some warrants; some apply to others.  So let's actually

11   look at the ones that are in each of the affidavits.  Right?

12           So statement 4(b) here is that *Jonathan Yioulos*

13   *engaged in embezzlement of funds from National Air Cargo*

14   *before engaging in transactions with Mr. or Ms. Tew.*  That is

15   true, Your Honor.  The agents didn't know that at the time --

16           DEFENDANT K. TEW:  Yes, they did.

17           MR. FIELDS:  -- and there's no allegation that they

18   did.

19           THE COURT:  Miss Tew, you are going to have to remain

20   silent, please.

21           Go ahead, Mr. Fields.

22           MR. FIELDS:  And they have presented no evidence that

23   that was true.

24           Even if it was true, the affidavit lays out the fact

25   that Mr. Yioulos was defrauding National Air Cargo.  That's

Julie H. Thomas, RMR, CRR                           (303)335-2111

1   laid out in multiple paragraphs.  He's described as a

2   coconspirator.  So the magistrate judge is already, sort of,

3   on notice that this person who is making these statements is a

4   fraudster.  So there's no intent to sort of deceive or mislead

5   there.

6           *Jonathan Yioulos was threatened with a loss of*

7   *employment if he refused to pay fraudulent invoices.*  That

8   statement in its precise form -- in that precise form is not

9   in the affidavit.  If you go to paragraph 23 of Government's

10  Exhibit 1, which is the kley@me, what you get here is that

11  *Mr. Yioulos stated that M. Tew and K. Tew threatened to alert*

12  *NAC about Mr. Yioulos's prior payment of fraudulent invoices*

13  *and that such disclosure could threaten Mr. Yioulos's*

14  *continued employment.*

15          So you get sort of a paraphrase of that here.  They

16  are alleging that that's false.  Even if that threat wasn't in

17  there or there was some, like, issue involving Mr. Yioulos,

18  it's hard to see how that fundamentally affects probable

19  cause.  Remember, like, that doesn't actually say that there's

20  no scheme going -- you take that out, it doesn't actually,

21  sort of, reflect on whether or not a scheme was actually

22  happening and whether or not kley@me.com was used to

23  perpetrate this scheme.  So even if you take that out, it's

24  still immaterial.

25          4(d), that *Michael Tew made the suggestion to use*

Julie H. Thomas, RMR, CRR                              (303)335-2111

20-cr-00305-DDD                Motion Hearing                10/12/2022   33

1    *phony invoices -- phony companies for invoices to NAC when it*

2    *was Jonathan Yioulos who determined the mechanics.*  So a

3    dispute among the conspirators about who came up with the

4    mechanisms to defraud National Air Cargo, again, doesn't

5    fundamentally affect whether or not the scheme was actually

6    taking place.  Instead, what you have got is a lot of finger

7    pointing over this coconspirator was the one who did it, no,

8    it was this one, or maybe actually just a confused

9    recollection over who initially came up with the idea.  Again,

10   immaterial to whether there was actually a fraud scheme and

11   whether or not kley@me.com was used to perpetrate it.

12        4(e).  *Kimberley Tew said she wanted to take*

13   *responsibility for the NAC fraud at the meeting held July 28,*

14   *2020, at Yeti.*  So in Government's Exhibit 1 that's paragraph

15   65.  So, first of all, the statement that they are saying is

16   false, again, isn't in there.  So the meeting at Yeti was

17   actually on July 29th, not July 28th.  And what's actually

18   stated in the affidavit is not, sort of, the verbatim

19   allegation there but instead kind of in the middle of this

20   paragraph -- this is on Government's Exhibit 1, and it's Bates

21   labeled at the bottom SW 80.  So the actual statement in the

22   affidavit is:  *K. Tew also made statements indicating that the*

23   *intent of her action was to take responsibility for the*

24   *fraudulent payments originating at NAC in order to allow*

25   *M. Tew to remain out of custody in order for him to parent*

Julie H. Thomas, RMR, CRR                        (303)335-2111

 1  *their children.*  The exact statement that they are saying is

 2  false isn't in the affidavit.  What you have here is a classic

 3  agent paraphrase of a meeting at Yeti on July 29th, 2020.

 4  Even if you took that out that M. Tew indicated she wanted to

 5  take responsibility, okay, that actually shows that she's

 6  involved with the scheme, but there's other evidence,

 7  including the rest of the warrant describing the fact that

 8  she's getting a lot of the money into her accounts, describing

 9  her involvement in the scheme.  So, again, even if you strike

10  that, we are still left with a situation where there's plenty

11  of probable cause in the warrant.

12          I would add, and actually I will do this at each

13  point, if you eliminated each of these statements that I have

14  been talking about, you would still have probable cause

15  because you'd still have all of the evidence that National Air

16  Cargo was not paying millions of dollars to the Tews for

17  services that weren't being rendered and that they were

18  getting the money.  Right?  That's fundamentally the fraud

19  here.  And those bank accounts, a lot of them had kley@me.com

20  as a contact address, showing that it's involved in the

21  scheme.  That's all you need is a fair probability that a

22  crime occurred and a fair probability that the evidence would

23  be there.

24          And so if we -- the next one is that *Kimberley Tew*

25  *communicated with Jonathan Yioulos about paying fraudulent*

Julie H. Thomas, RMR, CRR                            (303)335-2111

1    *invoices when it was actually he who insisted on only talking*

2    *to Michael Tew.*  So that's not in the affidavit, so that's an

3    alleged omission.  If that was added to the affidavit, it

4    actually would have made the affidavit stronger.  It would

5    have shown that Kimberley Tew was communicating about paying

6    fraudulent invoices.  So that is a particular one where if you

7    added it to the affidavit, it would just make probable cause

8    stronger.  So that's certainly not a basis for granting a

9    *Franks* hearing.

10          If we go to the next page, 4(g), you have:  *Jonathan*

11   *Yioulos received small amounts of Bitcoin for his part of the*

12   *fraud.*  That is in the affidavit.  The Tews in their affidavit

13   sort of assert that they know he was getting more about that.

14   When the agents proffered the Tews, they didn't say anything

15   about that.  The evidence available at the time to the agents

16   showed that he would get some Bitcoin from the Tews, and

17   that's described in the affidavit, but he would often

18   immediately give it back, usually because Kimberley Tew would

19   say, I need it back, because she had a gambling debt or

20   something else that she needed the money for.

21          So this is also a statement where even if it turns

22   out that Jonathan Yioulos was getting more money as part of

23   the scheme, again, it doesn't fundamentally affect the

24   probable cause to believe that there was a scheme.  Also

25   doesn't fundamentally affect the probable cause to believe

Julie H. Thomas, RMR, CRR                              (303)335-2111

20-cr-00305-DDD                    Motion Hearing                    10/12/2022    36

1   that kley@me.com was used to further the scheme.  So, again,

2   immaterial.  All that would do is sort of assign relative

3   culpability among the coconspirators, again, not really

4   affecting probable cause.

5           4(h), that *Kimberley Tew had accounts and was on*

6   *forms* -- I think that should be "forums" -- *on the Dark Net.*

7   That's not in the affidavit.  Also hard to see how whether or

8   not she is or is not on the Dark Net really affects probable

9   cause.

10          4(i), so *Kimberley Tew shared bank accounts (plural)*

11  *with Michael Tew.*  This is in paragraph 40 of Government's

12  Exhibit 1.  And it's only in this one.  And so it's -- down at

13  the bottom it's SW 74.  And it's in this, sort of,

14  parenthetical just before the agent lists all of the various

15  accounts.  It says, *Some of the accounts listed are jointly*

16  *held with M. Tew.*  The idea, I guess, being since that -- only

17  one of these accounts is actually joint.  It's the one ending

18  8486.  The other ones are actually held by Kimberley Tew.  So

19  the idea, I guess, is that this statement is false because

20  it's "accounts (plural)" when only one is actually a joint

21  account.

22          Again, hard to see how that's material especially

23  since at other points in the affidavit it's clearly described

24  that both were using these accounts.  So, for instance, if you

25  go to SW 70, paragraph 16 of Government's Exhibit 1, the agent

Julie H. Thomas, RMR, CRR                            (303)335-2111

1   makes it very clear that this is a scheme where ACH payments

2   from National Air Cargo were made into accounts owned and

3   controlled by M. Tew and sometimes also by his wife, K. Tew.

4   And then it talks about some of the accounts were personal

5   accounts belonging to one or the other.  Hard to see how one,

6   sort of, arguable misstatement about whether or not they had

7   more than one joint account really affects probable cause

8   under these circumstances.  And, again, add up each of these,

9   and we're still not even close to, sort of, piercing the

10  fundamentals here, which is was there a scheme, were they

11  involved, and is evidence at kley@me.

12          4(j).  *Michael Tew's bank deposits came from the*

13  *National Air Cargo fraud.*  That statement is not in any of the

14  affidavits, so I guess that would be an alleged omission.  If

15  the agents had added that, it would have increased probable

16  cause, not decreased it.  But fundamentally here the agents

17  were never alleging that every deposit into their bank

18  accounts was from the fraud.  Most were, because we are

19  talking about $5 million, which is a lot of money, but not all

20  of them.  He had -- he was doing, sort of, other -- this was a

21  side hustle.  He did have a real job, and the agents have

22  never argued otherwise, and nothing in the affidavit says

23  otherwise.

24          4(k) is sort of similar to 4(c).  It's that thing

25  about the threats, so I have already addressed that.

1           4(l).  *Kimberley Tew accessed fraudulent payments*

2    *from NAC in a variety of bank accounts.*  That exact statement

3    is not in any of the warrants, but sort of being charitable, I

4    have pointed out where you might actually, if you, sort of,

5    read it generally, find sort of a paraphrase of that

6    sentiment.

7           So, again, Government's Exhibit 1, this is the

8    closest one to it:  *He advised that both he and K. Tew*

9    *accessed the fraudulent proceeds from National Air Cargo in a*

10   *variety of bank accounts.*  So they are arguing that that's

11   false.  If you go through, you can see how the agents in the

12   next -- in the next one, next part of Government's Exhibit 1,

13   paragraphs 42 through 56, actually describe in some detail

14   exactly the, sort of, flow of money.  The bank records

15   themselves sort of bear that out.  And even if, again, you

16   strike that -- let's assume that it's false for purposes of

17   this affidavit -- does it affect materiality?  And the answer

18   to that is no, because you still get specific instances where

19   bank accounts associated with the kley@me.com address are used

20   to access funds derived from National Air Cargo which were not

21   authorized to be paid by National Air Cargo.  So still scheme,

22   participants, fair probability that there's evidence here.

23          The next page.  The next page, page 3.  Just if you

24   scroll down.  I can actually pull it up on the document camera

25   if it's easier.

Julie H. Thomas, RMR, CRR                              (303)335-2111

```
 1            So the next one is 4(m).  This is the Florida

 2   corporation.  I have already addressed that one.

 3            Then 4(n) and 4(o).  4(n) is:  Invoices submitted to

 4   National Air Cargo were from unapproved vendors.  And 4(o) is:

 5   The payments via ACH were not approved.

 6            So, first of all, neither of these statements in

 7   those exact terms are in the affidavit.  What the affidavit

 8   does describe, instead, is the process by which Jonathan

 9   Yioulos would pay the sham companies set up by the Tews.  So

10   it does talk about how those companies were not approved to be

11   paid by National Air Cargo.

12            Or Payments via ACH were not approved.  That

13   statement -- what they are getting at here is Jonathan

14   Yioulos, a coconspirator, would approve the payments, but

15   that's different than National Air Cargo saying that they are

16   approved.  So that's sort of a weird quibbling about the

17   evidence, but doesn't -- if you read these paragraphs in their

18   entirety -- so in Government's Exhibit 1 it's paragraphs 15,

19   16, and 17 -- these are paragraphs sort of summarizing what

20   the Tews told the agents in their proffers, so that they have

21   already admitted to be true, what Jonathan Yioulos said, and

22   also what happened on that pretextual call.

23            So the way the scheme worked is that an insider,

24   Jonathan Yioulos, would approve payments to these sham

25   companies.  Now, National Air Cargo did not have good internal
```

```
 1   controls.  The coconspirators were basically exploiting all

 2   those internal controls.  So I think what they are getting at

 3   here is that National Air Cargo didn't really have a system

 4   for approving vendors.  And National Air Cargo when it comes

 5   to, sort of, ACH payments was sort of loose about them.  But

 6   this is not a false statement.  And even if it was, even if we

 7   are talking about, sort of, internal controls by National Air

 8   Cargo, again, that doesn't fundamentally affect the probable

 9   cause here, which is:  Was National Air Cargo being fleeced by

10   these coconspirators?  Yes.  Millions of dollars were leaving

11   National Air Cargo for services that were never rendered, and

12   it ended up in the Tews' bank accounts, and those bank

13   accounts were associated with kley@me.com.

14            Or, in other instances, now if we look at the other

15   warrants, Michael Mora, the Political Media, or the Chris

16   Rincon account, those were e-mail accounts set up to further

17   the scheme.  So those accounts send false invoices to give the

18   scheme the appearance of legitimacy.  And that's all laid out

19   in the affidavits.

20            All of this is to say, Your Honor, that, again, even

21   if you assumed that the agents were just lying because they

22   were trying to get a warrant they otherwise weren't entitled

23   to, none of these would be material.  And the Tews here are

24   not really quibbling with a vast majority of the affidavit

25   which lays out in detailed terms how this fraud took place.
```

Julie H. Thomas, RMR, CRR                           (303) 335-2111

 1   So for a *Franks* hearing you need both of those prongs, and the

 2   Government's contention is that they haven't met either of

 3   those.

 4            THE COURT:  All right.  Thank you, Mr. Fields.

 5            Mr. Bornstein, why don't I give you a chance to

 6   respond.

 7            MR. BORNSTEIN:  Thank you.

 8            Let me begin by saying that, as the affidavit spells

 9   out, and we don't argue, that Mr. Tew worked for National Air

10   Cargo for many years.  He was essentially their controller or

11   their financial officer, even though -- for many of those

12   years.  So the matters that are being stated here for a large

13   part are based on his knowledge, which is why he submitted the

14   affidavit about what occurred.  And the actual issue about

15   whose bank accounts were involved in terms of Miss Tew, she

16   would know that information because that's within her purview,

17   within her knowledge.

18            But let me deal with this, because "materiality" is a

19   word that is amorphous.  I mean, what's material to one person

20   may not be material to another.  But my position is that there

21   are so many of these things that build on top of each other

22   and are repeated in warrant after warrant, affidavit after

23   affidavit.  As the Government says, for example, in number

24   4(c) this appears in paragraph 14 of three separate

25   affidavits, paragraph 23 of a fourth affidavit, and paragraph

 1   35 of a fifth affidavit, that Jonathan Yioulos was threatened

 2   with the loss of employment.  Now, the point of that that I

 3   make -- the point of that being pointed out as a

 4   misstatement -- and, again, I want -- it doesn't have to be

 5   intentional; it doesn't have to be lying; it can be reckless

 6   disregard for the truth -- is that the Government found out or

 7   should have found out and apparently did find out eventually

 8   that Jonathan Yioulos was not telling them the truth.  He was

 9   embellishing statements that he made to them at the beginning

10   of the case.  And he told them that the reason he was involved

11   in this was that he was being threatened -- that's the word,

12   "threatened" -- that he would be turned in to NAC and would

13   lose his employment.

14          THE COURT:  Right, but they didn't know that at the

15   time of these affidavits, right, the agents, when they wrote

16   these warrant applications?

17          MR. BORNSTEIN:  Well, maybe not at the first one, but

18   by the time they -- by the time they got to the ones that were

19   in September -- not the ones in July -- the ones that were in

20   September and the one that was in December, they should have

21   known that by that time, because eventually -- we know that

22   eventually it shows up in their statements, um, the, uh, the

23   statement to the Court in advance of plea for Mr. Yioulos,

24   that he was not threatened.  He was a willing participant in

25   this fraud of NAC.

20-cr-00305-DDD                    Motion Hearing                    10/12/2022    43

1              Excuse me for a minute, Your Honor.

2              THE COURT:  Mm-hmm.

3          (The defendants and counsel confer.)

4              MR. BORNSTEIN:  So that Mr. Yioulos tried to tell the

5    agents at the beginning in July of 2020 that, Oh, I did this

6    because whatever I did I was being threatened by Mr. Tew or

7    Mrs. Tew, and that's the reason I was involved, and that they

8    would get me fired unless I kept going on this.  Well, that

9    turns out to not be true.  He was -- number one, had devised

10   this ability to steal from NAC all by himself way before these

11   events started.  And, number two, if you listen, and we have

12   listened, to the telephone conversations which the Government

13   had, for example, like the telephone conversation that

14   occurred on July 7th, the pretext call, there's nothing in

15   that pretext call that would suggest to an agent that

16   Mr. Yioulos was acting because he was threatened with his loss

17   of employment.  That's number 4(b) and 4(k).

18             4(a), let's go to 4(a).  4(a) appears in -- they have

19   put down here GX 5.  I'm not sure, reading their exhibit,

20   which search warrant GX 5 is offhand, but whatever it is it's

21   probably one of the later ones.  I could go look it up, if it

22   makes a difference.

23             THE COURT:  I don't think it does.  My guess is it's

24   the -- what is the date on this one -- July 31st, 2021, search

25   warrant.

Julie H. Thomas, RMR, CRR                              (303)335-2111

1          MR. BORNSTEIN:  Is that a 2021, which is --

2          THE COURT:  Or, I'm sorry, 2020.

3          MR. BORNSTEIN:  Okay.  The issue in this is that

4   Mr. Yioulos was trying to tell the agents, erroneously, that

5   as far as July 1st of 2020 he was still getting text messages

6   from Kimberley Tew to participate in this.  It turns out that

7   that text message was not from her.  It wasn't from her

8   account, and it wasn't from her phone number.  And that was

9   something that the agents could easily have determined that

10  Mr. Yioulos misled the agents.

11         So part of the issue is Mr. Yioulos is misleading the

12  agents about some facts.  They, in turn, give it to the

13  magistrate and mislead the magistrate as to some of the facts

14  necessary to establish probable cause.

15         4(d).  *Michael Tew made the suggestion to use the*

16  *phony companies.*  It turns out that we know that Mr. Yioulos

17  used phony companies to embezzle money for himself before

18  2018, before the alleged fraud started.  So that he was the

19  one who had determined, as a CPA, which he is, and the

20  Government knew that, and the Government knew that he was in

21  charge of paying the invoices and that he was the financial

22  officer at that time of the company and had taken Mr. Tew's

23  place as the financial officer of that company, that he had

24  used phony invoice matters.  We have an e-mail from the agents

25  in which they are asking NAC, Please look up these different

Julie H. Thomas, RMR, CRR                              (303) 335-2111

```
 1   invoices that predate the fraud, and they come from

 2   Mr. Yioulos.  So the agents at some point knew that there was

 3   phony invoices that predated Mr. Yioulos's explaining to

 4   Mr. Tew, according to the Government, how to do this fraud

 5   with the phony invoices for phony companies.  The magistrate

 6   should have known that.  That might have made a difference.

 7   Maybe any one of these wouldn't make a difference, but when

 8   you add them all up and accumulate them, that's where we say

 9   they do make a difference.

10            4(e).  At the time of this meeting at Yeti, which is

11   a store, I guess, in Cherry Creek, Miss Tew shows up at the

12   meeting, and she makes the statement, which is misinterpreted

13   by the agents.  The statement they interpret says that she

14   wanted to take responsibility for the NAC fraud.  Well, at

15   that point in time she did not even know what the agents were

16   investigating.  She couldn't take responsibility for the NAC

17   fraud because she didn't know that that's what the agents were

18   talking about.  In fact, she thought that the agents were

19   talking about an issue with American Express cards, that had

20   nothing to do with this particular part of the NAC fraud, or

21   the agents were talking about a meeting that she had had with

22   government agents previously, the prior January, with regard

23   to her transactions in Bitcoin, which relates to another

24   matter which is the Government knew, should have known,

25   because the agents had interviewed her in January of '20, well
```

Julie H. Thomas, RMR, CRR                              (303)335-2111

     1   before these matters came to arrest, that she had been

     2   interviewed about what her knowledge was with dealing with

     3   various individuals on the Bitcoin cryptocurrency market and

     4   that she had been recruited to potentially be an informant for

     5   the government on Bitcoin transactions for people that they

     6   were investigating.  The Government should have known that

     7   because there is a e-mail from the agent who had interviewed

     8   her, and the e-mail back to the agent, saying, Leave this

     9   alone; we're investigating her now for something new.  And the

    10   agent sends a e-mail that says, Good, we're going to cease all

    11   operations and contact with Miss Tew, and we're going to not

    12   use her as a possible informant or government cooperator.

    13          Which then goes back to another one of these issues,

    14   number 4(l) -- h, i, j, k, l -- 4(l).  *Kimberley Tew accessed*

    15   *fraudulent payments from NAC in a variety of bank accounts.*

    16   What the agents never said was that she had been involved and

    17   had this Bitcoin business in which she made a substantial

    18   amount of money that went into these bank accounts from a

    19   legitimate Bitcoin business that she had and that she was

    20   working on over the course of many years that provided money

    21   that went into bank accounts and that was in addition to any

    22   employment that Michael Tew had that also had money going into

    23   these bank accounts.  The affidavit would lead the magistrate

    24   to believe that these bank accounts were filled with fraud

    25   money, that's all that was in there was fraud money, and,

     Julie H. Thomas, RMR, CRR                              (303)335-2111

1   therefore, anything that came out of these bank accounts was

2   fraud money.  And that's how they misled the magistrate,

3   because that was not a true fact or a true set of

4   circumstances.

5          Number 4(f), the Government calls that an omission,

6   that *Kimberley Tew communicated with Jonathan Yioulos about*

7   *paying fraudulent invoices.* . . .  They got this -- they made

8   a -- they didn't understand this.  What we meant in 4(f) was

9   that the agents said that Yioulos and Kimberley Tew

10  communicated about paying fraudulent invoices.  What the fact

11  is is that at a very early point in time Mr. Yioulos cut

12  Miss Tew off from any contact by phone and insisted that the

13  only person he would talk to was Michael Tew.  And so for

14  significant periods of time there is no communication with

15  Jonathan Yioulos except there was some -- some communication

16  in 2018.  In 2018 they cut her off -- or he cut her off, and

17  so that statement is a misunderstanding and, therefore, a

18  misrepresentation of the relationship between Yioulos and

19  Kimberley Tew.

20         Again, materiality is if you take all of these and

21  you present them to the magistrate, does the magistrate start

22  to say:  I'm not sure I should issue this search warrant.

23  These matters are material to me.  They do change the

24  calculus, and, therefore, I'm not going to issue a search

25  warrant if you tell me these matters.

Julie H. Thomas, RMR, CRR                           (303)335-2111

```
 1            That's speculation.  I understand that's speculation.

 2    I can't speak for what's in the magistrate's mind or what the

 3    magistrate would or would not have done, but we're left after

 4    the fact to go over these matters, and then Your Honor makes

 5    the determination of materiality one way or the other.

 6            For example, the Government makes it sound like all

 7    of Mr. Tew's bank deposits came from fraud.  That's 4(j).

 8    That's not a true fact.  As even the Government admits now, he

 9    had income, separate income.  Miss Tew had separate income.

10    So to tell the magistrate, well, all this money, bank

11    deposits, came from the fraud is misleading.

12            Kimberley Tew shared bank accounts with Michael Tew.

13    This is an attempt by the affidavit writer to say that they

14    are working hand in glove, they're working absolutely together

15    on this fraud, therefore, issue the warrant for her Apple

16    account because they shared these bank accounts, and any money

17    that came to Michael Tew was shared with Kimberley Tew.  Well,

18    the fact is that the primary accounts that were done during

19    2018 and up to some date in 2019 were a bunch of variety of

20    banks.

21            The true fact is that Mr. Tew was working for a

22    company that was in the cannabis industry.  And whenever a

23    bank found out that he was getting money that was related to a

24    company called Cannasys, in the banking industry, as we know,

25    banks got scared and stopped those accounts, so he had to find
```

Julie H. Thomas, RMR, CRR                                    (303)335-2111

1    another account.  Eventually, as the Government says, they had

2    an account at Navy Federal Credit Union.  In that one the only

3    account that they shared was one, one checking account, not a

4    multiple set of accounts.  So the magistrate may have thought,

5    well, these people are working together with all these

6    accounts when that's not true.

7           Where else am I here?  With regards to *Payments via*

8    *ACH were not approved,* the point about that is, Your Honor,

9    that under the NAC bookkeeping system, if they paid by check,

10   they had to have two signatures.  So Mr. Yioulos would not pay

11   by check.  Mr. Yioulos was allowed, under the system, if he

12   paid with an ACH payment, that he could do it solo, by

13   himself.  And that was how he did that.  He was the financial

14   officer of the company.  If he sent an ACH payment, literally

15   that was an approved payment from the company even if it

16   turned out to be to a vendor that didn't exist.

17          Which is then 4(n), that *Invoices submitted to NAC*

18   *were from unapproved vendors.*  There was no way in -- there

19   was no system in National Air Cargo for this vendor is

20   approved, this vendor isn't approved.  And that should have

21   been learned early on because in July, around July 4th or 5th

22   of 2020, the agents went to Buffalo, New York.  There they met

23   with the accountant for the company named Abby Schwartz, they

24   met with the president of the company, and they had an

25   opportunity to learn the bookkeeping system and how the

Julie H. Thomas, RMR, CRR                              (303)335-2111

20-cr-00305-DDD                 Motion Hearing                10/12/2022    50

1   bookkeeping system worked.

2          So basically I think I've gone through all of them,

3   but putting them all together you see exactly where they --

4   where we are now.

5          I'm looking at a search warrant affidavit.  I'm not

6   sure which one it is in the list, but at paragraph 35, and it

7   says, *According to Mr. Yioulos, M. Tew, and at times K. Tew as*

8   *well, continued to ask and demand that he process fraudulent*

9   *invoices even after M. Tew's employment at NAC was terminated.*

10  *Mr. Yioulos described that between June of 2018 and early July*

11  *of 2020 K. Tew contacted him via phone and/or text messages on*

12  *multiple occasions.*

13         Well, back in July 7th when Mr. Yioulos was

14  interviewed, they got his phone.  They asked for his phone; he

15  gave up his phone.  They looked in his phone, and they well

16  could have seen and should have seen that between June 2018

17  and early July '20 Kimberley Tew did not contact him via phone

18  or text messages on multiple occasions.

19         They then say, *Mr. Yioulos described telling Michael*

20  *Tew that he had attempted to block Kimberley Tew on his phone*

21  *but that she still was able to get through by using other*

22  *phone numbers.*  That's not a true statement either.

23         Paragraph 36 of this particular affidavit says,

24  *Mr. Yioulos also stated that while he exchanged various*

25  *cryptocurrencies with M. Tew and/or K. Tew at various points*

Julie H. Thomas, RMR, CRR                            (303)335-2111

Motion Hearing                10/12/2022    51

1   *during the scheme, he only retained a few Bitcoin for his own*

2   *personal benefit.*  We've gone back and looked, and the

3   agents -- from the agents obtaining his bank records, that he

4   had hundreds of thousands of dollars worth of Bitcoin, not,

5   quote, retained a few for his own personal benefit.

6            All I can say is, you know, the Court will make its

7   own determination.  That's why we submitted this motion.

8   That's why we believe that there is substantial evidence that

9   shows that there were misstatements.  My understanding of the

10  law is that if we meet the hurdle, then we get a hearing.  At

11  that hearing I could call the agents.  At that hearing I could

12  call them as adverse witnesses, and I could go through these

13  with them and demonstrate why they should have known that this

14  was false at an earlier stage and why they put it into their

15  warrant -- or affidavit for the warrant anyway.

16           So just to go back, we're asking for a hearing, and

17  that's what the issue is for the Court.  Do we get a hearing?

18  If we have that hearing, I intend to subpoena the agents and

19  fill in the other material with respect to why it was

20  reckless.  It doesn't have to be intentional.  It can be a

21  reckless matter.  But that's what I would do if the Court

22  granted me a hearing.  Thank you.

23           THE COURT:  Thank you, Mr. Bornstein.

24           So I have reviewed the briefs.  I appreciate

25  everyone's arguments.  I appreciate going through the

```
 1   affidavits.  I don't believe that a hearing is appropriate in

 2   this case.  As everyone recognizes, it's a very high bar to

 3   even get the hearing.  I understand that the defendants have

 4   put forward a number of statements that are false.  As the

 5   Government pointed out, though, a number of those are only

 6   false in a very technical way that don't really affect the

 7   statements as they are included in the affidavits.

 8           In addition, a lot of the statements are things that

 9   apparently Mr. Yioulos, according to the defendants, lied to

10   the investigators.  And the investigators, I suppose, could

11   have done more to follow that up, as Mr. Bornstein points out,

12   but that is not enough to meet this fairly high standard.  As

13   the Colkley case points out, requiring that sort of thing

14   before a search warrant is obtained would sort of put us in an

15   endless loop.  And so the fact that Mr. Yioulos may have been

16   misleading investigators at times I don't think suggests that

17   there was knowing, intentional, or reckless disregard for the

18   truth with most of these statements.  I do think there are a

19   few things in there that seem to have been mistakes or

20   overstatements.  Most of them are quite technical.  Even if I

21   removed all of the statements that the defense pointed to,

22   though, these are lengthy, detailed -- lengthy, detailed

23   affidavits, and to me they don't undermine the probable cause.

24   The discussion of threats or that sort of thing, these are

25   not -- these were not extortion or anything.  The search
```

Julie H. Thomas, RMR, CRR                          (303)335-2111

 1    warrants weren't based on threats.  They were based on

 2    potential fraud investigation.  And so, in my view, there

 3    remains probable cause, so under, sort of, both prongs of this

 4    test I don't think a *Franks* hearing is necessary.

 5              So, with that, I think we need to take a bit of a

 6    break at this time.  Why don't we try to come back at 11:20 to

 7    at least get started on -- and I would like to at least get

 8    started on the motions to suppress.  I know I suggested an

 9    order.  My usual practice with a motion to suppress, since the

10    burden is, sort of, on the Government, is to let the

11    Government go first, and then let you cross-examine any

12    witnesses, and we'll have a bit of an argument on each one.

13    So that will be my plan.

14              Mr. Fields, I guess my intention was to start with

15    200, but we can start with another one if you prefer.  But for

16    now why don't we take a break until, say, 11:20.

17         (Proceedings recessed 11:04 a.m. to 11:22 a.m.)

18              THE COURT:  All right.  Let's take our seats.

19              As I indicated, I think we should turn now to the

20    motions to suppress.  I've read the motions and the briefing

21    on them, so you don't need to reiterate the arguments, but,

22    Mr. Fields, which do you think we should start with?

23              MR. FIELDS:  Your Honor, my proposal is that we start

24    with the motion to suppress the statements and then the

25    photographs of the apartment, and we start by, sort of, laying

Julie H. Thomas, RMR, CRR                            (303)335-2111

1    down that testimony, and then we can have argument on all the

2    motions.  ECF 200 I think is mostly legal because it's about

3    the reach of *Carpenter*, so we don't need to, sort of, start

4    with that.

5              THE COURT:  All right.  That works for me.  Why don't

6    you go ahead, then, with your evidence.

7              MR. FIELDS:  Thank you, Your Honor.  The United

8    States called Anthony Romero.

9              COURTROOM DEPUTY:  Please raise your right hand.

10        (The witness was sworn.)

11             COURTROOM DEPUTY:  Please be seated.

12             Please state your name, and spell your first and last

13   names for the record.

14             THE WITNESS:  My name is Anthony Romero.

15   A-n-t-h-o-n-y, R-o-m-e-r-o.

16     **ANTHONY ROMERO, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

17   BY MR. FIELDS:

18   Q.  It's still the morning, so good morning.

19   A.  Good morning.

20   Q.  Mr. Romero, or Special Agent Romero, where do you work?

21   A.  I work at the Denver Field Office for the Internal Revenue

22   Service.

23   Q.  Do you work in a particular part of the Internal Revenue

24   Service?

25   A.  Criminal investigation.

Julie H. Thomas, RMR, CRR                              (303)335-2111

1    Q.   What is your title?

2    A.   Special agent.

3    Q.   What are your current responsibilities?

4    A.   I work on an organized crime strike force with the FBI.

5    Q.   Did you have those same responsibilities back in 2020?

6    A.   I did not.

7    Q.   What did you do then?

8    A.   I worked criminal tax cases and money laundering cases.

9    Q.   Have you received training in interviewing witnesses?

10   A.   I have.

11   Q.   What kind of training?

12   A.   The training was at FLETC, Federal Law Enforcement

13   Training Center.  And basically it just dealt with how to talk

14   to people, how to ask questions, and how to hopefully get

15   answers that are truthful.

16   Q.   Do you get training on when to issue what's called a

17   Miranda warning?

18   A.   I am, yes.  I do.

19   Q.   Describe that to us.

20   A.   Typically when someone is being detained, you want to read

21   them the Miranda warning once somebody is being arrested.

22   Q.   In your mind, what does it mean for somebody to be

23   detained?

24   A.   When they are no longer free to move about.  When their

25   freedom has been curtailed, I guess you could say.

 1   Q.  During your years in the IRS, approximately how many

 2   interviews would you say you have done?

 3   A.  Hundreds.

 4   Q.  Sometimes when you are doing those interviews, are there

 5   safety concerns?

 6   A.  There are, absolutely.

 7   Q.  How do those come up?

 8   A.  When you don't know the situation.  When tensions are

 9   high.  When somebody becomes erratic, so to say.  Typically if

10   you are unfamiliar with the surroundings, say a closed door or

11   something like that, that could be agent safety, agent safety

12   issue.

13   Q.  When you have those safety concerns, what do you do to

14   address them while you are conducting an interview?

15   A.  Typically what I try to do is I try to keep the situation

16   calm, and the individual in question I try to keep them with

17   me at all times.

18   Q.  When you say "keep them with you," do you detain them?

19   A.  Oh, no.  I don't have the right to detain them, no.

20   Q.  So how do you keep them with you?

21   A.  I ask them.

22   Q.  Are you familiar with an investigation of Michael Aaron

23   Tew and Kimberley Tew?

24   A.  I am, yes.

25   Q.  How did you become familiar with it?

Julie H. Thomas, RMR, CRR                              (303)335-2111

1   A.  I became familiar with it on July 8, 2020.  I was asked to

2   respond to an address in Cherry Creek, Denver.  At that point

3   I knew nothing about the case, but I did know that there was

4   concern at the time that Mr. and Mrs. Tew were going to flee

5   the country.

6   Q.  Who asked you to do that?

7   A.  Special Agent Lisa Palmer and Supervisor Special Agent

8   Emil Stark.

9   Q.  Lisa Palmer, what was her role in the investigation?

10  A.  She is one of the two case agents.

11  Q.  What is a case agent?

12  A.  Case agent is typically somebody who is in charge of the

13  case.  They delegate things to be done.  They write up

14  affidavits and such.  They are the main person on a case.

15  Q.  So when you were asked to go to this address, were you

16  asked to do anything in particular?

17  A.  Basically, I was asked to go and surveil.  They wanted to

18  know if they were there.  So my objective was to find if they

19  were there, and, if so, I was to basically maintain

20  surveillance on the location.

21  Q.  When you say "maintain surveillance," what does it mean to

22  conduct surveillance in a situation like this?

23  A.  Watch the comings and goings of who is coming into the

24  building, who is leaving the building, specifically if the

25  Tews were coming or going.

20-cr-00305-DDD                 Romero - Direct                10/12/2022    58

1   Q.   What was the identified address for Michael Tew?

2   A.   It was 3222 East First Avenue, Denver, Colorado.

3   Q.   All right.

4            MR. FIELDS:   And if we could, let's see if we can

5   pull up Government's Exhibit 6, page 2.   That's not in

6   evidence.

7   A.   I'm sorry.   What was that again?

8   BY MR. FIELDS:

9   Q.   Government's Exhibit 6, page 2.

10  A.   Okay.   I have that.

11  Q.   Let's see.

12           MR. FIELDS:   Just two digits, 06, and then page 2.

13           May I have just a moment, Your Honor, to do some

14  troubleshooting?

15  BY MR. FIELDS:

16  Q.   Do you recognize this photograph?

17  A.   I do.

18  Q.   What is it?

19  A.   That is the apartment complex where the Tews were living

20  at the time.

21  Q.   Now, if we go to page 2 or, sorry, page 3, just down one,

22  what is that?

23  A.   That's going to be entrance, I believe, to the lobby of

24  the apartment complex they lived in, the Steele Creek

25  Apartments.

Julie H. Thomas, RMR, CRR                              (303)335-2111

1          MR. FIELDS:  Your Honor, at this time I'd move for

2    the admission of Government's Exhibit 6, pages 2 and 3.

3          THE COURT:  Any objection, Mr. Bornstein?

4          MR. BORNSTEIN:  No objection for this hearing.

5          THE COURT:  All right.  It's admitted.

6       (Government's Exhibit 6:2-3 admitted.)

7    BY MR. FIELDS:

8    Q.  Is there a lobby area to the building, or was there at the

9    time?

10   A.  There was.

11   Q.  Where were the residences located?

12   A.  The residence was located on the second -- I believe there

13   are seven or eight floors in that building -- second of the

14   seven or eight floors.

15   Q.  Approximately what time did you arrive at the apartment

16   building?

17   A.  1 o'clock.

18   Q.  Who was with you?

19   A.  I was with four other agents:  Agents Stark, Tweet,

20   Garrett, and -- it's difficult to spell --

21   M-o-d-o-l-t-s-t-o-v [sic].

22   Q.  Is that Molotsov?

23   A.  I believe so, yes.

24   Q.  How were you all dressed?

25   A.  Casually.  I believe I had a long shirt on.  Everyone else

Julie H. Thomas, RMR, CRR                          (303)335-2111

1   had a long shirt on.

2   Q.  Were you armed?

3   A.  We were.

4   Q.  Where were your firearms?

5   A.  Concealed underneath our shirts.

6   Q.  Why were they concealed?

7   A.  By IRS it's policy not to show your weapons when you are

8   working, period.

9   Q.  What did each of you do when you arrived at the apartment

10  building?

11  A.  It was our objective to determine whether the Tews were

12  there, so we looked at the garage first, and we did locate

13  their vehicle.

14  Q.  Then what did you do?

15  A.  At that point we positioned two agents in the lobby by the

16  elevator, and myself and two additional agents went up to the

17  second floor, and we positioned ourself by unit 224, which was

18  their residence.

19  Q.  What did you do after you positioned yourself?

20  A.  Really nothing.  We just waited.  We had determined, to

21  the best of our knowledge, that they were there, so our

22  objective was not to make contact.  It was, rather, to follow

23  them if they went somewhere and, again, to observe comings and

24  goings.

25  Q.  What happened at approximately 2:50 p.m.?

```
 1   A.   A gentleman walked out, who I believed to be Michael Tew,

 2   of unit 224.

 3   Q.   As you sit in the courtroom today, do you see that same

 4   gentleman?

 5   A.   I do.

 6   Q.   Where is he seated?

 7   A.   He's seated at the defense table there to my left.

 8   Q.   Did you approach that person?

 9   A.   I did.

10   Q.   Describe this first interaction for us.

11   A.   I identified myself as a special agent with the IRS-CI.  I

12   asked him if he was Michael Tew.  He said he was.  I said that

13   there was an FBI agent, Sarah Anderson, that was on her way at

14   the time to talk with him.  And I asked him if there was

15   someplace we could talk privately, we could meet privately.

16   Q.   What did he say in response to that?

17   A.   He was agreeable to that.  He said, yes, there was.  He

18   had to inform his wife of what was going on.  And he

19   recommended that we meet in the common area behind his

20   apartment.

21   Q.   Where is that common area?

22   A.   It's on the second floor.  It's visible from First Avenue.

23   It's a common area that's open-air.  It's directly behind the

24   Tews' apartment, and basically they can enter the common area

25   from the back of their apartment.
```

Julie H. Thomas, RMR, CRR                                    (303)335-2111

20-cr-00305-DDD                Romero - Direct                10/12/2022    62

1   Q.  So after this first encounter in the hallway, where did

2   Mr. Tew go?

3   A.  He went back into his residence.

4   Q.  Where did you go?

5   A.  I went, per his direction, around the hall to the common

6   area.  There was an exit on the east side of the hallway.

7   Q.  Why did you let him go back in his residence?

8   A.  I had no reason to believe that there was a concern at

9   that time, that there was danger at that time.  We had just

10  contacted him.  He was being very -- he was being very

11  cooperative.  So I let him go back into his apartment.  Plus

12  we didn't have any authority to detain him at that time.

13  Q.  So did you go out to that common area?

14  A.  I did.

15  Q.  What happened when you got to that common area?

16  A.  We were joined shortly by Mr. Tew and -- Mr. and Mrs. Tew.

17  Q.  Can you describe for us this common area?  What does it

18  look like?

19  A.  What I would say is I believe there was three residences

20  that back up to it.  It's an open-air common area.  There's a

21  fire pit there, and there are chairs and sofas surrounding the

22  fire pit.

23          MR. FIELDS:  Let's look at Government's Exhibit 8, if

24  we can go to page 34.  So if you type in 08-034.

25  BY MR. FIELDS:

Julie H. Thomas, RMR, CRR                              (303)335-2111

1    Q.  Do you recognize this photograph?

2    A.  I do.

3    Q.  Or I'll give you a second.  Do you need it on the monitor,

4    or you can pull it up?

5    A.  I can see it on the monitor, yes.

6    Q.  Okay.  Do you see a door right there?

7    A.  Yes, I do.

8    Q.  Where does that door go?

9    A.  That's an exit.  I believe it goes back into the hall area

10   that's on the west side of the structure.

11   Q.  If we go to the next page, what do you see here?

12   A.  What I can see is the common area -- well, I guess the

13   back patio for the Tews.  And you can see the fire pit also

14   with the sofas I have mentioned previously and the chairs

15   mentioned previously.  That's the common area I was referring

16   to.

17   Q.  Can you -- on your screen there if you just sort of use

18   your finger, you can circle the fire pit area.  Can you circle

19   that for us?

20   A.  Sure.  It's right there.

21           MR. FIELDS:  At this time I'd move for the admission

22   of Government's Exhibit 8, page 34 and 35.

23           MR. BORNSTEIN:  I'm sorry.  Exhibit what?

24           MR. FIELDS:  It's 8.

25           THE COURT:  Just those two pages; is that right?

Julie H. Thomas, RMR, CRR                        (303)335-2111

1          MR. FIELDS:  Just those two pages for now, Your

2    Honor.

3          MR. BORNSTEIN:  Which two pages, please?

4          MR. FIELDS:  34 and 35.

5          THE COURT:  Any objection?

6          MR. BORNSTEIN:  No objection.

7          THE COURT:  All right.  I'll admit those.

8      (Government's Exhibit 8:34-35 admitted.)

9    BY MR. FIELDS:

10   Q.  So we will stay here on page 35.  Can you describe for us

11   where you were and where the Tews were during your encounter?

12   A.  Yes.  From what I recall, the Tews were sitting on the

13   sofa that's not facing us.  It's facing towards the open area.

14   I have circled that.

15          I was seated right here in this chair marked by an X.

16          There was an agent on the far sofa also marked by an

17   X.

18          And then there was also a chair to the right where

19   the third agent was.

20   Q.  And you have mentioned the Tews' residence.  In this

21   photograph where is the Tews' residence?

22   A.  If you look to the right, there's a door opening right

23   there.  That goes into the residence right there.

24   Q.  And this patio area where we see two chairs, is that their

25   patio area?

Julie H. Thomas, RMR, CRR                    (303)335-2111

20-cr-00305-DDD                Romero - Direct                10/12/2022   65

1   A.   It is.

2   Q.   And so this common area, do you also see a door right

3   there?

4   A.   I do.

5   Q.   And then doors right there?

6   A.   Yes.

7   Q.   Does one of those doors lead into the common hallway?

8   A.   It does, yes.

9   Q.   These doors, were any of them locked?

10  A.   Not to my knowledge.

11  Q.   And during your encounter with the Tews, were they able to

12  get up and move around?

13  A.   They were.

14  Q.   Did they?

15  A.   They did, yes.

16  Q.   Where did they move around to?

17  A.   They moved around in the patio area.  They moved around

18  where you can see the sofa, the fire pit.  Their children were

19  also there as well.

20  Q.   Now, when you were asked to go out to this apartment

21  building, were you asked to look for both Mr. Tew and

22  Mrs. Tew?

23  A.   It was Mr. Tew.

24  Q.   So when he showed up here with Mrs. Tew, was that a

25  surprise to you?

Julie H. Thomas, RMR, CRR                              (303)335-2111

20-cr-00305-DDD                Romero - Direct                10/12/2022   66

 1   A.  Uh, I didn't know that she was home at the time.  I didn't

 2   know she was home until he had told me.  I guess it was a

 3   surprise, yes.

 4   Q.  So if you were there for just Mr. Tew, why did you allow

 5   Miss Tew to join this conversation?

 6   A.  Because I wasn't there necessarily to interview them, to

 7   have them answer questions.  I was basically there to -- to

 8   observe until Special Agent Anderson arrived.

 9   Q.  So at this point when you had made an encounter with

10   Mr. Tew and he was there and Special Agent Anderson hadn't

11   arrived yet, what was your plan?

12   A.  My plan was just to engage him in small talk, just

13   conversation.  Again, I knew nothing about the case.  I just

14   wanted to make them at ease, and so we just talked about

15   pretty much whatever they wanted to talk about.  Just

16   background questions, you know.  I believe I asked them about

17   their kids or something like that.

18   Q.  Did you have a plan if they had declined to speak with

19   you?

20   A.  Well, if they had declined to speak with me, there was

21   nothing I could have done.  They weren't being detained, so

22   they were free not to engage with me.

23   Q.  What would you have done at that point?

24   A.  Nothing.

25   Q.  How would you describe the demeanor of the Tews when they

Julie H. Thomas, RMR, CRR                              (303)335-2111

1   first came out?

2   A.   They were very calm.  Mr. Tew was very calm.  I would say

3   Mrs. Tew was maybe, uh, concerned, and that went up and down

4   as we -- as we spoke.

5   Q.   Now, you said at some point the Tews got up and they were

6   able to move around?

7   A.   Yes.

8   Q.   At one point in time did Mr. Tew get up to walk back

9   inside his apartment?

10  A.   He did.

11  Q.   What did you do at that point?

12  A.   I asked if he could please stay in the area where I could

13  see him.

14  Q.   Why did you ask him that?

15  A.   It goes back to the agent safety.  I believe during that

16  point in the conversation tensions were high.  I believe

17  Mrs. Tew was acting erratic at that time.  And I was

18  concerned, based on what I was seeing, that not only was there

19  a danger to myself and my fellow agents but also to Mr. Tew

20  and the children.  So I didn't know what was inside the house,

21  and that's why I asked him to stay visible to me.

22  Q.   What did he do?

23  A.   He complied.

24  Q.   After that, what happened?

25  A.   The tensions I would say subsided.  I only talked to them

Julie H. Thomas, RMR, CRR                              (303)335-2111

20-cr-00305-DDD                 Romero - Direct                 10/12/2022    68

```
 1  about 20 minutes before Special Agent Anderson arrived.
 2  Q.  During this 20 minutes, did they ever decline to answer
 3  any of your questions?
 4  A.  They declined to answer the questions, but they did have
 5  questions of their own.
 6  Q.  And what happened when they declined to answer questions?
 7  A.  I didn't -- I didn't press the issue.
 8  Q.  Why not?
 9  A.  Because, again, I had no set interview questions for them.
10  I knew nothing about the case, and the issues that I was
11  attempting to speak with them about was simply background
12  information, how long they had lived in Colorado, information
13  about their kids, things like that.
14  Q.  I think you said you were there for about 20 minutes
15  before Special Agent Anderson arrived.
16  A.  Correct.
17  Q.  Approximately what time do you think she arrived?
18  A.  Approximately 3:12 p.m.
19  Q.  You say approximate and 3:12.  That's pretty specific.
20  Why are you so specific on the time?
21  A.  It's in the memorandum.
22  Q.  Did you review that memorandum --
23  A.  I did.
24  Q.  -- before your testimony?
25          How was Special Agent Anderson dressed?
```

Julie H. Thomas, RMR, CRR                           (303)335-2111

1  A.  Very casually.  I would say she's dressed like she is

2  today.  Business coat, business slacks.

3  Q.  Was she armed?

4  A.  I couldn't tell you, but I'd assume she was, yes.

5  Q.  How would you describe her demeanor?

6  A.  Very calm, very professional, very relaxed.

7  Q.  What did she do when she arrived?

8  A.  She basically -- she identified herself.  She said she was

9  there to ask questions of them related to employment with NAC.

10  Specifically, there were questions concerning, I believe, gift

11  card transactions and also credit card transactions.

12  Q.  How did Kimberley respond when Special Agent Anderson

13  started asking questions?

14  A.  She was erratic.  She really didn't want to answer

15  questions at that time.

16  Q.  Did Special Agent Anderson ask to record the conversation?

17  A.  She did.

18  Q.  What happened when she made that request?

19  A.  Mrs. Tew said she did not want the conversation to be

20  recorded.

21  Q.  How did Special Agent Anderson respond when Kimberley said

22  she didn't want it recorded?

23  A.  That was well within Mrs. Tew's rights.  There wasn't any

24  kind of confrontation.  She was fine with that.

25  Q.  At some point during this conversation after Special Agent

Julie H. Thomas, RMR, CRR                              (303)335-2111

1   Anderson arrived, did Kimberley Tew accuse the IRS agents of

2   having done something?

3   A.   Yes.

4   Q.   What was the accusation?

5   A.   She accused me of grabbing her husband Michael when I

6   first encountered him in the hallway outside of his apartment.

7   Q.   Did you grab him?

8   A.   I did not.

9   Q.   What happened after she made the accusation?

10  A.   I turned to Mike, and I asked him if that was true, if I

11  did grab him.  And he said, no, it wasn't true.

12  Q.   Did you ever put your hands on him?

13  A.   I didn't, no.

14  Q.   Did you ever, sort of, get up into his personal space or

15  something like that?

16  A.   No.

17  Q.   So at that point who took the lead in asking questions?

18  A.   Special Agent Anderson did.

19  Q.   And how did the Tews respond to Special Agent Anderson's

20  questions?

21  A.   I do know that they answered some of the questions Special

22  Agent Anderson was asking.  They also volunteered information.

23  They were making a mention of, I believe, an individual back

24  in New York was the cause of them moving out to Colorado.  I

25  believe Mrs. Tew said that they had been set up, something

Case Nase: 202-0-003035-DDDD Document 64234  Filed 01/24/22  USDC Court 284  pg
194 of 460

1   like that.

2   Q.  At some point did Kimberley ask Michael not to provide any

3   more information?

4   A.  Yes.

5   Q.  And what happened at that point?

6   A.  At that point Special Agent Anderson served the Tews with

7   a grand jury subpoena.

8   Q.  Did Special Agent Anderson ask if they wanted to meet at

9   another time?

10  A.  Yes.

11  Q.  So what happened when she made that request?

12  A.  They did want to meet at another time.  I think there was

13  issues with the children and some kind of appointment, but

14  they did agree to meet a few days later.

15  Q.  How did they set up that meeting?

16  A.  The meeting was set up initially as Special Agent Anderson

17  asked for a phone number, but Mrs. Tew declined to provide

18  that.  She didn't want to.  So they agreed upon Mrs. Tew

19  providing an e-mail address.

20  Q.  Did Mrs. Tew say that she would send an e-mail to Special

21  Agent Anderson?

22  A.  Yes.

23  Q.  Did she send an e-mail?

24  A.  As far as I know, she did, yes.

25  Q.  Did you note the time of that in your report?

Case No. 1:20-cr-00305-DDD   Document 643-4   Filed 01/24/22   USDC Colorado   pg
195 of 460

```
 1   A.   I believe the time was 3:42.

 2   Q.   So between the time Special Agent Anderson got there and

 3   the time this e-mail was sent, approximately how much time had

 4   elapsed?

 5   A.   Approximately half an hour.

 6   Q.   And what did Kimberley do after saying she sent the

 7   e-mail?

 8   A.   She went back into the apartment with the kids.

 9   Q.   Anyone stop her?

10   A.   No.

11   Q.   You have mentioned these children.

12   A.   Yes.

13   Q.   Where were they during this interview?

14   A.   I believe they were in the common area -- or not the

15   common area, the patio for the Tews at the time.  I believe

16   Mrs. Tew had closed the gate so she could observe them, but

17   they were kind of in a confined area.

18   Q.   When Kimberley went back into the apartment, did anyone

19   stop her?

20   A.   No.

21   Q.   Why not?

22   A.   It wasn't within our right to stop her.

23   Q.   So at that point was Michael Tew by himself?

24   A.   He was.

25   Q.   What did he do?
```

1   A.  He made some small talk.  He asked if there was a problem.

2   He, I believe, also asked if I could be present at the next

3   interview when that did occur, but --

4   Q.  Did he explain why he wanted you present at the next

5   interview?

6   A.  He didn't, but I think it was because there was a good

7   rapport between him and I.  He felt comfortable with me.

8   Q.  So at some point did Michael go back inside the apartment?

9   A.  He did.

10  Q.  What happened at that point?

11  A.  At that point there was a brief period of time where the

12  back door was open.  We could observe them.  We were still in

13  the area.  After a couple minutes, though, they closed the

14  door to their apartment and closed the blinds as well.

15  Q.  Anyone stop him from going inside the apartment?

16  A.  No.

17  Q.  Why not?

18  A.  It wasn't within our right.

19  Q.  And after they closed the door and closed the blinds, what

20  happened at that point?

21  A.  After that happened, it was approximately -- I believe it

22  was approximately 3:49, and we were still awaiting further

23  notice, I believe, Special Agent Anderson was, so we remained

24  in the area, in that common area.

25  Q.  Did Special Agent Anderson come back and give you

Julie H. Thomas, RMR, CRR                              (303)335-2111

1   instructions?

2   A.  She did.  She said that a warrant had been issued for

3   Michael's arrest.  That was at approximately 4:11 p.m.

4   Q.  So how long were you waiting outside without the Tews

5   present?

6   A.  Approximately 20 minutes.

7   Q.  After that 20 minutes, what did you do?

8   A.  Once the warrant for his arrest came about, contacted

9   them.  I knocked on the back door, myself and the other

10  agents.  Michael answered the door.  He came to the back.  I

11  asked him to come outside.  I told him he was under arrest,

12  had him turn around.  I cuffed him.  I searched him quickly,

13  and then I read him his rights, to which he -- I asked him did

14  he understand them, and he said, yes, he did.

15  Q.  Is that the first time you had read him his rights?

16  A.  It is, yes.

17  Q.  Why did you only read him his rights at that point?

18  A.  Because he wasn't detained before that.

19  Q.  Even before you had read him his rights, did he decline to

20  answer some of your questions?

21  A.  He did.

22          MR. FIELDS:  Your Honor, may I have just a moment?

23          THE COURT:  Yes.

24  BY MR. FIELDS:

25  Q.  Just one final question, Mr. Romero.  During the course

 1  of -- you know, you were there talking to the Tews for a

 2  little bit.  Special Agent Anderson arrived.  And then they

 3  went back.  How would you describe the sort of tone and tenor

 4  of the conversation throughout the encounter?

 5  A.  You know, I'd say with Mr. Tew it was very calm and

 6  collected.  There was good rapport, and there was calm

 7  conversation.  I would say there were times, though, when

 8  during this interaction Mrs. Tew became very erratic, and

 9  that's when tensions seemed to rise.

10  Q.  When you say "erratic," what do you mean by that?

11  A.  Just making loud statements, again, about accusing someone

12  in New York about setting them up.  Again, the accusation to

13  me as far as touching her husband, laying hands on her

14  husband.  And it seemed to go up and down emotionally like

15  that.

16          MR. FIELDS:  Your Honor, no further questions at this

17  time.

18          THE COURT:  Thank you, Mr. Fields.

19          Mr. Bornstein, cross-examination?

20                   **CROSS-EXAMINATION**

21  BY MR. BORNSTEIN:

22  Q.  Mr. Romero, hi.

23  A.  Hello, sir.

24  Q.  I'm Peter Bornstein.  I represent Mr. and Mrs. Tew.

25  A.  Nice to meet you.

20-cr-00305-DDD                    Romero - Cross                    10/12/2022    76

 1  Q.  We've never met before?

 2  A.  I don't believe so, no.

 3  Q.  Okay.  So, as I understand it, on July 8th of 2020 Emil

 4  Stark was your supervisor?

 5  A.  That's correct, yes.  No, he wasn't my supervisor.  He was

 6  a supervisor in the office.

 7  Q.  Okay.  He wasn't your supervisor, but he was a supervisor?

 8  A.  Correct.  Correct.

 9  Q.  Because this report that I believe you looked at is

10  written by him.

11  A.  It is.

12  Q.  And Lisa Palmer is a lawyer with the IRS?

13  A.  No.

14  Q.  She's a special agent?

15  A.  Correct.

16  Q.  And you work with her?

17  A.  I do.

18  Q.  Which one of them contacted you about going to the

19  apartment?

20  A.  I believe it was Supervisor Special Agent Stark.

21  Q.  Stark, okay.

22  A.  Yes.

23  Q.  And they said that they had information that the Tews were

24  going to flee; right?

25  A.  Correct.

Julie H. Thomas, RMR, CRR                              (303)335-2111

1   Q.   Flee what?

2   A.   Flee the country.

3   Q.   Why?

4   A.   I have no idea.

5   Q.   Well, as an agent, you said, Well, they're going to flee.

6   What did they do?  Right?  You asked Stark, What did they do?

7   Why would they flee?

8   A.   No.

9   Q.   Mr. Romero, are you saying that you received a request

10   that some people might be fleeing the country, and that the

11   IRS wanted to stop them from fleeing, and they wanted four

12   agents with guns to go to the apartment?  Right?

13   A.   I was asked to respond to that address, yes.

14   Q.   No, you were asked -- four agents were asked to go.  Did

15   you go in four cars?

16   A.   I believe so, yes.

17   Q.   And who was in charge?

18   A.   Supervisor Special Agent Stark.

19   Q.   Okay.  And you positioned yourself in the garage, in the

20   lobby, and on the second floor; right?

21   A.   No.

22   Q.   I thought you said two agents went to the garage to

23   determine if the car was there.

24   A.   We positioned ourselves in the lobby of the first floor by

25   the elevator, and the rest were in the hallway on the second

1   level.  There was no agents in the garage.

2   Q.  You didn't determine if the car was there?

3   A.  When we got there, we did, yes, but there was no one

4   positioned there.

5   Q.  I'm sorry?

6   A.  I said initially when we first went there we went to the

7   garage to determine the cars were there.

8   Q.  Yes.

9   A.  Then after that point there were no agents in the garage.

10  Q.  Okay.  How did you know what cars to look for?

11  A.  We were instructed by the case agent what cars to look

12  for.

13  Q.  Uh-huh.  And you were given pictures of Mr. Tew?

14  A.  I was given a description of Mr. Tew.

15  Q.  By who?

16  A.  I believe it was Supervisor Special Agent Stark.

17  Q.  All right.  And do you know, was it a mugshot?

18  A.  I don't believe it was a mugshot.  No, I don't believe so.

19  Q.  Was it a photograph?

20  A.  I believe it was a DMV photograph.

21  Q.  So apparently Agent Stark had a DMV photograph to show

22  you.  Right?

23  A.  I believe he did, yes.

24  Q.  And he showed all the agents in case any of the agents

25  would see Mr. Tew?

Julie H. Thomas, RMR, CRR                              (303)335-2111

1   A.  I don't know what he did with the other agents.

2   Q.  So if Mr. Tew was going to flee the country, you were

3   going to let him flee the country?

4   A.  Well, at that point, again, it was within his rights to go

5   wherever he wanted to go.  My objective at that time was to,

6   A, determine if he was there and to, B, follow him if he went

7   anywhere.

8   Q.  Is that really correct, Agent Romero, that you would have

9   let him flee the country?

10  A.  Would I have let him flee the country?

11  Q.  Would you let him flee Denver?

12  A.  Well, what I would have done is I would have followed him.

13  Q.  You would have followed him to the airport?

14  A.  Wherever, wherever he went.

15  Q.  Would you have gotten on the airplane with him?

16  A.  I can't answer that.  I don't know.

17  Q.  And your other agents, they were also instructed to say

18  that he should not be allowed to flee the country; right?

19  A.  No.  That was never -- that was never said.

20  Q.  Didn't you have knowledge that there was, quote, PC,

21  standing for probable cause, to stop him from fleeing?

22  A.  No.

23          DEFENDANT K. TEW:  Hmm.

24  BY MR. BORNSTEIN:

25  Q.  While you were going to the apartment, what were you told

20-cr-00305-DDD          Romero - Cross          10/12/2022   80

1   Agent Anderson was doing?

2   A.  I was told she was on her way.

3   Q.  Now, the report says that Anderson explained Title 18

4   United States Code 1001.  Do you know what that is?

5   A.  False statements given to federal officers.

6   Q.  All right.  Let's -- let me ask you this.  This was

7   July 8th; right?

8   A.  Yes, sir.

9   Q.  Two days earlier, on July 6th, did you send a e-mail to

10  Daniel at Bustabit with a copy to Lisa Palmer?

11  A.  I don't recall that.

12          DEFENDANT K. TEW:  Hmm.

13          MR. BORNSTEIN:  What exhibit is that?

14          MR. FIELDS:  I haven't marked it.

15          DEFENDANT K. TEW:  It was submitted in discovery.

16          MR. BORNSTEIN:  Oh.

17  BY MR. BORNSTEIN:

18  Q.  You don't remember sending an e-mail?

19  A.  I don't, no.

20          DEFENDANT K. TEW:  Hmm.

21  BY MR. BORNSTEIN:

22  Q.  Do you remember saying -- who is Daniel@bustabit?

23  A.  I have no idea.

24  Q.  Do you remember saying, Please find the attached letter of

25  request and two attachments for Bustabit account holder

Julie H. Thomas, RMR, CRR                          (303)335-2111

20-cr-00305-DDD                Romero - Cross                10/12/2022   81

1   information?

2   A.  I don't recall that, sir.

3          MR. BORNSTEIN:  Can I have this marked and your staff

4   give it to the witness?

5          THE COURT:  Yes.  You can give it to Mr. Keech,

6   please.

7          COURTROOM DEPUTY:  What do you want it marked as?

8          MR. BORNSTEIN:  Defense Exhibit 10 --

9          COURTROOM DEPUTY:  A?

10         MR. BORNSTEIN:  I think the Judge wants only numbers.

11         THE COURT:  For this we can do it however.  A is

12  fine.  I'm not sure which number we would be on.

13         COURTROOM DEPUTY:  Do you want to use the Elmo so

14  everyone can see it or --

15         MR. BORNSTEIN:  Uh, yes.  Yes, let me do that so

16  that -- I don't have a lot of copies.

17         Can the witness see it without anybody else seeing

18  it?

19         COURTROOM DEPUTY:  No, it's all or --

20         MR. BORNSTEIN:  All or nothing?

21         THE COURT:  That's all right.  I'm not a jury.  I can

22  clear my mind of it if I decide not to admit it.  Go ahead.

23  BY MR. BORNSTEIN:

24  Q.  Can you see what's now been marked as Exhibit A?

25  A.  Yes, I can.

Julie H. Thomas, RMR, CRR                            (303)335-2111

20-cr-00305-DDD              Romero - Cross              10/12/2022    82

```
 1   Q.  And do you see that the date is July 6th of 2020?

 2   A.  I do.

 3   Q.  And do you see that it's an e-mail from you?

 4   A.  Yes, I do.

 5   Q.  Do you remember it now?

 6   A.  I do not.

 7           DEFENDANT K. TEW:  Hmm.

 8   A.  I mean, obviously that's my e-mail address.  I'm not

 9   disputing that I sent that, but I have no idea what this

10   pertains to.

11   BY MR. BORNSTEIN:

12   Q.  And Lisa Palmer gets a carbon copy or a copy of it?

13   A.  Yes.

14   Q.  In fact, isn't it a fact that this involved Kimberley Tew?

15   Right?

16   A.  Again, I do not recall this.

17   Q.  Well, do you know who Bustabit is?

18   A.  I do not, no.  I deal in many, many hundreds of e-mails,

19   and I deal with many, many cyber-related activities.  This is

20   just one of many hundreds.  I have no idea.

21   Q.  Do you know why this is in the discovery provided to the

22   defense by the Government?

23   A.  I do not.

24   Q.  Did you provide this to the Government?

25   A.  No.  Did I provide this to the Government?
```

Julie H. Thomas, RMR, CRR                         (303)335-2111

 1    Q.  Yes.

 2    A.  Well, it's part of a record as a federal employee.

 3    Q.  Did you provide this to the United States Attorney

 4    handling this case?

 5    A.  No, I did not.

 6    Q.  Are you aware that in July of 2020 that the IRS had made

 7    contact with Kimberley Tew?

 8    A.  Am I aware now that that happened?

 9    Q.  Well, are you aware now?

10    A.  I am aware now, yes.

11    Q.  Were you aware then?

12    A.  No.

13    Q.  What are you aware now?

14    A.  I'm aware now of everything that, you know, that I'm

15    learning as part of this process, but, again, I wasn't the

16    case agent for this case.

17    Q.  Well, were you the case agent for Operation Honest

18    Cocaine?

19    A.  I was one of the agents involved in that case, yes.

20    Q.  And are you aware that the agents in Honest Cocaine had

21    interviewed Kimberley Tew in January of 2020?

22    A.  I do know that agents from the Phoenix field office

23    interviewed her.

24    Q.  What were their names?

25    A.  I don't recall I think one was Special Agent Fleischman,

 1   possibly.

 2   Q.   But you were part of Honest Cocaine?

 3   A.   Uh, we -- at the time I was assigned to an HSI task force.

 4   Honest Cocaine was one of many hundreds of leads that we had.

 5   Q.   What kind of a task force?

 6   A.   It was an HSI Dark Net task force.

 7   Q.   I'm sorry.  Maybe the court reporter got that, but I can't

 8   understand.

 9   A.   Homeland Security Investigations Dark Net task force.

10   Q.   Okay.

11   A.   Yeah.

12   Q.   And what is a Dark Net task force?

13   A.   You know, I could talk about it all day, but what I will

14   say is it was a task force that was designed to go after Dark

15   Net market vendors and marketplaces selling illegal drugs.

16   Q.   And was Daniel@bustabit somebody who was on the Dark Net?

17   A.   I don't recall.

18   Q.   Based on being part of this, do you know what Bustabit is?

19   A.   I don't recall.

20   Q.   Do you know that it's an online gambling site?

21   A.   You know what, now that you mention it, yes, it may be

22   something like that, but I don't recall specifically what this

23   was.

24   Q.   And online gambling sites is something that Homeland

25   Security was interested in back in 2020?

Julie H. Thomas, RMR, CRR                          (303)335-2111

  1   A.  I can't speak to that.  I don't know.

  2   Q.  Well, okay, what was Honest Cocaine then?

  3   A.  Honest Cocaine was a cocaine vendor.  He sold cocaine on

  4   the Dark Net.

  5   Q.  So Honest Cocaine is a person, not a code name for an

  6   investigation.

  7   A.  Honest Cocaine is a person.  It's a moniker.

  8   Q.  Oh, a monitor?

  9   A.  Yes, a moniker.

 10   Q.  A moniker?

 11   A.  It's like a slang.  It's, uh, a nickname.

 12          MR. BORNSTEIN:  Offer the exhibit, Your Honor,

 13   Exhibit A.

 14          THE COURT:  Mr. Fields, any objection?

 15          MR. FIELDS:  No objection, Your Honor.

 16          THE COURT:  All right.  I'll admit it.  Go ahead.

 17       (Defendant's Exhibit A admitted.)

 18   BY MR. BORNSTEIN:

 19   Q.  All right.  So there was no statement to the officers or

 20   the agents that there was information sufficient to get a PC

 21   arrest, in other words, a warrantless arrest of Mr. Tew;

 22   right?

 23   A.  I didn't know the specifics of why we were there that day.

 24   I simply responded to conduct surveillance.

 25          MR. BORNSTEIN:  Can I have another exhibit marked,

20-cr-00305-DDD                 Romero - Cross                 10/12/2022   86

1   Your Honor?

2          THE COURT:  Yes.

3          MR. BORNSTEIN:  Can I put it on the Elmo?

4          THE COURT:  Sure, yeah.

5          MR. BORNSTEIN:  Or do you want Mr. Keech to do that?

6          THE COURT:  No, if you can do it, go ahead.

7   BY MR. BORNSTEIN:

8   Q.  Can you see Exhibit B, Mr. Romero?

9   A.  I can't see the exhibit tag, sir, but I can see the arrest

10  report in front of me.

11  Q.  Okay.  You see -- let me see if I can --

12  A.  Yes, I see it now.

13  Q.  Do you see that Exhibit B is dated July 9th of 2020?

14  A.  I do.

15  Q.  And do you see that Emil Stark signed it?

16  A.  I do.

17  Q.  And do you see -- is this a form that the IRS uses?

18  A.  Can you pull it down a little bit?

19  Q.  This way?

20  A.  The other way.

21  Q.  Form 1327-A?

22  A.  Yes.

23  Q.  This way?

24  A.  That's good, yes.

25  Q.  That's an IRS form?

Julie H. Thomas, RMR, CRR                           (303)335-2111

1    A.  Yes.

2    Q.  You use that for arrests.

3    A.  Yes.

4    Q.  All right.  Do you see that Mr. Stark, who wrote the same

5    report that you used to refresh your memory, wrote this

6    report?  Right?

7    A.  It's a form, yes.

8    Q.  And it says on July 8th, 2020 --

9            MR. BORNSTEIN:  Well, let me offer the exhibit,

10   Exhibit B, please, before I read it.

11           THE COURT:  Any objection, Mr. Fields?

12           MR. FIELDS:  Yes, Your Honor.  This is another

13   agent's report.  I'm not sure it's particularly relevant here,

14   so I would object on those grounds.

15           THE COURT:  I will admit it, and you can -- we can

16   discuss its relevance.  Go ahead.

17      (Defendant's Exhibit B admitted.)

18   BY MR. BORNSTEIN:

19   Q.  Do you see on box section 17 it says that the special

20   agent who was the arresting officer is yourself?

21   A.  Yes, I do.

22   Q.  Do you see that the box 15 says that the arrest is on

23   July 8th of 2020?

24   A.  Yes, I see that.

25   Q.  All right.  So this is the Internal Revenue Service form

1   for your arrest of Mr. Tew; right?

2   A.  Yes.

3   Q.  It wasn't Agent Anderson's arrest or Agent Palmer's

4   arrest?

5   A.  It was my arrest, yes.

6   Q.  It was your arrest?

7   A.  Yes.

8   Q.  Why were you the arresting person if it was Agent Anderson

9   who was coming to speak to Mr. Tew?

10  A.  I was the person delegated to make the arrest.

11  Q.  By who?

12  A.  By Special Agent Anderson, Special Agent Palmer, Special

13  Agent Stark.

14  Q.  All three of them?

15  A.  From what I recall, yes.

16  Q.  It says in box 23 that the special agent filing the

17  affidavit is Agent Palmer; right?

18  A.  That is correct.

19  Q.  Do you know why she is filing the affidavit rather than

20  Agent Stark or yourself?

21  A.  Again, she was the case agent.  I can't speak to more than

22  that.

23  Q.  It says, *July 8th of 2020, AUSA Doshi informed FBI special*

24  *agent to conduct a PC arrest of Michael Tew at his residence.*

25          What's a PC arrest?

Julie H. Thomas, RMR, CRR                              (303)335-2111

20-cr-00305-DDD                    Romero - Cross                    10/12/2022    89

1    A.   Probable cause.

2    Q.   So that's a nonwarrant arrest?

3    A.   Yes --

4    Q.   Warrantless arrest?

5    A.   There was sufficient evidence to make an arrest.

6    Q.   Is that a warrantless arrest when you say "PC arrest"?

7    A.   I believe, yes.

8    Q.   Because otherwise, if it wasn't a warrantless arrest, you

9    would have said conduct an arrest pursuant to a warrant issued

10   by a magistrate; right?

11   A.   Correct.

12   Q.   He was placed in custody, and then you said, *Later the*

13   *same day IRS-CI special agent swore out a criminal complaint*

14   *of Tew for Title 18 United States Code 1956(h).*

15        That's money laundering; right?

16   A.   Yes.

17   Q.   *A memo of activity and a memo of interview were completed*

18   *and are referenced to this report.*  Is that right?

19   A.   Yes.

20   Q.   You wrote a memo of interview, didn't you?

21   A.   I don't recall.

22   Q.   So when Exhibit B says that you wrote a memo of interview,

23   what does that mean?

24   A.   Well, I think what you are -- I think what you are

25   referring to is the memo that Special Agent Stark wrote that I

Julie H. Thomas, RMR, CRR                              (303)335-2111

1  witnessed.

2  Q.  On July 8th there was an arrest warrant issued, wasn't

3  there?

4  A.  Yes.

5  Q.  And who sought the arrest warrant that day?

6  A.  I believe it was AUSA Hetal Doshi and FBI Special Agent

7  Sarah Anderson.

8  Q.  So while the IRS was keeping an eye on Mr. Tew at the

9  apartment, the AUSA and a FBI special agent were seeking an

10  arrest warrant; right?

11  A.  I can't speak to what they were doing at that time.  I can

12  only speak to what I was doing.

13  Q.  Well, you knew -- you were told that while you were doing

14  what you were doing the FBI Agent Anderson, working with an

15  AUSA, was seeking an arrest warrant for Michael Tew, weren't

16  you?

17  A.  Well, I know that, again, there was concern with him

18  fleeing the country.  I know that I was tasked to keep an eye

19  on him, if you would.  I believe that there was conversation

20  between the FBI special agent and the AUSA as to what to do

21  were that to occur, but I was not privy to those

22  conversations.

23  Q.  Well, was Emil Stark privy to those conversations?

24  A.  Again, I don't know.  I'm not Emil Stark.

25  Q.  Well, you talked to him.  Fellow agents speak to each

1    other, don't they?

2    A.   Well, in that instance on that day, sir, we were focused

3    on the task at hand, which is making sure that we knew where

4    Mr. Tew was -- Mr. and Mrs. Tew were.

5    Q.   And making sure he wouldn't flee the country; right?

6    A.   Well, again, I didn't have the authority to prevent him

7    from going anywhere.

8    Q.   You said there's -- you had warrantless arrest authority

9    for a PC arrest; right?

10   A.   That was after the fact, sir.  I'm talking about when I

11   dealt with Mr. Tew prior to the arrest.

12   Q.   Okay.  When you did arrest him, you were told that

13   Anderson and -- AUSA Doshi and Agent Anderson had obtained an

14   arrest warrant; right?

15   A.   I was told an arrest warrant had been obtained.

16   Q.   Who told you?

17   A.   I believe it was Supervisor Special Agent Stark.

18   Q.   You guys are in constant communication during this, aren't

19   you?

20   A.   Say that again?

21   Q.   You agents are in constant communication with each other

22   during this, aren't they?

23   A.   I don't know, sir.  Again, I can only speak to what I was

24   doing.

25   Q.   You weren't in contact using communication devices?

1   A.  Myself?  No.

2   Q.  Agent Stark?

3   A.  I can't speak to what he was doing at the time.

4   Q.  Who was with you on the second floor?

5   A.  Agent Stark, Agent Garrett, Agent Anderson.

6   Q.  They had communication devices, cell phones, didn't they?

7   A.  I was watching a door.  I wasn't watching them.

8   Q.  So you were the one who said that Agent Anderson was on

9   her way and that she would like to speak to Michael Tew; is

10  that right?

11  A.  Yes, sir.

12  Q.  And then you said, Is there a place we could speak

13  privately; right?

14  A.  Yes.

15  Q.  All right.  Now, actually you arrived not at 1 o'clock,

16  but about 11:55; right?

17  A.  I believe that's when Special Agent Stark arrived.

18  Q.  Okay.  How about if that was when Special Agent Stark was

19  asked to --

20  A.  Actually, you know what, correct, you're right, he was

21  asked to, and he arrived about 1 o'clock, I believe.  All of

22  us arrived at the same time.

23  Q.  So then you took Michael Tew to this back area of the

24  apartment; right?

25  A.  No.  I actually met him there.

Julie H. Thomas, RMR, CRR                              (303)335-2111

1  Q.  I thought you met him in the hallway coming out of the

2  front door.

3  A.  Both.  I met him in the hallway coming out the front door.

4  Then he went back inside his apartment to tell his wife what

5  was going on, and we went and met in the back.

6  Q.  It says here that you asked if there was a place to speak

7  privately.

8  A.  Yes.

9  Q.  Why did you want to speak privately to Michael Tew?

10  A.  Well, I wanted a place where we could meet privately.

11  And, again, it was for her -- it was for his -- I didn't want

12  him to be embarrassed.  It was for his, I guess, privacy, if

13  you would.

14  Q.  What would embarrass him?

15  A.  Four individuals meeting with somebody, you know,

16  overhearing something like that.

17  Q.  Four individuals who were getting ready to arrest him;

18  right?

19  A.  At that point I had no knowledge of that, sir.

20  Q.  Well, you knew that FBI Agent Anderson was coming to speak

21  to him; right?

22  A.  Yes, I did.

23  Q.  And you knew that FBI Agent Anderson, working with an

24  Assistant United States Attorney, was also seeking an arrest

25  warrant too?

Julie H. Thomas, RMR, CRR                              (303)335-2111

1    A.  I had no knowledge of that.

2    Q.  How did you know Anderson was coming?

3    A.  I was told by Special Agent Stark.

4    Q.  Now, let's talk about this common area a minute.

5    A.  Okay.

6           MR. BORNSTEIN:  Could we have the photograph back up,

7    please.  It's Exhibit --

8           MR. FIELDS:  8.

9           MR. BORNSTEIN:  -- 8, and pages 3 and 4, I believe.

10          MR. FIELDS:  34 and 35.

11          MR. BORNSTEIN:  34 and 35.

12   BY MR. BORNSTEIN:

13   Q.  Okay.  Let's start with this page.

14   A.  Okay.

15   Q.  So you see the page that's displayed?

16   A.  Yes, I do.

17   Q.  Do you see the children's toys?

18   A.  I do.

19   Q.  All right.  So, now, that's the door on the left into the

20   house; right?

21   A.  Yes.

22   Q.  And on the right there's a door for this patio area?

23   A.  It's a gate, yes, sir.

24   Q.  Where were the children?

25   A.  From what I recall, I believe the children were in this

Julie H. Thomas, RMR, CRR                              (303)335-2111

1   area right here, the patio area.

2   Q.   And you talked to them, didn't you?

3   A.   I don't recall.

4   Q.   You made nice to the children?

5   A.   You know what, I like kids.   Maybe I did.   Possibly.

6   Q.   Okay.   You made nice to the children.   Did you tell one of

7   the girls -- they're two young girls; right?

8   A.   I believe so, yes.

9   Q.   All right.   And did you tell one of the girls that you

10   were not there to arrest their daddy?

11   A.   I don't recall that.

12   Q.   Don't recall that.

13   A.   No.

14   Q.   All right.   So then there's this door up here.   What's

15   that door to?

16   A.   That's the exit right there, or one of the two exits.

17   Q.   Exit to what?

18   A.   Back to the hall area.

19   Q.   All right.   And that door was closed when you were in the

20   hall area; right?

21   A.   I don't recall that.   I never went out that door or

22   exited -- I never used that door right there.

23   Q.   Okay.   Then how did you get to this patio?

24   A.   There's a door behind this photo.   So we are looking west

25   right now.   The other door is on the east side of that common

```
 1  area.  That's the door that we used to get into the -- into
 2  the common area.
 3  Q.  Okay.  The patio; right?
 4  A.  Patio, common area, yes.
 5  Q.  Well, it wasn't common to the whole building, was it?
 6  A.  I believe anybody that is a resident of that building was
 7  able to use that common area.
 8  Q.  What makes you think that?  What makes you think it wasn't
 9  only for the people on that floor?
10  A.  I don't know.
11  Q.  You don't know that; right?
12  A.  I know it was a common area that was available to at
13  least, you know, people -- a certain amount of people that
14  rented apartments there.
15  Q.  And the door to the hallway is locked, isn't it?
16  A.  I believe it was locked.
17  Q.  And you were in the hallway.  There was a locked door to
18  get to this common patio area.  Who unlocked the door for you?
19  A.  I believe it was Mr. or Mrs. Tew.
20  Q.  So in terms of a locked door, that would indicate that it
21  was not available to anybody in the building; right?
22  A.  I don't know.
23          MR. BORNSTEIN:  Could we have the other photo,
24  please.
25  BY MR. BORNSTEIN:
```

Julie H. Thomas, RMR, CRR                                    (303)335-2111

1  Q.  Okay.  So this is looking the other direction; correct?

2  A.  Yes, that's looking towards the east.

3  Q.  And so is this the door you went out of?

4  A.  I believe it is, yes.

5  Q.  And what is this?

6  A.  I believe that's another unit.

7  Q.  Ah.  How many units per floor?

8  A.  No idea.

9  Q.  Well, you were out in the hallway.  You could count.

10 A.  My job wasn't to count the units on the floor.  It was to

11 keep an eye on one specific unit.

12 Q.  All right.  While you were out there, you talked to

13 Michael Tew about his employment at National Air Cargo; right?

14 A.  I believe -- I don't recall the specifics of what I spoke

15 to him about before Special Agent Anderson got there, but I do

16 know that once she got there, NAC was brought up.

17 Q.  And you were privy to that conversation.

18 A.  Yes.

19 Q.  And once she got there, NAC was brought up.  So it was

20 brought up that he had worked for National Air Cargo; right?

21 A.  I believe so, yes.

22 Q.  And that he was no longer working for National Air Cargo;

23 right?

24 A.  Yes.

25 Q.  And she asked questions about what he had done with

Julie H. Thomas, RMR, CRR                        (303)335-2111

```
 1   National Air Cargo; right?

 2   A.  I don't recall if she had asked what he had done with

 3   National Air Cargo.  I just know that National Air Cargo was

 4   brought up.

 5   Q.  Well, she explained 18 United States Code 1001 to him, so

 6   that it was an explanation that says please don't lie to an

 7   FBI agent; right?

 8   A.  Again, she explained that code, but I wouldn't say that

 9   she used that -- that wording right there.

10   Q.  No, but she said 1001 would get you in a lot of trouble;

11   right?

12   A.  Never said that.

13   Q.  She said it's a felony, isn't it?

14   A.  Never said that.

15   Q.  What did she say?

16   A.  Again, I believe she explained the nuances of 1001.  I

17   don't believe she used that language right there.

18   Q.  She essentially said don't lie to an FBI agent, didn't

19   she?

20   A.  She explained 1001.

21   Q.  Isn't that don't lie to an FBI agent?  Isn't that -- isn't

22   that what that's all about?

23   A.  She explained 1001.

24   Q.  All right.

25            MR. BORNSTEIN:  Excuse me, Your Honor.
```

1    BY MR. BORNSTEIN:

2    Q.   Well, Mr. Romero, then what triggered the fact that you

3    asked Michael Tew to come outside and be arrested?

4    A.   I was informed that a warrant for his arrest had been

5    issued.

6    Q.   All right.  And you knocked on the door.

7    A.   I did.

8    Q.   And he opened the door?

9    A.   He did.

10   Q.   And you placed him under arrest.

11   A.   I did.

12   Q.   And he was barefoot?

13   A.   I don't recall.

14   Q.   You don't recall the fact that he needed to have his shoes

15   put on?

16   A.   Yes, he did have to have his shoes put on, yes.

17   Q.   Do you recall his wife putting his shoes on because he

18   couldn't do it with the handcuffs?

19   A.   I believe that happened.

20   Q.   And you believe that while his wife was putting on the

21   shoes and he was handcuffed, one of his daughters was crying

22   and screaming, Don't take my daddy, Don't take my daddy.  Do

23   you remember that?

24   A.   No.

25   Q.   Do you remember the daughter saying, You promised that you

Julie H. Thomas, RMR, CRR                          (303)335-2111

 1  would not arrest my daddy?

 2  A.  I do not recall that.

 3          MR. BORNSTEIN:  No further questions.

 4          THE COURT:  All right.  Thank you, Mr. Bornstein.

 5          MR. BORNSTEIN:  Where should I put Exhibit A and B,

 6  Your Honor?

 7          THE COURT:  You can give them to Mr. Keech for now.

 8          MR. BORNSTEIN:  Here's A.  What did I do with B?

 9          THE COURT:  It might still be on the overhead.

10          COURTROOM DEPUTY:  It's over here.

11          THE COURT:  Mr. Fields, any redirect?

12          MR. FIELDS:  Very briefly, Your Honor.

13          THE COURT:  All right.  Go ahead.

14                     **REDIRECT EXAMINATION**

15  BY MR. FIELDS:

16  Q.  Special Agent Romero, do agents work in teams?

17  A.  They do.

18  Q.  Are there, sort of, separate IRS teams?

19  A.  Yes.

20  Q.  Sometimes will one team ask another team to perform tasks?

21  A.  Yes.

22  Q.  Why?

23  A.  Depending on the volume of the workload, aspects of the

24  case, it's simpler for someone to -- one team to perform

25  surveillance while the other team is working on another aspect

1    of the case.

2    Q.  So you weren't the case agent on this case, were you?

3    A.  No, I was not, no.

4    Q.  Have you been the case agent on other cases?

5    A.  I have.

6    Q.  When you have been the case agent on other cases, have you

7    asked other agents to help you?

8    A.  Yes, I have delegated the responsibility to other agents.

9    Q.  When you have asked other agents to help you, what do you

10   tell them?

11   A.  Just the basics.  I don't give them a full background on

12   the case.  I just tell them what they need to know to be

13   successful with that specific task.

14   Q.  Do you remember being shown that e-mail to someone on

15   Bustabit?

16   A.  I do.

17   Q.  Are agents sometimes asked to serve process?

18   A.  They are.

19   Q.  What does that mean?

20   A.  That means basically they are asked to serve subpoenas or

21   summonses to third-party companies for information.

22   Q.  So, as the case agent, sometimes on your own cases have

23   you asked other agents to serve process?

24   A.  Yes.

25   Q.  When you do that, what do you tell them?

Julie H. Thomas, RMR, CRR                          (303)335-2111

1    A.  Please serve this for me --

2    Q.  Do you --

3    A.  -- the attachment.  Thank you very much.

4    Q.  Do you tell them anything else?

5    A.  No.

6    Q.  Why not?

7    A.  Because they don't need to know.

8    Q.  Have you asked other agents to do surveillance for you?

9    A.  I have.

10   Q.  When you ask them to do surveillance for you, what do you

11   tell them?

12   A.  Basically the specifics of the surveillance, maybe a

13   description of the individuals involved, the cars in question,

14   possibly small background on the case, but not the details.

15   Q.  So in this particular case when you were asked to do

16   surveillance, did you ask any questions about the case?

17   A.  No.

18   Q.  Why not?

19   A.  Because I didn't need to know the case, the specifics, to

20   be successful at the job I was asked to do.

21   Q.  Now, you were asked a lot of questions about a PC arrest,

22   et cetera.  Was this all a ruse to arrest Michael Tew?

23   A.  No, it was not.

24   Q.  Why did you go to the apartment that day?

25   A.  To perform surveillance.  To identify whether Mr. Tew was

Julie H. Thomas, RMR, CRR                        (303) 335-2111

20-cr-00305-DDD          Romero - Redirect          10/12/2022   103

 1  there.  And if he were to leave the apartment, to follow him.

 2  Q.  Who were the case agents on the case?

 3  A.  Special Agent Sarah Anderson and Special Agent Lisa

 4  Palmer.

 5  Q.  So we talked a little bit about a PC arrest.  What does it

 6  mean to make a PC arrest?

 7  A.  Have probable cause to basically initiate an arrest

 8  without a warrant being available.

 9  Q.  Does that mean that an agent would have to have sufficient

10  information based on their, sort of, personal knowledge of a

11  case to decide to make an arrest?

12  A.  Yes.

13  Q.  Did you have sufficient, sort of, information about the

14  case to arrest Michael Tew?

15  A.  No.

16  Q.  Who would have?

17  A.  Special Agent Palmer.  Special Agent Anderson.

18  Q.  And what would they have done, based on your experience as

19  an IRS agent, before making any determination like that?

20  A.  They would have consulted with the U.S. Attorney's Office.

21  Q.  You have been an IRS agent for how long?

22  A.  25 years.

23  Q.  In your experience, will agents sometimes try to interview

24  a subject before making an arrest?

25  A.  Yes.

Julie H. Thomas, RMR, CRR                          (303)335-2111

 1  Q.   Why?

 2  A.   Typically more information would be available at that

 3  point before someone would be arrested.  People would be more

 4  inclined to speak at that point.

 5  Q.   And sometimes do you want to get your subject's side of

 6  the story before you make an arrest?

 7  A.   Yes.

 8  Q.   Why?

 9  A.   It's important to the case.  You have to know all aspects

10  of the case.

11  Q.   Is it typical when that happens, when you interview a

12  subject before making an arrest or before making any

13  decisions, are they detained?

14  A.   No.

15  Q.   Why not?

16  A.   Because there is no PC developed at that point.  If there

17  was, they would be arrested.  And there is no warrant that has

18  been issued.

19  Q.   All right.  Let's just talk about this timeline again so

20  it's clear.

21       When you first got there, what did you do?

22  A.   1 o'clock we determined that the Tews' vehicle was in the

23  garage.

24  Q.   What did you do after that?

25  A.   We then put two agents in the lobby guarding the -- not

1   guarding, but basically watching the elevator.  Then myself

2   and two other agents were on the second floor where unit 224

3   was located, and we just basically kept eyes on the unit.

4   Q.  Did Michael Tew eventually come out?

5   A.  He did.

6   Q.  Okay.  Then, after that, was that the discussion out on

7   the common area?

8   A.  You mean as far as what we talked about?

9   Q.  Yeah.

10  A.  From what I recall, we didn't talk about anything

11  specific.  I think, uh, talked about his children.  Uh, his

12  wife was volunteering information as far as she asked if I

13  knew about cryptocurrency, and she made some other statements.

14  But as far as specifics of the case, nothing was asked at that

15  point.

16  Q.  Then Special Agent Anderson arrived?

17  A.  Yes.

18  Q.  Who took the lead at that point?

19  A.  Special Agent Anderson did.

20  Q.  Did that portion of the interview conclude?

21  A.  My portion of the interview?

22  Q.  Yeah.

23  A.  Yes, it did.

24  Q.  Then the portion with Special Agent Anderson, did it

25  eventually conclude?

1   A.  It did, yes.

2   Q.  What happened at the conclusion of that portion?

3   A.  She served a subpoena to Mr. Tew for Sand Hill LLC.

4   Q.  Did he go back in his residence?

5   A.  She did first.  She went, I believe it was 3:42, and he

6   went in about 7 minutes later.

7   Q.  Then after all of that had taken place, when was the

8   decision made to make an arrest?

9   A.  4:11.

10  Q.  Who made that decision?

11  A.  The decision was made by the case agent upon consultation

12  with the U.S. Attorney's Office, the AUSA.

13          MR. FIELDS:  Your Honor, may I have just a moment?

14          THE COURT:  Sure.

15  BY MR. FIELDS:

16  Q.  One final subject matter.  You were shown all those

17  reports.

18  A.  Yes.

19  Q.  Do you remember seeing that?

20  A.  I do.

21  Q.  Do you remember seeing the report from Emil Stark about an

22  arrest?

23  A.  I do.

24  Q.  Based on your experience as an IRS agent, would that have

25  been written before the arrest or after?

Julie H. Thomas, RMR, CRR                        (303)335-2111

1    A.   After.

2    Q.   Why?

3    A.   Because you can't necessarily state all the facts as they

4    are occurring.  You have to wait until time has passed.

5    Typically we have a certain set time, but I think this was

6    written within a day or so.  But you have to gather all the

7    facts before you can memorialize it in your reports.

8              MR. FIELDS:  No further questions, Your Honor.

9              THE COURT:  All right.  Thank you, Mr. Fields.

10             Agent Romero, you may step down.  Thank you.

11             THE WITNESS:  Thank you.

12             THE COURT:  All right.  It's 12:30.  Why don't we

13   take a one-hour lunch break and return at 1:30 to continue.

14   Thank you.

15        (Proceedings recessed 12:30 p.m. to 1:34 p.m.)

16             THE COURT:  Please take your seats.

17             Welcome back.  Mr. Fields, I understand you have more

18   witnesses.

19             MR. FIELDS:  Yes, Your Honor.  Two more witnesses.

20             THE COURT:  All right.  Go ahead.

21             MR. FIELDS:  The United States calls Sarah Anderson

22   to the stand.

23        (The witness was sworn.)

24             COURTROOM DEPUTY:  Please be seated.

25             Please state your full name, and spell your first and

Julie H. Thomas, RMR, CRR                         (303)335-2111

```
 1   last names for the record.
 2            THE WITNESS:  Sarah Anderson.  S-a-r-a-h,
 3   A-n-d-e-r-s-o-n.
 4            MR. FIELDS:  May I begin, Your Honor?
 5            THE COURT:  Yes, go ahead.
 6     SARAH ANDERSON, GOVERNMENT'S WITNESS, DIRECT EXAMINATION
 7   BY MR. FIELDS:
 8   Q.  Where do you work?
 9   A.  I work at the FBI Denver division.
10   Q.  What is your title?
11   A.  Special agent.
12   Q.  Were you a special agent in 2020?
13   A.  Yes.
14   Q.  Where were you assigned?
15   A.  I was assigned to a white collar financial crimes squad.
16   Q.  How long have you been a special agent?
17   A.  Since 2008.
18   Q.  Have you had training in interviewing witnesses?
19   A.  Yes.
20   Q.  Describe that training for us.
21   A.  I had new agent training at Quantico, Virginia, and then
22   I've had just on-the-job training in interviewing.
23   Q.  As part of that training, are you given instructions on
24   when to issue something called a Miranda warning?
25   A.  Yes.
```

20-cr-00305-DDD                Anderson - Direct              10/12/2022   109

1   Q.  Generally speaking, when would an agent give such a

2   warning?

3   A.  When an individual is in custody and you are attempting to

4   interview them.

5   Q.  What does that mean?

6   A.  So when you have detained an individual, when they are no

7   longer voluntarily with you.

8   Q.  During your years in the FBI, approximately how many

9   interviews would you say you have done?

10  A.  Hundreds.

11  Q.  Are you familiar with an investigation of Michael Aaron

12  Tew and Kimberley Tew?

13  A.  Yes.

14  Q.  How are you familiar with it?

15  A.  I'm the assigned case agent from the FBI for that case.

16  Q.  Were you working on the case with any other agencies?

17  A.  I was working with a co-case agent from IRS criminal

18  investigation.

19  Q.  Who is she?

20  A.  Special Agent Lisa Palmer.

21  Q.  On July 8th, 2020, did you receive information indicating

22  that Michael Tew might be trying to flee?

23  A.  Yes.

24  Q.  Describe how that happened.

25  A.  I was aware of a text communication that indicated he was

Julie H. Thomas, RMR, CRR                        (303)335-2111

20-cr-00305-DDD                    Anderson - Direct                    10/12/2022    110

1    concerned Jonathan Yioulos was working with law enforcement, I

2    think the FBI in particular, and was indicating he might need

3    to get away, get out of the country.

4    Q.   Where were you when you got this information that Michael

5    Tew might be trying to flee?

6    A.   Um, I can't recall specifically, but earlier that day I

7    was in court on another proceeding.

8    Q.   After you found out about the possibility that he might

9    flee, what were you asked to do?

10   A.   To go over to attempt to interview Michael Tew.  And I

11   also had a subpoena that had been prepared, to serve him with

12   a subpoena.

13   Q.   Were you able to make it to Mr. Tew's residence right

14   away?

15   A.   Not immediately.  So initially the court proceeding, I

16   thought, was anticipated to be done before lunch.  It ran

17   long, so we came back in.  And that was after I was notified

18   it would be good if I could go conduct an interview.  So after

19   that was finished for the afternoon session, I went back to my

20   office in order to get the subpoena.  I didn't have it with me

21   at the time, and I wanted to print it and take it.

22   Q.   Were you able to make it to the Tew residence that

23   afternoon?

24   A.   Yes.

25   Q.   Around what time?

Julie H. Thomas, RMR, CRR                              (303)335-2111

1    A.   Late afternoon.

2    Q.   Where was the residence?

3    A.   It was on East First Avenue in the Cherry Creek area.

4    Q.   What did you do when you arrived?

5    A.   When I arrived, I notified the IRS agents who were already

6    located at the residence that I was -- I had just gotten

7    there.  I think they were awaiting my arrival.  I met with one

8    agent, and then I -- I walked with him up to the residence,

9    where the residence area was.

10   Q.   Describe the residence area for us.

11   A.   So I was taken outside into, like, a courtyard area, what

12   I'd describe as a courtyard area.  It was a common area that

13   various apartments seemed to back up to.  And as I went out

14   there, Mr. and Mrs. Tew were in a -- sort of a cordoned off

15   area on their property.  It wasn't like a deck, but it was

16   like a patio for their property.

17   Q.   Let me pull up Government's Exhibit 8, page 35.  It's

18   already in evidence.

19        MR. FIELDS:  So just type in 08-035.

20   BY MR. FIELDS:

21   Q.   Do you recognize this photograph?

22   A.   Yes.

23   Q.   What do you see there?

24   A.   Um, so you see the area I described as the patio area for

25   the Tews' residence, and then beyond that there's like a

Julie H. Thomas, RMR, CRR                              (303)335-2111

20-cr-00305-DDD                Anderson - Direct                10/12/2022    112

 1    retaining wall and then more of an open courtyard area with a

 2    fire pit and some seating around it.

 3    Q.  So when you got to this area, could you point out for

 4    us -- you can actually draw on the monitor -- where did you

 5    see the Tews?

 6    A.  Behind the patio wall here.

 7    Q.  Where were the agents?

 8    A.  Spread around the courtyard area beyond that patio wall.

 9    Q.  How were you dressed?

10    A.  I was dressed like much like I am today.

11    Q.  Business casual?

12    A.  Um, I was in a suit, I believe.  I had just come from

13    court.

14    Q.  Suit, with a jacket?

15    A.  Yes, with a jacket.

16    Q.  Were you armed?

17    A.  Yes.

18    Q.  Where was your firearm?

19    A.  It was on my -- it was on my waist.

20    Q.  In a holster?

21    A.  Yes.

22    Q.  Was it visible?

23    A.  Not evidently visible.  I can't say it was never visible,

24    depending on clothing movement, but it was concealed under a

25    jacket.

1   Q.  All right.  So when you got into this common area, what

2   did you do?

3   A.  So I spoke with Mr. and Mrs. Tew and told Mr. Tew I'd like

4   to ask him some questions regarding his previous employment at

5   National Air Cargo.

6   Q.  How did he respond?

7   A.  He indicated that he'd be willing to answer some

8   questions.

9   Q.  Did you ask him some questions?

10  A.  I did.

11  Q.  And so what happened as you proceeded to ask him

12  questions?

13  A.  So we proceeded over towards the fire pit area and then

14  sat around on the sofa at the fire pit area.  Just Mr. Tew

15  came over to that location and was seated.  I began to ask him

16  questions about National Air Cargo and his employment there.

17  Q.  Did he answer your questions?

18  A.  Yes.

19  Q.  At some point during this initial part of the encounter

20  did you ask to record the interview?

21  A.  Yes.

22  Q.  What happened when you asked?

23  A.  So Mrs. Tew, she was not seated with us at the courtyard

24  area.  She was at the retaining wall area of the patio, but

25  she could hear what was going upon and sort of participating

 1   in an offset area.  But she yelled over not to record, that

 2   they did not want to allow the interview to be recorded.

 3   Q.  How did you respond to that request?

 4   A.  I didn't engage the recorder.  I didn't turn it on.

 5   Q.  So during the course of your interview, were there any

 6   times where Mr. Tew declined to answer questions?

 7   A.  Yes.

 8   Q.  Describe that for us.

 9   A.  So there were pauses in the interview where he would say,

10   um, you know, I don't want to answer the question, or rather

11   than answering the question ask a question of us, sort of, um,

12   what we were doing, what this was all about.  And at times

13   during the interview Mrs. Tew would interject and sometimes

14   volunteer information that I wasn't soliciting, that wasn't in

15   response to the question I was asking.

16   Q.  At some point during the interview did you give him

17   something called a 1001 warning?

18   A.  Yes.

19   Q.  What is that?

20   A.  So during the interview it became apparent -- it became

21   apparent to me in at least one occurrence that I was receiving

22   an answer that wasn't being forthright.  So after that

23   occurred, I just told him that it's a federal offense to lie

24   to a federal officer.

25   Q.  How did he respond to that?

1  A.  Just acknowledged.

2  Q.  Did he stop the interview?

3  A.  Um, no.  And at the time I provided that, the interview

4  was effectually over already.

5  Q.  At some point during the interview did Kimberley give

6  instructions to Michael?

7  A.  Yes.  She -- she told him that he shouldn't answer any

8  further questions and should revisit the interview at a later

9  time.

10 Q.  After she gave that instruction, what did you do?

11 A.  I said:  I'd be happy to do that.  I just want to set up a

12 date and time that we could do it.

13 Q.  What happened when you tried to set up a date and time?

14 A.  So initially I just asked for a phone number so that I

15 could recontact them to -- to set up the appointment, but I

16 wasn't provided a telephone number.  So I asked for another

17 form of communication, like an e-mail, that I could

18 communicate with them.

19 Q.  Were you given an e-mail?

20 A.  Yes.

21 Q.  Now, during this interview, was -- do you see this door

22 here on the right-hand side of this photograph, Government's

23 Exhibit 35?

24 A.  Yes.

25 Q.  Where does that lead to?

20-cr-00305-DDD                Anderson - Direct                10/12/2022    116

1   A.   That goes into the Tews' residence.

2   Q.   Was it open during the entire interview?

3   A.   To the best of my recollection, it was open, and I -- it

4   was open, but concealed because I think there were window

5   coverings kind of hanging down.  So it was -- the residence

6   itself seemed obscure.

7   Q.   Were there children present during the interview?

8   A.   Yes.

9   Q.   Where were they?

10  A.   They were in different locations.  They were in and out of

11  the unit from time to time.  I can't recall if they were

12  frequently on the other side of the retaining wall, like the

13  patio wall, but I know they were -- the majority of the time

14  they spent on that patio area.

15  Q.   Did the Tews themselves move around during the interview?

16  A.   Yes.

17  Q.   Describe that for us.

18  A.   Well, Mr. Tew, at one point during the interview when he

19  agreed to answer questions he sat along the fire pit area.

20  Then subsequent to a few questions being asked, he got up and

21  returned to the area behind the retaining wall.

22  Q.   All right.  Could you describe to us how the interview

23  came to an end?

24  A.   It ended, um, after I made the attempt to get the e-mail

25  address and obtain that, and then at the conclusion of the

Case 1:20-cr-00305-DDD   Document 654   Filed 02/24/23   USDC Colorado   pg
240 of 460

 1  interview I provided a subpoena for records to Mr. Tew related

 2  to his entity Sand Hill.

 3  Q.  What happened at that point?

 4  A.  I just told him I have a subpoena for records I'd like to

 5  give to him he took from me.  Typically when I give someone a

 6  subpoena, I just show them that the contact information for

 7  the U.S. Attorney's Office and the AUSA handling the matter is

 8  on the front and explain that there's a second page to the

 9  subpoena about how to comply with it and where to send the

10  records to so there's no questions.

11  Q.  How would you describe the tone of the interview?

12  A.  Um, I would say that it was not a very fruitful interview

13  in that many of the questions I asked were just not answered.

14  I didn't think that they were going to be forthright.  I think

15  they were more just trying to figure out what I was there for

16  specifically.

17  Q.  Were any voices raised?

18  A.  Um, Mr. Tew was pretty quiet.  Kimberley Tew sometimes,

19  um, became a little more irritable during the course of the

20  interview.

21  Q.  At the end of the interview where did Michael Tew go?

22  A.  Um, I -- I believe when I left the interview area he was

23  in the courtyard, like his patio area.  And I departed the

24  area prior to him actually going back inside his residence.

25  Q.  What did you do when you left the interview?

Julie H. Thomas, RMR, CRR                          (303)335-2111

1    A.  I had a phone call coming in, and so I took a phone call,

2    but I went back inside the corridor of the apartment complex

3    itself.

4    Q.  Who was the phone call with?

5    A.  It was with AUSA Hetal Doshi.

6    Q.  Was a decision made as a result of that phone call?

7    A.  Yes.  I spoke with AUSA Doshi and just told her what had

8    happened during the course of the interview, and then she gave

9    me a green light, if you will, to go ahead and execute a

10   probable cause arrest on Mr. Tew.

11   Q.  What is a probable cause arrest?

12   A.  It's an arrest based on knowledge of the case without

13   having a warrant issued, a physical warrant.

14   Q.  Did you have probable cause to make an arrest before you

15   went to the apartment that day?

16   A.  I believed I did.

17   Q.  But had you decided to make an arrest before you went to

18   the apartment that day?

19   A.  No.

20   Q.  Why not?

21   A.  Um, one basic reason was I had never made a probable cause

22   arrest prior to this incident, so it was unusual for me to do

23   so in any of my cases.  And at the time I really just wanted

24   to solicit information to see if he would cooperate in our

25   investigation and also just to see what kind of answers or

Julie H. Thomas, RMR, CRR                           (303)335-2111

20-cr-00305-DDD                Anderson - Cross                10/12/2022    119

1    confessions I might be able to get from him.

2    Q.  So when you got back into that courtyard, where was

3    Michael Tew?

4    A.  He was inside the residence.

5    Q.  Describe how he was arrested.

6    A.  So we remade contact with him.  And I actually can't

7    recall if we called him out, if there was still an open

8    doorway, or if we called him out and said, Mr. Tew, we need

9    you to step outside, or we knocked and then told him he needed

10   to step outside.  But he stepped outside into that courtyard

11   area, and then we informed him he was under arrest, and then

12   he was handcuffed.

13             MR. FIELDS:  Your Honor, may I have a moment?

14             THE COURT:  Sure.

15             MR. FIELDS:  Your Honor, I have no further questions.

16             THE COURT:  All right.  Thank you, Mr. Fields.

17             Mr. Bornstein, cross-examination?

18             MR. BORNSTEIN:  Thank you.

19                       **CROSS-EXAMINATION**

20   BY MR. BORNSTEIN:

21   Q.  Good afternoon, Agent Anderson.

22   A.  Good afternoon.

23   Q.  I'm Peter Bornstein.  I represent Michael and Kimberley

24   Tew.  We have not met before; right?

25   A.  No.

Julie H. Thomas, RMR, CRR                         (303)335-2111

20-cr-00305-DDD                Anderson - Cross                10/12/2022   120

1   Q.  Okay.  Let me walk a little backwards here.  We're talking

2   about July 8th, 2020.  When was a complaint filed in the

3   court?

4   A.  On July 8, 2020.

5   Q.  And that complaint was filed by AUSA Doshi?

6   A.  Yes.

7   Q.  Was that complaint -- was there an affidavit attached to

8   that complaint?

9   A.  Yes.

10  Q.  And were you the author of that affidavit?

11  A.  No.

12  Q.  Who was the author of that affidavit?

13  A.  My co-case special agent, Lisa Palmer.

14  Q.  Okay.  When was the affidavit prepared?

15  A.  I can't say specifically, but I believe it was prepared

16  when the decision was made to arrest Michael Tew.

17  Q.  So do you think it was prepared late in the afternoon?

18  A.  I do.

19  Q.  And you had a -- but you had a subpoena that was signed

20  that was issued for Sand Hill.

21  A.  Yes.  I actually had two subpoenas, one for Sand Hill and

22  one for a different entity, that were both prepared in advance

23  of a potential interview with Mr. Tew.  I only served one

24  subpoena.

25  Q.  Not the other one?

Julie H. Thomas, RMR, CRR                          (303)335-2111

```
 1  A.  I served the other one to the registered agent, which was

 2  a company located in the Denver Tech Center, later on.

 3  Q.  Okay.  So was this subpoena signed by an AUSA, or was it

 4  an administrative subpoena issued by the IRS?

 5  A.  It wasn't an administrative subpoena.

 6  Q.  It was or not?

 7  A.  It was not.

 8  Q.  So it was one that was signed by an AUSA?

 9  A.  Yes.

10  Q.  And had you met with -- was that AUSA Doshi?

11  A.  Yes.

12  Q.  Okay.  Had you met with her to physically obtain the

13  subpoena?

14  A.  I had not.

15  Q.  Had Agent Palmer met with her to physically obtain the

16  subpoena?

17  A.  I can't say for certain, but I don't think so, because I

18  believe she was still in Buffalo, New York, around the time

19  that the subpoena was being prepared.

20  Q.  Okay.  So the subpoena -- this wasn't a subpoena that you

21  were faxed or e-mailed.

22  A.  I received it via e-mail after it was, I guess, um, after

23  it was prepared.

24  Q.  All right.  All right.  So do you know about -- were you

25  in verbal contact or e-mail contact with the AUSA Doshi that
```

1   day?

2   A.   I was in telephonic contact.

3   Q.   All right.  So she was the one who called you and said,

4   Arrest him?

5   A.   No, she didn't call me to say, Arrest me [sic].  She

6   called to ask how the contact with him went, how the interview

7   went.

8   Q.   Right.

9   A.   Yes.

10  Q.   And you said, Not well, and then she said, Arrest him?

11  A.   I told them his responses to some of the questions I

12  received, and I told them my opinion that he wasn't being

13  forthright with some of his responses.  And then she told me,

14  based upon the scheme that we had uncovered previously, that

15  it would be advisable to arrest him under probable cause.

16  Q.   All right.  Now, I was under the impression, having just

17  talked with Agent Romero -- and you were listening to that

18  colloquy; right?

19  A.   Yes.

20  Q.   He seemed to indicate that he was arrested pursuant to a

21  warrant that afternoon.

22  A.   Yes.

23  Q.   Is he wrong?

24  A.   I think he was mistaken, yes.

25  Q.   Now, usually there's a warrant that goes along with a

20-cr-00305-DDD                    Anderson - Cross                    10/12/2022    123

1    complaint filed in this court for a arrest pursuant to -- or a

2    case that's beginning by a complaint before a grand jury.  Do

3    you -- do you know if there was a warrant issued out of this

4    court?

5    A.  I'm a little confused on what you are asking, but I know

6    there was a warrant issued.  It was -- a complaint was filed

7    later that evening, and I did receive a copy of the warrant

8    that evening, but he was already booked into the downtown

9    detention center.

10   Q.  So you are aware that, in terms of procedure, if the

11   AUSA -- if the U.S. Attorney's Office is proceeding with a

12   complaint, as opposed to an indictment, they always get a

13   warrant to go along with it.

14   A.  Yes.

15   Q.  Okay.  But you think that the warrant in this case was

16   issued after he was arrested.

17   A.  Yes.

18            MR. BORNSTEIN:  Your Honor, is the warrant in the

19   case file?

20            THE COURT:  Yeah.

21            MR. BORNSTEIN:  And with a timestamp on it?

22            THE COURT:  Well, let me look.

23            DEFENDANT K. TEW:  I have the return of the warrant.

24   They tried to get it signed.

25            THE COURT:  I don't see any time information on the

Julie H. Thomas, RMR, CRR                              (303)335-2111

20-cr-00305-DDD                Anderson - Cross              10/12/2022   124

 1    docket, no.

 2           MR. BORNSTEIN:  So the file just indicates the

 3    warrant itself?

 4           THE COURT:  Right.

 5           MR. BORNSTEIN:  Okay.

 6           THE COURT:  And the day, but not the time.

 7           COURTROOM DEPUTY:  Your Honor, was that a warrant in

 8    this case or the underlying MJ case?

 9           THE COURT:  Oh, the arrest warrant, which I think is

10    document 2 on the docket.  I think that's what we're talking

11    about.  Right?  The arrest warrant for Mr. Tew --

12           MR. BORNSTEIN:  That's what I --

13           THE COURT:  -- on July 8th?  That's what we're

14    talking about?

15           MR. BORNSTEIN:  That's what we're talking about.

16           THE COURT:  That's what I have.  I don't see a time.

17           MR. BORNSTEIN:  Okay.  Thank you for looking.

18           THE COURT:  Sure.  Go ahead.

19    BY MR. BORNSTEIN:

20    Q.  All right.  So now let me go back -- I started at the end.

21    Let me go back a bit.

22           That morning you believe that your co-agent Lisa

23    Palmer was in Buffalo, New York?

24    A.  Yes.

25    Q.  And you understood that she was interviewing Jonathan

Julie H. Thomas, RMR, CRR                              (303)335-2111

```
 1  Yioulos.
 2  A.  Or was in Buffalo because in the preceding days she had
 3  interviewed him.  I don't have a recollection if she met with
 4  him on the 8th or not.  I know she had traveled out there to
 5  conduct an interview.
 6  Q.  All right.  I mean, I know we have an audio of an
 7  interview on the 7th.  I just was interested if there was also
 8  a follow-up meeting on the 8th.
 9  A.  Yes, I don't recall if there was or not.
10  Q.  But, anyway, she was the source of the information that
11  the Tews were going to flee.
12  A.  Yes.  She had received, I believe, a text message
13  forwarded on to her from Mr. Yioulos.  So she was the, I
14  guess, the go-between.  I think the source was Mr. Yioulos.
15  Q.  Okay.  So Yioulos had a text message.  He showed it to
16  Agent Palmer.  Agent Palmer relayed to you the contents.
17  A.  Yes.
18  Q.  And the contents of that text message was both Mr. and
19  Mrs. Tew were going to flee the country.
20  A.  Without looking at it again, I couldn't say if it was
21  inclusive, or if it was one of them, or if you could determine
22  if it was indicating both or one would want to flee.  I'd have
23  to look at it again, but it was indicating that he wanted to
24  flee the country or was -- I think, it was best for him to do
25  so.
```

| | |
|---|---|
| 1 | Q.  Did it indicate what they were going to do with their |
| 2 | children? |
| 3 | A.  No. |
| 4 | Q.  You knew they had children. |
| 5 | A.  Yes. |
| 6 | Q.  And you took that seriously. |
| 7 | A.  The text message? |
| 8 | Q.  Yes. |
| 9 | A.  Yes. |
| 10 | Q.  And that would be normal FBI procedure to say if you have |
| 11 | word that a suspect under investigation was going to flee the |
| 12 | country, to stop them -- to stop them from doing so; correct? |
| 13 | A.  It's a concern.  I wouldn't necessarily say it falls under |
| 14 | any specific procedure. |
| 15 | Q.  In your experience, there have been many instances where |
| 16 | individuals under investigation get stopped at one or another |
| 17 | airport about to board a plane and taken off the plane and |
| 18 | said, You're not leaving, and put under arrest; right? |
| 19 | A.  I don't have a lot of personal experience with it, with |
| 20 | those -- that type of cases where individuals are attempting |
| 21 | to flee.  I don't think it's outside the realm of reason, but |
| 22 | I don't have a lot of experience with it. |
| 23 | Q.  All right.  At least you have read reports or even media |
| 24 | reports about the FBI stopping people at the airport or even |
| 25 | taking them off of a plane before it leaves; correct? |

Julie H. Thomas, RMR, CRR                                    (303)335-2111

1   A.   Um, yes.

2   Q.   In your mind, you were not going to let the Tews, one or

3   both, leave this country; right?

4   A.   Well, I was concerned that they were attempting to flee.

5   It wasn't a steadfast, um, hard line that they wouldn't flee.

6   I didn't have any preconceived notions about what they were

7   going to do.

8   Q.   Let me ask you.  This came from Jonathan Yioulos.  At that

9   point in time did you believe Mr. Yioulos?

10  A.   Yes, I had no reason to doubt the -- the text that he had

11  received.

12  Q.   And you don't remember the contents of that text.

13  A.   I remember the generalization of it, but I don't unless I

14  saw it specifically again to refresh my memory.

15  Q.   In any event, you were sufficiently concerned that you

16  contacted not FBI agents but you contacted IRS agents to

17  assist; is that right?

18  A.   No, I didn't make any contact with the IRS agents.

19  Q.   That came from Buffalo.

20  A.   I think it came just from the IRS office itself.

21  Q.   Was there a specific request from Agent Palmer sitting in

22  Buffalo saying do something, take some action?

23  A.   I don't know specifically who gave the overall order to

24  contact him immediately.

25  Q.   All right.  But you knew about that order.

1    A.   Yes.

2    Q.   How did you find out?

3    A.   When I was in court earlier that day, I think we had a

4    lunch recess, so I went out and checked my phone in my car and

5    saw voicemails or -- I'm not sure if it was a voicemail, but

6    it might have had a voicemail to return a call.  So I called

7    Hetal Doshi, or perhaps I took a call while I was out on the

8    recess.  I can't specifically remember, but I spoke with her,

9    and she asked me if I could go over to the Tews' residence

10   because there was IRS agents gonna stand by to try to

11   interview him and get a subpoena served.  I just informed her

12   that I couldn't immediately do that, I had an obligation I had

13   to continue with.  And then when that was over, then I

14   proceeded over there.

15   Q.   So I'm -- listening to your testimony, I'm beginning to

16   get an idea that AUSA Doshi was in the middle of all of this.

17   A.   Yes.

18   Q.   So that she would be the one who would receive information

19   from Agent Palmer.  She would relay information to you.  You

20   would relay information back to her.  And she was kind of the

21   captain of the ship.

22   A.   In part.  She was engaged.

23   Q.   Okay.

24        Okay.  So she told you that at least four, maybe

25   five, IRS agents had been dispatched to the apartment on

1  Second [sic] Avenue.

2  A.  I don't remember her specifying a number, but she did

3  indicate IRS agents had gone to his residence and that they

4  were expecting me to arrive to conduct an interview.

5  Q.  And AUSA Doshi knew this, but you don't know how she knew

6  this.

7  A.  Not specifically, no.

8  Q.  All right.  But she did tell you IRS agents were over at

9  the -- coming over to the apartment.

10  A.  Yes.

11  Q.  And did she tell you that one of their operational

12  instructions was, Don't let Mr. Tew leave?

13  A.  No.

14  Q.  What did you know about the instructions to the IRS

15  agents?

16  A.  The instructions that I knew was they were standing by

17  because it was thought prudent to try to conduct an interview

18  of Mr. Tew.  But because the co-case agent was not in the area

19  at the time, none of the IRS agents who were asked to go to

20  assist with interviews would have had any knowledge of the

21  case, so they were standing by for my arrival, because I would

22  have had the case -- historic case knowledge.

23  Q.  When you arrived, you found at least two agents in the

24  first floor by the elevator where anybody would leave?

25  A.  I can't remember how many.  It was a little bit of a

 1   whirlwind when I first arrived, but I did arrive.  I met one

 2   agent from the IRS in the parking lot, and he then walked me

 3   up.  And I can't remember even walking through the lobby at

 4   that time.  There was also some, like, interior stairwells.

 5   So I don't know if we went up through the elevator in the

 6   lobby or if we just went in one of the stairwells and walked

 7   up to the second floor --

 8   Q.  This --

 9   A.  -- that they had already had access to.

10   Q.  This parking lot was attached to the building.  It was for

11   tenants.

12   A.  It was adjacent to the building.  It was a surface lot.

13   Q.  Okay.  Was it open or closed?

14   A.  It was open.  There is a closed lot under the building I

15   think you might need a pass code or keycard to get into, but I

16   just parked in a lot behind the building that I considered to

17   be probably overflow or maybe for the residences there.

18   Q.  All right.  And an agent met you there in the parking lot.

19   A.  Yes.

20   Q.  And he directed you up to the second floor, whether it was

21   by elevator or stairs.

22   A.  Yes.

23   Q.  So when you got up to the second floor, was the

24   apartment [sic] to 222 open or closed?  Or 224.

25   A.  I think it was -- it's Apartment 224, but I don't -- I

Julie H. Thomas, RMR, CRR                              (303)335-2111

1   didn't go to the front of the apartment unit, the one that

2   would be -- the entrance that would let out into the common

3   interior hallway.  I was escorted by the IRS agent to the

4   courtyard area.

5   Q.  Okay.  And was that door locked at that time, or was that

6   door left open?

7   A.  I don't recall.  We -- the two of us, without anyone

8   opening it for us, were able to make entry into the courtyard.

9   So I don't know if it was propped open or if he had a card.  I

10  don't remember.  We just went into the courtyard area.

11  Q.  When you went into the courtyard area, you found the rest

12  of the IRS agents already there.

13  A.  Yes.

14  Q.  And I believe, from Agent Romero, that would be Agent

15  Stark, Agent Romero, and one other agent.

16  A.  Um --

17  Q.  I'm trying to remember the name he gave us --

18  A.  Yes, um --

19  Q.  -- but I don't remember it.

20  A.  Agent Molotov or --

21  Q.  Okay.  So those three were already there in the rear of

22  the apartment area that is either a patio or a common area or

23  whatever name we are going to give it.

24  A.  Yes.

25  Q.  Were those agents around the fire pit?

1    A.  Um, no, I wouldn't say they were around the fire pit.

2    They were throughout that courtyard area.  I think one might

3    have been leaning against a wall.  They weren't seated, um,

4    but they were just in that general area.

5    Q.  Okay.  Was there an agent watch -- making surveillance in

6    the hallway leading to the main door to the apartment?

7    A.  Yeah, I don't think I was aware of it at the time, but I

8    later learned there were additional IRS agents located in the

9    vicinity of the apartment.

10   Q.  Okay.  They were located and positioned in a way that if

11   Mr. Tew had tried to bolt out of the front door of the

12   apartment, he would be stopped by an agent.

13   A.  I don't know what their intentions were.  I wasn't even

14   sure -- I didn't know they were there until after we executed

15   an arrest.

16   Q.  Well, I'm sure you'd noticed these males standing around

17   who looked like agents.  I mean, you knew they were there.

18   A.  The three that were on the courtyard, but the way we made

19   entry to the courtyard from the parking lot, there were two

20   other IRS agents there, but I didn't know they were there

21   until after --

22   Q.  Okay.

23   A.  -- we made contact with Mr. Tew.

24   Q.  But now you know that there was one waiting in the hallway

25   so that if Mr. Tew were to try to bolt and leave via the main

Julie H. Thomas, RMR, CRR                              (303)335-2111

20-cr-00305-DDD                Anderson - Cross              10/12/2022   133

1    door, he could be stopped.

2    A.   I'm not sure what -- what they were standing out there for

3    or where they were located during that period of time.

4    Q.   All right.  Well, then let me ask you this.  You certainly

5    were not surprised, when you walked into the outdoors, to see

6    three agents out there with -- waiting for you.

7    A.   Initially I was a little surprised.  I just thought I'd --

8    when I went up, I initially thought I'd have a moment before

9    making contact with Mr. Tew myself initially to kind of get a

10   little handoff or this is what's going on.  I didn't realize

11   they were already in contact with Mr. and Mrs. Tew when I went

12   out there initially.  In fact, I probably would have liked to

13   have gotten the recorder on and done an intro into the

14   recorder, and then I was caught cold out in the courtyard and

15   began to engage with Mr. and Mrs. Tew.

16   Q.   And at that point you said he was sitting on a couch.  She

17   was behind the wall.

18   A.   No, he wasn't sitting on the couch.  I think he came over

19   to the couch when he agreed to answer some questions, and then

20   we thought let's sit down, and it turned into a conversation.

21   I can't remember exactly where he was.  He might have been in

22   the courtyard.  He might have been on the patio initially.

23   Q.   All right.  So I'm looking at the report that Agents Stark

24   and Romero prepared, and they say that *At approximately*

25   *3:12 p.m. FBI Special Agent Sarah Anderson arrived.*  Is that

Julie H. Thomas, RMR, CRR                          (303)335-2111

1   accurate?

2   A.   That sounds about accurate.

3   Q.   Okay.  And it said the first -- *She confirmed with Michael*

4   *and Kimberley that there were no weapons in the residence.*

5   A.   Yes.

6   Q.   Okay.  Now, that's standard procedure, is it not, to

7   determine that your safety is secured because there's no

8   weapons in the residence?

9   A.   Typically.  I like to feel a little safe, and because of

10  the location where we were and not being able to see into the

11  residence, I just wanted to kind of make sure that our safety

12  wasn't, um, at risk.

13  Q.   All right.  Now, would you agree with me that when one of

14  the first things out of the mouth of an FBI agent -- I mean,

15  I'm sure you identified yourself.  Maybe you showed your

16  badge, or I don't know if you did or not, but as soon as you

17  identify yourself, I'm Sarah Anderson, I'm with the FBI, are

18  there any weapons around, that that would alert the suspect

19  that something is afoot; right?

20  A.   It might.

21  Q.   Okay.  All right.  And then you told Mr. Tew that you were

22  there because of his previous employment with National Air

23  Cargo and some credit card and gift card activities.  Is that

24  accurate?

25  A.   That is accurate.

 1  Q.  All right.  And Mrs. Tew responded that they didn't want

 2  to answer any questions about, what, credit card and gift

 3  cards?  Is that what she said?

 4        It says here that she -- *She responded they didn't*

 5  *want to answer any questions and then stated multiple times*

 6  *they had filed IC3 reports two years ago on Craig LN* -- last

 7  name unknown.

 8  A.  Yes.

 9  Q.  And at that point in time you knew who Craig last name

10  unknown was, Craig Fiken; right?

11  A.  I did know who she was referring to, yes.

12  Q.  And an IC3 report is an FBI internet report of what?

13  A.  It's -- we call it IC3.gov report, but it's a report that

14  someone submits when they want to file a complaint on an

15  internet-based crime.  It goes to a portal so they can be

16  sorted and allocated properly.

17  Q.  But it's an FBI portal?

18  A.  Yes.

19  Q.  Okay.  And then one of the Tews explained that the IC3 is

20  for internet crimes.  And you already knew that, but they were

21  telling you that?

22  A.  Yes.  I didn't actually ask about that, but they

23  volunteered that they had submitted those reports.

24  Q.  And then you said, I want to record this conversation, and

25  Mrs. Tew said, We don't consent.

20-cr-00305-DDD                    Anderson - Cross                    10/12/2022   136

1   A.   Correct.

2   Q.   And you honored that.

3   A.   Yes.

4   Q.   But you also know that once you take out your recording

5   and say, I want to record the statement, that alerts the

6   suspect that the FBI is serious about this.

7   A.   I can't say what they thought when I asked to record it,

8   but they declined.

9   Q.   Then, according to this, Mrs. Tew said -- asked why were

10  the agents there and why had they come.  Is that right?

11  A.   Yes.

12  Q.   And then at that point she wondered why somebody had

13  grabbed Michael, and they went through this issue about

14  whether Michael was grabbed or not grabbed.

15  A.   I don't recall a lot of that conversation.  I know it's in

16  the report, but I don't -- I didn't have a context for it when

17  I showed up as to what was being talked about, so I really

18  didn't, um -- that didn't register with me at the time.

19  Q.   Did you ever get a report from Mr. -- Agent Romero about

20  what he had learned prior to your arrival?

21  A.   No.

22  Q.   Did you ever ask him, What did you ask and what did you

23  learn prior to my arrival?

24  A.   No.

25  Q.   All right.  But at the time of your arrival and your

1    questions, you were still not going to Mirandize Mr. Tew.

2    A.   No.

3    Q.   But then you did ask him that you wanted to ask him about

4    his previous employment at National Air Cargo.

5    A.   Yes.

6    Q.   And then he told you facts.  Like, he said, I was referred

7    for employment by an older gentleman that worked for National

8    Air Cargo by a contract through his company Sand Hill.  And

9    those were facts that you learned.

10   A.   Yes.

11   Q.   And then you learned that Chris Alf is the owner of NAC,

12   but you already knew that?

13   A.   Yes.

14   Q.   Okay.  And then Mrs. Tew jumped in and said that Chris

15   owns NAC, but his spouse Lori Alf fired Michael.  Is that

16   accurate?

17   A.   Yes.

18   Q.   And then you learned that before Michael was fired,

19   somebody was in communication with Chris Alf, and then

20   communication just stopped.  And then you talked about Michael

21   getting a letter from NAC that he was no longer employed.  He

22   wasn't told why.

23            Those are all accurate parts of your conversation

24   with him; right?

25   A.   Yes.

20-cr-00305-DDD              Anderson - Cross              10/12/2022   138

 1   Q.   Okay.  And you were told this all went back to 2018, which
 2   would be about -- almost two years before.
 3   A.   Yes.
 4   Q.   And Mr. Tew went on.  He told you that he was close to
 5   Mr. Chris Alf and that he wished he was still working for NAC.
 6           Did he say that?
 7   A.   I don't recall it at this point, but I have reviewed the
 8   MOI and read it in there.  But I don't remember him
 9   specifically saying that he wished he still worked at NAC.
10   Q.   Who was taking notes?  You weren't?
11   A.   I wasn't.  There was an IRS agent taking notes.  I think
12   the individual who prepared the MOI.
13   Q.   Was that Mr. Stark?
14   A.   I believe so.
15   Q.   I mean, this is pretty detailed.  That's why I -- somebody
16   must have been taking notes.
17   A.   Sure.
18   Q.   But you could see an agent taking notes.
19   A.   Yes.
20   Q.   Mr. Tew also told you that he had helped Chris Alf from
21   going bankrupt.  And that's factual; right?
22   A.   Yes.
23   Q.   And she -- Mrs. Tew said that her last contact with Lori
24   was in November of 2018, and that Michael worked for Lori, and
25   that Lori had fired Richie Schaeffer because Michael -- before

Julie H. Thomas, RMR, CRR                         (303)335-2111

20-cr-00305-DDD                  Anderson - Cross              10/12/2022    139

 1   Michael.  That's accurate?
 2   A.  Yes.  At the time I didn't know who Richard Schaeffer was.
 3   So some of the information I had no frame of reference for,
 4   but it was volunteered.
 5   Q.  Okay.  Oh, so you -- some of this was new.  Some of it was
 6   old.
 7   A.  Correct.
 8   Q.  All right.  Michael referred to himself as a fixer during
 9   his employment with NAC, and he also told you he had an M.B.A.
10   Was that new or old?
11   A.  I was aware he had an M.B.A.
12   Q.  But not that he was a fixer?
13   A.  I mean, I had never thought of his employment there in
14   that term on my own before, but --
15   Q.  You thought he was like a financial officer.
16   A.  Of some sort, and he was involved -- I did know he was
17   involved in helping sort through the bankruptcy proceedings
18   for National Air Cargo.
19   Q.  So you knew all that before you interviewed him?
20   A.  Yes.
21   Q.  Okay.  You asked Michael if he still talked to anyone at
22   National, and that time neither one answered.
23   A.  Correct.
24   Q.  Did that send little alarm bells in your head?
25   A.  A little bit, yes.

          Julie H. Thomas, RMR, CRR                      (303)335-2111

1  Q.  Because you really wanted to know if they were talking to

2  Yioulos; right?

3  A.  I expected if they were going to be answering truthfully,

4  they would indicate they had made contact with him.  That was

5  my -- what I anticipated.

6  Q.  And then Michael -- you pressed.  You pressed on that a

7  little bit, and Michael said that Jacob last name unknown was

8  telling him what was going on at NAC.

9  A.  Yes.

10  Q.  Do you know who this Jacob is now?

11  A.  No, I do not.

12  Q.  So you learned all of -- as far as this report is

13  concerned, those are all things that you learned from

14  interviewing him.

15  A.  Yes.

16  Q.  Would you consider that to be incriminating evidence in

17  terms of your preparing a case?

18  A.  I think the -- the thing that I thought was most

19  incriminating was just the, um, the failure to acknowledge he

20  had been in recent contact with some employees at National Air

21  Cargo.

22  Q.  Were you -- so when you -- let's go through this a minute.

23         When you got the phone call or the message from AUSA

24  Doshi to make the arrest, describe what happened.

25  A.  So I received a phone call, and so I took -- took my phone

Julie H. Thomas, RMR, CRR                              (303)335-2111

20-cr-00305-DDD                Anderson - Cross              10/12/2022   141

1    and went inside where I could speak with her more privately.

2    And I think I gave her a synopsis of what had occurred, that I

3    had been able to serve the subpoena, attempted interview

4    questions, they wanted to potentially meet at another time to

5    answer questions further, and just gave her an overview of

6    what the interaction had been.

7    Q.  All right.  And then she said, Arrest him.

8    A.  She said we could proceed with a, um -- we could -- I

9    think there was enough probable cause with the text message

10   and the information we had gleaned from the investigation thus

11   far to proceed with the probable cause arrest.

12   Q.  You communicated that to Romero?

13   A.  I did.

14   Q.  Because he was the actual arresting officer?

15   A.  Yes.  And I don't know if I communicated to Romero

16   initially or Agent Stark with the IRS.  I can't specifically

17   say.  I would have known I would have communicated to them we

18   had been given the go-ahead to make a probable cause arrest of

19   Mr. Tew or to -- and I can't say I told them it was a probable

20   cause, but to go ahead and arrest Mr. Tew.

21   Q.  Did you watch?

22   A.  Yes, I was present for the arrest.  I just didn't handcuff

23   him.

24   Q.  Did he come out with his bare feet and had to get arrested

25   in -- barefooted?

Julie H. Thomas, RMR, CRR                              (303)335-2111

1  A.  I don't know if he had socks on or barefoot.  I do know we

2  later got him shoes, so I don't think he had footwear on at

3  the time.

4  Q.  And his wife helped him put the shoes on?

5  A.  Yes.  Not on the courtyard, but after he was in cuffs, we

6  proceeded to an interior hallway area just so it wasn't so out

7  in the open, and then at that point we tried to prepare him

8  for the, like, transport, so . . .

9  Q.  When did you Mirandize him?

10  A.  He was Mirandized when he was still in the courtyard as

11  soon as he was informed he was under arrest.

12  Q.  Was that done in writing or just orally?

13  A.  Orally.

14  Q.  You didn't ask him to sign a Miranda form?

15  A.  No.

16  Q.  And do you remember one or more of the children crying?

17  A.  No, I don't recall the children crying.

18  Q.  You don't remember one of the children saying, You

19  promised not to arrest my daddy?

20  A.  No.

21  Q.  Where were the children when you watched the arrest?

22  A.  When Michael was actually in custody, to the best of my

23  recollection the children were inside the residence.  I can't

24  say they didn't appear or they didn't -- they weren't at the

25  window and couldn't see into the courtyard, but I don't

20-cr-00305-DDD                Anderson - Cross                10/12/2022   143

 1   remember them in the courtyard at that time.  I do -- I do

 2   know one of the reasons we moved him into the interior hallway

 3   of the apartment complex was because I think Mrs. Tew had

 4   expressed concern that she didn't want her children to see him

 5   arrested or handcuffed, so we walked back into the interior

 6   where --

 7   Q.  And so --

 8   A.  -- it would be less visible.

 9   Q.  She brought out shoes for him?

10   A.  Yes.

11   Q.  And those were put on while he was in the hallway?

12   A.  Correct.

13   Q.  What were the other agents doing while Mr. -- Agent Romero

14   and you were effectuating an arrest?

15   A.  They were -- they were colocated with us.  They were

16   assisting and preparing him to transport.

17              MR. BORNSTEIN:  No further questions.  Thank you.

18              THE COURT:  Thank you, Mr. Bornstein.

19              Redirect?

20              MR. FIELDS:  No, Your Honor.

21              THE COURT:  All right.  Thank you.

22              You may step down, Agent Anderson.

23              You can call your next witness, Mr. Fields.

24              MR. FIELDS:  Thank you, Your Honor.  The United

25   States calls Lisa Palmer.

Julie H. Thomas, RMR, CRR                            (303)335-2111

```
 1              COURTROOM DEPUTY:  Please raise your right hand.
 2         (The witness was sworn.)
 3              COURTROOM DEPUTY:  Please be seated.
 4              Please state your name, and spell your first and last
 5    names for the record.
 6              THE WITNESS:  My name is Lisa Palmer.  L-i-s-a,
 7    P-a-l-m-e-r.
 8              MR. FIELDS:  May I --
 9              THE COURT:  Go ahead.
10         LISA PALMER, GOVERNMENT'S WITNESS, DIRECT EXAMINATION
11    BY MR. FIELDS:
12    Q.  Miss Palmer, where do you work?
13    A.  I work for the IRS in the criminal investigation division.
14    Q.  What's your title?
15    A.  Special agent.
16    Q.  What are your current responsibilities?
17    A.  The primary responsibility is to investigate allegations
18    of basically tax fraud, money laundering, and other related
19    financial crimes.
20    Q.  Did you have those same responsibilities back in 2020?
21    A.  I did.
22    Q.  How long have you been an IRS agent?
23    A.  I started with the agency in 2017, and I graduated the
24    academy in 2018.
25    Q.  Did you get training on executing search warrants?
```

Julie H. Thomas, RMR, CRR                              (303)335-2111

1    A.   I did.

2    Q.   Describe that training for us.

3    A.   We received a mix of training.  Some was, I will say,

4    theoretical, so like the legal framework that underlines an

5    agent and an agency's ability to execute a search warrant, and

6    some of it was practical.  So we would have mock search

7    warrants with role players who were on site to act as either

8    attorneys or subjects or observers, and we would then -- once

9    we had executed these, you know, mock search warrants, we

10   received feedback on what we did well, what we did poorly.

11           And then there's also practical on-the-job training

12   when you get out of the academy where you start going on

13   warrants, and it's a constant process of continual feedback

14   and what can we do better, that sort of stuff.

15   Q.   There's standard procedures you follow when you are

16   executing a search warrant?

17   A.   There are.

18   Q.   What are they?

19   A.   So the first thing we do when we make entry is we knock

20   and announce:  Police with a warrant.  Open the door.

21           The building is then made clear, meaning that the

22   agents who have made entry are looking for threats and for

23   people.  Once entry has been made and the site has been

24   secured, the entire warrant location will be photographed.

25   Then once the photographs have been made, the search will be

```
 1   executed.  Evidence is then photographed in place and then

 2   also separately to give an idea of scale and details.  Once

 3   the warrant is complete and there's no further places to be

 4   searched, the residence or the premises will be photographed

 5   again to document the state it was left in.  And the site has

 6   to be secured.  And definition of "secure" can vary depending

 7   on the particulars of the site, but generally it means that

 8   the building cannot be reentered if it is private.

 9   Q.  So it sounds like there are three sets of photographs.

10   A.  Correct.

11   Q.  That's a lot of photographs.  Why do you take so many

12   photographs?

13   A.  Two reasons.  One is to protect the government, and the

14   other is to protect the subjects of the investigation.  In the

15   case of protecting the government, it's to show, hey, here is

16   what was at the site when it was searched and what we found.

17   And to protect the subjects, basically to show this is what

18   happened while we were there, this is what it was like before,

19   what it was after.  It makes it very difficult for agents to

20   behave improperly.

21   Q.  Do those photographs also sometimes have independent

22   evidentiary value?

23   A.  They do.

24   Q.  How so?

25   A.  For example, today in identifying the apartment building.
```

20-cr-00305-DDD                    Palmer - Direct                10/12/2022    147

1   Sometimes we might have -- there might be something where it

2   is not on a list of items to be seized, but it is still of

3   interest.  Maybe we didn't know something was there

4   beforehand.  We will take a photograph of it to save for

5   later, potentially for another warrant.

6   Q.  Let's talk about the search warrant in this case.  Did you

7   prepare a warrant for -- or was a warrant prepared to search

8   3222 First Avenue, Apartment 204 [sic]?

9   A.  It was.

10  Q.  What was the objective of that warrant?

11  A.  The objective was to obtain Kimberley Tew's cell phone as

12  well as two money bags.

13  Q.  When you say "money bag," what do you mean by that?

14  A.  In surveillance footage we saw that there was, like, a

15  cloth zippered pouch that had the name of a bank on it.  We

16  discovered through the proffer with Mr. Tew that those money

17  bags were given to him by the bank when he would go and

18  withdraw cash from the bank.  He would then take the cash and

19  go to various locations, including Bitcoin ATMs, and deposit

20  the proceeds.

21  Q.  Approximately when was the search warrant executed?

22  A.  I believe it was executed the afternoon of July 31st,

23  2020.

24  Q.  Were you part of the execution team?

25  A.  I was part of the search warrant team, yes.

Julie H. Thomas, RMR, CRR                                    (303)335-2111

1   Q.  How many agents were on the search?

2   A.  I believe there were approximately ten personnel.  Not all

3   of them were agents, though.  I think seven or eight of them

4   were agents.

5   Q.  Why did you need seven or eight agents?

6   A.  Standard procedure.  Um, when we execute a search warrant,

7   we bring a fairly large team with us.  We never know exactly

8   what we are going to encounter, so we want to make sure that

9   we have enough personnel to kind of overcome the unknowns.

10  And then also, from a safety perspective, we find that things

11  tend to be de-escalated and calmer when there are a lot of

12  agents around instead of just one or two.

13  Q.  So when the search warrant was executed, did you make

14  initial entry?

15  A.  I did not.

16  Q.  What did you do?

17  A.  I waited in the hallway for the entry team to complete

18  their sweep and securing the residence.

19  Q.  What happened after the sweep?

20  A.  We began documenting the scene, in this case, the photos.

21  And then I entered the residence, and I believe it was Special

22  Agent Anderson and myself made contact with Mr. Tew.

23  Q.  What did you tell him?

24  A.  That we were executing a search of the residence, and we

25  told him we were looking for Mrs. Tew's phone and the two

Julie H. Thomas, RMR, CRR                              (303)335-2111

20-cr-00305-DDD                    Palmer - Direct                    10/12/2022    149

1    money bags.

2    Q.  What did he say about the phone?

3    A.  He said that Kimberley Tew was no longer at the residence,

4    she had her phone with her, and the phone wasn't there.

5    Q.  What did he say about the money bags?

6    A.  He showed us where to find the money bags.

7    Q.  Were photographs taken during the search?

8    A.  They were.

9    Q.  Did you review those photographs before your testimony

10   today?

11   A.  I did.

12          MR. FIELDS:  Let's look at Government's Exhibit 6.

13   BY MR. FIELDS:

14   Q.  Are these the photographs taken before the search?

15   A.  This particular photo is just -- it's done at kind of the

16   start of every search showing the location that's being

17   searched, who is the photographer, that sort of stuff, so yes.

18   Q.  Yeah.  So if we go through each of these, is this the

19   tranche of photographs sort of documenting the beginning of

20   the search?

21   A.  Yes.

22          MR. FIELDS:  Your Honor, at this time I'd move for

23   the admission of Government's Exhibit 6.

24          THE COURT:  Any objection, Mr. Bornstein?

25          MR. BORNSTEIN:  Can I voir dire a little bit, because

Julie H. Thomas, RMR, CRR                                    (303)335-2111

1    this exhibit seems to have 30 pages.

2          THE COURT:  Sure, briefly.

3                   **VOIR DIRE EXAMINATION**

4    MR. BORNSTEIN:

5    Q.  Ms. Palmer -- Agent Palmer, does this exhibit have 30

6    pages?

7    A.  I would have to double-check if -- I'm not sure without

8    scrolling through the pages myself at this moment.

9    Q.  Did you review it before the hearing today?

10   A.  I did.

11   Q.  Do you remember approximately how many pages there were?

12   A.  I believe it would be approximately 30 pages, yes.

13   Q.  And what do those pages show?  I mean, Mr. Fields just

14   showed us a couple of the first ones.

15   A.  They show photographs that were taken during the search.

16   Q.  All right.  So, um, you don't have the ability to maneuver

17   that.

18          MR. BORNSTEIN:  Would you do 21?

19          MR. FIELDS:  Do you want page 21?

20          MR. BORNSTEIN:  Page 21.

21          THE COURT:  You do have a paper copy of it, too, I

22   think --

23          THE WITNESS:  Oh, thank you.

24          THE COURT:  -- if that's easier.

25          THE WITNESS:  I'm so sorry.

```
 1              THE COURT:  That's okay.

 2              MR. BORNSTEIN:  Ah.  Okay.  Thank you, Your Honor.

 3    That makes things a lot easier.

 4    BY MR. BORNSTEIN:

 5    Q.  All right.  Page 21 shows a children's room?

 6    A.  Correct.

 7    Q.  It shows little children's toys?

 8    A.  Correct.

 9    Q.  It looks like a children's bed, two beds.

10    A.  Correct.

11    Q.  What's the evidentiary value for that photograph?

12    A.  We --

13              MR. FIELDS:  Your Honor, I object.  This is more of a

14    cross-examination and not the voir dire.

15              MR. BORNSTEIN:  Okay.  I'll -- let me just identify.

16    I won't go into it.  I'll --

17              THE COURT:  All right.

18              MR. BORNSTEIN:  I'll leave that alone.

19              THE COURT:  Thank you.

20    BY MR. BORNSTEIN:

21    Q.  Look at page 23.  Is that a children's room with two beds?

22    A.  It appears to be.

23    Q.  Page 24 looks like a children's closet.

24    A.  Correct.

25    Q.  Same with 25?
```

Case 1:20-cr-00305-DDD   Document 654   Filed 02/24/23   Page 162 of 204
275 of 460

1    A.   Agreed.

2    Q.   27, looks like a photograph of at least one child, maybe

3    two.

4    A.   Correct.

5    Q.   28.  What's shown in 28?

6    A.   28 appears to be the same room and the same individuals as

7    the previous photo.

8    Q.   Is that an adult or a child?

9    A.   It looks like there are two adults and one child -- or,

10   sorry, two children and one adult.

11   Q.   What's picture 30?

12   A.   Is 30 the closet with the white hangers?

13   Q.   Yes.

14   A.   It appears to be a closet with white hangers.

15   Q.   Go back, if you would, please, to picture 13.  What's 13?

16   A.   Is 13 what is showing right now?

17   Q.   Yes.

18   A.   That appears to be the main room and a little bit of the

19   kitchen area of the Tews' residence.

20   Q.   What's 12?  I'm going backwards.

21   A.   12 appears to be a utility closet.

22   Q.   11?

23   A.   That appears to be another photograph of the utility

24   closet.

25   Q.   To, what, a washing machine and a dryer?

20-cr-00305-DDD            Palmer - Voir Dire           10/12/2022   153

1    A.   It appears that way.

2    Q.   Picture 7, what's in 7?

3    A.   That appears to be -- it's a room with a lot of bookcases

4    and a desk.

5    Q.   Where was that in the apartment?

6    A.   I believe that was just off of the kitchen, but I would

7    have to check a floor plan to be sure.

8    Q.   All right.  What's in picture 17?

9            MR. FIELDS:  Your Honor, I object.  This is going

10   beyond voir dire.  The pictures are what they purport to be.

11           THE COURT:  I'll go ahead, but --

12           MR. BORNSTEIN:  I believe a record should be made of

13   what this exhibit really is.  That's why I'm trying to -- I

14   want this in the record.  That's why I'm making it.

15           THE COURT:  Okay.  I mean, this is a suppression

16   hearing.  You don't have a jury.  You're just trying to get

17   stuff in front of me so I can decide --

18           MR. BORNSTEIN:  Correct.

19           THE COURT:  -- what's what.  But you can go ahead for

20   a little bit.

21           MR. BORNSTEIN:  And for purposes of my

22   cross-examination, I just wanted to get subject matter

23   established in the record.

24   BY MR. BORNSTEIN:

25   Q.   The last question.  What's 17?

Julie H. Thomas, RMR, CRR                        (303)335-2111

20-cr-00305-DDD               Palmer - Direct               10/12/2022   154

1    A.   17 appears to be a bathroom.

2              MR. BORNSTEIN:  Thank you.  No further voir dire.

3              No objection.

4              THE COURT:  Okay.  So that's admitted.

5         (Government's Exhibit 6 admitted.)

6              THE COURT:  Go ahead, Mr. Fields.

7                    **DIRECT EXAMINATION (Resumed)**

8    BY MR. FIELDS:

9    Q.   You mentioned three tranches of photographs earlier.  We

10   were just looking at the photographs taken before the search.

11   Let's look at Government's Exhibit 7.

12             MR. FIELDS:  And if we go to page 35.

13             MR. BORNSTEIN:  What page?

14             MR. FIELDS:  35.

15   BY MR. FIELDS:

16   Q.   Is this the tranche of photographs taken after the search?

17   A.   I believe so, yes.

18             MR. FIELDS:  Your Honor, at this time I'd move for

19   the admission of Government's Exhibit 7.

20             MR. BORNSTEIN:  Is that a one-page exhibit?

21             MR. FIELDS:  No.  It's approximately 30 pages.

22             MR. BORNSTEIN:  Excuse me.  Let me look at this, Your

23   Honor, if I might.

24             THE COURT:  Okay.

25             MR. BORNSTEIN:  My problem is I think I'm looking at

Julie H. Thomas, RMR, CRR                          (303)335-2111

 1   Exhibit 7, and something else is on the screen.

 2            MR. FIELDS:  This is page 35 of Government's

 3   Exhibit 7.

 4            MR. BORNSTEIN:  Oh, I'm sorry.  Okay.

 5            No objection.

 6            THE COURT:  All right.  It's admitted.

 7       (Government's Exhibit 7 admitted.)

 8            THE COURT:  When you said "before and after the

 9   search," could you just get the witness to clarify what you

10   mean by "before and after the search" in these two different

11   exhibits?

12            MR. FIELDS:  Yeah, sure.  Let's talk about that

13   again.  First of all, let's take that down.

14   BY MR. FIELDS:

15   Q.  So you described for us earlier in your testimony the

16   procedure that's used when you're executing warrants.

17   A.  Mm-hmm.

18   Q.  Describe for us the three parts of a warrant where

19   photographs are taken.

20   A.  So the first part is after the residence or the premises

21   has been secured.  A photographer will go and they will take

22   photographs of the entire location to be searched, including

23   interior and exterior photos, to document the state of the

24   premises when we entered.

25   Q.  What's the second time they take photographs?

1    A.  The second time that they take photographs is whenever

2    evidence is found.  So say an agent is searching the bedroom,

3    and they find a cell phone or a pile of drugs.  They'll call

4    the photographer over and have them photograph the evidence,

5    first, in place where it was found and then, secondly, kind of

6    in detail.  So if it's a cell phone, they will flip it over so

7    you can see, you know, the serial number on the back,

8    something like that, or hold a ruler up to it so they can

9    actually see the size and have some context for what the photo

10   is of.

11   Q.  So Government's Exhibit 6 was before the search.

12   Government's Exhibit 7 was after the search.  Now let's look

13   at Government's Exhibit 8.

14           MR. FIELDS:  And if we could, please, go to page 20.

15   BY MR. FIELDS:

16   Q.  Now, in this photograph do you see a little yellow

17   placard?

18   A.  I do.

19   Q.  What does that yellow placard indicate?

20   A.  That yellow placard indicates that evidence was found at

21   that location.

22   Q.  So is this tranche of photographs that's Government's

23   Exhibit 8, are these the photographs that were taken during

24   the search?

25   A.  Yes.

20-cr-00305-DDD                Palmer - Direct                10/12/2022   157

1   Q.  So this would be that third tranche of photographs?

2   A.  Yes.  I think you said the third tranche was after, so --

3   Q.  So, yeah, before, during, after.

4   A.  Correct.  This would be the photos taken during the

5   search.

6          MR. FIELDS:  Your Honor, at this time I'd move for

7   the admission of Government's Exhibit 8.

8          THE COURT:  Mr. Bornstein?

9          MR. BORNSTEIN:  Your Honor, I'm going to object to 8,

10  because it's represented that this is what was found in the

11  search that has evidence or documents, what they seized that

12  was pursuant to the court warrant, and I don't believe that

13  that's what these photographs are.

14         THE COURT:  Why don't you go ahead and respond,

15  Mr. Fields.

16         MR. FIELDS:  Your Honor, the agent just testified

17  that that little placard there, which shows a 1, is where they

18  found evidence pursuant to the search.

19         THE COURT:  Okay.

20         MR. BORNSTEIN:  Yes, but this is 40 pages of

21  photographs, and only one page is what they found in the

22  search.

23         THE COURT:  All right.  So I guess is that right,

24  Mr. Fields?  Does just this one photograph have the placard?

25  Is that right?

20-cr-00305-DDD                    Palmer - Direct                    10/12/2022    158

1          MR. FIELDS:  That is right, Your Honor.  For purposes

2   of this motion to suppress, as I understand their motion, they

3   are saying there were an excessive amount of photographs.  I

4   think getting all of these photographs into the record

5   establishes exactly how many photographs were taken.  And the

6   agent has just described, sort of, how and why they were

7   taken.  So I think they are relevant for that purpose.

8          THE COURT:  So I will overrule the objection and

9   admit number 8 with that kind of understanding of what these

10  show, which is obviously different than what might happen in a

11  trial.

12      (Government's Exhibit 8 admitted.)

13  BY MR. FIELDS:

14  Q.  All right.  So when agents take these photos three times,

15  before, during, after, are they photographing the same areas

16  of a place?

17  A.  Yes.

18  Q.  Do they photograph the entire place?

19  A.  Yes.

20  Q.  Why?

21  A.  We will photograph the entire area that we are allowed to

22  search regardless of whether or not we find evidence there, at

23  least for the first tranche and the last tranche of photos.

24  And, again, it's to document the scene as we found it and as

25  we left it.

Julie H. Thomas, RMR, CRR                              (303)335-2111

```
 1   Q.  Are agents sometimes accused of damaging property?

 2   A.  They are.

 3   Q.  So how do photographs help -- why are they relevant to

 4   accusations like that?

 5   A.  So if agents do damage property, it should show up in

 6   those photos, whether it be even that first tranche if damage

 7   was made during entry or in that last tranche if damage was

 8   made during the search.  It documents the scene as it was at

 9   the time the photos were taken.

10   Q.  All right.  So here we are in Government's Exhibit 8, page

11   20, and we talked about this yellow placard.  Now could we go

12   to Government's Exhibit 8, the next page, page 21?  Is this a

13   close-up view?

14   A.  Yes, that's a close-up view.

15   Q.  And now page 22.  Now are we even closer?

16   A.  Yes.

17   Q.  What did the agents find?

18   A.  We found one of the two money pouches we were searching

19   for.

20   Q.  Now page 23.  Is this one of those money pouches?

21   A.  Yes.

22   Q.  Now let's go to Government's Exhibit 7.  These are the

23   photographs taken after the search.  Page 30.  Do you

24   recognize this space?

25   A.  Yes, I do.
```

20-cr-00305-DDD                Palmer - Direct                10/12/2022    160

1   Q.  What is this space?

2   A.  That space is the primary bedroom of the apartment that we

3   searched that day.

4   Q.  Do you recognize the closet?

5   A.  I do.

6   Q.  Was anything found inside that closet?

7   A.  I believe one of the money pouches was found in that

8   closet.

9   Q.  So if we go to Government's Exhibit 8 and page 24.

10          MR. FIELDS:  08-024.

11  BY MR. FIELDS:

12  Q.  Do you see another yellow placard?

13  A.  I do.

14  Q.  Now the next page, page 25.

15          MR. BORNSTEIN:  What page are we looking at for

16  another placard?

17          MR. FIELDS:  24.  So let's go back up to page 24.

18          MR. BORNSTEIN:  Oh, okay.  I'm sorry.  Thank you.

19  BY MR. FIELDS:

20  Q.  Just so we have it in the record, do you want to circle

21  where you see the placard?

22  A.  It's a little off, but in the white box.

23  Q.  Now if we go to the next page, page 25.  Is that a

24  close-up view?

25  A.  It is.

Julie H. Thomas, RMR, CRR                          (303)335-2111

1    Q.  Page 26, is that an even closer view?

2    A.  It is.

3    Q.  Now if we go to page 27, does that show the bag that was

4    found?

5    A.  It does.

6           MR. FIELDS:  Okay.  We can take those down.

7    BY MR. FIELDS:

8    Q.  How long did it take to execute the search warrants?

9    A.  I believe it took approximately two hours.

10   Q.  Now, if Mr. Tew pointed out the location of the bags and

11   said that the phone wasn't in the apartment, why did it take

12   two hours?

13   A.  We still are obligated to perform a complete and thorough

14   search until we find everything we are looking for.  And

15   people lie to federal agents during investigations.

16   Q.  Yeah.  So if Mr. Tew told you that the phone wasn't there,

17   why didn't you take his word for it?

18   A.  Again, people lie, so we had the right per the warrant to

19   be at the premises to execute the search, so we completed the

20   search until we were confident the phone was not on the

21   premises.

22   Q.  Did you find the phone?

23   A.  We did not find the phone.

24   Q.  What was ultimately seized pursuant to the warrant?

25   A.  The two money pouches.

Julie H. Thomas, RMR, CRR                            (303)335-2111

20-cr-00305-DDD                    Palmer - Cross                    10/12/2022    162

1               MR. FIELDS:  May I have a moment, Your Honor?

2               THE COURT:  Sure.

3               MR. FIELDS:  No further questions, Your Honor.

4               THE COURT:  All right.  Thank you.

5               Cross-examination?

6                         **CROSS-EXAMINATION**

7    BY MR. BORNSTEIN:

8    Q.  Miss Palmer, you said you graduated from the academy in

9    2018?

10   A.  That is correct.

11   Q.  What month?

12   A.  I believe it was February 2018.

13   Q.  So in July of 2020 you had been a special agent for a year

14   and a half?

15   A.  Uh, I think it's two and a half, two years and change, at

16   that point.

17   Q.  Two years.  And during those two years, how many warrants

18   did you obtain, personally sign off on?

19   A.  I believe at that point none.

20   Q.  And how many warrants did you participate with a team in

21   executing a warrant up to that point?

22   A.  My best guess is 15 to 20, but I'm not actually sure.

23   Q.  All right.

24               MR. BORNSTEIN:  So if we could call up Exhibit 8 with

25   the number 2 on it, please.

Julie H. Thomas, RMR, CRR                              (303)335-2111

20-cr-00305-DDD                    Palmer - Cross                    10/12/2022    163

```
 1              MR. FIELDS:  You want page 2?

 2              MR. BORNSTEIN:  The page with the number 2, uh,

 3    placard that shows something found.  That's one.  Okay.  So if

 4    you could go back a photo, please.

 5              MR. FIELDS:  So placard 2 is here.

 6              MR. BORNSTEIN:  Okay.

 7    BY MR. BORNSTEIN:

 8    Q.  So placard 2 is -- that shows -- what kind of money bag is

 9    that?

10    A.  It's a cloth pouch with a zipper.

11    Q.  Okay.

12              MR. BORNSTEIN:  Could we do the next photo, please?

13    BY MR. BORNSTEIN:

14    Q.  And how big is that bag?

15    A.  Um, I would have to look at the measurements, but maybe

16    like 4 or 5 inches by 9 inches approximately.

17    Q.  All right.  And what bank is it from?

18    A.  Guaranty Bank and Trust Company.

19              MR. BORNSTEIN:  Could we see the next photograph, I

20    believe?

21    BY MR. BORNSTEIN:

22    Q.  And does that show the ruler?

23    A.  Yes, it does.

24              MR. BORNSTEIN:  And then the next photograph?

25    BY MR. BORNSTEIN:
```

Julie H. Thomas, RMR, CRR                                    (303)335-2111

20-cr-00305-DDD                    Palmer - Cross                    10/12/2022    164

1   Q.  Where did all those little thumb drives show up?

2   A.  I believe they were inside the bag.

3   Q.  So did that indicate to you that that bag had never been

4   used for money?

5   A.  No, it did not.

6   Q.  It was used to store thumb drives?

7   A.  No, it did not.

8   Q.  Why not?

9   A.  Because you don't get a bag like that without it being

10  provided by the bank.

11  Q.  That's true.  It's got a bank name on it, but in this case

12  it was not being used for money, was it?

13  A.  At this point in time, no, it was not being used for

14  money.

15  Q.  How did you know at that point in time that it had ever

16  been used for money?

17  A.  Guaranty Bank and Trust Company was one of the banks where

18  Mr. Tew had accounts that received proceeds from the alleged

19  NAC fraud.  That included cash withdrawals.

20  Q.  All right.  So you, "you" meaning the IRS, conducted

21  surveillance of Mr. Tew at banks; right?

22  A.  No, we did not.

23  Q.  You didn't conduct surveillance or get surveillance

24  footage at the Navy Federal Credit Union?

25  A.  We did get surveillance footage from Navy Federal Credit

1    Union.

2    Q.  Did you ever get surveillance footage from Guaranty Bank?

3    A.  No, I did not.

4    Q.  Do you have a date when he ever went to Guaranty Bank to

5    withdraw any money?

6    A.  I believe that there are bank statements that show that

7    cash withdrawals were made in person, but I would want to

8    check my notes before I answered that definitively.

9    Q.  You have here in this photograph proof that this bag was

10   used to store thumb drives; right?

11   A.  Correct.

12   Q.  How -- for how long had that bag been used to store thumb

13   drives?

14   A.  I do not know.

15   Q.  Okay.  Now, explain to me, please, how seizing that bag

16   was given to you -- I mean, how seizing that bag fits into the

17   warrant you obtained.

18   A.  The warrant included a list of items to be seized, and it

19   included two cloth bags.  During Mr. Tew's proffer, he had

20   detailed that he had used bags to transport cash withdrawals.

21   Q.  Let me go back to the question.  The question was:  What

22   makes you think that the warrant allowed you to seize a bag

23   that has thumb drives in it?

24   A.  Because the name of the bank on the bag is one of the

25   banks where Mr. Tew received proceeds from the National Air

1   Cargo fraud, and then Mr. Tew told us that he used bags such

2   as this to transport currency that he withdrew from those

3   accounts.

4   Q.  What year?

5   A.  I believe Mr. Tew had the Guaranty Bank and Trust account

6   in 2018, but I would have to double-check my records.

7   Q.  So he had a bank account in 2018, and you are doing a

8   search in 2020, and you find a Guaranty Bank [sic] with a lot

9   of thumb drives in it, and you think that your warrant gave

10  you permission to take that bag?

11  A.  Yes.

12  Q.  All right.  Did you ask -- did you write the warrant?  Did

13  you write the affidavit?

14  A.  I helped in preparing it.

15  Q.  And who else helped?

16  A.  AUSA Doshi and Special Agent Anderson and, I believe,

17  other members of the prosecution team.

18  Q.  Okay.  Who else on the prosecution -- you had a lawyer

19  from the Attorney General's -- I mean, the, uh -- from the

20  prosecution.  You had a special agent from the FBI.  Yourself.

21  Who else?

22  A.  There was a forensic accountant by the name of Matt Morgan

23  who helped with our review of financial documents.

24  Q.  What did Matt Morgan's review have to do with a bank bag?

25  A.  We were reviewing bank documents, and Mr. Morgan helped

Julie H. Thomas, RMR, CRR                              (303)335-2111

1    with the review of bank documents.

2    Q.   Okay.

3    A.   It relates to the affidavit as a whole.

4    Q.   So you were looking for a Wells Fargo Bank bag too; right?

5    A.   Correct.

6    Q.   When did Mr. Tew have any account at Wells Fargo?

7    A.   I do not remember the dates that he had the account, but I

8    do know that between 2018 and 2020 he did receive multiple

9    deposits from National Air Cargo as part of the fraud.

10   Q.   That's not my question.  My question is:  You asked the

11   magistrate judge for permission to seize a Wells Fargo bag.

12   What made you think a Wells Fargo bag was evidence of a crime?

13   A.   Because Mr. Tew had received deposits from the National

14   Air Cargo as part of the fraud to his accounts at Wells Fargo,

15   and he --

16   Q.   Okay.  Link that to Wells Fargo.  When did he have a Wells

17   Fargo account?

18   A.   I do not remember the exact dates of the statements, but I

19   know during the fraud between 2018 and 2020 Mr. Tew received

20   deposits into a Wells Fargo account from National Air Cargo as

21   part of the fraud.

22   Q.   He only had a Wells Fargo account for about three months;

23   isn't that true?

24   A.   I don't remember the duration.  I could check the bank

25   statements and let you know.

Julie H. Thomas, RMR, CRR                        (303)335-2111

```
 1   Q.  When you asked the magistrate judge for permission to

 2   seize a Wells Fargo bag, what made you think that that bag was

 3   linked to any fraud with National Air Cargo?

 4   A.  We reviewed the Wells Fargo Bank statements for the

 5   accounts that Mr. Tew was the signatory on, and he made large

 6   cash withdrawals at Wells Fargo immediately after receiving

 7   the NAC proceeds from the fraud.

 8   Q.  How many times?

 9   A.  I don't remember off the top of my head.

10   Q.  More than five?

11   A.  I don't remember.

12   Q.  Six times?

13   A.  I don't remember.

14   Q.  Large cash.  How much?

15   A.  I would have to check my notes, but several thousand

16   dollars at least.

17   Q.  How is several thousand dollars supposed to fit into a

18   bank bag that size?

19   A.  Depends on the denomination.  If you use bills such as

20   hundred bills, a thousand dollars is only ten bills.

21   Q.  Did you have evidence of hundred-dollar bills?

22   A.  No.

23   Q.  What evidence did you have that that bank bag was actually

24   linked to this crime?

25   A.  Mr. Tew told us that he used bank bags in his proffer, and
```

Julie H. Thomas, RMR, CRR                              (303)335-2111

 1  then we had security footage from the -- a couple of -- from

 2  two different Bitcoin kiosks.  One in particular included a

 3  video where he was taking money out of the bag and putting it

 4  into the Bitcoin kiosk.

 5  Q.  What bank bag was used?

 6  A.  I don't recall off the top of my head.

 7  Q.  Was it Wells Fargo?

 8  A.  I don't recall.

 9  Q.  So I'm going to go back.  You asked a judge to give you

10  permission to seize a Wells Fargo bag by name; right?  It's in

11  the warrant; right?

12  A.  I would double-check, but yes.

13  Q.  You said to the judge, I want to seize a Wells Fargo bag.

14          Were you taught at the academy that you have to link

15  what you want to seize to the crime?

16  A.  Yes.

17  Q.  So I'm asking you:  How did you link a Wells Fargo bag in

18  2020 to accounts that were used years before?

19  A.  Again, Mr. Tew or accounts controlled by Mr. Tew received

20  deposits from National Air Cargo as part of the fraud.  That

21  was at Wells Fargo.

22  Q.  When?

23  A.  I don't recall without looking at bank statements, but it

24  was between 2018 and 2020.

25  Q.  Closer to '18, or closer to '20?

Julie H. Thomas, RMR, CRR                              (303)335-2111

1    A.   I do not recall the exact dates.

2    Q.   '19?

3    A.   I do not recall the exact dates.

4    Q.   For how many months did he have that account opened at

5    Wells Fargo?

6    A.   I do not recall without checking the bank statements.

7    Q.   All right.  One other question.  Did you ask the

8    magistrate judge for permission to take hundreds -- 120

9    photographs?

10   A.   We did not explicitly ask permission to take photographs.

11   Q.   Why not?

12   A.   Because it is standard operating procedure for all

13   agencies to take photographs related to a search warrant.

14   Q.   Well, do you know what the Fourth Amendment to the

15   Constitution of the United States says about what you can

16   seize?

17   A.   It says that we can seize whatever the Court allows us to

18   so long as we have probable cause.

19   Q.   And you did not ask the Court for permission to seize a

20   hundred-some photographs, did you?

21   A.   We did not seize photographs.  We took photographs, and we

22   did not ask the Court for permission to take photographs.

23   Q.   You seized images of the apartment.  Correct?

24          MR. FIELDS:  Your Honor, this is skating into legal

25   territory over what constitutes a seizure.  I'm not sure the

Julie H. Thomas, RMR, CRR                         (303)335-2111

```
 1   agent is competent to answer those legal questions.
 2             MR. BORNSTEIN:  Well, I'm just trying to --
 3             THE COURT:  That they took all those pictures I don't
 4   think is really contested, so go on.
 5             MR. BORNSTEIN:  All right.
 6   BY MR. BORNSTEIN:
 7   Q.  So is it your testimony that because -- you work for the
 8   United States Treasury department; right?
 9   A.  At the IRS, yes.
10   Q.  Is it your testimony that the United States Treasury
11   department has a procedure that says you don't have to ask
12   permission from a magistrate judge to seize images in an
13   apartment building?
14   A.  It is our policy.  It is what we are taught.  I do not
15   point to the policy number for that, but we are taught to
16   document a scene when we arrive.  We are taught to take photos
17   before, during, and after.
18   Q.  Were you taught whether that policy meets the requirements
19   of the Fourth Amendment to the United States Constitution?
20   A.  It is my understanding that that particular policy is
21   constitutional, but I am not a lawyer.
22             MR. BORNSTEIN:  No further questions.
23             THE COURT:  Okay.  Thank you.
24             Any redirect?
25             MR. FIELDS:  Very briefly, Your Honor.
```

```
 1              THE COURT:  Okay.
 2                     REDIRECT EXAMINATION
 3   BY MR. FIELDS:
 4   Q.  Special Agent Palmer, do you recall being asked about the
 5   evidence linking those particular bank bags to the crime?
 6   A.  Yes, I do.
 7   Q.  Did you actually put that -- was that put into the
 8   warrant?
 9   A.  It was.
10   Q.  Were you shown the warrant during your cross-examination?
11   A.  I didn't check it, no.
12   Q.  Let's look at Government's Exhibit 5, if we could, and
13   then let's go to --
14              MR. BORNSTEIN:  Can I get that out, please?
15              Thank you.
16   BY MR. FIELDS:
17   Q.  Let's go to page 15.
18   A.  Is it page 15 of the exhibit or page --
19   Q.  Page 15 of the exhibit.  It's stamped at the bottom SW 45.
20   A.  Thank you.
21   Q.  If you could please read to yourself paragraphs 40 and 41.
22              Have you read them?
23   A.  Yes.
24   Q.  Do those photographs describe in sum and substance and in
25   pertinent part why two bank bags were relevant to your
```

20-cr-00305-DDD                    Palmer - Redirect                    10/12/2022    173

1    investigation?

2    A.   Yes, it does.

3    Q.   Who told you about these bank bags?

4    A.   Mr. Tew told us about the bank bags, and then the

5    surveillance footage was also a source of information.

6    Q.   And what two bank bags were you told about?

7    A.   The Guaranty Bank and Trust bag and the Wells Fargo bag.

8    Q.   What two bank bags were seized during the warrant?

9    A.   The Guaranty Bank and Trust bag and the Wells Fargo bag.

10   Q.   And do you remember being asked whether or not the warrant

11   authorized your ability to seize those particular bank bags?

12   A.   Yes, I do.

13   Q.   So if we could look at Government's Exhibit 5 again, and

14   let's go to page 4.  Is this attachment B to the warrant?

15   A.   It is.

16   Q.   Is this the attachment that tells you what you are allowed

17   to seize when you execute a warrant?

18   A.   Yes, it does.

19   Q.   What does part A there tell you you are allowed to seize?

20   A.   Two cloth, or similar material, bags approximately the

21   size of 8.5 by 11 inches piece of paper, with one bag bearing

22   the insignia, label, or logo of Wells Fargo and the other

23   bearing an insignia, label, or logo of another bank.

24   Q.   Now, when you seized these bank bags pursuant to the

25   search warrant, you also took those photographs as well;

Julie H. Thomas, RMR, CRR                                      (303)335-2111

1    right?

2    A.   Correct.

3    Q.   Do those photographs help show where the bank bags came

4    from?

5    A.   Yes.

6    Q.   Why is that important?

7    A.   It's to show kind of the context for where they were

8    found, and also to show kind of their scale and if they were

9    in use in another form or how they existed at the time they

10   were found.

11   Q.   When you are trying to show the relevance of these bags,

12   do you have to show who may have owned or used them?

13   A.   Not at the time of the photos.

14   Q.   But can those photos help -- do they provide evidence of

15   who might have used those bags?

16   A.   Yes, they do.

17   Q.   How so?

18   A.   It can be where it was found.  So say it was found in the

19   subject's bedroom.  That would be evidence or support that the

20   subject was using them, whereas if they were found, say, in

21   someone else's room, that would be support for the fact that

22   maybe they weren't the subject's.

23            MR. FIELDS:  No further questions, Your Honor.

24            THE COURT:  All right.  Thank you, Mr. Fields.

25            Agent Palmer, you may step down.

Julie H. Thomas, RMR, CRR                            (303)335-2111

1          THE WITNESS:  Thank you so much.

2          THE COURT:  Mr. Fields, am I right that that is the

3    extent of your evidence?

4          MR. FIELDS:  It is, Your Honor.

5          THE COURT:  All right.  Why don't we take a 10-minute

6    recess and come back and discuss this and then move on to

7    discussing the remaining items.  So we'll take a 10-minute

8    recess.

9      (Proceedings recessed 3:07 p.m. to 3:21 p.m.)

10          THE COURT:  Please take your seats.

11          Okay.  So we've completed the evidentiary portion of

12    the hearing.  I think now we can talk about a little bit of a

13    discussion about the -- a little bit of argument as to the

14    suppression issues.

15          Why don't we begin with the Government.  Explain why

16    you believe you've met the burdens for these motions.

17          MR. FIELDS:  Your Honor, I'm going to start

18    backwards.  I'm going to start with the motion to suppress the

19    evidence at the apartment building.

20          THE COURT:  Okay.

21          MR. FIELDS:  First, I just want to note for the

22    record that I think, given that each of these searches was

23    conducted pursuant to a warrant under *Carhee*, it's actually

24    the defense that bears the burden of showing a motion -- that

25    everything should be suppressed.  That being said, the motion

Julie H. Thomas, RMR, CRR                              (303)335-2111

```
 1   should be denied for several reasons.
 2           So the motion to suppress -- this is the motion to
 3   suppress the search at 3222.  That's ECF number 221 is the
 4   defense motion.  So two arguments raised by the defense there.
 5   One is there was no link between the bank bags and the crime.
 6   There was.  And if you look at Government's Exhibit 5 on page
 7   15 and 16, paragraphs 40 and 41, you will see how the agents
 8   sort of lay it out.
 9           Why did they think the bank bags were used in the
10   scheme?  Well, because Michael Tew told them that he used bank
11   bags to collect money from the scheme.  And even if he hadn't
12   told them that, they saw ATM surveillance footage of him with
13   the bags collecting proceeds of the fraud.  So that's the
14   link.
15           The photographs.  So there are a lot of photographs
16   here, Your Honor.  The Government is not going to use all of
17   these photographs at trial.  Most of that I think can be
18   addressed through a motion in limine, but here we are at a
19   motion to suppress.  He's asking for blanket suppression of
20   all of them.  Blanket suppression should not be the remedy
21   here.  It should be, sort of, photograph by photograph.
22           Even before we get to that, though, we need to see
23   was there actually a seizure, and there was not.  So a
24   seizure, the definition is a -- something that interferes with
25   the possessory interests of the user.  So if there's no
```

Julie H. Thomas, RMR, CRR                              (303) 335-2111

1    seizure, there's no Fourth Amendment violation.

2           So the, sort of, keynote case here is *Maryland versus*

3    *Macon*, 472 U.S. 463, but you can also look at *Arizona versus*

4    *Hicks*.  So *Arizona versus Hicks* is that kind of famous case

5    that's taught in law school still where agents are there, they

6    find some stereo equipment, they look underneath, and they see

7    a serial number.  The lifting of the stereo equipment, Justice

8    Scalia says, Well, that's a search, but actually just

9    recording the serial number, not a seizure.  And the reason

10   for that, as he explains on page 324 of that opinion, is that

11   you are not interfering with anyone's possessory interest of

12   those particular speakers.

13          The same is true here, Your Honor.  Taking all of

14   these photographs does not interfere with anyone's possessory

15   interest in anything in the apartment building, and so there

16   was no seizure.  And without a seizure, no Fourth Amendment

17   violation.  That's what the courts conclude in *Bills versus*

18   *Asteline* and *United States versus Harb* cited in the

19   Government's brief.

20          Even if you were to conclude that it was a seizure,

21   here the question would be:  Okay.  Well, is it in violation

22   of the Fourth Amendment?  And no.  It would be under plain

23   view.  The agents certainly had authority to be inside of the

24   apartment.  They could describe to a jury everything that they

25   saw in, sort of, minute detail.  Oftentimes -- you know, we

Julie H. Thomas, RMR, CRR                          (303)335-2111

20-cr-00305-DDD       Motion Hearing       10/12/2022    178

1   are not dealing with that here, because in this era federal

2   agents didn't wear bodycams, but if they were, they'd have a

3   bodycam, so you're recording everything, just like their eyes,

4   and all of that would be plain view. They have authority to

5   be there. So no Fourth Amendment violation there.

6          And even then, Your Honor, if you are inclined to

7   say, okay, maybe it wasn't plain view, or maybe it was a

8   seizure, the agents -- the warrant authorized them to collect

9   evidence or information related to these crimes. Attribution

10   evidence showing that these particular bank bags actually

11   belonged to Michael Tew is relevant and is evidence of the

12   crime. And the fact that these bank bags were located within

13   the apartment owned by Kimberley Tew and Michael Tew and used

14   solely by them as their family residence surely is evidence

15   attributing those bank bags to them and then those bank bags

16   used in the crime.

17          Does Your Honor want to sort of go -- do you want me

18   to argue about all the motions now?

19          THE COURT: No. Why don't you let Mr. Bornstein

20   respond on that one, and then we can move on.

21          MR. BORNSTEIN: Your Honor, in the old tradition of

22   the search and seizure law, we were involved with things like

23   possession and trespass, but -- and since that time search and

24   seizure law has moved from the physical trespass of property

25   and physical possession of property into expectations of

Julie H. Thomas, RMR, CRR                (303)335-2111

1   privacy, and we are now talking about -- and this gets into a

2   little bit about motion 200 -- that once you start talking

3   about expectations of privacy, you start talking about do you

4   have an expectation of privacy of your apartment where you

5   live, your residence, which the Fourth Amendment has always

6   been -- had a special favor for residences.  And to walk into

7   somebody's apartment and then say we can -- as the evidence

8   is, Michael Tew gives them these two bank bags, says, My wife

9   isn't here, which is very easy to determine.  He calls his

10  wife during the course of this search and says that they're

11  here.  They could call and make a phone call and say that her

12  phone is not there, because she answers the phone, and

13  determine it's time to leave.  They should have finished their

14  search and left instead of doing what they did, which was to

15  stay there for two and a half hours photographing every room,

16  including the kids' house -- kids' rooms.  That's point one.

17          Point two is in their own exhibits 27 and 23 --

18  photographs 27 and 23 as part of Exhibit, I believe, 8, shows

19  that the bank bags that they seized were not 8 and a half by

20  11.  The warrant says that these bank bags are to be 8 and a

21  half by 11, the size of a -- of a, you know, regular paper, 8

22  and a half by 11 sheet of paper.  These bags were 4 by 9,

23  approximately half the size that they had told the magistrate

24  judge that they were looking for.

25          Third, the plain view doctrine was established to say

Julie H. Thomas, RMR, CRR                              (303)335-2111

```
 1    that if you see something illegal, contraband, in plain view,

 2    you didn't have to shut your eyes to it.  It's not a plain

 3    view doctrine that says that you can, you know, look for

 4    things all over the apartment once you have finished your

 5    search or should have finished your search just to see if,

 6    quote, maybe I can find something.  That's --

 7              THE COURT:  So let me ask you --

 8              MR. BORNSTEIN:  Yeah.

 9              THE COURT:  -- a quick question, because I do think

10    probably your best argument on this one is that they should

11    have stopped their search, not that photographs are seizures

12    or anything like that, but they found all the evidence they

13    were going to find early on --

14              MR. BORNSTEIN:  Right.

15              THE COURT:  -- but continued on.  But is that

16    actually true?  I mean, I suppose they could have taken his

17    word for it or done something else, but they were

18    authorized -- I mean, let me take a step back.  Yes, you

19    certainly have an expectation of privacy in your apartment,

20    but a warrant was issued to search it.  Your expectation of

21    privacy once a warrant has been issued to search your

22    apartment is certainly decreased, if not completely gone.

23              But you're right that -- I think you're right that

24    once the agents have found all the evidence they are

25    authorized to seize, they have to end their search, but what
```

Julie H. Thomas, RMR, CRR                              (303)335-2111

```
 1    is -- how do I know that that -- when and how that happened?

 2    When do you think they should have stopped?

 3           MR. BORNSTEIN:  All right.  I think that they should

 4    have stopped when Michael Tew called on his phone and talked

 5    to his wife.

 6           THE COURT:  Because they should have known that that

 7    was the phone, that they weren't going to find the phone at

 8    that point?

 9           MR. BORNSTEIN:  Yes.  Or they could have, you

10    know -- they knew because it's -- when they got the warrant,

11    it says the phone number.  The warrant has a phone number in

12    it.  And so they know that -- they have phones.  If they

13    didn't believe him that he was calling that phone number, they

14    could pick up their phone, call that phone number, and say,

15    Mrs. Tew, and all she has to do is say yes, and that's the end

16    of it.

17           THE COURT:  Okay.

18           MR. BORNSTEIN:  That's if they don't believe him.

19           THE COURT:  Right.  And I don't think they are

20    obligated to believe him.  I mean, I guess they could, but --

21           What do you think of Mr. Fields' point that even if

22    some of this should be suppressed or shouldn't be used, that

23    your motion just asks for a blanket suppression of everything

24    from the apartment and that that's not appropriate even if

25    they took too many photographs and spent too long there?
```

1          MR. BORNSTEIN:  I guess if you ask for the sun, the

2    moon, and the stars, and the Court says, I'm going to give you

3    the sun, but you aren't going to get the moon and the stars,

4    that that's part of life in arguing motions in front of a

5    court in a criminal case.  So I think if the Court cuts

6    back -- issues a ruling in which the Court cuts back on what

7    is excessive in terms of the execution of the warrant, then

8    that's the Court's prerogative.  And the Court certainly has

9    the discretion and the ability to do that, and I don't think

10   any appellate court would fault the Court for doing that.

11         THE COURT:  Okay.  You can go ahead, if you have a

12   couple of other --

13         MR. BORNSTEIN:  No, I think those were the things

14   that I wanted to deal with from Mr. Fields' argument.  Those

15   were the plain view doctrine, the possession versus privacy,

16   the size of the bags, the fact that the execution went too

17   long, and the idea that somehow taking all those photographs

18   is not a seizure.  But, you know, if the Court -- I kind of --

19   I appreciate the Court's comments that -- the fact that they

20   exceeded what's reasonable.  I mean, reasonable has always

21   been the touchstone of Fourth Amendment, what was reasonable

22   in terms of when you stop the search.  The search was not

23   reasonable.

24         THE COURT:  Okay.  Thank you.

25         Mr. Fields, do you want to have a little bit of

Julie H. Thomas, RMR, CRR                            (303)335-2111

20-cr-00305-DDD              Motion Hearing              10/12/2022   183

1   rebuttal?

2           MR. FIELDS:  No, Your Honor.

3           THE COURT:  All right.  Thank you.  Why don't we then

4   move on to the next motion.

5           MR. FIELDS:  So, Your Honor, again sort of working

6   backwards through the testimony, the next one I'd like to

7   address is the motion to suppress the statement, so this is

8   defense motion 216.

9           THE COURT:  Go ahead.

10           MR. FIELDS:  There we heard testimony from Special

11  Agent Anderson and Special Agent Romero.  I don't want to

12  repeat too much of what's in the brief, so what I will do now

13  is I will just put it in the context of the testimony we

14  heard.

15           So the question here is whether or not these

16  statements were custodial.  The definition is, of course,

17  could a reasonable person would [sic] have felt he or she was

18  not at liberty to terminate the interrogation and leave.  And

19  the courts have elucidated a five factor test:  location of

20  the interview, the duration, statements made during the

21  interview indicating whether or not someone had a belief that

22  they could leave, whether physical restraints were used, and

23  whether or not the interviewee is released at the end.  All of

24  those factors weigh in favor of a finding here that this was

25  not custodial.

1          First of all, the location.  There is no doubt that

2     this took place at the Tews' residence, so this was not a

3     police-dominated environment.  This is their personal

4     residence where they are going to feel most comfortable.  They

5     have got their children there.  They are free to move around.

6     They can go into this common space.

7          This factor is not, sort of, determinative, but I

8     would say that the courts do give it more weight than others.

9     That's the *Richie* case, cited in our brief, which says the

10    courts are much less likely to find something was custodial

11    when it takes place at home as opposed to, you know, a police

12    station or a cruiser or something like that.

13         The duration of the interview.  The actual sort of

14    meat of the interview was about 30 minutes, so we are not

15    talking about, sort of, a, you know, five-hour long

16    interrogation here where someone's will was overborne.  We are

17    talking about a short encounter, which again I think weighs in

18    the favor of the finding that it's not custodial.  30 minutes

19    just sitting and chatting is not, sort of, a huge limitation

20    on someone's freedom of action.

21         Statements made during the interview.  In this

22    particular case, the Tews declined to answer a lot of

23    questions.  They weren't really being responsive.  At one

24    point Kimberley Tew actually told Michael Tew to stop, and he

25    did.  At one point in time the agents asked to record the

```
 1   interview, and that invitation is declined.  All of that does
 2   not -- all of that indicates a situation where the Tews here
 3   are well aware that they have freedom, that they can make
 4   decisions, and they are not in custody.
 5        THE COURT:  Let me just interrupt you a little bit,
 6   because I guess in my mind I have a little trouble keeping
 7   distinct the idea of being in custody and voluntarily making
 8   statements, which are related, obviously, and both can cause
 9   problems, but are not necessarily the same thing.  So I think
10   you could be in custody and still refuse to answer questions.
11   I mean, these are pretty sophisticated people, probably
12   understand they have a right not to answer questions.  So the
13   fact that they at times at least said, We don't want to answer
14   questions, might play into whether other statements were
15   voluntary, but I'm not sure it plays into whether -- or how it
16   plays into the custody question.  Does that make sense?
17        MR. FIELDS:  It does, Your Honor.  And actually the
18   courts -- oftentimes the, sort of, Miranda motion is paired
19   with a voluntariness motion.  As I understand the defense's
20   motion, it's just about Miranda.  So when you look at Miranda,
21   I think what the courts have often done is that analysis gets
22   compressed into, sort of, one, sort of, step, you know, the
23   voluntariness and the statements.  I think the way to read
24   that case law is to say that, sort of, you're right that
25   someone can be in custody and their statement can still be
```

Julie H. Thomas, RMR, CRR                    (303)335-2111

```
 1   voluntary.  In terms of were they in custody in the first
 2   place -- and maybe actually courts have, sort of, created
 3   this, like, ouroboros loop, but I think it's a fair reading of
 4   the case law to say that the courts look to see did these
 5   individuals, sort of, make statements indicating their
 6   voluntariness, which would indicate that they are not in
 7   custody.  Right?  They still have freedom of action.  They
 8   still have freedom of movement.  The court's looking at
 9   custody as sort of a real limitation on someone's freedom and
10   as someone's will sort of being -- not overborne in sort of
11   a -- you can be in custody and still make statements, but
12   still there's a dividing line somewhere along there.
13           I'm not sure how to parse that out here, and I don't
14   think we have to.  I think it's, sort of, one factor among
15   many, and it's one that weighs in favor of a finding here that
16   it's not custodial even if it's not determinative.
17           THE COURT:  Okay.
18           MR. FIELDS:  And then release at the end.  Now, the
19   release at the end here was only about 20 minutes, but courts
20   have said that's enough.  He was free to go.  He went back
21   into his apartment.  The agents had to go get him.  That is
22   also unrebutted.
23           THE COURT:  I think you would agree if he had hopped
24   in a cab, he might not have been free to -- they might have
25   stopped him then.  Don't you think there's -- they were
```

1   prepared, if they had to, to arrest him if he started to

2   leave, not just to go back in the apartment, but to actually

3   go somewhere else where they weren't?

4           MR. FIELDS:  I think they were making those

5   preparations, Your Honor, which is what the testimony says.

6   Right?  So you have this place where the -- the agents are

7   there.  They are conducting surveillance.  They are not sure

8   they are going to make an arrest yet.  They want to talk to

9   him.  Eventually they do make that decision, and it happens

10  pretty quickly, but it is made after the interview.  Right?

11  And so, you know, could he have left?  What would have

12  happened?  All of that is speculative.  And, also, the courts

13  are very clear on this, the subjective intent of the agents

14  does not matter.

15          So looking at all of this objective -- all of these

16  objective factors, the Government would urge the Court to deny

17  the motion because this was not custodial.

18          THE COURT:  All right.  Thank you, Mr. Fields.

19          Mr. Bornstein.

20          MR. BORNSTEIN:  In my view, what the Court started to

21  ask about is the key question in the case or key fact in the

22  case in this motion.  A commonsense, ordinary, regular human

23  beings, not lawyers in court, we're told that the agents went

24  there to make sure that he was not going to flee, would say

25  that if he tried to leave, they would have stopped him.  And

Julie H. Thomas, RMR, CRR                              (303)335-2111

1   the idea that they wouldn't have stopped him or they would

2   have followed him to the airport and watched him get on a

3   plane and head to wherever it would be, South America, is just

4   not believable.  They would not have done that.

5          THE COURT:  So I agree with you about that, and I

6   think Mr. Fields agrees, largely, but I think Mr. Fields'

7   point is that's not the question because that's not what

8   happened.  What happened was they showed up, they asked him

9   some questions, then they let him go back in his apartment,

10  and then they decided to arrest him.

11         And in some senses, you know, I think a normal

12  citizen, FBI agents -- a bunch of FBI agents show up, no

13  matter what, you are going to feel some sense that your

14  freedom to move is restricted in some sense.  I think we all

15  understand that just being confronted by a bunch of law

16  enforcement officers in almost any circumstances is, in that

17  sense, a normal person wouldn't typically just think, well,

18  nothing will happen if I just start to run, for example.

19         On the other hand, the law is also pretty clear that

20  despite maybe that instinct that we all would have, that

21  that's not enough to say you are in custody.  There has to be

22  some actual reasonable either expression or the circumstances

23  have to show that you are not allowed to leave.

24         And here what are those factors, I mean, that he

25  actually would have known about?  Now, there was, as you

Julie H. Thomas, RMR, CRR                              (303)335-2111

 1   pointed out, a lot going on behind the scenes.  They may have

 2   been preparing to arrest him, but why would someone in his

 3   circumstances feel that he was in custody in a way that

 4   someone -- anyone else in similar circumstances wouldn't?  I

 5   guess my point is:  Doesn't your argument prove a little bit

 6   too much that basically any kind of interrogation or

 7   questioning by law enforcement officers is going to be

 8   involuntary if I agree with your argument here or going to

 9   mean you are in custody?

10           MR. BORNSTEIN:  No, Your Honor, because this goes

11   back to Mr. Fields' argument about subjective versus

12   objective.  So that if the -- if we put a defendant on the

13   stand and say, How did you feel about these officers, and he

14   says, Oh, my God, there were four officers, I knew they were

15   armed, I knew that if I did anything they'd, you know, shoot

16   me or stop me or do something to me, that would be subjective,

17   and he would say, Absolutely, subjectively I thought I was in

18   custody.  And the law has said we're not interested in that.

19   You know, you can get on the witness stand and say you

20   subjectively thought that you were not free to leave, and we

21   are not going -- the law is not going to give that a lot of --

22   give -- is not going to make that the touchstone, not going to

23   make that the test.

24           So that's why I go back to the actual test is

25   objectively he couldn't leave.  He could stay in that

1  apartment until they arrested him, but eventually they were

2  going to go into that apartment and arrest him.  The AUSA is

3  obtaining a complaint and a warrant to arrest him.  These

4  agents are aware of that from the AUSA being in contact with

5  them.  So I'm going to go with Mr. Fields' subjective versus

6  objective line of cases.

7           THE COURT:  All right.  I get what you are saying,

8  and I think you are saying that objectively we know all these

9  things, but I think the test is maybe some kind of a weird --

10 well, it's not that weird.  It's -- we do it pretty

11 frequently, I think, in the law, which is -- it's an objective

12 test, but it's from the perspective of a reasonable person in

13 the defendant's -- in the person challenging -- the person

14 making the statements, it's from a reasonable person test in

15 those circumstances.  And he didn't know about what the AUSA

16 was doing behind the scenes.  So that I don't think is

17 relevant to the question of what a reasonable person in his

18 circumstances would have thought about whether he was free to

19 go.  Because the reason custody is important is because we, I

20 guess, sort of as Mr. -- we want to make sure that people when

21 they are -- as Miranda says, we want to make sure people when

22 they are in custody know that they are free not to answer

23 questions.  If you can just walk away or think you can just

24 walk away, then we are not as concerned if you voluntarily --

25 if you go ahead and answer questions.

Julie H. Thomas, RMR, CRR                          (303)335-2111

1           MR. BORNSTEIN:  Well, let me give you a hypothetical

2    then.  Let me give you a hypothetical.

3           THE COURT:  I thought I'm the one who's supposed to

4    give hypotheticals.  This is why I got out of practicing law.

5    But go ahead.

6           MR. BORNSTEIN:  Suppose a very savvy police officer,

7    detective, FBI agent, whatever it is, approaches the subject

8    and says to that subject:  I promise you, I will not arrest

9    you.  I just want to have a couple of words with you.  You

10   know, maybe after you talk to me I'll understand that you are

11   not part of this criminal activity, and I absolutely promise

12   you I'm not going to arrest you.  And he's lying.  I mean, his

13   subjective intent was he was going to arrest him when this was

14   over.  And the subject says, Oh, I believe you.  Oh, you know,

15   you're a law enforcement officer wearing a badge and a gun,

16   and if you tell me I'm -- you know, you're not going to arrest

17   me, I believe you.  Does that mean that they are not in

18   custody?

19          THE COURT:  Yeah, it's a good question.  Isn't the

20   answer no, they are not in custody?  I think the answer is no

21   in that circumstance, isn't it?  Because a reasonable person

22   would say, if they didn't want to answer the questions, would

23   either say, I'm not going to answer it, or just say, Leave me

24   alone, I don't want to talk to you.

25          MR. BORNSTEIN:  But the reason that we ask for

Julie H. Thomas, RMR, CRR                        (303)335-2111

1   Miranda is to advise the subject that what you say might be

2   used against you, and before you talk to me you need to know

3   that what you say might be used against you.  And if you need

4   to consult with a lawyer before making that decision, you have

5   a right to do so.

6            And if you are not told that -- I mean, Miranda is

7   more than just a talisman.  I mean, it actually is supposed to

8   be -- whether, you know -- how it actually works on the field

9   is sometimes a little hard to fathom, but it's supposed to be

10  a talisman that does advise you that, you know, you have some

11  rights.

12           THE COURT:  I agree.  So what do you think are the

13  factors that would tell a reasonable person in Mr. Tew's

14  circumstances that he was in custody at the time he made these

15  statements, not afterwards, but at the time he answered the

16  questions that he answered?

17           MR. BORNSTEIN:  I think the number of agents there is

18  certainly -- and the fact that the agents have positioned

19  themselves so that they are in all different locations in that

20  area.  He goes out in the hallway.  He sees at least two of

21  them in the hallway.  He might not know there's one or two

22  waiting at the bottom of the lobby, but he knows that -- he

23  goes out in the hallway, and here's these people who were out

24  there.  They identify themselves as agents.  More show up, and

25  eventually they tell him that an FBI agent is on her way to

Julie H. Thomas, RMR, CRR                              (303)335-2111

20-cr-00305-DDD          Motion Hearing          10/12/2022    193

```
 1   question you.  Those are all the factors that I would stress.
 2            THE COURT:  Okay.  Thank you.
 3            Mr. Fields, any rebuttal?
 4            MR. FIELDS:  No, Your Honor, but thank you.
 5            THE COURT:  All right.  Thank you.
 6            All right.  So I'm going to take these motions under
 7   advisement and issue a written order on all the suppression.
 8            So why don't we move on, then, to the e-mail, the
 9   electronic information motion, which is 200, I think.  I think
10   probably, Mr. Bornstein, I should let you go first and last on
11   this one, since it's not really an evidentiary question, and
12   just highlight for me kind of your legal arguments, and then
13   I'll let Mr. Fields go, and let you have the last word too, if
14   you want to, on this motion.
15            MR. BORNSTEIN:  Thank you.
16            The issue that this motion raises for the Court is
17   twofold.  The first fold is was the use of the Stored
18   Communications Act to obtain ESP, electronically stored data,
19   to obtain ESP records, was that constitutional.  The courts --
20   we argue that it's not constitutional and that the search
21   warrants were invalid.  And we stressed the issue of Carpenter
22   versus the United States, but I also want to go back a few
23   years to Riley versus California.  And in Riley California the
24   Court issued the cell phone determination and determined that
25   what was in your cell phones in terms of data was what you --
```

Julie H. Thomas, RMR, CRR                              (303)335-2111

1    you were carrying around, you know, your life in your cell

2    phone, and that if the police or the FBI, or whatever the law

3    enforcement agency, wanted the contents of your cell phone,

4    they had to get an order.  And in this case when you have

5    Google and Apple, you're talking about not only your cell

6    phone, but your entire cell phone plus your computers, no

7    matter how many computers you have or what other cell phones

8    you have.  And in this case we also have factual information

9    that Mr. Tew's Apple data became merged in Miss Tew's Apple

10   data, and things that were not separate but between the two of

11   them, we're not quite sure how that happened, but at some

12   point those datas were mixed.  So now what you have is not

13   just in terms of *Riley versus California,* not just your cell

14   phone, but your cell phone plus your computer and plus any

15   other computers or cell phones that are linked.  And Google

16   and Apple ask you -- literally ask you, Please, you know, link

17   all of your -- all of your material together.

18            So once you look at *Riley* and *Carpenter* together, we

19   have, in my view, the law catching up or trying to catch up

20   with technology.

21            THE COURT:  Well, let me -- so let me ask you to,

22   sort of, stop right there, because I think I agree with you,

23   the law has probably not entirely caught up with technology,

24   but to go back to *Carpenter*, I mean, the Government is right,

25   the Supreme Court went out of its way to try to limit the

Case 1:20-cr-00305-DDD   Document 854   Filed 02/24/23   USDC Colorado   pg
318 of 460

1    holding in *Carpenter*, and you, I think, are -- you know,

2    you're not wrong to suggest that maybe all of these things you

3    just said are true about what is on people's phones and their

4    e-mail and their -- all these accounts being linked up

5    together.  You are not wrong about how modern technology, sort

6    of, puts everything out there.  But I think my view of the law

7    is you've got to convince a higher court than me to deal with

8    that.  The Supreme Court basically said in *Carpenter*, Hey,

9    we're talking a step to modernize some of this Fourth

10   Amendment law when it comes to modern technology, but we're

11   not undoing our precedents as to anything else.  And I'm just

12   down here at the bottom of the ladder, and I'm stuck with

13   that.  Right?  I'm not the one who gets to say, Hey, yeah, now

14   is the time to, sort of, expand *Carpenter* into a new area.

15   Right?

16           MR. BORNSTEIN:  I understand what the Court is

17   saying, obviously.  I mean, I have anticipated that thought

18   and that argument, and I went back, and I read in *Carpenter*

19   what the court said about *Miller* and *Smith*, because *Miller* and

20   *Smith* are the third-party doctrine cases, and that was what

21   was preserved specifically in *Carpenter* was to preserve the

22   *Miller* and *Smith* records for business records exceptions.  I

23   cited to the Court a magistrate judge out of Kansas.  Waxby is

24   the name of the magistrate judge.  And although obviously

25   that's not precedent for this Court, it is a 20-some-odd page

1  opinion that's very well reasoned.  It's a 2016 opinion that's

2  very well reasoned in terms of why *Miller* and *Smith* can stand

3  there, because *Miller* was based on the business records of a

4  bank, and the relationship between the customer and the bank

5  records is limited by the business records exception and by

6  the fact that the customer does direct business with the bank.

7       We do not do direct business with Google.  We do not

8  do direct business with Apple.  If we do a search looking for

9  doctors or -- well, let's say we are looking for abortion

10 clinics, and we are doing that search.  We don't ask Google or

11 Apple to save that information for us like we ask them to save

12 our bank records.  They do it whether we want them to do it or

13 not.  We can't even stop them from doing it.  So there's a

14 difference -- a distinction with a real difference between the

15 bank records in *Miller* and the way that these records are kept

16 by Google, Amazon, Microsoft, et cetera, et cetera.

17       THE COURT:  Okay.

18       MR. BORNSTEIN:  So I agree, the court did want to

19 preserve *Miller* and *Smith*.  If I remember, *Smith* was the

20 traditional trap and trace device which we've -- law

21 enforcement has used for 25, 30 years.  The trap and trace

22 device is a way in which the telephone company would record

23 that the suspect's telephone called these 25 numbers on this

24 day.  It wouldn't tell you who owned those 25 numbers, what

25 those 25 numbers -- whether, you know -- content of the

Julie H. Thomas, RMR, CRR                          (303)335-2111

1  conversation.  I think it did record how many minutes the

2  conversation lasted, but law enforcement would have to find

3  another way to find out who is on that other end of those

4  telephones.  They did.  They often knew that, you know, one

5  drug dealer was calling another drug dealer, and they knew

6  both telephone numbers, and so they could figure out that

7  there was conversations going on between the two.

8          But *Smith* is also different because your relationship

9  to your telephone company is, again, a direct relationship

10  where you make your calls, they bill you.  Often if you ask

11  them, Can I see who I called, can you give me a printout of

12  what my calls were, for example, a business wants to see that,

13  and it's a direct one-to-one relationship, different again

14  from the fact that Google doesn't ask you, you know, what they

15  are going to save.

16          THE COURT:  I get it.  I guess -- and, I mean,

17  believe me, I'm not -- the way that our information is used by

18  Google and other companies, I'm not here to defend that, but

19  isn't the fact that they -- when you use Google or these

20  e-mail -- these free e-mail providers, aren't you -- I mean,

21  it's worse in some ways.  Right?  At least with your bank it's

22  just the two of you having this relationship.  They are not

23  sharing your bank account information with whoever comes along

24  and asks to buy all of it.  Right?  And that's what these

25  internet companies do.  They share it -- it's not just third

Julie H. Thomas, RMR, CRR                          (303) 335-2111

 1   party.  There's millions of people who have access to all this

 2   information.

 3           MR. BORNSTEIN:  And they make money doing it.

 4           THE COURT:  Exactly.  That's their product.

 5           MR. BORNSTEIN:  They make money telling you, you

 6   know, how to make searches so that they are tailored directly

 7   to the kinds of --

 8           THE COURT:  Right.

 9           MR. BORNSTEIN:  -- businesses that you historically

10   went to.

11           THE COURT:  Right.  So, but that suggests that you

12   are sharing this information with everybody who wants it.

13           MR. BORNSTEIN:  All I can say to the Court is that

14   the court in *Warshak* was willing to go out on a limb a little

15   bit with its ruling, that in *Carpenter* both the majority and

16   the dissent cited to *Warshak*.  Neither one criticized it as

17   being an example of going too far.  You know, yes, maybe I am

18   asking this Court to go out on a limb a little bit, but, you

19   know, in the interest of -- in the interest of the

20   Constitution, I guess I am, I'm asking this Court to go out on

21   a limb.

22           THE COURT:  All right.  Fair enough.  I appreciate --

23   I appreciate that.

24           Let me then just ask you to address the standing

25   argument, which is sort of tied to the idea that these are

Julie H. Thomas, RMR, CRR                              (303)335-2111

1   kind of, very broad motions that you haven't necessarily tied

2   to every particular account.  You know, each -- you can only

3   assert your own privacy interests in a Fourth Amendment

4   context, not others'.  Mr. Tew can't protect Mrs. Tew's

5   privacy interests, vice versa, let alone anyone else.  And I'm

6   not totally sure I know whose these accounts all are.

7            MR. BORNSTEIN:  Maybe I should call Mr. Tew to the

8   witness stand and put him on about these accounts.

9            THE COURT:  If you want to, I suppose you could do

10  that.  I'm willing to, sort of, take your word for it, though,

11  if you want to just tell me --

12           MR. BORNSTEIN:  I mean, I can tell you -- I think in

13  my reply -- let me look and see if it's in my reply.

14           THE COURT:  I mean, you do list each one, but isn't

15  it -- isn't it that if Miss Tew had an account, it would only

16  be suppressed as to her?  I mean, do you disagree with that

17  sort of proposition?

18           MR. BORNSTEIN:  No, I do not.  I agree with that

19  proposition.  I agree that if the account -- what I do want to

20  make sure the record is clear.  Even though these accounts had

21  Political Media, Rincon, Meyer Consulting, those individuals

22  were not responsible for those e-mail addresses.  Those e-mail

23  addresses were created by one or more of my clients.  So they

24  were not belonging to Mike Meyers.  They were not belonging to

25  Christian Rincon.  They were not belonging to third parties.

Julie H. Thomas, RMR, CRR                              (303)335-2111

1    They belonged to either Mr. or Mrs. Tew, probably Mr. Tew.  I

2    can put him on, we can make a factual record, but I do agree,

3    yes, if that e-mail account is one created by Mr. Tew,

4    Mrs. Tew does not have a privacy interest in it.

5              THE COURT:  Okay.  Before we have him come up, unless

6    there's something else you want to say right now, why don't I

7    let Mr. Fields respond.  And then if we need to, we can -- I

8    will certainly let you come back up, and if we need to, we can

9    take some evidence.  I don't think it's probably necessary.

10             MR. BORNSTEIN:  I just want to say if standing is an

11   issue, then I can clear that standing issue up with that one

12   or -- of my clients has standing to make that issue, to make

13   that argument.

14             THE COURT:  Okay.  All right.  That's good enough for

15   me for now on that.  Thank you.

16             Mr. Fields.

17             MR. FIELDS:  Thank you, Your Honor.  So, as I

18   understand the defendant's motion, we are not talking -- I

19   mean, a warrant was used here.  Right?  So the question is:

20   Does -- do 2703(d) orders, which ask for noncontent, sort of,

21   routing metadata, do those run afoul of the Fourth Amendment?

22   In this particular case, I would say it's not a matter of

23   extending *Carpenter*.  It would actually be running up directly

24   against Tenth Circuit precedent.  *United States versus*

25   *Perrine*, which is cited in the Government's brief,

Julie H. Thomas, RMR, CRR                          (303)335-2111

1  specifically held there's no reasonable expectation of privacy

2  in any of that information.  So for the Court to conclude that

3  the 2703(d) orders here violated the Fourth Amendment, it

4  would actually have to somehow distinguish *Perrine*, and I

5  don't think the defendant has offered any valid way to do

6  that.

7          Let's say maybe, actually, there's the suggestion

8  that *Carpenter*, sort of, sub silentio overturned Tenth Circuit

9  decisions like *Perrine*.  That's where you I think you get into

10  Justice Roberts' very, very explicit, sort of, language that

11  he is not overturning the third-party doctrine in multiple

12  different contexts.  And for good reason, Your Honor.  I mean,

13  if you look at the solicitor general's brief in that case, it

14  was really concerned with the idea that if the court ruled a

15  certain way, use of subpoenas generally might come into

16  question.  Right?  And the use of subpoenas goes back all the

17  way to the common law, to the writs of King Henry VIII.

18  There's precedent going back hundreds of years.  That's why we

19  cite cases like *Morton Salts*, *Oklahoma Press*.  Subpoenas can

20  be used to gather information from third parties without

21  running afoul of the Fourth Amendment.  You give your

22  accountant all of your tax records, and the government

23  subpoenas your accountant, not a violation of the Fourth

24  Amendment.

25          Now, when you start dealing with technology, maybe

Julie H. Thomas, RMR, CRR                           (303)335-2111

 1    eventually you get to a point where there's, sort of, issues

 2    with, you know, sort of, a mosaic of surveillance over

 3    someone.  That's what I think *Carpenter* was getting at was

 4    sort of drawing that line right there, but there's been -- I

 5    think drawing that line here is very difficult, and there's

 6    not a good reason to extend *Carpenter*.  For one, we are not

 7    dealing with location information, sort of, 24/7 surveillance.

 8    That's not the information we are talking about here.  We are

 9    talking about basically the information that's on the envelope

10    of an electronic communication.  The Supreme Court has ruled

11    for hundreds of years, going back all the way back to *Ex parte*

12    *Jackson* in the 1900s, that sort of the information on an

13    envelope when it goes to the postal service, it's in plain

14    view, and there's no Fourth Amendment violation to read the

15    envelope or to use it.

16           THE COURT:  Doesn't the motion make a decent argument

17    that this goes a little bit beyond that, sort of, very basic

18    information that would be on an envelope?  I mean, it's a

19    little bit -- it doesn't include the contents of the e-mails,

20    but doesn't it go a little bit beyond just maybe what an

21    envelope would?

22           MR. FIELDS:  I think so, Your Honor, and there I

23    think we run up against -- in order for the Court to rule in

24    the defendants' favor, you'd almost have to kind of overrule

25    *Katz* a little bit.  You'd have to get into a reasonable

Julie H. Thomas, RMR, CRR                              (303)335-2111

1   expectation of privacy test.  And as has already been

2   discussed, a lot of these companies are very up front about

3   the fact that the bargain here is you get to use Google for

4   free, you get Gmail, you get the suite of documents, and it's

5   great for you, the consumer, who gets all this free stuff, but

6   in return we are going to pillage your data, and we are going

7   to use it, and we are going to sell it to third parties.  And

8   they are very up front about that.

9            So you don't have a reasonable expectation of privacy

10  when you use Google accounts.  If you wanted to use something

11  else, there are all sorts of other, sort of, market actors

12  that will actually protect your privacy.  You can use

13  ProtonMail.  You can use Signal.  You can use all sorts of

14  other things if that's really important to you.  That wasn't

15  this case.

16           So I think in order to extend *Carpenter,* you have got

17  multiple problems.  It's overruling *Perrine.*  It's then

18  getting into, sort of, is *Katz*' reasonable expectation of

19  privacy test privacy-protective enough in this world?  And

20  that is definitely something that could percolate up, but the

21  law on that is very clear.  In order for the Fourth Amendment

22  to apply, it's a reasonable expectation of privacy that

23  society is willing to protect, and it's both subjective and

24  objective.

25           So I think for all of those reasons extending

1    *Carpenter* here does not make a lot of sense.

2             And then I just want to address this, sort of, direct

3    business test potentially that we could use.  I think with a

4    bank oftentimes there will be a personal relationship when you

5    are doing direct business.  It's not really the case with a

6    lot of phone companies.  Right?  Or the idea that the phone

7    company is different because you can call them, and they're

8    keeping track of your number so you have it for a bill, that's

9    exactly what Google does.  You have got all of your e-mails

10   that you could ever use to a personal particular person sorted

11   for you.  So let's say you wanted to talk to your accountant

12   about preparing your taxes.  Here's all the e-mails I sent,

13   you know, to that accountant or to someone else.  That is the

14   service they provide, and you are doing direct business with

15   Google, again, recognizing the bargain that's been struck when

16   you signed their terms of service and got that, the mail.  So

17   I'm not sure that a, sort of, direct business test really gets

18   us any further.

19            The other thing I'll note is just the courts that

20   have addressed whether or not *Carpenter* should be extended

21   here, all the Circuit Courts to address it have declined to do

22   so.  So *Soybel*, cited in the Government's brief at 13 F.4th

23   584, that's particularly talking about, sort of, ISPs and

24   whether or not they should be discovered under the *Carpenter*

25   ambit, but the cases cited in there from various other

1    circuits have come to the same conclusion:  *Carpenter* does not

2    extend to 2703 information.  So if the Court is inclined to

3    look towards persuasive authority, I think those are the cases

4    it should look at.

5           The District of Kansas cases that the defendant is

6    citing -- I think they are on page 9 of his brief -- those are

7    cases, sort of, describing *Warshak* and, sort of, the fallout

8    from *Warshak*.  And the question there was:  Can you use 2703

9    to get content?  And there's this whole content/noncontent

10   distinction.  We are not there here because the Government got

11   a warrant.  It did exactly what the *Warshak* court said the

12   Government should do.

13          So for all --

14          THE COURT:  Let me ask you a quick question about

15   that.  Wouldn't, though, all of the discussion we just had

16   about how Google and these e-mail companies share your

17   information and they sweep through all your stuff, don't they

18   do the same thing with the content of your -- I mean, they may

19   not share it directly in the same way, but, I mean, they seem

20   to know what's in your e-mails.  They get the content.  So

21   wouldn't our -- if we are going to say the third-party

22   doctrine applies -- I mean, this is not that case because you

23   are not asking -- you didn't do that here, but wouldn't truly

24   applying the third-party doctrine in the way we are talking

25   about, sort of, mechanically saying, Well, did you share this

20-cr-00305-DDD            Motion Hearing            10/12/2022    206

 1    with someone else who shares it with a third party, wouldn't

 2    that apply to the content too?

 3              MR. FIELDS:  Yes.

 4              THE COURT:  Okay.

 5              MR. FIELDS:  And so I think actually what the court

 6    ended up there doing is -- you know, the reasonable

 7    expectation of privacy test, *Katz*, really does depend on

 8    higher courts saying this is a privacy interest that society

 9    is prepared to accept.  So they did that in *Carpenter*.  They

10    did that in *Warshak*.  They have not done that with all this,

11    sort of, routing digiting ISP information we are talking about

12    here.

13              Also I just wanted to note for the record that even

14    if the Court was inclined to conclude that the use of 2703(d)

15    orders here runs afoul of the Fourth Amendment, then you get

16    this analysis where, okay, all of that stuff should be severed

17    from the warrants.  And so then you look at the warrants and

18    you say, Is there still probable cause?  And there is, Your

19    Honor.  If you look at the warrants, what you will see is it

20    describes the fraud, and then National Air Cargo, the victim

21    here, had e-mails in its servers from these e-mail accounts,

22    the ones that were the subject of the warrants, with sham

23    invoices.  So that gives you probable cause to believe that

24    those e-mail addresses, the ones that submitted the sham

25    invoices, may have evidence of a crime.  So I still think you

Julie H. Thomas, RMR, CRR                          (303)335-2111

```
 1    have PC even if the Court were inclined to extend Carpenter
 2    and to do sort of a Kastigar-type analysis.  You could sever
 3    out all of that stuff and still conclude that these warrants
 4    shouldn't be suppressed.
 5             And even then, Your Honor, if the Court were inclined
 6    to rule that the use of this information violated the Fourth
 7    Amendment, if the Court were inclined to then strike all those
 8    portions from the warrants and conclude that they weren't
 9    valid, then you get to good faith, and then you get to the
10    fact that here the agents are relying on Perrine and other,
11    sort of, well-established Tenth Circuit cases saying that
12    you -- this is how you do investigations.  You start from
13    small to big.  Right?  So we don't have probable cause yet.
14    We have reasonable and articulable suspicion, so we use a 2703
15    order, and you sort of go up the ladder in terms of invading
16    people's privacy.  They followed that law, and they did what
17    the courts and everyone have asked them to do.
18             THE COURT:  Let me ask you about that.  I meant to,
19    kind of, do a little research on that, but I didn't, so maybe
20    you have.
21             How does that work when -- my understanding of the
22    good faith is when, say, a warrant includes information that's
23    wrong and you go to the wrong place, but if -- if the mistake
24    is a legal one, that this was actually not legally authorized,
25    does good faith really apply in that circumstance?  Because it
```

Julie H. Thomas, RMR, CRR                          (303)335-2111

1    seemed odd to me.  How would you ever -- no one would ever win

2    one of these cases.  Right?

3          MR. FIELDS:  That's right, Your Honor, and actually

4    they don't win that initial case.  Instead, basically a

5    precedent is created where future defendants might win.

6          So *Warshak* is actually a great example.  *Warshak*,

7    there they declared 2703(b) unconstitutional to the effect

8    that it allowed the Government to obtain the content of e-mail

9    without a warrant.  But the Sixth Circuit said, Actually, our

10   precedent at the time allowed the Government to do just that,

11   so we are not going to suppress, but now we have told you, and

12   everyone is on notice that you need to get a warrant from now

13   on.  So defendant lost in that particular case, but future

14   defendants got the, sort of, fruit of that.

15         THE COURT:  Well, that's sort of a heads I win, tails

16   you lose situation, right, for the Government?  And why would

17   anyone bother to take these cases to the Supreme Court if they

18   would lose either way?

19         MR. FIELDS:  Because sometimes you get strategic

20   litigants who are concerned about, sort of, shaping the law

21   for future defendants.  But in particular cases, Your Honor,

22   the reason for this, as stated in, sort of, *Herring* and *Leon*,

23   is that suppression is a really radical remedy.  What we are

24   talking about here is distorting the truth process and

25   preventing a jury -- like, the fact is maybe actually, because

Julie H. Thomas, RMR, CRR                              (303)335-2111

1   we haven't actually looked through these warrants because of

2   the sanctions motion that we will talk about, but if there are

3   text messages in there in which the Tews are talking back and

4   forth about, sort of, fleecing a company out of $5 million and

5   those just exist, going into court with all of that, like,

6   factual information removed from a jury is a distortion, which

7   is not what the courts are all about.  So the Supreme Court

8   has said you should only do that if it's going to deter

9   misconduct.  There's no misconduct here, Your Honor.  The

10  agents did exactly what everyone wants agents to do, which is

11  get a warrant.  They didn't, sort of, you know, go out on a

12  limb.  They didn't try to do anything.  What they did is they

13  consulted an AUSA who said, This is the state of the law at

14  the time.  AUSA reviews the warrant.  It gets submitted to a

15  magistrate judge.  And the magistrate judge, also taking into

16  account legal training and, sort of, you know, knowledge of

17  precedent, issues the warrant.  So good faith should still

18  apply under all these circumstances.

19          There are also some arguments that haven't been

20  addressed orally, Your Honor, about, sort of, the two-step

21  process and, sort of, gathering all that stuff.  I'm happy to

22  address them, but they weren't addressed initially, and I

23  think our brief recognizes or addresses all of them.

24          THE COURT:  I agree.  Thank you.

25          Mr. Bornstein, rebuttal?

Julie H. Thomas, RMR, CRR                        (303)335-2111

20-cr-00305-DDD                Motion Hearing                10/12/2022      210

```
 1              MR. BORNSTEIN:  Your Honor, I want to address the

 2    two-step process --

 3              THE COURT:  Okay.

 4              MR. BORNSTEIN:  -- if I might.

 5              THE COURT:  Go ahead.

 6              MR. BORNSTEIN:  Because in this case the two-step

 7    process has failed, completely failed.  The Government asked

 8    Apple and Google and AT&T to execute the warrant and give them

 9    all of the information in this e-mail accounts between certain

10    dates.  They didn't pay attention to what the warrant said.

11    They gave dates -- they gave information that went back way

12    beyond and way greater than what the warrant issued and even

13    what the U.S. Attorney said this is what we want.  And so

14    Apple and Google -- first of all, I have some problems

15    saying -- the Fourth Amendment talks about law enforcement

16    watching these warrants, and it says, for example, that the

17    law enforcement agent is to file a return with the court.  I

18    have not found any returns from Apple or Google.  There was a

19    return filed for AT&T.  It turned out to have -- AT&T sent the

20    U.S. Attorney the wrong person's -- somebody else's

21    information, and the U.S. Attorney had to go back to AT&T and

22    say, No, no, you sent me the wrong information, do it again.

23    But I don't think there's -- the returns on Rule 41 are

24    supposed to be done by the law enforcement.  We don't have

25    returns yet.  The Government has admitted that now, two
```

Julie H. Thomas, RMR, CRR                              (303)335-2111

1    years -- it was 20 months when I wrote the brief, so it's

2    obviously more than 20 months now, and they don't know what's

3    in these e-mails.  They haven't read these text messages,

4    these e-mails, or these other matters to ensure that the

5    two-step process -- that what they got was, in fact, what the

6    magistrate authorized them to take.

7              And we've found that they have in their computers a

8    huge trough of information that they are not entitled to have.

9    And so the two-step process just has not -- I mean, it made

10   sense.  You used to take -- I mean, we had cases.  The FBI

11   would seize a computer.  They would take a image of that

12   computer, of how it existed on that date.  They'd give the

13   computer back -- except that it had child porn or something,

14   then they wouldn't give it back -- but they -- if it didn't

15   have child porn, if it had something else, they would give it

16   back.  They had the image.  They'd send it to the forensic

17   laboratory and process it and determine what was in there.

18   But in this case the facts of this case are they haven't done

19   that yet.  They have not sifted through hundreds of thousands

20   of text messages and e-mails to determine what's not

21   authorized by the warrant, and to me that is such a problem.

22   And that's, again, technology exceeding the law and, in fact,

23   in this case exceeding the ability of the U.S. Attorney to

24   process what they got.

25              THE COURT:  Okay, and I think I understand.  I may

Julie H. Thomas, RMR, CRR                              (303)335-2111

1   give Mr. Fields, since I didn't have him speak on this, a

2   chance to respond to that.  But, I mean, isn't that partly my

3   fault, partly you suggesting they shouldn't be going through

4   those?  I mean, isn't that because they're concerned about

5   potential privileges in there?

6          MR. BORNSTEIN:  As to privileges, yes, but not as to

7   nonprivileged information.  And their privilege was originally

8   limited to only the attorney-client privilege, and we said

9   that there's husband-wife spousal material, there's medical

10  material, there's accountant material.  Those privileges,

11  that's one box.  The other box is irrelevance, thousands and

12  thousands of irrelevant texts and e-mails that have never been

13  culled out.

14          Okay.  That's -- I'll --

15          THE COURT:  Go ahead.

16          MR. BORNSTEIN:  *Perrine,* United States versus

17  *Perrine*, it predates both *Riley* and *Carpenter*, and it

18  represents the fact that the courts had not at that time in

19  *Perrine* caught up with cloud computing at all.  *Perrine* is

20  just a case that the law has, by *Riley* and *Carpenter*, have

21  gone beyond it.  And, as I say, I think *Riley* is as important

22  as *Carpenter* in terms of where we are.

23          And then, finally, I wanted to say the affidavit and

24  application in this case were reviewed by a lawyer, a member

25  of the U.S. Attorney's Office, and so the agent -- most of the

Julie H. Thomas, RMR, CRR                        (303)335-2111

1    time on our *Leon* good faith we sort of say, Well, here's this

2    police officer, not a trained lawyer, doesn't know the law,

3    hasn't been there, acts in good faith, accepts what the

4    magistrate judge says because the magistrate judge is a lawyer

5    and knows the law, and so we can't punish the police officer

6    for violating the Constitution.  In this case, we have the

7    entire United States Attorney's Office involved in the

8    decision as to what's in these warrants.

9            And the key about the 2703(d) is that what's

10   important to the case is what made it into the warrants,

11   because it's the warrants that have the content, and it's the

12   content that's going to be the evidence at a trial.  So how

13   did the Government get all this content evidence?  They got it

14   from a warrant, and that warrant was based on all of these

15   270 (d)'s [sic] requests, in part.  In part.  I need to say

16   that.

17           THE COURT:  I appreciate that.

18           If Mr. Fields wants to respond on the two-step, go

19   ahead, since he brought it up.

20           MR. FIELDS:  Thank you, Your Honor.

21           So with regards to the two-step process, this isn't a

22   technological problem at all.  In fact, agents had started to

23   execute the warrants.  They had started to actually -- so

24   they'd get the entire account, step one.  Then they have to go

25   through it, apply Attachment B and actually see the relevant

1   communications.  When they started to do that, they realized

2   that despite the fact they had already tried to filter out

3   communications taking place before the arrest, so before known

4   lawyers were involved, it looked like there still might be

5   lawyers.  So out of an abundance of caution, they stopped.  At

6   that time the Tews were not represented, so a decision was

7   made, Let's wait until they've got a lawyer.  Then that

8   lawyer, who would be in the best position to protect their

9   privilege, we can engage with the lawyer and, sort of, figure

10  out a filter process.

11          The Tews' lawyer, Mr. Ekeland, asserted a blanket

12  privilege and said, Do not look at anything regarding these.

13  Right?  The Government counsel tried to work through with

14  Mr. Ekeland how that was going to happen.  I was actually

15  scheduled to meet with him in Brooklyn in December, was

16  getting on a train to go out there, and I get a call that he's

17  withdrawing from the case.  So we never had an opportunity to

18  do that.

19          And, actually, the reason the Government hasn't done

20  this is not because we are not, sort of -- I think we have a

21  right to go through it, and we can, but when you get motions

22  for sanctions talking about Government attorneys, sort of,

23  rifling through privileges, that makes even, sort of, you

24  know, the most stiff-spined AUSA a little bit nervous.  And so

25  we haven't done that.  We have been waiting for this motion to

Julie H. Thomas, RMR, CRR                        (303)335-2111

1    get resolved and to potentially engage Mr. Bornstein in our

2    filter process.  Mr. Bornstein's position, as I understand it,

3    is the same as Mr. Ekeland's:  That our entire filter process

4    is problematic.  We shouldn't be using filters at all.  No one

5    from the Government should be looking to see what's relevant

6    at all yet.  Instead, there needs to be maybe a special master

7    or something else.

8            We disagree with that, but that's why the warrants

9    haven't been executed yet.  So it's not a technological

10   problem.  It's actually, sort of, a legal one, and it's the

11   Government being, sort of, mindful and prudent and thoughtful

12   about how to go about doing this.

13           THE COURT:  Okay.  Thank you.  Well, why don't we go

14   ahead and talk about the sanctions motion, then.  I should

15   probably let Mr. Bornstein go first on that.

16           Why don't you go ahead and address the sanctions

17   motion, and specifically address, kind of, the -- you can talk

18   about whatever you think you need to highlight, but about

19   this, sort of, last point about what exactly -- I mean, I know

20   you asked for dismissal as a sanction, but is there not

21   something else?  Why -- is there any other possible sanction?

22   Is there any other possible way to resolve any of this?  Why

23   do you think that's appropriate?

24           MR. BORNSTEIN:  By the time I got into this case,

25   this issue had already been raised by prior counsel and

Julie H. Thomas, RMR, CRR                          (303)335-2111

```
 1   decisions had been made.  And, as I understood the decision --

 2   and I received a memo that was authored by Mr. Fields.  I

 3   believe it's dated March of 2022.  And that memo indicated or

 4   said what the Government's position was and that they had

 5   assigned a filter team, taint team, and that the taint team

 6   was dealing with the attorney-client privilege because prior

 7   counsel, Mr. Ekeland, had raised the attorney-client privilege

 8   and had raised a Fourth Circuit Court of Appeals case

 9   concerning, concerning that case, the one I cite on paragraph

10   7 of my motion.

11           When I got the case, I felt that it was too late to

12   deal with these issues that way anymore, that they had already

13   had this information.  They did not set up this filter team.

14   I mean, they were talking about searches that occurred in

15   2020, July, September, December of 2020.  I get a memo that's

16   written in 2022, and my determination was, okay, it's too late

17   for this.

18           And, beside that, the team has not been asked to look

19   at spousal privilege material, has not been asked to look at

20   medical privilege material, has not been asked to look at

21   accountant privilege material.  And there's a lot of spousal

22   material.  Perhaps some of that spousal material may be, you

23   know, admissible in evidence because of coconspirator law.

24   Perhaps it might be admissible because of crime-fraud

25   exception or something, but it had not been culled out.  So I
```

1  needed to figure out what I was going to do.

2          I think that what could be done as terms of a lesser

3  sanction is to not let the Government use the Apple computer

4  material.  That's the biggest tranche of e-mails and text

5  messages which we demonstrated go back to 2013 when the

6  warrant said that it only wanted two years worth of documents,

7  and Google paid no attention to being told that they only

8  wanted two years worth of documents.  They did not filter out

9  by time or date.  They just dumped their entire file on the

10  U.S. Attorney.  And so I think that could be a lesser way to

11  deal with it is to simply say they can't use the Apple

12  computer material.  They can use the other material as long as

13  it doesn't have privileged documents in it.

14          I don't know how else to deal with it.  I mean, if

15  the Court fashions some way to deal with this problem that's

16  intermediate or less onerous, I guess I just -- I just don't

17  know how to do it, but if the Court has a way of doing it,

18  obviously the Court has the discretion to fashion any remedy

19  that the Court feels is appropriate.

20          THE COURT:  Let me ask you to at least address the

21  argument that these other privileges you are asserting beyond

22  attorney-client privilege are not appropriate, that some of

23  them may apply to the evidence the Government could introduce

24  at trial, but they don't apply necessarily to this sort of

25  information -- the investigatory process.  Can you address

```
 1   that?

 2            MR. BORNSTEIN:  I'm not sure I understand the Court's

 3   question yet.

 4            THE COURT:  Well, the Government -- a big part of the

 5   problem you are asserting is that the Government maybe has

 6   never planned, doesn't plan to, and has never filtered out

 7   anything but attorney-client --

 8            MR. BORNSTEIN:  Right.

 9            THE COURT:  -- privileged material.  What is your

10   argument as to why they have to?  I mean, the Government I

11   think says some of that may not be ultimately admissible, but

12   that doesn't mean that it has to be filtered out of their

13   investigatory process.

14            MR. BORNSTEIN:  Okay.  If the purpose of the

15   privileges are to take -- as I say, there's a difference

16   between testimonial privileges and communication privileges.

17   And the purpose of the privileges -- and we are talking about

18   the communication privileges, not the testimonial ones, right

19   now.  And the communication privileges essentially say, for

20   example, if I'm called into the grand jury and I'm asked by

21   the grand jury, What did your wife tell you about

22   such-and-such, I can tell the grand jury, That's private, and

23   I don't need to tell you that.  And if they then take me to

24   court and seek a court order ordering me to violate a private

25   communication between husband and wife, my hope is that the
```

Julie H. Thomas, RMR, CRR                              (303)335-2111

 1   court would say, No, you can't, we are not going to hold you

 2   in contempt for not answering that question in front of the

 3   grand jury.

 4          So I would say that that's material that the husband

 5   and wife or the doctor and patient can say:  It's off limits.

 6   You're not supposed to know that I have cancer.  You're not

 7   supposed to know that I have some other life threatening

 8   disease.  You're not supposed to know what we talked about

 9   unless you can establish a crime-fraud exception or some kind

10   of exception to that.

11          And that would be a two-step process also because

12   then you would go to the Court seeking a contempt citation and

13   say, We have a right to know this information because the

14   privilege has been broken.  But I believe that that's the way

15   the privileges are supposed to be protected.

16          THE COURT:  All right.  Then let me ask how you

17   think -- I know you said you think it's too late.  Just humor

18   me with how you think the process should have worked or, if it

19   weren't too late, how you think it should work.  You recognize

20   there's some exceptions.  Some of these statements maybe could

21   come in some other way.  Whose burden is it at which stage to

22   establish that, which ones come in and which ones don't?  How

23   would we figure that out?

24          MR. BORNSTEIN:  I think that when you have conducted

25   a search and in that conducting of a search the Government has

Julie H. Thomas, RMR, CRR                              (303)335-2111

 1    material that is, let's say, potentially privileged, including

 2    spousal privilege, that they should set that aside, not use it

 3    to obtain other warrants or other material or use it in their

 4    investigation.  Set it aside, and go to a court.  If there's

 5    been an indictment, then we have a court to deal with.  If

 6    there hasn't been an indictment, we have all these cases that

 7    are now propping up with regard to these privileges that are

 8    being handled by the court that issued the search warrant, and

 9    say, Judge, we have a problem with this material.  And then if

10    the Government wants it, they need to argue why it's -- why

11    they should be able to look at it and use it.  And if they

12    fail to do that, which they can do at a reasonably early stage

13    in the search process, not two years later, I think that would

14    work.

15              THE COURT:  Okay.  Do you think a filter team would

16    ever suffice?

17              MR. BORNSTEIN:  It's up in the air.  I mean, we

18    have -- we all know about the Eleventh Circuit Court of

19    Appeals and what they are going to say about a special master

20    as opposed to a filter team.  I think that's an area of the

21    law that's in flux.

22              THE COURT:  Okay.  Fair enough.

23              MR. BORNSTEIN:  I mean, I prefer -- I think I would

24    prefer a special master for reasons that they are independent

25    of the prosecution team, and that protects that -- it's a

1    level of protection.  I could understand if some Court of

2    Appeals says these taint teams are good enough, but I

3    personally would like to see more use of special masters if

4    this comes up.

5              THE COURT:  Okay.

6              MR. BORNSTEIN:  And this never used to come up.  It's

7    coming up again because they're getting these warrants for

8    massive amounts of data in the cloud, and it's the cloud.

9    It's not your -- your computer at your desk that they can take

10   an image of.  It's the damn stuff is all up there in the

11   cloud.

12             THE COURT:  I get it.  Thank you.

13             Okay.  I'll give Mr. Fields a chance to respond.

14             MR. FIELDS:  Just a couple of things, Your Honor.

15             First, it hasn't been two years.  Different defense

16   counsel have taken different approaches to this.  Initial

17   defense counsel for the Tews did not require filtering for

18   spousal privilege, did not assert any of these other

19   privileges and, in fact, really tried to cooperate with the

20   Government on a way to best protect attorney-client privilege,

21   which is sui generis and I'm going to set aside because it's

22   just analytically difficult.

23             Really what happened is -- so all this prior counsel

24   were sort of allowing it.  The Tews had proffered, it looked

25   like they were going to cooperate, and then they fire their

Julie H. Thomas, RMR, CRR                         (303)335-2111

1    attorneys, and there's a period of a couple of months before

2    the indictment where they have no attorneys.  I've already

3    said in those circumstances, Your Honor, what happened is when

4    we started to execute the warrants, there was attorney-client,

5    and we decided it would make sense:  indictment, work with

6    defense counsel.  That's when you get defense counsel --

7    basically over the span of a year it's been defense counsel

8    who has said:  Don't look at anything.  If you look at any of

9    this stuff, we are going to move for sanctions.  It's

10   completely inappropriate.  We don't like your filter process.

11   Just don't do it.

12        We were trying to work through that, Your Honor, and

13   again that's when Mr. Ekeland, sort of, withdrew.  Then we had

14   another couple-of-month period where there was no

15   representation, and Mr. Bornstein.  Mr. Bornstein, as I

16   understand it, continues to object to the entire idea of a

17   filter process.  And even here when you asked him point blank,

18   he didn't have sort of a good answer as to what should happen

19   here.

20        Suppressing all of this stuff because the Government

21   acted prudently and tried to engage defense counsel to best

22   protect attorney-client privilege is not an appropriate remedy

23   and would run counter to, again, all of the -- you know, *Leon*

24   and *Herring* aren't directly on point, but if the idea of

25   suppression is sort of to deter misconduct, this would do the

Julie H. Thomas, RMR, CRR                          (303)335-2111

    1    opposite of that, Your Honor.  It would sort of reward

    2    defendants', sort of, just delay and, sort of, dilatory

    3    tactics and punish AUSAs who are trying to act in good faith

    4    to resolve difficult privilege issues.

    5           So that's why these warrants have not yet been

    6    executed because we have been waiting on all of that.

    7           Now let's look at spousal privilege and everything

    8    else.  First, I want to draw the Court's attention to *United*

    9    *States versus Wilson*.  It's F05 [sic] F.Supp. 3d 3.  It's out

   10    of the District of Massachusetts.  It's one of these Varsity

   11    Blues cases.  So those have been somewhat high-profile cases

   12    involving often husband and wives who are offering bribes to

   13    get their children into various elite schools.  The question

   14    came up should -- the government has all these e-mails.  Do

   15    they need to filter for spousal privilege?  Squarely keyed up,

   16    and the court there said, No, absolutely not.  And the reason

   17    for that is all of these privileges are creatures of Federal

   18    Rule of Evidence 501.  They are not constitutionally based,

   19    Your Honor.  This is federal common law.  And when you are

   20    dealing with, sort of, *Wong Sun* and fruit of the poisonous

   21    tree and, sort of, other issues related to suppression, those

   22    remedies are associated with constitutional violations.

   23    That's why cases cited in the Government's brief like

   24    *Squillacote* or *Squillacote* -- I'm never going to be able to

   25    pronounce that -- of the Fourth Circuit make it very clear

Julie H. Thomas, RMR, CRR                              (303)335-2111

```
 1    that because these are evidentiary privileges, sort of,
 2    suppressing everything isn't appropriate.  The Government can
 3    still look at them.  They can use them potentially for
 4    derivative evidence.  They can look to see if there's an
 5    exception to the privilege.  And really all this will come
 6    into play during motions in limine or at the trial itself
 7    when, let's say, the Government sort of offers a
 8    communication, defense objects and says, Actually, that's
 9    protected by Federal Rule of Evidence 501.  Then you get a
10    ruling.
11              THE COURT:  Let me ask you to respond to
12    Mr. Bornstein's hypothetical, I guess, about someone being
13    asked to testify against their spouse in front of a grand
14    jury.  How do you think that would play out?
15              MR. FIELDS:  I think that hypothetical is -- there
16    are cases on this, actually.  So because the spousal privilege
17    is two privileges -- right?  It's the testimonial privilege,
18    and it's also the communications privilege.  So if they are
19    actually married, completely inappropriate.  You could not use
20    a grand jury subpoena to compel someone to testify because of
21    the testimonial privilege.  Let's say they are divorced, and
22    actually one of the spouses does not want to talk in the grand
23    jury.  It's -- I think, as a matter of substantive law, they
24    could actually compel that testimony, and the grand jury would
25    be entitled to use it to gather other evidence, because the
```

```
 1    grand jury is an investigative body.  And so you are not

 2    dealing -- the Rules of Evidence don't apply.  You don't have

 3    to deal with Rule 501.  So they could do that.  Would an AUSA

 4    do that?  I don't know, and the reason is because there's a

 5    lot of churn in that case law over whether or not that's

 6    appropriate to do.

 7            THE COURT:  So then what's the different -- why is

 8    that different from you guys looking through spouse's e-mails

 9    to each other?

10            MR. FIELDS:  Here we have a -- well, so here what you

11    have is warrants laying out a conspiracy between a husband and

12    wife.  So a magistrate judge looked at all of that, concluded

13    that a warrant should issue for accounts for the husband and

14    wife, sort of, detailing the conspiracy, and then allowing and

15    specifically, sort of, ex ante, like before the Government

16    even gets started, allowing the Government to search through

17    that for evidence of a crime because there's probable cause.

18    So there there's been, sort of, judicial buy-in and, sort of,

19    judicial sanction before they do it.

20            That being said, Your Honor, I will say actually if

21    you were to, sort of, press me, could the AUSA compel

22    testimony from [sic] a grand jury from an ex-spouse about

23    communications, the answer to that is yes.  And the grand jury

24    could use that evidence that they have gathered to gather

25    other evidence that might result in an indictment.  I think
```

1    there would be issues with using the actual communications in

2    the grand jury to get an indictment, but you could use it to

3    gather derivative evidence, if that makes sense.  So a spouse

4    says -- ex-spouse says, Yeah, I talked to my husband about a

5    bank robbery, and he buried the bag of money in the backyard.

6    The grand jury could then direct the evidence -- the agents to

7    go get that bag of money in the yard and use that bag of

8    money -- maybe it's got the fingerprints on it -- without

9    using the actual communications, if that makes sense.  That

10   would be the prudent way to do it there.

11           And that's essentially what we are trying to do here,

12   Your Honor, is sort through the evidence and figure out what

13   could actually be used in a court of law consistent with Rule

14   501.

15           THE COURT:  Let me just make sure I understand where

16   we actually are on this.  There was a time where the

17   Government was reviewing some of this.  They began this

18   process, right, when there was prior counsel, and then

19   stopped?  So some number of -- presumably some number of

20   communications -- let's say you perfectly filtered out all the

21   attorney-client privileged communications, but some number of

22   these others were not filtered out.  Right?

23           MR. FIELDS:  Correct.

24           THE COURT:  Okay.  And it got to you guys, the

25   prosecution team.

Julie H. Thomas, RMR, CRR                          (303)335-2111

1        MR. FIELDS:  Correct, Your Honor.  And I will say,

2   very candidly, spousal communications in particular, right,

3   because this is a conspiracy committed by husband and wife?

4        THE COURT:  Sure.

5        MR. FIELDS:  So the exact timeline here is a lot of

6   these warrants come down.  We execute them in December.  We

7   start getting them in January.  The indictment is in February.

8   Agents started searching very specifically for communications

9   between coconspirators.  Right?  And some of those were used

10  to secure the indictment.  After defense counsel comes on

11  board and says, Do not look through any of those, we are going

12  to move for sanctions, it's completely inappropriate, we stop

13  out of an abundance of caution.  Right?  And then there's a

14  period where there's some negotiations, and the Government

15  says, Look, we are negotiating here.  We are going to set up

16  this filter process and ask the agent to go back and actually

17  start looking at it again.  And that's when the agent finds

18  something that might actually be related to an attorney, and

19  full stop, and nothing has been looked at since that time.

20        Again, the reason for that is because -- and this is

21  my specific ask of the Court -- we would like an order from

22  the Court specifically denying this motion for sanctions and

23  allowing the Government's filter process to continue.  At that

24  point the Government can expeditiously execute the warrants,

25  look at Attachment B, which is the evidence we are actually

```
 1    able to seize, and that's when we can start preparing a James

 2    log, which -- now I'm getting a little bit ahead, but I think

 3    the Government's ask with respect to a James hearing is we are

 4    not opposed to one, but we need time to execute the search

 5    warrants, which have been sort of delayed I think in good

 6    faith as we tried to work through this with defense counsel,

 7    but now it's teed up for the Court.  Once we get that ruling,

 8    we'd like a period of approximately eight weeks to sort

 9    through that, prepare the James log, and have the hearing.

10              THE COURT:  That was obviously the --

11              MR. FIELDS:  Yeah.

12              THE COURT:  -- I think the last thing on the agenda

13    today.  We might as well just talk about it briefly, because I

14    know I have to do some kind of order.  Do you think eight

15    weeks -- is that a real estimate?  Do you think you can do it

16    quicker than that?  Obviously we are -- the trial date in this

17    case is going to be very difficult to stick, if it's possible

18    at all.  So I'm just trying to figure out what we're looking

19    at.  Do you really think it will be eight weeks to do the

20    James log?

21              MR. FIELDS:  I think actually eight weeks is really

22    aggressive on our part in terms of, like, time frame, because

23    we are talking about searching through all that and then

24    preparing the log.  If -- we want this to happen

25    expeditiously.  If the Court orders it to happen in eight
```

 1   weeks, we will do it, but ideally we would actually like

 2   closer to maybe 12 weeks, which I know is sort of pushing

 3   things, but I think consistent with the Speedy Trial Act the

 4   Court could set the hearing on that motion sometime in

 5   January, which would toll the statute of limitations while

 6   that -- or not -- speedy trial while that hearing is pending,

 7   and there's 30 days after that to resolve the hearing, so that

 8   would put trial sometime in February or March.  I think that

 9   would be appropriate.  I think it's doable.

10          I also think it's quite possible that as we start

11   executing the warrants and the evidentiary picture starts to

12   harden even more, defense counsel might need a little bit more

13   time to prepare for trial, so we might get another ends of

14   justice motion, which I think would be sort of warranted on

15   the facts here.

16          THE COURT:  Okay.  Thank you.

17          Why don't I let Mr. Bornstein respond on all of that.

18          MR. BORNSTEIN:  Number one, Mr. Fields said something

19   interesting that I wanted to emphasize in the record, which is

20   that attorney -- not attorney -- husband-wife communications

21   were used in the grand jury to obtain the indictment in this

22   case.  And that's partially why I can say it's too late to put

23   the genie back in the bottle, because it's already been used

24   to obtain an indictment.  I'm not sure where they, you

25   know -- I have a grand jury transcript, and there was

Julie H. Thomas, RMR, CRR                            (303)335-2111

1    testimony about the -- that Mr. and Mrs. Tew said this to each

2    other.

3              Second -- your court reporter is --

4              COURT REPORTER:  Just shaking my hands out --

5              MR. BORNSTEIN:  -- showing some --

6              COURT REPORTER:  -- while you pause.  Go ahead.

7              MR. BORNSTEIN:  -- showing some signs of wear and

8    tear here, Your Honor.

9              THE COURT:  I know, and we should all finish up as

10   quickly as we can, but go ahead.  I want you to say your

11   piece.

12             MR. BORNSTEIN:  I've just -- I've never had a case

13   like this.  I've never been -- I've never been two months from

14   trial in a case that's two years old and had the Government

15   say a large tranche -- a large piece of the evidence we are

16   going to use at trial we haven't even seen yet, and after we

17   see it, then we'll determine what we want to use, and then

18   we'll file a *James* log, and then you can object that it's

19   either not part of the conspiracy, you know, the whole *James*

20   thing, you know, it either wasn't in further of the conspiracy

21   or at the time it wasn't -- this person wasn't in the

22   conspiracy or it's not conspiratorial.  I have never had this

23   happen to me.

24             THE COURT:  Well, you probably have more experience

25   than me.  I haven't either, but I think that the -- a large

Julie H. Thomas, RMR, CRR                          (303)335-2111

1   part of that is because the Government was going down a more

2   routine path, and then counsel changed, strategy changed, the

3   approach to privilege and the filter team changed, lots of

4   things changed, and so they, sort of, stopped in the middle,

5   and now here we are.  I need to resolve these issues before

6   they can go on, because obviously part of your position is

7   they shouldn't be looking at any of that.  So if they had gone

8   through it -- if they had just bowled through and reviewed all

9   of it, your sanctions motion would be even more outraged than

10  it already is.  Right?  So, I mean, I think there's a reason

11  we are in this unusual position, and until I resolve some of

12  these legal issues, we are sort of stuck with that.  Right?

13          MR. BORNSTEIN:  And I am the one who raised the

14  spousal privilege.

15          THE COURT:  Right.

16          MR. BORNSTEIN:  Prior counsel only was dealing with

17  attorney-client.  I am the one who said, Whoa, you know,

18  there's a whole other set of privileges that are here,

19  especially husband-wife.

20          THE COURT:  Okay.  Yeah, exactly, and so they sort of

21  stopped -- it strikes me as, in good faith, they stopped in

22  the middle to make sure they weren't going even further down a

23  path, your position is, was incorrect.

24          So I agree with you, it's unusual.  It's very

25  strange.  I can't see any way that the trial date sticks given

Julie H. Thomas, RMR, CRR                              (303)335-2111

20-cr-00305-DDD                    Motion Hearing              10/12/2022    232

1   everything that's going on, but I do need to resolve all these

2   motions so, to be fair to everybody in the case, we can know

3   the ground rules and proceed.  So I'm going to rule on them

4   all as quickly as I can.  But did you have anything else you

5   wanted to respond to?

6           MR. BORNSTEIN:  Let me look at my notes here.

7           Oh, yes.  Yes.  With respect to the *James* proffer and

8   the *James* hearing, there are hearsay statements that the

9   Government has from Michael Mora, Christian Rincon, Michael

10  Meyers, and Larry Ward which, if they are coconspirators,

11  which they might be, I am not sure if the Government says so,

12  they could have done *James* proffers for all of those people in

13  the interim time.  There are hearsay statements from Jonathan

14  Yioulos.  They know that Jonathan Yioulos and Michael Tew

15  communicated about financial matters related to NAC that were

16  not part of any fraudulent scheme.  And so separating those

17  out in terms of whether they are going to try to use any of

18  those or whether those were made by a conspirator during the

19  course of the conspiracy and in furtherance of the conspiracy,

20  so they could have done some *James* work while waiting for

21  this, and they didn't.

22          There's hearsay statements from Michael Tew's cell

23  phone which they obtained -- he gave it up early in the case,

24  and they made a -- copies, took screenshots from his cell

25  phone with communications between him and his wife.  That

Julie H. Thomas, RMR, CRR                              (303)335-2111

```
 1   could have been subject to a James.  Those are all other James
 2   things that are beyond just the material in the iCloud.
 3          THE COURT:  Okay.  So that's probably a good reason I
 4   can sort of hold them to the fire on a somewhat shorter
 5   timeline for the James briefing, but I do think we are going
 6   to need a James hearing in this case once they -- and I do
 7   want to give them time to review it.  So I will probably --
 8   eight weeks or so is probably fair.  But anything else?
 9          MR. BORNSTEIN:  No.  Thank you.
10          THE COURT:  All right.  Thank you, Mr. Bornstein.
11          All right.  I already earlier denied the motion for a
12   Franks hearing.  Everything else I am taking under advisement
13   for now.  We will get out written orders to try to be as clear
14   as possible about my rulings on all those.  I will try to do
15   it as soon as I can and then after that either have a status
16   conference or ask for status report about the timing as we go
17   from there, but I do want to move this along as quickly as we
18   can.  I appreciate everybody's patience.
19          If there's nothing else -- well, why don't I ask.
20          Is there anything else for the Government,
21   Mr. Fields?
22          MR. FIELDS:  No, Your Honor.  Thank you very much.
23          THE COURT:  Anything else, Mr. Bornstein?
24          MR. BORNSTEIN:  I have nothing for today.
25          THE COURT:  All right.  Thank you all for your time
```

20-cr-00305-DDD                  Motion Hearing              10/12/2022    234

1    and attention.  The Court will be in recess.

2         (Proceedings concluded 4:59 p.m.,

3         October 12, 2022.)

4
                         REPORTER'S CERTIFICATE
5
             I, JULIE H. THOMAS, Official Court Reporter for the
6    United States District Court for the District of Colorado, a
     Registered Merit Reporter and Certified Realtime Reporter, do
7    hereby certify that I reported by machine shorthand the
     proceedings contained herein at the time and place
8    aforementioned and that the foregoing pages constitute a full,
     true and correct transcript.
9            Dated this 27th day of December, 2022.

10
                          _____/s/ Julie H. Thomas_____
11                           Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25


Julie H. Thomas, RMR, CRR                            (303)335-2111

```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO
 2
       Criminal Action No. 20-cr-305-2-DDD
 3
       UNITED STATES OF AMERICA,
 4
           Plaintiff,
 5
       vs.
 6
       KIMBERLEY ANN TEW,
 7
           Defendant.
 8     _____

 9                        REPORTER'S TRANSCRIPT
                           SENTENCING HEARING
10     _____

11            Proceedings before the HONORABLE DANIEL D. DOMENICO,

12     Judge, United States District Court for the District of

13     Colorado, occurring at 1:30 p.m., on the 8th day of August,

14     2024, in Courtroom A1002, United States Courthouse, Denver,

15     Colorado.

16                             APPEARANCES

17            Bryan Fields, Sarah Weiss and Laura Hurd, Assistant

18     U.S. Attorneys, 1225 17th Street, Suite 700, Denver, Colorado,

19     80202, appearing for the Government.

20            David Kaplan and Jamie Hubbard, Stimson LaBranche

21     Hubbard, LLC, 1652 North Downing Street, Denver, CO 80218,

22     appearing for the Defendant.

23

24         TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
                901 19th Street, Denver, Colorado 80294
25         Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer
```

1          **P R O C E E D I N G S**

2       (In open court at 1:06 p.m.)

3            *THE COURT:*  Good afternoon.  Please take your seats.

4   We're here for a sentencing hearing in case number 20-cr-305-2,

5   United States versus Kimberley Tew.

6            Why don't I begin by having counsel enter their

7   appearances.  For the government?

8            *MR. FIELDS:*  Good afternoon, Your Honor.  Bryan Fields

9   for the United States.  I'm joined by my co-counsel,

10  Sarah Weiss, co-counsel, Laura Hurd, and Special Agent Lisa

11  Palmer.

12           *THE COURT:*  Welcome.

13           *MR. KAPLAN:*  Good afternoon, Your Honor.

14  David Kaplan, appearing on behalf of Kimberley Tew, along with

15  Jamie Hurd (sic) Mrs. Tew is present.

16           *MS. HUBBARD:*  My last name is Hubbard, Your Honor.

17           *THE COURT:*  I thought so.  From probation?

18           *PROBATION:*  Josh Roth, from probation.

19           *THE COURT:*  Thank you for being here, as well.  We're

20  going to begin with a discussion of the Government's Motion For

21  A Preliminary Order Of Forfeiture, which the defendant has

22  objected to.  I, in addition, then will turn to sentencing.  We

23  will take a break somewhere.  I'm not sure if it will be

24  in-between the forfeiture issue and the sentencing itself, but

25  I will plan to take a break at some point.

```
 1              I do want to address forfeiture first, and I think I
 2    will just, sort of, tell you, based on my understanding of the
 3    law and what has been filed so far, that I understand the
 4    defendant's position, but that the law of conspiracy, in
 5    particular, which she has been convicted of, makes it somewhat
 6    difficult for defendants to argue that they should, sort of, be
 7    separated out from the proceeds, even if they didn't have
 8    themselves a direct role in a particular transaction.
 9              So, while I understand the factual and, sort of,
10    fairness argument that the defendant has before it, the
11    government seems to be on fairly strong legal grounds on this
12    issue, but I would like to hear from both sides.
13              I think it makes sense to start with the government,
14    since it's their burden, and so is Ms. Hurd going to address
15    this?
16              MS. HURD:  Your Honor, may I step to the podium?
17              THE COURT:  Please.
18              MS. HURD:  Thank you.  Your Honor, in our filings we
19    address the conspiracy issue, and you have, sort of, intimated
20    that there is strong legal basis for this.  The government
21    agrees.
22              The evidence at trial established that Michael Tew,
23    Kimberley Tew and John Yioulos engaged in this conspiracy, in
24    netting more than $5 million, and they did it by submitting the
25    false invoices for services that were not rendered to the
```

1      company here.

2              After Mr. Tew was terminated, they continued to submit

3      invoices through Jonathan Yioulos for payment.  Mr. Tew

4      continued to recruit -- or attempt to recruit other individuals

5      into the conspiracy, and had personal connections with various

6      individuals involved in the company submitting invoices.  The

7      Tews also used multiple business and dummy email accounts to

8      disguise their conduct.  As a result, as was before the jury

9      and found by the jury, the scheme netted $5,023,878.50.

10             Ms. Tew is arguing she should only be responsible for

11     the substantive accounts, but that doesn't align with the

12     jury's findings here nor does it align with the statute.

13     Your Honor, under 18 United States Code 981(a)(1)(C), any

14     property, which constitutes or is derived from proceeds

15     traceable to either wire fraud or a conspiracy shall be

16     forfeited.  Interestingly, Your Honor, 981 specifically states

17     conspiracy, therefore understanding that anything derived from

18     the conspiracy can be forfeited in a case.  That is where the

19     government has strong legal basis supporting what it's asking

20     for today.

21             THE COURT:  All right.  Me interrupt you and I

22     apologize, but let me just ask you a couple of questions, one

23     sort of directly related to that, which is I understand what

24     the statute says and your position, but if the forfeiture

25     applies to funds that have been derived or proceeds of it, do

```
 1    you have to show -- do I have to find, that she has those
 2    funds?  What if 4 million of it we all agreed Yioulos kept
 3    completely himself and the Tews never got, would she still be
 4    subject to forfeiture for that?

 5              MS. HURD:  The facts make all of the difference.  So
 6    you are correct, the government -- technically speaking, the
 7    Tenth Circuit hasn't ruled on Honeycutt, in whether it applies
 8    981, because it doesn't discuss the very important wording, the
 9    person obtained, right?  It just says derived from the
10    conspiracy.  So the Tenth Circuit has, sort of, skirted this
11    issue to date, but from a policy perspective we generally try
12    to attribute the funds to those that received or enjoyed the
13    benefit of them, and that's, sort of, in line with the
14    Honeycutt decision.  It said, you can't just take from a
15    low-level player everything that's going on, right.  We are not
16    applying Pinkerton liability to that, but what we do want to
17    recognize is that you should look to what the person is
18    enjoying.  What they are getting from the fraud.

19              I don't think there's any doubt in this case
20    Your Honor, that Ms. Tew and Mr. Tew, in a joint marital
21    relationship, enjoyed the bulk, if not all, every single dollar
22    in this conspiracy.  They don't need to retain it.  They just
23    have to have used it for their benefit.

24              THE COURT:  But I do have to find that they obtained
25    it, at some point.  I understand that they don't have to have
```

```
 1    retained it.
 2          MS. HURD:  Yes, Your Honor.  I think the evidence is
 3    clear, the exhibits, especially Exhibit 108 -- sorry -- 1008
 4    sort of sets forth the whole scheme.  Then the jury was tasked
 5    with figuring out the scope of the conspiracy, and they were
 6    given the jury instructions which says look at the Indictment,
 7    and then determine if this is within the conspiracy, right?  So
 8    for Count 1, one of the facts set forth in the Indictment said
 9    over $5 million, as a result of this particular fraud.  Further
10    the -- all of the -- excuse me, Your Honor, all of the bank
11    accounts that were admitted in trial, there were many, those
12    also show, kind of, the use of these funds, as they went to the
13    benefit of Mr. and Mrs. Tew, this included the cryptocurrency,
14    personal expenses, various other things that are just normal
15    expenses of a marital relationship.
16          THE COURT:  Okay.  And you don't think anything should
17    be subtracted out from that total number?  I agree with you,
18    it's clear that 5-million number is very clearly established
19    from the Indictment and elsewhere, but I'm just curious if you
20    acknowledge anything should be netted out, I guess?
21          MS. HURD:  Your Honor, that would be their burden
22    under 981(a)(2), but nonetheless, the idea is if you are using
23    it for your benefit, whether it's a kickback, whether it's paid
24    to other people, because you are running another scheme, it
25    doesn't really matter.  Those aren't expenses, those aren't
```

1    deductions that are normally understood, because the defendants

2    realized the gain when they got the funds.

3            THE COURT:  Okay.  Thank you.

4            MS. HURD:  Thank you, Your Honor.

5            Your Honor, I think we've explain the law in regards

6    to retaining or obtaining those funds.  There's little doubt

7    that there was multiple statements in furtherance of the

8    scheme, and those, sort of, tell the tale of the obtaining of

9    the funds.  I won't go through all of those, Your Honor, that

10   relate to each transaction here, but generally speaking, Ms.

11   Tew was, sort of, the driving forcing behind this.  She was

12   consistently asking for money.  The fact she may not have

13   executed the original wire fraud is irrelevant under the law.

14   Accordingly, Your Honor, the government maintains that she

15   should be fully responsible for the full amount of the fraud,

16   in the amount of 5,023,878.50.

17           Your Honor, as noted in the government's motion, we

18   will not seek to get both from the defendants; meaning, we

19   would only get the total amount of 5 million, if the Court were

20   to find that the full amount should be attributable to her.

21           THE COURT:  Okay.  Thank you.  I appreciate that

22   clarification.

23           MS. HURD:  Your Honor, we rest on the remaining

24   pleadings and the law we have set forth in those pleadings, and

25   I think that it's well within the law to make her responsible

 1    for the full amount.  Thank you.

 2              THE COURT:  Thank you.  Mr. Kaplan?

 3              MR. KAPLAN:  Yes, Your Honor.  Your Honor, our

 4    position, as the Court acknowledged in its introductory

 5    comments have been placed in our pleading.  I would just add a

 6    couple of items.  I agree with the Court's acknowledgment of

 7    the conspiracy law, as it relates to forfeiture, and what the

 8    weight of it says, but I also agree with the Court having some

 9    concern about Ms. Tew being held responsible for the entire

10    amount.  We've indicated to the Court that the response would

11    be for $184,300 that we think is the amount attributable to her

12    behavior, and we would ask the Court to consider that as the

13    forfeiture amount.

14              The government comes up and says that because of the

15    conspiracy she should be responsible for the entire amount, and

16    we take objection to that, as the Court said, in the government

17    establishing that she had obtained the $5 million.  The other

18    item that is of concern is the government just spoke of her

19    being the driving force behind the fraud.  I assume that's

20    going to be much of what's contested during the sentencing

21    hearing in front of the Court, and so I want to take exception

22    to that whenever it is stated, even if it's stated in the

23    context of a forfeiture.

24              I'm also concerned with the manner in which the

25    government chose to ask for this as $5 million, simply by

```
 1    Ms. Kimberley Tew.  I assume, although it's difficult to assume
 2    things, I don't like to do it much, but that that is the amount
 3    that will also be requested of Mr. Tew, and although there is
 4    certainly evidence that I don't need to belabor, there should
 5    be an amount that is attributable to Mr. Yioulos, whatever that
 6    may be, during argument during his sentencing.
 7         So the fact that the government hasn't asked for this
 8    to be joint and several gave me the impression, at least the
 9    statements that just were made, that trailing the comment that
10    she was the driving force behind the fraud and therefore
11    responsible for the $5 million, as if that should be an amount
12    that is attributable to her.
13         Again, I don't want to presume how the government is
14    going to discuss the amount when Mr. Tew in front of the Court,
15    but I take exception to that manner of issuing and order as it
16    relates to restitution.
17         Other than that, rest on the information I provided
18    the Court.
19         THE COURT:  All right.  Thank you, Mr. Kaplan.  And I
20    do think that the government clarified, again, that they won't
21    be seeking forfeiture from both of the Tews in that amount, and
22    obviously then, there's also the interplay with restitution
23    that I do think is requested, or at least recommended to be
24    joint and several among all three of the defendants, and how
25    that plays out is a bit of a complication, and also I take into
```

account your concern with describing her as the driving force.
I don't think that's a necessary part of my analysis of the
forfeiture issue, and I do think we will have time to discuss
that, but I do find that the facts here, as I indicated,
support that the government's position on forfeiture, whether
or not she was the driving force, Ms. Tew was indicted and
convicted of being part of this conspiracy.  The conspiracy
obtained that amount, that amount is proceeds derived from the
criminal activity, and there's no reason to separate out, under
the law, only those transactions that Mrs. Tew was individually
involved in directly, because she, at the very least,
indirectly received some benefit from all of those
transactions, and so I think the government has met its burden
on this, particularly under the *US vs. Channon* case, where the
defendants are married, the money went into one or both of
their accounts.  I think that Mrs. Tew fits the description of
someone who benefit -- who derived these benefits, taking into
account the government's admission that it won't be seeking
double forfeiture, which would be, obviously, problematic.

So I'm going to grant -- I'm going to grant the
Government's Motion For A Preliminary Order Of Forfeiture In
The Amount Of $5,023,878.50.

I think we should at least go ahead and just get
started on the sentencing itself, and maybe after we deal with
objections or something I will take a quick break, but I will

1    just kind of give you, again, try to give you a little bit of

2    an idea of some of my initial consideration.  Mr. Kaplan?

3              MR. KAPLAN:  Your Honor, could I just have one more

4    comment on the forfeiture issue, based on something that you

5    said?

6              THE COURT:  Sure.  Go ahead.

7              MR. KAPLAN:  Will be very brief.  Your Honor, the

8    Court mentioned some issues that involve with forfeiture versus

9    restitution that I recognize also.  I just wanted to point out,

10   in the government's document on forfeiture, it indicated that

11   pursuant to the Attorney General recommendation or a

12   recommendation to the Attorney General, the forfeiture money

13   was going to be provided to the eligible victims, and I would

14   just, in the Court's contemplation of the question of

15   forfeiture and restitution, I think that plays a role in how

16   the government can ask for funds or additional funds from

17   Ms. Tew.

18             THE COURT:  Maybe we should go ahead and have a little

19   discussion of that, because I have gotten myself worked up

20   about restitution and forfeiture before, and it, sort of,

21   bothers me, the idea, at least, under the law that the US can,

22   kind of, decide whether or not to, sort of, double up on and

23   make someone, both, provide full restitution and forfeiture.

24             My understanding, what the government is saying, is

25   that their recommendation will be to not double up; that any

 1     restitution be counted against the forfeiture.  But, Ms. Hurd,

 2     would you make me make sure I understand the position.

 3              MS. HURD:  Yes, Your Honor.  28 CFR Subpart 9 sets

 4     forth that any net proceeds from forfeited funds can be applied

 5     to restitution, restoration, depending on a civil or criminal

 6     case.  We just have the authority to recommend that to the

 7     Attorney General, and his delegees, but generally speaking,

 8     Your Honor, there's some factors that have to be met, most

 9     cases meet those factors.  It's rare when people can pay twice.

10     So really the government is, like, primary goal is to get money

11     back for restitution, and that's just the mechanism.  So we

12     were just telling the Court that we intend to, when we find out

13     proceeds -- or when we find any assets, those net proceeds,

14     once they are sold or whatever else, we would ask that the

15     Attorney General use their discretion to apply those to restore

16     the victim; meaning, provide it to the Clerk of the Court for

17     restitution.  Does that make sense, Your Honor?

18              THE COURT:  It does, as a legal matter.  Again, I

19     have -- it's always seemed to me that if they have to pay

20     restitution, that they no longer have those proceeds to

21     forfeit.  So it's, sort of, seems to me it should be less

22     discretionary on the part of the Attorney General, but I

23     understand that's the law.

24              MS. HURD:  Yeah, Your Honor.  If I could do it in

25     every case, that I have that magic wand, I would.

```
 1   Unfortunately, it's just not the way it's written or the scheme
 2   that its set forth.  So we just follow that procedure,
 3   Your Honor.  I'm always hopeful that we can get money back to
 4   victims that way, as well.
 5            THE COURT:  Okay.
 6            MS. HURD:  Thank you, Your Honor.
 7            THE COURT:  I appreciate the government's
 8   representations that they will seek to do that in this case.
 9            Mr. Kaplan, was that what you were trying to address?
10            MR. KAPLAN:  Yes, it was.  And it was my understanding
11   from the paper, so I wasn't necessarily suggesting that they
12   were trying to do something differently, but when the Court
13   raised it as a legitimate concern, I recognized, and the
14   government obviously recognizes, I was just pointing out that
15   that is my understanding, notwithstanding the requirement that
16   the Attorney General weigh in, but it was my understanding how
17   the government, in this case, was seeking to proceed.
18            THE COURT:  Okay.  Well, thank you.  Now we've got our
19   belt and suspenders on, on that issue, so thank you.
20            So, as I was indicating, I will just give you a little
21   bit of a heads up of my thinking on the sentencing.  To some
22   extent I'm in a similar position on some of these objections.
23   I feel like the government has taken a fairly aggressive
24   approach on enhancements in this case, but for the most part I
25   think I'm, at this point, convinced that they are correct on
```

1    most of them.

2          There are two, and one in particular that I will

3    indicate I question most, one is the aggravating role, the

4    leader or organizer question, and then probably the one I'm

5    most on the fence about is the obstruction of justice

6    enhancement.  The rest, I think the government is on solid

7    legal ground.

8          Why don't -- we can go ahead and begin.  I guess what

9    I would probably want to do on this is begin.  Mr. Kaplan or

10   Ms. Hubbard, are you going to address the objections.  So let

11   me just say what I would like to do first, and say the

12   overarching objection that you have made to sort of the

13   presentence report's quoting from the government's sentencing

14   statement, I understand that general objection and some of the

15   specific objections within it, but I also understand that

16   that's how the process works.  The presentence investigation

17   report is very clear that it's simply reporting what it was

18   given by the government.  I don't take it for anything more,

19   establishing facts beyond that.  I participated in the trial, I

20   understand a lot of the facts.  I take the additional context

21   that's been provided by me -- or by you to me in response into

22   account.  So I don't -- I'm -- I expect I will be overruling,

23   kind of, that general objection, with the understanding that

24   you have provided additional context and I am not simply going

25   to rely on those statements for anything more than just an

 1    understanding of the government's position.

 2         So with that, I think I would like to begin if you

 3    feel the need to add to anything on that, you can do so, and

 4    then let's just, maybe, address whether there are any other

 5    objections that don't affect the guideline range that we still

 6    need to address.

 7         MS. HUBBARD:  Your Honor, just as a general matter, on

 8    that policy, to quote from the government's sentencing

 9    statement, I think oftentimes that's less problematic than it

10    is in this case.  Largely, because often times the government's

11    sentencing statement is written much more factually, than it is

12    in this case.  The vitriol with which the government has

13    approached the sentencing arguments against my client is

14    something that I have never seen before.  I don't understand

15    the basis for it.  So that really causes more concern in this

16    case than would typically be true, and the reason for that,

17    Your Honor, it's not so much for you, because you presided over

18    the trial, you know, we tried to acknowledge most of our

19    sentencing pleadings, that we don't need to re-litigate the

20    facts with you, who is way more familiar with the facts than

21    you usually are at a sentencing, but this document follows

22    Ms. Tew into custody.  It is a document that goes to the bureau

23    of prisons.  It is a document full of adjectives and adverbs

24    that are defamatory and slanderous and just accusatory, and

25    full of vitriol about my client that the bureau of prisons

```
 1    officials don't need to read all of that.

 2            It is easy to prepare a neutral summary of the facts.

 3    The Indictment, quite frankly, in this case, is a speaking

 4    Indictment that is long and in detail about what happened, and

 5    so it's just that whole narrative, that is the government's

 6    argument about why Kimberley Tew is the ringleader and the

 7    driving force, and this master manipulator, who made her poor

 8    powerless husband steal all of this money.  That's the

 9    narrative, that's -- it's just unnecessary for that to follow

10    her into the bureau of prisons.

11            So, you know, that's just my -- I'm off my soapbox,

12    apologies, Your Honor.  I don't think it affects the

13    sentencing.  I don't believe it's going to affect Your Honor's

14    rulings here, but it is, from my perspective, a bigger issue,

15    than just how it plays out in this courtroom, because the

16    intent of the PSR is to provide the bureau of prisons with the

17    information that they need to meet her needs and provide for

18    educational opportunities and health concerns, and that's what

19    a PSIR is intended to do, both to educate the Court, and to

20    make sure she gets her needs met in the bureau of prisons.  So

21    this ten-pages of vitriol for my client just doesn't need to be

22    there.

23            THE COURT:  All right.  I will say, in general, I

24    agree that the sentencing statement probably could have been a

25    little bit more matter of fact, and I appreciate that.  I don't
```

 1    think, in this case, there's anything in there, that I'm

 2    especially concerned would cause problems with the bureau of

 3    prisons, but in general, I understand it.

 4           Are there any other sort of nonguideline objections

 5    that haven't been addressed, that you think we need to rule on?

 6           MS. HUBBARD:  No, nothing specific, Your Honor.

 7           THE COURT:  Okay.  So then I'm going to overrule the

 8    objection, to that extent, and then why don't we turn then to

 9    the objections that do affect the guideline range, and I

10    indicated to you that I was most troubled by, at this point,

11    but it may make sense instead to just go -- not to address

12    those first.

13           Why don't we go ahead and start with 18-level

14    enhancement for the amount of loss.  I think as we, sort of,

15    just discussed, I think you have got a tough legal position to

16    overcome on that but go ahead if you would like.

17           MS. HUBBARD:  Your Honor, I do think there's a

18    distinction between how loss is treated for purpose -- or

19    misuse words.  So, how the amount at issue is treated for

20    purposes of forfeiture and restitution, and how it's treated

21    for purposes of 2B1.1, for sentencing.  And I think, you know,

22    there's a little bit of two sides to the coin, and this is true

23    of many of our sentencing arguments is, you know, sometimes

24    it's actually a misapplication of the guidelines, and other

25    times it's just things we want the Court to consider and in

 1    fashioning an overall sentence, right?  But we wanted to

 2    articulate the same considerations so that you could have them

 3    in mind as you think about, *Do these guidelines apply*?  And if

 4    you say, *Well, the guideline applies*, you have it in mind for

 5    what's an appropriate sentence.  But when you look at loss, you

 6    know, there is -- the law on conspiracy, that I think is

 7    particularly apt in this case, is once you are in a conspiracy,

 8    there are significant steps you have to take to withdraw from a

 9    conspiracy.  We're not contending those were met here, and so,

10    for purposes of whether Kimberley Tew was not guilty of certain

11    aspects of the conspiracy, we didn't present that defense.  But

12    I think that is different than how much is relevant conduct and

13    how much should be attributed to her, for purposes of the loss

14    calculation under 1B -- 2B1.1, in that I don't believe there

15    has to be that same formalistic withdrawal in order to not have

16    the later parts of a conspiracy accounted for.

17          I know in this federal court the conspiracy law often

18    is applied in drug cases, and we're here arguing, you know,

19    there's a conspiracy with 20 kilos, but my guy was only

20    involved with one, and that's how the Court is typically

21    sentencing people.  There has to be some direct involvement,

22    some direct link between the person, who is being sentenced,

23    and the amount of the conspiracy that can be attributed to that

24    person.

25          So the reason I say that this distinction is

```
 1    particularly apt in this case, is because the evidence of
 2    Ms. Tew's involvement in the conspiracy, the people who she was
 3    connected to, the relationships she had, the evidence was much
 4    more... Your Honor, I'm going to struggle a little bit, as I'm
 5    trying to do the best I can to make sure that my client's
 6    appellate rights are fully preserved, as I make all of these
 7    sentencing arguments.  So forgive me if I stumble over some
 8    words.  But I believe the evidence the government presented was
 9    stronger that she had the relationship with Hannah Scaife, who
10    were the first invoices presented, that she had some
11    relationship with Michael Meyers, who was amongst the first,
12    and then there is very slim evidence of any of her direct
13    involvement when the numbers in this case, got huge, right?
14    Because if you look at the amounts of the invoices, at first,
15    they are -- I mean, they are not tiny, but in the scheme of the
16    5 million, I think it's like 3-and-a-half million were stolen
17    at the very end, through the entities, where there's no link to
18    my client at all.  Michael Tew set up those entities.  All of
19    the conversations are between him and John Yioulos.  At that
20    point, the government's evidence against is that she is a
21    nagging wife asking her husband to get money.
22            So when you are talking about this conspiracy, you
23    have somebody who, the evidence is stronger at the beginning
24    and then it falls off, I think for purposes of relevant conduct
25    and purposes of 2B1.1, that needs to be taken into account.
```

1    Her direct involvement with the amounts at issue.

2           We've posed two different alternatives for how the

3    Court could consider the evidence, either the counts of

4    conviction, which I think are the 184,300, or the counts of

5    conviction, plus those early entities, where the evidence was

6    stronger that she had the direct connections to people or she

7    was more directly involved with setting up or facilitating any

8    of those invoices.

9           Once you get to Arrow Maintenance Resources, once you

10   get to... I'm forgetting the other acronyms, but later in the

11   conspiracy, there isn't the evidence of her continued

12   involvement.

13          *THE COURT:*  So let me just ask you, so you talked

14   about relevant conduct, and you talked about, sort of, those

15   specific transactions she was convicted of.  She was also

16   convicted of conspiracy, and the 2B1.1's language just talks

17   about increasing the offense level if the loss from the offense

18   shall she was convicted of, adds up to a certain amount, in

19   this case over three-and-a-half-million dollars.  The

20   conspiracy, as we talked about a little bit, involved over $5

21   million.  She was convicted of conspiracy, why isn't that alone

22   enough?

23          *MS. HUBBARD:*  I think the Court has to make an

24   individualized determination for each defendant, and so, just

25   like when, in a drug case, somebody pleads guilty to the

1    entirety of the conspiracy, you don't look at it and say, *The*
2    *conspiracy was 20 kilos, so you get hit with sentencing for the*
3    *full 20 kilos,* that's the purse of relevant conduct and the
4    purpose of individualized sentencing under the guidelines, is
5    for the Court to look deeper and look at each individual
6    defendant's involvement, because again we are not talking about
7    guilty or not guilty, for purposes of conspiracy law, right?
8    We're talking about what is this individual defendant's role,
9    in the overall scope of the conspiracy?  Because now that we're
10   at sentencing, what happens with Michael Tew or what happens
11   with Jonathan Yioulos is really not at issue.  The Court is
12   here to sentence Kimberley Tew, and so I think that's the
13   distinction, Your Honor, is that sentencing is a time for
14   individualized consideration, and that applies to the loss as
15   well.

16              THE COURT:  Okay.  Thank you.

17              MS. HUBBARD:  Do you want me to tackle all of them
18   while I'm here?

19              THE COURT:  Why don't we let the government respond on
20   that.

21              MS. HUBBARD:  That works.

22              THE COURT:  Thank you.  Mr. Fields?  Thank you,
23   Your Honor.  So two issues, one matter of law, one a matter of
24   fact.  I will start with, sort of, the legal issue.  I agree
25   there does need to be an individualized determination here, but

1    the individualized determination the Court is going to make is

2    what was the scope of the conspiracy for this particular

3    person?  What did they agree to?  Were the steps in furtherance

4    of that conspiracy?  And was it reasonably foreseeable?

5           Defense counsel didn't cite any of that law or apply

6    it or even assess it in what we just heard, that's 1B1.3

7    relevant conduct, and that's the individualized determination

8    here.  So as the government points out in its sentencing

9    papers, there's no disagreement about the scope of the

10   agreement here.  The jury found, beyond a reasonable doubt,

11   that she agreed to execute an essential objective of the

12   conspiracy, which was to defraud National Air Cargo.

13          The second thing, Were these in furtherance?  The

14   Court has already made a finding, by a preponderance of the

15   evidence, that all of the communications in -- well, most of

16   the communications in the *James* log were in furtherance.  Many

17   of those featured Kimberley Tew.  They feature Kimberley Tew in

18   every aspect of the conspiracy with each and every vendor, and

19   so that leaves the individualized determination as to whether

20   or not any of this was reasonably foreseeable to her.  And as

21   the government points out in its sentencing papers, right up

22   until the very end, in June of 2020, she is asking Michael

23   about whether the FBI -- like, *What has John said about the*

24   *FBI's investigation in the National Air Cargo*, and, *Oh by the*

25   *way, when is John going to send it again.  Stick with me.*

1          So as a legal matter, I think the Court has everything

2   it needs to make an individualized determination for Kimberley

3   Tew, under 1B1.3, that three-prong test, and then as a factual

4   matter she was involved in every aspect of this.

5          So I would just say two things, so the -- when defense

6   counsel says that there has to be some direct link, that's just

7   not true, as a matter of law, especially when it comes to

8   conspiracy.  If we're talking about she has to be involved in

9   each and every transaction, it's just not true.  The direct

10  link here is, *Did you agree to be part of the conspiracy*?  So

11  let's use the drug example, right?  You are talking about two

12  people, and one defendant agrees, *Yeah, I'm going to help you*

13  *distribute cocaine from Mexico, here into Denver, Colorado*, and

14  they keep on doing that and the objective of the conspiracy is

15  to distribute cocaine.  It's not a separate part of the

16  conspiracy where like, *I only agreed to provide you with sort*

17  *of you know a car, to actually get you know some bricks of*

18  *cocaine on this one day to cross the border on one day*.  The

19  scope of the agreement might be a little different for that

20  particular defendant, but if you just agreed to help distribute

21  cocaine on the streets of Denver, and, you know, you -- and

22  acts are taken in furtherance of that and it's reasonably

23  foreseeable to you that cocaine is going to be distributed on

24  the streets of Denver, you are liable for all of that cocaine.

25              THE COURT:  Let me ask you to clarify how you think

    1    that example applies.  So I think everyone would agree, if

    2    you're my supplier and we have an agreement that I'm going to

    3    get a certain amount from you and distribute it, we are both

    4    liable for all of that amount, but if you are the higher up in

    5    the organization and you also have an agreement with ten other

    6    people, isn't the question, am I -- you're liable for all of

    7    theirs, but am I also liable for the ten other people's

    8    distribution?  Do you think that I would be liable for

    9    everybody else too, if I'm just one spoke and you are the hub?

   10         MR. FIELDS:  I think the Court would have to make the

   11    finding that that, sort of, was part of the agreement, right.

   12    There were going to be, sort of, other channels, right, and

   13    that is within the scope.  So, you know, if it's a supplier and

   14    a, sort of, I don't know, like basically a wholesaler and

   15    retailer, right, and so the retailer has to understand that

   16    the -- or the wholesaler has to understand the retailer is

   17    going to have sub-vendors, things like that, right?  It's

   18    within the scope.  If there's a finding, if the facts establish

   19    that the wholesaler knew that, agreed to it, and wanted it,

   20    that's all that you need to be in furtherance of the

   21    conspiracy, and that's what we have here, Your Honor.

   22         Kimberley Tew understood what was going on here.

   23    There's communications throughout the conspiracy in which she

   24    is asking Michael Tew to take money from National Air Cargo.  I

   25    don't think there's any doubt as a matter of law and fact that

1   she intended to get the whole amount, and it was reasonably

2   foreseeable.

3          THE COURT:  I agree with you.  I think it's clear that

4   she understood and agreed and was part of the conspiracy to

5   defraud National Air Cargo, and the jury found that, but I

6   don't know that there's evidence, and certainly as the defense

7   points out, the jury didn't find and she was not charged with

8   each particular transaction, and there's not evidence, I think,

9   that would let me say, *I know that she had agreed to each of*

10  *the transactions, that you put evidence on, that add up to the*

11  *$5 million*.  But my understanding is that your position is that

12  it's not necessary to have that, as long as it was reasonably

13  foreseeable and within, kind of, the scope of the basic

14  conspiracy that she did enter into; is that right?

15         MR. FIELDS:  That's right, Your Honor.

16         THE COURT:  Okay.

17         MR. FIELDS:  I have nothing more, Your Honor.

18         THE COURT:  All right.  Thank you.  Yes.  Ms. Hubbard,

19  I will give you a moment, if you want to have, sort of, a bit

20  of rebuttal on this particular issue.

21         MS. HUBBARD:  Your Honor, I think the spoke-and-hub

22  analogy is apt here in that what the government is trying to do

23  is to hold Kimberley Tew responsible for everything that was

24  happening in the middle.  The evidence was very strong at trial

25  of recordings and communications between Michael Tew and

1    Jonathan Yioulos that they were talking about how much money

2    NAC had, talking about how to get that money out of NAC to

3    Michael Tew, and again, as the conspiracy goes on, the evidence

4    becomes that Kimberely's role was to say, *Michael, we need more*

5    *money, get more money, get more money*, and that's not evidence

6    of the same level of direct involvement in the nexus of the

7    conspiracy that exists early.

8          So, Your Honor, I will just stand on our pleadings,

9    unless the Court has further questions on that point?

10         *THE COURT:*  I don't.  I'm going to overrule that

11   objection.  I understand it.  Again, as I discussed in

12   forfeiture, the forfeiture discussion I have some, sort of, at

13   least emotional understanding of how unfair it may seem, but I

14   think on the law the government is correct that Mrs. Tew

15   entered into a conspiracy, took steps in furtherance of that

16   conspiracy, was convicted of doing so by the jury, and while

17   she may not have known the specifics of particular transactions

18   or particular arrangements between her husband and Mr. Yioulos,

19   they were all essentially the same sort of transactions that

20   she did know about and were certainly reasonably foreseeable.

21         So I think under the law that enhancement -- or that

22   section, the 18-point increase, under 2B1.1 has to be a

23   applied.  So that objection is overruled.

24         Why don't you go ahead to the next one.

25         *MS. HUBBARD:*  Is the next one on your list the

 1   sophisticated means?

 2          THE COURT:  Sure.  Sure.

 3          MS. HUBBARD:  Just trying to follow your organization,

 4   Your Honor.  If you want me to go in a different order, just

 5   say so.  I think I'm just following the list.

 6          You know, our primary argument as to sophisticated

 7   means, again, touches on the fact that the Court, at the time

 8   of sentencing, has to make an individualized determination.  I

 9   am not here arguing that the scheme, overall, doesn't have

10   sophisticated means, given the number of companies, Michael Tew

11   setting up an LLC in another state, all of the things that the

12   PSR points out, about invoices not being consecutively

13   numbered.

14          The Court heard testimony and saw communications

15   between John Yioulos and Michael Tew where they are talking

16   about, *What should I use as the description on this invoice*,

17   *so, that we're not raising suspicion inside NAC*?  I'm not here

18   arguing that none of that happened.  What I'm here to point

19   out, Your Honor, is that none of it involved Kimberley Tew, and

20   the sophisticated means enhancement, Application Note 10(C) to

21   2B1.1 is very specific on this issue.  It says, *If the offense

22   otherwise involved sophisticated means and this defendant,*

23   Kimberley Tew, *intentionally engaged in those sophisticated

24   means, or caused those sophisticated means to be used*, that's

25   where the evidence falls short.  There's not evidence that

1   Kimberley Tew engaged in the sophisticated means.  There's not

2   evidence that she made the invoices.  There's not evidence that

3   she was involved in those conversations about what should be on

4   the invoices.  There's not evidence that she was responsible

5   for sending them, receiving them, any of that.  That's all

6   John Yioulos and Michael Tew.

7         So again, because we are at sentencing, the issue is

8   not whether it was sophisticated means, the issue is whether

9   this specific enhancement should apply to Kimberley Tew, and

10  whether Kimberley Tew's guideline range should go up by two

11  points?  And I think under the facts of the case and the law as

12  applied to this enhancement, there just isn't the evidence

13  necessary here for that enhancement to apply.

14        THE COURT:  I think there's certainly evidence

15  sufficient to find, by a preponderance of the evidence, that

16  Mrs. Tew, at least at some point, knew of the basics, that fake

17  companies and fake invoices were being used to carry out the

18  scheme.  Is that not enough?  And that she encouraged it, and

19  if only by saying *We need more money*, caused some of those

20  false invoices to be submitted?

21        MS. HUBBARD:  I think if the issue was, *Did she cause*

22  *the fraud itself to occur*, that would be a different issue.

23  But the issue here is *Did she cause the specific sophisticated*

24  *means to occur here*?  And so, I'm not aware of any evidence

25  that she said, *Michael, go set up an LLC in Wyoming.  Make sure*

1    *it's something in the aerospace industry.  Talk to John about*

2    *what we should put on the invoices, to make sure we're not*

3    *raising anybody's suspicion at NAC*.  She is not doing that.

4    Like, I think what you are talking about, as far as was she

5    potentially causing -- is *Michael get money*, is that causing

6    Michael to then potentially go to John and say, *We need money*?

7    Maybe.  But it's not causing Michael to say, *Okay, now, I have*

8    *got to do the LLC*.  That's all Michael's doing; that's

9    Michael's doing, in conversation with John Yioulos; that's John

10   Yioulos saying, *Hey, Michael, I don't think I can send more*

11   *money to Political Media because that is not a legitimate*

12   *expense for NAC*.  *There's only so much I can send to a*

13   *marketing company without raising suspicions*, and then Michael

14   saying, *Let's start using another company*.  That's all

15   happening between the two of them.  So that's not Kimberley Tew

16   causing the sophisticated means to occur, if that makes sense.

17           *THE COURT:*  I understand the argument, yes.

18   Mr. Fields.

19           *MR. FIELDS:*  Thank you, Your Honor.  I'm going to

20   bracket the invoice issue for a second.  So I'm going to focus

21   on all of the other sophisticated means that are in paragraph

22   80 of the PSR.  So this would include using other's

23   identifiers, creating fake email accounts, recruiting others to

24   be use, sort of, sham account holders, using cryptocurrencies,

25   and all of the cases that the government cites, in its

 1    sentencing statement, on pages 35 through 38, none of those are

 2    addressed by the defendant in any of their responses.  None of

 3    them were addressed now.  The defendant concedes, in the

 4    response, that the cases cited therein, say those sorts of

 5    things are sophisticated means.  So the government's first

 6    argument here would be that they have waived any argument that

 7    all of those means, in paragraph 80, are sophisticated.

 8    There's no doubt that they are and there's no doubt that the

 9    defendant individually did that.

10         So you recall the testimony at trial from Hannah

11    Scaife, that Kimberley Tew reached out to her, to specifically

12    used her bank account, so that they could launder money that

13    was being taken from National Air Cargo.  You will also recall

14    the testimony of Michael Meyers at trial, who testified really

15    extensively about his online relationship with Kimberley Tew

16    and how she convinced him to let her use his bank account to

17    again launder money that was being taken from National Air

18    Cargo.  The Court will also recall all of the photographs of

19    Kimberley Tew standing in front of Bitcoin ATMs.  Also recall

20    the substantial bank records, where money would come from

21    National Air Cargo into the accounts, and then be immediately

22    transferred to Kimberley Tew, frequently, and then from there,

23    into various cryptocurrency exchanges, Gemini, Kraken, et

24    cetera.  All of those are sophisticated means.

25         If we are going to look at the use of the shell

companies themselves, the issue isn't, *Did she set it up*?  The
issue is, *Did she engage in the sophisticated means?  Did she
use it and did she cause it to be used*?  And the defendant's
statements that there's no evidence is a wild overstatement,
Your Honor.

If you look at Government's Exhibit 295, this was a
text message -- sorry this is *James* log entry 295.  So
Government's Exhibit 895.  *Hahn, there's only 919 left in
Global Fuel, because all of the Wynn stuff hit*.  And Kimberley
Tew responds, *Okay, so hold off on depositing at Sand Hill*.  Or
Government's Exhibit 902, *What's the email for PayPal linked to
Sand Hill*.  Again, one of the sham companies used.  Michael Tew
responds, *M2@globalfuel.co*.  Another exhibit, Government's
Exhibit 932, Kimberley Tew asking, *How much did you withdraw
from Global*?  Government's Exhibit 914, *If it works for Global
Fuel deposit cash into Sand Hill*.  And then Government's
Exhibit 962, *How much money are you showing*, Kimberley asked
Michael.  The response, *55.5 plus the 93 John sent in Global
Fuel*.

She is asking about these shell companies.  She knows
that they are being used.  She is encouraging Michael Tew to
use them.  It's just factually incorrect to say that she did
not -- wasn't aware of the sophisticated means.

When it comes to the invoices, Your Honor, there was
testimony at trial that Kimberley Tew had submitted her own

1    invoices to National Air Cargo.  Government submitted those

2    invoices at trial.  If you look at Government's Exhibit 986,

3    it's one of those invoices that Kimberley Tew submitted.  If

4    you look at Government's Exhibit 543, Michael Meyers' invoice,

5    they look remarkably similar.  There's evidence that Kimberley

6    Tew used the Michael Meyers' email account.  She admitted as

7    such in her replies, the government notes, in that Motion To

8    Suppress, but there's also independent evidence, including all

9    of the Google records, the shipments of clothing to her house.

10   So she is using someone else's email account and there's

11   independent evidence, and it's a fair inference, that she is

12   the one who submitted those invoices.  And you add, on top of

13   that, Your Honor, all of the evidence recounted in the

14   government's sentencing statement and its objections as to her

15   conversations with Michael Tew, specifically about invoicing.

16   Or her conversations with Jonathan Yioulos, where Yioulos would

17   ask her for an invoice.  *I need an invoice from Scaife*, right?

18   These are those, sort of, one-sided conversations, we don't

19   know what she says, but we certainly know that an invoice was

20   submitted for Hannah Scaife, because Yioulos testified about

21   it, and Abby Schwarts talked about the invoices that were in

22   National Air Cargo's books.  So again, it's a fair inference

23   that she caused -- she engaged in the sophisticated means and

24   caused it to be used.

25            The jury's findings here really leave no doubt that

1    sophisticated means were used, and the Court has already found,

2    by a preponderance of the evidence, that many of these entries

3    in the *James* log were in furtherance of the conspiracy, and if

4    you look at those cases, they are sophisticated means.

5           So for all of those reasons, the government would say

6    that the enhancement applies.

7           THE COURT:  All right.  Thank you.  Ms. Hubbard, would

8    you like a brief rebuttal?

9           MS. HUBBARD:  Since I have to stand up here anyway for

10   the next issue, I might as well.

11          Your Honor, just briefly, to point out that my

12   understanding of the sophisticated means is that it was

13   applying to the wire fraud counts, and so I think this

14   reference to the use of cryptocurrency and structuring

15   transactions, that appears in paragraph 80 of the PSIR, isn't

16   applicable.

17          I would also urge the Court, given that it's 2024, I

18   think it would be an overstatement to say that just because

19   somebody uses cryptocurrency that makes it sophisticated.  It

20   is becoming an evermore present part of our society.

21          So, just wanted to make those couple of points and

22   stand on the preexisting record.

23          THE COURT:  Okay.  I understand that argument and I do

24   think that, at least for some of these transactions, it's not

25   clear that Mrs. Tew participated, but I think that the

1    enhancement still applies, even if it was only a limited amount

2    that she was involved in the use of sophisticated means.  I do

3    think that she, at least, caused and participated in their use,

4    as Mr. Fields explained, both -- I guess on both ends of the

5    transactions, encouraging the use of, she clearly understood

6    the use of shell corporations and the different corporations

7    and invoices.  I think the use of Mr. Meyers' and Ms. Scaife's

8    information.  There's at least evidence I think with -- I think

9    it's probably stronger, my recollection, as to Michael Meyers,

10   that Mrs. Tew was a driving force in that aspect of it, using

11   other's bank accounts, and that that is sufficient.

12          The cryptocurrency, I think you are right, it's

13   becoming more commonplace, but I don't think that means it's

14   not a sophisticated means.  I don't -- I think that taking

15   money out of a -- that may have been criminally derived and

16   immediately or very quickly turning it into cryptocurrency is

17   an effort to hide the money through the use of very

18   sophisticated technology, even if it's relatively commonplace.

19   So I'm going to overrule that objection.

20          Go ahead, Ms. Hubbard.

21          MS. HUBBARD:  I believe the next one in the PSIR is

22   leader organizer enhancement.  Your Honor, I would note, I

23   think one of the important distinctions here is that the wire

24   fraud counts have three defendants, the money laundering counts

25   have two.  And the reason I think that matters is when you are

1    talking about the leader/organizer enhancement the key -- the

2    key aspect that the Court is supposed to look at is relative

3    culpability.  There's all of these terms, leader, organizer,

4    control, all of that appears in the case law.  But the key,

5    kind of, policy reason for this enhancement is if one member of

6    the conspiracy is more relatively culpable than the other one,

7    they should be assigned this enhancement, and this is not an

8    enhancement -- I understand the case law that the government

9    cited, where more than one person can be a leader/organizer,

10   and sure that's absolutely true, there often is conspiracies of

11   10, 20, people, and there's multiple people who are heads of

12   that conspiracy, but that's not what we have here.

13         What we have here is a two-person conspiracy, between

14   a husband and a wife, and, Your Honor, I would call the Court's

15   attention to the government's own motion, their Preliminary

16   Order For Forfeiture, **ECF Number 513**, on page seven, the

17   government says, *Michael and Kimberley Tew were equally*

18   *culpable in the conspiracy that obtained 5 million plus from*

19   *the victim company for their benefit.  Based on their joint*

20   *conduct, joint use of proceeds, and joint responsibility,*

21   *government seeks forfeiture*.

22         That's the issue here.  If there's two people in a

23   conspiracy, and the evidence is that they are equally culpable,

24   then the leader/organizer enhancement simply doesn't apply.

25   This is not one that just gets applied in every case.  It's

1  intended to apply when there's truly somebody who has increased

2  culpability, right?  We could, and as the Court has seen in

3  other conspiracy cases, I'm going to default to drug cases

4  because I feel like that's just what we have so many of in this

5  district, but the guidelines are driven by amount of drugs.

6  Guidelines here are driven by amount of loss.  Guidelines are

7  driven by sophisticated means.

8        The Court has said there's sophisticated means in this

9  case that apply to all of the defendants.  So when you look at

10  the Chapter 2 enhancements, in the Sentencing Guidelines, those

11  are, kind of, what is in the whole conspiracy.  What's the

12  action at issue in the whole conspiracy?  This enhancement is

13  Chapter 3.  Chapter 3 is really intended to distinguish between

14  people who have different roles in a conspiracy case, and in

15  this case, this enhancement applies to money laundering.  The

16  proof at trial was on the money laundering that Kimberley Tew

17  and Michael Tew were equally as involved.

18        There were countless pictures of Michael Tew at the

19  Bitcoin ATMs.  There was a handful of Kimberley Tew.  The bank

20  witnesses that came in and testified, had a number of

21  interaction with his Michael Tew.  They remember him asking all

22  kinds of questions about, *What are your withdrawal limits*?  He

23  wanted to know about the bank's policies for how he can access

24  money.  They presented pictures of him going into the lobby,

25  and then driving through the drive through to get more money,

1   right?  Those are all evidence of what Michael Tew was doing

2   with respect to the laundering.  There was one time that the

3   bank teller remembered Kimberley Tew coming and making a

4   withdrawal.  One time.

5        Now, I'm not here to argue that Kimberley Tew was less

6   involved than Michael Tew.  I'm aware of all of the

7   communications between the two of them, about what money is in

8   what account.  How money should be transferred from here to

9   there and moved around.  All -- honestly, Your Honor, none of

10  that is shocking, given that this is a married couple.  A

11  married couple where there are not two separate sources of

12  income.  It's a married couple where one of the two of them has

13  always made the money, since the kids were born at least, and

14  the other one has taken care of the kids and not brought in

15  their own on independent income.

16       These communications about where the bank balances are

17  and where the money lives and how it should be transferred

18  between accounts are not surprising.  They don't make Kimberely

19  the organizer/leader of a money laundering conspiracy anymore

20  than I would be for my husband when I tell him where to pay the

21  pills -- honestly, I just pay the bills, but one of the two

22  people in a relationship takes on that role, and that doesn't

23  make Kimberley Tew the organizer/leader over Michael Tew for

24  the money laundering.

25           THE COURT:  I agree with you, sort of, as a factual,

1    your factual description of how relationships work and just

2    reading, for example, Application Note 2, to this, I would

3    think you are on very strong ground, but the government points

4    to binding Tenth Circuit precedent, the *Valdez-Arieta* case,

5    that says exactly, that a defendant can organize illegal

6    activity without exercising control over the other

7    participants, and that there can be an organizer enhancement

8    under Subsection C, which is specifically for small

9    conspiracies, small criminal enterprises, and even if they are,

10   sort of, co-organizer, without one of them being the other

11   one's supervisor, why doesn't that defeat your argument?

12          *MS. HUBBARD:* Because, again, Your Honor, I would go

13   back to the whole purpose of this 2S1.1, is relative

14   culpability, and so when there are only two people, if they are

15   equally culpable, the application doesn't apply to either of

16   them, and I understand that case law, as far as defining the

17   term *control*, and that you do not need to have control in order

18   for the enhancement to apply, that's how I read the case, is

19   you don't need to have proof of control.

20          But here we're talking about two people, equally

21   culpable, and... I lost my train of thought.  Sorry,

22   Your Honor.  Equally culpable for the money laundering, the

23   enhancement shouldn't apply to either of them.

24          The other issue, I think, is when you are applying

25   this enhancement to maybe a different kind of conspiracy, where

1    there was a different aspects of it, that different people

2    could be in charge of, perhaps you could have two people who

3    are both leader/organizer of different aspects of it, but

4    that's not the proof in this case with respect to money

5    laundering.

6           My understanding of the money laundering is it's

7    moving the money to a different account, once it has been

8    transferred to the Tews, spending of proceeds.  And so the

9    money laundering, itself, is taking the money from what had

10   been transferred from NAC into the Tews account and moving it

11   to a different account, and this isn't where, for purposes of

12   the money laundering, Michael Tew could be responsible for part

13   of it and Kimberley Tew be responsible for some other aspect.

14   Like, I keep going back to drugs, and I apologize for that, but

15   perhaps, if there was a conspiracy where one person had the

16   connection in Mexico, they are the leader/organizer for how it

17   gets into the United States, right?  Maybe they are a

18   leader/organizer of the importation into the United States.

19   There's another person who is leader/organizer of the

20   distribution ring here in Denver.  I could see, kind of,

21   scenarios and different factual situations, where you are

22   talking about both people could be leader/organizer even in an

23   only two-person conspiracy, but this isn't -- this is a much

24   simpler case when you look at what is actually charged as money

25   laundering.  It's just the moving of the funds.

1          THE COURT:  But it's a three-person conspiracy, right?

2     Not as to the money laundering, but as to the overall

3     conspiracy, right?  The enhancement is -- I guess my question,

4     couldn't both of the Tews have been leaders and organizers for

5     this enhancement?

6          MS. HUBBARD:  So my understanding is that in the

7     guidelines, and I can find the cite when I sit down, but that

8     there's a specific provision that says, *If the defendant is*

9     *charged with money laundering, that leader/organizer should be*

10    *determined based on money laundering.*  So that's why I think

11    the Court's focus here should be on the money laundering

12    conspiracy, that conspiracy has two defendants, that

13    conspiracy, we're talking about money laundering, it's the

14    moving of the funds, once it touches the Tews' account into

15    another account.  That's where I think there's no evidence that

16    one of the Tews was a leader/organizer over the other.  There

17    was conversations.  They talked to each other about how to move

18    the money, where to move the money, when to move the money.

19    There's Michael Tew going to move the money.  Kimberley Tew

20    doing so, less so.  But there's not somebody who is markedly

21    more culpable than the other one as to the money laundering

22    conspiracy.

23         THE COURT:  Okay.  Why don't I let the government

24    respond.  Thank you.

25         MR. FIELDS:  Thank you, Your Honor.  It's always nice

1    when there are at least some points of agreement.  I agree with

2    Ms. Hubbard the focus needs to be on the money laundering.

3    Where we disagree is the notion that this needs to be focused

4    on a conspiracy.  The enhancement actually talks about

5    participants.  They don't need to be co-conspirators.  In fact,

6    the part of the enhancement that we're talking about, 3B1.1(c),

7    specifically refers to criminal activity.

8            As the government pointed out in its response, and has

9    gone unrebutted now, just like it went unrebutted before, the

10   defendants are completely ignoring the testimony of

11   Michael Meyers.  Kimberley Tew actively recruited him to be

12   part of the money laundering, to use his accounts to transfer

13   money from National Air Cargo, and he testified that he knew

14   something shady was going on, but he agreed to do it anyway.

15   He is a participant in the criminal activity, one -- Kimberley

16   Tew organized that entire part of the fraud.  So when we're

17   talking about, sort of, *Are they both, sort of, culpable?*

18   *Equally culpable*?  Yes.  *Did they organize different parts of*

19   *the money laundering conspiracy?*  Absolutely.  Kimberley Tew

20   was responsible for organizing things like that.  She organized

21   it regarding Michael Meyers.  She also organized with regard to

22   Christain Rincon.

23           If you look at Government's Exhibit 659, that's

24   another example of Kimberley Tew talking -- this is Michael Tew

25   actually saying, *Kimberley knows more about why you are sending*

         1    *all of this money to Christain Rincon*, who was one of Kimberley

         2    Tew's, again, online buddies, very similar situated to

         3    Michael Meyers.  Ignoring all of that, it's a waiver, and that

         4    by itself is enough to constitute leader/organizer, but there's

         5    more, Your Honor.  It also ignores evidence that the defendant

         6    organized the money laundering conspiracy by using her mother's

         7    identifiers, her bank accounts, organizing that entire aspect

         8    of the scheme.

         9          There's also plenty of evidence, as the government

        10    points out, and has again gone unrebutted, that the defendant

        11    was the one organizing and directing Michael Tew to make

        12    particular transactions.  So, *It needs to go into this*

        13    *particular account.  It needs to be this particular amount.  I*

        14    *want you to put it into this particular cryptocurrency*

        15    *exchange*.

        16          The government cites numerous entries from the *James*

        17    log, which again the Court has already found, by a

        18    preponderance of the evidence, were in furtherance of the

        19    conspiracy.  All of those are part of her organizing the

        20    conspiracy.

        21          Also want to say that the defendant -- defense counsel

        22    didn't distinguish, in any meaningful legal way, *United States*

        23    *vs. Valdez-Arieta*.  The response that I heard was to go back

        24    and look at the, you know, policy issues and the guidelines,

        25    but presumably the Tenth Circuit already did that, and the

1    Tenth Circuit has decided, as a matter of law, that there could

2    be two organizers, even in a simple scheme like this, and that

3    3B1.1(c) can apply in these circumstances.

4            So I think the law is very clear regarding who can be

5    an organizer, and the facts are also clear that Kimberley Tew

6    was organizing this.

7            Another example that the Court can look at, it's one

8    of the summary charts, chart 1025, one of the money laundering

9    counts, and if you look there it cites to Government's Exhibit

10   931, with Kimberley Tew giving very specific instructions, *Go

11   to Wells Fargo*, *in this particular amount*.  All of that is part

12   of the organization of the money laundering, which was about

13   taking these proceeds from National Air Cargo and then using

14   the banking system to disburse them as quickly as possible, as

15   efficiently as possible, to the defendant's benefit, that makes

16   her an organizer and this enhancement should apply.

17           *THE COURT:*  Thank you, Mr. Fields.

18           *MS. HUBBARD:*  Your Honor, I was looking more closely

19   at the *Valdez-Arieta* case.  It looks like that is a drug case

20   where there was two people indicted, who are, essentially, the

21   hubs, and the government, for a change, chose not to indict all

22   of the spokes or all of the people on the outside.  And so

23   while there was only two defendants, in that case, it's very

24   clear to me, based on the facts set forth in the case, that the

25   conspiracy, overall, was significantly bigger than two people.

```
 1    And again, when you are talking here, I understand the
 2    government wants to talk about Kimberley's mother, who I'm not
 3    aware there's any evidence that money went into her account,
 4    now trickled down, ten, fifteen transactions later, I
 5    understand there's some evidence Kimberley had access to
 6    accounts in her name, but the money laundering, itself, is
 7    moving the money from the account it goes to into another one,
 8    and I am not aware of any evidence that Kimberley's mom's
 9    account was involved with that or that Kimberley's mom was
10    involved in anyway.
11         THE COURT:  Money laundering can involve multiple
12    transactions, right?  It's not just the initial transfer from
13    their account to something else, right?  You can money launder
14    things through multiple transactions, I think.
15         MS. HUBBARD:  I think that's true under different
16    theories of money laundering, but this one in particular I
17    think it spending.  So I believe the money laundering has
18    occurred when the money moves.  That's my understanding.  Not
19    my specialty area of law.
20         But as to Michael Meyers there was evidence of both
21    Michael and Kimberley being involved with Michael Meyers.  Now
22    certainly there was evidence that Kimberley had a relationship
23    with Michael Meyers, but Michael Meyers testified to driving
24    and meeting Michael Tew, to actually do the financial
25    transaction itself.  So when you are talking about, again,
```

     1    money laundering, the moving of the money, taking the money out

     2    of one person's account, depositing it somewhere else, there

     3    was evidence that Michael Tew was equally as involved with

     4    Michael Meyers as Kimberley Tew was.  So again, that doesn't

     5    put Kimberley higher or an organizer over Michael Tew with

     6    respect to Michael Meyers.  It puts her involved with money

     7    laundering perhaps in Michael Meyers, but not more so than

     8    Michael Tew, and when you look at the Section 3 enhancement

     9    here, it is again the relative culpability.

    10        *Valdez-Arieta* says, *Sure, you don't have to have*

    11    *control over another person, for the enhancement to apply*, but

    12    there's it does not say that you don't need to have *more*

    13    *culpability than other people who are involved*.  The

    14    enhancement only applies if you are *more culpable* than other

    15    people in the conspiracy and that's where I think the proof

    16    falls short.

    17        THE COURT:  All right.  Thank you.  So I'm -- as I

    18    indicated this one is, I think, a fairly close call, for me.  I

    19    actually think, though, that probably the evidence of

    20    Mrs. Tew's role as an organizer, at least, or leader is

    21    probably stronger on the money laundering side than on the wire

    22    fraud side.

    23        As we talked about, I think her relationship with

    24    Mr. Meyers, in particular, suggests this, sort of, leadership

    25    of another less culpable individual, that I think we all agree

  1   is at least suggested in *Valdez-Arieta*.  I think the other --

  2   use of the other bank accounts is troubling, and the use -- and

  3   it was clear to me, that, I think, from the evidence that

  4   Mrs. Tew was the one driving the withdrawals, purchases of

  5   cryptocurrency, that were, sort of, the key to the money

  6   laundering, and so I do think on the -- I'm going to overrule

  7   this objection.  Like I said, I think it's kind of a close

  8   case, and I will take into account that fact at sentencing, as

  9   part of my consideration of the Motion For A Variant Sentence,

 10   but I am going to overrule it as an objection.  I do think as a

 11   legal matter that that enhancement is properly applied, at

 12   least under *Valdez-Arieta*.

 13        Ms. Hubbard, I think that also, I think, sort of,

 14   obviates the possibility of the two-level reduction for

 15   zero-point offenders.  I will tell you, I definitely will still

 16   consider the criminal history and lack of any criminal history

 17   as part of my sentencing decision, but I don't think I can

 18   apply that reduction, and so I think, if I'm not mistaken,

 19   there's one more objection.

 20        *MS. HUBBARD:*  Just the obstruction?

 21        *THE COURT:*  Yeah.

 22        *MS. HUBBARD:*  Yeah.  I agree with, Your Honor, as a

 23   matter of law, as I read the zero-point offender, it cannot be

 24   applied to Ms. Tew if the Court finds leader/organizer.

 25        On the obstruction, Your Honor, I feel like we've

 1   briefed it.  I'm not -- the government keeps faulting us for

 2   not addressing every aspect of every point raised, and I have,

 3   quite frankly, never filed objections even close to as long as

 4   I did in this case.  So with the obstruction, there is one area

 5   in particular that I feel like has been quite a moving target

 6   for us to try to address what the alleged obstruction is, in

 7   this case.

 8          If the Court wants to point me to where your thinking,

 9   I'm happy to direct my comments in that way.

10          THE COURT:  Yeah.  Thank you.  Let me just tell you.

11   So, I'm not impressed by the government's position that

12   convincing someone not to stop cooperating with the government

13   is obstruction of justice, and I'm, frankly, surprised that

14   they pressed that position without more.  So I will say, I

15   don't see any evidence that what happened with Mr. Tew amounts

16   to obstruction of justice.

17          I have a bit of concern about what happened with

18   Ms. Scaife, who did testify that there was some sort of threat

19   to reveal embarrassing information, so that concerns me a bit.

20   I did look back at the transcript of her testimony, and at

21   the -- those look like text messages to me, but maybe they are

22   the Instagram message that was referenced in her testimony.  To

23   me it's a bit of a stretch to call that a threat, and maybe in

24   some context it could be.  So that's where I am on that.

25          The deletion of text messages is probably more

1    problematic.  I'm not sure what to make of taking contradictory

2    positions.  I think those are all of the justifications, but

3    you know, if you want to address particularly though three,

4    Ms. Scaife, the deletion of text messages, maybe with knowledge

5    that there was an investigation going on, and then the

6    contradictory positions.  Those are, I think, worth your time.

7            *MS. HUBBARD:*  Okay.  Thank you, Your Honor.  With

8    respect to Ms. Scaife, quite frankly, I don't think that

9    happened.  If it happened, I don't think there's any proof that

10    Hannah Scaife's memory is reliable as to when.  We submitted

11    the messages between Ms. Scaife and my client.  I honestly

12    don't know whether they are text messages or Instagram or

13    something else, but -- and Ms. Scaife was wrong on the timing

14    of the other messages that she testified about.  She testified

15    that Kimberley Tew had sent, you know, pictures from their

16    prior friendship, which she felt like was manipulative.  The

17    timing with which she testified to, that those messages had

18    been sent was wrong, when you look at the messages themselves.

19    And the timing on this matters, Your Honor, because I think

20    that's what the government is saying is allegedly

21    obstructionist, is the timing of this message that was

22    supposedly sent with which there is no proof the message

23    actually was sent, other than Ms. Scaife's own words.

24            My sense was that, you know, obviously, the Court

25    heard the testimony, this was a tumultuous relationship,

1    perhaps not a healthy friendship.  I don't see anything that's

2    obstruction.  I certainly don't see anything that the

3    government has met its burden that the timing of any messages

4    that may or may not have been sent was intended to somehow

5    affect this investigation.  I just don't think that the proof

6    is there.

7         THE COURT:  Okay.

8         MS. HUBBARD:  On the deletion of data, right, we have

9    the recording, where Kimberley, with two 6-year olds in tow,

10   runs down and sees her husband and freaks out, right?  And

11   makes comments, I can't remember exactly what it was but*, I*

12   *have already wiped most of it anyway.*

13        There is no proof, and it is the government's burden

14   here, to establish the facts necessary to apply any

15   enhancement.  There's no proof as to when that wiping would

16   have occurred.  They say she made the statement, and then later

17   we got data that shows some messages were supposedly missing,

18   that, you know, the government couldn't find, supposedly, the

19   one-sided messages.

20        It's curious to me that Ms. Tew would have wiped data

21   and left 7,000 pages of messages with her husband, where they

22   talk about all of the transactions, in this case, needing

23   money, getting money, all of that.  I just don't think there's

24   any evidence for the obstruction enhancement to apply.  The

25   deletion of data has to be intended to interfere with the

```
 1   investigation.  I don't think that there's proof of that in
 2   this case.  Even if there was some deletion of data, there's no
 3   proof as to when that deletion of data may have occurred or
 4   that it was after Kimberley Tew knew about the investigation in
 5   this case.
 6           As the Court remembers, the government kind of
 7   happened upon all of this and then went and talked to John
 8   Yioulos, in New York, and did the call with Michael Tew that
 9   was recorded, and then the Tews had no idea that this
10   investigation was happening until Michael was arrested, and
11   this meeting happened within days of that.
12           So we're not talking about a long timeframe here.
13   We're talking about a very short window.  So I just don't think
14   there's the proof necessary for the Court to find that
15   Kimberley Tew, if there was any data deleted, which I'm not
16   sure there's really any proof of that, given all of the data
17   that the Court has seen, all of which came from Ms. Tew's
18   iPhone account, all of those text messages that were presented
19   at trial, all of it came from Mrs. Tew's iCloud account.  I
20   don't know how you wipe one string of text messages and oh, and
21   when you do so, there's only one -- you only wipe one-half of
22   the text messages?  I just think the proof is very lacking
23   here.
24           And then what was the last one the Court wanted me to
25   address?
```

1        THE COURT:  Oh, taking contradictory sort of factual

2   positions about her use of a particular account.

3        MS. HUBBARD:  Your Honor, I think that that should be

4   attributed to Ms. Tew's counsel, not Ms. Tew herself.  There's

5   a number of things that I think are in the government's

6   sentencing pleadings, including the supposed treatment of

7   witnesses at trial.  My Cross-examination of Hannah Scaife is

8   one of them that is being thrown at Kimberley Tew as a reason

9   the Court should hammer her with a sentence.  That was my

10  strategic decision.  Ms. Tew actually did not approve and did

11  not encourage that Cross-examination.

12        The government was offered -- I won't go into all of

13  the details.  That was unfortunate that Ms. Scaife had to go

14  through that, because the government felt like they needed to

15  subpoena her, put her on the stand, and ask her to defame my

16  client's character.  That decision, that I made, shouldn't be

17  held against my client, and I would say the same is true for

18  any contradictory statements that may have been at different

19  points in the case, when she had different counsel.  If we

20  didn't realize a different position had been taken earlier in

21  the case, I don't think that should be attributed to Mrs. Tew.

22        THE COURT:  Okay.  Thank you.  Mr. Fields.

23        MR. FIELDS:  Thank you, Your Honor.  With the Court's

24  indulgence, I'm going to start with Michael Tew, and I

25  recognize how the Court has foreshadowed its ruling and its

current thoughts and I appreciate that, but just for purposes

of the record I want to note the cases that are cited on page

42 and 43 of the government's sentencing filing, at **ECF 459**

United States vs. Hesser, which is an 11th Circuit case, kind

of specifically on point, where a husband tries to convince

another family member not to cooperate --

THE COURT:  Yeah, but in that case the husband said he

will know *whose head to lop off* if they cooperate, that doesn't

seem like -- is there evidence -- I mean, the enhancement

applies to what seems to me to be unlawful witness tampering,

threatening, intimidating, otherwise unlawfully influencing a

codefendant.  Where is that?  Where is the unlawfulness?

MR. FIELDS:  So it doesn't need to be unlawful,

Your Honor.  The statute is *corruptly persuades*, and I would

say going to the Yeti store and haranguing your husband not to

cooperate, and pleading with him and sort of emotionally

manipulating him is enough.

Tampering with a witness is definitely obstruction.  I

don't take the Court to be taking a position that it, sort of,

categorically can never be obstruction.  In mob cases, in New

York and Brooklyn, it was applied all the time.  You can see

why.  You can imagine, members of the mob, close family, sort

of, persuading one another, maybe not using real threats, just

sort of corruptly persuading, *Hey, you might not want to*

*testify against someone*.

1    You also have the *Pofahl* case, which is a Fifth

2    Circuit case, that one did not involve a threat, as far as I

3    can tell, that was just a letter, a husband writing a letter --

4    or a wife writing a letter, just imploring him not to provide

5    information to the authorities, that was considered enough for

6    the enhancement.

7    *THE COURT:* Well, I don't think that's accurate

8    either. I think the Fifth Circuit said that there was

9    additional evidence that supported the enhancement beyond just

10   that. And I agree with you, I wouldn't certainly say it never

11   can apply, but I do think the government to apply -- to hold

12   someone liable for obstruction of justice for encouraging them

13   or convincing them to do something that they have the right to

14   do, whether it was good advice in this case or not. I mean it

15   seems, to me, to have been a bad decision, ultimately, for

16   everybody involved. But attorneys convince people not to

17   cooperate with the government all the time. People tell their

18   friends, don't consent to searches, that's not obstruction of

19   justice.

20   *MR. FIELDS:* No, Your Honor. It would need to be

21   *corruptly persuading*. In this particular case what would

22   distinguish it from those other scenarios, I leave aside the

23   attorney scenario, which I think is sui generis. You have a

24   case where charges have already been brought. It was very

25   clear, and he was cooperating, that was also very clear. So we

1    have this direct link to an investigation, and Kimberley Tew,

2    very specifically, trying to corruptly persuade her husband not

3    to give the phone, that's going to have evidence of all of the

4    incriminating messages, to the authorities.  She corruptly

5    persuaded him.  We have evidence of that in Government's

6    Exhibit 551, and I think that would be enough for a charge of

7    witness tampering that could have been found by a jury.  It

8    certainly more likely than not, as we sit here today.  But I

9    understand the Court's position, so I'm going to move on to the

10   three other aspects of the obstructive conduct.

11        THE COURT:  Yeah.  I think we just disagree about the

12   adverb.  I think it may have been *unwisely or foolishly*

13   *persuaded him*, but I don't think it was *corruptly* as it's used

14   in the statute.  So go on to the others.

15        MR. FIELDS:  Your Honor, I will start with the data

16   deletion.  So with regard to the data deletion, it shouldn't be

17   a surprise, at all, that only certain messages were missing,

18   but there were thousands of other messages, and the reason it

19   shouldn't be surprising, at all, is if the Court will recall

20   that the testimony at trial was that Kimberley Tew -- that the

21   Michael Tew and Kimberley Tew iCloud accounts had both been

22   merged into one.  So the fact that Kimberley Tew would have

23   deleted messages in her account wouldn't have affected the

24   merger to Michael Tew's account.

25        We have further corroboration of that in the

1    defendant's own submissions.  You have messages from her

2    personal phone, not from the iCloud, where you have both sides

3    of the communication with Hannah Scaife and with

4    Michael Meyers.

5           *THE COURT:*  Yeah.  Let me interrupt you, because I --

6    I agree with you on that.  It seems pretty clear to me that

7    some effort was made to delete from her phone relevant text

8    messages.  The real question for me has to do with the timing,

9    because as I read -- as I read the enhancement, it tries to be

10   somewhat careful about limiting the timeframe, and there's a

11   possibility -- I mean it seems clear that it was done before

12   she was arrested or anything like that, but that doesn't

13   necessarily mean it doesn't apply.  But if it was done weeks or

14   months ahead of time and she just said, *Man, I don't want to*

15   *have those on here, that looks really bad*, I don't know that

16   that's enough if you haven't met your burden of showing that it

17   was done specifically in response not just to the kind of

18   understanding that maybe there was evidence of wrongdoing but

19   of actual criminal investigation that was pending or about to

20   be pending.  Am I wrong about that?

21           *MR. FIELDS:*  Well, two responses, one legal, one

22   factual.  So first is the factual matter as to the timing here.

23   The Court will recall there are messages shortly before Michael

24   Tew gets arrested in July.  The arrest is a complete surprise,

25   I think, both to the agents and to Michael Tew himself, right?

1    So there wasn't sort of a long lead up for them when she is

2    likely going to delete messages.  You have this interim period

3    between July 2020, where Michael Tew is charged, but she is

4    not, but Michael Tew is cooperating and providing information

5    on his cell phone, and the Indictment in February.  She shows

6    up at the Yeti store, during the interim period, where Michael

7    Tew has already been charged, and she basically says something

8    to the effect of, you know, *What you are doing here is going to*

9    *be ineffectual because I already wiped it.*

10            So is it more likely than not, the standard that the

11   Court needs to make, that she deleted the messages within that

12   timeframe?  I would argue that it is, Your Honor.  I think the

13   timing of her comments is strong evidence of that, and I also

14   think just the factual circumstances, that that's the time

15   period where she is most in jeopardy, Michael Tew has already

16   been arrested, but she has not been indicted yet, that's the

17   most likely period that she would have deleted it.

18            But even if the Court doesn't agree with that as a

19   factual matter, as a legal matter the enhancement could still

20   apply if it had a material hindrance on the litigation.

21            Now I will refer to the arguments that the government

22   makes in its sentencing filings about how this did have a

23   material hindrance.  It ended up being a key component of the

24   defendant's defense at trial, and during the *James* hearing,

25   trying to cast doubt on the authenticity of a lot of these

 1    messages because there was only one side of it, and trying to

 2    tell the jury, *Hey, all of these text messages looked a little*

 3    *weird*.  *Like, why are some of these only one sided*?  In a way,

 4    to sort, of discount those in front of the jury.  And so to

 5    rebut that, the government had to task an FBI data analyst to

 6    go into the raw data tables associated with the Apple account,

 7    design -- sort of, write scripts to, sort of, sift through all

 8    of that, sort of sort through it and find the tables, because

 9    they are not organized in an intuitive way.

10         THE COURT:  Yeah, I agree with you.  But let me ask

11    you, sort of, about your legal position, because I'm not sure I

12    agree with it.  Your position is even if I think she deleted

13    these well in advance, before she had any necessary

14    understanding that the Feds were looking into it, that as long

15    as it had a material impact on the investigation, that the

16    enhancement applies?

17         MR. FIELDS:  I'm sorry, Your Honor, I misunderstood

18    you.  No.  I think, you know, this is the example of someone

19    flushing drugs down the toilet, right?  So of contemporaneous.

20    I think there's evidence, for a long period of time, like

21    actually throughout the conspiracy, that she thought Yioulos

22    would go to the FBI.  You have those very early on.  Including,

23    you know, she is calling Yioulos a rat, she is very concerned

24    about it.  So, as a factual matter, I think there's evidence,

25    sort of, throughout from the *James* log, again found by

```
 1    preponderance of evidence, that she was concerned about this.
 2    So if the Court doesn't think that she deleted the messages
 3    during what I would say is the most likely time period, even
 4    then, as long as it had a material hindrance on the
 5    prosecution, the obstruction enhancement would apply.
 6           THE COURT:  All right.  I mean, I guess I have a
 7    little bit of a problem with that position, because what if
 8    they just automatically -- they know -- a defendant knows they
 9    are involved in illegal activity, they don't want to get
10    caught, or if they do get caught they want to hide as much
11    evidence as possible so they just, sort of, routinely delete
12    everything or use a burner phone.  Does that automatically
13    subject under this enhancement, just because, you know, they
14    knew that it would help them if there happened to be an
15    investigation?
16           MR. FIELDS:  Your Honor, I would -- if I could grab my
17    guideline book?
18           THE COURT:  Sure.
19           MR. FIELDS:  So in that regard, Your Honor, I would
20    say, you know, you can parse the facts, you know, pretty
21    finely, I would say.  I do think there would be, sort of, a
22    legal distinction between, sort of, designing your criminal
23    enterprise, so that no evidence is created at all, right?
24    Like, so not -- using a burner phone, right?  Or using
25    Snapchat.  Using only, sort of, direct, face-to-face
```

          communications.  I don't think that's obstruction.  On the

          other hand, let's say you have a burner phone, and it's got all

          of these text messages on it, you needed that burner phone to

          coordinate all of your transactions.  It's got your contacts.

          It knows where your drug buddies are, talking a lot about drug

          cases today because they come up a lot.  And then you find out

          that there's an investigation or you suspect that one of your

          co-conspirators might go to the FBI, so you throw the phone in

          the river, that's obstruction, and that's what the guidelines

          say, if that has a material hindrance.

                 So I do think the burner-phone example is one.  Not

          creating the evidence in the first place isn't necessarily

          obstruction, if that makes sense.

                 So our position here, like this is very different, she

          knows that she has got all of these incriminating messages, and

          there's substantial evidence here that she deleted it.  She

          admitted it, and the evidence at trial sort of bore out the

          messages were deleted.  The question is, did it have a material

          hindrance, and the government's position is it did.

                 THE COURT:  All right.  Thank you, Mr. Fields.

          Ms. Hubbard, I don't think you have another one to address, but

          you can come up for quick rebuttal, if you like.

                 MS. HUBBARD:  Just so used to coming back up here, at

          this point.  Your Honor, from a factual perspective, I would

          note that the last message that was the one-sided texts, that

1   was -- that I know to exist is from February 19th, 2019. There

2   was significant testimony from Mr. Yioulos, himself, about

3   Kimberley Tew and Jonathan Yioulos having a tumultuous

4   relationship. One that went up and down and back and forth

5   and. So it's not -- it is entirely conceivable that given the

6   only evidence that looks like it was potentially deleted is

7   this one text string, that Kimberley Tew could have deleted

8   that at any point in time after February 19th, 2019, when she

9   was like, *You know what I'm done with that guy.* Right? *I'm*

10   *done with that guy. I don't want to hear him. I don't want*

11   *his messages on my phone anymore.* Because we have both sides

12   of text messages with Hannah Scaife. We have both sides of

13   text messages with Michael Meyers. We have both sides of text

14   messages with other people who are also involved, in some way,

15   with the supposed scheme, and so the only evidence that there

16   is -- the only supposed deletion is this one text string

17   between Kimberley Tew and John Yioulos, there isn't any

18   evidence that it happened at a time -- a point in time where it

19   would have been an attempt to interfere with this

20   investigation.

21         I also disagree with how Mr. Fields interprets the

22   provision. I was just looking at 3C1.1 in the notes. It seems

23   to me that it needs to be around the time of the investigation,

24   and the way I read that, if it causes a material hindrance,

25   that's the example given if you swallow evidence at the time of

1    arrest, that obstruction doesn't apply if you swallow evidence

2    at the time of the arrest or you do something when you are

3    arrested, unless it also has a material hindrance.

4         The last thing I would note, Your Honor, the

5    government had to call their analysts because they needed to

6    authenticate evidence, that was the purpose of those people's

7    testimony.  I handled both of those Cross-examinations.  The

8    Court had previously ruled that they needed to present the

9    evidence, to lay the foundation for the downloads, and to do

10   the chain of custody, to make sure that it was all admissible

11   evidence.  Those people testified for that purpose.

12        THE COURT:  All right.  Thank you.  I'm going to

13   sustain this objection.  I appreciate the arguments.  As I

14   indicated, I think the evidence as to Mrs. Tew's discussions

15   with Mr. Tew, while I indicated they may have been a mistake,

16   for both of them, in hindsight at least, don't rise to

17   threatening, intimidating or otherwise unlawfully influencing

18   him.

19        The Ms. Scaife testimony about feeling threatened, is

20   a closer call to me, but the evidence just isn't there to

21   support that that was a threat to try to get her to somehow

22   influence the investigation, particularly given the confusion

23   about the timing and the odd context of that exchange, as far

24   as I'm aware.

25        The deletion, I think, if I were more confident about

```
 1  exactly when it had happened, would be the most problematic of
 2  these factors, but I just can't quite get to a determination
 3  that it's more likely than not that that was done purposefully
 4  to interfere with this investigation.  I don't think it's a
 5  crazy position to take.  I just can't find that it meets the
 6  government's burden.  So I'm going to sustain that objection.
 7          That, I believe, is all of the objections, and if I'm
 8  not mistaken, I have granted -- or sustained one objection,
 9  which would reduce the offense level by two, to 30.  The
10  guideline range -- the defendant's Criminal History Category is
11  Category I, and I think my understanding is that yields a
12  guideline range of 97 to 120 month -- 121 months of
13  imprisonment.  I think the supervised release and the fine
14  remains the same, if I'm not mistaken.
15          Officer Roth, am I right about that?
16          PROBATION:  Yes, sir.  Well, the fine is reduced to
17  30,000 --
18          THE COURT:  I'm sorry, 30,000.  Thank you for that
19  clarification.
20          So understanding everyone preserves their objections
21  to my rulings on those objections, unless there's anyone who --
22  who thinks we got the calculation wrong, what I would like to
23  do is take our break now, and come back and discuss the
24  ultimate sentence.
25          So, hearing no objection, we will take a break until 3
```

```
 1    o'clock.

 2            THE COURTROOM DEPUTY:  All rise.  Court is now in

 3    recess.

 4        (Recess at 2:45 p.m.)

 5        (In open court at 3:03 p.m.)

 6            THE COURT:  Please take your seats.  So we have dealt

 7    with the guideline calculations, as I indicated, and now we

 8    have the -- ultimate sentencing decision, which is tied up with

 9    the Defendant's Motion For A Variant Sentence.  The defendant

10    has asked for a 21-month term of imprisonment, the government's

11    request was at the top of the guidelines for 151 months.

12            I will just tell you, based on my initial review and

13    understanding of the case so far, I think probably 21 months is

14    not quite sufficient to meet the purposes of sentencing, but I

15    do think that 151 months would be much more than is necessary.

16    So I'm likely to arrive at a sentence somewhere in-between, but

17    I want to allow everyone to present their positions on that

18    before I make a final decision.

19            I will ask the government to go first, then Mrs. Tew's

20    counsel and then, of course, if she wishes to make any

21    statement, she will be permitted to do so.  But would the

22    government like to explain their sentencing position?

23            MS. WEISS:  Yes, Your Honor.  Thank you.

24            THE COURT:  Thank you.

25            MS. WEISS:  Thank you, Your Honor.
```

1          THE COURT:  Go ahead.

2          MS. WEISS:  Today we're here to talk about the 3553(a)

3     sentencing factors as they apply to Kimberley Tew following

4     eight days of a jury trial, in which she was convicted on

5     nearly all counts.  Thousands of -- near thousands of exhibits,

6     dozens of witnesses that came from all over the country to

7     testify, in support of this case.

8          Today, is about the consequences of Kimberley Tew's

9     choices, and that is what the 3553(a) factors are meant to

10    enable, is the consequences of her behavior.  During this

11    criminal activity, after this criminal activity, through the

12    trial, up through today.

13         Kimberley Tew is a person that understands the concept

14    of consequences, and we know that she understands the concept

15    of consequences, because she leveraged threats of consequences

16    in order to achieve her criminal conspiracies in this case.

17    The Court has heard all of the evidence that the jury heard in

18    reaching their guilty verdicts, and you have considered our

19    written sentencing filing, as well as the defendant's

20    sentencings filings, and what I want to do today is really

21    focus on Kimberley Tew's words, and how they show that she

22    understands what consequences are and how she used that against

23    others in this case.

24         Government's Exhibit 659, this was a text message

25    where Kimberley Tew took over Michael Tew's phone and texted to

1    Jonathan Yioulos.  *You should take this seriously, because you*

2    *could lose your license if he reports you.*

3          Government's Exhibit 205, and I apologize, I'm going

4    to be using the *James* log exhibit numbers, for the most part.

5    *Michael Meyers is dumb, dumb so dumb, dumb enough to do it.*

6          In response, in the same conversation, as Michael Tew

7    is talking about filing an FBI complaint against Chris Rincon.

8    *Don't file an FBI complaint.  You are not think it go through.*

9    Same conversation.  *The only thing that concerns me about Chris*

10   *Rincon and Michael Meyers*, once again two individuals that she

11   recruited into this scheme, in order to money mule those

12   invoices from National, through her husband's accounts, into

13   her own uses, *The only thing that concerns me about those*

14   *individuals is National*.  She knew there was a potential for

15   consequences.

16          To her husband, *You operate on fear, that's why we're*

17   *married*.  In trying to convince him how to behave in this case.

18          Government's Exhibit 242, *I don't know why you never*

19   *talk to John in front of me.  You let him treat you like shit.*

20   *Okay.  I don't respect you.  If he doesn't call you within the*

21   *next 20 minutes, I will personally turn him in.  Fuck it.  He*

22   *can't even help us at this point.  No plan.  No clarity.*

23          During this trial we heard a lot, during the defense

24   case, about how there was only one bank account that was

25   jointly in Kimberley Tew and Michael Tew's names, and that the

1    rest of the accounts were in Michael Tew's name.  No accident.

2    Kimberley Tew was foreseeing consequences, she was foreseeing

3    the arguments that she was going to make in this courtroom in

4    front of that jury.  How do we know that?  Government's Exhibit

5    254.  A text message to Michael, *I want to get 15,000 of*

6    *Bitcoin*.  Michael:  *You need me to go to the bank*?  Kimberley:

7    *Yes, how else would I get it*?

8         Another exhibit, Government's Exhibit 265, to Jonathan

9    Yioulos, message:  *Fuck you.  This is Kimberley.  I'm calling*

10   *the fucking husband.  We're all in this together.  You have*

11   *sent money once in awhile.*

12        Government's Exhibit 306, Michael Tew:  *How much*

13   *should I go for with John today and tomorrow?  What's*

14   *realistic*?  Kimberley Tew:  *As much as you can.*

15        Government's Exhibit 317 text message from Kimberley

16   Tew to Michael Tew:  *Tell Jonathan I'm personally calling the*

17   *local jail to have the guy she is having an affair with pick*

18   *him up.  I don't care if we all go down.*

19        Consequences, Your Honor.  It's very confusing, this

20   case, why someone, with all of the advantages that Kimberley

21   Tew has had in her life, from being adopted into a loving and

22   supportive family, to marrying a high-earning husband, living

23   in an opulent apartment, having two children with that person,

24   why one would risk that all?  And the only explanation that

25   could possibly be mitigating in this case is that Kimberley Tew

 1    is an addict.  She has a severe gambling addiction.  She talked

 2    about that addiction to agents, even though she denies it to

 3    this Court today.  She has admitted it at various moments in

 4    time, but how we know whether or not she has really admitted it

 5    to herself, which is the first step to addressing that

 6    addiction, is her behavior, and we know that she would sit in

 7    this courtroom, during those days of trial, hearing the

 8    evidence come in to this courtroom against her, and she would

 9    leave this courtroom, and she would get on a laptop, and she

10    would go to a cryptocurrency betting site, and she would bet

11    thousands of dollars at a time on betting websites, during this

12    case, with absolutely everything on the line.

13           I really hoped that we would come in here and we would

14    see some evidence that she was taking steps to address that

15    addiction, and that's not what's in her objections or her

16    sentencing statement.  We would see some ownership of the way

17    in which, potentially, drugs are play into this.  We have not

18    seen any ownership of that.  We've seen denials of that.

19           And that, Your Honor, when it comes to 3553(a)

20    factors, presents an ongoing serious risk to the community, to

21    herself, to her family, to all of the people that she claims

22    this Court should consider, in fashioning a sentence against

23    her.  They are all at risk.

24           People like Michael Meyers, someone who had

25    significantly less education, street smarts, savviness, who met

```
 1    Kimberley Tew on the internet, had his life almost destroyed by

 2    her.

 3           Hannah Scaife, someone who knew Kimberley in college,

 4    ran back into her in New York, had an addiction herself, and

 5    Kimberley Tew saw vulnerability in that addiction.  A

 6    vulnerability that, in recorded calls, her husband laughed

 7    about.  That she explained was part of what made her a good

 8    foil for this.  And I want to take counsel at their word that

 9    the decision about how that witness was treated on the stand

10    was that counsel's decision and not Kimberley Tew's decision,

11    but, Your Honor, you observed Kimberley Tew's demeanor in this

12    courtroom during that testimony, and that is on her, that's a

13    consequences that is on her.  She was triumphant about how that

14    woman was treated on that stand.  Triumphant about how

15    Michael Meyers was treated on that stand.

16           Up to her latest sentencing filings where she is

17    accusing her husband of infidelity, in trying to distance

18    herself from the purchase of luxury goods to her home, using an

19    email address that she previously told this Court was hers.

20    Consequences.

21           And so when we talk about what the government is

22    asking for today, especially, and I will -- I don't know if you

23    want to handle the Motion For A Variance separately, but

24    especially when we trial talk about this argument about a trial

25    tax.  What we have in this case, Your Honor, is a long period
```

```
 1    of time, prior to this courtroom starting, this trial starting,
 2    where the government new Kimberley Tew from a distance, from an
 3    impressionist perspective, and the government got to know
 4    Kimberley Tew, through introduction of that evidence, through
 5    her demeanor at trial, through her demeanor during the
 6    proceedings pretrial, and outside of the visibility of the jury
 7    and within the visibility of the jury, so you come from an
 8    impressionist painting to a realistic painting.  That was one
 9    of the risks that she took here, and there are consequences to
10    that risk.
11            Talking about the nature and circumstances of
12    Kimberley Tew, herself.  I understand Your Honor's position
13    about the obstruction of justice enhancement, and I don't want
14    to belabor that too much, other than to say that we attached, I
15    believe, as an exhibit to Docket Entry 394, a transcript of the
16    portion of that incident at the Yeti store when Kimberley Tew
17    arrived on scene.  It's 30-pages long.  It's a quick read, and
18    I would ask Your Honor, to indulge the government by rereading
19    that transcript prior to sentencing, briefly, and I want to
20    talk about what she said during that meeting.
21            I apologize, I should have kept a finger on this mouse
22    pad so it didn't give up on me.  She talked about a lot of the
23    factors that she wants this Court to consider mitigating.
24    Things like her kids needing her as a parent at home.  Here is
25    what she said during that meeting about being a parent to those
```

children.  She said, *The girls need one parent Michael, I'm a*
*better person to give up*.  She said, *Michael is the better*
*parent*.  She begged him to leave that meeting, to remove his
phone from where it was being imaged with agents.  She tried to
appeal to his parenting and how much the girls needed him, and
when that didn't work, here is what she said instead, *I*
*actually will not turn myself in, because obviously Michael,*
*you are not a good parent.  So I'm going to go home to our*
*children that are crazy worried about you.  Michael you deserve*
*it if this is your choice.  You have the right person in*
*custody -- or not in custody, but with the agents, because you*
*don't give a shit about our children.*

        That's consistent behavior with how we saw Kimberley
Tew act with Jonathan Yioulos, with Abby Schwartz, with
Michael Meyers, with Chris Rincon, with Hannah Scaife.  Start
out nice, and if it doesn't work out the way you want it to,
then you go for the gut.

        Now she is starting out saying that she wants
Your Honor to consider things like her family and her children,
and her background and her upbringing and her education as
mitigating factors.  Your Honor, those are aggravating factors.
Those are things that she used and leveraged against people to
convince them to either participate in these crimes, to
continue to participate in these crimes, to ignore their better
nature and their own sense of morality, to follow her down this

path.

I want to talk about the 3553(a) factors, about
seriousness of the crimes, promoting deterrence, protecting the
public.  Your Honor, there's a general deterrence factor and a
specific deterrence factor and both of these matter here.  When
it comes to general deterrence in our filing, I cited several
cases about how the concept of collateral consequences are not
ones that fall within the 3553(a) factors, and it creates a
real risk when we say things like becoming a felon, having your
reputation tarnished, et cetera, are somehow justifiable for
mitigating a sentence outside of the guidelines range or below
the guidelines range --

THE COURT:  Let me ask you about that, I guess.  I
mean, on their own, no, but don't they suggest, particularly
for someone with no criminal history, don't they play into, at
the very least, the question of deterrence, and the risk of
recidivism, and the need for -- the general need for -- I mean
you are asking for an additional 12 years in prison, in this
case.  Isn't that appropriate to take into account whether
those collateral consequences would play into some of those
other factors that are listed?

MS. WEISS:  Yes, Your Honor, and I think this is one
of these cases where if we were just dealing, as we were
pretrial, during plea negotiations, with the impressionism
version of the facts, perhaps I would give that more credit in

1    this case.  But what we have, instead, are we've now seen, in

2    this courtroom, text messages, we've heard the testimony of

3    witnesses, who have all shown us that Ms. Tew was very

4    cognizant of those collateral consequences.  She just didn't

5    think she would ever get caught and if she did get caught, she

6    would get out of it, right?

7         One of the things that they talked about, her and

8    Michael was, *I messaged John.  Truthfully we owe him our lives*

9    *I don't think he never knew how bad it was.  If really hates us*

10   *we should figure something out and get immunity.  I told him I*

11   *would turn myself in and negotiate immunity for you, Michael,*

12   *so the kids could have a chance.*

13        This wasn't a crime or situation where desperation in

14   a moment drove an incredibly poor decision.  This was a

15   two-year span of time, that was thought about extremely

16   strategically, the entire way through, in which, Ms. Tew in

17   some ways had some advantages, in knowing that her day of

18   reckoning before the Court and charges in front of this Court

19   might be coming, by virtue of the fact that her husband was

20   arrested on that complaint, months before she was ever

21   indicted, a period of time in which she came in and gave a

22   proffer interview, hoping to achieve a sentence that she would

23   be happier with, and then did not take, and then had a period,

24   years, in the making, in which there were a series of hiring

25   and firing counsel and filing various motions, including

1       motions to delay this case in the days leading up to the trial.

2       She strategically prolonged these proceedings as long as she

3       could.  Every moment in time there represents an opportunity to

4       make a different choice and that wasn't taken.

5               On top of that, Your Honor, we have indications with

6       the relevant conduct that, whether or not we take the generic

7       statistics filed by the defense, about the chances of

8       recidivism in white collar cases, as Ms. Hubbard so eloquently

9       said, we are here to sentence this defendant today.  What do we

10      know about this defendant?  Well, we know she was running a

11      cryptocurrency algorithm, soliciting investors, including

12      Michael Meyers, and the plaintiffs in Denver District Court,

13      and then fleecing them out of money.  We know that she was

14      gambling prior to being indicted, after being indicted, all the

15      way up through the days of trial in this case, following the

16      days of trial in this case, after she was convicted.

17              This is a serious risk.  I mean gambling is an

18      addiction, like any other.  We can look at that behavior, and

19      we can see that that risk is ongoing, that potential for

20      recidivism, when she needs that money so badly so she can

21      gamble it.  It's a huge risk.

22              So again, Your Honor, I would just encourage us not to

23      think about distractions.  Let's look at Kimberley Tew's words,

24      let's look at her actions, let's look at her behavior, and

25      let's tailor the 3553(a) factors at analysis appropriately

1 according to that.

2  THE COURT: Okay. So I did want you to address

3 whatever you need to as to the motion, in addition to anything

4 just specifically under the factors. If you have something

5 that you want to add specifically on that, you should do it

6 now.

7  MS. WEISS: No, Your Honor. I will just touch briefly

8 on the kinds of sentences and sentence disparities. I believe

9 most of this is addressed in our written filings, but we would

10 indicate that the vast majority of sentences in this district

11 are -- for white collar offenders do fall within the guideline

12 range, and that's part of achieving the objectives of the

13 guidelines more generally, that all types of crime are being

14 sentenced concordant with how that matrix has developed and the

15 congressional intent behind it.

16  Here, Your Honor has ruled on the objections, and

17 we're now at an Offense Level of 30, with Criminal History

18 Category I, for 97 to 121 months. Given that change,

19 Your Honor, the government is still going to request the top of

20 that now applicable guidelines range, and ask for 121 months.

21 I know Your Honor expressed, and I want to be to be cognizant

22 of some of the things that were said during our previous part

23 of this hearing, when we're talking about a leader/organizer

24 role, which Your Honor, I believe understands is close, I would

25 encourage you to think about the words that I read out to you

today, which are Kimberley Tew's own words.  The hundreds of

text messages, in which she was saying to her husband things

like, *I don't need this sulking.  I told you to get in touch*

*with John and get money.  Figure out if you want to be in this*

*family.  You are extremely rude to me in front of John and have*

*said horrible things these past days*.

And to John, not knowing that John was under

investigation at the time, *Oh my God thank you, oh my God you*

*have saved me and my family.  I mean that.  Don't send anything*

*this fall*.  And then moments later, *No chance at sending*

*anything today and tomorrow?  Like splitting it*?  *Or best just*

*all at once.  I don't know how it all works, that's Michael's*

*area*.

Those are the things that she was saying when she was

leading her husband, Mike Meyers, Chris Rincon, Hannah Scaife,

all these others down her path.

I also want to address how that plays into the

Zero-Point Offender Rule.  Again, I think this touches upon

what we were talking about previously, in terms of risk of

recidivism.  The Zero-Point Offender Rule was designed

appropriately to take into account someone who has no criminal

history, whatsoever.  Is at the lowest chance of recidivism,

presumably.  But what it doesn't account for are all of the

instances where someone has committed crimes that don't show up

on a criminal history category score.  And what do we have

1    here?

2         We have a person that we know has a gambling

3    addiction, through their own admissions, during the exhibits.

4    We know somebody that has used drugs, numerous times.  In fact,

5    and I know that the filings say there wasn't any drug problem,

6    but the messages belie that.  For instance, *We need to get*

7    *another wire for Friday, I played gambling, last night on*

8    *drugs, and lost.  I need my pills and I need you to get on John*

9    *to cash that check tomorrow.  We need something this week.*

10   *Anything.  John is going to screw us over.  I really, really*

11   *don't want to stress you out, but we're going to need more*

12   *money.  It's just not enough.  It leaves nothing for Vegas.*

13   *We're going to Vegas Down*.  That's not a criminal history

14   category score, but that's behavior that creates a risk of

15   recidivism, Your Honor.

16        As is things like the details that came out in the

17   Denver District Court case, about that algorithm, the amount of

18   money she was able to swindle out of other people in order to

19   feed that gambling addiction, as is the evidence Your Honor

20   heard in this courtroom, about taking the National Air Cargo

21   credit card and driving all over Denver and spending $35,000 on

22   gift cards.  Things that someone with a low chance of

23   recidivism doesn't do.  They don't do things like that.

24        So that might not equate to a criminal history

25   category point, but when we're talking about 3553(a) factors,

1    we're talking about how to sentence this defendant, not a

2    generic defendant, this defendant, based on everything that we

3    know about her.  I would encourage Your Honor to take into

4    account the facts of this defendant, which speak for

5    themselves.

6            Anymore questions for me?

7            THE COURT:  Not at this time.

8            MS. WEISS:  Thank you.

9            THE COURT:  Mr. Kaplan?

10           MR. KAPLAN:  So, Your Honor, it is correct, this is

11   the time where there's disagreements and arguments about 3553

12   considerations, and what we all know, and the phrase that we

13   use in determining the appropriate sentence, pursuant to 3553

14   is, *A sentence that's sufficient but not greater than*

15   *necessary*.  Everything else kind of is the umbrella, 3553, and

16   it's not unusual, for this time, that there's a dispute about

17   that, and the government and defense counsel will argue their

18   side.

19           I do want to point out, as we did in our paper, and I

20   do here, that in this case, we have a little bit of an insight

21   into what the government felt was an appropriate sentence,

22   sufficient but not greater than necessary, and that is the plea

23   offer that was made very shortly before we went to trial.  I

24   understand that now we have guidelines.  There's repercussions

25   of not taking it.  That's not what I'm suggesting to the Court.

1    But when the government comes up here and talks about the

2    necessity for what they they wanted, which was 151-month

3    sentence, then it is incumbent on me to point out and put a

4    mirror to some of this position of the government, under these

5    circumstances, the protocol that was mentioned in the footnote

6    by the government in terms of you know, it's not legally

7    prohibited, but there's, sort of, like some sort of protocol

8    not to bring that up.  I understand where that's coming from.

9    We want free flow of conversation.  We don't want that to come

10   back later on, when there's those kind of conversations, but it

11   is hard for me not, and I will refuse to come before the Court

12   and know that prior to trial there was an agreed to amount --

13   when I say *agreed to*, the government presented something that,

14   in their calculations, was a sentence between 51 and 64 months.

15   And what does that mean, at the time, I would suggest to the

16   Court that what it means, at the time, is that the government

17   come before the Court and justify a plea agreement, with all of

18   the considerations that the government needs to have, as to

19   what is appropriate under the guidelines and appropriate under

20   3553, that what is sufficient, but not greater than necessary,

21   is 51 to 64 months, and I just can't sit here and out of some

22   sort of protocol for future negotiations, not raise that as

23   pretty good evidence of what they thought right before trial.

24           Now I understand, also, I'm well aware, I have been a

25   criminal defense attorney a very long time, that there are

1    risks to going to trial and having things revealed to the

2    Court, sometimes, and sometimes even the prosecutor that is --

3    that they are unaware of, that would change the whole set of

4    circumstances, in terms of what they think was appropriate.

5           But I would suggest to the Court that that didn't

6    happen here.  They knew, as the Court knows, we had an

7    extensive *James* log hearing.  It was an incredibly extensive

8    log of communications, involving all of the defendants.  They

9    had a cooperating defendant from the beginning of the case, in

10   John Yioulos, who they could speak to about, you know, all of

11   the things that he ended up testifying to, and I am sure many

12   more.

13          They were intimately familiar, in speaking with the

14   members of National Air Cargo and John about the circumstances

15   of National Air Cargo and what the scheme -- what impact it had

16   and finally there were downloads of information that the Court

17   is well aware of, that the government has demonstrated, very

18   successfully, from banks, computers, incredible amount of

19   telephonic communication, recorded conversations that they have

20   used very effectively in the terabytes of information.

21          So to suggest that there was something was disclosed,

22   including the witnesses, those that they called and those that

23   they didn't call, who they had interviewed and spoke with, in

24   the preparation of this case, again, as the government has

25   pointed out and the Court know was prepared numerous times by

1    numerous lawyers representing both the Tews.

2            And so the idea that what Ms. Weiss said was what we

3    learned about Ms. Tew was not, I would suggest to the Court,

4    significant, something that was significantly revealed during

5    trial, that they didn't have when we were engaged in

6    discussions about disposition.

7            What then did they say, in their own submissions to

8    the Court that they learned during trial, because that's

9    another thing that we don't have to wonder about.  They put it

10   in the submission to the Court when they talked about it.  The

11   demeanor of the defendant.  The impact on others.  And they

12   specifically discussed the humiliation of Ms. Scaife.  That she

13   never admitted -- that Ms. Tew has never admitted wrongdoing.

14   No effort to address mental health or gambling addiction.  And

15   then I think they suggested in lots of materials that somehow

16   she was a driving force in the operation.

17           None of those things, as contained in the information

18   that the government gave the Court as revelations during trial,

19   would be the kind of significant differences that would make a

20   difference in what was a, as we've said, sufficient but not

21   greater sentence than necessary.  And they conclude in that

22   that Ms. Tew lacks respect for the law and holds her victims in

23   contempt.  That was what they learned.  It doesn't

24   significantly impact the difference of what these factors are,

25   with what they initially thought was sufficient and now coming

1   before the Court now, and asking for 151, I understand, because

2   of the Court's rulings, that it will be less than that.

3          Their discussion, in the materials they gave the

4   Court, had to do with what they now say is her role in this

5   offense, which I will get to momentarily.

6          The other thing that I want the Court to take into

7   consideration, in terms of how the government views the scheme

8   and how they view it when it was indicted, is how they indicted

9   the case.  If they were talking about Ms. Tew as they did with

10  the materials as being some sort of leader that it would not --

11  I think the language they used was, *It would not have happened*

12  *but for Ms. Tew.*

13         Well, how they indict something is certainly not the

14  be all and end all of what they believe the particular

15  culpability is.  Matter of fact, in their materials, they talk

16  about how they wouldn't file every count for every violation

17  because they couldn't do that in cases they brought to trial,

18  in every case it would be cumbersome and not valuable.  I don't

19  disagree with that at all.  But when they indicted the case, it

20  is instructive, in terms of what they felt the scheme was, and

21  I would offer to the Court it has not changed, that Mr. Yioulos

22  was indicted on 40 counts, Mr. Tew was indicted on 59 counts,

23  including four counts of tax fraud, where he was found guilty

24  of all of those, and Ms. Tew merely 14 counts of which she

25  ended up convicted of 12.

1          I don't want to put too sharp of an edge on that, but

2     it is an indication of what they believed the relative

3     culpability, I will suggest to the Court, of the defendants

4     that were involved in this particular scheme.  Another area

5     that would support the 50-plus months that they initially were

6     discussing in plea negotiations.

7          I was going to take some more time, but I don't think

8     it's necessary, based on the Court having not only gone through

9     the trial, which I knew, obviously, but also some of the

10    Court's comments to try to counter the paper that was submitted

11    to the Court that tried to paint Ms. Tew as, you know, some

12    sort of leader of men here, and without which this wouldn't

13    happen, because there couldn't be anything more absurd than

14    that.  You know, notwithstanding, you know, Michael Tew's

15    attorney putting the campfire images up on the screen, these

16    were sophisticated people that Ms. Tew was dealing with, much

17    more sophisticated than she was.

18         Now, the government comes up and talks about an

19    isolated piece of information here.  The way she conducted

20    herself on some occasions with individuals.  Some of the text

21    messages and the emails they come up, to try to paint a picture

22    of Ms. Tew that is not accurate in terms of what the Court

23    heard, as to how the scheme was actually conducted.

24         The scheme was conducted by two sharp, sophisticated,

25    accomplished individuals, who, far and away, without much room

1    for debate, knew exactly how this scheme would be the most

2    effective, and that was not the position that Ms. Tew was in,

3    nor was how she -- what her participation was.  I'm not here

4    defending -- the jury has spoken, and it's conspiracy, all

5    right, and she is responsible for those things.  I'm not here

6    trying to minimize that at all.  What I'm here, having to spend

7    a little bit of time, notwithstanding them not having said it

8    today, is this idea that her involvement somehow overcame the

9    will and the ability to stay away from being participants in

10   this scheme by Mr. Yioulos and Mr. Tew, and I don't think

11   anything in the presentation of the facts would justify that

12   conclusion.  Far to the contrary.

13          And they talk, in their papers, about the effect on

14   the company, and the loss of trust by the people that were

15   involved in it.  That was Mr. Tew and Mr. Yioulos who was

16   involved with that.

17          The government talks about conversations that she had,

18   random conversations that Ms. Tew had with Mr. Yioulos.  The

19   testimony was that, at trial, was that -- by Mr. Yioulos, was

20   that -- I think he said it a few different ways, but at one

21   point I believe he said 98 percent of the conversations he had

22   having to do with anything having to do with the scheme was

23   with Mr. Tew, and it was over two years that he had these

24   conversations.  And at one point he said, *Yeah, he did not want*

25   *to speak with Kimberley Tew anymore*.  So that was the end of

1    that.  I believe that was probably at the end of 2019 beginning

2    of 2020.

3         So if you are talking about the people who made this

4    train run on time, in terms of being able to take the money

5    from NAC, not minimizing the jury has spoken, but suggest in

6    the paper that somehow we've now shifted into blaming Ms. Tew

7    as the impetus, without which this wouldn't happen, is just

8    preposterous.

9         What she did is she was nagging for money.  I think

10   that was demonstrated.  She nagged Michael for money.  Michael

11   was the individual who provided, at least since the children

12   were born, the financial health of the family.  He is -- he is

13   competent and capable of it.  He obtained the funds during the

14   scheme, and best I can tell from documents provided to the

15   Court and in the probation reports, his pretrial reports, he is

16   capable of making millions of dollars still.  And so, to

17   suggest that there's a *nagging wife aggravator*, that should

18   result in the government now coming before the Court saying

19   that Kimberley Tew should get more time because of her

20   involvement in this case than even Michael Tew, shows what I --

21   what we've suggested throughout the paperwork, a certain

22   animus, a certain vitriol, and I think also demonstrated here,

23   a certain personal dislike for Ms. Tew, that is not appropriate

24   for, I think, a sentencing decision, and certainly not

25   reflective of her involvement in this particular offense.

 1          The government talks about, that the other parts of

 2   the 3553 issue should be having to do with her -- the way she

 3   conducted herself during the pendency of this case.  I don't

 4   know what the government is observing or what they want -- or

 5   what they want the Court to conclude.  Ms. Tew has been

 6   compliant during the entire prosecution of the case.  She has

 7   been respectful to the Court.  She has not caused any delay or

 8   problems with the Court.  Her demeanor during trial, I am at a

 9   loss.  I sat at the same table as Ms. Tew throughout the whole

10   trial.  I do not know.  Her demeanor.  There was suggestions

11   that she was going to leave the jurisdiction.  She did not.

12   And much of what the government talks about, in terms of things

13   that they want held against her is really things that were done

14   by lawyers and in the defense of Ms. Tew.

15          It is dangerous to suggest to the Court that things

16   that are done by counsel, defending a defendant, who had the

17   audacity to go to trial, would now come back to be an

18   aggravating factor.  The response to our request for variant

19   sentences is just -- some of the lines that were in it.  They

20   said, quote, *Her stubborn refusal to take any responsibility*

21   *for her actions should weigh heavily in favor of a significant*

22   *custodial sentence.*  Is that stubborn refusal bringing her case

23   to trial?  Is that what we're punishing?  The disregard, the

24   very real threat of incarceration?  I want to be clear to the

25   Court, I understand that we look and see people that make bad

 1    decisions.  The Court mentioned a few things saying well, *She*
 2    *did it, I don't know that it was the best decision for her, but*
 3    *what does it stand for?  What significance does it have when*
 4    *you are deciding what the appropriate sentence is?*  And
 5    anything that suggests that she should be punished, the
 6    sentence needs to be longer and larger and harder and more
 7    punitive, because she took something to trial, regardless of
 8    how ill-advised any of us would think that might be, is not a
 9    basis.
10         We've talked about telling the government one thing in
11    a proffer and then repeating -- repeatedly telling the jury
12    something different.  That was legal litigation that
13    Ms. Hubbard and I pursued on her behalf, as we must do, as we
14    are proud to do, because we are aggressive in the defense of
15    somebody who chooses to exercise their right to a trial, but
16    somehow, that gets turned as some sort of aggravating factor.
17         The financial and nonfinancial resources of subjecting
18    numerous lay out of state witnesses to a nearly two-week jury
19    trial was reason enough to justify the government's generosity
20    in a plea agreement.  Again, are we now placed in a situation
21    where the plea -- and I get -- I get that we can save
22    resources.  It's not illegitimate about that.  But when the
23    government talks about that's the reason why we need a lengthy
24    sentence and to aggravate it is because we need to go through
25    the requirements of a jury trial, which, by the way, by any

1    statistic that you look at, somewhere around 3 percent of

2    all -- of all prosecutions end up indictments/charges end up in

3    trial.  All right.  So talk about the trial tax, you know, it's

4    more complicated than that buzzword, that's why I haven't used

5    it till now.  But it is a real thing, in terms of people not

6    going to trial, because the repercussions of the way the system

7    operates now, is so hard that they can't exercise that right.

8    And you know, the government was actually more clear and honest

9    about what they were upset with, having to do with Ms. Tew,

10   than I would have anticipated.

11        You know, Your Honor, I sit and listen to first

12   advisements and a judge tells the defendant, facing charges,

13   that you have an absolute right to go to trial.  A

14   constitutional right to go to trial.  And in the business that

15   I'm in, that we, as defense attorneys in, that, it actually

16   feels -- I mean, it's such an important right.  When I hear

17   that, I take pride in the fact that in this country, not only

18   do we have the right, but the sincerity in which the Court

19   advises anybody in custody of their right to go to trial,

20   really ends up being, you know, it's almost spine tingling.

21   And you know when it happens again?  At a providency hearing.

22   It happens again at a providency hearing, when at the end of a

23   lengthy discussion, the soliloquy, the questions, the answers,

24   I tell people, federal court, at the end of what is a very

25   complete advisement, the very last thing that a judge says is,

1     *We have gone through all of this, but I want to tell you, that*

2     *if you don't want to do this, you have a right to go to trial*,

3     and that's at the beginning and at the end.  That's when we get

4     something that really is, in some ways, unique to our justice.

5             Yet, what I'm hearing from the government in their --

6     in what their most -- well I don't know about most.  Let me not

7     say that.  What I'm hearing from the government is that Ms. Tew

8     had the audacity to do that.  It comes with repercussions.  I

9     have said that before and I am going to say it again, I'm not

10    naive about that.  Lord knows that I'm not naive about that.

11    But it shouldn't come as a punishment for doing it.

12            You can't evaluate who Ms. Tew is by taking out

13    different emails and texts, over the course of a couple years,

14    and thousands, upon thousands, upon thousands of text messages

15    and phone calls, and have the Court conclude that she is some

16    sort of horrible person.  It is rightful that -- there was an

17    introduction of the tens of thousands of communications, that

18    have to do with demonstrating that she is a loving wife, and a

19    loving -- and effective and loving mother, and involved in the

20    schools and going to deal with the family situation.  It is a

21    skewed, terribly skewed view to demonize her by taking clearly

22    what they have and clearly what they used to gather the

23    convictions, and to suggest that the Court, and I would say

24    without much of which having to do with her behavior in this

25    case, without justification, that she is somehow an evil person

1    needing to be incarcerated.  That's not what the Court is

2    determining, but it is the sense of the documents that have

3    been provided the Court, in a real kind of sense of what the

4    government's statements are.

5         So I would suggest to the Court that the Court has

6    already indicated 21 months, and was a number that we arrived

7    upon if we won all of the objections to the guidelines.  So it

8    didn't come out of thin air.  It was indeed something that was

9    rooted in our arguments having to do with the guidelines, but

10   when you come to what the Court did on the guidelines, and how

11   it reached its agreement or disagreement, in most every portion

12   of our objections, to every -- whether it was the loss amount

13   or the organizer/leader, what the Court said is that it was

14   arguments to be entertained, and I took from the Court that

15   they were not all easily defeated or easily agreed to the other

16   way.  And so what does that mean to the request for a variance,

17   including the lack of criminal history?  Which the government

18   seems to suggest is a lack of criminal history because she,

19   perhaps, has a drug problem where there's no evidence of a drug

20   problem, by the way.

21        I mean, what they cited and what was a very narrow

22   look at it and what was contained in the presentence

23   investigation report is Ms. Tew does take prescribed

24   medication.  The presentence investigation report talked about

25   what she took.  She tried cocaine sometime in her youth and she

```
 1    smokes marijuana occasionally.  Not a drug problem.  They are

 2    concluding an addiction to gambling, which, I mean, I guess

 3    people could draw their own conclusions, but I don't know that

 4    there was any testimony as to that, and then they borrow from

 5    things that the Court will decide whether it's appropriate to

 6    consider those things.  The civil case, which we, in our

 7    responses, question whether that is appropriate.  I understand

 8    the Court can draw conclusions about the algorithm as it

 9    relates to some of the people who testified, but

10    cryptocurrency, in and of itself, is not aggravating.  I mean

11    they are really pulling at some straws outside of what is

12    appropriate, and that is that she has been convicted.  She was

13    convicted of the offense that she was convicted of, and that

14    results in repercussions.

15          We ask the Court to consider 21 months.  Like I said,

16    if we had been successful it would have been something around

17    that time.

18          We talk about deterrence and punitive and those kind

19    of things, and I will add this, as it relates to the more

20    specific factors under 3553, and that is, 150 months really

21    rolls off the tongue pretty easy for the government, and what's

22    not sufficient amount of time, when you are talking about years

23    incarcerated, rolls off maybe all of our tongues too easily.  I

24    know doesn't roll off any judge's tongue too easily, because

25    you are required to impose it and have a real understanding of
```

1  what impact that might have, but I do think we have a tendency,

2  when we get lost in the numbers, you know, the guidelines, and

3  what's an appropriate sentence, to get a little calloused, a

4  little immune to what that means, and I don't think anyone of

5  us want to do that.  I wouldn't suggest the Court does.  But I

6  think that when you are in this environment and dealing with

7  numbers, the real reality of what is an appropriate sentence,

8  in terms of being incarcerate and what deters and what prevents

9  it from happening in the future, it does not need the kind of

10  numbers that the government is coming here and asking, and so

11  we would ask the Court to provide a sentence that's close to

12  what we've recommended, as the Court, in good conscience, can

13  provide.

14        I don't know if now is the time to talk about

15  surrendering and things like that.

16        THE COURT:  We can talk about that in a little bit.

17  After I have determined the sentence.

18        MS. WEISS:  Your Honor, may I respond very briefly?

19        THE COURT:  No, I have heard enough.  Thank you.  I

20  did -- let's see, I think I had one question about whether

21  Ms. Tew wishes to make a statement, though.

22        Ms. Tew, you have the right to make a statement before

23  I make a decision, but you are not required to.

24        MS. HUBBARD:  Just going to talk to her.

25        (Discussion off the record between counsel and her

 1   client.)

 2        THE DEFENDANT:  Thank you.  I ... I'm sure I'm not

 3   going to say the things you want me to say, but I do want to

 4   tell you I am very grateful for you and for your courtroom, and

 5   I love our country and I love that I had a trial, and I think

 6   about the jurors and I am very grateful for them.

 7        This has not been hard -- this has not been easy.  My

 8   husband was arrested on July 8th of 2020, and since then we

 9   have tried to keep our heads up and raise our children the best

10   that we can.

11        And for the record, Michael is a great parent, so.  He

12   is funny, he makes them laugh, and I'm just more serious.  I do

13   want to say that I really care, very much, for Hannah, and I

14   also care for Michael Meyers.  I liked who he was, as a person,

15   and who he was trying to become.  And I still want only the

16   best for them.  Especially Hannah.

17        Thank you for letting me speak.

18        THE COURT:  Thank you, Mrs. Tew.  All right.  Thank

19   you everyone for your efforts in this case and your time today.

20   I have considered, as I indicated, the record in this case,

21   both what we've discussed today, as well as a number of other

22   things, going back through the record, the docket, the filings

23   in this case, and based on my review of the record, the

24   sentencing factors set forth in Title 18 Section 3553(a), my

25   judgment is that the defendant, Kimberley Ann Tew, be committed

to the custody of the bureau of prisons for a term of 48 months

on each conviction -- each count to run consecutive --

concurrent, sorry, to each other.

Upon release from imprisonment, she will be placed on

supervised release for a term of three years, again, on each

count, to run concurrently.  I will impose a fine at the bottom

of the guidelines, which is $30,000.  She is also required to

pay a special assessment of a hundred dollars on each count of

conviction, which I believe totals $1200.  She will be required

to pay restitution in the amounts, and as indicated in the

presentence investigation report, jointly and severally with

her codefendants in this case, as we previously discussed.  She

will also be ordered to forfeit her interest in the money

judgment as discussed at the beginning of this hearing.

Mrs. Tew, while on supervision, you will be required

to comply with all of the terms of supervision that are

recommended and discussed in the presentence investigation

report.  So that will include all of the mandatory statutory

conditions.  The standard conditions that this Court has

adopted in General Order 2020-20.  Will also include all of the

special conditions recommended by the probation officer, which

I do find are reasonably related to the factors laid out in the

statute, given the facts of this case and the history and

characteristics of this defendant.  Those will include

participation in programs of mental-health treatment and

1    cognitive behavioral treatment, as supervised and approved by

2    the probation officer. It includes restrictionns on gambling

3    and use of cryptocurrency, both of those, given what happened

4    in this case, and the conviction and the issues that seem to

5    have led to, at least, some of this conduct, are necessary to

6    ensure that it doesn't reoccur.

7         There are a number of financial conditions that are

8    required to ensure payment of the various financial penalties,

9    and you will be subject to the search condition, which will

10    ensure that there are not ongoing issues of this type and only

11    kicks in, of course, if there's reasonable suspicion of a

12    violation of those conditions. It does appear that the

13    defendants can pay interest, so I will require interest on the

14    restitution.

15         My justification for this sentence, is, as I

16    indicated, I think some of the -- first of all, some of the

17    guideline calculations while legally appropriate are somewhat

18    borderline cases that ran up the guideline numbers a bit higher

19    than seemed appropriate in this case. I don't rely super

20    heavily on the plea agreement draft that was offered, but it

21    does, at least, make me feel a bit more confident that the

22    number I have arrived at is not completely out of line with

23    where the government, at one point, thought would be an

24    appropriate punishment for this case.

25         In particular, as I indicated, while the two point --

```
 1   two-level reduction for first time offender doesn't technically
 2   apply in this case, that reduction, to me, is often
 3   insufficient to meet the importance that I put on the fact that
 4   someone who has never been in front of a court before, never
 5   been sentenced to anything significant, in this case to
 6   anything at all, to me is just in a very, very different
 7   position than someone even who may have a couple of minimal
 8   criminal history points or even some criminal history that's
 9   not accounted for.
10           In this case, 48 months, for someone who has never
11   served any time before, never had any interaction with the
12   criminal justice system, to me, is a sufficient sentence to
13   meet all of the purposes of sentencing.  It is a significant
14   sentence for a first-time offender.
15           This is a significant crime though.  The government
16   has pointed out the damage that this caused to a number of
17   people, the company, for one, just in general, this sort of
18   conduct requires companies that could, instead of wasting time
19   on a bunch of redundant accounting procedures, could be doing
20   something productive and useful to society.  So I take that
21   into account.  And it's a serious crime.  There's a lot of
22   money involved here.  I think the parties, obviously, have sort
23   of a different conception of Mrs. Tew's role in the crime.  I
24   guess I fall somewhere in the middle, as my sentence does.  It
25   seems clear to me Mrs. Tew understood what was going on, was,
```

1    in many ways, a driving force in the sense that her need or

2    desire for money pushed her husband to do this and in turn

3    Mr. Yioulos to do this.  On the other hand, it doesn't seem at

4    all as clear to me that she set out to set her husband and

5    Mr. Yioulos into doing something criminal, more that she took

6    advantage of it, and certainly participated in it, that's

7    worthy of a crime, but I don't think it's quite fair to

8    consider her the *but for cause*, or at least not the only *but*

9    *for cause*, and so I think she deserves a significant sentence

10   to reflect the seriousness of the offense, and to deter others

11   from engaging in sort of thing in the future, as well as to

12   ensure that both she understands that this was not just wrong

13   but deserving of punishment and that it can't happen again.

14           I think, as -- I guess I indicated in questioning, my

15   question with Ms. Weiss, I do take into account, at least to

16   some degree, the collateral consequences, not so much

17   reputational or anything like that, but there are children

18   involved here that will suffer because a sentence like this,

19   and would suffer even more with an additional six years or so.

20   I just don't think that should be discounted completely.  I do

21   think that the deterrence of a sentence like this, in a case

22   like this, is impacted and the likelihood, both general and

23   specific deterrence is impacted, that I just can't justify a

24   sentence -- an incarceration sentence that's that much longer.

25   Particularly, this was driven by greed.  This was a crime

1   seeking money.  The financial penalties here are significant,

2   and will be difficult to overcome, and so for all of those

3   reasons I think a variant sentence, not to the degree requested

4   by the plaintiff, which I think would be insufficient to

5   recognize her role, but I do think it's sufficient.

6           I don't know that Mrs. Tew's demeanor during the trial

7   is really relevant for my consideration either.  I also, sort

8   of, not sure how it would play out.  I do -- I do think that

9   what happened with Ms. Scaife and with Mr. Meyers is very

10  concerning.

11          I think the government's position that the gambling

12  addiction or habit or whatever we want to call it, which I

13  think is not too far separate from the attraction to Bitcoin,

14  as a form of gambling for a lot of people, I share the concern

15  that that could get someone in a financial hold that could lead

16  them into a temptation to do this sort of thing again, and so

17  21 months, I think, would be insufficient.  Forty-eight months

18  is my best effort to balance all of those factors and to make

19  sure that Mrs. Tew's able to overcome those compulsions or

20  desires and recognize that she can't encourage someone or get

21  involved in something like this again, no matter how much there

22  might be a desire for money.

23          Obviously, this is a significant downward variance,

24  but only about half a variance from the guidelines, as I

25  calculated it, for a first-time offender under these

```
 1    circumstances, with no threat of violence.  I do take into
 2    account, as Mr. Kaplan pointed out, that she has been
 3    compliant.  She may have tried to put off going to trial, as
 4    long as possible, but none of the parade of horribles that have
 5    been suggested about what would happen before trial, none of
 6    those came to pass.  I do take that into account, with the
 7    suggestion that Mrs. Tew has recognized the need to be more
 8    respectful of the law and her obligations, and I expect that
 9    that she will be and this sentence is my effort to balance all
10    of those factors, and I think it's sufficient but not greater
11    than necessary to do so.
12          As I may have hinted, to that extent I'm not inclined
13    to remand the defendant, at this time, unless something
14    significant has changed between when we last discussed this?
15    Does the government believe there's something significantly new
16    that would warrant immediate remand?
17          MR. FIELDS:  Your Honor, I am prepared to talk about
18    that, but there's also a request I would like to make regarding
19    restitution.
20          THE COURT:  Okay.  Go ahead.
21          MR. FIELDS:  So we just ask that it be due and payable
22    immediately, and that she be required to pay restitution at 10
23    percent of her income.
24          THE COURT:  Yeah.  So those I think I would -- I would
25    impose the restitution requirement.  Those are recommendations
```

1    in the presentence report.  I will adopt all of those.  Thank

2    you.

3          MR. FIELDS:  Thank you very much, Your Honor.  With

4    regard to remand, we would ask for it, Your Honor, but we're

5    mindful of the Court's conclusions.  The only thing is that now

6    she is certainly facing four years of jail, which has made

7    people leave before, so that's the only thing that's changed.

8          THE COURT:  All right.  Thank you.  I appreciate that,

9    Mr. Fields.

10          Mr. Kaplan, Ms. Hubbard, do you have anything to add

11    on any of this?

12          MR. KAPLAN:  Just a couple things, Your Honor.  I

13    know -- I appreciate not having Mrs. Tew remanded.  I know that

14    the Court -- well, everybody is aware that Mr. Tew is going to

15    be sentenced in about a month, and I understand that usually,

16    that -- the procedure is if she is not remanded that she

17    reports after it's designated, but in this situation, we would

18    request a stay for 60 days, because in 30 days Michael and

19    Kimberley will know what is required of them and for how long

20    and the circumstances of that.  I mean, it's a little bit

21    different.  It's not that they were not prepared, because I

22    know it's been coming a long time, but the final preparations

23    will be made after they can tell somebody, if they need to, of

24    you know how they are going to deal with the child care,

25    depending on his sentence now and for how long and what

|    |                                                                         |
|----|-------------------------------------------------------------------------|
| 1  | location, and those are kind of considerations that, quite              |
| 2  | frankly, are better finalized when the family knows what the            |
| 3  | circumstances of both parents are.                                      |
| 4  | Aside from that, given the conversation about               |
| 5  | prescribed medication, government suggesting that there may be          |
| 6  | an addiction, we would request an RDAP.                                 |
| 7  | THE COURT: Okay. Let me address the first issue you         |
| 8  | raised, first. I assume the government would oppose that,               |
| 9  | since they believe immediate remand is appropriate. I                   |
| 10 | understand that. But I think these are unusual circumstances,           |
| 11 | as I indicated. I think -- I'm not concerned about Mrs. Tew at          |
| 12 | this point absconding.                                                  |
| 13 | Mr. Roth, is there a way that we can phrase, I think      |
| 14 | it requests that we not designate for 60 days to make that             |
| 15 | work? I know you have done it before, but I forget the exact            |
| 16 | mechanism.                                                              |
| 17 | PROBATION: Yes. To avoid any issues with the BOP           |
| 18 | potentially designating her a time that you are not                    |
| 19 | anticipating, I would recommend a specific date. So I would            |
| 20 | recommend October 8th or later that she be designated.                 |
| 21 | THE COURT: Okay. So would that make sense that         |
| 22 | she -- that we include that kind of language in the judgment?           |
| 23 | MR. KAPLAN: Yes, that would be appreciated.            |
| 24 | THE COURT: Okay. I will do that. As to the RDAP, I     |
| 25 | don't see the necessity, based on what I know, but if it's a            |

  1   request that she at least be made -- that that be possibly be

  2   made available.  Anybody who wants to participate in that I'm

  3   happy to recommend it, as long as Mrs. Tew understands those

  4   sorts of things I can't order.  They are only recommendations,

  5   and BOP will make a decision based on a number of factors.

  6        MR. KAPLAN:  Along those same lines ... well, if I may

  7   have a moment?

  8            (Discussion off the record between counsel.)

  9        MR. KAPLAN:  Your Honor, also, it's not unusual, and I

 10   know the -- the Court always minimizes the importance of it.

 11   We may request a placement for her, but I don't want to do --

 12   request the Court put a recommendation for a placement, but I

 13   think it would make more sense if I spoke with Ms. Tew and

 14   found out where the kids might be.  So right now I don't want

 15   to recommend a Colorado placement if that's the -- the kids

 16   aren't there.

 17        THE COURT:  Well, it's difficult for women too.  There

 18   are only so many federal facilities for women.  So, I think

 19   yeah, if we're going to do that, we may have to do a little

 20   research.

 21        MR. KAPLAN:  We will do that.

 22        THE COURT:  Okay.  The only other thing I wish to say

 23   is I know you have indicated that you plan to appeal your

 24   conviction.  I just want to advise you that if you do wish to

 25   appeal, you must do so within 14 days after judgment is entered

```
 1    or your right to appeal will be lost.  If you can't afford an

 2    attorney for an appeal, the Court will appoint one to represent

 3    you, and if you are request, the Clerk of the Court of this

 4    court must immediately prepare and file a Notice of Appeal on

 5    your behalf.

 6            Is there anything else from the government?

 7            MR. FIELDS:  Your Honor, I just want to put on the

 8    record that we respectfully oppose the Court recommending RDAP.

 9    We see that as another manipulation, that's an opportunity for

10    her to get an even lower sentence.  She has not admitted to

11    having a drug problem or a gambling problem.  There's no basis

12    in the record for the Court to recommend that.  It's, in fact,

13    contrary to everything that they have been filing, and so for

14    the Court to put its thumb on the scales to BOP with that

15    recommendation, we think would be improper.

16            THE COURT:  Okay.  Noted, but overruled, to the extent

17    it was a motion.  Anything on behalf of the defendant?

18            MR. KAPLAN:  No, Your Honor.

19            THE COURT:  Anything else, Mr. Roth?

20            PROBATION:  No, Your Honor.

21            THE COURT:  All right.  The Court will be in recess.

22            THE COURTROOM DEPUTY:  All rise.  Court is now in

23    recess.

24        (Recess at 4:20 p.m.)

25
```

1                        REPORTER'S CERTIFICATE

2

3          I certify that the foregoing is a correct transcript from
   the record of proceedings in the above-entitled matter.

4

5          Dated at Denver, Colorado, this 26th day of August, 2024.

6                              s/Tammy Hoffschildt

7                         _____

8                         Tammy Hoffschildt, FCRR,RMR,CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25